## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re EFFEXOR XR ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>Direct Purchaser Individual Actions | Lead Case No. 3:11-cv-05479 (Direct)<br>3:11-cv-6985 (Walgreen)<br>3:12-cv-3523 (Rite Aid)<br>3:12-cv-3116 (Giant Eagle) |

_____

## INDIVIDUAL DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL
## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
_____

Pursuant to this Court's Order dated June 28, 2013, Plaintiffs in the *Walgreen*, *Rite Aid/CVS*, and *Giant Eagle* cases (the "Individual Plaintiffs") submit this supplemental memorandum regarding the impact of the Supreme Court's recent decision in *F.T.C. v. Actavis*, 133 S. Ct. 2223 (2013), on Defendants' pending motions to dismiss.

## <u>INTRODUCTION</u>

In *Actavis*, the Supreme Court emphatically rejected Defendants' primary argument for dismissal of Plaintiffs' claims challenging the "reverse payment" agreement between Wyeth and Teva:  that the agreement's restraints on generic competition were within the "scope" of Wyeth's patents.  *Actavis*, 133 S. Ct. at

2230 ("[Even though an] agreement's anticompetitive effects fall within the scope of the exclusionary potential of the patent[,] . . . we do not agree that that fact, or characterization, can immunize the agreement from antitrust attack.").  In fact, *Actavis* expressly held that, regardless of the patent, "if the basic reason [for the reverse payment] is a desire to maintain and to share patent-generated monopoly profits, then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement."  *Id.* at 2237.  Consequently, the Supreme Court held that a rule of reason analysis was required to determine whether such agreements, on balance, were anticompetitive. *Id.*

Since *Actavis* has eviscerated the substantive basis of their motion to dismiss, Defendants will likely argue that *Actavis* only applies where a generic is paid with "cash" or "money" to delay its market entry—and that, here, Teva received only "non-cash" consideration:  (1) Wyeth's promise not to launch an "authorized generic" during Teva's valuable 180-day generic exclusivity period; (2) Wyeth's promise to extend Teva's period of exclusivity by 5 months over the 180 days provided by the Hatch-Waxman Act; and (3) rights to sell and earn revenue on a product that was not at issue in the patent litigation (immediate release Effexor rather than the extended release Effexor XR at issue in the patent case).  This consideration represented a significant transfer of Wyeth's monopoly profits to Teva and is clearly actionable under *Actavis*.  Indeed, the FTC has

estimated that authorized generics take 40-52% of a first filer's generic sales during the first 180 days of generic competition.[1]  Since Effexor XR was a blockbuster drug with over $2 billion in annual sales, that promise alone put hundreds of millions of dollars in Teva's pocket.

Defendants' "cash only" argument contradicts the teachings and logic of *Actavis*.  *Actavis* was built on a long line of Supreme Court precedent condemning agreements not to compete.  133 S. Ct. at 2230-33.  Not one of these cases required the patentee to pay cash to the infringer.  The Supreme Court mandated that courts compare the anticompetitive effects of patent settlements against procompetitive antitrust policies.  *Id.* at 2231.   Nothing in *Actavis* suggests that this overarching principle can be easily sidestepped by granting non-cash contractual terms that a generic manufacturer can easily convert into cash.

As detailed below, the likely effects of the Wyeth-Teva agreement are exactly the same as the likely effects of the reverse payment agreement in *Actavis*: delayed generic competition resulting in higher prescription drug prices.  In *Actavis*, the first filing generic was induced not to compete with the brand manufacturer by an alleged "large and unjustified" payment.  133 S. Ct. at 2229.

---

[1] *See* Federal Trade Comm'n, Authorized Generic Drugs:  Short-Term Effects and Long-Term Impact at iii (2011) ("[T]he presence of authorized generic competition reduces the first-filer generic's revenues by 40 to 52 percent, on average."), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf ("FTC Study").

