# COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP

COUNSELLORS AT LAW

PARK 80 WEST - PLAZA ONE 250 PEHLE AVE. SUITE 401 SADDLE BROOK N.J. 07663 201-845-9600 FAX 201-845-9423

General E-mail: clphk@njlawfirm.com
Internet Address: www.njlawfirm.com

PETER S. PEARLMAN, ESQ.   Email: psp@njlawfirm.com

June 6, 2018

*Via ECF*
Honorable Lois H. Goodman, U.S.M.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Federal Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

> Re:   *In re Effexor XR Antitrust Litigation*
> **Master Docket No. 11-5479 (PGS/LHG)**

Dear Judge Goodman:

The parties submit this joint letter in accordance with this Court's order of May 14, 2018 [ECF #518] and its May 31, 2018 docket entry [ECF #526].[1]

## I.   Wyeth Should Produce Complete Document Families, Including All Related Email Attachments and Embedded Files

### Plaintiffs' Statement

All parties should produce "complete document families." Teva has agreed to do so; Plaintiffs have as well. Wyeth should be ordered to do likewise. Emails should be produced with all their attachments; Word or PowerPoint documents should be accompanied by any embedded files. This simple proposition is not novel; indeed, it is recognized by the Federal Rules. *See* Fed. R. Civ. P. 26(b)(1) (importance of access to complete document families outweighs potential burden, if any, of proposed truncated search).

An attachment is part of an email communication – the email and attachments are expected to be read together – so all attachments to responsive emails should be included. *See* Fed. R. Civ. P. 34(b)(2)(E)(ii); *Virco Mfg. Corp. v. Hertz Furniture*

---

[1] The plaintiffs are evaluating Wyeth's June 4, 2018 responses and objections to plaintiffs' second request for production of documents, and if necessary will timely bring any unresolved disputes relating thereto to the Court's attention.

Honorable Lois H. Goodman, U.S.M.J.                                    Page 2
June 6, 2018

*Sys.*, 2014 WL 12591482, at *5-6 (C.D. Cal. Jan. 21, 2014) ("emails produced in discovery should be accompanied by their attachments" and the failure to do so is, in effect, an improper, unilateral redaction of "portions of documents it otherwise apparently views to be discoverable/relevant/ responsive"); *Nguyen v. Roth & Rau AG*, 2009 WL 10682036, at *2-3 (D. Md. Jul. 28, 2009) ("e-mails and attachments must be produced together"). Likewise, a spreadsheet embedded in a responsive PowerPoint presentation or Word document is part of the PowerPoint or Word document. The embedded Excel spreadsheet may include the backup calculations upon which a chart in a corresponding PowerPoint is based. Like email attachments, all such embedded files should be produced.

Wyeth proposes to chop up its production, withholding any document that does not itself contain agreed search terms. And it would do so even if the withheld document is expressly referenced by another part of the family, and appears to be relevant based on the description in the other part of the document family that is being produced. For example, Wyeth would produce a cover email without its attachment if the agreed search terms hit the email but not the attachment; Wyeth would also withhold spreadsheet files embedded within a responsive document unless the spreadsheet itself is also hit by a search term. Wyeth's approach denies Plaintiffs relevant discovery and is improper.

Wyeth's claim that production of complete families would be voluminous or burdensome is insufficient. Even if inconvenient, inconvenience to Wyeth does not outweigh the proportional benefit to Plaintiffs from discovery of complete document families. *See Virco Mfg. Corp.*, 2014 WL 12591482, at *6; *Nguyen*, 2009 WL 10682036, at *3. Besides, Plaintiffs are not asking for different search parameters to be applied, only for the production of *complete* versions of documents that are returned when Wyeth uses the agreed upon search terms. There *is not* additional search or review burden.

Wyeth's citation to *G.P.P., Inc. v. Guardian Prot. Prods.*, 2016 U.S. Dist. LEXIS 88926, at *2-3 (E.D. Cal. July 8, 2016) is misleading. There, the term "document family" is not used to describe email attachments or embedded files, but a distinct category of business records (profit and loss statements). In *G.P.P.*, the court held only that "family" documents outside the relevant time restriction need not be produced. Similarly distinguishable is *Han v. Futurewei Techs., Inc.*, 2011 U.S. Dist. LEXIS 104538 (S.D. Cal. Sept. 15, 2011). Instead of considering whether email attachments should be produced, the court held that a producing party did not have to produce full copies of hard drives from personal computers.

Honorable Lois H. Goodman, U.S.M.J.                                                  Page 3
June 6, 2018

Wyeth proposes an in-house "methodology" that uses limited searches to isolate some responsive email attachments. It presumes that complete documents families should not be produced. But the presumption should be production of the complete family. *See* Fed. R. Civ. P. 26(b)(1). Under the presumption of full production, Wyeth still can selectively redact. *See* ECF No. 245, ESI protocol, at §D.1.i. Authority cited by Wyeth exemplifies a similar redaction procedure. *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 223 (N.D. Ill. 2013) (allowing redactions based on relevance, but specifically ordering producing party "to review its redacted documents to ensure that the context is clear and produce documents with less redaction if the produced versions are unintelligible"). The least burdensome and only way to ensure that Wyeth's production is complete is for Wyeth to review and produce complete families of documents.

**<u>Wyeth's Statement</u>**

Plaintiffs' request that Wyeth review and produce "complete document families," along with their request that Wyeth search the files of every individual listed in Wyeth's Initial Disclosures, would have the combined effect of more than tripling Wyeth's document review burden, from an already challenging and costly 1 million documents to a completely unreasonable and disproportionate 3.1 million documents. Wyeth could not substantially complete such a review by the August 31, 2018 deadline. And, as shown below, the overwhelming burden to Wyeth would result in no significant additional benefit to Plaintiffs. Plaintiffs' request should be denied.

Numerous courts have held that it is appropriate for a producing party to withhold certain non-responsive documents because the requesting party is not entitled to the discovery of non-relevant information. *See, e.g.*, *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 222 (N.D. Ill. 2013) ("Withholding and redacting documents that are non-responsive to [a party's] document requests is appropriate.") (collecting cases); *Han v. Futurewei Techs., Inc.*, 2011 U.S. Dist. LEXIS 104538, at *13 (S.D. Cal. Sept. 15, 2011) ("A requesting party . . . must rely on the representations of the producing party or its representative that it is producing all responsive, relevant, and non-privileged discovery."). In the context of producing document families, courts have recognized that it is appropriate to assess the responsiveness of each document in a family separately and that it can be proper to withhold non-responsive attachments. *See, e.g.*, *G.P.P., Inc. v. Guardian Prot. Prods.*, 2016 U.S. Dist. LEXIS 88926, at *2-3 (E.D. Cal. July 8, 2016); *In re: Takata Airbag Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS 46206, at *145-46 (S.D. Fla. Mar. 1, 2016). It would be appropriate for Wyeth to withhold non-responsive attachments here.

Honorable Lois H. Goodman, U.S.M.J.                                    Page 4
June 6, 2018

It is also appropriate for Wyeth to use search terms to identify non-responsive attachments, rather than having to review each such document manually. It is axiomatic that when adopting a search term methodology for identifying potentially responsive documents, the producing party generally will not review documents that do *not* hit on search terms, as the point of search terms is to narrow the universe of what will need to be reviewed, and then produce the documents that are deemed responsive. *See BancPass, Inc. v. Highway Toll Admin., LLC*, 2016 U.S. Dist. LEXIS 96978, at *8 (W.D. Tex. July 26, 2016) (search terms "simplify and limit the scope of production responsive to [document requests]"). Plaintiffs nonetheless complain that Wyeth does not plan to review and produce attachments that do not hit on search terms ("Non-Hit Attachments"), even if they are in a family of documents where another family member hits on a search term, because Wyeth will instead use a search term methodology to identify responsive attachments. According to Plaintiffs, Wyeth's approach will "chop up its document production" and "deny Plaintiffs relevant discovery." These concerns are unfounded.

Wyeth and its parent company Pfizer have a well-established, search term-based methodology for efficiently identifying, reviewing, and producing responsive documents in large cases such as this one.[2] That methodology begins with running a broad set of search terms, including *all* the terms proposed by Plaintiffs (as amended through the meet-and-confer process). *See* Exhibit D (listing Wyeth's broad, agreed-upon search terms). Wyeth then reviews the documents that hit on a search term to determine whether each document is responsive to Plaintiffs' requests (as amended by Wyeth's objections and the meet-and-confer process), and produces all non-privileged, responsive documents it identifies. And if a search-hit document is an attachment responsive to a document request, Wyeth will also review and produce its parent document, if it is not privileged, regardless of whether the parent itself contains a search term, as parent documents may provide Plaintiffs the context they need to review the corresponding responsive attachments. Any attachments that do not contain search terms, or that contain search terms but are deemed non-responsive after review, will be produced as slipsheets marked "non-responsive." Rather than "chop[ping] up its production," Wyeth will produce non-responsive attachments as slipsheets with their corresponding families, so Plaintiffs will be fully aware of their existence and relation to other documents.

Wyeth's approach also will not deny Plaintiffs relevant discovery because, as Wyeth has already explained to Plaintiffs, the process includes iterative statistical

---

[2] Wyeth would be happy to provide a declaration with additional details about this methodology, if the Court would find it useful.

sampling that allows Wyeth to identify responsive attachments that do *not* hit on previously agreed upon search terms, and then to expand search terms to capture those and similar documents. Wyeth has already conducted a statistical sample in this case, concluding that over 90% of the Non-Hit Attachments were *not* responsive to Plaintiffs' requests. Nonetheless, Wyeth broadened its search terms to capture the responsive Non-Hit Attachments in an effort to identify those documents as search hits going forward. Wyeth will continue to sample Non-Hit Attachments and is confident the vast majority of responsive attachments will be produced. Thus, Wyeth's methodology for identifying responsive attachments will be statistically validated, and Wyeth will share the ultimate results with Plaintiffs.

Wyeth does not have unlimited resources for reviewing documents. Nor do the Federal Rules require that every document in a company be reviewed. Proportionality is the goal. Fed. R. Civ. P. 26. Accordingly, the goal of Wyeth's review method is to use Wyeth's resources to find, review, and produce more *responsive* documents in an efficient manner, rather than reviewing hundreds of thousands of attachments that do not contain the parties' extremely broad agreed-upon search terms and are thus highly unlikely to be relevant. On the other hand, if Wyeth had to take on Plaintiffs' suggested additional review burden, it would have to narrow its search terms so that the total universe of documents to be reviewed would remain proportional to the needs of this case. The result would be that Wyeth would locate fewer responsive documents and instead produce more non-responsive documents.

The burden Plaintiffs seek to impose on Wyeth is not proportional to the needs of this case: a manual review of Non-Hit Attachments would add 678,000 documents to the over one million documents Wyeth is currently reviewing—and each of these 678,000 documents would have to be reviewed for responsiveness, privilege, patient information and/or personal information prior to production. Additionally, the privilege logs in this case, which will be substantial because many of the custodians are attorneys, would grow exponentially as Wyeth would be required to log non-responsive documents if they were withheld as privileged. Weighed against this significant burden is only Plaintiffs' speculation that in some cases Wyeth's methodology *might* fail to identify a responsive attachment—notwithstanding the statistical sampling described above, and its success in other cases in identifying substantially all responsive attachments. As Wyeth has explained, Wyeth is taking reasonable steps to try to mitigate against this very possibility, and it will continue to discuss the results of its statistical sampling with Plaintiffs. Plaintiffs' speculation therefore cannot outweigh the staggering costs that would be involved in their request.

Honorable Lois H. Goodman, U.S.M.J.                                Page 6
June 6, 2018

    Finally, Wyeth respectfully submits that it is unnecessary to approach this issue in the abstract, given the significant burdens a blanket rule would impose.  After Plaintiffs review Wyeth's production, if they feel that Wyeth has incorrectly withheld specific attachments, Wyeth would be happy to meet and confer with Plaintiffs in the context of the specific documents.

## II.    Wyeth Should Search the Files of Wyeth Employees that Wyeth Identified in its Rule 26 Initial Disclosures

### Plaintiffs' Statement

    Wyeth should also be directed to search the files of all current and former Wyeth employees that Wyeth identified in its Initial Disclosures under Fed. R. Civ. P. 26(a)(1)(A) as "likely to have discoverable information that Wyeth may use to support its defenses."  The importance of searching these files is undisputed—Wyeth affirmatively asserts that these employees possess relevant information.

    Wyeth incorrectly claims that it is *Plaintiffs'* burden to show why custodians are necessary.  But Wyeth cannot identify Wyeth employees with relevant information that "Wyeth may use to support its defenses," who will likely be deposed and may be called at trial, and then refuse to search their files.  Plaintiffs must be permitted to discover, prior to trial, information that is relevant to the claims and defenses in this litigation.

    Wyeth has not shown any burden from searching these employees' files, let alone a burden that would outweigh the clear, undisputed benefit of searching the files.  Wyeth only claims that it might be forced to review duplicate documents in the files of multiple custodians.  But the parties have already agreed that multiple copies of the same document need not be produced, and Wyeth can automatically sort duplicate documents.  Section C.4 of the Agreement Establishing Protocol for Discovery of Electronically Stored Information provides that "each Party may produce only a single copy of a responsive document or record… [t]he Producing Party can [] de-duplicate documents within custodians, or across custodians."  *See* ECF No. 245, at 6-7.  In other words, Wyeth need not produce multiple copies of the same document, and so need not review the multiple copies.

### Wyeth's Statement

    Plaintiffs ask the Court to order Wyeth to collect and produce documents from every current and former Wyeth employee listed in Wyeth's Rule 26 Initial Disclosures.  But the standards for identifying individuals in Initial Disclosures is not

Honorable Lois H. Goodman, U.S.M.J.                                    Page 7
June 6, 2018

the same as the standard for determining who should be a custodian. Instead, on the one hand, Rule 26 *requires* a party to identify in its Initial Disclosures, "each individual likely to have discoverable information . . . that the disclosing party *may* use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i) (emphasis added). By contrast, Rule 26(b)(1) requires that discovery be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

Consistent with these differing standards, Wyeth took a comprehensive approach to its Initial Disclosures, with the expectation that Plaintiffs would work with Wyeth in good faith to agree on a subset of individuals who would make appropriate custodians. And, initially, that is exactly what happened, before Plaintiffs abruptly changed course and demanded that Wyeth produce documents from *everyone* identified in its Disclosures—an additional 31 individuals.[3]

Once Wyeth has adopted a reasonable search methodology, including reasonable custodians, it becomes *Plaintiffs'* burden to demonstrate that any additional requested custodians have "*unique*, responsive ESI that Defendants improperly failed to capture through their search methodology." *Enslin v. Coca-Cola Co.*, 2016 WL 7042206, at *4 (E.D. Pa. June 8, 2016) (emphasis added); *see also Forth Worth Employees Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013) ("[P]laintiffs must demonstrate that the additional requested custodians would provide *unique* relevant information not already obtained."). This burden is not met by simply asserting without support that additional custodians possess relevant information. *Enslin*, 2016 WL 7042206, at *2. Yet, Plaintiffs never named in the meet-and-confer process, and still fail to name in their motion, a single individual who they think would have unique information, much less explain why that individual's documents adds value that is proportional to the needs of the case and the burden they are seeking to impose. Indeed, as Wyeth has repeatedly told Plaintiffs,

---

[3] Wyeth initially proposed 20 custodians, but agreed to add seven more at Plaintiffs' request. Plaintiffs' counsel responded by saying, "If the defendants are representing that the current universe of custodians is sufficient to identify all such documents, we have to at some level take you at your word on that for now." Two days later, however, Plaintiffs retracted this agreement and demanded Wyeth add all individuals identified in its Rule 26 Disclosures. In the spirit of compromise, Wyeth agreed to add seven more custodians (for a total of 34).

based on Wyeth's current knowledge it is unlikely the other individuals listed in Wyeth's Initial Disclosures would have unique, material information not possessed by the custodians that Wyeth has already agreed to search.

Finally, Plaintiffs' suggestion that they need discovery from all the individuals listed in Wyeth's Initial Disclosures because Wyeth *may* rely on these individuals in presenting its defense is not persuasive. The individuals that Wyeth has proposed as custodians are those most likely to be the individuals on whom Wyeth will rely. And, if Wyeth does decide to rely on any other individual, Wyeth will produce that individual's documents.

## III.   Plaintiffs Should Produce Documents and Data Regarding Products That Compete with Effexor XR and Venlafaxine

### Defendants' Statement

Effexor XR (venlafaxine) competes with many other antidepressants, including immediate release Effexor ("Effexor IR") and at least 38 others. In this crowded market, a subcategory of 12 "Second Generation Antidepressants" are most likely to compete with Effexor XR.[4] Defendants' own documents demonstrate that Effexor XR competed with—and had a relatively low market share when compared to—a number of other antidepressants. *See* Exh. C-1 to C-3. And at least one Plaintiff has acknowledged that "[l]ess expensive therapeutic alternatives to Effexor XR include [SSRIs and SNRIs] – such as instant release venlafaxine (Effexor)" and that Effexor faced "substitution competition." Am. Compl. at ¶¶ 86-87, *Am. Fed'n of State, Cty. & Mun. Employees v. Pfizer, Inc.*, No. 1:12-cv-02237 (S.D.N.Y. Oct. 16, 2012), Dkt. No. 18 (Exh. B-1)

Defendants therefore seek documents relevant to the scope of the relevant market,[5] a critical issue in this case, as in virtually all antitrust cases. *See Mylan*

---

[4] 1) Celexa (citalopram); 2) Cymbalta (duloxetine); 3) Desyrel (trazodone); 4) Effexor (venlafaxine); 5) Lexapro (escitalopram); 6) Serzone (nefazodone); 7) Paxil (paroxetine); 8) Pristiq (desvenlafaxine); 9) Prozac (fluoxetine); 10) Remeron (mirtazapine); 11) Wellbutrin (bupropion); and 12) Zoloft (sertraline).

[5] The Requests at issue, as described in Exhibit A-1, are: Req. to DPPs 16-30, 33-35, 38-62, 73, 79-87, 90, 112, 118; Req. to Retailers 2, 11-12, 16-36, 38-62, 73, 79-87, 97-112, 114-17, 119, 123-27, 130, 136; Req. to EPPs 5, 11-43, 45-78, 81-83, 86, 97, 103-12, 135, 141, 148-55.

*Pharms. v. Warner Chilcott PLC* ("*Doryx II*"), 838 F.3d 421, 433, 435 (3d Cir. 2016).[6] In the spirit of compromise, Defendants are, for now, willing to accept documents relating only to the Second Generation Antidepressants, rather than 38 antidepressants.  In response, Plaintiffs made an arbitrary offer to search for documents concerning three (later five) drugs of Defendants' choice—a proposal bearing no connection to the facts, unlike Defendants' proposal to limit the Requests to the drugs most likely to compete with Effexor.

### A.     Discovery into the Relevant Market Is Relevant and in Some Cases Has Been Found to Be Dispositive on Summary Judgment

The discovery that Defendants seek is relevant—and may be dispositive—under Third Circuit law.  In *Doryx II*, the Third Circuit emphasized that "uncontradicted evidence" of the interchangeability of antibiotics was fatal to the plaintiff's attempt to define a market limited to a single antibiotic, and that within the broader market, the defendant lacked monopoly power.  838 F.3d at 436.  *Doryx II* made clear that documents from market participants, including purchasers, retailers, and end-payors (like Plaintiffs), are critical to defining the relevant market and evaluating monopoly power.  *See id.*  Indeed, the district court in *Doryx* relied heavily on the exact types of documents Defendants seek here: promotion/marketing documents, labeling, drug substitutability evidence, physicians' preference evidence, and drug pricing, among others.  *See Mylan Pharms. v. Warner Chilcott PLC* ("*Doryx I*"), 2015 U.S. Dist. LEXIS 50026, at *23-29 (E.D. Pa. Apr. 16, 2015).  And similar discovery was ordered in another case in this Circuit involving the same market for antidepressants at issue here.  In *In re Wellbutrin XL Antitrust Litigation*, the court required plaintiffs to produce documents regarding *all* antidepressants that might compete with Wellbutrin (including Effexor XR).  Order at 2, No. 08-cv-02431 (E.D. Pa. Mar. 12, 2010), Dkt. No. 175 (Exh. B-2); *see also In re Niaspan Antitrust Litig.*, 2018 U.S. Dist. LEXIS 55298, at *2 (E.D. Pa. Mar. 20, 2018) (ordering discovery on additional products in market).

---

[6] Plaintiffs seek to distinguish *Doryx II* by arguing that it was brought under Sherman Act Section 2.  But Plaintiffs alleged Section 1 *and* Section 2 claims here. This case is therefore unlike *In re Aggrenox Antitrust Litigation*, 199 F. Supp. 3d 662 (D. Conn. 2016), which only involved Section 1.  Moreover, at least one court in this Circuit has applied *Doryx II* to the same type of Section 1 claims at issue here, which also require defining a relevant market.  *See In re Niaspan Antitrust Litig.*, 2018 U.S. Dist. LEXIS 55298, at *2 (E.D. Pa. Mar. 20, 2018).

Honorable Lois H. Goodman, U.S.M.J.                                    Page 10
June 6, 2018

In response, Plaintiffs cite district court decisions from other circuits, but these do not help Plaintiffs. *In re Loestrin 24 Fe Antitrust Litigation* held that the same "bull's-eye set" of discovery Defendants seek here was appropriate for 10 competing drugs unless the plaintiffs conceded disputed issues such as therapeutic interchangeability (which the plaintiffs did not do). 2017 U.S. Dist. LEXIS 38558, at *25 (D.R.I. Mar. 15, 2017). *In re Solodyn Antitrust Litigation* involved a request to expand discovery after the plaintiffs' production was already well-underway, while here Plaintiffs have not yet even agreed to search terms. 2016 U.S. Dist. LEXIS 162361, at *22 (D. Mass. Sept. 19, 2016). And, *In re Asacol Antitrust Litigation*, No. 15-cv-12730, ECF No. 257, at *4 (D. Mass. Jan. 3, 2017) (Appx. 4), and *Aggrenox*, 199 F. Supp. 3d 662, are not persuasive, particularly given the Third Circuit cases that allow this type of discovery. Indeed, even one of the cases cited by Plaintiffs rejected *Aggrenox* as an outlier case that improperly cut off discovery. *See Loestrin*, 2017 U.S. Dist. LEXIS 38558, at *19-21.

While Plaintiffs argue that they are not obligated to produce the requested discovery because only price data is relevant to defining the market, the Third Circuit has rejected this proposition, holding that "[t]o determine if two products are in the same market, we ask if they are readily substitutable for one another, an inquiry that requires us to assess the reasonable interchangeability of use between a product and its substitute." *Doryx II*, 838 F.3d at 435. "The term '[i]nterchangeability implies that one product is roughly equivalent to another for the use to which it is put.' It also means that 'while there might be some degree of preference for … one [product] over the other, either would work effectively.'" *Id.* at 436 (citation omitted). Function and product qualities, *not only* price and cross-elasticity of demand, are relevant.[7]

Plaintiffs also argue that only documents directly *comparing* an antidepressant to Effexor XR (which in Plaintiffs' view means that the document contains the word "Effexor") will be relevant to interchangeability. But in fact many documents will be relevant because they do *not* include the word "Effexor." In *Doryx,* the court found particularly important the fact that Doryx had been *replaced* on a formulary by other drugs, which demonstrated that Doryx and these other drugs were interchangeable. *Doryx I*, 2015 U.S. Dist. LEXIS 50026, at *25. If Effexor XR was not listed on a

---

[7] *See also Graco, Inc. v. PMC Global, Inc.*, 2012 U.S. Dist. LEXIS 188865, at *24-26 (D.N.J. Mar. 6, 2012) (Sheridan, J.) (in market analysis, various spray foam equipment products could "be distinguished . . . in terms of quality and function"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("product market [is] determined by the reasonable interchangeability of use," among other things).

formulary because another antidepressant was preferred, that would be relevant and persuasive precisely because the word "Effexor" did *not* appear. Indeed, Defendants have identified a publicly-available document by Plaintiff Rite Aid that lists antidepressants for which Rite Aid offers discounts, and does not include Effexor XR.[8] Plaintiffs are certain to have additional such documents, and Defendants are entitled to review them.

Plaintiffs also have refused to produce purchase and sales data regarding antidepressants, which is necessary even under their improperly limited method for defining a market solely by prices. *See, e.g.*, Req. to DPPs 56-57, 60; Req. to Retailers 56-57, 60; Req. to EPPs 83. Plaintiffs argue that Defendants do not need Plaintiffs' data because Defendants can reconstruct the prices through third party provider data ("IMS" data). However, pricing in the chain of pharmaceutical distribution is complex, with the ultimate price paid at each level of the chain dependent on not just the initial price paid but also credits, rebates, discounts, adjustments, chargebacks, coupons, and other pricing mechanisms that alter the ultimate price. *See, e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87, 107 (D. Mass 2008) ("drug pricing" is a "difficult area" with many "complexities"). While IMS data is a component in the analysis, it omits several price adjustments, such as coupons, and must be considered in light of the *actual* prices paid. Thus, Defendants need Plaintiffs' data to understand how prices *really* moved in response to product introductions—the very price-based analysis Plaintiffs say should be done here— *after* all adjustments.[9]

### B.    Plaintiffs Have Not Tried to Demonstrate a Substantial Burden

Because the material requested by Defendants is critical to the case, only a substantial burden would justify curbing discovery. *Niaspan*, 2018 U.S. Dist. LEXIS 55298, at *2 (importance of discovery to market definition outweighed burden). Accordingly, Plaintiffs must make an actual showing of burden. *See P.V. v. Sch. Dist.*, 2012 U.S. Dist. LEXIS 27129, at *8 n.2 (E.D. Pa. Mar. 1, 2012). Yet Plaintiffs admit they have not even tested any search terms to assess the burden of the discovery sought. Instead, Plaintiffs simply assert that they are "veteran[s]" with a lot of

---

[8]     https://www.riteaid.com/shop/info/pharmacy/prescription-savings/rite-aid-prescription-savings-program/directory-of-generic-medications.

[9] Plaintiffs suggest that Defendants must provide an explanation from an economic expert as to the relevance of this discovery in order to obtain such discovery. That is not correct. Third Circuit law is clear on the relevance of this discovery. And, it is premature to require expert disclosures at this stage.

experience, and the Court should therefore trust them that the more search terms a party runs, the more documents the party will need to review.  Of course that is true, but it misses the point.  Under Rule 26, the relevant question is proportionality.  Plaintiffs' choice not to even try to demonstrate burden and to rely on their "experience" instead is not a substitute for the showing required by the Rules that the requested discovery is not proportional to the needs of *this* case.

In fact, courts consistently require plaintiffs to produce information regarding at least 10-12 products in these types of cases.  *See, e.g.*, Order at 10-11, *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-md-2472 (D.R.I. Mar. 15, 2017), Dkt. No. 282 (Exh. B-3) (discovery ordered on ten additional drugs and generic equivalents); Order at 2, *Mylan Pharms. v. Warner Chilcott PLC*, No. 12-cv-3824 (E.D. Pa. Nov. 26, 2012), Dkt. No. 118 (Exh. B-4) (discovery ordered on nine additional drugs on top of three agreed to by plaintiffs).  Indeed, in *Wellbutrin*, plaintiffs had to produce documents relating to virtually *all* antidepressants—including Effexor XR—because such discovery might show "that the scope of the market is broader than what plaintiffs allege."  Order at 2, No. 08-cv-02431 (E.D. Pa. Mar. 12, 2010), Dkt. No. 175 (Exh. B-2).  Moreover, in that case, Rochester Drug—one of the plaintiffs here—*offered* to "produce transaction price data from its database, showing the prices at which it sells approximately 36 other antidepressants."  268 F.R.D. 539, 544 (E.D. Pa. 2010).  Plaintiffs cannot claim burden here with respect to *twelve* antidepressants in light of this precedent.

## Plaintiffs' Statement

Plaintiffs have offered to run eleven broad search terms.  These include the name of brand and generic versions of Effexor, the brand and generic names of five additional products of Defendants' choosing, and a string of connected terms generally relating to "relevant market issues."  Running these searches imposes a far greater burden than Plaintiffs have taken on in any other generic delay antitrust case (most involve two search terms).  These eleven searches will retrieve – and Plaintiffs will produce – documents that compare Effexor to other drugs.

Yet Defendants ask the Court to require Plaintiffs to search for other documents that *do not* mention Effexor or venlafaxine.  Defendants contend that these other drug documents will show therapeutic substitutability and help define a relevant market.  But courts across the country routinely *deny* efforts to compel purchasers to produce additional documents for this purpose:

- In *Aggrenox*, the district court limited document discovery to branded Aggrenox and its generic, explaining that the broader "therapeutic market" had

Honorable Lois H. Goodman, U.S.M.J.                              Page 13
June 6, 2018

no bearing on any issue in the case; the Second Circuit denied the defendants 1292(b) petition. *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2016 WL 4203387, at *6 (D. Conn. Aug. 8, 2016) ("*Aggrenox*") *per app. denied*, *In re Aggrenox Antitrust Litig.,* No. 16-2864 [ECF No. 77] (2d Cir. Jan. 9, 2017) (Appx. 1).

