**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| IN RE: EFFEXOR XR ANTITRUST LITIGATION | : : : : : : | Civil Action No. 11-5479 (PGS)(LHG) |
| IN RE: LIPITOR ANTITRUST LITIGATION | : : : : : : | Civil Action No. 12-2389 (PGS)(DEA)<br><br>**ORDER** |

GOODMAN, Magistrate Judge; ARPERT, Magistrate Judge

These matters come before the Court by way of letter applications from the parties concerning a number of discovery disputes. The issues discussed herein were presented to the Court first by way of a joint letter in *In re: Effexor Antitrust Litigation*, Civil Action No. 11-5479. *See* ECF No. 528 (the "Effexor Joint Letter"). Thereafter, the parties in *In re Lipitor Antitrust Litigation*, Civil Action No. 12-2389 filed a similar letter containing many overlapping issues and incorporating the first letter by reference. *See* ECF No. 812 (the "Lipitor Joint Letter"). The Court addresses each of the issues in turn below.

**I. Whether Plaintiffs Should Produce Documents and Data Regarding Competing Products (Effexor Joint Letter at 8-17) (Lipitor Joint Letter at 2-14).**

In both the Effexor and Lipitor cases, Defendants seek documents from Plaintiffs pertaining to the scope of the relevant market. The Lipitor parties rely primarily on the Effexor briefing, and therefore the issue will be addressed in that context. The Court will then address the separate issue raised by the Lipitor parties.

Effexor Defendants seek discovery relating to the market for antidepressants. They claim that Effexor XR competes with immediate release Effexor and at least 38 other antidepressants. ECF No. 528 at 8. Nevertheless, they concede that a subcategory of 12 "Second Generation Antidepressants" is most likely to compete with Effexor XR and they offer to narrow their document requests to those 12. *Id*.

In response, Effexor Plaintiffs have offered to run eleven broad search terms, including "Effexor" and its generic equivalent, and the brand and generic names for five additional products of Defendants' choosing, with a string of connected terms relating to "relevant market issues." *Id*. at 12. Plaintiffs have also agreed to produce any document mentioning substitutability of Effexor and another drug. *Id*. at 15. Beyond this, Plaintiffs object to any further discovery on the bases of both relevance and burden.

According to Effexor Plaintiffs, other drug products are irrelevant because their case concerns only Effexor and its AB-rated generic equivalents rather than a broader class of antidepressants. *Id*. at 14. In support of their theory of the case, they first contend that they have direct evidence of Wyeth's market power and, if the jury determines this evidence establishes market power, any indirect evidence of a broader therapeutic market would be rendered meaningless. *Id*. Plaintiffs rely largely on *In re Aggrenox Antitrust Litigation*, 199 F. Supp. 3d 662 (Aug. 8, 2016) ("*Aggrenox*") for this proposition. *Id*. at 15. Plaintiffs also argue that, should it come to it, a relevant market is properly defined not by therapeutic interchangeability but by economic interchangeability, that is, those products for which there is a substantial cross-elasticity of demand. *Id*. at 14. Here again, Plaintiffs cite to *Aggrenox* and that court's rationale for barring discovery beyond the brand at issue and its generic equivalent. In Plaintiffs' view, the *Aggrenox* decision leads to the conclusion that: 1) just

2

because another drug might treat the same ailment, it does not follow that it also affects the price of the branded drug; and 2) even if the pricing of another drug did affect the price of the branded drug, that effect would be apparent in the pricing of the branded drug itself, rendering redundant any information as to the pricing of the competing drug. *Id*. Accordingly, Plaintiffs argue that the only pricing information needed is the data for Effexor and its generic equivalents.

Effexor Plaintiffs also object based on the burden that would be imposed by discovery as to competing products. They criticize Defendants for failing to come forward with an expert to explain how or why Defendants need the product information they seek. *Id*. at 16. According to Plaintiffs, the data Defendants are demanding is more readily available from a prescription drug data provider, such as IMS Health, that is used regularly by industry, academia, and litigants. Plaintiffs contend the IMS data incorporates the wholesale and retail pricing that is needed here. In support, Plaintiffs cite their trial counsel's wealth of experience in this field and assert that Defendants' discovery demands will needlessly burden the parties, nonparties, the record, and the Court, particularly given that Defendants demand documents that do not even mention Effexor. *Id*. at 17. Plaintiffs offer to submit client and expert affidavits in support of their assertions as to burden. *Id*.

In response, Defendants press their own preferred case as to relevance: *Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co.*, 838 F.3d 421 (3d Cir. 2016) ("*Doryx II*"). In *Doryx II*, the Third Circuit observed that monopoly power can be proven by either direct or indirect evidence. 838 F.3d at 434. To prove monopoly power by indirect evidence, a plaintiff must show that a defendant had market power in a relevant market. *Id*. at 435. A relevant market is comprised of products that are reasonably interchangeable and for

which there is cross-elasticity of demand, *i.e.*, a price change for one product affects the demand for the other products in the market. *Id*. at 435–436. The Third Circuit in *Doryx II* affirmed the district court's finding on summary judgment that the relevant market was the class of drugs at issue, rather than just the branded drug and its generic equivalents. *Id*. at 437. Moreover, given the branded pharmaceutical's minority share in that broader market, the Circuit affirmed the district court's finding that there was no monopoly. *Id*. at 437–438.

The Court has considered the parties' positions with respect to relevance and reviewed the authority cited. While the Third Circuit has not addressed the precise question of what discovery is relevant in a reverse payment settlement suit, as Defendants point out, the Third Circuit has endorsed a full rule of reason analysis in *Doryx II*. In that case, the Court of Appeals rejected a single-product market like the one Plaintiffs propose here, and instead considered both the economic and therapeutic interchangeability to define a relevant market. Since then, at least one other district court in this circuit has applied the reasoning from *Doryx II* to do the same. *See FTC v. Abbvie*, 329 F. Supp. 3d 98 (E.D.P.A. 2018).[1]

In the Court's view, Plaintiffs' reliance on *Aggrenox* is understandable, if ill-fated. Its appeal is obvious: *Aggrenox* also centered on an allegedly suspect reverse-payment settlement and, were its reasoning applied here, it would substantially streamline the analysis and the discovery, much to Plaintiffs' benefit. *Aggrenox* was, however, highly aggressive in both its interpretation of the Supreme Court's *Actavis* decision and, even more so, in the timing of its decision to limit the relevant market to the brand and its generic equivalents so early in the case on a motion to compel. In fact, the court in *Aggrenox* explicitly recognized

---

[1] The Court notes for the record that it has considered the parties' briefing with respect to this more recently issued decision as set forth in the parties' letters. [11-cv-5479 ECF Nos. 545 and 546].

the extraordinary nature of its ruling and took the unusual step of certifying its decision for discretionary interlocutory appeal.  199 F. Supp. 3d at 670.

