# COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP

COUNSELLORS AT LAW

PARK 80 WEST - PLAZA ONE 250 PEHLE AVE. SUITE 401 SADDLE BROOK N.J. 07663 201-845-9600 FAX 201-845-9423

General E-mail: clphk@njlawfirm.com
Internet Address:  www.njlawfirm.com

PETER S. PEARLMAN, ESQ.  Email: psp@njlawfirm.com
Direct Dial: 551-497-7131  /  Cell Phone: 201-709-0597

June 27, 2019

**VIA ECF**
Honorable Lois H. Goodman, U.S.M.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Federal Bldg. & U.S. Courthouse
402 East State Street, Room 7050
Trenton, New Jersey 08608

       Re:    *In Re Effexor XR Antitrust Litigation*
               **Civil Action No.:  3:11-cv-5479 (PGS/LHG) (Lead)**

Dear Judge Goodman:

    Plaintiffs and Defendant Teva submit this joint letter in accordance with L. Civ. R. 37.1(a)(1).  As described in more detail below, Plaintiffs and Teva have met and conferred on discovery-related issues but have reached impasse on the following issue, which Plaintiffs wish to bring to the Court's attention.[1]

**Teva's Privilege Claims for Redacted or Withheld Documents in Exhibit D.**

    **Plaintiffs' Statement**

    Teva has improperly withheld and redacted relevant factual information involving dates on which Teva expected to launch generic Effexor XR that is not protected by attorney-client privilege.  Throughout the course of this dispute, Plaintiffs have identified thousands of documents over which Teva has claimed privilege even though Teva has refused to tell Plaintiffs whose legal advice the documents purportedly contain and even though these thousands of documents were not authored by an attorney nor sent to or received from an attorney.[2]  Through

---

[1] Prior to submission of this letter, the parties engaged in a substantial meet and confer process regarding Teva's withheld and redacted documents, which is the subject of this joint discovery letter.  Plaintiffs and Teva engaged in a telephonic meet and confer on December 19, 2018 and exchanged numerous letters.  *See, e.g.*, Ex. A, Dec. 11, 2018 Letter from counsel for Direct Purchaser Class Plaintiffs, Erin C. Burns, to counsel for Teva, Matthew P. Downer, at 1-3; Ex. B, Dec. 6, 2018 Letter from counsel for Direct Purchaser Class Plaintiffs, Erin C. Burns, to counsel for Teva, Matthew P. Downer, at 2-4; Ex. C, Oct. 17, 2018 Letter from counsel for Direct Purchaser Class Plaintiffs, Erin C. Burns, to counsel for Teva, Matthew P. Downer, at 1-3.

[2] None of the documents in Exhibit D were sent to counsel or contained legal advice of counsel; otherwise, Teva would have listed the name of the counsel in these privilege log entries either as

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 2

extensive meet and confer, the parties have narrowed the scope of the dispute,[3] but have reached impasse regarding Teva's privilege claims for an important subset of documents, those shown in Exhibit D to this letter.[4]

These Teva documents (listed in Exhibit D) are not privileged because the factual information Plaintiffs seek is not connected to legal advice. The mere participation of counsel in the formation of a corporation's plans does not turn all facts related to those plans into privileged information. Therefore, this Court should reject Teva's unsubstantiated and unwarranted privilege claims, and should compel Teva to promptly produce unredacted versions of the relevant documents, which are identified in the attached Exhibit D.

---

the senders, recipients, or sources of privilege in the description field. A very small subset of the documents in Exhibit D are from attorney custodial files, but these files too bear no attorney author, recipient, or source of privilege in the description field of Teva's privilege logs. Moreover, Teva has had multiple opportunities to produce privilege logs demonstrating that these documents were privileged, as Plaintiffs repeatedly brought these deficiencies to Teva's attention. The meet and confer history and the privilege logs thus do not support Teva's claim that the documents at issue were purportedly authored by attorneys and "subsequently sent between discrete groups of non-attorneys." *See infra* at 13. Attorneys had no involvement in authoring these documents and even if they had, the facts contained in the documents are not legal advice that a party can exclude from discovery via privilege claims.

[3] While Teva has "rectified some of Plaintiffs' concerns," the parties have reached impasse regarding Teva's privilege claims for which Teva has refused to provide adequate support, including failing to identify an attorney as the source of the purported privilege. *See infra* Ex. P, Mar. 5, 2019 Email from Counsel for Direct Purchaser Class Plaintiffs, Michael D. Ford, to Counsel for Teva, Gavin R. Tisdale (noting that "Plaintiffs believe that we are at an impasse with regard to many of Teva's claims of privilege"). Exhibit D contains a highly relevant subset of the non-privileged documents that Teva has improperly withheld, and Teva should be forced to produce the documents listed in Exhibit D given Teva's inability to justify its privilege claims for these documents, which are not privileged.

[4] The documents listed in Exhibit D are selected entries from Teva's privilege logs with minor revisions to the columns identifying the documents' bates numbers. Teva has clawed back some purportedly privileged documents and reproduced them with different or additional redactions under the original bates number but with an added "_R" or "_R2" suffix. Teva, however, has not updated the log to reflect the correct bates numbers for each document (i.e., its privilege log does not include the "_R" or "_R2" suffixes). In order to avoid confusion, Plaintiffs have ensured that the bates numbers listed in Exhibit D reflect any updated bates numbering by Teva.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 3

### A.    Legal Background

A party that has withheld a document in its entirety or redacted a portion of a document based on a claim of privilege must provide a privilege log that gives the opposing party sufficient information to evaluate the claim of attorney-client privilege. *See* Fed. R. Civ. P. 26(b)(5)(A)(ii) (describing requirements for claiming privilege in a manner that permits the non-withholding party to assess the claim). While attorneys in corporate settings routinely provide both legal and business advice, only legal advice falls under the protection of attorney-client privilege. *La. Mun. Police Emp. Ret. Sys. v. Sealed Air Condition*, 253 F.R.D. 300, 305-06 (D.N.J. 2008). Documents created or disseminated by non-attorneys are protected by attorney-client privilege only if the contents of the documents themselves are privileged. *See In re Niaspan Antitrust Litig.*, 13-MD-2460, 2017 WL 3668907, at *1-2 (E.D. Pa. Aug. 24, 2017) (for documents exchanged internally between non-attorneys to be privileged they must still be of the form of "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client."). Furthermore, attorney-client privilege does not protect documents from discovery simply because they are contained in an attorney's custodial file. *See SEPTA v. Caremarkpcs Health, L.P.*, 254 F.R.D. 253, 259 (E.D. Pa. 2008) (holding documents that are only "transferred to or routed through an attorney" are not privileged) (internal quotes omitted).

As with any assertion of privilege, the party asserting privilege over corporate communications bears the burden of demonstrating the "precise and certain reasons for preserving their confidentiality" beyond conclusory assertions that the document withheld or redacted is privileged. *SmithKline v. Beecham Corp*., 232 F.R.D. 467, 482 (E.D. Pa. 2005) (internal quotes omitted). *See also Hurt v. Phila. Hous. Auth.*, No. 91-4746, 1994 WL 263714 (E.D. Pa. Jun. 8, 1994) (finding defendants failed to establish attorney-client privilege for 107 out of 112 documents based on defendants' privilege log, affidavit, and submission of documents for *in camera* review, noting that "the proponent [of a challenged privilege claim] must show by affidavit that precise facts exist to support the claim of privilege."). To that end, a valid claim of privilege should identify a specific attorney as the source of privilege. *Caremarkpcs Health*, 254 F.R.D. at 259. *See also Schwarz Pharma., Inc. v. Teva Pharm. USA, Inc*., No. CIV A 01-4995 (DRD), 2007 WL 2892744, at *3 (D.N.J. Sept. 27, 2007) (finding redacted paragraph was not privileged where redacting party had not identified specific counsel whose advice was contained in the paragraph and could not provide sufficient information for the court to "infer some nexus between the author of the [redacted] Paragraph and an attorney."). *In camera* review may be necessary to determine the adequacy of claims of privilege where, as here, a party's claim of privilege fails to identify specific counsel and merely states that the document was "requested by or generated by an attorney." *See, e.g., In re Abilify (Aripiprzole) Prod. Liab. Litig.*, No. 3:16-MD-2734, 2017 WL 6757558, at *6 (N.D. Fla. Dec. 29, 2017) (utilizing *in camera* review where party asserting privilege failed to identify specific counsel); *In re Denture Cream Prods. Liab.*

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 4

*Litig.*, No. 09-MD-2051, 2012 WL 5057844, at *13 (S.D. Fla. Oct. 18, 2012) (requiring *in camera* review where documents "did not reference an attorney, [were] authored by a non-attorney and/or [were] disseminated by two non-attorneys").

Attorney-client privilege does not apply to facts and, as a result, a party cannot redact or withhold purely factual information without establishing that such factual statements were provided for a specific *legal* purpose. *See, e.g.*, *RBS Citizens, NA v. Hussain*, 291 F.R.D. 209, 219 (N.D. Ill. 2013) ("Without any explanation of what the documents are, who authored them, or the purpose for which they were created, the Court determines that the vast majority of the disputed documents—mostly spreadsheets containing financial data—are not in fact privileged."). *See also Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994) ("a litigant [cannot] refuse to disclose facts simply because that information came from a lawyer"); Order (ECF No. No. 590), at 23, *In re: Effexor XR Antitrust Litig.*, No. 3:11-cv-05479 (D.N.J. May 23, 2019) (noting that "Defendants argue that 'facts' cannot be protected and, indeed, the Third Circuit has said as much, at least with respect to attorney client privilege."). A stamped disclaimer claiming that a document is privileged "will not create a privilege or protection where one would otherwise not exist." *Crawford v. Corizon Health, Inc.*, No. 17-cv-113, 2018 WL 3361147, at *4 (W.D. Pa. Jul. 10, 2018) (finding "attorney-client privilege label stamped on each" document made "no difference" for assertion of privilege because such labels do not have a "talismanic power to relieve a party of its obligation to prove each of the privilege's elements in order to take shelter under its protection.") (citing *United States v. Singhal*, 800 F. Supp. 2d 1, 10 (D.D.C. 2011)).

Moreover, courts have determined that anticipated launch dates for drugs are discoverable facts, not legal analysis. *See FTC v. Abbvie, Inc.*, No. 14-5151, 2015 WL 8623076, at *6 (E.D. Pa. Dec. 14, 2015) (holding that redacted estimated launch date for a drug was not legal advice but instead "the product of a business analysis of the competition in the market for the generic drug"). Courts have found that launch dates are not privileged even in documents that indicate that the launch date and accompanying business analysis was based upon attorney feedback. *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797, 2011 WL 2623306, at *7 (E.D. Pa. Jul. 5, 2011) (holding that "[t]he fact that [a document] was 'based on verbal feedback' from a lawyer cannot transform a business communication into a privileged one" and that "it does not matter that [the document] juxtaposes speculation about launch dates with the expected progress" of a lawsuit. This is because forecasted launch dates are generated by pharmaceutical companies, including Teva for business purposes—*as Teva's Ms. Pastore has previously testified*. *See* Ex. J, Transcript of Nexium Trial, Nov. 21, 2014, Vol. 2, at 151:6-9 (Teva's Jill Pastore testifying: "Our sales and marketing teams would be assessing the timing of anticipated launch, and they would then communicate that to the teams that would need to prepare for launch."); *id.* at 155:1-11 ("Early as Approval," and "Early as Launch" projections used by business management team "to effectively order applications timely -- in a timely way

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 5

so that we know approximately when we potentially might see an approval, and when we might potentially launch.").

Teva has failed to carry its burden of showing that privilege shields Plaintiffs' discovery of the factual launch date information redacted and withheld in the 109 documents listed in Exhibit D hereto, and these documents should be promptly produced.

### B.     The Documents At Issue, Which Are Listed in Exhibit D, Are Relevant and Non-Privileged.

Exhibit D lists 109 documents in which Teva improperly withheld or redacted purely factual information concerning the anticipated launch date for generic Effexor XR.  These documents were created before, during, and after Teva and Wyeth entered into the challenged reverse payment agreement.[5]  Teva did not redact legal advice, but rather redacted the date information showing when Teva anticipated launching its generic Effexor XR.  The information Teva redacted reflects Teva's business judgment about when Teva would be ready, willing, and able to enter the market for generic Effexor XR, not legal advice.  These are facts Teva would have formulated regardless of the underlying patent litigation and its eventual settlement.

Teva has not carried its burden of establishing that any of the documents identified in Exhibit D are privileged.  Teva has merely provided Plaintiffs with unsubstantiated assurances that the documents contain privileged content from unspecified counsel.[6]  In order to properly assert privilege, however, Teva must identify whose legal advice a non-attorney sought or conveyed in all documents Teva has withheld or redacted.  Teva has not done so.  This Court

---

[5] Additionally, Plaintiffs have provided examples of Teva's improper redactions for the Court's review.  *See* Ex. E, PRIV-22665, TEVA_EFFEX_0234612_R, at p. 3, Rows 172-74, Column T, at p. 4, Rows 32, 42-43, Column T, at p. 8, Rows 96-98, Column T (spreadsheet created on Sept. 18, 2003, before Wyeth and Teva settled, in which Teva has redacted the projected launch date for generic Effexor XR and IR); Ex. F, PRIV-21995, TEVA_EFFEX_0776460_R, at p. 7, Rows 224-26, Column U, at p. 8-9, Rows 34-36, Column U, at p. 16-17, Rows 70-72, Column U (spreadsheet created on October 14, 2005, around the time when Wyeth and Teva were negotiating a settlement, in which Teva redacted the "early as launch" date for generic Effexor XR and IR); Ex. G, PRIV-21928, TEVA_EFFEX_0138420_R, TEVA_EFFEX_0138433_R (spreadsheet created on Oct. 26, 2007, after Wyeth and Teva settled, in which Teva has redacted the "Early as Launch Date" for generic Effexor XR and IR).

[6] *See, e.g.*, Ex. H, Dec. 18, 2018 Letter from counsel for Teva, Matthew P. Downer, to Counsel for Direct Purchaser Plaintiffs, Erin C. Burns, at 3-4; Ex. I, Nov. 8, 2018 Letter from counsel for Teva, Matthew P. Downer, to Counsel for Direct Purchaser Plaintiffs, Erin C. Burns, at 2-4.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 6

should not permit Teva to use boilerplate assertions of privilege as a basis to withhold highly relevant, non-privileged facts from discovery.[7]

In addition, Teva's privilege claims are unsupported by case law and undermined by Teva's own litigation practice in other, similar litigations. For example, in *FTC v. Abbvie, Inc.*, the court rejected a nearly identical privilege claim, holding that the anticipated launch date for a pharmaceutical product was not privileged because a launch date is "the product of a business analysis of the competition in the market for the generic drug," not legal advice. *See FTC v. Abbvie, Inc.*, No. 14-5151, 2015 WL 8623076, at *6 (E.D. Pa. Dec. 14, 2015) (finding defendant could not assert privilege to redact a launch date for a drug). After concluding that the launch date was the product of business analysis and not privileged, the court noted that additional information from the document further undermined the defendants' claim of privilege. *Id.* (noting "[i]n addition" the unredacted text of the document demonstrated that the launch date was "mentioned to assess future steps" for the defendant to take in pursuit of "its business strategy").

The *In re Nexium (Esomeprazole) Antitrust Litigation* trial further illustrates that the factual information contained in the documents at issue is not privileged. There, Teva—by and through the same counsel representing Teva in this case (the Kirkland & Ellis law firm)—acknowledged that expected launch dates are not privileged.[8] In the *Nexium* litigation, Teva

---

[7] Similarly, Teva has failed to substantiate its privilege claims over the mere five documents from the 109 documents listed in Exhibit D that eventually ended up in the custodial files of attorneys. *Compare infra* at 12-13, *with Caremarkpcs Health, L.P.*, 254 F.R.D. at 259 ("What would otherwise be routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda.") (internal quotes omitted).

[8] In the *Nexium* trial, Jill Pastore, a regulatory affairs employee at Teva, admitted that regulatory affairs did not handle the creation of a 2010 document listing an unredacted, anticipated launch date for generic Nexium. *See* Ex. J, Transcript of Nexium Trial and Trial Exhibits 153, 155, 180, and 181, Nov. 21, 2014, Vol. 2, at 158:11-159:11 (plaintiffs' counsel examined Ms. Pastore with trial exhibits listing varying launch dates for Nexium of July 2008, May 2014, September 2009, and November 2014 without objection from Teva's counsel). Ms. Pastore testified that business personnel created the document and, most importantly, did not testify that any of the launch date information in the document came from the advice of counsel. *See id.* (responding to question regarding who was responsible for the document with "our sales or marketing team, the new product launch team" and having no knowledge as to why launch dates were changed). *See also* Ex. K, Transcript of Nexium Trial and Trial Exhibits 145 and 151, Nov. 13, 2014, at 127:8-146:7

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 7

produced numerous documents that listed unredacted launch dates. Those documents were ultimately admitted into evidence and were used at trial during the examination of Teva's witnesses, without any claims that the expected launch dates were privileged. Teva's prior admissions that launch dates are not privileged refute Teva's argument here that this same information is somehow privileged.[9] Moreover, the plaintiffs' use of the facts pertaining to launch dates in the *Nexium* trial demonstrates not only that such dates are not privileged but also that the expected launch dates are highly relevant to cases like this one (and like *Nexium*) alleging that generic competition would have occurred sooner absent the challenged pay-for-delay at issue (here, the challenged Wyeth-Teva agreement).

Teva claims that the documents at issue are privileged based on a declaration of one of its non-attorney employees and based on internal disclaimers Teva put on its own documents. As with its privilege log, Teva's declaration by a non-attorney does not substantiate its privilege claims because the declaration does not identify counsel whose advice is contained in the documents listed in Exhibit D. *Compare Caremarkpcs Health, L.P.*, 254 F.R.D. at 261-62 (holding affidavit of attorney asserting that documents contained "*her* legal advice to *her* clients" was sufficient to establish privilege) (emphasis added), *with Hurt*, 1994 WL 263714, at *2-5 (finding most of defendants' challenged documents were not privileged despite defendants' privilege logs and attorney's affidavit, which lacked sufficient factual statements to support defendants' privilege claims). Moreover, Teva's internal privilege disclaimers do not justify Teva's privilege claims because the documents in Exhibit D "contain[] no legal advice and pertain[] entirely to financial concerns regarding generic launch dates and product orders." *See King Drug Co. of Florence, Inc.*, 2011 WL 2623306, at *7. *See also Crawford*, 2018 WL 3361147, at *4 (finding privilege disclaimers insufficient to establish privilege). Teva's attorneys did not author, send, or receive the documents listed in Exhibit D, and Teva's insistence that the documents were "updated based on advice from attorneys" is insufficient to show the documents are privileged. *Compare infra* at 12, *with King Drug Co. of Florence, Inc.*, 2011 WL 2623306, at *7 ("The fact that [a document] was 'based on verbal feedback' from a lawyer cannot transform a business communication into a privileged one."). The redacted launch

---

(plaintiffs' counsel examined Teva employee Patricia Jaworski with trial exhibits listing launch dates for Nexium of July 2008 and May 27, 2014 without objection from Teva's counsel); Ex. L, Transcript of Nexium Trial and Trial Exhibit 183, Nov. 24, 2014, Vol. 1, at 22:4-24:25 (plaintiffs' counsel examined Ms. Pastore with trial exhibits listing launch date of November 1, 2014 without objection from Teva's counsel).

[9] *See* Ex. M, Jan. 9, 2019 Letter from counsel for Teva, Matthew P. Downer, to Counsel for Direct Purchaser Plaintiffs, Erin C. Burns, at 1 (asserting that potential launch dates are "not mere descriptive facts" but instead are "the product of legal analysis and advice from Teva's legal counsel").

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 8

dates identified in Exhibit D are not privileged even if Teva personnel had formulated them after consultation with counsel because the dates themselves do not contain any legal advice.  *See Abbvie, Inc.*, 2015 WL 8623076, at *11 (finding a party could not redact every instance of a date that a corporation anticipated its competitors would enter the market even though the date was derived from consultation with in-house counsel).

Furthermore, in this lawsuit, despite repeated instances of redacting launch dates, Teva has selectively chosen to produce similar business spreadsheets with launch dates included, [10] undermining its assertions of privilege over launch dates in the documents listed in Exhibit D. Teva attempts to justify this inconsistency by noting that the redacted documents were stamped with privilege disclaimers or contained the same launch dates as other documents that had disclaimers.  *See infra* Ex. Q, at ¶ 11.  Teva's inconsistent redaction of its generic launch date, however, highlights the impropriety and selective nature of Teva's redactions.  Moreover, again, Teva's internal disclaimers are not adequate to meet Teva's burden of establishing that the redacted information is privileged.[11]  Despite having "personal knowledge of many of [the] documents" in Exhibit D, Ms. Pastore did not identify a single attorney in her declaration whose advice is contained in any of the 109 documents.  *See id.* at ¶ 3.  Launch dates are discoverable facts and not themselves privileged legal advice, particularly where Teva can only tell Plaintiffs that the dates are "*derived from and based upon*" legal analysis and advice from unknown members of Teva's vast legal department.  *See id.* at ¶ 11 (emphasis added).  Such business assessments are factual and do not become privileged simply because of the "legal and regulatory parameters" within which Teva conducts its business or the disclaimers Teva places upon the documents its non-attorney personnel draft and circulate.  *See id.* at ¶ 3.  Even if an attorney had provided Teva with the launch dates it has redacted and withheld from the documents listed in Exhibit D, these documents should nevertheless be produced because "[a] litigant cannot shield from discovery the knowledge it possessed by claiming it has been

---

[10] *See, e.g.,* Ex. N, TEVA_EFFEX_0135866_R2, at p. 1, Row 66, Column K ███████████████████████ ██████████████████████████████████████████); Ex. O, TEVA_EFFEX_0135876_R2, at p. 1, Row 17, Columns J and L (████████████████████████ ███████████████████████████████████████); TEVA_EFFEX_0429853_R, at p. 2, Rows 197-98, Column O (████████████████████ ████████████████).

[11] Any purported concern Teva may have about what inferences a jury could conceivably draw from boilerplate disclaimers featured in its own documents could be adequately addressed by the Court at trial; for example, with a jury instruction that jurors should not draw any inferences— one way or the other—from such disclaimers.  *See infra* at 18 n.17.  In contrast, there will be substantial irreversible prejudice to Plaintiffs if they are precluded from obtaining the highly relevant, non-privileged facts Teva has redacted and withheld from these same documents.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 9

communicated to a lawyer; nor can a litigant refuse to disclose facts simply because that information came from a lawyer." *See Rhone-Poulenc Rorer, Inc.*, 32 F.3d at 864.

### Teva's Statement

Throughout the process of Teva's extensive document production and the parties' meet and confers, Plaintiffs have consistently overgeneralized legal principles and mischaracterized Teva's willingness to further substantiate its privilege claims. So too here. Plaintiffs' request to compel is premised on purported categorical principles of privilege and an incomplete account of Teva's claims and efforts to provide Plaintiffs with additional information.

As explained in the parties' February 21, 2019 joint discovery dispute letter, Teva has performed a robust and more-than-reasonable search and production of documents responsive to Plaintiffs' requests for production. Jt. Disc. Dispute Letter to Judge Goodman (ECF No. 575). To date, Teva has produced over one-hundred thousand documents as a result of the parties' expansive agreed upon search parameters and Teva's further agreement to search additional custodians and perform additional, discrete searches. Teva also produced rolling privilege logs with over twenty-thousand total entries.[12] And, at Plaintiffs' request, Teva agreed to re-review thousands of privilege log entries and documents to ensure that Teva did not over-redact or inadvertently withhold documents. Teva reproduced documents, where necessary, with fewer redactions or as completely non-privileged, and amended its privilege log in order to provide Plaintiffs with additional details in support of its privilege claims.

Indeed, Plaintiffs have conceded that Teva's substantial and good faith efforts to review these documents, reproduce where necessary, and amend its privilege log, have rectified the vast majority of their stated concerns. *See* Ex. P, Mar. 5, 2019 Email from Counsel for DPP, Michael D. Ford, to Counsel for Teva, Gavin R. Tisdale. The result is that out of over twenty-thousand privilege log entries, Plaintiffs present here and dispute only approximately one hundred documents *relating to a single issue*: whether legal analysis and advice that has been articulated as an assessed future date is privileged where it bears clear indicia of privilege, including privilege disclaimers specifically tied to that discrete forward-looking analysis. As described below, the answer is clearly yes under the circumstances here, and Plaintiffs' request to compel production of unredacted documents should be denied.

---

[12]    The number of privileged documents reflects the fact that Teva logged a separate entry for each document in the email family, including non-responsive attachments. Additionally, of the nineteen custodians Teva agreed to search, four are attorneys. Understandably, these custodians possessed a higher percentage of privileged documents.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 10

### A.  Legal Background

"The privilege forbidding the discovery and admission of evidence relating to communications between attorney and client is intended to ensure that a client remains free from apprehension that consultations with a legal adviser will be disclosed." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994) (citing *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888)). "As the privilege serves the interests of justice, it is worthy of maximum legal protection." *Id.* (citation omitted).

Relevant here is the application of the attorney-client privilege to the corporate context. "Courts have consistently held that communications relaying legal advice provided by corporate counsel among nonattorney corporate employees who share responsibility for the subject matter underlying the consultation are privileged." *Moffatt v. Wazana Bros. Int'l*, CIV.A. No. 14-1881, 2014 WL 5410201, at *2 (E.D. Pa. Oct. 24, 2014) (quotation omitted) (citing cases); *see also Se. Pa. Transp. Auth. v. Caremarkpcs Health, L.P.*, 254 F.R.D. 253, 258 (E.D. Pa. 2008) ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds.") (citation omitted).

> Indeed, it is not uncommon within a complex organization that when a request for information is made by outside counsel communications among corporate employees transmitting the request for information frequently will simply refer to the request as coming from outside counsel as opposed to a specific attorney or law firm. The important inquiry from a privilege perspective is the nature of the communication and the context in which it is made and not necessarily the precise identification of the source of the request for information.

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*, No. 3:16-MD-2734, 2017 WL 6757558, at *6 (N.D. Fla. Dec. 29, 2017).

Further, not identifying a specific attorney, by name, upon which privilege is based does not vitiate a privilege claim, it merely calls for closer scrutiny. *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476 (E.D. Pa. 2005); *see also Schwarz Pharma., Inc. v. Teva Pharm. USA, Inc.*, CIV. A. No. 01-4995 (DRD), 2007 WL 2892744, at *3 (D.N.J. Sept. 27, 2007) ("Plaintiffs' failure to identify specific individuals in their description of the author and the recipients, in and of itself, does not vitiate their assertion of the attorney-client privilege. However, and as one district court in this Circuit has recognized, said failure will subject Plaintiffs' assertion of privilege to close judicial scrutiny.") (internal citation omitted). "[W]here a specific name is not identified, this is not fatal to the assertion of privilege so long as it is evident that the information being compiled or discussed by corporate employees was

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 11

information requested by or generated by an attorney." *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 2017 WL 6757558, at *6.

To evaluate a privilege claim appropriately, a court must distinguish between legal advice and business advice, as well as between legal advice and facts. In the corporate context, "legal advice is often intimately intertwined and difficult to distinguish from business advice." *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 305-06 (D.N.J. 2008) (quotations and citations omitted). "Thus, the proper inquiry is focused on whether the communication is designed to meet problems which can fairly be characterized as predominately legal." *Id.* at 306 (citations omitted). Regarding the distinction between facts and legal advice, while facts may be discoverable, "the legal conclusions regarding those facts are not." *Rhone-Poulenc Rorer Inc*, 32 F.3d at 864.

**B. The Requested Information Contains Legal Analysis from Teva's Legal Department Warranting Privilege Redactions.**

The information sought by Plaintiffs was appropriately withheld or redacted as privileged because the documents contain legal analysis and conclusions, provided by members of Teva's Legal Department, and the majority of these documents contain specific disclaimers stating as much. Through Teva's initial review, and subsequent re-review, of documents, Teva identified a discrete category of privileged information that it concluded warranted privilege redactions. Specifically, Teva determined that information related to "As Early As" and "As Late As" potential launch date assessments were projections based upon legal advice, and "Reasons for Change" were short summaries of the legal basis for any changes to the early and late launch date assessment columns. Teva reached this decision because of: (1) its understanding that these date assessments were legal analysis, not factual information; (2) its understanding that these documents were routinely sent to Teva's Legal Department, and that Teva's counsel provided these date assessments for the purposes of addressing predominantly legal issues; and (3) the express privilege disclaimers on the documents specifically identifying this discrete category of analysis as originating from legal counsel. As such, Teva redacted information in these columns as privileged and provided Plaintiffs with privilege log descriptions and additional information through Teva's letters evincing the privileged status of this discrete class of information.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 12

### 1. The redacted information is legal analysis.

To be clear, the information in the early and late launch date assessment columns, as well as columns containing the legal basis for changes to these date assessments, are not facts, but rather legal analysis and conclusions from Teva's Legal Department. Plaintiffs mischaracterize the redacted information as "purely factual information concerning the anticipated launch date for generic Effexor XR," *supra*, at 5, but this is inaccurate. While some of the redacted analysis was conveyed in the form of (then) future date assessments, the mere fact that the analysis was reduced to a date assessment (sometimes with rationale) cannot mean, as a categorical matter, that the information is purely factual. As described in the accompanying Declaration from Jill Pastore, Teva's Legal Department provided legal advice and analysis that derived and adjusted the early and late date assessment depending on the fluid legal landscape affecting product development and potential future launch. *See* Ex. Q, Declaration of Jill Pastore, Teva's Director of Regulatory Affairs, ¶¶ 3, 5, 8, 9, 11 ("Pastore Declaration" or "Pastore Decl.").[13] Accordingly, intrinsic within each date assessment is the legal analysis of the various litigation, patent, regulatory, and contractual issues that might influence that date, all of which require legal analysis to decipher. Pastore Decl. ¶ 6. As such, this information is based upon legal advice, which is subject to privilege. *Rhone-Poulenc Rorer Inc.*, 32 F.3d at 864 (explaining that "the legal conclusions regarding . . . facts are not [discoverable]").

### 2. Teva's Legal Department provided the information for legal purposes.

Through the course of Teva's review of documents, Teva determined that these documents were emailed to attorneys for legal input as a matter of course or updated based on advice from attorneys, thus confirming the validity of the privilege disclaimers and bolstering Teva's privilege claim. Pastore Decl. ¶¶ 5, 8, 11. Indeed, Plaintiffs' own list of contested

---

[13] Plaintiffs' contention that a non-attorney's affidavit cannot establish privilege is without merit. Plaintiffs have merely emphasized a court's use of pronouns (*i.e.* "*her* legal advice to *her* clients") for the proposition that only an attorney can provide facts sufficient to establish privilege. *See supra* at 7 (quoting *Caremarkpcs Health, L.P.*, 254 F.R.D. at 261-62 (emphasis added)). Nothing in that case establishes that affidavits can only establish privilege if signed by an attorney. The proper analysis simply asks whether the asserting party, through supporting evidence including affidavits, provided "the court with enough information to enable the court to determine privilege." *Caruso v. Coleman Co.*, CIV. A. No. 93-CV-6733, 1995 WL 384602, at *1 (E.D. Pa. June 22, 1995); *Vanguard Sav. & Loan Ass'n v. Banks*, No. CIV. 93-CV-4627, 1995 WL 555871, at *2 (E.D. Pa. Sept. 18, 1995). As explained, *infra*, Teva has done just that—through the Pastore Declaration, Teva's privilege log, and Teva's correspondence with Plaintiffs—by establishing that the redacted information contains legal analysis provided by Teva's counsel for legal purposes.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 13

documents includes five documents that clearly have an attorney custodian.  *See* Ex. D, PRIV-08236 (Richard Egosi, former Chief Legal Officer); PRIV-20373 (same); PRIV-20374 (same); PRIV-08535 (Kirsten Bauer, SVP and General Counsel, North America and Global Operations); PRIV-08536 (same).  Additionally, despite Plaintiffs' baseless assertion that "[n]one of the documents in Exhibit D were sent to counsel," s*upra*, at 1 n.2, Teva's privilege log and production contains dozens of examples attorney custodians possessing these same types of reports.  *See*, *e.g.*, PRIV-01217 (David Stark, Chief Legal Officer); PRIV-08111 (same); PRIV-14505 (Richard Egosi); PRIV-19612 (same).  And contrary to Plaintiffs' contention, the fact that this privileged material was subsequently sent between discrete groups of non-attorneys does not undermine Teva's privilege claim.  *See Moffatt*, 2014 WL 5410201, at *2 ("[C]ommunications relaying legal advice provided by corporate counsel among nonattorney corporate employees who share responsibility for the subject matter underlying the consultation are privileged."); *Se. Pa. Transp. Auth.*, 254 F.R.D. at 258 ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." (citation omitted)).  Further, the parent emails of these documents frequently stated that the contents were confidential and instructing recipients not to copy.  Pastore Decl., ¶¶ 7, 10.  Because the legal analysis in these documents originated with Teva's legal counsel, Teva redacted this analysis when it was subsequently sent between non-attorneys, as is permitted under the law.

Additionally, Teva's Legal Department provided this legal analysis so that key members of Teva's regulatory and product launch teams understood the legal parameters in which they were operating.  Pastore Decl., ¶¶ 6, 9, 11.  This prevented Teva from running afoul of any regulatory or legal restrictions, including those stemming from patents, licensing agreements, or other regulatory approval procedures.  *Id.* ¶ 6.  As such, this information was provided for predominantly legal purposes.  *La Mun. Police Emps. Ret. Sys.*, 253 F.R.D. at 306 ("Thus, the proper inquiry is focused on whether the communication is designed to meet problems which can fairly be characterized as predominately legal." (citation omitted)).

### 3.  The documents contain privilege disclaimers.

As Teva explained to Plaintiffs in Teva's December 18, 2018 letter, Teva also based this privilege determination, in part, on the fact that most of these documents contain a clear privilege disclaimer.  Ex. H, Dec. 18, 2018 Letter, at 4 ("[T]here are many communications between employees at Teva attaching and discussing documents that were created with clear privilege warnings and disclaimers . . . .").  Of the 109 documents identified in Exhibit D:

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 14

- Fifty-eight contain the disclaimer: "CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGE DO NOT COPY." *See e.g.*, Ex. R, TEVA_EFFEX_0321627_R.[14]

- Of these 58 documents, 32 contain an additional, specific disclaimer: "WITH RESPECT TO ALL PENDING FILES PIV OR ACTIVE LITIGATION, EARLY AND LATE DATES BASED UPON LEGAL ADVICE." *See e.g.,* Ex. S, TEVA_EFFEX_0321623_R.

- Seven documents (in addition to the 58 documents identified above) contain that same, specific disclaimer regarding the privileged nature of the "EARLY AND LATE DATES." *See e.g.,* Ex. T, TEVA_EFFEX_0715074_R2.

- An additional thirteen documents include a disclaimer that the content is "CONFIDENTIAL" and instructing recipients, "DO NOT COPY." *See e.g.*, Ex. U, TEVA_EFFEX_0776456_R.

- Forty-eight documents have a column titled "Reason for Change," which contain the legal rationale for any changes in the early and late date assessments. *See e.g.*, Ex. R, TEVA_EFFEX_0321627_R.

### C. Plaintiffs' Reliance on Overgeneralized Principles of Law Is Without Merit.

With all of this in mind, Teva took the approach of redacting the "As Early As" and "As Late As" columns for venlafaxine, and any column containing the legal rationale for changing these date assessments (*i.e.* the "Reason for Change" column), as privileged. Teva provided Plaintiffs with sufficient information to evaluate Teva's privilege assertion. First, because Teva produced these documents in redacted form, Plaintiffs could see the privilege disclaimers, as described above, on the face of the documents.[15] Second, all of Teva's privilege log descriptions

---

[14]     Pursuant to Section D.1. of the Agreement Establishing Protocol For Discovery of Electronically Stored Information ("ESI") (ECF No. 245), Teva produced many of these spreadsheets in Native Format, along with a TIFF placeholder (*i.e.* slip-sheet) containing the confidentiality designation and Bates number. The documents attached as Exhibits R-U contain both the slip-sheet and a PDF of the Native .xls document. Teva excerpted here the pages containing information relevant to Teva's privilege redactions in order to minimize the size of the attachments.

[15]     Plaintiffs' request for *in camera* review is at odds with the realities of their request. The only relevant portions of the documents that are redacted as privileged are either date assessments or the legal analysis for changes in those date assessments. The parties, and now the Court, know the type of information that Teva redacted. The question before the Court is

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 15

for these documents specify that redacted information came from Teva's Legal Department. Because many of these documents are updated versions of the same type of document, the descriptions are predominantly similar.  *See e.g.,* Ex. D, PRIV-17688 ████████████████

████████████████████████████████████████████████████████████████████.  And, as described above, Teva's privilege log clearly indicates that these documents were routinely sent to counsel. *See* Ex. D, PRIV-08236 (Richard Egosi, former Chief Legal Officer); PRIV-20373 (same); PRIV-20374 (same); PRIV-08535 (Kirsten Bauer, SVP and General Counsel, North America and Global Operations); PRIV-08536 (same).  Third, Teva explained the privileged nature of these documents in their December 18, 2018 letter.  Teva explained that many of the documents contained the above-mentioned disclaimers and that Teva determined that the information contained in parts of these documents was based upon legal advice from Teva's legal department.  Ex. H, Dec. 18, 2018 Letter, at 4.  Yet with all of this information at their disposal, Plaintiffs insist that "Teva has not carried its burden of establishing that any of the documents identified in Exhibit D are privileged."  *Supra,* at 5.

For support, Plaintiffs again overgeneralize the law.  Plaintiffs continue to assert, as they did in their correspondence that Teva must indicate a specific attorney in order to establish a valid privilege claim.  *See supra,* at 3-5; Ex. B, Dec. 6, 2018 Letter, at 3.  But the case law is clear: A party's inability to identify a specific attorney (by name) upon which they assert privilege does not vitiate their privilege claim; it merely requires closer scrutiny.  *SmithKline Beecham Corp.*, 232 F.R.D. at 476; *Schwarz Pharma., Inc.*, 2007 WL 2892744, at *3; *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 2017 WL 6757558, at *6.  In addition, practically speaking, the complex nature of privilege in a corporate setting does not always permit a litigant to identify a specific attorney, especially when the underlying privileged documents were created many years prior.  *Id.*  Teva's privilege log contains over twenty-thousand entries, and, wherever possible, Teva identified the specific attorney in its privilege log.  The discrete group of documents in Exhibit D contain descriptions discussing the role of Teva's Legal Department in providing legal analysis for the early and late launch date projections.  Teva's privilege log entries—especially those entries showing Teva's counsel as custodians to these documents—as well as the information Teva sent to Plaintiffs regarding these documents, *see* Ex. H, Dec. 18, 2018 Letter, at 4, and the attached affidavit, provide sufficient information to establish the nexus between Teva's attorneys and the underlying privileged information.

Plaintiffs also cite two cases for the categorical proposition that a pharmaceutical company's launch dates are not privileged.  But these cases are readily distinguishable and

---

whether such content is appropriately redacted as privileged, which does not require *in camera* review.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 16

cannot be applied as a categorical rule.  Plaintiffs first cite *FTC v. Abbvie, Inc.* for the proposition that "the anticipated launch date for a pharmaceutical product was not privileged because a launch date is 'the product of a business analysis of the competition in the market for the generic drug,' not legal advice."  *Supra*, at 6 (quoting *FTC v. Abbvie, Inc.*, No. 14-5151, 2015 WL 8623076, at *6 (E.D. Pa. Dec. 14, 2015)).  But, like all privilege claims, the court's analysis in *Abbvie, Inc.* is limited to the facts presented in that case, which are distinct from Teva's claim here.  In *Abbvie Inc.*, the "anticipated launch date" was within a paragraph wherein the very next sentence discussed the "possible locations for conducting the bioequivalence study," which the court concluded was part of an effort to "assess future steps Besins should take in pursuing its business strategy."  *Abbvie, Inc.*, 2015 WL 8623076, at *6.  Further, the second portion of that paragraph specifically asked "business advice from business colleagues."  *Id.*  As such, the court determined that the anticipated launch date and the rest of the paragraph discussing Besins's business strategy were not privileged.  *Id.*

Here, unlike in *AbbVie*, Teva did *not* redact the "anticipated launch date" columns in other spreadsheets that did not bear the same clear indicia of privilege as the information at issue here.  *See* Exs. N & O (leaving the column titled "Anticipated Launch Date" unredacted).  Instead, Teva here correctly opted to limit its privilege redactions to the early and late date assessment columns, as well as the legal analysis for any changes to these columns, for which clear and direct evidence of privilege is available.  *See* Ex. R, TEVA_EFFEX_0321627_R.  As described above, Teva also underwent the effort of distinguishing between privileged launch date assessments and non-privileged launch dates through the use of disclaimers, which differs from *AbbVie* in which the business information and purported legal analysis and business analysis were inextricably intertwined in the same paragraph.  Teva's supporting evidence accordingly provides justifications absent in *Abbvie, Inc.*, including the specific privilege disclaimers and the fact that these documents were sent to counsel for legal analysis.  Pastore Decl., ¶¶ 3, 5, 8, 9, 11.

Plaintiffs also cite *King Drug Co.* for the proposition that "launch dates are not privileged even in documents that indicate that the launch date and accompanying business analysis was based upon attorney feedback."  *See supra*, at 4 (citing *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797,2011 WL 2623306, at *7 (E.D. Pa. July 5, 2011).  Here too, Plaintiffs propose a categorical rule when the court's decision in *King Drug Co.* is limited to the facts in that case, and the facts of that case presented a different issue.  In *King Drug Co.*, the communication at issue was an email transmitting information, purportedly from an attorney, about the time-line for launch of *other manufacturers'* generic products.  *Id.*, at *6-7.  The court stated that the focus of that timeline was "a matter of economic concern."  *Id.*, at *7.  Although the court cautioned that some of that information may "implicate legal matters," the court concluded that the specific communication did not appear to be for the purposes of obtaining or providing legal assistance, which undermined the asserting party's claim.  *Id.*

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 17

Like *Abbvie*, the facts presented here, and Teva's supporting evidence, distinguish *King Drug Co.* Unlike *King Drug Co.*, Teva's redacted information concerned legal assessment for early and late launch dates for its own products. This is important because these assessments were performed by Teva's attorneys, based on the "various legal issues, such as those relating to patents, litigation, regulatory requirements and approval, and licensing or other business agreements" applicable to their client, Teva. Pastore Decl., ¶6. And Teva's counsel provided the early and late launch date assessments—as distinguished from other launch date columns that Teva left unredacted—so that "Teva's production and launch teams were aware of and could operate within the legal and regulatory parameters relating to their operation." *Id.* Where in *King Drug Co.*, the asserting party did not provide sufficient information for the court to find the withheld information was provided for the purposes of legal advice, here, Teva has provided this Court with sufficient information to substantiate its privilege claim.

Plaintiffs next contend that *In re Nexium (Esomerprazole) Antitrust Litigation* establishes that the documents are not privileged. For support, they attach the testimony of Jill Pastore, Teva's Director of Regulatory Affairs, for the proposition that, because documents similar (but not identical) to a handful of documents at issue here were used at trial in a different jurisdiction without objection, and because Ms. Pastore did not explicitly state that the documents were created by legal counsel, Teva cannot assert privilege on the documents in Exhibit D. *Supra*, at 6-7. Plaintiffs' analogy fails for at least three reasons. First, it does not matter that, as Ms. Pastore testified, the documents were not created by an attorney. *See Se. Pa. Transp. Auth.*, 254 F.R.D. at 258 ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds.") (citations omitted). The key question is not who created the document, but whether the document contains and conveys legal analysis and advice from an attorney. Second, Ms. Pastore never testified that certain information in the identified spreadsheets was not privileged, but rather answered counsel's question about which group created the document. Teva's decision not to object to documents specific to the context of the *Nexium* trial and unrelated to venlafaxine does not impute a broad waiver of privilege, or by implication, demonstrate that the discrete information redacted here is not privileged. Finally, the documents attached to Exhibit J are examples of a discrete type of document entitled "Major Milestone Report." Of the 109 documents listed in Exhibit D, only thirteen are similar versions of the Major Milestone Report. Most of the other documents, as described above, are a different type of document containing specific attorney-client privilege disclaimers. These Major Milestone Reports contain the same early and late date assessment columns as other the other reports with specific attorney-client privilege disclaimers. Pastore Decl., ¶ 9. Likewise, the early and late date assessments in the Major Milestone Reports were created by Teva's Legal

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 18

Department for the purposes of providing legal advice.  *Id*.  As such, the redacted information in the Major Milestone Reports is privileged information warranting redaction.[16]

Plaintiffs' assertion that bald privilege disclaimers, standing alone, cannot create attorney-client privilege where it does not exist misses the point several times over.  As an initial matter, the privilege disclaimers at issue here identify with specificity the discrete legal analysis redacted from the challenged documents as based on legal advice.  And of course Teva does not base its privilege claim on just these disclaimers standing alone, though they must be viewed as evidence of privilege and Teva's intention to maintain this information as privileged and confidential by limiting its circulation and notifying recipients of its privileged nature.  Rather, as described herein, Teva has further established the privileged nature of the redacted information through its privilege log descriptions, explanatory correspondence with Plaintiffs, and the attached affidavit from an employee directly knowledgeable about the documents at issue.

The documents cited by Plaintiffs—Exhibits E, F, and G—are among the discrete group of 31 documents that do not contain the attorney-client privilege disclaimer, and instead either contain no disclaimer or contain a disclaimer indicating that the document is "CONFIDENTIAL."  Although these are the exception to the bulk of documents challenged here, Teva asserts privilege over these documents based on the nature of the legal advice included in these near-identical documents and Teva's knowledge that this analysis and advice consistently originated from attorneys in Teva's Legal Department.[17]  Pastore Decl., ¶ 11.

Finally, Plaintiffs attach Exhibits N and O as examples where Teva purportedly chose to "produce similar business spreadsheets with launch dates included."  *Supra*, at 8.  According to Plaintiffs, this is evidence the Teva has "selectively chosen" to disclose certain documents but not others.  *Id.*  Here too, Plaintiffs misstate Teva's claim of privilege and misconstrue the issue.  Teva has not redacted all launch-related dates in all documents for the appropriate and proper

---

[16]     In addition, Plaintiffs' argument that—because plaintiffs used this information in the Nexium trial—this information is "highly relevant" is a red herring.  The comparative relevance of a particular document does not overcome a party's claim to privilege.  *See Rhone-Poulenc Rorer Inc.*, 32 F.3d at 861 ("Rule 26 thus provides that relevant but privileged matters are not discoverable.").

[17]     The ramifications of compelling Teva to unredact this information warrants consideration.  If Teva were to unredact these date assessments, Plaintiffs could put before a jury these documents containing disclaimers stating that certain dates were based on legal advice from Teva's counsel.  The jury could conclude, through Plaintiffs' inference or otherwise, that such dates were indeed based on legal analysis and would weigh that evidence accordingly.  Such a likely outcome is incongruent with Plaintiffs' position here that this information is not legal advice.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
June 27, 2019
Page 19

reason that it has limited its claim of privilege only to that information which bears the appropriate indicia of privilege. In other words, Teva has with deliberation and care identified the specific information representing legal analysis originating from counsel and extended its claims of privilege only to that information. Far from demonstrating that Teva's claims of privilege are improper, the production of these other materials without redaction shows that Teva has asserted privilege judiciously. As the Exhibits demonstrate, Teva is redacting only very specific and discrete early and late launch date assessments, as well as the columns related to the legal rationale concerning these date assessments, because these date assessments are based on the legal analysis of Teva's Legal Department. Exhibits N and O do not include these early and late launch date assessments, and so Teva produced these documents without privilege redactions.

Teva's redaction of this discrete and targeted set of information is fully justified, and Teva has provided Plaintiffs with sufficient information to demonstrate the validity of Teva's privilege claim. The Court should deny Plaintiffs' motion to compel.

Respectfully yours,

*/s/ Peter S. Pearlman*

Peter S. Pearlman

PSP:mds

cc:     All Counsel of Record *(Via ECF)*

# EXHIBIT A



December 11, 2018

<u>VIA ELECTRONIC MAIL</u>

Matthew P. Downer, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

   Re: *In re Effexor XR Antitrust Litigation,*
     <u>Master Docket No. 11-cv-5479 (D.N.J.)</u>

Dear Mr. Downer:

   Plaintiffs write to raise objections to (1) Teva's "Partially Privileged" redactions for certain documents identified in its first four privilege logs and (2) Teva's redaction of certain documents on "Non-responsive" grounds.

   Teva's claims of privilege over the partially redacted documents identified in its first four privilege logs are largely deficient under Rule 26(b)(5) because frequently Teva has redacted responsive, non-privileged information, such as launch dates or the names of individuals at Teva.  Similarly, throughout its productions, Teva has also improperly redacted as purportedly non-responsive information that is relevant to defenses Defendants will likely raise in this litigation.  Teva also sometimes has identified documents as privileged yet made no redactions for privilege.  Still at other times, Teva had produced documents that are illegible, thereby failing to provide Plaintiffs with an adequate basis to assess Teva's redactions.

   Sections I through IV of this letter address each of these problems in more depth with the hope that Teva will promptly address Plaintiffs' concerns.  Plaintiffs, however, will file a motion to compel if Teva fails to produce all non-privileged, responsive information in documents to which Plaintiffs' are entitled.

## I. Teva Redacted for Privilege Information that is Responsive and Not Privileged.

   Many of Teva's redacted privilege log entries correspond to spreadsheets, emails, and other documents that do not contain any legal advice or requests for legal advice.  Without the crucial component of legal advice, these documents are not protected under attorney-client privilege and Teva must produce the documents without spurious redactions for privilege.  These improperly redacted documents include:  factual

Matthew P. Downer, Esq.
December 11, 2018
Page 2

_____

information, such as launch dates, paragraph IV filings, and sites where drugs are manufactured; financial information; communications between non-attorneys; the names of individuals involved in a committee; and full titles of columns and rows in spreadsheets. These incorrectly redacted documents are reflected in the privilege log entries in the spreadsheet attached as Exhibit A.

Attorney-client privilege does not extend to facts, only to communications where a client sought or obtained legal counsel.  *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.*, 32 F.3d 851, 862 (3d Cir. 1997) (citing *In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir. 1979).  *See also Upjohn Co. v. U.S.*, 449 U.S. 383, 395-96 (1981) ("A fact is one thing and a communication concerning that fact is an entirely different thing.") (internal quotes removed).  Even though the legal advice of corporate attorneys "is often intimately intertwined and difficult to distinguish from business advice," attorney-client privilege does not protect communications that "relate to business rather than legal matters." *La.Mun.Police Emp. Ret. Sys. v. Sealed Air Condition*, 253 F.R.D. 300, 305-06 (D.N.J. 2008) (internal quotes removed).

Thus, a corporate client asserting attorney-client privilege must demonstrate that the purportedly privileged communication only existed because of "the client's need for legal advice or services."  *Id.* at 306.  This party bears the burden of providing the opposing party with a "specific designation and description of the documents" it claims are privileged.  *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, L.L.C.*, 202 F.R.D. 418, 423 (M.D. Pa. 2001).  This burden entails providing "precise and certain reasons for preserving their confidentiality" beyond "mere conclusory or *ipse dixit* assertions."  *Id.* (internal quotes removed).  For instance, a spreadsheet containing merely financial information is not itself a privileged document absent information about who authored the document and for what purpose.  *RBS Citizens, NA v. Husain*, 291 F.R.D. 209, 219 (N.D. Ill. 2013).

Throughout the documents identified in Exhibit A, Teva has failed to meet this burden.  Many of the documents in Exhibit A are spreadsheets where Teva redacted purely factual information under a claim of privilege.  *See e.g.,* PRIV-00734, TEVA_EFFEX_0145327 (redacting financial information).  An examination of these documents and the privilege logs does not support these redactions, yet Teva nonetheless has incorrectly asserted attorney-client privilege over the factual information the documents contain.  Indeed, Teva recognizes this type of information is not privileged by producing it in similar documents without claiming privilege. *Compare* PRIV-09104, TEVA_EFFEX_0268345 (redacting all information entered in column titled ▮▮▮▮▮▮) *and* PRIV-09107, TEVA_EFFEX_0268372 (redacting all information entered in column titled ▮▮▮▮▮▮) *with* PRIV-09141, TEVA_EFFEX_0138894 (leaving all information entered in column titled ▮▮▮▮▮▮) *and* PRIV-09660, TEVA_EFFEX_0323049 (leaving all information entered in column titled ▮▮▮▮▮▮).

Matthew P. Downer, Esq.
December 11, 2018
Page 3

_____

Similarly, Teva often has redacted as privileged the titles of columns and rows in a spreadsheet that came from the custodial file of a non-attorney. *See e.g.,* PRIV-00486, TEVA_EFFEX_0134468 (redacting full column in spreadsheet titled ███████████ █████). Mere titles of columns and the information that business spreadsheets contain are discoverable facts and could not constitute information within the scope of attorney-client privilege. Teva's privilege log descriptions for such entries fail to explain whose legal counsel the redaction removed, and instead feature vague and conclusory descriptions. *See e.g., id.* ████████████████████████████████████████ █████). After a close examination of these documents in conjunction with a review of the vague privilege log descriptions supporting Teva's claims of privilege, Plaintiffs conclude that Teva has failed to carry its burden of showing that attorney-client privilege protects these spreadsheets from discovery since recitation of factual information is not privileged.

Teva's problematic claims of privilege persist across all types of documents identified in its privilege logs. A review of numerous redacted emails confirms what their accompanying, sparse privilege log entries hint at: attorney-client privilege does not shield these documents because they appear to only involve responsive, discoverable facts. *See e.g.,* PRIV-00445, TEVA_EFFEX_0135805—TEVA_EFFEX_0135806 ████████████████

PRIV-00679

Plaintiffs demand that Teva produce versions of the documents identified in Exhibit A without the unjustified redactions.

## II.     Teva Redacted Information as "Non-Responsive" Despite It Being Relevant and Responsive.

Separate from the privilege issues discussed above, Teva has improperly withheld and redacted information as "non-responsive," impeding Plaintiffs' ability to assess defenses Defendants may raise. Unless Teva and Wyeth are both willing to stipulate now that they will not raise any defenses relating to Teva's readiness, willingness, or ability to launch its generic Effexor XR earlier than July 1, 2010, Teva must produce the information improperly redacted as non-responsive.

Teva's non-responsiveness redactions are keeping Plaintiffs from getting a full sense of how Teva prioritizes its allocation of regulatory and manufacturing resources when bringing a drug to market. *See e.g.,* TEVA_EFFEX_0453135, at TEVA_EFFEX_0453173 ██████████████████████

Matthew P. Downer, Esq.
December 11, 2018
Page 4

_____

███████████████████████████████); TEVA_EFFEX_0259740—
TEVA_EFFEX_0259743████████████████████████████████████
███████████████████████████████████████████████████;
TEVA_EFFEX_0094586—TEVA_EFFEX_0094602 ██████████████
████████████████████████████████████); TEVA_EFFEX_0094767
███████████████████████████████████████████████████████
█████; TEVA_EFFEX_0245641███████████████████████████████
█████████████████. TEVA_EFFEX_0269705████████████████
██████████████████████████. Teva's over redaction of
information also prejudices Plaintiffs because it makes many of Teva's documents
incomprehensible to a juror or witness and prevents Plaintiffs from gaining a full
understanding of the context of a given document.

    In addition, Teva has redacted information specifically relevant to generic Effexor
XR itself, including anticipated launch dates and correspondence from the FDA regarding
the launch of generic Effexor XR.  *See, e.g.*, TEVA_EFFEX_00716220 ████████████
████████████████████); TEVA_EFFEX_0253373 ██████████████████
████████████████████).[1]

    These facts in the documents listed in Exhibit B are relevant if either Defendant
will assert a defense that Teva was not ready or was unable to get FDA approval and
launch its generic Effexor XR earlier than July 2010.  Thus, the factual information is
relevant, and Teva's redaction of this information for purported non-responsiveness is
improper and prejudices Plaintiffs.  *See Tetris Holding, LLC v. Xio Interactive*, No. CV 09-
6115 (FLW), 2011 WL 13141049, at *17 (D.N.J. June 20, 2011) (finding defendant waived
attorney-client privilege where fairness necessitated the plaintiff's examination of
documents to meet certain defenses).  Unless Teva promptly produces versions of these
documents that do not include these improper redactions, Plaintiffs will move to compel
their production.

    Additionally, Teva has redacted hundreds of documents in their entirety as non-
responsive.  Based on prior meet and confers, Plaintiffs understand that some of these
documents are non-responsive documents that are part of a document family that includes
responsive documents, such as a non-responsive attachment to a responsive cover email
that has been produced.  Nonetheless, given the sheer volume of such entirely withheld
"non-responsive" documents, Plaintiffs have identified these documents in the attached
Exhibit C and request that Teva confirm why these documents have been withheld.

_____

[1] The above are just a few examples of what is a pervasive problem throughout Teva's production.  A more
comprehensive list of similarly improperly redacted documents is attached at Exhibit B.  Plaintiffs reserve
the right to further update this list as discovery progresses, but at this point request that Teva reproduce
unredacted versions of all documents listed in Exhibit B.

Matthew P. Downer, Esq.
December 11, 2018
Page 5

_____

## III.   Documents on Teva's Log That Have Not Been Redacted for Privilege.

Teva incorrectly identifies numerous documents as redacted on account of privilege with the code "Partially Privileged – Redact" in its privilege logs. Yet, Teva in fact made no redactions based upon a claim of privilege in the documents themselves. These documents instead feature only redactions for non-responsiveness. *See e.g.,* PRIV-00961, TEVA_EFFEX_0167148—TEVA_Effex_0167167 (redacting only for non-responsiveness). The privilege log entries corresponding to these documents are contained in the spreadsheet attached as Exhibit D.

Documents not redacted for privilege do not belong in the privilege logs. However, it is possible that Teva has marked redactions for privilege as redacted for non-responsiveness. Such an error would significantly prejudice Plaintiffs' ability to assess Teva's redactions for privilege if those redactions are wrongly identified in the documents. Teva must confirm that its redactions are accurately characterized.

## IV.   Teva Produced Illegible Documents.

Plaintiffs also have identified various documents redacted as privileged that are impossible to evaluate in their current format because they are partially illegible. These entries are contained in a spreadsheet attached as Exhibit E.

Plaintiffs demand that Teva produce legible versions of the documents identified in Exhibit E so that Plaintiffs can properly assess Teva's claims of privilege.

\* \* \*

Plaintiffs look forward to Teva's response. Please respond to these issues by Friday, December 28, 2018.

Sincerely,

*/s/ Erin C. Burns*

Erin C. Burns

Attachments
cc:  Gregory T. Arnold, Esq.
       Lauren G. Barnes, Esq.
       Don Barrett, Esq.
       Jack Baughman, Esq.
       Farrah R. Berse, Esq.

Matthew P. Downer, Esq.
December 11, 2018
Page 6

_____

John P. Bjork, Esq.
Rachel A. Blistan, Esq.
Eric L. Bloom, Esq.
Justin N. Boley, Esq.
Elizabeth Brehm, Esq.
Michael M. Buchman, Esq.
Moira Cain-Mannix, Esq.
James E. Cecchi, Esq.
Neill W. Clark, Esq.
Yahonnes Cleary, Esq.
Michelle C. Clerkin, Esq.
Deborah Sampieri Corbishley, Esq.
Caitlin G. Coslett, Esq.
Brian M. English, Esq.
Lori A. Fanning, Esq.
Michael D. Ford, Esq.
Susan M. Fowler, Esq.
Raj Gandesha, Esq.
Bryan Gant, Esq.
Matthew F. Gately, Esq.
David P. Germaine, Esq.
Sheryn George, Esq.
Brandi R. Hamilton, Esq.
Brian Hill, Esq.
Jonathan D. Janow, Esq.
Debra G. Josephson, Esq.
Jeffrey L. Kodroff, Esq.
Peter Kohn, Esq.
Nina Kovalenko, Esq.
David E. Kovel, Esq.
Maureen S. Lawrence, Esq.
John Marcoretta, Esq.
Marvin A. Miller, Esq.
Robert Milne, Esq.
David S. Nalven, Esq.
Dianne M. Nast, Esq.
Anna T. Neill, Esq.
Linda P. Nussbaum, Esq.
Peter S. Pearlman, Esq.
Scott E. Perwin, Esq.
Lauren C. Ravkind, Esq.
Barry L. Refsin, Esq.

Matthew P. Downer, Esq.
December 11, 2018
Page 7

_____

Emily M. Renzelli, Esq.
Kevin P. Roddy, Esq.
Michael L. Roberts, Esq.
Stephanie E. Smith, Esq.
Thomas M. Sobol, Esq.
David F. Sorensen, Esq.
Sterling Starns, Esq.
Adam Steinfeld, Esq.
Kathryn Swisher, Esq.
Barry S. Taus, Esq.
Lindsey H. Taylor, Esq.
Gavin R. Tisdale, Esq.
William H. Trousdale, Esq.
Bethany R. Turke, Esq.
Joseph M. Vanek, Esq.
Karen N. Walker, Esq.
Kenneth A. Wexler, Esq.
Matthew Wisnieff, Esq.

# EXHIBIT B



December 6, 2018

<u>VIA ELECTRONIC MAIL</u>

Matthew P. Downer, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

      Re:    *In re Effexor XR Antitrust Litigation,*
                <u>Master Docket No. 11-cv-5479 (D.N.J.)</u>

Dear Mr. Downer:

      Plaintiffs write in connection to our October 17, 2018 letter, Teva's November 8, 2018 letter in response, and the fourth privilege log Teva produced on November 27, 2018. Please note, Plaintiffs do not agree that this fourth privilege log comprises Teva's final privilege log because Teva will produce another log in connection with future document productions, including, for instance, in connection with the production of additional custodians that Teva agreed to search in its October 19, 2018 letter to Plaintiffs. Despite our letter and Teva's opportunity to produce a new log, Plaintiffs maintain that many of the entries and claims of privilege contained in Teva's privilege logs are not in compliance with Rule 26(b)(5) of the Federal Rules of Civil Procedure.

      As you know, it is Teva's responsibility to demonstrate the bases for its claims of attorney-client privilege in its privilege logs. Consequently, it is not the Plaintiffs' obligation to infer that valid claims of privilege exist where Teva's privilege log entries fail to adequately demonstrate attorney-client privilege under Rule 26.

      To date, Teva has not carried this burden and Plaintiffs have not waived any privilege arguments. *See FTC v. AbbVie*, No. CV 14-5151, 2015 WL 8623076, at *12, n. 14 (E.D. Pa. Dec. 14, 2015) ("AbbVie also argues that the FTC's privilege challenge is untimely because the FTC had these privilege logs since 2007 and never challenged them in prior patent litigation. This argument is without merit."). Plaintiffs respectfully request that Teva review its logs and promptly provide Plaintiffs with updated versions that comply with its obligations under Rule 26.

Matthew P. Downer, Esq.
December 6, 2018
Page 2

_____

I.   **Plaintiffs' October 17, 2018 Letter Focused on *Entries* in Teva's Privilege Logs; Teva Responded by Discussing the Scope of Attorney-Client Privilege in General.**

In our October 17, 2018 letter, Plaintiffs' raised four types of entries appearing throughout Teva's privilege logs that made it impossible for Plaintiffs to adequately assess Teva's claims of attorney-client privilege.  Crucially, Plaintiffs' discussion focused on the character of those entries and Teva's obligation under Rule 26 to provide entries in a format that would permit Plaintiffs to adequately assess Teva's claims of privilege.

Teva's response on November 8, 2018, however, did not address Plaintiffs' central contention that Teva's privilege log entries fail to provide Plaintiffs with "sufficient detail to establish the application of attorney-client privilege."  *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2013 WL 4836752, at *8 (E.D. Pa. Sept. 11, 2013) (finding merit in FTC's argument that defendants' privilege logs contained insufficient detail to establish attorney-client privilege and requiring an *in camera review* to determine the validity of the defendants' claims of privilege).  Instead, Teva outlined the contours of attorney-client privilege in corporate settings.

As noted from the opening of the October 17, 2018 letter and throughout, the aim of Plaintiffs' letter was to identify entries where Teva had not provided sufficient information for Plaintiffs to conclude that attorney-client privilege existed.  Plaintiffs' goal was not to raise substantive concerns about the permissible scope of attorney-client privilege in corporate settings.  We ask that Teva address the contentions Plaintiffs actually made.

II.   **Teva's Privilege Log Entries Still Consistently Fail to Identify a Valid Basis for Attorney-Client Privilege.**

The four broad categories of entries identified in Plaintiffs' October 17, 2018 letter are all deficient because all lacked sufficiently descriptive entries that would allow Plaintiffs to adequately determine that Teva had made a valid claim of privilege.  Based upon review of Teva's fourth privilege log, it remains clear Teva's privilege logs do not comply with Rule 26 because many entries in the privilege logs fail to provide sufficient information for Plaintiffs to conclude that Teva has properly asserted attorney-client privilege.

A proper privilege log must have entries that provide the non-withholding party with enough information to determine that a particular entry corresponds to a document that is protected by attorney-client privilege.  *See* Fed. R. Civ. P. 26(b)(5)(A)(ii) (requiring description of the "nature of the documents, communications, or tangible things not produced or disclosed" in a format that "will enable other parties to assess the claim" of attorney-client privilege).  Only after an adequate showing of privilege in an entry, a valid privilege log entitles the withholding party to prevent the discovery of the corresponding

Matthew P. Downer, Esq.
December 6, 2018
Page 3

_____

privileged document. *See Zimmerman v. Norfolk Southern*, 706 F.3d 170, 181 (3d Cir. 2013) (holding that Third Circuit requires the party asserting attorney-client privilege to bear the burden of proving its existence). Crucially, the ability to withhold purportedly privileged documents is contingent upon an adequate demonstration of the bases of privilege in a privilege log. *Id.*

A party's privilege log entries "must be sufficiently detailed," containing "a specific designation and description of the documents" and "precise and certain reasons for preserving their confidentiality" for the party to adequately carry its burden in establishing attorney-client privilege. *SmithKline Beecham Corp. v. Apotex Corp.,* 232 F.R.D. 467, 475, 482 (E.D. Pa. 2005) (internal quotes omitted). In determining the adequacy of privilege logs, "[t]he focus is on the specific descriptive portion of the log, and not on conclusory invocations of the privilege or work product rule, since the burden of the party withholding documents cannot be discharged by mere conclusory or ipse dixit assertions." *Balt. Scrap Corp. v. David J. Joseph Co.,* No. L-96-827, 1996 WL 720785, at *13 (D. Md. Nov. 20, 1996) (quoting *Golden Trade S.r.L. v. Lee Apparel Co.*, No.90-cv-6291, 1992 WL 367070, at *5 (S.D.N.Y. 1992) (internal quotes omitted).

A party cannot merely assert that a document a non-attorney created is protected by attorney-client privilege. *FTC,* 2015 WL 8623076, at *3. "In particular, where the party does not identify any specific attorney with whom a confidential communication was made. . . [the party] has failed to provide sufficient detail to demonstrate fulfillment of the legal requirements for application of the privilege." *Id.* (internal quotes omitted). As a result, an adequate privilege log should identify a specific attorney as the source of privilege in order for a party to carry its burden of establishing attorney-client privilege. *SEPTA v. Caremarkpcs Health, L.P.*, 254 F.R.D. 253, 259 (E.D. Pa. 2008).

As Plaintiffs' noted in their October 17, 2018 letter, numerous entries in Teva's privilege logs demonstrate no clear attorney involvement. Those entries, contained in exhibits B and C to the October 17, 2018 letter, either had no attorney participant in the communications or the only attorneys involved appeared in the carbon copy or blind carbon copy fields of the communications. To make matters worse, the descriptive portions of Teva's privilege logs that accompanied those entries systematically failed to identify an attorney as the source of attorney-client privilege. Instead of attributing privilege to a specific attorney, Teva utilized vague, boilerplate descriptions that provided Plaintiffs with an imprecise and uncertain information to determine whether Teva had valid claims of privilege. *See e.g.,* PRIV-00030 (justifying privilege simply with, ██████ ████████████████████████████████████" without crediting that legal advice to any particular attorney); PRIV-12796 (failing to identify any particular attorney as the source of privilege and simply naming the firm of ███████████████). Such entries are patently deficient.

Matthew P. Downer, Esq.
December 6, 2018
Page 4

_____

The failure to adequately claim privilege persists in Teva's fourth privilege log.
Exhibit A included with this letter includes all entries from Teva's four privilege logs
where Teva has failed to provide sufficient information to determine which attorney or
attorneys' advice is the source of privilege.  Please note, in addition to all deficient entries
in Teva's fourth privilege log, Exhibit A also includes essentially all of the entries
identified in Exhibits A and B of Plaintiffs' October 17, 2018 letter because these entries
remain deficient under Rule 26.

Exhibit A additionally includes entries where Teva had previously identified Marc
Goshko as the source of attorney client privilege and subsequently amended its privilege
logs to create different, yet equally deficient entries.  *See e.g.* PRIV-10963 (amending
description from ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████  As Teva kindly informed Plaintiffs, Marc Goshko is not an
attorney and therefore cannot be the source of attorney client-privilege.  Given that
nothing else has changed about entries where Teva previously identified Marc Goshko as
the source of privilege, and Teva has failed to identify the source of privilege, these entries
remain deficient under Rule 26 and the documents are plainly not privileged.   Please
confirm that Teva will promptly produce all documents where it claimed Mr. Goshko to be
the source of the privilege, as his status as a non-attorney makes such a claim impossible.

In the attached Exhibit A, Plaintiffs have removed the few entries where Teva did
adequately assert privilege in its previous privilege logs, and Plaintiffs ask that Teva now
go back and ensure that all entries across all three privilege logs look similar to PRIV-
00513, in compliance with Teva's obligations under Rule 26.

## III.   Teva's Logs Still Include Non-Privileged Email Attachments.

Despite Teva's agreement in its November 8, 2018 letter to stop including non-
privileged junk files in its future privilege logs (Teva's Letter at 2), Teva has continued to
include such entries in its fourth privilege log.

As Plaintiffs previously explained, each document must have an independent basis
for privilege.  *Leonen v. Johns-Manville*, 135 F.R.D. 94, 98 (D. N.J. 1990).  A party cannot
claim that documents are "simply standard components of a single email" and thus
privileged, but must instead assert privilege on a "document by document" basis.  *See*
Teva's Letter at 2; *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990)
(finding that a party cannot make blanket assertions of privilege).

Exhibit B included with this letter specifies all entries from Teva's fourth privilege
log that lack an independent basis for privilege.  These entries correspond to non-

Matthew P. Downer, Esq.
December 6, 2018
Page 5

_____

privileged files like signature blocks, automatically generated attachments to emails, and files where Teva has not provided any information about the file format.  Complicating matters further, some entries have clumsy descriptions that inaccurately describe the non-privileged files Teva has withheld.  *See e.g.*, PRIV-18207 (withholding a non-privileged image file with the incorrect description of ███████████████████████████████ ████████████████████████████████████████) (emphasis added).

These entries uniformly fail to establish an independent basis for privilege.  Plaintiffs are disappointed that Teva has failed to comply with its November 8, 2018 agreement to remove such files from its fourth privilege log.  Teva's continued logging of such junk files is unnecessarily complicating Plaintiffs' review of Teva's privilege logs and wasting significant time as Plaintiffs have to sort through such entries before being able to review substantive entries.  It is difficult to credit Teva's complaints about the speed with which Plaintiffs are reviewing Teva's privilege logs when Teva continues to waste Plaintiffs' time with such entries.

* * *

Plaintiffs request a meet and confer on these issues so that they can be promptly resolved.  We are generally available the week of December 10, 2018.

Sincerely,

*/s/ Erin C. Burns*

Erin C. Burns

Attachments
cc:   Gregory T. Arnold, Esq.
      Lauren G. Barnes, Esq.
      Don Barrett, Esq.
      Jack Baughman, Esq.
      Farrah R. Berse, Esq.
      John P. Bjork, Esq.
      Rachel A. Blistan, Esq.
      Eric L. Bloom, Esq.
      Justin N. Boley, Esq.
      Elizabeth Brehm, Esq.
      Michael M. Buchman, Esq.
      Moira Cain-Mannix, Esq.
      James E. Cecchi, Esq.
      Neill W. Clark, Esq.

Matthew P. Downer, Esq.
December 6, 2018
Page 6
_____

Yahonnes Cleary, Esq.
Michelle C. Clerkin, Esq.
Deborah Sampieri Corbishley, Esq.
Caitlin G. Coslett, Esq.
Erin C. Durba, Esq.
Brian M. English, Esq.
Lori A. Fanning, Esq.
Michael D. Ford, Esq.
Susan M. Fowler, Esq.
Raj Gandesha, Esq.
Bryan Gant, Esq.
Matthew F. Gately, Esq.
David P. Germaine, Esq.
Sheryn George, Esq.
Brandi R. Hamilton, Esq.
Brian Hill, Esq.
Jonathan D. Janow, Esq.
Debra G. Josephson, Esq.
Jeffrey L. Kodroff, Esq.
Peter Kohn, Esq.
Nina Kovalenko, Esq.
David E. Kovel, Esq.
Maureen S. Lawrence, Esq.
John Marcoretta, Esq.
Marvin A. Miller, Esq.
Robert Milne, Esq.
David S. Nalven, Esq.
Dianne M. Nast, Esq.
Anna T. Neill, Esq.
Linda P. Nussbaum, Esq.
Peter S. Pearlman, Esq.
Scott E. Perwin, Esq.
Lauren C. Ravkind, Esq.
Barry L. Refsin, Esq.
Emily M. Renzelli, Esq.
Kevin P. Roddy, Esq.
Michael L. Roberts, Esq.
Stephanie E. Smith, Esq.
Thomas M. Sobol, Esq.
David F. Sorensen, Esq.
Sterling Starns, Esq.
Adam Steinfeld, Esq.

Matthew P. Downer, Esq.
December 6, 2018
Page 7
_____

     Kathryn Swisher, Esq.
     Gavin R. Tisdale, Esq.
     Barry S. Taus, Esq.
     Lindsey H. Taylor, Esq.
     William H. Trousdale, Esq.
     Bethany R. Turke, Esq.
     Joseph M. Vanek, Esq.
     Karen N. Walker, Esq.
     Kenneth A. Wexler, Esq.
     Matthew Wisnieff, Esq.

# EXHIBIT C



October 17, 2018

<u>VIA ELECTRONIC MAIL</u>

Matthew P. Downer, Esq.
655 Fifteenth Street, N.W.
Washington, D.C. 20005

      Re:   *In re Effexor XR Antitrust Litigation,*
              <u>Master Docket No. 11-cv-5479 (D.N.J.)</u>

Dear Mr. Downer:

    Plaintiffs have completed a preliminary review of Teva's July 13, 2018, August 30, 2018, and October 10, 2018 privilege logs. We write to raise our initial concerns about many entries and claims of privilege. Plaintiffs maintain that Teva's privilege logs are deficient and not in compliance with Rule 26(b)(5) of the Federal Rules of Civil Procedure. Plaintiffs have identified four initial broad groups of entries from Teva's privilege logs that present deficient claims of privilege. Plaintiffs will raise additional substantive issues with Teva's privilege logs in subsequent correspondence.

## I.    Entries Pertaining to Miscellaneous Image Files Are Not Privileged.

    The first category of deficient entries is comprised of the many entries in the privilege logs pertaining to miscellaneous image files. The challenged entries are contained in the spreadsheet attached at Exhibit A. Numerous image files identified in the privilege logs appear to have been embedded in emails, oftentimes in signature blocks. Throughout its privilege logs, Teva has claimed that these various jpeg, gif, and other files are privileged, yet has provided Plaintiffs with no reasonable basis that such files are privileged under Rule 26.

    A party claiming privilege must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that . . . will enable other parties to assess the claim" of privilege. Fed. R. Civ. P. 26(b)(5)(A)(ii). The Third Circuit narrowly construes the scope of privilege and requires that a party asserting privilege must bear the burden of proving its existence. *Zimmerman v. Norfolk Southern*, 706 F.3d 170, 181 (3d Cir. 2013).

Matthew P. Downer, Esq.
October 17, 2018
Page 2

_____

Merely attaching a file to a privileged communication does not make the file itself privileged, particularly when that file is obviously a junk file that contains a company logo or similar image.  *See Leonen v. Johns-Manville,* 135 F.R.D. 94, 98 (D.N.J. 1990) (holding each attached document must have an independent basis for privilege).  Any claims of privilege "must be asserted document by document, rather than as a single, blanket assertion."  *United States v. Rockwell Int'l,* 897 F.2d 1255, 1265 (3d Cir. 1990).  Descriptions in a privilege log "must be sufficiently detailed" to establish attorney-client privilege.  *SmithKline Beecham Corp. v. Apotex Corp.,* 232 F.R.D. 467, 475 (E.D. Pa. 2005); *see Kelchner v. Int'l Playtex, Inc.,* 116 F.R.D. 469, 472 (M.D. Pa. 1987) ("In addition to description, an index should contain precise and certain reasons for preserving confidentiality or privilege.")) .

Teva has failed to meet its burden under Rule 26 because it has not provided Plaintiffs with adequate grounds to assess Teva's claims of privilege over the various jpeg, gif, and other miscellaneous files contained in its privilege logs.  Because each file must have its own basis for a claim of privilege, Teva cannot assert, for instance, that an image from an email is privileged merely because the substance of the email itself is purportedly privileged.  Plaintiffs seek an explanation as to why Teva appears to be claiming privilege over company logos embedded in signature blocks and that it stop including such files in future privilege logs; such junk files simply waste the Parties' time in evaluating substantive documents included on Teva's privilege logs.

## II.   Entries Pertaining to Documents and Communications Involving Only Non-Lawyers Are Not Privileged.

In each privilege log, Teva has identified many documents and communications as privileged even though non-attorneys created the documents or the communications transpired between two or more individuals that Teva has not identified as attorneys.  The challenged entries are contained in the spreadsheet attached as Exhibit B.

Attorney-client privilege applies if "the person to whom the communication was made is a member of the bar of a court, or his or her subordinate."  *Gloucester Twp. Hous. Auth. v. Franklin Square Assocs.,* 38 F. Supp. 3d 492, 496 (D.N.J. 2014).  Moreover, the subject of the communication itself must be connected to the practice of law.  *Id.*  Thus, documents that non-attorneys create during the normal course of business are discoverable and have the protection of neither attorney-client privilege nor the work product doctrine.  *In re Gabapentin Patent Litig.,* 214 F.R.D. 178, 186 (D.N.J. 2003).

Teva's privilege logs showcase numerous communications between two or more non-attorneys where attorney-client privilege could not have arisen given the absence of an attorney as a sender or recipient of such communications.  Moreover, with other entries in the privilege log, Teva has failed to identify a source of attorney-client privilege for

Matthew P. Downer, Esq.
October 17, 2018
Page 3

_____

documents held in the custodial files of non-attorneys.  These facts negate any claim of attorney-client privilege over the documents commemorating such conversations.

Without additional information, Plaintiffs cannot agree that Teva has appropriately exercised its ability to withhold as privileged such communications under Rule 26. Plaintiffs request that Teva either produce the numerous documents currently listed in the privilege logs that reflect communications between non-attorneys (identified in Exhibit B) or specify in each description in the privilege logs precisely why the attorney-client or work product protections attach despite the lack of any discernible attorney involvement in these communications.

**III.   Entries Pertaining to Communications Where No Attorney Actively Participated Are Not Privileged.**

The third category of deficient entries is the group of entries where individuals Teva has identified as attorneys did not actively participate in a way that could have given rise to attorney-client privilege.  Specifically, in such documents the purported attorneys merely appear in the carbon copy or blind carbon copy fields of allegedly privileged communications.  Such documents are listed in the spreadsheet attached at Exhibit C.

Attorney-client privilege does not arise simply because a lawyer has been copied on an email or other communication.  *In re Human Tissue Prod. Liab. Litig.*, 255 F.R.D. 151, 164 (D.N.J. 2008); *Adritz v. Beazer East, Inc.*, 174 F.R.D. 609, 633 (M.D. Pa. 1997) ("What would otherwise be routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda.").  Similarly, communications that non-attorney employees have merely forwarded to an attorney do not give rise to attorney-client privilege or work product protections.  *In re Gabapentin Patent Litig.,* 214 F.R.D. at 186.

Teva has claimed that attorney-client privilege protects numerous communications where attorney involvement is limited solely to the carbon copy and blind carbon copy sections of email chains.  Without knowing more, Plaintiffs are unable to assess the allegedly privileged nature of these documents because Teva personnel could have merely routed such communications through attorneys rather than engaged with those attorneys with the genuine goal of obtaining legal advice.  Plaintiffs request that Teva either produce the numerous documents currently listed in the privilege logs that reflect communications without direct attorney involvement (reflected in Exhibit C) or specify in each log description precisely why the attorney-client or work product protections attach despite the lack of any discernible attorney involvement in these communications.

Matthew P. Downer, Esq.
October 17, 2018
Page 4

_____

**IV.     Teva's Inconsistent Representations of Marc Goshko and Maureen Cavanaugh as Attorneys Make it Impossible for Plaintiffs to Evaluate Numerous Claims of Privilege.**

The fourth category of deficient entries in Teva's privilege logs consists of those entries where Teva has identified either Marc Goshko or Maureen Cavanaugh as an attorney.  The challenged entries are contained in a spreadsheet attached at Exhibit D.  Teva's privilege logs alternate between identifying Mr. Goshko and Ms. Cavanaugh as attorneys and as non-attorneys.  Plaintiffs' preliminary independent research indicates that neither Mr. Goshko nor Ms. Cavanaugh is an attorney.[1]

In light of Teva's apparent mistaken belief that Mr. Goshko and Ms. Cavanaugh are attorneys, Plaintiffs are left wondering whether Teva has incorrectly predicated a claim of privilege on their roles as attorneys or on some other grounds.  Plaintiffs request that Teva explain their claims that Mr. Goshko and Ms. Cavanaugh are attorneys.

Plaintiffs have identified our initial objections through this categorization process for ease of reference and to simplify the process of resolving the issues presented.  Plaintiffs do not waive any further deficiencies that may be identified once these initial issues are resolved or that arise after further review of Teva's logs.

Plaintiffs look forward to Teva's response.  In an effort to efficiently resolve the privilege issues as quickly as possible, please respond to these initial issues by October 26, 2018.

Sincerely,

*/s/ Erin C. Burns*

Erin C. Burns

Attachments
cc:   Gregory T. Arnold, Esquire
      Lauren G. Barnes, Esquire
      Don Barrett, Esquire
      John P. Bjork, Esquire
      Rachel A. Blistan, Esquire

_____

[1] *See* Press Release, Teva USA, Teva Announces Newly Named Grant Program and 2015 Awardees and Boston Symposium, (last visited Oct. 15, 2018) (available at http://news.tevausa.com/phoenix.zhtml?c=251945&p=mediaMention&id=594773) (noting Marc Goshko's lack of formal legal training); Maureen Cavanaugh, LINKEDIN, https://www.linkedin.com/in/maureen-cavanaugh-29a43624 (last visited Oct. 15, 2018) (listing no law license or legal training).

Matthew P. Downer, Esq.
October 17, 2018
Page 5

_____

Eric L. Bloom, Esquire
Justin N. Boley, Esquire
Elizabeth Brehm, Esquire
Michael M. Buchman, Esquire
Moira Cain-Mannix, Esquire
James E. Cecchi, Esquire
Neill W. Clark, Esquire
Michelle C. Clerkin, Esquire
Deborah Sampieri Corbishley, Esquire
Caitlin G. Coslett, Esquire
Erin C. Durba, Esquire
Lori A. Fanning, Esquire
Michael D. Ford, Esquire
Susan M. Fowler, Esquire
Matthew F. Gately, Esquire
David P. Germaine, Esquire
Brandi R. Hamilton, Esquire
Brian Hill, Esquire
Debra G. Josephson, Esquire
Jeffrey L. Kodroff, Esquire
Peter Kohn, Esquire
David E. Kovel, Esquire
Maureen S. Lawrence, Esquire
John Marcoretta, Esquire
Marvin A. Miller, Esquire
David S. Nalven, Esquire
Dianne M. Nast, Esquire
Anna T. Neill, Esquire
Linda P. Nussbaum, Esquire
Peter S. Pearlman, Esquire
Scott E. Perwin, Esquire
Lauren C. Ravkind, Esquire
Barry L. Refsin, Esquire
Kevin P. Roddy, Esquire
Michael L. Roberts, Esquire
Stephanie E. Smith, Esquire
Thomas M. Sobol, Esquire
David F. Sorensen, Esquire
Sterling Starns, Esquire
Adam Steinfeld, Esquire
Barry S. Taus, Esquire
Lindsey H. Taylor, Esquire

Matthew P. Downer, Esq.
October 17, 2018
Page 6
_____

     Bethany R. Turke, Esquire
     Joseph M. Vanek, Esquire
     Kenneth A. Wexler, Esquire

# EXHIBIT D

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**

# EXHIBIT E

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**

# EXHIBIT F

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**

# EXHIBIT G

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**

# EXHIBIT H

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

<table>
<tr><td>Matthew Downer<br>To Call Writer Directly:<br>+1 202 879 5226<br>matthew.downer@kirkland.com</td><td>655 Fifteenth Street, N.W.<br>Washington, D.C. 20005<br>United States<br><br>+1 202 879 5000<br><br>www.kirkland.com</td><td>Facsimile:<br>+1 202 879 5200</td></tr>
</table>

December 18, 2018

**By Email**

Erin C. Burns
Nast Law LLC
1101 Market Street
Suite 2801
Philadelphia, PA 19107

Re:     *In re Effexor XR Antitrust Litigation*, Case No. 3:11-cv-05479 (D.N.J.)

Dear Counsel:

We write in response to Erin C. Burns's December 6, 2018 letter regarding Teva's privilege logs, which repeated many of plaintiffs' objections that Teva addressed in its November 8, 2018 letter.

As an initial matter, Teva fundamentally disagrees with plaintiffs' contention that Teva has done anything to complicate or delay plaintiffs' review of Teva's privilege log. To the contrary, Teva has complied with its obligations under the various court orders, agreements with plaintiffs, and Rule 26, promptly producing multiple rolling privilege logs on July 13, 2018, August 30, 2018, October 11, 2018, and November 27, 2018 and, as described more fully below, responding in detail to the apparent concerns first raised in plaintiffs' October 17 correspondence—coming more than three months after receipt of Teva's first rolling privilege log. Nonetheless, Teva remains committed to addressing, and where possible resolving, any specific and concrete objections raised by plaintiffs regarding its privilege logging, but can only do so where those issues are clearly defined with some specificity.

## I.     Teva's November 8, 2018 Letter Responded to Each Issue Raised in Plaintiffs' October 17, 2018 Letter

Plaintiffs first assert that Teva's November 8, 2018 letter failed to "address the contentions Plaintiffs actually made" in their October 17, 2018 letter. Instead, plaintiffs argue that Teva merely "outlined the contours of attorney-client privilege in corporate settings." Not so. To the contrary, Teva provided specific responses to each of plaintiffs' contentions.

# KIRKLAND & ELLIS LLP

Erin C. Burns
December 18, 2018
Page 2

*First*, Teva responded to plaintiffs' contention regarding so-called "junk" files, as explained further below, by agreeing to remove from its future privilege logs those files plaintiffs identified as "junk." *See* Teva's November 8, 2018 Letter at 2. *Second*, Teva responded to plaintiffs' incorrect assertion that a communication originating from legal counsel cannot be privileged when later conveyed from and to nonattorneys. Teva further explained how it complied with the governing law when logging "communications between nonattorneys by identifying with as much specificity as possible with whom the privileged advice originated." *Id.* at 2–3. *Third*, Teva addressed plaintiffs' broad objection to the withholding of privileged communications in which attorneys were CC'd or BCC'd by again correcting plaintiffs' mistaken "underlying premise" that an attorney must be a direct addressee (or actively participate in each withheld communication) for the privilege to apply and asking plaintiffs to "identify those specific entries" that (they contend) fall short of the "proper legal standard." *Id.* at 3–4. *Fourth*, Teva addressed the inadvertent labelling of Mr. Goshko and Ms. Cavanaugh as attorneys. *Id.* at 4–5.

In short, plaintiffs' suggestion that Teva did not respond to the issues raised in plaintiffs' October 17 letter is simply belied by the record. In what follows, Teva again seeks to respond to the apparent issues raised in plaintiffs' more recent correspondence.

## II.    Teva Appropriately Removed the So-Called Miscellaneous "Junk" Files Identified By Plaintiffs

Plaintiffs both misstate what Teva agreed to do in its November 8, 2018 letter and wrongly contend that Teva disregarded that agreement. Specifically, plaintiffs state that Teva agreed to "stop including *non-privileged* junk files in its future privilege logs." (emphasis added). But that misstates the agreement. Rather, Teva maintains that these "junk" files are in fact components of privileged communications. As Teva explained in its November 8, 2018 letter, these "junk" files are standard "embedded" components of a single email document, which are expressed electronically as a multi-file document family. Because plaintiffs insisted on production of non-responsive documents in an otherwise responsive family, including where an image was "embedded" in a parent email, Teva initially included these files in each of the rolling privilege logs. When plaintiffs' reversed their request in connection with their October 17 letter, however, Teva agreed to sort through these privileged, non-responsive files and to "stop including [them] in future privilege logs."

As a result of that agreement, Teva applied extra scrutiny to files with certain document extensions while preparing its most recent privilege log. In particular, Teva flagged all files ending in .bin, .gif, .jpeg, and .png (which were typical of the junk files identified by plaintiffs' Exhibit A to their October 17, 2018 letter) and then reviewed those files to ensure that Teva removed the sort plaintiffs label as "junk" and not files that might contain substantive information. That additional

## KIRKLAND & ELLIS LLP

Erin C. Burns
December 18, 2018
Page 3

scrutiny resulted in removing from the most recent privilege log hundreds of files like those plaintiffs' describe as "junk."

Plaintiffs nonetheless contend that Teva inappropriately included 42 such files in its fourth privilege log. In reality, plaintiffs identify many files as "junk" that contain substantive information and therefore were appropriately logged. Plaintiffs, for example, identify PRIV-18207 as containing a "clumsy description[] that inaccurately describe[d]" a junk file. That is wrong. Although that file is a ".gif" or "graphics interchange format" file, Teva accurately described the file as a "spreadsheet" because it is in fact a graphic of a spreadsheet. Teva therefore determined that the file was not "junk" and should be logged as a component of a privileged communication.

## III.    Teva Appropriately Logged its Privileged Documents

Finally, plaintiffs broadly challenge Teva's assertions of attorney-client privilege for roughly four-thousand privilege-log entries. Plaintiffs state that the documents in Exhibit A are all entries where Teva has purportedly "failed to provide sufficient information to determine which attorney or attorneys' advice is the source of privilege." In doing so, plaintiffs contend that a privilege-log description identifying a group of attorneys, such as the Teva Legal Department or Goodwin Procter LLP, is insufficient. Plaintiffs further insist instead that each description must identify a "specific attorney"—by name—or else Teva cannot carry its burden under Rule 26.

That view is improperly narrow and at odds with the realities of privilege in a corporate setting. The inability to specify the name of the attorney giving the legal advice at issue does not defeat privilege. *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, No. 3:16-MD-2734, 2017 WL 6757558, at *6 (N.D. Fla. Dec. 29, 2017). Indeed, many instances arise in the corporate setting where it would be impossible to name the specific attorney for privileged communications. For example:

> [I]t is not uncommon within a complex organization that when a request for information is made by outside counsel communications among corporate employees transmitting the request for information frequently will simply refer to the request as coming from outside counsel as opposed to a specific attorney or law firm. The important inquiry from a privilege perspective is the nature of the communication and the context in which it is made and not necessarily the precise identification of the source of the request for information.

*Id.* When an organization has a privileged document but cannot identify the specific attorney from whom that document originated, a privilege log description that explains that the document was

# KIRKLAND & ELLIS LLP

Erin C. Burns
December 18, 2018
Page 4

created at the "request of counsel" is sufficient.  *In re Denture Cream Prod. Liab. Litig.*, No. 09-2051-MD, 2012 WL 5057844, at *9–10 (S.D. Fla. Oct. 18, 2012) (holding that a privilege log description was sufficient for a document between nonattorneys that explained that the document was made "at the request of counsel" without identifying a specific attorney).  In these instances, naming a group of attorneys or an outside firm is appropriate and sufficient for the purposes of Rule 26.

As described in Teva's October November 8, 2018 letter, when logging a communication between nonattorneys, Teva attempted to identify with specificity from whom the privileged communication originated.  In many of the instances identified in Exhibit A to plaintiffs December 6, 2018 letter, however, the withheld document was clearly privileged on its face, despite the fact that it was not readily apparent from which specific attorney the privileged information originated.  For example, there are many communications between employees at Teva attaching and discussing documents that were created with clear privilege warnings and disclaimers, such as "CONFIDENTIAL - ATTORNEY   CLIENT PRIVILEGE," or "BASED UPON LEGAL ADVICE."  During Teva's review and logging of these documents, Teva determined that these documents were indeed based upon legal advice from members of Teva's Legal Department or an outside firm.  Teva used the identifier, "Teva Legal Dept.*," for many of these documents to establish that the withheld document was privileged because it contained or discussed legal advice from an unspecified member or members of Teva's Legal Department.  As another example, if nonattorneys were discussing legal advice from outside counsel, such as Goodwin Procter, but did not mention a specific name, Teva would identify the firm itself as the source of privilege.

In addition, plaintiffs again claim that communications with Marc Goshko are not privileged and requested that Teva "promptly produce all documents where it claimed Mr. Goshko to be the source of privilege."  This request once again reflects an incorrect view of the law and ignores Teva's prior response on this issue.   As explained in Teva's November 8 letter, although Mr. Goshko is not an attorney, he worked within Teva's Legal Department as a member of the regulatory team and therefore worked at the direction of attorneys, as is evidenced by the attorneys who frequently appear as other recipients of communications to and from Mr. Goshko.  Thus, many communications from Mr. Goshko are privileged because they relay legal advice from his attorney supervisors.  Indeed, plaintiffs own cited cases support this conclusion.  *See* Plaintiffs' October 17, 2018 Letter at 2 (attorney-client privilege applies "if the person to whom the communication was made is a member of the bar of a court, *or his or her subordinate*." (quoting *Gloucester Twp. Hous. Auth. v. Franklin Square Assocs.*, 38 F. Supp. 3d 491, 496 (D.N.J. 2014) (internal quotations omitted) (emphasis added)).  Teva accordingly has appropriately logged privileged communications to and from Mr. Goshko.

However, despite these apparent disagreements as to the appropriate requirements for privilege logging, and in a good faith effort to accommodate plaintiffs' stated concerns, Teva will

# KIRKLAND & ELLIS LLP

Erin C. Burns
December 18, 2018
Page 5

agree to re-review the four thousand documents identified in Exhibit A in order to ensure that Teva has identified the attorney or attorneys upon which Teva based its privilege claim where possible. After performing this review, Teva will amend its privilege log or, if necessary, produce any inadvertently withheld documents.

******

Teva believes that this letter resolves the issues raised in plaintiffs' December 6, 2018 letter, and we remain available to meet and confer with plaintiffs as previously scheduled to discuss any remaining issues.

Sincerely,

*/s/ Matthew P. Downer*

Matthew P. Downer

cc:     All Counsel of Record

# EXHIBIT I

# KIRKLAND & ELLIS LLP

#### AND AFFILIATED PARTNERSHIPS

Matthew P. Downer
To Call Writer Directly:
+1 202 879 5226
matthew.downer@kirkland.com

655 Fifteenth Street, N.W.
Washington, D.C. 20005
United States

+1 202 879 5000

www.kirkland.com

Facsimile:
+1 202 879 5200

November 8, 2018

**Via Email**

Ms. Erin C. Burns
NastLaw LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107

Re:     *In re Effexor XR Antitrust Litigation*, Case No. 3:11-cv-05479 (D.N.J.)

Dear Counsel:

We write in response to Erin C. Burns's letter of October 17, 2018, which purported to raise plaintiffs' various "initial concerns about many entries and claims of privilege" in the logs Teva produced on July 13, 2018, August 30, 2018, and October 11, 2018.

As an initial matter, plaintiffs' delay in raising these issues many months after plaintiffs received Teva's first rolling privilege log subverts the very process that plaintiffs proposed and that the Court adopted.  During the parties' discussions with the Court, plaintiffs insisted on a requirement for rolling privilege logs—each wave of which would follow six weeks after a related production—for the express purpose of allowing plaintiffs to raise and resolve "right away" any issues with the first log and thereby avoid recurring issues going forward.  Judge Arpert agreed with plaintiffs' asserted rationale.  Teva thereafter fulfilled its end of that process, producing each new privilege-log installment six weeks after each production, first in July, then in August, and most recently in October.  Plaintiffs meanwhile neither raised any issue with Teva's privilege logs nor produced any privilege logs of their own, until—one week after Teva's *third* privilege log—plaintiffs finally raised the concerns addressed herein, which date back to the initial privilege log.

Even once raised, plaintiffs' vague "concerns" largely derive from overgeneralization and misstatement of the law governing claims of privilege.  Each of the issues plaintiffs raise is addressed in turn below.

## I.     Entries Pertaining to So-Called Miscellaneous "Junk" Image Files

The lead issue raised in plaintiffs' letter is frivolous.  Plaintiffs have identified a series of several hundred entries across the three rolling privilege logs plaintiffs say consist merely of

## KIRKLAND & ELLIS LLP

Ms. Erin C. Burns
November 8, 2018
Page 2

"company logos embedded in signature blocks" that they characterize as "junk files [that] simply waste the Parties' time."    Plaintiffs request that Teva provide an explanation and "stop including such files in future privilege logs."

To explain:  As plaintiffs recognize in their letter, the so-called "junk" files are simply standard components of a single email document—like company logos in a letterhead or signature-block images within emails—which are expressed electronically as a multi-file document family with the logo image attached to the email.  For the sake of being comprehensive, and given plaintiffs' repeated insistence during our meet and confer that each non-responsive family member of a responsive document be accounted for, Teva logged these separate electronic image components of the privileged documents given that they appear on the face of a document in the ordinary course.

Teva will nonetheless agree to "stop including such files in future privilege logs," as plaintiffs now request.

## II.    Entries Pertaining to Documents and Communications Involving Non-Lawyers

Plaintiffs next broadly contend that Teva's privilege logs contain multiple entries "where attorney-client privilege could not have arisen given the absence of an attorney as a sender or recipient."  *See* Letter at 2.  In support, plaintiffs apparently take the blanket position that withheld communications must always be made to or by an attorney or his or her subordinate for the privilege to attach.  *Id.*  But plaintiffs cite no support for their improperly narrow view of the scope of privilege, which is not the law.

"Plaintiffs' insistence that an attorney must be involved as a participant in the communication before it can be found to reflect a client confidence or legal advice is misplaced." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 433 (N.D. Ill.), *supplemented*, 432 F. Supp. 2d 794 (N.D. Ill. 2006); *see also King Drug Co. of Florence v. Cephalon, Inc.*, No. 2:06-cv-1797, 2013 U.S. Dist. LEXIS 129472, at *37 (E.D. Pa. Sep. 11, 2013) ("[C]ommunications shared by non-attorney employees may be privileged if they were made in order to relay information requested by attorneys, or to disseminate legal advice given by those attorneys so that the corporation's employees act appropriately.").

"Courts have consistently held that communications relaying legal advice provided by corporate counsel among nonattorney corporate employees who share responsibility for the subject matter underlying the consultation are privileged."  *Moffatt v. Wazana Bros. Int'l*, No. CIV.A. 14-1881, 2014 WL 5410201, at *2 (E.D. Pa. Oct. 24, 2014) (internal citation and quotation omitted) (citing cases); *see also FTC v. AbbVie, Inc.*, No. 14-5151, 2015 U.S. Dist. LEXIS 166723, at *6 (E.D. Pa. Dec. 14, 2015) ("There need not be an attorney participating in the communication if the

# KIRKLAND & ELLIS LLP

Ms. Erin C. Burns
November 8, 2018
Page 3

communication conveys legal advice to other employees so that they may comply."); *Se. Pennsylvania Transp. Auth. v. Caremarkpcs Health, L.P.*, 254 F.R.D. 253, 258 (E.D. Pa. 2008) ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." (citations omitted)).   A common example of privileged communications between nonattorneys includes documents transmitting or containing legal advice.  *See, e.g.*, *A & R Body Specialty & Collision Works, Inc. v. Progressive Cas*. Ins. Co., No. 3:07CV929(WWE), 2013 WL 6044342, at *4 (D. Conn. Nov. 14, 2013) (holding that communications between nonattorneys that reflect legal advice were protected by attorney-client privilege).

Nor are plaintiffs correct that privilege cannot exist when "non-attorneys created the documents" or because "the communications transpired between two or more individuals that Teva has not identified as attorneys," Letter at 2.   *Med. Protective Co. v. Bubenik*, No. 4:06CV01639(ERW), 2007 WL 3026939, at *2 (E.D. Mo. Oct. 15, 2007) ("[T]hose documents which contain communications between corporate representatives who are non-lawyers, regarding advice received from an attorney, are subject to the attorney-client privilege."); *Baltimore Scrap Corp. v. David J. Joseph Co.*, No. L-96-827, 1996 WL 720785, at *6 (D. Md. Nov. 20, 1996) (holding that a memorandum was protected by attorney client privilege even though the author and recipient were nonattorneys).

In such instances, Teva logged communications between nonattorneys by identifying with as much specificity as possible with whom the privileged advice originated.  *See, e.g.*, Exhibit B to Letter, Row 116, Column H (███████████████████████████████████
███████"); *Id.* at Row 1721, Column H ████████████████████████████████████
████████████████).

In sum, plaintiffs' broadly-stated concern on this issue is borne of a fundamental misunderstanding of the governing law on privilege.  If, however, after applying the appropriate legal standard plaintiffs still wish to raise for discussion a refined set of log entries, plaintiffs should identify those entries and specify how they run afoul of the proper legal standard in light of the specific information detailed in each entry.

## III.   Entries Pertaining to Communications Where Attorneys are CC'd or BCC'd

Plaintiffs further suggest that attorneys who "appear in the carbon copy or blind carbon copy fields of allegedly privileged communications" could not "actively participate in a way that could have given rise to attorney-client privilege." Letter at 3.  This contention fails for the same reason as the previous one: plaintiffs' underlying premise that an attorney must participate in each withheld communication for the privilege to apply is simply incorrect.  Although plaintiffs correctly assert that merely copying an attorney on an email does not, by itself, make that email

## KIRKLAND & ELLIS LLP

Ms. Erin C. Burns
November 8, 2018
Page 4

privileged, Teva never claimed otherwise.  To the contrary, Teva specified the basis for privilege in each privilege log entry and plaintiffs have not engaged meaningfully with those stated bases.

This contention fails for two other reasons as well.  *First*, just because an attorney is CC'd on an email does not mean that her inclusion on the CC line is the basis for the email's privilege. Indeed, plaintiffs' exhibit is replete with entries where Teva indicated a different attorney or attorneys for the basis of the privilege in addition to the one plaintiffs insist is insufficient.

*Second*, just because the attorney is listed in the "CC" line rather than in the "To" line does not mean, as plaintiffs contend, that the attorney "did not actively participate in a way that could have given rise to attorney-client privilege."  Letter at 3.  An attorney can respond to a request for legal advice just as easily from the "CC" field as from the "To" field.  In any case, when the privilege log lists an attorney in the "CC" field, the entry also indicates the basis for the privileged claimed.

Here, too, plaintiffs have premised their stated concern on a fundamental misunderstanding of the governing law.  Should plaintiffs wish to raise discrete log entries for further discussion under the proper legal standard, Teva asks that plaintiffs identify those specific entries and articulate the alleged deficiency in a manner that meaningfully engages with the stated basis of privilege.

## IV.    Entries Pertaining to Marc Goshko and Maureen Cavanaugh

Plaintiffs also challenge certain entries that mention either Marc Goshko or Maureen Cavanaugh, apparently on the basis that some of those entries include an asterisk symbol indicating (incorrectly) that they are attorneys.  Plaintiffs conclude that, because neither is an attorney, all entries that include the errant asterisk must not be privileged.  That is incorrect, for at least two reasons.

*First*, plaintiffs ignore the fact that the stated reason for logging many of the entries they challenge has little or nothing to do with Mr. Goshko or Ms. Cavanaugh but instead is based on the fact that the logged document was a privileged communication to or from core members of Teva's legal team.  Plaintiffs challenge, for example, an entry that lists Teva's current Chief Legal Officer, David Stark, as the sender of an email ██████████████████████████ ██████████ simply because that entry also places an asterisk next to Mr. Goshko's name in the recipient column.  *See* Exhibit D to Letter, Row 16, Column D.  Even though Mr. Goshko is not an attorney, the entry unmistakably demonstrates the basis for the document's privilege—the sender was a senior company lawyer communicating legal advice.  The same is true of many other challenged entries, and plaintiffs do not even attempt to explain a good-faith basis for challenging them.

# KIRKLAND & ELLIS LLP

Ms. Erin C. Burns
November 8, 2018
Page 5

*Second*, even if the challenged entries listed no attorneys, communications between non-attorneys can still convey legal advice and therefore justify privilege, as discussed above. Indeed, although Mr. Goshko and Ms. Cavanaugh are not themselves attorneys, both worked intimately with—and therefore often conveyed or requested the advice of—various members of Teva's legal team. In particular, Mr. Goshko was a highly respected regulatory expert who served as part of Teva's Legal Staff and who, in that capacity, regularly communicated legal advice to colleagues. The same is true of Ms. Cavanaugh, who as Chief Operating Officer also worked closely with core members of Teva's legal team. In any case, although Teva will remove the errant asterisks and otherwise adjust the entries as needed, plaintiffs must identify for discussion any entries they actually wish to challenge and provide—with some specificity—the basis for those challenges in light of the details provided in the log entries and the information above.

\*     \*     \*

Timing and substance aside, when plaintiffs seek to serve correspondence on Teva in the future, they should do so on all counsel of record for Teva (as Teva has repeatedly requested in this litigation), rather than copying scores of plaintiffs' counsel on the one hand and copying only one attorney for Teva on the other. We appreciate your professional courtesy in this regard going forward.

Sincerely,

/s/ Matthew P. Downer

Matthew P. Downer

# EXHIBIT J

1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3                          No. 12-md-02409-WGY
                    Volume 2, Pages 80-163
4

5

6  In Re:  NEXIUM (ESOMEPRAZOLE)
           ANTITRUST LITIGATION
7

8

9                      ********

10

11               For Jury Trial Before:
                 Judge William G. Young
12

13

14            United States District Court
              District of Massachusetts (Boston)
15            One Courthouse Way
              Boston, Massachusetts 02210
16            Friday, November 21, 2014

17

18

19                     ********

20

21

22

23      REPORTER: CHERYL B. PALANCHIAN, RMR, CRR
              Official Court Reporter
24            United States District Court
              One Courthouse Way, Room 5510
25                 Boston, MA 02210

```
 1                     A P P E A R A N C E S

 2          THOMAS M. SOBOL, ESQ.
            KRISTEN JOHNSON PARKER, ESQ.
 3             Hagens Berman Sobol Shapiro, LLP
               55 Cambridge Parkway, Suite 301
 4             Cambridge, MA 02142
               Email: Tom@hbsslaw.com
 5       and
            STEVE D. SHADOWEN, ESQ.
 6             Hilliard & Shadowen, LLC
               39 West Main Street
 7             Mechanicsburg, PA 17055
         and
 8          RICHARD ARNOLD, ESQ.
               Kenny Nachwalter, P.A.
 9             201 South Biscayne Boulevard, Suite 1100
               Miami, Florida 33131
10             For plaintiffs

11          LAURENCE A. SCHOEN, ESQ.
               Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
12             One Financial Center.
               Boston, MA 02111
13             Email: Lschoen@mintz.com
         and
14        KAREN N. WALKER, ESQ.
          KEVIN VAN WART, ESQ.
15             Kirkland & Ellis, LLP
               655 Fifteenth Street, N.W., Suite 1200
16             Washington, DC 20005
               Email: Kwalker@kirkland.com
17             For Teva defendants

18          JOHN E. SCHMIDTLEIN, ESQ.
            PAUL B. GAFFNEY, ESQ.
19          DANE H. BUTSWINKAS, ESQ.
               Williams & Connolly, LLP
20             725 Twelfth Street, N.W.
               Washington, DC 20005
21             Email: Jschmidtlein@wc.com
               For AstraZeneca defendants
22
          JAMES D. BALDRIDGE, ESQ.
23        DANIELLE R. FOLEY, ESQ.
               Venable, LLP
24             575 7th Street, N.W.
               Washington, DC 20004
25             Email: Jdbaldridge@venable.com
               For Ranbaxy defendants
```

```
 1                    I N D E X

 2   WITNESS:          DIRECT  CROSS   REDIRECT   RECROSS

 3   JILL PASTORE, Resumed

 4     By Ms. Walker   83

 5     By Mr. Sobol              142

 6
       EXHIBITS                              PAGE
 7

 8       178 . . . . . . . . . . . . . . .115

 9       179 . . . . . . . . . . . . . . .120

10       180 . . . . . . . . . . . . . . .153

11       181 . . . . . . . . . . . . . . .156

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               P R O C E E D I N G S

2          (Whereupon the jury entered the courtroom at

3     11:14 a.m.)

4          THE CLERK:  Court is back in session.  You may be

5     seated.

6          THE COURT:  Proceed.

7               JILL PASTORE, (Resumed)

8               DIRECT EXAMINATION, (Cont'd.)

9     BY MS. WALKER:

10         Q.   Ms. Pastore, when we broke we were just starting

11    to go into the approval process.  And can you -- I'm asking

12    again, can you tell us what some of the major problems were

13    that Teva had with this generic Nexium approval process?

14         A.   Sure.  There were three areas that really stood

15    out that FDA had asked us a lot of questions about.  The

16    first was the drug substance form of the -- the form of API,

17    and the form API in the drug product.  The second area, they

18    raised a lot of DMF deficiencies with respect to Cipla's

19    DMF.  And the third area is related to something referred to

20    as nasogastric dosing.

21         Q.   Okay.  I want to have you describe those one at a

22    time.  First, the drug API issues.  Can you give us a

23    general description of what that was about?

24         A.   Yes.  FDA, in our first review letter, posed

25    questions with respect to the polymorphic form of the API.

1    They asked us several questions, and that seemed to be a

2    theme.  We saw questions related to the polymorphic form of

3    the API in a subsequent letter.

4        Q.   Can I ask you to tell us, try to explain to us in

5    layman's terms what "polymorphic form" is referring to?

6        A.   Sure, I'll try.  Drug substances often come in

7    multiple polymorphic forms, meaning they may have

8    different -- they may come with different crystalline

9    structures.  In the case of esomeprazole, sometimes those

10   polymorphs may be in the form of a hydrate, which basically

11   means water molecules that are part of the crystalline

12   structure.

13       Q.   And what kind of crystalline structures or

14   polymorphs were involved with respect to the Teva generic

15   Nexium product?

16       A.   Teva's product uses the dihydrate form of the drug

17   substance; whereas, the brand product uses the trihydrate

18   form.

19       Q.   The second issue identified was DMF issues with

20   Cipla.  Can you describe those generally?

21       A.   Yes.  As we talked about earlier, every time the

22   FDA would review the Cipla DMF and find questions or

23   deficiencies, they would send a deficiency letter directly

24   to Cipla.  However, when they did that, they would also

25   notify Teva in a review letter or a deficiency letter that

```
1   the DMF was found deficient.  And they notified us that we

2   could not answer our review letter until the DMF questions

3   had been addressed.

4       Q.   And what aspects of the product in Teva's generic

5   Nexium file did -- was Cipla responsible for?

6       A.   They, with respect to the DMF, they were

7   responsible for the active drug substance.

8       Q.   And, again, can you explain to us what the --

9   well, can you explain to us concretely, in the case of

10  generic Nexium, what the active drug or API is?  What does

11  it look like, et cetera?

12      A.   It's a powder.  If you looked at it, it would be

13  just a white, off-white powder.

14      Q.   And what is the finish dose; what does that look

15  like with respect to generic Nexium?

16      A.   The finished dosage form is a capsule.  That's

17  finished dosage form.

18      Q.   And which was involved in the Cipla DMF process?

19      A.   Strictly the active drug substance, or the powder

20  form.

21      Q.   And the third issue you mentioned was nasogastric

22  testing; is that right?

23      A.   Correct.

24      Q.   First, can you explain to us what nasogastric

25  tubes are?
```

1      A.   Yes.   Nasogastric tubes are effectively feeding

2  tubes.   They're plastic tubing that's run through a

3  patient's nose, down through their throat and into their

4  stomach, typically used for patients who are having

5  difficulty swallowing.   It's a way to get food and

6  medication to their stomach.

7      Q.   And what issue was presented by FDA with respect

8  to the nasogastric tubes and this generic Nexium product?

9      A.   FDA noted that the brand product labeling allowed

10  for dosing of the product.   Instead of the patient just

11  swallowing the capsule, for those patients who might have

12  had a nasogastric tube in place, what the physician or the

13  nurse could do would be to open the capsule shell, empty

14  those little pellets that we spoke about earlier, put them

15  in a syringe, add water, shake that, and then basically

16  squirt the contents of the syringe down through the

17  nasogastric tube.

18      Q.   And -- I'm sorry.   What did FDA require with

19  regard to the nasogastric tube testing in this case?

20      A.   What FDA wanted to see is that if Teva's product

21  were dosed via nasogastric tubing, similar to the brand,

22  that our product would behave the same way and could

23  transverse those nasogastric tubes in the same way.

24      Q.   All right.   I want to now go chronologically

25  through some of the letters, and we'll also be moving

1    through those three issues as we do so.

2            So beginning with the chemistry issue, can you

3    explain what the main chemistry problem presented was?

4        A.   Yes.  Initially FDA seemed confused by which form

5    of the API Teva was using.  And they asked us several

6    questions, just, you know, asking us again and again to

7    confirm the form that we were using, and asking us to state

8    whether the form that we were using was different than what

9    the brand product contained.

10       Q.   What, if any, concerns did the FDA raise regarding

11   polymorphic forms?

12       A.   First, they wanted to know for certain what form

13   the Teva product contained.  They also wanted to know how

14   that compared to the form that the brand product contained.

15   And then they wanted to know, if there were differences

16   between the Teva product and the brand product, if that

17   would impact the drug product quality.

18       Q.   I want to now go through a few of these deficiency

19   letters and we'll start with the first one, April 2006.  So

20   I'm going to hand you -- I'm going to hand you what is

21   already in evidence as Exhibit 130, document YB.

22           First of all, do you recognize document 130 YB?

23       A.   Yes, I do.

24       Q.   What is this?

25       A.   This is a deficiency letter that FDA issued to

1    Teva with respect to our esomeprazole ANDA.

2        Q.   And when did this letter issue to Teva?

3        A.   This letter was dated April 12th, 2006.

4            MS. WALKER:  And could we go to the second page,

5    "Chemistry Comments," and specifically if we could highlight

6    item 2, John.

7        Q.   And I apologize for the poor quality, but if you

8    could refer to the letter and just give us a general sense

9    of what issues the FDA is raising with Teva here?

10       A.   Yes.  In this case comment the FDA is saying that

11   the brand labeling informs the reader that the brand product

12   contains the trihydrate form of the API.  They're saying

13   that they believe Teva is using the dihydrate form, and

14   they're asking us to clarify that.  And to also explain or

15   confirm whether the form that's in our product is a mixture

16   or if it's simply one form or the other.  And then, finally,

17   if our form is different from the brand, if there is an

18   impact on the product quality.

19       Q.   And let's just get some terms separate first.  Do

20   you see the reference to "RLD"?

21       A.   Yes.

22       Q.   Can you explain what "RLD" refers to?

23       A.   Yes.  That's an acronym that's used in the

24   industry.  It stands for "reference listed drug," or

25   basically the brand product for which the generic is seeking

1    to be an equivalent of.

2         Q.    And in the case of generic Nexium, who was the RLD

3    or the brand product?

4         A.    AstraZeneca is the holder of the RLD, which is

5    Nexium.

6         Q.    And can you explain what issues or what concerns

7    the FDA had with respect to the polymorphic forms that you

8    described?

9         A.    Yes.  Basically, they seemed to still want us

10   to -- or they wanted us to confirm the form that we were

11   using.  They wanted us to state whether the form that we

12   were using was completely dihydrate, or if it may have been

13   a mixture of other forms.  And they wanted to know if we

14   were using a form that was different from the brand, would

15   there have been an impact on the product quality.

16        Q.    And, specifically, the last question regarding the

17   effect on drug quality, what does the FDA mean?  What are

18   they trying to ask specifically with respect to drug

19   quality?

20        A.    I think what they were looking for here is to see

21   if our product did use a different polymorphic form than the

22   brand, which it does, if there would have been an impact

23   potentially on the dissolution of our product, or also

24   potentially on the stability of our product.

25             MS. WALKER:  John, could we have page 4, item 1?

1      Q.   Directing your attention to the last page of the

2  exhibit, can you tell us what the FDA is inquiring of Teva

3  or advising Teva in item 1 on the last page?

4      A.   Yes.  They're advising us that Cipla's DMF, or DMF

5  18821, that's Cipla's DMF for esomeprazole magnesium

6  dihydrate.  And FDA here is informing Teva that Cipla's DMF

7  was found deficient, and advising us that we would need to

8  wait for Cipla to answer their letter in order for us to

9  answer ours.

10     Q.   With respect to the polymorphic form questions the

11  FDA raised, what steps did Teva undertake in reaction to

12  this letter?

13     A.   Initially we would have called the team together,

14  including chemists.  We would have had Teva chemists as well

15  as Cipla chemists on such a call.  Because this was related

16  to polymorphic form, that is always, in a regulatory mind,

17  something that we reach out to our legal team as well and

18  make sure that they're involved and participate in preparing

19  the response.

20     Q.   I'd like to hand you what has been marked for

21  identification as Exhibit ATS.  Sorry.

22          Do you recognize document ATS?

23     A.   Yes, I do.

24     Q.   And what is this document?

25     A.   This is an e-mail from one of the consultants that

1    Teva has used in the past to assist us with responses to

2    FDA.

3         Q.   And is --

4         A.   And he's e-mailing Teva.

5         Q.   I'm sorry.  I apologize.

6              And is the e-mail from the consultant addressing

7    the deficiency letter we just saw?

8         A.   Yes, it is.

9         Q.   And who sent this letter to Teva, this e-mail?

10   Excuse me.

11        A.   So this was sent by a gentleman named John

12   Franolic, who was a member of the Lachman Consulting firm.

13        Q.   I direct your attention to the second page.

14             MS. WALKER:  Do not publish, John.

15        Q.   Do you see here what the consultant is referring

16   to?  Can you just describe, generally, without reading the

17   document, what this is about?

18        A.   Yeah.  So effectively the consultant had been

19   provided our attempt at responsing -- or responding to the

20   letter, and in this e-mail he is providing his opinion on

21   the response that we had drafted to date, and giving some

22   input and guidance on how we should answer.

23        Q.   Did Teva seek this advice from the consultant?

24        A.   Yes, we did.

25        Q.   Did Teva receive this information in the ordinary

1    course of business?

2        A.   Yes, we did.

3            MS. WALKER:  I offer it, your Honor.

4            MR. SOBOL:  Objection.

5            THE COURT:  Sustained.

6            Let me ask you this question.  You, yourself, are

7    not a scientist?

8            THE WITNESS:  I'm a pharmacist by training.

9            THE COURT:  A pharmacist.

10           THE WITNESS:  Yes.

11           THE COURT:  So I'm going to ask you these

12   questions, but having in mind, is it generally agreed,

13   because people may differ here, but based upon your work

14   here that the dihydrate product --

15           THE WITNESS:  Uhm-hmm.

16           THE COURT:  -- could convert into the trihydrate

17   form when exposed to moisture?

18           THE WITNESS:  There is the potential for that

19   conversion, yes.

20           THE COURT:  And at least among the people who are

21   reporting through you, that potential is generally

22   recognized?  Is that right?  That's not disputed?

23           THE WITNESS:  Right.  That's correct.

24           THE COURT:  Well, a juror asks the very percipient

25   question, if you're going to take the pill apart and have

1   the little coated pieces and put them in water, swish it

2   around, and in a syringe, you send it down the gastric tube.

3          THE WITNESS:  Uhm-hmm.

4          THE COURT:  Is it possible that that would -- I

5   shouldn't say possible, possible, you can't guess --

6   wouldn't that produce the same result, it will convert to

7   trihydrate form?

8          THE WITNESS:  Well, different forms of API may be

9   stable, and by -- just by their nature won't necessarily

10  convert.  I think the other thought that comes to my mind in

11  answer to that question is if you think back where I was

12  talking about those little sugar spheres, and that we -- the

13  first coating layer that we put on them is the drug

14  substance, from there we put other layers of coating, and

15  the idea is to protect the drug product that's below them.

16  And the idea of that --

17         THE COURT:  Always tell the jury.

18         THE WITNESS:  Yes.

19         The idea is that when that product gets to the

20  patient's stomach, the stomach acids won't immediately erode

21  those coating layers.  So that will enable those little

22  pellets to get further in the gastrointestinal tract before

23  the substance is made available to the body.

24         So I think my answer is that you wouldn't

25  necessarily expect conversion just because the drug is

 1    actually, the drug substance, is protected by those coating

 2    layers.

 3            THE COURT:  Go ahead, Ms. Walker.

 4        Q.    Did Teva respond to the deficiency letter that we

 5    just reviewed where the FDA raised the polymorphic form

 6    issues?

 7        A.    Yes, we did.

 8        Q.    I'm handing you now what has been admitted into

 9    evidence as Exhibit 130, document DT.

10            Is this Teva's response to the FDA?

11        A.    Yes.  This is our response.

12        Q.    Could you take as much time as you need to review

13    it.  I'd like to direct your attention to item 2 on the

14    second page.

15        A.    Okay.

16            MS. WALKER:  Can we blow that up, John?

17        Q.    All right.  And just to -- if you could, just

18    explain, because I think we're going to see a few of these

19    letters, the item 2 that's in bold here, what is that?

20        A.    So the language that you see in bold is the actual

21    FDA question.  What we do is we copy it verbatim from the

22    deficiency letter and we type it right into our amendment or

23    our response.  That just enables the reviewer at FDA to

24    easily see what they asked, remind themselves what they

25    asked, and then see our direct answer to that question.

1    Q.   All right.  And so when we see a bold number like

2    this, this is actually what the FDA asked Teva?

3    A.   Correct.

4    Q.   And under "Response," what is that?

5    A.   And under "Response," where you see it's unbolded,

6    that is our reply to the question that is above bolded.

7    Q.   Item 2, "RLD labeling indicates," et cetera,

8    that's the same question we just saw in the deficiency

9    letter?

10   A.   Correct.

11   Q.   All right.  And can you explain, generally, what

12   Teva is telling the FDA in response to that question?

13   A.   Yes.  So here what we're saying is that we reached

14   out to Cipla, or the manufacturer of the drug substance, by

15   that, we meant Cipla, and we got their confirmation that the

16   form of the API, or the drug substance that they were using

17   in our drug product, is the dihydrate.  And that was

18   confirmed based on the various tests that are mentioned in

19   the letter, including melting point, XRD, et cetera.

20   Q.   Could you explain to us what those tests are?  For

21   example, what is XRD testing?

22   A.   "XRD" stands for X-ray diffraction testing.  It's

23   a type of method -- sorry.  It's a type of method used in

24   our lab.  Basically, XRD or X-ray diffraction, you shoot X

25   rays through a sample of your dry powder and it -- you then

1   use the results from that test to confirm the identity of

2   your drug substance.  So what you do is you run your test,

3   your sample through this XRD test, and then you compare it

4   to a reference standard that's absolutely known to be the

5   material that you're trying to confirm.

6        Q.   And could you go over this letter, generally, and

7   give us a general sense of how many different inquiries Teva

8   responded to in this letter?

9        A.   This letter in total contained 19 direct

10  deficiency comments, as well as four additional notes and

11  acknowledgments.

12       Q.   I'd like to talk about the notes and

13  acknowledgments.

14            MS. WALKER:  Could we have page 9?

15       Q.   So this would be -- you're referring to item B as

16  the additional notes?

17       A.   Correct.

18       Q.   Okay.  And can you explain what response number 1

19  is about?

20       A.   Yes.  This was the comment we mentioned when we

21  talked about the review letter.  And FDA had told us that

22  Cipla's DMF 18821 for esomeprazole had been found deficient,

23  letting -- they let us know that they had directly told

24  Cipla about those deficiencies and that we are to let FDA

25  know when we respond that Cipla had responded.

1        Q.   And can you please tell us what item 2 is about?

2        A.   Yes.  Item 2, FDA is asking for stability data for

3   our drug product.  And so when we submit an original

4   application, we provide initial stability data.  However,

5   the stability studies continue, and FDA was seeking

6   additional data in that question.

7        Q.   First of all, what are stability studies?

8        A.   Stability studies, as a generic applicant we put

9   our drug product into stability chambers.  And the idea is

10  that you want to show that your product, under controlled

11  room-temperature conditions, and also under accelerated

12  conditions, meaning heat and humidity, that your product

13  would remain stable.  So if you tested it at the beginning

14  of your shelf life and you tested it at the end, that your

15  product would produce similar results.

16       Q.   And you said that the stability studies continued.

17  What did you mean by that?

18       A.   The original ANDA is required to contain, or at

19  least at the time this ANDA was submitted we were required

20  to submit three months of stability data.  Twelve weeks on

21  accelerated conditions, which were those high heat, high

22  humidity conditions, and the original ANDA also had

23  contained three months of room temperature conditions.  The

24  room temperature studies continue for the length of time

25  that you wanted to demonstrate your product as stable.

1      Q.   And what length of time is typical for those

2   studies?

3      A.   A typical product, we would seek a 24-month or a

4   two-year shelf life.

5      Q.   And I'd like to move on to the FDA's next

6   chemistry letter.  So I'm handing you what has been admitted

7   into evidence as Exhibit 130, document ALL.

8           Is this a deficiency letter from FDA?

9      A.   Yes, this is.

10      Q.   I'd like to direct your attention to the second

11   page.  And can you tell us what division this comes from?

12      A.   This letter was issued to Teva by FDA's chemistry

13   division.

14      Q.   And if you could just go to the first item and

15   give us a general sense in question 1 what the agency is

16   coming back to Teva to inquire about?

17      A.   FDA is again posing additional questions with

18   respect to the polymorphic form of our drug substance.  And

19   similar to the one juror question, FDA was actually asking

20   if the form of our API or drug substance changed during the

21   manufacture of our drug product.

22      Q.   And what did Teva -- what was Teva's reaction in

23   terms of steps to undertake in response?

24      A.   I think first our reaction was a little bit of

25   frustration.  We felt we had answered these questions pretty

 1   thoroughly with our first review-letter response.  However,

 2   you know, upon receiving these questions, we once again had

 3   to pull together both the Teva chemists and the Cipla

 4   chemists, and also the legal team to, sort of, plan our

 5   approach to responding.

 6        Q.   And what steps in terms of scientific steps, did

 7   Teva take to follow up on this issue?

 8        A.   Ultimately what we did here to answer this

 9   question is we made new product batches.  Our original ANDA

10   batches were expired at the time of receiving this review

11   letter.  So we made fresh drug product batches, and then we

12   put those sample -- samples of those batches into those

13   stability chambers.  We put them in for a period of six

14   months to see -- and to demonstrate that there was no

15   conversion in the time that the product was in the stability

16   chamber.

17        Q.   Could you stop and explain to us what you meant by

18   batches and by batches being expired?

19        A.   Sure.  So to submit an original application, the

20   applicant has to make batches of their drug product.  They

21   need to test them and give FDA results of the tests, as well

22   as the results of the stability testing that I just had

23   mentioned.

24             Batches, as I said, typically are given a two-year

25   shelf life.  And once they're expired, they're expired, and

1    you shouldn't use them.

2         Q.   And can you now explain to us what batch testing

3    Teva conducted to respond to this letter?

4         A.   Sure.  So, again, because our original ANDA

5    batches had been expired, we undertook making a new batch.

6    We then put samples, packaged that batch, and then samples,

7    packaged product, into our stability chamber under various

8    heat and humidity conditions.

9         Q.   Can you explain to us what a stability chamber is?

10        A.   Yeah.  It's -- it's effectively an oven where you

11   can set the particular temperature and the particular level

12   of humidity that you want to expose the product to.

13        Q.   And how long does this testing take?

14        A.   In this particular case we did the study -- we ran

15   the product in the stability chamber for a total of six

16   months.

17        Q.   And can you give us a sense of what the -- what

18   procedure Teva uses -- how is the testing done, before and

19   after?  Can you explain to us how it's done?

20        A.   Yes.  For this product, Cipla did the testing for

21   us, so the chemist in the lab would take samples of the

22   product and run the full gamut of tests that we told FDA in

23   the application that we would apply to this product.

24        Q.   I'd like to direct your attention to question 6 in

25   the FDA's letter on the same page.  Are you with me?

1      A.   Yes.

2      Q.   Do you find item 6?

3      A.   Yes.

4      Q.   And can you tell us what the FDA is raising in

5   question 6?

6      A.   Yes.  In question 6 they're posing a question

7   related to the USP --

8      Q.   Excuse me.  Why don't I stop you there.  Can you

9   explain to us what the USP is?

10     A.   Certainly.  The USP is a book that is published

11  annually by the United States Pharmacopeia Convention.

12  Basically, it's a book of standards where certain drug

13  substances and certain drug products, standards for those

14  drug substances and drug products are outlined to

15  identify -- or to prove identity of the substance of the

16  product, and then certain quality attributes.

17          THE COURT:  A juror question goes right to this.

18  You've been talking about batches.

19          THE WITNESS:  Yes.

20          THE COURT:  What you did with batches.  Do the

21  batches have a standard quantity or size?

22          THE WITNESS:  Yes.  For an original ANDA

23  application batches have to be a minimum of 100,000 dosage

24  units.  And that's once the batch is packaged.  So if there

25  are losses during manufacture, your batch has to be at least

102

1    100,000, in this case, capsules packaged in order to qualify

2    for submission.

3              THE COURT:  Do these batches, since they're in the

4    developmental stage, do they have some value?  I mean, the

5    component parts are value, you have to take those things

6    that you have, but they don't have any commercial value, do

7    they, at this stage?

8              THE WITNESS:  No, correct.  These would be

9    experimental batches, so they are not saleable.

10        Q.   Okay.  We were on USP.  Could you explain the

11   relationship between the USP and the FDA review process?

12        A.   Yes.  So, effectively, if there is a USP chapter

13   or document specific to a particular drug substance or a

14   particular drug product, FDA will be aware of that.  And

15   they -- it's a requirement that a generic applicant abide by

16   the requirements of the USP monograph.

17        Q.   Okay.  Now you used another word.  What's a

18   "monograph"?

19        A.   A monograph is basically a chapter, if you will,

20   or a section of the USP book that would be specific to a

21   particular drug substance or a particular drug product.

22        Q.   All right.  And what USP issue is the FDA raising

23   with Teva in item 6?

24        A.    In this comment they're notifying us that

25   requirements had changed with respect to pharmaceuticals in

1    July of 2008, and they're particularly directing us to a

2    chapter of USP, known as 467, related to residual solvents.

3         Q.   And can you explain what residual solvents are?

4         A.   Yes.  When drug substances are made, or

5    excipients, or what we would also call inactive ingredients,

6    or potentially even a drug product, different reagents or

7    solvents may be used in order to make those compounds or

8    items.

9              And what FDA wants to ensure is that ultimately

10   what goes to the patient, what's in the capsule, in this

11   case, that's given to the patient, has very low levels of

12   those solvents, and referred to as residual solvents.

13        Q.   And what effect did the requirement of USP

14   467 have on the approval process?

15             MR. SOBOL:  Objection.

16             THE COURT:  The question again?

17        Q.   What effect did the requirement of USP 467 have on

18   the approval process?

19             THE COURT:  No, overruled.  She may answer.

20        A.   It was -- required a lot of work for Teva and for

21   Cipla.  In order to address this question, not only did we

22   have to go to Cipla, but Cipla needed to also go to all of

23   the suppliers of the inactive ingredients utilized to

24   manufacture Teva's esomeprazole capsules.  And I can tell

25   you --

1        THE COURT:  Well, that -- I know I'm interrupting,
2   but there was an objection to this question so I'm attuned
3   to the answer.
4        Were you involved yourself in this with respect to
5   this letter, or is this something you looked at from the
6   file?
7        THE WITNESS:  I was -- I am familiar with this
8   issue with respect to all of Teva's applications, but in
9   this particular case, as in most, the chemists or our
10  purchasing people would have been the ones to directly
11  communicate with the various suppliers.
12       THE COURT:  But my -- that's an answer to my
13  question.  But more precisely, were you the one checking to
14  see that they, in fact, did it and answers came back?  Were
15  you pulling this together?  Or do you just know about it
16  because it was going on in your office?
17       THE WITNESS:  I was not directly involved with
18  this direct response, no.
19       THE COURT:  Go ahead.
20   Q.   Are there other USP monographs other than 467?
21       MR. SOBOL:  Objection.  Sidebar.
22       THE COURT:  Yes.
23  SIDEBAR CONFERENCE AS FOLLOWS:
24       THE COURT:  Well, my attention is focused because
25  she said this took a lot of work, and then she's telling us

1   what this work was.  A little slow, but she doesn't herself

2   know because she's getting the letters, this is just stuff

3   going on in her office.  So don't you have some hearsay

4   problem here?

5            MS. WALKER:  That was my last question on the

6   residual side of this issue.  But, yes, she's interacting

7   with chemists, et cetera.  She's not going --

8            THE COURT:  Not on this.  No, no.  No one requires

9   she do all the work herself.  I wouldn't let her testify

10  about it because she's not a chemist.  But her testimony, as

11  I get it, is she just knows this work is going on in the

12  office.  And so maybe we better go on to another topic.

13  Isn't that good enough at this stage?

14           MR. SOBOL:  It is, your Honor.  I wanted to just

15  flag, to avoid a sidebar, I believe I've seen the monograph,

16  some notion of an additional USP monograph for which Teva

17  never receives a deficiency, and I'm mindful that whether or

18  not there's going to be something that lacks foundation in

19  that area.

20           THE COURT:  What's he talking about?

21           MS. WALKER:  He's talking about the monograph on

22  the trihydrate and dihydrate forms, which there has been

23  ample evidence during the plaintiffs' case about --

24  Dr. Blume testified about it.  It's been in the case.  So,

25  yes, I absolutely intend to ask her about her knowledge of

1    the dihydrate, trihydrate monographs.

2              THE COURT:  Does she have knowledge herself?

3              MS. WALKER:  Yes.  She is the --

4              THE COURT:  In the sense that she was the hands-on

5    regulator doing this?  Not just that she was in the office.

6              MS. WALKER:  She was the -- again, she has her

7    staff, she has people under her, but she is involved with

8    this specific --

9              THE COURT:  Well, involved, you know --

10             MS. WALKER:  She reviewed the letters before they

11   go to the FDA.

12             THE COURT:  There's different ways of operating.

13   There's straight bureaucracies, in which case the top dog

14   may be responsible, but doesn't actually know about the

15   things, but relies upon their skilled subordinates.  Then

16   there's the situation, I'll use judicial chambers as an

17   example.  A lot of stuff I delegate, but nothing goes out of

18   here unless my signature is on it, which means I have spoken

19   to that issue and it's my responsibility.  No hearsay there

20   if I were to be called because I'm the responsible party

21   saying or ordering whatever it is.

22             Do you see the difference?  She's a top person,

23   very knowledgeable about procedures, and I don't fault her

24   for not doing all the work herself, but I may require on

25   this, in light of his concern, some foundation about the

107

1    extent of her involvement so I can make the determination.

2            MS. WALKER:  Fine.  I will -- I don't even intend

3    to ask her about interaction with FDA, but she knows what

4    the monograph is and she ought to be able to testify as to

5    what the monograph is.

6            THE COURT:  I'm not making -- he's flagging it.

7    It's not with the question now, but it's coming.  She

8    doesn't do all the work in that office.  It's just a

9    difference between personal knowledge and hearsay.  And I'm

10   trying to draw an appropriate line.

11           MS. WALKER:  Okay.

12           (Whereupon the sidebar conference concluded.)

13   BY MS. WALKER:

14       Q.   You recall we just referenced something called

15   USP?

16       A.   Correct.

17       Q.   Okay.  Can you explain to us what USP is?

18       A.   Yes.  USP is a book published by the United States

19   Pharmacopeia Convention, and they're an independent

20   organization that sets standards for the identity, quality,

21   purity, et cetera, of drug substances and drug products for

22   the United States.

23       Q.   And how is that information communicated?

24       A.   It is communication -- or communicated in the form

25   of an annual book to which there are periodic supplements

```
 1    that are published throughout the year.

 2          Q.    And why is the -- let me reask.

 3                How does the USP affect Teva's operations?

 4          A.    Teva is required, as an applicant, to abide by any

 5    USP requirements.

 6          Q.    And can you identify any USP monograph that

 7    relates to generic Nexium?

 8          A.    Yes.  There is a monograph specifically for

 9    esomeprazole magnesium, the drug substance.  There's

10    actually also now one for the drug product.

11          Q.    And I'm going to hand you now what has been marked

12    for identification as ASI.  What is Exhibit ASI?

13          A.    These are photocopies of the book that I've just

14    talked about, the USP book.  And this is a monograph, or a

15    document specific to esomeprazole magnesium drug substance.

16          Q.    And what is the date of that monograph?

17          A.    This monograph became official on August 1st,

18    2008.

19          Q.    And what type of -- what are the requirements that

20    this USP monograph imposes with respect to --

21                MR. SOBOL:  Objection.

22          Q.    -- with respect to generic Nexium?

23                MR. SOBOL:  Objection.

24                THE COURT:  Well, the document speaks for itself.

25    Sustained.
```

1          MS. WALKER:  Then I offer it.

2          MR. SOBOL:  Objection.

3          THE COURT:  Well, may I see it?  I'll hear you.

4   SIDEBAR CONFERENCE AS FOLLOWS:

5          THE COURT:  Well, shouldn't we have this simply

6   for the fact that they considered that they were supposed to

7   comply with this?

8          MR. SOBOL:  There's never any deficiency that the

9   product that was being proposed by Teva failed to comply

10  with that USP, and I believe that there's going to be

11  this --

12         THE COURT:  All right.  All right.  Oh, I

13  understand that.  So it's a relevance objection.

14         MS. WALKER:  At any given time deficiency

15  raised -- it is not true that a drug company can disobey

16  applicable standards just because the FDA hasn't yet written

17  them a letter about it.  So this is a document that she's

18  identified that is applicable to the FDA review process, and

19  I think that the document just for, as you said, whatever

20  the document says, should come into evidence.

21         THE COURT:  No, we're going to focus on

22  deficiencies, not reconstruct the universe as a matter of

23  case management.  It's too peripheral.  I'm going to sustain

24  the relevance objection.  Stuff having to do with

25  deficiencies, of course we'll -- she can --

1          MR. VAN WART:  Your Honor, as was pointed --

2          THE COURT:  Usually it's one person a witness, but

3     I'll hear you.

4          MR. VAN WART:  It's tied to Dr. Blume yesterday

5     where it came out that during this period where the FDA is

6     acting on this, the review of the Teva file has been

7     suspended because of a deficiency.

8          THE COURT:  Well, if you tie it back to that,

9     maybe.  But that's my ruling.

10          (Whereupon the sidebar conference concluded.)

11          THE COURT:  Move on.

12     BY MS. WALKER:

13     Q.   I want to move on to the next -- to Teva's

14     response.  I'm sorry.  So I'm going to hand you Exhibit 130,

15     already in evidence, document EA.

16          And can you tell us what document EA is?

17     A.   Yes.  This is Teva's response to FDA's previous

18     review letter or deficiency letter.

19     Q.   And what amendments or what information is Teva

20     providing?

21     A.   In this letter to FDA we are addressing their

22     chemistry questions from the previous deficiency letter.

23     Q.   And as we saw before, is the format the same?

24     A.   Yes.

25     Q.   So the bolded --

1        A.    The bolded question, followed by Teva's response.

2   Right.

3        Q.    If we could go to the second page, to the -- what

4   is essentially the first response.  Do you see that on the

5   second page?

6        A.    Yes, I do.

7        Q.    Okay.  And what information is Teva providing to

8   the agency here?

9        A.    In this response we are telling the FDA that we

10  had conducted additional testing, that we had made an

11  additional research batch of product, and that we had put it

12  on stability in order to address their questions with

13  respect to potential polymorphic conversion.

14       Q.    And what information or data did Teva provide that

15  it had been working on?

16       A.    Well, what we're giving them here is the stability

17  data that was generated on that, that six-month report that

18  I mentioned.

19       Q.    Do you also see the reference to -- to an XRD

20  study?

21       A.    Yes.

22       Q.    And can you explain what that was?

23       A.    This was the methodology that I mentioned already.

24  X-ray diffraction is the premier method that we would use to

25  demonstrate which polymorphic form of the drug substance was

1    present.

2              MS. WALKER:  Could I please have exhibit -- excuse

3    me -- page 6?

4         Q.   I direct your attention to page 6 and to item 9.

5    And, again, we'll focus on the response.  Well, actually,

6    I'm not clear.  I'm referring to the final paragraph.  Is

7    the final paragraph part of the item 9 response?

8         A.   No.  This is a separate note.

9         Q.   Okay.  Then -- thank you for correcting me.

10             What is the final paragraph about?

11        A.   In this paragraph Teva is informing FDA of some

12   unsolicited changes that Cipla had made to their DMF.

13        Q.   What do you mean by unsolicited changes?

14        A.   By that I mean changes that FDA didn't actually

15   ask them to make, so they made out of their own accord.

16        Q.   And what was Cipla required -- what was Cipla

17   amending or proposing to amend?

18        A.   In this paragraph what Cipla -- or what Teva is

19   explaining is that Cipla decided they needed an additional

20   site, an additional facility that could manufacture

21   esomeprazole magnesium.  And Teva, likewise, is proposing

22   that additional site to be allowable to supply drug

23   substance for our application.

24        Q.   What impact, if any, does the addition or change

25   of a site have on the ANDA approval?

1          MR. SOBOL:  Objection.

2          THE COURT:  Would you ask the question again?

3     Q.   What impact, if any, does the addition of a site

4     have on the ANDA approval process?

5          THE COURT:  She can give us her understanding.

6     A.   My opinion of that is it definitely serves to

7     extend the review of an ANDA.  Once again, because it's data

8     that FDA did not ask for, it's additional data, though, that

9     they must review prior to concluding the review of the

10    application.

11    Q.   And what is -- what was Cipla proposing to do or

12    what did Cipla ask Teva to do with respect to this issue?

13    A.   Cipla had asked us to submit this new facility in

14    our application.

15    Q.   And while we're on the subject of Cipla, I want to

16    now, sort of, follow into the second issue that you

17    described, which was the issues with Cipla.

18         Again, can you explain what some of the

19    difficulties with the Cipla part of the application were?

20    A.   Yes.  I think, you know, the frustrating part with

21    respect to Cipla was the fact that each chemistry review

22    letter that we received included one deficiency comment that

23    said that the DMF had been found deficient.

24    Q.   Were there any practical difficulties or

25    complexities in interacting with Cipla on this ANDA?

1           MR. SOBOL:  Objection.  Foundation.

2           THE COURT:  Did you yourself -- were you,

3    yourself, involved with this, this aspect of it?

4           THE WITNESS:  I was not directly involved with

5    Cipla.

6           THE COURT:  No, I'm going to sustain it.

7     Q.    Can -- I want to go back to the -- to the ANDA

8    file.  And can you identify how Teva has to respond when

9    there are DMF deficiencies?

10    A.    Yes.  What we need to do is communicate with the

11   DMF holder to learn what questions FDA had posed to them and

12   to see what the impact will be on our documentation that's

13   contained in our application.

14    Q.    Where is Cipla located, by the way?  I forgot to

15   ask.

16    A.    They are located in India, which has added its own

17   level of complexity just from a communication standpoint.

18    Q.    What do you mean by that?

19    A.    If nothing else, the shear time, distance change,

20   time zone change.

21    Q.    Okay.  I want to move to the third issue that you

22   talked about, which was nasogastric testing.  Do you have

23   that in mind?

24    A.    Right, uhm-hmm.

25    Q.    And I'd like to hand you what has been marked as

115

1  Exhibit, for identification, Exhibit YC.

2         MS. WALKER:  And it has been stipulated to as to

3  admissibility, under the stipulations --

4         THE COURT:  YC, yes, will be admitted then as

5  Exhibit 178.

6         (Exhibit 178 received in evidence.)

7    Q.   And can you identify Exhibit 178?

8    A.   Yes.  This is a deficiency letter that was issued

9  by FDA to Teva.

10   Q.   And I'd like to direct your attention to the

11  second page, item 1.  And when you're there can you let me

12  know what FDA's communicating to Teva?

13   A.   They're, again, informing us that Cipla's DMF was

14  found inadequate or deficient.

15   Q.   And I'd like to direct your attention -- feel free

16  to note anything you feel is important, but I wanted to

17  direct your attention to item 12.

18   A.   Okay.

19   Q.   And can you tell me what the FDA's raising with

20  Teva in item 12?

21   A.   Yes.  Here FDA is informing Teva that they realize

22  the brand labeling provides for administration of Nexium via

23  a nasogastric tube, and what they're generally asking us

24  here to do is to demonstrate that if our product was dosed

25  through a nasogastric tube, that it would behave similarly

1    to the brand product if dosed the same way.

2        Q.   And what is the relevance of the brand labeling

3    here?

4        A.   The brand labeling is where that information would

5    have been available that would have directed a doctor or a

6    nurse or a patient how they would dose this product, if they

7    needed to, through a nasogastric tube.

8        Q.   And how did the brand labeling affect Teva's

9    requirements?

10       A.   Teva's labeling has to mirror the brand product

11   labeling.  For the most part the only differences,

12   typically, between our labeling and theirs are differences

13   that we would note in our formulation, or the appearance of

14   our product, or how we package it.  But aside from that, our

15   labeling has to mirror the brand.

16       Q.   Is the requirement of nasogastric testing common

17   in ANDA approvals?

18       A.   In my opinion, no.  In all my years in regulatory,

19   I've only seen Teva be asked this question three times, or

20   asked for nasogastric data three times.

21       Q.   Referring back to your description of batches,

22   could Teva or Cipla do this testing with the existing

23   batches that it had?

24            MR. SOBOL:  Objection.

25            THE COURT:  Well, doesn't that call for some

1    chemist?  I'll sustain it on that foundation.

2         Q.   Do you know what Teva did to respond to item 12?

3         A.   Yes.  So we contacted Cipla.  It was noted that at

4    the time of receipt of this letter the ANDA batches --

5              MR. SOBOL:  Objection, your Honor.  It's hearsay.

6              THE COURT:  No.  She may answer what did they do.

7    There was no objection to that.  She may tell us what Teva

8    did.

9         A.   So at the time this letter was received, our ANDA

10   batches were expired.  The additional batch that I mentioned

11   earlier that was manufactured to support the polymorphic

12   form testing was also expired.  So it was in our best

13   interest to manufacture a fresh batch of product to ensure

14   that our product would be tested against the brand.

15        Q.   I'm going to hand you now what has been admitted

16   as Exhibit 130, YD, already in evidence.  And can you tell

17   us what this FDA letter is about?

18        A.   Yes.  This is a letter that was issued to Teva by

19   FDA, and specifically by the Division of Bioequivalence.

20        Q.   Let me start there and clarify.  So we just saw

21   another letter.  And so can you contrast who these letters

22   are from, who these two letters are from?

23        A.   Yes.  The previous letter that we spoke of had

24   been issued to us by the chemistry division of FDA.  This

25   letter that we're now speaking of was issued by the

```
 1    bioequivalence division.

 2         Q.    But what, generally, did the bioequivalence letter

 3    relate to?

 4         A.    This letter, for the most part, relates to that

 5    nasogastric study that FDA had requested.

 6         Q.    And what information, generally, did this letter

 7    provide about nasogastric testing?

 8         A.    This letter was much more definitive and more

 9    specific in describing the nasogastric dosing or research

10    that FDA wanted us to do.  The prior letter was very vague.

11    This letter goes into much greater detail of what specific

12    tests were required and generally how to do them.

13         Q.    I'd like to direct your attention to page 4, and

14    between -- well, first of all, the last item, number 5, do

15    you see where it says, "Please conduct all of the above

16    testing on unexpired test and reference batches"?  Do you

17    see that?

18         A.    I do.

19         Q.    What does a "reference batch" refer to?

20         A.    A reference batch would refer to the brand

21    product --

22         Q.    And what is --

23         A.    -- in this case Nexium.

24         Q.    I'm sorry.

25         A.    In this case Nexium.  Sorry.
```

1       Q.   And what is a test batch?

2       A.   A test batch is referring to the generic product.

3       Q.   So what is the FDA asking for or requiring here?

4       A.   Here they're advising that they want the

5   nasogastric studies done, but they do not want it done on

6   product that's expired.  They want it done on fresh product.

7       Q.   Okay.  And where does Teva get reference batches?

8       A.   We purchase brand product.

9       Q.   In this case, whose product?

10      A.   AstraZeneca's Nexium.

11      Q.   I'd like to direct your attention to the next

12  paragraph that begins, "Please note."  Do you see where it

13  says, "Please note that the following deficiencies were

14  provided to you in the DB II deficiency letter dated

15  January 10, 2007"?

16           Do you see that?

17      A.   Yes, I do.

18      Q.   Do you know what this is about?

19      A.   This was a surprise to Teva, yes.  This was the

20  first that we were aware or notified that FDA, and

21  specifically the bioequivalence division, had generated a

22  review letter in 2007.

23      Q.   And do you know why that happened?

24      A.   Yes.  Once we got this letter we were puzzled.  We

25  contacted FDA.  They ultimately provided us a copy of the

1   January 2007 letter.  And what had happened, they had faxed

2   it to an incorrect fax number so it actually went missing

3   for five and a half years.

4        Q.   Did Teva respond to a letter it didn't receive?

5        A.   No, we did not.

6        Q.   I'd like to hand you Exhibit 13 -- no, excuse me.

7   Exhibit marked for identification as FZR.

8             What is Exhibit FZR?

9        A.   This is the 2007 bioequivalence deficiency letter

10  that we just spoke of.

11            MS. WALKER:  I offer it.

12            (Whereupon counsel conferred.)

13            MR. SOBOL:  No objection anyway.

14            THE COURT:  And it is, the letters again?

15            MS. WALKER:  FZR.

16            THE COURT:  FZR is admitted, Exhibit 179.

17            (Exhibit 179 received in evidence.)

18        Q.   All right.  And can you tell me where on the

19  letter -- first of all, what is the original date of the

20  letter?

21        A.   The original date of the letter, you can tell by

22  the last page of the document, it was dated by FDA

23  January 10, 2007.

24            MS. WALKER:  Can you blow that up?

25        Q.   How can you tell that from the document?

1      A.    FDA electronically date-stamps when they sign

2  letters.

3      Q.    All right.  And then going to the first page, how

4  do you know when Teva received it?

5      A.    If you'll see in the upper right area of the

6  letter, every letter that is received into regulatory

7  affairs is stamped by our administrative assistant, and

8  initialed and dated on the date they're received.

9      Q.    If you could go to the second page, please.

10         Can you tell us, first of all, what division the

11  letter was from?

12     A.    This was issued by the bioequivalence division.

13     Q.    And what, generally, does the letter raise with

14  Teva?  What issues does it raise?

15     A.    In this letter FDA is posing two questions that

16  relate back to the bio studies that were contained in our

17  original ANDA.

18     Q.    I'd like to go to, from 2012 moving on to 2013.  I

19  want to hand you what's been admitted as Exhibit 130, ALO.

20         Is this Teva's next response to the FDA?

21     A.    Yes, this is.

22     Q.    And can you tell us, generally, what information

23  in terms of the bioequivalence information here is being

24  conveyed to FDA?

25     A.    Yes.  This response answers the two bioequivalence

1    deficiency letters that we just reviewed.  So this letter

2    contains data specific to the testing that we did with

3    nasogastric tubing, and it also addresses those comments

4    that were posed regarding our bioequivalence studies.

5         Q.   And can you identify which -- which passages or

6    portions of the letter result -- excuse me -- relate to the

7    NG testing?

8         A.   Yes.  If you look starting on page 1, we reiterate

9    the FDA deficiency comment.  The next several pages address

10   the nasogastric tube data.  And then finally -- excuse me --

11   on page 6 we address the questions that were posed specific

12   to the bioequivalence studies.

13             MS. WALKER:  Could we go to page 4, please?

14        Q.   And you see there's a chart at the top of page 4?

15        A.   Yes.

16        Q.   And I don't need specifics, but can you just tell

17   us, generally, what it is -- what information is being

18   provided to the FDA?

19        A.   Yes.  This is some of the data that they had asked

20   for.  You'll see it says, "Comparative recovery through

21   syringe plus 8 French nasogastric tube."  Basically, Teva,

22   the tests that we conducted, we emptied our capsule contents

23   into the syringe, ran it through the nasogastric tube into a

24   beaker.  We did the same with the brand product.  And then

25   we compared what ended up in the beaker from the Teva

123

```
 1    product compared to what came through the nasogastric tubing
 2    into the beaker from the brand product.
 3         Q.    I'd like to direct your attention to page 6.
 4               MS. WALKER:  And if you could put the three lines
 5    on the top of page 6 up.
 6         Q.    I'd like to direct your attention to that.
 7               You see where it says, "Please note the following
 8    deficiencies."  Are you with me?
 9         A.    Yes.
10         Q.    Okay.  So what is this part turning to?
11         A.    So here we're reiterating -- again, because it's
12    in bold, we reiterated the comments that FDA had provided to
13    us.
14         Q.    I'm sorry.  I'm referring to above the -- above
15    number 6, the, "Please note that the following deficiencies
16    were provided in the DB letter."  I may be confused, but is
17    that also a quote from the FDA letter?
18         A.    Yes, that is.
19         Q.    Oh, okay.  So what is being communicated in this
20    section of the letter?
21         A.    FDA had, again, referred to the January 10, 2007,
22    review letter.  And in this section we are -- and they note
23    in their subsequent letter that we had never -- that Teva
24    had not received that original letter.  But in this section
25    we are addressing those questions.
```

1        Q.   The questions from the 2007 letter?

2        A.   Correct.

3        Q.   And it refers to "BE fasting."  Do you know what

4    that means?

5        A.   Yes.  "BE" is another acronym that stands for

6    "bioequivalence."  And the fasting study was one of three

7    bioequivalence studies that we had conducted and submitted

8    in our original application.

9             THE COURT:  Let me interrupt with a juror

10   question, and this will take you back a little bit but --

11            THE WITNESS:  Okay.

12            THE COURT:  But I noted this too.  So you told us

13   the fax got lost for about five years?

14            THE WITNESS:  Yes, that is correct.

15            THE COURT:  How often does that happen?

16            THE WITNESS:  Fortunately not very often.  I've

17   never seen one lost for that period of time.  But

18   periodically -- very rarely, but occasionally -- FDA will

19   send a letter to an incorrect fax number.  And actually,

20   worse yet, I've seen them send Teva letters to our

21   competitors.

22            THE COURT:  Go ahead.

23       Q.   Was it a mistake?

24       A.   It was truly a mistake.

25       Q.   Moving onward I'd like to hand you admitted

1    Exhibit 130, BVN, document BVN.

2              What is this 2013 document?

3        A.    This is Teva's response to FDA's March 2012

4    chemistry review letter.

5        Q.    And in item 1 what is Teva addressing with FDA?

6        A.    Here we're acknowledging that Cipla's DMF had been

7    found deficient, but noting to FDA that Cipla had addressed

8    those deficiencies.

9        Q.    How many questions in all did Teva provide

10   responses to in this letter?

11       A.    This letter provides response to a total of 12

12   deficiencies.

13       Q.    I'd like to direct your attention to page 8,

14   item 12.  And specifically the written response rather than

15   the data tables.  So item 12, again, the top is the quote

16   from the FDA's letter; is that right?

17       A.    That's correct.

18       Q.    And the FDA letter says, "Since the labeling

19   states that the drug product may be administered by

20   nasogastric tube, please perform an in-vitro in-use test to

21   compare the performance of your product to the RLD."

22             What is an in-vitro in-use test?

23       A.    In vitro is in the lab, as opposed to being done

24   in humans.

25       Q.    And what response does Teva provide to the agency

1   with respect to item 12?

2       A.   In this response we generated the data that had

3   been requested in the comment, with the exception that

4   originally the comment asked Teva to run these nasogastric

5   studies using both water and apple juice to disperse those

6   pellets.   However, we had phoned FDA to clarify that the

7   brand labeling actually doesn't enable the patient to use

8   apple juice for the capsule product.   We got FDA's buy-in

9   that, yes, we just needed to do the testing in water.

10      Q.   And did Teva, in fact, provide testing data to the

11  agency in this letter?

12      A.   Yes, we did.

13      Q.   Directing your attention to item 13 at the bottom

14  of page 9.   Can you tell us what information Teva's

15  providing to the agency in item 13?

16      A.   Yes.   In question 13 FDA had posed a follow-up

17  question with respect to the residual solvent testing that

18  we spoke of earlier, and Teva provided a response to that

19  question.

20      Q.   And then I'd like to direct your attention to

21  page 10, and at this point there are no more numbered

22  queries or questions from the FDA; correct?

23      A.   Correct.

24      Q.   So what is the information that's being presented

25  here under, "Additional Changes"?

1          A.    In this section Teva is informing FDA of some

2     additional changes to the chemistry documentation, changes

3     that had been made subsequent to the original ANDA filing.

4          Q.    And I'd like to direct your attention to the

5     second bullet under the big chart.  Do you see that?

6          A.    Yes.

7          Q.    Where it says, "Updates have been made to the

8     manufacturing batch record," do you see that?

9          A.    Yes.

10         Q.    And can you read that to yourself and tell us what

11    information is being provided by Teva here?

12         A.    In this section what we're informing FDA is that

13    Cipla had made some changes to the drug product

14    manufacturing process, and we're informing FDA of those

15    changes.

16         Q.    And the second paragraph below the bullet that

17    starts, "Both capsule-filling machines," can you explain,

18    generally, what this paragraph's about?

19         A.    Yes.  In the previous paragraph we had informed

20    FDA that Cipla chose to change to a different capsule-fill

21    machine, a new piece of equipment, or a different piece of

22    equipment than had originally been used.  These

23    capsule-filling machines basically control the number of

24    those pellets that we spoke of earlier.  This machine

25    controls the number of pellets that ultimately end up in

1    each capsule shell, which is important to make sure that the

2    product has the potency that it's required to have.

3         Q.   I'm handing you next what has been admitted as

4    Exhibit 130, BVO.  And can you tell us what BVO is?

5         A.   Yes.  This is a complete response deficiency

6    letter that FDA issued to Teva.

7         Q.   All right.  And what's the date of this letter?

8         A.   This letter is dated February 11th, 2014 -- or,

9    I'm sorry -- February 10th, 2014, initially.

10        Q.   So February of this year?

11        A.   Correct.

12        Q.   And is this the first one we've seen that's a

13   complete response letter?

14        A.   Yes.  This is the first one with that title.

15        Q.   And can you remind us what's different about this

16   letter being a complete response letter?

17        A.   Yes.  The complete response format effectively

18   pools any and all comments from the review divisions that we

19   previously spoke of into a single review letter.

20        Q.   And I'd like to direct your attention to the

21   headings and ask you, are the underlined headings indicative

22   of the various divisions?

23        A.   Yes, that's correct.

24        Q.   I'd like to start with, "Product Quality."  And

25   item 1 under "Product Quality," please.  And what deficiency

1    is the FDA raising with respect to product quality in

2    item 1?

3        A.   Here they, once again, are informing Teva that

4    Cipla's DMF for esomeprazole had been found deficient.

5        Q.   And I'd like to ask you about item 6.  Can you

6    tell us what on page 2 in item 6, what kind of deficiency

7    FDA's communicating there?

8        A.   Yes.  In this question FDA is asking for

9    additional stability data that had been generated on batches

10   made in support of this application.

11       Q.   And now do you see, lower in that page, the entry

12   "bioequivalence"?

13       A.   Yes.

14       Q.   And what deficiencies are raised with respect to

15   bioequivalence?

16       A.   Here, once again, the Division of Bioequivalence

17   is asking further questions with respect to the nasogastric

18   studies that Teva had conducted.

19       Q.   And what, specifically, were raised as problems?

20       A.   Here they're telling us that they feel the

21   methodology that we used to generate the data previously

22   submitted was insufficient, and they're effectively sending

23   us back to the drawing board to do new testing.

24       Q.   And what, specifically, in terms of new testing,

25   was required?

1      A.    Here they're telling us that we needed to use a

2  different type of methodology to test the particle size of

3  those pellets.

4      Q.    And at the end of item 4 there's a direction that

5  begins, "Please repeat the above steps."

6          Do you see that?

7      A.    Yes.

8      Q.    Below those?

9      A.    Uhm-hmm.

10         MS. WALKER:   John, at the bottom, under D.

11     Q.    "Please repeat the above steps."  Do you see that?

12     A.    Yes.

13     Q.    And it references soak times.  Do you see that?

14     A.    Uhm-hmm.

15     Q.    Can you explain to us what this instruction is

16  about?

17     A.    Yes.  You know, as we talked about earlier,

18  initially FDA asked us to do the nasogastric testing in

19  apple juice and in water.  They later informed us that we

20  just needed to do the testing in water.  And at the time

21  they suggested that -- well, initially they just said water,

22  and then in a subsequent letter, I believe it was, they

23  asked us to do the testing using water of different pHs, you

24  know, more or less acidic.  Here they're asking us to do the

25  testing again, but in water using different pH than we had

1    used previously.

2         Q.   And again what was the date of that letter?

3         A.   This letter is February 10th, 2014.

4         Q.   And did Teva respond to that letter?

5         A.   Yes, we did.

6         Q.   I'm handing you what has been admitted as

7    Exhibit 130, CCJ.

8              Is this Teva's response?

9         A.   Yes.  This is our response to that February 2014

10   letter.

11        Q.   And if you could go to "Product Quality"?

12        A.   Okay.

13        Q.   To item 6.  What information did Teva provide back

14   to the agency here?

15        A.   Here we provided the stability data that they had

16   specifically requested.

17             MS. WALKER:  If you could blow up the response?

18        Q.   Are you referring to the response that begins,

19   "The accelerated long-term stability data"?

20        A.   Yes.

21        Q.   And can you tell us, generally, what kind of data

22   is being presented here?

23        A.   Yes.  The accelerated data and the long term are

24   the stability data that we spoke of earlier.  Long term is

25   another way of phrasing controlled room-temperature data.

1    So the accelerated would be product that was stored in those

2    ovens that we spoke of at a higher heat and level of

3    humidity.  A controlled room-temperature or long-term

4    stability data is product in those stability chambers or

5    ovens that's not quite as high of a temperature or humidity

6    level.

7         Q.   I'd like to direct your attention to page 5, to

8    the beginning of the bioequivalence section.

9         A.   Okay.

10        Q.   What information was Teva providing to the agency

11   regarding bioequivalence?

12        A.   In this section, generally, we are answering their

13   last round of questions with respect to the nasogastric

14   dosing data.

15        Q.   Was that the last deficiency letter from the

16   agency?

17        A.   No, it was not.

18             MR. SOBOL:  Objection.

19        Q.   I'd like to hand you what has been admitted into

20   evidence as Exhibit 130, BZU.  What is Exhibit BZU?

21        A.   This is an additional complete response deficiency

22   letter issued by FDA to Teva.

23        Q.   And when did the FDA issue this?

24        A.   This letter was dated July 11th, 2014.

25        Q.   And what issues, generally, did the agency raise

```
 1   with you last July?

 2            MR. SOBOL:  Objection.

 3            THE COURT:  Your question again?

 4       Q.   What issues, generally, were raised last July?

 5            THE COURT:  Do you know, yourself?

 6            THE WITNESS:  Yes.

 7            THE COURT:  You may testify.

 8            MR. SOBOL:  Sidebar, your Honor?

 9            THE COURT:  You may.

10            THE WITNESS:  Yes, I --

11            THE COURT:  Wait, no.  He said sidebar.  I have a

12   bit role, but I play it.

13   SIDEBAR CONFERENCE AS FOLLOWS:

14            THE COURT:  She's proceeding from documents in

15   evidence.

16            MR. SOBOL:  If the document got in after you --

17   let me put it this way, your Honor.  Before trial the

18   plaintiffs filed a motion to preclude evidence post May 27,

19   2014.  You denied it at that time.  As a result, there was

20   an agreement with respect to this document on the basis of

21   that ruling.

22            Since then the Court has, I think appropriately,

23   that's the plaintiffs' position, indicated there should not

24   be post May 27, 2014 evidence.  Accordingly, while the

25   document is in, I think it's consistent with everything else
```

1    that's happened at the trial that we have no further

2    comments about what happens post May 27, 2014.

3              MS. WALKER:  May I be heard?

4              THE COURT:  Yes.

5              MS. WALKER:  The document is in evidence.  They

6    stipulated to it.  I don't think it's appropriate to renege

7    on that stipulation.

8              THE COURT:  They're not.

9              MS. WALKER:  The document is evidence.

10             THE COURT:  They're not.

11             MS. WALKER:  The witness has identified the

12   document.  This is also relevant because we don't know in

13   May -- the last prior letter, of course, was in February.

14   So in part what we see in the subsequent letters explained

15   to us is what was happening up to May 27.  I don't intend to

16   ask her anything about, except for the two documents that

17   are in evidence -- excuse me -- three documents that were in

18   evidence.  And they're already in evidence.  She should be

19   permitted to talk about them.

20             THE COURT:  So let me state your position.  The

21   pre-May 27, they -- the letters are afterwards, raising

22   issues.  Right.

23             MS. WALKER:  And but the letters are showing --

24   are helping to show what happened between February and May,

25   even if this cut-off would somehow keep this document out.

1    But in addition, I have two grounds, which is they

2    stipulated the document.  It is in evidence.

3              THE COURT:  It's in evidence.

4              MS. WALKER:  So within the confines of the four

5    corners of document I should be able to ask her.

6              THE COURT:  It's too peripheral.  Sustained.

7              (Whereupon the sidebar conference concluded.)

8    BY MS. WALKER:

9         Q.   I want to talk more generally about the regulatory

10   review process now that we've gotten to 2014.  Thank you.

11              When Teva satisfies the FDA as to all the -- its

12   technical issues, is Teva permitted to launch then?

13        A.   No, we're not.

14        Q.   And why not?

15        A.   We have to achieve a final FDA approval prior to

16   being able to launch.

17        Q.   And in the case of generic Nexium, what would that

18   require?

19        A.   We would be required to have final approval of our

20   existing ANDA.

21        Q.   And when Teva satisfies all the technical issues

22   will that entitle it to final approval?

23        A.   In the case of this application, no.

24        Q.   And why not?

25        A.   At this point of review we would only be entitled

1    to --

2              MR. SOBOL:   Well --

3         A.   -- a tentative approval.

4         Q.   Are you familiar with the term -- the regulatory

5    term "selective waiver"?

6         A.   Yes, I am.

7         Q.   What is selective waiver?

8         A.   A selective waiver is where the first applicant

9    who is the first to challenge the innovator's patents, for

10   whatever reason, decides that they do not want to launch

11   their own product.  So upon achieving a final approval, if

12   they launch some of their own product they may then

13   selectively waive that -- their entitlement to that

14   exclusivity period to another applicant.

15        Q.   And have you also heard of a term, regulatory term

16   called "voluntary relinquishment"?

17        A.   Yes, I have.

18        Q.   And what is voluntary relinquishment?

19        A.   Relinquishment would be, again, where the first

20   filer, the first applicant who was entitled to exclusivity,

21   chose not to or was unable to exercise their right to that

22   exclusivity and effectively gave it up to any other

23   applicant.

24        Q.   Can the first-to-file party transfer that to a

25   specific generic by voluntary relinquishment?

1     A.   By relinquishment, no.

2     Q.   Why not?

3     A.   In order to provide one's exclusivity specifically

4  to another company, you need to achieve a final ANDA

5  approval, and you need to launch your own product, and then

6  selectively waive your exclusivity to a particular

7  applicant.

8     Q.   Was Teva's ANDA ever put on hold by the regulatory

9  affairs group?

10         MR. SOBOL:  Objection.

11         THE WITNESS:  May I --

12         THE COURT:  No.  I'm slow, forgive me.

13         THE WITNESS:  Sorry.  I'm hard of hearing.

14         THE COURT:  Why don't you say prior to May 27th.

15         MS. WALKER:  Okay.  Actually, that was written in.

16  I apologize.

17     Q.   Prior to May 2014 did Teva ever put its ANDA on

18  hold?

19     A.   No, not to my knowledge.

20         MR. BUTSWINKAS:  Did Teva -- I'm sorry, I --

21         THE COURT:  Did it ever put its ANDA on hold.  Her

22  answer:  No, not to my knowledge.

23         MR. BUTSWINKAS:  Thank you, Judge.

24     Q.   Are there other generic companies with ANDAs on

25  generic Nexium other than Ranbaxy and Teva?

1     A.    Yes, there are other applicants that we are aware

2     of.

3           Q.    Do you know if any of them have obtained approval?

4           A.    No.  As of today or yesterday --

5                 MR. SOBOL:  Objection, your Honor.

6                 THE COURT:  Yeah, we're --

7                 MS. WALKER:  She doesn't know.  I can ask it, your

8     Honor.

9                 THE COURT:  Since everyone's fighting over this,

10    the reason I picked May 27, 2014, is very simple.  That's

11    the date that's in these agreements.  So if there was any

12    antitrust harm it had to come before that date, because

13    after that date the agreements say you can do whatever you

14    can do.  That's too simple but it will work here.

15                Now, one of the issues, of course, is could Teva

16    actually have gotten its version to market prior to that

17    date.  So that's the date.  But we live in the world today,

18    and naturally they're saying, Well, today.  Well, I'm

19    keeping today out.  My responsibility.

20                She'll reframe it and she can have the evidence.

21          Q.    As of May 27th, 2014, had -- did any of those

22    other generics have approval?

23          A.    No, they did not.

24          Q.    Has Teva diligently pursued its ANDA with respect

25    to generic Nexium?

```
 1            MR. SOBOL:  Objection.

 2            THE COURT:  No, overruled.  That's leading but she

 3    can have it.  The jury will sense it's leading.

 4            Have you?

 5            THE WITNESS:  I'm sorry.  Can you repeat the

 6    question?

 7       Q.   Has Teva diligently pursued its ANDA on generic

 8    Nexium?

 9       A.   Yes, we have.

10       Q.   In what way?

11            MR. SOBOL:  Objection.

12            THE COURT:  Overruled.  She can give us her view.

13       A.   We've talked about all the review letters that --

14    or the deficiency letters that we've received.  We have

15    addressed every review comment, every deficiency letter that

16    we've received to date.

17       Q.   And looking at our timeline, back to April of

18    2008, did the fact that Ranbaxy settled its patent challenge

19    in 2008, did that affect Teva's regulatory approval efforts?

20            MR. SOBOL:  Objection.

21            THE COURT:  Well, do you know?

22            THE WITNESS:  I have my opinion.

23            THE COURT:  I'm going to let her voice her

24    opinion, given her position in the organization.

25       A.   No.
```

1        THE COURT:  What's your opinion?

2      A.    My opinion is that no, there's absolutely no

3  impact.  Regulatory always strives to answer FDA's

4  questions, and our job is to get our applications approved.

5      Q.    And were there efforts to respond to Teva's --

6  excuse me.

7        Were there efforts to respond to FDA's questions

8  after April 2008?

9      A.    Yes.

10     Q.    And what about in January 2010; did the fact that

11  Teva settled its patent challenge in 2010, did that affect

12  Teva's regulatory approval efforts?

13        MR. SOBOL:  Objection.

14        THE COURT:  She can give her opinion.

15     A.    No, it did not impact the regulatory efforts.

16     Q.    After January 2010 did Teva continue to respond to

17  FDA deficiency letters?

18     A.    Yes, we did.

19     Q.    Do you believe that some of the delays are

20  attributable to the FDA itself?

21        MR. SOBOL:  Objection.

22        THE COURT:  Sustained.  Don't lead the witness.

23     Q.    What delays, other than Teva's, if any, do you

24  believe were relevant here?

25        MR. SOBOL:  Objection.

1              THE COURT:  No, sustained.  She's not the judge of

2     what's relevant.

3         Q.   Was generic Nexium the only pending ANDA before

4     your regulatory affairs department during this time period?

5         A.   No, it was not.

6         Q.   Were the deficiency letters that you received with

7     respect to generic Nexium the only deficiency letters Teva

8     received during this time period?

9         A.   No, certainly not.

10        Q.   Do you know during any given year how many FDA

11    deficiency letters the regulatory affairs group gets, let's

12    say in 2011, for example?

13        A.   Yes.  I'm able to answer that question because I

14    had looked at that specific information for my boss very

15    recently.  And in recent years, particularly the year 2011,

16    we received well over a hundred review letters or deficiency

17    letters.  And those letters were specific to chemistry.  So

18    not even counting letters that we receive for our ANDAs with

19    respect to bioequivalence or labeling.

20        Q.   Do you know how many total deficiency letters Teva

21    received that year?

22        A.   I don't have the total, but my guess would be it

23    was certainly well above 150, and most likely it probably

24    approached close to 200, if not more, in total.

25        Q.   As of May 27, 2014, did Teva have tentative

```
 1    approval on its generic Nexium product?

 2         A.   No, we did not.

 3              MS. WALKER:  Nothing further.

 4              THE COURT:  AstraZeneca, any questions for this

 5    witness?

 6              MR. BUTSWINKAS:  No, your Honor.

 7              THE COURT:  And Ranbaxy, any questions for this

 8    witness?

 9              MS. FOLEY:  Nothing, your Honor.

10              THE COURT:  Mr. Sobol?

11              (Whereupon counsel conferred.)

12                        CROSS-EXAMINATION

13    BY MR. SOBOL:

14         Q.   Good afternoon.

15         A.   Good afternoon.

16         Q.   You testified during your direct examination that

17    this was not typical for Teva; fair to say?

18         A.   Yes.

19         Q.   Please explain to the jury why this wasn't

20    typical?

21         A.   As I mentioned during my direct examination, we

22    definitely have seen -- in my time in the regulatory

23    department I've seen applications approved in a much shorter

24    period of time.  As I mentioned, though, we have seen

25    applications take longer.
```

1      Q.   So why is this not typical then?

2      A.   FDA publishes approximate or median review times,

3  average approval times across the generic industry.  And

4  their numbers are lower than nine years.

5      Q.   What's the average or median time?

6      A.   In most recent years FDA has averaged

7  approximately three to four years to approve most

8  applications.

9      Q.   And I think you've indicated to the jury that

10  Teva's a rather large generic company; correct?

11      A.   Correct.

12      Q.   And about how many ANDAs for a new product would

13  be approved in a given year for Teva, say, in the 2007

14  period?

15      A.   How many applications would receive approval?

16      Q.   Yes.

17      A.   It changes from year to year.  I would say it

18  could range anywhere from maybe 25 to 40 or so.

19           MR. SOBOL:  So if we can go to Exhibit 111,

20  please.  And page 14.

21      Q.   This is a securities filing that was made on

22  behalf of Teva, and then there's a listing here.  Can you

23  see that on the screen or --

24      A.   Actually, it's hard to see.  Do you have a paper

25  copy?

1      Q.   Fair enough.  Yep.  You can look at the front

2  page, too, if you want to know the document.

3           Is this a list of the ANDAs that were approved for

4  Teva during the calendar year 2007?

5      A.   Actually, the way I read this list, it's a list of

6  products that we launched that year, which wouldn't

7  necessarily mean products that were approved that year.

8      Q.   Okay.  Fair enough.  These were new products that

9  you launched that year?

10     A.   That's what this list appears to be, yes.

11     Q.   So they obtained approval either in 2007 or

12 sometime before then, obviously?  Fair to say?

13     A.   Yes.

14     Q.   Okay.  So there are about 25 generic versions

15 listed here; correct?

16     A.   I didn't count, but --

17     Q.   It's about --

18     A.   -- appears to be correct, yes.

19     Q.   It just says it right above in the products line.

20     A.   Oh, yes, it does.  Yes.  Thank you.

21     Q.   And then are there similar lists that -- of

22 approvals for generic products that are originally launched

23 in 2008, 2009, 2010 for Teva?

24     A.   Yes.  We maintain lists of products that were

25 approved year to year.

1    Q.    Okay.  And your best range of each year, how many

2    new products would be approved, would be in the range of

3    what?

4    A.    My earlier estimate was 25 to 40, I believe is

5    what I said.

6    Q.    And in connection with those launches, you're

7    familiar with the concept of launching at risk?

8    A.    Yes, I am.

9    Q.    Can you explain to the jury what you understand

10   that to be?

11   A.    My understanding is, is that's a legal term that

12   if you -- if an applicant has achieved final approval of

13   their application, but that litigation might still be unyet

14   resolved, that the generic applicant, after a certain period

15   of time mandated by the law, the FDA is entitled to give the

16   applicant a final approval, and the generic applicant can

17   choose to launch at risk or they may choose to wait until

18   the conclusion of litigation.

19   Q.    And the jury's familiar, I think you're referring

20   to the expiration of the 30-month stay?

21   A.    Yes, that's correct.

22   Q.    And so I'm going to show you what's been marked as

23   Exhibit 167.  These are some answers that Teva gave in this

24   case to some questions.

25         Turning to page 7 of this document, which is in

 1    evidence, there is a listing of products.  Is it your

 2    understanding that all of these products Teva launched at

 3    risk?

 4            MS. WALKER:  Objection, your Honor.  Foundation

 5    and relevance.

 6            THE COURT:  Oh, well, may I see the document?

 7            THE WITNESS:  Certainly.

 8            THE COURT:  Overruled.

 9            MS. WALKER:  Your Honor, may I be heard on

10    relevance?

11            THE COURT:  You may be.

12    SIDEBAR CONFERENCE AS FOLLOWS:

13            THE COURT:  Yes.

14            MS. WALKER:  My objection is as to launches at

15    risk.  The Court held that there was no issue with Ranbaxy

16    launching at risk previously, and Teva cannot have launched

17    at risk because it was the second filer standing behind

18    Ranbaxy.  So there was no relevance as to Teva launching at

19    risk in this case.

20            THE COURT:  Yeah, and you may point that out.  He

21    may have the question.

22            MR. GAFFNEY:  Your Honor, I have a second

23    objection, that I join.

24            THE COURT:  Yes.

25            MR. GAFFNEY:  That is that in light of the Court's

1    rulings that the patents were not going to be adjudicated

2    invalid, they can't be a launch at risk because they would

3    be enjoined.  And if there is an argument that there's a

4    launch at risk it brings in all the back evidence.

5              THE COURT:  He's going to have to answer that

6    question at 2:00.  That, to me, is the key question.  And

7    but I'm operating as I must operate now, on the assumption

8    that I've denied it.  But I'm not counting anything that's

9    being said here as to the record when it closed.  So I'm

10   going to let him have the answer.

11             (Whereupon the sidebar conference concluded.)

12             THE COURT:  You may answer the question.  Having

13   read that, is it your understanding that Teva may have

14   launched those products at risk?

15             THE WITNESS:  Yeah, that's what's stated in this

16   document.  Uhm-hmm.

17   BY MR. SOBOL:

18        Q.   And is that true?

19        A.   Could you actually repeat the original question?

20        Q.   Sure.  The question is, is it your understanding,

21   ma'am, that this list of drugs Teva launched at risk?

22        A.   Honestly, I had never seen this document prior to

23   just now but that's what it states in the document, yes.

24        Q.   Well, how about just your independent knowledge?

25   Do you know that Teva, over the years you worked there, has

1    launched products at risk?

2         A.   To my knowledge we have, uhm-hmm.

3         Q.   And do you understand that in the generic industry

4    Teva is one of the more frequent -- undertakes at-risk

5    launches more frequently than other generic companies?

6         A.   I honestly couldn't speak to that.  I don't

7    necessarily know what other companies have launched at risk

8    or not.

9         Q.   You gave some testimony regarding some deficiency

10   notices received by Teva, and responses by Teva, over the

11   years; correct?

12        A.   Yes.

13        Q.   Okay.  Did Teva ever receive a major deficiency?

14        A.   No.  None of our letters were titled "major."

15        Q.   Okay.  Can you describe to the jury what the

16   difference is between a minor and a major deficiency?

17        A.   Sure.  OGD, or Office of Generic Drugs, may

18   classify review letters as either major or minor.  They also

19   issue telephone deficiencies or information requests.

20   Information requests, telephone requests, typically are

21   something very minor in nature, something that they think

22   you can answer in a -- just a few days time.  A minor letter

23   is a very broad category to encompass a number of

24   deficiencies.  Whereas, a major letter typically would

25   require something more significant, such as manufacture of a

1    new batch, or perhaps repeating a bioequivalence study.

2         Q.   What's the function of the FDA, at least at some

3    point in time -- well, at some point during this process the

4    FDA used the distinction between minor and major

5    deficiencies; fair to say?

6         A.   Fair to say.

7         Q.   And so what was the purpose of labeling those two

8    different kinds of deficiencies at FDA?

9         A.   I would say, in my experience, FDA reserves

10   classification of a letter as major really to significant

11   situations that require a lot of work on the part of the

12   applicant, or potentially will require a lot of time on the

13   part of the reviewer.

14        Q.   And so you gave some testimony about how the ANDA

15   was originally filed in 2005; correct?

16        A.   Yes.

17        Q.   Okay.  And I take it that at Teva, with all of

18   these different ANDAs that you're working on, you try to

19   keep various records tracking the timing of the various

20   ANDAs?

21        A.   Yes, we do.

22        Q.   Okay.  And for what purpose is that?

23        A.   Well, you know, as I've mentioned, we have a lot

24   of pending applications.  So it's tough to keep them all

25   straight.  Not keep them straight, but there's a lot to --

150

1    to, sort of, keep track of.  So, yes, we do maintain very

2    accurate records of what's pending, what review letters

3    we've received, and what we've answered.

4        Q.   And do you also track when the planned launch date

5    is for the product?

6        A.   Regulatory affairs?  Or when you --

7        Q.   You, I mean Teva, from what your understanding is?

8        A.   Teva would.  Regulatory affairs, not necessarily.

9        Q.   When the generic Nexium ANDA was filed for Teva,

10   what was the projected launch date internally at Teva?

11       A.   I don't know the answer to that question.

12       Q.   Let me put before you a document which is in

13   evidence as 130, FKJ.  And let me ask you this first.  Did

14   you have any personal responsibility for the Nexium ANDA in

15   April of 2006?

16       A.   In April 2006 I don't recall that I did.

17       Q.   Okay.  So were you aware that in April of 2006

18   Teva was seeking to get approximate commercial batch

19   manufacturing timelines in order?

20       A.   No.  As a regulatory person, I wouldn't have been

21   aware of the commercial efforts.

22       Q.   Okay.  So, well, then perhaps you can just have us

23   understand this.  Regulatory affairs, I take it, is one part

24   of Teva; fair to say?

25       A.   Yes.

1    Q.   And so who makes these decisions regarding

2    commercial batch decisions?

3    A.   I would just -- those decisions would be made

4    outside of regulatory, for certain.

5    Q.   But do you know where at Teva?

6    A.   Yes.  Our sales and marketing teams would be

7    assessing the timing of anticipated launch, and they would

8    then communicate that to the teams that would need to

9    prepare for launch.

10   Q.   Okay.  You gave us some testimony earlier on about

11   the size of a batch for your testing purposes.  Do you

12   recall that?

13   A.   Yes.

14   Q.   Do you have any understanding about the size of a

15   commercial launch for a product like generic Nexium in the

16   time frame of 2006?

17   A.   I do not know the answer to that.

18        MR. SOBOL:  Can I have 153, please?

19   Q.   I put before you Exhibit 153.  In the time period

20   of April of 2007 did you have any personal responsibilities

21   regarding Nexium?

22   A.   I would have been involved in certain aspects of

23   the application, yes.

24   Q.   Okay.  And are you familiar with this document?

25   A.   No, I've not -- I'm not.

1     Q.   All right.  And are you familiar, if you turn to

2  the third page of this exhibit, which has, "Esomeprazole DR

3  Capsules," do you see that at the top?

4     A.   Yes, I do.

5     Q.   And underneath that there's a launch readiness

6  date of July of 2008.  Do you see that?

7     A.   Yes, I see that.

8     Q.   So does that refresh your memory as to when in

9  2007 Teva was designating its launch readiness date for

10  generic Nexium?

11     A.   As I mentioned earlier, from a regulatory

12  personnel perspective my focus was on getting the ANDA

13  approved.  Again, the launch readiness or those efforts

14  would have been left to a different function within Teva.

15     Q.   Okay.  So then if you turn to the prior page of

16  this document, the second page of the exhibit, I believe

17  it's the second page, where it says, "We are initiating

18  launching activities for esomeprazole," you weren't aware of

19  that then in 2007?

20     A.   I don't believe I was.  I don't recall.

21          MR. SOBOL:  May I have ERJ, please?  And after

22  that ERK.

23     Q.   I put before you what we've had marked as ERJ.

24          (Whereupon counsel conferred.)

25     Q.   If you turn to the -- you'll see that it's a

1    fairly lengthy e-mail to a variety of people, including --

2    I've highlighted it so you can't see it, so I'm going to

3    show you.  About four lines down in the "To" line, I think

4    that's you.  Is that Ms. Pastore?

5         A.   Yes, I was -- this e-mail was circulated to me.

6         Q.   And what kind of document is this?

7         A.   This document is what we refer to as our Major

8    Milestone Report.

9         Q.   And what's that do -- why don't you move the

10   microphone a little bit away.

11        A.   Yeah, I keep forgetting it's there.  Can you still

12   hear me?

13        Q.   Yes.

14             And what kind of report is that?

15        A.   This is a document that we used to have that

16   basically tracked all of our pending applications, or

17   applications that we were intending to submit to the FDA,

18   and the timelines around those products.

19             MR. SOBOL:  I offer it.

20             MS. WALKER:  No objection.

21             THE COURT:  It may be received.  The letters

22   again?  I'm sorry.

23             MR. SOBOL:  ERJ.

24             THE COURT:  ERJ is Exhibit 180.

25             (Exhibit 180 received in evidence.)

154

1          MR. SOBOL:  If we can go to the second page of

2    this document, actually the third page of this document, and

3    reorient it.  And can you just blow up the first, the top

4    column so that we can have the witness identify what the

5    information is on the document.

6          Q.   So if you can identify, please, just is this the

7    kind of information that gets tracked, a project name, and

8    then various pieces of information regarding that project?

9          A.   This is one of the reports that is used.

10         Q.   Right.  Because there are so many ANDAs, this is

11   the kind of information you need to be able to track; fair

12   to say?

13         A.   This is information tracked, but not directly by

14   regulatory affairs.

15         Q.   Okay.

16         A.   We have our own separate tracking.

17         Q.   I see.  So who would be using the Major Milestone

18   Report, doing this tracking?

19         A.   This document, when we used to use this report,

20   was generated by our project management team.

21         Q.   Okay.  Now, there are columns that have "Project

22   Name," and then there's a column that's "Brand Sales"?

23         A.   Yes.

24         Q.   Correct?

25         A.   Yes.

1    Q.   All right.  And then as we go forward toward the

2    right, I see that the -- there are two columns, "Early as

3    Approval," and then, "Early as Launch."

4         Do you see those two?

5    A.   Yes, I do.

6    Q.   Can you just tell the jury what those two are?

7    A.   Those are projections that our team, notably in

8    this case our project management team, uses to effectively

9    order applications timely -- in a timely way so that we know

10   approximately when we potentially might see an approval, and

11   when we might potentially launch.

12   Q.   Okay.  And then the second entry, then, for the

13   project name, here is esomeprazole magnesium, generic

14   Nexium; correct?

15   A.   Yes, that's correct.

16   Q.   And the column for "Brand Sales" here indicates

17   5.468 billion; correct?

18   A.   Yes, that's correct.

19   Q.   And then the "Early as Approval" date is what, for

20   Nexium at this time, generic Nexium at this time?

21   A.   The projection on this report was April 2009.

22   Q.   And what was the "Early as Launch" projection?

23   A.   The projection was April 2009.

24   Q.   And what is the date of this milestone report?

25   A.   This was dated March 26th, 2008.

1      Q.   So now I put before you what I think is another

2  milestone report, ERK.   Is that what that is?

3           THE COURT:   That's a little bit wrong in form.

4  We're not interested in what he thinks some piece of paper

5  is, but this may not be an issue.

6           Is it?

7           THE WITNESS:   Yes.   This is another version of

8  that form.

9           THE COURT:   Now that she said so, that's the

10  testimony.   ERK.

11           MR. SOBOL:   I offer it.

12           THE COURT:   Any objection?

13           MS. WALKER:   No objection.

14           THE COURT:   It may be received as evidence,

15  Exhibit 181.

16           (Exhibit 181 received in evidence.)

17      Q.   This milestone report is dated what?

18      A.   This document is dated May 26, 2008.

19      Q.   And so this is about how much after the prior

20  milestone report?

21      A.   It's approximately -- it is two months later.

22      Q.   Okay.   And two months later, in this milestone

23  report, I think there's an entry for esomeprazole magnesium

24  on the second-to-last page about -- is there an entry for

25  esomeprazole magnesium about six or seven lines up from the

157

1    bottom?

2         A.   Yes, there is.

3         Q.   And, again, the market size, the "Brand Sales" is

4    indicated at 5.468 billion; correct?

5         A.   Yes.

6         Q.   And what's the "Early as Approval" date at this

7    time?

8         A.   The "Early as Approval" projection on this report

9    was April 2009.

10        Q.   And what's the "Early as Launch" date?

11        A.   Here it's stated as November 2014.

12        Q.   So about how many years later than had been

13   projected two months earlier?

14        A.   Approximately five years.

15        Q.   And why was this change made?

16        A.   I don't update this report.  I wasn't the person

17   who modified it.

18        Q.   So you don't know?

19        A.   No.

20             MR. SOBOL:  Can I have 155, please?

21        Q.   I put before you Exhibit 155.  You'll notice that

22   there's an indication, "Redacted—Nonresponsive" on this

23   document.

24             THE COURT:  You may say it.

25        Q.   That has been put on by the lawyers.  Neither you

1   nor, I think, anyone else should take any -- anything from

2   that.  Okay.

3           THE COURT:  I let him say that.  That's fair in a

4   matter such as this.  I don't want you to be spooked by it.

5   That's my concern.  Nobody's hiding anything from you where

6   I let a document go in in, quote, redacted form.  Either it

7   has to do with stuff that has nothing to do with the case or

8   one or another legal reason.  Don't draw any conclusions

9   from it.

10          Go ahead.

11      Q.   So if you turn to the front page of this document

12   you'll see up at the top it seems the title is, "Cipla/Teva

13   Commercial Launch/New Product Launches."

14          Do you see that?

15      A.   Yes.

16      Q.   Is this something that you had personal

17   responsibility with at this time at Teva?

18      A.   No.

19      Q.   Is this in regulatory affairs or somewhere else?

20      A.   This is somewhere else.

21      Q.   Okay.  Do you know where?

22      A.   This would have been with our sales or marketing

23   team, the new product launch team.

24      Q.   And again, the second page, if you look down

25   toward the bottom, and here there's an entry that talks

1    about an additional API site.

2           Do you see that?

3       A.   Yes, I do.

4       Q.   And is it your understanding that this is the

5    additional API site that might have been attempted with

6    Cipla?

7       A.   Yes.  This is the site that I spoke of during my

8    direct.

9       Q.   Okay.  But now the projected launch -- well, the

10   projected launch at this time is May 2014; correct?

11      A.   That's what's stated here, yes.

12           THE COURT:  It's probably a good place to stop.

13           It's 1:00.  We'll stop taking testimony at this

14   time.  One sort of -- they all lead with their feet.  But

15   one additional matter.  We're getting closer to the end of

16   this case and so now at least legal press is showing some

17   interest.  I don't know as you would run across it, but I do

18   instruct you, just as I say, and it isn't by rote, don't

19   talk to anyone about the case.  Should you see any reference

20   to this case in any of the media -- I've seen it only in the

21   legal press -- you're instructed you've got to turn the

22   page.  It hasn't been on electronic media, but turn the

23   channel, and the like.  You're getting all the evidence

24   about this case right here in the courtroom.

25           And we're not getting -- getting closer, but we're

```
 1   not done.  So keep your minds suspended.  Do not discuss the

 2   case either among yourselves nor with anyone else.  I wish

 3   you a very good weekend.  If you run into people you don't

 4   normally see, you can say you're serving on a jury so long

 5   as you immediately say, The judge said we can't say anything

 6   about it.

 7           Have a good weekend.  We'll resume at 9:00 a.m. on

 8   Monday morning.  The jury may stand in recess until that

 9   time.

10           THE CLERK:  All rise for the jury.

11           (Whereupon the jury left the courtroom at

12   1:01 p.m.)

13           THE COURT:  Please be seated.  And you may step

14   down.

15           (Whereupon the witness stepped down.)

16           THE COURT:  Total elapsed time -- which I didn't

17   announce the other day, but total elapsed time now stands:

18   Plaintiff, eleven days, thirty minutes; defense, eight days,

19   three hours, ten minutes.

20           Be aware that if this goes -- well, be aware if

21   this goes the distance I expect to be done the week after

22   Thanksgiving.  That would take us up to about the 5th of

23   December.  I know if you count out 30 days it will take us

24   into the next week, but the way you're going I expect you to

25   be done that week.
```

1          Also, as you're looking at your remaining time,

2     have in mind that days 14 and 15 are probably tied up with

3     arguments and charge.

4          All right.  We will resume at 2:00 p.m., ten

5     minutes a side, orally, addressing only the question that I

6     posed, and then I'll see what we're going to do.

7          We'll recess then in this case until 2:00 p.m.

8          MS. WALKER:  Your Honor, can I have 30 seconds at

9     sidebar on a housekeeping matter?

10          THE COURT:  Does it need to be at the sidebar?

11          MS. WALKER:  It is a bit of a personal matter.

12          THE COURT:  Of course.  Would you approach?

13     SIDEBAR CONFERENCE AS FOLLOWS:

14          MS. WALKER:  The issue is with respect to

15     Ms. Pastore.  We had thought she was going to go on first

16     thing this morning and she'd be off today.  She had family

17     plans because of school vacation issues with her family next

18     week.  We're going to move heaven and earth to try to get

19     her back here Monday morning to resume.  But I -- I will try

20     to work with everyone to make that work somehow, but I did

21     want to raise that right now.  I don't know exactly how I'm

22     going to make that work.

23          THE COURT:  Well, I don't think you're terribly

24     embarrassed if you get her back for cross after

25     Thanksgiving?

 1          MR. SOBOL:  We'll make whatever accommodation is

 2   needed, your Honor.

 3          THE COURT:  Right.  But you're really trying.

 4          MS. WALKER:  We will --

 5          THE COURT:  This is an attentive jury.

 6          MS. WALKER:  I understand that.  I think it makes

 7   sense.  We'll do everything we can to, expensewise, to see

 8   if we can accommodate this.

 9          THE COURT:  Thank you.

10          (Whereupon the sidebar conference concluded.)

11          THE COURT:  We'll recess.

12          THE CLERK:  All rise.

13

14          (Luncheon recess.)

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

I, Cheryl B. Palanchian, Official Court Reporter
for the United States District Court for the District of
Massachusetts, do hereby certify that the foregoing pages
are a true and accurate transcription of my shorthand notes
taken in the aforementioned matter to the best of my skill
and ability.

_____

CHERYL B. PALANCHIAN
Official Court Reporter
1 Courthouse Way
South Boston, Massachusetts 02110

| From: | Zoita Titi |
|---|---|
| Sent: | Tuesday, April 10, 2007 10:00 PM |
| To: | Stavroula Drosatou |
| Cc: | Pat Jaworski; Jane Frahn; Anna Kalika; Kavita Srivastava |
| Subject: | Re: Esomeprazole Capsules DR - Launch Activities Initiation |
| Attach: | ESOMEPRAZOLE DR CAPSULES Initiation.doc; Esomeprazole - Section I - mfg, pkg & testing sites.pdf; Esomeprazole - Section VII - composition.pdf; Esomeprazole - Section X - outside firms.pdf; Esomeprazole - Section XI - process flow chart & scale up.pdf; Esomeprazole - Section XIII- Pkg configuration.pdf |

Hi Stavroula,

Here is the information you requested for Esomeprazole Capsules DR, 20 mg and 40 mg, ANDA 78-003:

1) CMC Deficiency - Received 4/12/06 - targeted to respond by 4/30/07 (Cipla still needs to do some lab work)

Two Bioequivalency Deficiencies - Received 5/05/06 and 10/03/06 – Bioequivalency Amendment responded 11/13/06

1) Labeling Deficiency - none



Please let me know if you need anything else.

Thanks and regards,

Zoita Titi
Manager, Regulatory Affairs
Phone (215)-293-6162
Teva Pharmaceuticals USA, Inc.




Stavroula Drosatou/MIA/TEVA/IL
02/22/2007 02:04 PM

To
Judy Hauser/NOW/TEVA/IL@TEVANEW, Jennifer King/NOW/TEVA/IL@TEVANEW, rashmivs@cipla.com
cc
Bill Hobart/SEL/TEVA/IL@TEVANEW, John James/SEL/TEVA/IL@TEVANEW, John Blanke/MON/TEVA/IL@TEVANEW, Pat Jaworski/NOW/TEVA/IL@TEVANEW, Zoita Titi/NOW/TEVA/IL@TEVANEW, Lance Kann/MIA/TEVA/IL@TEVANEW, Virginia



**Exhibit**

**153**

Highly Confidential

Teva-ESO-075757

Hogan/NOW/TEVA/IL@TEVANEW, Jane Frahn/NOW/TEVA/IL@TEVANEW, Debbie
Jaskot/KUL/TEVA/IL@TEVANEW
Subject
Esomeprazole DR Capsules - Launch Activities Initiation

Dear All,

We are initiating launch activities for Esomeprazole DR Capsules. Please
provide the required information (per the attached letter) by March 30th, 2007.

Thank you in advance for your support

Stavroula Drosatou
Associate Director, Project Management
Supply Chain - Operations
TEVA Pharmaceuticals
phone: (305) 575-4028
Fax: (305) 575-4135

ATTENTION: This message contains information that may be privileged or
confidential and is the property of TEVA Pharmaceuticals and its subsidiaries.
It is intended only for the person to whom it is addressed. If you are not the
intended recipient, you are not authorized to read, print, retain, copy,
disseminate, distribute, or use this message or any part thereof. If you
receive this message in error, please notify the sender immediately and delete
all copies of this message.

Teva-ESO-075758

**<ins>Esomeprazole DR Capsules</ins>**

**<ins>Submitted ANDA #:</ins>** 78-003
**<ins>Launch Readiness date:</ins>** July 2008

<ins>TEVA Marketing:</ins>
- Confirm required for launch packaging configuration
- Confirm forecast for each packaging configuration
- Provide detailed forecast sheets with marketing assumptions

<ins>TEVA Regulatory US</ins>:
- Provide current filing status.
    - Status of Chemistry, Bio and Labeling deficiency letters.
    - Target response date for any open deficiency letters.
    - Any special requirements which may delay answering the letter (i.e. manufacture of new batches).

- Provide following information to New Product Launch Coordinator:
    - List of outside contractors and responsibilities (testing and packaging)
    - Packaging configuration table (bottles and unit dose)
    - Sites listed as manufacturing, testing and/or packaging sites
    - Quantitative List of Ingredients
    - Process Flow Chart
    - Difference between ND batch and Scale Up SOI
    - Scale Up SOIs code numbers and batch sizes

**Please provide the required information  by March 30th , 2007**



*Cipla/Teva USA Commercial/New Product Launches*
*Agenda*

| | |
|---|---|
| **MEETING DATE:** 17-September-2010 | |
| **TITLE: Cipla/Teva Commercial/New Product Launches** | |
| **PURPOSE:** Product Review Meeting | **FACILITATOR:** Beth Sturtevant |
| **LOCATION:** Conference Call | **PERSON TAKING MINUTES:** Beth Sturtevant |

# Redacted - Non-responsive

Cipla/Teva Commercial/New Product Launches Project Review Agenda 17-September-2010

Page 1 of 3

Highly Confidential



Teva-ESO-129724

# Redacted - Non-responsive

## Status of Submitted Products

# Redacted - Non-responsive

## Esomeprazole DR Capsules 20 mg, 40 mg
- Additional API Site
  - API currently manufactured at Bangalore, Cipla plans to add their Kurkumbh site as an additional site due to forecast volume
  - Teva informed Cipla to hold off on manufacturing the batch to address the additional site until closer to launch
- Deficiency Response
  - ***Projected launch May 2014***

Cipla/Teva Commercial/New Product Launches Project Review Agenda 17-September-2010

Highly Confidential

# Redacted - Non-responsive

Highly Confidential

| | |
|---|---|
| **From:** | Andrew Brimer |
| **Sent:** | Wednesday, March 26, 2008 5:07:30 PM |
| **To:** | Alisa Capreri; Andrea Guardia; Anne Payne; Beth Baver; William Hobart; Chris Pelloni; Craig Lea; Debra Hoenscheid; Debbie Jaskot; Deborah Griffin; Diana Landa; Dolores Stolzer; Edward Trauffer; Rydberg, Elaine; Elizabeth Guevara; Emily Tiemann; CN=Evjatar Cohen/OU=NOW/O=TEVA/C=IL@TEVANEW; George Morabito; Gregg DeRosa; CN=Hanh Seckner/OU=IRV/O=TEVA/C=IL@TEVANEW; Jennifer King; Jill Pastore; John Blanke; John Derstine; CN=John James/OU=SEL/O=TEVA/C=IL@TEVANEW; John McCafferty; Karen Feldtmose; Karen Loberg; Kenneth Lavin; Kendy Merritt; Kirsten Bauer; Lance Kann; Lori Chan; Mahesh Chudasama; Marc Goshko; Margaret Wrigley; CN=Mark Rienstra/OU=NOW/O=TEVA/C=IL@TEVANEW; Maureen Cavanaugh; Michael Ferrigno; CN=Paul Fackler/OU=KUL/O=TEVA/C=IL@TEVANEW; CN=Philip Cohen/OU=NOW/O=TEVA/C=IL@TEVANEW; Philip Erickson; CN=Richard Willmunder/OU=IRV/O=TEVA/C=IL@TEVANEW; Ronen Elron; Sean Hamilton; CN=Shanna Knight/OU=NOW/O=TEVA/C=IL@TEVANEW; CN=Shanna Knight/OU=NOW/O=TEVA/C=IL@TEVANEW; Shosh Neumann; Shubha Chungi; Susan Irving (NOW); Timothy Crew; Tina Guilder; CN=Todd Salsbury/OU=KUL/O=TEVA/C=IL@TEVANEW; Yatindra Joshi; Yehudah Livneh; Yoram Fuchs |
| **Subject:** | BD for US Major Milestone Report - March 26, 2008 |
| **Attachments:** | 03-26-08 MMR BD for US.xls |

Good Afternoon:

Attached is the updated BD for US Major Milestone Report. This report replaces the one dated January 21, 2008.

The Major Milestone Report is confidential and should not be copied.

If you have any questions or comments, please let me know.

Andrew

Andrew Brimer
TEVA Pharmaceuticals USA
Sr. Project Manager, Alliance Management
Phone: (215) 591-8859
Fax: (215) 591-8811

**Exhibit 180**

Confidential

Teva-ESO-052307

**US / BD - Major Milestone Report**

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TA PI | Prefor m Start | | Dev. Start | | Pivotal Start | | Bio Start | | Sub. Date | | Early As Approval | | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carbamazepine Oral Solution 100 mg/ml by BD for US (Tegretol) | - | $7.17 / -14% | BD | US | PI | S / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Apr-05 | 32 | Dec-07 | 4 | Mar-08 | ASAP | ASAP |
| Cetirizine Dihydrochloride/Pseudoephedrine ER Tablets 5/120 mg by BD for US (Zyrtec D 12 hour) | B | $175.06 / -0% | BD | US | PIV FTF | S / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Jun-04 | 30 | Dec-06 | 16 | Mar-08 | ASAP | ASAP |
| Bupropion HCl ER Tablets 150 mg (Wellbutrin XL) by BD for US | B | $912.25 / 8% | BD | US | PIV NFTF | TA / ANCN | 0 | Nov-03 | 0 | Nov-03 | 6 | May-04 | 3 | Aug-04 | 3 | Nov-04 | 25 | Dec-06 | 16 | Apr-08 | ASAP | ASAP |
| Fentanyl Transdermal Patch 25 mcg - 50 mcg - 75 mcg - 100 mcg per 24 hours by BD for US (Duragesic) | .S | $1,237.32 / 2% | BD | US | PII | S / AVEV | 0 | - | 0 | - | 0 | - | 0 | Jul-04 | 8 | Mar-05 | 38 | Apr-08 | 0 | Apr-08 | ASAP | ASAP |
| Amphetamine Aspartate/Amphetamine Sulfate/Dextroamphetamine Saccharate/Dextroamphetamine Sulfate Tablets 5 mg - 10 mg - 20 mg - 30 mg by BD for US (Adderall) | - | $112.22 / -3% | BD | US | PII | S / OS | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 345 | May-08 | ASAP | ASAP |
| Desogestrel/Ethinyl Estradiol Tablets 0.15/0.03 mg (Desogen) by BD for US | B | $160.74 / -2% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-03 | 64 | May-08 | 0 | May-08 | ASAP | ASAP |
| Fluconazole Powder for Oral Suspension 10 mg/ml by BD for US (Diflucan) | A | $8.83 / -27% | BD | US | PII | S / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Jan-05 | 33 | Sep-07 | 8 | May-08 | ASAP | ASAP |
| Ethinyl Estradiol/Norethindrone Acetate/Ferrous fumarate Tablets 1/0.02 mg (Loestrin FE 1/20) by BD for US | B | $75.84 / 14% | BD | US | PII | FA / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Feb-04 | 15 | May-05 | 38 | Jun-08 | ASAP | ASAP |
| Desogestrel/Ethinyl Estradiol Tablets 0.15/0.03 mg (OrthoCept) by BD for US | B | $157.09 / -3% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-03 | 66 | Jul-08 | 0 | Jul-08 | ASAP | ASAP |
| Ethinyl Estradiol/Levonorgestrel Tablets 0.02/0.1 mg (Alesse-28) by BD for US | B | $115.51 / -17% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-04 | 52 | Jul-08 | 0 | Jul-08 | ASAP | ASAP |
| Ethinyl Estradiol/Levonorgestrel Tablets 0.03/0.05 mg - 0.03/0.125 mg - 0.04/0.075 mg (Triphasil 28) by BD for US | B | $73.00 / 19% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Dec-04 | 43 | Jul-08 | 0 | Jul-08 | ASAP | ASAP |
| Ethinyl Estradiol/Norethindrone Acetate/Ferrous fumarate Tablets 1.5/0.03 mg (Loestrin FE 1.5/30) by BD for US | B | $67.29 / 13% | BD | US | PII | FA / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Feb-04 | 14 | Apr-05 | 39 | Jul-08 | ASAP | ASAP |
| Ethinyl Estradiol/Norethindrone Tablets 0.035/0.5 mg - 0.035/.075 mg - 0.035/1 mg (Ortho-Novum 7/7/7) by BD for US | B | $67.46 / 16% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Apr-02 | 76 | Jul-08 | 0 | Jul-08 | ASAP | ASAP |
| Ethinyl Estradiol/Norethindrone Tablets 0.035/1 mg (Ortho Novum 1-35) by BD for US (Ortho-Novum 1-35) | B | $96.41 / 7% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Apr-02 | 76 | Jul-08 | 0 | Jul-08 | ASAP | ASAP |
| Desogestrel/Ethinyl Estradiol & Ethinyl Estradiol Tablets 0.15/0.02 & 0.01 mg (Mircette-28) by BD for US | - | $135.21 / 16% | BD | US | PIII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-03 | 68 | Oct-08 | 0 | Oct-08 | Oct-20-08 | ASAP |
| Ethinyl Estradiol/Norethindrone Tablets 0.035/0.4 mg (Ovcon 35) by BD for US | B | $48.72 / -45% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Jun-06 | 28 | Oct-08 | 0 | Oct-08 | ASAP | ASAP |

Teva-ESO-052308

**US / BD - Major Milestone Report**

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TAPI | Prefor m Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approval | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Omeprazole DR Capsules 40 mg by BD for US (Prilosec) | .S | $205.05 / 3% | BD | US | PIV NFTF | TA / IMPX | 0 | - | 0 - | 0 - | 0 - | 0 - | 0 Nov-02 | 73 Nov-08 | ASAP | ASAP |
| Esomeprazole Magnesium DR Capsules 20, 40 mg (Cipla) by BD for US (Nexium) | - | $5,468.1 8 / 6% | BD | US | PIV NFTF | A / CPLA | 0 | - | 0 - | 0 - | 0 - | Nov-05 | 41 Apr-09 | Apr-09 | ASAP | ASAP |
| Repaglinide Tablets 0.5, 1, 2 mg by BD for US (Prandin) | B | $163.60 / 5% | BD | US | viii | A / CPLA | 0 | - | 0 - | 0 Feb-08 | 1 Mar-08 | 4 Jun-08 | 13 Jul-09 | Jul-09 | Mar-14-09 w/o PED | ASAP |
| Enoxaparin Sodium Pre-filled Syringe 150 mg/ml - 100 mg/ml (0.3 - 0.4 - 0.6 - 0.8 - 1 ml) by BD for US (Lovenox) | .S | $2,357.5 5 / 12% | BD | US | PIV NFTF | S / ITF | 0 | - | 0 - | 0 Apr-03 | 77 Sep-09 | Sep-09 | ASAP | ASAP |
| Ethinyl Estradiol/Norgestimate Tablets 0.025/0.250, 0.025/0.180, 0.025/0.215 mg by BD for US (Ortho Tri-Cyclen-Lo) | A | $407.91 / 1% | BD | US | PIII* | A / PTN | 0 | - | 0 - | 0 Dec-07 | 4 Mar-08 | 4 Jul-08 | 18 Jan-10 | Jan-10 | ASAP | ASAP |
| Amphetamine Asparatate/Amphetamine Sulfate/Dextroamphetamine Saccharate/Dextroamphetamine Sulfate Tablets 7.5, 12.5, 15 mg (IR) (Specific Strengths) by BD for US (Adderall) | - | $8.65 / 1% | BD | US | PII | A / TS | 0 | - | 0 - | 0 May-08 | 0 - | 0 Sep-08 | 18 Mar-10 | Mar-10 | ASAP | ASAP |
| Metoprolol Succinate ER Tablets 50, 100, 200 mg by BD for US (Toprolol XL) | .S | $1,265.0 6 / -12% | BD | US | PIII | A / CPLA | 0 | - | 0 - | 0 Apr-08 | 1 May-08 | 4 Aug-08 | 24 Aug-10 | 0 Aug-10 | ASAP | ASAP |
| Progesterone Soft Gelatin Capsules 100, 200 mg by BD for US (Prometrium) | B | $121.43 / 6% | BD | US | PI | A / PII | 0 | - | 0 - | 0 - | 0 Aug-08 | 24 Aug-10 | 0 Aug-10 | ASAP | ASAP |
| Testosterone Topical Gel 2.5, 5, 150 (Pump) g by BD for US (Androgel) | A | $457.92 / 21% | BD | US | PIV NFTF | A / CPLA | 0 | Jul-07 | 1 Aug-07 | 8 Apr-08 | Apr-08 | 4 Aug-08 | 24 Aug-10 | Aug-10 | ASAP | ASAP |
| Drospirenone/Ethinyl Estradiol Tablets 3/0.02 mg by BD for US (Yaz) | - | $262.21 / 523% | BD | US | PIV NFTF | A / CPLA | 1 | Nov-07 | 3 Jan-08 | 1 Mar-08 | Apr-08 | 6 Oct-08 | 24 Sep-10 | Sep-10 | NP Oct-29-13 | ASAP |
| Drospirenone/Ethinyl Estradiol Tablets 3/0.03 mg by BD for US (Yasmin) | - | $571.96 / 3% | BD | US | PIV NFTF | A / CPLA | 0 | Nov-07 | 0 - | 0 May-08 | 1 Jun-08 | 3 Sep-08 | 24 Sep-10 | 0 Sep-10 | Oct-29-13 | ASAP |
| Ethinyl Estradiol/Norethindrone Acetate Tablets 0.02/1 mg by BD for US (Loestrin 24 FE) | B | $155.15 / 294% | BD | US | PIII | A / PTN | 0 | - | 0 - | 0 - | 0 - | 0 Dec-07 | 24 Dec-09 | 9 Sep-10 | NP Jul-22-14 | ASAP |
| Ethinyl Estradiol/Norgestrel Tablets 0.03/0.3 mg by BD for US (Lo/Ovral) | B | $108.50 / -9% | BD | US | PII | A / PTN | 0 | - | 0 - | 0 Jan-08 | 5 Jun-08 | 4 Oct-08 | 24 Oct-10 | Oct-10 | ASAP | ASAP |
| Diltiazem HCl ER Capsules 120, 180, 240, 300, 360, 420 mg by BD for US (Tiazac) | B | $115.58 / -28% | BD | US | PIV NFTF | A / CPCN | 0 | Dec-07 | 0 - | 0 May-08 | 3 Aug-08 | 4 Dec-08 | 24 Nov-10 | Nov-10 | ASAP | ASAP |
| Trandolapril/Verapamil HCl ER Tablets 1/240, 2/180, 2/240, 4/240 mg by BD for US (Tarka) | B | $98.46 / 5% | BD | US | PIII | A / CPLA | 0 | - | 0 - | 0 - | 0 - | 0 Nov-08 | 24 Nov-10 | 0 Nov-10 | Feb-24-15 | ASAP |

## US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TA PI | Preform Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approval | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Estradiol/Norethindrone Acetate Tablets 0.5/0.1, 1/0.5 mg by BD for US (Activella) | B | $56.97 / 0% | BD | US | PIII | A / PTN | 0 | -[0] | -[0] | Jul-08[4] | Nov-08[3] | Jan-09[24] | Jan-11[0] | Jan-11 | ASAP | ASAP |
| Escitalopram Oxalate Tablets 5 mg - 10 mg - 20 mg by BD for US (Lexapro) | - | $2,184.26 / 18% | BD | US | PIV FTF | FA / CPLA | 0 | -[0] | -[0] | Jun-03[36] | May-06[59] | - | - | Mar-11 | ASAP | ASAP |
| Fexofenadine HCl/Pseudoephedrine ER Tablets 180mg/240 mg (Once Daily) by BD for US (Allegra-D 24 Hour) | .S | $164.87 / 32% | BD | US | PIV NFTF | A / CPLA | 0 | Oct-07 | Nov-07[7] | Jun-08[18] | - | Dec-09[15] | - | Mar-11 | ASAP | ASAP |
| Exemestane Tablets 25 mg by BD for US (Aromasin) | B | $127.42 / 14% | BD | US | PIII | A / CPLA | 1 | Apr-07[3] | Jul-07[9] | Apr-08[1] | May-08[0] | Aug-08[24] | Aug-10[8] | Apr-11 | Apr-1-11 | Oct-21-04 |
| Ethinyl Estradiol/Levonorgestrel Tablets 0.03mg/0.15mg mg by BD for US (Nordette) | B | $72.82 / 3% | BD | US | PII | A / PTN | 0 | Nov-07[3] | Feb-08[0] | Mar-08[0] | Apr-08[5] | Aug-08[34] | May-11 | May-11 | ASAP | ASAP |
| Estradiol Transdermal Patch 25, 37.5, 50, 75, 100 mg/24hr (ER Film) by BD for US (Vivelle-DOT) | B | $144.66 / 12% | BD | US | PIV FTF? | A / AVEV | 0 | - | - | - | - | Apr-09[27] | Jul-11 | Jul-11 | ASAP | ASAP |
| Lidocaine Transdermal Patch 5 % by BD for US (Lidoderm) | A | $913.52 / 22% | BD | US | PIV FTF? | A / AVEV | 0 | - | - | - | - | Dec-08[24] | Dec-10[9] | Sep-11 | May-2-12 | ASAP |
| Fluticasone Furoate Nasal Suspension 0.0275 mcg/inh (Spray) by BD for US (Veramyst) | .S | $47.95 / 0% | BD | US | PIV FTF? | A / XEM | 0 | Oct-07[6] | Apr-08[12] | Apr-09 | May-09[6] | Nov-09[24] | Oct-11 | Oct-11 | ASAP | ASAP |
| Testosterone Topical Gel 1 % by BD for US (Testim) | B | $104.56 / 45% | BD | US | PIII* | A / CPLA | 0 | - | - | Nov-07[3] | Feb-08[13] | Feb-08[18] | Aug-10[15] | Nov-11 | ASAP | - |
| Candesartan Cilexetil/HCTZ Tablets 16/12.5, 32/12.5 mg by BD for US (Atacand HCT) | B | $105.19 / 4% | BD | US | PIV FTF? | A / CPLA | 1 | - | Dec-06[14] | Feb-08[1] | Mar-08[4] | Jul-08[24] | Jun-10[24] | Jun-12 | Jun-4-12 | ASAP |
| Fexofenadine HCl/Pseudoephedrine HCl ER Tablets 60/120 mg by BD for US (Allegra-D) | A | $340.16 / -7% | BD | US | PIV FTF | TA / IMPX | 0 | - | - | - | - | Dec-01[27] | Feb-04[102] | Jul-12 | ASAP | ASAP |
| Candesartan Cilexetil Tablets 16, 32 mg by BD for US (Atacand) | B | $200.73 / 4% | BD | US | PIV NFTF | A / CPLA | 1 | - | Nov-06[8] | Jul-07[1] | Aug-07[4] | Dec-07[18] | Jun-09[42] | Dec-12 | Jun-4-12 | ASAP |
| Tolterodine Tartrate Tablets 1 mg - 2 mg by BD for US (Detrol) | A | $61.95 / 15% | BD | US | PIV NFTF | S / | 0 | - | - | - | - | Dec-03[44] | Aug-07[68] | Mar-13 | Sep-25-12 | ASAP |
| Gadopentetate Dimeglumine Injection 46.9, 469.01, 469.01 mg/ml (Vial 100mL ), (Syringe ), (Vial ) by BD for US (Magnevist) | A | $198.17 / -1% | BD | US | PIV FTF? | A / CPLA | 0 | - | - | - | - | Jan-10[24] | Dec-11[22] | Oct-13 | Oct-1-13 | ASAP |
| Dutasteride Soft Gelatin Capsules 0.5 mg by BD for US (Avodart) | B | $361.90 / 47% | BD | US | PIII | A / CPLA | 0 | Jan-08 | Feb-08[2] | Apr-08[4] | - | Jul-10[24] | Nov-15[65] | Nov-15 | Nov-20-15 | Nov-20-06 |
| Lopinavir/Ritonavir Tablets 100/25, 200/50 mg by BD for US (Kaletra) | B | $565.30 / 6% | BD | US | PIV FTF | A / CPLA | 0 | - | - | - | - | Dec-08[24] | Dec-10[74] | Dec-16 | Dec-26-16 PED | ASAP |
| Amphotericin B for Injection 50 mg/vial (Liposomal) by BD for US (Ambisome) | B | $76.22 / 10% | BD | US | EIV* | I / OS | 0 | -[0] | -[0] | -[0] | - | -[0] | -[0] | - | ASAP | ASAP |
| Amphotericin B Lipid Complex Injection 5 mg/ml by BD for US (Abelcet) | B | $36.39 / 17% | BD | US | EIV* | I / OS | 0 | -[0] | -[0] | -[0] | - | -[0] | -[0] | - | ASAP | ASAP |

**CONFIDENTIAL DO NOT COPY**

## US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Targ et Mar ket | P.F.S | Status / Sub.T ype | TA PI | Prefor m Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approv al | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amphotericin B Lipid Complex Injection 50, 100 mg by BD for US (Amphotec) | C | $0.08 / - 15% | BD | US | EIV* | I / OS | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | ASAP | ASAP |
| Ampicillin Sodium/Sulbactam Sodium for Injection 1.5, 3, 15 g by BD for US (Unasyn) | A | $58.08 / - 22% | BD | US | EI | I / OS | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | ASAP | ASAP |
| Azelaic Acid Topical Gel 15 % by BD for US (Finacea Gel) | B | $46.14 / 13% | BD | US | PIV FTF? | I / OS | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | ASAP | ASAP |
| Aztreonam Injection 0.5, 1, 2 g by BD for US | - | - / 0% | BD | US | - | I / | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | - | - |
| Aztreonam Injection 1, 2 g by BD for US (Azactam) | - | $22.61 / 2% | BD | US | - | I / | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | - | - |
| Budesonide Nasal Suspension 32, 64 mcg (Metered Spray) by BD for US (Rhinocort Aqua) | - | $261.36 / -12% | BD | US | - | A / XEM | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | - | - |
| Busulfan Injection 6 mg/ml (Ampule 10mL ) by BD for US (Busulfex) | C | $22.63 / 14% | BD | US | PIII | I / OS | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | Mar-30-14 | ASAP |
| Calcium Carbonate/Risedronate Sodium Tablets 500/35 mg (Combo Pack) by BD for US (Actonel with Calcium) | .S | $21.42 / 47% | BD | US | TBD | I / OS | 1 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | ASAP | ASAP |
| Candesartan Cilexetil Tablets 4, 8 mg (Specific Strengths) by BD for US | - | - / 0% | BD | US | - | I / OS | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | Jun-4-12 | - |
| Capecitabine Tablets 150, 500 mg by BD for US (Xeloda) | A | $400.07 / 18% | BD | US | PIII | I / CPLA | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | Jan-13-11 | ASAP |
| Cefepime HCl Powder for Injection 0.5, 1, 2 g by BD for US (Maxipime) | A | $172.57 / -4% | BD | US | EII | I / OS | 1 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | ASAP | ASAP |
| Ceftazidime Sodium for Injection 1, 2, 6 g (Bulk V B),(LYO Vial S) by BD for US (Fortaz) | B | $27.64 / 23% | BD | US | EIII | I / OS | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | ASAP | ASAP |
| Chlorothiazide Sodium Injection 0.5 mg/vial by BD for US | | $33.93 / 36% | BD | US | PI | I / OS | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | - | - |
| Chlorpheniramine Polistirex/Codeine Polistirex Oral Suspension 4/20 mg/5ml by BD for US (Codeprex SR) | C | - / 0% | BD | US | PI | A / SPI | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | ASAP | ASAP |
| Chlorpheniramine Polistirex/Hydrocodone Polistirex ER Capsules 4/5, 8/10 mg by BD for US | - | - / 0% | BD | US | - | I / | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | - | - |
| Chlorpheniramine Polistirex/Hydrocodone Polistirex Oral Suspension 8/10 mg/5ml by BD for US (Tussionex Pennkinetic ER Suspension) | B | $175.16 / 3% | BD | US | PI | A / SPI | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | ASAP | ASAP |
| Cilastatin Sodium/Imipenem Powder for Injection 250/250, 500/500 mg by BD for US (Primaxin) | A | $181.82 / -1% | BD | US | EIII | I / OS | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | Non OB Sep-15-09 | ASAP |
| Cilastatin Sodium/Imipenem Powder for Injection 500mg/500 mg (PDR Vial S) by BD for US (Primaxin I.M.) | - | $2.70 / 6% | BD | US | - | I / | 0 | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | 0  - | Sep-15-09 | - |

**US / BD - Major Milestone Report**

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TA PI | Preform Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approval | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ciprofloxacin Powder for Oral Suspension 250, 500 mg/5 ml mg/5ml by BD for US | C | $9.51 / - 18% | BD | US | PIV FTF? | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Clavulanate Potassium/Ticarcillin Disodium Injection 3.1 g by BD for US (Timentin) | - | $3.86 / - 4% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | - | - |
| Clavulanate Potassium/Ticarcillin Disodium Injection 3.1, 31 g by BD for US (Timentin) | - | $10.62 / - 42% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | - | - |
| Clonidine ER Film Transdermal Patch 0.1, 0.2, 0.3 mg/24hr by BD for US (Catapres-TSS) | B | $273.58 / 5% | BD | US | PII | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Cyclophosphamide for Injection 100, 200, 500, 1000, 2000 mg/vial by BD for US | - | - / 0% | BD | US | - | I / OS | 0 | - | - | - | - | - | - | - | - | - |
| Desflurane Inhalation 99.9 % (Liquid) by BD for US (Suprane) | A | $205.23 / 1% | BD | US | PIV FTF? | A / CPLA | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Desogestrel/Ethinyl Estradiol Tablets 0.025/0.1 and 0.025/0.125 and 0.025mg/0.15 mg by BD for US (Cyclessa) | - | $17.11 / 21% | BD | US | - | I / OS | 0 | - | - | - | - | - | - | - | ASAP | - |
| Diclofenac Sodium/Misoprostol DR Tablets 50/0.2, 75/0.2 mg by BD for US (Arthrotec) | B | $159.44 / -10% | BD | US | PIV FTF? | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Dolasetron Mesylate Injection 20 mg/ml (Vial 25mL )(Monohydrate MDV) by BD for US (Anzemet) | - | $9.43 / - 27% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | Jul-2-11 | - |
| Dolasetron Mesylate Injection 20 mg/ml (Vial 5mL ),(Vial 0.625mL )(Monohydrate SDV) by BD for US (Anzemet) | - | $31.12 / - 60% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | Jul-2-11 | - |
| Dolasetron Mesylate Pre-Filled Syringe 12.5 mg/ml (Syringe 0.625 )(Monohydrate) by BD for US (Anzemet) | - | $1.65 / - 80% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | Jul-2-11 | - |
| Doripenem Injection 500 mg by BD for US (Doribax) | - | $0.20 / - 0% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | Oct-12-12 | - |
| Entacapone Tablets 200 mg by BD for US (Comtan) | B | $81.84 / 7% | BD | US | PIV NFTF | A / PSP | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Epinephrine Pre-Filled Syringe 0.15, 0.3 mg/syr (Syringe 2mL ) by BD for US (Epipen) | A | $183.83 / 17% | BD | US | PI | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Ertapenem Sodium Injection 1 g/vial by BD for US (Invanz) | A | $106.40 / 17% | BD | US | PIV FTF? | I / OS | 0 | - | - | - | - | - | - | - | May-21-16 PED | Nov-21-06 |
| Estradiol Acetate Tablets 0.45, 0.9, 1.8 mg by BD for US (Femtrace) | B | $4.93 / - 1% | BD | US | PI | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Estradiol Tablets 0.5, 1, 1.5, 2 mg by BD for US | - | - / 0% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | - | - |
| Estradiol Topical Gel 0.06 % by BD for US | - | - / 0% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | ASAP | - |
| Estradiol Vag Vaginal Tablets 25 mcg by BD for US (Vagifem) | - | $97.02 / 20% | BD | US | PI | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Estradiol Vaginal Cream 0.01 % by BD for US (Estrace) | - | $74.13 / 0% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | - | - |

CONFIDENTIAL DO NOT COPY
Teva-ESO-052308

# US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TAPI | Preform Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approval | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Estrogens Conjugated Synthetic A Tablets 0.3, 0.45, 0.625, 0.9, 1.25 mg by BD for US (Cenestin) | C | $44.73 / 9% | BD | US | PIV FTF? | A / EVUL | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Estrogens Conjugated Tablets 0.3, 0.45, 0.625, 0.9, 1.25, 2.5 mg by BD for US (Premarin) | A | $632.66 / -3% | BD | US | PIII | A / EVUL | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Estrogens Conjugated Topical Cream 0.625 mg by BD for US (Premarin) | B | $145.17 / 16% | BD | US | PIII | A / EVUL | 0 | - | - | - | - | - | - | - | Feb-1-12 | ASAP |
| Estrogens Conjugated/Medroxyprogesterone Acetate Tablets 0.3/1.5, 0.45/1.5, 0.625/2.5, 0.625/5 mg by BD for US (Prempro) | - | $228.84 / 4% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | Feb-26-12 | - |
| Ethinyl Estradiol/Etonogestrel Vaginal Ring Device 0.015/0.12 mg by BD for US (NuvaRing) | - | $250.93 / 32% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | ASAP | - |
| Ethinyl Estradiol/Levonorgestrel Tablets 0.03/0.15 mg by BD for US (Seasonale) | - | $98.46 / 5% | BD | US | PII | I / OS | 0 | - | - | - | - | - | - | - | ASAP | - |
| Ethinyl Estradiol/Levonorgestrel/Ethinyl Estradiol Tablets 0.03/0.15/0.01 mg by BD for US (Seasonique) | B | $37.55 / 238% | BD | US | PII | I / OS | 0 | - | - | - | - | - | - | - | NP Jan-30-24 | ASAP |
| Felodipine ER Tablets 2.5, 5, 10 mg by BD for US (Plendil) | - | $251.11 / 15% | BD | US | - | I / | 0 | - | - | - | - | - | - | - | ASAP | - |
| Fenofibrate Tablets 48, 145 mg by BD for US (Tricor) | .S | $1,382.88 / 12% | BD | US | PIV FTF? | A / CPLA | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Fentanyl Citrate Oral Lozenges 0.2, 0.4, 0.6, 0.8, 1.2, 1.6 mg (Troche Lozenge) by BD for US (Actiq) | A | $582.78 / -18% | BD | US | PII | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Fentanyl HCl Transdermal Patch 40 mcg by BD for US (Ionsys) | A | - / 0% | BD | US | TBD | I / OS | 0 | - | - | - | - | - | - | - | - | - |
| Fentanyl Transdermal Patch 12 mg/hr (Line Extension) by BD for US (Duragesic) | .S | $35.27 / 69% | BD | US | PII | I / TS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Frovatriptan Succinate Tablets 2.5 mg by BD for US (Frova) | - | $60.00 / 13% | BD | US | - | I / OS | 0 | - | - | - | - | - | - | - | Nov-7-15 | - |
| Gadodiamide Injection 287 mg/ml by BD for US (Omniscan) | A | $125.85 / -32% | BD | US | PIII | A / CPLA | 0 | - | - | - | - | - | - | - | Nov-8-11 | ASAP |
| Gadoteridol Injection 279.3 mg/ml by BD for US (Prohance) | B | $23.04 / 2% | BD | US | PIV FTF? | A / CPLA | 0 | - | - | - | - | - | - | - | Dec-12-12 | ASAP |
| Gadoversetamide Injection 330.0, 330.9 mg/ml (Syringe ),(Vial S) by BD for US (Optimark) | B | $42.00 / 1% | BD | US | PIII | A / CPLA | 0 | - | - | - | - | - | - | - | Jul-14-09 | ASAP |
| Goserelin Acetate Injection 10.8 mg (12 week-IMPL) by BD for US (Zoladex) | B | $87.62 / 15% | BD | US | PIV FTF? | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Goserelin Acetate Injection 3.6 mg (4 week- IMPL) by BD for US (Zoladex) | B | $12.59 / 6% | BD | US | PIV FTF? | I / OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |

## US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TAPI | Preform Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approval | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Griseofulvin, Microcrystalline Susp Oral Suspension 125mg/5ml by BD for US | - | - / 0% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | - | - |
| Ibutilide Fumarate Injection 0.1 mg/ml by BD for US (Corvert) | B | $13.14 / 20% | BD | US | PIII | I/OS | 0 | - | - | - | - | - | - | - | Dec-28-09 | - |
| Iron Dextran Injection 50 mg/ml (MDV) by BD for US (Infed) | C | $10.26 / 12% | BD | US | PII | I/ EMCR | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Iron Dextran Injection 50 mg/ml by BD for US (Dexferrum) | C | $36.55 / 1% | BD | US | PII | I/OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Lenalidomide Capsules 5, 10, 15, 25 mg by BD for US (Revlimid) | B+ | $172.62 / 236% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | Jul-24-16 | - |
| Levetiracetam Injection 100 mg/ml by BD for US (Keppra) | B | $32.03 / 511% | BD | US | PIII | I/OS | 0 | - | - | - | - | - | - | - | Jul-31-09 | ASAP |
| Levonorgestrel Device 52 mg (intrauterine device) by BD for US (Mirena) | - | $268.34 / 48% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | ASAP | - |
| Linezolid Injection 2 mg/ml by BD for US (Zyvox) | - | $229.66 / 17% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | May-18-15 | - |
| Lubiprostone Soft Gelatin Capsules 8, 24 mcg by BD for US (Amitiza ) | B | - / 0% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | Sep-5-20 | - |
| Meropenem Powder for Injection 500, 1000 mg by BD for US (Merrem) | A | $158.77 / 32% | BD | US | EIII | I/OS | 0 | - | - | - | - | - | - | - | Non OB Jun-21-10 | ASAP |
| Mesalamine Suppositories 500, 1000 mg by BD for US (Canasa) | B | $72.30 / 11% | BD | US | PI | I/OS | 0 | - | - | - | - | - | - | - | ASAP | - |
| Metoprolol Succinate ER Tablets 25 mg (Specific Strengths) by BD for US (Toprol XL) | - | $246.48 / -24% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | ASAP | - |
| Metoprolol Succinate/HCTZ ER Tablets 25/12.5, 50/12.5, 100/12.5 mg by BD for US (Dutoprol) | A | - / 0% | BD | US | TBD | I/OS | 0 | - | - | - | - | - | - | - | Aug-28-09 | - |
| Morphine Sulfate Injection 10 mg/ml (Vial 1mL S),(Vial 1.5mL S),(Vial 2mL S)(Liposome) by BD for US (DepoDur) | B | $3.16 / - 32% | BD | US | PIV* | I/OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Naltrexone Injection 380 mg by BD for US (Vivitrol) | B | $6.56 / 513701 % | BD | US | - | I/OS | 0 | - | - | - | - | - | - | - | TBD | ASAP |
| Niacin ER Tablets 500, 750, 1000 mg by BD for US (Niaspan) | A | $744.87 / 16% | BD | US | PIV NFTF | I/OS | 0 | - | - | - | - | - | - | - | ASAP | ASAP |
| Nisoldipine ER Tablets 10, 20, 30, 40 mg by BD for US (Sular) | B+ | $127.04 / 30% | BD | US | PIII | I/OS | 0 | - | - | - | - | - | - | - | Jun-8-08 | ASAP |
| Nisoldipine ER Tablets 8.5, 17, 25.5, 34 mg by BD for US | - | - / 0% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | Jun-8-08 | - |
| Norethindrone Tablets 0.35 mg by BD for US (Miconor-28) | - | $49.40 / 6% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | - | - |
| Norethindrone Tablets 0.35 mg by BD for US (Nor-QD) | - | $53.11 / 0% | BD | US | - | I/ | 0 | - | - | - | - | - | - | - | - | - |

**CONFIDENTIAL - DO NOT COPY**

Teva-ESO-052308

## US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TA PI | Preform Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approval | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Octreotide Acetate ER Powder for Injection 10, 20, 30 mg (LAR) by BD for US (Sandostatin LAR) | B | $408.47 / 12% | BD | US | PIV FTF? | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Oxandrolone Tablets 2.5, 10 mg by BD for US (Oxandrin) | B | $46.60 / 8% | BD | US | PIV NFTF | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Oxybutynin Chloride Transdermal Patch 2.6, 3.9 mg/24hr by BD for US (Oxytrol) | C | $39.96 / 8% | BD | US | PIV FTF? | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Paclitaxel for Injection 100 mg (Albumin-Bound) by BD for US | - | - / 0% | BD | US | - | I / | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | - |
| Paclitaxel Injection 6 mg/ml (Vial 5mL ),(Vial 25mL ),(Vial 50mL ),(Vial 16.7mL ) by BD for US (Taxol) | B | $94.87 / 17% | BD | US | PI | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Paroxetine HCl ER Tablets 12.5, 25 , 37.5 mg by BD for US (Paxil CR) | - | $315.14 / -12% | BD | US | - | I / | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | - |
| Pentostatin for Injection 10 m/vial mg by BD for US (Nipent) | B | $20.08 / 1% | BD | US | PII | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Phytonadione Injection 2, 10 mg/ml by BD for US (Vitamin K1) | B | $20.03 / 4% | BD | US | PII | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Piperacillin Sodium/Tazobactam Sodium Injection 2/0.25, 3/0.375, 4/0.5 g (Bag 50mL ) by BD for US (Zosyn) | B | $332.06 / 6% | BD | US | EIV | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Piperacillin Sodium/Tazobactam Sodium Powder for Injection 2/0.25, 3/0.375, 4/0.5, 36/4.5 g by BD for US (Zosyn) | B | $302.66 / 46% | BD | US | PII | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Pirbuterol Acetate Metered Dose Inhalation Aerosol 0.2 mg/inh (CFC) by BD for US | - | - / 0% | BD | US | - | I / | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | - | - |
| Propafenone HCl ER Capsules 225 , 325 , 425 mg by BD for US (Rhythmol SR) | B | $100.78 / 35% | BD | US | PIV NFTF | A / PSP | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Propranolol HCl ER Capsules 80, 120 mg by BD for US (Innopran XL) | C | $17.74 / 16% | BD | US | PIV FTF? | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Rivastigmine Transdermal Patch 4.6, 9.5 mg/24hr (Once-daily) by BD for US (Exelon) | B | $14.79 / 0% | BD | US | - | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | - |
| Rotigotine Transdermal Patch 2, 4, 6 mg/24hr (CDS) by BD for US (Nupro) | B | $12.51 / 0% | BD | US | - | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | May-9-12 | - |
| Sevoflurane Solution for Inhalation 100 % by BD for US (Ultane) | A | $292.25 / -9% | BD | US | PIV NFTF | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Sodium Hyaluronate Pre-filled Syringe 8 mg/ml by BD for US (Synvisc) | - | $78.46 / 59% | BD | US | - | I / | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | - | - |

# CONFIDENTIAL - DO NOT COPY

## US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TA PI | Prefor m Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approval | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tazarotene Topical Cream 0.05, 0.1 % by BD for US (Tazorac) | B | $69.70 / 10% | BD | US | PIII | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | Jun-13-11 | ASAP |
| Teriparatide Pre-Filled Syringe 250 mcg/ml (Recombinant Human) by BD for US (Forteo) | .S | $553.46 / 8% | BD | US | PIV FTF? | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | Dec-8-18 | ASAP |
| Thalidomide Capsules 50, 100, 150, 200 mg by BD for US (Thalomid) | A | $402.84 / -3% | BD | US | PIV NFTF | A / EXCL | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Tolterodine Tartrate ER Capsules 2, 4 mg by BD for US (Detrol LA) | .S | $836.23 / 5% | BD | US | PIV FTF? | A / CPLA | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Vorinostat Capsules 100 mg by BD for US (Zolinza) | A | $11.05 / 695% | BD | US | PIII | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ODE Oct-6-13 | Oct-6-11 |
| Zolpidem Tartrate ER Tablets 6.25, 12.5 mg by BD for US (Ambien CR) | .S | $932.77 / 58% | BD | US | PIV* | I / OS | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | Mar-2-09 | - |

Key:

| Status | Priority | Partner | |
|---|---|---|---|
| A = Active | A = High | ADX = Andrx | FERR = Ferring |
| I = Inactive | B = Medium | ANCN = Anchen | IMPX = Impax |
| S = Submitted | C = Low | AVEV = Aveva | INTS = Intas |
| | S = Strategic | BIO = Biovail | ITF = Italfarmaco |
| | | BIOS = BioSante | PII = Pharmaceutics International Inc |
| | | CPCN = Capricorn | PTN = Patheon |
| | | CPLA = Cipla | PSP = Pharmaceutical Sourcing Partner, Inc |
| | | CPS = Catalent Pharma Solutions | RUB = Rubicon |
| | | EMCR = Emcure | SPI |
| | | EVUL = Evultis | SNRX = Synrex |
| | | EXCL = Excela | XEM = Xemplar |

| | |
|---|---|
| From: | Deborah Griffin |
| Sent: | Tuesday, May 27, 2008 12:15:58 PM |
| To: | Felicia Ladin; Jamie Berlanska |
| Subject: | Fw: BD for US Major Milestone Report - May 26, 2008 |

Attachments:      05-26-08 MMR BD for US.xls

Deborah Griffin
Vice President and Chief Financial Officer
Teva Pharmaceuticals USA

Phone: 215-591-8712
Fax: 215-591-8807
------ Forwarded by Deborah Griffin/NOW/TEVA/IL on 05/27/2008 08:13 AM ------

>           Andrew
>           Brimer/NOW/TEVA/IL        To   Alan Whitworth/LON/TEVA/IL@TEVANEW, Alisa Capreri/KUL/TEVA/IL@TEVANEW, Andrea
>                                          Guardia/FRF/TEVA/IL@TEVANEW, Anne Payne/MON/TEVA/IL@TEVANEW, Asaf
>           05/26/2008 11:31 PM            Reshef/MIJ/TEVA/IL@TEVANEW, Ayne Klein/NOW/TEVA/IL@TEVANEW, Beth
>                                          Sturtevant/NOW/TEVA/IL@TEVANEW, Bill Hobart/SEL/TEVA/IL@TEVANEW, Birdella
>                                          Kenney/NOW/TEVA/IL@TEVANEW, Chris Pelloni/SEL/TEVA/IL@TEVANEW, Craig
>                                          Lea/IRV/TEVA/IL@TEVANEW, Debbie Hoenscheid/KUL/TEVA/IL@TEVANEW, Debbie
>                                          Jaskot/KUL/TEVA/IL@TEVANEW, Deborah Griffin/NOW/TEVA/IL@TEVANEW, Diana
>                                          Landa/NOW/TEVA/IL@TEVANEW, Dolores Stolzer/KUL/TEVA/IL@TEVANEW, Edward
>                                          Trauffer/NOW/TEVA/IL@TEVANEW, Elaine Rydberg/MON/TEVA/IL@TEVANEW, Elizabeth
>                                          Guevara/MIA/TEVA/IL, Emily Tiemann/KUL/TEVA/IL@TEVANEW, Evjatar
>                                          Cohen/NOW/TEVA/IL@TEVANEW, George Morabito/FRF/TEVA/IL@TEVANEW, Gregg
>                                          DeRosa/KUL/TEVA/IL@TEVANEW, Hanh Seckner/IRV/TEVA/IL@TEVANEW, Jennifer
>                                          King/NOW/TEVA/IL@TEVANEW, Jill Pastore/KUL/TEVA/IL@TEVANEW, John
>                                          Blanke/MON/TEVA/IL@TEVANEW, John Derstine/KUL/TEVA/IL@TEVANEW, John
>                                          James/SEL/TEVA/IL@TEVANEW, John McCafferty/NOW/TEVA/IL@TEVANEW, Karen
>                                          Feldtmose/NOW/TEVA/IL@TEVANEW, Karen Loberg/IRV/TEVA/IL@TEVANEW, Ken
>                                          Lavin/SEL/TEVA/IL@TEVANEW, Kendy Merritt/NOW/TEVA/IL@TEVANEW, Kirsten
>                                          Bauer/KUL/TEVA/IL@TEVANEW, Lance Kann/NOW/TEVA/IL@TEVANEW, Lori
>                                          Chan/NOW/TEVA/IL@TEVANEW, Mahesh Chudasama/FRF/TEVA/IL@TEVANEW, Marc
>                                          Goshko/KUL/TEVA/IL@TEVANEW, Margaret Wrigley/NOW/TEVA/IL@TEVANEW, Mark
>                                          Rienstra/NOW/TEVA/IL@TEVANEW, Maureen Cavanaugh/NOW/TEVA/IL@TEVANEW, Mike
>                                          Ferrigno/FRF/TEVA/IL@TEVANEW, Mike Teiler/PTG/TEVA/IL@TEVANEW, Paul
>                                          Fackler/KUL/TEVA/IL@TEVANEW, Philip Cohen/NOW/TEVA/IL@TEVANEW, Philip
>                                          Erickson/KUL/TEVA/IL@TEVANEW, Richard Willmunder/IRV/TEVA/IL@TEVANEW, Ronen
>                                          Elron/HAC/TEVA/IL@TEVANEW, Sean Hamilton/NOW/TEVA/IL@TEVANEW, Shosh
>                                          Neumann/PTG/TEVA/IL@TEVANEW, Shubha Chungi/SEL/TEVA/IL@TEVANEW, Susan
>                                          Irving/SEL/TEVA/IL@TEVANEW, Tim Crew/NOW/TEVA/IL@TEVANEW, Tina
>                                          Guilder/NOW/TEVA/IL@TEVANEW, Todd Salsbury/KUL/TEVA/IL@TEVANEW, Wayne
>                                          Cagno/SEL/TEVA/IL@TEVANEW, Yatindra Joshi/NOW/TEVA/IL@TEVANEW, Yehudah
>                                          Livneh/PTV/TEVA/IL@TEVANEW, Yoram Fuchs/PTV/TEVA/IL@TEVANEW
>                                     cc
>                                Subject   BD for US Major Milestone Report - May 26, 2008

Good Evening,

Attached is the updated BD for US Major Milestone Report.  This report replaces the one dated March 26, 2008.

The Major Milestone Report is confidential and should not be copied.

If you have any questions or comments, please let me know.

Andrew

Andrew Brimer
TEVA Pharmaceuticals USA
Sr. Project Manager, Alliance Management
Phone:  (215) 591-8859
Fax:  (215) 591-8811

**Exhibit 181**

Teva-ESO-039230

# CONFIDENTIAL – DO NOT COPY

## US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TAPI | Preform Start | | Dev. Start | | Pivotal Start | | Bio Start | | Sub. Date | | Early As Approval | | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bupropion HCl ER Tablets 150 mg (Wellbutrin XL) by BD for US | B | $912.25 / 8% | BD | US | PIV NFTF | FA / ANCN | 0 | Nov-03 | 0 | Nov-03 | 6 | May-04 | 3 | Aug-04 | 3 | Nov-04 | 25 | Dec-06 | 18 | May-08 | ASAP | ASAP |
| Carbamazepine Oral Solution 100 mg/ml by BD for US (Tegretol) | - | $7.17 / - 14% | BD | US | PI | S / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Apr-05 | 32 | Dec-07 | 6 | May-08 | ASAP | ASAP |
| Fluconazole Powder for Oral Suspension 10 mg/ml by BD for US (Diflucan) | A | $8.83 / - 27% | BD | US | PII | S / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Jan-05 | 33 | Sep-07 | 9 | Jun-08 | ASAP | ASAP |
| Ethinyl Estradiol/Norethindrone Acetate/Ferrous fumarate Tablets 1.5/0.03 mg (Loestrin FE 1.5/30) by BD for US | B | $67.29 / 13% | BD | US | PII | FA / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Feb-04 | 14 | Apr-05 | 39 | Jul-08 | ASAP | ASAP |
| Ethinyl Estradiol/Norethindrone Acetate/Ferrous fumarate Tablets 1/0.02 mg (Loestrin FE 1/20) by BD for US | B | $75.84 / - 14% | BD | US | PII | FA / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Feb-04 | 54 | Aug-08 | 0 | Aug-08 | ASAP | ASAP |
| Desogestrel/Ethinyl Estradiol Tablets 0.15/0.03 mg (Desogen) by BD for US | B | $160.74 / -2% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-03 | 68 | Sep-08 | 0 | Sep-08 | ASAP | ASAP |
| Desogestrel/Ethinyl Estradiol Tablets 0.15/0.03 mg (OrthoCept) by BD for US | B | $157.09 / -3% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-03 | 68 | Sep-08 | 0 | Sep-08 | ASAP | ASAP |
| Ethinyl Estradiol/Norethindrone Tablets 0.035/0.5 mg - 0.035/.075 mg - 0.035/1 mg (Ortho-Novum 7/7/7) by BD for US | B | $67.46 / 16% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Apr-02 | 78 | Sep-08 | 0 | Sep-08 | ASAP | ASAP |
| Ethinyl Estradiol/Norethindrone Tablets 0.035/1 mg (Ortho Novum 1-35) by BD for US (Ortho-Novum 1-35) | B | $96.41 / - 7% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Apr-02 | 78 | Sep-08 | 0 | Sep-08 | ASAP | ASAP |
| Ethinyl Estradiol/Levonorgestrel Tablets 0.03/0.05 mg - 0.03/0.125 mg - 0.04/0.075 mg (Triphasil 28) by BD for US | B | $73.00 / 19% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Dec-04 | 47 | Nov-08 | 0 | Nov-08 | ASAP | ASAP |
| Omeprazole DR Capsules 40 mg by BD for US (Prilosec) | .S | $205.05 / 3% | BD | US | PIV NFTF | TA / IMPX | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Nov-02 | 73 | Nov-08 | ASAP | ASAP |
| Ethinyl Estradiol/Levonorgestrel Tablets 0.02/0.1 mg (Alesse-28) by BD for US | B | $115.51 / -17% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-04 | 57 | Dec-08 | 0 | Dec-08 | ASAP | ASAP |
| Fentanyl Transdermal Patch 25 mcg - 50 mcg - 75 mcg - 100 mcg per 24 hours by BD for US (Duragesic) | .S | $1,237.32 / 2% | BD | US | PII | S / AVEV | 0 | - | 0 | - | 0 | - | Jul-04 | 8 | Mar-05 | 45 | Dec-08 | 0 | Dec-08 | ASAP | ASAP |
| Desogestrel/Ethinyl Estradiol & Ethinyl Estradiol Tablets 0.15/0.02 & 0.01 mg (Mircette-28) by BD for US | - | $135.21 / 16% | BD | US | PIII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-03 | 73 | Mar-09 | 0 | Mar-09 | Oct-20-08 | ASAP |
| Ethinyl Estradiol/Norethindrone Tablets 0.035/0.4 mg (Ovcon 35) by BD for US | B | $48.72 / 45% | BD | US | PII | S / PTN | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Jun-06 | 33 | Mar-09 | 0 | Mar-09 | ASAP | ASAP |
| Enoxaparin Sodium Pre-filled Syringe 150 mg/ml - 100 mg/ml (0.3 - 0.4 - 0.6 - 0.8 - 1 ml) by BD for US (Lovenox) | .S | $2,357.55 / 12% | BD | US | PIV NFTF | S / ITF | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Apr-03 | 77 | Sep-09 | 0 | Sep-09 | ASAP | ASAP |

CONFIDENTIAL – DO NOT COPY

Teva-ESO-039230

## US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Targ et Mar ket | P.F.S | Status / Sub.T ype | TA PI | Prefor m Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approv al | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ethinyl Estradiol/Norgestimate Tablets 0.025/0.250, 0.025/0.180, 0.025/0.215 mg by BD for US (Ortho Tri-Cyclen-Lo) | A | $407.91 / 1% | BD | US | PIII* | A / PTN | 0 | Dec-07 [4] | - [0] | Mar-08 [5] | - | Aug-08 [18] | Feb-10 [0] | Feb-10 | ASAP | ASAP |
| Repaglinide Tablets 0.5, 1, 2 mg by BD for US (Prandin) | B | $163.60 / 5% | BD | US | viii | A / CPLA | 0 | Sep-08 [0] | Sep-08 [6] | Mar-09 [13] | - | Apr-10 [0] | Apr-10 | Mar-14-09 w/o PED | ASAP |
| Testosterone Topical Gel 2.5, 5, 150 (Pump) g by BD for US (Androgel) | A | $457.92 / 21% | BD | US | PIV NFTF | A / CPLA-BIOS | 0 | Jul-07 [1] | Aug-07 [8] | Apr-08 [0] | Apr-08 | Aug-10 [24] | Aug-10 [0] | Aug-10 | ASAP | ASAP |
| Diltiazem HCl ER Capsules 120, 180, 240, 300, 360, 420 mg by BD for US (Tiazac) | B | $115.58 / -28% | BD | US | PIV NFTF | A / CPCN | 1 | Dec-07 [0] | - [0] | May-08 [3] | Aug-08 [4] | Dec-08 [24] | Nov-10 [0] | Nov-10 | ASAP | ASAP |
| Gadodiamide Injection 287 mg/ml by BD for US (Omniscan) | A | $125.85 / -32% | BD | US | PIII | A / CPLA | 0 | Jul-08 [0] | - [0] | Jul-08 [0] | - | Dec-08 [24] | Nov-10 [0] | Nov-10 | Nov-8-11 | ASAP |
| Gadopentetate Dimeglumine Injection 46.9, 469.01, 469.01 mg/ml (Vial 100mL ), (Syringe ), (Vial ) by BD for US (Magnevist) | A | $198.17 / -1% | BD | US | PIV FTF? | A / CPLA | 0 | Jul-08 [0] | - [0] | Jul-08 [0] | - | Dec-08 [24] | Nov-10 [0] | Nov-10 | Oct-1-13 | ASAP |
| Ethinyl Estradiol/Norgestrel Tablets 0.03/0.3 mg by BD for US (Lo/Ovral) | B | $108.50 / -9% | BD | US | PII | A / PTN | 0 | - [0] | - [0] | Aug-08 [2] | Oct-08 [4] | Feb-09 [24] | Jan-11 [0] | Jan-11 | ASAP | ASAP |
| Metoprolol Succinate ER Tablets 50, 100, 200 mg by BD for US (Toprolol XL) | .S | $1,265.0 6 / -12% | BD | US | PIII | A / CPLA | 0 | Oct-08 [1] | Nov-08 [4] | Mar-09 [24] | Feb-11 [0] | Feb-11 | | ASAP | ASAP |
| Drospirenone/Ethinyl Estradiol Tablets 3/0.03 mg by BD for US (Yasmin) | A | $571.96 / 3% | BD | US | PIV NFTF | A / CPLA | 0 | Nov-07 [0] | - [0] | May-08 [1] | Jun-08 [10] | Apr-09 [24] | Mar-11 [0] | Mar-11 | Oct-29-13 | ASAP |
| Drospirenone/Ethinyl Estradiol Tablets 3/0.02 mg by BD for US (Yaz) | A | $262.21 / 523% | BD | US | PIV NFTF | A / CPLA | 1 | Nov-07 [0] | Jan-08 [1] | Mar-08 [1] | Apr-08 [13] | May-09 [24] | Apr-11 [0] | Apr-11 | NP Oct-29-13 | ASAP |
| Estradiol/Norethindrone Acetate Tablets 0.5/0.1, 1/0.5 mg by BD for US (Activella) | A | $56.97 / 0% | BD | US | PIII | A / PTN | 0 | - [0] | - [0] | Oct-08 [3] | Dec-08 [4] | Apr-09 [24] | Apr-11 [0] | Apr-11 | ASAP | ASAP |
| Exemestane Tablets 25 mg by BD for US (Aromasin) | B | $127.42 / 14% | BD | US | PIII | A / CPLA | 1 | Apr-07 [3] | Jul-07 [9] | Apr-08 [1] | May-08 [7] | Dec-08 [24] | Dec-10 [4] | Apr-11 | Apr-1-11 | Oct-21-04 |
| Thalidomide Capsules 50, 100, 150, 200 mg by BD for US (Thalomid) | A | $402.84 / -3% | BD | US | PIV NFTF | A / EXCL | 0 | - [0] | - [0] | - [0] | May-09 [24] | Apr-11 [0] | Apr-11 | ASAP | ASAP |
| Trandolapril/Verapamil HCl ER Tablets 1/240, 2/180, 2/240, 4/240 mg by BD for US (Tarka) | B | $98.46 / 5% | BD | US | PIII | A / CPLA | 0 | - [0] | - [0] | - [0] | May-09 [24] | Apr-11 [0] | Apr-11 | Feb-24-15 | ASAP |
| Progesterone Soft Gelatin Capsules 100, 200 mg by BD for US (Prometrium) | B | $121.43 / 6% | BD | US | PI | A / PII | 0 | - [0] | - [0] | - [0] | Jun-09 [24] | May-11 [0] | May-11 | ASAP | ASAP |
| Fexofenadine HCl/Pseudoephedrine ER Tablets 180mg/240 mg (Once Daily) by BD for US (Allegra-D 24 Hour) | .S | $164.87 / 32% | BD | US | PIV NFTF | A / CPLA | 0 | - [0] | - [0] | May-08 [1] | May-08 [5] | Oct-08 [18] | Apr-10 [15] | Jul-11 | ASAP | ASAP |
| Estradiol Transdermal Patch 25, 37.5, 50, 75, 100 mg/24hr (ER Film) by BD for US (Vivelle-DOT) | B | $144.66 / 12% | BD | US | PIV FTF? | A / AVEV | 0 | - [0] | - [0] | - [0] | Mar-09 [29] | Aug-11 [0] | Aug-11 | ASAP | ASAP |

# US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TA PI | Prefor m Start | | Dev. Start | | Pivotal Start | | Bio Start | | Sub. Date | | Early As Approval | | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capecitabine Tablets 150, 500 mg by BD for US (Xeloda) | A | $400.07 / 18% | BD | US | PIII | A / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Oct-09 | 24 | Sep-11 | 0 | Sep-11 | Jan-13-11 | ASAP |
| Testosterone Topical Gel 1 % by BD for US (Testim) | B | $104.56 / 45% | BD | US | PIII* | A / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Mar-09 | 18 | Aug-10 | 15 | Nov-11 | ASAP | - |
| Ethinyl Estradiol/Levonorgestrel Tablets 0.03mg/0.15mg mg by BD for US (Nordette) | B | $72.82 / 3% | BD | US | PII | A / PTN | 0 | Nov-07 | 3 | Feb-08 | 1 | Apr-08 | 6 | Oct-08 | 5 | Feb-09 | 34 | Dec-11 | 0 | Dec-11 | ASAP | ASAP |
| Fluticasone Furoate Nasal Suspension 0.0275 mcg/inh (Spray) by BD for US (Veramyst) | .S | $47.95 / 0% | BD | US | PIV FTF? | A / XEM | 1 | Oct-07 | 9 | Jul-08 | 12 | Jun-09 | 1 | Jul-09 | 6 | Jan-10 | 24 | Jan-12 | 0 | Jan-12 | ASAP | ASAP |
| Lidocaine Transdermal Patch 5 % by BD for US (Lidoderm) | B | $913.52 / 22% | BD | US | PIV FTF? | A / AVEV | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Jun-09 | 24 | May-11 | 9 | Feb-12 | May-2-12 | ASAP |
| Escitalopram Oxalate Tablets 5 mg - 10 mg - 20 mg by BD for US (Lexapro) | - | $2,184.26 / 18% | BD | US | PIV FTF | FA / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | Jun-03 | 36 | May-06 | 71 | Mar-12 | ASAP | ASAP |
| Candesartan Cilexetil/HCTZ Tablets 16/12.5, 32/12.5 mg by BD for US (Atacand HCT) | B | $105.19 / 4% | BD | US | PIV FTF? | A / CPLA | 1 | - | 0 | Dec-06 | 14 | Feb-08 | 3 | May-08 | 4 | Sep-08 | 24 | Aug-10 | 21 | Jun-12 | Jun-4-12 | ASAP |
| Fexofenadine HCl/Pseudoephedrine HCl ER Tablets 60/120 mg by BD for US (Allegra-D) | A | $340.16 / -7% | BD | US | PIV FTF | TA / IMPX | 0 | - | 0 | - | 0 | Dec-01 | 27 | Feb-04 | 102 | Jul-12 | | | | | | ASAP | ASAP |
| Candesartan Cilexetil Tablets 16, 32 mg by BD for US (Atacand) | B | $200.73 / 4% | BD | US | PIV NFTF | A / CPLA | 1 | - | 0 | Nov-06 | 8 | Jul-07 | 1 | Aug-07 | 4 | Dec-07 | 18 | Jun-09 | 42 | Dec-12 | Jun-4-12 | ASAP |
| Tolterodine Tartrate Tablets 1 mg - 2 mg by BD for US (Detrol) | A | $61.95 / 15% | BD | US | PIV NFTF | S / CPLA | 0 | - | 0 | - | 0 | - | 0 | Dec-03 | 44 | Aug-07 | 68 | Mar-13 | | | Sep-25-12 | ASAP |
| Ethinyl Estradiol/Norethindrone Acetate Tablets 0.02/1 mg by BD for US (Loestrin 24 FE) | B | $155.15 / 294% | BD | US | PIII | A / PTN | 0 | - | 0 | - | 0 | - | 0 | Dec-07 | 24 | Dec-09 | 56 | | | Jul-14 | NP Jul-22-14 | ASAP |
| Esomeprazole Magnesium DR Capsules 20, 40 mg (Cipla) by BD for US (Nexium) | B | $5,468.18 / 6% | BD | US | PIV NFTF | A / CPLA | 0 | - | 0 | - | 0 | - | 0 | Nov-05 | 41 | Apr-09 | 69 | | | Nov-14 | ASAP | ASAP |
| Budesonide Nasal Suspension 32, 64 mcg (Metered Spray) by BD for US (Rhinocort Aqua) | - | $261.36 / -12% | BD | US | - | A / XEM | 1 | Jan-08 | 0 | - | 0 | Oct-08 | 8 | Jun-09 | 18 | Nov-10 | 24 | Nov-12 | 29 | Apr-15 | - | - |
| Dutasteride Soft Gelatin Capsules 0.5 mg by BD for US (Avodart) | B | $361.90 / 47% | BD | US | PIII | A / CPLA | 0 | Jan-08 | 0 | - | 0 | Feb-08 | 2 | Apr-08 | 7 | Nov-08 | 24 | Oct-10 | 62 | Nov-15 | Nov-20-15 | Nov-20-06 |
| Chlorpheniramine Polistirex/Hydrocodone Polistirex Oral Suspension 8/10 mg/5ml by BD for US (Tussionex Pennkinetic ER Suspension) | B | $175.16 / 3% | BD | US | PI | A / NORT | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 0 | | ASAP | ASAP |
| Desflurane Inhalation 99.9 % (Liquid) by BD for US (Suprane) | A | $205.23 / 1% | BD | US | PIV FTF? | A / CPLA | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | ASAP | ASAP |
| Estrogens Conjugated Synthetic A Tablets 0.3, 0.45, 0.625, 0.9, 1.25 mg by BD for US (Cenestin) | C | $44.73 / 9% | BD | US | PIV FTF? | A / EVUL | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | ASAP | ASAP |

# CONFIDENTIAL – DO NOT COPY
## US / BD - Major Milestone Report

| Project Name | Pri | Brand Sales (M$) / % | Dev Site | Target Market | P.F.S | Status / Sub.Type | TAPI | Preform Start | Dev. Start | Pivotal Start | Bio Start | Sub. Date | Early As Approval | Early as Launch | PLMD | NCE/PLFD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Estrogens Conjugated Tablets 0.3, 0.45, 0.625, 0.9, 1.25, 2.5 mg by BD for US (Premarin) | A | $632.66 / -3% | BD | US | PIII | A / EVUL | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Estrogens Conjugated Topical Cream 0.625 mg by BD for US (Premarin) | B | $145.17 / 16% | BD | US | PIII | A / EVUL | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | Feb-1-12 | ASAP |
| Ethinyl Estradiol/Levonorgestrel Tablets 0.02/0.09 mg by BD for US (Lybrel) | B | $2.60 / 0% | BD | US | - | A / PTN | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | Sep-3-19 | - |
| Fenofibrate Tablets 48, 145 mg by BD for US (Tricor) | .S | $1,382.88 / 12% | BD | US | PIV FTF? | A / CPLA | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Gadoteridol Injection 279.3 mg/ml by BD for US (Prohance) | B | $23.04 / 2% | BD | US | PIV FTF? | A / CPLA | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | Dec-12-12 | ASAP |
| Gadoversetamide Injection 330.0, 330.9 mg/ml (Syringe ),(Vial S) by BD for US (Optimark) | B | $42.00 / 1% | BD | US | PIII | A / CPLA | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | Jul-14-09 | ASAP |
| Iron Dextran Injection 50 mg/ml (MDV) by BD for US (Infed) | C | $10.26 / 12% | BD | US | PII | I / EMCR | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |
| Lopinavir/Ritonavir Tablets 100/25, 200/50 mg by BD for US (Kaletra) | A | $565.30 / 6% | BD | US | PIV FTF | A / CPLA | 0 | 0 - | 0 - | 0 - | 0 - | - | 0 - | 0 - | Dec-26-16 PED | ASAP |
| Tolterodine Tartrate ER Capsules 2, 4 mg by BD for US (Detrol LA) | .S | $836.23 / 5% | BD | US | PIV FTF? | A / CPLA | 0 | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | 0 - | ASAP | ASAP |

**Key:**

| Status | Priority | Partner | |
|---|---|---|---|
| A = Active | A = High | ANCN = Anchen | EXCL = Excela |
| I = Inactive | B = Medium | AVEV = Aveva | IMPX = Impax |
| S = Submitted | C = Low | BIOS = BioSante | ITF = Italfarmaco |
| | S = Strategic | CPCN = Capricorn | NORT = Nortec |
| | | CPLA = Cipla | PII = Pharmaceutics International Inc |
| | | EMCR = Emcure | PTN = Patheon |
| | | EVUL = Evultis | XEM = Xemplar |

# EXHIBIT K

1               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

3                               No. 12-md-02409-WGY
                             Volume 2, Pages 58-153
4

5

6  In Re:  NEXIUM (ESOMEPRAZOLE)
            ANTITRUST LITIGATION
7

8

9                       ********

10

11                  For Jury Trial Before:
                    Judge William G. Young
12

13

14                  United States District Court
                    District of Massachusetts (Boston)
15                  One Courthouse Way
                    Boston, Massachusetts 02210
16                  Thursday, November 13, 2014

17

18

19                      ********

20

21

22

23      REPORTER: CHERYL B. PALANCHIAN, RMR, CRR
                    Official Court Reporter
24               United States District Court
                 One Courthouse Way, Room 5510
25                     Boston, MA 02210

```
 1                    A P P E A R A N C E S

 2        THOMAS M. SOBOL, ESQ.
          KRISTEN JOHNSON PARKER, ESQ.
 3          Hagens Berman Sobol Shapiro, LLP
            55 Cambridge Parkway, Suite 301
 4          Cambridge, MA 02142
            Email: Tom@hbsslaw.com
 5   and
          STEVE D. SHADOWEN, ESQ.
 6          Hilliard & Shadowen, LLC
            39 West Main Street
 7          Mechanicsburg, PA 17055
     and
 8        RICHARD ARNOLD, ESQ.
            Kenny Nachwalter, P.A.
 9          201 South Biscayne Boulevard, Suite 1100
            Miami, Florida 33131
10          For plaintiffs

11        LAURENCE A. SCHOEN, ESQ.
            Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
12          One Financial Center.
            Boston, MA 02111
13          Email: Lschoen@mintz.com
       and
14      KAREN N. WALKER, ESQ.
        KEVIN VAN WART, ESQ.
15          Kirkland & Ellis, LLP
            655 Fifteenth Street, N.W., Suite 1200
16          Washington, DC 20005
            Email: Kwalker@kirkland.com
17          For Teva defendants

18        JOHN E. SCHMIDTLEIN, ESQ.
          PAUL B. GAFFNEY, ESQ.
19        DANE H. BUTSWINKAS, ESQ.
            Williams & Connolly, LLP
20          725 Twelfth Street, N.W.
            Washington, DC 20005
21          Email: Jschmidtlein@wc.com
            For AstraZeneca defendants
22
        JAMES D. BALDRIDGE, ESQ.
23      DANIELLE R. FOLEY, ESQ.
            Venable, LLP
24          575 7th Street, N.W.
            Washington, DC 20004
25          Email: Jdbaldridge@venable.com
            For Ranbaxy defendants
```

```
1                        I N D E X

2    WITNESS:          DIRECT  CROSS   REDIRECT   RECROSS

3    THOMAS MCGUIRE, RESUMED

4      By Mr. Shadowen   61                97

5      By Mr. Schmidtlein        82

6      By Mr. Schoen             92

7    RICHARD S. BARKER, via deposition

8                      101

9    PATRICIA JAWORSKI, via video deposition

10                     127

11   USHA SANKARAN, via video deposition

12                     146

13

14     EXHIBITS                          PAGE

15       144 . . . . . . . . . . . . . . . .126

16       145 . . . . . . . . . . . . . . . .146

17       146 . . . . . . . . . . . . . . . .146

18       147 . . . . . . . . . . . . . . . .146

19       148 . . . . . . . . . . . . . . . .146

20       149 . . . . . . . . . . . . . . . .146

21       150 . . . . . . . . . . . . . . . .146

22       151 . . . . . . . . . . . . . . . .146

23       152 . . . . . . . . . . . . . . . .146

24

25
```

```
1               P R O C E E D I N G S
2          (Whereupon the jury entered the courtroom at
3    11:00 a.m.)
4          THE CLERK:  Court is back in session.  You may be
5    seated.
6          THE COURT:  Much more for this witness,
7    Mr. Shadowen?
8          MR. SHADOWEN:  A little bit, your Honor.
9          THE COURT:  All right.
10              THOMAS MCGUIRE, Resumed
11              DIRECT EXAMINATION, Cont'd.
12   BY MR. SHADOWEN:
13     Q.   Dr. McGuire, directing your attention to
14   paragraphs 158 to 168 of your initial report.  What
15   observations, if any, did you make regarding the economic
16   incentive of Ranbaxy to erect and strengthen a bottleneck?
17          MR. SCHOEN:  Objection.  Summary judgment order.
18          MR. SCHMIDTLEIN:  Objection, your Honor.
19          THE COURT:  Let me see.  Well, 168 is out.  158,
20   the first two economic reasons he can testify to them.  158,
21   second and third sentences.  Actually --
22          THE WITNESS:  I'm sorry, your Honor, may I proceed
23   or --
24          THE COURT:  I thought you could with that
25   instruction.  Yes.
```

1            What incentives -- those two sentences -- did you

2    find that arguably would impel Ranbaxy in these

3    circumstances to settle?

4            THE WITNESS:  There were two factors I identified

5    in this part of the report that include the increased

6    likelihood of being able to use the 180-day exclusivity

7    period, that's number one.  And number two is the saving in

8    litigation costs Ranbaxy would gain from not having to

9    pursue litigation.

10       Q.   Did you reach that conclusion as to the economic

11   value to Ranbaxy of participating in an agreement with

12   AstraZeneca to erect and strengthen the bottleneck?

13            MR. SCHOEN:  Objection.  Summary judgment ruling.

14            MR. SCHMIDTLEIN:  Objection.

15            THE COURT:  Where is it in the report?

16            MR. SHADOWEN:  Starting paragraph 162, your Honor.

17            THE COURT:  Starting at 162.

18            MR. SCHMIDTLEIN:  Could we have a sidebar, your

19   Honor?

20            THE COURT:  Yeah, I think you could.

21   SIDEBAR CONFERENCE AS FOLLOWS:

22            THE COURT:  Mr. Shadowen, the more we horse around

23   here, the more I think that a instruction might be

24   appropriate.  We're not -- what is the logic, what is the

25   relevance of getting into the dollar amounts that the

| 1 | settlement would have benefited Ranbaxy?  The live issue is, |
|---|---|
| 2 | and I'm letting you have everything I can think of that goes |
| 3 | to it, the incentive to Ranbaxy to conspire with AstraZeneca |
| 4 | to keep other people out of the market for that period.  How |
| 5 | does this go to that? |
| 6 | MR. SOBOL:  If I may, your Honor, for |
| 7 | Mr. Shadowen? |
| 8 | THE COURT:  You may, yes. |
| 9 | MR. SOBOL:  Thank you very much.  So here we maybe |
| 10 | hit the rubber on the road at this point.  Right? |
| 11 | THE COURT:  Just a minute. |
| 12 | MR. SOBOL:  It's really two different directions, |
| 13 | your Honor.  We are trying to prove, consistent with your |
| 14 | instructions, the conspiracy between AstraZeneca and Ranbaxy |
| 15 | to effectuate generic delay. |
| 16 | What are Ranbaxy's reasons to do so?  Well, |
| 17 | Ranbaxy's reason to do so, this man's going to testify, is |
| 18 | about $700 million in his pocket that he otherwise wouldn't |
| 19 | have. |
| 20 | THE COURT:  Wait a minute, wait a minute.  No, |
| 21 | that's their reason to settle.  What keeps your case against |
| 22 | Ranbaxy alive is the contingent launch provision.  What -- |
| 23 | I'll allow his testimony -- look, as I see this, what you |
| 24 | should have done, and didn't do, is once you had the summary |
| 25 | judgment motion you should have sat down with this fellow |

1    and he should have done a whole new report and designed to

2    the theory that you now have.  He didn't.

3           I'm sticking to my rulings.  I don't see the

4    700 million being relevant.

5           MR. SOBOL:  Well, if I may, your Honor.

6           THE COURT:  Yeah.

7           MR. SOBOL:  I don't know any other way to explain

8    it.  The question about whether or not Ranbaxy's going to go

9    into this conspiracy depends upon what the value is of it to

10    do so.

11           THE COURT:  No, it depends upon the value of the

12    contingent launch provision.  That, I've let every scrap of

13    data that he has, and maybe you can argue it, I don't know.

14    But I'm not going back and I --

15           MR. SOBOL:  No, no.

16           THE COURT:  And I really think it might make

17    everyone more comfortable if I gave an instruction.  Do you

18    want an instruction about how that, because there's no

19    evidence that Ranbaxy could have gotten to market, that's

20    why we're keeping out various things about the settlement

21    with Ranbaxy.

22           MR. SOBOL:  Well, see, here -- the answer is no,

23    not at this point.  But here's the reason why, your Honor.

24           THE COURT:  Okay.

25           MR. SOBOL:  And I'm going to address it in the

```
 1    most frank way I can.

 2              THE COURT:  You always do.

 3              MR. SOBOL:  The elephant in the room.  The

 4    elephant in the room right now is this:  The agreement that

 5    is entered into, the conspiracy that is entered into between

 6    AstraZeneca and Ranbaxy is one which has an impact on Teva.

 7    We don't care one wit whether it had an effect on Ranbaxy.

 8              THE COURT:  I -- well, I happen to agree with

 9    that, if you say that, and so I let him testify to that.

10              MR. SOBOL:  Sure.  But then the question is, okay,

11    how is the agreement between AstraZeneca and Ranbaxy, this

12    conspiracy, affecting Teva?

13              Here's the thing, the miscommunication I think

14    we've had.  One of the ways it affects -- one of the ways

15    that conspiracy affects Teva is by moving this first-to-file

16    date well out into May 2014.  And there are reasons for why

17    that conspiracy happened.

18              THE COURT:  Our first sidebar --

19              MR. SOBOL:  It's got nothing to do with Ranbaxy

20    entering, it's the impact it has on Teva.

21              THE COURT:  One of the things that's gratifying

22    here is that I can talk to all you people and you talk to me

23    with some common understanding.

24              MR. SOBOL:  Yes.

25              THE COURT:  I understand that.  I don't buy it.
```

| | |
|---|---|
| 1 | The very first sidebar I said I'm not going for the fact |
| 2 | that the settlement with Ranbaxy, had there not been that |
| 3 | settlement then Teva could have gotten in in 2011.  I'm |
| 4 | allowing, on the sole theory that I -- the one thing I've |
| 5 | changed from summary judgment -- everyone take warning from |
| 6 | this, if we get beyond next Tuesday, a matter of distinct |
| 7 | interest. |
| 8 | Look, I really don't think patents have very much |
| 9 | to do with this.  So it wasn't too much to scrape McCool off |
| 10 | this.  So McCool's out.  But I very much stand by my ruling, |
| 11 | and I'm not going back on that ruling.  Ranbaxy could never |
| 12 | get to market, everything confirms that.  So the deal there, |
| 13 | the only thing that we are interested in is that was Ranbaxy |
| 14 | knowingly in on a deal with AstraZeneca where they fully |
| 15 | expected AstraZeneca would cause delay by buying off other |
| 16 | people. |
| 17 | MR. SOBOL:  Sure. |
| 18 | THE COURT:  That I've let you have. |
| 19 | MR. SOBOL:  Okay.  So here's the other point then. |
| 20 | I want to do it directly with your question, which is, if I |
| 21 | understand it correctly, you want to see a connection |
| 22 | between the incentives and the contingent launch provision |
| 23 | for us to go forward. |
| 24 | THE COURT:  That's too broad. |
| 25 | MR. SOBOL:  Fair enough. |

1          THE COURT:  But I want to work out from there.

2          MR. SOBOL:  If I may then.

3          THE COURT:  And he's stuck with this report which

4    was drafted for a different purpose.

5          MR. SOBOL:  Well, I understand that, your Honor.

6    Right.  But look, we get criticized when we supplement, we

7    get criticized when we don't supplement.

8          THE COURT:  Not from me.

9          MR. SOBOL:  Fair enough.  Okay.  Here's the point,

10   your Honor.  The contingent launch provisions have a

11   different kind of impact when there is a no-authorized

12   generic provision.  Dr. McGuire began testifying that way

13   earlier today, and he should be able to testify --

14         THE COURT:  If it's in the report I would let

15   him testify.

16         MR. SOBOL:  I also want to dovetail this with

17   something, your Honor, so you can appreciate it.  The

18   document that I introduced this morning from Teva, the

19   document that has Teva on it indicates that in July of 2009

20   Teva did not know there was a no-AG provision.  In other

21   words, Teva, in looking at the situation, was willing to do

22   some kind of a deal because there was no authorized, no

23   no-AG provision.  And we think that's going to dovetail with

24   the fact that --

25         THE COURT:  And you say these things are going to

```
 1    dovetail.  I let you have all that.
 2              MR. SOBOL:  Fair enough.  That's what we want to
 3    be able to get into the no-AG provision.
 4              THE COURT:  You're stuck with this.  You're stuck
 5    with this report.
 6              (Whereupon the sidebar conference concluded.)
 7              THE COURT:  Mr. Shadowen, you may continue.
 8              (Whereupon counsel conferred.)
 9    BY MR. SHADOWEN:
10        Q.   Dr. McGuire, drawing your attention to
11    paragraphs 123 to 135 of your report.
12        A.   Yes.
13        Q.   Did you draw any conclusions regarding the
14    incentives of AstraZeneca to erect and strengthen the
15    bottleneck?
16              MR. SCHOEN:  Objection, your Honor.
17              THE COURT:  Wait a second.  But I note your
18    objection.
19              He may testify consistent with 123.  And 135, as
20    to -- the question was as to AstraZeneca, and he may so
21    testify consistent with what he's disclosed.
22              MR. SOBOL:  Your Honor, it was 123 through 135.
23              THE COURT:  Oh, all right.  I'll have to read more
24    carefully.  I appreciate that.  Thank you.
25              MR. SCHMIDTLEIN:  If we can have a sidebar on
```

```
1    that, your Honor, please?
2               THE COURT:  I'll hear you.
3    SIDEBAR CONFERENCE AS FOLLOWS:
4               THE COURT:  Okay.  What's the matter with this?
5               MR. SCHMIDTLEIN:  He's now just getting back into
6    the same issue.  He's estimating the value --
7               MR. BALDRIDGE:  This is out of the case.
8               THE COURT:  Wait a minute.  Please don't be so
9    conclusory.  We'll stick with Mr. Schmidtlein first.  A
10   quick review --
11              MR. SCHMIDTLEIN:  This is all now talking about
12   the alleged sort of value of these -- of this agreement to
13   AstraZeneca, profits gained by delay, the flow of profits.
14   This has nothing to do with the accelerated launch
15   provision.  The only thing that's left is what was Ranbaxy's
16   incentive to do something that affects Teva.
17              This has nothing to do with any of that.  This is
18   another attempt by them to get into the payment issue.  I
19   mean, in section -- you look at 132 and confirm 452 to
20   835 million is the net sales of the authorized generic.
21   They're valuing the authorized generic.  This is a payment
22   opinion.  That's been struck.
23              THE COURT:  Well, I won't say it's been struck.
24   I'll hear Mr. Baldridge.
25              MR. BALDRIDGE:  The entire predicate this section
```

1   is based on, no agreement Ranbaxy could enter at risk as

2   early as April 19, 2008, that's out of the case.  We know as

3   a matter of law that that's not probable.  Then if you look

4   at the rest of it, just like Mr. Schmidtlein says, it goes

5   directly into almost exclusively payments to Ranbaxy.  And

6   this is a way to back in that which is not in the report.

7          THE COURT:  I understand the argument.

8          MR. SHADOWEN:  Your Honor?

9          THE COURT:  Yeah, go ahead.

10         MR. SHADOWEN:  AstraZeneca obviously is, we say,

11   the ring leader of this three-way collusion and their

12   incentive, what they got out of doing that is obviously the

13   centerpiece of the conspiracy.  And I've directed the

14   question directly to the erecting and the strengthening of

15   the bottleneck.  The interest is not just in keeping Ranbaxy

16   out, but everybody including Teva.  And that's what they

17   did.

18          THE COURT:  I will --

19         MR. SCHMIDTLEIN:  That has nothing to do with

20   that.

21         THE COURT:  No, I will allow the question and

22   we'll see what the answer is.  If I have to give an

23   instruction, I will.

24         (Whereupon the sidebar conference concluded.)

25

1    BY MR. SHADOWEN:

2        Q.   Dr. McGuire, directing your attention to

3    paragraphs 123 to 135 of your opening report, what

4    observations, if any, did you make regarding the economic

5    incentives of AstraZeneca to erect and strengthen the

6    bottleneck?

7        A.   This section is entitled, "The Economic Value of

8    Settlement to AstraZeneca, Longer Exclusivity and a

9    No-authorized Generic."  What this section does is evaluate

10   quantitatively the value to AstraZeneca of obtaining a delay

11   in generic entry, and quantitatively evaluates the lost

12   profit opportunities to AstraZeneca in agreeing to the no-AG

13   clause.

14       Q.   Why don't you walk us through what you did.

15            MR. SCHOEN:  Objection, your Honor.

16            THE COURT:  Well, let me explain something here.

17   This is not -- what I do is not rocket science, even though

18   I have all these suits around me over there.

19            There's little dispute here that before

20   AstraZeneca and Teva settled about which we've heard lots of

21   evidence, there was a lawsuit against the first filer,

22   Ranbaxy, and that settled.  Now, the lawyers and I have done

23   a lot of work to get this case streamlined for you.  You may

24   think it's a long case, but it's a lot shorter than

25   originally when we got into the back-and-forth.  And

1    originally when we got into the back-and-forth, the

2    plaintiffs here were saying, Well, there's something wrong

3    with the AstraZeneca-Ranbaxy settlement.

4              Now, whether or not there is, there's no

5    sufficient evidence in this case, and I've been through

6    pounds of evidence, that Ranbaxy ever could have gotten to

7    market with a generic Nexium.  None.  Through May 27, 2014.

8    Ranbaxy couldn't have done it.  Whatever their deal was,

9    they couldn't have done it.

10             Well, now, since I've been through all that, the

11   plaintiffs are stuck with that.  And that's how we're trying

12   the case.  So they're saying, Well, the AstraZeneca-Teva

13   agreement has a large and unjustified payment.  Question 1.

14   They say, they say AstraZeneca had monopoly power.

15   Question 2.  They say it's anticompetitive.

16             Now, I am going to let him answer and go through

17   the value to AstraZeneca, and he's listening to me -- the

18   value to AstraZeneca of settling with Ranbaxy.  Well, part

19   of that value is with Ranbaxy in that lead position, unless

20   someone cuts a deal with Ranbaxy, they're going to keep

21   getting their profits from their patented item for the

22   length of time of the patent.  I'll let you hear that.  You

23   can make what you want of it.  Enough.

24             So with that explanation, you have Mr. Shadowen's

25   question in mind?  We're focused on Ranbaxy, and I pointed

1    out -- strike that.  I said it wrong.

2              MR. SHADOWEN:  AstraZeneca.

3              THE COURT:  We're focused on AstraZeneca, sir.  I

4    told the jury there's no evidence that Ranbaxy could ever

5    get to market, but they were the first-filing ANDA.  And so

6    how did the AstraZeneca-Ranbaxy deal benefit AstraZeneca?

7              THE WITNESS:  Okay.  As I explained a minute ago,

8    there's two parts of this that bear on AstraZeneca.  The

9    first part is, as in the title of my section, the longer

10   exclusivity, which you can equate to a delay.  How much was

11   that worth to AstraZeneca?

12             And then the other element of the agreement that

13   had financial consequences for AstraZeneca was the

14   concession of not to enter during the 180-day period with an

15   authorized generic.  So there's going to be a plus and

16   there's going to be a minus.

17             Now to evaluate the plus, I need to understand and

18   estimate how much more money AstraZeneca makes per unit time

19   as they succeed in delaying competition from a generic.

20   Now, you heard some things about this this morning that are

21   very similar to what's contained in my report that have to

22   do with the profits per year that AstraZeneca was

23   forecasting for itself just around the time they were

24   considering settling with Ranbaxy.

25             These were big numbers.  The big numbers that I

 1    reference in my report are during 2007 AstraZeneca was known

 2    to have made $2.7 billion in gross margin from selling

 3    Nexium.  They were forecasting, at this point, 2008.  They

 4    forecasted in the first half of 2008 to make another

 5    $1 billion in gross margin.  So it would have been

 6    something -- the second part of 2008.  Then there's forecast

 7    for 2009, 2010, that are more than a billion dollars.  I

 8    think the figures were forecast to be 1.7 billion and

 9    $1.3 billion that AstraZeneca would make if it were able to

10    continue to sell without generic entry.

11            And of course you can -- and I, in my report, make

12    a simple extrapolation of that and say if AstraZeneca were

13    able to continue to sell with exclusivity through 2011, 2012

14    and 2013, you can have in your mind a conservative number

15    that they're making about $1 billion per year in each of

16    those years.  And that seems, to me, to be grounded firmly

17    on the forecast that AstraZeneca was making for itself at

18    the time.

19            THE COURT:  All right.  Let me interrupt only to

20    say this:  It's entirely up to you whether you believe what

21    a witness says, disbelieve what a witness says, and what I'm

22    going to say now does not suggest any quarrel with the

23    witness.  All I have to talk about is the law.  I'm neither

24    agreeing with him nor disagreeing.

25            Also keep in mind that they had patents for this

1      item.  So earning this money, unless the antitrust laws have

2      been abused, the issues that will be before you, they had

3      patents.  No one's declared those patents invalid.  And that

4      is one of the return, in order to give companies an

5      incentive to do the research and develop worthwhile

6      medicines and things, we have this patent law.  So if you

7      believe that's true and they were earning them, well, they

8      had patents.

9              The question is, the questions that I'm -- we're

10     going to put to you, did they keep Teva out of the market by

11     making a large and unjustified payment.  Did they,

12     AstraZeneca, conspire with both Teva and Ranbaxy to extend

13     this delay period up to the date.  Those are the questions.

14             But I'm letting the testimony come in.  Go ahead.

15             MR. SOBOL:  Your Honor, can we have a sidebar

16     briefly?

17             THE COURT:  You may.

18     SIDEBAR CONFERENCE AS FOLLOWS:

19             MR. SOBOL:  So now we've hit another part of the

20     rubber in the road because our case in part is that it was

21     an antitrust violation.

22             THE COURT:  Of course it is.  I left that open.

23             MR. SOBOL:  And so if we're permitted, therefore,

24     to now go into what the payment was to Ranbaxy --

25             THE COURT:  We're not.  You're not.

1          MR. SOBOL:  That's the proof of the antitrust

2     violation under the Supreme Court Actavis case.

3          THE COURT:  If I'm in error on that, Ranbaxy could

4     never get it to market, I'm in error.

5          MR. SOBOL:  Regardless of whether it turned out

6     Ranbaxy could or could not get into the market, the fact

7     that it's making its way into dollars, you just told the

8     jury you have to consider the patent.  The only way under

9     the law for them to resolve that is to determine whether or

10    not there was a violation of the antitrust laws there.

11         THE COURT:  No, because I don't know how he's

12    going to do it, but Blume's going to say that Teva would

13    have cut a deal and come in earlier but for the

14    anticompetitive buyout agreement of Teva.  That I'm going to

15    let you have if you've got experts who will say it.

16         MR. SOBOL:  Okay.

17         (Whereupon the sidebar conference concluded.)

18         MR. SHADOWEN:  Scott, can we see figure 5, please?

19    BY MR. SHADOWEN:

20    Q.   Dr. McGuire, did you prepare a graph here to help

21    explain this part of your testimony to the jury?

22    A.   Yes, I did.

23    Q.   Why don't you show us what we're looking at here.

24    A.   All right.  This is another timeline with a level

25    of profit that is -- this is in blue indicating a level of

77

| | |
|---|---|
| 1 | profit for AstraZeneca prior to a time when Ranbaxy might |
| 2 | enter the -- |
| 3 | THE COURT:  See, I've got a problem with this. |
| 4 | There's no evidence that Ranbaxy ever would have entered. |
| 5 | So let's -- that may be the amount they were earning without |
| 6 | Ranbaxy, and I take it from this diagram that amount is just |
| 7 | going to consider -- continue constant up to May 27, 2014. |
| 8 | Right? |
| 9 | THE WITNESS:  That's correct, your Honor. |
| 10 | THE COURT:  Right.  I understand that.  And that's |
| 11 | fine.  Don't get thinking about Ranbaxy making some early |
| 12 | entry.  No evidence of that.  We're not going to hear any |
| 13 | evidence of it. |
| 14 | Go ahead, Mr. Shadowen. |
| 15 | Q.  Picking up on the judge's comments, Dr. McGuire, |
| 16 | did the bottleneck, in addition -- did the bottleneck have |
| 17 | an effect on the entry of generic manufacturers other than |
| 18 | Ranbaxy? |
| 19 | A.  Yes, it did. |
| 20 | Q.  Okay. |
| 21 | A.  I've explained that.  That it made it more |
| 22 | difficult for subsequent entrants to break the bottleneck. |
| 23 | Q.  Okay.  Proceed with your explanation, please. |
| 24 | A.  I think it will help -- |
| 25 | MR. SCHOEN:  Objection, your Honor.  Calls for a |

1    narrative.  Not in the report.

2              THE COURT:  No, I've confined him to those

3    paragraphs and I -- I'm alert to it.  You may answer, sir.

4         A.    Let me click through to the last part here, which

5    I think will deal with the judge's concerns.

6              MR. SCHMIDTLEIN:  Your Honor, this is precisely

7    the objection --

8              MR. BALDRIDGE:  Your Honor, this is the slide --

9              THE COURT:  Which slide are we talking about?

10             MR. SCHMIDTLEIN:  The one he just clicked through.

11             THE COURT:  Well, which one is it?  What figure

12   are you looking at, sir?

13             THE WITNESS:  Figure 5 from my original report.

14             THE COURT:  Oh, figure 5.  Right.  I've taken care

15   of that by emphasizing to the jury.  He may use figure 5.

16   You may use it.

17        Q.    Proceed with your explanation, please,

18   Dr. McGuire.

19             THE COURT:  I don't know now where he's going so

20   why don't you ask a more precise question.

21        Q.    You mentioned that there was both a plus and a

22   minus regarding AstraZeneca's incentives with respect to

23   erecting and strengthening the bottleneck?

24        A.    Yeah.

25        Q.    You've discussed now some of the plus.

1        A.    Yes.

2        Q.    What's the minus?

3        A.    The minus is shown here on the far right of the

4   graphic.  At the agreed-upon entry date of May 27th, 2014,

5   AstraZeneca may or may not have entered with an authorized

6   generic.  If they do enter with an authorized generic, they

7   make some money.  That's an additional product, additional

8   sales, additional profits, which has the consequence that

9   the fall in their profit rate is less steep if they decide

10   to enter with an authorized generic.

11        So in addition to continuing to be able to sell

12   their brand, they'll get a part of the generic market.

13   That's the option that includes the pinkish color area on

14   the figure.

15        The other option for AstraZeneca, the one that

16   they chose, was not to enter with an authorized generic

17   under the agreement on May 27th, 2014, which means in the

18   absence of selling that additional product they would make

19   less money.  So the no-AG profit line falls more quickly for

20   AstraZeneca if they concede not to enter with an authorized

21   generic.  This figure is meant to graphically show the

22   consequences to AstraZeneca of that settlement feature.

23        Q.    So netting out the pluses and the minus order of

24   magnitude, what did you conclude regarding the incentive of

25   AstraZeneca to erect and strengthen the 180-day barrier?

1          MR. SCHOEN:  Objection, your Honor.

2          THE COURT:  Overruled.  He may have it.

3     A.   It's in the hundreds of millions of dollars.

4     Q.   Hundreds of what?

5     A.   Hundreds of millions of dollars.

6     Q.   Okay.

7     A.   That the gains exceed the losses.

8     Q.   Okay.  Dr. McGuire, drawing your attention to

9  paragraphs 136 through 138 of your report, what

10  observations, if any --

11     A.   I'm sorry.  I missed the numbers that you're

12  referring to?

13     Q.   136 to 138.

14          What observations, if any, did you make regarding

15  the incentive of AstraZeneca to, in fact, launch an

16  authorized generic version of Nexium had they not instead

17  chosen to erect and strengthen the bottleneck?

18          MR. SCHMIDTLEIN:  Objection, your Honor.

19          THE COURT:  Overruled.  He may have it consistent

20  with 136 to 138.

21     A.   This section is titled, "Industry Experience and

22  AstraZeneca's Own Decisions About Authorized Generics Imply

23  That AstraZeneca Would Have Launched an Authorized Generic

24  for Nexium."  And the section then explains the -- those two

25  sources of supportive evidence behind the opinion that it

1    would be profitable for AstraZeneca to launch an authorized

2    generic.

3        Q.   Start with the industry experience, please.

4        A.   The first set of evidence I refer to is industry

5    experience.  This is something that the Federal Trade

6    Commission keeps track of, the frequency of launching of

7    authorized generics among drug companies who face patent

8    challenges.  And during the period we're talking about,

9    during the period in the middle part of the 2000s, and

10   specifically the period between 2003 and 2008, of the 19 --

11   I'm sorry -- of the 24 largest drugs that faced generic

12   competition, the brand launched an authorized generic

13   80 percent of the time.  That is, in 19 out of those 24

14   cases the brand decided it was in their interest to launch

15   an authorized generic.

16            Now, the FTC further commented this might have

17   been even higher --

18            MR. SCHMIDTLEIN:  Objection, your Honor.

19            THE COURT:  That's hearsay.  Sustained, what they

20   may have said.

21            THE WITNESS:  Okay.

22       Q.   Anything else regarding industry experience?

23            MR. SCHMIDTLEIN:  Objection.

24            THE COURT:  Well, I don't understand that

25   question.

1          MR. SHADOWEN:  Okay.

2          THE COURT:  The point you're making is usually

3    a -- when faced with generic competition, a brand or a

4    patented product will come up with its own authorized

5    generic.  Is that your opinion?

6          THE WITNESS:  That's very good.  Yes, thank you.

7          THE COURT:  All right.

8      Q.   And did you review AstraZeneca's own records to

9    determine whether or not they had made preparations to

10   launch an authorized generic?

11     A.   As I mentioned in summarizing the title of this

12   section, this is evidence from AstraZeneca itself that it

13   was planning, prepared and anticipated profits from

14   launching an authorized generic.

15         MR. SHADOWEN:  Your Honor, within the confines of

16   the sidebars, I have no further questions for this witness.

17         THE COURT:  Thank you.  Mr. Schmidtlein, any

18   questions for this witness?

19         MR. SCHMIDTLEIN:  Yes, your Honor.

20                    CROSS-EXAMINATION

21   BY MR. SCHMIDTLEIN:

22     Q.   Good morning, Dr. McGuire.

23     A.   Good morning.

24     Q.   I want to first just ask you a few questions about

25   the contingent launch provision testimony you gave earlier

1   today.  Okay?

2         A.    Okay.

3         Q.    Now, Teva was not involved in the settlement

4   negotiations with Ranbaxy; correct?

5         A.    Not so far as I know.

6         Q.    Okay.  And you're not aware of any evidence that

7   Teva was aware that Ranbaxy had a contingent launch

8   provision in its settlement agreement; correct?

9         A.    At the time this settlement launch -- this

10  contingent launch agreement was negotiated, AstraZeneca, my

11  understanding is, was also in negotiations with Teva.  But

12  what happened in those negotiations I have no direct

13  knowledge of.

14        Q.    You have no evidence that Teva was aware, after

15  the Ranbaxy settlement, that Ranbaxy had a contingent launch

16  provision in its settlement agreement; isn't that right?

17        A.    I don't know what was said by whom to the others

18  during the confidential settlement.

19        Q.    And if Teva didn't know about an accelerated or a

20  contingent launch provision in the Ranbaxy settlement

21  agreement, then that provision could not have deterred Teva

22  from taking any action; correct?

23             MR. SHADOWEN:  Objection.

24             THE COURT:  No, he may ask that question as a

25  matter of logic.

1      A.   It -- they may have anticipated what rational

2  actors would have done had they even not had direct

3  knowledge of that agreement and kind of back-engineered it.

4  Then --

5      Q.   You've not offered any opinion in your expert

6  report that Teva back-engineered anything, did you?

7      A.   You asked me the question.  I'm trying to answer

8  your question.

9      Q.   Right.

10     A.   So they needn't have had direct knowledge if they

11 were able to foresee how rational actors would have set up

12 the agreement in the first place.

13     Q.   So you're saying it would have been rational for

14 Ranbaxy to set up the agreement like that in the first

15 place?

16     A.   I was explaining how it was very much in the

17 self-interest of Ranbaxy to preclude the likelihood that

18 Teva challenges and breaks the claim.

19     Q.   Ranbaxy settled in 2008; right?

20     A.   Yes.

21     Q.   April 2008?

22     A.   Yes.

23     Q.   Teva settled in January 2010; right?

24     A.   Yes.

25     Q.   And Teva litigated very hard after the Ranbaxy

1    settlement; correct?

2        A.   I don't know about the "hard," but they were

3    litigating.

4        Q.   Teva filed a separate declaratory judgment action

5    after the Ranbaxy settlement; correct?

6        A.   I believe that's correct, yes.

7        Q.   And you did not reach any opinion in this case

8    that Teva either took or did not take some action in the

9    Nexium case as a result of the AstraZeneca-Ranbaxy

10   settlement; isn't that right?

11       A.   I'm not sure I understand your question.  I'm

12   sorry.

13       Q.   You did not reach any opinion that Teva either

14   took some action or didn't take some action because of the

15   Ranbaxy settlement?

16       A.   I really don't know.

17       Q.   You didn't study that question, did you?

18       A.   I don't know.  I'm not sure what else I can tell

19   you.

20       Q.   Now, if AstraZeneca had not settled the Nexium

21   case with Ranbaxy and the case had gone to trial, you don't

22   have an opinion on what would have happened at the trial;

23   correct?

24       A.   I don't have an opinion on the likelihood of the

25   generic or the brand winning.

1    Q.   Right.  And if AstraZeneca had won at the trial,

2    what do you assume would have been the generic entry date

3    for Ranbaxy?

4    A.   My assumption is they would have had to wait -- I

5    don't know what -- whether a win is a clean win or whether

6    there's partial wins or what exactly you're asking, but it

7    would have been whatever the ruling required for whatever

8    patents remained valid or not infringed, as they expired.

9    Ranbaxy would have had to wait.

10   Q.   So if AstraZeneca had gone to trial in one, you're

11   not sure how long they could have excluded Ranbaxy from the

12   market lawfully?

13   A.   I wouldn't say that.  I think I'm not exactly sure

14   what a win is in this case and whether it's a complete and

15   utter victory, in which case it would have been the last

16   standing patent, but I'm -- there could be other

17   possibilities.  I'm just not sure.

18   Q.   What were the expiration dates on the patents that

19   were at issue in the AstraZeneca-Ranbaxy Nexium litigation?

20   A.   I believe the latest expiration date was 2019.

21   They came forward.  There was 14 altogether.  They came

22   forward to -- through 2014, and my belief is there were some

23   that would have expired even earlier than that.

24   Q.   So if Ranbaxy's Nexium product infringed

25   AstraZeneca's patents, there would be nothing

1    anticompetitive about AstraZeneca getting an injunction and

2    keeping Ranbaxy's product off the market; isn't that right?

3            MR. SHADOWEN:  Objection.

4            THE COURT:  No, he may ask the question.

5        A.    I -- if the patents were valid, then Ranbaxy --

6    then AstraZeneca's entitled to the -- whatever the patents

7    give them in terms of exclusivity.

8            THE COURT:  There's a juror question.  It's a good

9    place to ask it.

10           You, from looking at industry data and the Federal

11   Trade Commission reports, you've given us your opinion that

12   80 percent of the time when faced with generic competition a

13   brand name will launch an authorized generic.  Have I got

14   your opinion right?

15           THE WITNESS:  That's correct.

16           THE COURT:  Well, given the curves that you've

17   shown us there, the brand makes money by launching an

18   authorized generic; isn't that correct?

19           THE WITNESS:  That's also correct.

20           THE COURT:  So have you formed an opinion why, in

21   20 percent of the situations, the companies, brand

22   companies, don't launch an authorized generic?

23           THE WITNESS:  That's a very good question.  The --

24   one possibility --

25           THE COURT:  Well, I really can't invite you to

1    speculate in the sense that I'm going to tell them they're

2    not going to be interested in possibilities, they're going

3    to be interested in what's been proved.  But if you have an

4    opinion, I'll let you give it.

5              THE WITNESS:  My opinion is that it would have

6    been even higher had some of the settlement agreements with

7    generics not included no-AG clauses.

8              THE COURT:  Thank you.  Go ahead, Mr. Schmidtlein.

9         Q.   Now, prior to this case you had never before

10   analyzed whether it would be in a brand name drug

11   manufacturer's economic self-interest to market an

12   authorized generic; right?

13        A.   That's correct.

14        Q.   And you would agree -- well, your support for this

15   80 percent figure comes from an FTC report; correct?

16        A.   The 80 percent figure of the frequency that brands

17   launch authorized generics, yes.

18        Q.   But that FTC report didn't identify by name any of

19   the drugs that were launched as authorized generics;

20   correct?

21        A.   I don't remember one way or the other.

22        Q.   You weren't able to do a comparison by looking at

23   the FTC report to see if the drugs, where there was an AG

24   launched, were comparable in any way to Nexium because the

25   FTC report didn't identify the drugs by name; isn't that

1    right?

2         A.    Well, I don't remember whether they did or they

3    didn't.  But I was looking at industry averages, which I

4    thought would be informative about a particular participant

5    in the industry.

6         Q.    You would agree there are circumstances where it

7    would not be in the brand name drug manufacturer's economic

8    self-interest to launch an authorized generic; correct?

9         A.    Correct.

10        Q.    And you're aware there have been instances where a

11   brand name manufacturer has decided not to launch an

12   authorized generic; correct?

13        A.    That's correct.

14        Q.    And the 80 percent figure that you looked at, do

15   you know what percentage of those were in response to a

16   generic launch at risk?

17        A.    I probably should know this but, I'm sorry, I

18   don't.

19        Q.    And do you know how many of those, that

20   80 percent, were done after the patents had expired?

21        A.    I don't remember the breakdown.  I'm sorry.

22        Q.    Okay.  And you'd agree, the fact that two

23   companies settle a patent infringement case and -- well,

24   strike that.

25             You're aware there have been numerous instances

1    over the years where AstraZeneca has decided not to launch

2    an authorized generic; correct?

3         A.   It doesn't always launch an authorized generic.

4         Q.   Right.  Have you -- did you do a comprehensive

5    study of in what percentage of times AstraZeneca launched an

6    authorized generic?

7         A.   I don't have a percentage.  I have a list of drugs

8    in which they did, and I looked at their planning model to

9    help inform my judgment.

10        Q.   Okay.  And at the time of the Ranbaxy settlement

11   in April 2008, how many times had AstraZeneca launched an

12   authorized generic?

13        A.   I think on the order of five or six.

14        Q.   Sir, at the time, as of April 2008, AstraZeneca

15   had launched an authorized generic one time; isn't that

16   right?

17        A.   Well, I'm -- the drugs that I have in mind, and

18   maybe the timing is what I have wrong here, is Plendil,

19   Prilosec, Accolate, Toprol, and there's a couple others that

20   I don't remember the names.

21        Q.   At the time of the settlement, Toprol was the only

22   time they'd done it before; isn't that right?

23             THE COURT:  Just so I'm -- at the time of the

24   settlement with Ranbaxy or with Teva?

25             MR. SCHMIDTLEIN:  I'm sorry.  With Ranbaxy, your

1    Honor.

2         Q.   In April 2008, AstraZeneca had launched an

3    authorized generic only in the case of Toprol; correct?

4         A.   Well, I don't remember the timing.

5         Q.   Okay.  And the Toprol authorized generic launch

6    was in response to a generic launch at risk; correct?

7         A.   I'm -- I don't remember that either.

8         Q.   Did you study or do any analysis as to whether, on

9    balance, AstraZeneca's experience in launching an authorized

10   generic in the case of Toprol turned out to be profitable

11   for AstraZeneca?

12        A.   I didn't check that.

13        Q.   Okay.  And you made some -- you gave some

14   testimony about looking at AstraZeneca's internal documents

15   about preparations that AstraZeneca was making to launch an

16   authorized generic version of Nexium; is that right?

17        A.   Yes.

18        Q.   And those preparations to launch an authorized

19   generic version of Nexium that you looked at were to

20   launch -- were for the possibility of launching an

21   authorized generic version of Nexium in the case of a

22   generic at-risk launch; correct?

23        A.   Well, it was in around the time period of the

24   summer 2008, in which --

25        Q.   And --

1      A.   I'm going to agree with you -- in which my

2  understanding is the litigation with Ranbaxy could -- could

3  have been continuing.

4      Q.   You're not aware of any instance where AstraZeneca

5  launched an authorized generic version of a drug during the

6  180-day exclusivity period of a first filer; correct?

7      A.   Well, that's the part I'm not remembering here on

8  the stand.

9      Q.   Okay.

10          MR. SCHMIDTLEIN:  No further questions, your

11  Honor.

12          THE COURT:  Mr. Schoen, any questions?

13          MR. SCHOEN:  I do, your Honor.

14          THE COURT:  You may.

15                    CROSS-EXAMINATION

16  BY MR. SCHOEN:

17      Q.   Good morning, Dr. McGuire.

18      A.   Good morning.

19      Q.   Ranbaxy and AstraZeneca settled in 2008; correct?

20      A.   Yes.

21      Q.   And Teva was not a party to that agreement between

22  Ranbaxy and AstraZeneca?

23      A.   As far as I know.

24      Q.   And as far as you know Teva had no involvement

25  whatsoever in the negotiation of that agreement?

1          A.    As far as I know.

2          Q.    As far as you know Teva had no control whatsoever

3     over the launch, the licensed entry date of May 27th, 2014,

4     that Ranbaxy and AstraZeneca agreed to; correct?

5          A.    I agree with you.

6          Q.    And you've prepared about six expert reports in

7     this case; is that right?

8          A.    Yes.

9          Q.    And you reviewed a lot of documents in connection

10    with that work?

11         A.    Yes, I did.

12         Q.    And in all the documents you looked at, you didn't

13    see any that showed that Teva actually had knowledge of the

14    contingent launch provision that was in the

15    AstraZeneca-Ranbaxy agreement before Teva entered into its

16    settlement; is that correct?

17         A.    I'm interpreting this as -- to be the same

18    question I was asked by the previous counselor.

19         Q.    Yes.  And before you offered some speculation,

20    well, maybe they could have guessed.  I'm asking you did you

21    actually see any documents that show that Teva knew before

22    it entered into that agreement about the contingent launch

23    provision in the Ranbaxy agreement?

24              MR. SHADOWEN:  Objection.

25              THE COURT:  Overruled.

1          A.    I saw no direct evidence.

2          Q.    And you also didn't see any direct evidence that

3     Teva knew anything about the no-authorized-generic provision

4     in the Ranbaxy agreement before Teva entered into its

5     settlement; correct?

6          A.    This is -- involved interpretation of the

7     announcements that were public.  And I believe there was

8     indication of the no-AG part in some of the announcements.

9     So it might have been known by Teva.

10         Q.    You're not sure of that sitting here right now?

11         A.    I think it's true.

12              MR. SCHOEN:  Can we throw up figure 5, please,

13    from Dr. McGuire's report which we were looking at earlier?

14         Q.    You recall discussing this with Mr. Shadowen on

15    direct examination?

16         A.    Yes, I do.

17         Q.    And you were -- the title of this chart is

18    "AstraZeneca's Gains and Losses From the Settlement."

19    Correct?

20         A.    That's right.

21         Q.    And you're talking about the Ranbaxy settlement?

22         A.    Yes.

23         Q.    And this chart is making an assumption that

24    Ranbaxy would have, absent the settlement, that Ranbaxy

25    would have been able to enter earlier than May 27th, 2014;

1    correct?

2            THE COURT:  Well, let me caution you, Mr. Schoen.

3    I let him use that chart but I struck -- I've instructed the

4    jury that there is no such evidence, nor will there be, in

5    this case.  So I'm -- I don't understand your question.  The

6    chart assumes that, but I didn't think the chart would lead

7    us astray because I asked the witness and he said, Well,

8    profits would have run along there up until May 27, 2014.

9            So against that background, frame another

10   question.

11   Q.   None of the things in this chart came to fruition;

12   correct?

13           MR. SHADOWEN:  Objection, your Honor, with respect

14   to the timing.

15           THE COURT:  Yeah -- well, the chart assumes a

16   happenstance after May 27th.  So I'll let him answer that.

17           That's true, isn't it?  None of that has actually

18   happened at least immediately after May 27th, did it?

19           THE WITNESS:  I'm actually not aware of what's

20   happened after May 27th.

21           THE COURT:  That's the date the jury's going to be

22   concerned with.  So let's move on.

23   Q.   Okay.  You understand, sir, that Ranbaxy's 180-day

24   exclusivity is something that's granted by statute; correct?

25   A.   I do.

1      Q.   And since you talked about a bottleneck, but since

2  the Court has found that Ranbaxy wouldn't have been able to

3  enter prior to May 27th, '14, with or without the

4  settlement, what's actually creating a bottleneck right now

5  is Ranbaxy's 180-day statutory exclusivity and not anything

6  to do with this settlement; correct?

7           THE COURT:   I'm going to, on my own motion,

8  sustain that.  He said, "The Court has found."  I don't find

9  anything.  Things are for the jury.  I said there is not

10  evidence and there will not be.  That's what I said.

11           So now put your question again.

12           MR. SCHOEN:   Sure.  I'll reframe the question.

13      Q.   Given that the Court has ruled that there is no

14  evidence that Ranbaxy would have been able to enter prior to

15  May 27th, 2014, with or without the settlement with

16  AstraZeneca, isn't it correct that to the extent there's any

17  bottleneck, that bottleneck is created by Ranbaxy's

18  statutory exclusivity under the Hatch-Waxman Act and not

19  anything to do with the settlement?

20           MR. SHADOWEN:   Objection.

21           THE COURT:   No, overruled.  He can give us his

22  answer.

23      A.   I don't agree with that.  I explicitly explained

24  how Teva is linked in here and how the presence of the

25  agreement and the components of the agreement would affect

1    Teva's behavior and how they might make a decision about

2    whether they want to push for litigation or not.

3         Q.   But Ranbaxy still has that exclusivity, regardless

4    of what date?  Even if Ranbaxy had never entered into a

5    settlement with AstraZeneca, it still has that 180-day

6    exclusivity under the statute?

7         A.   That's not the only way for Teva to get in.

8         Q.   And did any of those other ways come to fruition?

9         A.   They did not.

10             MR. SCHOEN:  Thank you.

11             THE COURT:  Mr. Baldridge, anything?

12             MR. BALDRIDGE:  No questions, your Honor.

13             THE COURT:  Thank you.  Any redirect,

14   Mr. Shadowen?

15             MR. SHADOWEN:  Yes, your Honor.

16             THE COURT:  You may.

17                      REDIRECT EXAMINATION

18   BY MR. SHADOWEN:

19        Q.   Dr. McGuire, you testified that you saw no direct

20   evidence of Teva's knowledge of the contingent launch

21   provisions.  What, if any, indirect evidence did you find?

22             MR. SCHMIDTLEIN:  Objection, report.

23             THE COURT:  No, he was asked that and he may

24   answer.

25             Let me just cabin it in a little.  You don't know,

 1    yourself, do you?

 2              THE WITNESS:  No, I have no direct evidence, your

 3    Honor.

 4              THE COURT:  All right.  You've testified to that.

 5    Now, I'm going to let you answer, did you, in your review,

 6    see any indications on -- with respect to that matter?  As I

 7    framed it can you answer that?

 8              THE WITNESS:  Yes.  And I believe I did.  The Teva

 9    agreement with AstraZeneca has exactly the same clause.

10         Q.   And what, if anything, would be the effect on

11    subsequent filers, that is subsequent even to Teva, of there

12    now being two such contingent launch provisions in the

13    agreements?

14              MR. SCHOEN:  Objection, your Honor.  Outside the

15    scope of the cross.

16              THE COURT:  Sustained.  It is.

17              MR. SHADOWEN:  No further questions, your Honor.

18              THE COURT:  Nothing further?  You may step down.

19    Thank you.  Well, excuse me.  I was too quick.

20              Mr. Schmidtlein, nothing?

21              MR. SCHMIDTLEIN:  Nothing, your Honor.

22              THE COURT:  Mr. Schoen, nothing?

23              MR. SCHOEN:  No, your Honor.

24              THE COURT:  Mr. Baldridge, nothing?

25              MR. BALDRIDGE:  No.

```
 1                THE COURT:  Thank you.  You may step down.
 2                (Whereupon the witness stepped down.).
 3                THE COURT:  Call your next witness.
 4                MR. SOBOL:  The plaintiffs call Mr. Richard
 5    Barker.  And I think this is being done -- your Honor,
 6    you've already gone through the transcript.  We're doing it
 7    as a mock, if you will; a person on the stand just going
 8    through it.
 9                THE COURT:  Oh, I understand that.  And I'll have
10    a charge for -- whoever's going to play Mr. Barker can come
11    up, and since we're going back to people who aren't live
12    witnesses, stand up and stretch.
13                (Stretch break.)
14                MR. BUTSWINKAS:  Your Honor, just so this is
15    clear, this contains their designation, our
16    counter-designations.  Can you explain that process?
17                THE COURT:  Yes.
18                MR. BUTSWINKAS:  Thank you.
19                THE COURT:  Let me just tee it up here.  Would you
20    state your name, for the record, and spell your last name?
21                MR. LETTER:  Sure.  Christopher Letter,
22    L-E-T-T-E-R.
23                THE COURT:  And you're a lawyer for -- in these
24    plaintiff lawyers -- or what are you?  Are you a lawyer?
25                THE WITNESS:  I am, in fact, a lawyer.
```

1          THE COURT:  Okay.  Well, this morning they've

2   called -- you see we don't swear him.  They call him up

3   simply to read the answers that this Mr. Barker, whoever he

4   is, gave on deposition.  And this is a perfectly acceptable

5   way of doing it.  We've seen depositions where you actually

6   get to see the witness.  Another way of doing it, if you

7   were reading short depositions, is for the lawyer himself to

8   stand up and say.

9          "QUESTION:  Where were you?

10          "ANSWER:  I was at the store.

11          "QUESTION:  What door did you go in?

12          "ANSWER:  I went in the front door."

13          Now, if anything is more boring than that, I don't

14   know what it is.  So simply to make it realistic they've

15   called this person.  He's just a reader.  Mr. Barker was

16   under oath.  Like any other witness you can believe what he

17   reads, disbelieve it, believe parts of it, just like any

18   other witness.  This is simply to make it more realistic.

19          I do have one instruction to our reader.  Don't

20   hoke it up.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  You just read the answers.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  And Mr. Butswinkas -- and this has

25   been true, incidentally, of other of these depositions that

1   have been played for you.  Among the things you see me

2   shuffle up here are the written copies of these depositions.

3   And we never read them all, but they read parts, the parts

4   they think are key.  And it's not just the parts they think

5   are key.  The defendants, AstraZeneca, Teva, Ranbaxy, they

6   get to read those parts that they want as well.

7           So even though Mr. Sobol's going to do the

8   questioning and this reader's going to do the answering for

9   Mr. Barker, some of these questions actually AstraZeneca,

10  Teva, Ranbaxy want you to hear.  I don't think that makes

11  much difference, candidly, because I -- it's up to you what

12  you believe.  You can believe parts of it, all of it, or

13  disbelieve it in its entirety.

14          So we don't swear the witness.  And you go ahead,

15  Mr. Sobol.

16          MR. SOBOL:  Your Honor, I guess I should also

17  state the name of the witness and spell it, too.

18          THE COURT:  You may do that.

19          MR. SOBOL:  Richard Stephen, S-T-E-P-H-E-N,

20  Barker, B-A-R-K-E-R.

21              RICHARD S. BARKER, via deposition

22                      EXAMINATION

23      Q.   Please state your full name.

24      A.   Richard Stephen Barker.

25      Q.   Who is your employer?

1        A.    AstraZeneca Pharmaceuticals.

2        Q.    Your current title?

3        A.    My current title is customer account manager.

4        Q.    Just approximately, as a percentage of your time,

5   what is spent on Nexium?

6        A.    Percentage.  Logistically I would say 70 percent.

7        Q.    How about Project Genesis?

8        A.    Project Genesis was the internal name for our

9   looking at developing the unauthorized generic for Nexium.

10       Q.    Is that Project Genesis still alive?

11       A.    It's still alive in the fact that we still have

12   the capability to make the product if we needed to.

13       Q.    I believe you've been involved with potential or

14   existing business relationships with Ranbaxy; is that

15   correct?

16       A.    I've been involved with the business relationship

17   with Ranbaxy.  The lower costing piece.  I'm not sure.

18       Q.    Can you tell me all of the different projects or

19   products that you have been involved with Ranbaxy

20   relationships on within AstraZeneca?

21       A.    In AstraZeneca?  There is a distribution agreement

22   for a felodipine generic.  There was a distribution

23   agreement for the omeprazole 40-milligram generic.  There's

24   an agreement with a subsidiary of Ranbaxy called Ohm

25   Pharmaceuticals for the development of the knowledge and

1    know-how to formulate Nexium capsules, 40-milligram

2    capsules.

3              There's an agreement with Ranbaxy, Ranbaxy's

4    affiliate in India to transfer the knowledge and know-how to

5    manufacture the active ingredient that's used for Nexium.

6    There were technical transfer protocols for transferring the

7    process to formulate the capsules to Ohm.

8              There's a transfer protocol for transferring the

9    API active ingredient from AstraZeneca to Ranbaxy in India.

10   There are knowledge and know-how agreements associated with

11   both the capsule technology transfer and the information

12   associated with that, as well as the API for the information

13   associated with that.

14             I also had limited, very limited involvement in

15   the settlement agreement document between AstraZeneca and

16   Ranbaxy.

17        Q.   The settlement was related to the Nexium patent?

18        A.   Yes.

19        Q.   What was that role?

20        A.   It was -- the role was primarily to provide

21   feedback around our -- the impact of -- on our capability,

22   capabilities, if we were to agree to certain required

23   quantities for both the API and the capsules, if they were

24   to be -- if the agreement were to be executed.

25        Q.   Okay.  Let me go back to what -- I believe it was

1    Plendil and the distribution agreement; is that right?

2         A.    Uh-huh.

3         Q.    Describe what that relationship is.

4         A.    That is a relationship where we have agreed with

5    Ranbaxy to provide them product under their label for them

6    to distribute in the U.S. market on AstraZeneca's behalf.

7         Q.    Do you know what volume of business that involves?

8         A.    Volume in what sense?

9         Q.    Any sense, capsules or dollars?

10        A.    Capsules is, across all strengths, between 25 and

11   30 million capsules a year.

12        Q.    Do you know what the dollar value is of those

13   capsules?

14        A.    I don't know the -- I don't know what our transfer

15   price is.

16        Q.    What is that?

17        A.    What we sell the product to them for.  I would

18   be -- without having the numbers right in front of me, I

19   don't know the exact costs.  But I have knowledge of that

20   cost.  I don't have any knowledge of the price that Ranbaxy

21   sells that product on their own.

22        Q.    What, approximately, is the cost?

23        A.    Well, there are three strengths.  There's a

24   2.5-milligram strength, which is approximately $16 a

25   hundred, for a hundred tablets.  There's 5-milligram cost

1   that is -- for clarity, that is the cost that AstraZeneca

2   sells the product to Ranbaxy for, of around $13, I believe.

3   And there's a 10-milligram that is similarly priced in the

4   $13 range per hundred tablets.

5       Q.   Were you involved in the negotiation of the

6   distribution agreement?

7       A.   Yes.

8       Q.   Do you know why the distribution agreement was

9   engaged in by AstraZeneca?

10      A.   No.

11      Q.   Were there any discussions as to the benefits to

12  AstraZeneca of the distribution agreement?

13      A.   Not with me.

14      Q.   Who is the responsible -- who is responsible for

15  negotiating that agreement?

16      A.   The responsibility -- my main contact was Terri

17  Bowman.

18      Q.   That's an attorney; right?

19      A.   Yes.

20      Q.   Was there anyone that was a businessperson

21  involved in negotiating that distribution agreement?

22      A.   Within the U.S. commercial business, you mean?

23  No.

24      Q.   Do you know why it was terminated?

25      A.   Yes.

1     Q.    Why?

2     A.    There were provisions in the distribution

3  agreement that if the sale of the 40-milligram omeprazole

4  product by Ranbaxy ended up being negative in contribution,

5  losing money, that would provide for the means for

6  AstraZeneca and Ranbaxy to terminate the distribution

7  agreement.

8     Q.    Do you know who initiated the termination?

9     A.    AstraZeneca.

10    Q.    Another agreement you mentioned was the API -- and

11 I'm sorry, I didn't catch which API it was for?

12    A.    That's esomeprazole.

13    Q.    Is there currently a relationship with the API?

14    A.    Yes.

15    Q.    What is that relationship?

16    A.    It's a supply agreement relationship that Ranbaxy

17 in India manufactures certain quantity of API for

18 AstraZeneca that we purchase from Ranbaxy and use for the

19 formulation of Nexium in the U.S.

20    Q.    Do you know the volume of supply that's provided

21 by Ranbaxy?

22    A.    I don't know the exact volume.

23    Q.    Do you know approximately the value?

24    A.    I have no idea of the value.

25    Q.    Approximately what's the volume?

1       A.    The volume is, I would say, 25 metric tons per

2  year.

3       Q.    Do you know who negotiated that supply agreement?

4       A.    Not in total.  I know of some, but I would not be

5  able to say all.

6       Q.    Well, tell me who you do know?

7       A.    It would have been Terri Bowman, Jeff Pott, Steve

8  Fishwick, Bjorn Screvrius.  Pia Jansson is another legal

9  counsel in Sweden.  If there were others, I'm not aware or

10  don't recall.

11       Q.    Were you aware of any discussions relating to the

12  value of the API supply agreement?

13       A.    No.

14       Q.    Let me move to the Ohm knowledge agreement related

15  to the 40-milligram Nexium capsule.  What is the current

16  status of that relationship?

17       A.    Current status is that we are awaiting the final

18  FDA approval of their facility.  Ohm is now in the process

19  of validating the processes associated with making the

20  product.

21            MR. SCHMIDTLEIN:  Your Honor, may I just make one

22  clarification?  It might help, because there's some time

23  relationships being referred to in the deposition where they

24  talk about "currently."

25            THE COURT:  The date of the deposition?

1              MR. SCHMIDTLEIN:  Yes.

2              MR. SOBOL:  September 1, 2011.

3              THE COURT:  And thank you, Mr. Schmidtlein and

4     Mr. Sobol.  Go ahead.

5         Q.   Let's transition over to authorized generics.  And

6     first, if you would explain to me the potential authorized

7     generic products that you've personally worked on?

8         A.   Potential?  Can you explain "potential"?

9         Q.   Anything that was considered.

10        A.   Considered but not marketed or considered and

11    marketed?

12        Q.   And/or marketed.  Considered and/or marketed.

13        A.   So there's the omeprazole AG; felodipine AG; I

14    worked on an AG version of the product for Seroquel JR; I

15    worked on a generic equivalent for Nexium; and I worked on a

16    generic equivalent of Entocort.

17        Q.   What is Entocort?

18        A.   Entocort is a GI product that is indicated for

19    Crohn's disease.

20        Q.   Any others?

21        A.   Yes.  Generic version of Crestor.

22        Q.   I want to go through each of these one by one,

23    first for the Plendil.  About what year was that?

24        A.   That would have been 2008.

25        Q.   What was the strategy that you are aware of for

1    that product?  What was AstraZeneca's strategy?

2         A.    The manufacturing strategy or the --

3         Q.    The overall business strategy for why AstraZeneca

4    was considering putting out a Plendil AG?

5         A.    Well, the Plendil product itself was already -- I

6    don't recall the exact timing.  It was already off patent or

7    soon to be, so having an authorized generic version -- I

8    think there was already a generic on the market, I just

9    can't be sure, that would offer additional opportunities for

10   AstraZeneca.  I don't have any direct responsibility or

11   knowledge of what the commercial strategy would be.

12        Q.    What ultimately happened with the Plendil AG?  Did

13   it come on to the market?

14        A.    Yes.

15        Q.    About what year?

16        A.    It would have been 2008.

17        Q.    Is Plendil AG being marketed by AstraZeneca or is

18   it outsourced to another company?

19        A.    The Plendil AG is being distributed by Ranbaxy, to

20   the best of my knowledge, there are no marketing -- there's

21   no marketing spend associated with it.

22        Q.    How -- excuse me.

23              About how long did it -- you work on the Plendil

24   AG?

25        A.    I still do.

1      Q.    When did you start working on it?

2      A.    It would have been 2008.

3      Q.    Did you work on it before it launched?

4      A.    Yes.

5      Q.    About how long before it launched did you work on

6   it?

7      A.    Six months.

8      Q.    What were your responsibilities?

9      A.    The responsibilities were to implement the

10   product.  So it's making sure we produce the product.  We

11   develop all the labeling, all the components, we have a way

12   to package it.  We establish the means to be able to sell

13   it.

14      Q.    Let's turn to Prilosec.  What year was the

15   Prilosec AG worked on?

16      A.    Again, to the best of my knowledge, without having

17   the timelines in front of me, it was in the third quarter

18   time frame 2008 is when the patent -- was when Watson

19   Pharmaceuticals launched their 40-milligram version.

20      Q.    What was your personal responsibility or your

21   role?

22      A.    Same as felodipine.

23      Q.    At what time did you become involved?

24      A.    It would have been roughly six months prior to.

25      Q.    Do you know what the strategy was, business

1    strategy, for work on Prilosec AG?

2        A.   Not directly.

3        Q.   What did you know about it?

4        A.   I just know that we were instructed to have an

5    authorized generic prepared so that we could go to the -- to

6    market when Watson Pharmaceuticals launched their version,

7    which would be the first generic version of omeprazole or

8    Prilosec 40-milligram.  That's why the dates for me are a

9    little nebulous, because it's really dependent on what

10   Watson did more than it was a fixed date.

11       Q.   Did AstraZeneca, in fact, come up with a Prilosec

12   AG?

13       A.   Through the distribution agreement with Ranbaxy.

14       Q.   Do you have ongoing responsibility with Prilosec

15   AG?

16       A.   No.  We don't market the Prilosec AG anymore.

17       Q.   When did that stop?

18       A.   Again, it was sometime in second quarter of 2009,

19   to the best of my knowledge.

20       Q.   Approximately when was the Entocort AG worked on?

21       A.   That happened in June of this year.

22       Q.   What is its current status?

23       A.   It was launched in June.

24       Q.   When did you first become involved with that

25   product?

1        A.    In June.

2        Q.    What --

3        A.    The AG product?

4        Q.    Yes.

5        A.    It would have been in June.

6        Q.    What were your responsibilities?

7        A.    To develop the capability to package a generic

8   version of Entocort.

9        Q.    How long did it take to develop the capability to

10  package Entocort?

11       A.    Well, this was primarily a packaging capability

12  project, so that was done in three weeks.

13       Q.    Where is the product being produced?

14       A.    Entocort?

15       Q.    Yes.

16       A.    The product itself is produced in Sweden.

17       Q.    Is it produced at the same facility as the brand;

18  the AG and the brand produced at the same facility?

19       A.    For Entocort?

20       Q.    Yes.

21       A.    Yes.

22       Q.    Who markets the AG product?

23       A.    Parr Pharmaceuticals.

24       Q.    Mr. Barker, I want to turn to the potential Nexium

25  authorized generic that I know you did some work on.  First,

1    when did you become involved in working on Nexium AG?

2         A.   It was in 2007.

3         Q.   Do you know who within AstraZeneca recommended

4    initiating work on a Nexium AG?

5         A.   I don't know who was responsible for actually

6    recommending the initiation personally.  No, I don't know or

7    have knowledge of that.

8         Q.   Do you know why AstraZeneca initiated work on a

9    Nexium AG?

10        A.   The only thing that I know is that there were

11   activities related to the challenges of Nexium patents that

12   required us to look at capabilities.

13        Q.   What were your responsibilities relating to the

14   potential Nexium AG?

15        A.   To develop what options that we would have to

16   develop something that could be a product, a product that

17   could be used as a generic version of Nexium, to understand

18   broadly what a timeline would be to do the preparations, and

19   to identify order of magnitude of cost for -- that

20   AstraZeneca would have to incur if it were to choose to

21   make, prepare the product.

22        Q.   What were the options that you came up with?

23        A.   We looked at options around the identity of the

24   product.  We looked at what we would -- we physically could

25   chemically manufacture that would not be too different from

1    the branded Nexium product, but would be a product that

2    would be defined from a clinical and regulatory perspective

3    to be equivalent.

4              So in broad terms it was to come up with a

5    different color capsule that would be unique

6    identification -- could be used as a unique identifier for

7    the product.

8         Q.   Anything else with respect to the options?

9         A.   In what regard?

10        Q.   Any of the work that you did?

11        A.   Oh, we certainly looked around our capabilities

12   and did some high-level work with regard to what would have

13   to be done in order to make the assets available to produce

14   the product.  So that would be related to primarily --

15   primarily time within the manufacturing facilities to do it.

16        Q.   What were the -- what did you find out about what

17   assets would be available to produce?

18        A.   We found out that it would take some time for us

19   to be able to make the assets available to actually do the

20   production if we were not to impact our ability to

21   manufacture the Nexium brand product that was forecasted for

22   that period of time.

23        Q.   What assets are you talking about?

24        A.   These are formulation assets used to formulate the

25   capsule primarily -- well, in packages, the lines that are

1    used to package what you would need to package.

2         Q.    What particular plant or facility was being

3    discussed?

4         A.    For the formulation piece it was Sweden, and the

5    packages piece it was Merck -- it is Merck.  Excuse me.

6         Q.    Has Merck done any formulation?

7         A.    Of the AG product?

8         Q.    Of either Nexium or the AG?

9         A.    Merck produces Nexium.

10        Q.    All right.  What did you come up with for

11   timelines for preparations for the Nexium AG?

12        A.    In broad timelines it was, from what I can

13   recollect, six to eight months.

14        Q.    Six to eight months, from what to what?

15        A.    From the time that the business would give us

16   authorization to start producing until we could have product

17   packaged and ready to distribute.

18        Q.    Did you report these timelines to anyone?

19        A.    Yes.

20        Q.    Who?

21        A.    It would have been reported to the senior

22   management within the AstraZeneca organization and through

23   the senior management within U.S. operations.

24        Q.    All right.  Let's turn to the cost that you worked

25   on.  What exactly did you do with respect to when you said

1    that you worked on cost for AstraZeneca to make the product?

2         A.    So what my responsibility was is to develop the

3    cost to AstraZeneca for the materials that would be needed

4    to make the quantity of product that we would -- estimated

5    that we would make as part of the preparation.  So that

6    would be materials such as the API, and all the other

7    ingredients that go into the product -- the capsule, the

8    components, bottles, labels, caps, shipping cartons -- the

9    major pieces of the costs that would be, to give the

10   business order-of-magnitude estimate of what the investment

11   would be.

12        Q.    Did you end up providing an assessment as to what

13   the investment would be?

14        A.    Yes.

15        Q.    What was your conclusion?

16        A.    As far as dollars?

17        Q.    Yes.

18        A.    From what I can recall, the estimates were

19   provided in sequential spend such -- so that if the business

20   understood how much additional value was being placed or

21   would be placed into the product as major parts of the

22   formulation of the packaging would take place.  So there

23   were several estimates that, in total, internally within

24   AstraZeneca.  I don't recall the exact numbers, but it was

25   several million dollars.

1      Q.   That was a total of several million dollars for

2  AstraZeneca?

3      A.   Yes, beginning to end.

4      Q.   Did you report these cost figures?

5      A.   Yes.

6      Q.   What was done with the cost figures?

7      A.   The cost figures, I don't know exactly what was

8  done with them.  The purpose was to inform the business

9  around -- to give a sequential timeline and an approximate

10  order-of-magnitude cost to produce the product.  I mean,

11  that was the purpose for the work that I did.

12      Q.   Do you know what the business did with the

13  information with respect to the timelines and the cost

14  information that you reported to?

15      A.   As I mentioned, I reported to senior management

16  both within the commercial organization and senior

17  leadership within U.S. operations.  I don't know what was

18  done with those costs, but the decision was eventually to

19  make the product.

20      Q.   I believe you said the decision was to make the

21  product; is that correct?

22      A.   Yes.

23      Q.   And was product actually made?

24      A.   Yes.

25      Q.   How much was actually made?

```
 1        A.    In quantity?

 2        Q.    Yes.

 3        A.    Approximately 110 million capsules across the

 4   range.

 5        Q.    What was done with the 110 million capsules?

 6        A.    The 110 million capsules that were produced were

 7   packaged and placed into a warehouse.

 8        Q.    Is that where they sit today?

 9        A.    Actually, that product has since been destroyed.

10        Q.    Do you know why the figure 110 million was chosen?

11        A.    Yes.

12        Q.    Why?

13        A.    It was based on assumptions around what the market

14   demand would be if there were to be a decision to launch.

15   And it was based on what we believed our response time would

16   be in the event that there was a launch.  And it was

17   designed to be enough product to be able to allow someone to

18   distribute the product for us, and allow us enough time then

19   to convert our manufacturing operations for -- from Nexium

20   brand over to the AG formulation to allow for the supply to

21   continue.

22        Q.    When was the 110 -- when were the 110 million

23   capsules actually produced?

24        A.    To the best of my recollection, it would have been

25   very late in 2007 to the beginning of 2008.
```

1          Q.   When were they placed in the warehouse?

2          A.   It would have been in 2008.

3          Q.   When were they destroyed?

4          A.   The expiration on the product is three years.   So

5     it would have been the beginning of -- I don't recall

6     exactly.

7          Q.   Do you know what the cost was to make the

8     110 million capsules?

9          A.   The cost to AstraZeneca?

10         Q.   Yes.

11         A.   Yes.

12         Q.   What is it?

13         A.   It was approximately $10 million.

14         Q.   Did anybody else contribute?

15         A.   To that cost?

16         Q.   Yes.

17         A.   No.

18         Q.   Did anybody else have any cost associated with

19    producing the 110 million that's not represented by that

20    $10 million figure?

21         A.   No.

22         Q.   You mentioned that assumptions on market demand

23    were used in determining the 110 million figure.   Who made

24    assumptions on market demand?

25         A.   That was done by folks who have responsibilities

1    for intelligence and forecasting.

2         Q.    Who are those individuals at this time?

3         A.    At this time was Travis Cook and Steve Rothwein.

4         Q.    Anybody else?

5         A.    I'm just thinking of the finance link.  It would

6    have been John Brazzo.

7         Q.    What did Mr. Cook, Mr. Rothwein, Mr. Brazzo

8    actually do in terms of preparing these assumptions for

9    market demand?

10        A.    I don't know exactly what they did, but the output

11   was to do some modeling with regard to what the potential

12   dynamic would be if there were generic introduction of

13   Nexium in the marketplace as it would relate to impact on

14   Nexium brand, erosion of the brand and, I guess, what an

15   expected uptake of generic product would look like.

16        Q.    Did you actually see these models?

17        A.    I did.

18        Q.    Going back to the 110 million capsules that were

19   produced, I asked you when they were produced but I'm not

20   sure if there's any difference in production and being ready

21   to be marketed.

22             So let me ask you the question going back to the

23   110 million capsules.  When would those 110 million capsules

24   have been ready to actually be sold to customers in the

25   marketplace?

1          A.    In 2008.

2          Q.    About what month?

3          A.    March.

4          Q.    Were you part of any discussions related to who

5     might enter as a generic competing against Nexium?

6          A.    Yes.

7          Q.    Who was being discussed?

8          A.    For the discussions that I was directly involved

9     in it was Ranbaxy.

10         Q.    And who gave you -- or who discussed that Ranbaxy

11    might enter?

12         A.    Again, the -- my lead contact with regard to those

13    discussions was Terri Bowman.

14         Q.    Were you part of any discussions where the

15    likelihood of Ranbaxy's entering was discussed?

16         A.    Yes.

17         Q.    Who did you actually have discussions with with

18    relationship to the likelihood that Ranbaxy would enter?

19         A.    Terri Bowman.

20         Q.    Was there anyone else?

21         A.    Jeff Pott was involved in discussions.

22         Q.    Anyone else?

23         A.    Others would have come.  I don't want to

24    speculate.  There were others.

25         Q.    Business people at AstraZeneca?

1      A.    Yes.

2      Q.    Are you aware of whether anyone at AstraZeneca

3  assessed whether Nexium AG would be profitable for

4  AstraZeneca?

5      A.    No.

6      Q.    Okay.  We've discussed about the production of the

7  110 million capsules in 2008 time frame.  Were there any

8  technical obstacles that prevented a launch, that you are

9  aware of, in 2008?

10      A.    Strictly on the technical aspects of formulating

11  the product, no.

12      Q.    Are you aware of any business reason not to launch

13  in 2008?

14      A.    No.

15      Q.    Do you know who made this decision not to launch

16  Nexium AG?

17      A.    No.

18      Q.    What's the status of the production side if the

19  business wanted to produce more Nexium AG caps?

20      A.    There is the capability.

21      Q.    What would you -- excuse me.

22            What would need to be done in order to launch

23  Nexium AG currently?

24      A.    Essentially, the same thing that would have had to

25  have been done to prepare.

1          Q.   About how long do you think it would take in order

2     to launch Nexium AG from today?

3          A.   Six to eight months.

4          Q.   Are you aware of any technical or business reasons

5     why such a launch could not occur if AstraZeneca decided to

6     move forward in the next six to eight months?

7          A.   Purely from a technical perspective, no.

8          Q.   Mr. Barker, you have before you what has been

9     marked as PX 212, which appears to be two pages and an

10    attachment with slides on it.  The Bates stamp number are

11    NEX-RBX-3514442 through 453.

12          Do you recognize what PX 212 is?

13          A.   Yes.

14          Q.   What is it?

15          A.   This is just a communication of the general

16    summary of the framework around the actions and general

17    information around what the Nexium AG project would look

18    like to -- my communication of this was to others within

19    AstraZeneca that would be -- need to be informed around some

20    information that may impact them on the operation side of

21    the business.

22          Q.   In the e-mail, at the top of the first page, which

23    is from you to several individuals, it looks like one of the

24    people you mentioned before, Karin, then there's Christian

25    Trulsson and Philippe Pican.  Who are the second two

1    individuals?

2         A.    Christian Trulsson works within Sweden operations,

3    and he worked with the Nexium planning group at Sweden as it

4    relates to the manufacture of Nexium product in general.

5         Q.    And the last person?

6         A.    And Philippe Pican worked in our AstraZeneca

7    France organization, and at the time was responsible for the

8    API, the active ingredient manufacture within AZ France.

9         Q.    At any time was Merck not supportive of the

10   project, that you recall?

11        A.    Strictly from an operations point of view they --

12   I wasn't aware of Merck not being prepared to support us if

13   we asked them to package the product, no.

14        Q.    Outside of strictly operations, did you hear of

15   any indication that Merck was not supportive at any time of

16   the project?

17        A.    No.

18        Q.    What did Merck have to do to support the project?

19        A.    In general terms they needed to create some time

20   on their packaging assets to physically package the capsules

21   into a final, marketable package.

22        Q.    Anything else?

23        A.    No.

24        Q.    Were there additional costs to Merck, for creating

25   that time on the packaging assets, that you're aware of?

1      A.    No.

2      Q.    You have before you what's a one-page document

3   identified as PX 214.  It's an e-mail from Steve Rothwein to

4   Richard Barker cc'g Travis Cook, "Subject, Genesis."  There

5   is an attachment indicated, but I do not have the attachment

6   with this particular e-mail.  The Bates stamp number of this

7   exhibit is NEX-RBX-3514366.

8          Do you recall this e-mail?

9      A.    Yes.

10     Q.    What is the e-mail referring to?

11     A.    This is referring to a graphical form of the

12  projections of what would happen to the branded volume of

13  Nexium if there were a generic launch, to the best of my

14  knowledge, assuming one entry for six months and then up to

15  maybe others further on, and what the expected erosion curve

16  of the brand would be as it relates to the time -- to time

17  from when a generic was launched onward.

18     Q.    In terms of the numbers given in the first

19  paragraph, related to the erosion, were there any updates

20  that you received that significantly altered the numbers

21  that you were working under?

22     A.    I'm sure there were many updates to the

23  assumptions.  Again, based on the date of this particular

24  communication, this was relatively early on in discussion,

25  so I would think it is highly likely that there were updates

1   associated with some of these assumptions.

2           MR. SOBOL:  Your Honor, that concludes this.

3           There were, I believe, two exhibits mentioned.

4   The second, which was PX 214, I understand is Exhibit 126.

5   And then the first of the two, which was identified as PX

6   212, has been marked for identification as DDX, and we offer

7   it.

8           MR. SCHMIDTLEIN:  No objection.

9           THE COURT:  There is an objection.  May I see it?

10          MR. SCHMIDTLEIN:  No, I'm sorry, your Honor.  I

11  said, "No objection."

12          THE COURT:  Okay.  So PX 212, DVX now, is admitted

13  in evidence, Exhibit 144.  Oh, it's DDX.  Thank you.  But it

14  will be in evidence 144.

15          (Exhibit 144 received in evidence.)

16          THE COURT:  You may step down, thank you.

17          Call your next witness.

18          MR. SOBOL:  Plaintiffs call Patricia Jaworski by

19  video deposition.

20          THE COURT:  Very well.  We may play the

21  deposition.  Hold up one second.  How long is it?  Just --

22  will it take us till 1:00 or is it shorter?

23          MR. SOBOL:  It's 22 minutes -- I'm sorry, 25

24  minutes.

25          THE COURT:  Twenty-five minutes.  Stand up and

1    stretch.  I express no opinion on any of this.  If I let you

2    see it, it's evidence.  You may believe it in its entirety,

3    you may disbelieve it, you may believe parts of it.

4              (Stretch break.)

5              THE COURT:  Please be seated.  Play the

6    deposition.

7              (Video played.)

8                   PATRICIA JAWORSKI, via video

9                      DIRECT EXAMINATION

10       Q.   Good morning, Ms. Jaworski.

11       A.   Good morning.

12       Q.   My name is Peter Kohn.  I'm going to be taking

13   your deposition here today in the Nexium antitrust

14   litigation.  Are you ready?

15       A.   I am.

16       Q.   So you've been with Teva since 2006; is that

17   right?

18       A.   Correct; as part of an Ivax acquisition.

19       Q.   And when you moved over to Teva, you continued to

20   be in regulatory affairs; is that right?

21       A.   I -- yes, I did.

22       Q.   Now, I want to talk to you a little bit about how

23   an ANDA gets FDA approval.  And I'm going to ask you whether

24   or not you agree with this statement.

25              You submit an ANDA for a generic product.  The FDA

1    goes through a review process.  Any questions that FDA may

2    have are addressed by the applicant, and at such time as the

3    FDA finds the product to be pharmaceutically equivalent and

4    bioavailable to the reference listed drug, we would receive

5    approval.

6              Do you agree with that statement?

7         A.   I do.

8         Q.   Now, I want to talk about amendments to ANDAs for

9    a moment.  Is that something that is a normal occurrence in

10   your experience as a regulatory affairs professional?

11        A.   Yes, it is.

12        Q.   What are amendments to an ANDA?

13        A.   They're -- excuse me.  They're responses to the

14   agency's questions.

15        Q.   So in the course of the back-and-forth between the

16   generic drug company that filed the ANDA, and FDA, the

17   agency, FDA, often has questions that it addresses to the

18   generic drug company about the ANDA; is that right?

19        A.   That's correct.

20        Q.   And the generic drug company answers those

21   questions by way of things called amendments; is that right?

22        A.   Yes, that's correct.

23        Q.   And priorities within Teva can dictate when an

24   ANDA gets filed; is that right?

25        A.   I'm sorry.  Can you say again?

1          Q.    Sure.  Didn't you previously testify that

2     priorities within the organization, that is within Teva,

3     dictate when ANDAs get submitted to FDA?

4          A.    Originally -- I suspect you're asking the question

5     about an original ANDA, when it would be filed.

6          Q.    Yes.

7          A.    "Priorities," I don't know that "priority" is the

8     correct word.  But certainly within any organization there

9     is typically a number of submissions planned for a year, and

10    depending upon the success of a bio study, depending upon

11    the availability to be first to file, depending on a lot of

12    different facets that are business-related would then

13    determine the priority of that submission.

14         Q.    I want to turn now to Teva's plans for ANDA

15    approval and launch of generic esomeprazole magnesium.

16               Let's mark this Jaworski 4.

17               Okay, good.  So this is a series of e-mails

18    between Cipla and Teva; is that right?

19         A.    Yes.

20         Q.    And they are from April of 2006; is that right?

21         A.    That's correct.

22         Q.    And so Rashmi at Cipla writes this e-mail in April

23    of 2006 to Stavroula Drosatou; is that correct?

24         A.    Yes.

25         Q.    And April of 2006 is how many months after the

1    esomeprazole magnesium was filed by Ivax and acquired by

2    Teva?

3         A.   What was the date of filing?  It was in 2005?

4         Q.   I think it was in November of 2005, you previously

5    testified.

6         A.   So then five months.  Did I do the math correctly?

7         Q.   I think that's right.

8              Now, before I ask you more about this, what is

9    Cipla?

10        A.   Cipla, in the case of esomeprazole, is both the

11   API manufacturer, supplier, and the contract manufacturer

12   for the product.

13        Q.   So "API," so the jury understands, is "active

14   pharmaceutical ingredient"; is that right?

15        A.   That's correct.

16        Q.   And you also use the phrase "contract

17   manufacturer."  Would you explain what that is?

18        A.   It's -- Teva is not manufacturing the product.

19        Q.   Somebody else is?

20        A.   Cipla is, in this case.

21        Q.   For Teva?

22        A.   Yes.

23        Q.   And did Cipla have a number of contracts with Ivax

24   in connection with contract manufacturing of API and

25   finished drug products?

1    A.   I can recall that we worked on more than one ANDA

2    with Cipla at the time that we were Ivax.

3    Q.   And how about after Teva acquired Ivax?  Was Cipla

4    still the contract manufacturer for esomeprazole magnesium?

5    A.   Yes.  Cipla's remained the contract manufacturer.

6    Q.   All right.  So it looks like Rashmi at Cipla is

7    asking Teva here, "We would like to know approximate

8    commercial batch manufacturing timeline for esomeprazole

9    magnesium DR" -- does that mean "delayed release"?

10   A.   Yes, it does.

11   Q.   -- "capsules."  Did I read that right?

12   A.   Yes, you did.

13   Q.   Okay.  And then Lance is asked by Rashmi that

14   question again a couple of days later; is that right?

15   A.   Yes.  There's a -- Rashmi asks Lance that same

16   question.

17   Q.   And then Ms. Drosatou of Teva responds to Rashmi

18   on April 26th at 11:04 p.m.; is that right?

19   A.   That's what this e-mail says.

20   Q.   And she says, "Dear Rashmi:  Currently projected

21   launch date is July 2008."  Is that right?

22   A.   That's what this says, yes.

23   Q.   Okay.  And July 2008 corresponded with the end of

24   the 30-month stay applicable to Teva's ANDA; is that right?

25   A.   That would be correct.

1      Q.   And the 30-month stay that I just referred to is

2  the 30-month stay during which FDA may not approve Teva's

3  ANDA because AstraZeneca sued Teva for patent infringement

4  under the Hatch-Waxman Act; is that right?  Is that your

5  understanding, as a regulatory affairs professional?

6      A.   Yes, that's correct.

7      Q.   Okay.  All right.  And then Rashmi responds a day

8  later to Ms. Drosatou of Teva and she says, "Thanks for your

9  response.  Since the manufacturing site of esomeprazole

10  capsules is Cipla Kurkumbh, K-U-R-K-U-M-B-H, where we have

11  already started the commercial batches of other products, we

12  would like to know the preliminary forecast of esomeprazole

13  capsules to look at batch size, equipment, and commercial

14  manufacturing facility."

15          Did I read that correctly?

16      A.   Yes, you did.

17      Q.   And she asks, "Further, it will be helpful to us

18  if you can arrange to send the same ASAP."

19          Did I read that correctly?

20      A.   Yes, you did.

21      Q.   Okay.  I'm going to show you another document

22  which I'm going to mark as Jaworski 6.

23          Is this an e-mail that was sent to you by

24  Stavroula Drosatou?

25      A.   Yes.

1          Q.   And did she send that to you on January 17, 2008?

2          A.   She did.

3          Q.   And the subject is, "Esomeprazole API Site

4     Transfer."  Is that right?

5          A.   That's the subject.

6          Q.   And she writes to you and to Ms. Titi in

7     regulatory affairs and says, "Cipla wants to discuss the

8     possibility of a site transfer for the esomeprazole API.

9     Please can you advise what information you would need to

10    evaluate the change and the regulatory requirements and

11    decide on the timing that would not impact timing for

12    launch?"

13         Did I read that correctly?

14         A.   Yes, you did.

15         Q.   So do you recall Cipla thinking about a site

16    transfer for the manufacture of esomeprazole magnesium API?

17         A.   In the review of some documents that I've looked

18    at in the past day, yes, there seems to have been some

19    discussion about a site transfer.

20         Q.   Now, as a regulatory affairs professional you are

21    familiar with whatever steps are required in order to obtain

22    FDA approval for a site transfer for API manufacturing; is

23    that right?

24         A.   One would hope.

25         Q.   Yes.  And so site transfers for API are the sort

1    of thing that goes into what's called a DMF; is that right?

2         A.    Cipla would provide that information in their DMF.

3         Q.    And the "DMF" is an abbreviation for the "drug

4    master file"; is that correct?

5         A.    That's correct.

6         Q.    And companies like Cipla who manufacture active

7    pharmaceutical ingredient, or API, that is going to be used

8    in pharmaceutical products sold in the United States have to

9    submit or have on file things called DMFs; is that right?

10        A.    That's correct.

11        Q.    And are those DMFs submitted to FDA?

12        A.    They are.

13        Q.    And does FDA approve those DMFs and review them

14   from time to time?

15        A.    FDA reviews those DMFs in conjunction with an

16   application.

17        Q.    So Ms. Drosatou here in Jaworski 6 is interested

18   in input from regulatory affairs with respect to this API

19   site change; right?

20        A.    Uhm-hmm.  Yes.

21        Q.    And she expresses some concern about the timing

22   that would not impact the timing for launch; is that right?

23        A.    Yes.

24        Q.    And this is January 17 of 2008; is that right?

25        A.    That's correct.

1          Q.   Now, Exhibit 9 is an e-mail on which you were

2     copied; is that correct?

3          A.   Yes.

4          Q.   And it's another one of the "Cipla New Products

5     Agenda For Meeting" e-mails; is that right?

6          A.   Yes, that's what it says here.

7          Q.   This one, Jaworski 9, is an agenda for a meeting

8     on May 9th, 2008; right?

9          A.   That's correct.

10          Q.   And this e-mail is sent to the group by Ayne

11     Klein; is that right?

12          A.   That's correct.

13          Q.   In regulatory affairs; right?

14          A.   Yes.  In 2008 Ayne was still in regulatory.

15          Q.   And so she -- she was responding to an e-mail from

16     Stavroula Drosatou; is that right?

17          A.   Yes.

18          Q.   And in the agenda there's a line item for

19     esomeprazole capsules.  Do you see that?

20          A.   I do.

21          Q.   And the item says, "Target launch date change."

22     Do you see that?

23          A.   I do.

24          Q.   And Jaworski 12 is an e-mail from Andrea Guardia.

25     Do you see that?

1        A.    I do.

2        Q.    And she see sends this e-mail to, among other

3   people, yourself; is that right?

4        A.    That's correct.

5        Q.    And the subject is, "Cipla/TUSA Meeting Minutes –

6   August 20, 2009."  Is that right?

7        A.    Yes.

8        Q.    And "TUSA" is Teva USA; is that right?

9        A.    That's correct.

10        Q.    And Ms. Guardia says, "To all team members,

11   attached are the minutes from August 20th meeting.  Please

12   review the minutes to ensure that your responsibilities are

13   addressed," and she schedules a next meeting for

14   September 3rd; is that right?

15        A.    That's what it says here, yes.

16        Q.    What is the team that you were on?

17        A.    I don't recall attending this meeting, but my

18   colleague and someone from my department, Aglaye Metellus,

19   in all likelihood attended.

20        Q.    And the title of the meeting minutes is

21   "Cipla/TUSA Project Review."  Is that right?

22        A.    That's what it says here, yes.

23        Q.    And the project review reviews the status of

24   various projects that Cipla and Teva are working on; is that

25   right?

1      A.   Well, Ms. Guardia has chosen some projects that

2   Cipla and Teva are working on, yes.

3      Q.   And to your -- to the best of your knowledge, this

4   "esomeprazole tablets" entry pertains to the esomeprazole

5   capsule ANDA that Ivax filed, and Teva acquired during the

6   acquisition of Ivax, and that was being

7   contract-manufactured by Cipla; right?

8      A.   In all likelihood this is the esomeprazole capsule

9   project that you're talking about.

10      Q.   And that project is listed as being on hold; is

11   that right?

12      A.   That's what it says here.

13      Q.   As of August 20th, 2009; right?

14      A.   Yeah.  But it also says "dual track," which I

15   don't understand.  So I don't understand what "on hold"

16   means.  Does dual track refer back to that Israel project?

17   I don't know.

18      Q.   Did the esomeprazole magnesium ANDA that Teva was

19   advancing and is advancing before FDA, did that ever receive

20   a major deficiency?

21      A.   A major chemistry deficiency?  I don't believe it

22   did.

23      Q.   Okay.  And how about any other major deficiency?

24      A.   I don't believe any of the letters were --

25   indicated major deficiency but I would have to review them.

1        Q.   Have you looked at Exhibit Jaworski 19?

2        A.   I've reviewed it.

3        Q.   Do you see at the footer at the bottom that it was

4   prepared by Sophy Abraham on February 9th, 2011, at 3:30

5   p.m.?

6        A.   I see that it says that, yes.

7        Q.   And the title of this document is, "Submission

8   Summary:  Esomeprazole Magnesium DR Capsules, 20-milligram

9   and 40-milligram."  Is that correct?

10       A.   That's what this -- that's what the title says.

11       Q.   And Sophy Abraham was a regulatory affairs

12  associate under your direction as of February 9th, 2011; is

13  that correct?

14       A.   I wasn't back in regulatory February of 2011.

15       Q.   Okay.  So my question was what is a submission

16  summary?

17       A.   Well, it appears here that the submission summary

18  is the event of incoming and outgoing correspondence from

19  the agency.

20       Q.   Between FDA and Teva?

21       A.   Between FDA and Teva.

22       Q.   And are submission summaries things that are

23  regularly created for ANDA files?

24       A.   Not necessarily.

25       Q.   Were there particular circumstances under which

1  submission summaries were created, in your experience?

2      A.   Not that I know of.

3      Q.   I'm going to show you Jaworski 20.  So this is an

4  e-mail sent by Andrea Guardia to a number of people,

5  including yourself, on August 25th, 2008; is that right?

6      A.   Yes.

7      Q.   And that was a few weeks after the August 5th,

8  2008, CMC deficiency was received by Teva; right?  Jaworski

9  18?

10      A.   Okay.

11      Q.   And she attaches meeting minutes from a Cipla

12  meeting dated August 19th; right?

13      A.   Yes.

14      Q.   And the first action item from that meeting was

15  TUSA regulatory status in responding to the esomeprazole

16  deficiency letter; right?

17      A.   Yes.

18      Q.   And that's from the meeting minutes of August 19,

19  2008; correct?

20      A.   That's correct.

21      Q.   Would you turn to the esomeprazole entry on

22  page 3 of Jaworski 20?  The first bullet under "Esomeprazole

23  Tablets" is "Cipla and TUSA, RA" -- and that's Teva USA

24  regulatory affairs; correct?

25      A.   Uhm-hmm.

1          Q.    -- "evaluated the deficiency letter received and

2     there are no significant risks."

3               Do you see that?

4          A.    I do.

5          Q.    And then the action item, the first action item

6     is, "Respond to the deficiency letter by week of 8/25."

7               Do you see that?

8          A.    I do.

9          Q.    Okay.  How do you understand the phrase "no

10    significant risks"?

11         A.    I don't.

12         Q.    You don't understand --

13         A.    -- understand the phrase "no significant risks."

14    I don't know if they're speaking to one deficiency, to the

15    entire letter, to the API, to the finished dosage form.  I

16    don't really know what the significant risks refer to.

17         Q.    So when, under "Esomeprazole," the first bulleted

18    point is, "Cipla and Teva USA Regulatory Affairs evaluated

19    the deficiency letter received and there are no significant

20    risks," when that appears in these meeting minutes you don't

21    know what the phrase "no significant risks" means; is that

22    your testimony?

23         A.    That's my testimony today.  I don't know what that

24    means.

25         Q.    And in the time, the intervening time between

1    August 19th of 2011, and now, which is September of 2013,

2    has Teva received a major deficiency?

3        A.   I don't believe we have.

4        Q.   So other than that chemistry deficiency from

5    August of 2008, is there any other open deficiency as of

6    July 23rd, 2010, according to Ms. Abraham's chronology?

7        A.   As represented by Sophy Abraham it would appear

8    that there isn't.

9        Q.   Would you now turn to Jaworski 24, which is the

10   meeting minutes and the response plan.

11       A.   Okay.

12       Q.   So it doesn't look like you're copied on this; is

13   that right?

14       A.   It doesn't look like I'm copied on many of these

15   correspondences.  That's right.

16       Q.   So the e-mail is from Joseph Faust.  Do you see

17   that?

18       A.   I do.

19       Q.   And he dates his e-mail March 29th, 2012; right?

20       A.   That's correct.

21       Q.   Who is Joseph Faust?

22       A.   I don't know.

23       Q.   And he is sending this to a number of people,

24   including John Kovaleski, who is in regulatory affairs;

25   right?

1      A.   Yes.   In 2012 he was still in regulatory affairs,

2  correct.

3      Q.   And Aglaye Metellus?

4      A.   Aglaye, yes.

5      Q.   Sorry.

6      A.   Still in regulatory affairs.

7      Q.   Are there any other regulatory affairs personnel

8  in the "To" line?

9      A.   Yeah.   Cheryl Kamiya, Ruth Collins, Diane Harper.

10     Q.   So there are a number --

11     A.   Rob Vincent.

12     Q.   Let's take a look at the response plan now, which

13 is the Excel spreadsheet that follows.   Do you see how there

14 are a number of DMF numbers?

15     A.   Yes.

16     Q.   And it goes from DMF 1 through DMF 14 -- do you

17 see that? -- in the first column?

18     A.   I do.

19     Q.   And you would understand those to be the

20 deficiencies that FDA identified in Cipla's DMF for the

21 active pharmaceutical ingredient esomeprazole magnesium;

22 right?

23     A.   Yes.

24     Q.   And further on down the line you would see -- you

25 see minor A1 through A13; right?

1      A.   Yes.

2      Q.   And those correspond to the enumerated chemistry

3  deficiencies that we saw in Jaworski 23; right?

4      A.   Yes, I would say so.  Uhm-hmm.

5      Q.   Okay.  In the next column, the actual text of

6  FDA's comment or deficiency is given; right?

7      A.   Okay.  I see that.

8      Q.   And then in the following column the response plan

9  is given; right?

10      A.   Yes.

11      Q.   Then there's a due date in the next column; right?

12      A.   Uhm-hmm.

13      Q.   The owner name in the next column?

14      A.   Uhm-hmm.

15      Q.   And then the status; right?

16      A.   Uhm-hmm.

17      Q.   Okay.  Now, up above, in the title of this

18  spreadsheet is the title, "Esomeprazole Magnesium Dihydrate

19  DMF Deficiency Letter dated January 27, 2012."

20           Do you see that?

21      A.   I do.

22      Q.   And "Esomeprazole Magnesium Delayed Release

23  Capsules 20-milligram and 40-milligram Minor Deficiency

24  Letter dated March 7, 2012 Response Plan."

25           Do you see that?

1     A.    I do.  I see that.

2     Q.    Okay.  So here we have the deficiencies all laid

3     out and the response plan laid out; right?

4     A.    The response -- the response plan is laid out.

5     Again, I'm not copied on here and I wasn't part of this

6     response plan.  But I'm assuming -- I will make the

7     assumption that regulatory agreed to this plan.  That is an

8     open assumption because oftentimes people put plans together

9     without our input.

10    Q.    Now, the launch date here is listed as May 27,

11    2014.  Do you see that?

12    A.    May 27, 2014.  I do see that.

13    Q.    And do you know if that launch date corresponds

14    with a date that is contained in an agreement between

15    AstraZeneca and Teva pertaining to esomeprazole magnesium?

16    A.    I don't know that personally, no.

17    Q.    Have you heard that?

18    A.    I heard that in terms of this litigation, yes.

19    Q.    My question to you simply, on Jaworski 27, is

20    this:  Do you see the revision date of the draft guidance on

21    esomeprazole magnesium is March of 2011?

22    A.    Yes.

23    Q.    Do you see anything in there about a nasogastric

24    tube study?

25    A.    In -- in this guidance?

1      Q.   Correct.

2      A.   No, I don't.

3      Q.   And this guidance is what FDA thinks should be

4   done by an ANDA filer seeking to demonstrate bioequivalence

5   to Nexium; is that right?

6      A.   This is the guidance -- this is a guidance that

7   Biopharm would be reviewing before conducting a

8   bioequivalence study.

9      Q.   So March of 2012 is the first time FDA ever told

10  Teva anything about the need to perform nasogastric tube

11  testing for esomeprazole magnesium; is that your testimony?

12     A.   So it appears that it is in 2012.

13          (Video stopped.)

14          THE COURT:  Is that it?

15          MR. SHADOWEN:  That's it.

16          For the record, your Honor, Deposition

17  Exhibit 4 is Exhibit EJN for identification.  Deposition

18  Exhibit 6 is Exhibit ELB for identification.  Deposition

19  Exhibit 9 is Exhibit ELI for identification.  Deposition

20  Exhibit 12 is Exhibit EMP for identification.  Deposition

21  Exhibit 19 is Exhibit FIM for identification.  Deposition

22  Exhibit 20 is Exhibit FIN for identification.  Deposition

23  Exhibit 24 is Exhibit EPW for identification.  Deposition

24  Exhibit 27 is Exhibit FIP for identification.  And

25  plaintiffs move the admission of all of those exhibits.

1          THE COURT:  No objection to those?

2          MS. WALKER:  No objection.

3          THE COURT:  Very well.  EJN is admitted,

4    Exhibit 145.  ELB is Exhibit 146.  ELI is Exhibit 147.  EMP

5    is Exhibit 148.  FIM is Exhibit 149.  FIN is Exhibit 150.

6    EPW is Exhibit 151.  FIP is Exhibit 152.

7          (Exhibits 145 - 152 received in evidence.)

8          THE COURT:  Time to start with another witness.

9    Let's do that.

10          MR. SHADOWEN:  Your Honor, plaintiffs call

11    Ms. Usha Sankaran by video deposition.

12          THE COURT:  Oh, well.

13          MR. SOBOL:  It is literally five minutes, so --

14          THE COURT:  Let's go.

15          MR. SHADOWEN:  -- it might be perfect.

16          THE COURT:  It might be.

17          (Video played.)

18               USHA SANKARAN, via video

19                    EXAMINATION

20     Q.   Do you understand that you're here to testify on

21    behalf of Ranbaxy as to topic 19; specifically, Ranbaxy's

22    regulatory approval of generic esomeprazole?

23     A.   Yes.

24     Q.   So you're currently Director of Regulatory Affairs

25    at Ranbaxy?

1    A.    That's correct.

2    Q.    Okay.  Let me just go back and make sure I've got

3    the timing correct.

4          In 2000 to 2008 you were a manager in the

5    regulatory affairs department?

6    A.    2005?

7    Q.    I'm sorry.  2007 to 2008?

8    A.    Yeah.  2007 -- yes, sometime in 2007 to 2008 I was

9    a manager.

10   Q.    Okay.  And then from 2008 to 2009 you were a

11   senior manager?

12   A.    Yes.

13   Q.    And then 2009 to approximately this year you were

14   associate director?

15   A.    Yes.

16   Q.    And has anything been filed associated -- with

17   FDA, associated with this, with Ranbaxy's esomeprazole ANDA,

18   in the last three years?

19   A.    For quite some time we couldn't file anything with

20   FDA.  And even if we filed, FDA wouldn't pick up any of

21   those submissions for review.  So until our consent decree

22   came into effect, we couldn't, even if wanted to, we

23   couldn't submit anything into the ANDA.  The OGD wouldn't

24   have picked it up since we were under the AIP policy, and

25   this ANDA was part of that AIP.

1      So even if we had submitted anything they wouldn't

2   have picked it up.  And since the consent decree, I don't

3   recollect on the top of my head making any submissions,

4   but...

5      Q.   You threw out a couple of new concepts there that

6   we need to define.  "AIP," what does that mean?

7      A.   Because of some compliance issues with the sites,

8   that you had shown a couple of documents to me earlier,

9   Ranbaxy got what you call an AIP letter, which is

10  "application integrity policy," because of which, what it

11  means is that the applications that fall under that AIP will

12  not be picked up for review by OGD unless some

13  remediations -- I don't know the details of what needs to be

14  done, but unless, like, a next action letter or unless OGD

15  is specifically instructed to review it.  Otherwise, OGD

16  will not pick up those applications for review at all.

17     Q.   Okay.  You also mentioned in your previous answer,

18  not the one that you just gave, a "consent decree."  What is

19  the consent decree that you're referring to?

20     A.   My understanding of the question was you asked

21  what was the consent decree as talked about.  Ranbaxy

22  entered into a consent decree with FDA sometime in early

23  2012, January, I believe, if I'm right.  So that is the one

24  I'm referring to.

25     Q.   Okay.  Let's put some time periods on this.  What

1    was the -- when did Ranbaxy receive the AIP letter?

2         A.   If I remember right, it was February of 2009.

3         Q.   Okay.  And you already said that the consent

4    decree was, to the best of your recollection, entered in

5    January 2012?

6         A.   Yes.

7         Q.   FDA, to use your words, picked up the review of

8    the atorvastatin ANDA before finalization of the consent

9    decree; correct?

10        A.   Yes.  It was picked up before the consent decree

11   was signed.

12             COURT REPORTER:  "Before the consent decree was"?

13             THE WITNESS:  Signed.

14        Q.   Was the Ranbaxy atorvastatin ANDA subject to the

15   AIP?

16        A.   Yes.

17        Q.   When did FDA resume review of the atorvastatin

18   ANDA?

19        A.   I don't know when exactly they resumed, but there

20   was a lot of -- I wasn't involved with any of the

21   negotiations or anything happening from that end, but for

22   quite some time we were told by OGD that they cannot pick up

23   any applications under AIP.  So -- and then one fine day we

24   received a letter from OGD saying that they will pick it up

25   for review.  I believe it was just a few months before we

1    got the final approval.

2        Q.   And you received final approval for atorvastatin

3    in November 2011; correct?

4        A.   That sounds right.

5        Q.   Okay.  So a few months prior to that --

6        A.   Yes.

7        Q.   -- was when FDA started reviewing the atorvastatin

8    ANDA again?

9        A.   Again, I don't know when exactly they picked it

10   up.  At least we got to know of it only just a very few

11   months before the approval.

12             (Video stopped.)

13             THE COURT:  That's it?  Perfect, as to timing.

14   Entirely up to you what you make of the testimony.

15             All right.  We're going to recess now.  We're

16   going to take a long weekend.  We planned this when we went

17   in.  We will not resume now until 9:00 a.m. on Tuesday, the

18   18th of November.

19             So you're entitled, I think, to a report as to how

20   we stand.  Actually, this particular break comes at, I

21   think, a very good time in the case.  None of these lawyers

22   representing anyone involved in this case is wasting your

23   time.  Every bit of it is data that at least we ought to

24   argue over.

25             So where do I think we are?  The lawyers didn't

1    tell me this, this is where I think we are.  I think the

2    plaintiffs are going to wrap up next week.  They're going to

3    finish their case.  Now, of course, even though the defense

4    counsel have cross-examined various of their witnesses, they

5    may have affirmative witnesses to put on and they may have

6    opinion witnesses to put on.  And we'll hear those

7    witnesses, everything that is germane.

8            My best estimate is that we will have the case in

9    your hands, no promise, but sometime the week after

10   Thanksgiving.  That's well within the time that we scheduled

11   for it.  And so we're taking this long break.  After this --

12   there's another reason why this is a good idea.  It lets

13   everyone reassess their positions, and maybe we can narrow

14   this down further.  But perhaps that's a pious hope on my

15   part.

16           In any event, so we go all next week, we go the

17   two days of Thanksgiving week, then you get the Wednesday

18   before and the Friday after Thanksgiving.  Then we're back

19   on Monday.  And I think that week we may well get this case

20   in your hands.

21           You have not heard all the evidence.  Keep your

22   minds suspended.  Do not discuss the case either among

23   yourselves nor with anyone else.  Now, given the fact of a

24   4-day break, you're going to run into people.  People ask

25   about you.  You can say you're on a jury so long as you say,

1   And the judge has said we can't say anything at all about

2   the case.

3          Have a good weekend.  Have a good break.  We'll

4   resume at 9:00 a.m. on Tuesday, the 18th of November.  We'll

5   stand in recess until that time.

6          (Whereupon the jury left the courtroom at

7   1:03 p.m.)

8          THE COURT:  Please be seated.  Total elapsed time:

9   Plaintiff is nine days, two hours, 45 minutes; defense six

10  days, 45 minutes.

11         We'll stand in recess until 9:00 a.m. on Tuesday,

12  the 18th of November.  Have a good weekend.  We'll recess.

13

14         (Proceedings adjourned.)

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**


        I, Cheryl B. Palanchian, Official Court Reporter

for the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.


                    _____
                           CHERYL B. PALANCHIAN
                           Official Court Reporter
                             1 Courthouse Way
                    South Boston, Massachusetts 02110



"rashmivs"
<rashmivs@cipla.com>
04/27/2006 12:14 AM

To  <Stavroula_Drosatou@ivax.com>
cc  <Lance_Kann@ivax.com>, "Shailesh_Shah"
    <Shailesh_Shah@ivax.com>, <Tatiana_Forman@ivax.com>
bcc
Subject  Fw: Fw: Commercial batch manufacturing timeline for
         Esomeprazole

Dear Stavroula,

Thanks for your response. Since the manufacturing site of Esomeprazole capsules is Cipla, Kurkumbh, where we have already started the commerical batches of other products, we would like to know the preliminary forecast of Esomeprazole capsules to look at batch size, equipment and commercial manufacturing facility. It will be helpful to us if you can arrange to send the same asap.

Thanks & kind regards,
Rashmi

----- Original Message -----
**From:** stavroula_drosatou@ivax.com
**To:** rashmivs@cipla.com
**Cc:** Lance_Kann@ivax.com ; Shailesh_Shah ; Tatiana_Forman@ivax.com
**Sent:** Wednesday, April 26, 2006 11:04 PM
**Subject:** Re: Fw: Commercial batch manufacturing timeline for Esomeprazole

Dear Rashmi,

currently projected launch date is July 2008. I will send you a preliminary forecast as an indication for you to look at appropriate batch sizes, equipment train and commercial manufacturing facility.

Stavroula Drosatou
Manager, New Product Launches and S&OP
IVAX Pharmaceuticals, Inc.
phone: (305) 575-4028
Fax: (305) 575-4135

ATTENTION: This message contains information that may be privileged or confidential and is the property of the IVAX Corporation and its subsidiaries. It is intended only for the person to whom it is addressed. If you are not the intended recipient, you are not authorized to read, print, retain, copy, disseminate, distribute, or use this message or any part thereof. If you receive this message in error, please notify the sender immediately and delete all copies of this message.

"rashmivs"
<rashmivs@cipla.com>

04/26/2006 02:46 AM          To  <Lance_Kann@ivax.com>



EXHIBIT
PENGAD 800-631-6989
Jaworski 4
9/5/13      70

ATTORNEY CONFIDENTIAL
HIGHLY CONFIDENTIAL

Exhibit
**145**

IV-007081
Teva-ESO-007154

cc <Stavroula_Drosatou@ivax.com>, "Shailesh_Shah" <Shailesh_Shah@ivax.com>, <Tatiana_Forman@ivax.com>
Subject Fw: Commercial batch manufacturing timeline for Esomeprazole        Magnesium DR capsules

Dear Lance,

Can we have tentative timeline for commercial batch manufacturing of Esomeprazole Magnesium DR capsules ?

Thanks & kind regards,
Rashmi

—— Original Message ——
From: rashmivs
To: Stavroula_Drosatou@ivax.com
Cc: Lance_Kann@ivax.com ; Shailesh_Shah ; prc@cipla. com ; Tatiana_Forman@ivax.com
Sent: Monday, April 24, 2006 12:42 PM
Subject: Commercial batch manufacturing timeline for Esomeprazole Magnesium DR capsules

Dear Stavroula,

We would like to know approximate commercial batch manufacturing timeline for Esomeprazole Magnesium DR Capsules.

Thanks in advance for your response.

Best regards,
Rashmi

ATTORNEY CONFIDENTIAL
HIGHLY CONFIDENTIAL

| | |
|---|---|
| **From:** | Joseph Faust |
| **Sent:** | Thursday, March 29, 2012 2:40:34 PM |
| **To:** | Brian Wishwanick; John Kovaleski; Aglaye Metellus; Cheryl Kamiya; Ruth Collins; Diane Harper; Michael Rapp; Carrie Groff; Andrea Guardia; Sian Cairns; Lindley Bley; Robert Vincent; Rashmivs@cipla.com; 'Wanda Williams'; 'Sandeep Shitole'; 'Venkatesh' |
| **Subject:** | RE: Esomeprazole Deficiency Response Planning |

**Attachments:**   Esomeprazole DR Caps DMF response plan 032712.xls

All,

I attached the response plan for the Esomeprazole Magnesium Dihydrate DMF deficiency and the Esomeprazole Magnesium Delayed-release Capsules, 20 mg & 40 mg Minor deficiency letters as per our meeting on 3/27/2012.

Response timing for the DMF deficiency has been targeted (4/27/2012) but there is not current timing for the Minor deficiency response.  The timing of the Minor response will be fine tuned at the next meeting when more information is available.

Please let me know if there are any corrections needed.

Joe


-----Original Appointment-----
**From:** Brian Wishwanick
**Sent:** Monday, March 26, 2012 8:49 AM
**To:** Brian Wishwanick; John Kovaleski; Joseph Faust; Aglaye Metellus; Cheryl Kamiya; Ruth Collins; Diane Harper; Michael Rapp; Carrie Groff; Andrea Guardia; Sian Cairns; Lindley Bley; Robert Vincent; Rashmivs@cipla.com; 'Wanda Williams'; NW1 Conf Room 110; 'Sandeep Shitole'; 'Venkatesh'
**Subject:** Esomeprazole Deficiency Response Planning
**When:** Tuesday, March 27, 2012 7:00 AM-8:00 AM (GMT-05:00) Eastern Time (US & Canada).
**Where:** Teleconference Call-In 866-225-0660; Access Code 7032993


When: Tuesday, March 27, 2012 7:00 AM-8:00 AM (GMT-05:00) Eastern Time (US & Canada).
Where: Teleconference Call-In 866-225-0660; Access Code 7032993

Note: The GMT offset above does not reflect daylight saving time adjustments.

*~*~*~*~*~*~*~*~*~*



**Highly Confidential**

Teva-ESO-048293

**Exhibit**
**151**

**Esomeprazole Magnesium Dihydrate DMF Deficiency Letter Dated  (1/27/2012) and**
**Esomeprazole Magnesium Delayed-Released Capsules,  20 mg and 40mg Minor Deficiency Letter (Dated 3/7/2012) Response Plan**

**File Date:** 11/23/2005      **Launch Date:** 5/27/2014

| Item# | Item | Response Plan | Due Date | Owner | Status | Comments |
|-------|------|---------------|----------|-------|--------|----------|
| DMF 1 | Please add methylene chloride and acetic acid into the raw material control. Also, recycled methylene chloride is used at the Kurkumbh site. Please add the control for this recycled solvent. | No impact on final Drug Substance. Cipla has the data for Methylene Chloride and Acetic Acid. Cipla will provide in response. | 4/27/2012 | Cipla | Open | |
| DMF 2 | We request information on how you control un-reacted reagents used in the manufacturing process for Diethyl D-tartrate and Cumene hydroperoxide in the drug substance. As Cumene hydroperoxide is a known genotoxic impurity, we require you to provide your control strategy, which limits its exposure to <1.5 µg/day based on the maximum daily dose of the drug product (Ref. http://www.eme.europa.edu/docs/en_GB/document_library/Scientific_guideline/2009/09/WC500002903.pdf). For Diethyl D-tartrate, please include method(s) of analysis along with LOD, LOQ information. | Cipla has demonstrated <1.5 ug/day for both components.  Cipla will provide data within 2 weeks.  Results will be one time only, not routine test.  Testing one lot per year will be proposed. | 4/13/2012 | Cipla | Open | |
| DMF 3 | You propose to scale up at step I and step II per the 11/15/2011 amendment. You state that comparative data for the physical and chemical quality parameters are provided in Annexure 1; notification for completion of scale up. However, we can not locate it. Please clarify. | Data already available.  Cipla will provide in response. | 4/27/2012 | Cipla | Open | |
| DMF 4 | You propose to add Kurkumbh as an additional site for manufacturing API in the 3/26/2010 amendment. You state that comparative data for the physical and chemical quality parameters are provided in Annexure 1. However, we can not locate it. Please: clarify the amendment date you have provided for this information or provide it again with your response. | Data already available.  Cipla will provide in response. | 4/27/2012 | Cipla | Open | |
| DMF 5 | Please propose output for step I at 400 kg input at the Kurkumbh site, based on available data. | Response will have no affect on final specifications.  Cipla will provide in response. | 4/27/2012 | Cipla | Open | |

| DMF 6 | Regarding the manufacturing process and inputs for raw materials at the Bangalore site and the Kurkumbh site, we have the following concerns:<br>• It was noticed that the manufacturing procedure at the two sites have minor differences. For example, the procedure for purification of Cumene Hydroperoxide.<br>• The quantity of raw materials at the two sites is not proportional. For example: 300 kg O1 compound, using 142 kg sodium sulphate anhydrous at the Bangalore site and 400 kg O1 compound, using 100 kg sodium sulphate anhydrous at the Kurkumbh site.<br>• Recycled solvents are used at the Kurkumbh site. No recycled solvents are proposed at the Bangalore site.<br><br>Please explain these differences and provide justifications. | Cipla has already harmonized as per FDA.<br><br>Update documents (MBR). | 4/7/2012 | Cipla | Open | |
| DMF 7 | Regarding the batch inputs for raw material at stage Manufacturing Esomeprazole Magnesium Dihydrate per 2/26/2008 amendment, we have the following question:<br>• Please clarify why hyflo supercel is used in one case and not used in the other case.<br>• Please clarify why volumes of acetone and methanol used are different for two cases, but the batch size is the same. | Cipla has already harmonized as per FDA.<br><br>Update documents (MBR). | 4/7/2012 | Cipla | Open | |
| DMF 8 | Please note that the USP specifications for Esomeprazole Magnesium trihydrate will apply to impurities, total impurities (NMT 0.5%), magnesium content; and that the material needs to comply with the USP identification tests. Your release specifications need to be revised to include identification test B (Magnesium identification). In addition, the content of Magnesium needs to be tightened per monograph to 3.30% - 3.55%, on an anhydrous basis. We recommend that you update your specifications (release and stability) and provide COAs from both manufacturing sites to ensure the drug substance will comply with the USP limits.<br><br>___ | Cipla currently has two ID tests:. They also have a content of magnesium titration test which is not as selective and spec wider than USP AA test.<br><br>Cipla has evaluated batches with USP AA magnesium test and all batches passed.  They will adopt method and spec officially for both the USP Magnesium ID test and Content of Magnesium AA test.<br><br>Document update 1 week to complete. | 4/7/2012 | Cipla | Open | |
| DMF 9 | We noticed that the stability limit for Enantiomeric purity by HPLC: R-Omeprazole is different than that in the release limit.  Please clarify and revise per USP monograph. | Already completed.  In-house spec in-line with USP spec but Cipla uses in-house method.  An equivalency report generated, will confirm with 3-4 days. | 4/2/2012 | Cipla | Open | |

| DMF 10 | We believe that you should establish a melting point for the API. Furthermore, we note that Esomprazole Magnesium also exists in an amorphous and an anhydrous form. Therefore, we conclude that the melting point specification for the dihydrate Esomeprazole Magnesium is a useful distinguishing test and should be established. | Melting Point is not recommended since the API will char (decompose) before melts so test not accurate. Cipla has used DSC in the past. They will generate official Melting Point data/report and justify not adding.  Since Polymorph tested via other method, justification will include that.<br><br>Provide data / report. | 4/7/2012 | Cipla | Open | |
| DMF 11 | The official USP monograph for Esomeprazole Magnesium (as of 8/1/11), includes a Color of Solution test. We believe that you should also establish this testing in your API. | Cipla will add test.<br><br>Document update by 1st week of April. | 4/7/2012 | Cipla | Open | |
| DMF 12 | You provide stability data in the 11/15/2011 amendment for several batches. Since our last review of your application, more than ten amendments and annual reports were submitted, and many changes were proposed in these amendment. Please specify which batches are original batches, which batches are annual batches, and which batches are manufactured for the proposed specified changes. We recommend including site information/date of manufacturing/original or annual information on the stability table itself. | Data already available.  Cipla will provide in response. | 4/27/2012 | Cipla | Open | |

| | | | | | | |
|---|---|---|---|---|---|---|
| DMF 13 | Please demonstrate Esomeprazole Magnesium dihydrate manufactured is stable at room temperature. For this reason, please provide 24 months controlled room temperature stability data (25°C±2/RH 60±5%) or six months accelerated stability data (40°C±2/RH 75±5%) for three batches from each site (preferably recent lots). Also, note that the USP pending monograph for dihydrate and the USP monograph for the trihydrate do not recommend cold storage. Salts of Esomepazole (unlike Omeprazole USP) are more stable and do not need refrigeration. If Cipla proposes to refrigerate, the firm should needs to demonstrate, and document, ambient and accelerated stability data at the conditions mentioned above. | Cipla has been storing DS at 2-8 C.  RLD uses trihydrate, Cipla dihydrate.  Jan. 2011 USP Pending Monograph states to store amorphous form at 2-8 C.  Level of hydration apparently affects stability.<br><br>Cipla has done studies at 40 C, 25 C (CRT), and 30 C.  For the 40 C, DS only stable for 3 months due to Physical Appearance (color) change.  DS stable for 12 months at 25 C (CRT) and 6 months at 30 C.  Cipla will commit to provide data at various conditions. | | | | |
| | | Cipla to review Impurity growth at 40 C, and determine if stability done beyond 12 months for 25 C -CRT and 6 months for 30 C.  Will provided overall justification / strategy within 5 days. | 4/7/2012 | Cipla | Open | |
| | | Cipla will also start additional long term stability studies including 3 batches from both sites. | ASAP | Cipla | Open | |
| DMF 14 | The amendment containing stability data from Cipla Kurkumbh lists the storage condition as 30°C/65% RH, which is considered an intermediate condition per ICH. Please address the actual storage temperature. If indeed you have perfomed at intermediate conditions, we recommend continuing for batches up to 12 months and subject the other batches (from the Bangalore site) to similar conditions. Cipla needs to compare drug substance from both sites at the same stability storage conditions. The present conditions explained on the data are not uniform. | One site used 25 C, other 30 C so Cipla will harmonize temperatures at both sites.  Cipla will provide in response. | 4/27/2012 | Cipla | Open | |
| Minor A1 | The amendment for the DMF 18821 has been reviewed and found inadequate. The DMF holder has been notified. | See above comments.  Overall target is 3 - 4 weeks for DMF response. | 4/27/2012 | Cipla | Open | |
| Minor A2 | The molecular weight of esomeprazole should be calculated as follows: 749.16 (wt of esomeprazole-Mg dihydrate) - (24.305 (wt. Mg) + 36.04 (wt water)+ 2.016 (wt of 2 hydrogen atom) = 690.8. Therefore, "749.1 mg of esomeprazole magnesium dihydrate corresponds to 690.8 mg of Esomeprazole". Please correct accordingly. | FDA is correct and Cipla agrees.  The FP specs and Batch record will need updating.<br><br>Document updates (DP specs & MBR). | TBD | Cipla | Open | |

| Minor A3 | Please update facilities who will perform manufacturing, packaging of finished product and testing of raw materials (API and excipients) and packaging components, in-process, finished product release, and stability testing. If the facilities used for ANDA batch and commercial batch are different, please specify and justify. Any outside contract testing laboratories and their functions also should be specified. | Cipla has all information requested, no justification needed.  Clarification will be provided in response. | TBD | Cipla | Open | |
| Minor A4 | Please be aware that DMF holder of 18821 has tightened the Enantiomeric purity (R-Omeprazole %) from NMT 0.70% to NMT 0.20%. Please revise accordingly. | As per DMF comments above so will be needed for DMF response. | 4/27/2012 | Cipla | Open | |
| Minor A5 | Please tighten the content of Magnesium to 3.30%-3.55% per USP. | As per DMF comments above so will be needed for DMF response. | 4/27/2012 | Cipla | Open | |
| Minor A6 | The official USP monograph for Esomeprazole Magnesium (as of 8/1/11) includes a Color of solution test. We believe that you should also establish this testing in your API. In addition, the proposed criteria for total impurities should be followed per USP (NMT 0.5%). | As per DMF comments above so will be needed for DMF response. | 4/27/2012 | Cipla | Open | |
| Minor A7 | We acknowledge that the DS manufacturer and DP manufacturer are the same: Cipla. Please clarify if the sites for DS manufacturer and DP manufacturer are the same. If not, please provide method transfer report from site of DS manufacturer to site of DP manufacturer for DS analytical methods. | The sites within Cipla are different although Method Transfer reports are completed and available.  Cipla will provided in response. | TBD | Cipla | Open | |
| Minor A8 | Please also be informed that if the bulk capsules were shipped a short distance prior to final packaging, you should provide assurance that the pellets and capsules will not be compromised in the future with any unintended further processing. We believe that you should commit to perform a "Simulated Ship Test". Furthermore, please provide assurance that you have at least 6 month bulk stability data (accelerated) for the capsules and pellets as appropriate. | Cipla does NOT ship, packaging occurs at manufacturing site.  Cipla will provided written justification.<br><br>Fiber drum capsule stability done for 6 months and submitted but pellet stability not submitted. Pellets stability done but not sure for how long. Cipla to provide information for review. | TBD<br><br>3/30/2012 | Cipla<br><br>Cipla | Open<br><br>Open | |

| Minor A9 | Please specify if the sieve sizes noted in the pellet manufacturing are corresponding to ASTM sizes. As the drug product has NG tube administration on the label, we recommend that you establish a particle size distribution for the pellets. | Cipla currently using Sieves #22 & 24 which are equivalent to the ASTM #25. Cipla will harmonize sieves with ASTM #25.<br><br>Update MBR with ASTM #25.<br><br>Cipla is currently specifying sieve size / specification but not in DP In-Process specification document.<br><br>Update DP In-Process Specs with test / specification. | TBD<br><br><br>TBD | Cipla<br><br><br>Cipla | Open<br><br><br>Open | |
| --- | --- | --- | --- | --- | --- | --- |
| Minor A10 | Please be aware that there is an USP-PF 37 (3) In-process Revision article for Esomeprazole Magnesium delayed-release capsules. We recommend that you examine the USP-PF methods, compare them to yours and provide an evaluation/discussion of any differences. | Paper evaluation has been done and methods different. Cipla needs to evaluate methods but all DP samples old. Once samples received, 2 weeks to evaluate methods.<br><br>Currently Cipla has tighter specifications for impurities than USP. Cipla will retain tighter specs. | TBD | Cipla | Open | |
| Minor A11 | Your dissolution test method indicates (M-3) Tris buffer is employed. However, your QOS states TriSodium Orthophosphate dodecahydrate, Na3PO4 · 12H2O is used. Please clarify what you mean by Tris. | Not an issue, only clarification needed. Will be updated when DP specs updated. | TBD | Cipla | Open | |
| Minor A12 | Since the labeling states that the drug product may be administered by nasogastric tube, please perform an in-vitro in-use test to compare the performance of your product to the RLD. Please evaluate and compare dispersibility in 50 mL of apple juice/water, sedimentation rate, flocculation and any physical observations. Also, you should perform a comparative recovery study in which recovery is measured from 1) the syringe and 2) a combination of the syringe with the nasogastric tube (as per label). Since it is not clear what size tube willbe ultimately used, all materials of construction available (eg. Tygon, silicone, polyurethane) should be tested to evaluate adsorption. To demonstrate in-vitro in-use test robustness, we recommend testing different brands of apple juice and different holding positions of the tube. You must provide full assurance that no tube blockage in-use can potentially occur with your pellet sizes and the various tubes (sizes, and makes) used in the patient care setting. | Cipla is currently preparing a protocol to describe testing. Will provide week of 4/2.<br><br>Actual study timing is TBD until protocol is fully reviewed and approved. | 4/7/2012<br><br><br>TBD | Cipla<br><br><br>Cipla | Open<br><br><br>Open | |
| Minor A13 | Please revise Drug Product release specification for residual solvent USP <467> to state that your DP meets USP <467> Option 1 rather than Option 2. | Will be updated when DP specs updated.<br><br>Teva-ESO-048294.xls | TBD | Cipla | Open | |

DMF Target response date:   4/27/2012

*Minor Target response date:*     TBD

Meeting minutes from   3/27/2012

# EXHIBIT L

1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                                No. 12-md-02409-WGY
                                 Volume 1, Pages 1 - 64
4

5

6    In Re:  NEXIUM (ESOMEPRAZOLE)
     ANTITRUST LITIGATION
7

8

9

10                        * * * * * * * * *

11

12
                        For Jury Trial Before:
13                      Judge William G. Young

14

15
                        United States District Court
16                      District of Massachusetts (Boston)
                        One Courthouse Way
17                      Boston, Massachusetts 02210
                        Monday, November 24, 2014
18

19                        * * * * * * * *

20

21
              REPORTER: RICHARD H. ROMANOW, RPR
22                    Official Court Reporter
                      United States District Court
23      One Courthouse Way, Room 5510, Boston, MA 02210
                      bulldog@richromanow.com
24

25

```
 1                  A P P E A R A N C E S

 2    THOMAS M. SOBOL, ESQ.
         Hagens Berman Sobol Shapiro, LLP
 3       55 Cambridge Parkway, Suite 301
         Cambridge, MA 02142
 4       Email: Tom@hbsslaw.com
     and
 5    STEVE D. SHADOWEN, ESQ.
         Hilliard & Shadowen, LLC
 6       39 West Main Street
         Mechanicsburg, PA 17055
 7       Email: Steve@hilliardshadowenlaw.com
     and
 8    RICHARD ARNOLD, ESQ.
         Kenny Nachwalter, P.A.
 9       201 South Biscayne Boulevard, Suite 1100
         Miami, FL 33131
10       For plaintiffs

11    LAURENCE A. SCHOEN, ESQ.
         Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
12       One Financial Center.
         Boston, MA 02111
13       Email: Laschoen@mintz.com
     and
14    KAREN N. WALKER, ESQ.
      KEVIN VAN WART, ESQ.
15       Kirkland & Ellis, LLP
         655 Fifteenth Street, N.W., Suite 1200
16       Washington, DC 20005
         For Teva defendants
17
      JOHN E. SCHMIDTLEIN, ESQ.
18    PAUL B. GAFFNEY, ESQ.
      DANE H. BUTSWINKAS, ESQ.
19       Williams & Connolly, LLP
         725 Twelfth Street, N.W.
20       Washington, DC 20005
         Email: Jschmidtlein@wc.com
21       For AstraZenca defendants

22    JAMES D. BALDRIDGE, ESQ.
      DANIELLE R. FOLEY, ESQ.
23       Venable, LLP
         575 7th Street, N.W.
24       Washington, DC 20004
         Email: Jdbaldridge@venable.com
25       For Ranbaxy defendants
```

```
 1                      I N D E X

 2

 3    WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

 4

 5    JILL PASTORE:

 6        By Ms. Walker:

 7        By Mr. Butswinkas:              38, 61

 8        By Mr. Sobol:            10                    55

 9

10                      E X H I B I T S

11

12    EXHIBIT 182.......................................  19

13    EXHIBIT 183.......................................  22

14    EXHIBIT 184.......................................  36

15    EXHIBIT 185.......................................  57

16

17

18

19

20

21

22

23

24

25
```

```
 1            P R O C E E D I N G S

 2            (Begins, 8:50 a.m.)

 3            THE COURT:  I understand you people have a report

 4   to make to me.

 5            MR. SOBOL:  Your Honor, the plaintiffs report an

 6   agreement in principle with the defendant Teva only.

 7            THE COURT:  All right.

 8            And that's correct?

 9            MR. VAN WART:  Yes, your Honor.

10            THE COURT:  All right.  That's splendid.  Now,

11   with respect to the lady on the stand, um, physically is

12   she back there?

13            MR. VAN WART:  Yes, your Honor.

14            MS. WALKER:  Yes, your Honor.

15            THE COURT:  Okay, why don't we just let her go on

16   on the theory -- and say to the jury -- well, one, I'm

17   going to let Teva go and clear them out of here, and

18   say, "Pay no attention to that, that will shorten the

19   trial."  But let the witness go and say -- I'm not going

20   to strike her testimony, but say, "Well, we may have her

21   back, we'll see," and then they'll go on with another

22   witness.

23            How's that?

24            MR. SOBOL:  I think that the preference is that,

25   because the issue of Teva being able to get into the
```

```
 1   market or not is still ripe, the parties -- at least the
 2   plaintiffs and Teva had still expected that the
 3   plaintiffs would finish their examination of
 4   Ms. Pastore.
 5          THE COURT:  So long as you agree.
 6          MR. SOBOL:  Yeah.
 7          THE COURT:  No one could be more agreeable.
 8          Oh, you don't agree?
 9          MR. VAN WART:  Your Honor, they have indicated
10   that their preference is to finish Ms. Pastore, but if
11   we're out of the case, we're out of the case.
12          THE COURT:  But we've got the witness on the
13   stand, so the question is --
14          MR. VAN WART:  Yes.
15          THE COURT:  -- are you going to sit there?  I can
16   let you sit there as observers, go around, when he's
17   done, without calling on you, and then let you go at the
18   break.
19          How's that?
20          MR. VAN WART:  Your Honor, that's fine.  Again we
21   believe we're out of the case.  We don't intend to pose
22   any questions.
23          THE COURT:  That's right.  So just to keep the
24   rhythm, I will call on you, but you will have no
25   redirect, etc., and we'll be done.  So we'll proceed
```

1   that way.

2       All right.  Now, um, no going back on the

3   settlement here.

4       So I have had a chance to go over the papers that

5   have been filed and I am prepared to rule with respect

6   to the pending motions for a directed verdict.

7       We'll cut right to the case.  On Friday afternoon

8   I posed a specific question or I posed it in the morning

9   and I wanted an answer in the afternoon, and Mr. Sobol,

10  as a matter of theory, gave me an answer.  I think it's

11  extraordinarily well-framed, I think it captures the

12  thrust of the *Actavis* opinion, indeed I may crivet it

13  for my charge, but I have to tell you, as near as I can

14  see, whether you've proved that is rank speculation.

15      And I'll say to Mr. Baldridge, I think

16  Mr. Baldridge cut right to it when the question, and I

17  could revise the question, but "I thought we'd get a

18  month and year here?"  I just don't see the evidence

19  that will support a month and year.

20      That having been said, the motion for a directed

21  verdict's denied.  There are a variety of prudential

22  reasons why we ought get a jury verdict in this case.

23  And now we'll -- I know, at the end of the evidence, the

24  remaining defendants are going to file for a motion for

25  directed verdict, I'll deny it, not because I have

1   prejudged it, but because I'm within a day of getting it

2   to the jury.

3          We'll give it to the jury.  That will set you up

4   for a motion for a judgment -- I used to say "NOV," but

5   all you young people now call it "MOL," and so we'll get

6   those motions and I will act on them.

7          I can say nothing more.  The plaintiffs can cobble

8   together whatever they have in the record and counter --

9   and indeed it's a concern that the plaintiffs can

10  counter, and I'd be jumping too quickly, that causes me

11  to deny the motion for a directed verdict.  But I will

12  tell you as judge, on that causation aspect, I don't see

13  the evidence of record.

14         All right.  So now, with Teva out, we're going to

15  get this case to the jury, um, by Friday of next week?

16         MR. BUTSWINKAS:  I believe so, your Honor, if not

17  sooner.

18         MR. BALDRIDGE:  Yeah, I would think sooner

19  actually, your Honor.

20         THE COURT:  Well, that's fine.  But we'll wait

21  until the end of today.  But can I tell the jury --

22  you've got a happy and engaged jury.  If I tell them

23  that, they're going to be looking for that.

24         So you think I can?

25         MR. BUTSWINKAS:  Yes, your Honor.

```
1           MR. BALDRIDGE:  We agree.

2           THE COURT:  And plaintiffs agree?

3           MR. SOBOL:  I think so.  I think your time limits

4    impose it almost.

5           THE COURT:  Um -- we'll see.  So this is very

6    helpful.

7           So for the morning --

8           Are they all here, Jenn?

9           THE CLERK:  They're not all here, Judge.

10          THE COURT:  They're not all here, nor need they

11   be, but just as soon as they are here, everything stays

12   the same, and we'll invite all you Teva folks to stay at

13   least till the break, we'll finish with Ms. Pastore,

14   we'll go on and I'll continue working through the

15   materials you've given me this morning.

16          All right.  We'll recess.

17          (Recess, 9:00 a.m.)

18          (Resumed, 9:30 a.m.)

19          THE COURT:  This will -- I show you I'm really

20   back there.  We're waiting on the jurors.  The traffic

21   is very bad today.

22          And, Mr. Shadowen?

23          MR. SHADOWEN:  Your Honor, on reflection, given

24   our resolution with Teva and that we're in the middle of

25   the cross-examination of this witness, the plaintiffs
```

```
 1    would propose that we simply strike all the witness's
 2    testimony and dismiss her.  And we understand that Teva
 3    has no objection to this.
 4          THE COURT:  Does anyone else have an objection to
 5    this?
 6          MR. BALDRIDGE:  Yes, we do, your Honor.
 7          MR. BUTSWINKAS:  Yes, we object, your Honor.
 8          THE COURT:  Yes.  And it does seem to me she has
 9    evidence that's useful in the case, so if we object,
10    then I think we have to finish with her.  I just think
11    it would be improvident.
12          Ms. Pastore, I do apologize if we have, um --
13    well, the truth is I don't apologize that much, a trial
14    is important, but I understand you have personal
15    concerns.  And I also understand that counsel has been
16    willing to be very accommodating on the schedule.  And
17    personally, I will say sincerely, thank you for coming
18    in today, we should finish with you, and we'll get going
19    just as soon as we have the jury here.  Thank you.
20    We'll recess.
21          (Recess, 9:35 a.m.)
22          (Resumed, 9:45 a.m., jury enters.)
23          THE COURT:  Welcome back.  And I'm so
24    appreciative.  I know how early some of you get up in
25    order to be here.  Somebody said, in the time we were
```

```
 1   waiting, this is about the third worst traffic day that
 2   we can remember.  Your presence is so deeply
 3   appreciated, you're the life's blood of this system.
 4        We're all ready to go.  And if you'll remind the
 5   witness.
 6        THE CLERK:  I'd like to remind you that you are
 7   still under oath.
 8        THE COURT:  And, Mr. Sobol, you may continue.
 9        MR. SOBOL:  Thank you, your Honor.
10
11   CROSS-EXAMINATION BY MR. SOBOL:  (Continued.)
12   Q.    Good morning.
13   A.    Good morning.
14   Q.    Okay.  When we were last here on Friday, you gave
15   some testimony regarding your role at Teva over the
16   years.  Do you recall that?
17   A.    I do.
18   Q.    When you first got there, it was in 1999, and you
19   said as an entry level associate?
20   A.    I joined the Regulatory Affairs Department in
21   1999.
22   Q.    Okay.  The ANDA that was filed here was filed by
23   IVAX in 2005, 2006, correct?
24   A.    In 2005, correct.
25   Q.    Okay.  And there was a woman by the name of -- I
```

1    think her name is "Jaworski," do you know who that is?

2    A.    I do.

3    Q.    And who is she?

4    A.    Pat or Patricia Jaworski used to work for Teva in

5    the Regulatory Affairs Department.  She's no longer with

6    the company.

7    Q.    Okay.  And, um, she was the person who signed the

8    ANDA on behalf of IVAX at that time, correct?

9    A.    I believe so, yes.

10   Q.    Okay.  In the pretrial proceedings in this case,

11   Teva identified seven people that would have information

12   in the case and they identified three people from

13   Regulatory Affairs, Patricia Jaworski, Robert Vincent,

14   and Phillip Ericson.  Did you know that?

15   A.    I did know that the night before.  I just learned

16   that yesterday.

17         THE COURT:  Excuse me?

18   A.    I just learned that yesterday.

19   Q.    I see.  And what did you learn yesterday?

20   A.    Just I was told that those three names were in

21   discussion.

22   Q.    I see.  Yours was not though, correct?

23   A.    Not to my knowledge.

24   Q.    Okay.  Ms. Jaworski was identified as a "Senior

25   Director," correct?

```
 1   A.    I don't know what she was identified as.  I don't
 2   know what paperwork you're looking at.  She had
 3   different titles during her time at Teva.
 4   Q.    But at one point she was a Senior Director?
 5   A.    Yes.  Uh-huh.
 6   Q.    And Robert Vincent was also -- well, he was a
 7   Director of Regulatory Affairs, correct?
 8   A.    Yes.
 9   Q.    And Phillip Ericson, at one point, was a Senior
10   Director of Regulatory Affairs, correct?
11   A.    Yes, that's correct.
12   Q.    Now, when the ANDA was first filed by IVAX, it was
13   prepared in New Jersey, correct?
14   A.    Yes.
15   Q.    There was a separate regulatory department, or
16   "office," if you will, of regulatory affairs at Teva in
17   New Jersey as compared to where you worked in
18   Pennsylvania, correct?
19   A.    The IVAX pharmaceuticals regulatory group was in
20   New Jersey, correct.
21   Q.    Right.  So when the IVAX ANDA got filed from the
22   regulatory affairs people in New Jersey, that was in
23   fact even before Teva inquired IVAX, correct?
24   A.    That's correct.
25   Q.    And over the years, from 2005 and 2006, it was the
```

1    people at the office in New Jersey from -- who used to

2    be working at IVAX, who were carrying forward the

3    prosecution of that -- if you will, the "prosecution,"

4    but whatever the activities regarding the ANDA for

5    generic Nexium, true?

6    A.    When the ANDA was originally filed, IVAX of course

7    was in charge and did all of the work related to that.

8    After Teva's acquisition, the regulatory group in New

9    Jersey that had been IVAX's regulatory group remained,

10   but they effectively merged with Teva's regulatory group

11   that was in Pennsylvania.

12   Q.    All right.  But Ms. Jaworski has signed a

13   declaration in this case that says that "The relevant

14   times from January of 2006" --

15        MR. BUTSWINKAS:  Objection, your Honor.

16        THE COURT:  Yeah, it's not in evidence, so, um,

17   see if you can't frame a question.

18        MR. SOBOL:  Your Honor, I move into evidence FWS.

19        THE COURT:  Any objection?

20        MR. BUTSWINKAS:  Objection, hearsay.

21        THE COURT:  May I see it?

22        (Shows.)

23        THE COURT:  Yes, sustained.

24   Q.    Isn't it true that Ms. Jaworski was responsible

25   for overseeing the preparation and submission of

1    regulatory filings to the FDA regarding generic Nexium?

2    A.    At a point in time that would have been correct --

3    or that was correct, yes.

4    Q.    Okay.  And isn't that point in time from January

5    of 2006 to January of 2014?

6    A.    Um, no.

7    Q.    So that would be a false statement?

8    A.    I would disagree with your statement, correct.

9    Q.    And, um, the other day you testified regarding --

10   well, let me ask you this.

11        Is it fair to say that, um, the projects of New

12   Jersey, as compared to Pennsylvania, the projects are

13   not necessarily shared among groups, each group has

14   their own set of projects?

15   A.    To a certain extent, yes, that's true.

16   Q.    Okay.  On Friday I put before you a group of

17   documents that are communications between Teva and the

18   FDA.  You recall testifying about that, correct?

19   A.    Correct.

20   Q.    On the submissions that were made by Teva to the

21   FDA, how many did you sign?

22   A.    I did not sign any of them, that I recall.

23   Q.    Okay.  Ms. Jaworski signed most of them, correct?

24   A.    I would imagine.  I don't recall exactly who

25   signed each, but it's certainly a mixture of various

1    people in addition to Patricia -- Ms. Jaworski.

2    Q.    Well, I put before you a listing that was prepared

3    by my office this weekend.

4          MR. SOBOL:   And I think we have provided counsel

5    for the defendants a copy.

6    A.    (Looks.)

7    Q.    When you were preparing for your testimony in this

8    case, did you look at how many documents you had signed

9    in connection with the ANDA for generic Nexium?

10   A.    I would think many documents that were part of the

11   file.

12   Q.    And how many documents did you sign?

13   A.    I did not sign any of them.

14   Q.    Okay.  Did you notice that Ms. Jaworski, during

15   the years 2005 through 2009 or so, had signed most of

16   the documents?

17   A.    Yes, according to your log here, that's correct.

18   Q.    Robert Vincent was another person who signed the

19   submissions, correct, not you?

20   A.    Correct.

21   Q.    And a gentleman by the name of Scott Tomsky,

22   correct?

23   A.    Correct.

24   Q.    Who was a Vice-President of Regulatory Affairs at

25   this time, is that fair to say?

1    A.    He is currently our Vice-President, yes.

2    Q.    And Mr. Tomsky actually had hands-on involvement

3    in connection with this ANDA, correct?  Yes or no.

4    A.    No.

5    Q.    He just signed the documents?

6    A.    The way our department works, um, is --

7    Q.    It's just a "yes" or "no."  Did he just sign the

8    documents, "yes" or "no"?

9    A.    At the direction of the people working for him,

10   yes.

11   Q.    Not you?

12   A.    Um, in some cases, yes, me.

13   Q.    You did sign the documents?

14   A.    No, I did not sign them.

15   Q.    I see.

16         Now, um, when do you recall personally first

17   seeing the, um -- any of the documents that were put

18   before you on Friday that are before you right now,

19   when's the first time in your life you recall actually

20   seeing them yourself?

21   A.    I would have seen them at the time the fee or fee

22   records were received, I would have seen those incoming

23   letters, those that came in one step ahead of acquiring

24   IVAX, and certainly I read them, the submissions to FDA,

25   at the time that they were submitted.

1    Q.    No, I'm not asking what you would have done, I'm

2    asking what do you -- do you recall having actually done

3    that at the time?  "Yes" or "no."

4    A.    I'm certain I did, yes.

5    Q.    So you recall it?

6    A.    I don't recall each individual letter.  I look at

7    hundreds of letters a year.

8    Q.    Right, so you don't recall these letters

9    specifically, correct?

10   A.    Not specifically, correct.

11   Q.    Right.  Preparing for testimony though in this

12   case, I take it that you personally went back to the

13   files of Teva and pulled these documents out yourself,

14   correct?

15   A.    I did, yes.

16   Q.    Okay.  And when's the first time that you learned

17   that Ranbaxy had settled litigation with AstraZeneca?

18   A.    I honestly don't know.

19   Q.    Preparing for trial here?

20   A.    I think so, truthfully, yeah.

21   Q.    Yeah.  And so was that the first time you tried to

22   formulate your view that you gave to the jury on Friday

23   about whether or not that settlement, between

24   AstraZeneca and Ranbaxy, affected this file?

25   A.    No.

1    Q.    Okay.  So although you first might have learned

2    about it in preparing for this case, you formulated an

3    opinion before then?

4    A.    I don't have an opinion on the Ranbaxy settlement,

5    so I have no opinion to formulate.

6    Q.    Okay.  And similarly, I take it, you don't have

7    any opinion then in terms of whether the settlement

8    between AstraZeneca and Teva affected the file?

9    A.    From a regulatory perspective my goal is to get

10   the application approved.  Um, legal would be the

11   department that would be aware and working with the

12   settlement.

13   Q.    And isn't it fair to say that really the

14   esomeprazole ANDA was Ms. Jaworski's ANDA to deal with

15   in, for instance, the 2010 time frame, not you?

16   A.    In the 2010, um, based on the signature log that

17   you have before me?  Um, no.

18   Q.    No, how about just from your memory?  Put that

19   aside, ma'am, because I don't want you to have to have

20   your memory affected by that.

21         On the basis of your memory, ma'am, isn't it fair

22   to say that in 2010 you considered the generic Nexium

23   ANDA the province of Ms. Jaworski?

24   A.    No, not necessarily.

25   Q.    Okay.  I put before you what's been marked as ENC.

1   A.    (Looks.)

2   Q.    Is ENC an e-mail between various people at Teva?

3   A.    Yes, it is.

4   Q.    Okay.  And if you look at the first line there at

5   the top of the page, do you see what you're writing to

6   Ms. Jaworski?

7   A.    Yes, I sent an e-mail to Ms. Jaworski and another

8   member of our team.

9   Q.    Okay.  And was this document prepared in your

10  ordinary course of your business at Teva?

11  A.  I don't recall the specific e-mail, but it appears

12  to have been, yes.

13        MR. SOBOL:  I offer it.

14        MR. BUTSWINKAS:  I have no objection.

15        THE COURT:  It may be received, EMC is admitted in

16  evidence as Exhibit 176.

17        Oh, wait a minute, wait a minute, the Clerk

18  properly corrects me.  In evidence as 182.

19        (Exhibit 182, marked.)

20  Q.    So looking at the top of this document, um -- you

21  were writing Ms. Jaworski, correct, at the top?

22  A.    That's correct.

23  Q.    Down below:  "Someone else at Teva is forwarding

24  to you some information about Cipla seeking to qualify a

25  second site for the launch of a generic esomeprazole,"

1    correct?

2    A.    Yes, correct.

3    Q.    So on the first page Mr. Altman writes to you and

4    says:  "Cipla intends to qualify a second site for this

5    launch.  Early-as date is May 14, so there is time."

6    That's what he writes, correct?

7    A.    Correct.

8    Q.    What did he mean by "early-as date is May 14, so

9    there is time"?

10   A.    (Pause.)  I can only guess as to what he meant

11   when he wrote this e-mail.

12   Q.    Then let's not guess.

13         So then at the top you write back -- you forward

14   this information to Ms. Jaworski, correct?

15   A.    I do, correct.

16   Q.    And you tell her, "Please see below for an

17   upcoming change relating to your esomeprazole ANDA,"

18   correct?

19   A.    Yes.

20   Q.    So you considered this her esomeprazole ANDA at

21   that time, correct?

22   A.    At that time, yes, I was informing her of this

23   change.

24   Q.    Okay.  Now, um, you follow what are called

25   "critical dates," correct?

1    A.    Teva does, correct.

2    Q.    And what are "critical dates"?

3    A.    "Critical dates" are dates that we saw in a major

4    milestone report that we looked at on Friday, it would

5    be dates where we manufacture a critical batch, dates

6    where we dose our studies, where we submit our ANDA, et

7    cetera.

8    Q.    All right.  I mean I think it's fair to say, you

9    testified to the jury on Friday, that there are a lot of

10   ANDAs that you're trying to manage at any one time,

11   correct?

12   A.    Yes.

13   Q.    And in the process of trying to deal with any one

14   ANDA, there are -- probably too much to say an infinite

15   amount of decisions, but there are innumerable

16   decisions, fair to say?

17   A.    Yes, that's fair to say.

18   Q.    And, um, isn't a part of your job trying just to

19   manage the priorities of all the things that need to be

20   done in connection with those ANDAs?

21   A.    Yes, it is.

22   Q.    Right, and so therefore you prepare what's called

23   a "critical date list," among other things?

24   A.  Our project management team would create the

25   critical date list, yes.

1    Q.    And you use it, from time to time, to manage what

2    needs to be done when?

3    A.    Yes.

4    Q.    So I put before you FVF.

5    A.    (Looks.)

6    Q.    Is FVF an example of a critical date list

7    generated at Teva and used in the ordinary course of

8    business for the management of various tasks for ANDAs?

9    A.    (Looks.)  Um, it does -- I don't recall seeing

10   this list before.  Um, it has some of the dates, yes.

11   Q.    Yes?

12   A.    Yes.

13         MR. SOBOL:  I offer it.

14         MR. BUTSWINKAS:  I have no objection.

15         THE COURT:  It may be received.  FVF is admitted

16   in evidence Exhibit 183.

17         (Exhibit 183, marked.)

18   Q.    Okay.  And if we could go to the page that starts

19   with the chart, the EXCEL chart.

20   A.    (Turns.)  Okay.

21         MR. SOBOL:  And just blow up the top line, please.

22         (Blows up.)

23   Q.    And isn't it fair to say that this is the kind of

24   information that's tracked in this kind of a report,

25   fair to say?

```
 1    A.    This differs from a major milestone or a critical
 2    milestone report that we looked at Friday --
 3    Q.    Yes.
 4    A.    -- but this does have the dates, yes.
 5    Q.    Right.  I recall, just so we can refresh the
 6    jury's memory, the critical milestone -- excuse me, the
 7    milestone report had an early-as date and the late-as
 8    date at the end of the -- at the end of this column row,
 9    fair to say?
10    A.    Yes.
11    Q.    Okay.  And that's one kind of tool that's used to
12    manage the kinds of activities that are done for an
13    ANDA, correct?
14    A.    That's used by project management, yes.
15    Q.    Right.  And now there's this kind of a report that
16    -- at least in the array it's called a "critical date
17    list"?
18    A.    (Looks.)
19    Q.    Is that what this is called?
20    A.    I don't -- according to the title of this e-mail,
21    yes.
22    Q.    All right.
23    A.    Again I've never seen -- I don't recall seeing
24    this exact report published on a regular basis.
25    Q.    Right, or this iteration of it?
```

1    A.    Or the writing.

2    Q.    Right.  But in any event, if you go to the far

3    right, then it indicates "critical date," correct?

4    A.    Yes, it does.

5    Q.    And that's the critical date that you were

6    identifying for the jury earlier, correct?

7          MS. WALKER:  Objection.  Foundation.

8          THE COURT:  Sustained, on that ground.

9    Q.    If you go to the last page of this document, the

10   very top line of the last page.

11   A.    (Turns.)  Okay.

12         MR. SOBOL:  May I have that blown up, please.

13         (Blows up.)

14   Q.    Oh, I should put it -- the e-mail that sends this

15   document is dated September of 2008, correct?

16   A.    Yes, that's correct.

17   Q.    And that's about four months or so after the

18   announcement of the AstraZeneca-Ranbaxy settlement, do

19   you know that?

20   A.    No, I don't know that.

21   Q.    Okay.  And what is the critical date that's given

22   for the esomeprazole, the generic Nexium, at Teva in

23   September of 2008?

24   A.    The critical date stated here is November 1st,

25   2014.

1   Q.    (Pause.)  I take it that -- you can put that down,

2   ma'am.

3        In addition to these management tools, I take it

4   that there are other management tools that you have at

5   Teva to manage priorities, for instance looking at the

6   time frame for responding to deficiencies.

7        Is that something you look at from time to time?

8   A.    We certainly look at time frames, yes.

9   Q.    Okay.  And is that also to be able to adjust

10  priorities of what work people are doing, when, and why?

11  A.    That's fair to say, yes.

12        MR. SOBOL:  May I have 154, please.

13        (On screen.)

14  Q.    You gave some testimony regarding the potential or

15  lack of potential for conversion of the dihydrate to the

16  trihydrate in your testimony on Friday, do you recall

17  that?

18  A.    I do.

19  Q.    Now, I put before you what's been marked as

20  Exhibit 154.  It's already in evidence.

21  A.    (Looks)

22  Q.    And is that document, um -- it does not have your

23  name on it at the top, correct?

24  A.    Correct.

25  Q.    So this appears to be -- and this is Ms. Jaworski,

1   right, in the 2008 time frame?

2   A.   Yes, it is from her.

3   Q.   To a person names "Rashimi."  Do you know who that

4   is?

5   A.   No, I do not.

6   Q.   Okay.  So you're not familiar with the

7   interactions between Ms. Jaworski and Cipla in this time

8   frame of 2008, 2009, and 2010?

9   A.   Only indirectly.

10   Q.   Right.  The people who know the most about that

11   would be Ms. Jaworski at Teva, is that fair to say?

12   A.   She's no longer with Teva, so she no longer can be

13   the most knowledgeable for Teva.

14   Q.   Right.  As a practical matter, you understand that

15   Ms. Jaworski was the person who testified under oath as

16   the Teva representative on 30(b)(6) -- on regulatory

17   issues in this case?

18   A.   Yes.

19   Q.   Okay.  And isn't it fair to say that since

20   Ms. Jaworski's departure, you've been asked to sort of

21   come in and pinch hit for her?

22   A.   I've been asked to come in and testify, if that's

23   the meaning of "pinch hit."

24   Q.   Oh, sure.

25          THE COURT:  And I've explained what a Rule

1    30(b)(6) witness is.

2         Go ahead.

3         MR. SOBOL:  Yes, your Honor.

4    Q.    Now, at the top of this, um, e-mail, Ms. Jaworski

5    writes Cipla in March 2008 and she says:  "We need the

6    stability study" -- excuse me.  "We need the stability

7    and corrected conclusion to the solubility study today.

8    We cannot wait until tomorrow."

9         Do you recall that happening at that time?

10   A.    No, I do not.

11   Q.    Now, the, um -- if I put before you 171, um, does

12   this appear to be a response by Cipla that same day, in

13   fact a few minutes later, responding to Ms. Jaworski's

14   request that she get information immediately?

15   A.    (Looks.)  Based on the date and the time, it

16   appears to be, yes.

17   Q.    Okay.  When you were preparing to testify here,

18   did you get any documents from the Teva lawyers to look

19   through for your testimony?

20   A.    Just the documents that I already have available

21   to me.

22   Q.    Okay, not the one that, for example, is in front

23   of you?

24   A.    No, I've never seen this before.

25   Q.    Okay.

1          Now, if you go several pages in, um, of the bottom

2     right-hand corner, 719?

3     A.    (Turns.)  Okay.

4     Q.    Okay.  And then there's, in the conclusion, you'll

5     see that:  "Based on the above data, we confirm that

6     esomeprazole magnesium dihydrate and esomeprazole

7     magnesium trihydrate have a comparable solubility

8     profile to the above buffer solutions."

9          Did I read that correctly?

10    A.    Yes.

11    Q.    Okay.  And from your review of the file, in

12    preparation for your testimony, you did see that at some

13    point in early 2008 Cipla was confirming the comparable

14    solubility profile between the dihydrate and the

15    trihydrate, correct?

16    A.    Yes, that was part of her response to the FDA.

17    Q.    There's no question in your mind that what was

18    being reported here is true and accurate?

19          MR. BUTSWINKAS:  Objection.  Foundation.

20          THE COURT:  No.  Overruled.  She may give us her

21    view, if she's able to.

22    A.    This document is signed and dated, um, which is an

23    indication that it's been audited.  So I have no reason

24    to question the data.

25    Q.    Well, you also know that it was submitted to the

1    FDA shortly after Cipla gave it to Teva, correct,

2    because that you know from your -- the review of the

3    documents for preparing to testify?

4    A.    Yes.

5    Q.    All right.  And so from that you certainly

6    understood that, um, Teva wouldn't file something that

7    it had any reason to think was inaccurate?

8    A.    Correct.

9    Q.    All right.  And so therefore you would draw the

10   conclusion that this was completely accurate and when

11   given to the FDA?

12   A.    Correct.

13   Q.    Okay.  So as early as this point in time in 2008,

14   the view from Teva was that the solubility profile was

15   comparable for both the dihydrate and the trihydrate,

16   true?

17   A.    True.

18   Q.    Now, you've indicated that Teva did receive a

19   deficiency notice sometime in August of 2008, correct?

20   A.    Correct.

21   Q.    Okay.  Now, you understand that the normal course

22   of events would be for people to meet, um, probably in

23   New Jersey, maybe on the phone with Cipla, to talk about

24   that deficiency, correct?

25   A.    Yes.

1   Q.    And did you get any documents from the lawyers

2   from Teva about what people thought immediately in the

3   wake of receiving that deficiency?

4   A.    I don't recall specifically.

5   Q.    Okay.  So I put before you what is marked as ELN.

6   A.    (Looks.)

7   Q.    Is ELN a memo regarding minutes of a Cipla meeting

8   in August of 2001?

9   A.    Yes, this appears to be an e-mail from someone in

10  regulatory, um, forwarding a meeting summary.

11  Q.    Okay.  And this is in evidence as Exhibit 130,

12  ELN.

13        MR. SOBOL:  If we can go to the third page,

14  please.

15        (Blows up.)

16  Q.    And then there's a summary here about the generic

17  Nexium minor deficiency, correct?

18  A.    Correct.

19  Q.    And then there are these answers that are --

20  excuse me, these comments regarding Questions 2 through

21  8 of the questions that had been posed by FDA, correct?

22  A.    That's what this appears to me to be, correct.

23  Q.    Okay.  Now, do you recall that there was a time

24  in, um, January of 2012 that Teva learned that there was

25  a consent decree that had been entered into between

Ranbaxy and the FDA?

A. No, I don't recall.

Q. Let me put before you what's been in evidence as EPL.

MR. SOBOL: Could I have that?

THE COURT: Well, you're saying it's in evidence. So EPL is what?

MR. SOBOL: I'm sorry, Exhibit 130 at EPL, your Honor.

THE COURT: Thank you.

MR. SOBOL: My mistake.

(On screen.)

A. (Looks.)

Q. And if you could orient yourself first to the -- do you mind if I?

A. Oh, no.

Q. If you'd orient yourself first to the e-mail that begins on the bottom page, the bottom half of the first page, um, to be able to put the context, if you will, for the response above it.

A. (Looks.)

Q. So here their subject is: "Ranbaxy potential forfeitures and Teva file status." Do you see that?

A. I do.

Q. Okay. And you'll notice, by the way, that while I

1   don't think that you're on these e-mails here -- well,

2   no, you are, you're the first two here, correct?

3   A.    I am on these e-mails, yes.

4   Q.    Okay.  And then you'll see how they talk about a

5   variety of different drugs here, tolterodine, Tartrate,

6   esomeprazole, and some others?

7   A.    Yes.

8   Q.    And so does this help refresh your memory that at

9   this point in time Teva had learned about the potential

10  forfeiture by Ranbaxy of some products and so, in the

11  ordinary course of business, Teva was looking at whether

12  there would be some business opportunities for it?

13  A.    Well, I mean Teva knew from basically the time

14  that we submitted the application that we were not first

15  to file and I believe we knew for a while that Ranbaxy

16  was first.  There comes a point after an ANDA applicant

17  submits their application that they don't get a timely

18  tentative approval, and basically what a "timely

19  tentative" approval means is if you don't get a

20  tentative within 30 months from the date that you

21  submitted your application, there is a real potential

22  that you have forfeited your entitlement exclusivity.

23       MR. BALDRIDGE:  Your Honor, I don't want to

24  interrupt the flow, but could I ask that we be reminded

25  that this is one of those documents that's admissible

1    only against Teva per your prior ruling?

2         THE COURT:  And you've done it.

3         MR. BALDRIDGE:  Did I do it?

4         (Laughter.)

5         THE COURT:  And we understand that.

6         And there has been some implications here, so have

7    that in mind, Mr. Sobol.

8         MR. SOBOL:  Yes, your Honor.

9    Q.   And so, in any event, you did -- the person,

10   Karen, did make a note regarding esomeprazole, to you,

11   correct, at the top?  Yes or no.

12   A.   Yes, she made the note to everyone on the e-mail.

13   Um-huh.

14   Q.   Okay.  And she wrote:  "Any estimate on approval,

15   re deficiency letter response, seems like we have plenty

16   of time before launch date, but it's really RA call."

17        That's what she wrote, correct?

18   A.   That's what she wrote, correct.

19   Q.   And you responded to her, didn't you?

20   A.   I don't recall.  I would think that I did, but I

21   don't recall specifically.

22        (Pause.)

23   Q.   Okay.  By the way, before I move from -- oh, no,

24   that's fine.

25        So I put before you what has been marked as EPM.

1    A.     (Looks.)

2    Q.     Is EPM an e-mail from you to various people at

3    Teva regarding "Ranbaxy potential forfeitures and Teva

4    file status"?

5    A.     This is my response to the previous e-mail from

6    Karen.

7    Q.     And did you generate this e-mail in the course of

8    your ordinary responsibilities at Teva?

9    A.     Yes.

10   Q.     And the document was generated in the ordinary

11   course of business at Teva, fair to say?

12   A.     Fair to say.

13          MR. SOBOL:  I offer it.

14          THE COURT:  Any objection?

15          (Silence.)

16          THE COURT:  I hear none.

17          What's the --

18          MR. BALDRIDGE:  Your Honor, it's the same issue.

19          THE COURT:  Yeah, it's the same issue?

20          MR. BALDRIDGE:  Yes, sir.

21          THE COURT:  Well, then as to Ranbaxy, it's

22   sustained.

23          MR. BUTSWINKAS:  Same, your Honor.

24          THE COURT:  Well, then that being so, I'm going to

25   exclude it.

1      MR. SOBOL:  Sidebar, your Honor?

2      THE COURT:  You may.

3

4      AT THE SIDEBAR

5      THE COURT:  The question is relevance because

6  you've adequately laid the ground work that it's a

7  business record.  So why is it relevant in the case

8  against AstraZeneca and Ranbaxy?

9      MR. SOBOL:  Because what it's going to show is

10  there's a delay by Teva.  In the middle of the page,

11  when she's addressing esomeprazole, she goes through

12  what the deficiencies are, but she calls them "show

13  stoppers."

14      THE COURT:  Yes, well, but the posture of the

15  case, as I now know it to be, what difference does that

16  make?

17      MR. SOBOL:  Well, the question as to AstraZeneca

18  and Ranbaxy, their defense is that Teva couldn't have

19  gone to market earlier, and we say it can, and this

20  shows that they had a date that was well out in time and

21  they could have done things earlier, they could have if

22  they wanted to.

23      THE COURT:  Is that your defense that --

24  AstraZeneca, that Teva could not have gotten to market

25  earlier?

```
 1        MR. BUTSWINKAS:  We think they have a burden to
 2   prove that, Teva would have to prove that.
 3        THE COURT:  Yes, and so it's relevant as to that,
 4   so I'll admit it.
 5        MR. BALDRIDGE:  As to Teva?
 6        THE COURT:  No, as to both.
 7        MR. BALDRIDGE:  Oh, that's right.
 8
 9        (In open court.)
10        THE COURT:  EPM is admitted Exhibit 184.
11        MR. SOBOL:  And, your Honor, that's as to all
12   parties?
13        THE COURT:  That's not limited.  It's admitted.
14        (Exhibit 184, marked.)
15   Q.   So the paragraph here that begins with the word
16   "esomeprazole," you wrote back to -- I take it that
17   these are various senior people in Regulatory Affairs at
18   Teva and in January of 2012?
19   A.   These are folks in project management, sales
20   marketing, um, portfolio management, et cetera, R and D.
21   Q.   Okay.  And you wrote regarding esomeprazole:  "We
22   last submitted a minor CMC amendment, August of 2011,
23   and this included an API site change.  A March of 2008
24   amendment answered questions about in-process controls
25   for the various coating stages of manufacturer.  So no
```

1    obvious "show stoppers."  And I agree with Karen that

2    CMC reviews should be wrapped up in advance of the

3    settlement date of May 2014.  However, one other item

4    that we identified that could be an issue is whether or

5    not nasogastric dosing has been studied.  Brand insert

6    allows for dosing via NG tube.  OGD," that's Office of

7    Generic Drugs, "has not asked for this info yet, but

8    they very likely will."

9          That's what you wrote on that date, correct?

10   A.    That's correct.

11   Q.    And what steps, if any, were taken, at this

12   immediate time in January of 2012, two years and several

13   months before the May 2014 date to begin NG tube

14   testing?

15   A.    I don't recall specifically

16         (Pause.)

17         MR. SOBOL:  Nothing further, your Honor.

18         THE COURT:  Mr. Van Wart, nothing further?

19         MR. VAN WART:  No, your Honor.

20         THE COURT:  Candidly I forget.

21         Mr. Gaffney, is it you or is it Mr. Butswinkas?

22         MR. BUTSWINKAS:  Yes, your Honor.

23         THE COURT:  Anything further for this witness?

24         MR. BUTSWINKAS:  Yes, your Honor.

25

1    REDIRECT EXAMINATION BY MR. BUTSWINKAS:

2    Q.    Good morning, Ms. Pastore.

3    A.    Good morning.

4    Q.    Except in the hall earlier, we've never met,

5    correct?

6    A.    Correct.

7    Q.    Okay.  I just have a few questions about your

8    testimony.

9          You were asked about, um, whether you would have

10   read the correspondence from the FDA related to this

11   ANDA.  Do you remember that question, generally?

12   A.    Yes.

13   Q.    Okay.  And I think you said, "I don't remember

14   specifically reading each letter."

15         Did I capture your testimony accurately?

16   A.    Right, I can't say exactly what date that I read

17   every letter, but in the course of my job it's part of

18   my responsibility to be aware of and read all of the

19   correspondence.

20   Q.    And is that your practice?

21   A.    Yes, that's my practice.

22   Q.    And as you've testified to the jury, do you have

23   any reason to believe that you wouldn't have read those

24   submissions?

25   A.    I have no reason to believe that I wouldn't have,

1    no.

2    Q.    Would it surprise you if you had not?

3    A.    It would, but we're all human.  Sorry.

4    Q.    And is that also true with respect to Teva's

5    submissions to the Food and Drug Administration

6    concerning this ANDA?

7    A.    Yes.

8    Q.    And that was part of your job to review those?

9    A.    Yes.  Uh-huh.

10   Q.    Okay.  And you were asked questions about, um -- I

11   think you testified to Ms. Walker's questions on Friday

12   that there was never any effort within Regulatory

13   Affairs at Teva to delay the approval process for

14   generic Nexium?

15        MR. SOBOL:  Objection.

16        THE COURT:  No, overruled.  He may have it.

17   Q.    Is that accurate?

18   A.    Yes, to my knowledge there was never an intention

19   on Regulatory's part to providing the movement of this

20   application forward.

21   Q.    And given your position as you've described your

22   responsibilities on Friday, is that something that you

23   would have known about?

24   A.    Most certainly.

25   Q.    And there's been a suggestion in this case that,

1   um, when deficiencies come that are entitled "minor,"

2   that they are immediately correctable, is that your

3   understanding?

4   A.    In some cases, yes, but in many cases, no, that's

5   not the case.

6   Q.    How about in the case of this ANDA?

7   A.    No, a lot of these letters did require a lot of

8   time, a lot of effort, a lot of coordination.  So these

9   were not just simply quick responses.

10  Q.    And was your department, Regulatory Affairs,

11  making a diligent effort to seek approval at any point

12  under your watch?

13        MR. SOBOL:  Objection.

14        THE COURT:  Overruled.

15  A.    The -- for as long as I can recall, it's been our

16  effort to answer, I mean, every FDA review letter as

17  thoroughly and as accurately as we can, to keep the file

18  moving forward to a tentative approval or an approval

19  when that time comes.

20  Q.    And despite those efforts, um, am I correct that

21  deficiencies continued to be noted by the Food and Drug

22  Administration with respect to this ANDA?

23        MR. SOBOL:  Objection.

24        THE COURT:  Overruled.

25  A.    Yes, that's correct.  I mean even as recent as

1    July of this year, 2014, we were still receiving

2    comments from FDA.

3    Q.    And so would I be correct to characterize the

4    process as the FDA would identify deficiencies,

5    questions, or problems they had with the application,

6    right?

7    A.    Yes.

8         MR. SOBOL:  Objection.  Your Honor, may we have a

9    sidebar?

10        THE COURT:  We may.

11

12        AT THE SIDEBAR

13        THE COURT:  Well, this isn't beyond the scope and

14   in a multi party case he's entitled to ask questions in

15   this form.

16        What's the matter?

17        MR. SOBOL:  Well, I don't think that he's ever

18   established the foundation for it.  It's leading her

19   through a series of propositions.

20        THE COURT:  It is, but she's a knowledgeable

21   person as to this.

22        MR. SOBOL:  I don't think so.

23        THE COURT:  You don't think she is?

24        MR. SOBOL:  Well, as to the specifics.  So it's a

25   matter of like some broad brush, "Do you think this?"

1    "Do you think that."

2          THE COURT:  Well, I'll be alert to it, but those

3    are my rulings.

4          MR. SOBOL:  Sure.

5

6          (In open court.)

7    Q.    Now, Ms. Pastore, my question was, um, the process

8    has the Food and Drug Administration identifying

9    chemistry deficiencies and other deficiencies, and they

10   send a letter to Teva, is that correct?

11   A.    That's correct.

12   Q.    And then Teva processes responses to those letters

13   and sends them back to the Food and Drug Administration?

14   A.    Yes, that's correct.

15   Q.    And trying to answer the inquiries they have made

16   in their letter?

17   A.    Correct.

18   Q.    And in some instances that requires studies to be

19   done?

20   A.    Yes, I believe it would.

21   Q.    And in some instances experiments in the

22   laboratory?

23   A.    Most definitely.

24   Q.    And sometimes the editing of a label, for example?

25   A.    Yes.

1    Q.    Various and sundry things that the FDA is entitled

2    to raise before they grant tentative approval?

3    A.    Correct.

4    Q.    And then your office compiles all of that, a

5    collection of information in response to the specific

6    letter?

7    A.    Correct.

8    Q.    But that doesn't guarantee tentative approval,

9    correct?

10   A.    No, it does not.

11   Q.    What happened here was it generated additional

12   letters with additional deficiencies?

13         MR. SOBOL:  Objection.

14         THE COURT:  Well, in that form, sustained.

15   Q.    Let me ask you, if I could, to look at one of the

16   documents you were shown, GEB, which was this list.

17   A.    (Looks.)

18   Q.    Ms. Pastore, do you have GEB in front of you?

19   A.    I do.

20   Q.    Okay.  And this was represented to be an exchange

21   of correspondence regarding this ANDA between Teva and

22   the FDA.  Do you remember that?

23   A.    Yes.

24   Q.    Okay.  And what I asked you was, um -- with your

25   experience with this particular ANDA, it appears that

1    each time you filed a response, it led to another

2    deficiency letter from the FDA.

3          Am I correctly characterizing the chronology?

4    A.    Yes, that's correct.

5    Q.    And I think you said that that process of back and

6    forth continued that way at least up until May 27th,

7    2014?

8    A.    It did and it's continued through the summer at

9    least.

10         MR. SOBOL:  Motion to strike.

11         THE COURT:  Motion to strike is denied.

12   Q.    Now, there's been a suggestion in this case by an

13   opinion witness that if you had tried harder you would

14   have gotten approval sooner.

15         Do you agree with that suggestion?

16         MR. SOBOL:  Objection.

17         THE COURT:  No, sustained.

18   Q.    (Pause.)   Now, I think you testified that the

19   form of esomeprazole magnesium that Teva was proposing

20   in its ANDA was dihydrate, is that correct?

21   A.    Yes, that's correct.

22   Q.    And you're aware, aren't you, that in, I believe,

23   in August of 2008, the USP standard was modified to

24   require -- to say that the form of esomeprazole

25   magnesium needed to be trihydrate?

1          MR. SOBOL:  Objection.

2          THE COURT:  Do you know that yourself?

3          THE WITNESS:  I do.

4          THE COURT:  You do know.

5          MR. SOBOL:  Scope, your Honor?

6          MR. BUTSWINKAS:  He asked about dihydrate.

7          THE COURT:  He did.  Overruled.

8    Q.    Are you aware of that, ma'am?

9    A.    Yes.

10   Q.    Okay.  And at that point in time the form that

11   Teva was proposing to the Food and Drug Administration

12   did not meet that standard?

13         MR. SOBOL:  Objection.

14         THE COURT:  Well, um -- yeah, that's beyond the

15   scope.  Sustained.

16   Q.    That standard stayed in place until January of

17   2011, didn't it?

18         MR. SOBOL:  Objection.

19         THE COURT:  You may have that.

20         Do you know that?

21         THE WITNESS:  Yes.

22   A.  Yes, and in January of 2011 the USP published their

23   intent to modify the monograph to incorporate and to

24   allow it to provide for the dihydrate as well as the

25   trihydrate.

1    Q.    And so for that three-year period that standard
2    was a hurdle to Teva, was it not?
3          MR. SOBOL:  Objection.
4          THE COURT:  Overruled.
5    A.    Yes, it was definitely a hurdle.
6    Q.    Now, you were asked questions about the
7    relationship between launch dates and your efforts to
8    seek approval.
9          Do you remember those questions generally?
10   A.    Yes.
11   Q.    Okay.  And I think you said that there was a
12   difference between the launch date and your effort to
13   get approval.
14         Do you remember that?
15   A.    Yes.
16   Q.    Could you explain what you meant by that?
17   A.    Yes.  I mean because I testified that Regulatory's
18   role and responsibility is to get the application to an
19   approval.  We don't prepare launch -- we don't prepare
20   for launch, our goal is to get the approval to enable
21   the departments that do handle launch to do their job.
22   Q.    Okay.  So does that mean that things that are
23   going on in the commercial side may not affect things
24   that are going on in Regulatory Affairs?
25   A.    Correct.

```
1    Q.     With respect to priorities?

2    A.     Yes, I think that's fair to say.  Yes.

3    Q.     Now, you were asked questions about nasogastric

4    testing.  Do you remember that generally?

5    A.     Yes.

6    Q.     Has that been a hurdle to get approval?

7    A.     That's been a very large hurdle.

8    Q.     And how long has that been going on back and forth

9    with the Food and Drug Administration?

10   A.     The first question that we got from the Office of

11   Generic Drugs with respect to nasogastric came in the

12   form of a deficiency letter that we received in March of

13   2012.  So we've been working on it since that time.

14   Q.     So you were shown this letter -- this Exhibit 184.

15   I ask you if you could look at that again.  It's --

16   A.     BPI?

17   Q.     BPI.  It was one of the last documents.  Do you

18   have it?

19   A.     I do.

20   Q.     Okay.  And this was an e-mail that you wrote,

21   ma'am, is that right?

22   A.     The top portion, yes, this is an e-mail written by

23   myself.

24   Q.     Yes, and it was pointed out to you, um, in the

25   second paragraph of the e-mail, that says, um, makes
```

1   mention, um, of "nasogastric dosing," right?

2   A.    Yes.

3   Q.    Do you see that?

4   A.    Yes.

5   Q.    And that issue is that because the Nexium label

6   provides that brand Nexium has been proven efficacious

7   in that form, the issue is whether you can duplicate

8   that label, right?

9   A.    Correct.

10  Q.    And it was read to you where you say "OGD,"

11  that's, I think you said, the "Office of Generic Drugs"?

12  A.    The "Office of Generic Drugs," right.

13  Q.    "Has not asked for this information yet, but they

14  very likely will."  That was your prediction?

15  A.    Yes.

16  Q.    And you were right?

17  A.    Yes.

18  Q.    In fact two months later they asked about it in a

19  deficiency letter, right?

20  A.    That's correct.

21  Q.    And when they did that, did you all diligently try

22  to address that deficiency?

23  A.    We have been, yes.

24  Q.    Okay.  Let me ask you to look at Exhibit 182.

25  A.    (Looks.)

```
1    Q.    It's um, ENC.

2    A.    (Looks.)  Yes, here it is.

3    Q.    Great.  Thank you.

4          This is an e-mail that was shown to you by

5    plaintiffs' counsel.  Do you remember that?

6    A.    Yes.

7    Q.    Okay, I just have some questions about who the

8    people are.

9          At the bottom there's a "Michael Altman."  Do you

10   see that?

11   A.    Yes.

12   Q.    Is he someone in Regulatory Affairs?

13   A.    No, he's not.

14   Q.    What is his job?

15   A.    Well, he's no longer with Teva.

16   Q.    That had occurred to me.  What was his job at the

17   time?

18   A.    He was in the Department's commercialization team.

19   Q.    And what do they do?

20   A.    They basically queue things up and, um, ensure

21   we're ready to launch.

22   Q.    Okay.  And then he is sending an e-mail to a

23   gentleman -- and I may butcher the name, "Wayne Cagno,"

24   C-A-G-N-O.  Do you see that?

25   A.    I do.
```

1    Q.    Who was he at the time, do you know?

2    A.    Um, Wayne was at Teva, he's no longer with the

3    company.  He was there for several years and he wore

4    different hats.  I honestly don't recall exactly what

5    role he played at this time.

6    Q.    Was he in Regulatory Affairs?

7    A.    No, he was never in Regulatory.

8    Q.    Okay.  And so then he forwards this e-mail, um, to

9    you, it appears, is that right?

10   A.    Yes.

11   Q.    All right.  Did this e-mail affect your efforts to

12   seek approval -- tentative approval of your Nexium ANDA?

13         MR. SOBOL:  Objection.

14         THE COURT:  Ask the question again, if you

15   wouldn't mind.

16         MR. BUTSWINKAS:  Yes.

17   Q.    Did this -- did reading this e-mail affect how

18   diligent or nondiligent your department was going to be

19   with respect to its efforts to set up approval?

20         MR. SOBOL:  Objection, foundation, your Honor.

21         THE COURT:  Yeah, and sustained on that ground.

22   Q.    Well, you received this e-mail, right?

23   A.    I did.

24   Q.    And you read it?

25   A.    I certainly should have, yes.

1    Q.    And you were read by counsel this line that says
2    "Early-as date is May 14th, so there is time."  Do you
3    remember being read that?
4    A.    Yes.
5    Q.    When you received this, did you call your folks
6    and say, "You don't have to hurry to try to seek
7    approval of the generic Nexium ANDA"?
8    A.    Actually probably quite the opposite.
9    Q.    Why do you say that?
10         MR. SOBOL:  Objection.
11         THE COURT:  Well, the way you answered, probably
12   quite the opposite.  I mean, do you have a recollection
13   of what you did, you, yourself?
14         THE WITNESS:  Not exactly directly, no.
15         THE COURT:  Okay, then I'm going to sustain it.
16   Q.    Well, you didn't slow down as a result of it?
17         MR. SOBOL:  Objection.  The same objection.
18         THE COURT:  We'll ask it this way.
19         Was there any difference in the dealing with these
20   issues of which you're aware, any difference, of which
21   you're aware?
22         THE WITNESS:  I don't recall this exact --
23         THE COURT:  -- issue?
24         THE WITNESS:  -- situation.
25         THE COURT:  All right.  If you don't recall it,

1   we'll stop there.

2       THE WITNESS:  Okay, we'll stop there.

3       THE COURT:  All right.

4   Q.   Do you remember during that time period, March of

5   2010, taking any steps to, um, deprioritize the generic

6   Nexium ANDA?

7       MR. SOBOL:  Objection, it's the same thing.

8       THE COURT:  Yeah, it is.  And so sustained.  She

9   doesn't recall as to this issue.

10   Q.   Do you know whether any steps were taken, in the

11   early part of 2010, to delay efforts to seek approval

12   within Regulatory Affairs?

13       MR. SOBOL:  Objection.

14       THE COURT:  Sustained.  Based on her answer,

15   sustained.

16       MR. BUTSWINKAS:  But that is a foundation

17   question, your Honor.

18       THE COURT:  Well -- yeah, sustained.

19       Anything else for this witness?

20       MR. BUTSWINKAS:  Yes.

21   Q.   Let me ask you to look at Exhibit 183, of which

22   you were asked about.

23   A.   Show me.

24   Q.   It's FVF.

25   A.   (Looks.)  Yes.

1    Q.    Thank you.  Do you have Exhibit 183 in front of

2    you?

3    A.    Yes.

4    Q.    Okay.  Do you remember being asked about this?

5    A.    I do.

6    Q.    I just have some more questions about who is who

7    again.

8          And there's a reference to a "Mr. Salsbury."  Do

9    you see that?

10   A.    I do.

11   Q.    Who is he?

12   A.    He was in our project management group.

13   Q.    And what is the responsibility of the project

14   management group?

15   A.    The project management team basically creates

16   those critical milestone reports that we looked at on

17   Friday and, um, they basically have written reports or

18   created reports that outline the critical time points

19   per each product.

20   Q.    And had you seen the document that's attached to

21   this before?

22   A.    I don't recall.  My name is on there, so I may

23   have -- I believe I would have it in the normal course

24   of business in reading my e-mail.

25   Q.    Was this a document that you were using to guide

1    your efforts to seek tentative approval of the Nexium

2    ANDA?

3    A.    Um, without recalling it, I can't say for certain.

4    I mean I think this would have factored into just my

5    understanding of the project, but it wouldn't have

6    defined my day-to-day work.

7    Q.    Do you know what "PLMD" stands for?

8    A.    Yeah, "PLMD" is a term used for "Preliminary

9    Limited Market Date."

10   Q.    What does that mean?

11   A.    It's basically our best guess, um, of the earliest

12   time period that we might potentially be willing to

13   launch a product.

14   Q.    And so what does that tell you with respect to if

15   you're using that as a guideline for your efforts to

16   seek approval?

17   A.    Well, I think everyone in the, um, the Regulatory

18   understands that the PLMD has a lot of factors that go

19   into the calculation of that date.  But it does give us

20   a sense of order whether something may be in the next

21   year or two versus something that might be a few years

22   out as far as when we would be able to launch.

23   Q.    Let me direct your attention, Ms. Pastore, back to

24   the document that you were shown by plaintiffs' counsel,

25   the last page.

```
 1    A.     (Looks.)

 2    Q.     Do you see the top line as esomeprazole capsules?

 3    A.     Yes, I do.

 4    Q.     And is there a column for PLMD, which you were

 5    just talking about?

 6    A.     Yes, there is.

 7    Q.     And what does it say next to esomeprazole capsules

 8    20 and 40 milligrams?

 9    A.     It's "ASAP."

10    Q.     Which means what?

11    A.     "As soon as possible."

12           (Pause.)

13           MR. BUTSWINKAS:  Just one moment, your Honor.

14           THE COURT:  Of course.

15           (Pause.)

16           MR. BUTSWINKAS:  Your Honor, nothing further.

17           THE COURT:  Ms. Foley, anything?

18           MS. FOLEY:  Nothing, your Honor.

19           THE COURT:  Any further examination, Mr. Sobol?

20           MR. SOBOL:  Yes.

21

22    RECROSS-EXAMINATION BY MR. SOBOL:

23    Q.     Regarding the document that you were just being

24    asked questions about?

25    A.     Yes.
```

1    Q.    How many other ANDAs are marked "ASAP" on the last
2    page, only on that document?
3    A.    On this last page actually most of them.
4    Q.    Most of them are?
5    A.    Sorry?
6    Q.    You said most of them?
7    A.    Yes, most of them are marked "ASAP."
8    Q.    All right.  How is the order of the ANDAs sorted
9    in this submission?
10   A.    It appears to be sorted by the last column, which
11   is just looking at the critical date.
12   Q.    Right, so it's sorted.  So if we could turn to the
13   first of the table, the first entry has a critical date
14   of June 24, 2005, correct?
15   A.    Correct.
16   Q.    And then it goes to later critical dates as we go
17   on in time, um, the whole first page has in order of
18   critical dates, the second page has in order of critical
19   dates?
20   A.    Uh-huh.
21   Q.    The third page has in order of critical dates.
22   The fourth page has critical dates.
23        But it's not until we get to the last page where
24   generic esomeprazole is identified, correct?
25   A.    Correct.

1    Q.    You knew about the nasogastric tube testing issue

2    two years before 2012, correct?

3    A.    No, I believe the first that -- from the e-mail it

4    became apparent to us in early 2012 for this product.

5    Q.    But you knew about the issue of nasogastric tube

6    testing for Nexium two years earlier, correct?

7    A.    I don't recall that.

8    Q.    I put before you what has been marked as FVJ.

9    A.    (Looks.)

10   Q.    Is FVJ an e-mail from a person by the name of Paul

11   Fackler to various people at Teva including you?

12   A.    Yes, it is.

13   Q.    Dated March 24th, 2010?

14   A.    Correct.

15   Q.    And this was an e-mail that was generated in the

16   ordinary course at Teva in order to provide some

17   information to various people, including yourself,

18   regarding, as the subject here indicates, "French tube

19   dimensions."  Do you see that?

20   A.    Yes, I see that.

21         MR. SOBOL:  I offer it.

22         MR. BUTSWINKAS:  No objection.

23         THE COURT:  It may be received as Exhibits 185 in

24   evidence.

25         (Exhibit 185, marked.)

1    Q.    Do you recall receiving a photocopy of this

2    article that apparently is dated in December of 2002?

3    A.    I'm sorry.  Could you repeat that question?

4    Q.    Do you recall someone forwarded you this article

5    about "esomeprazole magnesium pellets through a small

6    caliper in standard nasogastric tubes"?

7    A.    (Looks.)  I don't recall receiving this, but I am

8    on this e-mail as having received this in March of 2010.

9    Q.    Okay.  Does this document refresh your

10   recollection that a study had been performed about a

11   decade earlier on esomeprazole magnesium and how it is

12   that the pellets might be able to be in some way

13   processed through a small caliper in standard

14   nasogastric tubes?

15   A.    Again, I don't recall being aware of this.  I

16   don't recall this e-mail.  But I don't know that I would

17   have been aware of it prior to the date of this e-mail.

18   Q.    What was done in Regulatory Affairs two years

19   before 2012 in order to begin nasogastric tube testing

20   for generic Nexium?

21   A.    I don't know that anything was done, but I'm

22   assuming, based on this e-mail, the fact that people

23   were aware.  Someone would have contacted Cipla about --

24   at least beginning to think about what we might need to

25   do if they were to ask us a question --

Q.    I'm sorry?

A.    I'm sorry.  If they were to ask us a question with respect to this topic.

Q.    Sure.  You at least would have expected that to be done, correct?

A.    Yes.

Q.    You hadn't been shown any documents that in fact that was done, correct?

A.    Um, not today, no.

Q.    And, um, finally, you're aware that there was a deficiency notice that was sent in August of 2008 that we've gone into several times, correct?

A.    Uh-huh.

Q.    You have to vocalize "yes" or "no".

A.    Yes.

Q.    And you were not personally involved in any of the discussions that occurred during the three-year period that it took, between August of 2008 and when the response was filed in 2011, you were not involved in any discussions that occurred -- personally you weren't involved in discussions that occurred between Teva and Cipla regarding how to address that deficiency, is that true?

A.    I don't recall being a part of those conversations, you're correct.

1   Q.    Right.  You hadn't been provided any documents

2   about why it is that that took three years, correct?

3   A.    I don't recall being provided documents, no.

4   Q.    If the critical date for Teva's generic

5   esomeprazole had not been May of 2014 or November of

6   2014, but instead had been the fall of 2009, do you

7   think that, um, Teva, it would be acceptable, from your

8   point of view, for it to have taken them three years to

9   respond to that deficiency?

10  A.    (Silence.)

11  Q.    If the critical date, according to Teva, had been

12  the fall of 2009, would it be acceptable, from your

13  point of view, that the deficiency notice that came out

14  a year earlier would take three years to respond to?

15  A.    There was a lot of work that went into that

16  deficiency response, so certainly three years, I would

17  hope, we would have answered it more quickly than that.

18  But knowing the amount of work and coordination that

19  went into it, I can't say I'm surprised that it took

20  that long.

21  Q.    But you just testified that you weren't personally

22  involved in the discussions that occurred in dealing

23  with -- between Teva and Cipla during that three-year

24  period, correct, you weren't personally involved in it?

25  A.    I was not personally involved.

```
 1    Q.    And nor were you given any documents regarding

 2    what happened between those two, between Teva and Cipla

 3    during that three-year period, correct?

 4    A.    I was still aware of the work that was being done.

 5    Q.    And you certainly would have hoped that it would

 6    have been done quicker, don't you?

 7    A.    I'm sorry?

 8    Q.    You certainly would have hoped that it would have

 9    been done more quickly than three years?

10         MR. BALDRIDGE:  Objection, asked and answered.

11         THE COURT:  No, overruled.  He may have it.

12    A.    I would agree.

13         MR. SOBOL:  Thank you.

14         (Sits down.)

15         THE COURT:  Now, Mr. Van Wart, nothing further?

16         MR. VAN WART:  No, your Honor.

17         THE COURT:  And, Mr. Butswinkas, nothing further?

18         MR. BUTSWINKAS:  Just one question, your Honor?

19         THE COURT:  You may.

20

21    REREDIRECT EXAMINATION BY MR. BUTSWINKAS:

22    Q.    This exhibit, Ms. Pastore, that you were just

23    shown, 185, where it's sending around this 2002 study?

24    A.    Yes.  The January?

25    Q.    Yes, it's now 185?
```

```
 1    A.    Yes.

 2    Q.    Okay.  You had said that the ANDA -- and I'm going

 3    to apologize because there's going to be more than one

 4    question, your Honor, so I'll apologize in advance.

 5          You had said that the Nexium ANDA for Teva was

 6    filed in late 2005, is that right?

 7    A.    Yes, in 2005.

 8    Q.    And when was the first time that the FDA said to

 9    Teva that the absence of efficacy data on nasogastric

10    testing was a deficiency?

11    A.    The first deficiency comment was March 2012.

12    Q.    And when that happened, did Teva respond

13    diligently?

14          MR. SOBOL:  Objection.  Scope.

15          THE COURT:  He may have that question.

16          Did they, to your own knowledge?

17          THE WITNESS:  Yes, we did.

18          THE COURT:  All right.

19          MR. BUTSWINKAS:  No further questions, your Honor.

20          THE COURT:  And nothing further, Ms. Foley?

21          MS. FOLEY:  Nothing, your Honor.

22          THE COURT:  And, Mr. Sobol?

23          MR. SOBOL:  No, your Honor.

24          THE COURT:  And, Mr. Van Wart?

25          MR. VAN WART:  No, your Honor.
```

1          THE COURT:  You may step down.  Thank you.

2          THE WITNESS:  Thank you.

3          (Steps down.)

4          THE COURT:  We'll take a shortened recess, because

5    we started a little late, and then we'll get to the next

6    witness.

7          Keep your minds suspended.  Do not discuss the

8    case among yourself nor with anyone else.  We may stand

9    in recess until 11:15.  We'll stand in recess.  I'll

10   remain on the bench.

11         (Jury leaves, 10:50 a.m.)

12         THE COURT:  Please be seated.  The Teva counsel

13   are excused.

14         In light of this happy news, it's been a privilege

15   having you here in this courtroom.  And we'll continue

16   at 11:15.  We'll recess.

17         (Recess, 10:55 a.m.)

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

4           I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5      do hereby certify that the foregoing record is a true

6      and accurate transcription of my stenographic notes

7      before Judge William G. Young, on Monday, November 24,

8      2014, to the best of my skill and ability.

9

10

11

12    /s/ Richard H. Romanow 11-24-14
      _____
13    RICHARD H. ROMANOW Date

14

15

16

17

18

19

20

21

22

23

24

25

| From: | Yatindra Joshi |
|---|---|
| Sent: | Sunday, September 14, 2008 4:04 PM |
| To: | Todd Salsbury |
| Cc: | Alisa Capreri; Bill Hobart; David Marshall; Debbie Hoenscheid; Debbie Jaskot; Jill Pastore; John Kovaleski; Kendy Merritt; Philip Erickson |
| Subject: | Re: CMC Management Update |
| Attach: | Critical Date List.xls |

Todd:
Thank you very much for a very good job putting this information together.
Debbie J has made some good points, In addition, you should include
information related to deficiency letters, ie., major, minor, answerable or not
without redoing development + BE, etc.
Yatindra


Todd Salsbury/KUL/TEVA/IL
09/09/2008 05:02 PM

To
David Marshall/NOW/TEVA/IL@TEVANEW, Yatindra Joshi/NOW/TEVA/IL@TEVANEW, Debbie
Jaskot/KUL/TEVA/IL@TEVANEW, Bill Hobart/SEL/TEVA/IL@TEVANEW, Alisa
Capreri/KUL/TEVA/IL@TEVANEW, Philip Erickson/KUL/TEVA/IL@TEVANEW, Jill
Pastore/KUL/TEVA/IL@TEVANEW, Debbie Hoenscheid/KUL/TEVA/IL@TEVANEW, John
Kovaleski/FRF/TEVA/IL@TEVANEW
cc
Kendy Merritt/NOW/TEVA/IL@TEVANEW
Subject
CMC Management Update


All,

John, Debbie, and I met on Monday to review the project lists and establish our
initial action plan.  To prioritize our focus, all pending and tentatively
approved projects have been assigned a "critical date" which is the earlier of
it's MMA, PLMD, AEA Launch date, or Amend or Withdraw FDA commitment date. The
projects have been sorted by these dates and the list is attached below.
Please note that because some MMA dates have passed, those projects appear at
the top of the list with negative months left before the critical date.  We
propose that we delete the expired MMA dates on this report so that the
critical dates will default to the PLMD, AEA Launch date, or Amend or Withdraw
FDA commitment date.

A meeting will be scheduled for later this week or early next week to review

**Exhibit
183**

Confidential

Teva-ESO-083484

our proposals with the management group.  At that time, we will walk the group
through our priorities and discuss what we envision the overall process to be.
But we wanted to send this list out now for the group to get a feel for what
we're thinking.


Todd Salsbury
Sr. Director Project Management
Ext 3161
Cell 215-266-6802

Confidential

Teva-ESO-083485

**Pending Applications Tentative Approvals - Sorted Alphabetical**

| Status | Generic Name | Site | PIV | First to File | Submission Date | Launch | PLMD | Months to PLMD Expiration | MMA Date | Months to MMA Expiration | Pending Def. Date Rc'd | Months Pending | Sued (Y/N) | Critical Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TA | Modafinil Tablets | IL | Yes | Yes | Dec 24 2002 | Apr 6 2012 | Apr 6 2012 | -29 | Jun 24 2005 | -111 | TA | - | Y | Jun 24 2005 |
| TA | Losartan Tablets | IL | Yes | Yes | Dec 18 2003 | Apr 6 2010 | Apr 6 2010 | -53 | Jun 18 2006 | -99 | TA | - | N | Jun 18 2006 |
| TA | Losartan / HCTZ Tablets 50/12.5 & 100mg /25 mg | IL | Yes | Yes | May 24 2004 | Apr 6 2010 | Apr 6 2010 | -53 | Nov 24 2006 | -94 | TA | - | N | Nov 24 2006 |
| TA | Irbesartan Tablets | IL | Yes | Yes | May 25 2004 | Mar 30 2012 | Mar 30 2012 | -30 | Nov 25 2006 | -94 | TA | - | N | Nov 25 2006 |
| TA | Lansoprazole Delayed Release Capsules | IL | Yes | Yes | Aug 27 2004 | Mar 1 2009 | ASAP | - | Feb 27 2007 | -91 | TA | - | Y | Feb 27 2007 |
| TA | Rizatriptan Benzoate Tablets | IL | Yes | Yes | Sep 2 2004 | Jun 29 2012 | Jun 29 2012 | -27 | Mar 2 2007 | -90 | TA | - | N | Mar 2 2007 |
| TA | Metformin / Rosiglitazone Tablets | IL | Yes | Yes | Oct 22 2004 | Mar 7 2012 | ASAP | - | Apr 22 2007 | -89 | TA | - | Y | Apr 22 2007 |
| TA | Sildenafil Tablets 100, 50 & 25 mg | SV | Yes | Yes | Oct 25 2004 | Mar 7 2012 | Mar 7 2012 | -30 | Apr 25 2007 | -89 | TA | - | N | Apr 25 2007 |
| TA | Irbesartan / HCTZ Tablets 150/12.5, 300/12.5 & 300mg/25 mg | IL | Yes | Yes | Nov 10 2004 | Mar 30 2012 | Mar 30 2012 | -30 | May 10 2007 | -88 | TA | - | N | May 10 2007 |
| TA | Adenosine Injection (Vial) | IR | Yes | Yes | Dec 6 2004 | Nov 1 2008 | ASAP | - | Jun 6 2007 | -87 | TA | - | Y | Jun 6 2007 |
| TA | Nateglinide Tablets | IL | Yes | Yes | Dec 22 2004 | Sep 8 2009 | Sep 8 2009 | -60 | Jun 22 2007 | -87 | TA | - | N | Jun 22 2007 |
| P | Budesonide Inhalation Solution | RN | Yes | Yes | Dec 30 2004 | Sep 1 2008 | ASAP | - | Jun 30 2007 | -87 | - | - | N/A | Jun 30 2007 |
| TA | Fluoxetine / Olanzapine Capsules | SV | Yes | Yes | Jan 10 2005 | Oct 23 2011 | ASAP | - | Jul 10 2007 | -86 | TA | - | Y | Jul 10 2007 |
| TA | Galantamine Hydrobromide Tablets | IL | Yes | Yes | Feb 28 2005 | Sep 1 2008 | ASAP | - | Aug 28 2007 | -85 | TA | - | Y | Aug 28 2007 |
| P | Methylphenidate HCl ER Capsules (Metadate CD) 10, 20 & 30mg | SV | Yes | Yes | May 13 2005 | Oct 1 2008 | ASAP | - | Nov 13 2007 | -82 | - | - | N | Nov 13 2007 |
| P | Quetiapine Tablets 25 mg | TO | Yes | Yes | Jun 15 2005 | Jan 1 2010 | ASAP | - | Dec 15 2007 | -81 | - | - | Y | Dec 15 2007 |
| TA | Gemcitabine HCl for Injection | IR | Yes | Yes | Oct 31 2005 | Mar 1 2010 | ASAP | - | May 1 2008 | -76 | TA | - | Y | May 1 2008 |
| TA | Almotriptan Tablets | SV | Yes | Yes | Dec 7 2005 | Jan 7 2015 | Jan 17 2015 | 4 | Jun 7 2008 | -75 | TA | - | Y | Jun 7 2008 |
| TA | Linezolid Tablets | IL | Yes | Yes | Dec 20 2005 | Jul 29 2021 | Jul 29 2021 | 82 | Jun 20 2008 | -75 | TA | - | N | Jun 20 2008 |
| P | Moxifloxacin HCl Ophthalmic Solution 0.5% | IL | Yes | Yes | Dec 21 2005 | Sep 4 2014 | Sep 4 2014 | 0 | Jun 21 2008 | -75 | Nov 7 2007 | 82 | Y | Jun 21 2008 |
| P | Quetiapine Tablets 100, 200 & 300 mg | TO | Yes | Yes | Feb 20 2006 | Jan 1 2010 | ASAP | - | Aug 20 2008 | -73 | - | - | Y | Aug 20 2008 |
| P | Fentanyl Transdermal Patch | AVIV | No | - | Mar 21 2005 | Sep 01 2008 | ASAP | - | - | - | - | - | - | Sep 1 2008 |
| P | Metronidazole Topical Gel 0.75% | SV | No | - | Dec 29 2005 | Sep 1 2008 | ASAP | - | - | - | - | - | - | Sep 1 2008 |
| TA | Risperidone Oral Solution | SV | Yes | Yes | Jun 21 2002 | Sep 1 2008 | ASAP | - | Pre-MMA | | TA | - | N | Sep 1 2008 |
| P | Aripiprazole Tablets 10 mg | IL | Yes | Yes | Nov 15 2006 | Nov 1 2010 | ASAP | - | May 15 2009 | -64 | May 8 2007 | 88 | Y | Sep 30 2008 |
| P | Aripiprazole Tablets 2 & 5 mg | IL | Yes | Yes | Nov 15 2006 | Nov 1 2010 | ASAP | - | May 15 2009 | -64 | May 8 2007 | 88 | Y | Sep 30 2008 |
| P | Ezetimibe Tablets | IL | Yes | No | Dec 26 2006 | Oct 25 2016 | Oct 25 2016 | 25 | - | - | - | - | N | Sep 30 2008 |
| P | Fluticasone Nasal Spray | OP | No | - | Mar 3 2003 | Sep 1 2009 | ASAP | - | - | - | Sep 1 2006 | 96 | Y | Sep 30 2008 |
| P | Lansoprazole Delayed Release OD Tablets | IL | Yes | Yes | Dec 27 2006 | Oct 1 2009 | ASAP | - | Jun 27 2009 | -63 | - | - | Y | Sep 30 2008 |
| P | Valsartan / HCTZ Tablets 160/25, 160/12.5 & 80 mg/12.5mg | IL | No | - | Oct 17 2006 | Mar 21 2013 | Sep 21 2012 | -24 | - | - | Oct 26 2007 | 83 | - | Sep 30 2008 |
| P | Bicalutamide Tablets | IL | No | - | Dec 4 2006 | Oct 1 2008 | Oct 2 2008 | -71 | - | - | Jul 30 2008 | 74 | - | Oct 1 2008 |
| P | Carbamazepine Suspension | CG | No | - | Apr 18 2005 | Oct 1 2008 | ASAP | - | - | - | Jul 24 2008 | 74 | - | Oct 1 2008 |
| P | Dorzolamide Ophthalmic Solution | IL | No | - | Dec 28 2006 | Oct 1 2008 | Oct 28 2008 | -71 | - | - | N/A | - | - | Oct 1 2008 |
| P | Ethinyl Estradiol / Norethindrone Acetate Tablets (Loestrin 24 FE) | BD | No | - | Dec 28 2007 | Oct 1 2008 | Feb 17 2009 | -67 | - | - | - | - | - | Oct 1 2008 |
| P | Methylphenidate HCl ER Capsules (Metadate CD) 40, 50& 60mg | SV | Yes | Yes | Mar 15 2007 | Oct 1 2008 | ASAP | - | Sep 15 2009 | -60 | - | - | N | Oct 1 2008 |
| P | Rocuronium Bromide Injection | IL | No | - | Dec 22 2006 | Oct 13 2008 | Oct 13 2008 | -71 | - | - | - | - | - | Oct 13 2008 |
| P | Memantine Tablets | IL | Yes | Yes | Oct 16 2007 | Apr 16 2011 | Oct 16 2008 | -71 | Apr 16 2010 | -53 | Apr 10 2008 | 77 | Y | Oct 16 2008 |
| P | Ethinyl Estradiol & Desogestrel Tablets (Mircette) | ADX | No | - | Mar 2003 | Mar 2009 | Oct 20 2008 | -71 | - | - | Jan 9 2006 | 104 | - | Oct 20 2008 |
| P | Ethinyl Estradiol & Desogestrel Tablets (Desogen / Orthocept) | ADX | No | - | Feb 2003 | Nov 2008 | ASAP | - | - | - | Sep 14 2005 | 108 | - | Nov 1 2008 |

| Status | Generic Name | Site | PIV | First to File | Submission Date | Launch | PLMD | Months to PLMD Expiration | MMA Date | Months to MMA Expiration | Pending Def. Date Rc'd | Months Pending | Sued (Y/N) | Critical Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P | Ethinyl Estradiol & Levonorgestrel (Triphasil / Tri-Levlen) | ADX | No | - | Dec 29 2004 | Nov 1 2008 | ASAP | - | | - | Aug 1 2006 | 97 | - | Nov 1 2008 |
| P | Minocycline Tablets | SV | No | - | Dec 22 2006 | Nov 1 2008 | ASAP | - | - | - | - | - | - | Nov 1 2008 |
| P | Mupirocin Calcium Cream | SV | No | - | Dec 21 2006 | Nov 1 2008 | ASAP | - | - | - | - | - | - | Nov 1 2008 |
| TA | Raloxifene Tablets | IL | Yes | No | Mar 2 2006 | Nov 16 2008 | ASAP | - | - | - | TA | - | Y | Nov 16 2008 |
| P | Melphalan HCl for Injection 50 mg (Vial) | IR | No | - | Sep 29 2007 | Mar 1 2009 | Nov 18 2008 | -70 | | - | N/A | - | - | Nov 18 2008 |
| P | Clopidogrel Tablets | IL | Yes | No | Dec 29 2003 | Oct 1 2008 | ASAP | - | - | - | Jun 19 2007 | 87 | Y | Nov 30 2008 |
| P | Dorzolamide / Timolol Ophthalmic Solution | IL | Yes | No | Dec 21 2006 | Apr 28 2009 | Oct 28 2008 | -71 | | - | N/A | - | N | Nov 30 2008 |
| P | Fluoxetine Capsules 90 mg | IL | Yes | No | Mar 31 2005 | Jul 1 2009 | ASAP | - | | - | Jan 10 2007 | 92 | N N | Nov 30 2008 |
| P | Fluvastatin Capsules | IL | No | - | Jul 11 2006 | Jun 12 2012 | Jun 12 2012 | -27 | - | - | Mar 13 2007 | 90 | - | Nov 30 2008 |
| P | Ursodiol Tablets | IL | No | - | Aug 24 2007 | Dec 1 2008 | ASAP | - | - | - | Apr 23 2008 | 77 | - | Dec 1 2008 |
| P | Aripiprazole Tablets 15, 20 & 30 mg | IL | Yes | No | Apr 23 2007 | May 1 2011 | ASAP | - | - | - | Nov 16 2007 | 82 | Y | Dec 31 2008 |
| P | Ethinyl Estradiol & Levonorgestrel 0.02 / 0.1mg (Alesse) | ADX | No | - | Mar 25 2004 | Jan 1 2009 | ASAP | - | | - | - | - | - | Jan 1 2009 |
| P | Levetiracetam Tablets 1000 mg | IL | No | - | Jun 21 2007 | Jan 14 2009 | Jan 14 2009 | -68 | - | - | - | - | - | Jan 14 2009 |
| P | Levetiracetam Tablets 250, 500 & 750 mg | IL | No | - | Dec 28 2005 | Jan 14 2009 | Jan 14 2009 | -68 | - | - | - | - | - | Jan 14 2009 |
| TA | Omeprazole DR Capsules 40 mg | IMPX | Yes | No | - | Jan 21 2009 | ASAP | - | - | - | TA | - | Y | Jan 21 2009 |
| TA | Sumatriptan Succinate Injection (Pre-Filled Syringe) | IR | No | - | May 31 2006 | Aug 1 2009 | Feb 6 2009 | -67 | | - | TA | - | - | Feb 6 2009 |
| TA | Sumatriptan Succinate Injection (Vial) | IR | No | - | Sep 30 2005 | Feb 6 2009 | Feb 6 2009 | -67 | - | - | TA | - | - | Feb 6 2009 |
| TA | Sumatriptan Succinate Tablets | IL | Yes | No | Sep 4 2003 | Feb 6 2009 | Feb 6 2009 | -67 | - | - | TA | - | N | Feb 6 2009 |
| P | Zoledronic Acid Injection Vial | IR | Yes | Yes | Oct 31 2006 | Dec 1 2011 | Feb 20 2009 | -67 | May 1 2009 | -64 | N/A | - | TBD | Feb 20 2009 |
| P | Olopatadine Ophthalmic Solution 1% | IL | No | - | Dec 22 2006 | - | Jun 6 2015 | 9 | - | - | Jun 21 2007 | 87 | - | Feb 28 2009 |
| P | Ethinyl Estradiol / Norethindrone Tablets, 0.4 mg/0.035 mg (Ovcon-35) | ADX | No | - | Jun 23 2006 | Mar 1 2009 | ASAP | - | | - | Mar 9 2007 | 90 | - | Mar 1 2009 |
| P | Ethinyl Estradiol / Norethindrone (Ortho Novum 1-35) | ADX | No | - | Dec 2001 | Mar 2009 | ASAP | - | | - | - | - | - | Mar 1 2009 |
| P | Ethinyl Estradiol / Norethindrone (Ortho Novum 7/7/7) | ADX | No | - | Dec 2001 | Mar 2009 | ASAP | - | | - | - | - | - | Mar 1 2009 |
| TA | Topiramate Sprinkle Capsules | IL | No | - | Dec 16 2002 | Mar 26 2009 | Mar 26 2009 | -66 | - | - | TA | - | - | Mar 26 2009 |
| TA | Topiramate Tablets | IL | No | - | Dec 24 2001 | Mar 26 2009 | Mar 26 2009 | -66 | - | - | TA | - | - | Mar 26 2009 |
| P | Mycophenolate Mofetil Capsules | IL | No | - | May 4 2007 | May 3 2009 | May 3 2009 | -64 | - | - | Jan 25 2008 | 80 | - | May 3 2009 |
| P | Mycophenolate Mofetil Tablets | IL | No | - | Mar 29 2007 | May 3 2009 | May 3 2009 | -64 | - | - | Jul 15 2008 | 74 | - | May 3 2009 |
| P | Montelukast Sodium Tablets | IL | Yes | Yes | Nov 13 2006 | Aug 22 2009 | ASAP | - | May 13 2009 | -64 | - | - | Y | May 13 2009 |
| P | Epinephrine Pre-Filled Syringe Injection | IR | No | - | Dec 21 2007 | Jun 1 2009 | ASAP | - | - | - | N/A | - | - | Jun 1 2009 |
| P | Glimepiride & Rosiglitazone Tablets | IL | Yes | Yes | Dec 22 2006 | Mar 7 2012 | Mar 17 2012 | -30 | Jun 22 2009 | -63 | - | - | Y | Jun 22 2009 |
| P | Montelukast Sodium Chewable Tablets | IL | Yes | Yes | Dec 22 2006 | Oct 3 2009 | ASAP | - | Jun 22 2009 | -63 | May 27 2008 | 76 | Y | Jun 22 2009 |
| P | Divalproex Sodium ER Tablets  500 mg | IL | Yes | No | Dec 20 2006 | Jul 1 2009 | ASAP | - | - | - | - | - | Y | Jul 1 2009 |
| P | Donepezil HCl Tablets (Gate) | IL | Yes | No | Nov 22 2005 | Aug 1 2009 | ASAP | - | - | - | - | - | Y | Aug 1 2009 |
| P | Oxaliplatin (buffer) Injection 5 mg / ml, 10 & 20 ml | HL | Yes | Yes | Feb 9 2007 | Mar 1 2010 | ASAP | - | Aug 9 2009 | -61 | N/A | - | TBD | Aug 9 2009 |
| P | Oxaliplatin (lactose) Injection 5 mg / ml, 10 & 20 ml | HL | Yes | Yes | Feb 9 2007 | Mar 1 2010 | ASAP | - | Aug 9 2009 | -61 | N/A | - | TBD | Aug 9 2009 |
| P | Oxaliplatin powder for Injection 50 & 100 mg | HL | Yes | Yes | Feb 9 2007 | Mar 1 2010 | ASAP | - | Aug 9 2009 | -61 | N/A | - | Y | Aug 9 2009 |

**Pending Applications Tentative Approvals - Sorted Alphabetical**

| Status | Generic Name | Site | PIV | First to File | Submission Date | Launch | PLMD | Months to PLMD Expiration | MMA Date | Months to MMA Expiration | Pending Def. Date Rc'd | Months Pending | Sued (Y/N) | Critical Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P | Quetiapine Tablets  50, 150 & 400 mg | TO | Yes | Yes | Feb 12 2007 | Jan 1 2010 | ASAP | - | Aug 12 2009 | -61 | - | - | Y | Aug 12 2009 |
| P | Amphetamine Mix ER Capsules 25 mg | SV | Yes | No | Jan 13 2006 | Sep 1 2009 | ASAP | - | - | - | - | - | Y | Sep 1 2009 |
| P | Amphetamine Mix ER Capsules 30, 20, 15, 10 & 5 mg | SV | Yes | No | Dec 27 2004 | Sep 1 2009 | ASAP | - | - | - | - | - | N | Sep 1 2009 |
| P | Carbamazepine ER Capsules (Carbatrol) | SV | Yes | No | Dec 19 2006 | Sep 1 2009 | ASAP | - | - | - | - | - | Y | Sep 1 2009 |
| P | Dronabinol Capsules  10 mg | SV | No | - | Jun 29 2007 | Sep 1 2009 | ASAP | - | - | - | Dec 17 2007 | 81 | - | Sep 1 2009 |
| P | Dexmethylphenidate ER Capsules  5, 10 & 20 mg | SV | Yes | Yes | Mar 30 2007 | Feb 1 2010 | ASAP | - | Sep 30 2009 | -60 | Jun 13 2008 | 75 | Y | Sep 30 2009 |
| P | Venlafaxine ER Capsules  150, 75 & 37.5 mg | IL | Yes | Yes | Dec 10 2002 | Oct 1 2009 | Pre-MMA | - | - | - | - | - | Y | Oct 1 2009 |
| TA | Tamsulosin Capsules | IL | No | - | Mar 22 2005 | Apr 27 2010 | Oct 27 2009 | -59 | - | - | TA | - | - | Oct 27 2009 |
| P | Perindopril Tablets | IN | No | - | Jan 10 2006 | Nov 10 2009 | Nov 10 2009 | -58 | - | - | Sep 5 2008 | 72 | - | Nov 10 2009 |
| P | Ibandronate Tablets 150 mg | SV | Yes | Yes | May 16 2007 | Mar 1 2012 | Mar 17 2012 | -30 | Nov 16 2009 | -58 | Jan 17 2008 | 80 | Y | Nov 16 2009 |
| P | Ibandronate Tablets 150 mg (Gate) | SV | Yes | Yes | May 16 2007 | Mar 1 2012 | Mar 17 2012 | -30 | Nov 16 2009 | -58 | May 15 2008 | 76 | Y | Nov 16 2009 |
| P | Atomoxetine Capsules | IL | Yes | Yes | May 29 2007 | Nov 1 2010 | ASAP | - | Nov 29 2009 | -58 | Jan 30 2008 | 80 | Y | Nov 29 2009 |
| P | Alendronate Sodium & Cholecalciferol Tablets | SV | Yes | Yes | Nov 20 2007 | Dec 1 2009 | ASAP | - | May 20 2010 | -52 | May 7 2008 | 76 | N | Dec 1 2009 |
| P | Levalbuterol HCl Inhalation Solution BFS | RN | Yes | No | Dec 21 2007 | Dec 1 2009 | Aug 20 2013 | -13 | - | - | N/A | - | TBD | Dec 1 2009 |
| P | Alfuzosin HCl ER Tablets | IL | Yes | Yes | Jun 12 2007 | Dec 1 2009 | ASAP | - | Dec 12 2009 | -57 | - | - | Y | Dec 12 2009 |
| TA | Valacyclovir HCl Tablets | IL | Yes | No | Mar 29 2005 | Jun 23 2010 | Dec 23 2009 | -57 | - | - | TA | - | N | Dec 23 2009 |
| P | Lamivudine / Zidovudine Tablets | SV | Yes | Yes | Jun 26 2007 | Nov 18 2016 | Nov 18 2016 | 26 | Dec 26 2009 | -57 | May 14 2008 | 76 | Y | Dec 26 2009 |
| P | Tolterodine Tartrate ER Capsules | IL | Yes | Yes | Jul 30 2007 | May 1 2010 | ASAP | - | Jan 30 2010 | -56 | Jan 28 2008 | 80 | Y | Jan 30 2010 |
| P | Dexmethylphenidate ER Capsules  15 mg | SV | Yes | No | May 24 2007 | Feb 1 2010 | ASAP | - | - | - | Jun 13 2008 | 75 | Y | Feb 1 2010 |
| P | Rosuvastatin Calcium Tablets | IL | Yes | Yes | Aug 13 2007 | Feb 1 2011 | ASAP | - | Feb 13 2010 | -55 | May 5 2008 | 76 | N | Feb 13 2010 |
| P | Bivalirudin Injection LYO Vial | IR | No | - | Aug 7 2008 | Mar 1 2010 | Mar 23 2010 | -54 | - | - | N/A | - | - | Mar 1 2010 |
| P | Gemcitabine HCl Injection LYO Vial 2 g | IR | Yes | No | May 30 2008 | Mar 1 2010 | ASAP | - | - | - | N/A | - | TBD | Mar 1 2010 |
| P | Oxaliplatin (lactose) Injection 5 mg / ml, 10 & 20 ml  NDA | HL | Yes | - | Feb 9 2007 | Mar 1 2010 | ASAP | - | - | - | N/A | - | Y | Mar 1 2010 |
| P | Ibandronate Injection Vial | IR | Yes | Yes | Aug 30 2007 | Mar 1 2012 | Mar 17 2012 | -30 | Mar 2 2010 | -54 | N/A | - | N | Mar 2 2010 |
| P | Risedronate Tablets 75 mg | SV | Yes | Yes | Sep 7 2007 | Jun 1 2010 | Apr 16 2010 | -53 | Mar 7 2010 | -54 | May 5 2008 | 76 | Y | Mar 7 2010 |
| P | Atorvastatin Tablets 10, 20 & 40 mg | IL | Yes | No | Mar 12 2008 | May 28 2012 | Mar 24 2010 | -54 | - | - | - | - | Y | Mar 24 2010 |
| P | Atorvastatin Tablets 80 mg | IL | Yes | No | Dec 29 2006 | May 28 2012 | Mar 24 2010 | -54 | - | - | Aug 1 2007 | 85 | Y | Mar 24 2010 |
| P | Abacavir Sulfate & Lamivudine Tablets | SV | Yes | Yes | Sep 27 2007 | Nov 18 2016 | Nov 18 2016 | 26 | Mar 27 2010 | -54 | - | - | N | Mar 27 2010 |
| TA | Losartan / HCTZ Tablets 100 mg / 12.5 mg  (Amendment) | IL | No | - | Jul 21 2006 | Apr 6 2010 | Apr 6 2010 | -53 | - | - | TA | - | - | Apr 6 2010 |
| P | Risedronate Tablets 150 mg | SV | Yes | Yes? | Aug 12 2008 | May 1 2011 | Apr 16 2010 | -53 | Feb 12 2011 | -43 | - | - | TBD | Apr 16 2010 |
| P | Fenofibrate Tablets 145 mg | IL | Yes | Yes | Oct 19 2007 | Jul 01 2010 | ASAP | - | Apr 19 2010 | -53 | Jun 12 2008 | 75 | Y / Y | Apr 19 2010 |
| P | Levocetirizine Tablets | IL | viii | - | Dec 7 2007 | May 1 2010 | May 25 2010 | -52 | - | - | - | - | - | May 1 2010 |
| P | Quetiapine ER Tablets 400, 300 & 200 mg | SV | Yes | No | Jul 14 2008 | Apr 1 2011 | May 17 2010 | -52 | - | - | - | - | TBD | May 17 2010 |
| P | Tadalafil Tablets | IL | Yes | Yes | Nov 21 2007 | Nov 21 2017 | Nov 21 2017 | 38 | May 21 2010 | -52 | May 1 2008 | 76 | N | May 21 2010 |
| TA | AnastrazoleTablets | IL | Yes | No | Dec 19 2005 | Jun 1 2010 | Jun 27 2010 | -51 | - | - | TA | - | - | Jun 1 2010 |
| P | Calcium Carbonate / Risedronate Sodium Tablets | IL | Yes | Yes | Dec 18 2007 | Aug 1 2010 | ASAP | - | Jun 18 2010 | -51 | May 5 2008 | 76 | Y | Jun 18 2010 |
| P | Aripiprazole Oral Solution | SV | Yes | Yes | Dec 20 2007 | Nov 1 2010 | ASAP | - | Jun 20 2010 | -51 | - | - | Y | Jun 20 2010 |

**Pending Applications Tentative Approvals - Sorted Alphabetical**

| Status | Generic Name | Site | PIV | First to File | Submission Date | Launch | PLMD | Months to PLMD Expiration | MMA Date | Months to MMA Expiration | Pending Def. Date Rc'd | Months Pending | Sued (Y/N) | Critical Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P | Amlodipine / Benazepril Tablets 5 mg/40 mg & 10 mg/40 mg | IL | Yes | No | Dec 28 2007 | Jul 1 2010 | ASAP | - | - | - | - | - | Y | Jul 1 2010 |
| P | Pantoprazole Sodium Injection LYO Vial- 505(b)(2) | IR | Yes | - | Dec 21 2007 | Jul 1 2010 | ASAP | - | - | - | N/A | - | TBD | Jul 1 2010 |
| P | Naratriptan Tablets | TO | No | - | Dec 27 2006 | Jul 7 2010 | Jul 7 2010 | -50 | - | - | - | - | - | Jul 7 2010 |
| P | Iron Sucrose Injection | IR | No | - | Nov 30 2005 | Aug 1 2010 | ASAP | - | - | - | N/A | - | - | Aug 1 2010 |
| P | Pemetrexed Disodium Injection PDR Inf Vial  500 mg | IR | Yes | Yes | Feb 4 2008 | Feb 4 2011 | Feb 4 2011 | -43 | Aug 4 2010 | -49 | - | - | Y | Aug 4 2010 |
| P | Pramipexole Dihydrochloride Tablets | TO | No | - | Dec 18 2007 | Oct 8 2010 | Oct 8 2010 | -47 | - | - | May 22 2008 | 76 | - | Oct 8 2010 |
| P | Zoledronic Acid Injection 0.05 mg/ml Inf Vial 100 ml | IR | Yes | Yes? | Aug 29 2008 | Dec 1 2010 | Oct 16 2010 | -47 | Mar 1 2011 | -42 | - | - | | Oct 16 2010 |
| P | Clopidogrel Tablets 300 mg | IL | Yes | Yes? | May 16 2008 | Nov 17 2011 | Nov 17 2011 | -34 | Nov 16 2010 | -46 | - | - | TBD | Nov 16 2010 |
| P | Glimepiride / Rosiglitazone  Tablets 2mg/8 mg & 4mg/8mg | IL | Yes | Yes | May 29 2008 | Mar 7 2012 | Mar 17 2012 | -30 | Nov 29 2010 | -46 | - | - | TBD | Nov 29 2010 |
| TA | Pemetrexed Disodium Injection LYO Vial 100 mg | IR | Yes | Yes? | Jun 30 2008 | Feb 4 2011 | Feb 4 2011 | -43 | Dec 30 2010 | -45 | N/A | - | TBD | Dec 30 2010 |
| TA | Pioglitazone Tablets | IL | No | - | Jul 15 2004 | Jan 17 2011 | Jan 17 2011 | -44 | - | - | TA | - | - | Jan 17 2011 |
| P | Duloxetine HCl DR Capsules | IL | Yes | Yes? | Aug 4 2008 | Jun 1 2013 | Jun 11 2013 | -15 | Feb 4 2011 | -43 | - | - | TBD | Feb 4 2011 |
| P | Paricalcitol Capsules 4 mcg | SV | Yes | Yes? | Aug 25 2008 | May 1 2011 | ASAP | - | Feb 25 2011 | -43 | - | - | TBD | Feb 25 2011 |
| P | Esomeprazole Sodium Injection PDR Vial - 505(b)(2) | IR | Yes | - | Dec 21 2007 | Mar 1 2011 | ASAP | - | - | - | N/A | - | Y | Mar 1 2011 |
| P | Cinacalcet Tablets 90 mg | IL | Yes | No | Apr 3 2008 | May 1 2012 | Mar 8 2011 | -42 | - | - | Sep 4 2008 | 72 | Y | Mar 8 2011 |
| P | Azelastine Nasal Spray | RN | Yes | No | Nov 14 2001 | Apr 1 2011 | ASAP | - | - | - | N/A | - | N/A | Apr 1 2011 |
| TA | Levofloxacin Injection - Dextrose (Bag) | IR | Yes | No | Sep 30 2003 | Jun 20 2011 | Jun 20 2011 | -39 | | | TA | - | Y | Jun 20 2011 |
| TA | Levofloxacin Injection (Bag-Saline) 505(b)(2) | IR | Yes | No | Sep 1 2004 | Jun 20 2011 | Jun 20 2011 | -39 | | | TA | - | Y | Jun 20 2011 |
| TA | Levofloxacin Injection (Vial) | IR | Yes | No | Aug 29 2003 | Jun 20 2011 | Jun 20 2011 | -39 | - | - | TA | - | Y | Jun 20 2011 |
| TA | Levofloxacin Tablets 250 & 500 mg | IL | No | - | Feb 27 2002 | Jun 20 2011 | Jun 20 2011 | -39 | - | - | TA | - | N | Jun 20 2011 |
| TA | Levofloxacin Tablets 750 mg | IL | No | - | Feb 20 2002 | Jun 20 2011 | Jun 20 2011 | -39 | - | - | TA | - | N | Jun 20 2011 |
| TA | Olanzapine Tablets | SV | Yes | No | Jun 20 2003 | Oct 23 2011 | ASAP | - | - | - | TA | - | Y | Oct 23 2011 |
| P | Olanzapine Tablets  20 mg | NV | Yes | No | Sep 30 2004 | Apr 23 2012 | Oct 23 2011 | -35 | - | - | - | - | Y | Oct 23 2011 |
| P | Olanzapine Tablets 2.5, 5, 7.5, 10 & 15 mg | NV | Yes | Yes | Sep 30 2000 | Oct 23 2011 | Oct 23 2011 | -35 | Pre-MMA | - | - | - | Y | Oct 23 2011 |
| TA | Rosiglitazone Maleate Tablets | IL | Yes | Yes | May 27 2003 | Mar 7 2012 | ASAP | - | Pre-MMA | - | TA | - | Y | Mar 7 2012 |
| TA | Sildenafil Tablets  20 mg | SV | No | - | Jun 27 2006 | Mar 7 2012 | Mar 7 2012 | -30 | - | - | TA | - | - | Mar 7 2012 |
| TA | Escitalopram Tablets | IL | Yes | No | Nov 30 2004 | Mar 14 2012 | Mar 14 2012 | -30 | - | - | TA | - | N | Mar 14 2012 |
| P | Fluvastatin ER Tablets | IL | Yes | No | May 25 2007 | Oct 1 2012 | Apr 11 2012 | -29 | - | - | Dec 28 2007 | 81 | N | Apr 11 2012 |
| P | Olanzapine OD Tablets - 5, 10, 15 & 20 mg | SV | Yes | No | Jun 20 2003 | Apr 23 2012 | ASAP | - | Apr 11 2008 | - | 77 | Y | Apr 23 2012 |
| P | Candesartan Tablets 16 & 32 mg | CPLA | Yes | No | Dec 28 2007 | Dec 1 2012 | Jun 4 2012 | -27 | - | - | Jul 30 2008 | 74 | N | Jun 4 2012 |
| P | Candesartan Tablets 4 & 8 mg | CPLA | Yes | No | Apr 7 2008 | Dec 1 2012 | Jun 4 2012 | -27 | - | - | Jul 30 2008 | 74 | N | Jun 4 2012 |
| P | Rizatriptan OD Tablets | SV | Yes | No | Oct 12 2007 | Dec 29 2012 | Jun 29 2012 | -27 | - | - | - | - | N | Jun 29 2012 |
| TA | Fexofenadine / Pseudoephedrine ER Tablets | IMPX | Yes | No | Dec 13 2001 | Jul 1 2012 | ASAP | - | - | - | TA | - | NA | Jul 1 2012 |
| TA | Valsartan Tablets | NV | Yes | No | Jan 7 2005 | Sep 21 2012 | Sep 21 2012 | -24 | - | - | TA | - | N/A | Sep 21 2012 |
| P | Palonosetron HCl Injection  5 ml Vial | IL | No | - | Aug 20 2008 | Apr 15 2013 | Apr 15 2013 | -17 | - | - | N/A | - | - | Apr 15 2013 |
| TA | Finasteride Tablets 1 mg | IL | No | - | Nov 18 2003 | Nov 5 2013 | Nov 5 2013 | -10 | - | - | TA | - | - | Nov 5 2013 |
| P | Rivastigmine Tartrate Capsules | TO | No | - | Jun 6 2006 | Feb 11 2014 | Feb 11 2014 | -7 | - | - | - | - | - | Feb 11 2014 |
| TA | Moxifloxacin HCl Tablets | IL | Yes | No | Dec 10 2004 | Feb 28 2014 | ASAP | - | - | - | TA | - | Y | Feb 28 2014 |
| P | Celecoxib Capsules | IL | Yes | Yes | Nov 13 2003 | May 30 2014 | May 30 2014 | -4 | Pre-MMA | - | - | - | Y | May 30 2014 |
| P | Celecoxib Capsules 50 mg | IL | Yes | No | Apr 3 2008 | May 30 2014 | May 30 2014 | -4 | - | - | - | - | TBD | May 30 2014 |

**Pending Applications Tentative Approvals - Sorted Alphabetical**

| Status | Generic Name | Site | PIV | First to File | Submission Date | Launch | PLMD | Months to PLMD Expiration | MMA Date | Months to MMA Expiration | Pending Def. Date Rc'd | Months Pending | Sued (Y/N) | Critical Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P | Esomeprazole Capsules 20 & 40 mg | CG | Yes | No | Nov 23 2005 | Nov 1 2014 | ASAP | - | - | - | Aug 5 2008 | 73 | N/A | Nov 1 2014 |
| P | Imatinib Mesylate Tablets 400 mg | IL | Yes | No | Dec 21 2007 | Jul 4 2015 | Jul 4 2015 | 10 | - | - | Sep 2 2008 | 72 | N | Jul 4 2015 |
| P | Lamivudine Tablets | SV | No | - | Dec 29 2006 | Nov 18 2016 | Nov 18 2016 | 26 | - | - | Nov 28 2007 | 82 | - | Nov 18 2016 |
| P | Ribavirin Oral Solution | SV | No | - | Mar 1 2005 | Mar 21 2018 | Mar 21 2018 | 42 | - | - | - | - | - | Mar 21 2018 |
| P | Arsenic Trioxide Injection | IR | No | - | Dec 23 2006 | Nov 10 2018 | Nov 10 2018 | 50 | - | - | N/A | - | - | Nov 10 2018 |
| P | Ziprasidone Capsules 20 mg | SV | No | - | Dec 30 2005 | May 27 2019 | May 27 2019 | 56 | - | - | Aug 6 2008 | 73 | - | May 27 2019 |
| P | Ziprasidone Capsules 40, 60 & 80 mg | SV | No | - | Dec 28 2007 | May 27 2019 | May 27 2019 | 56 | - | - | Aug 6 2008 | 73 | - | May 27 2019 |
| P | Carbamazepine ER Capsules (Equetro) | SV | No | - | Dec 28 2007 | May 19 2024 | May 19 2024 | 116 | | - | - | - | - | May 19 2024 |
| TA | Acetaminophen / Tramadol Tablets (Divested) | IL | Yes | No | Nov 26 2003 | - | ASAP | - | - | - | TA | - | Y | - |
| P | Albuterol ER Tablets **505(b)(2)**   (Volmax) | NV | Yes | - | Sep 26 2002 | - | N/A | - | - | - | Jun 25 2004 | 123 | N | - |
| P | Albuterol Ipratropium Inhalation Solution | RN | Yes | Yes? | Apr 18 2003 | - | ASAP | - | Pre-MMA | - | N/A | - | N/A | - |
| P | Aprotinin Injection | IR | No | - | Dec 9 1999 | - | ASAP | - | - | - | N/A | - | - | - |
| P | Balsalazide Disodium Capsules | IL | No | - | Jul 19 2005 | - | ASAP | - | - | - | Jul 7 2008 | 74 | - | - |
| P | Bleomycin Injection | HL | No | - | Nov 25 2003 | - | ASAP | - | - | - | N/A | - | - | - |
| P | Carboplatin Injection 10 mg / mL (Mannitol Free) | HL | No | - | Apr 15 2005 | - | ASAP | - | - | - | N/A | - | - | - |
| TA | Cetirizine Tablets | IL | No | - | Dec 18 2002 | - | ASAP | - | - | - | TA | - | - | - |
| P | Enoxaparin Sodium Injection  100 mg / mL (Pre-Filled Syringe) | ITF | Yes | No | Apr 25 2003 | - | ASAP | - | - | - | Dec 4 2007 | 81 | Y Y | - |
| P | Esomeprazole Potassium Injection- **505(b)(2)** | IR | Yes | - | Jun 13 2008 | - | ASAP | - | - | - | N/A | - | TBD | - |
| P | Felodipine ER Tablets | SV | Yes | No | Nov 10 2000 | - | ASAP | - | - | - | N/A | - | N/A | - |
| P | Methotrexate Injection 25 mg / ml, 10 mL | HL | No | - | Dec 22 2006 | TBD | ASAP | - | - | - | N/A | - | - | - |
| P | Methotrexate Injection 25 mg / ml, 2 mL | HL | No | - | Dec 22 2006 | TBD | ASAP | - | - | - | N/A | - | - | - |
| P | Methotrexate Injection 25 mg / ml, 40 mL | HL | No | - | Nov 30 2006 | TBD | ASAP | - | - | - | N/A | - | - | - |
| P | Nicotine Polacrilex Gum (OTC) | IN | No | - | Oct 24 2003 | - | ASAP | - | - | - | - | - | - | - |
| TA | Propofol Injectable Emulsion | IR | No | - | Dec 22 1995 | | | - | - | - | TA | - | - | - |
| P | Risperidone OD Tablets   0.5 & 2 mg | IL | Yes | No | Nov 21 2003 | TBD | ASAP | - | - | - | Jun 18 2008 | 75 | N | - |
| P | Risperidone OD Tablets   1 mg | IL | Yes | Yes | Nov 21 2003 | TBD | ASAP | - | Pre-MMA | - | Jun 18 2008 | 75 | N | - |
| P | Spironolactone Tablets | WF | No | No | Sep 30 2004 | - | ASAP | - | - | - | - | - | - | - |
| P | Tolterodine Tartrate Tablets | CG | Yes | No | Dec 30 2003 | - | ASAP | - | - | - | - | - | N/A | - |
| P | Trandolapril Tablets | CG | No | - | Oct 1 2004 | - | ASAP | - | - | - | N/A | - | Y | - |

# EXHIBIT M

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005
United States

Matthew P. Downer
To Call Writer Directly:
+1 202 879 5226
matthew.downer@kirkland.com

+1 202 879 5000

www.kirkland.com

Facsimile:
+1 202 879 5200

January 9, 2019

**Via Email**

Ms. Erin C. Burns
NastLaw LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107

Re:     *In re Effexor XR Antitrust Litigation*, Case No. 3:11-cv-05479 (D.N.J.)

Dear Counsel:

We write in response to Erin C. Burns's letter of December 11, 2018, which raised various objections to Teva's redactions of information that is either privileged or confidential and non-responsive.  As discussed below, Teva is re-reviewing the documents challenged in plaintiffs' five exhibits to the December 11, 2018 letter to ensure that any inadvertent redactions are corrected and that all remaining redactions are appropriate.  In addition to the responses below, Teva will re-produce to plaintiffs any documents that required adjustment.

## I.     Teva Properly Redacted Privileged Information Related to Possible Launch Dates and Will Re-Produce Documents that were Redacted Inadvertently

Plaintiffs contend that Teva "improperly redacted…factual information" ranging from "launch dates" to "the names of individuals involved in a committee." Plaintiffs' Letter at 2.[1]  But as Teva has explained previously, information that reflects legal advice or analysis is not merely factual.  Analysis of potential launch dates is a prime example.  The redacted documents demonstrate that potential launch dates were not mere descriptive facts but were the product of legal analysis and advice from Teva's legal counsel.  They are therefore properly redacted as privileged.

At the same time, Teva acknowledges that a document should not be redacted as privileged when the information is truly only factual and disconnected from legal advice, such as a partial list

---

[1] Plaintiffs also raise concerns related to Teva's privilege log descriptions.  *See* Plaintiffs' Letter at 3.  Teva already addressed those concerns in its December 18, 2018 letter.

# KIRKLAND & ELLIS LLP

Ms. Erin C. Burns
January 9, 2019
Page 2

of committee members, *see* Plaintiffs' Letter at 3 (challenging PRIV-00679), or a spreadsheet column title, *see id.* (challenging PRIV-00486).  Once Teva has completed the process of re-reviewing the documents listed in the various exhibits to plaintiffs' letter of December 11, 2018, Teva will identify, correct, and re-produce any documents that were redacted inadvertently.

## II.   Teva Properly Redacted Non-Responsive, Confidential Business Information

Plaintiffs next contend that Teva "improperly withheld and redacted as 'non-responsive'" documents related to Teva's production pipeline for drugs *other than* Effexor.  Plaintiffs' Letter at 3.  But there is nothing improper about redacting non-responsive and confidential business information.  To the contrary, both the Discovery Confidentiality Order and the ESI Protocol specifically contemplate and authorize the redaction of "non-responsive Confidential Information."  *See* R. 245 at 12, PageID # 3820 (Order on ESI Protocol); R. 244 at 12, PageID # 3792 (Discovery Confidentiality Order).  Indeed, the parties extensively negotiated and agreed to these provisions, later adopted by the Court, with the express understanding that confidential information regarding unrelated drug products would be redacted.[2]

That is precisely what Teva has done here.  Specifically, plaintiffs' requests for production related to Effexor do not entitle plaintiffs to rummage through highly sensitive business information relating to Teva's full stable of drugs—all of which are completely distinct from Effexor and the disputes in this case.

Without any legal basis, plaintiffs invite Teva to "stipulate now that [it] will not raise any defenses relating to Teva's readiness, willingness, or ability to launch its generic Effexor XR earlier than July 1, 2010[.]"  Plaintiffs' Letter at 3.  Teva declines this invitation.  Nor do plaintiffs have any basis to demand that Teva either waive possible defenses or else produce highly confidential business information that is non-responsive to plaintiffs' requests for production.

Plaintiffs also "request that Teva confirm why [the documents listed in Exhibit C] have been withheld."  Plaintiffs' Letter at 4.  After a thorough re-review of the 700+ documents listed in Exhibit C, Teva can confirm what plaintiffs already suspected—the documents listed in Exhibit C are non-responsive in their entirety but were nonetheless produced in redacted form because plaintiffs requested that even non-responsive documents be produced when they "are part of a document family that includes responsive documents."  *Id.*  There are, however, two documents

---

[2] This is all the more necessary given plaintiffs' insistence that even entirely non-responsive documents be produced if they part of a document family that includes one responsive document.

# KIRKLAND & ELLIS LLP

Ms. Erin C. Burns
January 9, 2019
Page 3

that were accidently over-redacted.  These documents will be reproduced with the appropriate redactions.

## III.    Teva Will Correct And Withdraw Notations that Misidentify Non-Responsiveness Redactions as Privilege Redactions

Plaintiffs' next identify in Exhibit D 15 documents that were logged as containing privilege redactions but that actually contain only non-responsiveness redactions.  Plaintiffs' Letter at 5. After reviewing those documents, Teva can confirm that the privilege notations were inadvertent but that the documents were appropriately redacted for non-responsiveness.  Teva therefore withdraws its privilege assertions as to the 15 documents listed in Exhibit D and will adjust the privilege log accordingly.

## IV.    Teva Has Already Accommodated Plaintiffs' Request to Re-Produce Select Documents in More Legible Form

Finally, plaintiffs identify various documents that were "partially illegible."  Plaintiffs' Letter at 5.  On January 8, 2019, Teva re-produced those documents after ensuring their legibility.

\*     \*     \*

Once Teva has finished re-reviewing and (where necessary) correcting and re-producing the documents challenged by plaintiffs, Teva will provide plaintiffs with its availability to meet and confer about any remaining questions that plaintiffs might have.

Sincerely,

/s/ Matthew P. Downer

Matthew P. Downer

# EXHIBIT N

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**

# EXHIBIT O

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**

# EXHIBIT P

| From: | Michael D. Ford |
|---|---|
| To: | Tisdale, Gavin R. |
| Cc: | grega@hbsslaw.com; lauren@hbsslaw.com; Karen Lerner; donbarrettpa@gmail.com; jbaughman@paulweiss.com; fberse@paulweiss.com; jbjork@sperling-law.com; Blistan@marcus-shapira.com; ebrehm@kmllp.com; mbuchman@motleyrice.com; Erin Burns; cain-mannix@marcus-shapira.com; JCecchi@carellabyrne.com; nclark@farugilaw.com; ycleary@paulweiss.com; mclerkin@motleyrice.com; dsc@knpa.com; ccoslett@bm.net; Downer, Matthew; *english.brian; lfanning@millerlawllc.com; susanfowler@robertslawfirm.us; *rgandesha@whitecase.com; bgant@whitecase.com; MFG@NJLAWFIRM.COM; dgermaine@sperling-law.com; sheryn.george@whitecase.com; BHamilton@BarrettLawGroup.com; hill@marcus-shapira.com; Janow, Jonathan D.; debrajosephson@robertslawfirm.us; jkodroff@srkattorneys.com; pkohn@farugilaw.com; nkovalenko@paulweiss.com; dkovel@krnllp.com; Lefkowitz, Jay P.; jmacoretta@srkattorneys.com; mmiller@millerlawllc.com; rmilne@whitecase.com; Dianne Nast; aneill@knpa.com; *lnussbaum@nussbaumpc.com; eofosuantwi@walsh.law; PSP@NJLAWFIRM.COM; sep@knpa.com; brefsin@hangley.com; emily.renzelli@whitecase.com; kroddy@wilentz.com; mikeroberts@robertslawfirm.us; stephaniesmith@robertslawfirm.us; *tom@hbsslaw.com; dsorensen@bm.net; sstarns@barrettlawgroup.com; btaus@tcllaw.com; LTaylor@carellabyrne.com; *wtrousdale@tompkinsmcguire.com; brt@wexlerwallace.com; U, Edwin John; jvanek@sperling-law.com; Walker, Karen N.; lwalsh@walsh.law; kaw@wexlerwallace.com; matthew.wisnieff@whitecase.com; *ogierke@whitecase.com; mdms@njlawfirm.com |
| Subject: | [EXT] RE: Effexor: Teva Document Production |
| Date: | Tuesday, March 5, 2019 5:00:45 PM |
| Attachments: | EAS |

Counsel:

Thank you for the additional information.  Plaintiffs write today to address three additional issues.

First, pursuant to Plaintiffs' rights under Fed. R. Civ. P. 26(b)(5)(B) and the Discovery Confidentiality Order, Plaintiffs are evaluating Teva's request to claw back the documents identified in Exhibit Λ to its January 31, 2019.  Plaintiffs have noticed that Teva has made redactions for privilege to many of these documents yet has failed to justify these claims of privilege in Teva's February 7, 2019 privilege log. *See e.g.,* TEVA_EFFEX_0039514_R.  With other documents, Teva had previously included an entry in an older version of the privilege log that is now noticeably absent from the February 7, 2019 privilege log. *See e.g.,* TEVA_EFFEX_0135866_R (previously identified as PRIV-000507, a number not listed in Teva's February 7, 2019 privilege log).  Plaintiffs cannot assess Teva's request to replace the original documents until Teva provides Plaintiffs with privilege log entries that adequately justify its claims of privilege under Fed. R. Civ. P. 26(b)(5)(A). Please promptly provide corresponding privilege log entries or withdraw the request to claw back these documents.

Second, based on our communications to date, Plaintiffs believe that we are at an impasse with regard to many of Teva's claims of privilege.  While Teva's newest privilege log has rectified some of Plaintiffs' concerns, Teva nonetheless has continued with its pattern of failing to identify specific counsel as the source of attorney-client privilege.  Numerous withheld and redacted documents listed in Teva's newest privilege log demonstrate no clear attorney involvement to substantiate Teva's conclusory claims of attorney-client privilege.  *See e.g.,*  PRIV-13426 (describing withheld document as a "[s]preadsheet conveying legal advice and analysis from Teva Legal Dept.* regarding product launch issues[.]  The legal advice and

analysis in this spreadsheet is routinely provided by a member of the Teva Legal Department, and the document specifically indicates that it conveys privileged legal advice").   In many of the documents where Teva has failed to properly justify its assertions of privilege, Teva has redacted factual information like numerical dates or withheld communications and drafts created and shared between non-attorneys. *See e.g.,* PRIV-10057 (redacting numerical launch date from spreadsheet); PRIV-00150 (withholding communications between non-attorneys discussing a draft letter to the FDA).  Plaintiffs are entitled to discover such documents.

In addition, we have discovered several documents in which it appears that Teva may have redacted information regarding its royalty payments to Wyeth in connection with Effexor IR and Effexor XR, for example TEVA_EFFEX_0484788.  We have attached a list of similar documents.  Please review these documents and advise whether any include information about Effexor IR or Effexor XR royalties, and, if so, please promptly unredact this information and reproduce the documents.

Absent an agreement to produce the documents like those identified in this email by the close of business on Tuesday, March 12, 2019, Plaintiffs will move to compel. Thank you.

Michael D. Ford, Esquire

1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
(215) 923-9300
(215) 923-9302 Fax
mford@nastlaw.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This email may contain information that is privileged, confidential, or otherwise protected from disclosure. If you are not the intended recipient or otherwise have received this message in error, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you are not the intended recipient or otherwise have received this message in error, please notify me immediately by email, discard any paper copies, and delete all electronic files of the message.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Tisdale, Gavin R. [mailto:gavin.tisdale@kirkland.com]
**Sent:** Tuesday, February 19, 2019 3:02 PM
**To:** Michael D. Ford
**Cc:** grega@hbsslaw.com; lauren@hbsslaw.com; Karen Lerner; donbarrettpa@gmail.com; jbaughman@paulweiss.com; fberse@paulweiss.com; jbjork@sperling-law.com; Blistan@marcus-shapira.com; ebrehm@kmllp.com; mbuchman@motleyrice.com; Erin Burns; cain-mannix@marcus-

shapira.com; JCecchi@carellabyrne.com; nclark@faruqilaw.com; ycleary@paulweiss.com; mclerkin@motleyrice.com; dsc@knpa.com; ccoslett@bm.net; Downer, Matthew; *english,brian; lfanning@millerlawllc.com; susanfowler@robertslawfirm.us; *rgandesha@whitecase.com; bgant@whitecase.com; MFG@NJLAWFIRM.COM; dgermaine@sperling-law.com; sheryn.george@whitecase.com; BHamilton@BarrettLawGroup.com; hill@marcus-shapira.com; Janow, Jonathan D.; debrajosephson@robertslawfirm.us; jkodroff@srkattorneys.com; pkohn@faruqilaw.com; nkovalenko@paulweiss.com; dkovel@kmllp.com; Lefkowitz, Jay P.; jmacoretta@srkattorneys.com; mmiller@millerlawllc.com; rmilne@whitecase.com; Dianne Nast; aneill@knpa.com; *lnussbaum@nussbaumpc.com; eofosuantwi@walsh.law; PSP@NJLAWFIRM.COM; sep@knpa.com; brefsin@hangley.com; emily.renzelli@whitecase.com; kroddy@wilentz.com; mikeroberts@robertslawfirm.us; stephaniesmith@robertslawfirm.us; *tom@hbsslaw.com; dsorensen@brn.net; sstarns@barrettlawgroup.com; btaus@tcllaw.com; LTaylor@carellabyrne.com; *wtrousdale@tompkinsmcguire.com; brt@wexlerwallace.com; U, Edwin John; jvanek@sperling-law.com; Walker, Karen N.; lwalsh@walsh.law; kaw@wexlerwallace.com; matthew.wisnieff@whitecase.com; *ogierke@whitecase.com; mdms@njlawfirm.com

**Subject:** RE: Effexor: Teva Document Production

Counsel,

Ms. Harvey was an Associate Director of Legal Affairs and Risk Management while at Teva. During this time, she worked at the direction of counsel within the Teva legal department but was not yet an attorney (though she later became one).  The asterisks next to her name are therefore inadvertent, but Teva maintains privilege over the documents that inadvertently list Ms. Harvey as an attorney because Ms. Harvey was working at the direction of attorneys, such as David Stark and Kristen Bauer (as indicated in the referenced email), for the purposes of providing legal analysis and advice.

Sincerely,

**Gavin R. Tisdale**

------------------------------------------------------------

**KIRKLAND & ELLIS LLP**

655 Fifteenth Street, N.W., Washington, D.C. 20005

T +1 202 879 5255   M +1 202 679 6859

F +1 202 879 5200

------------------------------------------------------------

gavin.tisdale@kirkland.com

**From:** Michael D. Ford <MFord@nastlaw.com>
**Sent:** Thursday, February 14, 2019 12:12 PM
**To:** Tisdale, Gavin R. <gavin.tisdale@kirkland.com>
**Cc:** grega@hbsslaw.com; lauren@hbsslaw.com; donbarrettpa@gmail.com; jbaughman@paulweiss.com; fberse@paulweiss.com; jbjork@sperling-law.com; Blistan@marcus-shapira.com; ebrehm@kmllp.com; mbuchman@motleyrice.com; Erin Burns <EBurns@NastLaw.com>; cain-mannix@marcus-shapira.com; JCecchi@carellabyrne.com; nclark@faruqilaw.com; ycleary@paulweiss.com; mclerkin@motleyrice.com; dsc@knpa.com; ccoslett@bm.net; Downer, Matthew <matthew.downer@kirkland.com>; *english,brian <BEnglish@tompkinsmcguire.com>; lfanning@millerlawllc.com;

susanfowler@robertslawfirm.us; *rgandesha@whitecase.com <rgandesha@whitecase.com>;
bgant@whitecase.com; MFG@NJLAWFIRM.COM; dgermaine@sperling-law.com;
sheryn.george@whitecase.com; BHamilton@BarrettLawGroup.com; hill@marcus-
shapira.com; Janow, Jonathan D. <jonathan.janow@kirkland.com>;
debrajosephson@robertslawfirm.us; jkodroff@srkattorneys.com; pkohn@faruqilaw.com;
nkovalenko@paulweiss.com; dkovel@kmllp.com; Lefkowitz, Jay P. <lefkowitz@kirkland.com>;
jmacoretta@srkattorneys.com; mmiller@millerlawllc.com; rmilne@whitecase.com; Dianne
Nast <DNast@NastLaw.com>; aneill@knpa.com; *lnussbaum@nussbaumpc.com
<lnussbaum@nussbaumpc.com>; eofosuantwi@walsh.law; PSP@NJLAWFIRM.COM;
sep@knpa.com; brefsin@hangley.com; emily.renzelli@whitecase.com; kroddy@wilentz.com;
mikeroberts@robertslawfirm.us; stephaniesmith@robertslawfirm.us; *tom@hbsslaw.com
<tom@hbsslaw.com>; dsorensen@bm.net; sstarns@barrettlawgroup.com;
btaus@tcllaw.com; LTaylor@carellabyrne.com; *wtrousdale@tompkinsmcguire.com
<wtrousdale@tompkinsmcguire.com>; brt@wexlerwallace.com; U, Edwin John
<eu@kirkland.com>; jvanek@sperling-law.com; Walker, Karen N. <kwalker@kirkland.com>;
lwalsh@walsh.law; kaw@wexlerwallace.com; matthew.wisnieff@whitecase.com;
*ogierke@whitecase.com <ogierke@whitecase.com>; mdms@njlawfirm.com
**Subject:** [EXT] RE: Effexor: Teva Document Production

Counsel:

Thank you for sending Teva's updated privilege log.  Plaintiffs are in the process of reviewing
the log but seek clarification on one aspect.

In its prior privilege logs, Teva had identified Tammy Harvey as a non-attorney.  In its most
recent log, Teva has continued this trend but has also listed Ms. Harvey as the source of
attorney-client privilege in multiple descriptions.  *See e.g.,* PRIV-06276 (describing a withheld
document as an "Email from Tammy Harvey* requesting information regarding product
launch to facilitate the rendering of legal advice").

Can Teva please clarify whether Ms. Harvey is or was an attorney with Teva? Thank you and
have a nice day.

Michael D. Ford, Esquire

1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
(215) 923-9300
(215) 923-9302 Fax
mford@nastlaw.com

***********************
This email may contain information that is privileged, confidential, or otherwise protected from disclosure. If you are not the intended recipient or otherwise have received this message in error, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you are not the intended recipient or otherwise have received this message in error, please notify me immediately by email, discard any paper copies, and delete all electronic files of the message.
******

Attachments:
    image001.jpg (2570 Bytes)
    Effexor  Redacted Royalty Fields.pdf (18627 Bytes)

# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **In re Effexor XR Antitrust Litigation** | **Master Docket No. 3:11-cv-05479 (PGS/LHG)** |
| **THIS DOCUMENT RELATES TO:** **ALL ACTIONS** | |

## DECLARATION OF JILL PASTORE

I, Jill Pastore, hereby declare under penalty of perjury and to the best of my knowledge as follows:

1.     I am the Senior Director of Regulatory Affairs for Teva Pharmaceuticals USA, Inc. ("Teva"). Teva is a wholly owned, indirect subsidiary of Teva Pharmaceutical Industries Ltd., a global pharmaceutical company headquartered in Israel. Teva is an industry leader in the development, manufacture, and marketing of generic pharmaceutical products in the United States.

2.     I have over 20 years of experience in Teva's regulatory department. As part of my responsibilities, I routinely received/receive and reviewed/review reports from different working groups within Teva, including Teva's marketing and new product launch teams. These reports include Launch Reports, Major Milestone Reports, and other reports containing information concerning Teva's products, their regulatory status, and their assessed potential launch dates.

3.      I have reviewed the documents identified in Exhibit D to the discovery dispute letter.  I have familiarized myself with their contents.  These are the types of documents that I receive and review as part of my employment with Teva, and I have a personal knowledge of many of these documents.  As described in more detail below, the information contained in these documents related to the assessed potential early and late launch dates is information provided by Teva's legal counsel for the purposes of advising members of Teva about the legal and regulatory parameters relating to their operations.

4.      Fifty-one of these documents are "Launch Report" spreadsheets, as identified by their file name, such as "10-24-07 Launches 3yr.xls."  (PRIV-21970).  These Launch Reports are substantially similar to one another in format and content, and they were updated approximately every several weeks.  These Launch Reports were not created by Teva's Legal Department, but they do contain legal analysis provided by Teva's Legal Department.

5.      The early and late launch date assessments contained in these reports were provided by and based upon legal advice and analysis from Teva's legal counsel, and were routinely reviewed and, when necessary, updated based on continuing legal assessments and analysis from Teva's Legal Department.

6.      Teva's legal counsel provided these date assessments based on their legal analysis concerning various legal issues, such as those relating to patents,

2

litigation, regulatory requirements and approval, and licensing or other business agreements. Teva's Legal Department provided these date assessments so that Teva's production and launch teams were aware of and could operate within the legal and regulatory parameters relating to their operations.

7.     Efforts were made to keep the content of these reports privileged. First, these reports contain disclaimers specifically identifying their content as privileged. All Launch Reports contain a disclaimer stating: "CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGE DO NOT COPY." Thirty-two of these documents also contain a disclaimer stating: "WITH RESPECT TO ALL PENDING PIV OR ACTIVE LITIGATION, EARLY AND LATE DATES BASED UPON LEGAL ADVICE." Second, Teva employees who received these documents were instructed that these documents were confidential and that they were not permitted to copy the content of the documents.

8.     Thirteen of the documents in Exhibit D are Major Milestone Reports. These Major Milestone Reports contain similar information as the Launch Reports. These Major Milestone Reports were not created by Teva's Legal Department, but they do contain similar legal analysis and advice provided by Teva's Legal Department. These reports were routinely reviewed and, when necessary, updated based on continuing legal assessments and analysis from Teva's Legal Department.

9.    The Major Milestone Reports contained a column titled "Projected Launch (As Early As)."  The information contained in this column was based upon and derived from the same early launch information and assessments contained in the Launch Reports, and was likewise provided by Teva's Legal Department for the purposes of advising Teva's product launch team of the relevant legal and regulatory parameters.

10.    As with the Launch Reports, efforts were made to protect the Major Milestone Reports, including by using disclaimers ("CONFIDENTIAL DO NOT COPY") and by instructing recipients via email that the reports were confidential and instructing them not to copy.

11.    The remaining thirty-nine documents and spreadsheets in Exhibit D are miscellaneous documents and spreadsheets containing the same early and/or late date assessments described above, and derived from and based upon the same legal analysis and advice provided by Teva's Legal Department.  Twenty documents in Exhibit D are documents titled "Israel Project Brief."  These documents contain a column of information entitled "Early As Launch Date," which includes the same information provided by Teva's Legal Department for the purposes of advising Teva's product launch team of the relevant legal and regulatory parameters. Fourteen other of these documents are spreadsheets that contain the same early and/or late date assessments described above and contain "attorney-client privilege"

4

disclaimers or a disclaimers stating that the "early and late dates based upon legal advice." The remaining five spreadsheets do not contain privilege disclaimers, but contain the same privileged content as the other spreadsheets concerning early and late launch date assessments. As with the other spreadsheets discussed above, the early and late date assessment columns on these spreadsheets contain legal analysis provided by Teva's Legal Department for the purposes of advising Teva's project launch team of the relevant legal and regulatory parameters. All of these documents accordingly reflect legal analysis and advice routinely provided and, when necessary, updated by Teva's legal counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 17, 2019.

Jill Pastore

**EXHIBIT R**

**EXHIBIT REDACTED, FILED
PROVISIONALLY UNDER SEAL**

# EXHIBIT S

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**

# EXHIBIT T

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**

# EXHIBIT U

**EXHIBIT REDACTED, FILED PROVISIONALLY UNDER SEAL**