## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re EFFEXOR XR ANTITRUST LITIGATION<br><br>This Document Relates To:<br>All Indirect Purchaser Class Actions | **DECLARATION OF JAMES E. CECCHI IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT**<br><br>Civil Action No. 3:11-05661 (ZNQ/JBD)<br><br>Master Docket No. 3:11-cv-05479 (ZNQ/JBD) |

JAMES E. CECCHI, of full age, hereby declares as follows:

1.      I am an attorney licensed to practice in New Jersey and am a member of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. I am fully familiar with the facts contained herein, and I submit this Declaration in support of the Indirect Purchaser Plaintiffs' Unopposed Motion for Preliminary Approval of the Class-Action Settlement with Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva").

2.      A true and correct copy of the Settlement Agreement is annexed as **Exhibit A**.

### Procedural History and Facts

3.      After the Judicial Panel on Multidistrict Litigation centralized and transferred to this Court various actions alleging similar anticompetitive schemes to

delay market entry of generic Effexor XR, the Court consolidated such indirect purchaser class actions for all purposes, including trial. ECF No. 18.[1] The Court also appointed interim Lead Counsel for the indirect purchasers. ECF No. 33. Interim Lead Counsel have been intimately involved in every aspect of the litigation since its inception.

4.    The Indirect Purchaser Plaintiffs filed a Consolidated Class Action Complaint ("CAC") against Wyeth (a/k/a Wyeth LLC, f/k/a Wyeth, Inc., f/k/a American Home Products), Wyeth Pharmaceuticals, Inc., Wyeth-Whitehall Pharmaceuticals, and Wyeth Pharmaceuticals Company (collectively, "Wyeth") and Teva on January 9, 2012. ECF No. 37. The CAC alleged that, although Wyeth's marketing exclusivity for the original compound patent for Effexor XR lapsed on June 13, 2008, the first generic equivalent was foreclosed from entering the market for two more years, until June 2010, and other generics remained foreclosed until June 2011. *Id.* As alleged in the CAC, Teva and Wyeth engaged in a multifaceted anticompetitive scheme designed to prevent and/or delay the approval and marketing of generic versions of Effexor XR. *See id*. The CAC alleges that (i) Wyeth fraudulently procured three patents for extended-release formulations of venlafaxine hydrochloride, wrongfully listed those patents in the United States Food and Drug

---

[1] Unless otherwise indicated below, "ECF" citations are to *Man-U-Service Contract Trust Fund v. Wyeth*, No. 3:11-cv-05661 (D.N.J.), the lead docket for the Indirect Purchaser Class Actions.

Administration Orange Book, and engaged in serial sham litigation to prevent and/or delay multiple generic companies from timely entering the market for less expensive versions of extended-release venlafaxine hydrochloride capsules; (ii) that Wyeth and generic-manufacturer Teva entered into a horizontal market-allocation and price-fixing agreement; and (iii) that Wyeth negotiated settlement agreements with subsequent generic applicants to preserve and protect its monopoly and market-division agreement with first-filer Teva. *See id.*

5.    The Indirect Purchaser Plaintiffs brought claims for violations of numerous state antitrust and consumer protection laws and for unjust enrichment under state law. *See id.* ¶¶ 407-62; 472-82. They also sought declaratory and injunctive relief for Defendants' violation of Sections 1 and 2 of the Sherman Act. *Id.* ¶¶ 463-71.

6.    Defendants moved to dismiss the CAC on April 6, 2012. *See* ECF Nos. 75, 77.

7.    On September 10, 2012, Defendants moved for a stay pending the resolution of *In re K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir. 2012), *cert. granted, judgment vacated sub-nom. Upsher-Smith Labs., Inc. v. Louisiana Wholesale Drug Co., Inc.*, 570 U.S. 913 (2013), which the Court ultimately granted. ECF Nos. 116, 123.

8.    On July 17, 2013, the Court lifted the stay after *K-Dur* was decided. ECF No. 211, No. 3:11-cv-05479 (D.N.J.).

9.    On August 8, 2013, the Court established a single master docket for all of the previously consolidated and/or coordinated cases—Case No. 11-cv-5479 (D.N.J.). *See* ECF 233, No. 11-cv-5479.

10.    On January 16, 2015, the Court granted and denied in part Defendants' motions to dismiss. *See* ECF Nos. 151, 152.

11.    On February 4, 2015, Indirect Purchaser Plaintiffs filed a notice of appeal. ECF No. 156.

12.    On August 21, 2017, the United States Court of Appeals for the Third Circuit issued a decision reversing this Court's January 5, 2015 decision granting the motions to dismiss. *See In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017). In relevant part, the Court of Appeals held Plaintiffs had adequately alleged that Wyeth had entered into an unlawful, monopolistic ("reverse-payment") settlement agreement with would-be generic manufacturer Teva.

13.    By Order dated October 12, 2017, this Court reinstated the previously dismissed claims. ECF No. 161.

14.    On January 12, 2018, the Indirect Purchaser Plaintiffs filed a Second Amended Consolidated Class Action Complaint. ECF No. 138, No. 3:11-cv-05479 (D.N.J.). Defendants answered on February 15, 2018. ECF Nos. 470, 476, No. 3:11-

cv-05479 (D.N.J.). Thereafter, on April 16, 2018, Defendants moved for judgment on the pleadings pursuant to Rule 12 of the Federal Rules of Civil Procedure. ECF No. 165.

15.    On May 7, 2018, the Indirect Purchaser Plaintiffs filed a Third Amended Consolidated Class Action Complaint, ECF No. 155, No. 3:11-cv-5590 (D.N.J.).[2] On May 21, 2018, Defendants answered Indirect Purchaser Plaintiffs' Third Amended Complaint. ECF No. 521, No. 3:11-cv-05479 (D.N.J.).

16.    The Court granted in part and denied in part Defendants' related motions for judgment on the pleadings, on September 18, 2018 and November 11, 2018, respectively. *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363 (D.N.J. 2018); *In re Effexor Antitrust Litig.*, 337 F. Supp. 3d 435, 442 (D.N.J. 2018).

17.    After extensive negotiation and mediation, Wyeth and the Indirect Purchaser Plaintiffs reached a settlement for $25.5 million, which this Court approved on September 12, 2024, ECF No. 761, No. 3:11-cv-5479 (D.N.J.)

**History of Mediation and Settlement**

16.    The Court is well familiar with the long history of Interim Lead Counsels' efforts to reach a mutually agreeable settlement of this matter. Suffice it to say, settlement discussions, both directly between counsel and under the

---

[2] On October 18, 2018, Indirect Purchaser Plaintiffs filed a fourth amended consolidated class action complaint, ECF No. 171, No. 3:11-cv-5590 (D.N.J.), which was not ruled upon.

supervision of retired Judge Faith Hochberg, continued for over four years. During that period, counsel met in person on many occasions, conducted both telephone and Zoom conferences, and met with Judge Hochberg—individually and collectively—multiple times. Negotiations were at arm's-length, vigorous, and, at times, contentious. It is the considered view of Interim Lead Counsel that the resulting Settlement represents a fair compromise of the claims against Teva following the prior resolution of claims with Wyeth.

17.    Attached as **Exhibit B** is a true and correct copy of the Plan of Allocation.

18.    Attached as **Exhibit C** is a true and correct copy of the Proposed Long-Form Class Notice.

19.    Attached as **Exhibit D** is a true and correct copy of the Proposed Short-Form Class Notice.

22.    Attached as **Exhibit E** is a true and correct copy of the Proposed Third-Party Payor Claim Form.

23.    Attached as **Exhibit F** is a true and correct copy of the Proposed Consumer Claim Form.

24.    Attached as **Exhibit G** is a true and correct copy of the Declaration of Elaine Pang of A.B. Data.

I hereby declare under penalty of perjury that the foregoing is true and correct.

6

Dated: March 17, 2025

/s/ James E. Cecchi
JAMES E. CECCHI

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re EFFEXOR XR ANTITRUST LITIGATION | Civil Action No. 3:11-cv-05661 (ZNQ) (JBD) |
| This Document Relates To: All Indirect Purchaser Class Actions | Civil Action No. 3:11-cv-05590 (ZNQ) (JBD) |
| | Master Docket No. 3:11-cv-05479 (ZNQ) (JBD) |

### <u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement ("Settlement" or "Settlement Agreement") is entered as of March 7, 2025, between A. F. of L. – A.G.C. Building Trades Welfare Plan, IBEW - NECA Local 505 Health & Welfare Plan, Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund, Painters District Council No. 30 Health and Welfare Fund, Plumbers and Pipefitters Local 572 Health and Welfare Fund, City of Providence, Rhode Island, Sergeants Benevolent Association Health and Welfare Fund, and Patricia Sutter, individually and on behalf of the Indirect Purchaser Class defined below (collectively "Indirect Purchaser Plaintiffs") and Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva" and, together with the Indirect Purchaser Plaintiffs, the "Parties"). This Settlement Agreement is intended to, and upon occurrence of the Effective Date (as defined in Paragraph 6 below) will fully, finally, and forever resolve, compromise, discharge, and settle the claims of the Indirect Purchaser Plaintiffs against Teva in the above-captioned litigation, subject to the terms below (the "Settlement"). Nothing in this Settlement Agreement relates to or may be construed as relating to the Indirect Purchaser Plaintiffs' claims against defendants Wyeth—a/k/a Wyeth LLC, f/k/a Wyeth, Inc., f/k/a American Home Products; Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; or Wyeth Pharmaceuticals Company (collectively, "Wyeth").

1

WHEREAS, several similar class-action complaints were filed in this District on behalf of indirect purchasers of Effexor XR and/or its AB-rated generic equivalents, alleging Wyeth and Teva engaged in an anticompetitive scheme to prevent and/or delay the approval and marketing of generic versions of Effexor XR. These complaints alleged that Wyeth fraudulently procured three patents for extended release formulations of venlafaxine hydrochloride, wrongfully listed those patents in the Food and Drug Administration ("FDA") Orange Book as covering Effexor XR, and engaged in serial sham litigation to block and delay multiple generic companies, that Wyeth and generic manufacturer Teva entered into a horizontal market-allocation and price-fixing agreement, and that Wyeth negotiated settlements with subsequent generic applicants to preserve and protect Wyeth's monopoly and market-division agreement with first-filer Teva. As alleged in the complaints, this scheme caused Indirect Purchaser Plaintiffs to pay supra-competitive prices for Effexor XR and its AB-rated generic equivalents, in violation of state antitrust and consumer-protection laws and laws pertaining to unjust enrichment; and

WHEREAS, the indirect purchaser class cases filed in this District were consolidated before the United States District Court for the District of New Jersey (collectively, the "Court") and captioned *In re Effexor XR Antitrust Litigation*, No. 11-cv-05661 (the "Indirect Purchaser Class Action"); and

WHEREAS, Teva denies all of Indirect Purchaser Plaintiffs' allegations, has not conceded or admitted any liability, has not conceded or admitted the propriety of certification of any class for any purposes other than settlement, has not conceded that any conduct challenged by Indirect Purchaser Plaintiffs caused any damage at all, and has asserted a number of purported defenses to Indirect Purchaser Plaintiffs' claims; and

WHEREAS, on December 14, 2011, the Court appointed an Executive Committee

2

(hereinafter "EC") and Chair of the Executive Committee (hereinafter "Lead Counsel") to lead the prosecution of the indirect purchaser claims; and

WHEREAS, by Settlement Agreement dated April 24, 2024, the Indirect Purchaser Plaintiffs and Wyeth agreed that all claims of the Indirect Purchaser Plaintiffs and the Indirect Purchaser Class against Wyeth be settled, compromised, and dismissed with prejudice, subject to the approval of the Court, on the terms and conditions set forth in the April 24, 2024 Settlement Agreement;

WHEREAS, on September 12, 2024, the Court issued an Order and Judgment Granting Final Approval of Indirect Purchaser Plaintiffs' Class-Action Settlement with Wyeth;

WHEREAS, Lead Counsel has concluded, after extensive fact discovery and investigation, as well as consultation with experts, and after carefully considering the circumstances of the Indirect Purchaser Class Action, including the claims asserted and the possible legal and factual defenses thereto, that it would be in the best interests of the Indirect Purchaser Plaintiffs to enter into this Settlement Agreement in order to avoid the uncertainties of litigation, particularly complex litigation such as this, and to ensure a benefit to the Indirect Purchaser Class, and, further, that Lead Counsel consider the Settlement set forth herein to be fair, reasonable, and adequate compensation, and in the best interests of the Indirect Purchaser Class; and

WHEREAS, Indirect Purchaser Plaintiffs and Teva agree that neither this Settlement Agreement, nor the Settlement it embodies, nor any actions taken in furtherance of either the Settlement Agreement or the Settlement shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Teva or of the truth of any of the claims or allegations alleged in the Indirect Purchaser Class Action, or a waiver of any defenses thereto; and

WHEREAS, Teva has concluded, despite its belief that it is not liable for the claims asserted and that it has good defenses thereto, that it would be in its best interests to enter into this Settlement Agreement to avoid the uncertainties of litigation, and thereby avoid the risks inherent in complex litigation, and to finally put to rest the Indirect Purchaser Class Action as to Teva; and

WHEREAS, Teva's counsel agree to make no effort to suggest, solicit, facilitate, or otherwise encourage any putative member of the Indirect Purchaser Class to seek exclusion from the Indirect Purchaser Class, and/or attempt to effectuate any individual settlement of Released Claims (as defined in Paragraph 12(a)) with any putative member of the Indirect Purchaser Class, regarding the subject matter of this litigation or the settlement thereof, without first conferring with Lead Counsel, unless such putative member of the Indirect Purchaser Class has validly sought exclusion pursuant to Paragraph 16 hereof; and

WHEREAS, Lead Counsel and the EC, on behalf of the Indirect Purchaser Plaintiffs, and Teva have engaged in arm's-length settlement negotiations, including with the assistance of a mediator, and have reached this Settlement Agreement, subject to Court approval, which embodies all of the terms and conditions of the Settlement between Indirect Purchaser Plaintiffs and Teva.

NOW THEREFORE, it is agreed by the undersigned, on behalf of Teva and the Indirect Purchaser Plaintiffs, that all claims of the Indirect Purchaser Plaintiffs and the Indirect Purchaser Class against Teva be settled, compromised, and dismissed with prejudice and, except as hereinafter provided, without costs as to Teva or Indirect Purchaser Plaintiffs, subject to the approval of the Court, on the following terms and conditions:

1. **Settlement on behalf of the Indirect Purchaser Plaintiffs and the Indirect Purchaser Class.**

This settlement is on behalf of the Indirect Purchaser Plaintiffs and all "Class Members" of the Indirect Purchaser Class defined as follows: All persons or entities in Arizona, California,

Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin (the "Class States") who purchased, paid, and/or provided reimbursement for Effexor XR or AB-rated generic versions of Effexor XR for consumption by themselves, their families, or their members, employees, insureds, participants or beneficiaries, from June 14, 2008 through May 31, 2011 (the "Class Period"). For purposes of the Indirect Purchaser Class definition, persons or entities "purchased" Effexor XR or its generic versions if they paid or reimbursed some or all of the purchase price.

The following persons or entities are excluded from the Indirect Purchaser Class:

a.  Teva and Wyeth and their respective subsidiaries and affiliates;

b.  State and local governments to the extent their claims may be asserted under applicable state law only by the state Attorney General, or are otherwise prohibited by applicable law from being asserted by private counsel on a contingent fee basis;

c.  all persons or entities who purchased Effexor XR or its generic equivalent for purposes of resale or directly from Teva, Wyeth or their affiliates;

d.  fully insured health plans (*i.e.*, Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members);

e.  pharmaceutical benefit managers; and

f.  the judges in this case and any members of their immediate families.

**2.    <u>Reasonable Best Efforts to Carry Out This Settlement.</u>**

Lead Counsel and Teva agree to support approval of this Settlement Agreement before the Court and to undertake their reasonable best efforts, including undertaking all actions contemplated by and any steps necessary to effectuate this Settlement Agreement, to carry out the terms of this Settlement Agreement, and to secure the prompt, complete, and final dismissal with

5

prejudice of all claims against Teva in the Indirect Purchaser Class Action. This includes Teva serving notice on those entities required to receive notice under 28 U.S.C. § 1715.

3.    **Motion for Preliminary Approval of the Settlement.**

Within fourteen days of the execution of this Settlement Agreement, Lead Counsel for the Indirect Purchaser Plaintiffs shall file with the Court an unopposed motion for preliminary approval of the Settlement. That motion shall request the entry of a preliminary approval order substantially in the form of Exhibit A hereto (the "Preliminary Approval Order"), providing for: (i) the preliminary approval of the Settlement set forth in this Settlement Agreement because it is in the range of what is fair, reasonable, and adequate, and in the best interests of the Indirect Purchaser Class; (ii) preliminary approval of the plan for allocation of the Settlement Fund ("Allocation Plan"); (iii) approval of the notice and proposed notice plan; (iv) a schedule for providing Teva and the Court with a complete list of any indirect purchaser who opts out or seeks exclusion from the Indirect Purchaser Class and for a hearing by the Court after the notice period has expired to approve the Settlement and to consider Lead Counsel's applications for attorneys' fees and reimbursement of costs and expenses as set forth in this Settlement Agreement ("Fairness Hearing"); (v) a stay of all proceedings in the Indirect Purchaser Class Action against Teva until such time as the Court renders a final decision regarding approval of the Settlement; (vi) certification of the Indirect Purchaser Class, as defined in Paragraph 1, for purposes of settlement; (vii) appointment of a notice and claims administrator; and (viii) appointment of an escrow agent. After the Court preliminarily approves the Settlement, Indirect Purchaser Plaintiffs shall, per the Preliminary Approval Order, provide Indirect Purchaser Class members with notice of the Settlement pursuant to Rule 23 of the Federal Rules of Civil Procedure substantially in the form approved by the Court. Lead Counsel will recommend notice to Class Members according to the notice plan submitted by the claims and notice administrator, which shall provide for the best

notice practicable to the Class, including notice by publication to consumers and individual notice to third-party payor and consumer Class Members that can be identified with reasonable effort.

**4.    Class Certification.**

Indirect Purchaser Plaintiffs shall seek Court certification of the Indirect Purchaser Class for purposes of the proposed Settlement, concurrently with their motion for preliminary approval. Teva will not oppose certification of the Indirect Purchaser Class for purposes of the Settlement only.    Neither this Settlement Agreement nor any other Settlement-related document shall constitute, be construed as, or be deemed to be evidence of or an admission or concession by Teva as to whether any class, in this case or others, may be certified for purposes of litigation and trial.

**5.    Motion for Final Approval and Entry of Final Judgment.**

If the Court certifies the Indirect Purchaser Class for purposes of settlement and preliminarily approves the Settlement, Indirect Purchaser Plaintiffs shall submit a motion for final approval of this Settlement, after appropriate notice to the Indirect Purchaser Class, and shall seek entry of a "Final Judgment and Order" substantially in the form preliminarily approved by the Court, with any necessary additional findings of fact and conclusions of law:

a.    finding this Settlement Agreement and its terms to be fair, reasonable, and adequate as to Indirect Purchaser Plaintiffs and the members of the Indirect Purchaser Class within the meaning of Rule 23 of the Federal Rules of Civil Procedure, and directing its consummation pursuant to the terms of the Settlement Agreement;

b.    providing for payment of reasonable attorneys' fees and, in addition to reasonable attorneys' fees, reimbursement of the costs and expenses from the Settlement Fund (as defined in Paragraph 7);

c.    directing that upon the Effective Date, the Indirect Purchaser Class Action be dismissed as to Teva with prejudice;

7

d.    reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including the provisions of this Paragraph 5, the administration and consummation of this Settlement, the award of attorneys' fees and reimbursement of costs and expenses, and the payment of service awards to each of the named Indirect Purchaser Plaintiffs, if allowed by the Court; and

e.    directing that the judgment of dismissal of the Indirect Purchaser Class Action against Teva shall be final and appealable pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, there being no just reason for delay.

6.    **Finality of Settlement.**

This Settlement Agreement shall become final upon the occurrence of the following (the "Effective Date"):

a.    neither Teva nor the Indirect Purchaser Plaintiffs have availed themselves of their respective rights to cancel and terminate the Settlement under Paragraphs 15 or 17 hereof;

b.    the Settlement is approved by the Court as required by Rule 23(e) of the Federal Rules of Civil Procedure;

c.    entry, as provided for in Paragraph 5 herein, is made of the Final Judgment and Order; and

d.    the time for appeal from the District Court's approval of this Settlement as described in subparagraph 6(b) hereof and entry of the Final Judgment and Order as described in subparagraph 6(c) hereof has expired or, if appealed, either such appeal has been dismissed before resolution by the appellate court or approval of this Settlement and the Final Judgment and Order has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review.

7.    **Settlement Fund.**

The "Settlement Fund Amount" shall be two million, two hundred and fifty thousand

dollars ($2,250,000.00). Subject to the terms and conditions of this Settlement Agreement and an escrow agreement to be entered into by Lead Counsel, within ten (10) business days after the District Court grants preliminary approval to the Settlement, Teva shall deposit the Settlement Fund Amount into the Escrow Account held and administered by the Escrow Agent. Upon execution of this Agreement, Co-Lead Counsel will promptly, and no later than ten (10) days before the payment of Settlement Fund Amount is due, provide Teva with all information necessary to effectuate a wire transfer of the Settlement Fund Amount. If Co-Lead Counsel fails to provide Teva with all information necessary to effectuate a wire transfer of the Settlement Fund Amount by the date that is ten (10) days before payment of the Settlement Fund Amount is due, Teva's deadline for paying the Settlement Fund Amount shall be extended to the date that is ten (10) days after Co-Lead Counsel provides Teva with all information necessary to effectuate the wire transfer of the Settlement Fund Amount. The Settlement Fund Amount deposited by Teva into the Escrow Account and any accrued interest or earnings after deposit shall become part of and shall be referred to as the "Settlement Fund." Except as provided for in Paragraph 10 and 11, no disbursements shall be made to Indirect Purchaser Plaintiffs or members of the Indirect Purchaser Class until the Effective Date. The Settlement Fund shall be used solely for the benefit of the Indirect Purchaser Class, which does not include those who opt out of that Class. Once the above payment is made, as well as any payments subject to a court order under Paragraph 18 below, Teva and the Released Parties (as defined in Paragraph 12) shall have no further monetary obligations of any kind to Indirect Purchaser Plaintiffs, members of the Indirect Purchaser Class, or Lead Counsel under the terms and conditions of the Settlement. Teva and the Released Parties shall have no responsibility for, interest in, or liability whatsoever concerning the investment decisions or the actions of the Escrow Agent, or any transactions executed by the Escrow Agent.

9

Teva and the Released Parties shall have no responsibility for, interest in, or liability whatsoever for any aspect of the Allocation Plan or the implementation of that Plan. The Escrow Agent shall not distribute the Settlement Fund except as provided in the Settlement Agreement or by an order of the Court.

8.    **Qualified Settlement Fund.**

The Parties agree to treat the Settlement Fund as being at all times a Qualified Settlement Fund within the meaning of Treas. Reg. § 1.468B-l, and to that end, the Parties shall cooperate and shall not take a position in any filing or before any tax authority inconsistent with such treatment. In addition, Lead Counsel shall timely make such elections as necessary or advisable to carry out the provisions of this Paragraph 8, including the relation-back election (as defined in Treas. Reg. § 1.468B-lG)) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of Lead Counsel to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur. All provisions of this Settlement Agreement shall be interpreted in a manner consistent with the Settlement Fund being a "Qualified Settlement Fund" within the meaning of Treasury Regulation § 1.468B-l. Lead Counsel shall timely and properly file all information and other tax returns necessary or advisable with respect to the Settlement Funds (including without limitation the returns described in Treas. Reg. § 1.468B-2(k)(1)). Such returns shall reflect that all taxes (including any estimated taxes, interest, or penalties) on the income earned by the Settlement Fund shall be paid out of the Settlement Fund. Teva and the Released Parties shall not be responsible for and shall have no liability with respect to, the filing or payment of any taxes, interest, penalties, costs, distributions, or expenses connected to the Settlement Fund.

10

9.    **Full Satisfaction; Limitation of Interest and Liability.**

Members of the Indirect Purchaser Class shall look solely to the Settlement Fund for settlement and satisfaction against Teva of all Released Claims as defined in Paragraph 12 herein, including any costs, fees, or expenses of any of the Indirect Purchaser Plaintiffs or their attorneys, experts, advisors, agents, and representatives, including with respect to the negotiation, execution, and performance of their obligations under this Settlement Agreement.  In the event the Settlement becomes final under Paragraph 6 herein, the Settlement Fund will fully satisfy all Released Claims as defined in Paragraph 12 herein.  Except as provided by order of the Court, no member of the Indirect Purchaser Class shall have any interest in the Settlement Fund, or any portion thereof. Teva and the Released Parties shall not be responsible for, and shall have no liability with respect to, disbursements from the Settlement Fund according to any Court-approved Allocation Plan.

10.    **Reimbursement of Settlement Administration Costs, Fees, and Expenses**

Indirect Purchaser Plaintiffs and Lead Counsel shall be reimbursed and indemnified solely out of the Settlement Fund for all costs, fees, and expenses relating to the administration of this Settlement, including, but not limited to, the costs of notice of this Settlement to Indirect Purchaser Class members, administration of the Settlement Fund, escrow administration, and taxes.  Teva and the Released Parties shall not otherwise be responsible for, and shall have no liability with respect to, any costs, fees, or expenses of any of Indirect Purchaser Plaintiffs' respective attorneys, experts, advisors, agents, and representatives relating to Settlement administration, or for any costs, fees, or expenses for notice (other than the notice Teva is required by the Class Action Fairness Act to send to the states' attorneys general), Settlement administration, or other costs of implementing this Settlement.  All such costs, fees, and expenses as approved by the Court shall be paid out of the Settlement Fund.  Once Preliminary Approval is obtained, and prior to the Effective Date, Lead Counsel may, without an order of Court so directing, withdraw up to two

hundred and fifty thousand dollars ($250,000) for notice, notice-related expenses, escrow administration costs, and/or taxes due from the Settlement Fund, and no amount paid for such notice, accrued expenses and costs, and/or taxes shall be refundable to Teva in the event this Settlement Agreement is terminated or does not become effective. Additional funds for notice, notice-related expenses, escrow administration costs, and taxes may be withdrawn prior to the Effective Date only with Teva's written consent or as ordered by the Court. No amount for any such additional funds shall be refundable to Teva in the event this Settlement Agreement is terminated or does not become effective.

