# Exhibit 1
# (Filed Under Seal)

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

HIGHLY CONFIDENTIAL **– ATTORNEYS' EYES ONLY**
TO BE FILED UNDER SEAL
SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **In re EFFEXOR XR ANTITRUST LITIGATION**<br><br>**This Document Relates To:**<br>**Direct Purchaser Actions** | **Master Docket No. 3:11-cv-05479 (ZNQ-JBD)** |

EXPERT REPORT OF JEFFREY J. LEITZINGER, PH.D.

Econ ONE Research, Inc.

May 15, 2025

550 South Hope St., Suite 1085

Los Angeles, CA 90071

## TABLE OF CONTENTS

I.      Introduction ............................................................................. 1

II.     Assignment, Materials Reviewed and Summary of Conclusions ................................................................... 3

III.    The Role of Generic Competition ............................................. 5

IV.     Effexor XR Experience ............................................................ 10

V.      Price Impact of the Challenged Conduct ................................ 11

        A.  Delay Period .............................................................. 13

        B.  Teva Exclusivity Period ................................................ 15

VI.     Members of the Class ............................................................ 17

VII.    Proof of Class Member Impact .............................................. 19

        A.  Lost Generic Conversion .............................................. 20

        B.  Overcharges on Generic Purchases ................................ 21

        C.  Impact Conclusions ...................................................... 21

VIII.   Overcharge Methodology ....................................................... 22

        A.  Formulaic approach ...................................................... 22

        B.  Applying the overcharge formulas .................................. 23

i

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

IX.    Other Issues ............................................................................28

    A.  Accounting for Opt-Out Assignments ...............................................  28

    B.  Bypass .............................................................................  28

X.    Prospective Claim Values ..........................................................29



ii

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

# I.    Introduction

1.    I am an economist and Managing Director at Econ One Research, Inc., an economic research and consulting firm with offices in half a dozen cities around the country.  I have master's and doctoral degrees in economics from UCLA and a bachelor's degree in economics from Santa Clara University.  My doctoral work concentrated on the field within economics known as industrial organization, which involves among other things the study of markets, competition, antitrust, and other forms of regulation.

2.    During the past 45 years of my professional career, industrial organization has remained the principal focus of much of my work.  I have worked on numerous projects relating to antitrust economics, including analyzing issues involving market power, market definition, and the competitive effects of firm behavior.  I also have frequently assessed damages resulting from alleged anticompetitive conduct and have substantial experience in the calculation of damages in class action litigation.  Additionally, I have significant experience with economic issues related to class certification in antitrust contexts.

3.    I have testified as an expert economist in State and Federal courts, before a number of regulatory commissions and in international treaty arbitrations.  I have been involved continuously in research regarding the pharmaceutical industry for over twenty years now.  I am familiar with the economic and academic literature on the subject of generic drug competition, both as it operates normally and regarding strategies brand companies may employ to limit it.  I previously have conducted economic analysis of impact and damages for purposes of class certification in a number of cases involving alleged anticompetitive conduct directed against AB-rated[1]

---

[1] "AB-rated" is a term the United States Food and Drug Administration ("FDA") uses to classify a generic drug product that has been found to be therapeutically equivalent to its branded counterpart.  An AB-rated generic drug may be freely substituted for its branded counterpart at the pharmacy level without the prescribing physician's permission in most or all states.  The FDA lists such substitutable drugs in its "Orange Book," the formal title of which is *Approved Drug Products With Therapeutic Equivalence Evaluations.* "Therapeutically equivalent" is a technical term for products that meet certain criteria including safety and efficacy, "pharmaceutical equivalence," "bioequivalence," and labeling and manufacturing standards.  The definitions of therapeutic equivalence, pharmaceutical equivalence, and bioequivalence are listed in Sections 1.2 and 1.7 of the FDA's Orange Book.  The FDA Orange Book can be found at http://www.fda.gov/downloads/Drugs/DevelopmentApprovalProcess/UCM071436.pdf.



Page 1

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

generic competition.[2]  With few exceptions, the direct purchaser classes proposed in these cases were certified.[3]  I also have provided expert opinions regarding market power, anticompetitive effects, procompetitive justifications, overcharges, and/or class-member settlement allocations in connection with the merits phase of many of these same cases.  I previously submitted two declarations related to the settlement class in this case.[4]  A detailed summary of my training, past experience, and prior testimony is shown in Exhibit 1.

4.      Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $995 per hour.  Econ One also is being compensated for time

---

[2] *In re Lipitor Antitrust Litigation*, No. 12-2389 (D.N.J.); *In re Novartis and Par Antitrust Litigation,* No. 1:18-cv-04361 (S.D.N.Y.); *In re Glumetza Antitrust Litigation*, No. 3:19-cv-05822 (N.D. Cal); *In re Zetia (Ezetimibe) Antitrust Litigation*, MDL No. 2836 (E.D. Va.); *In re Intuniv Antitrust Litigation*, No. 16-cv-12653 (D. Mass.); *In re Opana ER Antitrust Litigation*, MDL No. 2580 (N.D. Ill.); *In re Loestrin 24 FE Antitrust Litigation*, MDL No. 2472 (D.R.I.); *In re Niaspan Antitrust Litigation*, MDL No. 2460 (E.D. Pa.); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-md-2503-DJC (D. Mass.); *In re Celebrex (Celecoxib) Antitrust Litigation*, No. 2:14-cv-00361 (E.D. Va.); *In re Lidoderm Antitrust Litigation*, No. 14-md-2521 (N.D. Cal.); *In re Prograf Antitrust Litigation*, No. 1:11-cv-10344-RWZ (D. Mass.); *In re Wellbutrin XL Antitrust Litigation*, No. 08-2431 (E.D. Pa.); *In re Relafen Antitrust Litigation*, Master File No. 01-12239-WGY (D. Mass.); *In re Tricor Direct Purchaser Antitrust Litigation*, C.A. No. 05-340 KAJ (D. Del.); *Meijer, Inc. et al. v. Warner Chilcott Holdings III, Ltd., et al.*, No. 05 Civ. 2195 CKK (D.D.C.) (involving the drug Ovcon 35); *In re Nifedipine Antitrust Litigation*, No. 03-MS-223 (D.D.C.); *In re K-Dur Antitrust Litigation*, No. 2:01-cv-01652 (D.N.J.); *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis, et al.* No. 1:07-cv-07343-HB (S.D.N.Y.) (involving the drug Arava); and *In re Flonase Direct Purchaser Antitrust Litigation*, Master File No. 2:08-cv-03149 (E.D. Pa.).  I also have offered testimony (either by deposition or declaration or both) regarding aggregate overcharge damages suffered by classes of direct purchasers in numerous cases including those listed above as well as:  *In re Cardizem CD Antitrust Litigation,* MDL No. 1278 (E.D. Mich.); *In re Buspirone Patent & Antitrust Litigation,* MDL No. 1413 (S.D.N.Y.); *In re Remeron Direct Purchaser Antitrust Litigation*, No. 03-CV-0085 (D.N.J.); *North Shore Hematology-Oncology Associates, P.C. v. Bristol-Myers Squibb Co.*, (D.D.C.) (involving the drug Platinol); *In re Terazosin Hydrochloride Antitrust Litigation,* MDL No. 1317 (S.D. Fla.); and *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, MDL No. 1383 (E.D.N.Y.).

[3] I understand that the Court denied class certification on "numerosity" grounds in *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2:06-cv-01797 (E.D. Pa. Aug. 28, 2017), *In re AndroGel Antitrust Litig. (No. II)*, No. 1:09-MD-2084 (N.D. Ga. Jul. 16, 2018), and *In re Zetia (Ezetimibe) Antitrust Litigation*, MDL No. 2:18-md-2836 (E.D. Va. Apr. 13, 2022), *In re Lipitor Antitrust Litigation*, No. 12-2389 (D.N.J.).  It's my understanding that the *Lipitor* case is on appeal.

[4] See, Declaration of Jeffrey J. Leitzinger, Ph.D. Related to Proposed Allocation Plan and Net Settlement Fund Allocation, dated April 8, 2024; Declaration of Jeffrey J. Leitzinger, Ph.D. Regarding Certification of the Proposed Settlement Class, dated April 8, 2024.



Page 2

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

spent by my research staff on this matter at their normal and customary hourly rates. No part of Econ One's compensation is contingent on the outcome of this matter.

## II.    Assignment, Materials Reviewed and Summary of Conclusions

5.    Rochester Drug Co-Operative, Inc., Stephen L. LaFrance Holdings, Inc. d/b/a SAJ Distributors, and Uniondale Chemists, Inc. seek to represent a proposed class of direct purchasers (collectively, "Plaintiffs") of branded and generic Effexor XR (the "Class").[5]  The Defendants in this case are Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva" or "Defendants").  Wyeth Pharmaceuticals, Inc., Wyeth-Whitehall Pharmaceuticals, and Wyeth Pharmaceuticals Company (collectively, "Wyeth") were formerly defendants in this case but settled. Effexor XR is Wyeth's branded version of extended release venlafaxine capsules, which is a "serotonin and norepinephrine reuptake inhibitor (SNRI)"[6] for the treatment of "depression, generalized anxiety disorder, social anxiety disorder, and panic disorder in adults."[7]  Plaintiffs allege that Teva and Wyeth entered into a "horizontal market-allocation and price-fixing agreement."[8]  Plaintiffs further allege that the amounts paid by Class members for extended release venlafaxine capsules were inflated as a result.[9]

---

[5] Direct Purchaser Class Plaintiffs' Second Amended Consolidated Class Action Complaint and Jury Demand, Filed October 23, 2013 (hereafter, "Complaint").

I understand from Counsel that for purposes of my analysis the Class is defined as:  All persons or entities in the United States and its territories who purchased Effexor XR and/or AB-rated generic versions of Effexor XR directly from Wyeth or Teva at any time during the period June 14, 2008 through and until May 31, 2011 (the "Class Period").

Excluded from the Direct Purchaser Class are Wyeth and Teva and their officers, directors, management, employees, subsidiaries, or affiliates, all governmental entities, and all persons or entities that purchased Effexor XR directly from Wyeth during the Class Period that did not also purchase generic Effexor XR directly.

[6] Effexor XR label, available at www.accessdata.fda.gov/drugsatfda_docs/label/2023/020699s118lbl.pdf.

[7] https://www.effexorxr.com/.

[8] Complaint, ¶¶ 2, 270.

[9] Complaint, ¶ 14.



Page 3

*Effexor XR* ● Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                        5/15/2025

6.      I have been asked to undertake several tasks in connection with the class certification and liability stages of this case, assuming that but for the alleged unlawful conduct, generic competition for Effexor XR would have begun earlier.  First, I have been asked to form an opinion about the impact of Defendants' alleged conduct on the prices Class members paid for extended release venlafaxine capsules.  Second, I have been asked to analyze whether proof of widespread antitrust injury (i.e., the payment of at least some overcharge) among members of the Class can be accomplished in this case with evidence that is common and classwide.  Third, I have been asked to calculate the aggregate amount of overcharges incurred by the Class.  Fourth, I have been asked to use my classwide overcharge estimates and, under various assumptions about the cost of individual litigation, evaluate the numbers of Class members that would face "negative value claims" associated with individual litigation.

7.      In completing this assignment, my staff and I collectively have reviewed the Complaint, documents produced thus far in discovery, sales data provided by Wyeth, Teva, and other generic manufacturers, other publicly available data, and economic literature regarding the nature and effect of generic competition.  A list of the materials we have reviewed is attached as Exhibit 2.

8.      By way of summary, I have concluded that:

        a.      The delay in, and limits on, generic competition for Effexor XR alleged by Plaintiffs would have substantially increased the amounts paid by Class members for extended release venlafaxine capsules (including capsules purchased as Effexor XR and its generic form).

        b.      Assuming that absent the challenged conduct, generic entry for Effexor XR would have occurred earlier as shown in Exhibit 10, there is evidence common to the proposed Class members which shows that the diminished generic competition Plaintiffs allege as a result of the challenged conduct highly likely caused each Class member to pay at least some overcharge on its Effexor XR purchases (brand or generic or both).

        c.      



*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

d. ███████████████████████████████████
███████████████████████████████████████
███████████████████

e. Based upon assumed individual litigation costs of $3.7 million, 30 of the 59 Class members (excluding Retailer Plaintiffs) would have a negative value associated with individual litigation; 11 of the 59 have trebled claims worth less than $1 million; and 8 have trebled claims worth less than $500,000.