The payments were in cash, but Defendants asserted that the payments were for other "services" that the FTC claimed to have "little value." *Id.* at 2229. Here, Teva was also induced not to compete by a "large and unjustified" payment. But instead of trying to hide the payment as a payment for services, Wyeth transferred value by agreeing not to introduce an authorized generic, to extend the period of exclusivity to eleven months rather than the 180 days specified by the Hatch-Waxman Act, and to allow Teva to sell and earn revenue on immediate release Effexor. *See* Walgreen Compl. ¶¶ 197-99.[2]  Plaintiffs should be permitted to establish the existence of a payment here just as the Supreme Court permitted such an opportunity in *Actavis*.

Indeed, the "no authorized generic" agreement here is in some respects *more* anticompetitive than the payments in *Actavis*.  Wyeth not only purchased Teva's agreement to extend Wyeth's branded Effexor XR monopoly, but also agreed not to compete with Teva's generic and to extend Teva's period of exclusivity under the Hatch-Waxman Act.  In other words, the anticompetitive effects of the agreement here caused supra-competitive prices not only during the period that Wyeth's monopoly was extended, but also (1) eliminated competition during the 180-day period of generic exclusivity when Wyeth would have likely introduced a lower priced authorized generic to compete with Teva; and (2) extended Teva's

---

[2] This brief cites the Walgreen Complaint in No. 3:11-cv-6985.  The complaints of the other Individual Plaintiffs are substantially the same.

period of exclusivity for five months over the 180-day period specified by Hatch-Waxman.

## ARGUMENT

I.  **Plaintiffs Have Alleged Facts That, Taken As True, Establish That The Wyeth-Teva Agreement Was Illegal Under *Actavis*.**

Individual Plaintiffs' complaints allege that Wyeth paid Teva to delay generic entry by: (1) agreeing not to compete with it by introducing an authorized generic; (2) agreeing to extend the period of Teva's exclusivity from the 180 days specified by Hatch-Waxman to eleven months; and (3) allowing Teva to sell and earn revenue on another product (immediate release Effexor).  Walgreen Compl. ¶¶ 197-99.  These terms were worth millions of dollars to Teva.

An "authorized generic" is a relabeled version of a brand drug sold by the brand company under its chemical name at a price competitive with those of traditional generic companies and much lower than that of the brand.[3]  Brand companies like Wyeth may launch authorized generics at any time, but typically do so only after a generic competitor, like Teva, launches its own generic.  Significantly, authorized generics *compete on price* with other generics, and qualify for automatic substitution for the brand at pharmacies.[4]  Therefore,

---

[3] Walgreen Compl. ¶¶ 194, 201; FTC Study at i.

[4] *Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 52 (D.C. Cir. 2005) ("[Brand-name's] so-called 'brand-generic' or 'authorized-generic' gabapentin qualifies for 'generic substitution' under state laws and third-party purchasing

authorized generics constitute a significant threat to the sales and profits of first ANDA filers like Teva.[5]

This threat is particularly acute during the 180-day Hatch-Waxman exclusivity period.  The Supreme Court in *Actavis* recognized the monetary potential that this period holds for a first filer:

> If the first-to-file generic manufacturer can overcome any patent obstacle and bring the generic to market, this 180-day period of exclusivity can prove valuable, possibly "*worth several hundred million dollars.*"  Indeed, the Generic Pharmaceutical Association said in 2006 that the "'vast majority of potential profits for a generic drug manufacturer materialize during the 180-day exclusivity period.'"

133 S. Ct. at 2229 (emphasis added) (internal citation omitted).

However, when a brand launches an authorized generic during this period, the first filer loses not only a significant portion of its sales (and thus profits) to the authorized generic, but also must lower its price to compete with the authorized generic.  Walgreen Compl. ¶ 194; FTC Study at iii.  Thus, the launch of an authorized generic can cost the first filer hundreds of millions of dollars if the drug at issue is a blockbuster like Effexor XR (with sales exceeding $5 billion between June of 2008 and 2010).  Walgreen Compl. ¶ 11.  But if the brand company agrees

---

plans, such as HMO formularies, and thus has competed directly with Teva's product during its period of exclusivity.").