•   In *Asacol*, the district court denied the defendants' motion to compel discovery on nine other drugs, holding that the materials sought were cumulative of information more easily available from other sources and "will not assist the defendants in proving market share 'in any meaningful way' and would not 'provide much other than anecdotal evidence.'" *In re Asacol Antitrust Litig.*, No. 15-cv-12730 [ECF No. 257, at *4] (D. Mass. Jan. 3, 2017) ("*Asacol*") (Appx. 4).

•   In *Solodyn*, the court found discovery of other drug information irrelevant, and denied it "in light of the likely additional burden and duplication of effort such an undertaking would require." *In re Solodyn Antitrust Litig.*, 2016 WL 6897809, at *1 (D. Mass. Sept. 19, 2016) ("*Solodyn*").

•   In *Loestrin*, the court denied broad discovery of unrelated drug terms, holding instead that discovery must be limited to a "bulls'-eye set" of documents "tending to show documents that reflect ways in which therapeutically interchangeable oral contraceptives are also economically interchangeable". *In re Loestrin 24 Fe Antitrust Litigation*, 2017 WL 1491911 (D.R.I. Mar. 15, 2017) ("*Loestrin*").

Each of these courts recognized that a plaintiff's documents and data, regardless of their place in the distribution chain, are neither necessary nor useful for describing the relevant market.

### A.   Purchasers' Documents Will Not Show or Rebut Market Power

The Supreme Court has defined market power as "the ability to raise prices above those that would be charged in a competitive market," *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984). Where direct evidence of market power, *i.e.*, evidence that a defendant has set supracompetitive prices or excluded competition, is available, a plaintiff need not define the relevant market. Moreover, the Supreme Court's *Actavis* decision holds that a "large reverse payment," standing alone, is "a strong indication of market power" possessed by a brand manufacturer. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 157 (2013). Plaintiffs allege that direct evidence exists to show that Wyeth agreed to pay competitor Teva hundreds of millions of

Honorable Lois H. Goodman, U.S.M.J.                                    Page 14
June 6, 2018

dollars to assist in delaying the entry of a cheaper generic version of Effexor, which would, "tend to eliminate the need formally to define a relevant market." *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 n.19 (D. Mass. 2013).

If the jury concludes that the direct evidence *does* establish market power, then circumstantial evidence of a broader therapeutic market would not alter that conclusion. *See Aggrenox*, 2016 WL 4203387, at *5 (in undertaking the burden to prove competitive harms directly, plaintiffs "may succeed or fail, but if they succeed, a showing by defendants of competition in a broader market . . . does not eliminate the competitive harm and therefore provides no defense to liability").

## B.      The Documents Defendants Seek Cannot Help their Defense

This case is about Effexor and its AB-rated generic equivalents, not the therapeutic class of antidepressants generally.  There is no dispute that drugs other than Effexor treat depression, and therefore no reason for Plaintiffs to produce documents on every antidepressant to establish this.  Here, Plaintiffs will define the relevant market by showing that, in contrast to generic equivalents, the existence of such therapeutic alternatives does not constrain Wyeth's ability to charge supracompetitive prices without losing sales.  It is *economic* interchangeability, not mere therapeutic similarity, that governs a relevant market analysis. *See, e.g., In re Nexium,* 968 F. Supp. 2d at 387-88 ([T]he reasonable interchangeability of a set of products is not dependent on the mere similarity of their forms or functions; instead, such limits are drawn according to the cross-elasticity of demand.") (internal quote omitted); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496-99 (2d Cir. 2004) (relevant market limited to *generic* versions of warfarin sodium, excluding other blood thinners and even chemically-identical branded version of warfarin sodium); *La. Wholesale Drug Co., Inc. v. Sanofi-Aventis*, 2008 WL 169362, at *7 (S.D.N.Y. Jan. 18, 2008) (product market limited to branded and generic versions of rheumatoid arthritis drug Arava).

Controlling law in this Circuit recognizes that only products that exhibit substantial cross-price elasticity of demand with Effexor are to be included in the relevant product market. *See, e.g., SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978) (despite similar uses, other antibiotics not in the same product market with cephalosporins, because other antibiotics did not exhibit sufficient cross-price elasticity of demand with cephalosporins); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437-38 & n.6 (3d Cir. 1997) (cross-price elasticity of demand defines a relevant market).  *See also Graco Inc. v. PMC Glob., Inc.*, 2012 WL 762448, at *8 (D.N.J. Feb. 15, 2012) (Sheridan, J.) (relying on cross-elasticity

Honorable Lois H. Goodman, U.S.M.J.                                  Page 15
June 6, 2018

evidence  and ruling that relevant market must be "defined by cross-elasticity of demand.").

In *Aggrenox*, the court limited discovery to branded Aggrenox and its generic. The court opined that, as a practical matter, the only 'relevant' market would be the market in which the challenged settlement agreement acted as an anticompetitive constraint. *Aggrenox*, 2016 WL 4203387, at *5; *id*. at *4 (citing IIB Areeda & Hovenkamp, Antitrust Law, ¶ 507 (3rd ed. 2007) (substitutability with other drugs shows a lack of market power only if it "effectively limit(s) the price  . . . to the competitive level or something slightly above")).  Thus, drugs that merely treat the same or similar ailments but do *not* constrain the competitive price of the branded drug at issue are necessarily *outside* the scope of the relevant product market. The *Aggrenox* court also held that, to the extent other drugs constrained Aggrenox pricing, the effect of that constraint would already be "priced in," *i.e.* apparent in the actual price of the brand drug at issue, making sales and pricing data about other drugs "redundant." *Id*. at *4.

Further, the notion that one branded or generic antidepressant can "substitute" for another is misleading.  Neither pharmacists nor patients have the power to switch from one drug to another; physicians write prescriptions for specific drugs, so substitution is limited solely to the brand product or its generic.  Even so, if a document mentions substitutability of Effexor and another drug, it will be produced.[10]

Most courts facing discovery motions on other drugs have denied them. The Defendants ignore these examples, placing all their eggs in the *Doryx* basket.  But there, the *Doryx* plaintiff (a generic drug company, not a purchaser) failed to make "a serious effort to present direct evidence of Defendants' monopoly power." *Mylan Pharm. Inc. v. Warner Chilcott plc*, 838 F.3d 421, 434 (3d Cir. 2016).  Conversely, here, the Plaintiffs will present direct evidence of monopoly power.  Moreover, in *Doryx*, Warner Chilcott's relevant market experts never even used purchasers' data.

---

[10] Defendants claim that they will rely on "formularies" to show competition among antidepressants, but fail to say that *direct purchaser plaintiffs do not create formularies*.  Formularies are typically created by pharmaceutical benefit managers and health plans; end-payor plaintiffs have already committed to producing their formularies.  Further, formularies often can be obtained from public sources. The Rite Aid drug list to which Defendants cite is not a formulary, but a list of generic drugs in broad categories such as "Mental Health Drugs," a category that includes products used to treat a range of conditions such as anxiety, psychosis, bipolar disorder and Parkinson's.

And *Doryx* did not involve a reverse payment, which as the Supreme Court ruled, is itself evidence of market power.  Instead, Warner Chilcott and its expert relied on market-wide consumer data. *See Mylan Pharm. Inc. v. Warner Chilcott plc*, 2015 WL 1736957, at *10 (E.D. Pa. Apr. 16, 2015) (to prove cross-elasticity of demand, defendants produced *unrebutted* evidence of consumer switching based on an increase in the price of Doryx), *aff'd* 838 F.3d 421, 437 (defendants offered unrebutted expert testimony based on statistical analysis of consumer data).  Purchaser documents were not used in *Wellbutrin XL either* for the purposes of analyzing a relevant market. *In re Wellbutrin XL Antitrust Litig.*, 268 F.R.D. 539, 544 & n.2 (E.D. Pa. 2010).  Better sources of information exist.

### C.     Plaintiffs' Data Cannot Help Defendants

Defendants claim they will use Plaintiffs' purchase and sales data to "reconstruct prices paid" for Effexor and dozens of other antidepressants throughout the distribution chain.  Defendants appear to propose to trace individual sales of Effexor (and other drugs) from manufacturer, to wholesaler, to retailer, to consumer (and third-party payor).  Defendants do not offer an expert to explain why or how such a project would be performed.   And Defendants cannot cite a single pharmaceutical antitrust case in which purchaser data was used to analyze the relevant market.  As the court warned in *Arava*:

> *[I]f* defendant gives me an expert affidavit explaining how the expert plans to use this and why this is a better source than the national data, et cetera, *then* I will consider giving the data over …. Assuming that the testifying expert is willing to be on the hook for that, I would reconsider and *I could grant the information if, and only if, if the expert . . . testifies that she needs it to do a market share analysis or a market definitional analysis*.[11]

Furthermore, Defendants acknowledge that a more convenient, more complete, and easily accessible data sets exist.   IMS Health is the leading provider of prescription drug data to the pharmaceutical industry.  IMS's data summarizes sales and prices at wholesale and at retail. The prices that are calculated from IMS data reflect the market activity of all entities making use of all formularies.  These data are used extensively by industry, government, academia, and litigation. *See In re Neurontin Mktg. & Sales Practices Litig.*, 2011 WL 3852254, at *32 (D. Mass. Aug.

---

[11] Hearing Tr. at 3, *La. Wholesale Drug Co., Inc. v. Sanofi-Aventis*, (S.D.N.Y. Mar. 4, 2008) (emphasis added) (Appx. 6).

Honorable Lois H. Goodman, U.S.M.J.                                    Page 17
June 6, 2018

31, 2011) ("To perform her analysis, Dr. Rosenthal used 'gold standard' national data on Neurontin and other anti-epileptic drugs from IMS Health and Verispan."). The parties and their experts invariably will do the same here.

### D.      The Production Sought Would be Unduly Burdensome

Rule 26(b)(1) instructs parties, in construing relevance and proportionality, to consider "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*. In recently amending the Rules to expressly incorporate this standard, the drafters did so "to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering the production of relevant information." *See Henry v. Morgan's Hotel Grp., Inc.,* 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016) (internal quotes omitted).

Each named Plaintiff is a veteran of other pharmaceutical antitrust cases. Plaintiffs know from experience that as defendants' drug list grows, the burden of searching documents for unrelated products grows proportionately. Again, Defendants' proposed search would be for documents that *do not mention* Effexor or venlafaxine. In other cases, many of the same plaintiffs here have substantiated the burdens involved in such searching with detailed declarations. Some of defense counsel have been in those cases, too. While Plaintiffs have not burdened this record with additional paper, Plaintiffs are prepared to submit the same kinds of client and expert affidavits here.

The burden of producing documents through Defendants' other drug discovery demands extends well-beyond the parties. Already, the Defendants have served 16 subpoenas on non-party drug manufacturers, retailers, third-party payers, and PBMs demanding "information, analyses, studies, projections, investigations, or reports" concerning **72** "prescribed or over the counter ('OTC') . . . branded or generic [drugs] for the treatment of depression, general anxiety disorder, social anxiety disorder, panic attacks, and/or any other treatment." *See, e.g.,* Subpoena to Optum Rx, Inc. dated May 25, 2018 (Appx. 5). The Defendants' disproportionate discovery demands will needlessly burden the parties, non-parties, the record, and the Court.

## IV.  Plaintiffs Cannot Avoid Producing Business Information Merely by Labeling It "Downstream" Discovery

### Defendants' Statement

Defendants seek relevant business documents, such as documents regarding discussions of competition between different antidepressants and documents regarding the creation of formularies—information that is discoverable in virtually all antitrust cases.[12]  Plaintiffs seek to curb such discovery by erroneously labeling it as "downstream discovery."  There is a fundamental disconnect, however, between what the term "downstream discovery" actually refers to and the way in which Plaintiffs use that term here.  Under *Hanover Shoe*, Defendants cannot raise as a defense to a *federal* direct purchaser antitrust claim that the purchaser "passed on" their damages to customers by raising prices, though such defenses apply to indirect purchaser claims asserted under state law.[13]  Certain discovery regarding prices charged to a plaintiff's customers could therefore, in limited cases, be relevant *exclusively* to a foreclosed pass-on defense under federal law, and thus would not be relevant if only federal antitrust claims were at issue.  That is what the phrase "downstream discovery" typically means—discovery relevant solely to a pass-on defense which is not available under federal law.  But Plaintiffs seek to preclude discovery into all documents even remotely involving their customers, even where they are not related to a federal pass-on defense.

For example, Plaintiffs have refused to produce documents regarding: (1) organizational structure (DPP Resp. 1-2; Retailer Resp. 1-2; EPP Resp. 1-2), (2) competition among antidepressants (*e.g.*, DPP Resp. 33, 85; Retailer Resp. 5, 12, 48, 85), (3) formularies, which *Doryx* recognized as highly material to the relevant market

---

[12] The Requests at issue, as described in Exhibit A-2, are: Req. to DPPs 1-2, 8, 10, 13, 15, 16, 18-19, 23, 25, 33-35, 38-46, 49, 51-54, 57-59, 61, 73, 79-90, 101, 108, 112; Req. to Retail. 1-3, 5, 9-16, 18-20, 22-23, 25-28, 30-35, 38-41, 43-45, 48-49, 51-55, 57-59, 61-62, 65, 73, 79-87, 93-94, 97-117, 119-22, 124-27, 130; Req. to EPPs 47-48, 57-60, 62, 74, 79-80, 113-15, 117.

[13] Plaintiffs cite *In re K-Dur Antitrust Litigation*, but it involved only *federal* claims. 686 F.3d 197 (3d Cir. 2012); *see also In re Namenda Direct Purchaser Antitrust Litig.*, 2017 U.S. Dist. LEXIS 95796 (S.D.N.Y. Jun. 21, 2017) (same).  And *In re Niaspan Antitrust Litigation* simply noted that the "parties did not brief" whether state antitrust laws allowed a pass-on defense; here, that issue *has* been briefed. 2015 U.S. Dist. LEXIS 92534, at *5-7 (E.D. Pa. July 9, 2015).

definition (*e.g.*, DPP Resp. 38; Retailer Resp. 38), (4) doctors' prescribing practices, which are relevant to the definition of the relevant market (*e.g.*, DPP Resp. 27, 28, 30; Retailer Resp. 20-21, 27, 30, 106; EPP Resp. 27-28, 30), (5) Plaintiffs' allegations in this case, including documents related to the alleged "nausea fraud" (*e.g.*, DPP Resp. 73; Retailer Resp. 65, 73; EPP Resp. 88-89), (6) Plaintiffs' adequacy to serve as class representatives (*e.g.*, DPP Resp. 44-45, 51-52, 86-90; Retailer Resp. 44-45, 51-52, 86-87; EPP Resp. 60, 110-111), (7) Plaintiffs' plan structure (for those Plaintiffs that are health plans) (*e.g.*, EPP Resp. 48-49, 57, 59-60, 62, 73, 113-17), and (8) alleged damages (*e.g.*, DPP Resp. 101-102; Retailer Resp. 124-125; EPP Resp. 118-19, 130-132). Plaintiffs claim that because these documents tangentially relate to their customers, they need not produce them. But, that is not what "downstream discovery" means.

Though Plaintiffs have objected to roughly *half* of Defendants' Requests on the basis of "downstream discovery," the only Requests that may relate to pass-on issues in any way are Requests to DPPs 41-42, 44, 57, and 61, Requests to Retailers 41-42, 44, 57, and 61, and Requests to EPPs 48, 57-60, 62, 80, and 114. But even if these Requests are relevant to pass-on issues, Plaintiffs should be compelled to produce this discovery anyway given the relevance to other critical issues in the case.

First, many states' antitrust laws either explicitly permit the assertion of a pass-on defense or provide that EPPs may only recover "actual damages," which courts have held are damages passed on to them and not then passed on to anyone else. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 U.S. Dist. LEXIS 182373, at *60-61 (N.D. Cal. Dec. 26, 2012) (under Minnesota law, "where multiple levels of purchasers have sued defendants alleging identical and/or overlapping claims, consideration of pass-on is necessary to avoid duplicative recovery"); *A & M Supply Co. v. Microsoft Corp.,* 252 Mich. App. 580, 584 (Mich. Ct. App. 2002); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 299 (Neb. 2006); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 107-08 (Fla. Dist. Ct. App. 1996); D.C. Code Ann. § 28-4509(b); N.Y. Gen. Bus. Law § 340(6). EPPs must therefore show that (a) there was an overcharge to DPPs, (b) which in turn passed on the overcharge to the Retailers, (c) which passed on the overcharge to the EPPs, (d) which did not pass on the alleged overcharge to others.[14] *See, e.g.*, *In re*

---

[14] Plaintiffs suggest that they can ultimately avoid a pass-on defense through various damages methodologies. Though this argument is premature, Defendants would be glad to explain why such methodologies fail if it would be helpful to the Court. In short, these approaches hide the pass-on problem, rather than cure it.

Honorable Lois H. Goodman, U.S.M.J.                                   Page 20
June 6, 2018

*Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) (indirect purchasers must prove "defendant overcharged its Direct-Purchasers . . . and that those Direct-Purchasers then passed on the overcharges to indirect purchasers").[15] Defendants are entitled to take discovery into these issues.

Second, discovery regarding EPPs' pass-on of prescription drug costs through premiums is relevant to class certification because it shows that an individual, plan-by-plan inquiry is required to measure injury and that those individualized inquiries would predominate. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 138 F. Supp. 2d 357, 360 (E.D.N.Y. 2001) (health insurers pass on costs through premiums);[16] *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552, at *9, 26 (E.D. Pa. Sept. 30, 2010) ("The impact of variable insurance plans affects whether many of the consumer plaintiffs suffered an injury."). Courts thus routinely permit such discovery *notwithstanding* that it might also be relevant to a federal pass-on defense. *See Doryx I*, 2015 LEXIS 50026, at *14; *In re Suboxone Antitrust Litig.*, 2016 U.S. Dist. LEXIS 83499, at *20-23 (E.D. Pa. June 28, 2016); *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, 2006 U.S. Dist. LEXIS 89353, at *13 (D.N.J. Sep. 7, 2006); Order, *In re Nexium Antitrust Litig.*, No. 12-MD-02409 (D. Mass. July 24, 2013), Dkt. No. 264 (Exh. B-5).

**Plaintiffs' Statement**

**A.    The Objectionable Requests Constitute Downstream Discovery**

In *Hanover Shoe Inc. v. United Shoe Mach. Corp*. and *Illinois Brick Co. v. Illinois*, the Supreme Court held that a direct purchaser in an antitrust case is injured to the full extent of the overcharge at the moment of purchase, and a defendant cannot assert as a defense any "pass on" of the overcharges to a plaintiff's customers. *Hanover Shoe, Inc. v. United Shoe Mach. Corp*., 392 U.S. 481 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Due to the unavailability of a "pass on" defense, downstream discovery of plaintiffs in antitrust cases is disfavored and is generally prohibited. *See, e.g., In re K-Dur Antitrust Litig*., 686 F.3d 197, 221 (3d Cir. 2012) (plaintiffs' sales and profits not discoverable on adequacy of representation, damages

---

[15] Plaintiffs cite *California v. ARC America Corp.*, but there the Court *deferred* to the states on the scope of indirect purchaser claims. 490 U.S. 93, 103 (1989).

[16] Plaintiffs assert that because *Blue Cross* involved a federal claim, a pass-on defense was not permitted. But the court was clear that *if* such a defense were cognizable (as here), it could have been asserted against insurers such as EPPs.

and indirect purchaser issues); *In re Niaspan Antitrust Litig.*, 2015 WL 4197590 (E.D. Pa. Jul. 9, 2015) (downstream discovery irrelevant in both the direct purchaser and indirect purchaser cases); *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488-CM-JCF [ECF No. 276] (S.D.N.Y. June 21, 2017) (Appx. 7) (denying defendant's downstream requests for sales data and distribution related materials because the requested information was not relevant to class certification, damages, or any other issue in the case).

Defendants attempt to circumvent this prohibition by narrowly defining such discovery as "prices charged" by plaintiffs to their customers. But the cases define downstream discovery more broadly, covering any business activity below Plaintiffs on the chain of distribution. *In re Solodyn,* 2016 WL 6897809, at *1 ("In an antitrust case such as this one, discovery regarding insurance coverage, formularies, patient savings and discount cards, free samples, and the Retailer Plaintiffs' sales of branded and generic Solodyn is commonly referred to as "'downstream discovery.'"). Each of the requests Plaintiffs have objected to concern issues not related to Plaintiffs' purchasing, but their sales or customers.

Even if Defendants were correct that downstream discovery was limited to pricing, many of their Requests would still be objectionable. While Defendants portray the Requests as calling for general "Business Documents," nearly all call for pricing and sales related information. Examples include requests for transactional sales data as well as documents concerning customer contracts, customer contract negotiations, pharmaceutical distribution profitability analyses, inventory practices, costs to fill prescriptions and marketing efforts. *See e.g.,* Defendants' Req. to Retailers 41-42, 44-45, 48, 51-52, 61, 86-87, 124-125.

Defendants' citations are not to the contrary. In *Wellbutrin*, the Court clarified that the production of transactional data had not been required. *In re Wellbutrin XL Antitrust Litig.*, 268 F.R.D. 539, 544 & n.2 (E.D. Pa. 2010). In *Suboxone,* the court permitted discovery on the impact of the alleged product hop on the direct purchasers' ability to compete, an argument not made here. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,* 2016 WL 3519618, at *6 (E.D. Pa. June 27, 2016). Defendants' remaining cases are similarly inapposite. *In re Terazosin Hydrochloride Antitrust Litig*, 220 F.R.D. 672 (S.D. Fla. 2004) (overcharges not passed on and did not concern downstream discovery); *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, 2006 WL 6907107 (D.N.J. Sep. 7, 2006) (D.N.J. Sep. 7, 2006) (request for downstream discovery denied); *In re Urethane Antitrust Litig.*, 237 F.R.D. 454 (D. Kan. 2006) (claimed need for downstream information not asserted by Defendants in this case); *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*,

Honorable Lois H. Goodman, U.S.M.J.                                    Page 22
June 6, 2018

2015 WL 1736957 (E.D. Pa. Apr. 16, 2015) (did not concern a downstream discovery dispute); *In re Nexium Antitrust Litig.*, 12-MD-02409 (no stated bases for Court's order).

### B.    Each of Defendants' Justifications for Downstream Discovery Falls Flat

Aside from their unfounded product market argument, Defendants do not seriously argue that downstream discovery is relevant to the direct purchaser cases. Instead, they claim the information is pertinent to the *EPP* case. As an initial matter, Direct Purchaser Plaintiffs and Retailers are not parties to the EPP case. As non-parties, the discovery protections of Rule 45, not Rule 34, govern the analysis as it relates to DPPs and Retailers. *In re Broiler Chicken Antitrust Litig.*, 2018 WL 999899, at *3 (N.D. Ill. Feb. 21, 2018) (downstream discovery from direct purchasers for use in a parallel indirect purchaser case "might be analogized to subpoenas issued to non-parties" and "Rule 45, of course, provides more protection for the recipient of a third-party subpoena than Rule 34 provides to a party"). Moreover, downstream discovery is irrelevant for the EPP case, as well.

EPPs need not demonstrate a pass on of overcharges to prove antitrust injury or damages, so no direct purchaser sales information is required. Rather, EPPs must prove only that the prices they paid were greater than they would have paid absent the challenged conduct. *See, e.g.*, *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 229 (E.D. Pa. 2012) ("in a foreclosed competition case, impact can be measured in terms of what product the end-payor was actually forced to buy because of the delayed entry, versus what product(s) they would have purchased"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 344 (E.D. Mich. 2001) ("[A]n indirect purchaser must estimate only the 'but for' price that it should have paid, which is a far less exacting exercise than apportioning the overcharge throughout the entire chain of distribution.") (internal quotations omitted). This showing can be made through what is called a "bottom across" damage calculation, a methodology that does not require tracing overcharges. *Cardizem*, *id.* ("'Bottom across' means that the overcharge is determined by examining the price differential between the generic and the brand drug at the retail level only. Thus, there is no need to review 'pass-through' variations.").

Defendants' claim for EPPs' sales information to establish a "pass on" defense falls flat because there is no pass-on defense to an EPP claim. Courts have consistently rejected this argument because insurance premiums are not designed to recover funds already paid. *In re Solodyn,* 2016 WL 6897809, at *2 ("insurance premiums . . . are set by anticipating future projected costs, not to recover money that

Honorable Lois H. Goodman, U.S.M.J.                                                 Page 23
June 6, 2018

insurers paid in the past"); *In re Neurontin Mktg. & Sales Practices Litig.*, 799 F. Supp. 2d 110, 120 (D. Mass. 2011) (rejecting defendants' "Hail Mary pass-on theory regarding increased premiums"). *Blue Cross & Blue Shield v. Philip Morris, Inc.,* 138 F. Supp. 2d 357, 361-65 (E.D.N.Y. 2001), holds that defendants are *not* allowed to use as an off-set to damages the fact that end-payors might pass their costs to customers in the form of higher premiums or employer contributions. (In fact, except for Blue Cross & Blue Shield of La., the institutional EPPs in this case are self-funded employer plans that do not charge "premiums" at all.) Employer contributions and premiums are forward-looking and calculated based on projected costs for the upcoming year for thousands of drugs, plus medical provider services. Those contributions do not mitigate the harm to EPPs, because EPPs were harmed the moment they paid the overcharge. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, 2017 WL 4621777, at *18 (D. Mass. Oct. 16, 2017). Thus, information relating to employer contributions and premiums and how those are calculated provide no useful information as damages or any other issue in the case.

Moreover, the "duplicative damages" argument is a red herring: direct purchasers are proceeding under federal law, while the EPPs are asserting state law claims. In *California v. ARC America Corporation*, the Supreme Court explicitly permitted recovery by end payors under state antitrust statutes. The authority Defendants cite concerned multiple claims under *state* law, not parallel claims under federal *and* state law, or is otherwise inapposite. *TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6709621 (N.D. Cal. 2012) (did not concern a federal claim); *A&M Supply Co. v. Microsoft Corp.*, 654 N.W. 2d 572, 586 (Mich. App. Ct. 2002) (EPPs damages proved with *publicly* available data); *In re Wholesale Elect. Anti-Trust Cases*, 147 Cal. App. 4th 1293 (2007) (concerned potential duplicative recovery deriving from California state statutes and the Federal Power Act and federal law preemption issues relating thereto); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081 (N.D. Cal. June 9, 2010) (pass through not required for EPP claims); *Mack v. Bristol-Myers Squibb Co*. 673 So. 2d 100 (Fla. Dist. Ct. App. 1996) (concerned standing issues under Florida Unfair Trade Practices Act); *Clayworth v. Pfizer*, 49 Cal. 4th 758 (2010) (did not concern a federal claim); *Kanne v. Visa USA, Inc.* 272 Neb. 489 (2006) (the duplicative recovery at issue involved different markets).

## C. Substantial Burden Further Warrants the Denial of Defendants' Demand

Defendants' downstream requests would also impose disproportionate burdens, a fact Plaintiffs will support with declarations should the Court require. Many of the Plaintiffs have hundreds, some even thousands, of locations. For the Retailers in

particular, their businesses maintain separate departments and personnel for pharmaceutical procurement and downstream operations such as reimbursements, dispensing and other interactions with patients, insurers, pharmacy benefit managers and others.  Likewise, Defendants' request targets dozens of drugs, sold in hundreds of distinct forms.  Merely assembling this data would impose heavy burdens.  *Broiler Chicken,* 2018 WL 999899, at *3 ("common sense supports the notion that responding to the extremely broad and granular downstream discovery requested by Defendants would be burdensome.").

## V.     Plaintiffs Should Be Required to Produce Documents from Assignors

### Defendants' Statement

Thirteen Plaintiffs are proceeding by way of assignment (collectively, the "Assignee Plaintiffs").  Assignee Plaintiffs made no direct purchases of Effexor XR from Wyeth, instead purchasing from wholesalers that purchased from Wyeth.  Thus, the assignors are the true direct purchasers and would ordinarily be required to bring their claims directly (and subject themselves to party discovery), while Assignee Plaintiffs are indirect purchasers and would not be permitted to bring a federal Sherman Act claim.  While such assignments are generally permissible, the corresponding obligation is that Assignee Plaintiffs must obtain from their assignors and produce documents responsive to Defendants' Requests.  Assignee Plaintiffs have an implied or explicit contractual right to produce these documents.