Under circumstances very similar to those here, in *In re Loestrin 24 Fe Antitrust Litigation*, another district court surveyed the cases in the wake of *Aggrenox* and declined to follow its guidance.  No. 13-2472, 2017 WL 1491911 (D.R.I. March 15, 2017).  The court in *Loestrin* emphasized that it was being asked to decide a discovery motion rather than a dispositive one, and it reasoned that under the rule of reason standard set out in *Actavis*, the parties were entitled to the discovery they needed to later present competing definitions of the appropriate relevant market.  2017 WL 14911 at *5–6.  The Third Circuit has also explicitly observed that a rule of reason inquiry is fact intensive and difficult to resolve at the summary judgement phase.  *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 170 n.64 (3d Cir. 2017).  Taken together, *Loestrin* and *Wellbutrin* counsel that defining a relevant market—a sizeable portion of the rule of reason analysis—on a discovery motion is premature at best.  *See also In re Asacol Antitrust Litig.*, 15-cv-12730, slip op. at 2 (D. Mass. Jan. 3, 2017) ("This court finds that the complex issue of the relevant product market is not appropriately decided in the context of the instant motion to compel.").  Accordingly, the Court finds that this is an issue best left to a dispositive motion, if not trial.  Prudence therefore dictates that, at this stage, the parties be permitted to build a fulsome record from which to properly put this issue before the Court.  Accordingly, Plaintiffs' objections to Defendants' competing product discovery based on relevance are overruled.

The other cases principally relied upon by Plaintiffs for this issue do not compel a different conclusion.  In *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-2503, 2016 WL 6897809 (D. Mass. Sep. 19, 2016), the court denied additional discovery

because the defendants had already conceded that the searches using the brand and generic

drug product terms were "appropriate and sufficient to capture the relevant documents," the

defendants had failed to timely seek the discovery at issue, and the additional burden it would

impose.  2016 WL 6897809 at *3.  Here, Defendants have made no such concessions, nor has

the timeliness of their application been challenged.  The Court will address the final basis,

burden, separately, *infra*.  Plaintiffs final principal case is *In re Asacol Antitrust Litigation*.

The court there was presented with unopposed affidavits from the plaintiffs: one from an

expert attesting that the competing product information sought was not necessary to the

defendants' case, together with separate affidavits attesting to the burden that the discovery

would impose on the plaintiffs.  No. 15-12730, slip op. at 2 (D. Mass. Jan. 3, 2017).  In the

face of that uncontradicted testimony, the *Asacol* court denied the defendants' discovery

requests, but did so without prejudice to their renewal at a later date, should the defendants'

experts opine that the requested information was necessary to formulate their opinions.  *Id*.

This Court has been presented with no such testimony

      The Court turns finally to the proportionality of what Effexor Defendants seek.  The

record is scant as to the burden that would be involved in responding to the disputed

discovery.  Plaintiffs provide no estimation of the costs in terms of time or money beyond

their counsels' bald claim of undue burden.  They offer to provide the Court with affidavits to

support their claims, but say they did not do so because they were concerned with burdening

the record.  ECF No. 528 at 17.  They also point to Defendants' failure to provide expert

affidavits in support of their need for the information.  *Id*. at 16.  If Plaintiffs wished the Court

to intercede on their behalf to limit the discovery Defendants seek, it was Plaintiffs' duty to

articulate their burden, not Defendants'.  In light of the Court's rejection of Plaintiffs'

relevancy objections and the shortage of information as to the burden of the discovery that is sought, the Court finds that a further meet and confer between counsel is appropriate. This will give the parties the opportunity to have a meaningful negotiation with respect to search terms, custodians, and other parameters that will affect the cost of the discovery to be exchanged. If, after a rigorous meet and confer, a party wishes to renew its request for relief based on the burden such discovery would impose, it is instructed to brief that issue fully, including any affidavits it wishes the Court to consider. The opposing party obviously should respond in kind. A joint submission on this issue should be submitted by no later than June 30, 2019.

The separate issue raised in the Lipitor Joint Letter pertains to Retailer Plaintiffs' refusal to search for "Pharmacy & Therapeutics" committee meeting minutes. ECF No. 812 at 7. Lipitor Defendants contend these documents are highly relevant, deeming them "some of the most important documents in a pharmaceutical antitrust case" insofar as they offer insight into why a given drug is placed on a formulary. *Id.* at 7–8. Retailer Plaintiffs first object on the same relevance grounds that they set out with respect to competing products discovery. *Id.* at 13. As set forth above, the Court overrules this objection. Retailer Plaintiffs, however, also deny having such committees or receiving such meeting minutes in the ordinary course of business. *Id.* They offer instead to produce any formularies provided by their Pharmacy Benefit Managers that are located in the files of their custodians. *Id.* Retailer Plaintiffs argue that is axiomatic that a party cannot produce what it does not have, and press what they urge is the related corollary: that it would be burdensome and disproportional to force them to conduct a search-term-based query for what they assert is not there. *Id.* (citing *In re Loestrin*, 2017 WL 1491911, at *6).

As the parties frame this dispute, the formularies themselves are less likely than the committee meeting minutes to provide a rationale as to why a drug is listed or not listed, and therefore are not a meaningful substitute. Retailer Plaintiffs refuse to search for the committee meeting minutes based on disproportionate burden, but they fall short of articulating the size and nature of the burden it would impose. The Court therefore declines to grant the protection they seek. Given the apparent probative value of the committee meeting minutes, the Court finds that they are a suitable subject of discovery. The parties are therefore instructed to confer to frame the search in such a way that would reduce any asserted burden. If no minutes can be located after a diligent search, Retailer Plaintiffs are to so certify.

## II. Whether Plaintiffs Must Produce "Business Information" That They Contend Is "Downstream Discovery" (Effexor Joint Letter at 18-24) (Lipitor Joint Letter 16-18) [2]

Defendants in both actions have served document requests seeking several categories of documents that Defendants describe generally as "business documents." Plaintiffs have objected to a number of these requests, arguing that the materials sought constitute irrelevant "downstream discovery." As described by Defendants, Plaintiffs have refused to produce information regarding the following types of information: (1) organizational structure, (2) competition among drug products, (3) formularies, (4) doctors' prescribing practices, (5) Plaintiffs' allegations, (6) Plaintiffs' adequacy to serve as class representatives, (7) Plaintiffs' health plan structure, and (8) damages. Defendants contend that Plaintiffs seek to preclude discovery into "all documents even remotely involving [Plaintiffs'] customers." ECF No. 528 at 18 (No. 11-5479). At issue are approximately 250 requests from both the Effexor and Lipitor matters. [3]

---

[2] The Lipitor parties rely primarily on the briefing in the Effexor joint letter.