11.    **Attorneys' Fees, Costs and Expenses, and Service Awards to the Named Plaintiffs.**

Lead Counsel may seek attorneys' fees of up to 34% of the Settlement Fund (including interest thereon), plus the reimbursement of reasonable costs and expenses incurred in the prosecution of the Indirect Purchaser Class Action. Any such attorneys' fees, expenses, and costs approved by the Court shall be payable solely out of the Settlement Fund upon the entry of an order approving Lead Counsel's application, and, except as may be ordered by a court pursuant to Paragraph 18 of this Settlement Agreement, Indirect Purchaser Plaintiffs, members of the Indirect Purchaser Class, and their respective counsel shall not otherwise seek payment of any attorneys' fees, expenses, or costs, from Teva in the Indirect Purchaser Class Action. Teva and the Released Parties (as defined in Paragraph 12 hereof) shall not have any responsibility for, and no liability whatsoever with respect to, any payment or disbursement of attorneys' fees, expenses, or costs, any allocation of attorneys' fees, expenses, or costs among counsel, or with respect to any allocation of attorneys' fees, expenses, or costs to any other person or entity who may assert any claim thereto. Lead Counsel shall allocate any such fee and expense award among indirect purchaser counsel.

12.     **Release and Covenant Not to Sue.**

(a)     Upon the occurrence of the Effective Date as defined in Paragraph 6 hereof, and in consideration for the Settlement Fund Amount described in this Settlement Agreement, Indirect Purchaser Plaintiffs and the Indirect Purchaser Class—except those who requested exclusion from the Indirect Purchaser Class and whose request was approved by the Court—on behalf of themselves and their respective past and present parents, subsidiaries, and affiliates, general and limited partners, officers, directors, employees, agents, attorneys, servants, predecessors, successors, heirs, executors, administrators, and representatives (the "Releasing Parties"), shall release and forever discharge, and covenant not to sue Teva and its respective past, present, and future parents, subsidiaries, divisions, affiliates, joint ventures, stockholders, general partners, limited partners, officers, directors, management, supervisory boards, insurers, employees, agents, servants, trustees, associates, attorneys, and any of their legal representatives (and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing) (the "Released Parties"), with respect to any and all past, present, or future liabilities, claims, demands, obligations, suits, damages, penalties, levies, executions, judgments, debts, charges, actions, or causes of action, at law or in equity, whether class, individual, or otherwise in nature, and whether known or unknown, arising out of or relating to any conduct, events, or transactions, prior to the date of preliminary approval of this Settlement Agreement, (a) alleged, or which reasonably could have been alleged, in the Indirect Purchaser Class Action concerning the alleged anticompetitive scheme to prevent and delay approval and market entry of AB-rated generic equivalents of Effexor XR, or (b) concerning end-payor purchases of Effexor XR and/or its AB-rated generic equivalents in the Class States and arising under the Sherman Act, 15 U.S.C. §§ 1 & 2, *et seq.*, or any other federal or state statute or common-law doctrine relating to antitrust or consumer protection (collectively, the "Released Claims").  Upon the Effective Date, the Releasing

Parties will be forever barred and enjoined from commencing, instituting, prosecuting, or continuing to prosecute any action or other proceeding in any forum whatsoever, including any court of law or equity, arbitration tribunal, or administrative forum, asserting the Released Claims against the Released Parties.

(b)    In addition, Indirect Purchaser Plaintiffs, on behalf of themselves and all other Releasing Parties, hereby expressly waive, release, and forever discharge, upon the Settlement becoming final, any provisions, rights, and benefits conferred by Section 1542 of the California Civil Code, which reads:

> Section 1542. General Release; extent. A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party;

or by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to Section 1542 of the California Civil Code. The Releasing Parties may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims which are the subject matter of this Paragraph 12, but each Releasing Party hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon this Settlement becoming final, any known or unknown, suspected or unsuspected, asserted or unasserted, contingent or non-contingent claim that would otherwise fall within the definition of Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

(c)    Reservation of Claims. The Releasing Parties intend by this Settlement Agreement to release only Teva and the Released Parties with respect to the Released Claims. The Releasing Parties specifically do not intend this Settlement Agreement, or any part hereof or any other aspect

of the proposed Settlement Agreement, to compromise or otherwise affect in any way any rights the Releasing Parties have or may have against any other person, firm, association, company, or corporation whatsoever, including Wyeth. The release set forth in this Paragraph 12 is not intended to and shall not release any claims other than the Released Claims.

(d)     This Settlement is not intended to and does not release claims arising in the ordinary course of business between the Releasing Parties and the Released Parties that are unrelated to the allegations in the Indirect Purchaser Class Action, such as claims under Article 2 of the Uniform Commercial Code (pertaining to Sales), the laws of negligence or product liability or implied warranty, breach of contract, breach of express warranty, or personal injury.

**13.     Stay of Proceedings.**

Pending Court approval of the Settlement embodied in this Settlement Agreement, the Parties agree to stay any and all proceedings against Teva in the Indirect Purchaser Class Action other than those incident to the settlement process and agree to reasonable extensions of time with respect to any court filings necessary to effectuate such stays.

**14.     Claim Forms.**

Indirect Purchaser Plaintiffs and Lead Counsel will ensure that each claim form contains a copy of the release set forth in Paragraph 12 hereof. A claim form shall be signed by each member of the Indirect Purchaser Class or its, his, or her authorized representative as a precondition to receiving any portion of the Settlement Fund. Electronic signatures shall satisfy the signature requirement set forth in this Paragraph.

**15.     Effect of Disapproval or Material Modification.**

If the Court (i) does not enter the Final Judgment and Order in substantially the form provided for in this Settlement Agreement or, as a result of objections to the proposed Settlement Agreement or otherwise, there is material modification to the terms of the Settlement, or (ii) enters

the Final Judgment and Order and appellate review is sought, and on such review, the Final

Judgment and Order is set aside or the Settlement is affirmed with material modification, then this

Settlement Agreement and the Settlement shall be terminated immediately upon the election of

either Teva or Lead Counsel by providing written notice to the Parties designated to receive such

notice hereunder in accordance with Paragraph 24 hereof within 10 business days following the

occurrence of any such event.  An Order by the Court awarding attorneys' fees, costs, expenses,

and/or service awards from the Settlement Fund in any amount lower than requested by Lead

Counsel pursuant to this Settlement Agreement shall not be deemed a material modification of all

or a part of the terms of this Settlement Agreement or the Final Judgment and Order and shall not

give rise to any right of termination.  A modification or reversal on appeal of any amount of Lead

Counsel's costs and expenses awarded by the Court from the Settlement Fund shall not be deemed

a material modification of all or a part of the terms of this Settlement Agreement or the Final

Judgment and Order and shall not give rise to any right of termination.

16.    **Opt-Outs.**

The Class Notice plan shall provide that any Indirect Purchaser Class Member's request

for exclusion or "opt-out" shall be in writing and shall be signed by the member of the Class who

is opting-out, or by its, his, or her authorized representative.  Indirect Purchaser Class Members

shall not be permitted to exclude other Indirect Purchaser Class Members.  Moreover, group or

class-wide exclusions shall not be permitted.  Any request for exclusion by a purported authorized

agent or representative of an Indirect Purchaser Class Member must be accompanied by proof of

the representative's legal authority and authorization to act and request exclusion on behalf of each

Indirect Purchaser Class Member they seek to opt out. In addition, third-party payors seeking

exclusion must submit with their opt-out request all data reflecting their purchases of, and

payments for, branded and generic Effexor XR to enable the parties to make a full assessment in

16

connection with the Opt-Out Threshold referred to in the following Paragraph 17. Consumer identities shall not be made public as part of the exclusion process. Identifying information shall be kept confidential and, absent a consumer's consent, Lead Counsel shall file under seal any opt-out requests.

17.    **Opt-Out Threshold.**

As set forth in a separate Confidential Supplement to this Settlement Agreement, between counsel for Teva and Indirect Purchaser Plaintiffs ("Confidential Supplement"), Teva shall have the discretion to terminate the Settlement if potential members of the third-party payors in the Indirect Purchaser Class exclude themselves as provided in Paragraph 16 and they reimbursed, in aggregate, a percentage of the sales of brand and/or generic Effexor XR units sold in the Class States during the Class Period that exceeds a threshold percentage. The Confidential Supplement will be provided to the Court, *in camera*, upon request.

18.    **Set-Aside Fund.**

Lead Counsel may seek that the Court award 12% of any payments made by Teva to any third-party payors who opt out of the Indirect Purchaser Class (the "Set Aside Fund Amount") to Indirect Purchaser counsel as attorneys' fees, costs, and expenses. Any such sum awarded by the Court shall be in addition to any attorneys' fees, costs, and expenses awarded in this Action or under other provisions of this Settlement. The amount of any such attorneys' fees, costs, and expenses awarded to Class Counsel from the Set-Aside Fund shall be determined by the Court.

19.    **Effect of Termination.**

In the event the Settlement is terminated pursuant to Paragraphs 15 or 17, or for any reason does not become final under the terms of Paragraph 6 hereof, then (a) this Settlement Agreement shall be of no force or effect; (b) the Parties will be returned to the status quo that existed immediately before the date of execution of this Settlement Agreement; (c) any amount of the

Settlement Fund attributable to this Settlement, including any and all interest earned thereon, but less the costs actually paid or incurred for notice of the Settlement, settlement administration, escrow administration, and taxes paid on the Settlement Fund, shall be paid to Teva within the later of (i) 14 business-days' notice of termination to Lead Counsel as provided for in Paragraph 24 hereof or (ii) Indirect Purchaser Plaintiffs' receipt of wire instructions and any related verifications from Teva; and (d) any release pursuant to Paragraph 12 above shall be of no force or effect.

**20.    Preservation of Rights.**

The Parties hereto agree that this Settlement Agreement, whether or not it shall become final the terms of Paragraph 6 hereof, and any and all negotiations, documents, and discussions associated with it, shall be without prejudice to the rights of any party; shall not be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by Teva, or of the truth of any of the claims or allegations contained in the complaint or any other pleading or document in the Indirect Purchaser Class Action; and evidence thereof shall not be discoverable, admissible, or otherwise used indirectly, in any way (except in accordance with the terms of this Settlement; and provided that the provisions of this Settlement Agreement can be used by the Parties to enforce the provisions of the Settlement Agreement), whether in the Indirect Purchaser Class Action or in any other action or proceeding. The Parties expressly reserve all of their rights if the Settlement does not become final in accordance with the terms of this Settlement Agreement.   Upon the Settlement becoming final, nothing in this Paragraph shall prevent Teva from asserting any release or using this Settlement Agreement to offset or dispute any liability to any other parties.

**21.    Resumption of Litigation.**

The Parties agree, subject to approval of the Court, that in the event the Settlement

Agreement is not approved by the Court, the Settlement Agreement is terminated pursuant to Paragraphs 15 or 17, the Settlement does not become final pursuant to Paragraph 6, or Teva does not perform under Paragraph 7 herein, litigation of the Indirect Purchaser Class Action against Teva will resume in a reasonable manner to be approved by the Court upon joint application by the Parties hereto.

**22.    Confidentiality.**

Unless Teva and Lead Counsel agree otherwise, the terms of this Settlement Agreement shall remain confidential until Indirect Purchaser Plaintiffs move for preliminary approval of the Settlement, except that the Court and any other parties may be informed of the fact of settlement. However, this provision does not apply to statements made in judicial filings necessary to obtain preliminary Court approval of the Settlement.  Additionally, Indirect Purchaser Plaintiffs, their counsel, and other agents for or representatives of Indirect Purchaser Plaintiffs and of the Indirect Purchaser Class, as well as Teva, its counsel, and other agents for or representatives of Teva, shall abide by the terms of the Discovery Confidentiality Order approved and entered by the Court on August 23, 2013 (ECF No. 244) (the "Confidentiality Order").  Notwithstanding the foregoing, the parties may disclose the terms of this Settlement Agreement to accountants, lenders, auditors, legal counsel, tax advisors, or consultants; or as part of any security or other disclosure required by law (as determined by Teva and its counsel); or in response to a request by any governmental, judicial, or regulatory authority or otherwise required by applicable law or court order.

**23.    Binding Effect.**

This Settlement Agreement shall be binding upon, and inure to the benefit of, the Parties hereto, the Released Parties, the Releasing Parties, and the successors and assigns of each of them. Without limiting the generality of the foregoing, each and every covenant and agreement herein by the Indirect Purchaser Plaintiffs and Lead Counsel shall be binding upon all members of the

Indirect Purchaser Class—except those who requested and were granted exclusion therefrom—and the Releasing Parties and their respective successors and assigns.

24. **Notice.**

Any and all notices, requests, consents, directives, or communications by any party intended for any other party shall be in writing and shall, unless expressly provided otherwise herein, be given personally, or by express courier, or by electronic transmission (such as e-mail) followed by postage prepaid mail, to the following persons, and shall be addressed as follows:

To Indirect Purchaser Plaintiffs and the Indirect Purchaser Class:

James E. Cecchi
Carella Byrne Cecchi Brody & Agnello, P.C.
5 Becker Farm Rd.
Roseland, NJ 07068
973-994-1700
jcecchi@carellabyrne.com


To Teva:

Devora W. Allon, P.C.
Kevin M. Neylan, Jr.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 390-4092
Facsimile: (212) 446-4900
devora.allon@kirkland.com
kevin.neylan@kirkland.com

Any of the Parties may, from time to time, change the address to which such notices, requests, consents, directives, or communications are to be delivered, by giving the other Parties prior written notice of the changed address, in the manner provided above, ten (10) calendar days before the change is effective.

25. **Integrated Agreement.**

This Settlement Agreement (including any exhibits hereto) contains an entire, complete,

and integrated statement of each and every term and provision agreed to, by and among the Parties. This Settlement Agreement shall not be modified in any respect except by a writing executed by all the Parties hereto.

**26.** **Headings.**

The headings used in this Settlement Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

**27.** **No Party Is the Drafter.**

None of the Parties hereto shall be considered the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

**28.** **Choice of Law.**

All terms of this Settlement Agreement shall be governed by and interpreted according to the substantive laws of the State of New Jersey without regard to its choice-of-law or conflict-of-laws principles.

**29.** **Consent to Jurisdiction.**

Teva and each member of the Indirect Purchaser Class who does not timely and properly seek and obtain Court approval of exclusion from the Indirect Purchaser Class hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the District of New Jersey for any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement. Nothing in this Paragraph shall prohibit (a) the assertion in any forum in which a claim is brought that any release herein is a defense, in whole or in part, to such claim or (b) in the event that such a defense is asserted in such forum, the determination of its merits in that forum.

30.    **No Admission of Liability.**

Nothing in this Settlement Agreement shall be construed as an admission in any action or proceeding of any kind whatsoever, civil, criminal or otherwise, before any court, administrative agency, regulatory body, or any other body or authority, present or future, by Teva including, without limitation, that Teva has engaged in any conduct or practices that violates any antitrust statute or other law. This Settlement Agreement shall not be admissible for any purpose except in an action to enforce its terms.

31.    **Class Action Fairness Act.**

Teva, at its sole expense, shall submit all materials required to be sent to appropriate Federal and State officials pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715.

32.    **Execution in Counterparts.**

This Settlement Agreement may be executed in counterparts. Signatures transmitted by facsimile or other electronic means shall be considered as valid signatures as of the date hereof, although the original signature pages shall thereafter be appended to this agreement.

33.    **Authority.**

Each of the Indirect Purchaser Plaintiffs and Teva represents and warrants that it is authorized to enter into this Settlement Agreement, that it has authorized its counsel to enter into the Settlement Agreement on its behalf, and that it intends this Settlement Agreement to be a valid and binding obligation, enforceable in accordance with its terms.

34.    **Knowledge and Understanding of the Settlement Agreement's Terms.**

Each of the Indirect Purchaser Plaintiffs and Teva warrants that it has read this Settlement Agreement, has had the opportunity to consult counsel about this Settlement Agreement, understands the Settlement Agreement's terms, and freely and knowingly enters into this Settlement Agreement.

IN WITNESS WHEREOF, each of the signatories represents that they are authorized to execute this Settlement Agreement on behalf of the party for whom they have signed, has agreed on behalf of their respective party to be bound by its terms, and has entered into this Settlement Agreement with full authority on behalf of the party or parties for whom they have signed as of March 7, 2025.

By: _____

Devora W. Allon, P.C.
Kevin M. Neylan, Jr.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 390-4092
Facsimile: (212) 446-4900
devora.allon@kirkland.com
kevin.neylan@kirkland.com

*Counsel for Teva*

By: _____

James E. Cecchi
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO**
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

*Chair of Indirect Purchaser Plaintiffs'
Executive Committee*

Michael M. Buchman
**MOTLEY RICE LLC**
800 Third Avenue, Suite 2401
New York, New York 10022
(212) 577-0040

Richard J. Burke
**QUANTUM LEGAL LLC**
2801 Lakeside Drive, Suite 100
Bannockburn, Illinois 60015

Kenneth A. Wexler
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450
Chicago, Illinois 60606
(312) 346-2222

Jeffrey L. Kodroff
**SPECTOR ROSEMAN & KODROFF,
P.C.**
2001 Market Street, Suite 3420

23

(847) 433-4500

James R. Dugan, II
**DUGAN LAW FIRM, PLC**
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
(504) 648-0180

Philadelphia, Pennsylvania 19103
(215) 496-0300

Marvin A. Miller
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, Illinois 60603
Telephone: (312) 332-3400

*Indirect Purchaser Plaintiffs' Executive
Committee*

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| *In re Effexor XR Antitrust Litigation* | Civil Action No. 3:11-cv-05661 (ZNQ)(JBD) |
| THIS DOCUMENT RELATES TO:<br><br>All Indirect Purchaser Class Actions | Master Docket No. 3:11-cv-05479 (ZNQ)(JBD) |

## PLAN OF ALLOCATION

This Plan of Allocation will govern distributions from the net proceeds of the $2.25 million settlement fund created by the March 7, 2025 Settlement Agreement in *In re Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-05479 (D.N.J.), entered into by Plaintiffs, A. F. of L. – A.G.C. Building Trades Welfare Plan, IBEW – NECA Local 505 Health & Welfare Plan, Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund, Painters District Council No. 30 Health and Welfare Fund, Plumbers and Pipefitters Local 572 Health and Welfare Fund, City of Providence, Rhode Island, Sergeants Benevolent Association Health and Welfare Fund, and Patricia Sutter (collectively, the "Plaintiffs"), on behalf of themselves and the Indirect Purchaser Class defined in the Settlement Agreement, and Defendants Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva"). To receive a distribution under this Plan of Allocation, an entity must timely submit a Claim Form and be an Eligible Claimant. The manner in which payments will be allocated and distributed to Eligible Claimants who submit timely Claim Forms is described below. If an individual or entity submitting a Claim Form is not a Class Member or does not provide the required information, then that individual or entity shall not be entitled to any distribution under this Plan of Allocation. If an individual or entity is a Class Member and provides the requisite information, their eligibility to participate in this Plan of Allocation and the amount of payment the Eligible Claimant shall receive

(if any) is described below.

## I.    <u>**General Definitions**</u>[1]

As used in this Plan of Allocation, the following terms shall have the indicated meanings:

1.    "Allocation Funds" means the Third-Party Payor Fund and the Consumer Fund, as further defined below:

     a.    "Consumer Fund" shall mean twenty-two percent (22%) of the Net Settlement Fund, which shall be distributed to Class Members who are individual consumers.

     b.    "Third-Party Payor Fund" shall mean seventy-eight percent (78%) of the Net Settlement Fund, which shall be distributed to Class Members that are third-party entities, not consumers.

2.    "Claim Form" shall mean the documents titled "Consumer Claim Form," and "Third-Party Payor Claim Form," which are available for download at www.EffexorXRIndirectSettlement.com, or by calling 1-877-933-2882. The timeliness and validity of a Claimant's Claim Form are set forth in the Class Notice and shall be determined by the Claims Administrator.

3.    "Claims Administrator" means A.B. Data, Ltd.

4.    "Class Member" means any individual or entity falling within the definition of the Class certified by this Court and who/which has not opted out of the Class.

5.    "Class Notice" mean the legal notice authorized by the Court.

6.    "Class States" means Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin.

---

[1] If not otherwise defined herein, capitalized terms shall be as defined in the Settlement Agreement.

7.      "Eligible Claimant" means a Class Member who submits a Claim Form that is accepted in whole or in part by the Claims Administrator. Class opt-outs are not Eligible Claimants.

8.      "Class Counsel" means the law firms of Carella, Byrne, Cecchi, Brody & Agnello, P.C., Motley Rice LLC, Wexler Boley & Elgersma LLP, Quantum Legal LLC, Spector, Roseman & Kodroff, P.C., The Dugan Law Firm, APLC, and Miller Law LLC.

9.      "Net Settlement Fund" means the Settlement Fund Amount ($2,250,000), less Court-approved attorneys' fees, reimbursement of costs and expenses, taxes, and fees and costs associated with issuing notice and claims and escrow administration in accordance with the Settlement.

10.     "Notice" shall mean the legal notice authorized by the Court in the Civil Action No. 3:11-5661; Master Docket No. 3:11-cv-05479 (D.N.J.), to be disseminated to the Class of indirect purchasers of Effexor ER and AB-rated generic versions of Effexor ER.

11.     "Qualifying Claim" shall mean (i) for consumers, the amount paid for the prescriptions of Effexor XR and/or AB-rated generic versions Effexor XR purchased in the Class States during the Class Period; (ii) for TPPs, the amount paid and/or reimbursed for Effexor XR and AB-rated generic versions of Effexor XR purchased in the Class States during the Class Period. For retail purchases, the State of purchase is the State where the pharmacy is physically located. If any purchases were made by mail order, the State to which the prescription was sent is considered the place of purchase.

12.     "Settlement" shall mean the Settlement Agreement dated March 7, 2025 and as described in the Notice.

## II.    Distribution Among Eligible Claimants

13.    No Eligible Claimant shall be permitted to recover from any Allocation Fund unless that Claimant submits a Claim Form with a Qualifying Claim for that Allocation Fund. Claimants who opted out of the Class shall not receive any distributions pursuant to this Plan of Allocation.

14.    Each Allocation Fund shall be distributed to Eligible Claimants in that Allocation Fund on a *pro rata* basis. To determine each Eligible Claimant's *pro rata* share of an Allocation Fund, the Claims Administrator shall multiply the total value of that Allocation Fund by a fraction, for which (a) the numerator is the Qualifying Claim for that Eligible Claimant for that Allocation Fund, and (b) the denominator is the sum total of all Qualifying Claims by all Eligible Claimants for that Allocation Fund.

15.    All funds in each Allocation Fund must be exhausted if possible, subject to the following: (a) to the extent that any money available for the Consumer Fund remains undistributed, such funds shall be transferred to the TPP Fund and used to pay valid claims of TPPs; and (b) to the extent that any money available for the TPP Fund remains undistributed, such funds shall be transferred to the Consumer Fund and used to pay valid claims of consumers. In no event shall any Eligible Claimant be allowed to collect more than an amount equal to that Eligible Claimant's Qualifying Claim.

16.    Eligible Claimants shall only be paid out of each Allocation Fund for which they submit a Qualifying Claim. Claimants are not eligible to be paid from an Allocation Fund if they have opted out of the Class.

17.    Eligible Claimants that are TPPs must submit transaction data supporting their Qualifying Claims. Eligible Claimants who are consumers must submit documentation of their purchases. Both TPPs and consumers may be required to submit additional claim documentation

at the discretion of the Claims Administrator.

18.    If an Eligible Claimant's distribution amount calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to that Eligible Claimant.

19.    Should a balance remain in the Net Settlement Fund after a reasonable amount of time from the initial date of distribution thereof—whether by reason of tax refunds, uncashed checks, or otherwise—the Claims Administrator shall, if feasible, and subject to Court approval, reallocate such balance, in an equitable and economic fashion, among Eligible Claimants who successfully received and deposited, cashed, or otherwise accepted a distribution amount. Provided, however, that such redistributions should only be made to those Eligible Claimants who would receive a distribution of at least $10.00. Subject to Court approval, these redistributions shall be repeated until the balance remaining in the Net Settlement Fund is no longer economically feasible to distribute to Eligible Claimants.

20.    If any funds remain undistributed pursuant to the terms of this Plan of Allocation, Class Counsel shall make an application to the Court for final disposition.

## III.    __Administration__

21.    All determinations under this Plan of Allocation shall be made by the Claims Administrator, subject to review by Class Counsel and approval by the Court.

22.    Each Class Member shall certify that any data or other information it submits to the Claims Administrator is true, accurate, and complete to the best of its knowledge. To verify the accuracy of claim information and to prevent duplication of claims, the Claims Administrator may reasonably request additional information from Class Members as the Claims Administrator deems appropriate.

**IV.** **Amendments to the Plan of Allocation**

23.     This Plan of Allocation may be amended. To obtain the most up-to-date information regarding the Plan of Allocation visit www.EffexorXRIndirectSettlement.com.

# EXHIBIT C

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

# Did You Purchase, Pay for, or Provide Reimbursement for Effexor XR and/or Its Generic Equivalent?
## You Could Get Money from a New Settlement

*A federal court authorized this Notice. You are not being sued.*

*Para conseguir una notificación en español, llame a 1-877-933-2882 o visite el sitio web:*
*www.EffexorXRIndirectSettlement.com.*

- There is a new settlement (the "Settlement") with Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva") in a class-action lawsuit claiming that Wyeth (also known as Wyeth LLC and formerly known as Wyeth, Inc. and American Home Products); Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; and Wyeth Pharmaceuticals Company (collectively, "Wyeth") and Teva unlawfully kept generic versions of Effexor XR off the market. Plaintiffs allege this conduct caused consumers and third-party payors to pay more for brand and generic Effexor XR than they should have. Wyeth and Teva deny they did anything wrong.

- You may have seen a previous notice about a $25.5 million settlement with Wyeth (the "Wyeth Settlement"). The Wyeth Settlement was approved by the Court in September 2024. Now, Teva has agreed to pay $2.25 million to resolve the remaining claims in this lawsuit. This Notice is about the new Settlement with Teva.

- Generally, you are included in the Settlement if you purchased, paid for, and/or reimbursed some or all of the cost of Effexor XR or AB-rated generic versions of Effexor XR in certain states from June 14, 2008 through May 31, 2011. The included states are: Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin. You may be able to get money from this Settlement.

- The $2.25 million Teva is paying in the Settlement will be used to pay (1) money to eligible Class Members; (2) notice and administration costs; (3) attorneys' fees; and (4) costs and expenses not previously reimbursed in connection with the Wyeth Settlement.

- **Your legal rights are affected even if you do nothing. Please read this Notice carefully.**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT | | DEADLINE |
|---|---|---|
| **SUBMIT A CLAIM** | The only way to get a payment from the Settlement.<br><br>If you already filed a claim for the Wyeth Settlement, you **do not** need to submit another claim. Your previous claim for the Wyeth Settlement will also serve as your claim for this new Settlement with Teva. | **[Month 00, 2025]** |
| **EXCLUDE YOURSELF** | You will not be bound by the Settlement and will not receive any benefits from the Settlement. You keep any rights to sue Teva on your own for the same legal claims made in this lawsuit. | **[Month 00, 2025]** |
| **OBJECT** | Write to the Court about why you do not like the Settlement. Whether or not you object, you must still file a claim by the deadline above to receive money from the Settlement. | **[Month 00, 2025]** |
| **GO TO A HEARING** | Attend a hearing to speak in Court about your opinion of the Settlement. | **[Month 00, 2025]** |

| **DO NOTHING** | If you did not already file a claim in connection with the Wyeth Settlement and do nothing now, you will not get a payment from this Settlement. You will also give up your right to sue Teva on your own for the same legal claims made in this lawsuit. | |

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

- The Court in charge of this case still must decide whether to approve the Settlement.