The sections below provide the basis for these conclusions.

## III. The Role of Generic Competition

9. Manufacturers of branded pharmaceuticals devote resources to the development of new drugs. The incentive for this effort is the substantial profit that often comes with clinically successful new drugs.[10] One reason for this profitability is the temporary legal protection from competition that newly developed drugs enjoy. In that regard, brand manufacturers often obtain patents covering the formulation of the pharmaceutical compound, its manufacturing process or its application.[11] Patents expire generally within twenty years of filing.[12] Drug developers list patents that, in their view, apply to their drugs in the FDA's Orange Book.[13] These filings are made available to the public, including would-be generic manufacturers.

10. In 1984, Congress passed the Hatch-Waxman Act ("Hatch-Waxman") to "make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962" and "to create a new incentive for increased expenditures for research and development of certain products which

---

[10] Congressional Budget Office, "How Increased Competition From Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry," July 1998 (hereafter, "CBO Study"), p. 3.

[11] Federal Trade Commission, "Generic Drug Entry Prior to Patent Expiration," July 2002 (hereafter, "2002 FTC Study"), p. 41.

[12] U.S. Patent and Trademark Office, "Patent Essentials," available at https://www.uspto.gov/patents/basics/essentials.

[13] 2002 FTC Study, p. 5; *Mylan Pharmaceuticals, Inc. v. Tommy G. Thompson, et al.*, 268 F.3d 1323 (Fed. Cir. 2001), p. 1325.



HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                     5/15/2025

are subject to premarket government approval."[14]  Under Hatch-Waxman, generic manufacturers are allowed to seek to bring generic drugs to market under an abbreviated application process ("Abbreviated New Drug Application" or "ANDA").[15]  Under Hatch-Waxman, the FDA must wait until five years after its approval of the brand's New Drug Application ("NDA") involving a new chemical entity to grant generic approval.

11.    When the FDA approves an ANDA it gives the generic drug an "AB" rating.  This rating is the FDA's assurance to physicians, pharmacists, and patients that the product will have the same therapeutic effects, safety, and efficacy as the brand.  Once an AB-rated generic enters the market, its lower price, state laws and regulations, managed care policies, and pharmacy incentives combine to induce rapid and substantial substitution in place of the branded version when it comes to filling prescriptions.  This generic-for-brand substitution greatly reduces the overall cost to the generic supplier of achieving market conversion.

12.    Often times ANDA filings by one generic manufacturer are followed by filings by other manufacturers.  However, under Hatch-Waxman, the first generic to file an ANDA to challenge the brand's claims regarding patent protection can obtain 180 days of regulatory protection as the sole (ANDA) generic supplier.[16]  Once there are multiple generic sellers, price-driven competition typically results in greatly reduced generic prices, typically a small fraction of the price of the reference brand drug.  As a result, that exclusivity is highly valuable to generic manufacturers.[17]  As the CBO

---

[14] H.R. Rep. 98-857 (I), 1984 U.S.C.C.A.N. 2647.

[15] *FTC v. Actavis, Inc.,* 133 S. Ct. 2223 (2013) (hereafter, "*Actavis*"), p. 2228 ("once the FDA has approved a brand-name drug for marketing, a manufacturer of a generic drug can obtain similar marketing approval through use of abbreviated procedures.  The Hatch-Waxman Act permits a generic manufacturer to file an [ANDA] specifying that the generic has the 'same active ingredients as,' and is 'biologically equivalent' to, the already-approved brand-name drug.").  See also, 21 U.S.C. § 355(j).

[16] *Actavis*, pp. 2228-2229.  See also, Federal Trade Commission, "Authorized Generic Drugs:  Short-Term Effects and Long-Term Impact," August 2011 (hereafter, "2011 FTC Study").  While the first ANDA filer is protected from competition by other ANDA filers for its first 180 days, a brand manufacturer can sell or license another manufacturer to sell a generic under its original NDA (what's called an "authorized generic") in competition with the ANDA recipient during its 180-day exclusivity period.

[17] *Actavis*, p. 2229 ("...this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred



*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

described it, "[s]ince generic prices tend to fall as the number of producers rises, generic manufacturers are most profitable when they are one of the first to enter a market."[18]

13.     Since the passage of Hatch-Waxman, generic competition has become an especially powerful engine for lower drug prices.[19]  There is an extensive body of published research concerning the effects of generic competition in pharmaceutical markets.[20] To take just a few examples, according to a 2010 FTC Study, "in a mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[21]  A study by Saha, et al. (2006) investigated 40 drugs that experienced generic entry between July 1992 and January 1998.  They found that generic prices averaged 76 percent of the brand price one month after generic entry and 54 percent of the

---

[17] million dollars.'").  See also, Grabowski, H., G. Long, and R. Mortimer, "Recent Trends in Brand-Name and Generic Drug Competition," *Journal of Medical Economics*, December 2013 (hereafter, "Grabowski, et al. (2013)"), p. 2.

[18] CBO Study, p. 32.  See also, 2011 FTC Study, Executive Summary ("During [the first 180 days], because of the absence of competition, both the generic drug price and the first-filer's revenues are significantly higher than they would be when there are additional generic competitors.").

[19] Association for Accessible Medicines, "Generic Drug Access & Savings in the U.S.:  Access in Jeopardy," 2018, p. 4 ("In 2017, generics generated a total of $265 billion in savings."); Generic Pharmaceutical Association, "Generic Drug Savings in the U.S.," 2013, p. 1 ("Over the 10-year period 2003 through 2012, generic drug use has generated more than $1.2 trillion in savings to the health care system."); Federal Trade Commission, "Pay-for-Delay:  How Drug Company Pay-Offs Cost Consumers Billions," January 2010 (hereafter, "2010 FTC Study"), p. 2 (The FTC estimated that pay-for-delay agreements, which delay the onset of generic competition, cost American consumers $3.5 billion per year – $35 billion over 10 years); *id.* at p. 8 (within a year, on average, generic prices were 85% lower than the pre-generic brand price and generics had captured 90% of the brand sales).

[20] See, for example, the references listed in Saha, A., H. Grabowski, H. Birnbaum, P. Greenberg and O. Bizan, "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business*, Vol. 13, No. 1, February 2006, pp. 15-38 (hereafter, "Saha, et al. (2006)").

[21] 2010 FTC Study, p. 8.  See also, IMS Institute for Healthcare Informatics, "Price Declines after Branded Medicines Lose Exclusivity in the U.S.," January 2016.



*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

brand price after one year.[22]  Lichtenberg and Duflos found that when generic competitors entered the market, prices declined by approximately 60 percent.[23]

14.   The literature also shows that the pricing benefits created by generic competition increase with the number of competitors.  Reiffen and Ward find that "generic drug prices fall with increasing number of competitors."[24]  They find that the "effect of increased competition on prices continues at least until the fifth firm enters, but is not likely to be important after the eighth firm enters."[25]  A 2019 study by the FDA found that generic prices relative to brand prices declined by nearly 50 percent as the number of generic competitors increased from one to three.[26]

15.   The broad pricing benefits associated with generic competition arise both because generics have lower prices than the brand and because, once generics become available, there is typically widespread utilization of generics to fill prescriptions within the brand prescription base.  This broad conversion to generics is well documented in the literature.  A 2009 FTC Study found that generics captured between approximately 72 and 85 percent of the brand's sales in the first six months.[27]  A 2010 FTC Study concluded that, one year following initial entry,

---

[22] Saha, et al. (2006), p. 28.

[23] Lichtenberg, F. and G. Duflos, "Time Release:  The Effect of Patent Expiration on U.S. Drug Prices, Marketing, and Utilization by the Public," *Medical Progress Report*, Center for Medical Progress at the Manhattan Institute, No. 11, October 2009, p. 5.

[24] Reiffen, D. and M. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1: 37 − 49, February 2005 (hereafter, "Reiffen and Ward (2005)"), p. 37.

[25] Reiffen and Ward (2005), p. 49.

[26] The FDA found that the average manufacturer prices ("AMPs") fell by nearly 50 percent moving from one to three generic competitors.  U.S. Food and Drug Administration, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," December 2019 (hereafter, "2019 FDA Study").  Available at https://www.fda.gov/media/133509/download.

[27] Federal Trade Commission, "Authorized Generics:  An Interim Report," June 2009.  See also Grabowski, et al. (2013) (noting that brand drugs facing first generic entry in 2011-2012 retained 16 percent of the volume a year after generic entry).  This is consistent with industry experience.  PharmaCare, a pharmacy benefit manager wholly-owned by CVS, shifted nearly 95 percent of its Zocor patients to generics during the first month of their availability.  CVS Caremark Press Release, "PharmaCare's Aggressive Outreach Successfully Shifts 95% of its Zocor Market Share to Generic Simvastatin in One Month, Generating Significant Savings



Page 8

*Effexor XR* ● Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                5/15/2025

generics typically accounted for 90 percent of the corresponding brand prescription base.[28]

16.    There also is evidence in the literature that generic competition can lead to better prices for the brand itself.  According to a study by the CBO, "[a] statistical analysis of pharmaceutical prices shows that purchasers tend to obtain higher discounts from manufacturers on brand-name drugs when generic substitutes are available… ."[29]  A 2011 FTC Study found that post-generic entry brand prices were 4-11 percent below the pre-generic level.[30]

17.    Viewed as a whole, this literature contains the following findings:

    a.    generic drugs have substantially lower prices than their branded counterparts;

    b.    more generic competitors increase those price benefits;

    c.    once they become available, generics typically capture the vast majority of the brand prescription base; and

---

for Clients," August 17, 2006.  Another pharmacy benefit manager, Medco, observed that generic dispensing rates for Allegra were nearly 90 percent within 30 days of the generic becoming available.  Medco Press Release, "New Analysis: Recent Generic Blockbusters Show Huge Gains; Consumer Adoption Rates Accelerate," January 18, 2006 (hereafter, "Medco Press Release").  Medco also claims that through its mail-order pharmacies, it "regularly achieves a near-95 percent substitution rate within the first week for new generic chronic-care medications." Medco Press Release.  Such rapid generic conversion led the former president of Par to observe that "[o]vernight, quite literally, the branded [drug] companies are losing their entire franchise," as a result of generic entry.  Levy, S.,"Why Authorized Generics Are Making a Comeback," *Drug Topics*, November 3, 2003.

[28] 2010 FTC Study, p. 8.

[29] CBO Study, p. 24.  Unlike some of the earlier literature, which focused just on list prices, the CBO Study used data including discounts from brand list prices.

[30] 2011 FTC Study, pp. 52 – 54 ("The average ANDA-Only contemporaneous brand price is 4% lower than the pre-entry brand prices in the unweighted sample and 11% lower than the pre-entry brand prices in the sales-weighted sample.  During exclusivity, the presence of an AG lowers relative brand wholesale prices between 7.7% and 12.2%, depending on the controls that are included in the regression model." (Citations omitted.)).


Page 9

*Effexor XR* ● Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                          5/15/2025

      d.      competition from generics often leads to direct price concessions from the brand manufacturer on the remaining brand sales.

18.    As a result, conduct which limits generic competition (either by delaying its onset, limiting the numbers of competing suppliers or, as alleged in this case, both) limits these generics-related price benefits, creating substantial overcharges in the amounts paid to purchase the affected drug.  In effect, conduct which delays generic competition extends the control that a brand company maintains over prices paid by its prescription base, artificially extending the temporary period of competitive protection contemplated under the Hatch-Waxman framework.

## IV.  Effexor XR Experience

19.    Effexor XR is the brand name for extended release venlafaxine capsules.  Wyeth received FDA approval for Effexor XR in 1997.[31]  The year prior to generic entry, Effexor XR sales in the U.S. were approximately $2.7 billion.[32]

20.    Prior to generic entry, the average net price Class members paid for brand Effexor XR purchased directly from Wyeth was approximately ▮▮▮ per capsule.[33]  Teva entered the market in July 2010.[34]  Over the next eleven months, the average net price Class members paid for generic Effexor XR purchased directly from Teva was approximately ▮▮▮ per capsule (a discount of approximately 34 percent from the pre-entry brand price).[35]  (See Exhibit 3.)  During this eleven-month period,

---

[31] FDA approval letter, available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/97/020699ap_effexor_apltr.pdf.