[5] Walgreen Compl. ¶ 194.

not to launch an authorized generic, the first filer can maintain all of its sales and profits during the 180-day exclusivity period without losing any to the authorized generic.

An agreement by a brand company to refrain from launching an authorized generic is no different from a cash payment.  As the FTC concluded:

> *[T]here is strong evidence that agreements not to compete with an authorized generic have become a way for brand-name companies to compensate generic competitors for delaying entry.  These agreements can be part of "pay-for-delay" patent settlements, which have long concerned the Commission.*[6]

Plaintiffs alleged that "Teva received significant … benefits in exchange for its agreement not to market its generic version of Effexor XR until June 2010." Walgreen Comp. ¶ 9.  These benefits included millions of dollars from Wyeth's agreement not to introduce an authorized generic, to extend Teva's period of exclusivity to 11 months, and to grant Teva rights to sell and earn revenue on immediate release Effexor.[7]  The agreement allowed Wyeth to maintain its high price on Effexor XR until June 2010, and thereafter "allowed Teva to maintain a relatively high generic price as the only generic manufacturer on the market and to earn higher profits than it otherwise would have earned, all at the expense of

---

[6] FTC Study at vi.

[7] Walgreen Compl. ¶¶ 9, 197-99.

Plaintiffs and other generic purchasers."[8]  These allegations, which must be taken as true, plainly establish that Teva received substantial value in exchange for its agreement not to compete.  In other words, Teva received a reverse payment to delay generic competition.[9]

There is no material difference between the FTC's allegations in *Actavis* and those here.  In both cases, the generic drug companies received substantial compensation for an agreement to refrain from entering the market for years, despite the obvious weakness of the defendants' patent claims (*F.T.C. v. Watson Pharms. Inc.*, 677 F.3d 1298, 1304-05 (11th Cir. 2012), *rev'd*, 133 S. Ct. 2223 (2013); Walgreen Compl. ¶ 8); and, in both cases, the patent settlements resulted in unlawfully-prolonged monopolies, to the detriment of competition (*Watson*, 677 F.3d at 1305; Walgreen Compl. ¶¶ 200).  Other than the superficial difference in the form of the payments to the first filers -- the generics in *Actavis* were paid in cash (but allegedly for other services), while Teva, here, was compensated with contractual terms easily converted into cash -- there is no meaningful distinction between the two cases.

---

[8] *Id.* ¶ 201.

[9] *See also* FTC Study at iii (generic prices are lower when authorized generic is available); *id.* at 139 (revenues of generic company free of competition from an authorized generic are approximately double what they are with such additional competition).

## II.   *Actavis* **Does Not Require Cash to Change Hands.**

Nothing in *Actavis* required a reverse payment to be in cash.  Indeed, *Actavis* itself dealt with facts where Defendants tried to disguise a reverse payment as a payment for other services.  The Supreme Court recognized that the FTC should be afforded the opportunity to prove that the services had "little value" and that the payments were actually for the delay of generic entry.  133 S. Ct. at 2229.  The opinion does not suggest that other mechanisms to disguise the transfer of value would be any more successful.

To the contrary, *Actavis* recognized that patent settlement agreements can be (and often are) anticompetitive when there are no cash payments.  The opinion relies on several cases in which the Supreme Court held that patent settlements were (or could have been) illegal.  133 S. Ct. at 2231-33.  Not one of the cases involved material cash payments.  *See U.S. v. New Wrinkle, Inc.*, 342 U.S. 371 (1952) (settlement agreement between two patentees which set retail prices; no cash changed hands); *U.S. v. Line Material Co.*, 333 U.S. 287 (1948) (cross-licensing agreement which set retail prices; no cash changed hands); *Standard Oil Co. (Indiana) v. U.S.*, 283 U.S. 163 (1931) (if settlement agreements had curtailed manufacturing or supply of unpatented product, they would have been illegal; no mention of requirement that cash change hands); *U.S. v. Singer*, 374 U.S. 174 (1963) (patent settlement agreement illegal because potential patentee dropped its

patent claim, which could have invalidated two existing patents, in exchange for a portion of the profits from the two questionable patents; minor cash payment not material/irrelevant to antitrust analysis).