Plaintiffs nonetheless claim that they lack "the legal right to obtain the documents on demand" and thus lack custody or control over their assignors' documents.  They claim that Defendants should instead be forced to seek discovery from the wholesalers under the more demanding standards of Rule 45 rather than the more appropriate standards for party discovery under Rule 26.  If Plaintiffs are correct, then the assignments are null and void—as "[t]he claims being asserted are those of the original [purchasers (the wholesalers)] [and] cannot be asserted by an agent or assignee without the concomitant obligation to produce relevant discovery to defendants.  If plaintiff[s] and the assignees failed to obtain rights to insist on cooperation from their assignors in providing such discovery, and cannot persuade the [wholesalers] to cooperate now, that is their problem, not defendants'."  *JP Morgan Chase Bank v. Winnick*, 228 F.R.D. 505, 507 (S.D.N.Y. 2005).  Indeed, it "would be unfair to the defendants to permit plaintiff[s] and the assignees to divorce the benefits of the claims from the obligations that come with the right to assert them, to the detriment of defendants."  *Id.*; *see also In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 U.S. Dist. LEXIS 3542, at *16 (E.D. Tenn. Jan. 10, 2014); *Bank of New*

*York v. Meridien Biao Bank Tanzania Ltd.*, 171 F.R.D. 135, 149 (S.D.N.Y. 1997). Accordingly, an assignee "bears the same discovery obligations that [the assignor] would carry had it remained the plaintiff." *Travelers Indem. Co. of Am. v. Kendrick Bros. Roofing, Inc.*, 2013 U.S. Dist. LEXIS 179545, at *5 (D. Idaho Dec. 18, 2013).[17]

### Plaintiffs' Statement

Assignee Plaintiffs cannot produce what they do not have. Plaintiffs' assignors are separate legal entities, and Assignee Plaintiffs do not have possession, custody or control of their assignors' documents. *See* Fed. R. Civ. P. 34(a). In the Third Circuit, a party has "control" of documents only if it has the legal right to obtain the documents on demand. *See Mercy Catholic Med. Ctr. v. Thompson,* 380 F.3d 142, 160 (3d Cir. 2004) ("In the Rule 34 context, control is defined as the legal right to obtain required documents on demand."). *See also Alexander v. F.B.I.,* 194 F.R.D. 299, 301 (D.D.C. 2000) ("'control,' which is defined not as possession, but as the *legal right to obtain documents on demand,* is the test as to whether production is required") (emphasis added). Contrary to Defendants' assertion, Plaintiffs have neither an implied nor an explicit contractual right to receive and produce documents responsive to Defendants' Requests from their assignors. For these same reasons, this same motion was denied in *In re Androgel Antitrust Litigation (II),* Order, 09-md-2084-TWT [ECF No. 489] (N.D. Ga. Nov. 8, 2011) (Appx. 3); Hrg. Tr. 49-50 [ECF No. 484] (Appx. 2) (denying motion to compel because "I don't believe under the law of this circuit that the drugstore chains have custody or control of the data that . . . the assignors may have").

Defendants rely on inapposite cases in which courts have faced situations where critical discovery was not in the possession of the assignee and the defendant could not obtain that discovery through compulsory process. In *JPMorgan Chase Bank v. Winnick,* 228 F.R.D. 505 (S.D.N.Y. 2005), for example, defendants sought discovery from assignors concerning their reliance on allegedly fraudulent representations, an essential element of the claim at issue. *Id.* at 506.

---

[17] Plaintiffs ask that this Court follow *Androgel* with respect to this issue. But in *Androgel*, fact discovery was already closed in that case when discovery was requested from the assignors and the court offered no reasoning for rejecting Defendants' motion, making it unclear whether the Court agreed with Plaintiffs' arguments, or simply refused to allow discovery beyond the deadline. Hrg. Tr. at 20, 49-50, *In re Androgel Antitrust Litig. (II),* No. 09-md-2084 (N.D. Ga. Nov. 8, 2011), Dkt. No. 484 (Ex. 1).

Honorable Lois H. Goodman, U.S.M.J.                                     Page 26
June 6, 2018

In *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 148 (S.D.N.Y. 1997), the assignor had affirmatively invoked the discovery power of the Court before assigning its claim.  The assignor also had an interest in the outcome of the assigned claims.  These cases have no application here.

In *Skelaxin*, the court recognized that the plaintiffs did not have control of the requested assignor documents, but ordered the plaintiffs to serve a subpoena on their assignors.  *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 129814 (E.D. Tenn. Jan. 10, 2014).  Recognizing the difficulties with asking plaintiffs to negotiate the subpoenas with their own assignors, defendants then took over the negotiation process.  The only impact of the order was that it directed who should initiate the subpoena process.  Requiring Defendants to deal directly with the assignors is simply more efficient, and avoids potential disputes over whether Plaintiffs are being sufficient zealous in their pursuit of documents.

The claims here raise issues that affect drug purchasers at every level of distribution; the discovery Defendants seek relates to issues that are not unique to the assignors or to the portion of their claims assigned to Plaintiffs, but to general industry matters.  The assignments here simply transfer the claim from one level of distribution (a wholesaler) to the next (a retailer).  *See, e.g., In re K-Dur Antitrust Litigation,* 338 F. Supp. 2d 517, 539 (D.N.J. 2004) ("express assignments of antitrust claims from a direct purchaser to an indirect purchaser are permissible").  Plaintiffs have already agreed to produce documents concerning these subjects from their own files.  If Defendants want additional documents from the assignors on these matters, they should seek that discovery from the assignors directly.

## VI.  Plaintiffs Cannot Use Privilege to Shield Facts Relevant to Class Certification, the Filing of the Instant Litigation, or Damages

### Defendants' Statement

Plaintiffs refuse to produce documents related to (a) class certification, (b) the filing of this litigation, and (c) damages, because in some cases the information may have been received from lawyers.[18]  For example, Requests to EPPs 88-95 seek the factual basis for certain allegations in the EPPs' complaint, yet EPPs claim they need not respond, because the factual basis for each allegation is privileged.  Not so.

_____

[18] The Requests at issue, as described in Exhibit A-3, are: Req. to DPPs 70-71, 88-90, 96, 98-99, 119; Req. to Retail. 64-65, 70-71, 137; Req. to EPPs 87-95, 98-102, 126-27, 129, 140, 142.

Honorable Lois H. Goodman, U.S.M.J.                                    Page 27
June 6, 2018

Plaintiffs cannot shield relevant *facts* from discovery in this way.  "A litigant cannot shield from discovery the knowledge it possessed by claiming it has been communicated to a lawyer; nor can a litigant refuse to disclose facts simply because that information came from a lawyer."  *See, e.g.*, *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994).  A plaintiff is required to produce the factual basis on which it relies, and cannot hide such material by claiming privilege.  And even if the information *were* privileged, Plaintiffs must log the responsive documents.[19]

### Plaintiffs' Statement

Defendants are seeking discovery of privileged documents, not of mere "facts."  Plaintiffs object to producing documents created in anticipation of this litigation.  Fed. R. Civ. P. 26(b)(3)(A).  The strong rule protecting privileged documents may be overcome only in narrow circumstances not present here.  Defendants have not identified a substantial need for any discoverable "facts" that cannot be obtained or created from other sources or methods.  Fed. R. Civ. P. 26(b)(3)(A).  *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 667 (3rd Cir. 2003) ("extraordinary circumstances" required to justify discovery of the privileged information).  Moreover, facts that may be contained in privileged documents *are* protected.  The sole case the Defendants rely upon, *Rhone-Poulenc Rorer v. Home Indem. Co.*, 32 F.3d 851 (3rd Cir. 1994), was an insurance coverage matter, where the protected documents at issue were not created in anticipation of litigation.  Nonetheless, even in that instance the Third Circuit reversed the trial court's disclosure order.

Defendants have refused to agree to search terms, instead asking the Court to upend the typical order of discovery, ruling on privilege before production has been made.  *See* Fed. R. Civ. P. 26(b)(3)(A); *see also Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (parties should develop their own discovery rather than relying on "wits borrowed from the adversary").  Defendants' position is unreasonable and premature.  Until custodial searches have been run and a privilege log is produced, these issues are not ripe.  *See* Fed. R. Civ. P. 26(b)(5) (production of privilege log "will enable other parties to assess the claim").

Defendants have made no showing that any facts are being withheld that would render protected work product or communications as their only source.  *See Hickman*,

---

[19] Plaintiffs say that this issue is not "ripe" "[u]ntil custodial searches have been run and a privilege log is produced."  But Plaintiffs *refuse* to run custodial searches or produce a privilege log.  That is why Defendants are moving here.

Honorable Lois H. Goodman, U.S.M.J.                                          Page 28
June 6, 2018

329 U.S. at 512 (finding that a "naked, general demand" is "insufficient to justify discovery"). Defendants' Requests to EPPs 88-95 seek documents relied upon in EPPs' complaint. Any documents quoted in the complaint are footnoted and publicly available. Any other documents relied on for the complaint would be work product. Defendants' Requests to EPPs 88, 89 and 102 seek assessments or analyses of the economic impact of the Wyeth/Teva settlement agreement, or analyses of the patent litigation. To the extent that Defendants are not seeking premature expert disclosures, they would be seeking attorney work product. Fed. R. Civ. P. 26(b)(4) ("Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert" absent *exceptional circumstances* under which it is impracticable for the party to obtain facts or opinions") (emphasis added). Defendants further incorrectly include DPP Resp. 88-90 here because Plaintiffs' objections (including as to relevance) are not based on any claim of privilege.

## VII. Plaintiffs May Not Limit the Relevant Time Period to Exclude the Periods Central to the Allegations in the Complaints

### Defendants' Statement

Plaintiffs have refused to provide any documents dated prior to January 1, 2008—shortly before the date on which their damages purportedly began—regardless of when the conduct at issue occurred. *See* Exh. A-4 (listing a sample of Requests). Plaintiffs claim that this limited date range—far shorter than what Plaintiffs requested from Defendants—is defensible because their documents become relevant only once damages begin to be incurred. Plaintiffs are wrong.

**Relevant product market:** For their own requests regarding relevant market, Plaintiffs have demanded documents dated as early as 1991. Defendants are asking Plaintiffs to search for such documents back to 2002, when the allegedly fraudulent patents issued. *See*, *e.g.*, Req. to DPPs 5, 12, 16-62, 79-87, 112, 118; Req. to Retail. 5, 16-62, 79-87, 97-127, 130, 136; Req. to EPPs: 5, 12, 16-86, 97, 103-112, 135, 141, 145-46, 148-55. In response, Plaintiffs say that *all* pre-2008 discovery necessarily focuses on Defendants' conduct rather than Plaintiffs' injury. But relevant market discovery has nothing to do with the defendant's conduct, but rather the scope of the market at the time of the conduct. Plaintiffs were participants in that market and should be ordered to produce documents on this issue from January 1, 2002 to January 1, 2012.

**Operation of market at time of settlement:** Defendants seek documents relating to the operation of the market in the years leading up to the Wyeth-Teva settlement, such as the ability of generics to enter/at risk launches (Req. to DPPs 7-8,

67-68; Req. to Retail. 7-8, 67-69; Req. to EPPs 7-8), the conditions under which a branded company would launch an authorized generic product (Req. to DPPs 67-68; Req. to Retail. 68; Req. to EPPs 92-93), and similar issues (Req. to DPPs 3-4, 6, 10, 110; Req. to Retail. 3-4, 6, 10, 128; Req. to EPPs 3-4, 6, 10, 133).  Plaintiffs allege that certain events—such as the launch of an authorized generic—"would" or "should have" occurred based on their views about how the market "should" work.  *See*, *e.g.*, DPP 2nd Amended Compl. ¶¶ 262, 269-70.  Because Plaintiffs participated in that market, they likely have relevant documents addressing these issues and should be ordered to produce such documents from January 1, 2002 to January 1, 2012.

     **Litigation-related materials:**  Defendants seek documents concerning (1) the evidentiary basis for Plaintiffs' complaints (Req. to DPPs 63-66, 69; Req. to Retail. 63-66; Req. to EPPs 87-93), (2) Plaintiffs' awareness of the patents and the Wyeth-Teva patent litigation and settlement, which relate to whether Plaintiffs' claims are time-barred (Req. to DPPs 70-72, 74-78; Req. to Retail. 70-72, 74-78; Req. to EPPs 94-96, 98-102), and (3) the assignment of claims to Plaintiffs (Req. to DPPs 103-109; Req. to Retail. 88-94).  *See also* Req. to DPPs 113-17, 119; Req. to Retail. 130-35, 137; Req. to EPPs 80-81, 136-40, 142.  All such documents are relevant regardless of when they were created.  Plaintiffs should be ordered to produce such documents from January 1, 2002 to the present.

     **Launch of Effexor IR:**  Defendants' Requests also address the impact of the Wyeth-Teva settlement on the market, such as the effect of generic Effexor on Plaintiffs' business (Req. to DPPs 14; Req. to Retail. 14; Req. to EPPs 14), and the procompetitive benefits of introducing generic Effexor (Req. to DPPs 11, 13, 15, 89; Req. to Retail. 11, 13, 15; Req. to EPPs 11, 13, 15, 119).  These competitive effects do not begin in 2008, as Plaintiffs argue, but rather at the time the settlement allowed Teva to introduce a generic Effexor IR product in June 2006.  Plaintiffs should be ordered to produce documents on this issue from January 1, 2006 to January 1, 2012, and data (which must continue through the damages period) (Req. to DPPs 60, 62; Req. to Retail. 60, 62; Req. to EPPs 86) from January 1, 2006 to December 31, 2017.

     **Class certification and Damages:**  Defendants agree that Plaintiffs need not produce class certification documents dated prior to January 1, 2008; however, the end-date for these documents should be December 31, 2017 to reflect the fact that class certification depends in part on Plaintiffs' current typicality and adequacy as class representatives and that damages are alleged to continue.  *See* Req. to DPPs 9, 88, 90-96, 102; Req. to Retail. 9, 95-96; Req. to EPPs 9, 113-18, 120-29, 130-32, 144-47.

Honorable Lois H. Goodman, U.S.M.J.                                        Page 30
June 6, 2018

### Plaintiffs' Statement

Plaintiffs have agreed to produce responsive documents beginning January 2008, nearly six months before the start of the class period.  Defendants demand that Plaintiffs produce documents back to 2002 – more than *six years* before the start of the class period.  Even if requested discovery is marginally relevant, the court may proscribe discovery if it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," Fed. R. Civ. P. 26(b)(2)(C).

Defendants have failed to show how their blunderbuss demands for documents that predate the claims in this case by six years will generate relevant discovery, or why the documents they purport to seek are not merely cumulative of documents Plaintiffs will produce from the period relevant to their claims, or that Defendants may find in their own files.  Defendants do not cite a single case supporting the relevance of the documents they seek, and they do not identify any instance in which a Court has required class representatives to produce documents going back so far.

Defendants make unspecified demands that Plaintiffs search their files going back more than 15 years for documents concerning the "Operation of the market," the "Wyeth-Teva patent litigation," or the "Launch of Effexor IR" without any offer of proof that Plaintiffs, who are *drug purchasers*, with no role in the manufacture and launch of prescription drugs, would possess documents relevant to these subjects.

Finally, Defendants concede that Plaintiffs need not produce documents pre-dating the beginning of the class period concerning class certification, but insist that it is insufficient for the date range of Plaintiffs' production to end with the commencement of this action.  However, Requests concerning subject matters such as the relevant product market, operation of the market at the time of the settlement, litigation-related materials and class certification and damages categories include documents that Plaintiffs object to producing.  It is premature to adjudicate time periods before it has been decided whether such documents are subject to production in the first instance.

Respectfully submitted,

*/s/ Peter S. Pearlman*

Peter S. Pearlman

Enclosures

cc:     All Counsel of Record *(W/Encl. via ECF)*

# Exhibit A

# Exhibit A-1

**EXHIBIT A-1**

**OBJECTIONS TO PRODUCT MARKET REQUESTS[1]**

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 16 | All Documents concerning the promotion, marketing, or sales of Venlafaxine and/or any other Antidepressant Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 17 | All Documents concerning any communication with any Defendant relating to any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 18 | All analyses, studies, reports, forecasts, or budgets concerning Venlafaxine and/or any other Antidepressant Treatment sold in the United States. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 19 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Antidepressant Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 20 | All Documents concerning the types of conditions or indications for which physicians or health care providers have prescribed or may prescribe any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 21 | All Documents concerning the factors that a physician or health care provider considers or may consider in deciding which Antidepressant Treatment to prescribe, including but not limited to efficacy, formulation, dosage, availability of extended release formulations, side effects, patient tolerance, patient adherence, price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

---

[1]    Given the length of the objections here, this exhibit identifies Plaintiffs' position only with respect to the relevant market issues, and is not a complete description of all objections Plaintiffs may have made.

EXHIBIT A-1

| No. | Request Text | DPPs' Position |
|-----|--------------|----------------|
| **DPP Responses and Objections re: Product Market** |||
| 22 | All Documents concerning comparisons between and among different Antidepressant Treatments, including but not limited to any analyses of actual, projected, or claimed benefit, harm, improvement, therapeutic equivalence, similarity or difference between or among them. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 23 | All Documents concerning the sale of, market share of, or competition between or among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 24 | All Documents concerning any policies, procedures, or standards concerning the prescribing of Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 25 | All Documents concerning any actual or potential substitution or interchangeability between and among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic), including "off label" uses. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 26 | All Documents concerning any assessment by You or anyone else of the efficacy of any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 27 | All Documents concerning the dosing regimens for and/or methods of administration of any Antidepressant Treatment, whether labeled, physician-directed, pharmacist-directed, or otherwise. | Refuse to produce any documents. |
| 28 | All Documents concerning any comparisons between or among different dosage strengths, dosage forms, dosing regimens, active ingredients, side effects, adverse events, and formulations of Antidepressant Treatments. | Refuse to produce any documents. |
| 29 | All Documents regarding any potential entry of an AB-rated generic version of Effexor XR, Effexor IR, and/or any other Antidepressant Treatment, including those listed in Appendix A. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | DPPs' Position |
|---|---|---|
| | **DPP Responses and Objections re: Product Market** | |
| 30 | All Documents concerning communications with physicians, health care providers, hospitals, pharmacies, pharmacy benefit managers, governmental organizations, health insurers, professional organizations, or publication editors concerning the relative safety and effectiveness of any Antidepressant Treatment. | Refuse to produce any documents. |
| 33 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Antidepressant Treatments. | Refuse to produce any documents. |
| 34 | All Documents concerning the relative price or cost of Antidepressant Treatments, including Effexor XR and Effexor IR. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 35 | All Documents concerning Authorized Generic versions of Antidepressant Treatments, including any discussion or analysis concerning Authorized Generic pricing, managed care coverage or coverage determinations, promotion and marketing, market impact, substitutability, and patient preference. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 38 | A copy of each formulary or drug list on which any Antidepressant Treatment is listed. | Refuse to produce any documents. |
| 39 | All Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents. |
| 40 | All Documents concerning the consideration of (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets, including all Documents that compare or contrast (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets to any other product. | Refuse to produce any documents. |

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 41 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Venlafaxine and/or any other Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 42 | All Documents concerning contractual negotiations between You and Defendants, or any other party, related to the purchase of Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 43 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Venlafaxine, or any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*; Refuse to produce any non-purchase related documents. |
| 44 | All contracts and/or agreements between You and any national account customers, pharmacies, pharmacy buying groups, pharmacy benefit managers, third-party payors, or institutional customers, concerning Your sales of Venlafaxine or any other Antidepressant Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents. |
| 45 | All contracts and/or agreements related to Your generic source/formulary program with any Pharmacy and/or Pharmacy buying group customers. | Refuse to produce any documents. |
| 46 | All contracts and/or agreements in Your possession, custody or control, between You (or Your Assignor) and any pharmaceutical retailer including, but not limited to Retailer Plaintiffs. | Refuse to produce any documents. |
| 47 | All Documents concerning Your policies, procedures, plans, and/or strategies for purchasing generic pharmaceuticals when they become available. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 48 | All Documents pertaining to Your strategies, policies or practices for stocking and/or inventory of brand name prescription drugs, including documents relating to which doses or pharmaceuticals to stock that could be relevant to or applied to Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

EXHIBIT A-1

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 49 | All opinions, comparisons, studies, or analyses describing any practice, custom, or policy of selling pharmaceuticals on a cost-plus basis that could be relevant to or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 50 | All Documents pertaining to any strategy of Arbitrage and/or the timing of Your purchases in connection with the purchase of brand name prescription drugs. | Refuse to produce any documents other than those specifically referencing Effexor/AB-rated generic Effexor or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 51 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 52 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, generic pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 53 | All Documents related to any price adjustment given to any purchaser concerning any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*; Refuse to produce any non-purchase related documents. |
| 54 | Any of Your communications regarding formularies or preferred drug lists referencing any Antidepressant Treatment. | Refuse to produce any documents. |
| 55 | All Documents sufficient to identify any Antidepressant Treatment which you have purchased or for which you have provided reimbursement. | Refuse to produce any documents (refer Defendants to DPPs' Purchase Data). |

| No. | Request Text | DPPs' Position |
|---|---|---|
| | **DPP Responses and Objections re: Product Market** | |
| 56 | For all purchases of Venlafaxine and/or any other Antidepressant Treatment by You during the Relevant Time Period, data extracted from the electronic databases, data summaries, or purchase records You maintain identifying in a tab-, comma-, or semi-colon delimited ASCII flat text file or similar electronic format sufficient to identify: (a) from whom it was purchased; (b) the quantities You purchased; (c) the prices You paid, including gross and net prices; (d) the dates of Your purchase(s); (e) any credits, rebates, discounts or other adjustments to price You received; (f) any chargebacks You processed; and (g) any terms of sales governing Your purchases; or, if Your records do not contain all of the requested information, all Documents sufficient to show such information. | Refuse to produce any data other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 57 | Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format sufficient to identify sales of Venlafaxine and/or any other Antidepressant Treatment by You during the Relevant Time Period in transaction-by-transaction format, as follows: | Refuse to produce any documents. |
| a | All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) numberof units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) pharmaceutical description, (xii) pharmaceutical form, (xiii) pharmaceutical strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like). | Refuse to produce any documents. |

| DPP Responses and Objections re: Product Market | | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| b | All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom You paid, or on whose behalf You accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which You paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular pharmaceutical sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated. | Refuse to produce any documents. |
| c | All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; | Refuse to produce any documents. |
| d | Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all othertransaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity. | Refuse to produce any documents. |

**EXHIBIT A-1**

| No. | | Request Text | DPPs' Position |
|---|---|---|---|
| | | **DPP Responses and Objections re: Product Market** | |
| | | Request Text | DPPs' Position |
| | e | The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate pharmaceutical list, including NDC, SKU, UPC, pharmaceutical description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms. | Refuse to produce any documents. |
| | 58 | All Documents concerning any changes in coverage for any Antidepressant Treatment, including but not limited to removing any Antidepressant Treatment from formularies or listing of any Antidepressant Treatment in a different formulary tier. | Refuse to produce any documents. |
| | 59 | All correspondence with any Mail Order Pharmacy concerning AntidepressantTreatment, including but not limited to:a. Documents sufficient to show reimbursement rates or schedules;b. Documents sufficient to show volume of purchases of Antidepressant Treatments by mail order;c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Venlafaxine or any other Antidepressant Treatment to consumers. | Refuse to produce any documents. |

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 60 | Documents sufficient to show, by package size, dosage form and seller:<br>a. Each purchase by You of Antidepressant Treatments;<br>b. The gross dollar expenditures in connection with each of Your purchases of these products;<br>c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products;<br>d. The net dollar expenditures in connection with each of Your purchases of these products; and<br>e. The gross and net prices You paid in connection with each of Your purchases of these products. | Refuse to produce any documents (Refer Defendants to DPPs' Purchase Data). |
| 61 | With respect to each Mail Order Pharmacy through which You sold any Venlafaxine to consumers, please provide Documents sufficient to show:<br>a. The identity and location of the Mail Order Pharmacy;<br>b. The Mail Order Pharmacy's purchase of Venlafaxine, or any Antidepressant Treatment, including Documents reflecting the date you sold to the Mail Order Pharmacy. | Refuse to produce any documents. |
| 62 | Data generated or provided by IMS and Verispan in whatever format it was received from IMS or Verispan for Venlafaxine and/or any other Antidepressant Treatment (if available, with data broken out by manufacturer, form, strength, NDC and channel), during the Relevant Time Period, as follows:<br>a. IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price;<br>b. IMS National Sales Perspective data, including total units, extended units, total sales dollars and price;<br>c. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price; and<br>d. National Disease and Therapeutic Index (NDTI data). | Refuse to produce any documents. |

EXHIBIT A-1

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 73 | Documents sufficient to show all adverse events, medication errors, or any other complaints or concerns expressed by healthcare professionals (including physicians, pharmacists, nurses, and others), consumers (including patients, family members, lawyers, and others), or government bodies (including the FDA and regulators outside the United States) related to Effexor IR or Generic Effexor IR purchased, distributed, or sold by You, including without limitation any incidence of nausea or emesis. | Refuse to produce any documents. |
| 79 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 80 | All Documents concerning generic or therapeutic substitution of Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for other Antidepressant Treatments and the effectiveness of such substitution. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 81 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Antidepressant Treatment to any generic Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 82 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from one brand name Antidepressant Treatment to another brand name Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | DPPs' Position |
|---|---|---|
| | **DPP Responses and Objections re: Product Market** | |
| 83 | All Documents concerning generic or therapeutic substitution involving Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for drugs. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 84 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Antidepressant Treatments to generic and/or lower-cost alternative Antidepressant Treatments. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 85 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Antidepressant Treatment may follow to compete with an AB-rated generic equivalent Antidepressant Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 86 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |

**EXHIBIT A-1**

| No. | Request Text | DPPs' Position |
|---|---|---|
| | **DPP Responses and Objections re: Product Market** | |
| 87 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 90 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of brand-name pharmaceuticals would be more or less profitable than distribution and/or servicing of generic versions of brand-name pharmaceuticals. | Refuse to produce any documents. |
| 112 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Antidepressant Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents. |
| 118 | All Documents concerning any communication between or among You and any other Plaintiff concerning any Antidepressant Treatment, including Effexor XR and Effexor IR, or any potential generic thereof. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | Retailers' Position |
|---|---|---|
| | **Retailer Responses and Objections re: Product Market** | |
| 2 | Organizational charts, personnel directories, telephone directories, and electronic mail user and address lists sufficient to show all personnel: <br> a. with any responsibility for the purchase or sale of pharmaceutical products, including but not limited to any Antidepressant Treatments, and all employees to <br> whom they report directly or indirectly; <br> b. with any responsibility for the purchase or reimbursement of any Antidepressant Treatment; <br> c. with any responsibility for negotiating any rebates or overall discounts with parties from whom You purchase Antidepressant Treatments; <br> d. with any responsibility for Pharmacy operations, including those administering any policies or practices related to therapeutic substitution; and <br> e. all senior management to whom the individuals identified in (b)-(d) report directly or indirectly. | Refuse to produce organizational charts for relevant departments other than pharmacy purchasing departments. |
| 11 | All Documents, irrespective of date, concerning Effexor IR or Generic Effexor IR. | Refuse to produce any documents. |
| 12 | All Documents concerning patients' ability or willingness to switch from Effexor IR to another drug product, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to: <br> a. All Documents concerning patients' ability or willingness to switch from Effexor IR to Generic Effexor IR. <br> b. All Documents concerning patients' ability or willingness to switch from Effexor IR to Effexor XR. <br> c. All Documents concerning patients' ability or willingness to switch from Effexor IR to any other Antidepressant Treatment. | Refuse to produce any documents. |
| 16 | All Documents concerning the promotion, marketing, or sales of Venlafaxine and/or any other Antidepressant Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 17 | All Documents concerning any communication with any Defendant relating to any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 18 | All analyses, studies, reports, forecasts, or budgets concerning Venlafaxine and/or any other Antidepressant Treatment sold in the United States. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 19 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Antidepressant Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 20 | All Documents concerning the types of conditions or indications for which physicians or health care providers have prescribed or may prescribe any Antidepressant Treatment. | Refuse to produce any documents. |
| 21 | All Documents concerning the factors that a physician or health care provider considers or may consider in deciding which Antidepressant Treatment to prescribe, including but not limited to efficacy, formulation, dosage, availability of extended release formulations, side effects, patient tolerance, patient adherence, price, brand name, and patents. | Refuse to produce any documents. |
| 22 | All Documents concerning comparisons between and among different Antidepressant Treatments, including but not limited to any analyses of actual, projected, or claimed benefit, harm, improvement, therapeutic equivalence, similarity or difference between or among them. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 23 | All Documents concerning the sale of, market share of, or competition between or among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 24 | All Documents concerning any policies, procedures, or standards concerning the prescribing of Antidepressant Treatments. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 25 | All Documents concerning any actual or potential substitution or interchangeability between and among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic), including "off label" uses. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 26 | All Documents concerning any assessment by You or anyone else of the efficacy of any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 27 | All Documents concerning the dosing regimens for and/or methods of administration of any Antidepressant Treatment, whether labeled, physician-directed, pharmacist-directed, or otherwise. | Refuse to produce any documents. |
| 28 | All Documents concerning any comparisons between or among different dosage strengths, dosage forms, dosing regimens, active ingredients, side effects, adverse events, and formulations of Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 29 | All Documents regarding any potential entry of an AB-rated generic version of Effexor XR, Effexor IR, and/or any other Antidepressant Treatment, including those listed in Appendix A. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 30 | All Documents concerning communications with physicians, health care providers, hospitals, pharmacies, pharmacy benefit managers, governmental organizations, health insurers, professional organizations, or publication editors concerning the relative safety and effectiveness of any Antidepressant Treatment. | Refuse to produce any documents |
| 31 | All Documents concerning switching between Antidepressant Treatments, including the frequency, safety, effectiveness, or reasons for switching or not switching from on Antidepressant Treatment to another. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 32 | All Documents concerning switching between any Antidepressant Treatments occurring at the Pharmacy, with or without physician notification. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 33 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Antidepressant Treatments. | Refuse to produce any documents. |
| 34 | All Documents concerning the relative price or cost of Antidepressant Treatments, including Effexor XR and Effexor IR. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*; Refuse to produce any non-purchase related documents. |
| 35 | All Documents concerning Authorized Generic versions of Antidepressant Treatments, including any discussion or analysis concerning Authorized Generic pricing, managed care coverage or coverage determinations, promotion and marketing, market impact, substitutability, and patient preference. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 36 | All Documents comparing Effexor XR with Effexor IR for the treatment of depression, general anxiety disorder, social anxiety disorder, and/or panic attacks, including not limited to Documents concerning efficacy, safety, and cost. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 38 | A copy of each formulary or drug list on which any Antidepressant Treatment is listed. | Refuse to produce any documents. |
| 39 | All Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents. |
| 40 | All Documents concerning the consideration of (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets, including all Documents that compare or contrast (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets to any other product. | Refuse to produce any documents. |

| No. | Request Text | Retailers' Position |
|-----|--------------|---------------------|
| **Retailer Responses and Objections re: Product Market** | | |
| 41 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Venlafaxine and/or any other Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 42 | All Documents concerning contractual negotiations between You and Defendants, or any other party, related to the purchase of Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 43 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Venlafaxine, or any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 44 | All contracts and/or agreements between You and any national account customers, pharmacies, pharmacy buying groups, pharmacy benefit managers, third-party payors, or institutional customers, concerning Your sales of Venlafaxine or any other Antidepressant Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents. |
| 45 | All contracts and/or agreements related to Your generic source/formulary program with any Pharmacy and/or Pharmacy buying group customers. | Refuse to produce any documents. |
| 46 | All contracts and/or agreements in Your possession, custody or control, between You (or Your Assignor) and any pharmaceutical wholesaler including, but not limited to Your assignors, e.g., McKesson, Cardinal, AmerisourceBergen, Bindley and National. | Refuse to produce any documents. |
| 47 | All Documents concerning Your policies, procedures, plans, and/or strategies for purchasing generic pharmaceuticals when they become available. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 48 | All Documents pertaining to Your strategies, policies or practices for stocking and/or inventory of brand name prescription drugs, including documents relating to which doses or pharmaceuticals to stock that could be relevant to or applied to Antidepressant Treatments. | Refuse to produce any documents. |

| No. | Request Text | Retailers' Position |
|---|---|---|
| | **Retailer Responses and Objections re: Product Market** | |
| 49 | All opinions, comparisons, studies, or analyses describing any practice, custom, or policy of selling pharmaceuticals on a cost-plus basis that could be relevant to or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 50 | All Documents pertaining to any strategy of Arbitrage and/or the timing of Your purchases in connection with the purchase of brand name prescription drugs. | Refuse to produce any documents. |
| 51 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 52 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, generic pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 53 | All Documents related to any price adjustment given to any purchaser concerning any Antidepressant Treatment. | Refuse to produce any documents. |
| 54 | Any of Your communications regarding formularies or preferred drug lists referencing any Antidepressant Treatment. | Refuse to produce any documents. |
| 55 | All Documents sufficient to identify any Antidepressant Treatment which you have purchased or for which you have provided reimbursement. | Refuse to produce any documents and will produce only data specifically reflecting purchases of Effexor XR and AB-rated generic versions of Effexor XR. |
| 56 | For all purchases of Venlafaxine and/or any other Antidepressant Treatment by You during the Relevant Time Period, data extracted from the electronic databases, data summaries, or purchase records You maintain identifying in a tab-, comma-, or semi-colon delimited ASCII flat text file or similar electronic format sufficient to identify: (a) from whom it was purchased; (b) the quantities You purchased; (c) the prices You paid, including gross and net prices; (d) the dates of Your purchase(s); (e) any credits, rebates, discounts or other adjustments to price You received; (f) any chargebacks You processed; and (g) any terms of sales governing Your purchases; or, if Your records do not contain all of the requested information, all Documents sufficient to show such information. | Refuse to produce any data other than those specifically reflecting purchases of Effexor XR and AB-rated generic versions of Effexor XR |

| No. | Request Text | Retailers' Position |
|---|---|---|
| | **Retailer Responses and Objections re: Product Market** | |
| 57 | Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format sufficient to identify sales of Venlafaxine and/or any other Antidepressant Treatment by You during the Relevant Time Period in transaction-by-transaction format, as follows: | Refuse to produce any documents. |
| a | All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) numberof units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) pharmaceutical description, (xii) pharmaceutical form, (xiii) pharmaceutical strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like). | Refuse to produce any documents. |

| Retailer Responses and Objections re: Product Market | |
|---|---|
| No. | Request Text | Retailers' Position |
| b | All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom You paid, or on whose behalf You accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which You paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular pharmaceutical sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated. | Refuse to produce any documents. |
| c | All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; | Refuse to produce any documents. |
| d | Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all othertransaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity. | Refuse to produce any documents. |