[3] The requests at issue are as follows: Effexor -- Req. to DPPs 1-2, 8, 10, 13, 15, 16, 18-19, 23, 25, 33-35, 38-46, 49, 51-54, 57-59, 61, 73, 79-90, 101, 108, 112; Req. to Retail. 1-3, 5, 9-16, 18-20, 22-23, 25-28, 30-35, 38-41,

Plaintiffs have refused to produce any information that Plaintiffs characterize as "downstream", which Plaintiffs define as information relating to any business activity below Plaintiffs in the chain of distribution.  Plaintiffs argue that such "downstream" information is irrelevant because a defendant in an antitrust case cannot raise as a defense to federal direct purchaser claims that the purchaser "passed on" their damages to customers by raising prices. This is in accordance with the Supreme Court's decisions in *Hanover Shoe, Inc. v. United Shoe Machinery Corporation*, 392 U.S. 481 (1968) and *Illinois Brick Co. V. Illinois*, 431 U.S. 720 (1977).  Under *Hanover Shoe*, a defendant cannot avoid antitrust liability by claiming that direct purchaser plaintiffs suffered no injury as the result of having "passed on" the supracompetitive prices to downstream members of the distribution chain.[4]  *Illinois Brick*, a complement to *Hanover Shoe*, expressly limits federal antitrust lawsuits to direct purchasers.

Under the relevant precedent, therefore, "[t]he proper inquiry in 'overcharge' anti-trust cases is not 'why' or 'whether' the cost was passed on to customers farther down stream, but 'if' an overcharge was improperly imposed in the first place." *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-CV-2680, 2015 WL 4510416, at *2 (S.D.N.Y. July 24, 2015). Generally, "events farther down the stream of commerce are irrelevant." *Id.* at *2.

Defendants do not disagree that "downstream" information may be irrelevant in certain situations.  However, Defendants offer a much narrower view of what constitutes impermissible downstream discovery, describing it as "[c]ertain discovery regarding prices charged to a plaintiff's customers [that is] relevant [only] to a foreclosed pass-on defense

---

43-45, 48- 49, 51-55, 57-59, 61-62, 65, 73, 79-87, 93-94, 97-117, 119-22, 124-27, 130; Req. to EPPs 47-48, 57-60, 62, 74, 79-80, 113-15, 117; Lipitor -- Req. to DPPs 8-10, 35, 37-39, 45-47, 51, 80-83; Req. to Retail 5, 11, 14-15, 17, 18, 22-23, 25, 28-29, 32-35, 38-39, 42-48, 50-51, 53, 54-56, 58-59, 76, 79, 82-84, 90, 94-109, 119, 121-124, 127; Req. to EPPs 33, 41, 50-53, 55, 72-73, 107-109.

[4] There are limited exceptions to this rule not relevant here.

under federal law." ECF No. 528 at 18.   Defendants note that such discovery would be

irrelevant "if only federal antitrust claims were at issue," which is not the case here. *Id.*

While admitting that a limited subset of their requests may relate to "pass-on" issues,

Defendants contend that the discovery they seek is nevertheless relevant to "other critical

issues in the case." ECF No. 528 (Civ. 11-5479).

Generally speaking, it appears that what may be labeled as "downstream discovery" is

broad.  As one court noted, "[d]ownstream discovery may include, among other things,

information concerning the plaintiffs' use, manufacture, sale, marketing, distribution or

supply of a product to entities and individuals lower in the distribution chain." *In re*

*Photochromic Lens Antitrust Litig.*, 279 F.R.D. 620, 623 (M.D. Fla. 2012); *see also In re*

*Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 14-2503, 2016 WL 6897809, at *1 (D.

Mass. Sept. 19, 2016) ("In an antitrust case such as this one, discovery regarding insurance

coverage, formularies, patient savings and discount cards, free samples, and the Retailer

Plaintiffs' sales of branded and generic Solodyn is commonly referred to as "downstream

discovery.").  Importantly, "there is no absolute rule barring downstream discovery in private

antitrust cases."  *In re Broiler Chicken Antitrust Litig.*, No. 16- 8637, 2018 WL 3398141, at

*1 (N.D. Ill. July 12, 2018).  Nevertheless, courts generally have precluded downstream

discovery based on a lack of relevance--even where the the requesting party argued that it

sought the discovery for reasons other than a pass-on defense, *e.g.*, market definition, class

certification, damages, or indirect purchaser issues.  *See*, *e.g.*, *In re Plasma-Derivative Protein*

*Therapies Antitrust Litigation*, No. 09-7666, 2012 WL 1533221, at *2 (N.D. Ill. 2012)

(downstream discovery not relevant to class certification analysis); *In re Air Cargo Shipping*

*Services Antitrust Litigation*, No. 12-02328, 2010 WL 4916723 (E.D.N.Y. Nov. 24, 2010)

(information regarding pricing decisions not relevant to class certification issues); *Meijer, Inc..v. Abbott Labs*., 251 F.R.D. 431, 433-34 (N.D. Cal. 2008) (information regarding drug sales not relevant on class certification issues); *In re Aspartame Antitrust Litigation*, No. 06-1732, 2008 WL 2275528, at *4-6 (E.D. Pa. 2008) (information regarding sales and end uses of product not sufficiently relevant to class certification and indirect purchaser issues); *In re K–Dur Antitrust Litigation*, No.01-1652, 2007 WL 5302308, at *11-12 (D.N.J. 2007) (information regarding sales, prices, and profits of the direct purchaser plaintiffs not relevant to adequacy of class certification, damages, and indirect purchaser issues). On the other hand, there have been some limited situations where courts have determined downstream discovery to be relevant. *See*, *e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 325 F.R.D. 551, 555 (E.D. Pa. 2016) (finding sales and pricing information relevant to product hop issues).

According to Defendants, Plaintiffs have objected to roughly <u>half</u> of Defendants' documents requests as seeking impermissible downstream discovery. Defendants contend that Plaintiffs have unjustifiably taken the position that if the information sought even remotely relates to Plaintiffs' customers, they need not produce it. Plaintiffs do not directly dispute that characterization and stand on the proposition that due to the unavailability of the pass-on defense, downstream discovery is disfavored and generally prohibited.