- Payments will be made to those who qualify only after the Court approves the Settlement and any appeals are resolved. Please be patient.

## Basic Information

| 1.   Why was this Notice issued? |
| --- |

The Court authorized this Notice because you have a right to know about a new proposed Settlement, your rights, and your options before the Court decides whether to approve the Settlement. This Notice explains the lawsuit, the Settlement, and your legal rights. Your legal rights are affected whether you act or not.

Judge Zahid N. Quraishi of the United States District Court for the District of New Jersey is overseeing this case. This lawsuit is known as *In re Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-05479. The people who sued are called the "Plaintiffs." Wyeth and Teva are the "Defendants."

 On September 12, 2024, the Court gave final approval to the $25.5 million Wyeth Settlement.

This Notice is about a new $2.25 million Settlement with Teva. If the Court approves it, the Settlement will resolve the claims against Teva.

| 2.   What is this lawsuit about? |
| --- |

The consumers and third-party payors who brought the lawsuit (the "Plaintiffs") claim that Wyeth took several actions to keep generic versions of Effexor XR off the market, causing brand and generic Effexor XR prices to be higher than they otherwise would have been. This meant that consumers and third-party payors paid more for brand Effexor XR and generic Effexor XR than they should have.

The lawsuit says that, in order to delay generic Effexor XR from coming to the market, Wyeth fraudulently obtained three patents covering Effexor XR and used those patents to wrongfully sue manufacturers who were applying to make, use, or sell a generic version of Effexor XR. It claims Wyeth then settled those lawsuits by agreeing to pay the generic manufacturers *if* those manufacturers agreed to delay selling their generic versions of Effexor XR.

The lawsuit also says Wyeth and generic manufacturer Teva entered into an unlawful agreement, called a horizontal market-allocation and price-fixing agreement, in which Wyeth paid generic manufacturer Teva to delay entering the market with its generic version of Effexor XR. Specifically, the lawsuit claims that Wyeth agreed to delay selling Wyeth's own generic version of Effexor XR once Teva was permitted to enter the market. This meant that Teva was allowed to sell its generic version of Effexor XR without any generic competitors for a longer time than it normally would have and could charge higher prices than it would have otherwise.

Plaintiffs allege that, if Wyeth and Teva did not take these actions or make this agreement, generic versions of Effexor XR would have been available sooner. Because of the delay in generic competition, consumers and third-party payors who paid for brand and generic Effexor XR were overcharged.

Wyeth and Teva deny all these allegations, including that the Plaintiffs or Class Members are entitled to damages or any other relief.

There has been no determination by the Court or a jury that the allegations against Wyeth and Teva have been proven or that, if proven, their conduct caused harm to the Class. This Notice is not an expression of any opinion by the Court as to the claims against Wyeth or Teva or the defenses asserted by Wyeth or Teva.

This lawsuit is not about the safety or efficacy of Effexor XR, and the Settlement does not involve any claims about the safety or efficacy of Effexor XR.

This Notice is only a summary. More detail is provided in the Settlement Agreement, available at www.EffexorXRIndirectSettlement.com.

| 3. Why is this a class action? |
| --- |

In a class action, one or more people or entities called "class representatives" (in this case, A. F. of L. – A.G.C. Building Trades Welfare Plan, IBEW - NECA Local 505 Health & Welfare Plan, Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund, Painters District Council No. 30 Health and Welfare Fund, Plumbers and Pipefitters Local 572 Health and Welfare Fund, City of Providence, Rhode Island, Sergeants Benevolent Association Health and Welfare Fund, and Patricia Sutter) sue on behalf of those who have similar claims. Together, all these people and entities are a "class" or "class members." One court and one case resolve the issues for all class members, except for those who exclude themselves from ("opt out" of) the class.

| 4. Why is there a new Settlement? |
| --- |

The Court previously approved the Wyeth Settlement. Now, Plaintiffs and Teva have agreed to settle Plaintiffs' claims against Teva. The Court has not decided in favor of the Plaintiffs or Teva. By agreeing to the Settlement, Plaintiffs and Teva avoid the costs and uncertainty of a trial, and Class Members receive the benefits described in this Notice. The proposed Settlement does not mean that any law was broken or that Teva did anything wrong. The parties believe the Settlement is best for all Class Members.

## Who is in the Settlement?

If you received a mailed Notice, then you may be a Class Member. But even if you did not receive a mailed Notice, you may be a Class Member, as described below.

| 5. Who is included in the Settlement? |
| --- |

You are included in the Settlement if, you:

> Are a person or entity who purchased, paid for, and/or reimbursed some or all of the cost of Effexor XR or AB-rated generic versions of Effexor XR for yourself, your family, or your members, employees, insureds, participants, or beneficiaries, from June 14, 2008 through May 31, 2011, in the following states: Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin.

| 6. Who is not included in the Settlement Class? |
| --- |

The Class does not include:
- Teva and Wyeth and their subsidiaries and affiliates;

- State and local governments that by state law can only make claims through the state Attorney General, or are prohibited by law from being represented in legal matters by private counsel on a contingent fee basis;
- Anyone who purchased Effexor XR or its generic equivalent for resale;
- Anyone who purchased Effexor XR or its generic equivalent directly from Wyeth, Teva, or their affiliates;
- Fully insured health plans (*i.e.*, plans that purchased insurance from another third-party payor that covered 100% of the plan's reimbursement for its members);
- Pharmaceutical benefit managers;
- The judges in this case and any members of their immediate families; and
- Anyone that properly excludes themselves from the Class (*see* Question 16).

| **7.   What if I am still not sure if I am included in the Settlement Class?** |
| --- |

If you are not sure whether you are a Class Member, or have any other questions about the Settlement, visit the website, www.EffexorXRIndirectSettlement.com, or call the toll-free number, 1-877-933-2882. You may also send questions to the Claims Administrator at Effexor XR Indirect Purchaser Settlement, c/o A.B. Data, Ltd., P.O. Box 173005, Milwaukee, WI 53217.

# The Benefits of the Settlement

| **8.   What does this Settlement provide?** |
| --- |

If the Settlement with Teva is approved and becomes final, it will provide money to Class Members. Teva will pay $2.25 million to settle the claims against it in this lawsuit. This Settlement would resolve all Class Members' claims against Teva.

This Settlement amount will be used to pay:
- Payments to eligible Class Members;
- Attorneys' fees of up to 34% of the Settlement amount;
- Costs and expenses that were not previously reimbursed in connection with the Wyeth Settlement; and
- Notice and administration costs and expenses.

The Court already approved a settlement with Wyeth totaling $25.5 million.

The Settlement Agreement and Plan of Allocation, available at www.EffexorXRIndirectSettlement.com, have more information.

| **9.   What can I get from this Settlement?** |
| --- |

You can get money from the Settlement with Teva. To get a payment, you must submit a valid Claim Form (*see* Question 11). **Note:** If you already filed a claim in the Wyeth Settlement, you **do not** need to submit another Claim Form; your previous claim for the Wyeth Settlement will also serve as your claim for this new Settlement with Teva.

At this time, it is unknown how much each individual or entity who submits a valid claim will receive. The amount of your payment will depend on the amount of Effexor XR or AB-rated generic versions of Effexor XR you purchased and the number of claims that are filed. Complete details of how your recovery will be calculated are in the Plan of Allocation, which can be viewed at www.EffexorXRIndirectSettlement.com.

| **10.  When will I get my payment from this Settlement?** |
| --- |

The Court must approve the Settlement, and any appeals of that decision must be resolved before any money is distributed to Class Members. The Claims Administrator must also finish processing all the Claim Forms and determine distribution amounts. This process can take several months. Please be patient.

## How to Get a Payment

**11. How can I get a payment from this Settlement?**

To apply for a payment from the Settlement with Teva, you must complete and submit a valid Claim Form. You **do not** need to submit another Claim Form if you already filed a claim in the previous settlement with Wyeth; your previous claim for the Wyeth Settlement will also serve as your claim for this new Settlement with Teva.

If you are a consumer and unless you consent, your identity will not be made public during any part of the claims process.

Claim Forms should be mailed to the address below and must be postmarked by [**Month 00, 2025**]. You can get a Claim Form at www.EffexorXRIndirectSettlement.com or by calling 1-877-933-2882 or writing the address below and requesting a Claim Form.

Effexor XR Indirect Purchaser Settlement
c/o A.B. Data, Ltd.
P.O. Box 173005
Milwaukee, WI 53217

You may also submit a Claim Form online at www.EffexorXRIndirectSettlement.com. If you submit a Claim Form online, you must do so by [**Month 00, 2025**]. Unless a consumer consents, all Claim Form submissions will be kept confidential.

**12. If I previously filed a claim in connection with the Wyeth Settlement, do I need to submit a claim to get a payment from this Settlement?**

No. If you already submitted a claim in connection with the Wyeth Settlement, you do not need to submit another claim to get a payment from this Settlement with Teva.

**13. Can I get a payment from this Settlement if I excluded myself from the previous Wyeth Settlement?**

Yes. If you excluded yourself from the previous Wyeth Settlement (and do not exclude yourself from the new Settlement with Teva), you can file a claim seeking payment from this Settlement with Teva.

**14. Can I submit a new claim for the previous Wyeth Settlement?**

No. The deadline to submit a claim in the Wyeth Settlement has passed, and you can no longer submit a new claim to get a payment from that Settlement.

## Excluding Yourself from the Settlement

If you do not want a payment from this Settlement with Teva, but you want to keep the right to sue or continue to sue Teva on your own concerning the legal issues in this case, then you must take steps to get out of the Class. This is called excluding yourself and is sometimes referred to as "opting out" of the Class.

**15. What am I giving up if I stay in the Settlement?**

If the Settlement becomes final, you will give up your right to sue Teva on your own for the claims being resolved by this Settlement. Unless you exclude yourself, the Court's decisions will bind you.

The specific claims you are giving up (the "released claims") against Teva are described in the Settlement Agreement, available at www.EffexorXRIndirectSettlement.com. The Settlement Agreement describes the released claims in detail, so please read it carefully.

If you have any questions, you can talk to the lawyers listed in Question 21 for free, or you can talk to your own lawyer if you have questions about what this means.

| **16. What if I do not want to be a part of this Settlement?** |
| --- |

If you do not want to be part of the Settlement with Teva, you must exclude yourself from the Class. If you exclude yourself, you will not receive any benefits that may result from this Settlement, but you will keep your right to sue Teva on your own for the claims in this lawsuit.

To exclude yourself, you must email or mail a letter to the Claims Administrator stating that you want to exclude yourself from the Class in this Settlement. The Claims Administrator's email address is info@EffexorXRIndirectSettlement.com, and its mailing address is:

Effexor XR Indirect Purchaser Settlement
EXCLUSIONS
c/o A.B. Data, Ltd.,
P.O. Box 173001
Milwaukee, WI 53217

Your email or letter must include:
- Your full name, current mailing address, and telephone number;
- A statement that you want to be excluded from the Teva Settlement Class in *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479; and
- Your signature (NOTE: You must personally sign the letter).

You must mail or email your letter so that it is postmarked or submitted by **[Month 00, 2025]**. This will be the only opportunity you will have to exclude yourself from the Settlement Class.

Third-party payors wishing to exclude themselves from the Settlement Class must also submit data (i) sufficient to establish Class membership, and (ii) reflecting their purchases of, and payments for, branded and generic Effexor XR. Class Members shall not be permitted to exclude other Class Members. Moreover, group or class-wide exclusions shall not be permitted. A request for exclusion must be submitted by each Class Member on an individual basis, and any request for exclusion by a purported authorized agent or representative of a Class Member must include proof of the representative's legal authority and authorization to act and request exclusion on behalf of each Class Member they seek to opt out.

You cannot exclude yourself over the telephone. Consumer identities will not be made public as part of the exclusion process. Unless a consumer consents, the Claims Administrator, the Court, Class Counsel, and Defense Counsel will keep that information confidential.

| **17. If I exclude myself, can I still get a payment from this Settlement?** |
| --- |

No. You will not get a payment from the Teva Settlement if you exclude yourself from this Settlement.

| **18. If I do not exclude myself, can I sue Teva for the same thing later?** |
| --- |

No. If the Court approves the proposed Settlement and you do not exclude yourself, you give up (or "release") the right to sue Teva for the claims made in this lawsuit. The specific claims you are giving up against Teva are described in detail in the Settlement Agreement, available at www.EffexorXRIndirectSettlement.com. Please read the Settlement Agreement carefully.

**19.  If I excluded myself from the Class in the Wyeth Settlement, do I need to exclude myself again?**

Yes. If you do not want to be part of this Settlement with Teva, you need to exclude yourself by the deadline set forth above, even if you previously excluded yourself from the previous Wyeth Settlement.

**20.  Can I still exclude myself from the previous Wyeth Settlement?**

No. The deadline to exclude yourself from the previous Wyeth Settlement has passed.

# The Lawyers Representing You

**21.  Do I have a lawyer in the case?**

Yes. The Court has appointed lawyers to represent you and the other Class Members. These lawyers are called "Class Counsel":

| CLASS COUNSEL | |
|---|---|
| James E. Cecchi<br>Carella, Byrne, Cecchi, Brody &<br>Agnello, P.C.<br>5 Becker Farm Road<br>Roseland, NJ 07068 | Michael M. Buchman<br>Motley Rice LLC<br>800 Third Avenue<br>New York, NY 10017 |
| Kenneth A. Wexler<br>Wexler Boley & Elgersma LLP<br>311 S. Wacker Drive<br>Suite 5450<br>Chicago, IL 60606 | Richard J. Burke<br>Quantum Legal LLC<br>2801 Lakeside Drive<br>Suite 100<br>Bannockburn, IL 60015 |
| Jeffrey L. Kodroff<br>Spector, Roseman & Kodroff, P.C.<br>2001 Market Street, Suite 3420<br>Philadelphia, PA 19103 | James R. Dugan, II<br>The Dugan Law Firm, PLC<br>One Canal Place<br>365 Canal Street, Suite 1000<br>New Orleans, LA 70130 |
| Marvin A. Miller<br>Miller Law LLC<br>53 W. Jackson Blvd., Suite 1320<br>Chicago, IL 60604 | |

You will not be charged for these lawyers. If you want to be represented by another lawyer, you may hire one at your own expense.

**22.  How will the lawyers be paid?**

Class Counsel will ask the Court for attorneys' fees of up to 34% of the Settlement amount, plus costs and expenses that were not previously reimbursed in connection with the Wyeth Settlement. Any attorneys' fees, expenses, and costs approved by the Court will be paid from the Settlement amount.

## Objecting to the Settlement

| 23. How do I comment on or object to the Settlement? |
| --- |

To comment on or object to the Settlement, you (or your lawyer if you have one) must send a written comment or objection to the Court and the counsel identified below, by way of the Court's electronic filing system or by first-class mail. You must send your comment or objection postmarked on or before [**Month 00, 2025**]. Your written comment or objection must include all grounds for your objection and can include any supporting materials, papers, or briefs you want the Court to consider. Your written comment or objection must include:

- Your name, address, telephone number, and an explanation of your objection;
- The case name and number: *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479;
- The name, address, and telephone number of any counsel representing you in connection with your objection;
- A statement as to whether you intend to appear at the Fairness Hearing (discussed further in Questions 26-28, below) and the identities of any counsel who will be appearing on your behalf;
- A list of all other objections submitted by you, or your counsel, to any class-action settlements submitted in any court in the United States in the previous five (5) years, including the full case name, the jurisdiction in which the objection was filed, and the docket number (or a statement that there are no such objections); and
- Documentation demonstrating that you are a member of the Class and/or this statement, followed by your signature: "I declare under penalty of perjury under the laws of the United States of America that [insert your name] is a member of the Class."

You <u>must</u> mail your comment or objection to the Court and mail copies to Class Counsel and Teva's Counsel (mailing addresses below). All comments and objections must be postmarked by [**Month 00, 2025**].

Individual consumers who do not want their identities to be put on the public record as part of the objection process may send their objection only to the Claims Administrator (mailing address also included below), who will redact (or "black out") such consumers' names, addresses, and telephone numbers and then provide such redacted versions to the Court for filing on the public court docket. The Claims Administrator will also send copies of the original, unredacted objections to the Court, Class Counsel, and Teva's Counsel. How the Judge and the parties treat the merits of your objection does not depend on whether you keep your identifying information off the public record.

| Court | Class Counsel | Teva's Counsel | Claims Administrator |
| --- | --- | --- | --- |
| Clerk<br>United States District Court<br>District of New Jersey<br>Clarkson S. Fisher Building<br>& U.S. Courthouse<br>402 East State Street<br>Room 2020<br>Trenton, NJ 08608 | James E. Cecchi<br>Carella, Byrne, Cecchi, Brody & Agnello, P.C.<br>5 Becker Farm Road<br>Roseland, NJ 07068<br>jcecchi@carellabyrne.com | Devora W. Allon, P.C.<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>devora.allon@kirkland.com | Effexor XR Indirect Purchaser Settlement OBJECTIONS<br>c/o A.B. Data, Ltd.,<br>P.O. Box 173001<br>Milwaukee, WI 53217 |

Any lawyer representing a Class Member for the purpose of making comments or objections must also file a Notice of Appearance with the Court using the Court's Case Management/Electronic Case Files (CM/ECF) system.

You may file a claim even if you object to, or comment on, the Settlement. Whether or not you object, you must have previously filed a claim in connection with the Wyeth Settlement or file a claim by the deadline in Question 11 above to receive money from the Settlement with Teva.

**24. Can I object to the previous settlement with Wyeth?**

No. The deadline to object to the previous Wyeth Settlement has passed.

**25. What is the difference between objecting and asking to be excluded?**

Objecting is simply telling the Court that you do not like something about the Settlement. You can only object if you stay in the Class. If you object to the Settlement, you are still a Class Member, and you can submit a Claim Form by [**Month 00, 2025**] (if you did not do so already in connection with the Wyeth Settlement, in which case, you do not need to submit another claim to get a payment from this Settlement with Teva).

Excluding yourself is telling the Court that you do not want to be a part of the Class. If you exclude yourself, you cannot receive a payment from this Settlement. You also will have no basis to object to the Settlement or appear at the Fairness Hearing (discussed below) because it no longer affects you.

## The Fairness Hearing

The Court will hold a hearing, called a Fairness Hearing, to decide whether to approve the Settlement. You may attend and ask to speak, but you do not have to do so.

**26. When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Fairness Hearing on [**Month 00, 2025**] at [**XX:00 x.m.**] Eastern in Courtroom 4W of the United States District Court for the District of New Jersey, Clarkson S. Fisher Building & U. S. Courthouse, 402 East State Street, Trenton, New Jersey. The hearing may be moved to a different date, time, or location without additional notice, so it is a good idea to check www.EffexorXRIndirectSettlement.com for updates.

At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them and will listen to people who have asked to speak at the Fairness Hearing. The Court may also decide whether to award attorneys' fees, costs, and expenses. After the Fairness Hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

**27. Do I have to come to the Fairness Hearing?**

No. Class Counsel will answer questions the Court may have at the Fairness Hearing. But you are welcome to come at your own expense. If you send an objection, you do not have to come to Fairness Hearing to talk about it. As long as you mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it is not necessary.

**28. May I speak at the Fairness Hearing?**

Yes, you may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send or email a letter stating that it is your "Notice of Intention to Appear in *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479." Be sure to include your name, address, telephone number, and your signature, along with copies of any papers, exhibits, or other evidence and the identity of all witnesses you intend to present to the Court in connection with the Fairness Hearing. Your Notice of Intention to Appear must be postmarked no later than [**Month 00, 2025**] and emailed or sent to the addresses listed in Question 23.

## If You Do Nothing

**29. What happens if I do nothing?**

If you already filed a claim in the Wyeth Settlement and do nothing, your previous claim for the Wyeth Settlement will also serve as your claim for this new Settlement with Teva, and you may get a payment from this Settlement too. If you did not already file a claim and do nothing now, you will not get a payment from this Settlement.

You will also be legally bound by the Court's orders, good or bad. You will remain in the Class and give up your right to sue Teva on your own for the legal claims made in this lawsuit.

## Getting More Information

| 30. How do I get more information? |
| --- |

This notice is only a summary. More details are in the Settlement Agreement, available at www.EffexorXRIndirectSettlement.com. You also may write with questions to the Clam Administrator at Effexor XR Indirect Purchaser Settlement, c/o A.B. Data, Ltd., PO Box 173005, Milwaukee, WI 53217 or call the toll-free number at 1-877-933-2882.

Complete copies of public pleadings, Court rulings, and other filings are available for review and copying at the Clerk's office during normal business hours. The address is United States District Court for the District of New Jersey, 402 East State Street, Trenton, NJ 08608.

Please do not contact the Court or the Judge regarding this Notice.

DATED: Month 00, 2025                              BY ORDER OF THE COURT
                                                   UNITED STATES DISTRICT COURT
                                                   DISTRICT OF NEW JERSEY

# EXHIBIT D

Legal Notice

## Did You Purchase, Pay for, or Provide Reimbursement for Effexor XR and/or Its Generic Equivalent?
## You Could Get Money from a New Settlement

There is a new $2.25 million settlement (the "Settlement") with Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva") in a class-action lawsuit claiming that Wyeth (also known as Wyeth LLC and formerly known as Wyeth, Inc. and American Home Products); Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; and Wyeth Pharmaceuticals Company (collectively, "Wyeth") and Teva unlawfully kept generic versions of Effexor XR off the market. Plaintiffs allege this conduct caused consumers and third-party payors to pay more for brand and generic Effexor XR than they should have. Wyeth and Teva deny they did anything wrong. The Court previously approved a $25.5 million settlement with Wyeth (the "Wyeth Settlement"). No one is claiming that Effexor XR is unsafe.

### Who is included in the Settlement?

You may be included in the Settlement if you are a person or entity who purchased, paid for, and/or reimbursed some or all of the cost of Effexor XR or AB-rated generic versions of Effexor XR for yourself, your family, or your members, employees, insureds, participants, or beneficiaries, from June 14, 2008 through May 31, 2011, in the following states: Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin.

A more detailed notice, including the full class definition and who is not included, is available at www.EffexorXRIndirectSettlement.com.

### What does the Settlement provide?

Teva will pay $2.25 million to settle this lawsuit. This amount will be used to pay (1) money to eligible Class Members; (2) notice and administration costs; (3) attorneys' fees; and (4) costs and expenses not previously reimbursed in connection with the Wyeth Settlement.

### How can I get a payment?

You must submit a valid claim form to apply for payment from the Settlement Fund. The amount of your payment will depend on the amount of Effexor XR or AB-rated generic versions of Effexor XR you purchased and the number of claims that are filed.

If you already filed a claim in connection with the Wyeth Settlement, you **do not** need to submit another claim; your previous claim form for the Wyeth Settlement will also serve as your claim form for this new Settlement with Teva. If you did not previously submit a claim in connection with the Wyeth Settlement, the claim forms, and information on how to submit them, are available at www.EffexorXRIndirectSettlement.com. Claim forms must be postmarked (if mailed) or received (if submitted online) on or before [**Month 00, 2025**]. You can no longer file a claim for the Wyeth Settlement.

### What are my rights?

Even if you do nothing, you will be bound by the Court's decisions. If you want to keep your right to sue Teva yourself, you must exclude yourself by [**Month 00, 2025**]. If you do not exclude yourself, you may object to the Settlement by [**Month 00, 2025**]. Detailed instructions about how to act on these rights are available at www.EffexorXRIndirectSettlement.com.

The Court will hold a hearing on [**Month 00, 2025**] to consider whether to approve the Settlement and a request for attorneys' fees of up to 34% of the Settlement, plus costs and expenses that were not previously

reimbursed in connection with the Wyeth Settlement. You or your own lawyer may appear and speak at the hearing at your own expense. The Court may change these deadlines or the hearing date and time. Check the website below for updates. Please *do not* call the Court or the Clerk of the Court for information about the Settlement.

**For more information: 1-877-933-2882**                    **www.EffexorXRIndirectSettlement.com**

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *In re Effexor XR Antitrust Litigation*<br><br>This Document Relates To:<br>All Indirect Purchaser Class Actions | Civil Action No. 3:11-5661(ZNQ)(JBD)<br><br>Master Docket No. 3:11-cv-05479 (ZNQ)<br>(JBD) |

## INSTRUCTIONS FOR SUBMITTING YOUR THIRD-PARTY PAYOR CLAIM FORM

To qualify to receive a payment from the new Settlement with Teva (the "Teva Settlement"), you must complete and submit this Claim Form. However, if you already submitted a Claim Form in connection with the previous settlement with Wyeth in this litigation (the "Wyeth Settlement"), you **do not** need to submit another claim to receive a payment from the Teva Settlement.

A third-party payor ("TPP") Class Member, or an authorized agent for a TPP, can complete this Claim Form. If both a TPP Class Member and its authorized agent submit a Claim Form, the Claims Administrator will consider only the TPP Class Member's Claim Form. The Claims Administrator may ask for supporting documents in addition to the documents and information requested below. The Claims Administrator may reject a claim if the TPP Class Member or its authorized agent does not provide all requested documents in a timely manner.

If you are a TPP Class Member submitting a Claim Form on your own behalf, complete "Section A – COMPANY OR HEALTH PLAN THIRD-PARTY PAYOR CLASS MEMBER ONLY," in addition to the other information requested by this Claim Form.

If you are an authorized agent of one or more TPP Class Members, you must provide the information requested in "Section B – AUTHORIZED AGENT ONLY," in addition to the other information requested by this Claim Form. **Do not submit a Claim Form on behalf of any other TPP Class Member unless that TPP Class Member provided you with prior written authorization to submit this Claim Form. If any conflicts arise that require resolution, you may be required to provide such written authority to the Claims Administrator.**

If you are submitting a Claim Form only as an authorized agent of one or more TPP Class Members, you may submit a separate Claim Form for each TPP Class Member OR you may submit one Claim Form for all such TPP Class Members, so long as you provide the information required for each TPP Class Member on whose behalf you are submitting this Claim Form.

If you are submitting Claim Forms on both your own behalf as a TPP Class Member AND as an authorized agent on behalf of one or more TPP Class Members, you should submit one Claim Form for yourself, completing Section A, and another Claim Form or Claim Forms as an authorized agent for the other TPP Class Member(s), completing Section B.

You can submit your Claim Form by mail or electronically on the Settlement website (www.EffexorXRIndirectSettlement.com). You may need to provide certain requested documents to substantiate your claim.