[32] Wyeth data for the period July 2009 through June 2010.

[33] Manufacturer data for the period May 15, 2009 – June 30, 2010.  Unless otherwise stated, prices are a volume weighted average across all three strengths (37.5mg, 75mg, and 150mg).  The pricing patterns discussed throughout are similar for each strength.

[34] Manufacturer data.

[35] Manufacturer data.



*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

approximately 60 percent of Effexor XR prescriptions were filled with generic Effexor XR (with the other 40 percent filled with brand Effexor XR).[36]

21.    Starting in June 2011, eight additional generic manufacturers entered the market with generic versions of Effexor XR.[37]  With the addition of more competitors, net generic Effexor XR prices paid by Class members fell to approximately $0.14 per capsule, a drop of over 95 percent compared to the pre-generic entry brand price.[38] Approximately 86 percent of demand for extended release venlafaxine capsules was filled with generic the fifth quarter following generic entry.  The generic ultimately accounted for over 95 percent of extended release venlafaxine capsule volume.  (See Exhibit 4.)

## V.    Price Impact of the Challenged Conduct

22.    As depicted in Figure 1A below, Plaintiffs' base case (Scenario 1) regarding generic entry is that, absent the challenged conduct, entry by Teva and an authorized generic (an "AG") would have occurred on May 15, 2009.  As shown in the figure, Plaintiffs' base case (Scenario 1) includes the entry of an additional generic seller on April 15, 2010, bringing the total number of generic competitors as of July 2010 to three (instead of the one that was actually in the market as of that time).

---

[36] Manufacturer data.

[37] Manufacturer data.  I note that over time, some of these generic manufacturers stopped selling.

[38] Manufacturer data.  Generic price calculation is based on data from Dr. Reddy's, Greenstone, Mylan, Teva, Torrent, Wockhardt, and Zydus.



Page 11

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    5/15/2025



**Figure 1A**
**Actual vs. But-For Number of Generic Competitors**
**But-For Generic Entry: Scenario 1 (May 15, 2009)**

23.   For purposes of analyzing the likely differences in pricing as a result of this earlier generic entry, it is useful to consider two sub-periods (as shown in Figure 1B). The first is May 15, 2009 through June 30, 2010, the period during which the challenged conduct allegedly delayed the onset of generic competition (the "Delay Period"). The second period is July 1, 2010 through May 31, 2011, the period during which Teva was the only generic seller ("Teva Exclusivity Period").

Page 12

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    5/15/2025

**Figure 1B**
**Actual vs. But-For Number of Generic Competitors**
**But-For Generic Entry: Scenario 1 (May 15, 2009)**



### A. Delay Period

24.  In actual experience, there were no generics available during the Delay Period, from May 15, 2009 through June 30, 2010, because generic competition did not start until July 1, 2010.  However, absent the challenged conduct (under Plaintiffs' base case), there would have been at least two and as many as three generic competitors in the market throughout this period.  Further, we know from actual experience that with Teva as the sole generic competitor (July 1, 2010 through May 31, 2011) its generic was sold to Class members at an average discount of approximately 34 percent relative to the net brand price paid by Class members before Teva's entry.  Finally, as noted above, we also know from the literature documenting the effects of generic competition that more generic competitors generally lead to lower generic prices-- which is what happened to the price of generic Effexor XR when additional generics launched in mid-2011.  Hence, absent the challenged conduct, I would expect that generic versions of Effexor XR would have been available at less than 66 percent of



HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

the net brand price prevailing just prior to May 2009 generic entry since initially there would have been two generics on the market driving the generic Effexor XR price down below the one-generic price Teva charged during the Teva Exclusivity Period, with prices falling even lower later in the Delay Period, when there would have been three generic competitors on the market.

25.    Actual experience also shows that following Teva's entry in July 2010, approximately 60 percent of brand Effexor XR prescriptions converted to generic Effexor XR within eleven months, and 86 percent by the beginning of the second year, and eventually over 95 percent of Effexor XR prescriptions were filled with generic Effexor XR.  Accordingly, one would then expect that with generic entry beginning in May 15, 2009, over 60 percent of Effexor XR volume would convert to generics during the Delay Period.  In short, the generic competition that would have occurred during the Delay Period would have reduced prices paid for over 60 percent of the Effexor XR prescription volume by more than 34 percent of the pre-generic entry net brand price (and in the later part of the period, prices would have been reduced even more).

26.    The likelihood of cost savings to this degree is born out in forecasts prepared internally by Teva and other generic sellers regarding the likely outcomes from generic competition for Effexor XR.  These forecasts predict large generic price savings relative to the brand and widespread generic conversion similar to the results attributed generally to generic competition in the literature discussed above.

27.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████      ████████████████████████
██████████████████████████████████████████      ██████████

---

[39] TEVA_EFFEX_0713424.  Prices are for the 37.5 mg tablet (generic price savings and generic conversion are the same for each strength in this forecast).

[40] TEVA_EFFEX_0713424.



*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                    5/15/2025



### B. Teva Exclusivity Period

28. During the Teva Exclusivity Period (July 1, 2010 – May 31, 2011), Teva was the only generic competitor. Based upon the generic entry scenario I have been given from Counsel, absent the challenged conduct there would have been three generic competitors (including an AG) during that same time period instead of only one (two generics would have launched initially, and then one additional generic would have launched before July 1, 2010). There is clear evidence that these additional generic competitors would have reduced generic prices. One source of evidence in this regard is actual experience. Average generic prices dropped from approximately $2.77 per capsule when Teva was the only generic manufacturer on the market to approximately $0.14 per capsule after June 1, 2011 when additional generic sellers joined Teva in this market. While the difference in pricing between one and three generic competitors might not be as large, the observed real-world substantial price drop associated with increased numbers of generic competitors certainly demonstrates that three generic competitors are expected to deliver much lower generic prices than a single generic competitor.

29. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[41] MYL-VENLA-0000002.

[42] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮

[43] WYEFFAT3609860 – WYEFFAT3610024 at WYEFFAT3609901.



Page 15

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                5/15/2025



30.     The literature concerning the price benefits of generic competition also supports the
conclusion that more generic competitors lead to lower prices.  For example, an FDA
study analyzed 181 drugs that experienced initial generic entry in 2015-2017.[46]  The
FDA concluded that "[g]reater competition among generic drug makers is associated
with lower generic drug prices."[47]  It found that, moving from one to three generic
competitors, average manufacturer prices ("AMPs") fell by nearly 50 percent.[48]  An
analysis of MarketScan commercial claims data for 2008 – 2014 by Dave, et al. found
that prices with three generic competitors were over 30 percent lower than with one
generic competitor.[49]  A second paper by Dave, et al. looked at market competition
levels and generic drug pricing using prescription claims data.[50]  They found generic
prices decreased in markets with more generic competition.

---

[44] TEVA_EFFEX_0713424; Jennifer Wodarczyk, Teva's former Director of New Product Forecasting,
testified that more competition leads to lower pricing.  Deposition of Jennifer Wodarczyk, pp. 132 – 133.

[45] TEVA_EFFEX_0713424.  Prices are for the 37.5 mg tablet (generic price savings and generic conversion
are the same for each strength in this forecast).  Mylan forecasts show that prices decrease with increasing
numbers of competitors.  MYL-VENLA-0000002.

[46] 2019 FDA Study, p. 6.

[47] 2019 FDA Study, p. 2.

[48] 2019 FDA Study, p. 9.  This study utilized two different measures of price--the average manufacturer price
("AMP") reported to the Centers for Medicare and Medicaid Services and "invoice-based wholesale prices
reflecting pharmacy acquisitions" from IQVIA.  The FDA's results using IQVIA data show generic prices fell
by approximately 36 percent moving from one to three competitors, with prices falling even lower with
additional competitors.

[49] Dave, C., A. Hartzema, and A. Kesselheim, "Prices of Generic Drugs Associated with Numbers of
Manufacturers," *The New England Journal of Medicine*, Correspondence, December 2017.

[50] Dave, C., A. Kesselheim, E. Fox, P. Qiu, and A. Hartzema, "High Generic Drug Prices and Market
Competition:  A Retrospective Cohort Study," *Annals of Internal Medicine*, Vol. 167, No. 3, August 2017, p.
149.



*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

31.     In this period as well, a second source of price impact from earlier generic entry
        would have been higher rates of generic conversion.  Generic conversion doesn't
        happen all at once.  It plays out over time as information, availability and market
        incentives for generics develop.  One can see this process at work in the actual
        extended release venlafaxine capsule experience.  As is readily apparent in Exhibit 4,
        showing the actual generic conversion rate that occurred for Effexor XR in each
        successive quarter following actual generic entry, generic conversion grows over time.

32.     According to Plaintiffs, in the absence of the challenged conduct, generic entry would
        have occurred in May 2009 (Scenario 1), and therefore generic conversion would
        have gotten started earlier, and so would have been higher by the time of actual entry
        in July 2010.  Using the actual progression over time in generic conversion shown in
        Exhibit 4, earlier entry dates would have increased generic conversion during the
        Teva Exclusivity Period by nearly 30 percentage points (from approximately 60
        percent to nearly 90 percent).[51]

## VI.    Members of the Class

33.     I was provided brand and generic Effexor XR transaction data from Wyeth, Teva,
        and other generic manufacturers.  Counsel instructed me to combine certain entities
        as shown in Table 1 below.  For purposes of identifying prospective Class members,
        I identified each named entity in the brand and generic Effexor XR transaction data
        provided by Wyeth and Teva during the Class period (June 14, 2008 – May 31, 2011).

---

[51] See also discussion in paragraphs 52 – 53 and Figure 2.



*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

Table 1
Instruction to Combine

| Name in Data | Combine with |
|---|---|
| (1) | (2) |
| AMERICAN HEALTH PACKAGING | AMERISOURCEBERGEN |
| BELLCO | AMERISOURCEBERGEN |
| DIK DRUG | CARDINAL HEALTH |
| KINRAY | CARDINAL HEALTH |
| PARMED | CARDINAL HEALTH |
| WHITMIRE DISTRIBUTION | CARDINAL HEALTH |
| CAREMARK | CVS CAREMARK |
| OMNICARE | CVS CAREMARK |
| PRICE CHOPPERS | GOLUB |
| GREAT LAKES WHOLESALE | HARVARD DRUG |
| MAJOR PHARMACEUTICALS | HARVARD DRUG |
| GENERAL INJECTABLES & VACCINES | HENRY SCHEIN |
| J M SMITH CORPORATION | J M SMITH CORPORATION D/B/A SMITH DRUG |
| SMITH DRUG | J M SMITH CORPORATION D/B/A SMITH DRUG |
| KINNEY DRUGS | KPH HEALTHCARE SERVICES INC |
| PEYTONS | KROGER COMPANY |
| MASTERS PHARMACEUTICAL | MCKESSON |
| DIXON SHANE | R & S NORTHEAST |
| PSS WORLD MEDICAL | REBEL DISTRIBUTORS N/K/A PSS WORLD MEDICAL |
| REBEL DISTRIBUTORS | REBEL DISTRIBUTORS N/K/A PSS WORLD MEDICAL |
| SAJ DISTRIBUTORS | STEPHEN L. LAFRANCE PHARMACY, INC. D/B/A SAJ DISTRIBUTORS |

34.     After incorporating these instructions and applying the exclusions listed in the Class
        definition provided by Counsel, I developed a list of Class members--each of which
        appears in the Wyeth and/or Teva sales data as a direct purchaser of brand and/or
        generic Effexor XR from Wyeth and/or Teva during the Class Period.[52]  The 67
        Class members are shown in Exhibit 5.

35.     In addition, I understand that certain Retailer Plaintiffs may request exclusion from
        the Class.[53]  If they do request exclusion and are permitted to opt out, then there

---

[52] The only Class member that does not appear in the data as a direct purchaser is Uniondale Chemists.  I
understand that Uniondale Chemists is a Class member by assignment from QK Healthcare, Inc.  Complaint,
¶ 20.  I also understand that Stephen L. LaFrance Pharmacy, Inc. d/b/a SAJ Distributors has an assignment
from McKesson.  Complaint, ¶ 19.  I note that SAJ Distributors also purchased the generic directly from
Teva during the Class Period.