As *Actavis* concluded, these prior cases establish that, if the "challenged terms and conditions" are anticompetitive, they can be challenged under the antitrust laws. 133 S. Ct. at 2233. The Court in no way limited these "challenged terms and conditions" to cash payments. Nor is there any basis in antitrust law or logic to do so since non-cash compensation can have the very same anticompetitive effects as cash payments.

III. **Plaintiffs' Allegations Satisfy The Five Factors Identified in *Actavis* As Indicative Of A Potentially Anticompetitive Agreement.**

In *Actavis*, the Supreme Court identified five factors supporting its holding that reverse payment agreements should be evaluated under the rule of reason. *Id.* at 2234-37. Each of these considerations applies, with equal force, to the agreement here where the terms to which Wyeth agreed transferred millions of dollars in value to Teva even though Wyeth made no direct deposit into Teva's bank account.

First, the Court held that a reverse payment has the "potential for genuine adverse effects on competition" because it "in effect amounts to a purchase by the patentee of the exclusive right to sell its product." *Id.* at 2234 (citing *F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460-61 (1986)). A branded company's

agreement not to launch an authorized generic, to extend the 180-day exclusivity period, and to allow a generic company to earn revenue by selling a product that it would otherwise not have been able to sell has the same potential to create this anticompetitive effect as a cash payment.

Teva itself has repeatedly recognized that an authorized generic creates competition for the first ANDA filer during its 180-day exclusivity period, severely curtailing its profits during the 180-day period.  In fact, in the early 2000s, Teva filed various briefs and citizen petitions urging courts and the FDA to prohibit brand companies such as Wyeth from launching authorized generics during the 180-day period.[10]

When that tactic failed (because both the courts and FDA found the lower prices resulting from competition by authorized generics to be pro-competitive[11]),

---

[10] *See, e.g.,* Teva's Citizen Petition, Docket No. 2004P-0261/CPI (June 9, 2004), *available at* www.fda.gov/ohrms/dockets/dailys/04/June04/061004/04p-0261-cp00001-01-vol1.pdf; Memorandum In Support of Plaintiffs' Motion for a Temporary Restraining Order from Amicus Curiae, Mylan Pharmaceuticals, Inc. at 9, 32, *Teva Pharms. USA, Inc. v. Crawford*, No. 04-1416 (D.D.C. Oct. 12, 2004), 2004 WL 3708352 at *4, 14 (supporting Teva's attempt to prevent the launch of an authorized generic; explaining that authorized generics "immediately drive prices down," "force[] the first-filer to reduce its prices and offer discounts to customers that greatly lower its profit margins," and "take away customers"), *motion denied in open court*, Minute Entry for Proceedings Held Before Judge Reggie B. Walton, *Teva Pharm. USA, Inc. v. Crawford*, No. 04-1416 (D.D.C. Oct. 13, 2004).

[11] *See* FDA Response to Mylan and Teva's Citizens' Petitions, FDA Docket Nos. 2004P-0075/CP1 & 2004P-0261/CP1, at 2 (July 2, 2004), *available at* http://www.regulations.gov/contentStreamer?objectId=0900006480e71b62&disposition=attachment&contentType=pdf (the marketing of authorized generics should

Teva switched to an anticompetitive tactic:  trading delayed entry of its generic for the branded company's agreement not to launch an authorized generic.  In its 2011 report, the FTC explained the anticompetitive effects of these "no authorized generic" provisions as follows:

> The generic firm benefits from greater profits during its 180-day exclusivity; the brand-name firm benefits from later generic entry; but consumers suffer from delay of generic competition.  Because generics often are priced substantially below the price of brand-name drugs, even a few additional months without generic competition can significantly increase overall prescription drug costs.[12]