EXHIBIT A-1

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| e | The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate pharmaceutical list, including NDC, SKU, UPC, pharmaceutical description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms. | Refuse to produce any documents. |
| 58 | All Documents concerning any changes in coverage for any Antidepressant Treatment, including but not limited to removing any Antidepressant Treatment from formularies or listing of any Antidepressant Treatment in a different formulary tier. | Refuse to produce any documents. |
| 59 | All correspondence with any Mail Order Pharmacy concerning Antidepressant Treatment, including but not limited to:<br>a. Documents sufficient to show reimbursement rates or schedules;<br>b. Documents sufficient to show volume of purchases of Antidepressant Treatments by mail order;<br>c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Venlafaxine or any other<br>Antidepressant Treatment to consumers. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 60 | Documents sufficient to show, by package size, dosage form and seller:a. Each purchase by You of Antidepressant Treatments;b. The gross dollar expenditures in connection with each of Your purchases of these products;c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products;d. The net dollar expenditures in connection with each of Your purchases of these products; ande. The gross and net prices You paid in connection with each of Your purchases of these products. | Refuse to produce any documents and will produce only data specifically reflecting purchases of Effexor XR and AB-rated generic versions of Effexor XR. |
| 61 | With respect to each Mail Order Pharmacy through which You sold any Venlafaxine to consumers, please provide Documents sufficient to show:  a. The identity and location of the Mail Order Pharmacy; b. The Mail Order Pharmacy's purchase of Venlafaxine, or any Antidepressant Treatment, including Documents reflecting the date you sold to the Mail Order Pharmacy. | Refuse to produce any documents. |
| 62 | Data generated or provided by IMS and Verispan in whatever format it was received from IMS or Verispan for Venlafaxine and/or any other Antidepressant Treatment (if available, with data broken out by manufacturer, form, strength, NDC and channel), during the Relevant Time Period, as follows: a. IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price; b. IMS National Sales Perspective data, including total units, extended units, total sales dollars and price; c. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price; and d. National Disease and Therapeutic Index (NDTI data). | Refuse to produce any documents. |
| 73 | Documents sufficient to show all adverse events, medication errors, or any other complaints or concerns expressed by healthcare professionals (including physicians, pharmacists, nurses, and others), consumers (including patients, family members, lawyers, and others), or government bodies (including the FDA and regulators outside the United States) related to Effexor IR or Generic Effexor IR purchased, distributed, or sold by You, including without limitation any incidence of nausea or emesis. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 79 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Antidepressant Treatments. | Refuse to produce any documents. |
| 80 | All Documents concerning generic or therapeutic substitution of Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for other Antidepressant Treatments and the effectiveness of such substitution. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 81 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Antidepressant Treatment to any generic Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 82 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from one brand name Antidepressant Treatment to another brand name Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 83 | All Documents concerning generic or therapeutic substitution involving Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for drugs. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 84 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Antidepressant Treatments to generic and/or lower-cost alternative Antidepressant Treatments. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically forAntidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 85 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Antidepressant Treatment may follow to compete with an AB-rated generic equivalent Antidepressant Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 86 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 87 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 97 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, all Documents showing each iteration of the Plan design, including but not limited to (i) whether the Plan is provided on a fee-for-service basis, as part of staff model HMO, IPA HMO, point-of-service HMO, Preferred Provider Organization, or Managed Indemnity product, or on some other basis; (ii) the premium or other payment charged to any person or other entity for coverage under the Plan; (iii) the pharmaceutical coverage, including but not limited to caps or limitations on coverage, cost sharing, step-therapy protocols, prior authorization requirements, the use of mail order (and the terms and conditions thereof); (iv) the use of an In-House Pharmacy; (v) the use of formularies, or preferred drug lists, including efforts to ensure or enhance formulary compliance, such as physician incentives or NDC lockouts; (vi) and the use of capitation or financial incentives at the physician or pharmacy level. | Refuse to produce any documents. |
| 98 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, the summary of plan benefits or other Documents used to describe the benefits and scope of coverage of each Plan and each Group entitled to coverage under each Plan for each year. | Refuse to produce any documents. |
| 99 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to describe any subcontracting or delegation by You of the management, operation, or administration of the pharmacy benefit of any Plan to any other parties, the identity of those parties, the terms of Your agreements with those parties, and any amendments thereto. | Refuse to produce any documents. |
| 100 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to show how You, from the beginning of the Relevant Time Period through the present, have determined the pharmaceutical coverage for Venlafaxine and any other Antidepressant Treatment, including but not limited to caps or limitations on coverage, cost sharing, step-care protocols, prior authorization requirements, or other limitations on coverage. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 101 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to show, from the beginning of the Relevant Time Period through the present, the method for determining a Plan's cost sharing, deductibles, exclusions from coverage, caps or limitations on coverage, and reimbursements to be paid to pharmacies for filling prescriptions for Plan members, including all Documents that concern coverage for Venlafaxine and any other Antidepressant Treatment,. | Refuse to produce any documents. |
| 102 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents concerning the coverage provided by the Plan to Plan Members for Venlafaxine or any other Antidepressant Treatment, including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions. | Refuse to produce any documents. |
| 103 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents concerning the any changes to coverage provided by the Plan to Plan Members for Venlafaxine or any other Antidepressant Treatment, including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions, from the Relevant Time Period through the present. | Refuse to produce any documents. |
| 104 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to show the coverage (including cost-sharing, deductibles, exclusions, limitations, and caps on coverage) provided by the Plan to Plan Members for each drug and all medical treatments or therapies that may be reasonable substitutes for Venlafaxine. | Refuse to produce any documents. |
| 105 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to show any changes to coverage provided by the Plan to Plan Members for Venlafaxine or any other Antidepressant Treatment, and any other medical treatments or therapies that may be reasonable substitutes for Venlafaxine. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 106 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, all Documents concerning Your policies, practices, or procedures to encourage health care providers, physicians, pharmacists, pharmacies, hospitals, and/or other health care providers to authorize or engage in therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) with respect to Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents. |
| 107 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, and that utilize formularies or preferred drug lists, all Documents concerning Your policies, practices, or procedures for creating, maintaining, promulgating, and updating the formulary or preferred drug list, including but not limited to policies, practices and procedures for determining the pharmaceutical products to be included thereon, from the beginning of the Relevant Time Period through the present. | Refuse to produce any documents. |
| 108 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, and that utilize formularies or preferred drug lists, all Documents, concerning the review, analysis, or consideration of Venlafaxine and any other Antidepressant Treatment, for inclusion thereon, including all Documents that compare or contrast Venlafaxine to any other product. | Refuse to produce any documents. |
| 109 | All Documents from the beginning of the Relevant Time Period through the present concerning Your use of step edits or step therapy, including but not limited to Documents concerning Your review, analysis, and consideration of implementing step edits or step therapy on Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents. |
| 110 | All Documents concerning Your policies, practices, or procedures, including but not limited to the use of co-pay tiers, pharmacy incentives, or physician incentives, to encourage therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand). | Refuse to produce any documents. |

| No. | Request Text | Retailers' Position |
|-----|-------------|---------------------|
| | **Retailer Responses and Objections re: Product Market** | |
| 111 | All Documents reflecting Your policies and procedures concerning the purchase, coverage, or reimbursement of Plan Members for brand name pharmaceutical products when generic alternatives, including both therapeutic alternatives and therapeutic equivalents, are available. | Refuse to produce any documents. |
| 112 | All Documents from the beginning of the Relevant Time Period through the present concerning Your rate of therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) for all of Your Plans and the effectiveness of any efforts to encourage either such substitution. | Refuse to produce any documents. |
| 114 | All Documents concerning any guidelines, instructions, manuals, materials, processes, or procedures used by or provided to any pharmacy and therapeutics ("P&T") committee, formulary review committee, financial review committee, or similar bodies with input into decisions regarding formulary listings, preferred drug listings, coverage restrictions, caps on coverage, or similar limitations. | Refuse to produce any documents. |
| 115 | All Documents concerning the evaluation, consideration, analysis or discussion of Venlafaxine or any other Antidepressant Treatment by any P&T committee, formulary review committee, financial review committee, or similar bodies with input into decisions regarding formulary listings, preferred drug listings, coverage restrictions, caps on coverage, or similar limitations, including but not limited to minutes of meetings, reports of results, and Documents considered. | Refuse to produce any documents. |
| 116 | Documents sufficient to show the membership of each P&T committee, formulary review committee, financial review committee, or similar body that evaluated, considered, analyzed, or discussed Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents. |
| 117 | All documents concerning any agreement with any drug manufacturer regarding the preferential treatment of any pharmaceutical product in comparison with any other pharmaceutical product in the same therapeutic class on any Plan formulary or preferred drug list. | Refuse to produce any documents. |
| 119 | All Documents concerning any agreements with or policies applicable to any pharmacy regarding the enforcement or use of Your formularies, preferred drug lists, Plan coverage restrictions or limitations, clinical programs, quality-assurance programs, or drug adherence programs. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 123 | All Documents concerning reports in Consumer Reports' Best Buy Drugs regarding Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents. |
| 124 | Documents sufficient to show the cost for You to fill a prescription at any of Your In-house or mail-order pharmacies. | Refuse to produce any documents. |
| 125 | Documents concerning the effectiveness and/or performance of Your in-house or mail-order pharmacies, and retail pharmacies in driving utilization from one pharmaceutical product to another pharmaceutical product. | Refuse to produce any documents. |
| 126 | Documents sufficient to show all pharmaceutical drugs for which one of Your Plans requires or previously required a (i) prior authorization or (ii) a step-edit or step therapy requirement and the effectiveness of each strategy. | Refuse to produce any documents. |
| 127 | Documents sufficient to show from the beginning of the Relevant Time Period through the present each Plan that did not cover Venlafaxine and the year in which Venlafaxine was not covered. | Refuse to produce any documents. |
| 130 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Antidepressant Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents. |
| 136 | All Documents concerning any communication between or among You and any other Plaintiff concerning any Antidepressant Treatment, including Effexor XR and Effexor IR, or any potential generic thereof. | Refuse to produce any documents. |

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 5 | All Documents concerning patients' ability or willingness to switch from Effexor XR to Generic Effexor XR, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to: a. All Documents concerning patients' ability or willingness to switch from Effexor XR to Generic Effexor XR. b. All Documents concerning patients' ability or willingness to switch from Effexor XR to Effexor IR. c. All Documents concerning patients' ability or willingness to switch from Effexor XR to any other Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 11 | All Documents, irrespective of date, concerning Effexor IR or Generic Effexor IR. | Refuse to produce any documents. |
| 12 | All Documents concerning patients' ability or willingness to switch from Effexor IR to another drug product, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to: All Documents concerning patients' ability or willingness to switch from Effexor IR to Generic Effexor IR. b. All Documents concerning patients' ability or willingness to switch from Effexor IR to Effexor XR. c. All Documents concerning patients' ability or willingness to switch from Effexor IR to any other Antidepressant Treatment. | Refuse to produce any documents. |
| 13 | All Documents concerning the introduction of Generic Effexor IR into the United States, including but not limited to Documents concerning Your awareness, understanding, or expectations regarding (a) the expected market share of penetration rate of Generic Effexor IR and (b) the expected price of Generic Effexor IR. | Refuse to produce any documents. |
| 14 | All Documents regarding the impact of the introduction of Generic Effexor IR on Your business, including but not limited to any assessments of sales, pricing, or volume changes resulting from such introduction. | Refuse to produce any documents. |
| 15 | All Documents regarding plans or strategies for responding to the introduction of Generic Effexor IR. | Refuse to produce any documents. |
| 16 | All Documents concerning the promotion, marketing, or sales of Venlafaxine and/or any other Antidepressant Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

EXHIBIT A-1

| | **EPP Responses and Objections re: Product Market** | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 17 | All Documents concerning any communication with any Defendant relating to any Antidepressant Treatment. | Refuse to produce any documents. |
| 18 | All analyses, studies, reports, forecasts, or budgets concerning Venlafaxine and/or any other Antidepressant Treatment sold in the United States. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 19 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Antidepressant Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 20 | All Documents concerning the types of conditions or indications for which physicians or health care providers have prescribed or may prescribe any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 21 | All Documents concerning the factors that a physician or health care provider considers or may consider in deciding which Antidepressant Treatment to prescribe, including but not limited to efficacy, formulation, dosage, availability of extended release formulations, side effects, patient tolerance, patient adherence, price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 22 | All Documents concerning comparisons between and among different Antidepressant Treatments, including but not limited to any analyses of actual, projected, or claimed benefit, harm, improvement, therapeutic equivalence, similarity or difference between or among them. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 23 | All Documents concerning the sale of, market share of, or competition between or among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 24 | All Documents concerning any policies, procedures, or standards concerning the prescribing of Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

EXHIBIT A-1

| No. | Request Text | EPPs' Position |
|-----|--------------|----------------|
| | **EPP Responses and Objections re: Product Market** | |
| 25 | All Documents concerning any actual or potential substitution or interchangeability between and among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic), including "off label" uses. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 26 | All Documents concerning any assessment by You or anyone else of the efficacy of any Antidepressant Treatment. | Refuse to produce any documents. |
| 27 | All Documents concerning the dosing regimens for and/or methods of administration of any Antidepressant Treatment, whether labeled, physician-directed, pharmacist-directed, or otherwise. | Refuse to produce any documents. |
| 28 | All Documents concerning any comparisons between or among different dosage strengths, dosage forms, dosing regimens, active ingredients, side effects, adverse events, and formulations of Antidepressant Treatments. | Refuse to produce any documents. |
| 29 | All Documents regarding any potential entry of an AB-rated generic version of Effexor XR, Effexor IR, and/or any other Antidepressant Treatment, including those listed in Appendix A. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 30 | All Documents concerning communications with physicians, health care providers, hospitals, pharmacies, pharmacy benefit managers, governmental organizations, health insurers, professional organizations, or publication editors concerning the relative safety and effectiveness of any Antidepressant Treatment. | Refuse to produce any documents. |
| 31 | All Documents concerning switching between Antidepressant Treatments, including the frequency, safety, effectiveness, or reasons for switching or not switching from one Antidepressant Treatment to another. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 32 | All Documents concerning switching between any Antidepressant Treatments occurring at the Pharmacy, with or without physician notification. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 33 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 34 | All Documents concerning the relative price or cost of Antidepressant Treatments, including Effexor XR and Effexor IR. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 35 | All Documents concerning Authorized Generic versions of Antidepressant Treatments, including any discussion or analysis concerning Authorized Generic pricing, managed care coverage or coverage determinations, promotion and marketing, market impact, substitutability, and patient preference. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 36 | All Documents comparing Effexor XR with Effexor IR for the treatment of depression, general anxiety disorder, social anxiety disorder, and/or panic attacks, including but not limited to Documents concerning efficacy, safety, and cost. | Refuse to produce any documents. |
| 37 | All Documents comparing Effexor XR with Generic Effexor XR for the treatment of depression, general anxiety disorder, social anxiety disorder, and/or panic attacks, including but not limited to Documents concerning efficacy, safety, and cost. | Refuse to produce any documents regarding "efficacy" or "safety," instead limiting the response to "cost." |
| 38 | All Documents comparing tablets to capsules for any pharmaceutical that You have reimbursed plan members for, including but not limited to reports, summaries of research, planning Documents, research, marketing materials, and questionnaires for patients or healthcare professionals, concerning the relative safety, efficacy, cost marketability, level of patient compliance, or patient preference for one as against the other. | Refuse to produce any documents. |
| 39 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Venlafaxine and/or any other Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 40 | All Documents concerning contractual negotiations between You and Defendants, or any other party, related to the purchase of Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents. |
| 41 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Venlafaxine, or any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| 42 | All contracts and/or agreements between You and Pharmacies, Pharmacy buying groups, Pharmacy benefit managers, third-party payors, concerning Your purchases and reimbursements of Venlafaxine or any other Antidepressant Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 43 | All contracts and/or agreements related to Your generic source/formulary program with any Pharmacy and/or Pharmacy buying group customers. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 45 | A copy of each formulary or drug list on which any Antidepressant Treatments is listed. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 46 | All Documents concerning the consideration of (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets, including all Documents that compare or contrast (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets to any other product. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 47 | All Documents sufficient to identify any Antidepressant Treatment which you have purchased or for which you have provided reimbursement. | Refuse to produce any documents. |
| 48 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatments, Documents sufficient to show Your determination of the premiums, negotiated monies, and/or employer contributions required by the Plan, including, but not limited to, all Documents concerning the determination of the premium, negotiated monies, and/or employer contributions required for (1) prescription drug coverage generally and (2) Venlafaxine and any other Antidepressant Treatments. | Refuse to produce any documents. |
| 49 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatments, Documents sufficient to show each state in which the Plan provides or has provided coverage. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

**EPP Responses and Objections re: Product Market**

| No. | Request Text | EPPs' Position |
|---|---|---|
| 50 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatments, Documents sufficient to describe the benefits and scope of coverage of the Plan and each group entitled to coverage under it for each year. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 51 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show for each year, the number of Plan Members enrolled in each Plan, their geographic distribution (by state), and the number of Plan Members who received benefits in connection with any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 52 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, the summary of plan benefits or other Documents used to describe the benefits and scope of coverage of each Plan and each Group entitled to coverage under each Plan for each year. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 53 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to describe any subcontracting or delegation by You of the management, operation, or administration of the Pharmacy benefit of any Plan to any other parties, the identity of those parties, the terms of Your agreements with those parties, and any amendments thereto. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 54 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show any risk sharing or other agreements between You and any Pharmacy benefit manager, self-funded Plan, insurance company, third party administrator, actuarial advisor/consultant, financial advisor/consultant, investment advisor/consultant, or other entity with regard to the Pharmacy benefit. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

EPP Responses and Objections re: Product Market

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | EPPs' Position |
| 55 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, all Documents showing each iteration of the Plan design, including but not limited to, whether the Plan is provided on a fee-for-service basis, as part of staff model HMO, IPA HMO, point-of-service HMO, Preferred Provider Organization, or Managed Indemnity product, or on some other basis; the premium, negotiated monies, and/or employer contributions structure; the Pharmacy coverage, including but not limited to caps or limitations on coverage, cost sharing, step-care protocols, prior authorization requirements, the use of mail order (and the terms and conditions thereof); the use of an In-House Pharmacy; the use of formularies, formulary compliance policies, preferred drug lists, physician incentives, or NDC lockouts; the use of capitation at the physician or Pharmacy level; and the use of mechanisms, if any, to ensure formulary compliance. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 56 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show how You determine or have determined the Pharmacy coverage for Venlafaxine and other Antidepressant Treatments, including but not limited to caps or limitations on coverage, cost-sharing, step-care protocols, prior authorization requirements, or other limitations on coverage. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 57 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the premiums, negotiated monies, and/or employer contributions collected in connection with the Plan, and the portion of total premiums, negotiated monies, and/or employer contributions associated with the various categories of coverage provided, including the Pharmacy benefit and amounts associated or related with Your providing coverage for Venlafaxine, and any other Antidepressant Treatments. | Refuse to produce any documents. |
| 58 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the amounts You spent in providing coverage in connection with the Plan, and, the total associated with the Pharmacy benefit and the amount associated with Your providing coverage for Venlafaxine and any other Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | EPPs' Position |
| 59 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show Your financial status at the end of each Plan year and the operating performance for each Plan year, including Your assets and liabilities at the end of each year, cash flows into and out of the fund over the course of each year, any target balance for the fund set by management overseeing the fund, and overall profit and loss or similar financial statements each year. | Refuse to produce any documents. |
| 60 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the profitability or increases in net assets of the Plan or the Pharmacy component thereof, including all Documents concerning the profitability of Your providing coverage for Venlafaxine and any other Antidepressant Treatments. | Refuse to produce any documents. |
| 61 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the Plan's method of determining cost sharing, such as co-pays or deductibles to be paid by groups or Plan Members; exclusions from coverage; caps or limitations on coverage; and reimbursements to be paid to pharmacies for filling prescriptions for Plan Members, including all Documents that concern coverage for Venlafaxine and any Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 62 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, all Documents concerning Your efforts to notify any governmental agency, or obtain any governmental agency's approval of, premiums, negotiated monies, and/or employer contributions to be charged by You for coverage under the Plan. | Refuse to produce any documents. |
| 63 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the coverage and all changes to coverage provided by the Plan to Plan Members including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 64 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the coverage (including cost-sharing, deductibles, exclusions, limitations, and caps on coverage) provided by the Plan to Plan Members for each drug and all medical treatments or therapies that may be reasonable substitutes for Venlafaxine. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 65 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show any changes to coverage provided by the Plan to Plan Members for any Antidepressant Treatment, and any other medical treatments or therapies that may be reasonable substitutes for Venlafaxine. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 66 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, all Documents concerning Your policies or procedures to encourage health care providers, physicians, pharmacists, pharmacies, hospitals, and/or other health care providers to authorize or engage in therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) with respect to Venlafaxine or any other Antidepressant Treatments, and the effectiveness of such policies and procedures. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 67 | All Documents from the beginning of the Relevant Time Period through the present concerning Your rate of therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) for all of Your Plans and the effectiveness of any efforts to encourage either such substitution. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 68 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment that utilizes formularies or preferred drug lists, all Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or preferred drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 69 | For each Plan that utilizes formularies or preferred drug lists and under which You provide or have provided coverage for any Antidepressant Treatment, all Documents concerning the review, analysis, or consideration of Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 70 | All Documents concerning Your use of step edits or step therapy, including but not limited to Documents concerning Your review, analysis, and consideration of implementing step edits or step therapy on any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| 71 | For purchases or reimbursements of any Antidepressant Treatment: a. Each of Your reimbursements for prescriptions filled by Plan Members (by Plan Member, date, and amount); b. Documents sufficient to show to whom payment was made and where; and c. Any co-pay, co-insurance or deductible paid by the Plan Member. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 72 | With respect to each Pharmacy You reimbursed or otherwise paid in connection with the dispensing of any Antidepressant Treatment, please provide:a. Documents sufficient to show the identity and location of the Pharmacy;b. All agreements between You and the Pharmacy, including any amendment thereto and all Documents concerning the enrollment of the Pharmacy as a participating Pharmacy;c. Documents sufficient to show reimbursement rates or schedules;d. Documents sufficient to show Your maximum allowable costs or reimbursement rates;e. All correspondence with the Pharmacy concerning Venlafaxine or any other Antidepressant Treatment;f. Documents sufficient to show (by date, location, and Plan affiliation) the amount of Venlafaxine or any other Antidepressant Treatment (in unit and dollar terms)dispensed by the Pharmacy to Plan Members; andDocuments sufficient to show the reimbursement or other payments, including dispensing fees, made by You to the Pharmacy (by date, location, and Plan affiliation) in connection with the Pharmacy's dispensing of Venlafaxine or any other Antidepressant Treatment to Plan Members. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 73 | If You purchased pharmaceutical products (as contrasted to reimbursing pharmacies or Plan Members in connection with purchases of Plan Members), please provide Documents sufficient to show, by package size, dosage form, and seller: a. Each purchase by You of Venlafaxine or any Antidepressant Treatment; b. The gross dollar expenditures in connection with each of Your purchases of these products; c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products; d. The net dollar expenditures in connection with each of Your purchases of these products; and e. The gross and net prices You paid in connection with each of Your purchases of these products. | Refuse to produce any documents. |

EPP Responses and Objections re: Product Market

EXHIBIT A-1

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 74 | With respect to each In-House Pharmacy through which You dispensed Venlafaxine, or any Antidepressant Treatment to Plan Members, please provide Documents sufficient to show:a. The identity and location of the In-House Pharmacy; andb. The In-House Pharmacy's dispensing of Venlafaxine or any Antidepressant Treatment, including Documents reflecting the date the product was dispensed, the dosage form, the co-pay, co-insurance or deductible paid by the Plan Member, and any other consideration You received. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 75 | All Documents reflecting Your policies and procedures concerning the purchase, coverage, or reimbursement of Plan Members for brand name pharmaceutical products when generic alternatives, including both therapeutic alternatives and therapeutic equivalents, are available. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 76 | All Documents concerning any changes in coverage for Venlafaxine or any Antidepressant Treatment, including but not limited to removing Venlafaxine from formularies or listing Venlafaxine in a different formulary tier. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 77 | All Documents concerning the actual or projected costs or utilization rates for Venlafaxine or any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 78 | All Documents showing the actual, projected, or estimated prescription drug cost for each of Your Plans for Venlafaxine or any Antidepressant Treatment, including but not limited to any Documents and data considered in any calculation or estimate of such costs. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 81 | Documents sufficient to show (by year), reimbursement rates Paid by You for Venlafaxine with each entity listed in Appendix B (25 Largest Retailers). | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| 82 | All correspondence with any Mail Order Pharmacy concerning Antidepressant Treatment, including but not limited to:<br>a. Documents sufficient to show reimbursement rates or schedules;<br>b. Documents sufficient to show volume of purchases of Antidepressant Treatments by mail order;<br>c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Venlafaxine or any other Antidepressant Treatment to consumers. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 83 | Documents sufficient to show, by package size, dosage form and seller:a. Each purchase by You of Antidepressant Treatments;b. The gross dollar expenditures in connection with each of Your purchases of these products;c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products;d. The net dollar expenditures in connection with each of Your purchases of these products; ande. The gross and net prices You paid in connection with each of Your purchases of these products. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 86 | Data generated or provided by IMS and Verispan in whatever format it was received from IMS or Verispan for Venlafaxine and/or any other Antidepressant Treatment (if available, with data broken out by manufacturer, form, strength, NDC and channel), during the Relevant Time Period, as follows:<br>a. IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price;<br>b. IMS National Sales Perspective data, including total units, extended units, total sales dollars and price;<br>c. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price; and<br>d. National Disease and Therapeutic Index (NDTI data). | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 97 | Documents sufficient to show all adverse events, medication errors, or any other complaints or concerns expressed by healthcare professionals (including physicians, pharmacists, nurses, and others), consumers (including patients, family members, lawyers, and others), or government bodies (including the FDA and regulators outside the United States) related to Effexor IR or Generic Effexor IR purchased, distributed, or sold by You, including without limitation any incidence of nausea or emesis. | Refuse to produce any documents. |