Although the parties here dispute whether the information sought by Defendants should bear the label "downstream discovery", how to label the information is not the fundamental question. Rather, the analysis in the first instance -- like any other discovery dispute -- boils down to whether the material sought is "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at

stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). *See, e.g., In re Vitamins Antitrust Litigation*, 198 F.R.D. 296 (D.D.C. 2000) (To determine whether downstream data is discoverable, "the Court must first determine whether this data is relevant to the subject matter at issue and then if it is deemed relevant, the Court must weigh the benefits of this information to the defendants against the burden or expense that discovery of this information would impose on the plaintiffs."); *see also In re Broiler Chicken Antitrust Litig.*, No. 16-8637, 2018 WL 3398141, at *5 (N.D. Ill. July 12, 2018) ("[T]he Court is not convinced that the downstream discovery Defendants have requested from DPPs is relevant or proportional to the needs of the case within the meaning of Federal Rule of Civil Procedure 26(b)(1)."); *In re Photochromic Lens Antitrust Litig.*, 279 F.R.D. 620, 624 (M.D. Fla. 2012) ("Defendants have not demonstrated the relevance of downstream discovery …").

When an objection has been raised, the party seeking the discovery bears the burden in the first instance to establish the relevance of the requested material. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Becton, Dickinson & Co.*, No. 14-4318, 2019 WL 1771996, at *3 (D.N.J. Apr. 23, 2019). In this regard, Defendants have addressed some, but not all, categories of the documents sought.  For example, Defendants state that the discovery requests regarding formularies and doctors' prescribing practices are material to defining the relevant market. Defendants also contend certain other requests are relevant to the adequacy of class representatives and damages.  To the extent that Defendants concede that some requests relate

to pass-on issues,[5] Defendants argue that many states' antitrust laws either explicitly permit the assertion of a pass-on defense (and state law antitrust claims are asserted in this case) or provide that EPPs may only recover "actual damages," which courts have held are damages passed on to them and not passed on to anyone else. Defendants maintain that because indirect purchasers must prove that the direct purchasers passed on any overcharges to the indirect purchasers, Defendants are entitled to the discovery they seek.  Defendants also argue that discovery regarding EPP's pass-on of prescription drug costs through premiums is relevant to class certification because it supports the argument that an individualized, plan-by-plan inquiry is required to measure injury.

In response, Plaintiffs contend that each of the requests to which Plaintiffs have objected concerns issues regarding Plaintiffs' pricing, sales, profits, marketing and promotion. Plaintiffs claim nearly all of the objectionable requests call for "transactional sales data as well as documents concerning customer contracts, customer contract negotiations, pharmaceutical distribution profitability analyses, inventory practices, costs to fill prescriptions and marketing efforts."  ECF No. 528 at 21 (Civ. No. 11-5479).  Plaintiffs assert that this information relates to events further down the stream of commerce than is permissible in light of *Hanover Shoe* and is progeny and is, therefore, not relevant to this case.

Here, given the large number of discovery requests that are at issue, the Court finds the parties' discussion of relevance to be cursory and extremely limited.  Furthermore, the parties offer little or no discussion on the issues of proportionality, importance, expense or

---

[5] Defendants concede that the following "handful" of requests may relate to pass-on issues: *Effexor*--Requests to DPPs 41-42, 44, 57, and 61; Requests to Retailers 41-42, 44, 57, and 61; and Requests to EPPs 48, 57-60, 62, 80, and 114; *Lipitor*-- Req. to DPPs 9, 35, 37-39, 45-47, 51, 80-83; Req. to Retail. 14, 18, 35, 38-39, 43, 45-47, 50-51, 53, 55, 82-84, 90, 94-108, 121, 124; Req. to EPPs 41, 50-53, 55, 72-73, 108; Req. to EPPs 41, 50-53, 55, 72-73, 108.

benefit.  Plaintiffs offer only a brief paragraph on burden and propose supplementing their

unsupported assertions of "disproportionate burdens" with declarations "should the Court

require." ECF No. 528 (Civ. No. 11-5479) at 23.

Reviewing the document requests at issue, it appears that some, but not necessarily all,

of the information Defendants seek may be the type of downstream discovery that lacks

sufficient relevance to the claims and/or defenses in this case.  However, the reasons that

other items are objectionable to Plaintiffs are less clear.  Overall, the relevance (or lack

thereof) of each of the 250 disputed requests is not necessarily obvious from the face of each

request, particularly given the complexities of this case.  Given the self-limiting nature of the

letter applications submitted, the Court finds that issues have not been adequately briefed.  As

such, that the parties will be given the opportunity to thoroughly brief the issues of relevance,

proportionality, importance, burden, expense, etc., so the disputed discovery requests can be

properly considered in light of the requirements of Rule 26.  Requiring this additional briefing

will permit the issues to be decided in a manner consistent with the approach courts have

generally taken -- giving due consideration to arguments concerning a party's need for the

information and the relevance to the issues in the case, and balancing that with the other

requisite factors.  The dispute will be submitted to the Special Master(s) being appointed in

this matter.  However, prior to submitting any further briefing on the issue, the parties are to

meet and confer in a good faith effort to reduce the number of requests in dispute.

### III.  Whether Plaintiffs Should Be Required to Produce Documents from Assignors (Effexor Joint Letter at 24–26) (Lipitor Joint Letter at 18–19).

One of the issues raised by Defendants in both the Effexor and Lipitor matters is the

difficulty they are having obtaining discovery from certain Plaintiffs.  ECF No. 528 at 24–25;

ECF No. 812 at 18 (Lipitor parties referring to and relying on Effexor briefing on this issue).

According to Defendants, a subset of Plaintiffs ("Assignee Plaintiffs") made no direct purchases of the drugs at issue, but instead purchased from wholesalers, who in turn made the purchases.  ECF No. 528. at 24.  Assignee Plaintiffs procured from these wholesalers an assignment of the right to sue under the Sherman Act.  *Id.*  Defendants seek an Order compelling Assignee Plaintiffs to produce relevant documents from their third-party assignors.  *Id.*

Assignee Plaintiffs have objected, arguing that they cannot make the production in question because they do not have possession, custody or control over the documents at issue. *Id.* at 25.  Defendants do not dispute this.  Rather, Defendants cite fundamental fairness and a series of cases recognizing that fairness, to support the notion that an assignee plaintiff that purports to stand in its assignor's shoes for purposes of seeking relief should also be compelled to assume the assignor's obligation to produce relevant discovery.  *Id.* at 24.