If you did not already submit a completed Claim Form in connection with the Wyeth Settlement, or you do not complete and submit your Claim Form postmarked (if mailed) or received (if submitted online) by [**Month 00, 2025**], you will not receive a payment from the Teva Settlement. Submitting a Claim Form does not guarantee you will receive payment from the Teva Settlement. If the Claims Administrator rejects or reduces your Claim, you may follow the dispute resolution process described on page 6-7.

# CLAIM INFORMATION AND DOCUMENTATION REQUIREMENTS

Please provide information to support your Claim of membership in the Class in the Teva Settlement, which for TPPs is defined as follows:

> All entities in Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin (the "Class States") that purchased, paid, and/or provided reimbursement for Effexor XR or AB-rated generic versions of Effexor XR for consumption by their members, employees, insureds, participants, or beneficiaries, from June 14, 2008 through May 31, 2011 (the "Class Period"). For purposes of the Class definition, persons or entities "purchased" Effexor XR or its generic versions if they paid or reimbursed some or all of the purchase price. An entity is considered to be "in" a given Class State if a purchase took place in that Class State (*i.e.*, if a person for whom the entity purchased, paid, or provided reimbursement for Effexor XR or an AB-rated generic version of Effexor XR purchased the drug in a pharmacy, or received the drug by mail-order prescription, in that Class State).

The Class **does not include** the following entities:

a) Wyeth, Inc.; Wyeth—a/k/a Wyeth LLC, f/k/a Wyeth, Inc., f/k/a American Home Products; Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; Wyeth Pharmaceuticals Company (collectively, "Wyeth"); Teva Pharmaceuticals USA, Inc.; Teva Pharmaceutical Industries Ltd. (collectively, "Teva"); and their respective subsidiaries and affiliates;

b) State and local governments to the extent their claims may be asserted under applicable state law only by the state Attorney General, or are otherwise prohibited by applicable law from being asserted by private counsel on a contingent fee basis;

c) All entities that purchased Effexor XR or its generic equivalent for purposes of resale or directly from Wyeth, Teva, or their affiliates;

d) Fully insured health plans (*i.e.*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

e) Pharmaceutical benefit managers; and

f) Entities who excluded themselves from (or opted out of) the Class in the Teva Settlement.

The following information should be provided to support your claim as a TPP Class Member:

a) Name of TPP Class Member;

b) NDC Number (the Settlement website provides a list of the NDCs the Claims Administrator will accept) – *e.g.*, 00000-0000-00; or Drug Name – *e.g.*, extended-release venlafaxine hydrochloride;

c) Fill Date or Date of Purchase – *e.g.*, 06/01/2012;

d) Location (State) of Purchase – *e.g.*, CA;

e) Location (State) of insured or beneficiary; and

f) Amount Paid by TPP net of co-pays, deductibles, and co-insurance – *e.g.*, $20.00.

If you are submitting a Claim Form on behalf of multiple TPP Class Members, also provide the following information for each purchase or reimbursement:

g) Plan or Group Name; and

h) Plan or Group FEIN – provide group number for each transaction.

An exemplar spreadsheet containing these categories and a list of applicable NDC Numbers can be downloaded from the Settlement website, www.EffexorXRIndirectSettlement.com. Please use this format if possible, and provide the electronic data in Microsoft Excel, ASCII flat file pipe "|", tab-delimited, or fixed-width format.

Data and/or information demonstrating membership in the class is mandatory. Transaction data is mandatory for claims of

$300,000 or more, but the Claims Administrator may also require transaction data for claims of less than $300,000, so keep related transaction data and any other documentation supporting your claim in case the Claims Administrator requests it later. If your claim is for less than $300,000, you should still provide the transaction data with your claim submission if you can. If, after an audit of your claim, the Claims Administrator still has questions about your claim and you have not provided sufficient substantiation of your claim, the Claims Administrator may reject your claim.

Please contact the Claims Administrator at 1-877-933-2882 with any questions about the required claims information or documentation.  Please do not contact the Court concerning these issues.

<table>
<tr><td>

**MUST BE POSTMARKED ON
OR BEFORE,
OR SUBMITTED
ONLINE BY [Month 00, 2025]**

</td><td>

*In re Effexor XR Antitrust Litigation
Indirect Purchaser Settlement*

</td></tr>
</table>

## THIRD-PARTY PAYOR CLAIM FORM

Use Blue or Black Ink Only

**Attention: This form should only be filled out on behalf of a <u>Third-Party Payor</u> (or its <u>authorized agent</u>) and only if you *did not* already file a claim in connection with the Wyeth Settlement.** If you are a Consumer who did not already file a claim in connection with the Wyeth Settlement, please fill out the Consumer Claim Form, available at www.EffexorXRIndirectSettlement.com.

■

- Complete Section A only if you are filing as an individual TPP Class Member.
- Complete Section B only if you are an authorized agent filing on behalf of one or more TPP Class Members.

**Section A: Company or Health Plan Class Member Only**

Company or Health Plan Name

Contact Name

Address 1

Address 2                                                                 Floor/Suite

City                                          State            Zip Code

Area Code - Telephone Number                      Tax Identification Number

Email Address

List other names by which your company or health plan has been known or other Federal Employer Identification Numbers ("FEINs") it has used since June 14, 2008.

☐  Health Insurance Company/HMO          ☐  Self-Insured Employee Health or Pharmacy Benefit Plan

☐  Self-Insured Health & Welfare Fund

☐  Other (Explain):

---

**Section B: Authorized Agent Only**

As an authorized agent, please check how your relationship with the TPP Class Member is best described. (You must provide documents demonstrating this relationship.)

☐    Third-Party Administrator or Administrative Services Only Provider

☐    Pharmacy Benefits Manager

☐    Other (Explain): _____

Authorized Agent's Company Name

_____

Contact Name

_____

Address                                                                                           Floor/Suite

_____          _____

City                                                State                         Zip Code

_____          _____          _____

Area Code - Telephone Number                          Authorized Agent's Tax Identification Number

_____                          _____

Email Address

_____

Please list the name and FEIN of every TPP Class Member (*i.e.*, company or health plan) for which you were authorized to submit this Claim Form. (Attach additional sheets to this Claim Form as needed.) Alternatively, you may submit the requested list of TPP Class Member names and FEINs in an electronic format, such as Excel or a tab-delimited text file. Please contact the Claims Administrator to determine which formats are acceptable.

| TPP CLASS MEMBER'S NAME | TPP CLASS MEMBER'S FEIN |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

## Section C: Purchase Information

Please type or print in the box below, the total amount, from June 14, 2008 through May 31, 2011, that you paid or reimbursed for Effexor XR or AB-rated generic versions of Effexor XR, for consumption by your members, employees, insureds, participants, or beneficiaries, where the person(s) purchased the drug in a pharmacy, or received Effexor XR or AB-rated generic versions of Effexor XR by mail-order prescription, in Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and/or Wisconsin.

Please note: For retail purchases, the State of purchase is the State where the pharmacy is physically located. If any purchases were made by mail order, the State to which the prescription was sent is considered the place of purchase. For example, if Effexor XR or generic Effexor XR was purchased by mail order and the prescription was sent to Arizona, Arizona would be considered the place of purchase for that transaction and the purchase would be eligible for a recovery. On the other hand, if Effexor XR or generic Effexor XR was purchased by mail order and the prescription was sent to South Carolina, that transaction would not be eligible for a recovery because the place of purchase would be considered South Carolina, which is not one of the Class States covered by the Settlement.

If you are an authorized agent completing this Claim on behalf of more than one TPP Class Member, enter the total amount paid by all the TPP Class Members included in this Claim. You must also provide the information required for each TPP Class Member on whose behalf you are submitting this Claim Form. An exemplar spreadsheet containing the required categories of information can be downloaded from the Settlement website, www.EffexorXRIndirectSettlement.com.

Do not submit a Claim Form for or on behalf of any of the entities:

a) Wyeth, Teva, and their respective subsidiaries and affiliates;

b) State and local governments to the extent their claims may be asserted under applicable state law only by the state Attorney General, or are otherwise prohibited by applicable law from being asserted by private counsel on a contingent fee basis;

c) All entities that purchased Effexor XR or its generic equivalent for purposes of resale or directly from Wyeth, Teva, or their affiliates;

d) Fully insured health plans (*i.e.*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

e) Pharmaceutical benefit managers; and

f) Any entity that excluded themselves from (or opted out of) the Class in the Teva Settlement.

| | |
|---|---|
| Total amount (net of co-pays, deductibles, and co-insurance) you paid or reimbursed for **Effexor XR** and/or **its AB-rated generic version(s),** in the Class States, from **June 14, 2008 through May 31, 2011,** for consumption by your members, employees, insureds, participants, or beneficiaries: | $ |

☐  Check this box and sign the certification in Section E to confirm that the Claimant indicated in Section A is a TPP Class Member and none of the exclusion criteria above is applicable. If any of the exclusion criteria is applicable to the Claimant, the Claims Administrator may reject the Claim.

## Section D: Proof of Payment and Disputes Regarding Claim Amounts

Please provide as much of the information requested above in the "CLAIM INFORMATION AND DOCUMENTATION REQUIREMENTS" section in the instructions as possible.

Transaction data supporting claims is **mandatory** for claims of $300,000 or more, but the Claims Administrator may also require transaction data for claims of less than $300,000, so please keep related transaction data and any other documentation supporting your claim (*e.g.*, invoices) in case the Claims Administrator requests it later. If, after an audit of your claim, the Claims Administrator still has questions about your claim and you have not provided sufficient substantiation of your claim, the Claims Administrator may reject your claim. The business records utilized to establish the list of transactions claimed may be requested during the review process; please maintain this information.

If the Claims Administrator rejects or reduces your claim and you believe the rejection or reduction is in error, you may contact the Claims Administrator to request further review. If the dispute concerning your claim cannot be resolved by the Claims Administrator and Class Counsel, you may ask the Court to review your claim.

To request Court review, you must send the Claims Administrator a signed written statement (a) stating your reasons for contesting the rejection or payment determination regarding your claim and (b) specifically stating that you "request that the Court review the determination regarding this claim." You must include all documentation supporting your argument(s). The Claims Administrator and Class Counsel will present the dispute to the Court for review, which may include public filing with the Court of your claim and the supporting documentation. Please note: Court review should only be sought if you disagree with the Claims Administrator's determination regarding your claim.

## Section E: Certification

By signing below, I hereby swear and affirm that (1) I have read and am familiar with the contents of the instructions accompanying this Claim Form; (2) the information I provided in this Claim Form and in any documents I have attached are true, correct, and complete to the best of my knowledge; and (3) I have provided all the information requested above to the extent I have it.

I further certify that I, or the TPP Class Member(s) I represent:

a) am/is/are an entity that purchased, paid for, or reimbursed some or all of the purchase price of Effexor XR or AB-rated generic versions of Effexor XR for consumption by my/its/their members, employees, insureds, participants, or beneficiaries, in one or more of the Class States, from June 14, 2008 through May 31, 2011; and

b) am/is/are not one of the following:

i.) Wyeth, Teva, and their respective subsidiaries and affiliates;

ii.) State and local governments to the extent their claims may be asserted under applicable state law only by the state Attorney General, or are otherwise prohibited by applicable law from being asserted by private counsel on a contingent fee basis;

iii.) Entities that purchased Effexor XR or its generic equivalent for purposes of resale or directly from Wyeth, Teva, or their affiliates;

iv.) Fully insured health plans (*i.e.*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members); or

v.) Pharmaceutical benefit managers.

I further certify that neither I, nor the TPP Class Member(s) I represent, asked to be excluded ("opted out") from the Class in the Teva Settlement.

I further certify that I, and the TPP Class Member(s) I represent, have read and are familiar with the releases stated in Paragraph 12 of the Settlement Agreement. The releases in that Paragraph provide as follows:

a) Upon the occurrence of the Effective Date as defined in Paragraph 6 hereof, and in consideration for the Settlement Fund Amount described in this Settlement Agreement, Indirect Purchaser Plaintiffs and the Indirect Purchaser Class—except those who requested exclusion from the Indirect Purchaser Class and whose request was approved by the Court—on behalf of themselves and their respective past and present parents, subsidiaries, and affiliates, general and limited partners, officers, directors, employees, agents, attorneys, servants, predecessors, successors, heirs, executors, administrators, and representatives (the "Releasing Parties"), shall release and forever discharge, and covenant not to sue Teva and its respective past, present, and future parents, subsidiaries, divisions, affiliates, joint ventures, stockholders, general partners, limited partners, officers, directors, management, supervisory boards, insurers, employees, agents, servants, trustees, associates, attorneys, and any of their legal representatives (and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing) (the "Released Parties"), with respect to any and all past, present, or future liabilities, claims, demands, obligations, suits, damages, penalties, levies, executions, judgments, debts, charges, actions, or causes of action, at law or in equity, whether class, individual, or otherwise in nature, and whether known or unknown, arising out of or relating to any conduct, events, or transactions, prior to the date of preliminary approval of this Settlement Agreement, (a) alleged, or which reasonably could have been alleged, in the Indirect Purchaser Class Action concerning the alleged anticompetitive scheme to prevent and delay approval and market entry of AB-rated generic equivalents of Effexor XR, or (b) concerning end-payor purchases of Effexor XR and/or its AB-rated generic equivalents in the Class States and arising under the Sherman Act, 15 U.S.C. §§ 1 & 2, *et seq.*, or any other federal or state statute or common-law doctrine relating to antitrust or consumer protection (collectively, the "Released Claims"). Upon the Effective Date, the Releasing Parties will be forever barred and enjoined from commencing, instituting, prosecuting, or continuing to prosecute any action or other proceeding in any forum whatsoever, including any court of law or equity, arbitration tribunal, or administrative forum, asserting the Released Claims against the Released Parties.

b) In addition, Indirect Purchaser Plaintiffs, on behalf of themselves and all other Releasing Parties, hereby expressly waive, release, and forever discharge, upon the Settlement becoming final, any provisions, rights, and benefits conferred by Section 1542 of the California Civil Code, which reads:

> Section 1542. General Release; extent. A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party; or by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to Section 1542 of the California Civil Code. The Releasing Parties may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims which are the subject matter of this Paragraph 12, but each Releasing Party hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon this Settlement becoming final, any known or unknown, suspected or unsuspected, asserted or unasserted, contingent or non-contingent claim that would otherwise fall within the definition of Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

c) Reservation of Claims. The Releasing Parties intend by this Settlement Agreement to release only Teva and the Released Parties with respect to the Released Claims. The Releasing Parties specifically do not intend this Settlement Agreement, or any part hereof or any other aspect of the proposed Settlement Agreement, to compromise or otherwise affect in any way any rights the Releasing Parties have or may have against any other person, firm, association, company, or corporation whatsoever, including Wyeth. The release set forth in this Paragraph 12 is not intended to and shall not release any claims other than the Released Claims.

d) This Settlement is not intended to and does not release claims arising in the ordinary course of business between the Releasing Parties and the Released Parties that are unrelated to the allegations in the Indirect Purchaser Class Action, such as claims under Article 2 of the Uniform Commercial Code (pertaining to Sales), the laws of negligence or product liability or implied warranty, breach of contract, breach of express warranty, or personal injury.

To the extent I was authorized to submit this Claim Form on behalf of one or more TPP Class Members and accordingly am submitting this Claim Form as an authorized agent, and to the extent I have been authorized to receive on behalf of the TPP Class Member(s) any and all amounts from the Settlement that may be allocated to them, I certify that such authority has been properly vested in me in writing, that I can and will submit such written authorization to the Claims Administrator if any conflicts arise that require resolution, and that I will fulfill all duties I may owe the Class Member(s). If amounts from the Settlement are distributed to me, and a TPP Class Member later claims I did not have the authority to claim and/or receive such amounts on its behalf, I and/or my employer will hold the Class, Class Counsel, and the Claims Administrator harmless with respect to any claims made by the TPP Class Member.

I/We hereby submit to the jurisdiction of the United States District Court for the District of New Jersey for all purposes connected with this Claim Form, including resolving disputes related to this Claim Form. I/We acknowledge that if I/we provided any false information or representations related to this claim, I/we may be subject to sanctions, including criminal prosecution. I agree to supplement the Claim Form by furnishing documentary backup for the information provided herein upon request of the Claims Administrator.

**I certify that the above information supplied by the undersigned is true and correct to the best of my knowledge and that this Claim Form was executed this _____ day of _____ 2025.**

Signature

Position/Title

Print Name

Date

Mail your completed Claim Form, along with any supporting documents as described in the CLAIM INFORMATION AND DOCUMENTATION INSTRUCTIONS on pages 2-3 above, to the address below, postmarked no later than [**Month 00, 2025**] or submit the information online at the website below by that date:

Effexor XR Indirect Purchaser Settlement
c/o A.B. Data, Ltd.
P.O. Box 173005
Milwaukee, WI 53217
Toll-Free Telephone: 1-877-933-2882
Website: www.EffexorXRIndirectSettlement.com

**REMINDER CHECKLIST:**

1.  Please complete and sign the above Claim Form or complete the online Claim Form.  Attach or upload documents supporting your claim.
2.  Keep a copy of your Claim Form and supporting documents for your records.
3.  If you would also like a receipt acknowledging your Claim Form was received, please complete the form online or mail this form via Certified Mail, Return Receipt Requested.

If you move and/or your name changes, please send your new address and/or your new name or contact information to the Claims Administrator at info@EffexorXRIndirectSettlement.com or via U.S. Mail at the address above.

# EXHIBIT F

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *In re Effexor XR Antitrust Litigation*<br><br>This Document Relates To:<br>All Indirect Purchaser Class Actions | Civil Action No. 3:11-5661 (ZNQ)(JBD)<br><br>Master Docket No. 3:11-cv-05479 (ZNQ)(JBD) |

## Instructions for Submitting Your Consumer Claim Form

If you are a Class Member who is a consumer and would like to qualify to receive a payment from the Teva Settlement, you must complete and submit this Claim Form. However, if you already submitted a Claim Form in connection with the previous settlement with Wyeth in this litigation (the "Wyeth Settlement"), you **do not** need to submit another claim to receive a payment from the Teva Settlement.

Your identity will not be made public during any part of the claims process. If you did not already file a claim in connection with the Wyeth Settlement, you must complete this Claim Form and mail it to the Claims Administrator at the address provided below, postmarked **no later than [Month 00, 2025],** or you can submit your claim online at www.EffexorXRIndirectSettlement.com, **no later than [Month 00, 2025]**.

- Complete all required portions of the attached Claim Form:

1. Complete *Section A*. You must provide your name and contact information.

2. Review and complete *Section B* to confirm you qualify to file a claim.

3. Complete *Section C* to provide information about your total purchases of Effexor XR or generic versions of Effexor XR (also known as extended-release venlafaxine hydrochloride).

4. Review *Section D* and provide documentation to show you purchased or paid for Effexor XR or generic versions of Effexor XR at least once.

5. Review *Section E* and sign the Claim Form to certify that the information you provided is true and correct to the best of your knowledge.

- By signing and submitting the Claim Form, you are swearing under penalty of perjury that you qualify to submit a claim according to the criteria given in *Section B*.

- You have two options to submit your Claim Form:

    o You can mail your completed and signed Claim Form and supporting documents by First-Class U.S. Mail, postage prepaid, postmarked no later than **[Month 00, 2025]**, to:

        ***Effexor XR Indirect Purchaser Settlement***
        **c/o A.B. Data, Ltd.**
        **P.O. Box 173005**
        **Milwaukee, WI 53217**

        **OR**

    o You can complete and submit the Claim Form and upload supporting documents on the Settlement website, www.EffexorXRIndirectSettlement.com, no later than **[Month 00, 2025]**. If you complete the online Claim Form, you will receive a receipt saying that your claim was submitted. If you choose this option and file a claim electronically, your electronic signature and submission of the form will conform to the requirements of the Electronic Signatures Act, 15 U.S.C. § 7001, *et seq.*, and will have the same force and effect as if you signed the Claim Form in hard copy.

- If you did not already submit a completed Claim Form in connection with the Wyeth Settlement, or your completed Claim Form in connection with the Teva Settlement is not postmarked (if mailed) or received (if

submitted) online by **[Month 00, 2025]**, you will not receive any payment from the Teva Settlement. Submitting this Claim Form does not guarantee that you will receive payment from the Teva Settlement. If the Claims Administrator rejects or reduces your Claim, you may follow the dispute resolution process described on page 5.

<table>
<tr><td>

**MUST BE
POSTMARKED ON OR
BEFORE,
OR SUBMITTED
ONLINE BY,
[MONTH 00, 2025]**

</td><td>

*In re Effexor XR Antitrust Litigation
Indirect Purchaser Settlement*

</td></tr>
</table>

## <u>CONSUMER CLAIM FORM</u>

Use Blue or Black Ink Only

**Attention: This form should only be filled out if you are a <u>Consumer</u> and you did not already file a claim in connection with the Wyeth Settlement.**

If you are a Third-Party Payor and you did not already file a claim in connection with the Wyeth Settlement, please fill out the Third-Party Payor Claim Form, available at www.EffexorXRIndirectSettlement.com.

### Section A: Claimant Identification

Claimant's Name

Agent/Legal Representative (if any)

Street Address

City                                    State            Zip Code

Daytime Telephone Number          Email Address*

*By providing your email address, you authorize the Claims Administrator to use that email address to send you information relevant to this claim.

### Section B: Should I File a Claim Form?

You may be eligible to file a Claim Form and receive a payment from this Settlement if you are a member of the certified Class. If you already filed a claim in connection with the Wyeth Settlement, you **<u>do not</u>** need to submit another Claim Form. For consumers, the certified Class is defined as follows:

All persons in Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin (the "Class States") who purchased, paid, and/or provided reimbursement for Effexor XR or AB-rated generic versions of Effexor XR for consumption by themselves or their families from June 14, 2008 through May 31, 2011 (the "Class Period"). For purposes of the Indirect Purchaser Class definition, persons "purchased" Effexor XR or its generic versions if they paid or reimbursed some or all of the purchase price. A person is considered to be "in" a given Class State if their purchase took place in that Class State (*i.e.*, if the individual purchased Effexor XR or an AB-rated generic version of Effexor XR in a pharmacy in that Class State or received the drug by mail-order prescription in that Class State).

Please note, certain consumers are **not included** in the Teva Settlement. You should not file a claim for yourself or on behalf of any of the following consumers:

- Persons who purchased Effexor XR or its generic equivalent for resale (not for personal use) or directly from Wyeth, Teva, or their affiliates;
- Judges in this case and any members of their immediate families; and/or
- Persons who excluded themselves from (or opted out of) the Class in the Teva Settlement.

**If you excluded yourself from the Class in the Teva Settlement, you may not file a claim. However, you may still file a claim if you excluded yourself from the Class in the Wyeth Settlement, so long as you did not also exclude yourself from the Class in the Teva Settlement.**

☐ Check this box and sign the certification in *Section E* to confirm that the claimant indicated in *Section A* is a consumer Class member and none of the exclusion criteria above is applicable. If any of the exclusion criteria applies to the claimant, the Claims Administrator may reject this claim.

## Section C: Purchase Information

If you are an eligible claimant, please type or print in the boxes below the total number of prescriptions and amounts you paid, from June 14, 2008 through May 31, 2011, for Effexor XR or generic Effexor XR purchases in the Class States listed in *Section B*. For retail purchases, the State of purchase is the State where the pharmacy is physically located. If any purchases were made by mail order, the State to which the prescription was sent—most likely your state of residence—is considered the place of purchase. For example, if you purchased Effexor XR or generic Effexor XR by mail order and had the prescription sent to Arizona, Arizona would be considered the place of purchase for that transaction and the purchase would be eligible for a recovery. On the other hand, if you purchased Effexor XR or generic Effexor XR by mail order and had the prescription sent to South Carolina, that transaction would not be eligible for a recovery because the place of purchase would be considered South Carolina, which is not one of the Class States listed in *Section B* that are covered by the Settlement.

| | |
|---|---|
| Total number of prescriptions of Effexor XR or generic Effexor XR purchased in the Class States from June 14, 2008 through May 31, 2011: | |
| Total amount of out-of-pocket payments for the Effexor XR or generic Effexor XR purchases identified above: | $ |

Were the Effexor XR or generic Effexor XR purchases identified above made using some form of insurance benefit that covered some of the costs of those purchases?   Yes _____    No _____   (Please check one.)

## Section D: Claim Documentation and Disputes Regarding Claim Amounts

You may file a claim by providing the information requested in *Sections A, B,* and *C* and completing the Certification in *Section E*, below.

You should also submit any of the following acceptable documents to support your claim:

1) Records from your pharmacy or insurer showing that you purchased Effexor XR or generic versions of Effexor XR at least once;
2) A note from your doctor (or records) describing the amount of Effexor XR or generic versions of Effexor

XR you were prescribed;

3) An explanation of benefits ("EOB") from your health plan or insurer describing transactions in Effexor XR or generic versions of Effexor XR; and/or

4) Other records showing purchases of Effexor XR or generic versions of Effexor XR, in the Class States, at any time during the period from June 14, 2008 through May 31, 2011, including but not limited to receipts, checkbook entries, and credit-card statements.

**Note**: You must submit documentation of your purchases and complete the certification below. If you do not provide documentation, the Claims Administrator will ask for additional claim documentation after you submit your Claim Form, so please keep all records of your purchases, such as receipts, checkbook entries, credit-card statements, and insurance EOBs. Claims may be selected for audit and rejected because of fraud concerns or potentially inaccurate amounts based on expected average purchases.

If the Claims Administrator rejects or reduces your claim and you believe the rejection or reduction is in error, you may contact the Claims Administrator to request further review. If the dispute about your claim cannot be resolved by the Claims Administrator and Class Counsel, you may ask the Court to review your claim.

To request Court review, you must send the Claims Administrator a signed written statement (a) stating your reasons for contesting the rejection or payment determination regarding your claim; and (b) specifically stating that you "request that the Court review the determination regarding this claim." You must include all documentation supporting your argument(s). The Claims Administrator and Class Counsel will present the dispute to the Court for review, which may include one or more public filings with the Court describing the dispute and arguments concerning it. Personal medical data and history relating to the dispute, however, will be filed under seal to preserve confidentiality. Please note that Court review should be sought only if you disagree with the Claims Administrator's determination regarding your claim.

## Section E: Certification

By signing below, I hereby swear and affirm that I have read and am familiar with the content of the instructions accompanying this Claim Form. I certify that the information I provided in this Claim Form and in any documents attached by me are true, correct, and complete to the best of my knowledge.

I certify further that I, or the consumer Class Member I represent, purchased, paid, and/or provided reimbursement for some or all of the purchase price of the cost of Effexor XR or generic versions of Effexor XR for personal consumption or consumption by family member(s), from June 14, 2008 through May 31, 2011, where the drug was purchased in a pharmacy in Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin, or received in one of those Class States by mail-order prescription.

I also certify that I, or the Class Member(s) I represent, did not ask to be excluded ("opt out") from the Class in the Teva Settlement and did not purchase Effexor XR or generic versions of Effexor XR for purposes of resale (not for personal use). In addition, I am not (or the represented Class Member is not) among the persons or entities that have been excluded from the Class, which are listed above in *Section B*.