[53] Walgreen Co., The Kroger Co. (including Peytons), Safeway, Inc., United Natural Foods, Inc. f/k/a
Supervalu Inc., H-E-B, L.P. f/k/a HEB Grocery Company, L.P., American Sales Company, Inc., Rite Aid



HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                              5/15/2025

would be 59 Class members, shown in Exhibit 6.[54]  Exhibit 7 shows the geographic
dispersion of these Class members; they are located in 24 states and Puerto Rico.  I
have been instructed to calculate overcharges based on the Class excluding
overcharges on direct purchases by the Retailer Plaintiffs.[55]

## VII.  Proof of Class Member Impact

36.     In my opinion, under Plaintiffs' entry scenarios, there is evidence common to
        members of the proposed Class showing that there is high likelihood that each of the
        59 Class members (excluding Retailer Plaintiffs) incurred antitrust injury (i.e., the
        payment of at least some overcharge) as a result of the challenged conduct.  As I
        explain below, this common evidence comes from i) the transaction data provided by
        Wyeth, Teva, and other generic manufacturers; ii) the forecasts prepared by Wyeth,
        Teva, and other generic manufacturers regarding the impact of generic entry on
        market outcomes; and iii) the literature and prior studies regarding the effects of
        generic competition.

37.     Above, I described two ways in which limits on generic competition would, as an
        economic matter, lead to overcharges (i.e., inflated prices) in the amounts paid by
        Class members for extended release venlafaxine capsules.  The first is delay in initial
        generic entry--delaying the process of generic conversion, limiting the uptake of
        generic price benefits, thereby inflating the amounts paid by Class members.  Second,
        limits on the number of generic competitors in the market at any point in time limit
        the size of the price benefit associated with a generic purchase, reducing the savings

---

Corporation, Rite Aid Hdqtrs. Corporation, JCG (PJC) USA, LLC, Maxi Drug, Inc. d/b/a/ Brooks
Pharmacy, Eckerd Corporation, Meijer, Inc., Meijer Distribution, Inc., Giant Eagle, Inc., and CVS Caremark
Corporation (including Caremark and Omnicare) (collectively, "Retailer Plaintiffs").

[54] I note that the Class period starts earlier than May 15, 2009 (Plaintiffs' base case entry scenario).  However,
if the Class period were to start on May 15, 2009 instead of June 14, 2008, then the Class membership would
not change since all Class members had relevant direct purchases on or after May 15, 2009.

[55] All calculations in this report are based on the Class containing 59 Class members, excluding Retailer
Plaintiffs, and do not include direct purchases by Retailer Plaintiffs.  I note, however, that as described below
in Section IX.A, I have not yet removed overcharges associated with assignments to the Retailer Plaintiffs,
but may do so if necessary, at the appropriate time.


Page 19

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                      5/15/2025

from generic conversion that did occur.  I discuss the impact implications of each of these effects below.

### A.  Lost Generic Conversion

38.  The generic competition literature and manufacturer forecasts consistently show generic conversion rates that eventually reach 90 percent or more.  Even during just the first eleven months following Teva's actual entry, generics captured approximately 60 percent of the total purchases for Effexor XR prescriptions.  Approximately 86 percent of demand for extended release venlafaxine capsules was filled with generic the fifth quarter following generic entry.  The generic ultimately accounted for over 95 percent of extended release venlafaxine capsule volume.  Wholesalers and retailers--which includes virtually all Class members--would therefore be expected to participate in this conversion.[56]

39.  And, because of the pronounced price benefits associated with generics, conversion from Effexor XR to its generics always gave rise to a lower effective price.  In fact for Class members that bought brand Effexor XR prior to generic entry, in every case, the price Class members paid to buy generic Effexor XR was well below the prices they paid for Effexor XR itself (see Exhibit 8).[57]  For all of these reasons, I find it highly likely that the loss in generic conversion allegedly caused by the challenged agreement--particularly during the Delay Period where all such conversion was prevented--would have impacted each Class member that purchased Effexor XR.

---

[56] Moreover, the Class as defined does not include purchasers that, for whatever reason, continued to buy only Effexor XR even after its generic versions were available (according to available data).  Consequently, every Class member that bought extended release venlafaxine capsules following actual generic entry did buy some generic (at a price lower than the price it paid for the brand), and likely would have purchased generic at a price lower than the brand price earlier had generic entry occurred earlier.

[57] I note that the variation in the Class members' precise prices paid or the rate at which they substituted the generic for the brand when the generic became available does not in any way conflict with my opinion that it is highly likely that each Class member was overcharged; the variation in amounts purchased or prices paid affects only the likely amount of overcharge incurred by each Class member, not the existence of at least some overcharge.

                                                                Page 20

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

### B. Overcharges on Generic Purchases

40.    As noted above, the literature and company forecasts clearly show that more generic competitors predictably lead to lower prices.  The actual extended release venlafaxine capsule experience bears this out.  Exhibit 9 shows generic prices paid by Class members who purchased generics both during the Teva Exclusivity Period and then later when there were multiple additional generic competitors.  As the exhibit shows, each of those Class members paid lower prices when there were more generic competitors.  This evidence shows that the reduced numbers of generic competitors allegedly caused by the challenged conduct highly likely would have caused each generic purchaser to incur an overcharge on at least some (if not all) of its generic purchases.

### C. Impact Conclusions

41.    Putting these two pieces--impact from lost conversion and impact from higher generic prices--of the overall impact picture together, I find it highly likely that under the generic entry scenario I've been asked to assume--in which absent the challenged conduct, generic entry by Teva and an AG would have occurred on May 15, 2009, with a third generic entrant entering prior to July 2010 (Scenario 1)--each Class member paid at least some overcharge as a result of the challenged conduct.  As discussed above, it is highly likely that Effexor XR buyers during the Delay Period incurred some overcharge as a result of the generic conversion prevented by the challenged conduct, and it is highly likely that generic buyers in the Teva Exclusivity Period incurred overcharges on their purchases of generic Effexor XR because, by virtue of the challenged conduct, the number of competing generic sellers was limited to one rather than three.  And, every Class member fell into one or both of these two groups.

42.    As noted above, I also was asked to consider the consequences for my conclusions of alternative entry scenarios (described in Exhibit 10).  These additional entry scenarios do not alter my opinions regarding impact; in my opinion, there is evidence common to the proposed Class members which shows it is highly likely that each Class



Page 21

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                    5/15/2025

member paid at least some overcharge on its Effexor XR purchases (brand or generic
or both) as a result of the diminished generic competition Plaintiffs allege.[58]

## VIII. Overcharge Methodology

### A. Formulaic approach

43.    In my opinion, a formulaic approach can be used here to reliably estimate aggregate
overcharges.  Here again, it is useful to discuss the approach separately for the Delay
Period and the Teva Exclusivity Period (including in this period continuing
overcharges that occur even after Teva no longer enjoyed exclusivity).  Arithmetically,
the formula for classwide overcharges associated with Effexor XR purchases during
the Delay Period is:

$$\text{Overcharges} = \text{Vol}_B * [(\text{G}_{\text{Conv}} * (\text{P}_B - \text{P'}_G)) + ((1 - \text{G}_{\text{Conv}}) * (\text{P}_B - \text{P'}_B))]$$

Where:

| | | |
|---|---|---|
| $\text{Vol}_B$ | = | Total Class purchases of Effexor XR |
| $\text{G}_{\text{Conv}}$ | = | Generic conversion rate absent the challenged conduct |
| $\text{P}_B$ | = | Average Effexor XR price |
| $\text{P'}_B$ | = | Average Effexor XR price absent the challenged conduct |

---

[58] Most of these scenarios involve later generic entry dates.  Class members (under the current Class
definition) that purchased the brand before the alternative generic entry date and did not purchase the generic
directly during the Class period would not be injured.  Accordingly, if it is determined that those entry dates
are what would have happened absent the challenged conduct, and if the Class definition is not amended to
account for that, those Class members would not have been injured.

Specifically, if it is determined that, absent the challenged conduct, generic Effexor XR entry would have
occurred July 15, 2009 or later, then QK Healthcare Inc. and its assignee Uniondale Chemists Inc. would not
have been injured since QK Healthcare Inc. has no direct purchases during the overcharge period in the
transaction data provided by Wyeth and Teva, July 15, 2009 or later.  Aggregate Class overcharges are the
same in these scenarios whether or not QK Healthcare Inc. and Uniondale Chemists Inc. are included as
Class members.  The other 57 of the 59 Class members (excluding the Retailer Plaintiffs) all purchased
directly from Wyeth or Teva during the overcharge periods for each scenario I have been asked to consider.



HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                              5/15/2025

$$P'_G \quad\quad = \quad \text{Average generic price that would have existed under the earlier entry scenario}$$

44. During the Teva Exclusivity Period (and continuing until the actual generic conversion rate equilibrates with the conversion rate that would have occurred with earlier generic entry), there are continuing Effexor XR overcharges generally following the formula above, with one modification: $G_{Conv}$ represents the increment to generic conversion that would have been associated with an earlier start to the process.

45. In addition, during the Teva Exclusivity Period there would be additional overcharges reflecting the higher generic prices that were paid because there were fewer generic competitors. Formulaically, these generic overcharges would represent:

$$\text{Overcharges} \quad = \quad \text{Vol}_G * (P_G - P'_G)$$

Where:

$$\text{Vol}_G \quad\quad = \quad \text{Aggregate Class purchases of generic Effexor XR during the Teva Exclusivity Period}$$

$$P_G \quad\quad = \quad \text{Average price paid for those generic Effexor XR volumes by the Class}$$

$$P'_G \quad\quad = \quad \text{Average generic price that would have existed under the earlier entry scenario}$$

### B. Applying the overcharge formulas

46. The elements needed to apply these formulas can all be readily derived on a classwide basis from the data produced in this case, discovery documents produced by Wyeth, Teva, and third-parties, and publicly available information sources. I derive actual brand and generic prices, along with volumes, from the transaction data produced by the manufacturers. These transaction data also can be used to calculate actual generic conversion rates following generic entry in July 2010. I show these conversion rates on a quarterly basis in Exhibit 4. For purposes of modeling generic conversion

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                          5/15/2025

absent the challenged conduct, I backcast this same progression of quarterly conversion rates to the time at which generic entry would have occurred (May 2009).[59]

47.     To model generic prices that would have existed with earlier entry, I again rely on actual experience following Teva's entry in July 2010.  As noted above, when Teva was the sole generic supplier, its net price was on average ▇▇▇ per capsule-- approximately 37 percent off the Effexor XR brand list price (or WAC) that existed just prior to Teva's entry.

48.     The entry scenario contains periods with two and three generic competitors which have no counterpart in actual experience.  Given the lack of actual experience with those numbers of competitors, I used a combination of the actual experience with one generic competitor on the market and another source of information regarding generic pricing--the manufacturers' forecasts.  In that regard, I have identified 50 forecasts from three manufacturers as containing useable forecast results.[60]

49.     These forecasts show generic pricing outcomes for one, two, or three generic competitors.  For my analysis, I utilized the forecast generic price discounts to measure the pricing outcome with differing numbers of generic competitors.[61]  From those forecasts, I calculated the average incremental difference in forecasted generic price discounts when there were two competitors instead of one, and when there were three competitors instead of two, and then used those differences to adjust upward the generic discount (based on actual experience) for one competitor.  I show how the generic prices are derived for two and three competitors in Exhibit 11.[62]

---

[59] The use of post-conduct ("after") experience as a benchmark for but-for performance is a widely recognized and utilized method for measuring antitrust damages.  See, e.g., ABA Section of Antitrust Law, *Antitrust Law Developments*, 6th edition, 2007, pp. 840 – 841.

[60] I utilized forecasts from Mylan, Teva, and Wyeth.  I utilized all forecasts that I had available to me that contained information regarding generic price discounts with anywhere from one to three generic competitors.

[61] Where the forecasts for a given company contained multiple outcomes for a given number of generic competitors, I averaged these outcomes to obtain a single company result.