Here, Wyeth's promise not to launch an authorized generic version of Effexor XR was worth hundreds of millions of dollars to Teva.  It is no different, in substance, from a deal in which Wyeth paid Teva hundreds of millions of dollars in cash to stay off of the market.  From a competitive standpoint, it was *worse*. Not only was there a delay in generic competition to Effexor XR, but once generic competition started, generic prices were significantly higher than they would have been otherwise for a longer period of time because the agreement both eliminated competition from the authorized generic and extended Teva's period of exclusivity

---

not be delayed because "this marketing appears to promote competition in the pharmaceutical marketplace, in furtherance of a fundamental objective of the Hatch-Waxman amendments"); *Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51 (D.C. Cir. 2005) (upholding FDA's conclusion that authorized generics should be allowed to compete during a first-filer's 180-day exclusivity period).

[12] FTC Study at vi (footnote omitted).

beyond that specified by Hatch-Waxman.

Second, *Actavis* explained that the anticompetitive effects of reverse payments "will at least sometimes prove unjustified," such as where the fact-finder determines that the cognizable pro-competitive effects of the payments (if any) do not offset the anticompetitive consequences of delaying generic entry. 133 S. Ct. at 2235-36. This consideration applies equally to cash and non-cash reverse payments including "no authorized generic" terms. The higher prices paid by consumers as a result of a "no authorized generic" agreement can be enormous— particularly for a blockbuster, multi-billion dollar drug like Effexor XR.

Third, *Actavis* recognized that the existence and size of a reverse payment can be a strong indicator that the patentee has market power. *Id.* at 2236. Again, this consideration applies equally to cash and non-cash reverse payments. Here, the terms to which Wyeth agreed transferred hundreds of millions of dollars to Teva.

Fourth, *Actavis* explained that, contrary to the reasoning of the Eleventh Circuit (and defendants here), an antitrust action challenging a reverse payment is administratively feasible, without the need to relitigate the underlying patent case, because "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself." *Id.* at 2236-2237 (citing 12 Phillip

E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2046, p. 350-352 (3d ed. 2012)).  Again, this applies with equal force to cash and non-cash reverse payments since the monetary value of non-cash reverse payments are readily calculable.[13]

Fifth, *Actavis* recognized that patent cases, like the one Wyeth filed against Teva, can be settled without reverse payments by letting the generic competitor into the market earlier "without the patentee paying the challenger to stay out prior to that point." 133 S. Ct. at 2237.  The FTC has expressly found that "no authorized generic" provisions are being used to make exactly such payments. And, that is exactly what Plaintiffs allege was the purpose of Wyeth's "no authorized generic" promise here:  to pay Teva to delay the launch of its generic. *See* Walgreen Compl. ¶ 9.  Once again, there is no difference between cash and non-cash reverse payments.

In sum, the *Actavis* court held that "[i]f the basic reason [the parties chose a reverse payment settlement] is a desire to maintain and to share patent-generated monopoly profits then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement."  133 S. Ct. at 2237.  This reasoning applies

---

[13] Indeed, the FTC has calculated the value to Teva of Wyeth's "no authorized generic" promise in this case to be over $400 million.  *See* Motion for Leave to Appear Amicus Curiae by Federal Trade Commission, Attachment #1: Federal Trade Commission's Amicus Curiae Brief, ECF No. 173 (Aug. 10, 2012) at 7-8, motion denied, ECF No. 187 (Oct. 3, 2012).

equally whether the generic shares in the brand's monopoly profits through a "no authorized generic" payment—which allows the generic to garner significantly higher sales and profits than if an authorized generic was launched during the 180-day period— other non-cash terms that transfer value to the generic, or through a cash payment.  There is no reason to analyze cash and non-cash reverse payments differently.