**EPP Responses and Objections re: Product Market**

EXHIBIT A-1

## EPP Responses and Objections re: Product Market

| No. | Request Text | EPPs' Position |
|---|---|---|
| 103 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Antidepressant Treatments. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 104 | All Documents concerning generic or therapeutic substitution of Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for other Antidepressant Treatments and the effectiveness of such substitution. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 105 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Antidepressant Treatment to any generic Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 106 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from one brand name Antidepressant Treatment to another brand name Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 107 | All Documents concerning generic or therapeutic substitution involving Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for drugs. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| 108 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Antidepressant Treatments to generic and/or lower-cost alternative Antidepressant Treatments. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 109 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Antidepressant Treatment may follow to compete with an AB-rated generic equivalent Antidepressant Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 110 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 111 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 112 | All Documents concerning the services provided by or made available to You by any Pharmacy benefit manager, claims administrator, insurance provider, actuary, or health benefits consultant concerning any Antidepressant Treatment, including but not limited to any agreements between You and such vendors. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| | **EPP Responses and Objections re: Product Market** | |
| 135 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Antidepressant Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 141 | All Documents concerning any communication between or among You and any other Plaintiff concerning any Antidepressant Treatment, including Effexor XR and Effexor IR, or any potential generic thereof. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 148 | Documents sufficient to identify the physician or other medical professionals who treated Individual IPP Plaintiff for the condition that precipitated the prescription of any Antidepressant Treatment. | Refuse to produce any documents. |
| 149 | All Documents that reflect or refer to any payment or reimbursement by any insurance, indemnification, prescription benefit, or health plan for purchases by Individual IPP Plaintiff of any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 150 | All Documents that relate to Individual IPP Plaintiff's willingness or unwillingness to use generic or branded generic rather than branded drugs, including labels of all prescription and over-the-counter medications in Individual IPP Plaintiff's possession, and Documents that relate to any purchase by Individual IPP Plaintiff of prescription or over-the counter medications. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 151 | All Documents relating to any generic substitution program, policy, or Plan that Individual IPP Plaintiff's insurer has implemented or considered implementing. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 152 | All Documents relating to the factors that did or may influence Individual IPP Plaintiff's purchasing decisions with respect to any Antidepressant Treatment, including the role of price, brand name, patents, side effects, dosing regimen, or other factors influencing such decisions. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 153 | Documents concerning Individual IPP Plaintiff's switch or failure to switch between and among any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| **EPP Responses and Objections re: Product Market** |||
| 154 | Documents sufficient to show duration of Individual IPP Plaintiff's use or nonuse of Venlafaxine, and/or any other Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |
| 155 | Documents concerning Individual IPP Plaintiff's use of co-pay coupons, free samples, or other financial assistance in connection with his use of any Antidepressant Treatment. | Refuse to produce any documents other than those specifically referencing Effexor/Venlafaxine or five additional drugs along with the words class*, therapeut*, categor*, substitut*, or interchange*. |

# Exhibit A-2

**EXHIBIT A-2**

**OBJECTIONS TO PRODUCING BUSINESS INFORMATION[1]**

| | DPP Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 1 | Documents sufficient to show Your organizational or business structure, including that of Your subsidiaries or affiliates, and the commercial relationships between and among You and Your subsidiaries or affiliates and any changes thereto since January 1, 2005. | Refuse to produce any organizational charts related to business operations involving customers. |
| 2 | Organizational charts, personnel directories, telephone directories, and electronic mail user and address lists sufficient to show all personnel:<br>a. with any responsibility for the purchase or sale of pharmaceutical products, including but not limited to any Antidepressant Treatments, and all employees to whom they report directly or indirectly;<br>b. with any responsibility for the purchase or reimbursement of any Antidepressant Treatment;<br>c. with any responsibility for negotiating any rebates or overall discounts with parties from whom You purchase Antidepressant Treatments;<br>d. with any responsibility for Pharmacy operations, including those administering any policies or practices related to therapeutic substitution; and<br>e. all senior management to whom the individuals identified in (b)-(d) report directly or indirectly. | Refuse to produce any organizational charts related to business operations involving customers. |
| 8 | All Documents concerning the introduction of Generic Effexor XR into the United States, including but not limited to Documents concerning Your awareness, understanding, or expectations regarding (a) the identity of any potential manufacturer of Generic Effexor XR; (b) the status of any ANDA concerning Generic Effexor XR; (c) any impediments to or delays in the launch of Generic Effexor XR (including but not limited to manufacturer problems and related issues); (d) the expected date for market entry for Generic Effexor XR; (e) the expected market share of penetration rate of Generic Effexor XR; and (f) the expected price of Generic Effexor XR. | Refuse to produce any documents unless they relate to the purchase of Generic Effexor XR. |
| 10 | All Documents regarding plans or strategies for responding to the introduction of Generic Effexor XR and/or Venlafaxine XR Tablets. | Refuse to produce documents relating to strategies or plans other than those relating to purchases. |

---

[1]   Given the length of the objections here, this exhibit identifies Plaintiffs' position only with respect to business information issues, and is not a complete description of all objections Plaintiffs may have made.

| | DPP Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | DPPs' Position |
| 13 | All Documents concerning the introduction of Generic Effexor IR into the United States, including but not limited to Documents concerning Your awareness, understanding, or expectations regarding (a) the expected market share of penetration rate of Generic Effexor IR and (b) the expected price of Generic Effexor IR. | Refuse to produce any documents relevant to Effexor IR (only relevant to the purchase of Effexor XR/ab-rated generic versions of Effexor XR). |
| 15 | All Documents regarding plans or strategies for responding to the introduction of Generic Effexor IR. | Refuse to produce any documents unless they relate to the purchase of Generic Effexor IR. |
| 16 | All Documents concerning the promotion, marketing, or sales of Venlafaxine and/or any other Antidepressant Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents that might be considered "downstream." |
| 18 | All analyses, studies, reports, forecasts, or budgets concerning Venlafaxine and/or any other Antidepressant Treatment sold in the United States. | Refuse to produce any documents that might be considered "downstream"; Will not produce analyses, studies, reports, forecasts, or budgets (will only produce purchase related documents). |
| 19 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Antidepressant Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents that might be considered "downstream"; Refuse to produce any documents concerning coverage or reimbursement (will only produce purchase related documents). |
| 23 | All Documents concerning the sale of, market share of, or competition between or among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents that might be considered "downstream." |
| 25 | All Documents concerning any actual or potential substitution or interchangeability between and among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic), including "off label" uses. | Refuse to produce any documents that might be considered "downstream." |
| 33 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Antidepressant Treatments. | Refuse to produce any documents. |

| | DPP Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 34 | All Documents concerning the relative price or cost of Antidepressant Treatments, including Effexor XR and Effexor IR. | Refuse to produce any documents that might be considered "downstream." |
| 35 | All Documents concerning Authorized Generic versions of Antidepressant Treatments, including any discussion or analysis concerning Authorized Generic pricing, managed care coverage or coverage determinations, promotion and marketing, market impact, substitutability, and patient preference. | Refuse to produce any documents that might be considered "downstream." |
| 38 | A copy of each formulary or drug list on which any Antidepressant Treatment is listed. | Refuse to produce any documents. |
| 39 | All Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents. |
| 40 | All Documents concerning the consideration of (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets, including all Documents that compare or contrast (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets to any other product. | Refuse to produce any documents. |
| 41 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Venlafaxine and/or any other Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream"; Refuse to produce any documents concerning sale or reimbursement (will only produce purchase related documents). |
| 42 | All Documents concerning contractual negotiations between You and Defendants, or any other party, related to the purchase of Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 43 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Venlafaxine, or any Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |

| | DPP Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | DPPs' Position |
| 44 | All contracts and/or agreements between You and any national account customers, pharmacies, pharmacy buying groups, pharmacy benefit managers, third-party payors, or institutional customers, concerning Your sales of Venlafaxine or any other Antidepressant Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents. |
| 45 | All contracts and/or agreements related to Your generic source/formulary program with any Pharmacy and/or Pharmacy buying group customers. | Refuse to produce any documents. |
| 46 | All contracts and/or agreements in Your possession, custody or control, between You (or Your Assignor) and any pharmaceutical retailer including, but not limited to Retailer Plaintiffs. | Refuse to produce any documents. |
| 49 | All opinions, comparisons, studies, or analyses describing any practice, custom, or policy of selling pharmaceuticals on a cost-plus basis that could be relevant to or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 51 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 52 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, generic pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 53 | All Documents related to any price adjustment given to any purchaser concerning any Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 54 | Any of Your communications regarding formularies or preferred drug lists referencing any Antidepressant Treatment. | Refuse to produce any documents. |

| DPP Responses and Objections re: Business Information | | |
|---|---|---|
| No. | Request Text | DPPs' Position |
| | Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format sufficient to identify sales of Venlafaxine and/or any other Antidepressant Treatment by You during the Relevant Time Period in transaction-by-transactionformat, as follows:a. All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) pharmaceutical description, (xii) pharmaceutical form, (xiii) pharmaceutical strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like). | Refuse to produce any documents. |
| 57 | b. All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom You paid, or on whose behalf You accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which You paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular pharmaceutical sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated. | Refuse to produce any documents. |

| DPP Responses and Objections re: Business Information | | |
|---|---|---|
| No. | Request Text | DPPs' Position |
| | c. All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code;d. Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all other transaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity. | Refuse to produce any documents. |
| | e. The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate pharmaceutical list, including NDC, SKU, UPC, pharmaceutical description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms. | Refuse to produce any documents. |
| 58 | All Documents concerning any changes in coverage for any Antidepressant Treatment, including but not limited to removing any Antidepressant Treatment from formularies or listing of any Antidepressant Treatment in a different formulary tier. | Refuse to produce any documents. |

| DPP Responses and Objections re: Business Information | | |
|---|---|---|
| No. | Request Text | DPPs' Position |
| 59 | All correspondence with any Mail Order Pharmacy concerning AntidepressantTreatment, including but not limited to:a. Documents sufficient to show reimbursement rates or schedules;b. Documents sufficient to show volume of purchases of Antidepressant Treatments by mail order;c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Venlafaxine or any other Antidepressant Treatment to consumers. | Refuse to produce any documents. |
| 61 | With respect to each Mail Order Pharmacy through which You sold any Venlafaxine to consumers, please provide Documents sufficient to show:<br>a. The identity and location of the Mail Order Pharmacy;<br>b. The Mail Order Pharmacy's purchase of Venlafaxine, or any Antidepressant Treatment, including Documents reflecting the date you sold to the Mail Order Pharmacy. | Refuse to produce any documents. |
| 73 | Documents sufficient to show all adverse events, medication errors, or any other complaints or concerns expressed by healthcare professionals (including physicians, pharmacists, nurses, and others), consumers (including patients, family members, lawyers, and others), or government bodies (including the FDA and regulators outside the United States) related to Effexor IR or Generic Effexor IR purchased, distributed, or sold by You, including without limitation any incidence of nausea or emesis. | Refuse to produce any documents. |
| 79 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Antidepressant Treatments. | Refuse to produce any documents that might be considered "downstream." |
| 80 | All Documents concerning generic or therapeutic substitution of Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for other Antidepressant Treatments and the effectiveness of such substitution. | Refuse to produce any documents that might be considered "downstream." |
| 81 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Antidepressant Treatment to any generic Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |

| | DPP Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 82 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from one brand name Antidepressant Treatment to another brand name Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 83 | All Documents concerning generic or therapeutic substitution involving Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for drugs. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 84 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Antidepressant Treatments to generic and/or lower-cost alternative Antidepressant Treatments. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 85 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Antidepressant Treatment may follow to compete with an AB-rated generic equivalent Antidepressant Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |

| DPP Responses and Objections re: Business Information | | |
|---|---|---|
| No. | Request Text | DPPs' Position |
| 86 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 87 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 88 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of Effexor XR would be more or less profitable than distribution and/or servicing of Generic Effexor XR and/or Venlafaxine XR Tablets. | Refuse to produce any documents. |
| 89 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of Effexor IR would be more or less profitable than distribution and/or servicing of Generic Effexor IR. | Refuse to produce any documents. |
| 90 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of brand-name pharmaceuticals would be more or less profitable than distribution and/or servicing of generic versions of brand-name pharmaceuticals. | Refuse to produce any documents. |
| 101 | All Documents, irrespective of date, relating to any method of computation for injury or damages sustained by You, Your insureds, members, beneficiaries, or plan participants, or any member of the alleged class as a result of Defendants' conduct as alleged in the Complaint. | Refuse to produce any documents. |
| 108 | If You base any claims on an assignment, Documents sufficient to show, for all periods for which You claim damages, each agreement in place between Your Assignor and any customer of Your Assignor that directly or indirectly specified the terms of sale for Effexor XR. | Refuse to produce any documents. |

| **DPP Responses and Objections re: Business Information** | | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 112 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Antidepressant Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 1 | Documents sufficient to show Your organizational or business structure, including that of Your subsidiaries or affiliates, and the commercial relationships between and among You and Your subsidiaries or affiliates and any changes thereto since January 1, 2005. | Refuse to produce any documents. |
| 2 | Organizational charts, personnel directories, telephone directories, and electronic mail user and address lists sufficient to show all personnel: a. with any responsibility for the purchase or sale of pharmaceutical products, including but not limited to any Antidepressant Treatments, and all employees to whom they report directly or indirectly; b. with any responsibility for the purchase or reimbursement of any Antidepressant Treatment; c. with any responsibility for negotiating any rebates or overall discounts with parties from whom You purchase Antidepressant Treatments; d. with any responsibility for Pharmacy operations, including those administering any policies or practices related to therapeutic substitution; and e. all senior management to whom the individuals identified in (b)-(d) report directly or indirectly. | Refuse to produce any organizational charts from before January 14, 2008 or after December 31, 2012; Refuse to produce organizational charts for relevant departments other than pharmacy purchasing departments. |
| 3 | All Documents, irrespective of date, concerning Effexor XR or Generic Effexor XR. | Refuse to produce any documents relevant to issues other than the sales or any other business operations (other than purchases) related to Effexor XR or Generic Effexor XR. |
| 5 | All Documents concerning patients' ability or willingness to switch from Effexor XR to Generic Effexor XR, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to:   a. All Documents concerning patients' ability or willingness to switch from Effexor XR to Generic Effexor XR. b. All Documents concerning patients' ability or willingness to switch from Effexor XR to Effexor IR. c. All Documents concerning patients' ability or willingness to switch from Effexor XR to any other Antidepressant Treatment. | Refuse to produce any documents. |

| Retailer Responses and Objections re: Business Information | | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 9 | All Documents regarding the impact of the introduction of Generic Effexor XR and/or Venlafaxine XR Tablets on Your business, including but not limited to any assessments of sales, pricing, or volume changes resulting from such introduction. | Refuse to produce any documents relating to changes in sales, pricing, or volume resulting from introduction (will only produce documents relating to changes in purchases). |
| 10 | All Documents regarding plans or strategies for responding to the introduction of Generic Effexor XR and/or Venlafaxine XR Tablets. | Refuse to produce any documents that might be considered "downstream." |
| 11 | All Documents, irrespective of date, concerning Effexor IR or Generic Effexor IR. | Refuse to produce any documents. |
| 12 | All Documents concerning patients' ability or willingness to switch from Effexor IR to another drug product, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to:<br>a. All Documents concerning patients' ability or willingness to switch from Effexor IR to Generic Effexor IR.<br>b. All Documents concerning patients' ability or willingness to switch from Effexor IR to Effexor XR.<br>c. All Documents concerning patients' ability or willingness to switch from Effexor IR to any other Antidepressant Treatment. | Refuse to produce any documents. |
| 13 | All Documents concerning the introduction of Generic Effexor IR into the United States, including but not limited to Documents concerning Your awareness, understanding, or expectations regarding (a) the expected market share of penetration rate of Generic Effexor IR and (b) the expected price of Generic Effexor IR. | Refuse to produce any documents that might be considered "downstream." |
| 14 | All Documents regarding the impact of the introduction of Generic Effexor IR on Your business, including but not limited to any assessments of sales, pricing, or volume changes resulting from such introduction. | Refuse to produce any documents that might be considered "downstream"; Refuse to produce any documents relating to changes in sales, pricing, or volume resulting from introduction (will only produce documents relating to changes in purchases). |
| 15 | All Documents regarding plans or strategies for responding to the introduction of Generic Effexor IR. | Refuse to produce any documents that might be considered "downstream"; Refuse to produce documents relating to strategies or plans other than those relating to purchases. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 16 | All Documents concerning the promotion, marketing, or sales of Venlafaxine and/or any other Antidepressant Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents that might be considered "downstream." |
| 18 | All analyses, studies, reports, forecasts, or budgets concerning Venlafaxine and/or any other Antidepressant Treatment sold in the United States. | Refuse to produce any documents that might be considered "downstream;" Will not produce analyses, studies, reports, forecasts, or budgets (will only produce purchase related documents). |
| 19 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Antidepressant Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents that might be considered "downstream;" Will not produce analyses, studies, reports, forecasts, or budgets (will only produce purchase related documents). |
| 20 | All Documents concerning the types of conditions or indications for which physicians or health care providers have prescribed or may prescribe any Antidepressant Treatment. | Refuse to produce any documents. |
| 22 | All Documents concerning comparisons between and among different Antidepressant Treatments, including but not limited to any analyses of actual, projected, or claimed benefit, harm, improvement, therapeutic equivalence, similarity or difference between or among them. | Refuse to produce any documents that might be considered "downstream." |
| 23 | All Documents concerning the sale of, market share of, or competition between or among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents that might be considered "downstream." |
| 25 | All Documents concerning any actual or potential substitution or interchangeability between and among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic), including "off label" uses. | Refuse to produce any documents that might be considered "downstream." |

13

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 26 | All Documents concerning any assessment by You or anyone else of the efficacy of any Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 27 | All Documents concerning the dosing regimens for and/or methods of administration of any Antidepressant Treatment, whether labeled, physician-directed, pharmacist-directed, or otherwise. | Refuse to produce any documents. |
| 28 | All Documents concerning any comparisons between or among different dosage strengths, dosage forms, dosing regimens, active ingredients, side effects, adverse events, and formulations of Antidepressant Treatments. | Refuse to produce any documents that might be considered "downstream." |
| 30 | All Documents concerning communications with physicians, health care providers, hospitals, pharmacies, pharmacy benefit managers, governmental organizations, health insurers, professional organizations, or publication editors concerning the relative safety and effectiveness of any Antidepressant Treatment. | Refuse to produce any documents |
| 31 | All Documents concerning switching between Antidepressant Treatments, including the frequency, safety, effectiveness, or reasons for switching or not switching from on Antidepressant Treatment to another. | Refuse to produce any documents that might be considered "downstream." |
| 32 | All Documents concerning switching between any Antidepressant Treatments occurring at the Pharmacy, with or without physician notification. | Refuse to produce any documents that might be considered "downstream." |
| 33 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Antidepressant Treatments. | Refuse to produce any documents. |
| 34 | All Documents concerning the relative price or cost of Antidepressant Treatments, including Effexor XR and Effexor IR. | Refuse to produce any documents that might be considered "downstream." |
| 35 | All Documents concerning Authorized Generic versions of Antidepressant Treatments, including any discussion or analysis concerning Authorized Generic pricing, managed care coverage or coverage determinations, promotion and marketing, market impact, substitutability, and patient preference. | Refuse to produce any documents that might be considered "downstream." |
| 38 | A copy of each formulary or drug list on which any Antidepressant Treatment is listed. | Refuse to produce any documents. |
| 39 | All Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents. |

| Retailer Responses and Objections re: Business Information | | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 40 | All Documents concerning the consideration of (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets, including all Documents that compare or contrast (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets to any other product. | Refuse to produce any documents. |
| 41 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Venlafaxine and/or any other Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream"; Refuse to produce any documents related to sales or reimbursement (will only produce purchase related documents). |
| 43 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Venlafaxine, or any Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 44 | All contracts and/or agreements between You and any national account customers, pharmacies, pharmacy buying groups, pharmacy benefit managers, third-party payors, or institutional customers, concerning Your sales of Venlafaxine or any other Antidepressant Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents. |
| 45 | All contracts and/or agreements related to Your generic source/formulary program with any Pharmacy and/or Pharmacy buying group customers. | Refuse to produce any documents. |
| 48 | All Documents pertaining to Your strategies, policies or practices for stocking and/or inventory of brand name prescription drugs, including documents relating to which doses or pharmaceuticals to stock that could be relevant to or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 49 | All opinions, comparisons, studies, or analyses describing any practice, custom, or policy of selling pharmaceuticals on a cost-plus basis that could be relevant to or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 51 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Antidepressant Treatments. | Refuse to produce any documents. |

| Retailer Responses and Objections re: Business Information | | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 52 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, generic pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Antidepressant Treatments. | Refuse to produce any documents. |
| 53 | All Documents related to any price adjustment given to any purchaser concerning any Antidepressant Treatment. | Refuse to produce any documents. |
| 54 | Any of Your communications regarding formularies or preferred drug lists referencing any Antidepressant Treatment. | Refuse to produce any documents. |
| 55 | All Documents sufficient to identify any Antidepressant Treatment which you have purchased or for which you have provided reimbursement. | Refuse to produce any documents or data that might be considered "downstream"; Refuse to produce documents (only will produce data). |
| 57 | Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format sufficient to identify sales of Venlafaxine and/or any other Antidepressant Treatment by You during the Relevant Time Period in transaction-by-transaction format, as follows: | Refuse to produce any documents. |
| a. | All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) pharmaceutical description, (xii) pharmaceutical form, (xiii) pharmaceutical strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like). | Refuse to produce any documents. |

| Retailer Responses and Objections re: Business Information | | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| b. | All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom You paid, or on whose behalf You accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which You paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular pharmaceutical sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated. | Refuse to produce any documents. |
| c. | All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; | Refuse to produce any documents. |
| d. | Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all other transaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity. | Refuse to produce any documents. |

| Retailer Responses and Objections re: Business Information | |
| --- | --- |
| **No.** **Request Text** | **Retailers' Position** |
| e. The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v)descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate pharmaceutical list, including NDC, SKU, UPC, pharmaceutical description, and package size; (bb) a separatetable that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction typeshould be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms. | Refuse to produce any documents. |
| 58 All Documents concerning any changes in coverage for any Antidepressant Treatment, including but not limited to removing any Antidepressant Treatment from formularies or listing of any Antidepressant Treatment in a different formulary tier. | Refuse to produce any documents. |
| 59 All correspondence with any Mail Order Pharmacy concerning Antidepressant Treatment, including but not limited to:<br>a. Documents sufficient to show reimbursement rates or schedules;<br>b. Documents sufficient to show volume of purchases of Antidepressant Treatments by mail order;<br>c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Venlafaxine or any other Antidepressant Treatment to consumers. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 61 | With respect to each Mail Order Pharmacy through which You sold any Venlafaxine to consumers, please provide Documents sufficient to show:  a. The identity and location of the Mail Order Pharmacy; b. The Mail Order Pharmacy's purchase of Venlafaxine, or any Antidepressant Treatment, including Documents reflecting the date you sold to the Mail Order Pharmacy. | Refuse to produce any documents. |
| 62 | Data generated or provided by IMS and Verispan in whatever format it was received from IMS or Verispan for Venlafaxine and/or any other Antidepressant Treatment (if available, with data broken out by manufacturer, form, strength, NDC and channel), during the Relevant Time Period, as follows:a. IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price;b. IMS National Sales Perspective data, including total units, extended units, total sales dollars and price;c. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price; andd. National Disease and Therapeutic Index (NDTI data). | Refuse to produce any documents. |
| 65 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of the market impact of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessment of the effect of any agreement on the relevant drug's unit and dollar sales, price, market share, or reimbursement. | Refuse to produce any documents. |
| 73 | Documents sufficient to show all adverse events, medication errors, or any other complaints or concerns expressed by healthcare professionals (including physicians, pharmacists, nurses, and others), consumers (including patients, family members, lawyers, and others), or government bodies (including the FDA and regulators outside the United States) related to Effexor IR or Generic Effexor IR purchased, distributed, or sold by You, including without limitation any incidence of nausea or emesis. | Refuse to produce any documents. |
| 79 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Antidepressant Treatments. | Refuse to produce any documents. |

| | **Retailer Responses and Objections re: Business Information** | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 80 | All Documents concerning generic or therapeutic substitution of Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for other Antidepressant Treatments and the effectiveness of such substitution. | Refuse to produce any documents that might be considered "downstream." |
| 81 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Antidepressant Treatment to any generic Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for AntidepressantTreatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 82 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from one brand name Antidepressant Treatment to another brand name Antidepressant Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 83 | All Documents concerning generic or therapeutic substitution involving Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for drugs. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |

| No. | Request Text | Retailers' Position |
|---|---|---|
| | **Retailer Responses and Objections re: Business Information** | |
| 84 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Antidepressant Treatments to generic and/or lower-cost alternative Antidepressant Treatments. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents that might be considered "downstream." |
| 85 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Antidepressant Treatment may follow to compete with an AB-rated generic equivalent Antidepressant Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 86 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |
| 87 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Antidepressant Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically for Antidepressant Treatments or any particular Antidepressant Treatment. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 93 | If You base any claims on an assignment, Documents sufficient to show, for all periods for which You claim damages, each agreement in place between Your Assignor and any customer of Your Assignor that directly or indirectly specified the terms of sale for Effexor XR. | Refuse to produce any documents. |
| 94 | If You base any claims on an assignment, Documents sufficient to show each sale of Effexor XR by Your assignor for all periods for which You claim damage, including the date, sale price, quantity sold, and identities of the buyer and seller. | Refuse to produce any documents that might be considered "downstream"; Refuse to produce assignors' documents; Refuse to produce own documents pertaining to sales (will only produce purchase data). |
| 97 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, all Documents showing each iteration of the Plan design, including but not limited to (i) whether the Plan is provided on a fee-for-service basis, as part of staff model HMO, IPA HMO, point-of-service HMO, Preferred Provider Organization, or Managed Indemnity product, or on some other basis; (ii) the premium or other payment charged to any person or other entity for coverage under the Plan; (iii) the pharmaceutical coverage, including but not limited to caps or limitations on coverage, cost sharing, step-therapy protocols, prior authorization requirements, the use of mail order (and the terms and conditions thereof); (iv) the use of an In-House Pharmacy; (v) the use of formularies, or preferred drug lists, including efforts to ensure or enhance formulary compliance, such as physician incentives or NDC lockouts; (vi) and the use of capitation or financial incentives at the physician or pharmacy level. | Refuse to produce any documents. |
| 98 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, the summary of plan benefits or other Documents used to describe the benefits and scope of coverage of each Plan and each Group entitled to coverage under each Plan for each year. | Refuse to produce any documents. |
| 99 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to describe any subcontracting or delegation by You of the management, operation, or administration of the pharmacy benefit of any Plan to any other parties, the identity of those parties, the terms of Your agreements with those parties, and any amendments thereto. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 100 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to show how You, from the beginning of the Relevant Time Period through the present, have determined the pharmaceutical coverage for Venlafaxine and any other Antidepressant Treatment, including but not limited to caps or limitations on coverage, cost sharing, step-care protocols, prior authorization requirements, or other limitations on coverage. | Refuse to produce any documents. |
| 101 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to show, from the beginning of the Relevant Time Period through the present, the method for determining a Plan's cost sharing, deductibles, exclusions from coverage, caps or limitations on coverage, and reimbursements to be paid to pharmacies for filling prescriptions for Plan members, including all Documents that concern coverage for Venlafaxine and any other Antidepressant Treatment,. | Refuse to produce any documents. |
| 102 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents concerning the coverage provided by the Plan to Plan Members for Venlafaxine or any other Antidepressant Treatment, including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions. | Refuse to produce any documents. |
| 103 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents concerning the any changes to coverage provided by the Plan to Plan Members for Venlafaxine or any other Antidepressant Treatment, including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions, from the Relevant Time Period through the present. | Refuse to produce any documents. |
| 104 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to show the coverage (including cost-sharing, deductibles, exclusions, limitations, and caps on coverage) provided by the Plan to Plan Members for each drug and all medical treatments or therapies that may be reasonable substitutes for Venlafaxine. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 105 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, Documents sufficient to show any changes to coverage provided by the Plan to Plan Members for Venlafaxine or any other Antidepressant Treatment, and any other medical treatments or therapies that may be reasonable substitutes for Venlafaxine. | Refuse to produce any documents. |
| 106 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, all Documents concerning Your policies, practices, or procedures to encourage health care providers, physicians, pharmacists, pharmacies, hospitals, and/or other health care providers to authorize or engage in therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) with respect to Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents. |
| 107 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, and that utilize formularies or preferred drug lists, all Documents concerning Your policies, practices, or procedures for creating, maintaining, promulgating, and updating the formulary or preferred drug list, including but not limited to policies, practices and procedures for determining the pharmaceutical products to be included thereon, from the beginning of the Relevant Time Period through the present. | Refuse to produce any documents. |
| 108 | With respect to each of Your Plans that provides or has provided coverage for Venlafaxine or any other Antidepressant Treatment, and that utilize formularies or preferred drug lists, all Documents, concerning the review, analysis, or consideration of Venlafaxine and any other Antidepressant Treatment, for inclusion thereon, including all Documents that compare or contrast Venlafaxine to any other product. | Refuse to produce any documents. |
| 109 | All Documents from the beginning of the Relevant Time Period through the present concerning Your use of step edits or step therapy, including but not limited to Documents concerning Your review, analysis, and consideration of implementing step edits or step therapy on Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 110 | All Documents concerning Your policies, practices, or procedures, including but not limited to the use of co-pay tiers, pharmacy incentives, or physician incentives, to encourage therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand). | Refuse to produce any documents. |
| 111 | All Documents reflecting Your policies and procedures concerning the purchase, coverage, or reimbursement of Plan Members for brand name pharmaceutical products when generic alternatives, including both therapeutic alternatives and therapeutic equivalents, are available. | Refuse to produce any documents. |
| 112 | All Documents from the beginning of the Relevant Time Period through the present concerning Your rate of therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) for all of Your Plans and the effectiveness of any efforts to encourage either such substitution. | Refuse to produce any documents. |
| 113 | All Documents concerning any changes in coverage for Venlafaxine, including but not limited to removing Venlafaxine from formularies or listing Venlafaxine in a different formulary tier. | Refuse to produce any documents. |
| 114 | All Documents concerning any guidelines, instructions, manuals, materials, processes, or procedures used by or provided to any pharmacy and therapeutics ("P&T") committee, formulary review committee, financial review committee, or similar bodies with input into decisions regarding formulary listings, preferred drug listings, coverage restrictions, caps on coverage, or similar limitations. | Refuse to produce any documents. |
| 115 | All Documents concerning the evaluation, consideration, analysis or discussion of Venlafaxine or any other Antidepressant Treatment by any P&T committee, formulary review committee, financial review committee, or similar bodies with input into decisions regarding formulary listings, preferred drug listings, coverage restrictions, caps on coverage, or similar limitations, including but not limited to minutes of meetings, reports of results, and Documents considered. | Refuse to produce any documents. |
| 116 | Documents sufficient to show the membership of each P&T committee, formulary review committee, financial review committee, or similar body that evaluated, considered, analyzed, or discussed Venlafaxine or any other Antidepressant Treatment. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 117 | All documents concerning any agreement with any drug manufacturer regarding the preferential treatment of any pharmaceutical product in comparison with any other pharmaceutical product in the same therapeutic class on any Plan formulary or preferred drug list. | Refuse to produce any documents. |
| 119 | All Documents concerning any agreements with or policies applicable to any pharmacy regarding the enforcement or use of Your formularies, preferred drug lists, Plan coverage restrictions or limitations, clinical programs, quality-assurance programs, or drug adherence programs. | Refuse to produce any documents. |
| 120 | All Documents concerning any agreements with or policies applicable to any pharmacy relating to reporting requirements or prior-authorization procedures requested by You and/or required by the manufacturer. | Refuse to produce any documents. |
| 121 | All Documents concerning Your evaluation, consideration, or discussion of the use by Plan Members of manufacturer co-pay or co-insurance assistance, such as co-pay coupons or similar programs, including but not limited to any restrictions or limitations on the use of such programs. | Refuse to produce any documents. |
| 122 | All Documents concerning any agreement with or policies applicable to any pharmacy regarding customer-service or other work performed by pharmacists. | Refuse to produce any documents. |
| 124 | Documents sufficient to show the cost for You to fill a prescription at any of Your In-house or mail-order pharmacies. | Refuse to produce any documents. |
| 125 | Documents concerning the effectiveness and/or performance of Your in-house or mail-order pharmacies, and retail pharmacies in driving utilization from one pharmaceutical product to another pharmaceutical product. | Refuse to produce any documents. |
| 126 | Documents sufficient to show all pharmaceutical drugs for which one of Your Plans requires or previously required a (i) prior authorization or (ii) a step-edit or step therapy requirement and the effectiveness of each strategy. | Refuse to produce any documents. |
| 127 | Documents sufficient to show from the beginning of the Relevant Time Period through the present each Plan that did not cover Venlafaxine and the year in which Venlafaxine was not covered. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 130 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Antidepressant Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents. |

| | EPP Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | EPPs' Position |
| 47 | All Documents sufficient to identify any Antidepressant Treatment which you have purchased or for which you have provided reimbursement. | Refuse to produce any documents. |
| 48 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatments, Documents sufficient to show Your determination of the premiums, negotiated monies, and/or employer contributions required by the Plan, including, but not limited to, all Documents concerning the determination of the premium, negotiated monies, and/or employer contributions required for (1) prescription drug coverage generally and (2) Venlafaxine and any other Antidepressant Treatments. | Refuse to produce any documents. |
| 57 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the premiums, negotiated monies, and/or employer contributions collected in connection with the Plan, and the portion of total premiums, negotiated monies, and/or employer contributions associated with the various categories of coverage provided, including the Pharmacy benefit and amounts associated or related with Your providing coverage for Venlafaxine, and any other Antidepressant Treatments. | Refuse to produce any documents. |
| 58 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the amounts You spent in providing coverage in connection with the Plan, and, the total associated with the Pharmacy benefit and the amount associated with Your providing coverage for Venlafaxine and any other Antidepressant Treatments. | Refuse to produce any coverage related documents (will only produce purchase related documents). |
| 59 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show Your financial status at the end of each Plan year and the operating performance for each Plan year, including Your assets and liabilities at the end of each year, cash flows into and out of the fund over the course of each year, any target balance for the fund set by management overseeing the fund, and overall profit and loss or similar financial statements each year. | Refuse to produce any documents. |
| 60 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, Documents sufficient to show the profitability or increases in net assets of the Plan or the Pharmacy component thereof, including all Documents concerning the profitability of Your providing coverage for Venlafaxine and any other Antidepressant Treatments. | Refuse to produce any documents. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| | **EPP Responses and Objections re: Business Information** | |
| 62 | For each Plan under which You provide or have provided coverage for any Antidepressant Treatment, all Documents concerning Your efforts to notify any governmental agency, or obtain any governmental agency's approval of, premiums, negotiated monies, and/or employer contributions to be charged by You for coverage under the Plan. | Refuse to produce any documents. |
| 74 | With respect to each In-House Pharmacy through which You dispensed Venlafaxine, or any Antidepressant Treatment to Plan Members, please provide Documents sufficient to show:a. The identity and location of the In-House Pharmacy; andb. The In-House Pharmacy's dispensing of Venlafaxine or any Antidepressant Treatment, including Documents reflecting the date the product was dispensed, the dosage form, the co-pay, co-insurance or deductible paid by the Plan Member, and any other consideration You received. | Refuse to produce any documents pertaining to the identity and location of the In-House Pharmacy or the dispensing of the product (will only produce purchase related documents). |
| 79 | All Documents related to the cost or projected cost of changes in prescription drug coverage considered or implemented by You. | Refuse to produce any documents. |
| 80 | Documents sufficient to show Your policies, procedures, and practices for experience rating, prospective rating, retrospective rating, deficit recovery charges, risk corridors, or other tools for recovering health care costs through premiums or other payments charged to any person or entity for coverage under any of Your Plans. | Refuse to produce any documents. |
| 113 | All Documents concerning meetings of Fund trustees, including but not limited to minutes, presentations, reports, or analyses prepared in connection with any trustee meeting. | Refuse to produce any documents. |
| 114 | All Documents concerning communications regarding projected or targeted balances for Your Fund. | Refuse to produce any documents. |
| 115 | Your trust agreements and any amendments thereto. | Refuse to produce any documents. |
| 117 | A copy of all resumes or CVs for each of Your current and former trustees. | Refuse to produce any documents. |
| 118 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of Effexor XR would be more or less profitable than distribution and/or servicing of Generic Effexor XR and/or Venlafaxine XR Tablets. | Refuse to produce any documents. |
| 119 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of Effexor IR would be more or less profitable than distribution and/or servicing of Generic Effexor IR. | Refuse to produce any documents. |

# Exhibit A-3

**EXHIBIT A-3**

**OBJECTIONS TO PRODUCING CLASS CERTIFICATION AND LITIGATION-RELATED DOCUMENTS[1]**

| | DPP Responses and Objections re: Class Certification and Litigation | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 70 | All Documents concerning the Effexor XR Wyeth-Teva Patent Litigation, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of the litigation. | Refuse to produce any documents. |
| 71 | All Documents concerning the Effexor XR Wyeth-Teva Patent Litigation settlement, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of each settlement. | Refuse to produce any documents. |
| 88 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of Effexor XR would be more or less profitable than distribution and/or servicing of Generic Effexor XR and/or Venlafaxine XR Tablets. | Refuse to produce any documents. |
| 89 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of Effexor IR would be more or less profitable than distribution and/or servicing of Generic Effexor IR. | Refuse to produce any documents. |
| 90 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of brand-name pharmaceuticals would be more or less profitable than distribution and/or servicing of generic versions of brand-name pharmaceuticals. | Refuse to produce any documents. |
| 96 | All Documents concerning any efforts by attorneys for Direct Purchaser Plaintiffs to locate or recruit any plaintiff or potential plaintiff in connection with this case. | Refuse to produce any documents. |
| 98 | Documents sufficient to show Your participation in any other litigation as a class representative. | Refuse to produce any documents. |
| 99 | All Documents that show or tend to show that common issues predominate over individual ones, that this lawsuit is manageable as a class action, or that the class action choice is the superior means of resolving Your claims. | Refuse to produce any documents. |
| 102 | All Documents, irrespective of date, concerning Your proposed method of allocating damages claimed by You among members of the proposed class. | Refuse to produce any documents. |
| 119 | All Documents that refer, concern, or relate to the claims, defenses, and/or subject matter of this litigation. | Refuse to produce any documents. |

---

[1] Given the length of the objections here, this exhibit identifies Plaintiffs' position only with respect to the class certification and litigation-related issues, and is not a complete description of all objections Plaintiffs may have made.

**EXHIBIT A-3**

| | Retailer Responses and Objections re: Class Certification and Litigation | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 64 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessments related to the fair market value of any consideration exchanged related to such agreements. | Refuse to produce any documents. |
| 65 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of the market impact of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessment of the effect of any agreement on the relevant drug's unit and dollar sales, price, market share, or reimbursement. | Refuse to produce any documents. |
| 70 | All Documents concerning the Effexor XR Wyeth-Teva Patent Litigation, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of the litigation. | Refuse to produce any documents. |
| 71 | All Documents concerning the Effexor XR Wyeth-Teva Patent Litigation settlement, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of each settlement. | Refuse to produce any documents. |
| 137 | All Documents that refer, concern, or relate to the claims, defenses, and/or subject matter of this litigation. | Refuse to produce any documents. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| | **EPP Responses and Objections re: Class Certification and Litigation** | |
| 87 | All Documents referred to, quoted, paraphrased, or excerpted in the IPP or TPP Complaints, or otherwise relied upon as the basis for any allegation in the Complaints. | Refuse to produce any documents. |
| 88 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the IPP or TPP Complaints, including any assessments related to the fair market value of any consideration exchanged related to such agreements. | Refuse to produce any documents. |
| 89 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of the market impact of any agreement referenced in the IPP or TPP Complaints, including any assessment of the effect of any agreement on the relevant drug's unit and dollar sales, price, market share, or reimbursement. | Refuse to produce any documents. |
| 90 | All Documents, irrespective of date, concerning Your allegations regarding the value of the "benefits" Teva received "in exchange for its agreement not to market its generic version of Effexor XR until June 2010" including but not limited to Your allegations at Paragraph 15 of the IPP Complaint and Paragraph11 of the TPP Complaint. | Refuse to produce any documents other than those EPPs intend to use affirmatively. |
| 91 | All Documents, irrespective of date, concerning Your allegations that "[h]ad Wyeth . . . not colluded with Teva to delay generic competition, Teva would have come to market with generic Effexor XR capsules at least by June 2008," including but not limited to Your allegations in Paragraph 303 of the IPP Complaint and Paragraph 265 of the TPP Complaint. | Refuse to produce any documents other than those EPPs intend to use affirmatively. |
| 92 | All Documents, irrespective of date, concerning Your allegations that "[h]ad Wyeth . . . not colluded with Teva to delay generic competition . . . Wyeth would have launched an authorized generic at the same time," including but not limited to Your allegations in Paragraph 303 of the IPP Complaint and Paragraph 265 of the TPP Complaint. | Refuse to produce any documents other than those EPPs intend to use affirmatively. |
| 93 | All Documents, irrespective of date, concerning Your allegations that "generic manufacturers would have been ready, willing and able to launch their generic versions of Effexor XR by June 2008 were it not for Wyeth's illegal acts and conspiracies with Teva," including but not limited to Your allegations in Paragraph 392 of the IPP Complaint and Paragraph 354 of the TPP Complaint. | Refuse to produce any documents other than those EPPs intend to use affirmatively. |
| 94 | All Documents concerning the Effexor XR Wyeth-Teva Patent Litigation, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of the litigation. | Refuse to produce any documents. |
| 95 | All Documents concerning the Effexor XR Wyeth-Teva Patent Litigation settlement, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of each settlement. | Refuse to produce any documents. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| | **EPP Responses and Objections re: Class Certification and Litigation** | |
| 98 | All documents concerning Your allegations that Wyeth or any of Wyeth's employees or agents committed *Walker Process* fraud. | Refuse to produce any documents other than those EPPs intend to use affirmatively. |
| 99 | Documents concerning the listing of any patent concerning Effexor XR in the Orange Book. | Refuse to produce any documents other than those EPPs intend to use affirmatively. |
| 100 | All Documents concerning any Paragraph IV Notifications concerning Venlafaxine XR. | Refuse to produce any documents other than those EPPs intend to use affirmatively. |
| 101 | All Documents concerning Your allegations that Wyeth engaged in "sham litigation against seventeen or more generic manufacturers." | Refuse to produce any documents other than those EPPs intend to use affirmatively. |
| 102 | Any Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of the patent litigations referenced in Paragraphs 271-369 of the IPP Complaint and Paragraphs 247-329 of the TPP Complaint: | Refuse to produce any documents. |
| 126 | All Documents concerning any efforts by attorneys for Indirect Purchaser Plaintiffs to locate or recruit any plaintiff or potential plaintiff in connection with this case. | Refuse to produce any documents. |
| 127 | All Documents concerning Your assessment of Your adequacy to serve as a class representative in this action. | Refuse to produce any documents until such time as they move for class certification. |
| 129 | All Documents that show or tend to show that common issues predominate over individual ones, that this lawsuit is manageable as a class action, or that the class action choice is the superior means of resolving Your claims. | Refuse to produce any documents until such time as they move for class certification. |
| 131 | All Documents, irrespective of date, relating to any method of computation for injury or damages sustained by You, Your insureds, members, beneficiaries, or plan participants, or (IPPs only) any member of the alleged class as a result of Defendants' conduct as alleged in the Complaints. | Refuse to produce any documents. |
| 132 | All Documents, irrespective of date, concerning Your proposed method of allocating damages claimed by You among members of the proposed class. | Refuse to produce any documents. |
| 140 | All Documents concerning all contacts or communications between Plaintiffs and any third party concerning the claims, defenses, or subject matter of this litigation, including without limitation, manufacturers of Generic Effexor XR, would-be generic Effexor XR ANDA filers, pharmaceutical suppliers, or former agents, representatives, servants, or employees of Plaintiffs. | Refuse to produce any documents from before June 14, 2008 or after December 31, 2012. |

**EXHIBIT A-3**

| | EPP Responses and Objections re: Class Certification and Litigation | |
|---|---|---|
| No. | Request Text | EPPs' Position |
| 142 | All Documents that refer, concern, or relate to the claims, defenses, and/or subject matter of this litigation. | Refuse to produce any additional documents other than those agreed to in other Responses. |

# Exhibit A-4

**EXHIBIT A-4**

**PARTIES' POSITIONS ON THE RELEVANT TIME PERIOD**

**(REPRESENTATIVE REQUESTS)[1]**

| | DPP Responses and Objections re: Relevant Time Period | | |
|---|---|---|---|
| | **Relevant Product Market** | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 16 | All Documents concerning the promotion, marketing, or sales of Venlafaxine and/or any other Antidepressant Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 19 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Antidepressant Treatment, including the role of price, brand name, and patents. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 34 | All Documents concerning the relative price or cost of Antidepressant Treatments, including Effexor XR and Effexor IR. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 80 | All Documents concerning generic or therapeutic substitution of Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for other Antidepressant Treatments and the effectiveness of such substitution. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| | **Market Dynamics at Time of Settlement** | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 8 | All Documents concerning the introduction of Generic Effexor XR into the United States, including but not limited to Documents concerning Your awareness, understanding, or expectations regarding (a) the identity of any potential manufacturer of Generic Effexor XR; (b) the status of any ANDA concerning Generic Effexor XR; (c) any impediments to or delays in the launch of Generic Effexor XR (including but not limited to manufacturer problems and related issues); (d) the expected date for market entry for Generic Effexor XR; (e) the expected market share of penetration rate of Generic Effexor XR; and (f) the | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |

---

[1]   Because these issues cut across all Requests, Defendants have not restated every Request here—but rather seek to provide a few representative Requests from each category of Requests for which the parties have a dispute regarding the relevant time period.

| DPP Responses and Objections re: Relevant Time Period | | |
|---|---|---|
| expected price of Generic Effexor XR. | | |
| 35 | All Documents concerning Authorized Generic versions of Antidepressant Treatments, including any discussion or analysis concerning Authorized Generic pricing, managed care coverage or coverage determinations, promotion and marketing, market impact, substitutability, and patient preference. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |

| Litigation Related Materials | | |
|---|---|---|
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 66 | All Documents, irrespective of date, concerning Your allegations at Paragraph 12 of the Complaint that "Wyeth paid Teva value worth over $500 million in exchange for Teva's agreement not to market its generic version of Effexor XR until June 2010." | January 1, 2008 to Present | January 1, 2002 to present |
| 74 | All documents concerning Your allegations that Wyeth or any of Wyeth's employees or agents committed Walker Process fraud. | January 1, 2008 to Present | January 1, 2002 to present |
| 109 | If You base any claims on an assignment, Documents sufficient to show each sale of Effexor XR by Your assignor for all periods for which You claim damage, including the date, sale price, quantity sold, and identities of the buyer and seller. | Period for which Plaintiffs are seeking damages | January 1, 2002 to present |

| Launch of Effexor IR | | |
|---|---|---|
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 11 | All Documents, irrespective of date, concerning Effexor IR or Generic Effexor IR. | January 1, 2008 to Present | January 1, 2006 to January 1, 2012 |
| 23 | All Documents concerning the sale of, market share of, or competition between or among (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 29 | All Documents regarding any potential entry of an AB-rated generic version of Effexor XR, Effexor IR, and/or any other Antidepressant Treatment, including those listed in Appendix A. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 118 | All Documents concerning any communication between or among You and any other Plaintiff concerning any Antidepressant Treatment, including Effexor XR and Effexor IR, or any potential generic thereof. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |

**EXHIBIT A-4**

| | DPP Responses and Objections re: Relevant Time Period | | |
|---|---|---|---|
| | **Class Certification** | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 91 | All Documents, irrespective of date, reflecting or concerning communications between You and any putative class members, or their employees, agents, or assignees, concerning Venlafaxine. | January 1, 2008 to Present | January 1, 2008 to December 31, 2017 |
| 92 | All Documents, irrespective of date, reflecting or concerning communications between You and any putative class members, or their employees, agents, or assignees, concerning this litigation or the allegations in the Complaint. | January 1, 2008 to Present | January 1, 2008 to December 31, 2017 |
| 93 | All Documents, irrespective of date, reflecting or concerning communications between You and any putative class members, or their employees, agents, or assignees, concerning the patent litigations referenced in the Complaint. | January 1, 2008 to Present | January 1, 2008 to December 31, 2017 |

| Retailer Responses and Objections re: Relevant Time Period | | | |
|---|---|---|---|
| **Relevant Product Market** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 18 | All analyses, studies, reports, forecasts, or budgets concerning Venlafaxine and/or any other Antidepressant Treatment sold in the United States. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 35 | All Documents concerning Authorized Generic versions of Antidepressant Treatments, including any discussion or analysis concerning Authorized Generic pricing, managed care coverage or coverage determinations, promotion and marketing, market impact, substitutability, and patient preference. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 80 | All Documents concerning generic or therapeutic substitution of Antidepressant Treatments, including any analyses or discussions of the impact on price or availability for other Antidepressant Treatments and the effectiveness of such substitution. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 84 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Antidepressant Treatments to generic and/or lower-cost alternative Antidepressant Treatments.   For avoidance of doubt, this request calls for any such Documents that would have been applicable to Antidepressant Treatments, whether or not such documents were prepared specifically forAntidepressant Treatments or any particular Antidepressant Treatment. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| **Market Dynamics at Time of Settlement** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 7 | All Documents concerning decisions by generic manufacturers to launch Generic Effexor XR products "at risk," including but not limited to the factors considered in deciding whether to launch "at risk." | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 69 | All Documents, irrespective of date, concerning Your allegations that "generic manufacturers would have been ready, willing and able to launch their generic versions of Effexor XR by June 2008 were it not for Wyeth's illegal acts and conspiracies with Teva," including but not limited to Your allegations in Paragraph 326 of the Rite Aid Complaint, Paragraph 290 of the Walgreen Complaint, Paragraph 285 of the Meijer Complaint and Paragraph 282 of the Giant Eagle Complaint. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |

| Retailer Responses and Objections re: Relevant Time Period | | | |
| --- | --- | --- | --- |
| Litigation Related Materials | | | |
| No. | Request Text | Plaintiffs' Position | Defendants' Position |
| 67 | All Documents, irrespective of date, concerning Your allegations that "[h]ad Wyeth . . . not colluded with Teva to delay generic competition, Teva would have come to market with generic Effexor XR capsules at least by June 2008," including but not limited to Your allegations in Paragraph 232 of the Rite Aid Complaint, Paragraph 204 of the Walgreen Complaint, Paragraph 199 of the Meijer Complaint and Paragraph 195 of the Giant Eagle Complaint. | January 1, 2008 to Present | January 1, 2002 to present |
| 75 | All Documents concerning the listing of any patent concerning Effexor XR in the Orange Book. | January 1, 2008 to Present | January 1, 2002 to present |
| 94 | If You base any claims on an assignment, Documents sufficient to show each sale of Effexor XR by Your assignor for all periods for which You claim damage, including the date, sale price, quantity sold, and identities of the buyer and seller. | Period for which Plaintiffs are seeking damages | January 1, 2002 to present |
| Launch of Effexor IR | | | |
| No. | Request Text | Plaintiffs' Position | Defendants' Position |
| 14 | All Documents regarding the impact of the introduction of Generic Effexor IR on Your business, including but not limited to any assessments of sales, pricing, or volume changes resulting from such introduction. | January 1, 2008 to Present | January 1, 2006 to January 1, 2012 |
| 15 | All Documents regarding plans or strategies for responding to the introduction of Generic Effexor IR. | January 1, 2008 to Present | January 1, 2006 to January 1, 2012 |
| 34 | All Documents concerning the relative price or cost of Antidepressant Treatments, including Effexor XR and Effexor IR. | January 1, 2008 to Present | January 1, 2002 to January 1, 2012 |
| 60 | Documents sufficient to show, by package size, dosage form and seller: a. Each purchase by You of Antidepressant Treatments; b. The gross dollar expenditures in connection with each of Your purchases of these products; c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products; d. The net dollar expenditures in connection with each of Your purchases of these products; and e. The gross and net prices You paid in connection with each of Your purchases of these products. | Period for which Plaintiffs are seeking damages | January 1, 2002 to December 31, 2017 |

| IPP Responses and Objections re: Relevant Time Period | | | |
|---|---|---|---|
| **Relevant Product Market** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 19 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Antidepressant Treatment, including the role of price, brand name, and patents. | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |
| 22 | All Documents concerning comparisons between and among different Antidepressant Treatments, including but not limited to any analyses of actual, projected, or claimed benefit, harm, improvement, therapeutic equivalence, similarity or difference between or among them. | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |
| 32 | All Documents concerning switching between any Antidepressant Treatments occurring at the Pharmacy, with or without physician notification. | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |
| 39 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Venlafaxine and/or any other Antidepressant Treatment. | January 1, 2008 to present | January 1, 2002 to January 1, 2012 |
| **Market Dynamics at Time of Settlement** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 7 | All Documents concerning decisions by generic manufacturers to launch Generic Effexor XR products "at risk," including but not limited to the factors considered in deciding whether to launch "at risk." | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |
| 35 | All Documents concerning Authorized Generic versions of Antidepressant Treatments, including any discussion or analysis concerning Authorized Generic pricing, managed care coverage or coverage determinations, promotion and marketing, market impact, substitutability, and patient preference. | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |
| **Litigation Related Materials** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 96 | All Documents, irrespective of date, concerning any patent related to Effexor XR, including without limitation U.S. Patent No. 6,274,171 (issued Aug. 14, 2001) (the "'171 patent"), U.S. Patent No. 6,403,120 (issued Jun. 11, 2002) (the "'120 patent"); U.S. Patent No. 6,419,958 (issued Jul. 16, 2002) (the "'958 patent"), and U.S. Patent No. 4,535,186 (issued Aug. 13, 1985) (the "'186 patent"), and any application thereof, including without | January 1, 2008 to December 31, 2012 | January 1, 2002 to present |

| IPP Responses and Objections re: Relevant Time Period | | |
|---|---|---|
| limitation any Document concerning the date upon which, or the circumstances under which, You first became aware of each such patent. | | |
| **Launch of Effexor IR** | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |

| No. | Request Text | Plaintiffs' Position | Defendants' Position |
|---|---|---|---|
| 5 | All Documents concerning patients' ability or willingness to switch from Effexor XR to Generic Effexor XR, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to: a. All Documents concerning patients' ability or willingness to switch from Effexor XR to Generic Effexor XR. b. All Documents concerning patients' ability or willingness to switch from Effexor XR to Effexor IR. c. All Documents concerning patients' ability or willingness to switch from Effexor XR to any other Antidepressant Treatment. | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |
| 29 | All Documents regarding any potential entry of an AB-rated generic version of Effexor XR, Effexor IR, and/or any other Antidepressant Treatment, including those listed in Appendix A. | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |
| 34 | All Documents concerning the relative price or cost of Antidepressant Treatments, including Effexor XR and Effexor IR. | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |
| 46 | All Documents concerning the consideration of (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, (v) Venlafaxine XR Tablets, and/or (vi) any other Antidepressant Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets, including all Documents that compare or contrast (i) Effexor XR, (ii) Effexor IR, (iii) Generic Effexor XR, (iv) Generic Effexor IR, and/or (v) Venlafaxine XR Tablets to any other product. | January 1, 2008 to December 31, 2012 | January 1, 2002 to January 1, 2012 |

| **Class Certification** | | |
|---|---|---|

| No. | Request Text | Plaintiffs' Position | Defendants' Position |
|---|---|---|---|
| 122 | All Documents, irrespective of date, reflecting or concerning communications between You and any putative class members, or their employees, agents, or assignees, concerning this litigation or any allegations in the IPP Complaint. | January 1, 2008 to December 31, 2012 | January 1, 2008 to December 31, 2017 |
| 123 | All Documents, irrespective of date, reflecting or concerning communications between | January 1, 2008 to | January 1, 2008 to |

**EXHIBIT A-4**

| IPP Responses and Objections re: Relevant Time Period | | |
|---|---|---|
| You and any putative class members, or their employees, agents, or assignees, concerning the patent litigations referenced in the IPP Complaint. | December 31, 2012 | December 31, 2017 |
| All Documents concerning communications between or among You and any other entities that are suing Defendants for alleged antitrust violations concerning Effexor XR, any of the Defendants, and/or any other entity concerning Effexor XR, and/or any generic thereof. | January 1, 2008 to December 31, 2012 | January 1, 2008 to December 31, 2017 |

# Exhibit B

# Exhibit B-1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN and SERGEANTS BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated, | Civil Action No.: 1:12-cv-02237 |

Plaintiffs,

v.

PFIZER, INC.,

Defendant.

## FIRST AMENDED CLASS ACTION COMPLAINT
## AND JURY DEMAND

e. **Pfizer knows that third party payors cannot tell when a co-pay is subsidized.**

84.     Pfizer knows that the Chantix co-pay subsidy program that Pfizer and its coupon administrators have designed makes it impossible for third party payors to tell if their members' co-pays are being subsidized by co-pay coupons.  Pfizer admits as much in the fine print of the Chantix Coupon's Terms and Conditions, where it attempts to push onto patients the responsibility for making such disclosures: "You must deduct the value of this coupon from any reimbursement request submitted to your insurance plan, either directly by you or on your behalf."  By burying this disclosure in the fine print of the coupon's Terms and Conditions, however, Pfizer makes a weak attempt to shield itself from liability with instructions it knows and intends will not be seen or followed.