For their part, Assignee Plaintiffs say they have already agreed to produce relevant documents that are in their possession, custody, or control, consistent with their obligations under Rule 34 and cases interpreting the rule in this Circuit.  In support of their position, Assignee Plaintiffs rely on *In re Androgel Antitrust Litigation (II)*, No. 09-2084 (N.D. Ga. Nov. 8, 2011) (ECF No. 528-1 at p. 8), in which the Northern District of Georgia refused to compel discovery under what Assignee Plaintiffs describe as similar circumstances.[6]  As a practical matter, Assignee Plaintiffs argue that they cannot produce what they do not have, and that Defendants can serve subpoenas directly upon the assignors to obtain the documents at issue under Rule 45.  *Id.* at 26.  In fact, Assignee Plaintiffs contend that this would be a

---

[6] The Court notes that only limited pages of the *Androgel* transcript have been provided.  In those pages, the court denies the request for assignor discovery, but the undersigned are left to speculate as to the context and circumstances.  (ECF No. 528-1 at 12–13).

more efficient process, given that Plaintiffs would otherwise be little more than discovery middlemen.  *Id.*

The parties do not cite any case law from the Third Circuit, nor could this Court locate any.  In the absence of specific guidance directly on point, the Court turns to guidance from courts outside of this Circuit.  The Court is not persuaded by the *Androgel* holding.  Rather, the Court finds persuasive the reasoning of the cases ordering assignor/assignee discovery. *See JPMorgan Chase Bank v. Winnick,* 228 F.R.D. 505 (S.D.N.Y. 2005) (finding that assignees should bear the "cost of purchasing cooperation or otherwise complying with discovery obligations");  *The Bank of New York v. Meridien Biao Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997) (ordering assignee to produce all relevant documents in assignor's possession); *see also Travelers Indem. v. Kendrick Bros. Roofing, Inc.*, 2013 WL 6681240 (D. Idaho 2013); *Royal Park Inv. v. Deutsche Bank Nat'l Trust*, 314 F.R.D. 341 (S.D.N.Y 2016); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-2343, 2014 WL 129814 (E.D. Tenn. Jan 10. 2014) ("it would be wholly unfair for Plaintiffs to step into the shoes of the assignors for the purposes of bringing their claims and not also assume a claimant's attendant discovery obligations").  These cases stand uniformly for the proposition that an assignee cannot take assignment of an assignor's right to sue without taking on the assignor's related obligation to provide relevant discovery.  Indeed, permitting the result sought by Assignee Plaintiffs would be to elevate form over substance, frustrate the process, and pervert the Federal Rules.  To the extent Assignee Plaintiffs and their assignors negotiated for the right to sue in federal court but somehow omitted the obligation of the assignors to assist in discovery, that omitted obligation had a value, a cost, that the assignees declined to absorb and instead hope to impose on Defendants in this case.  The Court does not agree that

Assignee Plaintiffs should be permitted to benefit from bargaining away Defendants'
litigation rights.

As a practical matter, while this Court cannot order Assignee Plaintiffs to produce
what they do not have, it can order them to make every reasonable, good faith effort to obtain
those documents from their assignors.  Their failure to do so may give rise to a request for
further relief from Defendants, either by way of sanctions or even a motion to strike, should
Defendants view the failure as one that invalidates the assignment.  That is for another day.
At this point, the relief sought by Defendants is granted with the proviso that Assignor
Plaintiffs are to either arrange to make the production at issue or face the consequences.

**IV.  Whether a Privilege Applies to Shield Certain "Facts Relevant to Class
Certification, the Filing of the Instant Litigation, or Damages" From Discovery (Effexor
Joint Letter at 26-28) (Lipitor Joint Letter at 19-20)**

In both of the Effexor and Lipitor matters,[7] Plaintiffs have refused to produce
documents responsive to a number of Defendants' document requests on the basis of
privilege.  According to Defendants the requests at issue relate to class certification, the filing
of this litigation, and damages.  Plaintiffs are withholding the materials pursuant to the work
product doctrine. Defendants state, however, that the materials are being improperly withheld,
as Defendants maintain that they are merely seeking "facts" and Plaintiffs cannot shield
relevant "facts" from discovery.  Defendants cite *Rhone-Poulenc Rorer Inc. v. Home Indem.
Co.*, 32 F.3d 851, 864 (3d Cir. 1994), in which the Third Circuit noted that, "[a] litigant
cannot shield from discovery the knowledge it possessed by claiming it has been
communicated to a lawyer; nor can a litigant refuse to disclose facts simply because that
information came from a lawyer."  Plaintiffs dispute that Defendants are merely seeking facts

---

[7] The *Lipitor* parties rely primarily on the briefing in the *Effexor* joint letter.

and further contend that, in any event, the issue is premature and will not be "ripe" until custodial searches have been run and a privilege log is produced.  At issue are documents responsive to fifty (50) separate document requests.[8]

The work product doctrine protects "documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3).  It is well-established that the work product doctrine does not cover documents prepared "in the ordinary course of business" or for other nonlitigation purposes. *United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d Cir. 1990).

A document is considered to be prepared "in anticipation of litigation [when] in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979). The party's anticipation of litigation must be objectively reasonable. *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993).

The work product doctrine is not an absolute bar to discovery of materials prepared in anticipation of litigation. "Work product can be produced upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *In re Cendant*, 343 F.3d at 663.

---

[8] This is the total of the following: 36 in the *Effexor* matter, 14 in *Lipitor*.  However, according to Plaintiffs, Defendants have incorrectly included Requests No. DPP 88-90. Defendants state that their objections to these requests are not grounded in any privilege. If this is true, the number is reduced to 47.

Courts in this Circuit apply a "two[-]part test for ascertaining whether the documents (or things) at issue should be protected under the [work-product doctrine]." *CDK Glob., LLC v. Tulley Auto. Grp. Inc.*, No. 15-3103, 2018 WL 4259843, at *4 (D.N.J. June 28, 2018) (quoting *In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 183 (D.N.J. 2003)).

> The first inquiry is the "reasonable anticipation test," which requires that the court determine whether "litigation could reasonably have been anticipated." *In re Gabapentin*, 214 F.R.D. at 183. "[T]he relevant inquiry is 'whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Maertin v. Armstrong World Indus.*, 172 F.R.D. 143, 148 (D.N.J.1997) … .  Although the litigation need not be imminent, *Rockwell*, 897 F.2d at 1266, "there must be an identifiable specific claim of impending litigation." *Maertin*, 172 F.R.D. at 148 ….
>
> The second inquiry is whether the documents were prepared "primarily for the purpose of litigation." [*Paris v. R.P. Scherer Corp.*, No. 02–1044, 2006 WL 1982876, at *2 (D.N.J. July 13, 2006)]. "Documents prepared for other purposes that prove useful in subsequent litigation are not attorney work-product." *In re Gabapentin*, 214 F.R.D. at 184. Accordingly, documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work-product doctrine. *See Rockwell*, 897 F.2d at 1265–66. Ultimately, "[e]ven where the reasonable anticipation of litigation is established, whether the document comes within the purview of the work-product [doctrine] still depends primarily on the reason or purpose for the documents production." *In re Gabapentin*, 214 F.R.D. at 184.