I further certify that I have provided all of the information requested above to the extent I have it.

I further certify that I, and the Class Member(s) I represent, have read and are familiar with the releases stated in Paragraph 12 of the Settlement Agreement. The releases in that Paragraph provide as follows:

a) Upon the occurrence of the Effective Date as defined in Paragraph 6 hereof, and in consideration for the Settlement Fund Amount described in this Settlement Agreement, Indirect Purchaser Plaintiffs and the Indirect Purchaser Class—except those who requested exclusion from the Indirect Purchaser Class and whose request was approved by the Court—on behalf of themselves and their respective past and present parents, subsidiaries, and affiliates, general and limited partners, officers, directors, employees, agents, attorneys, servants, predecessors, successors, heirs, executors, administrators, and representatives (the "Releasing Parties"), shall release and forever discharge, and covenant not to sue Teva and its respective

past, present, and future parents, subsidiaries, divisions, affiliates, joint ventures, stockholders, general partners, limited partners, officers, directors, management, supervisory boards, insurers, employees, agents, servants, trustees, associates, attorneys, and any of their legal representatives (and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing) (the "Released Parties"), with respect to any and all past, present, or future liabilities, claims, demands, obligations, suits, damages, penalties, levies, executions, judgments, debts, charges, actions, or causes of action, at law or in equity, whether class, individual, or otherwise in nature, and whether known or unknown, arising out of or relating to any conduct, events, or transactions, prior to the date of preliminary approval of this Settlement Agreement, (a) alleged, or which reasonably could have been alleged, in the Indirect Purchaser Class Action concerning the alleged anticompetitive scheme to prevent and delay approval and market entry of AB-rated generic equivalents of Effexor XR or (b) concerning end-payor purchases of Effexor XR and/or its AB-rated generic equivalents in the Class States and arising under the Sherman Act, 15 U.S.C. §§ 1 & 2, *et seq.*, or any other federal or state statute or common-law doctrine relating to antitrust or consumer protection (collectively, the "Released Claims"). Upon the Effective Date, the Releasing Parties will be forever barred and enjoined from commencing, instituting, prosecuting, or continuing to prosecute any action or other proceeding in any forum whatsoever, including any court of law or equity, arbitration tribunal, or administrative forum, asserting the Released Claims against the Released Parties.

b) In addition, Indirect Purchaser Plaintiffs, on behalf of themselves and all other Releasing Parties, hereby expressly waive, release, and forever discharge, upon the Settlement becoming final, any provisions, rights, and benefits conferred by Section 1542 of the California Civil Code, which reads:

> Section 1542. General Release; extent. A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party; or by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to Section 1542 of the California Civil Code. The Releasing Parties may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims which are the subject matter of this Paragraph 12, but each Releasing Party hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon this Settlement becoming final, any known or unknown, suspected or unsuspected, asserted or unasserted, contingent or non-contingent claim that would otherwise fall within the definition of Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

c) Reservation of Claims. The Releasing Parties intend by this Settlement Agreement to release only Teva and the Released Parties with respect to the Released Claims. The Releasing Parties specifically do not intend this Settlement Agreement, or any part hereof or any other aspect of the proposed Settlement Agreement, to compromise or otherwise affect in any way any rights the Releasing Parties have or may have against any other person, firm, association, company, or corporation whatsoever, including Wyeth. The release set forth in this Paragraph 12 is not intended to and shall not release any claims other than the Released Claims.

d) This Settlement is not intended to and does not release claims arising in the ordinary course of business between the Releasing Parties and the Released Parties that are unrelated to the allegations in the Indirect Purchaser Class Action, such as claims under Article 2 of the Uniform Commercial Code (pertaining to Sales), the laws of negligence or product liability or implied warranty, breach of contract, breach of express warranty, or personal injury.

To the extent a consumer Class Member authorized me to submit this Claim Form on their behalf and I am submitting this Claim Form as an authorized agent, and to the extent I have been authorized to receive any and all amounts from the Teva Settlement that may be allocated to this consumer Class Member on their behalf, I certify that such authority has been properly vested in me and that I will fulfill all duties I may owe the consumer Class Member. If amounts from the Teva Settlement are distributed to me, and a consumer Class Member later claims I did not have the authority to claim and/or receive those amounts on their behalf, I and/or my employer will hold the Class, Class Counsel, and the Claims Administrator harmless with respect to any claims made by the consumer Class Member.

I hereby submit to the jurisdiction of the United States District Court for the District of New Jersey for all purposes connected with this Claim Form, including resolving disputes related to this Claim Form. I acknowledge that if I provided any false information or representations related to this claim, I may be subject to sanctions, including criminal prosecution. If the Claims Administrator requests additional supporting documents to supplement this Claim Form and the information in it, I agree to provide them.

**I certify that the above information supplied by the undersigned is true and correct to the best of my knowledge, and this Claim Form was signed on _____ 2025.**

Signature

Print or Type Name

Mail your completed Claim Form, along any available documents supporting your claim, to the address below, postmarked no later than [**Month 00, 2025]** or submit the information online at the website below by that date:

Effexor XR Indirect Purchaser Settlement
c/o A.B. Data, Ltd.
P.O. Box 173005
Milwaukee, WI 53217
Toll-Free Telephone: 1-877-933-2882
Website: www.EffexorXRIndirectSettlement.com

**REMINDER CHECKLIST:**

1. Please complete and sign the above Claim Form or complete the online Claim Form. Attach or upload any documents supporting your claim.

2. Keep a copy of your Claim Form and supporting documents for your records.

3. If you would also like a receipt acknowledging your Claim Form was received, please complete the form online or mail this form via Certified Mail, Return Receipt Requested.

4. If you move and/or your name changes, please send your new address and/or your new name or contact information to the Claims Administrator at info@EffexorXRIndirectSettlement.com or via U.S. Mail at the address above.

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| *In re Effexor XR Antitrust Litigation* | Civil Action No. 3:11-cv-05661 (ZNQ) (JBD) |
| THIS DOCUMENT RELATES TO: | Master Docket No. 3:11-cv-05479 (ZNQ) (JBD) |
| All Indirect Purchaser Class Actions | |

**DECLARATION OF ELAINE PANG OF A.B. DATA, LTD. IN SUPPORT OF
INDIRECT PURCHASER PLAINTIFFS' MOTION TO APPROVE NOTICE PLAN**

I, Elaine Pang, being duly sworn, certify as follows:

1.      I am the Vice President of Media with A.B. Data, Ltd.'s Class Action Administration Company ("A.B. Data"). I submit this Declaration at the request of Class Counsel in connection with the above-captioned action (the "Action").

2.      A.B. Data was appointed by the Court to act as the Claims Administrator in this Action and recently completed the Court-approved notice plan informing potential Class Members about the Indirect Purchaser Plaintiffs' settlement with Wyeth (also known as Wyeth LLC and formerly known as Wyeth, Inc. and American Home Products); Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; and Wyeth Pharmaceuticals Company ("Wyeth").

3.      I previously submitted a declaration executed on April 25, 2024 ("Declaration of Elaine Pang of A.B. Data in Support of Indirect Purchaser Plaintiffs' Motion to Approve Notice Plan") outlining my and A.B. Data's credentials and describing the previous Court-approved notice plan in this Action.

4.      This Declaration is based upon my personal knowledge and upon information provided by Class Counsel, my associates, and A.B. Data staff members. The methods and tools

used in developing the Notice Plan are of a type reasonably relied upon in the fields of media, advertising, and communications.

5.     This Declaration summarizes the proposed Notice Plan for the proposed Settlement with Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. ("Teva"). The proposed Notice Plan, attached as **Exhibit A**, is similar to the notice plan previously effectuated in the notice and administration of the prior settlement with Wyeth. Class Members received a round of notice about the prior settlement in this Action and will receive information about the new proposed Settlement with Teva via direct notice, paid media (digital and social media), and earned media. The proposed Notice Plan is designed to meet Rule 23 of the Federal Rules of Civil Procedure and due process requirements. The objective of this Notice Plan is to provide notice to the Indirect Purchaser Class ("Class Members"), generally defined as follows:

> All persons or entities in Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin (the "Class States") who purchased, paid, and/or provided reimbursement for Effexor XR or AB-rated generic versions of Effexor XR for consumption by themselves, their families, or their members, employees, insureds, participants or beneficiaries, from June 14, 2008 through May 31, 2011 (the "Class Period"). For purposes of the Indirect Purchaser Class definition, persons or entities "purchased" Effexor XR or its generic versions if they paid or reimbursed some or all of the purchase price.[1]

6.     The Notice Plan is designed to reach two different types of Class Members: (a) consumers and (b) third-party payors ("TPPs"), such as health and welfare funds and insurance companies. A.B. Data's approach to reach these two groups are discussed below.

---

[1] Certain persons and entities are excluded from the Settlement Class, namely: 1) Wyeth and Teva and their respective subsidiaries and affiliates; (2) State and local governments to the extent their claims may be asserted under applicable state law only by the state Attorney General, or are otherwise prohibited by applicable law from being asserted by private counsel on a contingent fee basis; (3) all persons or entities who purchased Effexor XR or its generic equivalent for purposes of resale or directly from Wyeth, Teva, or their affiliates; (4) fully insured health plans (*i.e.*, Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members); (5) pharmaceutical benefit managers; and (6) the judges in this case and any members of their immediate families.

**Consumer Direct Notice**

7.     Direct notice will be sent using contact information for consumer Class Members who submitted claims in the prior settlement with Wyeth.

8.     A.B. Data will send the Short-Form Notice approved by the Court, formatted as an email ("Email Notice"), to Class Members who submitted claims in the prior settlement with Wyeth and for whom a valid email address is available. The Email Notice will include a link that allows recipients to visit the settlement website for additional information.

9.     Prior to emailing, A.B. Data will perform several tasks to maximize deliverability. These tasks include running the list of recipient email addresses through a deliverability analysis to ensure the email addresses are valid and working with our email service providers to develop sending strategies to achieve optimal deliverability. A.B. Data will also incorporate best practices, such as excluding words or phrases known to trigger SPAM or junk filters, not including email attachments, and sending the emails in tranches over a period of time.

10.     A.B. Data will send the Short-Form Notice approved by the Court, formatted as a postcard ("Postcard Notice"), via First-Class Mail to Class Members who submitted potentially valid claims in the prior settlement with Wyeth and for whom only a known mailing address is available or whose email addresses are determined to be invalid.

11.     Prior to mailing, A.B. Data will standardize and update all mailing addresses through the United States Postal Service's ("USPS") national change of address database. For Class Members with a registered change of address, A.B. Data will mail a Postcard Notice to the updated mailing address provided by the USPS. For any Postcard Notices returned by the USPS as undeliverable as addressed ("UAA") with a forwarding address, A.B. Data will promptly remail the Postcard Notices to the forwarding address. For any UAA Postcard Notices returned with no

forwarding address provided, A.B. Data will search for an updated address using an information provider. If an updated address is available, A.B. Data will promptly remail the Postcard Notice to the updated address.

### Consumer Target Audience

12.    As described in my previous declaration, A.B. Data reviewed how Effexor and Effexor XR were used and the circumstances under which this medication was prescribed to patients to develop the target audience for consumers and determine which media options should be considered for this case. Our research included reviewing the Effexor and Effexor XR[2] labels and prescribing information. This prescribed medication is used to treat major depressive disorder, generalized anxiety disorder, social anxiety disorder, and panic disorder.

13.    A.B. Data then examined the latest 2024 syndicated data from a nationally accredited resource, MRI-Simmons[3], for adults in the United States who have used Effexor or Effexor XR to update the target audience's demographics. It was determined that the target audience for this medication has the following characteristics:

- Men – 34.5%; Women – 65.5%

---

[2]    Food and Drug Administration, *Effexor (venlafaxine hydrochloride) label*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/020151s059lbl.pdf and Food and Drug Administration, Label for *Effexor XR (venlafaxine Extended Release capsule)*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/020699s107lbl.pdf (last visited March 14, 2025).

[3] MRI Simmons Survey of the American Consumer is the country's largest, most comprehensive, and most reliable consumer and media and product/service usage database. Data from the Survey of the American Consumer, conducted continuously since 1979, is used in the majority of media and marketing plans written in the United States. The firm's multidimensional database is the largest and most reliable source for integrated media planning. About 450 U.S. advertising agencies, including 90 of the top 100, subscribe to MRI Simmons Research, along with A.B. Data and more than 200 national marketers. MRI Simmons offers the most detailed and representative picture of U.S. demographics and lifestyles, including information on usage of nearly 6,000 product and service brands across 550 categories, the magazines and newspapers audiences read, the websites they look at, the radio stations they listen to, and the television programs they watch.

- Median Age – 52.4

- Median Household Income - $71,471

14.    Based on the MRI-Simmons demographic data, we again selected adults aged 25 years of age or older ("Adults 25+") as the buying target audience for the Notice Plan, with an emphasis on women.

15.    The members of the Indirect Purchaser Class are numerous and geographically dispersed across the United States. Notice will be targeted first to the Class States and then nationwide to reach those who may have relocated. As further detailed in the Notice Plan, the media portion of the Notice Plan was designed to ensure notice would be placed in media outlets likely to reach the buying target audience.

### Digital Media

16.    Digital media is included in the Notice Plan to reach potential consumer Class Members. Internet advertising allows the viewer to click on a banner advertisement ("banner ad") and instantly be directed to the settlement website to file a claim and/or obtain additional information about their rights.

17.    At least 236 million gross impressions[4] will be delivered across multiple devices, including desktop, tablet, and mobile to the target audience within the Class States and nationally. Banner ads will appear on a variety of websites for 30 days to allow ample time to deliver the targeted impressions.

18.    Banner and newsfeed ads will be placed in premium positions, so they can be viewed without scrolling and are easily seen when viewers first open the website page, electronic communication, or application. All digital and social media ads will include images appropriate for

---

[4] Gross (targeted) impressions are the duplicated sum of audiences of all media vehicles containing the notice.

this case to increase the ad visibility and an embedded link to make it easy for viewers to click-through to the case-specific settlement website.  Consumer and TPP banner ad examples are included in the attached Notice Plan (**Exhibit A**).

19.    Targeted digital advertising may be used to reach potential Class Members and include the following strategies:

| Strategy | Rationale |
|---|---|
| Demographic | Target a heavier concentration of women because they are more likely to purchase this medication. |
| Mobile – In-App | Target individuals while they are using relevant mobile applications. Mobile applications could include health and medical apps, game apps, weather apps, or entertainment/cooking apps. |
| Mobile – Websites | Target phones and tablets whose users are visiting websites that are contextually relevant and websites being visited by relevant users. |
| Contextual Targeting | Target individuals who visit websites with relevant content and context, such as those that provide health, medical, and lifestyle information. |
| Behavioral Targeting | Target users based on their previous online browsing activity (*e.g.*, if a user views or searches content related to Effexor on WebMD.com, a data profile with that information is created and targeted ads are served to them). |
| Predictive (Look-Alike) Modeling | Use look-alike modeling to target user IDs whose owners have strong similarities to users who have previously "clicked through" to the settlement website. |

## Social Media

20.    To further engage with potential Class Members, newsfeed ads will be purchased on Facebook, Instagram, and YouTube. Impressions served to social-media users can be highly targeted, specifically reaching those who have expressed an interest in information relevant to the case. Targeting strategies allow us to reach potential Class Members tactically and encourage them

to visit the settlement website. The case-specific Facebook page will also continue to serve as a landing page for the links in the Facebook and Instagram newsfeed ads.

### Keyword Search Sponsorships

21.     To make it easy for potential Class Members to locate the settlement website, sponsored search listings will be acquired on Google, the most highly visited search engine, and/or other search partners. When identified target phrases and keywords are used in search engines, relevant links appear on the search result pages.  Sample keyword terms or phrases may include "Effexor," "Effexor XR," "depression," "anxiety disorder," "Effexor XR Settlement," plus many others.

### Targeted TPP Notice

22.     Direct notice and supplemental media will be used to reach TPP Class Members.

23.     A.B. Data maintains and updates annually a proprietary database of approximately 43,000 entities that include: (i) insurance companies; (ii) health maintenance organizations; (iii) self-insured entities such as large corporations, labor unions, and employee benefit and pension plans; and (iii) certain record keepers and other entities that have relationships with or may represent TPPs, such as pharmacy benefit managers and third-party administrators (the "TPP Database").

24.     The Postcard Notice will be sent via First-Class Mail to the entire TPP database. Postcard Notices will also be mailed to TPP Class Members who submitted claims in the prior settlement with Wyeth and for whom only a known mailing address is available or whose email addresses are determined to be invalid. In addition, A.B. Data will send the Email Notice to potential TPP Class Members with available email addresses.

25.    In addition to direct notice, TPP customized banner ads will appear one time in e-newsletters to subscribers of the following industry-related websites:

a.    ThinkAdvisor.com/life-health

b.    BenefitNews.com

c.    SHRM.org

The TPP banner ads will include an embedded link to the settlement website.

### Earned Media

26.    In addition to the direct notice and paid media, A.B. Data will distribute a news release via *PR Newswire*'s US1 Newsline to help the settlement gain more attention from the media and potential Class Members. The news release will reach traditional media outlets (television, radio, newspapers, magazines), news websites, and journalists nationwide.

27.    News about the settlement will also be broadcast to the news media via X. It will be tweeted from *PR Newswire*'s and A.B. Data's X accounts to thousands of media outlets, journalists, and other followers.

### Toll-Free Telephone Number

28.    A.B. Data will update and maintain the case-specific toll-free telephone number to support the Action, with live operators available during business hours. Services include the following:

a.    Inbound toll-free line;

b.    Interactive-voice-response system;

c.    Live operators during business hours;

d.    Call scripts developed by our experts; and

e.    Detailed reporting.

**Case Website**

29.    The dedicated informational case website will be updated to ensure Class Members can easily access current information about the Action and proposed Settlement. The website provides, among other things, a summary of the case and Class Member rights and options, relevant documents, Claim Forms and the ability to submit a claim online, important dates, and any pertinent updates concerning the Action.

**Form and Content of Notice and Claim Forms**

30.    A detailed Long-Form Notice, Short-Form Notice, and Claim Forms will be available on the settlement website. The Notices include all required information about Class Members' rights and options and comply with the requirements for notices in the Federal Rules of Civil Procedure Rule 23.

31.    A Short-Form Notice will be used to provide notice of the proposed Settlement by direct mail and in a press release. The Short-Form Notice provides a clear, plain-language summary of the litigation, the proposed Settlement, and Class Members' rights and options.  The Short-Form Notice also includes the settlement website address and toll-free telephone number, so Class Members can obtain additional details about the case and background information about the Action.

32.    A Court-approved, detailed Long-Form Notice will be available on the case website and includes more detailed information about the Action and how Class Members can act on their rights and options, including how Class Members who did not do so previously can submit claims online or via mail. The Long-Form Notice is also written in plain language, contains all necessary information, and uses a question-and-answer format to make it easier for potential Class Members to find and understand the relevant information.

**Claims Administration Process**

33.    When administering the allocation and distribution of class action recoveries, A.B. Data implements a claims process to verify whether those filing claims are in fact class members and ensure that class members receive the recovery to which they are entitled under a Court approved plan of allocation and distribution.

34.    A.B. Data has extensive experience ensuring that recoveries are distributed to eligible claimants in accordance with the terms of the applicable plan of allocation, including taking steps to ensure that entities that are not a part of the class and/or are precluded from recovering do not receive a payment from the settlement or judgment. To do so, A.B. Data uses straightforward claims administration techniques that it has successfully employed in many pharmaceutical antitrust cases.

35.    Class Members who wish to be potentially eligible to receive a payment from the Settlement are required to complete and submit a properly executed and detailed claim form along with any required supporting documents either by mail or online through the case website no later than the claims submission deadline established by the Court.

36.    A.B. Data will review each Claim Form upon receipt to verify that all required information was provided and is accurate. Supporting documents provided with each Claim Form will be reviewed for authenticity and compared to the information provided to verify the claimant's identity and the purchasing information. A.B. Data will process each Claim in accordance with the Court-approved Settlement Agreement, Plan of Allocation, and/or relevant Court orders.

37.    If a claim is determined to be defective, A.B. Data will send a deficiency notification to the claimant, via letter or email, that describes why the claim is deficient, including, where applicable, what is necessary to cure the deficiency. A claim may be marked as deficient if it is

missing documentation or required information or includes ineligible drugs, among other conditions. It will also advise claimants how much time they have to submit the appropriate information and/or documentary evidence to complete/cure their claim. If the claimant does not cure the deficiency in their claim, the claim will be recommended for rejection (in whole or in part). The deficiency notification will also advise claimants of their right to contest A.B. Data's administrative determination with respect to their claim.

38.    If a claim is determined to be ineligible, A.B. Data will send an ineligibility notification to the claimant, via letter or email, that describes why the claim is ineligible. A claim may be marked as ineligible because it is duplicative of a previously filed claim (for example, where a claim was submitted online to A.B. Data and the original hard copy was sent by mail and received at a later date), submitted by an excluded person or entity, or withdrawn by the filer.

39.    After A.B. Data has fully processed the claims (and responses to deficiency notifications), performed quality assurance reviews, and made final administrative determinations as to which claims are valid, A.B. Data will present its administrative report on the claims received for the Settlement to the Court, along with a proposed plan for distribution. Thereafter, upon Court approval, A.B. Data will distribute the net Settlement proceeds to eligible Class Members.

## Conclusion

40.    It is my opinion that the proposed Notice Plan uses a strategic and contemporary method to deploy notice to the Class and is adequate and reasonable to effectively reach[5] Class Members. A.B. Data estimates that this comprehensive multi-channel approach, including direct notice, paid media (digital and social media advertising), and earned media efforts focused on consumer and TTP Class Members, will reach well over 70.5% of the target audience. The proposed

---

[5] Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

Notice Plan provides a reach similar to those approved by other courts and within the range recommended and considered reasonable by the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*.[6] The Notice Plan is, in my opinion, the best practicable approach to reach Class Members and fully complies with Rule 23 of the Federal Rules of Civil Procedure.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 14th day of March, 2025.

_____

Elaine Pang

---

[6] The *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* states: "The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70-95%."

# EXHIBIT A



A.B. Data, Ltd.
Class Action Administration Company
600 A.B. Data Drive
Milwaukee, WI 53217

# Proposed Notice Plan

*In re Effexor XR Antitrust Litigation*
Master Docket No. 3:11-cv-05479 (D.N.J.)
March 14, 2025

# CONTENTS

Case Background and Class Definition.......................................................... Page 3

Notice Plan Overview……......................................................................... Page 4

Consumer Direct Notice........................................................................... Page 7

Paid Media Planning Methodology............................................................. Page 7

Target Audience ...................................................................................... Page 8

Geographic Considerations........................................................................ Page 10

Media-Usage Analysis.............................................................................. Page 10

Digital Media Analysis and Recommendation.............................................. Page 11

Earned Media Notice Recommendation....................................................... Page 16

Targeted Notice to Third-Party Payors…..………………………..…………… Page 16

National Media Delivery........................................................................... Page 17

Notice Design Strategies .......................................................................... Page 18

## APPENDICES

APPENDIX A      MRI Data Audience Demographic – Used Effexor or Effexor XR
                prescription brand in the last 12 months

APPENDIX B      MRI Data Media Quintiles – Used Effexor or Effexor XR prescription
                brand in the last 12 months

APPENDIX C      MRI Data Digital Media, Websites and Social Media Usage – Used
                Effexor or Effexor XR prescription drugs

# CASE BACKGROUND AND CLASS DEFINITION

This proposed Notice Plan is being submitted by A.B. Data, Ltd. ("A.B. Data") in connection with a settlement (the "Settlement") reached in *In re Effexor XR Antitrust Litigation*, a case in the United States District Court for the District of New Jersey (the "Court"). The proposed Settlement is between the Indirect Purchaser Plaintiffs and Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. ("Teva").

Previously, A.B. Data designed and completed the Court-approved notice plan for the settlement with Wyeth (also known as Wyeth LLC and formerly known as Wyeth, Inc. and American Home Products); Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; and Wyeth Pharmaceuticals Company ("Wyeth").

Indirect Purchaser Plaintiffs claim that Teva and Wyeth unlawfully prevented and delayed the approval and marketing of generic versions of Effexor XR. The Indirect Purchaser Plaintiffs allege that, as a result, consumers and third-party payors ("TPPs") paid more for Effexor XR and its generic equivalents than they should have.

The "Indirect Purchaser Class" or "Class" is defined as follows:

> All persons or entities in Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin (the "Class States") who purchased, paid, and/or provided reimbursement for Effexor XR or AB-rated generic versions of Effexor XR for consumption by themselves, their families, or their members, employees, insureds, participants or beneficiaries, from June 14, 2008 through May 31, 2011 (the "Class Period"). For purposes of the Indirect Purchaser Class definition, persons or entities "purchased" Effexor XR or its generic versions if they paid or reimbursed some or all of the purchase price.[1]

This document outlines the efforts that will be made to provide Settlement notice to potential members of the Indirect Purchaser Class, referred to hereafter as "Class Members."

Although Indirect Purchaser Plaintiffs do not know the exact number of Class Members, it is believed they number in the millions. In these circumstances, direct notice to all Class Members is impracticable, and a paid media plan targeting unidentified Class Members is necessary. Notice will be provided via direct notice (to Class Members who previously filed a claim), paid media (digital and social media), and earned media as described below.

---

[1] Certain persons and entities are excluded from the Settlement Class, namely: 1) Wyeth and Teva and their respective subsidiaries and affiliates; (2) State and local governments to the extent their claims may be asserted under applicable state law only by the state Attorney General, or are otherwise prohibited by applicable law from being asserted by private counsel on a contingent fee basis; (3) all persons or entities who purchased Effexor XR or its generic equivalent for purposes of resale or directly from Wyeth, Teva, or their affiliates; (4) fully insured health plans (*i.e.*, Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members); (5) pharmaceutical benefit managers; and (6) the judges in this case and any members of their immediate families.

# NOTICE PLAN OVERVIEW

This document outlines the process for providing direct and publication notice of the proposed Settlement with Teva to potential Class Members (the "Notice Plan"). This proposed Notice Plan was designed to meet the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure and due process.

## Notice Plan Components

Previously, A.B. Data implemented a notice plan providing notice to Class Members about the prior settlement with Wyeth. Class Members who previously filed a claim in connection with the Wyeth Settlement will receive information about the proposed Settlement with Teva via direct notice, and notice will be provided to all Class Members via paid and earned media as described herein.

As described in the previous notice plan, A.B. Data determined the demographics of the population using the various Effexor formulations, *i.e.*, Effexor immediate-release ("Effexor") and Effexor extended-release ("Effexor XR") to develop the target audience and determine which media options should be considered for this case. A.B. Data reviewed how Effexor and Effexor XR were used and the circumstances under which this medication was prescribed to patients. Our research included reviewing the Effexor and Effexor XR labels and prescribing information.[2] This medication is used to treat major depressive disorder, generalized anxiety disorder, social anxiety disorder, and panic disorder.