[62] I assume the generic price for the period from June 2011 forward would be the same as it was in the actual



50.     This averaging is a form of meta-analysis which yields the central tendency of the various company perspectives.[63]  Moreover, in my experience, the use of average results from forecasts by market participants for purposes of projecting market outcomes is both common and accepted practice among economists.  I also observe that the results contained within these forecasts are generally reasonable and consistent with the literature pertaining to the effects of generic competition and my own experience studying generic competition over the last twenty years or so.  Indeed, I have used this same source of data to project generic price discounts in a number of cases over the last several years.[64]

51.     In modeling brand prices absent the challenged conduct during the Delay Period, I calculate the actual average net brand price paid by the Class relative to the brand list price (or WAC) after generic entry prior to April 1, 2011, when Effexor XR became subject to "penny pricing" under the 340B program.[65]  I then apply that ratio to the brand WAC that existed during the Delay Period.  In effect, I backcast the discount that generic entry yielded in brand prices relative to the brand WAC to the period

---

experience.  Hence there are no overcharges on generic purchases from June 2011 forward.

[63] The use of averages across many individual forecasts is a well-established method to improve forecast accuracy.  See e.g., Clemen, R., "Combining Forecasts: A Review and Annotated Bibliography," *International Journal of Forecasting*, Vol. 5, 1989, pp. 559 – 583, p. 559 ("[I]n many cases one can make dramatic performance improvements by simply averaging the forecasts."); Batchelor, R., "How Useful Are the Forecasts of Intergovernmental Agencies?  The IMF and OECD Versus the Consensus," *Applied Economics*, Vol. 33, No. 2, February 2001, pp. 225 – 235, p. 227 ("Just as spreading investments over many assets reduces risk, so averaging forecasts across different forecasters reduces the size of the expected error, a point first formalized by Bates and Granger (1969) almost 30 years ago.").

[64] Including *In re Novartis and Par Antitrust Litigation,* No. 1:18-cv-04361 (S.D.N.Y.); *In re Intuniv Antitrust Litigation*, No. 16-cv-12653 (D. Mass.); *In re Opana ER Antitrust Litigation*, MDL No. 2580 (N.D. Ill.); *In re Loestrin 24 FE Antitrust Litigation*, MDL No. 2472 (D.R.I.); *In re Niaspan Antitrust Litigation*, MDL No. 2460 (E.D. Pa.); and *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-md-2503-DJC (D. Mass.).

[65] I assume that penny pricing would start at the same time in the but-for world as it actually did (April 1, 2011).  Therefore, I do not shift back discounts on brand pricing associated with penny pricing to the Delay Period.  Health Resources & Services Administration, "What is HRSA's Penny-Pricing Policy Regarding 340B Ceiling Prices" ("When the 340B ceiling price calculation results in an amount less than $0.01, the 340B ceiling price will be $0.01.").  Available at https://www.hrsa.gov/about/faqs/what-hrsas-penny-pricing-policy-regarding-340b-ceiling-prices.  See also, 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation (82 FR 1210, January 5, 2017).  Available at https://www.govinfo.gov/content/pkg/FR-2017-01-05/pdf/2016-31935.pdf.



HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                      5/15/2025

following the alternative generic entry dates.  I assume that brand pricing after Teva's entry (July 2010 through the end of the overcharge period) would be the same as it was under actual experience.

52.    It can take years for generic competition to bring the market from protected monopoly pricing to a new competitive equilibrium (i.e., the point at which prices and conversion or substitution rates stabilize following entry of generic competition).  During the first eleven months following market launch in July 2010, generic Effexor XR accounted for approximately 60 percent of the total extended release venlafaxine capsule volume.[66]  Approximately 86 percent of demand for extended release venlafaxine capsules was filled with generic the fifth quarter following generic entry.  The generic ultimately accounted for over 95 percent of extended release venlafaxine capsule volume.  That is, it took almost five years for generics to generate the full extent of the competitive benefit they create.

53.    Hence, overcharges on Effexor XR stemming from a delay in generic entry do not stop on the day that generic entry finally occurs, but rather continue through June 2015.  As is shown in Figure 2, for some time afterwards, while the adjustment to competitive equilibrium is still underway, generic conversion will be lower than it would have been but for the generic delay, and thus overcharges will continue to accrue on brand purchases.

---

[66] Manufacturer data.



Page 26

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                    5/15/2025



**Figure 2**
**Actual vs. But-For Generic Conversion**
**But-For Generic Entry: Scenario 1 (May 15, 2009)**

54.    My calculations of overcharges for all scenarios I was asked to model are reported in Exhibits 12A and 12B.

55.    This formulaic approach to classwide overcharges did not require individualized analysis for Class members. In particular:

- The calculation of actual prices and quantities are based upon the manufacturers' electronic transaction data. This is a classwide source of evidence common to the Class rather than individual to its members. No investigation into Class member records or collection of data from individual Class members is needed.

- This calculation incorporates single market-wide estimates for generic conversion and brand and generic prices absent the challenged conduct. It is not necessary to examine prices or purchase patterns absent the challenged conduct as to individual Class members.



HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                    5/15/2025

- The overcharge calculation is performed through a set of computer programs and instructions applied to the manufacturer data jointly and formulaically as to all Class members.[67]  No Class member-specific calculations or programs are needed.[68]

## IX.   Other Issues

### A.  Accounting for Opt-Out Assignments

56.   I understand that some Class members may have assigned their entitlement to overcharges from a portion of their purchase volumes to certain Retailer Plaintiffs.  I have not yet accounted for these assignments in the overcharges presented above because the information needed to do so has not yet been submitted by the Retailer Plaintiffs.  However, it is a straightforward matter to do so, one which has frequently been part of my work in the past.  In particular, I would simply remove from my total overcharges the amounts claimed by the Retailer Plaintiffs for their assignments.  I would expect to incorporate this adjustment when information regarding those claims becomes available from the Retailer Plaintiffs.  My understanding is that Class Counsel does not yet have this information.

### B.  Bypass

57.   I have been asked to comment about bypass.  In this context, the term "bypass" or "generic bypass" is often used to describe the circumstance in which, following generic entry, some Class members' customers buy generics directly from generic manufacturers and "bypass" the wholesaler.  Defendants may argue that overcharge volumes need to be adjusted for bypass.  Whether or not that adjustment is necessary

---

[67] These aggregate formulas do not presume or require that each individual Class member experienced the same total or unit overcharge or that the generic conversion and pricing parameters that pertain to the Class in the aggregate apply to each Class member individually.  Indeed, the reliability of this overcharge approach is increased by using the overlapping experience across Class members.  In particular, the aggregation serves statistically to reduce the expected error rate (in statistical terms, "standard error") of the estimates.

[68] If the Court were to exclude (or combine) any direct purchaser from the Class, I could account for that within my classwide overcharge analysis, using the same classwide evidence and methodology.  My calculations could also be modified to account for other possible Court rulings or other generic entry scenarios found by the jury or provided by counsel.



Page 28

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                      5/15/2025

is ultimately a legal issue.[69]  However, assuming that the legal objective in calculating overcharges is to determine the total overcharges actually incurred by Class members as a result of the challenged conduct, it would be a mistake as an economic matter to exclude overcharges associated with Class member purchases simply because the Class member wouldn't have made those purchases absent the challenged behavior. The overcharge is incurred in the act of purchasing a product with an illegally inflated price.  Whether or not that buyer would have made those same purchases absent the illegal behavior doesn't in any way change the fact that by purchasing products at an inflated price, the Class member paid the overcharge, thereby incurring the harm created by the illegal behavior.

58.     However, should it be determined legally that overcharges associated with bypassed volumes must be removed from the analysis, the adjustment is straightforward and can be done using the same classwide common data used in the overcharge calculation itself.

## X.    Prospective Claim Values

59.     I have been asked by Plaintiffs' Counsel to translate my conclusion regarding classwide overcharges into prospective recoveries that individual Class members-- could reasonably anticipate were they to pursue their own cases--and then determine the number of Class members for whom that recovery, after trebling, falls short of the $3.7 million expenses incurred in the *Nexium* case, which was litigated through trial (giving rise to what are sometimes described as "negative value claims").[70] Counsel has also asked me to determine the number of Class members for which the

---

[69] I understand that a number of courts have ruled that bypass should not be deducted.  See *In re Relafen Antitrust Litigation*, 346 F. Supp. 2d 349, 369 (D. Mass. 2004); *In re Skelaxin (Metaxalone) Antitrust Litigation*, 2014 WL 2002887, at *5-7 (E.D. Tenn. May 15, 2014); *In re Niaspan Antitrust Litigation*, No. 13-MD-2460, 2015 WL 4197590, at *1-2 (E.D. Pa. July 9, 2015); *In re Prograf Antitrust Litigation*, No. 1:11-MD-02242-RWZ, 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014); *In re Loestrin 24 FE Antitrust Litigation*, MDL No. 13-2472, 2019 WL 3214257, at *5-6 (D.R.I. July 2, 2019); *In re Namenda Direct Purchaser Antitrust Litigation*, No. 15 Civ. 7488-CM-RWL, at 20 (S.D.N.Y. August 2, 2019).

[70] In the Nexium case, expert expenses were approximately $2.97 million and total expenses were approximately $3.7 million.  *In re Nexium (Esomeprazole) Antitrust Ligation*, Plaintiffs' Motion for Reimbursement of Expenses (Doc. No. 1580) 9/28/2015; *In re Nexium (Esomeprazole) Antitrust Ligation*, Joint Dec re Reimbursement of Expenses (Doc. No. 1582-1) 9/28/2015, at 2.

---



*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - **ATTORNEYS' EYES ONLY**                                            5/15/2025

prospective claim value, after trebling, is under $1 million and $500,000.  In this context, I find it reasonable to use the allocation method put forward for the Wyeth settlement as a means of translating my classwide overcharge estimates into anticipated Class member recoveries, before trebling.[71]

60.    Exhibit 13 shows these shares for each Class member under Scenario 1 (Plaintiffs' base case).  Applying these shares to the corresponding aggregate overcharge figure, I obtained the prospective recoveries shown for each Class member.

61.    As shown in Exhibit 13, 30 Class members have trebled prospective recoveries that are less than expenses in Nexium; 11 Class members have trebled prospective recoveries that below $1 million; and 8 Class members have trebled prospective recoveries below $500,000.

_(signature)_

Jeffrey J. Leitzinger, Ph.D.
May 15, 2025

---

[71] Indeed, I recommended the same allocation approach approved by the Court for purposes of the settlement with Wyeth.  See, Declaration of Jeffrey J. Leitzinger, Ph.D. Related to Proposed Allocation Plan and Net Settlement Fund Allocation, dated April 8, 2024.  However, here I have used Class purchases during the overcharge period corresponding to Plaintiffs' base case (Scenario 1).

Page 30

*Effexor XR* • Expert Report of Jeffrey J. Leitzinger, Ph.D.

**Exhibit 1**
**Page 1 of 9**



**Dr. JEFFREY J. LEITZINGER**
*Managing Director*
**Los Angeles, California**
**Tel: 213 624 9600**

**EDUCATION**

Ph.D., Economics, University of California, Los Angeles
M.A., Economics, University of California, Los Angeles
B.S., Economics, Santa Clara University

**WORK EXPERIENCE**

*Econ One Research, Inc.*, 1997 to date
Board Chairman and Managing Director, 2018 to date
Management Committee Chair, 2012-2018
President and CEO, 1997-2011
Founder, 1997

*Micronomics, Inc.,* 1988-1997
President and CEO, 1994-1997
Executive Vice President, 1988-1994
Cofounder, 1988

*National Economic Research Associates, Inc. 1980-1988*
(Last position was Senior Vice President and member of the Board
of Directors)

*California State University, Northridge*, Lecturer, 1979-1980

**BOARD EXPERIENCE**

Board of Visitors, UCLA Department of Economics, 2018-present
California United Bank, 2015-2017
Advisory Board Member, American Antitrust Institute, 2013-present
Bolton & Company, 2006-present
First Enterprise Bank, 2006-2015
Blind Children's Center, 2005-present

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                               **Page 2 of 9**

## AREAS OF EXPERTISE

Has offered expert testimony regarding:

- Competition economics

- Commercial damages

- Econometrics and statistics

- Intellectual property

- Valuation

## INVITED PRESENTATIONS

Some Implications of Tyson for Econometric Models in Class Action Antitrust Cases, *American Bar Association,* 65th Antitrust Law Spring Meeting, March 2017.

Where Are We on Class Certification? Examples from Health Care and Pharmaceutical Cases, *ABA Section of Antitrust Law, Health Care and Pharmaceuticals and Civil Practice and Procedure and Trial Practice Committees*, March 2016.

Corporations & Cartels: Should You Be a Plaintiff?, *American Bar Association,* 62nd Antitrust Law Spring Meeting, March 2014.