### IV. **"Payments" Include Transfers Of Value In Any Form, Including Non-Cash Agreements Not To Compete**

The distinction that Defendants seek to create between cash reverse payments and contract terms that transfer millions of dollars to a generic manufacturer elevates form over substance.  Such arguments are contrary to the Supreme Court's focus for decades on the substantive analysis of "actual market realities," not formalistic words or labels.[14]  *Actavis* did not change that principle.  And, the actual market realities are that contract terms such as "no authorized generic" provisions can transfer value just as efficiently as direct bank deposits.

Nor is Defendants' argument supported by the common understanding of the

---

[14] *See, e.g., Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 466-67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."); *American Needle*, *Inc. v. NFL*, 130 S. Ct. 2201, 2209 (2010) ("[W]e have eschewed . . . formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate."); *id.* ("[w]e seek the central substance of the situation"); *id.* at 2211 n.5 (emphasizing the Court's "focus on 'substance, not form'"); *id.* at 2212 ("the inquiry is one of competitive reality").

word "payment."  It is black letter law that a "payment" is not  limited to cash or

money.  Rather, a payment includes *anything of value* given to satisfy a promise or

obligation.  Black's Law Dictionary (9th ed. 2010) (defining "payment" as the

"[p]erformance of an obligation by the delivery of money *or some other valuable*

*thing* accepted in partial or full discharge of the obligation" (emphasis added)); 60

Am. Jur. 2d *Payment* § 30 (2013) ("A payment can refer to the transfer of value

*other than money*[.]" (emphasis added)); *Sauk County v. Employers Ins. of*

*Wausau*, 623 N.W.2d 174, 178 (Wis. App. 2000) ("'Payment' may be something

other than money.").

Similarly, an agreement to refrain from doing that which a payor is legally

entitled to do can be of enormous value to the payee, and can constitute a

payment.[15]  And, because a "payment" is made pursuant to a promise or obligation,

a "[p]ayment may also be defined as performance of the consideration clause of a

contract."  60 Am. Jur. 2d *Payment* § 1 (2013); *see also* 60 Am. Jur. 2d *Payment*

§ 3 (2013) ("Payment is . . . not a contract, but the performance of a contract

according to its terms.").

Wyeth's no-authorized generic agreement, agreement to extend Teva's

exclusivity period, and grant of rights to sell and earn revenue on the immediate

---

[15] *See, e.g.*, *Sauk County,* 623 N.W.2d at 178 (plaintiff's agreement not to seek
contribution from defendants in the future, entered into pursuant to a settlement, is
considered a payment:  "The fact that, in the circuit court's words, 'no sum of
money was ever paid to the counterclaimants' is immaterial.").

release form of Effexor constitute "payments" in every sense of the word.  Wyeth *paid* Teva by performing its contractual obligation to stay out of the market for generic Effexor XR, allowing Teva to garner all of the generic sales made during the 180-day period plus an extra five months, at supra-competitive prices (since Teva did not have to compete on price with the authorized generic), and allowing it to sell and earn revenue on immediate release Effexor.  By doing so, Wyeth transferred hundreds of millions of dollars in value to Teva at the expense of drug purchasers.

Defendants would have this Court render *Actavis* a nullity by permitting pharmaceutical manufactures to easily circumvent it using non-cash terms to transfer value.  Nothing in *Actavis* suggests that it can be so easily avoided.

### V.   The Fact-Intensive Rule Of Reason Analysis Mandated by *Actavis* Cannot Be Resolved On A Motion To Dismiss.

Finally, the rule of reason analysis proscribed by *Actavis* is not appropriately resolved on a motion to dismiss.  In a traditional rule of reason analysis, a plaintiff meets its initial burden by pleading (then proving) that the challenged agreement "produced adverse, anti-competitive effects" within the relevant market, such as an increase in price or decrease in output.  *U.S. v. Brown Univ.*, 5 F.3d. 658, 668 (3d Cir. 1993).  The burden then "shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective."  *Id.* at 669.  If the defendant carries its burden, "the plaintiff must demonstrate that the restraint is not

reasonably necessary to achieve the stated objective." *Id.*  At the pleading stage, a plaintiff need only allege the first step,[16] the plaintiff's allegations must be accepted as true with all reasonable inferences drawn in the plaintiff's favor,[17] and "defendant's pro-competitive justifications [if any are] considered unproven."[18]