Before starting CHANTIX, tell your doctor if you are pregnant, plan to become pregnant, or if you take insulin, asthma medicines, or blood thinners. Medicines like these may work differently when you quit smoking.

**Terms and Conditions**
**By using this coupon, you acknowledge that you currently meet the eligibility criteria and will comply with the terms and conditions described below:**
This coupon is <u>not</u> valid for prescriptions that are eligible to be reimbursed, in whole or in part, by Medicaid, Medicare, or other federal or state healthcare programs (including any state prescription drug assistance programs and the Government Health Insurance Plan available in Puerto Rico [formerly known as "La Reforma de Salud"]). This coupon is <u>not</u> valid for prescriptions that are eligible to be reimbursed by private insurance plans or other health or pharmacy benefit programs that reimburse you for the entire cost of your prescription drugs. Coupon is limited to $30 or the amount of your co-pay, whichever is less. No membership fees. You must deduct the value of this coupon from any reimbursement request submitted to your insurance plan, either directly by you or on your behalf. This coupon is not valid for Massachusetts residents whose prescriptions are covered in whole or in part by third-party insurance, or where otherwise prohibited by law. Coupon cannot be combined with any other rebate/coupon, free trial, or similar offer for the specified prescription.
**This coupon will be accepted only at participating pharmacies. This coupon is not health insurance.** Offer good only in the US and Puerto Rico. Coupon is limited to 1 per person during this offering period and is not transferable. Pfizer reserves the right to rescind, revoke, or amend this offer without notice. For reimbursement when using a non-participating pharmacy/mail order: Pay for the CHANTIX prescription and mail copy of original pharmacy receipt (cash register receipt NOT valid) with product name, date, and amount circled to: CHANTIX Savings Program, 6501 Weston Parkway, Suite 370, Cary, NC 27513. Be sure to include a copy of this page, your name, and your mailing address. Offer expires 12/31/2011.

*Please see full prescribing information and patient Medication Guide on the following pages.*

 © 2010 Pfizer Inc. All rights reserved.          Pfizer, PO Box 29387, Mission, KS 66201          VCP02614/291202-01          www.chantix.com

3.     **Pfizer's Effexor XR $4 Co-Pay Commitment Program**

a. **Pfizer faced competition from less expensive therapeutic alternatives after the launch of Effexor XR.**

85.     On October 20, 1997, the FDA approved Effexor XR (venlafaxine hydrochloride) to treat depression.  By 2008, sales of Effexor XR had topped $2.6 billion.

86.     Less expensive therapeutic alternatives to Effexor XR include selective serotonin reuptake inhibitors (SSRIs) – such as sertraline (Zoloft), citalopram (Celexa), bupropion XL (Wellbutrin XL), fluoxetine (Prozac)) and selective serotonin norepinephrine reuptake inhibitors (SNRIs) – such as instant release venlafaxine (Effexor)).

> **b.      In the wake of substitution competition from less expensive therapeutic alternatives, Pfizer created the Effexor XR $4 Co-Pay Commitment Program.**

87.     To combat the substitution competition it was facing from less expensive therapeutic alternatives, in or around April 15, 2010, Pfizer created the Effexor XR $4 Co-pay Commitment Program.  Pfizer's website invites patients to register for the program and receive a savings card that they can present to pharmacies to receive Effexor XR for as little as a $4 co-pay (up to $75 off per refill, or a maximum of $1000 per calendar year).[24]

---

[24] Effexor XR, http://www.effexorxr.com/default.aspx (last visited Dec. 6, 2011)
Patients who fill their prescriptions with a mail-order pharmacy receive the following savings under the program:
- For a 90-day supply, the consumer pays the first $10 and Pfizer pays the remaining amount, up to $225, or the amount of the consumer's co-pay, for a maximum savings of $1,000 per calendar year.
- For a 60-day supply, the consumer pays the first $8 and Pfizer pays the remaining amount, up to $150, or the amount of the consumer's co-pay, for a maximum savings of $1,000 per calendar year.

**EXHIBIT B-1**





88.     The program runs through December 31, 2013.

89.     The Effexor XR $4 Co-pay Commitment Program is not a need-based program. It is open to all patients with commercial prescription insurance coverage for Effexor XR. A patient can sign up by answering a few short questions and providing his or her name and address on Pfizer's website: https://www.effexorxr.com/signup.aspx. Once registered, patients may print a temporary savings card to use immediately. A permanent card is sent by mail within one to two weeks.

**c.     The Effexor XR $4 Co-Pay Commitment Program specifically provides that it does not apply to Medicare or Medicaid patients or to residents of Massachusetts.**

90.     When enrolling in the $4 Co-Pay Commitment Card program, members are asked whether they purchase prescription medication through Medicare, Medicaid, or a similar federal or state prescription drug program and whether, if they reside in Massachusetts, they have insurance coverage for their prescription medication. If a patient selects, "Yes, I live in Massachusetts and have insurance coverage for my prescription," he/she is told, "We are sorry.

31

You are not eligible for this offer." The same message is displayed if the patient indicates that he/she receives benefits through the federal or state government.

91.     The fine print Terms and Conditions printed on Pfizer's patient website similarly state,

> The Card is *not* valid for prescriptions that are eligible to be reimbursed, in whole or in part, by Medicaid, Medicare or other federal or state healthcare programs, including any state prescription drug assistance programs and the Government Health Insurance Plan available in Puerto Rico (formerly known as "La Reforma de Salud").
>
> The Card is not valid for Massachusetts residents whose prescriptions are covered in whole or in part by third-party insurance…

**4.     Pfizer's Geodon $4 Co-Pay Card**

**a.     Pfizer faced competition from less expensive therapeutic alternatives after the launch of Geodon.**

92.     Pfizer's atypical antipsychotic Geodon is available in capsule form as ziprasidone hydrochloride. It was approved by the FDA to treat schizophrenia in 2001, and in 2004 the FDA extended its approval to include Geodon as monotherapy in the treatment of acute manic or mixed episodes in bipolar I disorder, with or without psychotic features.

93.     In 2008, when Geodon's sales had reached close to $800 million, Pfizer CEO Jeff Kindler labeled Geodon (along with Xalatan, Viagra, and Lipitor), as one of four of the companies' "more mature in-line products" that were "successfully defending their positions against newer agents" in a "tough US marketplace."[25]

94.     In 2010, Geodon's sales held strong at $900 million. Geodon's patent expired on March 2, 2012, and generic Geodon is now readily available.

---

[25] Q2 2008 Pfizer Earnings Conference Call – Final, FD (Fair Disclosure) Wire (July 23, 2008).

# Exhibit B-2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: WELLBUTRIN XL | : | CIVIL ACTION |
| ANTITRUST LITIGATION | : | |
| | : | NO. 08-2431 (direct) |

<u>ORDER</u>

AND NOW, this 11th day of March, 2010, upon consideration of defendants SmithKline Beecham Corp. and GlaxoSmithKline PLC's (collectively "GSK") Motion to Compel Discovery from the Plaintiffs Regarding Other Antidepressants (Docket No. 146) and GSK's Motion to Compel Discovery from Plaintiff Rochester Drug Cooperative, Inc. (Docket No. 153), the plaintiffs' respective responses thereto, and following an on-the-record telephone conference with counsel on March 3, 2010, IT IS HEREBY ORDERED that GSK's motions are GRANTED in part and DENIED in part for the reasons stated on the record and as follows.

In our telephone conference last week, the Court left open a decision on requests number 7 and number 9 for price lists and price related information. The plaintiffs argue that these requests are for "downstream" discovery and that such discovery is never relevant in a direct purchaser antitrust case. Without deciding whether or not these requests are for "downstream" discovery, and without deciding whether the Court would allow other types of discovery that are clearly "downstream," the Court

will order the production of documents responsive to request
number 7 and request number 9.

The Court finds that such documents would be relevant.
GSK has stated that it seeks price lists and decision-making
documents that show how Wellbutrin XL competes with other
antidepressants in order to establish its anticipated defense
that the scope of the market is broader than what plaintiffs
allege. The Court is sufficiently persuaded by this argument to
allow the discovery. The plaintiffs have not argued that
producing documents responsive to these requests would be
burdensome. The plaintiffs shall produce the responsive
documents within two weeks of this order.

BY THE COURT:

/s/Mary A. McLaughlin
MARY A. McLAUGHLIN, J.

2

# Exhibit B-3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| IN RE LOESTRIN 24 FE ANTITRUST LITIGATION | : | MDL No. 2472 |
| | : | |
| THIS DOCUMENT RELATES TO: | : | Master File No. 1:13-md-2472-S-PAS |
| ALL ACTIONS | : | |

## MEMORANDUM AND ORDER

PATRICIA A. SULLIVAN, United States Magistrate Judge.

In this case, filed in the wake of the Supreme Court's seminal decision in FTC v. Actavis, 133 S. Ct. 2223 (2013), Plaintiffs, who are direct and indirect purchasers of a branded oral contraceptive known as Loestrin 24 Fe ("Loestrin 24"), seek antitrust damages and injunctive relief based on what they allege was a large and unjustified reverse payment settlement resolving patent litigation, as well as fraud on the Patent and Trademark Office in procuring the patent covering Loestrin 24, improper Orange Book listing, sham litigation, and an unlawful product hop.[1]  Before the Court for determination is Defendants' motion to compel product market

---

[1] The claims described in the operative complaints may be briefly summarized.  Defendant Warner Chilcott ("Warner") is the drug manufacturer that owns the patent covering Loestrin 24.  After Defendant Watson Pharmaceuticals, Inc. ("Watson") filed its notice of intent to introduce a generic version of Loestrin 24, Warner sued for patent infringement.  The parties settled on condition that Watson delay entry of its generic version; in exchange, Watson got favorable promotional deals, as well as the promise that Warner would not introduce its own generic version of Loestrin 24.  Next, Defendant Lupin Pharmaceuticals, Inc. ("Lupin") announced its intent to introduce a generic version of Loestrin 24; again, Warner sued and, again, the parties settled, agreeing that Lupin would delay the introduction of its generic Loestrin 24 in exchange for attorneys' fees and other benefits to Lupin.  Warner used the purchased delay to push its Loestrin 24 prescriptions to Minastrin 24 Fe ("Minastrin"), which would not face generic competition for several years.  See generally In re Loestrin 24 Fe Antitrust Litig., 814 F.3d 538, 541-42 (1st Cir. 2016).

Federal antitrust claims challenging these settlement agreements, as well as Defendant Warner's conduct during the patent prosecution, Warner's patent defense against Watson and Lupin, and a purported product hopping scheme, as violative of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, were brought by several large pharmaceutical and grocery companies, which are retail purchasers of Loestrin 24 (CVS Pharmacy, Inc., Rite Aid Corp., Rite Aid Hdqtrs Corp., Walgreen Co., The Kroger Co., Safeway Inc., HEB Grocery Co. L.P., Albertson's LLC) ("Retail Plaintiffs"), as well as by putative classes of Direct Purchaser Plaintiffs ("DPPs"), which comprise companies that purchase drugs, including Loestrin 24, and other products for resale or distribution.  Claims seeking injunctive relief under § 2 of the Sherman Act and damages and injunctive relief under the antitrust laws and common law of unjust enrichment of various states were brought by putative classes of End Payor Plaintiffs ("EPPs"); they consist of

discovery.  Defendants seek documents related to the economic substitutability of Loestrin 24

and its AB-rated generic equivalents and ten other therapeutically interchangeable oral

contraceptives.  ECF No. 244.

## I.    Introduction

Defendants seek what they describe as a targeted set of qualitative documents regarding

the pricing, sales and marketing of ten oral contraceptives that they claim[2] are therapeutically

interchangeable with Loestrin 24.  They are: Alesse, Beyaz, Femcon/Ovcon, Nordette, Ortho

Cyclen, Ortho Tri Cyclen, Ortho Tri Cyclen Lo, Ortho-Cept/Desogen, Yasmin, and Yaz.

Defendants do not seek data sets reflecting Plaintiffs' purchases or sales of these products,

conceding that nationwide data sets are more readily available and are sufficient to satisfy their

need for market data.  Nor do they seek so-called "down-stream" discovery – that is, discovery

that would be relevant to the development of the pass-on defense made largely unavailable by

Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), and Hanover Shoe, Inc. v. United Machine

Corp., 392 U.S. 481 (1968).  Instead, their focus is on documents relevant to economic

substitutability among Loestrin 24, its AB-rated equivalents, and these therapeutically

interchangeable oral contraceptives.

Defendants argue that the documents they seek will allow them to show that Plaintiffs

strategized about and/or were able to adjust their marketing, promotions, formularies and

---

health and welfare benefit plans, which have indirectly purchased, paid for, and reimbursed the purchase of Loestrin 24, and individuals who purchased or paid some or all of the purchase price of Loestrin 24.  All of the claims arise in the context of the regulatory framework established by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585, commonly known as the Hatch-Waxman Act.

[2] The Retail Plaintiffs do not dispute that the listed oral contraceptives are therapeutically interchangeable with Loestrin 24.  ECF No. 256 at 6.  EPPs acknowledge that there are therapeutic alternatives to Loestrin 24, but do not specifically acknowledge that the ten drugs proposed by Defendants are among them.  ECF No. 257 at 6.  DPPs argue that therapeutic substitutability is irrelevant but also complex if viewed from the perspective of whether patients can switch from one product to another.  ECF No. 262 at 15 & n.37.  Like EPPs, they do not concede that the ten drugs listed by Defendants are necessarily therapeutically interchangeable, nor do they expressly assert that they are not.

insurance plans to permit or encourage the substitution of lower-price oral contraceptives for Loestrin 24, resulting in robust price competition. They contend that the requests are limited to product marketing and promotional strategies, communications with PBMs about encouraging patients to ask for cheaper alternatives, and formularies, including documents reflecting discussions of formulary tiers or other adjustments for the purpose of pushing consumers to cheaper therapeutically interchangeable oral contraceptives. Supported by two declarations from an economist, Dr. Sumanth Addanki, ECF Nos. 245-3 ¶¶ 6-7; 272-2 ¶ 8,[3] Defendants assert that these documents will inform the analysis of economic substitutability for the purpose of defining the relevant product market, which they contend is an essential building block of their defense that the settlements in issue did not run afoul of state or federal antitrust laws.

Plaintiffs disagree. They ask the Court to deny the motion because the requested documents are totally irrelevant and therefore disproportionately burdensome to produce. Citing Judge Stefan Underhill's thoughtful decision in In re Aggrenox Antitrust Litigation, 199 F. Supp. 3d 662 (D. Conn. 2016), they argue that their claim is laser-focused on the market for Loestrin 24 and its AB-rated generic equivalents. They allege that Defendant Warner's patent gave it market power in that market, that the market power can readily be proven by establishing that Loestrin 24 was sold at a supracompetitive price, which is direct evidence of market power, and that the market power was illegally exercised through large reverse payment settlements with Watson and Lupin for the purpose of delaying generic entry and sustaining Warner's ability to

---

[3] Plaintiffs counter with the declaration of an equally well-credentialed economist, Dr. Meredith Rosenthal, who avers that the documents sought are neither "necessary or sufficient" for a determination of the antitrust market in issue. ECF No. 263-5 ¶¶ 9, 26. While such an averment may well be pertinent at a later phase of the case (particularly at summary judgment or trial), the only question for a threshold discovery dispute is whether the documents are relevant to Plaintiffs' claims (Dr. Rosenthal says they are not) or to Defendants' defenses (Dr. Addanki says they are).

3

continue to earn monopoly profits, shared with Watson and Lupin under the terms of the settlements.

Relying on the <u>Aggrenox</u> holding that <u>Actavis</u> progeny may be structured by trial courts to proceed in a streamlined and focused fashion, <u>id.</u> at 669, Plaintiffs contend that the only questions affecting liability are whether the Loestrin 24 patent created market power and whether Defendants acted wrongfully to extend the patent monopoly beyond its valid life.  Therefore, the existence of a broader product market, however competitive it may be, has no bearing on the issues in the case.  <u>Id.</u> at 667-68.  Because the effect of competition with economically substitutable oral contraceptives is already baked into the price of Loestrin 24,[4] Defendants do not need the requested discovery.  <u>Id.</u> at 667.  To order it, Plaintiffs argue, would impose a disproportionate burden contrary to the directive of Fed. R. Civ. P. 26(b)(1).

## II.      Law and Analysis

### A.      <u>Relevance</u>

In <u>Actavis</u>, the Supreme Court focused on the "complexities," holding that "the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification," as well as that "[t]he existence and degree of any anticompetitive consequence may also vary as among industries."  133 S. Ct. at 2237.  <u>Actavis</u> makes clear that reverse payment settlements <u>may</u> amount to the illegal use of market power in the narrow market for the branded drug and its AB-rated generic equivalent.  <u>Id.</u> at 2227, 2234.  However, the Court

---

[4] This proposition derives from the so-called "Cellophane Fallacy," an economic principle positing that proof that substitutes will enter a market in response to a meaningful price increase does not prove that the pre-increase price was set at a competitive level.  <u>Aggrenox</u>, 199 F. Supp. 3d at 667.  Rather, cross-elasticity of demand among certain drugs "may . . . be the product of monopoly power rather than a belief on the part of consumers that the products are good substitutes for one another."  <u>United States v. Eastman Kodak Co.</u>, 63 F.3d 95, 105 (2d Cir. 1992).

eschewed the FTC's urging that that it adopt a truncated decisional framework.  Id. at 2237

(rejecting "quick look" or *per se* approach).  Rather, it decreed that, for the present, the

traditional rule-of-reason framework should be deployed and directed lower courts to structure

the approach to these cases "so as to avoid, on the one hand, the use of antitrust theories too

abbreviated to permit proper analysis, and, on the other, consideration of every possible fact or

theory irrespective of the minimal light it may shed on the basic question – that of the presence

of significant unjustified anticompetitive consequences."  Id. at 2238.  As our Circuit observed,

"Actavis left many questions unanswered as to how these cases would be litigated and "le[ft] to

the lower courts the structuring of the present rule-of-reason antitrust litigation."  In re Loestrin

24 Fe Antitrust Litig., 814 F.3d 538, 545 (1st Cir. 2016) (quoting Actavis, 133 S. Ct. at 2238).

     Developed almost a century ago in Chicago Board of Trade v. United States, 246 U.S.

231 (1918), the rule of reason directs courts to look at an agreement to reduce or exclude

competition to determine whether its adverse competitive effects are offset by countervailing

procompetitive virtues.  FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 459 (1986).  In applying

the rule of reason, similar to an analysis under § 2 of the Sherman Act, courts should inquire

"into market definition and market power . . . to determine whether an arrangement has the

potential for genuine adverse effects on competition, [as] 'proof of actual detrimental effects,

such as a reduction of output,' can obviate the need for an inquiry into market power, which is

but a 'surrogate for detrimental effects.'"  Id. at 460-61 (quoting 7 P. Areeda, Antitrust Law ¶

1511, p. 429 (1986)).  In In re Nexium (Esomeprazole) Antitrust Litigation, 42 F. Supp. 3d 231

(D. Mass. 2014), aff'd, 842 F.3d 34 (1st Cir. 2016), the district court summarized the shifting

burdens in a rule of reason/monopolization reverse payment case as follows: first, the plaintiffs

must present evidence that the accused brand made a settlement payment to a generic that

5

exceeded anticipated future litigation costs and lacked "any other convincing justification,"

<u>Actavis</u>, 133 S. Ct. at 2237; next, the burden shifts to the defendants to show that the challenged

payment was justified by some procompetitive objective; then, the burden shifts back to the

plaintiffs to establish, under the rule of reason, that the settlement is nevertheless anticompetitive

on balance.  <u>Nexium</u>, 42 F. Supp. 3d at 262-63.

      Traditionally, the examination of anticompetitive effects relies on the definition of the

relevant product market in which they occur.  <u>Id.</u> at 263 (citing <u>Addamax Corp. v. Open

Software Found., Inc.</u>, 888 F. Supp. 274, 283 (D. Mass. 1995) ("To state a Sherman Act claim

under the rule of reason, [plaintiff] bears the initial burden of establishing that [defendant's]

actions have 'an actual adverse effect on competition as a whole in the relevant market.'")

(quoting <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 543

(2d Cir. 1993))).  That inquiry in turn examines the reasonable economic interchangeability of a

set of products, looking not at the similarity of their forms or functions, but rather at "the extent

to which purchasers will accept substitute products in instances of price fluctuation and other

changes." <u>George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.</u>, 508 F.2d 547, 552 (1st

Cir. 1974); <u>see</u> <u>Bayer Schering Pharma AG v. Sandoz, Inc.</u>, 813 F. Supp. 2d 569, 575 (S.D.N.Y.

2011) (product market limited to two oral contraceptives (Yaz and Yasmin) not plausible in light

of interchangeable alternatives; claim of conspiracy in violation of § 1 of Sherman Act

dismissed).

      Plaintiffs contend that the Loestrin 24 molecules (nonethindrone acetate and ethinyl

estradiol) constitute the market.  They may – or may not – turn out to be right.  Consistent with

this claim, their complaints each include averments alleging that, to the extent that proof of

monopoly power requires defining a relevant product market, that market is limited to Loestrin

24 and its AB-rated equivalents.  ECF No. 164 ¶ 303 (also includes Minastrin in market

definition); ECF No. 165 ¶ 303; ECF No. 174 ¶ 179; ECF No. 175 ¶ 182.  Defendants argue

vigorously that this snapshot of the market ignores the economic reality that Loestrin 24's price

is disciplined by actual price competition with an array of other oral contraceptives.  They seek

the documents to allow them to rebut Plaintiffs' averments with evidence that the relevant

product market is oral contraceptives that are economically interchangeable with Loestrin 24 and

its AB-rated equivalents.  Contrary to the Aggrenox holding that proof of a supracompetitive

price and an unduly "large" reverse payment are susceptible of simple proof, they contend that

they need the requested discovery to explain the real market dynamic to the fact finder so that

their rebuttal showing that the price was competitive and the reverse payment was not "large"

can be understood in the context of a highly competitive product market in which many

therapeutically interchangeable oral contraceptives compete.

       Courts should be wary of conflating the scope of discovery (permitting inquiry regarding

what is relevant to both claims and defenses) with what is plausibly alleged in a complaint

(ignoring the answer and affirmative defenses), what may be ruled out of the case at summary

judgment or what should be excluded from the evidence offered at trial.  For example, a court

may permit a complaint to proceed past a motion to dismiss by finding plausible a pleading

alleging a narrow relevant market limited to the brand and its AB-rated equivalents.  E.g., In re

Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 387-88 (D. Mass. 2013).  That

does not mean that discovery in such a case must be limited to that narrow market.  Compare

Meijer, Inc. v. Warner Chilcott Holdings, Co., III, Ltd., 245 F.R.D. 26, 31, 33 (D.D.C. 2007)

(product market discovery regarding Ovcon and potentially substitutable contraceptives ordered

to be provided because broader product market definition raised as defense), with Meijer, Inc. v.

Barr Pharms., Inc., 572 F. Supp. 2d 38, 62 (D.D.C. 2008) (jury could find relevant market

limited to Ovcon and its AB-rated equivalents).  In at least one case, broader product market

discovery regarding substitutes resulted in evidence that persuaded the court to reject the single

drug market based on robust economic competition.  Mylan v. Warner Chilcott Pub. Ltd. Co.,

838 F.3d 421, 436-38 (3d Cir. 2016) (affirming summary judgment in favor of defendants in

Doryx antitrust case).  And, except for Aggrenox, when such discovery has been denied, it was

not because the issue of the relevant product market was deemed entirely irrelevant, but rather

because the specific documents requested were found to be cumulative of information more

easily available from other sources.  E.g., In re Asacol Antitrust Litig., Civil Action No. 15-

12730-DJC, slip op. at 4 (D. Mass. Jan. 3, 2017) (filed in this case at ECF No. 258-4).

        Based on my review of the decisions presented by the parties, apart from Aggrenox, no

post-Actavis court has denied a timely motion to compel documents pertaining to product market

definition in a reverse payment case on grounds that the entire subject of economically

interchangeable substitutes for the brand and its AB-rated equivalents is irrelevant.  See In re

Asacol Antitrust Litig., slip op. at 4 (discovery regarding potentially substitutable products

assumed to seek relevant information but denied because not proportional); In re Suboxone

(Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., No. 13-MD-2445, 2016 WL

3519618, at *7 (E.D. Pa. June 28, 2016) (overruling magistrate judge's denial of motion to

compel documents to permit defendants to develop record on competition with other market

participants; "without the benefit of a fully developed record, rulings regarding the market

dynamic in this context would be premature and speculative"); In re Wellbutrin XL Antitrust

Litig., No. 2:08-cv-02431-MAM (E.D. Pa. Mar. 12, 2010) (product market documents relevant

to competition with other antidepressants ordered to be produced) (filed in this case at ECF No.

8

245-2); Meijer, Inc., 245 F.R.D. at 30-33 (discovery regarding contraceptives interchangeable

with Ovcon ordered to be produced).

That leaves Aggrenox.  Unsurprisingly, when asked to "let a hundred flowers bloom,"[5] in

the three years since Actavis was decided, trial courts have tried an array of "structures" to tackle

the potentially gargantuan proof problems posed by reverse payment settlement antitrust

litigation.  E.g., In re Nexium (Esomeprazole) Antitrust Litig., 309 F.R.D. 107, 135 (D. Mass.

2015), aff'd, 842 F.3d 34 (1st Cir. 2016) (one hundred forty-nine page opinion describing trial

court's approach to first post-Actavis reverse payment settlement claim tried to jury); In re

Loestrin 24 Fe Antitrust Litig., 45 F. Supp. 3d 180, 195 (D.R.I. 2014) (adopting interpretation

that Actavis requires cash consideration, but inviting parties to request interlocutory appeal under

28 U.S.C. § 1292(b)), vacated, 814 F.3d 538 (1st Cir. 2016.  Perhaps the most creative, "edgy,"

as the parties before me described it, Aggrenox holds that not just the discovery, but also the

evidence to be presented for the duration of the case, should be limited to the branded drug and

its AB-rated equivalents.  It relies on a sophisticated analysis of the law, as applied in the unique

setting of a reverse payment settlement case, finding that there is no need to articulate a relevant

market definition when direct evidence of market power is available.  199 F. Supp. 3d at 669 &

n.4 ("The relevant market serves merely as a proxy for market power when direct evidence of

market power is unavailable.  Where direct evidence of market power is available, however, a

plaintiff need not attempt to define the relevant market.") (quoting In re Nexium (Esomeprazole)

Antitrust Litig., 968 F. Supp. 2d at 388 n.19).  In recognition that his order was an experiment

worthy of early appellate review, Judge Underhill certified it for discretionary appeal pursuant to

---

[5] "Let a hundred flowers bloom and a hundred schools of thought contend."  English Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/hundred_flowers (viewed on Mar. 15, 2017) (attributed to 1956 speech of Chinese Communist Party Chairman Mao Zedong by https://en.wikipedia.org/wiki/Hundred_Flowers_Campaign).

28 U.S.C. § 1291(b). Aggrenox explains this unusual step, noting that "the economic issues discussed above are relatively technical, and their application to antitrust law is not without debate, nor is the caselaw touching on them uniform." Id. at 670. The Second Circuit Court of Appeals declined to accept the appeal. In re Aggrenox Antitrust Litig., 16-2864 (2d Cir. Jan. 9, 2017).

Aggrenox has a seductively binary elegance – either the price was supracompetitive or it was not; either the settlement was an excessive payment to exclude competition or it was not. Time may prove that Aggrenox lays out the right way to structure reverse payment antitrust litigation under the Hatch-Waxman Act. If so, its very sparseness will render litigation challenging anticompetitive reverse payment settlements manageable, with the salutary effect of deterring illegal arrangements that adversely impact prices of drugs that are critical for the patients, who are the ultimate consumers.

Nevertheless, I decline to take such a leap for a threshold discovery issue, which is all that has been referred to me. See 28 U.S.C. § 636(b)(1)(A). My job is not to establish the decisional infrastructure for this case; that task remains with the able District Judge to whom the case is assigned.[6] Rather, I am guided by Magistrate Judge Judith Dein, who wrote at an analogous procedural point in the life cycle of a reverse payment settlement antitrust case: "the complex issue of the relevant product market is not appropriately decided in the context of the instant motion to compel." In re Asacol Antitrust Litigation, slip op. at 2; see Meijer, Inc., 245 F.R.D. at 31 (magistrate judge declines to determine motion to compel based on what later may be admissible; information about other contraceptives relevant and discoverable). Under the cases interpreting the traditional rule of reason, documents related to the parties' competing

---

[6] My discovery decision should not be read as a rejection of the analytical framework adopted in Aggrenox. To the contrary, as the case proceeds, the parties remain free to propose to the Court that Aggrenox-based streamlining is appropriate and should be adopted.

versions of the relevant product market are relevant.  To the extent that the burden of producing

them is not out of proportion to their degree of relevance, they must be produced.

I turn next to the question of proportionality.