*CDK Glob., LLC v. Tulley Auto. Grp. Inc.*, No. CV 15-3103 (KM), 2018 WL 4259843, at *4 (D.N.J. June 28, 2018).

As an initial matter, the Court notes that this two-part test contemplates the Court having information about the documents being withheld—*e.g.*, the nature of the document and the circumstances of its creation.  Here, that information is not before the Court.  This supports Plaintiffs' contention that the dispute is prematurely before the Court and that the issue is not ripe until a privilege log has been produced. Indeed, under the circumstances of

this dispute, application of the relevant test is not possible--the Court has before it only the Defendants' requests, not any privilege log or documents to evaluate.

Furthermore, in reviewing Defendants' discovery requests, it appears that many of them seek documents that would likely be protected by the work product doctrine.  In arguing that the information sought is not protected work product, Defendants rely solely on the Third Circuit's decision in *Rhone-Poulenc Rorer, Inc. v. Home Indemnity Company*, 32 F.3d 851 (3d Cir. 1994).  *Rhone* was an insurance coverage matter.  At issue with respect to one of the affirmative defenses asserted by the defendant insurer was "what information [the plaintiff insureds] may have had prior to purchasing the policies that would have suggested that [the insureds' blood clotting products] might transmit the HIV virus and that [the insureds] would be subject to claims for injuries suffered as a result of transmitting that virus." 32 F.3d 851 at 856.  The *Rhone* defendants moved to compel the insureds to produce "all evaluations and assessments of [the plaintiffs'] potential liability for AIDS-related claims arising from [Plaintiffs'] blood products, including those in their possession and in the possession of their present and former agents and attorneys."  *Id.* at 857.  Ultimately, the district judge found that, in seeking a declaration of coverage, the plaintiffs had put at issue their knowledge of potential HIV-related claims at the time they purchased coverage and, therefore, the plaintiffs had waived any attorney-client or work product privilege relevant to that issue.

In reversing the district court's decision, the Third Circuit noted that the defendants sought "more than just information on what facts [the plaintiffs] had gathered about potential AIDS-related claims before they purchased the policies." *Id.* at 861.  Indeed, they sought "to discover the advice counsel provided to Rorer with regard to the legal significance of those facts and documents that identify and disclose communications relating to that advice."  *Id.*

20

The Third Circuit held that Plaintiffs had not waived the attorney client privilege by filing the lawsuit or by placing its state of mind at issue, and they had "not interjected the advice of counsel as an essential element of a claim." However, the Third Circuit "emphasize[d]' that its

> holding is not meant to preclude disclosure of the knowledge the insureds possessed at the time they obtained coverage. Facts are discoverable, the legal conclusions regarding those facts are not. A litigant cannot shield from discovery the knowledge it possessed by claiming it has been communicated to a lawyer; nor can a litigant refuse to disclose facts simply because that information came from a lawyer.

*Id.* at 864.

In the present case, Defendants, relying on the above language from *Rhone*, contend that their discovery requests are simply seeking the "facts" on which Plaintiffs' claims are based. However, it should be noted that in that particular passage, the Third Circuit was speaking in the context of the attorney-client privilege, not work product protection. Regarding work product, the *Rhone* court cautioned that "protection stemming from the work product doctrine belongs to the professional, rather than the client, and that efforts to obtain disclosure of opinion work product should be evaluated with particular care." 32 F.3d at 866.

Significantly, Defendants are not contending that Plaintiffs or its counsel have waived any privilege; they argue that the information sought falls outside the scope of any protection. However, despite Defendants' contentions, it appears that many of the requests seek documents that would likely have been prepared in anticipation of litigation, *i.e.*, they seek not merely facts, but Plaintiffs' (or their counsel's) analysis of those facts. For example:

> 88 (Effexor-EPP). All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the IPP or TPP complaints, including any assessments related to the fair market value of any consideration exchanged related to such agreements.

89 (Effexor-EPP). All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of the market impact of any agreement referenced in the IPP or TPP Complaints, including any assessment of the effect of any agreement on the relevant drug's unit and dollar sales, price, market share, or reimbursement.

64 (Effexor-Retailer). All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessments related to the fair market value of any consideration exchanged related to such agreements.

89 (Effexor-Retailer). All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessment of the effect of any agreement on the relevant drug's unit and dollar sales, price, market share, or reimbursement.

58 (Lipitor-Retailer). All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessments related to the fair market value of any consideration exchanged related to such agreements.

58 (Lipitor-Retailer). All Documents, irrespective of All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessments related to the fair market value of any consideration exchanged related to such agreements

120 (Lipitor-EPP). All Documents concerning Your assessment of Your adequacy to serve as a class representative in this action.

Similarly, many other requests, while not directly seeking any "analysis" or

"assessment", could likely tread into the realm of work product.  By way of example,

70 (Effexor-DPP) All Documents concerning the Effexor XR Wyeth-Teva Patent Litigation, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of the litigation.

71 (Effexor-DPP) All Documents concerning the Effexor XR Wyeth-Teva Patent Litigation settlement, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of the litigation.

96 (Effexor-DPP). All Documents concerning any efforts by attorneys for Direct Purchaser Plaintiffs to locate or recruit any plaintiff or potential plaintiff in connection with this case.

It appears that many of Defendants' requests specifically target documents that would have been prepared in anticipation of litigation.  However, this conclusion is based merely on consideration of Defendants' requests; the Court has no knowledge of what is actually being withheld. It is simply impossible to perform the appropriate work product analysis without some indication of what documents are being withheld (*e.g.*, privilege log).  Defendants argue that "facts" cannot be protected and, indeed, the Third Circuit has said as much, at least with respect to attorney client privilege.  However, what Defendants seek are documents, not abstract facts, and for the Court to properly consider Defendants' request to compel the production of such documents, the Court must know the nature of the documents that are being withheld.  The Court, therefore, denies Defendants' request.  Because the party asserting work product protection bears the burden of showing it applies, the issue is not ripe until Plaintiffs produce a privilege log.  Only after such a log is produced can an appropriate analysis be performed to determine if documents are being improperly withheld.[9]

**V.  Whether Plaintiffs May "Limit the Relevant Time Period" (Effexor Joint Letter at 28-30).**

The Effexor parties disagree as to the timeframe for which Plaintiffs should be required to produce their documents in five separate areas:  (1)  the relevant product market; (2)  operation of the market at the time of the underlying settlement; (3)  materials related to

---

[9] Comments in the Effexor Joint Letter give the Court insight into what may be at the heart of this particular dispute. In a footnote and in reference to Plaintiffs' argument that the privilege issue is not ripe, Defendants state that "Plaintiffs refuse to run custodial searches or produce a privilege log." ECF No. 528 at 27, n.19. Plaintiffs, on the other hand, state that "Defendants have refused to agree to search terms." *Id.* at 27. Other than these brief remarks made in the context of their larger arguments regarding privilege, the parties provide no details about this impasse, nor have they sought the Court's assistance to resolve it.

the underlying litigation; (4) the launch of authorized generic products; and (5) class certification and damages in this case. ECF No. 528 at 28–30. The Lipitor parties raise the same disputes, with the omission of the fourth issue. ECF No. 812 at 20–21.