A.B. Data then examined the latest 2024 demographic data from the nationally accredited resource, MRI-Simmons[3] to update the potential Class Member demographics and select the target audience that best encompasses the Class Members. We reviewed data for adults who used the prescription drug Effexor or Effexor XR ("Effexor users"). Effexor users have the following characteristics:

- Men – 34.5%
- Women – 65.5%
- Age 25+ – 93.4%
- Homeowners – 70.2%
- Household Income of $50K+ - 64.1%

---

[2]    Food and Drug Administration, Effexor (venlafaxine hydrochloride) label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/020151s059lbl.pdf; Food and Drug Administration, Label for Effexor XR (venlafaxine Extended Release capsule), https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/020699s107lbl.pdf; Viatris Specialty LLC, *Effexor XR® (Venlafaxine HCl)*, https://www.effexorxr.com; WebMD, *Effexor Tablet - Uses, Side Effects, and More*, https://www.webmd.com/drugs/2/drug-1836/effexor-oral/details; and Drugs.com, *Effexor*, www.drugs.com/effexor.html.

[3] MRI Simmons Survey of the American Consumer is the country's largest, most comprehensive, and most reliable consumer and media and product/service usage database. Data from the Survey of the American Consumer, conducted continuously since 1979, is used in the majority of media and marketing plans written in the United States. The firm's multidimensional database is the largest and most reliable source for integrated media planning. About 450 U.S. advertising agencies, including 90 of the top 100, subscribe to MRI Simmons Research, along with A.B. Data and more than 200 national marketers. MRI Simmons offers the most detailed and representative picture of U.S. demographics and lifestyles, including information on usage of nearly 6,000 product and service brands across 550 categories, the magazines and newspapers audiences read, the websites they look at, the radio stations they listen to, and the television programs they watch.

Based on the demographic information provided within MRI-Simmons, A.B. Data again selected adults aged 25 years of age or older ("Adults Age 25+") as the primary buying target audience, with an emphasis on women, to ensure the notice reaches those that have used the prescription medication Effexor or Effexor XR and their generic equivalents.

Notice will be targeted first to the Class States and then nationwide to reach those who may have relocated. The components of the proposed Notice Plan are as follows:

| Direct Notice (Consumers) | | |
| --- | --- | --- |
| **Vehicle** | **Unit** | **Estimated Quantity** |
| Direct Notice | Postcard/Email | 5,000 Postcards<br>25,000 Emails |

| Digital and Social Media | | | | |
| --- | --- | --- | --- | --- |
| **Audience** | **Ad Unit** | **Placement** | **Networks** | **Estimated Gross Impressions[4]** |
| Effexor/Effexor XR Users<br><br>Adults 25+ | Banner Ads, Newsfeed Ads, Google Search (AdWords) and/or other search partners | Mobile; In-App, Desktop, Tablet | Google Display Networks, YouTube, Facebook/Instagram, Google AdWords | 236 million impressions |

| Earned Media |
| --- |
| Press Release distributed via *PR Newswire*'s US1 National Newsline and Tweet to *PR Newswire* and A.B. Data followers. |

| TPP Notice & Media | | | |
| --- | --- | --- | --- |
| **Vehicle** | **Unit** | **Website** | **Quantity/Timing** |
| Direct Notice | Postcard/Email | | ~43,000 postcards<br>~1,500 emails |
| Digital media | E-Newsletter (Banner) ads | • ThinkAdvisor.com/life-health<br>• BenefitNews.com<br>• SHRM.org | One time in each e-newsletter |

The paid media (digital and social media) and earned media vehicles are all specifically targeted to reach unidentified potential Class Members. The dedicated informational case-specific settlement website, Facebook page, and toll-free telephone number will also be updated to complement the proposed Notice Plan and ensure Class Members can easily access current information. Detailed information about each component of the proposed Notice Plan and how it covers the target audience is included below.

---

[4] Gross impressions are the duplicated sum of audiences of all media vehicles containing the notice.

# Delivery and Due Process

A.B. Data media professionals used Comscore,[5] MRI-Simmons, and internal tools to calculate the estimated reach[6] and frequency[7] against the target audience. When combining direct notice and the paid media and earned media components, the proposed Notice Plan will reach well over 70.5% of the target audience with an average frequency of 1.4 times.

The methods described below reflect a strategic, highly targeted, and contemporary method to deploy notice to potential Class Members. This proposed Notice Plan provides a reach and frequency similar to those approved by other courts and within the 70%-95% range for reach recommended and considered reasonable by The Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*.[8]

The proposed Notice Plan, described in this document, is consistent with other notice plans developed and implemented by A.B. Data for other pharmaceutical cases, including the methods and tools used to develop such plans. The proposed Notice Plan is also similar to the notice plan previously approved and effectuated in this case.

Previous A.B. Data notice plans that have been court-approved include the following pharmaceutical cases:

- *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation*, MDL No. 2445, 13-md-2445 (E.D. Pa. Dec. 5, 2023);

- *In re Opana ER Antitrust Litigation*, No. 1:14-cv-10150 (N.D. Ill. Sept. 23, 2021);

- *In re EpiPen Marketing, Sales Practices and Antitrust Litigation*, Civil Action No. 2:17-md-02785 (D. Kan. Mar. 11, 2022);

- *In Re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litigation*, No. 18-md-2819 (E.D.N.Y. Jan. 18, 2022);

- *The Hosp. Auth. of Metro. Gov't. of Nashville & Davidson Cnty. v. Momenta Pharmas., Inc.*, No. 15-cv-01100 (M.D. Tenn. May 29, 2020);

- *In re Loestrin 24 FE Antitrust Litigation*, No. 1:13-md-2472 (D.R.I. March 23, 2020);

- *In re Aggrenox Antitrust Litigation*, No. 3:14-md-02516 (D. Conn. July 19, 2018);

- *In re Solodyn Minocycline Hydrochloride All End-Payor Actions*, No. 14-md-2503 (D. Mass. November 29, 2017);

- *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-01833 (E.D. Pa. April 21, 2020); and

---

[5] Comscore is a global Internet information provider on which leading companies and advertising agencies rely for consumer behavior insight and Internet data usage. Comscore maintains a proprietary database of more than two million consumers who have given Comscore permission to monitor their browsing and transaction behavior, including online and offline purchasing.

[6] Reach measures the percentage of a target audience that was exposed at least one time to a specific media message or combination of media messages, whether via print, broadcast, online, outdoor media, etc. within a given time period.

[7] Frequency is the estimated average number of opportunities an audience member has to see the notice.

[8] The *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* states: "The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70-95%."

- *Shannon Mahoney v. Endo Health Solutions, Inc.*, No. 15-cv-9841 (S.D.N.Y. June 23, 2017).

The proposed Notice Plan is, in A.B. Data's experience, the best practicable under the circumstances for reaching potential Class Members and meets due-process requirements.

# CONSUMER DIRECT NOTICE

A.B. Data will send an email or mailed notice to consumer Class Members who submitted claims in the prior settlement with Wyeth.

Where a valid email address is available, the Short-Form Notice, formatted as an email ("Email Notice"), will be sent to consumer Class Members who submitted claims in the prior settlement with Wyeth. Prior to emailing, A.B. Data implements certain best practices and performs several tasks to maximize deliverability. A.B. Data will run the list of recipient email addresses through a deliverability analysis to ensure the email addresses are valid and work with our email service providers to develop optimal sending strategies. The subject line, the sender, and the body of the message will be designed to overcome SPAM or junk filters and encourage readership. The Email Notice will be in an embedded html text format without attachments and other elements to decrease the likelihood that the message will be blocked by email service providers. A.B. Data will programmatically authenticate the Email Notices, so providers can verify that they are being sent from A.B. Data's authorized mail servers. The Email Notice will also include an embedded link to the settlement website, so potential Class Members can easily access frequently asked questions, important dates and deadlines, and other relevant documents and information about the case.

The Short-Form Notice, formatted as a postcard ("Postcard Notice"), will be sent via First-Class Mail to consumer Class Members who submitted potentially valid claims in the prior settlement with Wyeth and for whom only a known mailing address is available or whose email addresses are determined to be invalid. Prior to mailing, A.B. Data will standardize and update all mailing addresses through the United States Postal Service's ("USPS") national change of address database. For Class Members with a registered change of address, A.B. Data will mail a Postcard Notice to the updated mailing address provided by the USPS. For any Postcard Notices returned by the USPS as undeliverable as addressed ("UAA") with a forwarding address, A.B. Data will promptly remail the Postcard Notices to the forwarding address. For any UAA Postcard Notices returned with no forwarding address provided, A.B. Data will search for an updated address using an information provider. If an updated address is available, A.B. Data will promptly remail the Postcard Notice to the updated address.

# PAID MEDIA PLANNING METHODOLOGY

A.B. Data paid media notice was developed to effectively and efficiently reach class members. It does the following:

1. Identifies the class members' demographics using syndicated and/or peer-reviewed, accredited research to establish a primary target audience;
2. Outlines the methodology for selecting recommended media vehicles, the media vehicle's relationship to product/service purchase, and how the target audience uses them; and

3. Provides results that quantify for the Court the adequacy of the notice based upon recognized tools of media measurement.

The first steps are to determine potential class members' demographics and define the target audience. A.B. Data then analyzes media quintile usage data and the ability of each advertising medium to provide cost-efficient coverage of the target audience to develop the notice plan strategy, *i.e.*, whether notification is best done through print, online, broadcast, and/or some other methodology or media vehicle.

For many notice plans, A.B. Data uses reach and frequency as the standard upon which to measure how effective notice is delivered to a defined target audience. Below are the definitions of these terms as they relate to paid media.

- Reach – measures the percentage of a target audience exposed at least one time to a specific media message or combination of media messages—whether via print, broadcast, online, outdoor media, etc.—within a given time period.

- Frequency – the estimated average number of opportunities a member of the target audience has to see the notice during the media campaign.

Analytical tools, provided by Comscore and MRI-Simmons, are used to select the publications and/or websites and the number of insertions and/or impressions that will be purchased. MRI-Simmons is the leading supplier of multimedia audience research in the United States. As a nationally accredited research firm, it presents a single-source measurement of major media, products, services, and consumer demographic, lifestyle, and psychographic characteristics. Comscore provides detailed Internet data usage. It is the most trusted platform for planning, transacting, and evaluating digital media across platforms.

## TARGET AUDIENCE

A.B. Data examined the 2024 accredited marketing data from MRI-Simmons for "Adults Who Have Used the Prescription Brands Effexor or Effexor XR" ("Effexor users") to confirm the primary target audience for this case. *See* **Appendix A** for the complete results of the syndicated data from MRI-Simmons regarding this demographic group.

Below is a summary of some of the key demographic statistics for these categories.

| Demographics | Effexor Users |
|---|---|
| Men | 34.5% |
| Women | 65.5% |
| 18-24 | 6.7% |
| 25-34 | 12.3% |
| 35-44 | 17.9% |
| 45-54 | 18.8% |
| 55-64 | 20.3% |
| 65+ | 24.1% |
| 25+ | 93.4% |
| **Education** | |

| Demographics | Effexor Users |
|---|---|
| Did Not Graduate High School | 8.5% |
| Graduated High School Only | 30.8% |
| Attended/Graduated College | 60.7% |
| **Household Income** | |
| Median Household Income | $71,471 |
| HHI $100,000+ | 34.3% |
| HHI $60,000-$99,999 | 10.9% |
| HHI $30,000-$59,999 | 26.2% |
| HHI Under $30,000 | 17.7% |
| Wage Earner: Sole Earner | 18.6% |
| Wage Earner: Primary Earner | 18.5% |
| Wage Earner: Secondary Earner | 17.4% |
| Not Working/retired | 71.6% |
| **Marital Status** | |
| Now Married | 51.2% |
| **Household Size** | |
| Household size 2 | 36.8% |
| Household size 3-4 | 30.6% |
| Home Owned | 70.2% |
| **Spanish Language** | |
| Spanish, Hispanic, or Latino Descent | 9.4% |
| Spanish Spoken in Home | 9.2% |
| **County Size[9]** | |
| A County | 31.0% |
| B County | 35.7% |
| C County | 15.1% |
| D County | 18.2% |
| **Race*** | |
| White | 88.7% |
| Black/African American | 6.1% |
| Asian | 0.9% |
| Other Race/Multiple Classifications | 7.6% |

*May add up to more than 100%, as people could select more than one classification (if applicable).

---

[9] A Counties, as defined by A.C. Nielsen Company ("Nielsen"), are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the Metropolitan Statistical Area and include the largest cities and consolidated areas in the U.S. B Counties, as defined by Nielsen, are all counties not included under category A that either have a population greater than 150,000 or are in a metro area with a population greater than 150,000 according to the latest census. C Counties, as defined by Nielsen, are all counties not included under categories A or B that either have a population greater than 40,000 or are in a metro area with a population greater than 40,000 according to the latest census. D Counties are, essentially, rural counties.

Based on this data, Effexor users generally have the following characteristics:

- Older women
- Likely to be divorced, legally separated, or never married
- High School graduates or have an associate degree from college
- Tend to be unemployed/not working or retired
- Live in urban areas
- Likely Caucasian

## GEOGRAPHIC CONSIDERATIONS

The Indirect Purchaser Class is numerous and geographically dispersed across the United States. Notice to the Class will be targeted firstly to the Class States and secondly nationwide to reach those who may have relocated.

The Class States include: Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin.

## MEDIA-USAGE ANALYSIS

Everybody is exposed to and consumes media differently, and it may even change daily. However, over time, our media consumption follows a specific pattern, known as our individual media habits, which can be tracked. MRI divides those habits into five categories of media usage, from heavy consumption of media to light users of a media type. These five categories are defined by Quintiles ranked from 1 to 5, with Quintile 1 representing the heaviest user of a media vehicle and Quintile 5 representing a light user.

The target audience's media usage in each Quintile is expressed as an index. An index of 100 represents average usage of a particular medium. Therefore, an index above 100 indicates heavier usage of the medium than that of the average adult, and an index below 100 indicates lighter usage of the medium than that of the average adult.

Media vehicles in the Quintile analysis summarized below include magazines, newspapers and newspaper supplements, radio, television, and the Internet.

| Media Indices | Effexor Users |
|---|---|
| **Magazines** | |
| Quintile 1 | 110 |
| Quintile 2 | 95 |
| **Newspapers and Supplements** | |
| Quintile 1 | 110 |
| Quintile 2 | 114 |
| **Radio (Weekday)** | |
| Quintile 1 | 102 |
| Quintile 2 | 106 |
| **Television** | |

| Media Indices | Effexor Users |
|---|---|
| Quintile 1 | 134 |
| Quintile 2 | 99 |
| **Digital** | |
| Quintile 1 | 86 |
| Quintile 2 | 101 |

**Appendix B** includes the entire 2024 MRI-Simmons media Quintile analysis for Effexor users.

After considering geographic targeting, the demographic analysis, the media Quintile results, and time spent on media vehicles, targeted digital and social media were selected as effectual and cost-effective vehicles to reach the target audience.

## DIGITAL MEDIA ANALYSIS AND RECOMMENDATION

MRI-Simmons provides data on Internet usage by asking survey respondents about their online usage during the preceding 30 days. According to the 2024 MRI-Simmons Doublebase survey, 97.3% of Effexor users have used the Internet during the past 30 days.

Below is an overview of Effexor users' Internet usage. For a complete list of Internet usage activities, please refer to **Appendix C**.

| Internet Usage | Effexor Users |
|---|---|
| Looked at/used Internet in the last 30 days | 91.3% |
| Have Internet access at home | 96.3% |
| Desktop computer | 39.4% |
| Laptop or Netbook | 52.5% |
| iPad or tablet | 35.3% |
| Smartphone | 88.4% |
| Obtained financial information | 28.3% |
| Paid bills online | 66.2% |
| Used email | 87.3% |
| Used Instant Messenger | 82.0% |
| Made a purchase for personal use in past 30 days | 74.4% |
| Played games in past 30 days | 43.3% |
| Obtained the latest news/current events in | 52.7% |

11

| Internet Usage | Effexor Users |
|---|---|
| past 30 days | |
| Obtained medical information in past 30 days | 40.2% |
| Obtained entertainment/celebrity information in past 30 days | 29.7% |
| Visited a TV network's website | 19.2% |
| Looked for recipes online in past 30 days | 56.9% |
| Shared Photos through Internet website | 41.8% |

Because the Internet is such an integral part of the lives of Effexor users, it is recommended that online media drive the proposed paid media portion of the Notice Plan.

A.B. Data recommends utilizing a variety of top websites and social media applications to maximize Class Members' exposure opportunities. Additionally, websites and applications with audiences that include large percentages of our target audience will be selected. Digital impressions will be delivered to websites within relevant categories and content.

Following is a summary of the search engines and websites used most frequently by Effexor users. A complete list of search engines and websites included in the 2024 MRI-Simmons Doublebase survey is provided in **Appendix C**.

| Search Engines/ Websites Visited | Effexor Users |
|---|---|
| Google | 83.0% |
| Yahoo! | 16.8% |
| WebMD | 25.5% |
| Wikipedia | 24.5% |
| Facebook Messenger | 58.0% |
| Gmail | 65.6% |
| CNN | 13.7% |
| FOXNews | 13.2% |
| Accuweather | 24.4% |
| Amazon | 79.8% |

| Search Engines/ Websites Visited | Effexor Users |
|---|---|
| eBay | 19.2% |
| ESPN | 15.0% |
| Weather Channel | 42.3% |
| Zillow | 23.2% |

| Social Media Apps Visited | Effexor Users |
|---|---|
| Facebook | 46.0% |
| YouTube | 14.7% |
| Instagram | 8.8% |
| Pinterest | 1.6% |
| Snapchat | 2.0% |
| Twitter | 1.2% |

## Digital Media Recommendation

A.B. Data recommends placing banner and social media ads on a variety of websites and mobile applications to maximize exposure to potential Class Members and deliver the reach required to provide Rule 23-compliant notice.

Based on our in-house Comscore data analysis, we recommend running a mix of digital and social media and search advertising across websites, mobile devices, and apps using the Google Display Network, Facebook, Instagram, YouTube, and Google AdWords. A minimum of 236 million impressions will be served to the target audience.

The digital and social media and search advertising will run for 30 days to allow ample time to deliver the impressions. Banner advertisements ("ads") will use standard IAB (Interactive Advertising Bureau) sizes (300 x 250, 728 x 90, 300 x 600, 320 x 50, 300 x 50). All banner and newsfeed ads will include embedded and trackable links to the case-specific website. Links will be tracked using Google Analytics tracking codes to optimize the campaign.

Ads will be served across multiple devices, including mobile, tablet, and desktop. Ads will be placed in premium positions, so they can be viewed without scrolling and seen easily when visitors first open the website page, e-newsletter, or application.

Background information about each digital platform is detailed below:



- Google serves ads on its own properties, as well as 2 million websites across the Internet.[10]
- The target audience uses Google for search, email, maps, and other applications.
- Google allows us to select the relevant content where we want the banner ads to appear, such as websites with depression-related topics.
- A mix of display banner ad sizes will be utilized.



- More than 83% of Effexor users used Google to search for information in the past 30 days.
- Google AdWords text ads appear on the search results when relevant keyword search terms and phrases, such as "panic attack," "social anxiety," "depression," etc. are used.



- YouTube usage continues to grow with over 239 million adults in the U.S. viewing content on YouTube each month.[11]
- Owned by Google, so campaigns can be optimized jointly and simultaneously.
- YouTube offers advertisers very selective targeting abilities.
- Affinity targeting will be based on users' interests and habits (*i.e.*, targeting viewers who have viewed content related to depressive disorder, generalized anxiety disorder, social anxiety disorder, and panic disorder).
- Dynamic prospecting will be used where banner ads are served to new users who are searching for videos regarding depression and pain disorders.

**facebook**

- A case-specific Facebook page will be created as a landing page for Facebook and Instagram users and to share case information.
- Facebook is the most popular social media platform among Effexor users. Many are frequent visitors to the platform, using it to post photos and videos, send messages to family and friends, and stay current with their social network.

---

[10] Google.com, *About targeting for Display Network campaigns - Google Ads Help.* (2019), https://support.google.com/google-ads/answer/2404191?hl=en.
[11] Zote, Jacqueline. 2024. "30 YouTube Statistics to Power Your Marketing Strategy in 2023." Sprout Social. March 20, 2024. https://sproutsocial.com/insights/youtube-stats/.

14

- Nearly half of the target audience (46%) have visited Facebook in the last 30 days.
- Facebook allows specific demographic targeting, including reaching those who are interested in health, depression, seeking help with social anxiety, etc.



- Instagram has over 166.2 million users making it the third most popular social media platform worldwide[12].
- Mobile newsfeed ads will drive potential Class Members to the settlement website.
- Instagram is one of the most popular social media sites within the target demographic, reaching almost a third of the target audience.
- Instagram users can be targeted by location, interests, behaviors, and other demographic characteristics.

Digital media placements were chosen to meet audience-notification requirements and achieve maximum engagement with the advertisements. Campaigns and creative strategies will be optimized throughout the course of the proposed Notice Plan to maximize efficiency and effectiveness. Several campaign targeting strategies will be utilized, including:

| Digital Media Strategy | Digital Media Tactics |
| --- | --- |
| Demographic | Target a heavier concentration of women because they are more likely to purchase this medication. |
| Mobile In-App | Target individuals while they are using relevant mobile applications. Mobile applications could include health and medical apps, game apps, weather apps, or entertainment/cooking apps. |
| Mobile – Websites | Target phones and tablets whose users are visiting websites that are contextually relevant and websites being visited by relevant users. |
| Contextual | Target individuals who visit websites with relevant content and context, such as those that provide health, medical, and lifestyle information. |
| Behavioral | Target users based on their previous online browsing activity (*e.g.*, if a user views or searches content related to depression, health, or Effexor on WebMD.com, etc., a data profile with that information is created and targeted ads are served to them). |

---

[12] Kumar, Naveen. 2024. "How Many People Use Instagram 2024 [New Data]." DemandSage. September 30, 2024. http://www.demandsage.com/instagram-statistics/.

| Digital Media Strategy | Digital Media Tactics |
|---|---|
| Predictive Modeling | Use "look-alike" modeling to target user IDs whose owners have strong similarities to users who previously "clicked through" to the settlement website. |

A.B. Data employs a fully staffed digital buying team to manage all digital and social media programs in-house for the greatest control and oversight. While these advertisements are active, A.B. Data's digital media experts will monitor the success, conversions, and activity associated with the digital and social media notice campaigns and optimize the number of impressions delivered across each platform to achieve maximum engagement and efficiency. A.B. Data's digital media experts have the following certifications:

- Facebook's Certified Digital Marketing Associate Certification
- Google Ads Display Certification
- Google Ads Search Certification
- Google Analytics Certification
- IAB Digital Media Buying & Planning Certification

With this level of expertise, digital and social media campaigns are assured impressions are delivered directly to the target audience, with online ad verification and minimal threat of bot-traffic and inappropriate content.

## EARNED MEDIA NOTICE RECOMMENDATION

In addition to the proposed direct notice and paid media components, a news release will be distributed via *PR Newswire*'s US1 Newsline to help the Settlement gain more attention from the media and potential Class Members. The news release will reach traditional media outlets (television, radio, newspapers, magazines), news websites, and journalists nationwide.

News about the case will also be broadcast to the news media via X. It will be tweeted from *PR Newswire*'s and A.B. Data's X accounts to thousands of news media and other followers. The news release will also assist with driving search engine results and help increase traffic to the settlement website.

## TARGETED NOTICE TO THIRD-PARTY PAYORS

Class Members include TPPs. Accompanying the proposed Notice Plan above will be a significant TPP-targeted notice program using direct mail and digital media.

A.B. Data has a proprietary database listing the names and addresses of approximately 43,000 entities that include: (i) insurance companies; (ii) health maintenance organizations; (iii) self-insured entities such as large corporations, labor unions, and employee benefit and pension plans; and (iv) certain record keepers and other entities that have relationships with or may represent TPPs, such as pharmacy benefit managers and third-party administrators, compiled from membership listings and existing databases from publicly available sources, including U.S. Department of Labor Form 5500 filings, the Pharmacy Benefits Management Institute, and prior pharmaceutical litigation that A.B. Data has administered. This database is updated regularly.

16

A.B. Data's will prepare and send a Postcard Notice via First-Class Mail to entities in this database and TPP Class Members who submitted claims in the prior settlement with Wyeth and for whom only a known mailing address is available or whose email addresses are determined to be invalid.

A.B. Data will also send Email Notice to potential TPP Class Members in the database and TPPs who submitted claims in the prior settlement with Wyeth that have available email addresses.

To supplement the direct notice, digital banner ads, customized for TPPs, will appear one time in e-newsletters to subscribers of the following industry websites:

- ThinkAdvisor.com/life-health – This website is affiliated with the former publication *National Underwriter Life & Health*. It is uniquely positioned to provide agents and brokers with timely, insightful information as they navigate the specialty insurance markets and sort through critical industry developments.

- BenefitNews.com – This website is affiliated with the publication *Employee Benefit News*. It serves human resource management personnel that specialize in determining and implementing benefits for employees, including health insurance.

- SHRM.org – This website is the official website of the Society of Human Resource Management. Visitors to this website include human resource ("HR") managers who specialize in a variety of HR disciplines such as benefits, health insurance, compliance, and many others. It also reaches the HR management within large companies that offer private health insurance policies to their employees.

## NATIONAL MEDIA DELIVERY

A.B. Data estimates that the Notice Plan, including direct notice, paid media (digital and social media advertising), and earned media efforts focused on consumer and TTP Class Members, will reach well over 70.5% of the target audience.

These Notice efforts reflect a strategic, highly targeted, and contemporary method to deploy notice to potential Class Members. The proposed Notice Plan provides a reach and frequency that courts have approved previously and within the range recommended by The Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, which considers a 70%-95% reach among class members reasonable.

The proposed Notice Plan is, in A.B. Data's experience, the best practicable approach under the circumstances for potential Class Members and meets due-process requirements.

| Notice Plan Summary | |
|---|---|
| **Vehicle** | **70%+ Estimated Reach Plan** |
| Direct Notice | • Email/Postcard Notice to TPP Database and all Class Members who previously filed a claim |
| Digital Media | • 236 million impressions |

17

| Notice Plan Summary | |
| --- | --- |
| **Vehicle** | **70%+ Estimated Reach Plan** |
| | • Banner ads on general interest and health-related websites, social media<br>• Search advertising<br>• Case-specific Facebook page |
| Earned Media | • National Press Release (US1 National) plus Twitter Tweet/Image |
| TPP Media | • Thinkadvisor.com e-newsletter<br>• BenefitNews.com e-newsletter<br>• SHRM.org e-newsletter |

## NOTICE DESIGN STRATEGIES

The Federal Rules of Civil Procedure require notices in class action cases to be written in "plain, easily understood language." This process was utilized in developing the Long-Form, Short-Form, and Postcard Notices for this Settlement. A.B. Data is committed to adhering to the requirements provided for notice language outlined in the Federal Rules of Civil Procedure Rule 23.