Developments in Antitrust Cases Alleging Delayed Generic Competition in the Pharmaceutical Industry, *American Antitrust Institute,* 5th Annual Future of Private Antitrust Enforcement Conference, December 2011.

Class Certification and Calculation of Damages, *American Bar Association*, Section of Antitrust Law and *International Bar Association*, 8th International Cartel Workshop, February 2010.

Class Certification Discussion and Demonstration, *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2007.

Antitrust Injury and the Predominance Requirement in Antitrust Class Actions, *American Bar Association*, Houston Chapter, April 2007.

Class Certification Discussion and Demonstration, *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2005.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                              **Page 3 of 9**

## INVITED PRESENTATIONS (cont'd.)

What Can an Economist Say About the Presence of Conspiracy?, *American Bar Association,* Antitrust Law, The Antitrust Litigation Course, October 2003.

Lessons from Gas Deregulation, *International Association for Energy Economics,* Houston Chapter*,* December 2002.

A Retrospective Look at Wholesale Gas Industry Restructuring, *Center for Research in Regulated Industries*, 20th Annual Conference of the Advanced Workshop in Regulation and Competition, May 2001.

The Economic Analysis of Intellectual Property Damages, *American Conference Institute,* 6th National Advanced Forum, January 2001.

Law and Economics of Predatory Pricing Under Federal and State Law, *Golden State Antitrust and Unfair Competition Law Institute*, 8th Annual Meeting, October 2000.

Non-Price Predation--Some New Thinking About Exclusionary Behavior, *Houston Bar Association*, Antitrust and Trade Regulation Section, October 2000.

After the Guilty Plea:  Does the Defendant Pay the Price in the Civil Damage Action, *American Bar Association*, Section of Antitrust Law, 48th Annual Spring Meeting, April 2000.

Economics of Restructuring in Gas Distribution, *Center for Research in Regulated Industries*, 12th Annual Western Conference, July 1999.

A Basic Speed Law for the Information Superhighway, *California State Bar Association*, December 1998.

Innovation in Regulation, *Center for Research in Regulated Industries*, 11th Annual Western Conference, July/September 1998.

Electric Industry Deregulation: What Does the Future Hold?, *Los Angeles Headquarters Association,* November 1996.

Why Deregulate Electric Utilities?, *National Association of Regulatory Utility Commissioners*, November 1995.

Restructuring U.S. Power Markets: What Can the Gas Industry's Experience Tell Us?,  *National Association of Regulatory Utility Commissioners*, July 1995.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                          **Page 4 of 9**

**INVITED PRESENTATIONS** (cont'd.)

Natural Gas Restructuring: Lessons for Electric Utilities and Regulators, *International Association for Energy Economics*, May 1995.

Techniques in the Direct and Cross-Examination of Economic, Financial, and Damage Experts, *The Antitrust and Trade Regulation Law Section of the State Bar of California and The Los Angeles County Bar Association*, 2nd Annual Golden State Antitrust and Trade Regulation Institute, October 1994.

Demonstration: Deposition of Expert Witnesses and Using Legal Technology, *National Association of Attorneys General*, 1994 Antitrust Training Seminar, September 1994.

Direct and Cross Examination of Financial, Economic, and Damage Experts, *The State Bar of California, Antitrust and Trade Regulation Law Section,* May 1994.

Price Premiums in Gas Purchase Contracts, *International Association for Energy Economics,* October 1992.

Valuing Water Supply Reliability, *Western Economic Association,* Natural Resources Section, July 1992.

Transportation Services After Order 636: "Back to the Future" for Natural Gas, Seminar sponsored by Jones, Day, Reavis & Pogue, May 1992.

The Cost of an Unreliable Water Supply for Southern California, Forum presented by Micronomics, Inc., May 1991.

Market Definition: It's Time for Some "New Learning", *Los Angeles County Bar Association,* Antitrust and Corporate Law Section, December 1989.

Market Definition in Antitrust Cases: Some New Thinking, *Oregon State Bar,* Antitrust Law Section, March 1987.

Future Directions for Antitrust Activity in the Natural Gas Industry, *International Association of Energy Economists*, February 1987.

Information Externalities in Oil and Gas Leasing, *Western Economic Association Meetings*, Natural Resources Section, July 1983.

Economic Analysis of Offshore Oil and Gas Leasing, *Western States Land Commissioners Association*, December 1982.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                    **Page 5 of 9**

## PUBLISHED ARTICLES

"Statistical Significance and Statistical Error in Antitrust Analysis," *Antitrust Law Journal*, Volume 81, Issue 2, July 2017.

"The Predominance Requirement for Antitrust Class Actions--Can Relevant Market Analysis Help?," American Bar Association, Section of Antitrust Law, *Economics Committee Newsletter*, Volume 7, No. 1, Spring 2007.

"A Retrospective Look at Wholesale Gas: Industry Restructuring," *Journal of Regulatory Economics,* January 2002.

"Balance Needed in Operating Agreements as Industry's Center of Gravity Shifts to State Oil Firms," *Oil & Gas Journal*, October 2000.

"What Can We Expect From Restructuring In Natural Gas Distribution?" *Energy Law Journal*, January 2000.

"Gas Experience Can Steer Power Away from Deregulation Snags," *Oil & Gas Journal,* August 1996.

"Anatomy of FERC Order 636: What's out, What's in," *Oil & Gas Journal*, June 1992.

"Antitrust II – Future Direction for Antitrust in the Natural Gas Industry," *Natural Gas*, November 1987.

"Information Externalities in Oil and Gas Leasing," *Contemporary Policy Issues*, March 1984.

"Regression Analysis in Antitrust Cases:  Opening the Black Box," *Philadelphia Lawyer*, July 1983.

"Foreign Competition in Antitrust Law," *The Journal of Law & Economics*, April 1983.

## REGULATORY SUBMISSIONS

<u>In the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) Under its Experimental Gas Cost Incentive Mechanism and Related Gas Supply Matters; A.00-06-023</u>, Public Utilities Commission of the State of California, November 2001.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                              **Page 6 of 9**

## REGULATORY SUBMISSIONS (cont'd.)

Sempra Energy and KN Energy, Incorporation; Docket No. EC99-48-000 (Affidavit and Verified Statement), Federal Energy Regulatory Commission, March/May 1999.

Rulemaking on the Commission's Own Motion to Assess and Revise the Regulatory Structure Governing California's Natural Gas Industry (Market Conditions Report), Public Utilities Commission of the State of California, July 1998.

In the Matter of the Application of Pacific Enterprises, Enova Corporation, et al. for Approval of a Plan of Merger Application No. A. 96-10-038, Public Utilities Commission of the State of California, August/October 1997.

In re: Koch Gateway Pipeline Company; Docket No. RP 97-373-000, Federal Energy Regulatory Commission, May/October 1997 and February 1998.

In the Matter of the Application of Sadlerochit Pipeline Company for a Certificate of Public Convenience and Necessity; Docket No. P-96-4, Alaska Public Utilities Commission, May 1996.

Public Funding of Electric Industry Research, Development, and Demonstration (RD&D) Under Partial Deregulation, California Energy Commission, January 1995.

NorAm Gas Transmission Company; Docket No. RP94-343-000, Federal Energy Regulatory Commission, August 1994/June 1995.

Natural Gas Vehicle Program; Investigation No. 919-10-029, California Public Utilities Commission, July 1994.

Transcontinental Gas Pipe Line Corporation; Docket No. RP93-136-000 (Proposed Firm-to-the-Wellhead Rate Design), Federal Energy Regulatory Commission, January 1994.

In re: Sierra Pacific's Proposed Nomination for Service on Tuscarora Gas Pipeline; Docket No. 93-2035, The Public Service Commission of Nevada, July 1993.

Employment Gains in Louisiana from Entergy-Gulf States Utilities Merger, Louisiana Public Utilities Commission, December 1992.

Employment Gains to the Beaumont Area from Entergy-Gulf States Utilities Merger, Texas Public Utilities Commission, August 1992.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                     **Page 7 of 9**

## REGULATORY SUBMISSIONS (cont'd.)

<u>Transcontinental Gas Pipe Line Corporation; Docket No. RS 92-86-000</u> (Affidavit regarding Transco's Proposed IPS Service), Federal Energy Regulatory Commission, June 1992.

<u>In Re: Pipeline Service Obligations; Docket No. RM91-11-000; Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; Docket No. RM91-3-000; Revisions to the Purchased Gas Adjustment Regulations; Docket No. RM90-15-000</u>, Federal Energy Regulatory Commission, May 1991.

<u>In the Matter of Natural Gas Pipeline Company of America; Docket No. CP89-1281</u> (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, January 1990.

<u>In the Matter of United Gas Pipeline Company, UniSouth, Cypress Pipeline Company; Docket No. CP89-2114-000</u> (Proposed Certificate of Storage Abandonment by United Gas Pipeline Company), Federal Energy Regulatory Commission, December 1989.

<u>In the Matter of Tennessee Gas Pipeline Company; Docket No. CP89-470</u> (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, July 1989.

<u>In the Matter of Take-Or-Pay Allocation Proposed by Mississippi River Transmission Corporation</u>, Federal Energy Regulatory Commission, March 1988.

<u>In the Matter of Natural Gas Pipeline Company of America: Docket No.RP87-141-000</u> (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, December 1987.

<u>In the Matter of Application of Wisconsin Gas Company for Authority to Construct New Pipeline Facilities; 6650-CG-104</u>, Public Service Commission, State of Wisconsin, August 1987.

<u>Trans-Alaska Pipeline System: Docket Nos. OR 78-1-014 and OR 78-1-016</u> (Phase 1 Remand), Federal Energy Regulatory Commission, October 1983.

Econ One Research, Inc.
Los Angeles, California
Page 8 of 9

**Dr. Jeffrey Leitzinger**
**June 2021 – May 2025**

|     | Proceeding | Court/Commission/ Agency | Docket or File |
|-----|------------|--------------------------|----------------|
| 1.  | In Re: Rail Freight Surcharge Antitrust Litigation | U.S. District Court, District of Columbia | Case No. 1:07-MC-00489 |
| 2.  | In re: Opana ER Antitrust Litigation | U.S. District Court, Northern District of Illinois | Civil Action No. 14-cv-10150 |
| 3.  | In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | U.S. District Court, Southern District of New York | No. 1:14-md-02542 (VSB) (SLC) No. 1:19-cv-00325 (VSB) |
| 4.  | In Re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation | U.S. District Court, Eastern District of New York | No. 05-md-1720 |
| 5.  | International Construction Products, LLC v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC doing business as Cat Auction Services. | U.S. District Court, District of Delaware | C.A. No. 15-108-RGA |
| 6.  | In re: Novartis and Par Antitrust Litigation | U.S. District Court, Southern District of New York | Case No. 1:18-cv-04361-AKH |
| 7.  | Toll Brothers, Inc. and Porter Ranch Development Company v. Sempra Energy, Southern California Gas Company, et al. | Superior Court of the State of California, County of Los Angeles, Central Civil West | Case No. BC674622 |
| 8.  | David, et. al. v. Bread Company, Limited, et. al. | Ontario Supreme Court of Justice | CV-17-586063-00CP |
| 9.  | Pacific Steel Group v. Commercial Metals Company, et al. | U.S. District Court, Northern District of California, Oakland Division | No. 4:20-cv-07683-HSG |
| 10. | In re: Generic Pharmaceuticals Pricing Antitrust Litigation | U.S. District Court, Eastern District of Pennsylvania | MDL 2724 16-MD-724 |

**Econ One Research, Inc.**
**Los Angeles, California**
**Page 9 of 9**

**Dr. Jeffrey Leitzinger**
**June 2021 – May 2025**

| | Proceeding | Court/Commission/ Agency | Docket or File |
|---|---|---|---|
| 11. | Panini America, Inc. v. National Football League Players Incorporated | American Arbitration Association | AAA Case No. 01-23-0003-7163 |
| 12. | Giang Bui, v. Cargill Incorporated, et al. | Supreme Court of British Columbia | No. S-221365 |

**Exhibit 2**
**List of Materials Considered**

*Includes all documents, studies, and articles cited in the Declaration.*

**Pleadings and Motions**

Direct Purchaser Class Plaintiffs' Second Amended Consolidated Class Action Complaint and Jury Demand (10/23/2013)

**Declarations**

Declaration of Jeffrey J. Leitzinger, Ph.D. Related to Proposed Allocation Plan and Net Settlement Fund Allocation (04/08/2024)
Declaration of Jeffrey J. Leitzinger, Ph.D. Regarding Certification of the Proposed Settlement Class (04/08/2024)

**Depositions**

Varma, Suneet (03/27/2025)
Wodarczyk, Jennifer (02/26/2025)

**Original Data**

AMN-EFFEX Prefix

| | | |
|---|---|---|
| 0013335 - 0013349 | 0013390 | 0013452 - 0013459 |
| 0013353 - 0013357 | 0013392 | 0013492 - 0013494 |
| 0013361 - 0013366 | 0013394 | 0013496 - 0013497 |
| 0013368 | 0013396 | 0013499 - 0013500 |
| 0013378 - 0013387 | | |

ANCH Prefix

| | | |
|---|---|---|
| 628 | 797 | 1274 |
| 687 | 798 | 1358 |
| 691 | 1061 | 1543 |
| 692 | 1065 | 1544 |
| 696 | 1068 | 1567 |
| 697 | 1204 | 1841 |
| 698 | 1206 | 1842 |
| 730 | 1207 | 1934 |
| 731 | 1224 | 2016 |
| 764 | 1225 | 2019 |
| 766 | 1258 | 2021 |
| 767 | 1260 | 2103 |
| 777 | 1261 | 2104 |
| 779 | 1271 | 2115 |
| 780 | 1273 | 2116 |

APO-EFFXR Prefix

| | | |
|---|---|---|
| 00000109 - 00000110 | 00001637 | 00001933 |
| 00000113 - 00000115 | 00001837 | 00003105 - 00004575 |

Correspondence with Apotex regarding produced data.