"[T]he rule of reason requires ***the factfinder*** to decide whether ***under all the circumstances of the case*** the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 343 (1982) (emphasis added).[19]  This searching factual inquiry includes a

---

[16] "At the pleading stage, a plaintiff may satisfy the unreasonable restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets." *TruPosition, Inc. v. LM Ericsson Tel. Co.,* No. 11-4574, 2012 WL 3584626, at *23 (E.D. Pa. Aug. 21, 2012) (citation omitted); *U.S. v. Blue Cross Blue Shield,* 809 F. Supp. 2d 665, 672 (E.D. Mich. 2011) (same).

[17] *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citation omitted).

[18] *Advanced Health-Care Servs. v. Radford Community Hosp.*, 910 F.2d 139, 145 (4th Cir. 1990); *Reading Int'l  v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 322 (S.D.N.Y 2003).

[19] *See also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 n.12 (3d Cir. 2010) ("In the event a genuinely disputed issue of fact exists regarding the reasonableness of the restraint, the determination is for the jury." (citing *Maricopa Cnty.*, 457 U.S. at 343)); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 n.7 (3d Cir. 2006) ("When conducting a rule of reason inquiry, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."); *Weiss v. York Hosp.*, 745 F.2d 786, 817 (3d Cir. 1984) ("As its name suggests, the rule of reason requires the factfinder to decide whether, under all the circumstances of the case, the restrictive practice imposes an unreasonable restraint on competition.").

balancing of the anticompetitive effects of the challenged restraint alleged by plaintiffs against the procompetitive benefits (if any) asserted by defendants – a balancing that typically encompasses evaluation of a full factual record, as well as expert testimony from economists and others.  Therefore, "[t]he law clearly envisions that the [rule of reason] balancing test is normally reserved for the jury."[20]  Thus, this Court should not resolve the issue on a motion to dismiss.

## CONCLUSION

For the foregoing reasons, *Actavis* mandates the denial of defendants' motions to dismiss with regard to the Wyeth-Teva agreement. The legality of that agreement must be evaluated under the rule of reason, by the jury, based on a full factual record and expert testimony.

Dated: August 7, 2013                    Respectfully submitted,

                                         /s Barry L. Refsin
                                         Barry L. Refsin (BLR-5343)
                                         Monica L. Rebuck
                                         HANGLEY ARONCHICK SEGAL PUDLIN
                                         & SCHILLER
                                         One Logan Square, 27th Floor
                                         Philadelphia, PA 19103
                                         (215) 568-6200
                                         brefsin@hangley.com
                                         *Counsel for Rite Aid and CVS*

---

[20] *American Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996).
*See also* 11 Herbert Hovenkamp, Antitrust Law ¶ 1909b (2d ed. 2005) ("[O]nce the court decide[s] that the rule of reason should apply, disputed factual questions about reasonableness should be left to the jury.").

Deborah S. Corbishley (DC-3348)
Scott E. Perwin
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
E-mail: sperwin@knpa.com
*Counsel for Walgreen Plaintiffs*

Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA 15219-6401
(412) 471-3490
marcus@marcus-shapira.com
mcm@marcus-shapira.com
hill@marcus-shapira.com
*Counsel for Plaintiff, Giant Eagle, Inc*

## **CERTIFICATE OF SERVICE**

I, Barry L. Refsin, certify that this 7th day of August, 2013, I served the foregoing Individual Direct Purchaser Plaintiffs' Supplemental Brief In Opposition To Defendants' Motion To Dismiss by filing it on the Court's ECF system where is available for viewing and downloading.

/s Barry L. Refsin
Barry L. Refsin