### B.     <u>Proportionality</u>

Plaintiffs have agreed to produce documents that contain the terms "Loestrin" and

"Minastrin," which may include documents that discuss interchangeability; based on relevancy,

they refuse to search for interchangeability documents that name one of the other ten oral

contraceptives but omit the terms "Loestrin" and "Minastrin."  Defendants point out that, if their

hypothetical larger product market is a viable construct, Loestrin 24 is a bit player; therefore,

documents strategizing about economic interchangeability of oral contraceptives are likely to

name the other oral contraceptives, which are used by a higher percentage of women, and not to

mention Loestrin 24 or Minastrin.  Because the parties' meet-and-confer discussions regarding

these documents have been premised on Plaintiffs' assertion of the relevancy objection, the

parties have yet to roll up their collective sleeves to confer about what search terms, custodians,

time frame, locations to be searched or other parameters affecting the burden imposed by the

requested discovery render the discovery proportional in light of its relevancy to the issue for

which it is sought.  Defendants have made clear that everything is up for discussion, including

the list of oral contraceptives.  They have offered a time frame compromise and are willing to

tighten up the list of custodians.  They have made plain that they do not seek documents located

at individual pharmacies.  With all of these details in flux, it is premature for the Court to issue

an order mandating specific discovery.  Instead, I provide several points of guidance below, and

invite the parties to return to the Court for an informal conference followed by a motion, if their

meet and confer is not successful in resolving their differences.  See Interim Case Management Order Number 5 (ECF No. 236) ¶ 4.

First, it is axiomatic that Plaintiffs need not produce information that is not in their possession, custody or control; the corollary to the axiom is that a search-term-based query for what is not there is both burdensome and disproportional.  See Meijer, Inc., 245 F.R.D. at 33. Retail Plaintiffs and EPPs argue that some of the requested documents simply do not exist or exist only randomly, such as because an employee may have randomly procured a copy of a publicly available formulary.  They point out that it would be disproportionately burdensome to run searches through the files of multiple custodians to seek what not only is a needle in a haystack, but also is remotely relevant, in that the random occurrence of a stray document has little bearing on the theme (economic interchangeability) that justified the search.  I agree.  In their meet-and-confer conferences, the parties should work on developing boundaries to avoid such a resource-wasting exercise, mindful that the Loestrin 24/Minastrin-focused discovery that Plaintiffs have already agreed to provide may well reveal clues about the degree to which a search focused only on the other oral contraceptives will turn up documents related to economic substitutability of such drugs with Loestrin 24 and its AB-rated equivalents.

Second, it is not clear whether the parties agree that the ten oral contraceptives that are the subject of this motion are therapeutically interchangeable in that they are prescribed for the same indication and the same patient population.  See n.2 supra.  Therapeutic interchangeability is a threshold issue in that Defendants' relevant request is for documents that strategize about or discuss how therapeutically interchangeable oral contraceptives may be or are economically substitutable for Loestrin 24 and its AB-rated generic equivalents.  While Plaintiffs are right that documents focused exclusively on medical analyses of the science underlying the proposition

12

that the ten oral contraceptives are therapeutic substitutes for Loestrin 24 are only remotely relevant, Defendants are right that they need to know about therapeutic substitutability to properly focus their economic substitutability inquiry.  This should be resolvable by a meet and confer.  That is, the parties should be able to agree which oral contraceptives to target for product market discovery tailored to the bull's-eye set – documents that reflect ways in which therapeutically interchangeable oral contraceptives are also economically interchangeable in that patients can be steered to the least expensive among an array of therapeutic substitutes. Moreover, therapeutic interchangeability becomes squarely relevant if proof of economic substitutability is to be rebutted by the argument that the products are not therapeutically interchangeable.  However, to the extent that therapeutic interchangeability is undisputed, searches that are exclusively focused on the therapeutic effects of the molecules in each of the ten oral contraceptives are disproportional and should be carved out.

Third, DPPs have presented persuasive declarations (ECF No. 263-1 through -4) that describe their offer to search using ingredient hormones as search terms, rather than the names of the ten listed drugs.  They contend that this approach should provide Defendants with most, if not all, of what they need and avoid the burden of screening the overinclusive set that would be derived from use of the search terms Defendants propose.  This plaint is compelling, but buried in the relevancy/irrelevancy debate that was the gravamen of the motion.  With relevancy clarified, the parties should revisit these issues.  Unless Defendants' search terms will yield results that are demonstrably relevant and not cumulative, the Court will not be inclined to order the time-wasting and burdensome searching described in these declarations.

III.    Conclusion

Plaintiffs' objection based on relevancy is overruled and Defendants' motion to compel product market discovery (ECF No. 244) is granted, without prejudice to Plaintiffs' assertion of disproportionality as described herein.

So ordered.


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
March 15, 2017

# Exhibit B-4

EXHIBIT B-4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MYLAN PHARMACEUTICALS,** | : | |
| **INC., et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | **Civ. No. 12-3824** |
| | : | **CONSOLIDATED** |
| **v.** | : | |
| | : | |
| **WARNER CHILCOTT PUBLIC LIMITED** | : | |
| **COMPANY, et al.,** | : | |
| **Defendants.** | : | |
| | : | |

---

### O R D E R

Mylan and Warner Chilcott have submitted several letters regarding their discovery dispute, which they have asked me to resolve. *(Doc. Nos. 106, 107, 109.)* The Parties disagree as to what documents Mylan should produce about its own products that Warner Chilcott contends compete with Doryx in the same antitrust product market.

Doryx, the focus of this litigation, is an antibiotic most commonly prescribed to treat severe acne, but also prescribed to treat other bacterial infections. Plaintiff argues that the relevant product market comprises only Doryx and its AB-rated generic equivalents. Warner Chilcott asserts a broader definition, which would include all products that "compete" with Doryx in prescriptions for acne and other conditions.

Warner Chilcott seeks discovery with respect to several Mylan products that Warner Chilcott contends compete with Doryx. All these drugs are—at least occasionally—prescribed to treat the same conditions for which Doryx is prescribed. The discovery Warner Chilcott seeks is thus "relevant" to Mylan's "claim[]" and Warner Chilcott's "defense[]." Fed.R.Civ.P.

**EXHIBIT B-4**

26(b)(1). Accordingly, I will order Mylan to produce the following information for Amnesteem, BenzaClin, Avita, Zithromax (Azithromycin), Bactrim DS, Ciproflozacin (Cipro and Cipro XR), Clindamycin, Erythromycin (EES 400 and Erthrocin Stearate), and Spironolactone:

- All responsive files from Chemistry and Product Development departments and employees regarding prescribing and product formulation considerations, and scoring.
- All responsive files from Commercial Operations and Launch Management (aka Project Management) departments and senior employees regarding logistics, product comparisons, projected sales, forecasts, and budgets.
- All responsive files from Portfolio Management department and senior employees regarding competition, market share, product discontinuation, planning, forecasting, and scoring.
- All responsive files from Marketing department and employees regarding marketing plans and materials, press releases, coordination with any third parties, product comparisons, competition, marketing expenditures, product promotion, and sales force and office visits to dermatologists.
- All responsive files from Pricing and Contracts department and senior employees regarding pricing, sales and projected sales, as well as direct purchaser contracts.
- Detailed monthly transactional data that includes sales, revenues, costs, and net profits, as well as transaction-by-transaction data by customer and NDC code.

**AND NOW**, this 21st day of November, 2012, it is hereby **ORDERED** that Warner Chilcott's Letter Motion to Compel Discovery *(Doc. No. 106)* is **GRANTED** as set out above.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

_____

Paul S. Diamond, J.

# Exhibit B-5

**EXHIBIT B-5**

APPEAL,LEAD,MDL2409

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:12–md–02409–WGY

In Re: Nexium (Esomeprazole) Antitrust Litigation
Assigned to: Judge William G. Young
 related Case:  1:14–cv–14096–WGY
Case in other court:  USCA, 14–01521
 USCA, 14–01522
 USCA – First Circuit, 15–02005
 USCA – First Circuit, 15–02006
 USCA – First Circuit, 15–02007
Cause: 15:1 Antitrust Litigation

Date Filed: 12/07/2012
Jury Demand: Both
Nature of Suit: 410 Anti–Trust
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 07/24/2013 | 264 | Judge William G. Young: ELECTRONIC ORDER entered Motion allowed in part: Within 30 days the relevant plaintiffs shall produce documents responsive to par. 1, so much of par. 2 as constitute documents in the hands of insurance carriers which reflect the impact of the price of the price differential for Nexium on the setting of the rates, and par. 4, save that in lieu of responding the Direct Purchaser Plaintiffs may detail the particular depositions responsive to the request and produce the protective orders thought to prevent their present production. Motion otherwise denied. re 251 Motion to Compel (Paine, Matthew) (Entered: 07/25/2013) |

# Exhibit C

## Provisionally Filed Under Seal

# EXHIBIT D

**Exhibit D**

| Search Term |
|---|
| (*Egosi* OR *Marth* OR *Durand* OR *Stark* OR *Bauer* OR (george w/2 barrett) OR gbarrett OR *Sonnenschein* OR *Schreger* OR *Whitehouse* OR *Creel* OR *Dinger* OR *Holding* OR *Lewris* OR *Paddock* OR *Shvartsman* OR *Weisen*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (advertis* OR detail* OR DTC OR "direct to consumer" or "direct-to-consumer" OR "brand plan" OR (brand w/3 plan) OR demand* OR grow* OR market* OR Promot* OR Publici* OR Plan* OR "R&D" OR Strateg* OR study OR studies OR Substitut* OR sale* OR scenario* OR share* OR commercial* OR sale* OR sell* OR sold) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/50 (manufactur* OR formulat* OR develop* OR scale* OR process* OR validat* OR market* OR sell OR approv* OR reject* OR deficien* OR ANDA OR licens* OR bioequivalen* OR enter* OR entr*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (strength OR strong OR weak* OR analy* OR merit* OR succe* OR eval* OR (claim* w/5 chart*) OR assess* OR probab* OR lik* OR prevail* OR predict* OR scope OR anticip* OR (belief* w/25 (valid OR infring* OR enforce*)) OR (believ* w/25 (valid OR infring* OR enforc*))) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/150 (market* or sales* or shar* or NRx or TRx or prescription* OR promot*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (budget* OR royalty OR royalties OR COGS OR discount OR forecast* OR margin* OR model OR NRX* OR "P&L" OR pric* OR profit* OR Project* OR Purchas* OR Rebat* OR reduce OR refund* OR chargeback* OR "charge back" OR return* OR revenue* OR TRX OR WAC OR "wholesale acquisition cost" OR (profit w/3 loss)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (delay* OR block* OR prevent OR imped* OR restrain* OR hinder OR avoid* OR protect* OR prevent* OR postpon* OR slow* OR hurdle* OR eliminat* OR crippl* OR crush* OR reduc* OR limit* OR curtail* OR impair* Or bottleneck* OR forbear OR commenc* OR stall* OR frustrat* OR windfall) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("best case" OR upside OR downside OR scenario* OR "base case" OR model OR models OR analys* OR assumption* OR LOE OR exclusiv* OR "generic entry" OR "generic entrance" OR "generic launch" OR erosion OR erode OR retention OR retain* OR (generic w/2 penetrat*) OR analog*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (profit* OR margin* OR purchas* OR demand OR (consumer* w/5 prefer*) OR pay* OR territory* OR (sales w/1 rep*) OR prescriber OR (sales w/1 force) OR copay* OR "P&L" Or (profit w/2 loss) OR revenue OR projection OR promot*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("AG" OR (authoriz* w/2 (generic OR GX)) OR Entr* OR exclusiv* OR GX OR generic* OR AGx OR LCM OR "L.C.M." OR "life-cycle" OR lifecycle OR (life w/2 cycle) OR LOE OR "L.O.E." OR (los* w/5 exclusiv*) OR molecule* OR Penetrat* OR risk OR "auth. Gen." OR "fighting brand") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ((patent* w/100 litigat*) OR (patent* w/100 lawsuit*) OR infring* OR "Hatch-Waxman" OR "Hatch Waxman" OR (patent* w/100 settl*) OR consent* OR initiat* OR maintain* OR sue* OR assert* OR alleg* OR enjoin* OR injunction OR mediat*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/25 (market OR marketplace OR share OR grow* OR marketshare) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (suppl* OR distribut* OR sales* OR licens* OR suppliers OR exclusiv* OR insurer OR insurance OR TPA OR rebat* OR discount*) AND (contract* or agreement*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/50 (budget* OR cost* OR COGs OR margin*) |

**Exhibit D**

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ((project* OR model* OR forecast* OR scenario* OR budget*) w/10 (sale* OR profit* OR gross OR net OR pric* OR NRX OR TRX OR RX OR return* OR projection*))

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/200 compet*

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) AND (negotiat* OR settl* OR litig* OR case OR discuss* OR conversation* OR call* OR meet* OR agreement* OR term* OR "meet and confer" OR "M&C")

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/100 (Pric* OR WAC OR AWP OR "wholesale acquisition cost")

((Effexor OR venla* OR ven OR Efexor OR XR OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") OR ("AG" OR (authoriz* w/2 (generic OR GX)) OR "auth. gen." OR "fighting brand" OR "branded generic" OR "branded gx" OR "brand-name generic" OR "brand-name GX") OR "auth. Gen." OR "fighting brand") AND (Sandoz OR Prasco OR Par OR Andrx OR Watson OR Greenstone OR Barr)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@aurobindo.com" OR "*@aurobindousa.com" OR Prasad OR white)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) AND (pay* OR consideration* OR paid OR valu* OR exchang* litigat* OR settl* OR agree* OR contract* OR licens* OR royalt*)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (209 OR "study 209" OR "600B-209-US" OR "0600B1-209")

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (208 OR "study 208" OR "600B-208-US" OR "0600B1-208")

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (cost or price or reimburse* OR pay* OR paid OR sales) AND (method or Medicaid OR cash OR TPP OR "third-party pay*" OR ("third party" w/5 pay*))

((Effexor OR venla* OR ven OR Efexor OR XR OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") OR ("AG" OR AGx OR (authoriz* w/2 (generic OR GX)) OR "auth. gen." OR "fighting brand" OR "branded generic" OR "branded gx" OR "brand-name generic" OR "brand-name GX")) AND ("days of inventory" OR DOI OR backorder* OR "out of stock" OR back-order* OR "out-of-stock" OR unavailable or ("NOT" w/2 available))

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila OR orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (agreement OR term* OR exclusiv*)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) AND (sue* OR file* OR filing* OR bring* OR dismiss* OR merit* OR succe* OR prevail* OR infringe* OR "claim constru*")

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (367 OR "study 367" OR "600B-367-EU" OR "0600B1-367" OR "600-B-367-BE" OR "600-B-367-FR" OR "600-B-367-IT" OR "600-B-367-ST" OR "600-B-367-UK")

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (Verispan OR "Scott-Levin" OR IMS OR MediSpan OR ImpaxRX OR "First Databank" OR PriceChek)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) AND (consent OR judgment OR deal* OR licens* OR contract* OR MOU OR (memo w/2 understand*))

**Exhibit D**

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) AND (assert* OR allege* OR claim* OR defend* OR defense* OR injunction* OR enjoin* OR win* OR lose OR FTF OR (day* w/5 180))

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (patent* AND "Orange Book" OR list OR submit OR "patent information")

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila OR orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (stay* OR settle*)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) AND (quid* OR deal* OR MOU OR "memorandum of understanding" OR resol* OR dismiss* OR terminat* OR negotiat* OR withdraw*)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (patent w/30 (exten* OR length* OR prolong* OR LA OR "long acting" OR sustain* OR SR OR delay* OR control* OR "once-a-day" OR tighter OR flattened OR eliminating OR peaks OR troughs OR nausea OR emesis))

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("market entry" OR "generic entry" OR "GX entry" OR "product entry" OR (launch* w/10 (generic* OR GX)))

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (patent* w/50 (enforce* OR unenforc* OR litig*))

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ((patent* w/50 invalid*) OR (patent* w/50 valid*) OR (patent* w/50 infring*))

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("authorized generic" OR "AG" OR AGx OR "branded generic" OR "branded GX" OR "brand-name generic" OR "brand-name GX" OR "fighting brand" OR "auth. Gen.")

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (LOE OR (loss w/2 exclusiv*) OR (lose* w/2 exclusiv*) OR (lost w/2 exclusiv*) OR (losing* w/2 exclusive*) OR trigger*)

(Effexor OR venla* OR ven OR Efexor OR XR OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("authorized generic" OR "AG" OR AGx OR "branded generic" OR "brand-name generic" OR (authorize* w/5 generic)) AND (sales OR revenue* OR profit* OR margin* OR pric* OR discount* OR share OR launch* OR manufact* OR "ramp up" OR "lead time" OR forecast* OR produce)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR)) AND ("authorized generic" OR "authorized GX" OR "AG" OR AGx OR "branded generic" OR "branded GX" OR "brand-name generic" OR "brand-name GX" OR (authorize* w/5 (generic OR GX)) OR "auth. Gen." OR "fighting brand") AND (sales OR revenue* OR profit* OR margin* OR pric* OR discount* OR share OR launch* OR manufact* OR "ramp up" OR "lead time")

(Effexor OR venla* OR ven OR Efexor OR XR OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("authorized generic" OR "AG" OR AGx OR "branded generic" OR "brand-name generic" OR (authorize* w/5 generic) OR "auth. Gen." OR "fighting brand") AND (build OR batch OR inventor* OR api OR packag* OR insert* OR print* OR draft* OR emboss* OR label* OR stamp* OR (package w/5 insert*) OR artwork OR outsert* OR overlabel* OR relabel* OR carton* OR "trade dress" OR distribut* OR Ship*)

(Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/50 (tier* OR formular*)

**Exhibit D**

| |
|---|
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR)) AND ("authorized generic" OR "authorized GX" OR "AG" OR AGx OR "branded generic" OR "branded GX" OR "brand-name generic" OR "brand-name GX" OR (authorize* w/5 (generic OR GX)) OR "auth. Gen." OR "fighting brand") AND (api OR packag* OR insert* OR print* OR draft* OR emboss* OR label* OR stamp* OR (package w/5 insert) OR artwork OR outsert*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ((Compound OR method OR basic OR "extended release") w/15 (PATENT)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ((pool* w/15 data) OR (combin* w/5 data)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@biovail.com" OR godin OR gilbert OR seide OR rochelle) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("authorized generic" OR "authorized GX" OR "AG" OR AGx OR "branded generic" OR "branded GX" OR "brand-name generic" OR "brand-name GX" OR (authorize* w/5 (generic OR GX)) OR "auth. Gen." OR "fighting brand") AND (forecast* OR produce OR build OR batch OR inventor*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (application w/30 (exten* OR length* OR prolong*)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (negotiat* OR settl* OR litig* OR case OR discuss* OR conversation* OR call* OR meet* OR agreement* OR term* OR "meet and confer" OR "M&C") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@drreddys.com" OR Mukherjee OR abhijit OR amit OR patel) |
| (("6 403 120") OR (6403120) OR (120 w/25 patent)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@cadila.com" OR Pankaj OR patel) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (pay* OR consideration* OR paid OR valu* OR exchang* OR litigat* OR settl* OR agree* OR contract* OR licens* OR royalt*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (sue* OR file* OR filing* OR bring* OR dismiss* OR merit* OR succe* OR prevail* OR infringe* OR "claim constru*") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR PF00345408 OR PF-00345408 OR 020699 OR 20-699) AND (margin OR GM OR (prod* w/3 contrib*) OR profit) AND (sales OR revenues) AND (COGS OR cost of goods sold OR COG) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (assert* OR allege* OR claim* OR defend* OR defense* OR injunction* OR enjoin* OR win* OR lose OR FTF OR (day* w/5 180)) |
| ((Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) w/100 (meet* OR confer OR negotiat*) |
| (("6 274 171") OR (6274171) OR (171 w/25 patent)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (consent OR judgment OR deal* OR licens* OR contract* OR MOU OR (memo w/2 understand*)) |

**Exhibit D**

| |
|---|
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*ftc.gov" OR Albert OR Meier OR Pender) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (quid* OR deal* OR MOU OR "memorandum of understanding" OR resol* OR dismiss* OR terminat* OR negotiat* OR withdraw*) |
| (("6 419 958") OR (6419958) OR (958 w/25 patent)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/25 ("paragraph iv" OR "piv" OR "paragraph 4" OR "para IV" OR "para 4" OR "P-IV") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*apotex.com" OR Sherman) |
| (Hulina OR Spear) AND ("*@pto.gov") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (patent* w/20 prosecut*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@teva.com" OR "*@tevausa.com" OR "*@tevapharm.com" OR marth OR durand OR stark) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*mylan.com" OR "*@mylanlabs.com" OR roman) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ((rate* w/5 substit*) OR ((generic* or Gx) w/5 substitut*) OR ((generic* OR Gx) w/5 penetrat*) OR ((generic*or Gx) w/5 eros*)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (share* w/2 (generic* OR GX)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND Alza |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (("4 535 186") OR (4535186) OR (186 w/25 patent) OR (Husband* w/25 patent)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR)) AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) AND (settle* OR exclusive* OR licens* OR suppl* OR litig* OR *suit OR patent* OR pay* OR paid OR *promote* OR "authorized generic" OR AG OR AGx OR dismiss* OR consideration OR compen* OR "auth. Gen." OR "fighting brand") AND (120 w/25 patent) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*osmotica.com" OR Waldon OR Forrest) |
| ("08/821,137") OR ("08 821 137") OR (08821137) OR (821137) OR (137 w/25 application) OR ("AHP-95011") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/25 ("operating plan" OR "strategic plan" OR opplan* OR stratplan* or "strategic operating plan" or "brand plan" or "marketing plan") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (delay* w/5 (generic* OR GX)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (Markman) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@orchid.com" OR Rao OR Madhusudhana) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (market w/3 (study OR studies)) |
| ((Effexor OR venla* OR ven OR Efexor OR XR OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") OR ("AG" OR AGx OR (authoriz* w/2 (generic OR GX)) OR "auth. gen." OR "fighting brand" OR "branded generic" OR "branded gx" OR "brand-name generic" OR "brand-name GX")) AND ("Days on hand" OR DOH OR "weeks on hand" OR WOH OR "weeks of inventory" OR WOI) |
| ("60/014,006") OR ("60 014 006") OR (60014006) OR (014006) OR (006 w/25 application) OR ("AHP-95011") |

**Exhibit D**

| |
|---|
| ("08/964,328") OR ("08 964 328") OR (08964328) OR (964328) OR (328 w/25 application) OR ("AHP-95011") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (apply w/30 (exten* OR length* OR prolong*)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (invention w/30 (exten* OR length* OR prolong*)) |
| ("09/884,412") OR ("09 884 412") OR (09884412) OR (884412) OR (412 w/25 application) OR ("AHP-95011") |
| ("09/488,629") OR ("09 488 629") OR (09488629) OR (488629) OR (629 w/25 application) OR ("AHP-95011") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@lupin.com" OR nilesh OR vinta OR gupta) |
| ("08/830,903") OR ("08 830 903") OR (08830903) OR (830903) OR (903 w/25 application) OR ("AHP-95011") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (timing w/15 (generic* OR GX)) |
| ("09/950,965") OR ("09 950 965") OR (09950965) OR (950965) OR (965 w/25 application) OR ("AHP-95011") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@impax.com" OR Koch) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*orgenus.com" OR Satish OR Srinivasan) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (("6 440 457") OR (6440457) OR (457 w/25 patent) OR (Edgren w/25 patent)) |
| ((Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid)) w/100 (meet* OR confer OR negotiat*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (("5 506 270") OR (5506270) OR (270 w/25 patent) OR (Upton w/25 patent)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@anchen.com" OR Mooney) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (settle* OR exclusive* OR licens* OR suppl* OR litig* OR *suit OR patent* OR pay* OR paid) AND (120 w/25 patent) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (penetrat* w/2 (generic* OR GX)) |
| (PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("authorized generic" OR "authorized GX" OR "AG" OR AGx OR "branded generic" OR "branded GX" OR "brand-name generic" OR "brand-name GX" OR (authorize* w/5 (generic OR GX)) OR "auth. Gen." OR "fighting brand") AND (sales OR revenue* OR profit* OR margin* OR pric* OR discount* OR share OR launch* OR manufact* OR "ramp up" OR "lead time") |
| (PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("authorized generic" OR "authorized GX" OR "AG" OR AGx OR "branded generic" OR "branded GX" OR "brand-name generic" OR "brand-name GX" OR (authorize* w/5 (generic OR GX)) OR "auth. Gen." OR "fighting brand") AND (api OR packag* OR insert* OR print* OR draft* OR emboss* OR label* OR stamp* OR (package w/5 insert) OR artwork OR outsert*) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (orgenus OR aurobindo OR intellipharmaceutics OR IPC OR "dr. Reddy's" OR "reddy's" OR DRL OR nostrum OR Enem OR Zydus OR ZPI OR Orchid) AND (*promote* OR "authorized generic" OR AG OR AGx OR dismiss OR consideration OR compen* OR "auth. Gen." OR "fighting brand") AND (120 w/25 patent) |

**Exhibit D**

| |
|---|
| (Effexor OR venla* OR ven OR Efexor OR XR OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND elastic* |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (("4 138 475") OR (4138475) OR (475 w/25 patent) OR (McAinsh w/25 patent)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@torrent.com" OR dutt OR praveen OR ghandi OR kamesh OR venugopal) |
| (PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (teva OR impax OR anchen OR lupin OR LPI OR osmotica OR sandoz OR mylan OR wockhardt OR biovail OR apotex OR torrent OR cadila) AND (settle* OR exclusive* OR licens* OR suppl* OR litig* OR *suit OR patent* OR pay* OR paid OR *promote* OR "authorized generic" OR AG OR AGx OR dismiss* OR consideration OR compen* OR "auth. Gen." OR "fighting brand") AND (120 w/25 patent) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ((WO/1994/027589) OR (WO 94/27589) OR (27589) OR ("589 application") OR ("589 PCT application") OR (589 w/10 PCT)) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@zydus.com" OR Renner) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@nostrum.com" OR Asher) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@sandoz.com" OR degolyer) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("*@intellipharmaceutics.com" OR Allport) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("Pharmacy and Therapeutics Committee" OR "Pharmacy & Therapeutics Committee") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("05/833,339") OR ("05 833 339") OR (05833339) OR (833339) OR (339 w/25 application) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("06/545,701") OR ("06 545 701") OR (06545701) OR (545701) OR (701 w/25 application) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("principal investigator") |
| (Wyeth and Anchen) and agreement* |
| (Wyeth and Osmotica) and agreement* |
| (Wyeth and Teva) and agreement* |
| (Wyeth and Impax) and agreement* |
| (Wyeth and Lupin) and agreement* |
| (Wyeth and Sandoz) and agreement* |
| (Wyeth and Mylan) and agreement* |
| (Wyeth and Wockhardt) and agreement* |
| (Wyeth and Biovail) and agreement* |
| (Wyeth and Apotex) and agreement* |
| (Wyeth and Torrent) and agreement* |
| (Wyeth and Cadila) and agreement* |
| (Wyeth and Zydus) and agreement* |
| (Wyeth and Orgenus) and agreement* |
| (Wyeth and Aurobindo) and agreement* |
| (Wyeth and Intellipharmaceutics) and agreement |
| (Wyeth and Reddy*) and agreement* |
| (Wyeth and Nostrum) and agreement* |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (MAT OR YTD) |
| "direct brand profit" |

**Exhibit D**

| |
| --- |
| NrEffexor* OR TrEffexor* |
| ReportEffexorFamilyShChg |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (Abilify OR aripiprazole OR Celexa OR citalopram OR Cymbalta OR duloxetine OR Desyrel OR trazodone OR Lexapro OR escitalopram OR Nefazodone OR Paxil OR paroxetine OR Prozac OR fluoxetine OR Remeron OR mirtazapine OR Wellbutrin OR bupropion OR Zoloft OR sertraline) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (Pristiq OR desvenlafaxine) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND (Deino OR (Patricia AND sutter) OR AFL OR "A.F.L." OR "A.F. of L." OR "AF of L" OR "Building Trades" OR "American Sales" OR "CVS Caremark" OR Eckerd OR "Giant Eagle" OR "HEB Grocery Co.*" OR IBEW OR "I.B.E.W." OR "Local 505" OR "JCG (PJC)" OR Kroger OR "Louisiana Health") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ((bluecross w/4 lousiana) OR BCBSLA OR "B.C.B.S.L.A." OR "BCBS-LA" OR "B.C.B.S.-L.A.") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("Man-U Service" OR "Maxi Drug" OR "Local 119" OR "Medical Mutual of Ohio" OR Meijer OR "New Mexico United Food & Commercial Workers" OR UFCW  OR "U.C.F.W" OR "United Food" OR "Arizona Health and Welfare") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("Painters District Council" OR Plumbers OR "Local 572" OR Providence OR "Professional Drug" OR "Rite Aid" OR "Rochester Drug" OR "Safeway" OR SBA OR "Stephen L. LaFrance" OR "Supervalu" OR "Uniondale Chemists" OR Walgreen) |
| (Effexor OR venla* OR ven OR Efexor OR XR OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/200 (procomp* or "pro-comp*") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") w/25 (DOJ OR D.O.J. OR "Department of Justice" OR FTC OR "F.T.C" OR "Federal Trade Commission") |
| (Effexor OR venla* OR ven OR Efexor OR XR OR (XR AND IR) OR PF00345408 OR "PF-00345408" OR 020699 OR "20-699") AND ("anti-generic" OR antitrust OR "A/T" OR block* OR crush* OR delay* OR "anti-GX" OR antitrust OR block OR crush* OR delay* OR DOJ OR "D.O.J." OR FTC OR "F.T.C." OR Illegal OR Illicit OR Impede* OR justice OR monopol* OR unlawful OR sham OR anticompet* OR (anti w/3 compet*) OR baseless*) |