For the first three categories, Effexor Defendants argue that Plaintiffs should be required to make production going back to January 1, 2002, when the relevant patents issued. ECF No. 528 at 28–29. In each instance, Defendants argue that this information is necessary to establish what the market was doing before Plaintiffs say their damages began to accrue, and how the market reacted to the launch of the authorized generic. *Id*. For the fourth, Defendants ask that the discovery begin as of January 1, 2006, when the authorized generic was allowed to launch. *Id*. at 29. They also argue it is relevant to when Plaintiffs knew or should have known of the underlying settlement, in terms of triggering the applicable statute of limitations. The parties agree that the discovery start date for class certification and damages should be January 1, 2008 but disagree as to the end date. *Id*. On the final category, Defendants contend that more recent information is relevant to Plaintiffs' claimed status as class representatives. *Id*.

Effexor Plaintiffs contend that their own start dates are appropriate and that requiring them to look back before the start of the class period would lead to documents that are not relevant and are likely to be cumulative. *Id*. at 30. They also argue generally that they are not likely to have any documents with regard to the second, third and fourth categories. *Id*. Finally, Plaintiffs contend that the issue of timeframe for the production is premature, given that many of the documents sought are the subject of other pending discovery disputes. *Id*.

To the extent Effexor Plaintiffs' position is that the documents from the expanded timeframe would be irrelevant or cumulative, they have failed to substantiate that position in

light of Defendants' argument as to relevance.  Nor have Plaintiffs made any significant argument as to burden or proportionality.  As such, the Court is inclined to allow the expanded timeframe sought by Defendants.  Insofar as Plaintiffs' expressed concern that the timeframe issue is premature given the other pending issues—issues which have now been addressed—the parties are urged to continue to meet and confer to see if they can reach agreement on this issue.

With respect to the parties' corresponding disputes in the Lipitor matter, while the dates differ, the principles are the same.  For the reasons set forth above, the Court is also inclined to allow the expanded timeframe sought by the Defendants, and urges the parties to further meet and confer on this issue as well.

## VI.  Whether Privilege Protects Information Regarding Reasons Individual Plaintiffs Were Prescribed Lipitor and Whether and Why They May Have Switched Treatments (Lipitor Joint Letter at 14-16).

Defendants in the Lipitor matter have served discovery seeking medical information from consumer End Payor Plaintiffs.  They cite a single document request as the basis for this application -- Request to EPPs No. 141, which seeks "[d]ocuments sufficient to identify the physician or other medical professionals who treated Individual EPPs for the condition that precipitated the prescription on any Cholesterol Treatment."  ECF No. 812 at Ex. C-2.  On its face, the request seeks only the identification of the treating medical professionals. However, presumably Defendants' purpose in seeking this information, as well as Plaintiffs' objections, go further than the doctors' identities, as the arguments of both parties speak in terms of the individual Plaintiffs' "medical histories."  According to Defendants, such information is relevant to Plaintiff's assertions that (1) their injuries derive from being prescribed Lipitor; (2) their physicians did not view other statins as economically or therapeutically substitutable for

Lipitor"; and (3) they are typical of other class members "with respect to the reasons they were prescribed Lipitor rather than other statins…" ECF No. 812 at 14. Defendants contend they are entitled to the medical discovery in order to test these assertions.

Plaintiffs have objected to the production of such material on the basis of doctor-patient privilege.  Plaintiffs assert that they have not put their medical condition at issue in this case and, therefore, Plaintiffs have a statutory and common law[10] right to withhold discovery regarding their medical histories. Further, even if no such privilege applied, Plaintiffs contend the requested discovery is irrelevant.

Defendants argue that to the extent that Plaintiffs contend that their medical records are protected by a doctor-patient privilege, Plaintiffs should not be permitted to use their medical information as "a sword and a shield." ECF No. 812 at 15. Defendants maintain that Plaintiffs "cannot simultaneously assert claims based on their medical histories and the decisions of their physicians and refuse to allow discovery into the very same topics." *Id.* They assert that Plaintiffs have waived any privilege by putting their medical conditions at issue in this case. In support of their application, Defendants cite cases standing for the general proposition that a party can be compelled to produce medical records when that party puts his or her medical condition at issue. *See id.* (citing *In re Asbestos Prods. Liab. Litig.*, 256 F.R.D. 151, 155 n.10 (E.D. Pa. 2009) (permitting disclosure of "physician-patient privileged information when the patient puts his health at issue 'as part of a claim or defense in a lawsuit'"); *Iwanejko v. Cohen & Grigsby, P.C.*, 2005 U.S. Dist. LEXIS 22563, at **3-4

_____

[10] Plaintiffs cite law from the following states: Arkansas (Ark. Code Ann. § 23-76-129 and § 16-46-106); Hawaii (Haw. Rev. Stat. § 325-2); Massachusetts (Alberts v. Devine, 479 N.E.2d 113, 119-120 (Mass. 1985)); Montana (Mont. Code Ann. § 26-1-805); North Dakota (N.D. Cent. Code § 31-01-06); N.D.R. Ev. Rule 503); Wisconsin (Wis. Stat. Ann. § 905.04). Note that "it is well-settled that the federal common law does not recognize a physician-patient privilege." *Rodriguez v. City of New Brunswick*, No. 12-4722, 2017 WL 5598217, at *5 (D.N.J. Nov. 21, 2017).

(W.D. Pa. Oct. 5, 2005) (plaintiff waived "patient privilege by placing his . . . medical condition at issue, and therefore cannot use said privilege to shield records which pertain to his mental health and/or medical condition from discovery").

Resolution of this dispute thus centers on two issues. The first is whether the discovery sought is relevant.  Defendants bear the initial burden to show the relevance of the information sought. *Sherrill v. City of Hoboken*, No. 16-3092, 2018 WL 5630028, at *3 (D.N.J. Oct. 31, 2018) (noting that the burden to establish relevance is on party seeking discovery). If so, the second issue is whether Plaintiffs have waived the protections of the doctor-patient privilege by putting their medical histories at issue in this case.