The plain-language notices are designed with a large, bold headline that will be seen easily by potential Class Members. Plain, easily understood language in the body of the notice helps ensure Class Members understand the subject of the case and their legal rights and options.

The online banner ads and social media newsfeed ads are designed to alert potential Class Members about the proposed Settlement. The ads will each include a link to the settlement website, so potential Class Members may click on it and go directly to the website to obtain answers and other case information or to file a claim. The newsfeed and banner ads will also include product or usage photos to increase awareness, generate interest, and increase the click-through rate to the settlement website.

Shown below are proposed sample banner ads for consumers and TPPs:

 

# APPENDICES A-C

**Appendix A**
**Effexor Antitrust Litigation MRI Data**

**Audience Demographic: Prescription Brands Used: In last 12 months: Effexor/Effexor XR**

|  |  | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Adults |  | 2,396 | 0.93 | 100.00 | 100 |
| Men |  | 826 | 0.66 | 34.48 | 71 |
| Women |  | 1,570 | 1.19 | 65.52 | 127 |
| Respondent is parent of child under 18 currently living in the household |  | 564 | 0.89 | 23.52 | 95 |
| Respondent is mom of child under 18 currently living in the household |  | 369 | 1.07 | 15.41 | 114 |
| Respondent is dad of child under 18 currently living in the household |  | 195 | 0.68 | 8.12 | 73 |
| Respondent is parent of a child under 18 not currently living in the |  | 160 | 0.73 | 6.67 | 78 |
| Respondent is parent of an adult aged 18 or over not currently living in the household |  | 1,043 | 1.10 | 43.54 | 118 |
| Any parent (Any parent of an adult or child, living in home or out of home) |  | 1,590 | 0.98 | 66.35 | 105 |
| Age 18-24 |  | 159 | 0.54 | 6.65 | 58 |
| Age 25-34 |  | 295 | 0.65 | 12.31 | 70 |
| Age 35-44 |  | 428 | 0.99 | 17.86 | 106 |
| Age 45-54 |  | 451 | 1.12 | 18.84 | 120 |
| Age 55-64 |  | 486 | 1.15 | 20.30 | 123 |
| Age 65+ |  | 576 | 1.02 | 24.05 | 109 |
| Mean respondent age | 'A | 50.7 | N/A | N/A | 107 |
| Median respondent age | 'A | 52.4 | N/A | N/A | 110 |
| Adults 18-34 |  | 454 | 0.61 | 18.96 | 65 |
| Adults 18-49 |  | 1,077 | 0.79 | 44.93 | 84 |
| Adults 25-54 |  | 1,174 | 0.91 | 49.00 | 98 |
| Adults 35-54 |  | 879 | 1.06 | 36.69 | 113 |
| Men 18-24 | * | 55 | 0.37 | 2.28 | 40 |
| Men 18-34 |  | 192 | 0.51 | 8.01 | 55 |
| Men 18-49 |  | 439 | 0.64 | 18.31 | 69 |
| Men 25-34 | * | 137 | 0.61 | 5.73 | 65 |
| Men 25-54 |  | 469 | 0.74 | 19.59 | 79 |
| Men 35-44 |  | 177 | 0.83 | 7.40 | 89 |
| Men 35-54 |  | 332 | 0.81 | 13.86 | 86 |
| Men 45-54 | * | 155 | 0.78 | 6.46 | 84 |
| Men 55-64 | * | 145 | 0.71 | 6.05 | 76 |
| Men 65+ |  | 157 | 0.61 | 6.57 | 66 |
| Women 18-24 | * | 105 | 0.72 | 4.37 | 77 |
| Women 18-34 |  | 262 | 0.71 | 10.95 | 76 |
| Women 18-49 |  | 638 | 0.93 | 26.62 | 99 |
| Women 25-34 |  | 158 | 0.70 | 6.58 | 75 |

**Appendix A**
**Effexor Antitrust Litigation MRI Data**

**Audience Demographic: Prescription Brands Used: In last 12 months: Effexor/Effexor XR**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Women 25-54 | | 705 | 1.09 | 29.41 | 117 |
| Women 35-44 | | 251 | 1.16 | 10.45 | 124 |
| Women 35-54 | | 547 | 1.30 | 22.83 | 139 |
| Women 45-54 | | 297 | 1.45 | 12.38 | 155 |
| Women 55-64 | | 342 | 1.56 | 14.25 | 167 |
| Women 65+ | | 419 | 1.35 | 17.48 | 145 |
| Highest Degree Received by Respondent: 12th grade or less (did not graduate high school) | * | 204 | 0.83 | 8.53 | 89 |
| Highest Degree Received by Respondent: Graduated high school or equivalent | | 738 | 1.00 | 30.80 | 107 |
| Highest Degree Received by Respondent: Some college, no degree | | 402 | 0.95 | 16.78 | 101 |
| Highest Degree Received by Respondent: Associate degree | | 325 | 1.25 | 13.55 | 134 |
| Highest Degree Received by Respondent: Bachelor's degree | | 398 | 0.76 | 16.61 | 81 |
| Highest Degree Received by Respondent: Post-graduate degree | | 329 | 0.88 | 13.73 | 95 |
| Highest Degree Received by Respondent: Some college (no degree) OR Associate degree | | 727 | 1.06 | 30.33 | 114 |
| Highest Degree Received by Respondent: Bachelor's degree OR Post-graduate degree | | 727 | 0.81 | 30.34 | 87 |
| Employment: Working full time | | 1,005 | 0.81 | 41.93 | 86 |
| Employment: Working part time | | 299 | 0.90 | 12.49 | 96 |
| Employment: Working full time or part time | | 1,304 | 0.83 | 54.42 | 88 |
| Employment: Not working | | 1,092 | 1.11 | 45.58 | 118 |
| If not employed: Retired | | 623 | 1.12 | 25.99 | 119 |
| If not employed: Temporarily Unemployed | * | 110 | 0.98 | 4.57 | 105 |
| If not employed: Student | * | 51 | 0.70 | 2.12 | 75 |
| If not employed: Homemaker | * | 136 | 0.89 | 5.68 | 95 |
| If not employed: Other | | 173 | 1.87 | 7.23 | 201 |
| Occupation: Professional and related occupations | | 378 | 0.96 | 15.75 | 102 |
| Occupation: Management, business and financial operations | | 209 | 0.70 | 8.73 | 75 |
| Occupation: Sales and office occupations | | 275 | 0.93 | 11.48 | 100 |
| Occupation: Natural resources, construction and maintenance occup. | * | 96 | 0.68 | 3.99 | 73 |
| Occupation: Other employed | | 347 | 0.77 | 14.47 | 83 |
| Respondent is a Veteran of the U.S. Armed Forces | | 211 | 1.08 | 8.80 | 116 |
| Respondent is in the Reserves of the U.S. Armed Forces | * | 7 | 0.54 | 0.28 | 58 |
| Individual Employment Income: $250,000+ | * | 13 | 0.32 | 0.53 | 35 |
| Individual Employment Income: $200,000-$249,999 | * | 11 | 0.40 | 0.48 | 43 |
| Individual Employment Income: $150,000-$199,999 | * | 27 | 0.40 | 1.14 | 42 |
| Individual Employment Income: $100,000-$149,999 | * | 163 | 0.89 | 6.79 | 95 |
| Individual Employment Income: $75,000-$99,999 | | 148 | 0.75 | 6.19 | 80 |

**Appendix A**
**Effexor Antitrust Litigation MRI Data**


**Audience Demographic: Prescription Brands Used: In last 12 months: Effexor/Effexor XR**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Individual Employment Income: $60,000-$74,999 | | 162 | 0.95 | 6.76 | 101 |
| Individual Employment Income: $50,000-$59,999 | | 123 | 0.86 | 5.11 | 92 |
| Individual Employment Income: $40,000-$49,999 | | 182 | 1.07 | 7.60 | 115 |
| Individual Employment Income: $30,000-$39,999 | | 156 | 0.91 | 6.50 | 97 |
| Individual Employment Income: $20,000-$29,999 | * | 109 | 0.70 | 4.53 | 75 |
| Individual Employment Income: Under $20,000 | | 210 | 0.85 | 8.78 | 91 |
| Wage Earner Status: Employed | | 1,304 | 0.83 | 54.42 | 88 |
| Wage Earner Status: Sole earner | | 445 | 0.97 | 18.55 | 104 |
| Wage Earner Status: Primary earner | | 442 | 0.77 | 18.45 | 82 |
| Wage Earner Status: Secondary earner | | 417 | 0.77 | 17.42 | 82 |
| Household Income: $500,000+ | * | 28 | 0.64 | 1.16 | 68 |
| Household Income: $350,000-$499,999 | * | 11 | 0.27 | 0.47 | 29 |
| Household Income: $250,000-$349,999 | * | 46 | 0.48 | 1.91 | 51 |
| Household Income: $200,000-$249,999 | * | 147 | 1.02 | 6.15 | 109 |
| Household Income: $150,000-$199,999 | | 212 | 0.73 | 8.85 | 78 |
| Household Income: $125,000-$149,999 | | 129 | 0.67 | 5.39 | 72 |
| Household Income: $100,000-$124,999 | | 248 | 0.90 | 10.34 | 96 |
| Household Income: $75,000-$99,999 | | 332 | 1.00 | 13.85 | 107 |
| Household Income: $60,000-$74,999 | | 191 | 0.80 | 7.98 | 86 |
| Household Income: $50,000-$59,999 | | 192 | 1.12 | 8.02 | 120 |
| Household Income: $40,000-$49,999 | | 231 | 1.37 | 9.64 | 146 |
| Household Income: $30,000-$39,999 | | 205 | 1.20 | 8.57 | 128 |
| Household Income: $20,000-$29,999 | | 159 | 0.99 | 6.65 | 106 |
| Household Income: Under $20,000 | | 264 | 1.11 | 11.01 | 119 |
| Mean Household Income | 'A | 94,056.2 | N/A | N/A | 85 |
| Median Household Income | 'A | 71,470.6 | N/A | N/A | 84 |
| Household Income: $250,000+ | * | 85 | 0.47 | 3.54 | 50 |
| Household Income: $150,000+ | | 444 | 0.72 | 18.54 | 77 |
| Household Income: $100,000+ | | 821 | 0.76 | 34.27 | 81 |
| Household Income: $75,000+ | | 1,153 | 0.81 | 48.12 | 87 |
| Household Income: $60,000+ | | 1,344 | 0.81 | 56.10 | 87 |
| Household Income: $50,000+ | | 1,537 | 0.84 | 64.13 | 90 |
| Household Income: $40,000+ | | 1,768 | 0.89 | 73.77 | 95 |
| Household Income: $30,000+ | | 1,973 | 0.91 | 82.34 | 97 |
| Total Net Worth of All HH Members: $1,000,000+ | | 324 | 0.78 | 13.53 | 84 |
| Total Net Worth of All HH Members: $500,000-$999,999 | | 407 | 0.92 | 17.00 | 98 |
| Total Net Worth of All HH Members: $250,000-$499,999 | | 527 | 1.00 | 21.98 | 107 |
| Total Net Worth of All HH Members: $100,000-$249,999 | | 470 | 1.04 | 19.62 | 111 |
| Total Net Worth of All HH Members: Under $100,000 | | 668 | 0.92 | 27.87 | 98 |
| Census Region: North East | | 394 | 0.88 | 16.45 | 94 |

**Appendix A**
**Effexor Antitrust Litigation MRI Data**

**Audience Demographic: Prescription Brands Used: In last 12 months: Effexor/Effexor XR**

|  |  | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Census Region: South | | 959 | 0.97 | 40.03 | 104 |
| Census Region: Midwest | | 565 | 1.06 | 23.60 | 114 |
| Census Region: West | | 478 | 0.80 | 19.93 | 86 |
| Marketing Region: New England | | 134 | 1.12 | 5.60 | 120 |
| Marketing Region: Mid Atlantic | | 294 | 0.76 | 12.25 | 82 |
| Marketing Region: East Central | | 343 | 1.16 | 14.33 | 124 |
| Marketing Region: West Central | | 416 | 1.13 | 17.34 | 121 |
| Marketing Region: Southeast | | 578 | 1.06 | 24.12 | 113 |
| Marketing Region: Southwest | | 259 | 0.79 | 10.80 | 85 |
| Marketing Region: Pacific | | 373 | 0.71 | 15.56 | 76 |
| Mediamarkets: Top 5 | | 320 | 0.62 | 13.34 | 66 |
| Mediamarkets: Next 5 | | 208 | 0.72 | 8.69 | 77 |
| Mediamarkets: New York | * | 76 | 0.45 | 3.18 | 48 |
| Mediamarkets: Los Angeles | * | 99 | 0.68 | 4.14 | 73 |
| Mediamarkets: Chicago | * | 46 | 0.61 | 1.91 | 65 |
| Metropolitan CBSA | | 1,960 | 0.88 | 81.78 | 94 |
| Micropolitan CBSA/unassigned | | 437 | 1.27 | 18.22 | 135 |
| County Size: A | | 743 | 0.69 | 30.99 | 74 |
| County Size: B | | 856 | 1.11 | 35.73 | 118 |
| County Size: C | | 361 | 0.97 | 15.06 | 104 |
| County Size: D | | 437 | 1.29 | 18.22 | 138 |
| Marital Status: Never married | | 577 | 0.74 | 24.09 | 79 |
| Marital Status: Now married | | 1,226 | 0.93 | 51.18 | 99 |
| Marital Status: Legally separated/widowed/divorced | | 593 | 1.29 | 24.73 | 138 |
| Marital Status: Never married or Legally separated/widowed/divorced | | 1,170 | 0.94 | 48.82 | 101 |
| Marital Status: Engaged | * | 102 | 0.78 | 4.25 | 83 |
| Living w/partner/fiance/boyfriend or girlfriend (same or opposite sex) | | 332 | 1.02 | 13.87 | 109 |
| Married in last 12 months | * | 82 | 1.23 | 3.41 | 131 |
| Household size: 1 | | 430 | 1.13 | 17.95 | 121 |
| Household size: 2 | | 882 | 1.00 | 36.82 | 107 |
| Household size: 3-4 | | 734 | 0.83 | 30.62 | 89 |
| Household size: 5+ | | 350 | 0.84 | 14.61 | 90 |
| Children: Any | | 738 | 0.85 | 30.78 | 91 |
| Children: 1 | | 375 | 1.01 | 15.67 | 108 |
| Children: 2 | | 186 | 0.62 | 7.78 | 67 |
| Children: 3+ | | 176 | 0.89 | 7.33 | 96 |
| Child Age: <12 months | * | 77 | 0.62 | 3.21 | 66 |
| Child Age: 12-23 months | * | 52 | 0.76 | 2.18 | 81 |

**Appendix A**
**Effexor Antitrust Litigation MRI Data**

**Audience Demographic: Prescription Brands Used: In last 12 months: Effexor/Effexor XR**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Child Age: <2 years | * | 127 | 0.70 | 5.30 | 75 |
| Child Age: <6 years | | 286 | 0.74 | 11.95 | 79 |
| Child Age: 2-5 years | | 215 | 0.76 | 8.97 | 81 |
| Child Age: 6-11 years | | 343 | 0.89 | 14.31 | 95 |
| Child Age: 12-17 years | | 362 | 0.84 | 15.12 | 90 |
| Life Cycle: Respondent 18-34 1 person household | * | 38 | 0.58 | 1.60 | 62 |
| Life Cycle: Respondent 18-34 married no kids | * | 38 | 0.50 | 1.59 | 53 |
| Life Cycle: Respondent 18-34 married young child under 6 | * | 78 | 0.74 | 3.24 | 80 |
| Life Cycle: Respondent 18-34 married young child 6-17 | * | 8 | 0.37 | 0.35 | 39 |
| Life Cycle: Balance of respondents 18-34 | | 292 | 0.61 | 12.18 | 66 |
| Life Cycle: Respondent 35-49 1 person household | * | 57 | 1.00 | 2.37 | 107 |
| Life Cycle: Respondent 35-49 married no kids | * | 119 | 1.29 | 4.95 | 138 |
| Life Cycle: Respondent 35-49 married young child under 6 | * | 76 | 0.68 | 3.15 | 73 |
| Life Cycle: Respondent 35-49 married young child 6-11 | * | 95 | 0.91 | 3.95 | 97 |
| Life Cycle: Respondent 35-49 married young child 12-17 | * | 76 | 1.05 | 3.18 | 113 |
| Life Cycle: Balance of respondents 35-49 | | 200 | 1.06 | 8.37 | 113 |
| Life Cycle: Respondent 50+ 1 person household | | 322 | 1.34 | 13.42 | 144 |
| Life Cycle: Respondent 50+ married no kids | | 641 | 1.01 | 26.76 | 108 |
| Life Cycle: Respondent 50+ married w/kids | * | 96 | 0.91 | 4.02 | 97 |
| Life Cycle: Balance of respondents 50+ | | 261 | 1.22 | 10.88 | 131 |
| Years at Present Address: Under 1 year | | 213 | 0.74 | 8.89 | 79 |
| Years at Present Address: 1-4 years | | 694 | 0.90 | 28.95 | 96 |
| Years at Present Address: 5+ years | | 1,490 | 0.99 | 62.16 | 106 |
| Own or Rent Home: Own | | 1,682 | 1.00 | 70.19 | 107 |
| Own or Rent Home: Rent | | 684 | 0.83 | 28.53 | 89 |
| Own or Rent Home: Rent-free | * | 31 | 0.56 | 1.28 | 60 |
| Home Value: $500,000+ | | 318 | 0.68 | 13.25 | 73 |
| Home Value: $200,000-$499,999 | | 782 | 1.02 | 32.65 | 109 |
| Home Value: $100,000-$199,999 | | 377 | 1.34 | 15.74 | 143 |
| Home Value: $50,000-$99,999 | * | 113 | 1.12 | 4.72 | 120 |
| Home Value: Under $50,000 | * | 92 | 1.31 | 3.83 | 140 |
| Race: White | | 2,125 | 1.11 | 88.67 | 119 |
| Race: Black/African American | | 147 | 0.43 | 6.13 | 46 |
| Race: American Indian or Alaska Native | * | 31 | 0.73 | 1.28 | 78 |
| Race: Asian | * | 21 | 0.19 | 0.86 | 20 |
| Race: Other | | 131 | 0.52 | 5.45 | 56 |
| Race: White only | | 2,083 | 1.13 | 86.93 | 121 |
| Race: Black/African American only | | 131 | 0.42 | 5.46 | 44 |
| Race: Other race/Multiple classifications | | 182 | 0.45 | 7.60 | 48 |
| Spanish Spoken in Home (Most Often or Other) | | 220 | 0.47 | 9.16 | 51 |

**Appendix A**
**Effexor Antitrust Litigation MRI Data**

**Audience Demographic: Prescription Brands Used: In last 12 months: Effexor/Effexor XR**

|  |  | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Hispanic Respondent Personally Speaks at Home (Hispanic respondents only): Only English | * | 70 | 0.94 | 2.94 | 101 |
| Hispanic Respondent Personally Speaks at Home (Hispanic respondents only): Mostly English, but some Spanish | * | 74 | 0.68 | 3.08 | 72 |
| Hispanic Respondent Personally Speaks at Home (Hispanic respondents only): Only Spanish | * | 46 | 0.36 | 1.90 | 38 |
| Hispanic Respondent Personally Speaks at Home (Hispanic respondents only): Mostly Spanish, but some English | * | 23 | 0.24 | 0.95 | 25 |
| Hispanic Respondent Personally Speaks at Home (Hispanic respondents only): Both English and Spanish equally at home | * | 8 | 0.29 | 0.35 | 31 |
| Hispanic Birthplace of Respondent (Hispanic respondents only): United States |  | 129 | 0.58 | 5.37 | 62 |
| Hispanic Birthplace of Respondent (Hispanic respondents only): Other country | * | 87 | 0.44 | 3.64 | 47 |
| Hispanic Birthplace of Respondent (Hispanic respondents only): Puerto Rico or other U.S. Territories | * | 9 | 0.43 | 0.39 | 47 |
| Hispanic Birthplace of Respondent's Mother (Hispanic respondents only): United States | * | 77 | 0.74 | 3.20 | 79 |
| Hispanic Birthplace of Respondent's Mother (Hispanic respondents only): Other country | * | 133 | 0.47 | 5.54 | 50 |
| Hispanic Birthplace of Respondent's Mother (Hispanic respondents only): Puerto Rico or other U.S. Territories | * | 11 | 0.35 | 0.45 | 37 |
| Hispanic Birthplace of Respondent's Father (Hispanic respondents only): United States | * | 61 | 0.65 | 2.53 | 69 |
| Hispanic Birthplace of Respondent's Father (Hispanic respondents only): Other country |  | 145 | 0.51 | 6.06 | 55 |
| Hispanic Birthplace of Respondent's Father (Hispanic respondents only): Puerto Rico or other U.S. Territories | * | 9 | 0.28 | 0.39 | 30 |
| Hispanic Country of Ancestors' Origin (Hispanic respondents only): Mexico |  | 139 | 0.59 | 5.82 | 63 |
| Hispanic Country of Ancestors' Origin (Hispanic respondents only): Puerto Rico | * | 11 | 0.22 | 0.46 | 24 |
| Hispanic Country of Ancestors' Origin (Hispanic respondents only): Cuba | * | 7 | 0.26 | 0.27 | 28 |
| Hispanic Country of Ancestors' Origin (Hispanic respondents only): Dominican Republic | * | 10 | 0.47 | 0.40 | 51 |
| Hispanic Country of Ancestors' Origin (Hispanic respondents only): Other Central American Country | * | 13 | 0.27 | 0.55 | 29 |
| Hispanic Country of Ancestors' Origin (Hispanic respondents only): South America or other Spanish/Hispanic country | * | 63 | 0.66 | 2.63 | 70 |

**Appendix A**
**Effexor Antitrust Litigation MRI Data**

**Audience Demographic: Prescription Brands Used: In last 12 months: Effexor/Effexor XR**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Hispanic Length of Time Living in the United States (Hispanic respondents, born outside the U.S. only): Less than 5 years | * | 23 | 0.62 | 0.98 | 66 |
| Hispanic Length of Time Living in the United States (Hispanic respondents, born outside the U.S. only): 5 years but less than 10 | * | 11 | 0.30 | 0.44 | 32 |
| Spanish, Hispanic or Latino Origin or Descent | | 225 | 0.51 | 9.39 | 55 |
| Not of Spanish, Hispanic or Latino Origin/Descent | | 2,171 | 1.02 | 90.61 | 109 |
| Pet owner | | 1,675 | 1.17 | 69.88 | 126 |
| Dog owner | | 1,229 | 1.14 | 51.29 | 122 |
| Cat owner | | 900 | 1.37 | 37.56 | 147 |
| Generations: Gen Z (b.1997-2010) only includes respondents 18+ | | 216 | 0.60 | 9.02 | 64 |
| Generations: Millennials (b.1977-1996) | | 736 | 0.83 | 30.71 | 89 |
| Generations: GenXers (b.1965-1976) | | 530 | 1.10 | 22.11 | 117 |
| Generations: Boomers (b. 1946-1964) | | 796 | 1.15 | 33.21 | 123 |
| Generations: Early Boomers (b. 1946-1955) | | 311 | 1.01 | 12.98 | 108 |
| Generations: Late Boomers (b. 1956-1964) | | 485 | 1.27 | 20.23 | 136 |
| Generations: Pre-Boomers (b. before 1946) | * | 119 | 0.82 | 4.94 | 87 |
| Respondent's Sexual Orientation:  Heterosexual/Straight | | 2,031 | 0.92 | 84.77 | 98 |
| Respondent's Sexual Orientation:  NET Gay/Lesbian | * | 88 | 1.30 | 3.69 | 139 |
| Respondent's Sexual Orientation:  NET Gay/Lesbian/Bisexual/Transgender | | 193 | 1.30 | 8.06 | 139 |

* Projections relatively unstable, use with caution
Since W82 on, mag aud ests tabbed w/ probabilities, ratio-adjust to recent read for Tot, M & F AIA. Prior ests use recent-readng only.
Source: 2024 MRI-Simmons Spring Doublebase USA weighted to Population (000) - Base: All
No Audit Report Was Generated

**Appendix B**
**Effexor Antitrust Litigation MRI Data**

**Media Quintiles: Prescription Brands: Used: In last 12 months: Effexor/Effexor XR**

| | Weighted (000) | % Coverage | % Compositio | Index |
|---|---|---|---|---|
| Summaries: Media | 529 | 1.03 | 22.09 | 110 |
| Quintile/Tercile Codes: | | | | |
| Magazines II | 458 | 0.89 | 19.10 | 95 |
| Magazines III | 467 | 0.91 | 19.50 | 98 |
| Magazines IV | 476 | 0.93 | 19.86 | 100 |
| Magazines V (Light) | 466 | 0.91 | 19.45 | 98 |
| Newspaper I (Heavy) | 533 | 1.03 | 22.23 | 110 |
| Newspaper II | 543 | 1.06 | 22.65 | 114 |
| Newspaper III | 439 | 0.86 | 18.34 | 92 |
| Newspaper IV | 493 | 0.97 | 20.57 | 103 |
| Newspaper V (Light) | 388 | 0.76 | 16.21 | 81 |
| Radio/Audio I (Heavy) | 491 | 0.96 | 20.51 | 102 |
| Radio/Audio II | 506 | 0.99 | 21.13 | 106 |
| Radio/Audio III | 517 | 1.01 | 21.58 | 108 |
| Radio/Audio IV | 420 | 0.82 | 17.51 | 88 |
| Radio/Audio V (Light) | 462 | 0.90 | 19.28 | 96 |
| Radio/Audio (Primetime) I (Heavy) | 524 | 1.02 | 21.89 | 109 |
| Radio/Audio (Primetime) II | 517 | 1.01 | 21.57 | 108 |
| Radio/Audio (Primetime) III | 485 | 0.94 | 20.23 | 101 |
| Radio/Audio (Primetime) IV | 380 | 0.74 | 15.85 | 79 |
| Radio/Audio (Primetime) V (Light) | 490 | 0.96 | 20.47 | 102 |
| TV (total) I (Heavy) | 645 | 1.25 | 26.90 | 134 |
| TV (total) II | 473 | 0.92 | 19.72 | 99 |
| TV (total) III | 487 | 0.95 | 20.33 | 102 |
| TV (total) IV | 380 | 0.74 | 15.86 | 79 |
| TV (total) V (Light) | 412 | 0.80 | 17.19 | 86 |
| Internet I (Heavy) | 412 | 0.80 | 17.20 | 86 |
| Internet II | 484 | 0.94 | 20.18 | 101 |
| Internet III | 500 | 0.98 | 20.85 | 104 |
| Internet IV | 562 | 1.09 | 23.46 | 117 |
| Internet V (Light) | 439 | 0.85 | 18.31 | 91 |
| Social Media I (Heavy) | 423 | 0.82 | 17.63 | 88 |
| Social Media II | 522 | 1.02 | 21.79 | 109 |