AUROBINDO-EFFEXOR-XR Prefix

| | | |
|---|---|---|
| 00000001 | 00003191 | 00003631 |
| 00002711 - 00002717 | 00003563 | 00003644 |
| 00002735 | 00003623 | 00003832 |
| 00003003 | 00003628 | |

Correspondence with Aurobindo regarding produced data.

DRL Prefix

| | | |
|---|---|---|
| 000065 - 000073 | 000328 | 000345 - 000348 |
| 000298 | 000330 | 000350 - 000351 |
| 000305 - 000312 | 000332 - 000334 | 000353 - 000361 |
| 000313A | 000337 - 000343 | 000363 - 000367 |
| 000314 - 000326 | | |

Correspondence with Dr. Reddy's regarding produced data.

MYL-VENLA Prefix

| |
|---|
| 0000001 - 0000004 |

Correspondence with Mylan regarding produced data.

SAJ Prefix

| |
|---|
| 00000397 |

**Exhibit 2**
**List of Materials Considered**

TEVA  EFFEX Prefix

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0153024 | - | 0153026 | 0443762 | | | 0759710 | | |
| 0153031 | | | 0447421 | - | 0447422 | 0770410 | | |
| 0162211 | - | 0162231 | 0450645 | - | 0450646 | 0851187 | | |
| 0170258 | - | 0170278 | 0451485 | - | 0451486 | 0851509 | | |
| 0245646 | | | 0483826 | - | 0483827 | 0851552 | | |
| 0278448 | - | 0278464 | 0505438 | - | 0505439 | 0854103 | - | 0854107 |
| 0339194 | | | 0511124 | - | 0511125 | 0854114 | - | 0854122 |
| 0349438 | | | 0522927 | | | 0863423 | | |
| 0440109 | | | 0532032 | - | 0532033 | 0863425 | - | 0863427 |
| 0440111 | | | 0631602 | - | 0631603 | 0879587 | | |
| 0440649 | - | 0440650 | 0713068 | | | 0879589 | - | 0879591 |
| 0440656 | - | 0440657 | 0713070 | | | 0879593 | - | 0879594 |
| 0440758 | - | 0440759 | 0713199 | | | 0891441 | - | 0891442 |
| 0440791 | - | 0440792 | 0713201 | - | 0713203 | 0893211 | - | 0893212 |
| 0440837 | - | 0440839 | 0713205 | - | 0713206 | 0900319 | - | 0900326 |
| 0440841 | | | 0713422 | - | 0713424 | 0900347 | | |
| 0443328 | - | 0443329 | 0716248 | - | 0716251 | | | |

Correspondence with Teva regarding produced data.

TOREFX Prefix

| | | | | | |
|---|---|---|---|---|---|
| 006101 | - | 006102 | 008255 | - | 008256 |

Correspondence with Torrent regarding produced data.

UCDPPEFF   Prefix

00002843

WOCKHARDT - VN Prefix

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 00000002 | - | 00000005 | 00014984 | - | 00014990 | 00025075 | - | 00025079 |

Correspondence with Wockhardt regarding produced data.

WYEFFAT Prefix

| | | | | | |
|---|---|---|---|---|---|
| 2163587 | | | 04680349 | | 06523926 - 06523934 |
| 04266287 | | | 06382953 - 06382993 | | 08374117 - 08374126 |
| 04645250 | | | 06383044 - 06383087 | | |

Correspondence with Wyeth/Greenstone regarding produced data.

Zyd  Ven Prefix

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0000540 | - | 0000541 | 0004293 | - | 0004296 | 0029477 | | |
| 0000547 | - | 0000548 | 0004934 | - | 0004937 | 0029524 | | |
| 0000558 | - | 0000560 | 0010454 | | | 0029808 | | |
| 0000564 | | | 0010573 | | | 0029963 | | |
| 0000572 | | | 0015606 | | | 0031883 | - | 0031884 |
| 0001034 | - | 0001037 | 0029416 | | | 0032047 | - | 0032056 |
| 0001482 | - | 0001483 | | | | | | |

Correspondence with Zydus regarding produced data.

**Public Data**
Medi-Span WAC data

**Documents**
AMN-EFFEX Prefix

| | | |
|---|---|---|
| 0013335 | 0013345 | 0013361 |
| 0013336 | 0013346 | 0013362 |
| 0013337 | 0013347 | 0013363 |
| 0013338 | 0013348 | 0013364 |
| 0013339 | 0013349 | 0013365 |
| 0013340 | 0013353 | 0013366 |
| 0013341 | 0013354 | 0013368 |
| 0013342 | 0013355 | 0013378 |
| 0013343 | 0013356 | 0013379 |
| 0013344 | 0013357 | 0013380 |

**Exhibit 2**
**List of Materials Considered**

| | | |
|---|---|---|
| 0013381 | 0013394 | 0013459 |
| 0013382 | 0013396 | 0013492 |
| 0013383 | 0013452 | 0013493 |
| 0013384 | 0013453 | 0013494 - 0013495 |
| 0013385 | 0013454 | 0013496 |
| 0013386 | 0013455 | 0013497 - 0013498 |
| 0013387 | 0013456 | 0013499 |
| 0013390 | 0013457 | 0013501 |
| 0013392 | 0013458 | |

**ANCH Prefix**

| | | |
|---|---|---|
| 628 | 798 - 800 | 1358 - 1396 |
| 687 - 688 | 1061 - 1062 | 1543 |
| 692 | 1065 - 1067 | 1544 - 1566 |
| 696 | 1068 - 1072 | 1567 - 1605 |
| 697 | 1204 - 1205 | 1841 |
| 698 | 1206 | 1842 - 1933 |
| 730 | 1207 - 1223 | 1934 - 1935 |
| 731 - 763 | 1224 | 2016 - 2018 |
| 764 - 765 | 1225 - 1257 | 2019 - 2020 |
| 766 | 1258 - 1259 | 2021 - 2027 |
| 767 - 776 | 1260 | 2103 |
| 777 - 778 | 1261 - 1270 | 2104 - 2114 |
| 779 | 1271 - 1272 | 2115 |
| 780 - 796 | 1273 | 2116 - 2122 |
| 797 | 1274 - 1357 | |

**APO-EFFXR- Prefix**

| | | |
|---|---|---|
| 00000109 | 00000113 | 00000115 |
| 00000110 | 00000114 | |

**AUROBINDO-EFFEXOR-XR Prefix**

| | | |
|---|---|---|
| 00002735 - 00002736 | 00003563 - 00003622 | 00003631 - 00003640 |
| 00003003 - 00003005 | 00003623 - 00003627 | 00003643 - 00003645 |
| 00003191 - 00003255 | 00003628 - 00003630 | 00003896 |

**DRL- Prefix**

| | | |
|---|---|---|
| 000065 | 000317 | 000343 - 000344 |
| 000066 | 000318 | 000344 - 000345 |
| 000067 | 000319 | 000345 |
| 000068 | 000320 | 000346 |
| 000069 | 000321 | 000347 |
| 000070 | 000321 | 000348 - 000349 |
| 000071 | 000322 | 000350 |
| 000072 | 000323 | 000351 - 000352 |
| 000073 | 000324 | 000353 |
| 000305 | 000325 | 000354 |
| 000306 | 000326 - 000327 | 000355 |
| 000307 | 000328 - 000329 | 000356 |
| 000308 | 000330 - 000331 | 000357 |
| 000309 | 000332 | 000358 |
| 000310 | 000334 - 000336 | 000359 |
| 000311 | 000337 | 000360 |
| 000312 - 000313 | 000338 | 000361 - 000362 |
| 000313 A | 000339 | 000363 |
| 000314 | 000340 | 000364 |
| 000315 | 000341 | 000365 |
| 000316 | 000342 | |

**MYL-VENLA- Prefix**

| | | |
|---|---|---|
| 0000002 | 0000003 | 0000004 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 2**
**List of Materials Considered**

Orgenus_Prefix
- 00020907

QK_Prefix
- 0001687

SAJ Prefix
- 0010178

TEVA_EFFEX_Prefix

| | | |
|---|---|---|
| 0153024 | 0483826 | 0854103 |
| 0153025 | 0483827 | 0854104 |
| 0153026 - 0153030 | 0505438 | 0854105 |
| 0153031 | 0505439 | 0854106 |
| 0245646 - 0245650 | 0511124 | 0854107 - 0854113 |
| 0339194 - 0339235 | 0511125 | 0854114 |
| 0349438 | 0532032 | 0854115 |
| 0440109 - 0440110 | 0532033 | 0854116 |
| 0440111 | 0631602 | 0854117 |
| 0440649 | 0631603 | 0854118 |
| 0440650 | 0713068 - 0713069 | 0854119 |
| 0440656 - 0440657 | 0713070 | 0854120 |
| 0440657 | 0713199 - 0713200 | 0854121 |
| 0440758 | 0713201 | 0854122 |
| 0440759 | 0713202 | 0863423 - 0863424 |
| 0440791 | 0713203 | 0863425 |
| 0440792 | 0713205 | 0863426 |
| 0440837 | 0713206 | 0863427 |
| 0440838 | 0713422 | 0879587 - 0879588 |
| 0440839 - 0440840 | 0713423 | 0879589 |
| 0440841 | 0715251 | 0879590 |
| 0443328 | 0716248 | 0879591 - 0879592 |
| 0443329 | 0716249 | 0879593 |
| 0443762 - 0443766 | 0716250 | 0879594 |
| 0447421 | 0758710 | 0891441 |
| 0447422 | 0851187 - 0851189 | 0891442 |
| 0450645 | 0851509 - 0851549 | 0893211 |
| 0450646 | 0851552 - 0851593 | 0893212 |
| 0451485 | 0851581 | 0713424 |
| 0451486 | | |

TOREFX Prefix
- 006101

WYEFFAT Prefix

| | | |
|---|---|---|
| 0440111 | 3609860 - 3610024 | 04645250 |
| 0451486 | 3795941 - 3795946 | 04680349 |
| 0505439 | 04266287 | 06426692 |
| 2163587 - 2163591 | | |

Zyd_Ven-Prefix

| | | |
|---|---|---|
| 0000540 | 0000548 | 0000560 |
| 0000541 | 0000558 | 0000564 |
| 0000547 | 0000559 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 2**
**List of Materials Considered**

### Publicly Available Materials

ABA Section of Antitrust Law, *Antitrust Law Developments*, 6th edition, 2007.

Association for Accessible Medicines, "Generic Drug Access & Savings in the U.S.: Access in Jeopardy," 2018.

Batchelor, R., "How Useful Are the Forecasts of Intergovernmental Agencies? The IMF and OECD Versus the Consensus," *Applied Economics*, Vol. 33, No. 2, February 2001, pp. 225-235.