Arguing that the medical discovery sought is appropriate, Defendants cite[11] the following paragraphs from the Second Amended Complaint, contending that that the discovery is needed to "test [the following] assertions":

[455 (454)[12]]. At all relevant times, Pfizer had nationwide monopoly power, including in each of the United States, and the District of Columbia, because it had the power to maintain the price of the drug of Lipitor at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Lipitor, with the exception of AB-rated generic[13] versions of Lipitor.

[457 (456)]. Lipitor does not exhibit significant, positive cross-elasticity of demand[14] with respect to price with any product other than AB-rated generic versions of Lipitor.

[458 (457)]. Because of, among other reasons, its use and varying ability to inhibit the production of cholesterol, Lipitor is differentiated from all products other than AB-rated generic versions of Lipitor.

---

[11] *See* ECF No. 812 at 14.
[12] The first number references the paragraphs of the Second Amended Complaint cited in parties' letter (ECF No. 812).  The second number references the identical paragraphs in the Third Amended Complaint, which was filed subsequent to the August Letter.
[13] AB-rated drugs are drugs that meet the necessary bioequivalence standards established by the Food and Drug Administration.
[14] A positive cross-price elasticity value demonstrates that the two products are substitutes, which means that as the price of one product rises, the demand for the other product increases. Conversely, the demand for a substitute product falls when the price of another product is decreased.

[459 (458)]. Defendants needed to control only Lipitor and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lipitor profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Lipitor would render Pfizer unable to profitably maintain its current prices of Lipitor without losing substantial sales.

[473 (472)]. Defendants' illegal acts, which delayed introduction into the U.S. marketplace of generic versions of Lipitor, have caused Plaintiffs and the Class to pay more than they would have paid for atorvastatin calcium products absent Defendants' illegal conduct.

[475 (474)]. If generic competitors had not been unlawfully prevented from earlier entering the market and competing with Defendants, the End-Payor Plaintiffs and the End-Payor Class would have paid less for atorvastatin calcium by (a) substituting purchases of less-expensive AB-rated generic Lipitor for their purchases of more-expensive branded Lipitor, (b) receiving discounts on their remaining branded Lipitor purchases, and (c) purchasing generic Lipitor at lower prices sooner.

[479 (478)]. During the relevant period, Plaintiffs and members of the Class purchased substantial amounts of Lipitor indirectly from Defendants and/or purchased substantial amounts of AB-rated Lipitor bioequivalent generics indirectly from Defendants or others. As a result of Defendants' illegal conduct, members of the End-Payor Class were compelled to pay, and did pay, artificially inflated prices for their atorvastatin calcium requirements. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal conduct alleged herein, because: (1) the price of brand-name Lipitor was artificially inflated by Defendants' illegal conduct, (2) Class members were deprived of the opportunity to purchase lower-priced generic versions of Lipitor sooner, and/or (3) the price of AB-rated Lipitor generic atorvastatin calcium was artificially inflated by Defendants' illegal conduct. The supracompetitive prices were paid at the point of sale, which is where Plaintiffs and the EndPayor Class suffered antitrust impact.

[480 (479)]. As a consequence, Plaintiffs and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to end payors such as Plaintiffs and members of the Class.

[507]. Had manufacturers of generic atorvastatin calcium products entered the market and lawfully competed with Pfizer in a timely fashion, Plaintiffs and

other members of the Class would have substituted lower-priced generic atorvastatin calcium products for the higher-priced brand-name Lipitor for some or all of their atorvastatin calcium products requirements, and/or would have paid lower net prices on their remaining Lipitor and/or AB-rated bioequivalent purchases.

On their face, these allegations bear only a remote connection to Plaintiffs' medical histories. These paragraphs say little, if anything, about the Plaintiffs' medical conditions or the decision-making processes of their physicians. However, they do refer to Lipitor being "differentiated from all products other than AB-rated generic versions of Lipitor," and in the Lipitor Joint Letter Plaintiffs allude to "physician behavior" as being a consideration in determining the relevant market in an antitrust action. As such, it may be fair to assume that Defendants believe that information regarding the reasons Plaintiffs were prescribed Lipitor over other brands is relevant to defining the "relevant market" in this action.

Plaintiffs have narrowly defined the relevant market here as atorvastatin calcium products – *i.e.*, Lipitor (in all its forms and dosage strengths) and its approved generic. ECF No. 815 at 461. Defendants believe the market is broader and includes other statins that compete with Lipitor. Therefore, as discussed *supra*, discovery relating to the parties' competing market definitions is appropriate.

To the extent that information regarding competitive products is relevant to the question of "relevant market," it can be argued that information about the reasons Plaintiffs' doctors chose to prescribe Lipitor over competing products is similarly relevant. However, the character of the information is very different. Compared to information about competition in the marketplace, information from Plaintiffs' doctors would be anecdotal in nature and its relevance to the broader market is, at best, extremely weak.

Nevertheless, presuming the information is relevant, there appears to be no dispute that the information falls within the scope of the doctor-patient privilege.  While Defendants baldly assert that Plaintiffs' have waived the privilege, Defendants have not established that the individual Plaintiffs have placed their medical history at issue with respect to any claim or defense in this action.  Indeed, other than their prescription history, nothing about Plaintiffs' medical histories is implicated in the allegations cited by Defendants.

The parties have cited only one case that is relatively on point.  The complaint in *In re: Prograf Antitrust Litigation*, Case No. 11-2242 (D. Mass. 2013) alleged that the defendant pharmaceutical manufacturer filed a baseless citizen petition with the sole intent of foreclosing market entry by generic competitors, thereby improperly extending the defendant's monopoly and keeping the prices for defendant's product artificially high.  The defendant moved to compel the two individual indirect purchaser plaintiffs to provide HIPPA releases that specifically authorized third parties (such as physicians, hospitals, and medical care facilities) to produce certain records from consumer plaintiffs' medical, prescription, and insurance claims records.  While each consumer plaintiff in *Prograf* had already provided HIPPA releases with respect to their prescription history for the subject pharmaceutical, defendants sought broader discovery regarding the plaintiffs' medical histories (such as documents concerning the reason the patient was prescribed one formulation over another), arguing that the information was relevant to both liability and damages.  The *Prograf* court, however, disagreed, finding that "unlike in a medical malpractice or personal injury suit, it is difficult to see how the circumstances of this antitrust case give rise to the conclusion that consumer plaintiffs have placed their medical conditions at issue beyond their tacrolimus prescription drug history, [and] [a]bsent good reason to overcome consumer plaintiffs'

statutory privileges, [the] motion must be denied." *Id.* at 5.  A similar result is warranted

here, as Defendants have offered no persuasive argument to the contrary.


*s/ Lois H. Goodman*
LOIS H. GOODMAN
United States Magistrate Judge


*s/ Douglas E. Arpert*
DOUGLAS E. ARPERT
United States Magistrate Judge