**Appendix B**
**Effexor Antitrust Litigation MRI Data**

**Media Quintiles: Prescription Brands: Used: In last 12 months: Effexor/Effexor XR**

|  |  | Weighted (000) | % Coverage | % Compositio | Index |
|---|---|---|---|---|---|
| Social Media III |  | 575 | 1.12 | 24.00 | 120 |
| Social Media IV |  | 449 | 0.88 | 18.73 | 94 |
| Social Media V (Light) |  | 428 | 0.83 | 17.84 | 89 |
| Outdoor I (Heavy) |  | 447 | 0.88 | 18.67 | 94 |
| Outdoor II |  | 542 | 1.06 | 22.60 | 113 |
| Outdoor III |  | 508 | 0.99 | 21.20 | 106 |
| Outdoor IV |  | 435 | 0.85 | 18.14 | 91 |
| Outdoor V (Light) |  | 465 | 0.90 | 19.38 | 96 |
| TV (Prime time) I (Heavy) |  | 648 | 1.26 | 27.05 | 135 |
| TV (Prime time) II |  | 425 | 0.83 | 17.72 | 89 |
| TV (Prime time) III |  | 418 | 0.81 | 17.45 | 87 |
| TV (Prime time) IV |  | 485 | 0.95 | 20.25 | 101 |
| TV (Prime time) V (Light) |  | 420 | 0.82 | 17.54 | 88 |
| TV (Day time) I (Heavy) |  | 387 | 1.22 | 16.16 | 130 |
| TV (Day time) II |  | 275 | 0.86 | 11.48 | 92 |
| TV (Day time) III (Light) |  | 298 | 0.94 | 12.44 | 100 |
| Spanish Language TV Networks I (Heavy) | * | 52 | 0.60 | 2.16 | 64 |
| Spanish Language TV Networks II | * | 11 | 0.12 | 0.45 | 13 |
| Spanish Language TV Networks III | * | 39 | 0.44 | 1.64 | 47 |
| Spanish Language TV Networks IV | * | 63 | 0.71 | 2.63 | 77 |
| Spanish Language TV Networks V (Light) | * | 60 | 0.68 | 2.51 | 73 |

* Projections relatively unstable, use with caution
Since W82 on, mag aud ests tabbed w/ probabilities, ratio-adjust to recent read for Tot, M & F AIA. Prior ests use recent-readng only.
Source: 2024 MRI-Simmons Spring Doublebase USA weighted to Population (000) - Base: All
No Audit Report Was Generated

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Internet: Activities Done in last 30 days: Visited a chat room | * | 89 | 0.65 | 3.72 | 69 |
| Used e-mail | | 2,092 | 0.97 | 87.31 | 104 |
| Used instant messenger/IM | | 1,965 | 0.95 | 82.01 | 102 |
| Participated in on-line dating | * | 76 | 0.85 | 3.16 | 91 |
| Made a purchase for personal use | | 1,783 | 0.98 | 74.42 | 104 |
| Made a purchase for business use | | 308 | 0.87 | 12.85 | 93 |
| Obtained information to help make a purchase | | 1,096 | 1.01 | 45.73 | 108 |
| Made personal or business travel plans | | 557 | 0.89 | 23.24 | 95 |
| Played games online | | 1,037 | 1.05 | 43.29 | 112 |
| Downloaded a video game | | 349 | 0.93 | 14.57 | 99 |
| Used on-line gambling site | * | 35 | 0.49 | 1.47 | 52 |
| Obtained the latest news/Current events | | 1,264 | 0.95 | 52.74 | 102 |
| Obtained sports news/Information | | 646 | 0.87 | 26.95 | 93 |
| Obtained information for new or used car purchase | | 190 | 0.70 | 7.91 | 75 |
| Obtained information about real estate | | 326 | 0.84 | 13.62 | 90 |
| Obtained medical information | | 963 | 1.11 | 40.20 | 119 |
| Obtained childcare or parenting information | * | 114 | 0.91 | 4.74 | 98 |
| Obtained information about entertainment or celebrities | | 711 | 0.97 | 29.68 | 104 |
| Looked for employment | | 377 | 1.09 | 15.72 | 116 |
| Looked for recipes | | 1,364 | 0.99 | 56.90 | 106 |
| Took an online class or course | | 229 | 0.81 | 9.54 | 87 |
| Visited a TV network or TV show's website | | 460 | 0.96 | 19.19 | 103 |
| Looked for TV show schedules online | | 311 | 0.96 | 12.99 | 103 |
| Looked up movie listings or showtimes | | 364 | 0.76 | 15.18 | 82 |
| Downloaded a TV program | * | 91 | 1.02 | 3.81 | 109 |
| Watched a TV program online | | 460 | 0.79 | 19.20 | 85 |
| Downloaded a movie | | 152 | 0.88 | 6.35 | 94 |
| Watched a movie online | | 782 | 0.87 | 32.62 | 93 |
| Watched other online video | | 710 | 0.92 | 29.64 | 98 |
| Visited online blogs | | 253 | 0.88 | 10.54 | 94 |
| Wrote an online blog | * | 14 | 0.50 | 0.60 | 54 |
| Posted a comment or review on a blog, online forum, message or bulletin board | | 314 | 1.15 | 13.08 | 123 |
| Made a phone call | | 958 | 0.93 | 39.96 | 100 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Used video chat | | 768 | 0.89 | 32.05 | 96 |
| Uploaded or added video to website | | 197 | 1.05 | 8.24 | 113 |
| Shared photos through Internet website | | 724 | 1.04 | 30.21 | 112 |
| Sent an electronic greeting card | * | 117 | 1.17 | 4.90 | 126 |
| Internet: Activities Done Using A Social Media, Photo Or Video-Sharing Service In The Last 30 Days in last 30 days: Post an update | | 766 | 1.04 | 31.97 | 111 |
| Update your profile | | 464 | 1.12 | 19.36 | 120 |
| Post picture(s) | | 1,003 | 1.07 | 41.84 | 115 |
| Used a filter on a picture | | 212 | 0.94 | 8.86 | 101 |
| Create a video | | 170 | 0.84 | 7.09 | 90 |
| Post/share a video | | 498 | 1.07 | 20.77 | 114 |
| Post a website link | | 255 | 1.23 | 10.65 | 132 |
| Visit a friend's profile/page | | 1,133 | 1.09 | 47.27 | 116 |
| Comment on a friend's post | | 1,071 | 1.12 | 44.71 | 120 |
| Posted a blog entry | * | 16 | 0.48 | 0.68 | 52 |
| Rated or reviewed a product or service | | 192 | 1.07 | 8.03 | 114 |
| Sent a message or email | | 1,182 | 1.08 | 49.34 | 115 |
| Used Instant Messaging/IM | | 640 | 1.07 | 26.71 | 115 |
| Play a game | | 544 | 1.26 | 22.70 | 135 |
| Invited people to an event | * | 78 | 0.69 | 3.27 | 74 |
| Sent a real or virtual gift | * | 38 | 0.86 | 1.59 | 93 |
| Posted that you Like something | | 967 | 1.22 | 40.35 | 131 |
| Follow or become a fan of something or | | 640 | 1.11 | 26.70 | 119 |
| Clicked on an advertisement | | 392 | 1.05 | 16.37 | 112 |
| Watched a video | | 1,146 | 0.99 | 47.84 | 106 |
| Post/share your location | | 182 | 1.24 | 7.59 | 133 |
| Re-post or share a post created by someone else | | 510 | 1.39 | 21.29 | 149 |
| Make a purchase | | 626 | 1.04 | 26.11 | 111 |
| Visit a company or brands profile or page | | 432 | 1.12 | 18.02 | 120 |
| Share a meme or GIF | | 434 | 1.00 | 18.11 | 107 |
| Internet: Amazon Prime: You Or Anyone In Your | | 1,719 | 0.97 | 71.71 | 104 |
| Internet: Any Usage in last 30 days: Any Internet/Online usage | | 2,332 | 0.94 | 97.33 | 101 |
| Internet: Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): | | 2,041 | 0.91 | 85.16 | 98 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Internet: Chat, Instant Messenger, Or Video Chat Services, Used In The Last 30 Days: Discord | | 166 | 0.83 | 6.93 | 89 |
| Facebook Messenger | | 1,391 | 1.14 | 58.04 | 122 |
| FaceTime | | 696 | 0.87 | 29.06 | 93 |
| Google Meet | | 107 | 0.77 | 4.47 | 83 |
| Microsoft Teams | | 239 | 0.69 | 9.96 | 74 |
| Signal | * | 32 | 0.83 | 1.32 | 89 |
| Skype | * | 69 | 0.90 | 2.86 | 97 |
| Slack | * | 51 | 0.68 | 2.14 | 73 |
| Snapchat Chat | | 337 | 0.90 | 14.06 | 97 |
| Telegram | * | 66 | 0.89 | 2.77 | 95 |
| Viber | * | 9 | 0.54 | 0.38 | 58 |
| WeChat | * | 18 | 0.78 | 0.76 | 83 |
| WhatsApp | | 281 | 0.54 | 11.71 | 58 |
| Zoom | | 539 | 0.89 | 22.47 | 95 |
| Internet: Devices Used To Look At Or Use in last 30 days: Desktop Computer | | 944 | 0.87 | 39.39 | 94 |
| Laptop or Netbook Computer | | 1,257 | 0.86 | 52.45 | 92 |
| Any Computer | | 1,704 | 0.86 | 71.09 | 93 |
| iPad or other Tablet | | 847 | 0.93 | 35.34 | 100 |
| Cellphone or Smartphone | | 2,119 | 0.95 | 88.43 | 102 |
| E-reader | * | 115 | 1.27 | 4.82 | 135 |
| Video game console | | 239 | 0.81 | 9.96 | 86 |
| Television | | 767 | 0.99 | 32.00 | 105 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Internet: Have Access At Home: Yes | | 2,308 | 0.94 | 96.33 | 100 |
| Internet: How Respondent Connects To The Internet From Home: Dial-up modem | * | 21 | 0.69 | 0.88 | 73 |
| Cable Modem | | 848 | 0.85 | 35.38 | 91 |
| DSL Connection | | 277 | 1.37 | 11.55 | 147 |
| Fiber Optic service, such as Verizon Fios or AT&T Fiber | | 400 | 0.76 | 16.68 | 82 |
| Satellite Service | * | 130 | 1.36 | 5.41 | 146 |
| Any Broadband or High speed Connection | | 2,201 | 0.93 | 91.83 | 99 |
| Internet: Internet Browsers: Used In The Last 30 Days: Chrome | | 1,640 | 0.96 | 68.45 | 102 |
| Firefox | | 271 | 0.82 | 11.29 | 88 |
| Microsoft Edge | | 528 | 0.89 | 22.01 | 95 |
| Safari | | 935 | 0.90 | 39.01 | 96 |
| Internet: Internet Service Providers: Household: America On-line (AOL) | * | 42 | 1.87 | 1.76 | 200 |
| AT&T Internet | | 286 | 0.89 | 11.94 | 95 |
| CenturyLink | * | 83 | 1.08 | 3.48 | 116 |
| Cox | * | 72 | 0.66 | 3.01 | 71 |
| Frontier | * | 43 | 0.83 | 1.81 | 89 |
| Optimum | * | 56 | 0.75 | 2.32 | 80 |
| Spectrum | | 503 | 0.97 | 20.97 | 104 |
| Verizon or Fios by Verizon | | 210 | 0.94 | 8.78 | 100 |
| Xfinity/Comcast | | 476 | 0.84 | 19.88 | 90 |
| Any service | | 2,308 | 0.94 | 96.33 | 100 |
| Internet: Social Media, Photo Or Video-Sharing Services Visited Or Used In The Last 30 Days: Facebook | | 1,739 | 1.09 | 72.56 | 117 |
| Flickr | * | 27 | 1.72 | 1.12 | 184 |
| Google Photos | | 434 | 1.01 | 18.12 | 108 |
| Instagram | | 911 | 0.91 | 38.02 | 98 |
| LinkedIn | | 318 | 0.83 | 13.28 | 89 |
| Nextdoor | | 243 | 1.03 | 10.15 | 110 |
| Parler | * | 10 | 0.85 | 0.42 | 91 |
| Pinterest | | 580 | 1.30 | 24.22 | 139 |
| Reddit | | 293 | 0.93 | 12.22 | 99 |
| Shutterfly | * | 93 | 1.56 | 3.89 | 167 |
| Snapchat | | 424 | 0.84 | 17.69 | 90 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| TikTok | | 655 | 1.00 | 27.34 | 107 |
| Tumblr | * | 46 | 1.03 | 1.94 | 110 |
| Twitch | * | 59 | 0.56 | 2.45 | 60 |
| X [measured as Twitter in Waves 87-90] | | 369 | 0.82 | 15.39 | 88 |
| Vimeo | * | 37 | 0.90 | 1.53 | 96 |
| Yelp | * | 124 | 0.85 | 5.16 | 91 |
| YouTube | | 1,183 | 0.86 | 49.35 | 92 |
| Any Social Media/Photo/Video-sharing services | | 2,118 | 0.98 | 88.40 | 105 |
| Internet: Social Media, Photo Or Video-Sharing Services Visited Or Used Most Often: Facebook | | 1,102 | 1.26 | 45.96 | 135 |
| Google Photos | * | 17 | 0.36 | 0.70 | 38 |
| Instagram | | 211 | 0.77 | 8.80 | 82 |
| LinkedIn | * | 34 | 1.11 | 1.42 | 118 |
| Nextdoor | * | 24 | 0.92 | 0.98 | 99 |
| Pinterest | * | 39 | 1.15 | 1.63 | 123 |
| Reddit | * | 38 | 0.86 | 1.59 | 92 |
| Shutterfly | * | 0 | 0.00 | 0.00 | 0 |
| Snapchat | * | 49 | 0.71 | 2.03 | 76 |
| TikTok | | 174 | 0.89 | 7.25 | 95 |
| Tumblr | * | 0 | 0.00 | 0.00 | 0 |
| Twitch | * | 9 | 1.16 | 0.38 | 124 |
| X [measured as Twitter in Waves 87-90] | * | 30 | 0.49 | 1.24 | 53 |
| Yelp | * | 6 | 1.53 | 0.24 | 164 |
| YouTube | | 353 | 0.74 | 14.73 | 79 |
| Internet: Social Media: Total Time Spent Using Last Saturday: 10 or more hours | * | 40 | 0.70 | 1.66 | 75 |
| 5 hrs. - less than 10 hours | | 153 | 0.84 | 6.40 | 90 |
| 2 hrs. - less than 5 hours | | 470 | 1.04 | 19.61 | 111 |
| 1 hr. - less than 2 hours | | 516 | 1.00 | 21.54 | 107 |
| ½ hr. - less than 1 hour | | 414 | 1.05 | 17.27 | 112 |
| Less than ½ hour | | 348 | 0.92 | 14.52 | 99 |
| Internet: Social Media: Total Time Spent Using Last Sunday: 10 or more hours | * | 35 | 0.65 | 1.44 | 70 |
| 5 hrs. - less than 10 hours | | 142 | 0.87 | 5.94 | 94 |
| 2 hrs. - less than 5 hours | | 436 | 1.03 | 18.18 | 110 |
| 1 hr. - less than 2 hours | | 483 | 0.98 | 20.13 | 105 |
| ½ hr. - less than 1 hour | | 405 | 0.98 | 16.90 | 105 |
| Less than ½ hour | | 406 | 1.03 | 16.94 | 110 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Internet: Social Media: Total Time Spent Using Yesterday: 10 or more hours | * | 62 | 1.08 | 2.59 | 115 |
| 5 hrs. - less than 10 hours | | 158 | 0.83 | 6.58 | 88 |
| 2 hrs. - less than 5 hours | | 462 | 0.91 | 19.28 | 97 |
| 1 hr. - less than 2 hours | | 561 | 1.04 | 23.40 | 111 |
| ½ hr. - less than 1 hour | | 382 | 0.97 | 15.94 | 104 |
| Less than ½ hour | | 353 | 0.99 | 14.73 | 106 |
| Internet: Total Time Spent Using Last Saturday: 10 or more hours | | 181 | 0.90 | 7.55 | 97 |
| 5 hrs. - less than 10 hours | | 356 | 0.75 | 14.87 | 81 |
| 2 hrs. - less than 5 hours | | 802 | 1.06 | 33.48 | 114 |
| 1 hr. - less than 2 hours | | 490 | 0.99 | 20.47 | 106 |
| ½ hr. - less than 1 hour | | 242 | 1.03 | 10.09 | 111 |
| Less than ½ hour | | 121 | 0.79 | 5.05 | 85 |
| Internet: Total Time Spent Using Last Sunday: 10 or more hours | | 140 | 0.77 | 5.85 | 82 |
| 5 hrs. - less than 10 hours | | 351 | 0.79 | 14.63 | 85 |
| 2 hrs. - less than 5 hours | | 797 | 1.09 | 33.28 | 116 |
| 1 hr. - less than 2 hours | | 473 | 0.95 | 19.74 | 102 |
| ½ hr. - less than 1 hour | | 231 | 0.93 | 9.62 | 100 |
| Less than ½ hour | | 158 | 0.97 | 6.61 | 104 |
| Internet: Total Time Spent Using Yesterday: 10 or more hours | | 249 | 0.88 | 10.40 | 95 |
| 5 hrs. - less than 10 hours | | 509 | 0.86 | 21.25 | 92 |
| 2 hrs. - less than 5 hours | | 809 | 1.00 | 33.76 | 108 |
| 1 hr. - less than 2 hours | | 439 | 1.04 | 18.33 | 111 |
| ½ hr. - less than 1 hour | | 161 | 0.86 | 6.71 | 92 |
| Less than ½ hour | * | 95 | 0.90 | 3.95 | 97 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Email: AOL Mail | | 217 | 1.36 | 9.06 | 145 |
| Gmail | | 1,573 | 0.92 | 65.63 | 98 |
| Outlook | | 560 | 0.82 | 23.36 | 88 |
| Yahoo! Mail | | 571 | 0.98 | 23.82 | 105 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Entertainment: ABC | | 130 | 0.97 | 5.41 | 104 |
| BuzzFeed | | 127 | 1.24 | 5.28 | 133 |
| CBS | | 127 | 1.06 | 5.31 | 113 |
| Disney.com | * | 89 | 0.75 | 3.72 | 80 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| DisneyNOW | * | 14 | 0.80 | 0.57 | 85 |
| Fandango | * | 50 | 0.81 | 2.08 | 87 |
| Fox.com/FOX NOW | * | 92 | 1.00 | 3.86 | 107 |
| IMDb | | 262 | 1.08 | 10.94 | 115 |
| MSN Entertainment | * | 19 | 0.78 | 0.78 | 84 |
| MTV | * | 32 | 1.29 | 1.32 | 138 |
| NBC | * | 83 | 0.82 | 3.48 | 88 |
| PBS.org or PBS Video | * | 69 | 0.90 | 2.89 | 97 |
| POPSUGAR | * | 12 | 1.01 | 0.49 | 109 |
| Ticketmaster | | 191 | 1.12 | 7.96 | 120 |
| TMZ | * | 89 | 1.01 | 3.73 | 108 |
| Yahoo! Entertainment | * | 99 | 1.21 | 4.13 | 130 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Finance: CNBC | * | 49 | 0.57 | 2.06 | 61 |
| FOX Business | * | 59 | 0.67 | 2.47 | 72 |
| MSN Money | * | 9 | 0.23 | 0.36 | 25 |
| TheStreet | * | 9 | 0.42 | 0.37 | 45 |
| Yahoo! Finance | * | 58 | 0.46 | 2.43 | 49 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Games/Gaming: Apple Arcade | * | 93 | 1.28 | 3.86 | 137 |
| Twitch.tv or Twitch | * | 62 | 0.58 | 2.60 | 62 |
| YouTube Gaming | * | 54 | 0.68 | 2.25 | 72 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Health: WebMD | | 611 | 1.22 | 25.50 | 130 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Information/Reference: Angi | * | 14 | 0.44 | 0.57 | 47 |
| Answers.com | * | 15 | 0.49 | 0.61 | 52 |
| eHow.com | * | 35 | 0.73 | 1.46 | 78 |
| HomeAdvisor | * | 20 | 0.67 | 0.84 | 72 |
| Whitepages | * | 82 | 1.33 | 3.42 | 142 |
| Wikipedia | | 587 | 0.85 | 24.49 | 91 |
| Zillow | | 557 | 1.01 | 23.23 | 108 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Jobs/Careers: CareerBuilder | * | 27 | 0.68 | 1.15 | 73 |
| Indeed.com or Indeed Job Search | | 463 | 1.13 | 19.32 | 121 |
| Monster | * | 25 | 1.02 | 1.04 | 109 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: News/Commentary: ABCNews | | 197 | 0.98 | 8.21 | 105 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Apple News+ | * | 107 | 0.87 | 4.46 | 94 |
| BBC.com | * | 95 | 0.71 | 3.96 | 76 |
| Bloomberg.com | * | 61 | 0.78 | 2.54 | 83 |
| CBSNews | | 146 | 1.05 | 6.09 | 113 |
| CNN | | 328 | 0.90 | 13.70 | 97 |
| CNN en Espanol [25] | * | 9 | 0.29 | 0.36 | 31 |
| Fox News | | 316 | 0.93 | 13.19 | 100 |
| HuffPost | * | 70 | 0.91 | 2.94 | 98 |
| NBCNews | | 164 | 1.14 | 6.84 | 123 |
| NYTimes.com | | 303 | 0.70 | 12.65 | 75 |
| Reuters | * | 63 | 0.78 | 2.62 | 84 |
| The Washington Post | | 182 | 0.95 | 7.58 | 102 |
| USAToday.com | | 219 | 0.87 | 9.14 | 93 |
| WSJ.com | | 122 | 0.56 | 5.10 | 60 |
| Yahoo! News | | 203 | 0.97 | 8.48 | 104 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Shopping: Amazon | | 1,912 | 0.97 | 79.79 | 104 |
| Coupons | * | 35 | 0.79 | 1.45 | 84 |
| eBay | | 459 | 0.97 | 19.17 | 104 |
| Groupon | | 118 | 0.98 | 4.91 | 105 |
| LivingSocial | * | 2 | 0.23 | 0.09 | 24 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Socializing/Dating: Bumble | * | 34 | 0.92 | 1.42 | 99 |
| Eharmony | * | 7 | 0.84 | 0.31 | 90 |
| Match | * | 19 | 1.18 | 0.81 | 126 |
| Plenty of Fish | * | 21 | 1.15 | 0.86 | 123 |
| Tinder | * | 30 | 0.59 | 1.24 | 63 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Spanish Language: Telemundo.com | * | 28 | 0.32 | 1.15 | 34 |
| Univision.com or Univision NOW | * | 25 | 0.31 | 1.04 | 33 |
| Any Spanish Language Website/App [26] | * | 48 | 0.33 | 2.02 | 35 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Sports: BleacherReport.com or B-R | * | 59 | 0.81 | 2.46 | 87 |
| CBSSports | * | 109 | 1.04 | 4.56 | 112 |
| ESPN | | 360 | 0.82 | 15.02 | 88 |
| FOX Sports | * | 139 | 0.84 | 5.80 | 90 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| MLB | * | 111 | 0.94 | 4.65 | 101 |
| NASCAR | * | 73 | 1.75 | 3.06 | 187 |
| NBA | * | 71 | 0.73 | 2.97 | 78 |
| NBCSports.com | * | 38 | 0.82 | 1.57 | 88 |
| NFL.com or NFL | | 136 | 0.76 | 5.67 | 82 |
| WWE | * | 49 | 1.39 | 2.04 | 148 |
| Yahoo! Sports | * | 38 | 0.48 | 1.58 | 52 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Technology: CNET | * | 82 | 0.78 | 3.41 | 83 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Travel/Maps: Airbnb | | 332 | 1.04 | 13.87 | 112 |
| Bing Maps | * | 17 | 0.66 | 0.69 | 71 |
| CheapTickets | * | 61 | 0.91 | 2.55 | 97 |
| Expedia | | 271 | 1.06 | 11.30 | 114 |
| Google Maps | | 1,114 | 0.97 | 46.50 | 104 |
| Hotels.com | | 153 | 0.99 | 6.38 | 106 |
| Hotwire | * | 42 | 1.45 | 1.73 | 156 |
| Lyft | * | 88 | 0.72 | 3.69 | 77 |
| MapQuest | | 206 | 1.35 | 8.58 | 144 |
| Orbitz | * | 30 | 0.98 | 1.25 | 105 |
| Priceline | * | 106 | 1.12 | 4.41 | 120 |
| Travelocity | * | 70 | 0.87 | 2.90 | 93 |
| TripAdvisor | * | 106 | 0.73 | 4.40 | 79 |
| Uber | | 157 | 0.65 | 6.55 | 70 |
| Waze | | 270 | 1.05 | 11.25 | 113 |
| Internet: Websites Visited Or Apps Used In The Last 30 Days: Weather: AccuWeather | | 585 | 1.02 | 24.43 | 109 |
| The Weather Channel (weather.com) | | 1,014 | 1.01 | 42.31 | 108 |
| WeatherBug | * | 121 | 1.01 | 5.05 | 108 |
| Weather Underground (wunderground.com) | * | 97 | 1.05 | 4.06 | 113 |
| Internet: Websites/Search Engines: Used In Last 30 Days: AOL/AOL.com | * | 126 | 1.59 | 5.24 | 171 |
| Ask.com | * | 7 | 1.01 | 0.30 | 108 |
| Bing.com | | 168 | 0.76 | 7.00 | 81 |
| DuckDuckGo | | 161 | 0.82 | 6.73 | 88 |
| Google.com | | 1,988 | 0.92 | 82.97 | 98 |
| Yahoo.com | | 404 | 0.99 | 16.84 | 106 |

**Appendix C**
**Effexor ER Antitrust Litigation MRI Data**

**Digital Media, Websites and Social Media Usage-Used Effexor/Effexor XR prescription drugs**

| | Weighted (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Internet: Where Looked/Used in last 30 days: At home | 2,232 | 0.94 | 93.12 | 101 |
| At work | 920 | 0.84 | 38.38 | 90 |
| At school or library | 200 | 0.81 | 8.36 | 86 |
| Another place | 942 | 0.93 | 39.32 | 100 |

[25] Estimates for  CNN en Espanol  were modeled in Wave 87.
[26] Variable includes modeled data in Wave 87.
* Projections relatively unstable, use with caution
Since W82 on, mag aud ests tabbed w/ probabilities, ratio-adjust to recent read for Tot, M & F AIA.
Prior ests use recent-readng only.
Source: 2024 MRI-Simmons Spring Doublebase USA weighted to Population (000) - Base: All
No Audit Report Was Generated