Clemen, R., "Combining Forecasts: A Review and Annotated Bibliography," *International Journal of Forecasting*, Vol. 5, 1989, pp. 559-583.

Congressional Budget Office, "How Increased Competition From Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry," July 1998.

CVS Caremark Press Release, "PharmaCare's Aggressive Outreach Successfully Shifts 95% of its Zocor Market Share to Generic Simvastatin in One Month, Generating Significant Savings for Clients," August 17, 2006.

Dave, C., A. Kesselheim, E. Fox, P. Qiu, and A. Hartzema, "High Generic Drug Prices and Market Competition: A Retrospective Cohort Study," *Annals of Internal Medicine*, Vol. 167, No. 3, August 2017.

Dave C., A. Hartzema, and A. Kesselheim, "Prices of Generic Drugs Associated with Numbers of Manufacturers," *The New England Journal of Medicine*, Correspondence, December 2017.

Federal Register, "340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation," Vol. 82, No. 3, January 5, 2017.

Federal Trade Commission, "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact," August 2011, available at www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

Federal Trade Commission, "Authorized Generics: An Interim Report," June 2009, available at www.ftc.gov/os/2009/06/P062105authorizedgenericsreport.pdf.

Federal Trade Commission, "Generic Drug Entry Prior to Patent Expiration," July 2002, available at https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf.

Federal Trade Commission, "Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions," January 2010.

Generic Pharmaceutical Association, "Generic Drug Savings in the U.S.," 2013.

Grabowski, H., G. Long, and R. Mortimer, "Recent Trends in Brand-Name and Generic Drug Competition," *Journal of Medical Economics*, December 2013.

Health Resources & Services Administration, "What is HRSA's Penny-Pricing Policy Regarding 340B Ceiling Prices," available at https://www.hrsa.gov/about/faqs/what-hrsas-penny-pricing-policy-regarding-340b-ceiling-prices.

IMS Institute for Healthcare Informatics, "Price Declines after Branded Medicines Lose Exclusivity in the U.S.," January 2016.

Levy, S., "Why Authorized Generics Are Making a Comeback," *Drug Topics*, November 3, 2003.

Lichtenberg, F., and G. Duflos, "Time Release: The Effect of Patent Expiration on U.S. Drug Prices, Marketing, and Utilization by the Public," Medical Progress Report, Center for Medical Progress at the Manhattan Institute, No. 11, October 2009.

Medco Health Solutions, Inc., "New Analysis: Recent Generic Blockbusters Show Huge Gains; Consumer Adoption Rates Accelerate," January 18, 2006.

Reiffen, D., and M. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1: 37-49, February 2005.

Saha, A., H. Grabowski, H. Birnbaum, P. Greenberg, and O. Bizan, "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business*, Vol. 13, No. 1, February 2006, pp. 15-38.

U.S. Food and Drug Administration, *Approved Drug Products With Therapeutic Equivalence Evaluations*, 44th edition, 2024.

U.S. Food and Drug Administration, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," December 2019, available at https://www.fda.gov/media/133509/download.

U.S. Patent and Trademark Office, "Patent Essentials," available at https://www.uspto.gov/patents/basics/essentials.

Drugs@FDA

www.effexorxr.com

www.fda.gov

### Cited Cases

*FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013).

*Mylan Pharmaceuticals, Inc. v. Tommy G. Thompson, et al.*, 268 F.3d 1323, 1326 (Fed. Cir. 2001).

### Other

21 USC § 355

H.R. Rep. 98-857 (I), 1984 U.S.C.C.A.N. 2647



EXPERT REPORT                                           Source: Manufacturer data.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 4**
**Class Generic Conversion Rate**

| Quarter After Generic Entry | Class Generic Conversion Rate |
|:---:|:---:|
| | (Percent) |
| 1 | 67.1 % |
| 2 | 59.1 |
| 3 | 57.7 |
| 4 | 67.2 |
| 5 | 86.4 |
| 6 | 83.6 |
| 7 | 87.0 |
| 8 | 90.4 |
| 9 | 89.6 |
| 10 | 90.5 |
| 11 | 94.2 |
| 12 | 90.8 |
| 13 | 91.4 |
| 14 | 95.5 |
| 15 | 96.2 |
| 16 | 96.5 |
| 17 | 97.2 |
| 18 | 97.2 |
| 19 | 97.7 |
| 20 | 97.2 |
| 21 | 98.1 |
| 22 | 97.9 |
| 23 | 98.4 |
| 24 | 98.3 |
| 25 | 98.0 |

Source: Manufacturer data.

EXPERT REPORT

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 5
## List of Class Members

1. AETNA
2. AMERICAN SALES COMPANY
3. AMERISOURCEBERGEN
4. ASSOCIATED PHARMACIES
5. ATLANTIC APOTHECARY
6. AUBURN PHARMACEUTICALS
7. BARTELL DRUG COMPANY
8. BLOODWORTH WHOLESALE
9. BURLINGTON DRUG
10. CAPITAL WHOLESALE
11. CARDINAL HEALTH
12. CESAR CASTILLO INC
13. CIGNA
14. CVS CAREMARK
15. DAKOTA DRUG
16. DELHAIZE AMERICA
17. DISCOUNT DRUG MART
18. DMS PHARMACEUTICAL
19. DROGUERIA BETANCES
20. DRUGS UNLIMITED
21. DUANE READE
22. EXPRESS SCRIPTS
23. FRANK W KERR
24. GENETCO
25. GOLUB
26. H. D. SMITH WHOLESALE
27. HARVARD DRUG
28. HE BUTT
29. HENRY SCHEIN
30. HUMANA
31. J M SMITH CORPORATION D/B/A SMITH DRUG
32. KASH N KARRY FOOD STORES
33. KERR DRUG
34. KPH HEALTHCARE SERVICES INC
35. KROGER COMPANY
36. LOUISIANA WHOLESALE
37. MCKESSON
38. MEDCO
39. MEIJER
40. MIAMI LUKEN
41. MORRIS & DICKSON
42. NORTH CAROLINA MUTUAL WHOLESALE DRUG
43. OPTUM RX
44. PHARMACY BUYING ASSOCIATION
45. PRESCRIPTION SUPPLY
46. PRIME THERAPEUTICS
47. PUBLIX SUPER MARKETS
48. QK HEALTHCARE INC
49. QUALITY CARE PRODUCTS
50. QUEST PHARMACEUTICALS
51. R & S NORTHEAST
52. RDC
53. RICHIE PHARMACAL
54. RITE AID
55. SCHNUCKS PHARMACY
56. STEPHEN L. LAFRANCE PHARMACY, INC. D/B/A SAJ DISTRIBUTORS
57. SUPERVALU
58. THRIFTY WHITE
59. TOP RX
60. UNIONDALE CHEMISTS, INC
61. VALLEY WHOLESALE DRUG
62. VALUE DRUG
63. WAKEFERN FOOD CORP
64. WALGREENS
65. WALMART
66. WEIS MARKETS
67. WINN DIXIE

Source: Manufacturer data.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 6
## List of Class Members Excluding Retailer Plaintiffs

1. AETNA
2. AMERISOURCEBERGEN
3. ASSOCIATED PHARMACIES
4. ATLANTIC APOTHECARY
5. AUBURN PHARMACEUTICALS
6. BARTELL DRUG COMPANY
7. BLOODWORTH WHOLESALE
8. BURLINGTON DRUG
9. CAPITAL WHOLESALE
10. CARDINAL HEALTH
11. CESAR CASTILLO INC
12. CIGNA
13. DAKOTA DRUG
14. DELHAIZE AMERICA
15. DISCOUNT DRUG MART
16. DMS PHARMACEUTICAL
17. DROGUERIA BETANCES
18. DRUGS UNLIMITED
19. DUANE READE
20. EXPRESS SCRIPTS
21. FRANK W KERR
22. GENETCO
23. GOLUB
24. H. D. SMITH WHOLESALE
25. HARVARD DRUG
26. HENRY SCHEIN
27. HUMANA
28. J M SMITH CORPORATION D/B/A SMITH DRUG
29. KASH N KARRY FOOD STORES
30. KERR DRUG
31. KPH HEALTHCARE SERVICES INC

32. LOUISIANA WHOLESALE
33. MCKESSON
34. MEDCO
35. MIAMI LUKEN
36. MORRIS & DICKSON
37. NORTH CAROLINA MUTUAL WHOLESALE DRUG
38. OPTUM RX
39. PHARMACY BUYING ASSOCIATION
40. PRESCRIPTION SUPPLY
41. PRIME THERAPEUTICS
42. PUBLIX SUPER MARKETS
43. QK HEALTHCARE INC
44. QUALITY CARE PRODUCTS
45. QUEST PHARMACEUTICALS
46. R & S NORTHEAST
47. RDC
48. RICHIE PHARMACAL
49. SCHNUCKS PHARMACY
50. STEPHEN L. LAFRANCE PHARMACY, INC. D/B/A SAJ DISTRIBUTORS
51. THRIFTY WHITE
52. TOP RX
53. UNIONDALE CHEMISTS, INC
54. VALLEY WHOLESALE DRUG
55. VALUE DRUG
56. WAKEFERN FOOD CORP
57. WALMART
58. WEIS MARKETS
59. WINN DIXIE

Source: Manufacturer data.

# Exhibit 7

## Class Member Locations



Source: Manufacturer data; internet research.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



EXPERT REPORT

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



EXPERT REPORT

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 10**
**But-For Generic Entry Scenarios**

| Scenario | But-For Generic Entry Date: | | |
| | Teva | Authorized Generic | Third Generic Entrant |
| (1) | (2) | (3) | (4) |
| Scenario 1 (Base Case) | 05/15/2009 | 05/15/2009 | 04/15/2010 |
| Alternative But-For Generic Entry Scenarios: | | | |
| Scenario 2 | 04/15/2009 | 04/15/2009 | 03/16/2010 |
| Scenario 3 | 06/15/2009 | 06/15/2009 | 05/16/2010 |
| Scenario 4 | 07/15/2009 | 07/15/2009 | 06/15/2010 |
| Scenario 5 | 08/15/2009 | 08/15/2009 | 07/16/2010 |
| Scenario 6 | 09/15/2009 | 09/15/2009 | 08/16/2010 |
| Scenario 7 | 10/15/2009 | 10/15/2009 | 09/15/2010 |
| Scenario 8 | 12/15/2009 | 12/15/2009 | 11/15/2010 |
| Scenario 9 | 01/15/2010 | 01/15/2010 | 12/16/2010 |
| Scenario 10 | 05/15/2009 | 05/15/2009 | 06/01/2011 |

Note: Other generic manufacturers not listed enter at the same time as in the actual world.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



EXPERT REPORT



EXPERT REPORT

EXPERT REPORT

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXPERT REPORT

# Appendix A
# Manufacturer Forecasts Used in Overcharge Calculation

Mylan:    MYL-VENLA-0000002.
          MYL-VENLA-0000004.

Teva:     Wodarczyk Exhibit 10B (TEVA_EFFEX_0440657).
          Wodarczyk Exhibit 12B (TEVA_EFFEX_0863426);
            Wodarczyk Exhibit 13B (TEVA_EFFEX_0440841; duplicate);
            TEVA_EFFEX_0440650 (duplicate);
            TEVA_EFFEX_0440838 (duplicate);
            TEVA_EFFEX_0863425 (duplicate);
            TEVA_EFFEX_0863427 (duplicate).
          TEVA_EFFEX_0440759.
          TEVA_EFFEX_0440792;
            TEVA_EFFEX_0450646 (duplicate);
            TEVA_EFFEX_0891442 (duplicate);
            TEVA_EFFEX_0893212 (duplicate).
          TEVA_EFFEX_0443329.
          TEVA_EFFEX_0447422.
          TEVA_EFFEX_0631603;
            TEVA_EFFEX_0713070 (duplicate);
            TEVA_EFFEX_0713201 (duplicate);
            TEVA_EFFEX_0713203 (duplicate);
            TEVA_EFFEX_0713206 (duplicate).
          TEVA_EFFEX_0713424.
          TEVA_EFFEX_0716249.

Wyeth:    WYEFFAT3609860 - WYEFFAT3610024 at WYEFFAT3609901.
          WYEFFAT3795941 - WYEFFAT3795946 at WYEFFAT3795941.