# Exhibit 2
# (Filed Under Seal)

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE EFFEXOR XR ANTITRUST LITIGATION | C.A. No. 11-05479-ZNQ-JBD |
| This Document Relates To:<br><br>Direct Purchaser Class Actions | |

**EXPERT REPORT OF PROFESSOR THOMAS G. MCGUIRE, PH.D.**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE DISCOVERY
CONFIDENTIALITY ORDER**

# TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ................................................................................................ 1

II.    QUALIFICATIONS ...................................................................................................... 9

III.   COMPETITION AND REGULATION IN MARKETS FOR PRESCRIPTION DRUGS ....................... 12

A.    Regulatory Background ........................................................................................12

B.    Brand Market Power and Competition from AB-Rated Generics ...............................20

C.    Brand Market Power and Competition from Non-AB-Rated Products............................31

D.    Anticompetitive Settlements of Paragraph IV Challenges ........................................36

IV.   FACTUAL BACKGROUND .......................................................................................... 54

A.    Effexor IR and Effexor XR..................................................................................54

B.    Events Leading Up to the Wyeth-Teva Agreement ..................................................56

C.    Major Provisions of the Wyeth-Teva Agreement ....................................................62

D.    Events Following the Wyeth-Teva Agreement........................................................67

V.    OVERVIEW OF DIRECT AND INDIRECT EVIDENCE OF MARKET POWER............................. 74

VI.   MARKET POWER: DIRECT EVIDENCE ......................................................................... 76

A.    Price with Competition ........................................................................................77

B.    Gross Margins ...................................................................................................82

C.    Own-Price Elasticity of Demand ...........................................................................90

D.    Wyeth-to-Teva Unexplained Reverse Payments Imply Wyeth is Defending Market Power ...............96

E.    Summary of Direct Evidence................................................................................97

VII.  MARKET POWER: INDIRECT EVIDENCE ....................................................................... 98

A.    Cross-Price Elasticity of Demand and Economic Substitutability ...............................98

B.    Data and Methodology........................................................................................102

C.    Cross-Price Elasticities of Demand for Other Antidepressants with Respect to the Price of
Venlafaxine ER ..................................................................................................105

D.      **Cross-Price Elasticities of Demand for Effexor XR with Respect to Price of Other Antidepressants** ........................................................................................................................**107**

E.      **Inference about Cross-Price Elasticities from the Magnitude of the Own-Price Elasticity** ...............**109**

F.      **Other Forms of Venlafaxine: IR Generics and the Non-AB ER Tablet** ...................................**111**

G.      **The Hypothetical Monopolist and the SSNIP Test** ...........................................................**118**

H.      **Summary of Indirect Evidence** ...............................................................................**121**

VIII.   ECONOMIC EVALUATION OF THE WYETH-TEVA AGREEMENT AS LIKELY DELAYING GENERIC COMPETITION FOR VENLAFAXINE ER ............................................................ 122

A.      **Large, Unexplained Reverse Payments from Wyeth to Teva Imply a Likely Delay in Generic Competition**.......................................................................................................**122**

B.      **Payments to Teva in the Agreement were Sufficient to Induce Teva to Agree to a Delay in Entry**...**145**

C.      **Wyeth's Stock Market Price Jumps After Announcements Regarding the Agreement are Evidence that it Delayed Generic Entry** ...........................................................................................**152**

IX.    THE WYETH-TEVA AGREEMENT DIVIDED MARKETS ...................................................... 158

A.      **Market Allocation with an Implicit No-AG Clause Following the Express No-AG Clause Covering the First 180 Days After Teva Launched**.............................................................................**158**

B.      **The Wyeth-Teva Agreement is a Market Division Agreement** ............................................**161**

X.     EVALUATING PROCOMPETITIVE BENEFITS AGAINST ANTICOMPETITIVE HARMS OF THE REVERSE PAYMENTS AND MARKET DIVISION IN THE WYETH-TEVA AGREEMENT .......... 166

A.      **Harms to Purchasers and Payors from the Challenged Terms in the Wyeth-Teva Agreement**........**166**

B.      **Possible Procompetitive Benefits from the Wyeth-Teva Agreement** ...................................**169**

C.      **Anticompetitive Effects Vastly Outweigh Any Procompetitive Benefits** ...............................**171**

XI.    TIMING OF GENERIC ENTRY IN A COMPETITIVE AGREEMENT ......................................... 172

A.      **Market Dynamics and Profit Payoffs Absent a Settlement** ..................................................**175**

B.      **Profit Payoffs from Settling with a Competitive Agreement** ................................................**183**

C.      **The Feasible Range for an Entry Date in a Settlement without Reverse Payments** ...........................**185**

D.      **Determining the Generic Entry Date in a Settlement without Reverse Payments and Market Division** ........................................................................................................................**188**

XII.   SUMMARY OF COMPETITIVE HARM .............................................................. 192

# I.    EXECUTIVE SUMMARY

1.      I have been retained by "Direct Purchaser Plaintiffs" (or "DPPs") and their attorneys in this matter (hereinafter "Plaintiffs").  The DPPs are drug wholesalers that purchased Effexor XR directly from Wyeth and/or purchased Effexor XR's generic equivalent directly from Teva during the period from June 14, 2008 through and until May 31, 2011.[1]

2.      The Plaintiffs allege that Wyeth and Teva entered into a patent litigation settlement on November 2, 2005 (the "Wyeth-Teva Agreement," alternatively, the "Agreement") that contained illegal reverse payments and market division terms (the "challenged terms") that delayed the start of generic competition for Wyeth's branded Effexor XR product (venlafaxine extended-release capsules) and, after generic entry, reduced competition for generic versions of Effexor XR.

3.      I have been asked by counsel to address issues related to market definition and market power with respect to Effexor XR.

4.      I have also been asked to conduct an economic analysis of the Wyeth-Teva Agreement to address the question of whether or not the challenged terms in the Agreement caused substantial harm to competition and are anticompetitive.  I have been asked to determine whether there are any procompetitive justifications for the challenged terms that outweigh any anticompetitive impacts I identify.

5.      Finally, I have been asked to conduct an economic analysis of the competitive circumstances that would have unfolded if rational, competitively acting companies in the positions of Wyeth and Teva had not included the challenged terms in the Agreement.

---

[1]  The DPPs are: Rochester Drug Co-Operative, Inc., Stephen L. LaFrance Holdings, Inc. d/b/a SAJ Distributors, and Uniondale Chemists, Inc.  See Direct Purchaser Class Plaintiffs' Second Amended Consolidated Class Action Complaint and Jury Demand, October 23, 2013 (hereafter "DPP Complaint").  Plaintiffs brought suit against the following defendants: Wyeth LLC; Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; Wyeth Pharmaceuticals Company (collectively, "Wyeth"); Teva Pharmaceuticals USA, Inc.; and Teva Pharmaceutical Industries Ltd. (collectively, "Teva").  I understand from counsel for Plaintiffs that Plaintiffs have reached a settlement with Wyeth and that Wyeth is no longer a party to this litigation.

6.      I have reached a series of opinions to a reasonable degree of certainty in the area of applied microeconomics based on (i) my review of relevant materials in this matter, (ii) my education, training, and experience in the areas of applied microeconomics and health economics, and (iii) a series of analyses, including econometric analyses, conducted in this Report.

### Conclusions Regarding Market Power and Market Definition

7.      My analyses and conclusions about market power in this Report use the terms "market power," "substantial market power," and "monopoly power."  For purposes of clarity, I briefly define here how I use these terms.  "Market power" refers to the ability of a firm to profitably raise and sustain a price above the competitive level.  "Substantial market power" or "monopoly power" refers to market power that rises to the level of that possessed by a dominant seller in a market.[2]

8.      With regard to market definition and market power with respect to Effexor XR, I have examined both direct and indirect evidence and have concluded:

- Direct evidence (Section VI) leads to the conclusion that Wyeth possessed and maintained substantial market power with respect to Effexor XR from the time Wyeth began sales of Effexor XR in 1997 through the time of Teva's generic entry in July 2010.  Direct evidence of Wyeth's substantial market power includes:
  - The average price of brand and generic venlafaxine extended release (ER) (i.e., brand and generic Effexor XR)[3] fell drastically after generic competition began, from an IQVIA wholesale price of $4.15 per pill in June 2010, prior to Teva's generic venlafaxine ER entry, to $3.50 when Teva was the only generic, and then to $0.27 per pill in December 2011, six months after the start of multiple generic competition;

---

[2] Economists sometimes use the terms market power and monopoly power nearly interchangeably.  See, for example, the treatment throughout J. Church and R. Ware, *Industrial Organization: A Strategic Approach*, Boston, MA: McGraw Hill, 2000.

[3] Unless otherwise indicated, in this Report, venlafaxine ER refers to the capsule form (*i.e.* Effexor XR and its AB-rated generics).

- o Wyeth was able to sustain extremely high gross margins on Effexor XR, rising from 96% in 2002 to 99% in 2009; gross margins exceeded those for comparable firms in more competitive circumstances indicating Wyeth's ability to markup price above competitive levels;

- o Econometric analysis finds the demand for Effexor XR to be highly inelastic (a low own-price elasticity of demand), allowing Wyeth to profitably restrict output and raise and maintain the price of venlafaxine ER well above competitive levels; and

- o Wyeth made large, unexplained reverse payments to Teva, per the Agreement, valued conservatively at $412.8 million. A rational brand firm would only make such large and otherwise unexplained reverse payments if it is protecting monopoly profits and substantial market power. The presence of the large reverse payments to Teva is thus evidence that Wyeth possessed and sought to protect and extend substantial market power with respect to Effexor XR.

- Indirect evidence (Section VII) leads to the conclusion that Wyeth possessed a dominant share of the relevant antitrust market for Effexor XR prior to Teva's generic launch in July 2010. A series of econometric analyses estimates the cross-price elasticity of demand between Effexor XR and candidate economic substitute products to determine whether these products are in the relevant antitrust market. The econometric evidence includes:

  - o Empirical study of the change in quantity demanded of candidate economic substitute products in response to the fall in price of venlafaxine ER upon generic entry finds no evidence of economic substitution between Effexor XR and candidate substitute antidepressants (including newer antidepressants and other older drugs used to treat depression).

  - o Empirical study of the change in quantity demanded of Effexor XR in response to generic entry for candidate substitute drugs finds no evidence of economic substitution between Effexor and these candidate substitute antidepressants.

  - o The low own-price elasticity of demand referred to in the direct evidence section above offers confirmatory evidence that the magnitude of the cross-price elasticities of demand for Effexor XR are also low. Few patients leaving Effexor XR after a price rise means few patients moving to other products, implying a low cross-price elasticity of demand.

  - o Application of the logic of the U.S. Department of Justice/Federal Trade Commission's Hypothetical Monopolist Test implies the relevant market for analyzing the potential anticompetitive effects of the Agreement consists of brand Effexor XR and its AB-rated generic versions. The totality of the evidence indicates that prior to generic entry, Wyeth

controlled 100% of the relevant antitrust market including Effexor XR and was able to set and sustain a price far above the price with competition.

### *Conclusions Regarding the Agreement*

9.       My analyses and conclusions about the Wyeth-Teva Agreement use the terms "reverse," "unexplained," "large," and "unjustified" to describe payments made from Wyeth to Teva in the Agreement.  Again, for purposes of clarity, I briefly define how I use those terms.  Payments are "reverse" if they flow from the plaintiff (Wyeth) to the defendant (Teva) in a patent infringement lawsuit.  Payments are "unexplained" if, from the standpoint of the brand company, they cannot be understood as stemming from normal business considerations (excluding to avoid the risk of generic competition and/or to delay generic competition).  Payments are "large" if they exceed the magnitude of that which might be explained by normal business considerations.  Payments are "unjustified" if the anticompetitive harm to consumers caused by the payments exceed any procompetitive benefits.

10.      With regard to the competitive effects of the challenged terms in the Wyeth-Teva Agreement (Section VIII), I have concluded:

- Wyeth made reverse payments to Teva that cannot be explained by normal business considerations.  The Wyeth-to-Teva payments took three forms:

  o In Teva's license to sell generic Effexor XR in the U.S., *during* Teva's 180-day regulatory exclusivity period, Wyeth promised not to sell an authorized generic (AG), which would have been Teva's only potential generic competitor during that time period.  *After* the expiration of Teva's 180-day regulatory exclusivity period, the Agreement contains royalty terms disincentivizing Wyeth from selling an AG;

  o In Teva's license to sell generic Effexor IR in the U.S., Wyeth allowed Teva to begin selling two years prior to the expiration of the venlafaxine compound patent, which Teva had not challenged.  Wyeth explicitly promised not to license others to sell until after the compound patent expired (thus creating a two-year period of sales for Teva with no competition from other generics); and

- o In Teva's license to sell generic Effexor XR in Canada,[4] Wyeth allowed Teva to begin selling in December 2006, approximately 13 months before the parties expected generic entry to occur in January 2008.

- Wyeth's reverse payments are conservatively estimated to total $412.8 million in terms of expected value based on the information available at the time of the Wyeth-Teva Agreement.

- The $412.8 million in reverse payments is net of royalties that a company in Wyeth's position could have expected to collect from Teva as the result of terms in the Agreement. Royalty income therefore does not explain why a firm in Wyeth's position would make such large reverse payments.

- No normal business considerations explain why Wyeth would cede sales and profits to Teva in the generic Effexor IR license and the generic Effexor XR license in Canada. Wyeth materials indicate these licenses were intended to transfer value to Teva for agreeing to delaying U.S. entry for generic Effexor XR. A Teva email confirms that these licenses were linked to the entry date for generic Effexor XR in the U.S.

- The $412.8 million in reverse payments vastly exceeded the future litigation costs (estimated as $4.3 million) a company in Wyeth's position could reasonably anticipate saving in connection with settling its patent dispute with Teva. I found no other potential procompetitive explanation for the payment.

- A competitively acting rational firm in Wyeth's position would not have made such large and otherwise unexplained reverse payments unless it was receiving a likely delay in generic competition for Effexor XR in return. An expected delay in generic competition substantially benefits Wyeth while substantially harming purchasers of Effexor XR who must pay higher prices for longer.

- A firm in Teva's position could have expected to earn approximately $343.7 million more in profits from the Agreement with reverse payments than it could have made if it had won the patent litigation. The reverse-payment Agreement's value to Teva above the best-case scenario associated with continuing with litigation provides economic evidence that Teva was induced to delay the expected date of its generic entry.

- Wyeth's market capitalization increased by over $5 billion as news about the Agreement was released. Financial markets' recognition of the new profit flows from the Agreement is confirmatory evidence that the Agreement allocated markets and likely delayed generic competition.

---

[4] Unless noted otherwise, the text in this Report relates to the U.S. market and U.S. regulatory system; my discussion of Canada relates only to the license for generic Effexor XR in Canada in certain portions of this Report.

11.     The Agreement allocated markets for brand and generic Effexor XR (Section IX).

- The likely delay in generic entry purchased by the reverse payments in the Wyeth-Teva Agreement allocated the market for brand and generic Effexor XR to Wyeth for an extended period.  Further, after generic entry, the Agreement used an explicit no-AG clause and royalty-based implicit no-AG clauses to allocate sales of generic Effexor XR to Teva, which shared its elevated generic profits with Wyeth through royalty payments, for 11 months.  The royalty terms also disincentivized Wyeth from entering in settlements with other generics permitting them to sell generic Effexor XR 181 days after Teva launched, further protecting the market allocation to Teva.

12.     Regarding harms and potential procompetitive benefits (Section X) I have concluded:

- As set out in the Agreement, Teva delayed selling a generic version of Effexor XR until July 2010.  Teva would have entered in or around May 2009 in the absence of the challenged terms.  The expected market-wide harm to purchasers from the delay, as well as from a reduction in generic competition after entry due to Teva being the only generic on the market due to the market allocation clauses in the Wyeth-Teva Agreement, totals approximately $1 billion.

- The actual harm to purchasers was even higher because Wyeth's brand Effexor XR sales grew more than was expected at the time of the Agreement.  The substantially higher than expected sales imply that the actual harm from the challenged terms substantially exceeded $1 billion.

- Licensed entry by Teva and other generic firms prior to expiration of all claimed patents on Effexor XR does not constitute a procompetitive benefit of the Agreement.  Harm or benefit associated with an agreement should be assessed against what would emerge with competitive behavior (*i.e.*, no reverse payments and no market division), not against the alleged scope of claimed patents.

- Teva's licenses to sell generic Effexor IR in the U.S. and generic Effexor XR in Canada allowed some consumers to buy generic forms of these products earlier than they otherwise would have.  Wyeth documents indicate that these entries correspond to expected savings of about $134.1 million.  Sales data indicate they resulted in actual savings of about $79.0 million.  I have been instructed by counsel that anticompetitive harm in one market cannot be justified by purported benefits in a separate market, particularly when the anticompetitive harm was not the least restrictive means of obtaining the purported benefits in a separate market.  Accordingly, the anticompetitive harm to consumers in the Effexor XR market cannot be justified by any alleged procompetitive benefits to these separate markets.  Furthermore, both the expected and actual price savings by consumers in other markets ($134.1 million and $79.0 million, respectively) are

small in relation to expected and actual harms in the Effexor XR market
(approximately $1 billion and more than $1 billion, respectively).

In sum, the small potential procompetitive effects of the Wyeth-Teva Agreement fall far short of offsetting the massive anticompetitive harms.

### *Conclusions Regarding Competitive Behavior*

13.     In the absence of an anticompetitive agreement between Wyeth and Teva, reasonable, competitively acting companies in the positions of Wyeth and Teva could have and would have settled the patent litigation without reverse payments or market division agreements.  The most likely date for Teva's generic entry date in such a settlement is in or around May 2009 (Section XI).  Without the anticompetitive no-AG clause in place, a reasonable company in Wyeth's position would have launched an AG alongside Teva.  Other generics, acting rationally, would have entered as early as possible thereafter (Section XII).

14.     Before proceeding with the balance of the Report, I provide the informational textbox below which summarizes the positions of the parties prior to the Agreement and how subsequent events played out.

### What Happened Here?

Annual net sales of Effexor XR were $2.15 billion in 2004. As is typical among sellers of highly successful brand drug products, Wyeth was exercising substantial market power with respect to Effexor XR, selling Effexor at $2.69 per pill, about 50 times the cost of production.

Effexor XR was bound to attract interest from generic manufacturers. Wyeth's patent on the compound venlafaxine was set to expire in June 2008, and Wyeth's other "secondary" patents with later expiration dates were vulnerable. In December 2002, Teva became the first generic manufacturer to apply for FDA approval to market a generic version of Effexor XR after expiration of the compound patent.

As permitted by the Hatch Waxman Act of 1984, Wyeth sued Teva for patent infringement. The lawsuit put the potential competitors in closed-door negotiations that could lead to licensed generic entry prior to expiration of the Effexor XR patents.

Teva was in a strong position. As the first firm to apply for FDA approval, Teva may have been entitled to 180 days of sales without competition from another generic product (though Wyeth could compete with a Teva generic product via an authorized generic (AG) version of Effexor XR). Wyeth's planning documents indicate that Wyeth regarded the Effexor XR patents other than the venlafaxine compound patent as vulnerable, and that Teva was more likely than not to win the patent suit against Wyeth as to these other patents.

In such circumstances, negotiations between competitively acting companies in the positions of Wyeth and Teva would have led to a Teva license to sell generic Effexor XR not long after June 2008, giving Wyeth some, but limited, time to continue to sell as a monopolist after expiration of the compound patent and allowing Teva to start earning profits on generic Effexor XR soon after the expiration of the compound patent. Or, alternatively, if no agreement were reached (and an agreement would likely be reached), then Teva would launch upon receiving FDA approval after expiration of the compound patent in June 2008 and after winning its patent case against Wyeth.

Wyeth and Teva did not reach a competitive agreement. Instead, Wyeth and Teva increased their joint profits by entering into a settlement with anticompetitive reverse payments delaying the start of Teva's generic entry until July 2010 and allocating markets. To convince Teva to delay its generic Effexor XR entry, in stark examples of reverse payments, Wyeth transferred some of its profits associated with Effexor IR in the U.S. and Effexor XR in Canada to Teva. Wyeth had no normal business reason to transfer profits to Teva other than to induce Teva to delay its U.S. generic entry of Effexor XR. Wyeth also expressly agreed not to launch an AG during Teva's 180-day regulatory exclusivity and set royalty terms that further deterred an AG launch after the 180-day regulatory exclusivity period. Wyeth's reverse payments to Teva were worth at least $412.8 million. These massive reverse payments were more than made up for by the monopoly prices Wyeth charged purchasers during the delay in generic entry and the higher prices Teva could charge without generic competition for 11 months. Both Wyeth and Teva benefited from the anticompetitive reverse payments and market allocation, at the expense of purchasers.

## II.    QUALIFICATIONS

15.    I am Professor of Health Economics *Emeritus* in the Department of Health Care Policy at Harvard Medical School, where I taught health economics in Harvard University's Ph.D. Program in Health Policy from 2001.  In 2008, I received the Everett Mendelsohn Excellence in Mentoring Award from Harvard's Graduate School of Arts and Sciences.  I received an A.B. degree from Princeton University and a Ph.D. degree in economics from Yale University. Although retired from active teaching (in June 2022), I continue to conduct and publish research on health plan payment systems in the U.S. and internationally, and on competition and regulation in the drug industry.

16.    I am a member of the National Academy of Medicine and a Research Associate at the National Bureau of Economic Research.  I served for ten years as an editor of the leading journal in the field of health economics, the *Journal of Health Economics* and co-edited the *Handbook of Health Economics*, Volume II.  I co-chaired three conferences on the Industrial Organization of Health Care and edited special sections of economic journals in which the conference papers were published.[5]  I co-chaired four conferences on the economics of mental health sponsored by the National Institute of Mental Health and edited the publications in which the conference papers appeared.[6]

17.    For 50 years, I have conducted research on the economics of managed care, health insurance, health care payment systems, drug markets, health care disparities by race and ethnicity, and mental health policy.  Some of my research is on topics pertinent to the current

---

[5]  T. McGuire and M. Riordan (guest editors), "The Industrial Organization of Health Care," *Journal of Economics & Management Strategy*, 3(1), March 1994; A. Ma, T. McGuire, and M. Riordan (guest editors), "The Industrial Organization of Health Care, II," *Journal of Economics & Management Strategy*, 6(1), Spring 1997; and A. Ma and T. McGuire (guest editors), "The Industrial Organization of Health Care, III," *Journal of Economics & Management Strategy*, 8(3), Fall 1999.

[6]  T. McGuire and B. Weisbrod (eds), *Economics and Mental Health*, National Institute of Mental Health, Series EN No. 1, DHHS Publication No. (ADM) 81-114, Superintendent of Documents, USGPO, Washington, D.C., 1981; T. McGuire and R. Scheffler (eds.). *Research Issues in Economics and Mental Health*, JAI Press, Vol. 8, 1987; T. McGuire (guest editor), "Economics and Mental Health," special issue of *Administration and Policy in Mental Health*, 1990; R. Frank and T. McGuire (guest editors) "Mental Health Economics," *Administration and Policy in Mental Health*, 24(2), March 1997.

matter. I have written extensively and for many years on the economics of mental health care, including many publications specific to depression and clinical decision making.[7] I have authored peer-reviewed academic articles on the economics of drug prices, competition between branded and generic drug products, and insurance coverage for drugs.[8] Among other topics,

---

[7] Published papers specifically dealing with depression include the following: E. Berndt, R. Frank, and T. McGuire, "Alternative Insurance Arrangements and the Treatment of Depression: What Are the Facts?" *The American Journal of Managed Care*, 3(2), 1997, pp. 243-50; R. Frank, *et al.*, "The Value of Mental Health Services at the System Level: The Case of Treatment for Depression," *Health Affairs*, 18(5), 1999, pp. 71-86; K. Wells, *et al.*, "Overcoming Barriers to Reducing the Burden of Affective Disorders," *Biological Psychiatry*, 52, 2002, pp. 655-75; A. Balsa, T. McGuire, and L. Meredith, "Testing for Statistical Discrimination in Health Care," *Health Services Research*, 40(1), 2005, pp. 227-52; R. Henke, *et al.*, "Clinician and Organizational Level Factors in the Adoption of Evidence-Based Care for Depression in Primary Care," *Health Care Management Review,* 33(4), 2008, pp. 289-99; T. McGuire, *et al.*, "Testing for Statistical Discrimination by Race/Ethnicity in Panel Data for Depression Treatment in Primary Care," *Health Services Research*, 43(2), 2008, pp. 531-51; R. Henke and T. McGuire, "Clinical Inertia in Depression Treatment," *Medical Care.* 47(9), 2009, pp. 959-67; C. Fullerton, *et al.*, "Ten-Year Trends in Quality of Care and Spending for Depression: 1996-2005," *Archive of General Psychiatry*, 68(12), 2012, pp. 1218-26; and D. Hodgkin, *et al.*, "Testing for Clinical Inertia in Medication Treatment of Bipolar Disorder." *Journal of Affective Disorders*, 205, 2016, pp. 13-19. For additional publications concerned with the economics of mental health care more broadly, see Attachment A.

[8] T. McGuire and S. Bauhoff, "Adoption of a Cost-Saving Innovation: Germany, UK and Simvastatin," in N. Klusen, F. Verheyen, and C. Wagner (eds.), *England and Germany in Europe – What Lessons Can We Learn from Each Other?* Baden-Baden, Germany: Nomos, 2011, pp. 11-26; E. Berndt, T. McGuire, and J. Newhouse, "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," *Forum for Health Economics & Policy*, 14(2), 2011, Article 10; J. Glazer and T. McGuire, "A Welfare Measure of 'Offset Effects' in Health Insurance," *Journal of Public Economics,* 96, 2012, pp. 520-23; J. Glazer, H. Huskamp, and T. McGuire, "A Prescription for Drug Formulary Evaluation: An Application of Price Indexes," *Forum for Health Economics and Policy*, 15(2), 2012, Article 3; K. Drake, M. Starr, and T. McGuire, "Do 'Reverse Payment' Settlements Constitute an Anticompetitive Pay-for-Delay?" *International Journal of the Economics of Business,* 22(2), 2015, pp. 173-200; T. McGuire, *et al.*, "Resolving Reverse-Payment Settlements with the Smoking Gun of Stock Price Movements," *Iowa Law Review*, 101(4), 2016, pp. 1581-99; K. Drake and T. McGuire, "Stock-Price Evidence for Anticompetitive Effects in the Nexium 'Reverse-Payment' Settlement," *Journal of Competition Law & Economics*, 12(4), 2016, pp. 735-47; R. Hartman, K. Drake, and T. McGuire, "Event Study Analysis in Cases with Multiple Brand-Generic Reverse-Payment Settlements," *International Journal of the Economics of Business*, 26(3), 2019, pp. 399-410; K. Drake and T. McGuire, "Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements," *Journal of Competition Law and Economics*, 16(2), 2020, pp. 188-219; K. Drake, *et al.*, "No Free Launch: At-Risk Entry by Generic Drug Firms," *International Journal of the Economics of Business*, 29(3), 2022, pp. 301-15; K. Drake and T. McGuire, "Most-Favored Entry Clauses in Drug Patent Litigation Settlements: Reverse Payments and Anticompetitive Effects," *Antitrust Magazine Online*, August 2022, pp. 1-8; K. Drake and T. McGuire, "The Simple Math of Royalties and Drug Competition During the 180-Day Generic Exclusivity Period," *Journal of Competition Law and Economics*, February 2024, 20(1-2), pp. 50-59; K. Drake and T. McGuire, "Using Stock Price Movements to Estimate the Harm from Anticompetitive Drug Patent Litigation Settlements," NBER Working Paper 33196, November 2024 (https://www.nber.org/papers/w33196).

these publications address the frequency and timing of at-risk entry by generic manufacturers,[9] no-AG agreements, and the brand company's decision to launch an AG.[10]

18.     My research has been recognized by a number of awards, including the Victor Fuchs Lifetime Achievement Award for 2018, awarded by the American Society of Health Economics, the primary professional organization for health economists in the U.S., and the Arrow Award from the International Health Economics Association for the best paper in health economics published in English in 1998.[11]  I jointly authored a paper on reverse-payment settlements in the drug industry that received the Article of the Year Award from the *International Journal of the Economics of Business*.[12]  In 2023, I received an "Impact Award" from the European-based Risk Adjustment Network for development of econometric methods to improve the efficiency and fairness of the Dutch health plan payment model in their social health insurance system.[13]

19.     My litigation experience includes testimony at four drug industry antitrust trials.[14]  I also testified in Charleston, West Virginia regarding the social harms attributable to the widespread

---

[9]  Drake and McGuire (2020), *op. cit.*; Drake, *et al.* (2022)*, op. cit.*

[10]  Drake and McGuire (February 2024), *op. cit.*

[11]  In addition, I was the 1981 recipient of the Elizur Wright Award from the American Association of Risk and Insurance recognizing an "outstanding contribution to the literature on risk and insurance" for my book *Financing Psychotherapy*.  In 1991, I received the Carl Taube Award from the American Public Health Association for "outstanding contributions to mental health services research."  Two of my jointly authored papers received "Best Paper of the Year" awards in 2008, one from Academy Health for research on clinical decision making and one from the National Institute for Health Care Management for work on incentives in managed care plans.  My paper on designing payment systems for private health insurance markets received the best paper of the year award in 2014 from the National Institute for Health Care Management.

[12]  Drake, Starr, and McGuire, *op. cit.*

[13]  R. van Kleef, *et al.*, "Improving Risk Equalization with Constrained Regression," *The European Journal of Health Economics*, 18(9), 2017, pp. 1137-56.

[14]  *In re: Nexium (Esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2409, Civil Action No. 112-cv-11711, November 7 and 20, 2014; *In re: Solodyn (Minocycline Hydrocholoride) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 14-md-2503-DJC, March 26-27, 2018; *In re: Opana ER Antitrust Litigation*, United States District Court for the Northern District of Illinois Eastern Division, MDL No. 2580, Lead Case No. 14-cv-10150, June 21 and 23, 2022; and *In Re HIV Antitrust Litigation*, United States District Court for the Northern District of California, MDL No. 19-cv-02573, June 13-14, 2023.

use of prescription opioids.[15]  Attachment A contains my CV and a list of my recent testimony. Attachment B lists the materials I considered in my work on this Report.  Members of the staff of Greylock McKinnon Associates, an economics consulting firm, work under my direction in support of my work in this matter.  My rate of compensation in this matter is $1,000 per hour.  I also receive compensation from Greylock McKinnon Associates based on its collected staff billings in support of my work in this matter.  My compensation does not depend upon the outcome of this litigation.

## III.    COMPETITION AND REGULATION IN MARKETS FOR PRESCRIPTION DRUGS

20.    This section overviews competition and regulation in prescription drug markets to provide context for my analysis in the remainder of this Report.  Drugs in the pharmaceutical industry are characterized as "brands" or "generics."  The two main forms of competition in the industry are competition between a brand drug and its generic equivalents, and competition among brand drugs based on different molecules or formulations within a therapeutic category.[16]

## A.    Regulatory Background

### Brand and Generic Drugs

21.    New prescription drugs must be approved by the U.S. Food and Drug Administration (FDA) under the clinical testing requirements of a New Drug Application (NDA).[17]  Since

---

[15] *National Prescription Opioid Litigation*, United State District Court for the Northern District of Ohio, Eastern Region, Case No 1:17-op-45053-DAP (S.D. W.Va.) and Case No. 1:17-op-45054 (S.D. W.Va.).

[16] In "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," coauthors Ernst Berndt, Joseph Newhouse and I identified and discussed the two forms of drugs and two forms of competition in drug markets.  Berndt, McGuire, and Newhouse, *op. cit.*  We contrasted market structure for a single molecule with and without AB-rated generics to explain the effect of generic competition on brand sales and profits.  We also separately studied competition among competing patent-protected products within a therapeutic category.  Other economists also make a clear distinction between competition between a brand and its generics and among brands. See, for example, F. Scott Morton and M. Kyle, "Markets for Pharmaceutical Products," in M. Pauly, T. McGuire and P. Barros (editors), *Handbook of Health Economics*, Vol. 2, Elsevier/North Holland, 2012, pp. 763-823 and pp. 792-95.

[17] FDA, "The Drug Development Process," January 4, 2018 (https://www.fda.gov/ForPatients/Approvals/

---

passage of the Federal Food, Drug, and Cosmetic Act (FD&C Act) of 1938, every new drug marketed in the U.S. has been required to submit an NDA establishing that: the drug is "safe and effective in its proposed use(s);" the "benefits of the drug outweigh the risks;" the drug's proposed label accurately reflects information on its characteristics; and the methods used in its manufacturing and the "controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity."[18]  At the time the FDA approves an NDA, any compound or method-of-use patents claimed by the manufacturer are listed in an FDA publication commonly known as the *Orange Book*.[19]  The brand manufacturer may list additional or new patents for a drug after its NDA has been approved.  The FDA does not undertake any determination of patent validity, relying on the manufacturer to properly submit patents for *Orange Book* listing.[20]

22.     Generic drugs are prescription drug products that contain the same active ingredient as their brand counterpart.  Generic drugs are approved for marketing under a shorter regulatory review process than innovator products, pursuant to an Abbreviated New Drug Application (ANDA).  The FDA approves generic drugs on the basis of establishing that they are "therapeutically equivalent to their innovator counterparts."[21]  Therapeutically equivalent drugs

---

Drugs/default.htm).

[18]  FDA, "New Drug Application (NDA)," January 21, 2022 (https://www.fda.gov/drugs/types-applications/new-drug-application-nda).  For new molecular entities (NMEs), NDAs require three phases of clinical trials, including a small-scale first phase that establishes the NME's safety in healthy volunteers; a second phase establishing the drug's safety and efficacy in a relatively small sample of people who have the disease or condition the drug is intended to treat; and a third phase that evaluates safety, efficacy, and side effects in a larger sample of people with the disease or condition.  FDA, "Step 3: Clinical Research," January 4, 2018 (https://www.fda.gov/ForPatients/Approvals/Drugs/ucm405622.htm).

[19]  "The publication 'Approved Drug Products with Therapeutic Equivalence Evaluations' identifies drug products approved on the basis of safety and effectiveness by the FDA under the Federal Food, Drug, and Cosmetic Act (the FD&C Act)."  See FDA, "Orange Book Preface" March 27, 2025 (https://www.fda.gov/Drugs/Development ApprovalProcess/ucm079068.htm).

[20]  As explained by the FDA, "FDA's patent listing role is ministerial."  FDA, "Frequently Asked Questions on Patents and Exclusivity," February 5, 2020 (https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079031.htm).

[21]  B. Davit, *et al*., "Comparing Generic and Innovator Drugs: A Review of 12 Years of Bioequivalence Data from the United States Food and Drug Administration," *Annals of Pharmacotherapy*, 43(10), 2009, pp. 1583-97 at p. 1583.

"contain identical amounts of the identical active drug ingredient in the identical dosage form and route of administration [as the innovator drug]; … meet compendial or other applicable standards of strength, quality, purity, and identity; … are bioequivalent [to the innovator drug] … ; and … are manufactured in compliance with Current Good Manufacturing Practice regulations."[22]  Therapeutically equivalent drugs that have an "AB rating" from the FDA "can be substituted with the full expectation that [the innovator and generic] products will produce the same clinical response."[23]

### The Hatch Waxman Act of 1984 and the ANDA Process

23.    In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch Waxman Act.[24]  Congress intended the Hatch Waxman Act to balance the competing policy concerns of promoting competition between brand and generic drugs to lower drug prices and providing incentives to develop new and better drugs.

24.    Hatch Waxman increased the economic rewards for innovation by allowing longer periods of market exclusivity for newly approved products.[25]  In recognition of the gap in time between when a drug is patented and when it is sold, the Hatch Waxman Act allows patent holders to request a patent-term extension of up to five years.  Total patent time after FDA approval can be no more than 14 years, including any extension.[26]

25.    Hatch Waxman also established other regulatory exclusivities that may overlap with the patent term or run independently.[27]  Drugs classified as New Chemical Entities (NCEs) typically

---

[22] FDA (Orange Book Preface), *op. cit*., Section 1.2.

[23] Davit, *et al., op. cit*., p. 1584.

[24] Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch Waxman Act)," Public Law 98-417, 98th Congress, 1984 (https://www.gpo.gov/fdsys/pkg/STATUTE-98/pdf/STATUTE-98-Pg1585.pdf).

[25] *Ibid*.  See also C.S. Hemphill and M. Lemley, "Earning Exclusivity: Generic Drug Incentives and the Hatch Waxman Act," *Antitrust Law Journal*, 77(3), 2011, pp. 947-89.

[26] 35 U.S.C. § 156 (c)(3).

[27] Regulatory exclusivity periods prohibit other drug manufacturers from obtaining approval to market the same drug.  Regulatory exclusivity may extend after patents expire.  See R. Eisenberg, "Patents and Regulatory

---

receive a five-year exclusivity period from the date of FDA approval.[28]  During this period, the FDA will not accept an ANDA that references the drug; however, ANDAs with a Paragraph IV certification may be submitted after four years.  An NDA for a drug that involves a modification of a previously approved drug (*e.g.*, an extended-release version of an existing chemical entity, or a new indication for an existing drug) may be eligible for a one- or three-year exclusivity period from the time of FDA approval.  Generic manufacturers may submit ANDAs at any time during this shorter exclusivity period.[29]

26.     The Hatch Waxman Act also sought to accelerate brand-generic competition.  The Act expanded the scope of the ANDA process, reducing generic firms' regulatory costs by allowing them to rely on clinical trial data submitted as part of the NDA.[30]  The Act also created incentives for generic manufacturers to challenge weak, invalid, or improperly listed patents in the *Orange Book* in order to prevent such patents from blocking competition from lower-priced generics.  The conditions for generic entry are structured by four different Hatch Waxman certifications a generic company could make addressing the patent(s) listed by the brand drug manufacturer in the *Orange Book*:[31]

> Paragraph I: There are no filed patents in the *Orange Book* claiming the drug subject to the ANDA.
>
> Paragraph II: The patents in the *Orange Book* claiming the drug subject to the ANDA have expired.

---

Exclusivity," *Oxford Handbook on the Economics of the Biopharmaceutical Industry*, Oxford University Press, 2012, pp. 167-98 at p. 183.

[28]  Drugs classified by the FDA as "orphan drugs" receive seven years of market exclusivity.

[29]  See 21 C.F.R. § 314.107 and 21 C.F.R. § 314.108 – Date of approval of a 505(b)(2) application or ANDA.  See also FDA, "Small Business Assistance: Frequently Asked Questions for New Drug Product Exclusivity," (http://www.fda.gov/Drugs/DevelopmentApprovalProcess/SmallBusinessAssistance/ucm069962.htm) and C.S. Hemphill and B. Sampat, "When Do Generics Challenge Drug Patents?" *Journal of Empirical Legal Studies*, 8(4), 2011, pp. 613-49 at p. 618.  An FDA exclusivity period may confer more protection from competition than a patent. A patent covers specific aspects of a product (for example some methods of use) whereas an exclusivity period covers the entire product.

[30]  FDA, "Abbreviated New Drug Application (ANDA)," March 28, 2025 (https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda).

[31]  21 U.S.C. § 355(j) (2) (A) (vii) (I-IV).

Paragraph III: The patents claiming the drug subject to the ANDA are still valid, and the generic will not launch until those patents have expired.

Paragraph IV: The patents claiming the drug subject to the ANDA are invalid and/or unenforceable or not infringed by the generic's ANDA.

27.     Under a Paragraph IV certification, the generic manufacturer must notify the brand manufacturer of the filing of its ANDA.  The brand manufacturer then has 45 days to file litigation claiming patent infringement to dispute the assertion of patent invalidity and/or unenforceability or non-infringement, and to trigger what is known as a "30-month stay."[32]  If the brand manufacturer sues for infringement within 45 days, final FDA approval of the generic ANDA is withheld until the earliest of the following events: (1) the date the patent expires; (2) a final court determination of non-infringement or patent invalidity in the resulting litigation; or (3) the expiration of the 30-month stay.[33]

28.     For patents with method-of-use claims, a generic manufacturer may include a section viii statement instead of a Paragraph III or IV certification.  A section viii statement indicates the generic manufacturer has "carved out" patented methods of use from its label in order to avoid a legal dispute about them.[34]  For example, if a drug's label describes two methods of use, but only one is patented, the generic firm could submit an ANDA with a section viii statement indicating its label would only include the unpatented method.

29.     The FDA issues tentative approval if an application meets requirements for approval, but outstanding patents or exclusivity periods preclude final approval.  Drugs with tentative approval

---

[32]  A brand company may still sue for patent infringement after the 45-day period expires, but in that event, the brand company is not entitled to the 30-month stay.

[33]  21 U.S.C. § 355(c)(3)(C).

[34]  21 U.S.C. § 355(j)(2)(A)(viii).  A section viii statement asserts that the patent "does not claim a use for which the [generic] applicant is seeking approval under this subsection…"

are not approved to be marketed.[35]  To request final approval, applicants submit an amendment to a tentatively approved ANDA.[36]

30.     The first generic to submit a "substantially complete" ANDA including a lawfully maintained Paragraph IV certification (the "first filer") may be awarded a 180-day exclusivity period during which the FDA may not approve another ANDA.[37]  The 180-day exclusivity period begins on the first day that the holder of the exclusivity begins to commercially market the generic product, either on the basis of the generic's ANDA or via a license for the brand's NDA.[38]  The 180-day period can be triggered earlier if a generic firm, either the first filer or a later filer, wins a final, unappealable court decision.[39]

31.     The 180-day regulatory exclusivity period is highly profitable to the first-filing generic drug-maker(s) because the share of generic sales the first filer gets is large and the price, while below that of the brand, can be set well above cost and well above the price that will prevail after competition from other AB-rated generics begins.  During the first six months of generic sales, prices are 30% higher in markets with exclusivity than in markets where no exclusivity period was granted.[40]  Industry reports declare that generic manufacturers make the majority of their profits during periods of regulatory exclusivity.[41]

---

[35]  21 CFR § 314.105(d).

[36]  "FDA does not automatically grant final approval upon the expiration of any periods of exclusivity or patent protection that served as the basis of the TA [Tentative Approval]."  See FDA, "ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs: Guidance for Industry," January 2024, p. 6 (https://www.fda.gov/media/119718/download).

[37]  See 21 U.S.C. § 355(j)(5)(B)(iv); E. Lietzan and J. Post, "The Law of 180-Day Exclusivity," *Food and Drug Law Journal*, 71(3), 2016, pp. 327-400 at pp. 328-29; A. Patel, "Delayed Access to Generic Medicine: A Comment on the Hatch-Waxman Act and the 'Approval Bottleneck'," *Fordham Law Review*, 78(2), 2009, pp. 1075-1116 at pp. 1082-83.

[38]  See D. Korn, E. Lietzan, and S. Scott, "A New History and Discussion of 180-Day Exclusivity," *Food and Drug Law Journal*, 64(2), 2009, pp. 335-390.

[39]  This caveat applies before the Medicare Modernization Act of 2003 became law. See Lietzan and Post, *op. cit.*, p. 329.

[40]  S. Tenn and B. Wendling, "Entry Threats and Pricing in the Generic Drug Industry," *Review of Economics and Statistics*, 96(2), 2014, pp. 214-28 at p. 217.

[41]  The Generic Pharmaceutical Association (GPhA), now the Association for Accessible Medicines (AAM), has

---

32.     The 180-day regulatory exclusivity period does not prevent the brand company (*i.e.*, the NDA holder) from launching its own so-called "authorized generic" (AG).  An AG is essentially the brand company's drug (as approved by the FDA under the brand company's NDA) but sold as a "generic" under its chemical name.[42]  AGs compete on price with other generics and qualify for automatic substitution at pharmacies, as do AB-rated generics.[43]  Launching an AG when the first generic launches can be highly profitable to the brand, giving it access to a portion of a generic market when there is only one other generic seller, as here, during an unshared 180-day regulatory exclusivity period.

33.     Generic firms are aware of and motivated by profits to be gained by a successful Paragraph IV challenge.  Teva reported in 2010 that its "ability to achieve sales growth and profitability is dependent on our success in challenging patents, developing non-infringing products or developing products with increased complexity to provide launch opportunities with U.S. market exclusivity or limited competition."[44]  Other generic manufacturers make similar statements.[45]

34.     Since the passage of the Hatch Waxman Act, there has been a rapid expansion of the role played by generic products in pharmaceutical markets.  In 1984, the year the Act was passed,

---

stated that the "vast majority" of profits generic manufacturers make occur during the 180-day period.  Public Comment from the GPhA to the FTC, Re: Authorized Generic Drug Study: FTC Project No. P062105, June 27, 2006 (https://www.ftc.gov/system/files/documents/public_comments/2006/06/062806gpha.pdf).

[42]  FTC, "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact," August 2011, pp. 2-4 (https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf).

[43]  *Ibid.*

[44]  Teva Pharmaceutical Industries, Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended December 31, 2009," February 22, 2010, p. 5 (http://www.annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2009.pdf).

[45]  Par Pharmaceuticals, a generic manufacturer, states that "as a result of the 180-day marketing exclusivity period granted to generic pharmaceutical companies that are first to file an ANDA and successfully challenge the patent(s) on the corresponding branded drug, generic pharmaceutical products, at their launch, often are priced to yield *relatively high gross margins*."  Par Pharmaceuticals, "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended December 31, 2009," February 25, 2010, p. 16, emphasis added (https://www.sec.gov/Archives/edgar/data/878088/000087808810000019/finaledgar200910k22510.htm).

generic drugs accounted for 18.6% of prescriptions sold in the U.S.[46]  A study by the Congressional Budget Office (CBO) showed that the Hatch Waxman Act made it "easier and less costly" for generic drugs to enter the market.[47]  In 2016, nearly 89% of prescriptions were filled with generic drugs.[48]  In recent years, generics are prescribed 97% of the time when they are available.[49]

35.    Summarizing the Act's impact during the 1990s, David Balto, former Assistant Director of the Office of Policy and Evaluation, Bureau of Competition of the FTC, observed that the Act worked to achieve the two "seemingly contradictory objectives" of promoting generic entry and assuring adequate incentives for investment in new drug discovery:

> "Both of these objectives seem to have been fulfilled to a significant degree. … [T]he added protections and exclusivity term for innovator firms have accompanied a tremendous increase both in the investment in, and the success of, pharmaceutical innovation. … [At the same time], [t]he industry also has seen an increase in the percentage of branded drugs that have a generic competitor on the market.  Today, nearly 100% of the top-selling drugs with expired patents have generic versions available, versus only thirty-six percent in 1983."[50]

36.    Later FTC testimony to the U.S. Senate called special attention to the favorable effects of patent challenges:

> While "it is well known that the use of generic drugs … provides substantial savings, what is not so well known is the important role that generic drug firms' patent challenges

---

[46]  E. Berndt and M. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century after the 1984 Waxman-Hatch Legislation," *International Journal of the Economics of Business*, 18(2), 2011, pp. 177-201 at p. 181.

[47]  Congressional Budget Office (CBO), "How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry," July 1998, p. xiii (https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/6xx/doc655/pharm.pdf).

[48]  Association for Accessible Medicines (AAM), "Generic Drug and Biosimilars Access & Savings in the U.S.," 2017, p. 16 (https://accessiblemeds.org/wp-content/uploads/2024/12/2017-AAM-Access-Savings-Report-2017-web2.pdf).

[49]  IQVIA Institute, "The Use of Medicines in the U.S.: Spending and Usage Trends and Outlook to 2025," May 2021, p. 38 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/the-use-of-medicines-in-the-us/iqi-the-use-of-medicines-in-the-us-05-21-forweb.pdf).

[50]  D. Balto, "Pharmaceutical Patent Settlements: The Antitrust Risks," *Food and Drug Law Journal*, 55(3), 2000, pp. 321-41 at pp. 324-25.  The CBO study cited is CBO, *op. cit.*

play in delivering savings to consumers. ... [G]eneric competition following successful patent challenges involving just four major brand-name drugs … is estimated to have saved consumers more than $9 billion."[51]

## B.     Brand Market Power and Competition from AB-Rated Generics

37.     Generic drugs pose a unique competitive threat to profits for the brand drug to which they are AB-rated.  During periods of protection from generic competition due to patents and regulatory exclusivity, a brand manufacturer, behind high barriers to entry, is the only seller of the drug.  Brand manufacturers can make very high profits during this time.  The world changes dramatically for the brand when AB-rated generics of that drug become available:  brand sales and profits fall off the "patent cliff."[52]

### *Brand Drug Market Power*

38.     Substantial market power of a single manufacturer selling a valuable drug protected by patents or regulatory exclusivity is to be expected.  Indeed, the intention of the patent system is to give sellers of successful innovative drugs periods of time-limited protection from competition; the profits a brand firm can earn with protection from competition encourages investment in R&D and incentivizes a flow of new drugs onto the market.[53]  (Antitrust challenges result from allegedly unlawful conduct such as wrongfully *extending* the length of time during which the brand firm is protected from competition.)  An April 2021 report from the

---

[51] FTC, "Prepared Statement of the Federal Trade Commission Before the Subcommittee on Courts and Competition Policy Committee on the Judiciary, United States House of Representatives on 'Anticompetitive Pay-for-Delay Settlements in the Pharmaceutical Industry: Why Consumers and the Federal Government Are Paying Too Much for Prescription Drugs'," June 3, 2009, pp. 12-13 (https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-anticompetitive-pay-delay-settlements-pharmaceutical/p859910payfordelay.pdf).

[52] *E.g.*, R. Conti and E. Berndt, "Four Facts Concerning Competition in US Generic Prescription Drug Markets," *International Journal of the Economics of Business*, 27(1), 2020, pp. 27-48 at p. 35.

[53] H. Grabowski, J. DiMasi, and G. Long, "The Roles of Patents and Research and Development Incentives in Biopharmaceutical Innovation," *Health Affairs*, 34(2), 2015, pp. 302-10 at p. 302 ("Patents and other forms of intellectual property protection are generally thought to play essential roles in encouraging innovation in biopharmaceuticals").  Congressional Research Service, "Drug Pricing and Pharmaceutical Patenting Practices," February 11, 2020, p. 1 (https://sgp.fas.org/crs/misc/R46221.pdf) ("One of the basic rationales underlying the grant of patent rights is that such rights provide an incentive for inventors to innovate").

---

CBO stated that, "the patent system and certain [FDA] statutory provisions … provide pharmaceutical companies with a period of market exclusivity, when competition is legally restricted.  During that time, they can maintain higher prices on a patented product than they otherwise could, which makes new drugs more profitable and thereby increases drug companies' incentives to invest in R&D."[54]  Brand manufacturers rationally bring to market only the products they expect to be able to sell at prices substantially above cost.  In other words, drugs for which they expect to be able to exercise market power for some period of time.

39.    Economists recognize that the intended effect of the patent system in the drug industry is to create market power.  As Jena and Philipson put it, "the rationale for the patent system [is] to promote the inefficiency of high monopoly prices because of the innovation the system encourages,"[55] and "patents are good because innovators exploit the market power generated by them."[56]  A top-selling introductory economics textbook explains that "When a [pharmaceutical] firm discovers a new drug, patent laws give the firm a monopoly on the sale of the drug.  But eventually the firm's patent runs out, and any company can make and sell the drug, … [and] the market switches from being monopolistic to being competitive."[57]  As Scherer writes, "With strong patent protection and well-differentiated products, pharmaceutical producers enjoy considerable discretion over the prices they set."[58]

40.    Nonetheless, patent protection does not guarantee market power in the drug industry (or elsewhere).  While "market power should not be presumed merely from the existence of a patent,"[59] strong demand for a drug (*i.e.*, willingness to pay high prices) and lack of close

---

[54] CBO, "Research and Development in the Pharmaceutical Industry," April 2021, p. 2 (https://www.cbo.gov/publication/57126).

[55] A. Jena and T. Philipson, "Cost-Effectiveness as a Price Control," *Health Affairs*, 26(3), 2007, pp. 696-703 at p. 697.

[56] *Ibid.*, p. 703.

[57] N. Mankiw, *Principles of Economics*, 3rd ed., Thompson/Southwestern, 2004, pp. 324-35.

[58] F. Scherer, "Pharmaceutical Innovation," in N. Rosenberg and B. Hall (eds.), *Handbook of the Economics of Innovation*, Vol. 1, North Holland/Elsevier, 2010, pp. 539-74 at p. 562.

[59] FTC and DOJ, "Antitrust Enforcement and Intellectual Property Rights," April 2007, p. 110 (https://www.justice.gov/sites/default/files/atr/legacy/2007/07/11/222655.pdf).  "Although the intellectual property

economic substitutes, in combination with barriers to entry enforced by patent and/or regulatory exclusivity, are the ingredients of market power. In sum, substantial market power for a successful brand drug is to be expected but cannot be assumed; assessing it for a particular product is an empirical task.

### Sunk, Fixed, and Marginal Costs and Profit-Maximizing Prices

41.     In my experience, economists retained by defendant brand firms in pharmaceutical antitrust matters sometimes argue that the high monopoly prices charged by a brand firm prior to open competition are caused by the substantial investments in R&D necessary to develop the drug product. In simple terms, this argument is incorrect because it gets the causality backwards. The correct direction of causality, as the proceeding discussion makes clear, is from monopoly profits to R&D. To lightly paraphrase Jena and Philipson from above, "high monopoly prices encourage innovation." The prospect of monopoly profits is what motivates (causes) a firm to invest in R&D.

42.     A brief review of basic economics of costs and profit-maximizing price reinforces the point that R&D expenses are not the cause of high monopoly prices. Economists distinguish sunk, fixed, and marginal (or variable) costs.[60] Sunk costs *are non-recurring* past costs (*e.g.,* costs of research and development or costs to obtain FDA approval). Fixed costs are *recurring costs* independent of the level of output (*e.g.*, an annual equipment lease or central office expenses). Marginal costs *vary with output* (*e.g.*, costs of materials). All forms of cost play a role in drug markets but at different stages of a firm's decisions about supply.

---

right confers the power to exclude with respect to the specific product, process, or work in question, there will often be sufficient actual or potential close substitutes for such product, process, or work to prevent the exercise of market power." FTC and DOJ, "Antitrust Guidelines for the Licensing of Intellectual Property," January 12, 2017, p. 4 (https://www.justice.gov/atr/IPguidelines/download). "[T]he exclusive rights provided by IP law do not necessarily confer monopolistic market power in the economic sense – for example, there may be non-infringing substitutes for a patented good in the relevant market." Congressional Research Service, "Drug Pricing and Intellectual Property Law: A Legal Overview for the 116th Congress," April 4, 2019, p. 2, fn. 17 (https://crsreports.congress.gov/product/pdf/R/R45666).

[60] See, for example, Chapter 12 and pp. 615-16 of W. Nicholson, *Microeconomic Theory: Basic Principles and Extensions*, 7th Edition, The Dryden Press, 1998.

---

43.    By the time a drug is on the market, costs of R&D and obtaining FDA approval are in the past, *i.e.*, are "sunk." Costs of R&D matter when a firm is deciding about where and how much to invest in drug development. Innovator firms allocate resources to research on potential new products with high profit potential.[61]

44.    Fixed costs happen later, at the stage the firm is in production. Fixed costs matter for the decision of whether the firm should continue to sell or shut down. If the firm can cover fixed costs at some price and make a profit, the firm rationally stays in the market. This is sometimes referred to as a long-run supply decision (when all costs are variable).

45.    In the short run, the firm decides about pricing and output. Figure 1 depicts the economic situation of a firm with market power.[62] The firm faces a downward-sloping demand, line D. Marginal revenue (MR) is the extra revenue associated with the sale of one more unit, recognizing that the firm reduces the price for all units to make the extra sale. To maximize profit, the firm chooses the price that equates marginal revenue and marginal cost (MC). Figure 1 shows the profit-maximizing quantity, $Q^m$, and price, $P^m$. Figure 1 also shows an average cost curve (AC) that is equal to MC plus average fixed cost for each level of output. With constant MC, AC falls with quantity of output as a fixed cost is spread over a higher quantity.[63]

46.    This standard diagram shows why fixed and sunk costs *do not affect* the profit-maximizing pricing of brand drugs when the seller has market power.

> #1: *Fixed costs do not affect the profit-maximizing price*, which is driven by marginal cost and marginal revenue.
>
> #2: *Sunk costs, including R&D, do not affect the profit-maximizing price or the decision to continue participation in a market.*[64] Sunk costs do not appear in monopoly-pricing

---

[61] CBO (2021)*, op. cit.*, p. 1.

[62] Berndt, McGuire, and Newhouse, *op. cit.*, Figure 1.

[63] With constant MC, total costs are fixed costs (FC) + Q*MC. AC are therefore FC/Q + MC. As Q gets larger, AC approaches MC because the fixed cost, FC, is spread over a larger and larger quantity of output.

[64] "Sunk research-and-development costs are bygones and are therefore irrelevant in current pricing decisions." F. Scherer, "The Pharmaceutical Industry—Prices and Progress," *New England Journal of Medicine*, 351(9), 2004, pp. 927-32 at p. 929. "[A] product's fixed development costs are not relevant to how it is priced because they are sunk (already incurred and not recoverable) before the product reaches the market." CBO, "Research and Development

---

figures because it is not needed.  The profit-maximizing price depends on demand and marginal cost functions, not how much the firm had to invest in research and development to gain rights to sell as a monopolist.  Whether a drug cost $10 million or $500 million to develop and bring to market, <u>the price that maximizes profits remains the same</u>.  As the CBO explains, "Importantly, when drug companies set prices of a new drug, they do so to maximize *future* revenues net of manufacturing and distribution costs. A drug's sunk R&D costs – that is, the costs already incurred in developing that drug – do not influence its price" (emphasis in original).[65]

<div align="center">

**FIGURE 1**

**PRICE DETERMINATION FOR A BRAND DRUG COMPANY WITH MARKET POWER**

</div>



| D – Demand | MR – Marginal Revenue | MC – Marginal Cost |
|---|---|---|
| AC – Average Cost | $P^m$ – Profit Maximizing Price | $Q^m$ – Profit Maximizing Quantity |

in the Pharmaceutical Industry," October 2006, p. 4, fn. 2 (https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/ 76xx/doc7615/10-02-drugr-d.pdf).  "A sunk cost is a cost that has already been incurred and cannot be recouped; and because it cannot be changed, it should have no effect on *any* current decision." [emphasis added] P. Krugman, R. Wells, and K. Graddy, *Essentials of Economics*, 3rd ed., Worth Publishers, 2014, p. 221.  Also see, R. Frank and B. Bernanke, *Principles of Economics*, 3rd ed., Worth Publishers, 2007, p. 10.

65  CBO (2021)*, op. cit.*, pp. 1-2.

*Generic Entry and Drug Prices*

47.        The impact of competition with generics on a brand product's sales has been the subject of extensive study and has been found to be immediate and dramatic.  As noted above, when generic drugs enter, prescriptions quickly shift from brand-name drugs to their generic equivalents.[66]  Industry participants are well aware of the competitive effect of multiple generic entry on drug prices.[67]

48.        A substantial body of research supports the conclusion that with a sufficient number of competitors, price competition is vigorous for generic drugs.[68]  The first generic is typically

---

[66]  H. Grabowski, *et al*., "Does Generic Entry Always Increase Consumer Welfare?" *Food and Drug Law Journal*, 67(3), 2012, pp. 373-91.  Studies documenting effects of generic entry include:  R. Caves, M. Whinston, and M. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economics Activity, Microeconomics*, 1991, pp. 1-66; H. Grabowski and J. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, 35(2), 1992, pp. 331-50; R. Frank and D. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics and Management Strategy,* 6(1), 1997, pp. 75-90; CBO (1998), *op. cit*., pp. 28-9; S. Dong-Churl*, et al*., "Effect of Multiple-Source Entry on Price Competition After Patent Expiration in the Pharmaceutical Industry," *Health Services Research*, 35(2), 2000, pp. 529-47; and A. Saha, *et al*., "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business*, 13(1), 2006, pp. 15-38.

[67]  As explained in Teva's annual financial report for 2011, "Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies … receive approvals and enter the market for a given product and competition intensifies … [P]articularly if we are the only company authorized to sell during the 180-day period of exclusivity in the U.S. market, … our sales, profits and profitability can be substantially increased."  Teva Pharmaceutical Industries, Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended December 31, 2011," February 17, 2012, pp. 6 and 8 (https://www.sec.gov/Archives/edgar/data/818686/000119312512067417/d300203d20f.htm).

Forecast models created by Wyeth and Teva assumed that the generic price would fall substantially after multiple generics entered.  For example, see WYEFFAT3781144, tab "Base," rows 3-4; WYEFFAT06859914, tab "Generic Inputs," rows 24-26; TEVA_EFFEX_0440657; and TEVA_EFFEX_0863427.

[68]  Caves, *et al., op. cit*; Grabowski and Vernon (1992), *op. cit*.; H. Grabowski and J. Vernon, "Longer Patents for Increased Generic Competition in the US: The Waxman-Hatch Act after One Decade," *PharmacoEconomics*, 10(Suppl 2), 1996, pp. 110-23; Frank and Salkever, *op. cit*.; CBO (1998), *op. cit*.; Dong-Churl, *et al., op. cit*.; D. Reiffen and M. Ward, "Generic Drug Industry Dynamics," *Review of Economics and Statistics*, 87(1), 2005, pp. 37-49; Saha, *et al*., *op. cit*.; Grabowski, *et al.* (2016)*, op. cit*.; IMS Institute for Healthcare Informatics, "Price Declines after Branded Medicines Lose Exclusivity in the U.S.," January 2016 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/price-declines-after-branded-medicines-lose-exclusivity-in-the-us.pdf); S. Ganapati and R. McKibbin, "Markups and Fixed Costs in Generic and Off-Patent Pharmaceutical Markets," National Bureau of Economic Research, Working Paper No. 29206, September 2021 (http://www.nber.org/papers/w29206); H. Grabowski, G. Long, and R. Mortimer, "Recent Trends in Brand-Name and Generic Drug Competition," *Journal of Medical Economics*, 17(3), 2014, pp. 207-14; H. Grabowski, *et al*., "Updated Trends in US Brand-Name and Generic Drug Competition," *Journal of Medical Economics*, 19(9), 2016, pp. 836-44 at p. 837.

priced at some discount to the brand and quickly captures a sizable share of total sales; when multiple generics have entered, price competition intensifies, and the price decline accelerates. Prices fall more as the number of generic entrants rises.[69]  Top-selling brand drugs in particular, like Effexor XR, attract multiple generic entrants, driving prices towards marginal costs after the brand's exclusivity ends.[70]

49.    A 2016 study by the IMS Institute found that, for oral generics that came on the market between 2002 and 2004, the average generic wholesale price eight months after the first generic entered was 36% below the brand drug's pre-entry price.[71]  For generics entering between 2011 and 2013, prices fell more rapidly and to a greater extent than a decade earlier.  The average generic wholesale price for this group of drugs was 74% below the brand's pre-entry price eight months after entry.[72]  Within 2.5 years, prices for the generics that entered in 2011-13 were 90% below the brand's pre-generic entry wholesale price.[73]

50.    Wholesale prices provided by IQVIA (formerly IMS Health) are widely regarded as the "'gold standard' of pharmaceutical data."[74]  IQVIA's wholesale prices are the invoice-level prices that retail and non-retail outlets paid to manufacturers and wholesalers to receive the product.[75]  The price that outlets charge to patients and MCOs for the product is called the retail

---

[69] Caves, *et al*., *op. cit*.; CBO (1998), *op. cit*.; Dong-Churl, *et al.*, *op. cit.*; Reiffen and Ward, *op. cit*.; Saha, *et al*., *op. cit.*; IMS Institute for Healthcare Informatics, *op. cit.*

[70] Grabowski and Vernon (1992, 1996), *op. cit*.; Reiffen and Ward, *op. cit*.

[71] IMS Institute for Healthcare Informatics, *op. cit*., p. 2.

[72] *Ibid*.

[73] *Ibid.*

[74] L. Branstetter, C. Chatterjee, and M. Higgins, "Regulation and Welfare: Evidence From Paragraph IV Generic Entry in the Pharmaceutical Industry," *RAND Journal of Economics*, 47(4), 2016, pp. 857-90 at p. 877 and fn. 31.

[75] IQVIA wholesale data (NSP data) include both direct sales (sales from manufacturers to outlets) and indirect sales (sales from wholesalers to outlets).  Retail outlets include chain pharmacies, mass merchandisers, independent pharmacies, grocery store pharmacies, long-term care, and mail service.  Non-retail outlets include non-federal hospitals, clinics, federal, HMOs, home healthcare, prisons, and universities.  Wholesale prices are net of line-item discounts and chargebacks, but do not reflect prompt-pay discounts, bottom line invoice discounts, or rebates. (IQVIA, "National Sales Perspective & National Prescription Audit Overview," 2017).

price.[76] Wholesale and retail prices generally follow similar trends. A study by Berndt, *et al.* explains that "wholesale price ratios provide reasonable proxies for relative consumer price impacts."[77] While the wholesale prices do not account for various retail level discounts, the overall conclusion of the price decline following generic entry is not impacted by this. A recent study used estimates of rebates derived from publicly available financial information and found the average rebate in 2011-2013 for a sample of 778 brand drugs to have been about 30%.[78] If a brand drug's pre-entry list price is $10.00 per tablet and it has the average rebate of 30%, this corresponds to a $7.00 net price, if the rebate is treated as a price adjustment.[79] Taking a 90% decline in the wholesale price in 2.5 years after generic entry,[80] this corresponds to an 86% decline from the pre-generic launch price netting out the average rebate.[81] Therefore, while subtracting out rebates of the brand's wholesale price may reduce the price decline associated with generic entry by some percentage points (though some rebates are retained by PBMs and not passed through to payors), this does not affect the conclusion that the price declines substantially following generic entry.

51.    Using the IMS Generic Spectra data, which contains information on both wholesale and retail prices, Grabowski, *et al.,* studied 54 branded drugs that lost patent protection between 2006

---

[76] IQVIA retail data (NPA data) include retail sales by retail pharmacies (chain store pharmacies, independent pharmacies, and food store pharmacies), long-term care, and mail service pharmacies. IQVIA retail prices are not net of rebates or coupons.

[77] E. Berndt, *et al.*, "Authorized Generic Drugs, Price Competition, and Consumers' Welfare," *Health Affairs*, 26(3), 2007, pp. 790-99 at pp. 796-97. Note that IQVIA price data are transaction prices, not "list" prices.

[78] P. Kakani, M. Chernew, and A. Chandra, "The Contribution of Price Growth to Pharmaceutical Revenue Growth in the United States: Evidence from Medicines Sold in Retail Pharmacies," *Journal of Health Politics, Policy and Law*, 47(6), 2022, pp. 629-48 at Figure 2.

[79] (1-0.30)*$10.00=$7.00. "List price" indicates the price at which a drug wholesaler or other direct purchaser can buy the drug from the manufacturer before taking any discounts into account and is also known as the wholesale transaction cost or "WAC." J. Mattingly, "Understanding Drug Pricing," *U.S. Pharmacist*, June 20, 2012 (https://www.uspharmacist.com/article/Understanding-drug-pricing). Note that in 2009, the year before generic Effexor XR entered, Wyeth's sales adjustments (rebates, cash discounts, chargebacks, returns, and other sales adjustments) were 17.7% of Effexor XR's gross sales net of chargebacks and returns (see fn. 285 below). Using 18% as the rebate would correspond to a net price of $8.20. (1-0.18)*$10.00=$8.20.

[80] See ¶ 49 above.

[81] (1-.90)*$10.00=$1.00 which is the lower generic price. The decline from the pre-launch wholesale price netting out an average rebate is (1.00-7.00)/7.00*100=-86%.

and 2008 (the period during which the compound patent for Effexor XR expired).[82] They found that wholesale prices of generic drugs averaged 45% of the brand drug's price one year after generic entry, while retail generic prices averaged 66%.[83] For top-selling drugs – those having sales of $750 million or more in the year before generic entry – wholesale and retail generic to brand price ratios were even smaller at 18% and 48%, respectively, as prompt entry of multiple generics accelerated price declines.

52.      A 2019 FDA study examined price declines for drugs that experienced first generic entry in 2015-17, using data on wholesale transaction prices from IQVIA National Sales Perspective (NSP) and data on average manufacturer prices (AMP) from the U.S. Centers for Medicare and Medicaid Services (CMS).[84] Both price measures showed substantial declines in generic drug prices relative to the brand drug's price at the end of exclusivity, with the number of generic entrants increasing the magnitude of the decline.[85] For example, for drugs that had four generic entrants, the average generic AMP price was 79% below the brand drug price before generic entry, compared to 73% for the average wholesale transactions price.[86] With six or more generic entrants, the average generic price was 95% below the brand price using both price measures.[87]

---

[82] Grabowski, *et al*. (2012), *op. cit*.

[83] *Ibid*., p. 383.

[84] R. Conrad and R. Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," FDA Report, December 2019 (https://www.fda.gov/media/133509/download). The AMP is a measure that manufacturers report quarterly to CMS, which uses AMPs as a basis for computing rebates under federal drug programs. The AMP is the average price paid to manufacturers by wholesalers or pharmacies who purchase the drug directly from the manufacturer; as such, it does not include markups that may be reflected in the wholesale transaction price measured by IQVIA (*ibid*., p. 3). CMS specifies that "any rebate, discount, payment or other financial transaction associated with that sale should also be included in the determination of AMP," although "calculation of the AMP does not subtract rebates and discounts negotiated with PBMs [, nor] discounts to Medicaid programs" (*ibid*., fn. 3).

[85] *Ibid*., p. 2.

[86] *Ibid*., p. 3.

[87] *Ibid*.

53.     I coauthored a paper using IQVIA NSP data to study generic entry and the time path of generic prices for a cohort of 77 molecules that went off patent between 2010 and 2013.[88] (Effexor IR and Effexor XR were not included in the data used in this paper.)  For oral solids with large sales (like Effexor XR), ten generics, on average entered during the first year of generic competition.[89]  Generic prices following first entry for large-selling oral solids matched findings from earlier studies.  One year after the first generic entry, median generic prices were 80-90% lower than the brand prices prior to generic competition.[90]

54.     Regulation enhances the competitive effect of generic entry.  State generic substitution laws, which were adopted by all U.S. states in the 1970s and 1980s,[91] allow (and sometimes require) pharmacists to dispense a generic drug in place of a brand-name drug, as long as the physician does not indicate that the prescription should be "dispensed as written."[92]  Substitution laws save transaction costs of changing a prescription from a brand drug to a generic, and immediately shift prescriptions into lower-cost, therapeutically equivalent drugs after they become available.

55.     Health insurers also play a role in brand-generic competition.  Pharmacy benefit managers (PBMs) and other managed care organizations (MCOs) administer lists of covered drugs called formularies, create incentives for adherence to formulary drugs, and engage in other

---

[88]  R. Frank, T. McGuire, and I. Nason, "The Evolution of Supply and Demand for Generic Drugs," *The Milbank Quarterly*, 99(3), 2021, pp. 828-52.  NSP data contain prices reported by manufacturers and others on sales to wholesalers and large pharmacy chains.

[89]  *Ibid.,* p. 840.

[90]  *Ibid*., pp. 841-42.

[91]  State laws governing generic substitution have changed over the past 30 years to favor generic substitution. Caves, *et al*., *op. cit.*  In the 1970s, most states had laws limiting or prohibiting generic substitution.  By 1989 all states had repealed their anti-substitution laws.

[92]  From 2006 to 2012, the number of states with "mandatory" substitution laws increased from ten to eleven.  All other states had "permissive" substitution laws, which means that pharmacists are permitted, but not "mandated," to switch to an available generic.  See Y. Song and D. Barthold, "The Power of Not Asking: How Do Generic Drug Substitution Laws Affect Patient's Demand for Generic Drugs?" Working Paper version, January 27, 2015, pp. 11-12.  In most states, a substituted generic drug must be less or no more expensive than the brand drug, with the consumer benefiting from the cost saving.  J. Vivian, "Generic-Substitution Laws," *U.S. Pharmacist*, 33(6), 2008, pp. 30-4.

forms of cost management. Formulary management encourages the use of generic products when they are available. Tiered co-payments and mandatory substitution policies are among the methods used by PBMs and MCOs to encourage substitution to lower-priced generic products from higher-priced branded drugs.[93] Generally, for example for three-tier formularies, drugs in Tier 1 are low-cost generics for which enrollees have the lowest copay (such as $10); drugs in Tier 2 are "preferred brands," which have a higher copay (for example, $35); and drugs in Tier 3 are "nonpreferred" brands, which are covered by the plan but have a still-higher copay (for example, $60).[94] As of December 2024, PBMs administer prescription drug plans for over 275 million people in the U.S.[95]

56.    As generics rapidly become the dominant share of total sales of the drug (brand plus generic), the average price of the drug declines substantially relative to the brand's pre-generic entry price. Purchasers benefit from the competition from generic drugs. The Association for Accessible Medicines (AAM), a trade association comprised of generic drug companies, reports that generic medicines saved $3.1 trillion over the decade 2013-23 and over $445 billion in 2023 alone.[96] Thus, anticompetitive agreements that delay or hamper open generic competition postpone the onset of substantial savings in drug costs for all purchasers, including direct purchasers, third-party payers, and consumers.

---

[93] Berndt, McGuire and Newhouse, *op. cit.*, pp. 10-15.

[94] These copays are approximately the average copays found in the Kaiser Family Foundation's 2020 Survey of Employer Health Benefits for plans with three or more tiers and copays only (vs. coinsurance or a mixture of copays and coinsurance). Kaiser Family Foundation, "Employer Health Benefits: 2020 Annual Survey" 2020, p. 152 (https://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf). Increasingly formularies may also have fourth, fifth, or higher tiers for higher-cost brand drugs, specialty drugs, and/or biologics. As of 2020, 48% of workers enrolled in employer-sponsored health plans had drug-benefit coverage with four or more tiers. *Ibid.*, p. 151.

[95] Pharmaceutical Care Management Association, "The Value of PBMs," (https://www.pcmanet.org/the-value-of-pbms).

[96] See AAM, "The U.S. Generic & Biosimilar Medicines Savings Report," September 2024, p. 7 (https://accessiblemeds.org/sites/default/files/2024-09/AAM-2024-Generic-Biosimilar-Medicines-Savings-Report.pdf).

## C.    Brand Market Power and Competition from Non-AB-Rated Products

57.    In contrast to the very high substitutability between a brand drug product and its AB-rated generics, drug products within a therapeutic class based on different molecules or different formulations usually differ, sometimes considerably, with respect to their therapeutic attributes. Attributes that may differ across products in a class include:  the mechanism of action; comorbidities for which drugs are counter-indicated; the specific patient pool for which they are appropriate; their safety, efficacy, and side effects; other drugs with which they should not be co-administered; and the mode and convenience of administration.  As a consequence, brand-brand competition is primarily based on product attributes (rather than price) in contrast to the price-based competition from AB-rated generic products.

### *Consumers and Physicians*

58.    Competition among products not AB-rated to one another works through decisions of patients, physicians, and managed care plans.  Although brand drugs are generally very costly, health insurance coverage shields consumers from all or most of that cost, diminishing the role of price as a determinant of consumer demand.

59.    Physicians play a central role in competition among products based on different molecules or molecule combinations.  Product attributes figure prominently in physicians' prescribing decisions, which aim to match patients with the drug product(s) best suited to their needs.  For professional reasons and concern for their patients' clinical welfare, physicians are knowledgeable about the therapeutic effects of alternative drug products and base their choices on clinical considerations.[97]  Once the physician writes a prescription, the pharmacist or the patient may not change the product from one brand to another without going back to the physician to request a new prescription.

---

[97] For example, M. Pollock, O. Bazaldua, and A. Dobbie, "Appropriate Prescribing of Medications: An Eight-Step Approach," *American Family Physician*, 75(2), 2007, pp. 231-36.

60.    Physicians choose the drug product but do not pay or may not even be aware of the prices paid for the product. The disconnect between who chooses (the physician) and who pays (the insurer or consumer) reduces the effectiveness of price competition among alternative drugs.[98] A physician's practice typically contains patients covered by a diverse set of private and public insurance plans with different patient cost-sharing arrangements (deductibles, copays, coinsurance). In these circumstances, it can hardly be surprising that physicians often do not know what a specific product will cost a specific patient.[99] Similarly, the physician is likely to be unaware of what price the particular health plan pays for a drug product. Empirical studies confirm that physicians are often poorly informed about drug prices, though physicians may be aware and act on large changes in price for frequently prescribed drugs, for example, when generic versions of a drug become available.[100]

---

[98]  E. Berndt, *et al.*, "Information, Marketing and Pricing in the U.S. Antiulcer Drug Market," *American Economic Review*, 85(2), 1995, pp. 100-05 at pp. 100-01. E. Berndt, R. Pindyck, and P. Azoulay, "Consumption Externalities and Diffusion in Pharmaceutical Markets: Antiulcer Drugs," *Journal of Industrial Economics*, 51(2), 2003, pp. 243-70 at p. 251. E. Berndt, *et al.*, "The Roles of Marketing, Product Quality, and Price Competition in the Growth and Composition of the U.S. Antiulcer Drug Industry," in T. Bresnahan and R. Gordon (eds.), *The Economics of New Goods*, University of Chicago Press for the NBER, 1996, pp. 277-322 at pp. 295-300; D. Goldman, G. Joyce, and Y. Zheng, "Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health," *JAMA*, 298(1), 2007, pp. 61-69; K. Yeung, *et al.*, "Price Elasticities of Pharmaceuticals in a Value Based-Formulary Setting," *Health Economics*, 27(11), 2018, pp. 1788-1804.

[99]  C. Sloan, *et al.*, "Accuracy of Physician Estimates of Out-of-Pocket Costs for Medication Filling," *JAMA Network Open*, 4(11), 2021, pp. 1-11 at pp. 1 and 7; P. Ubel, *et al.*, "Study of Physician and Patient Communication Identifies Missed Opportunities to Help Reduce Patients' Out-of-Pocket Spending," *Health Affairs*, 35(4), 2016, pp. 654-61; C. Tseng, *et al.*, "Health Information Technology and Physicians' Knowledge of Drug Costs," *American Journal of Managed Care*, 16(4), 2010, pp. e105-10; W. Shrank, *et al.*, "Physicians' Perceptions of Relevant Prescription Drug Costs: Do Costs to the Individual Patient or to the Population Matter Most?" *American Journal of Managed Care*, 12(9), 2006, pp. 545-51; W. Shrank, *et al.*, "Physicians' Perceived Knowledge of and Responsibility for Managing Patients' Out-of-Pocket Costs for Prescription Drugs," *Annals of Pharmacotherapy*, 40(9), 2006, pp. 1534-40; M. Allan, J. Lexchin, and N. Wiebe, "Physician Awareness of Drug Cost: A Systematic Review," *PLoS Medicine*, 4(9), 2007, pp. 1486-96 at p. 1491.

[100]  See, for example, F. Scott Morton, "Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry," *International Journal of Industrial Organization*, 18(7), 2000, pp. 1085-1104 and Allan, Lexchin, and Wiebe, *op. cit.*, p. 1486. Allan, Lexchin and Wiebe, find that physicians' knowledge of drug prices tends to be better for higher- versus lower-priced drugs, yet they tend to underestimate prices of high-price drugs. *Ibid.* For a study of the impact of the introduction of generic simvastatin, see M. Carrera, *et al.*, "Do Physicians Respond to the Costs and Cost-Sensitivity of their Patients?" *American Economic Journal: Economic Policy*, 10(1), 2018, pp. 113-52.

---

*Promotion and Managed Care*

61.    Firms selling differentiated products compete for market share through promotion, largely directed at doctors.  Drug promotion consists of "detailing" visits to physicians' offices and hospitals, distribution of free samples, advertising in professional journals, and other types of promotion to the medical profession (such as sponsorship of conferences, research, and continuing medical education).  Physicians depend on detailing visits by representatives of brand drug companies and other promotional offerings by the brand drug companies for much of their information about the properties of branded drugs.[101]  As a result, brand drug companies spend substantial resources promoting their drugs to physicians, aiming to persuade them of the therapeutic advantages of their drug over the alternatives.[102]  Although spending on promotion may be evidence of rivalry among brand drug sellers, promotion designed to persuade physicians of the unique characteristics of a drug may reduce the effectiveness of competition on the basis of price.  Rizzo found that pharmaceutical companies' promotion of brand drugs tends to

---

[101] The literature examining the influence of pharmaceutical companies on physician decision making is massive. For example, P. Manchanda and P. Chintagunta, "Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis," *Marketing Letters*, 15(2-3), 2004, pp. 129-45; P. Azoulay, "Do Pharmaceutical Sales Respond to Scientific Evidence?" *Journal of Economics and Management Strategy*, 11(4), 2002, pp. 551-94; A. Datta and D. Dave, "Effects of Physician-Directed Pharmaceutical Promotion on Prescription Behaviors: Longitudinal Evidence," *Health Economics*, 26(4), 2017, pp. 450-68; F. Gönül, *et al.*, "Promotion of Prescription Drugs and Its Impact on Physicians' Choice Behavior," *Journal of Marketing*, 65(3), 2001, pp. 79-90; G. David, *et al.*, "The Effects of Pharmaceutical Marketing and Promotion on Adverse Drug Events and Regulation," *American Economic Journal: Economic Policy*, 2(4), 2010, pp. 1-25; G. Spurling, *et al.*, "Information from Pharmaceutical Companies and the Quality, Quantity, and Cost of Physicians' Prescribing: A Systematic Review," *PLoS Medicine*, 7(10), 2010, e1000352; D. Dave, "Effects of Pharmaceutical Promotion: A Review and Assessment," NBER Working Paper No. 18830, 2013 (http://www.nber.org/papers/w18830); C. DeJong, *et al.*, "Pharmaceutical Industry-Sponsored Meals and Physician Prescribing Patterns for Medicare Beneficiaries," *JAMA Internal Medicine*, 176(8), 2016, pp. 1114-22; I. Larkin, *et al.*, "Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing," *Journal of the American Medical Association*, 317(17), 2017, pp. 1785-95; and S. Hadland, *et al.,* "Association of Pharmaceutical Industry Marketing of Opioid Products to Physicians with Subsequent Opioid Prescribing," *JAMA Internal Medicine*, 178(6), 2018, pp. 861-63.

[102] Berndt, *et al.* (1995), *op. cit.*; Azoulay, *op. cit.*; Manchanda and Chintagunta, *op. cit.*; R. Kornfield, *et al.*, "Promotion of Prescription Drugs to Consumers and Providers, 2001-2010," *PloS One*, 8(3), 2013, e55504; and Datta and Dave, *op. cit.*  In economics, advertising is recognized as being persuasive and/or informative.  K. Bagwell, "The Economic Analysis of Advertising," in M. Armstrong R. Porter (eds.), *Handbook of Industrial Organization*, Vol. 3, North-Holland/Elsevier, 2007, pp. 1701-1844.  Brand company investment in advertising and other forms of promotion may include both informative and persuasive elements.

"systematically lower [the] price sensitivity" of demand for individual drugs.[103]  From the standpoint of the firm doing the promoting, reducing demand elasticity by increasing perceived product differentiation is one of the purposes of promotion, allowing the firm to raise price because physicians have been persuaded of the unique therapeutic properties of the firm's product.

62.    Funds devoted to pharmaceutical promotion are large.  In 2016, drug companies spent $26.9 billion promoting drugs to U.S. physicians and consumers, up from $17.1 billion in 1997.[104]

63.    Promotional spending is concentrated among newly launched brand drugs and/or top-selling brand drugs; older drugs and generic drugs are promoted much less or not at all.[105]  Drug promotion makes sense from the standpoint of the seller if the margin the seller makes on each sale is high, a general point, also acknowledged in the case of pharmaceuticals.[106]  Conversely, promotion does not make business sense for low-margin drugs, including most generics, which are treated as substitutable commodities by buyers.[107]  Companies that market brand drugs

---

[103]  J. Rizzo, "Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs," *Journal of Law and Economics*, 42(1), 1999, pp. 89-116 at p. 89.

[104]  L. Schwartz and S. Woloshin, "Medical Marketing in the United States, 1997-2016," *JAMA,* 321(1), 2019, pp. 80–96, online supplemental material (eTable).

[105]  Ma, *et al*., found that the top 250 drugs in terms of promotion spending accounted for 85.9% of the pharmaceutical industry's total promotion spending in 1998; the top 50 drugs accounted for 51.6% of total spending. J. Ma, *et al.*, "A Statistical Analysis of the Magnitude and Composition of Drug Promotion in the United States in 1998," *Clinical Therapeutics*, 25(5), 2003, pp. 1503-17.  As Calfee states, "DTCA has always focused on a small number of drugs.  The top 25 brands accounted for 57% of spending in 2006.  Most brands are not advertised to consumers at all."  J. Calfee, "An Assessment of Direct-to-Consumer Advertising of Prescription Drugs," *Clinical Pharmacology and Therapeutics*, 82(4), 2007, pp. 357-60 at p. 358.  On the subject of incentives to promote at the time of product launch, see E. Berndt, M. Kyle, and D. Ling, "The Long Shadow of Patent Expiration: Generic Entry and Rx-to-OTC Switches," in R. Feenstra and M. Shapiro, *Scanner Data and Price Indexes*, University of Chicago Press for the NBER, 2003, pp. 229-74 at pp. 234-35.

[106]  "Given the high margin of price over marginal cost for originator drugs, originator manufacturers invest heavily in promotion to physicians."  P. Danzon, "Competition and Antitrust Issues in the Pharmaceutical Industry," Wharton Working Paper, 2014, p. 8 (https://faculty.wharton.upenn.edu/wp-content/uploads/2017/06/Competition-and-Antitrust-Issues-in-the-Pharmaceutical-IndustryFinal7.2.14.pdf).

[107]  "Bioequivalence … eliminates the rationale for … promotion by generics, forcing generics to compete on price …. Most U.S. generics … incur minimal marketing effort or expense.  In this context, generic promotion of brand to doctors, patients or payers would be wasted expense, because pharmacies can substitute and are motivated mainly by price."  *Ibid.*, p. 11.

usually slow or stop promotion of the drug before generic entry because, " with each passing moment, the firm knows that it will enjoy monopoly profits for a shorter period of time on each extra unit of knowledge."[108]

64.     PBMs and other MCOs play a role in competition among therapeutic alternatives.  PBMs engage in selective contracting with drug manufacturers through a process of negotiations with the drug manufacturer.  While brand drug list prices are set by the manufacturer, PBMs have some ability to include or exclude drugs from formularies,[109] giving the PBM some bargaining leverage with manufacturers.[110]  While clinical factors generally predominate in formulary placement,[111] economic factors matter too.  Typically drug manufacturers use rebates to secure formulary coverage.  In exchange for even larger rebates, PBMs place drugs on preferred tiers of their formularies.

65.     Research consistently finds much greater substitutability based on price between a brand and an AB-rated generic than across non-AB rated alternatives.[112]  Other evidence for competition among non-AB-rated alternatives includes consumer surveys and the impact on sales of existing products of new product introductions.[113]  The degree of economic substitutability among alternative products is fundamentally an empirical question.

---

[108] J. Bhattacharya and W. Vogt, "A Simple Model of Pharmaceutical Price Dynamics," *Journal of Law and Economics*, 46(2), 2003, pp. 599-626 at p. 608.  See also Berndt, *et al.* (2003), *op. cit*., pp. 234-35.

[109] See ¶ 55 above for discussion on formulary tiers.

[110] Berndt, McGuire, and Newhouse, *op. cit*.  For discussion of some of the economic incentives associated with formulary design see M. Geruso, T. Layton, and D. Prinz, "Screening in Contract Design: Evidence from the ACA Health Insurance Exchanges," *American Economic Journal: Economic Policy*, 11(2), 2019, pp. 64-107 and K. Lavetti and K. Simon, "Strategic Formulary Design in Medicare Part D Plans," *American Economic Journal: Economic Policy*, 10(3), 2018, pp. 154-92.

[111] Academy of Managed Care Pharmacy, "Formulary Management," (https://www.amcp.org/concepts-managed-care-pharmacy/formulary-management).

[112] See, for example, A. Jena, *et al*., "'Me-too' Innovation in Pharmaceutical Markets," *Forum for Health Economics and Policy*, 12(1), 2009.

[113] C. Shapiro, "Mergers with Differentiated Products," *Antitrust*, 10, 1996, pp. 23-30.

D.    **Anticompetitive Settlements of Paragraph IV Challenges**

66.    Although overall the Hatch Waxman Act succeeded in encouraging competition in pharmaceutical markets, the Act has led to unintended consequences, including the brand's creation of "patent thickets," misuse of the Citizens' Petition process, launching a new version of a drug with small modifications prior to loss of patent exclusivity on the original version to move sales to the line extension not subject to immediate generic competition, among other tactics.[114] The unintended consequence that has attracted the most attention, however, are the so-called, "reverse-payment," or "pay-for-delay," settlements potentially allocating markets and delaying generic competition.[115]  Payments are referred to as "reverse" because they go from the plaintiff (the brand) to the defendant (the generic) in the patent suit, contrary to typical patent settlements where the payment goes from the defendant to the plaintiff.

67.    Hatch Waxman provides a mechanism by which a generic manufacturer can challenge patents that may be invalid, unenforceable, or uninfringed.  Under the Act, the filing of an ANDA with a Paragraph IV certification is treated as a technical act of patent infringement by the generic company,[116] and thus the brand company need not wait until the actual sale of the generic product to bring an infringement lawsuit (assuming the suit otherwise meets legal requirements).  After the required notification by the generic filer, the brand company may file a patent infringement suit.  The brand company's timely filing of the lawsuit invokes a statutory, automatic stay which prevents the FDA from approving a proposed generic for that drug while

---

[114]  For example, see C. Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting," in A. Jaffe, J. Lerner, and S. Stern (eds.), *Innovation Policy and the Economy*, Vol. 1, MIT Press, 2001, pp. 119-150; C.S. Hemphill and B. Sampat, "Evergreening, Patent Challenges, and Effective Market Life in Pharmaceuticals," *Journal of Health Economics*, 31(2), 2012, pp. 327-39; K. Vokinger, *et al.*, "Strategies That Delay Market Entry of Generic Drugs," *JAMA Internal Medicine*, 177(11), 2017, pp. 1665-69.

[115]  H. Hovenkamp, M. Janis, and M. Lemley, "Anticompetitive Settlement of Intellectual Property Disputes," *Minnesota Law Review*, 87(6), 2003, pp. 1719-66; C. Shapiro, "Antitrust Limits to Patent Settlements," *RAND Journal of Economics*, 34(2), 2003, pp. 391-411; T. Cotter, "Refining the 'Presumptive Illegality' Approach to Settlements of Patent Disputes Involving Reverse Payments: A Commentary on Hovenkamp, Janis and Lemley," *Minnesota Law Review*, 87(6), 2003, pp. 1789-1816; and K. Leffler and C. Leffler, "Want to Pay a Competitor to Exit the Market? Settle a Patent Infringement Case: An Argument For *Per Se* Condemnation of Payments by the Patent Holder," *Economics Committee Newsletter*, 2(1), 2002, pp. 26-35.

[116]  35 U.S.C. § 271(e)(2)(A).

litigation is pending for up to 30 months from the date of the receipt by the incumbent of the notice of the Paragraph IV ANDA filing.[117]  The patent suit puts the brand and generic in confidential negotiations about the terms on which they will compete.

68.     Patent disputes, including those in the drug industry, are usually between potential competitors, raising an antitrust concern when parties negotiate a settlement.  As Lemley and Shapiro put it:

> "There is no reason to assume that bargaining between the monopolist and the potential entrant to maximize their joint profits will lead to a socially optimal settlement.  … the monopolist and the entrant will have an incentive to negotiate in a way that leads to the monopoly level of output and the monopoly price. … an easy way for the parties to settle and achieve full monopoly profits: the incumbent can pay the potential entrant not to enter the market."[118]

69.     For a rational (*i.e.*, profit-maximizing) brand to make an otherwise unexplained reverse payment, the brand must expect to increase its profits by likely delaying the start of generic entry.  In other words, the brand must expect to profit more from obtaining a longer period prior to generic entry obtained under the agreement compared to what it could expect with litigation or a settlement without a reverse payment.[119]  This straightforward economic inference has been proven mathematically in a number of papers.[120]

70.     Figure 2 illustrates the economic inference.  Where there is no reverse payment, and the parties settle the litigation with an agreed entry date, that date is derived from a negotiation driven by the merits, or lack thereof, of the patent case.  Absent a reverse payment, the brand and generic remain adverse and the generic's economic interests remain aligned with those of purchasers in obtaining the earliest possible entry date.  This is depicted in Figure 2A showing a compromise date reflecting the competing interests of the brand and the generic.  Figure 2B

---

[117]  21 U.S.C. § 355(j)(5)(B)(iii).

[118]  M. Lemley and C. Shapiro, "Probabilistic Patents," *Journal of Economic Perspectives*, 19(2), 2005, pp. 75-98 at p. 91.

[119]  Edlin, *et al*. (2013), *op. cit.*; Elhauge and Krueger, *op. cit.*; and Drake and McGuire (2022), *op. cit.*

[120]  For example, see Edlin *et al*. (2013), *op. cit.*; Edlin, *et al*. (2015), *op. cit.*; and Elhauge and Krueger, *op. cit.*

shows what happens when a brand-to-generic payment is added to the settlement. Adding payment to the generic into the agreement means the generic will accept a later licensed entry date in the settlement. For the brand to have rationally made the payment, the new date must be later than without the payment.

**FIGURE 2A**
**A COMPROMISE DATE IN A SETTLEMENT WITHOUT A REVERSE PAYMENT**



**FIGURE 2B**
**A REVERSE PAYMENT ENABLES A DELAY, HARMING PURCHASERS**



71.    Because the economic inference is based on the condition of rational behavior of the brand at the time of reaching the agreement, the value of any unexplained reverse payment from the brand should be assessed from the brand's perspective as of the time of the settlement.[121]  Thus, the inference does not address whether a reverse payment settlement resulted in fact in delayed entry.[122]  At the time of the agreement, buying a "likely" delay is sufficient explanation for why a rational brand might make a payment to a generic.  For this reason, evidence of an otherwise unexplained reverse payment shows only that it is "likely" the date of generic entry has been delayed.

72.    A significant feature of this economic inference is that it is not necessary to know the strength of the disputed patent(s) or the brand's likelihood of success in litigation in order to determine if an agreement is anticompetitive (likely harms consumers).  The inference from the existence of an unexplained reverse payment can be made, as the Supreme Court has stated, "without litigating the validity of the patent."[123]

73.    Reverse-payment agreements within the Hatch Waxman regulatory framework can have particularly pronounced anticompetitive effects.  By delaying the entry of the first ANDA filer with 180-day regulatory exclusivity, the agreements delay all other generic competitors as well, because they cannot obtain final FDA approval and enter until the first filer's 180-day regulatory exclusivity has expired.  This blocking of all generic competition has been referred to as "bottlenecking."[124]  The historical record makes clear that Senator Hatch and Representative

---

[121]  Edlin, *et al.* (2015), *op. cit.*, p. 617, explains that "the correct antitrust analysis must be based on what was reasonably known to the parties… *at the time they entered into their settlement.*"

[122]  For example, a brand could pay a generic to agree to delay its entry (*i.e.*, agree to an anticompetitive settlement), but not in fact impact the actual timing of generic entry if the generic later proved incapable of obtaining FDA approval at any time before the agreed-upon date.

[123]  *Federal Trade Commission v. Actavis, Inc.*, 133 S. Ct. 2223 (2013) (hereafter "*Actavis* Decision"), p. 2237.

[124]  For extensive discussion of the unintended incentive effects of the 180-day exclusivity period, see Hemphill and Lemley, *op. cit.*  The authors argue that Paragraph IV filing (as opposed to a win in litigation or an at-risk launch) should not earn a first filer the 180 days.

Waxman did not intend to create the opportunity for brand companies to make a reverse payment in exchange for a delay in generic entry.[125]

74.    Reverse-payment agreements are win-wins for the drug manufacturers:  delay in generic entry keeps purchasers paying the high brand price, and the payment splits the monopoly profits resulting from those high prices with the generic.  But the win-win for the drug manufacturers imposes a substantial loss on drug purchasers and payors, who pay high prices for longer.  The preponderance of legal/economic scholarship concludes that reverse payments are anticompetitive.[126]

### Forms of Reverse Payments

75.    In the 1990s, brand manufacturers making a reverse payment simply paid cash to settle Paragraph IV disputes with generic challengers.[127]  Otherwise unexplained cash payments fell out of favor in the industry as a consensus emerged that such large cash payments were a red flag

---

[125]  See *Actavis* Decision, p. 2234: "(remarks of Sen. Hatch) ('It was and is very clear that the [Hatch Waxman Act] was not designed to allow deals between brand and generic companies to delay competition'); (remarks of Rep. Waxman) (introducing bill to deter companies from 'strik[ing] collusive agreements to trade multimillion dollar payoffs by the brand company for delays in the introduction of lower cost, generic alternatives')" (citations omitted).

[126]  Leffler and Leffler, *op. cit.*; Hovenkamp, Janis and Lemley, *op. cit.*;  Cotter, *op. cit.*; Shapiro (RAND, 2003), o*p. cit.*; C. Shapiro, "Antitrust Analysis of Patent Settlements Between Rivals," *Antitrust*, 2003, pp. 70-7; J. Bulow, "The Gaming of Pharmaceutical Patents," in A. Jaffe, S. Stern and J. Lerner (eds.), *Innovation Policy and the Economy*, Vol. 4, MIT Press for NBER, 2004, pp. 145-187; Lemley and Shapiro, *op. cit.*; C.S. Hemphill, "Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem," *New York University Law Review*, 81, 2006, pp. 1553-1623; C.S. Hemphill, "An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition," *Columbia Law Review*, 109(4), 2009, pp. 629-87; Hemphill and Lemley, *op. cit.*; and E. Elhauge and A. Krueger, "Solving the Patent Settlement Puzzle," *Texas Law Review*, 91, 2012, pp. 283-330. Some authors have referred to the inference as the "Actavis Inference" since the logic was referred to in the Supreme Court's landmark *Actavis* Decision.  A. Edlin, *et al.*, "Activating *Actavis*," *Antitrust,* 28(1), 2013, pp. 16-23; A. Edlin, *et al.*, "The *Actavis* Inference: Theory and Practice," *Rutgers University Law Review*, 67, 2015, pp. 585-635; Drake, Starr, and McGuire, *op. cit.*; McGuire, *et al.* (2016)*, op. cit.*; Drake and McGuire (2016), *op. cit.*; and Hartman, Drake, and McGuire, *op. cit.*

In addition, in the U.S. Supreme Court's *Actavis* case, a brief by more than 100 legal, economic and business professors supporting the FTC's position was submitted to the court, see Brief Amici Curiae of 118 Law, Economics, and Business Professors and the American Antitrust Institute in Support of Petitioners, *Federal Trade Commission v. Watson Pharmaceuticals, Inc., et al.*, in the Supreme Court of the United States, No. 12-416, January 29, 2013 (hereafter "*Amici Curiae*").

[127]  Hemphill (2009), *op. cit.*, p. 632.  One such settlement between Glaxo and GenPharm is discussed and analyzed in McGuire, *et al.* (2016), *op. cit.*, p. 1589.

---

signaling an anticompetitive agreement.  Other forms of value transfer emerged soon after, such as side deals favorable to the generic and no-AG clauses wherein the brand promises not to compete for some period.[128]  These other forms of value transfers from the brand to the generic have themselves come to be recognized as means by which a brand can pay a generic to delay entry.  One advantage to the settling parties of side deals and no-AG clauses, however, is that the payment in these forms can be disguised more easily than if a payment were made as a cash transfer.

Side Deals

76.    A side deal on terms unfavorable to the brand and favorable to the generic can transfer value.  The side deal is typically signed on the same day as the settlement of the patent dispute but may have no apparent connection to the settlement.  For example, the brand might license the generic to distribute a drug not at issue in the patent dispute (as happened here with respect to Effexor IR).  If such a side deal were independently attractive to both parties, it need not have been signed on the same date as the patent settlement.  A brand can transfer value to the generic by, for example, charging below market "royalty rates" to the generic through a licensing deal.  Notably, even though the flow of funds in a below-market royalty agreement goes from the generic to the brand, an economic perspective nonetheless implies that the transfer of value is from the brand to the generic.  If I give you something worth $10 but only charge you $5, I have transferred $5 of value to you.  Hemphill found that the types of deals between brands and generics included in Paragraph IV settlements were "rare outside of settlement," and that "the overall pattern suggests they provide a disguised means to confer payment."[129]

77.    Bradley Albert, the former Deputy Assistant Director of the FTC's Healthcare Division, has argued that contemporaneous side deals prompt "the question of whether the deal is designed

---

[128]  A vestige of cash payments remains in some Paragraph IV patent settlements in the form of payments from the brand to the generic on the order of several million dollars and cast as "payments to cover the generic's litigation costs."  Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2020," (https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2020-mma-report.pdf).

[129]  See Hemphill (2009), *op. cit.*, p. 633.  See also Edlin, *et al.* (2013), *op. cit.*, p. 18.

to persuade the generic to give up an earlier entry date."[130]  He observed, "[i]f the business opportunity is truly independent and makes sense for both parties, then it's gonna make sense a month afterwards."[131]  Mr. Albert also noted that "there's an easy way to reduce antitrust risk … Just don't enter into them at the same time – don't enter into the business deal and the settlement and make them contingent on one another."[132]

Explicit and Implicit No-AG Clauses:  Reverse Payments and Market Allocation

78.     A no-AG clause as part of a Paragraph IV patent settlement can constitute a payment by allocating the entire generic market during the 180-day regulatory exclusivity to the generic firm. Brand companies can use the threat of competition from an AG as a bargaining chip with a potential generic competitor.  According to data reported to the FTC for fiscal years 2004-2010, of the 157 Paragraph IV settlements with first-filers, 39 included an explicit no-AG provision in exchange for deferred entry by the first filer.[133]  These no-AG provisions affected large-selling drugs and many billions of dollars of health care expenditures.[134]

79.     Legal scholars Edlin, Hemphill, Hovenkamp and Shapiro regard the no-AG clause as a particularly insidious form of reverse payment because it "places a second naked market division agreement on top of the first," making "a bad situation worse."[135]  The authors point out that "… the no-AG provision is more harmful to competition than a cash settlement of the same

---

[130]  M. Lipman, "FTC Official Says Patent Settlement Side Deals Suspicious," *Law360*, April 16, 2015 (http://www.law360.com/articles/644134/ftc-official-says-patent-settlement-side-deals-suspicious).

[131]  *Ibid*.

[132]  *Ibid*.

[133]  FTC (August 2011), *op. cit.*, pp. 139-40.

[134]  "Over the seven years studied, settlements that combined deferred entry with 'No AG' promises governed the sales of drugs with a total market exceeding $23 billion."  *Ibid.*, p. 140.

[135]  Edlin, *et al.* (2015), *op. cit.*, p. 597.

magnitude."[136]   A no-AG clause is an attractive way for the brand to transfer value, as the pay received by the generic due to the clause is less than the sacrifice made by the brand.[137]

80.      Delay in exchange for a no-AG clause is a form of market division.  Firms have colluded to divide markets on the basis of geography, class of customer, or in another creative fashion.[138] In a no-AG pay-for-delay agreement, the exchange of non-compete clauses divides the market between the colluding producers on the basis of *time*.  The delayed entry transforms a duopoly for the molecule into a monopoly for the brand, while the no-AG clause gives the generic 100% of the initial generic sales after its entry.  Figure 3 depicts the reciprocal non-compete clauses dividing markets in a reverse-payment settlement when the payment consists of a no-AG pledge from the brand.

**FIGURE 3**
**RECIPROCAL NON-COMPETE CLAUSES DIVIDE MARKETS IN A DELAY/NO-AG SETTLEMENT**



81.      An *explicit* no-AG clause in an agreement prohibits or restricts a brand's ability to launch an AG.  After running afoul of antitrust scrutiny, the rate of explicit no-AG clauses declined.

---

[136] *Ibid.*

[137] The brand loses sales at a price reflecting competition between the settling generic and the AG, whereas the settling generic gains sales at the price when it is the only generic seller.

[138] In the notorious electrical equipment market division agreement in the 1950s, colluding firms divided the market according to the phase of the moon, with each company designated to be the low bidder on a government procurement during a particular phase of the moon.  See H. Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, Fifth Edition, West Publishing, 2016, p. 198 for discussion.

Following the 39 explicit no-AG clauses mentioned above in the years 2004-2010,[139] the FTC reported that only one drug patent litigation settlement included an explicit no-AG clause in FY2016 and none contained an explicit no-AG clause during FY2017-FY2021.[140]  In a 2019 settlement with the FTC that resolved three antitrust lawsuits, Teva agreed to a stipulation

---

[139]  Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2004," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/050107medicareactrpt.pdf); Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2005," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/fy2005drugsettlementsrpt.pdf); Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2006," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/mmareport2006.pdf); Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2007," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/mmaact.pdf); Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2008," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/100113mpdim2003rpt.pdf); Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2009," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/mmareport2009.pdf); and Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2010," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/1105mmaagreements.pdf).

[140]  Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2016," (https://www.ftc.gov/system/files/documents/reports/agreements-filled-federal-trade-commission-under-medicare-prescription-drug-improvement/mma_report_fy2016.pdf); Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2017," (https://www.ftc.gov/system/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-modernization/mma_report_fy2017.pdf); Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2018," (https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2018-mma-report.pdf); Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2019," (https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2019-mma-report.pdf); Bureau of Competition (FY 2020), *op. cit.*; and Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2021," (https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2021-mma-report.pdf).

---

barring it from entering patent litigation settlements with explicit no-AG clauses.[141]  The Wyeth-Teva Agreement, reached during the period of relatively high prevalence of explicit no-AG clauses, contains an explicit no-AG clause barring Wyeth from launching AG Effexor XR during Teva's 180-day regulatory exclusivity period for Effexor XR.[142]

82.      In its *Actavis* decision, the Supreme Court described how brand and generic firms could settle their litigation without reverse payments.[143]  The FTC's reports indicate that manufacturers routinely settle patent litigation without reverse payments.  Table 1 shows that, between FY2015 and FY2021, 82.7% of the patent litigation settlements between brand and generic drug manufacturers did not include any form of explicit or possible compensation.[144]  Further, 91.8% did not include any form of compensation other than small cash payments that could potentially have been made to avoid litigation costs.

---

[141]  FTC, "FTC Enters Global Settlement to Resolve Reverse-Payment Charges against Teva," February 19, 2019 (https://www.ftc.gov/news-events/news/press-releases/2019/02/ftc-enters-global-settlement-resolve-reverse-payment-charges-against-teva).

[142]  In this matter, I understand that the Appeals Court for the Third Circuit agreed that a no-AG clause can constitute a reverse payment for purposes of evaluating the anticompetitive effects of a brand-generic patent settlement.  Specifically, the court held "that a no-AG agreement, when it represents an unexplained large transfer of value from the patent holder to the alleged infringer, may be subject to antitrust scrutiny under the rule of reason." *In re Lipitor Antitrust Litigation*, 868 F.3d 231, 252 (3d Cir. 2017) (citing *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 403 (3d Cir. 2015)).

[143]  *FTC v. Actavis, Inc.*, 570 U.S. 136, 158 (2013) ("the fact that a large, unjustified reverse payment risks antitrust liability does not prevent litigating parties from settling their lawsuit.  As in other industries, they may settle in other ways, *e.g.*, by allowing the generic manufacturer to enter the patentee's market before the patent expires without the patentee's paying the challenger to stay out prior to that point.").

[144]  See Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2015," (https://www.ftc.gov/system/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-modernization/overview_of_fy_2015_mma_agreements_0.pdf); Bureau of Competition (FY 2016), *op. cit.*, pp. 1-2; Bureau of Competition (FY 2017), *op. cit.*, pp. 1-2; Bureau of Competition (FY 2018), *op. cit.*, pp. 1-2; Bureau of Competition (FY 2019), *op. cit.*, pp. 1-2; Bureau of Competition (FY 2020), *op. cit.*, pp. 1-2; and Bureau of Competition (FY 2021), *op. cit.*, pp. 1-2.

---

TABLE 1
BRAND-GENERIC PHARMACEUTICAL PATENT LITIGATION SETTLEMENTS
WITH AND WITHOUT EXPLICIT OR POSSIBLE REVERSE PAYMENTS
COUNT (% OF TOTAL)

| Fiscal Year | Total | No explicit or possible payment | No explicit or possible payment (other than litigation costs) |
|---|---|---|---|
| 2015 | 170 | 126 (74.1%) | 136 (80.0%) |
| 2016 | 232 | 188 (81.0%) | 214 (92.2%) |
| 2017 | 226 | 196 (86.7%) | 212 (93.8%) |
| 2018 | 245 | 202 (82.4%) | 228 (93.1%) |
| 2019 | 194 | 162 (83.5%) | 180 (92.8%) |
| 2020 | 205 | 183 (89.3%) | 200 (97.6%) |
| 2021 | 199 | 160 (80.4%) | 181 (91.0%) |
| Total | 1,471 | 1,217 (82.7%) | 1,351 (91.8%) |

83.    An agreement can eliminate competition from a brand AG without an explicit no-AG clause.  An *implicit* no-AG clause avoids making an explicit promise not to launch an AG during the generic's 180-day regulatory exclusivity period; but instead, commits the parties to a profit-sharing structure or distribution restrictions that make it economically irrational for the brand to launch an AG.  The role of generic-to-brand royalties (*i.e.*, profit sharing) in deterring an AG launch has been flagged by the FTC.[145]  A simple example, resembling the terms in the Wyeth-Teva Agreement applying to the period following Teva's regulatory exclusivity, shows how an implicit no-AG clause can work.[146]  Suppose the brand requires the generic to pay 50% of profits as royalties during a period when no other ANDA competition is possible so long as the brand does not launch an AG.  Suppose also, the brand retains the authority to launch an AG, but if it does, the generic would pay no royalties.  Because the price at which the generic product sells with only one seller exceeds the price when an AG is present, 50% of the generic's profits when

[145]  For example, in 2016, three agreements included "a declining royalty structure, in which the generic's obligation to pay royalties is reduced or eliminated if a brand launches an authorized generic product" that "may achieve the same effect as an explicit no-AG commitment."  Bureau of Competition (FY 2016), *op. cit.*, p. 2.

[146]  I have studied the incentives to the brand of various forms of royalty structures in Paragraph IV patent settlements and characterized those that qualify as an implicit no-AG clause.  See Drake and McGuire (February 2024), *op. cit.*

the generic is the only seller exceeds what the brand could make getting about half the market at a lower two-generic price. A royalty structure contingent on the brand's decision to sell an AG can divide markets and keep the rational brand out of the generic market just as effectively as an explicit no-AG clause.

84.     As I will explain later in my economic evaluation of the Agreement in Section IX below, the profit-sharing clauses in the Wyeth-Teva Agreement amount to an implicit no-AG clause. The Agreement does not prohibit Wyeth from launching its own AG after Teva's 180-day regulatory exclusivity period, but profit-sharing through Teva royalty payments penalizes Wyeth for doing so. This form of reverse payment avoids the red flag of explicit "no-AG" language in a settlement while harming consumers just the same, by leaving one fewer generic seller.

### *Acceleration Clauses/Most Favored Entry Provisions*

85.     Brand-generic patent settlements may include clauses that move the settling generic's entry date earlier under certain circumstances.[147] For example, a clause might provide that if a third party launches its generic product at risk prior to the date agreed to by the settling generic, the settling generic could also enter as soon as possible thereafter. An agreement might contain multiple clauses moving up the settling generic's date contingent on other events, such as another party obtaining an earlier license date. These provisions are referred to as "acceleration clauses," or, in some cases, "most-favored entry" (MFE) clauses, the latter term stemming from an analogy with "most-favored nation" (MFN) agreements about price.[148] Acceleration clauses can be conditional on events other than those related to third-party generic competition; for

---

[147] Acceleration clauses are common in Paragraph IV patent settlements. In 2009, the CEO of the generic company Apotex testified that acceleration clauses are "a standard component of every settlement today." M. Carrier, "Payment After *Actavis*," *Iowa Law Review*, 100(1), 2014, pp. 7-49 at p. 37. The FTC reported that the large majority of settlements reached in fiscal year 2017 (181 of 192) included "acceleration clauses," which "accelerate the effective date of the licenses or covenants not to sue based on other events." Bureau of Competition (FY 2017), *op. cit.*, p. 4.

[148] For discussion of the antitrust risks of MFN clauses see S. Smith, "When Most-Favored is Disfavored: A Counselor's Guide to MFNs," *Antitrust*, 27(2), 2013, pp. 10-14 and S.C. Salop and F.S. Morton, "Developing an Administrable MFN Enforcement Policy," *Antitrust*, 27(2), 2013, pp. 15-19 (https://www.nber.org/sites/default/files/2022-09/WhitePaper-Fowler10.2017.pdf).

---

example, a settling generic might be licensed to enter early if the brand market falls below some target sales. As I explain later in Section IV below, the Wyeth-Teva Agreement contains MFE clauses, and an acceleration clause triggered by a specified drop in the level of Effexor XR sales.

### Additional Value of Delay to the Brand Manufacturer with an Impending Product Switch to a Line Extension

86.     In order for a generic to be automatically substituted for the brand at pharmacies, the generic product must be AB-rated to the reference-listed drug (*i.e.*, the brand); without the AB-rating, the automatic substitution at the pharmacy does not take place. Importantly, an AB-rating is specific to the formulation, dosage, and route of administration of a drug. A pharmacist cannot, for example, automatically substitute a generic form of Effexor IR for a prescription for Effexor XR.

87.     New forms of the same chemical entity are commonly referred to as "line extensions" or "reformulations."[149] The presence of a line extension creates an opportunity for a drug manufacturer to move physician prescribing from the original product whose patent and/or regulatory exclusivity are about to end, to a modified version of the product without an AB-rated generic alternative.[150] Brand manufacturers use "soft-switch" tactics, convincing physicians through marketing to use the new forms, and/or "hard-switch" tactics, pulling the old forms off the market altogether to force physicians to use the new forms to keep their patients on the drug. Line extensions of existing products have become a common strategy.[151]

88.     An impending product switch to a line extension increases the profits a brand gains from delaying generic competition. In a reverse-payment Paragraph IV settlement that does not

---

[149] A. Fowler, "Pharmaceutical Line Extensions in the United States: A Primer on Definitions and Incentives," National Bureau of Economic Research White Paper, October 6, 2017 (https://www.nber.org/sites/default/files/2022-09/WhitePaper-Fowler10.2017.pdf). Fowler defines a line extension as "a branded pharmaceutical product that (1) includes the same active ingredient (either alone or in combination with other active ingredients) as an original product, (2) is manufactured by the same pharmaceutical company that makes the original product, or by one of its partners or subsidiaries, and (3) is launched after the original product." *Ibid.*, p. 3.

[150] Hemphill and Sampat (2012), *op. cit.*

[151] R. Beall, A. Kesselheim, and A. Sarpatwari, "New Drug Formulations and Their Respective Generic Entry Dates," *Journal of Managed Care & Specialty Pharmacy*, 25(2), 2019, pp. 218-24.

involve a product switch, the brand makes profits at some rate per month in the absence of generic competition, and the value of delay in generic entry to the brand is approximately proportional to the length of the delay. Two months of protection from competition is about twice as valuable as protection for one month. The situation differs with an impending product switch. Delay not only increases profits in the short term by protecting brand exclusivity on the original form, but it also increases profits in the longer term by buying the brand time to switch patients to the new form.

89.    The additional value of delayed entry to a brand when a line-extension is on the horizon is illustrated in Figures 4A and 4B, which graph the path of brand profits per period in two scenarios: one without and one with a delay in generic entry. With no delay in generic entry (say, as a result of an agreement about a date without a reverse payment), the dark blue dotted line in Figure 4A shows that the brand's profits collapse as generic versions are rapidly substituted for the branded product. At some point later, the line extension is introduced. The orange dotted line shows the relatively low level of profits the brand receives from the line extension as the line extension struggles to compete with generics of the original formulation.

90.    The brand makes more profits with a delay both because high profits are prolonged for the original product and also because the line extension can be more successfully marketed in the absence of a generic version of the original brand product. The more profitable paths with the delay are shown in solid lines in Figure 4B. High brand profits are maintained during the period of delay. And the delay builds a bridge to the line extension. During the delay, the brand manufacturer's profits remain high as customers are switched from the high-priced original brand product to the high-priced line extension. This is labeled Profit Window #1 in Figure 4B. And then, when the generic finally does enter, it is less of a threat to the line extension because the automatic substitution at the pharmacy cannot take place for the line extension and the number of prescriptions for the original brand is reduced due to the movement to the line extension. This is Profit Window #2 in Figure 4B.

**FIGURE 4A**
**BRAND PROFITS WITHOUT DELAY IN GENERIC ENTRY**



**FIGURE 4B**
**BRAND PROFITS WITH DELAY IN GENERIC ENTRY**



91.    It is well-recognized in the drug industry that the introduction of a line extension might be done to inhibit generic competition.  For example, Perret summarized the strategy as follows:

> "The goal of reformulation as a means of generic defense is clear: to prevent the substitution of the branded product by generics on patent expiry.  To do this it is sufficient to alter the branded product only to the extent that it is no longer the same as the product that the generic companies are using as the reference for their registrations.  This prevents pharmacies substituting generic product for the reformulated branded product which will not have been used as a reference formulation.  It is essential that the brand holder switch their patients to the new formulation prior to generic launch and the timing of the launch of the new formulation is crucial.  If it is launched too soon then the generics will simply use the new formulation as the reference, if it is launched too late then the market for the brand will have already been lost to the generics."[152]

92.    Wyeth documents appreciate the importance of launching a line extension for Effexor XR prior to the entry of generic versions of Effexor XR.  In a September 7, 2005 slide deck titled "Effexor Scenario Analysis," Wyeth modeled its expected revenue from Effexor XR and a line extension referred to as DVS, later named Pristiq.  Wyeth's first slide (reproduced here as Figure 5) shows that, without generic entry until 2017, a DVS launch in 2007 would capture approximately one third of Effexor XR's sales four years after its launch.[153]  This capture benefits Wyeth because sales moved to Pristiq are protected from generic substitution for Effexor XR, depicted in Figure 5 as the $1 billion of sales revenue for Pristiq continuing beyond 2017.  Direct generic competition essentially eliminates Wyeth's revenue from the original Effexor XR product.

---

[152]  S. Perrett, "The Modified-Release Drug Delivery Landscape: The Commercial Perspective," in *Modified-Release Drug Delivery Technology*, 2nd Edition, Volume 2, 2008, pp. 1-16 at pp. 2-3.

[153]  WYEFFAT3786830-56 at 34.

FIGURE 5
WYETH'S FORECAST OF EFFEXOR XR AND THE LINE EXTENSION DVS (PRISTIQ)



93.    Wyeth's second slide from the same deck (reproduced here as Figure 6) contemplates the Wyeth profit impacts of various dates of generic entry in connection with a settlement with Teva.[154]  Earlier generic entry lowers the net present value (NPV) to Wyeth of the flow of future profits from the Effexor XR family.  Wyeth expected its NPV to increase most rapidly (approximately $400 million) if it could delay Teva's generic entry from 2009 to 2010.  Delay over this period builds the revenue bridge between introduction of the line extension and Teva's entry.  The bridge gives Wyeth time to convert a greater portion of the Effexor XR prescriptions to the line extension DVS/Pristiq.  Further delay in Teva's generic entry continues to add to

---

[154]  WYEFFAT3786830-56 at 35.  The pattern of additional profits with delay indicates Wyeth's financial analysts' appreciation of the value of a delay with an impending product switch.

Wyeth profits, but once the bridge has been built and the line extension launched, the incremental value of delay is less. Wyeth expected that the incremental NPV of Wyeth profits from the delay from 2010 to 2011 is approximately $150 million; by 2015, an extra year of delay only adds about $50 million to NPV.

**FIGURE 6**
**WYETH'S FORECAST OF PROFITS FOR VARIOUS SETTLEMENT AND GENERIC ENTRY DATES**



## IV.    FACTUAL BACKGROUND

94.     As noted in the Executive Summary above, the DPPs are drug wholesalers that purchased Effexor XR directly from Wyeth and/or purchased Effexor XR's generic equivalent directly from Teva during the period from June 14, 2008 through and until May 31, 2011.[155]

95.     Wyeth, originally, but no longer a defendant, is a brand drug manufacturer that developed Effexor XR and was its exclusive U.S. seller from October 1997 to July 2010.[156]  Defendant Teva develops, manufactures, and markets pharmaceutical products, primarily generic drugs.[157]  Wyeth and Teva entered into the Wyeth-Teva Agreement on November 2, 2005, which is alleged to have delayed entry of generic versions of Effexor XR and divided markets for the generic form, causing Plaintiffs to pay more for venlafaxine ER than they would have absent the challenged conduct.

### A.    Effexor IR and Effexor XR

96.     Effexor XR is an encapsulated extended-release version of the compound venlafaxine hydrochloride.  Venlafaxine belongs to the class of drugs called selective serotonin and norepinephrine reuptake inhibitors (SNRIs), which are used to treat depression, anxiety, and other mood disorders.[158]

---

[155]  The DPPs are: Rochester Drug Co-Operative, Inc., Stephen L. LaFrance Holdings, Inc. d/b/a SAJ Distributors, and Uniondale Chemists, Inc.  See DPP Complaint.

[156]  "Wyeth" refers collectively to Wyeth Pharmaceuticals, Inc, Wyeth LLC, Wyeth Pharmaceuticals Company, and Wyeth-Whitehall Pharmaceuticals.  Wyeth was acquired by Pfizer, Inc., in 2009.  A. Sorkin and D. Wilson, "Pfizer Agrees to Pay $68 Billion for Rival Drug Maker Wyeth," *New York Times*, January 25, 2009 (https://www.nytimes.com/2009/01/26/business/worldbusiness/26iht-26drugB.19675793.html). See Order Approving Direct Purchaser Class Plaintiffs' Motion for Distribution from the Settlement Fund, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD (D.N.J), ECF 763 (September 18, 2024).

[157]  "Teva" refers collectively to Teva Pharmaceuticals USA and Teva Pharmaceuticals Ltd.

[158]  FDA, "Venlaxafine (Marketed as Effexor) Information" July 10, 2015 (https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/venlafaxine-marketed-effexor-information).  Currently, Effexor XR is indicated to treat major depressive disorder, generalized anxiety disorder, social anxiety disorder, and panic disorder; it is not indicated for use in pediatric populations due to risks of causing suicidal ideation.  FDA, "Highlights of Prescribing Information [Effexor XR]," revised August 2023, p. 1 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020699s118lbl.pdf).

97.     Venlafaxine was discovered and developed by researchers at Wyeth Pharmaceuticals.[159]
Wyeth originally marketed an instant-release (IR) Effexor tablet, which was approved by the
FDA in December 1993 and launched in early 1994.[160]  Effexor IR, as a New Chemical Entity
(NCE), received regulatory exclusivity until December 28, 1998.[161]  Effexor IR had to be taken
two or three times per day.[162]

98.     On May 16, 1995, Wyeth submitted an NDA for an extended-release venlafaxine
capsule, to be marketed as Effexor XR, that could be taken once a day.[163]  The FDA approved
Effexor XR on October 20, 1997,[164] and sales began the following month.[165]  Effexor XR
received three years of regulatory exclusivity when approved in 1997.[166]

99.     Prescriptions for Effexor XR quickly surpassed prescriptions for Effexor IR.  Effexor IR
prescriptions had averaged 300,000 per month in the 12 months before Effexor XR launched.[167]
By the end of its second year on the market, Effexor XR prescriptions topped 575,000 per

---

[159]  P. Novelli, "Effexor (R) XR Achieved Long-Term Remission in 67 Percent of Recurring Depression Patients,"
Wyeth Press Release, May 21, 2002 (https://www.eurekalert.org/news-releases/476880).

[160]  FDA, "Approval Date(s) and History, Letters, Labels, Reviews for NDA 020151"
(https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=020151).

[161]  FDA, "Orange Book: Approved Drugs with Therapeutic Equivalence Evaluations," 14th ed., 1994, p. AD44.

[162]  E.g., FDA, "Product label for Effexor (venlafaxine hydrochloride) Tablets," March 16, 2001, p. 25
(https://www.accessdata.fda.gov/drugsatfda_docs/label/2001/20151s17s18lbl.pdf).

[163]  FDA, "Approval Package for NDA 20699 [Effexor XR]," October 20, 1997, p.4 (https://www.accessdata.fda.gov/
drugsatfda_docs/nda/97/020699ap_effexor_apltr.pdf).

[164]  Ibid.

[165]  Pink Sheet, "Wyeth Effexor XR Approval Brings Dosing in Line with SSRIs; Launch Planned for Early
November," October 27, 1997 (https://medtech.pharmaintelligence.informa.com/PS031049/Wyeth-Effexor-XR-
approval-brings-dosing-in-line-with-SSRIs-launch-planned-for-early-November).  November 1997 is the first month
in which the IQVIA data record prescriptions for Effexor XR.

[166]  FDA, Administrative Documents for NDA 20-699 [Effexor XR], August 15, 1997 ("Exclusivity Summary," pp.
63-70 of the pdf document (https://www.accessdata.fda.gov/drugsatfda docs/nda/97/020699ap effexor
clinphrmr_admindoc)).  Effexor XR was submitted as a "Type 3 - New Dosage Form" NDA, appropriate for a drug
that is "a new dosage form of an active ingredient that has been approved or marketed in the United States by the
same or another applicant but in a different dosage form …."  FDA, Center for Drug Evaluation and Research,
"Manual of Policy and Procedures: NDA Classification Codes," December 8, 2022, p. 3 (https://www.fda.gov/
downloads/aboutfda/centersoffices/officeofmedicalproductsandtobacco/cder/manualofpoliciesprocedures/ucm47077
3.pdf).

[167]  Figures cited in this paragraph are computed from the IQVIA NPA data.

---

month; by July 2003, Effexor XR prescriptions exceeded 1.5 million per month. By July 2003, Effexor IR sales had fallen to 142,000 per month.

100.    Effexor XR was a highly profitable drug for Wyeth. Net sales of Effexor XR rose from $204.7 million in 1998 to $1.3 billion in 2002, putting it in the blockbuster category.[168]

## B.    Events Leading Up to the Wyeth-Teva Agreement

### *Teva is the First Generic to File for FDA Approval*

101.    On December 10, 2002, Teva submitted an ANDA seeking FDA approval to market a generic version of Effexor XR.[169] At the time, Wyeth had listed six patents in the Orange Book related to Effexor XR, listed in Table 2.[170] The '186 patent claims the compound venlafaxine hydrochloride, and is referred to as the "compound patent."[171] The '171 patent claims the extended release formulation of venlafaxine hydrochloride.[172] The '120 patent[173] and '958 patent[174] describe method-of-use claims for extended-release formulation with reduced side effects. Teva's ANDA included a Paragraph IV certification, claiming that the '708 patent, '171 patent, '120 patent, and '958 patent were "invalid, unenforceable, or w[ould] not be infringed"

---

[168] WYEFFAT06382990, tab "PCA-XR 1998 to 2004."

[169] TEVA_EFFEX_0000001-267 at 017.

[170] See FDA, "Approved Drugs Products with Therapeutic Equivalence Evaluations," 18th ed., 1998; FDA, "Approved Drugs Products with Therapeutic Equivalence Evaluations," 22nd ed., 2002; and FDA, "Approved Drugs Products with Therapeutic Equivalence Evaluations," 23rd ed., 2003.

[171] WYEFFAT04751595-741 at 683.

[172] WYEFFAT04751742-2084 at 1745.

[173] WYEFFAT04751489-594 at 523. The '120 patent claims a method for achieving a therapeutic blood plasma concentration of venlafaxine over a 24-hour period while minimizing side effects.

[174] WYEFFAT04752312-424 at 416-417. The '958 patent claims methods for extended-release dosage formulations and unit dosage forms designed to minimize side effects.

by the sale of Teva's product.[175]  Teva's ANDA also included a Paragraph III certification with respect to the '186 patent, and a section viii statement with respect to the '923 patent.[176]

TABLE 2
EFFEXOR XR PATENT INFORMATION

| First Appearance in Orange Book | Patent Number | Expiration Date | Teva's Certification |
|---|---|---|---|
| 1998 | 4,535,186 | 6/13/2008 | Paragraph III |
| 2002 | 6,274,171 | 9/20/2017 | Paragraph IV |
| 2002 | 5,916,923 | 12/28/2013 | Section viii |
| 2003 | 6,403,120 | 9/20/2017 | Paragraph IV |
| 2003 | 6,419,958 | 9/20/2017 | Paragraph IV |
| 2003 | 6,444,708 | 12/28/2013 | Paragraph IV |

All expiration dates include a pediatric exclusivity extension.

### The Wyeth-Teva Patent Infringement Litigation and Settlement Negotiations

102.    Wyeth promptly sued Teva for patent infringement with respect to the '171 patent, the '120 patent, and the '958 patent.[177]  The subsequent 30-month stay associated with a Paragraph IV filing and litigation prevented the FDA from issuing final approval until August 13, 2005 (*i.e.*, the expiration of 30 months) or until a district court decision finding the patent was invalid or uninfringed by Teva's generic.[178]  Teva was the "first filer" of an ANDA, making it eligible for 180 days of regulatory protection from competition from another ANDA generic.

---

[175] TEVA_EFFEX_0000001-267 at 029.

[176] TEVA_EFFEX_0000001-267 at 029.  The Paragraph III certification stated that Teva would not sell a generic form of Effexor XR until June 13, 2008, when the '186 patent expired.  A section viii statement (with respect to the '923 patent) asserts that the method-of-use claims do not describe any use for which Teva seeks approval.  21 U.S.C. § 355(j)(2)(A)(viii).  In other words, Teva's product label would not include wording related to the '923 patent's method-of-use-claims until the expiration of the '923 patent.

[177] TEVA_EFFEX_0006362-86 at 63.  Wyeth filed suit against Teva on March 24, 2003.  *Ibid.*  Wyeth did not file suit with respect to the '708 patent within 45-days of receiving notice of Teva's ANDA filing.  *Ibid.*

[178] 21 U.S.C. 355 (c)(3)(C).  FDA, Approval Package for ANDA 076565 (*Venlafaxine Hydrochloride Extended-Release Capsules*), June 28, 2010 at p. 347 (https://www.accessdata.fda.gov/drugsatfda_docs/anda/2010/076565 Orig1s000.pdf).

103.    On July 21, 2005, a scheduling order was issued in the patent litigation, requiring parties
to submit initial claim construction (or *Markman*) briefs on July 29, 2005.[179] By August 5, 2005,
Wyeth and Teva were discussing potential settlement terms.[180] The *Markman* hearing occurred
on August 29, 2005.[181] Later that day, a Wyeth forecaster wrote in an email with the subject
"Effexor Ruling" that Wyeth would have "new scenarios based on the negative outcome in
today's Teva ruling."[182] On September 6, 2005, the court issued a written claim construction
opinion.[183] The opinion was favorable to Teva because the court narrowed Wyeth's patent
claims.[184]

104.



---

[179] Order, *Wyeth v. Teva Pharmaceuticals USA, Inc. et al.,* No. 2:03-cv-01293-WJM-RJH (D.N.J), ECF No. 102
(July 21, 2005).

[180] WYEFFAT3753472.

[181] A patent claim defines the boundary of protection offered by the patent. In a claim construction hearing (also
called a *Markman* hearing), a judge determines the interpretation and scope of the plaintiff's asserted patent claims.
See "Markman Hearing," Thompson Reuters Practical Law (https://content.next.westlaw.com/practical-
law/document/Id4cf190ff3ad11e28578f7ccc38dcbee/Markman-Hearing). The interpretation of the patent claims
plays a significant role in the outcome of the litigation.

[182] WYEFFAT2907466.

[183] Markman Opinion, *Wyeth v. Teva Pharmaceuticals USA, Inc.*, No. 2:03-cv-01293-WJM-RJH (D.N.J), ECF No.
124 (September 6, 2005); WYEFFAT2162406-26.

[184] WYEFFAT2162406-26 at 11 and 17-18 (adopting Teva's narrow claim construction). On Wyeth's motion for
reconsideration of the court's claim construction ruling, the court reaffirmed its prior findings, holding that Wyeth's
arguments "support[ing] a broader construction" were "unpersuasive." WYEFFAT2405090-96 at 91-92. Analysts
described the narrowing of the "extended release formulations" claim as a "a significant pre-trial victory for Teva."
TEVA_EFFEX_0771657-70 at 58 and TEVA_EFFEX_0771655-56 at 56.

[185] WYEFFAT06452251.00001 (Cohn Ex. 3).

[186] WYEFFAT06452251.00001 (Cohn Ex. 3).



105.    On September 16, 2005, Wyeth sent Teva the first draft of a term sheet.[188]  The term
sheet included a settlement of the ongoing patent litigation, and granted Teva an exclusive
license to enter on October 1, 2007 for the IR product and January 1, 2011 for the XR product.[189]



Negotiations continued.

106.    On September 26, 2005, after considering some proposed changes from Teva, Wyeth sent
a revised term sheet.[192]  In the new proposal, Wyeth agreed to an earlier entry date for the IR
product[193] of July 1, 2006 and for the



---

[187]  WYEFFAT06452251.00001 (Cohn Ex. 3).

[188]  TEVA_EFFEX_0752832-33.

[189]  TEVA_EFFEX_0752834-40 at 36.

[190]

[191]  TEVA_EFFEX_0752832-33 at 32.

[192]  TEVA_EFFEX_0755496-97.

[193]  The September 26, 2005 term sheet gave Teva an option to launch an Effexor IR AG (called "Wyeth Supplied IR Product"), but this option did not make it into the final Wyeth-Teva Agreement. TEVA_EFFEX_0755498-506 at 499.

███████████████████████████████████████████

███████████████████████████████████████████

██ ██ █████████████████████████████████████

████████ ██ ████████████████████████████████

███████████████████████████████████████████ █

107.     Wyeth had requested a re-argument of the court's *Markman* decision (that was unfavorable for Wyeth).  On October 6, 2005, the court rejected Wyeth's request.[197]

108.     On October 14, 2005, Teva responded with a revised term sheet.[198]  The proposed agreement included the explicit no-AG clauses they had previously discussed.  In Teva's revision, Wyeth could not market an AG for the IR product (from the signing date to the Compound Patent Termination Date)[199] or XR product during Teva's 180-day regulatory exclusivity period.[200]  Teva proposed an earlier entry date of June 15, 2006 for the IR product[201] and July 1, 2010 for the XR product,[202] or earlier under the circumstances described above from the latest Wyeth proposal.  ███████████████████████████████████████

---

[194]  TEVA_EFFEX_0755498-506 at 501.

[195]  TEVA_EFFEX_0755496-97 at 97.

[196]  TEVA_EFFEX_0755498-506 at 503.

[197]  TEVA_EFFEX_0771673-75.

[198]  TEVA_EFFEX_0758581-82.

[199]  The Compound Patent Termination Date is defined as "(i) the expiration of U.S. Patent No. 4,535,186, (ii) such patent is held unenforceable, or (iii) all claims covering venlafaxine therein are held invalid…by a final decision by a court."  TEVA_EFFEX_0758589-600 at 595.

[200]  TEVA_EFFEX_0758589-600 at 590.

[201]  TEVA_EFFEX_0758589-600 at 595.  The October 14, 2005 term sheet proposed some different terms should Teva choose to launch an Effexor IR AG, but these terms did not make it into the final Wyeth-Teva Agreement.  See TEVA_EFFEX_0758589-600 at 591-92.

[202]  TEVA_EFFEX_0758589-600 at 596.



109.    The following day, on October 15, 2005, Teva sent a draft "term sheet for Canada" to the same group.[205]  Subsequently, Wyeth expressed concern "about the delinking of the U.S. and Canadian deals," [206] preferring a single agreement.  Teva wanted the Canadian deal to stand alone, meaning that if the U.S. deal fell through the Canadian one was still on.[207]  An October 17, 2005 e-mail indicates that "a bundled agreement is on the table with an offer to allow Wyeth to terminate the Canadian agreement should the US agreement not reach completion."[208]  At this point they were still negotiating Teva's advance prep time prior to launch, and the terms of the profit split as it related to the Canadian license.[209]

110.    On October 18, 2005, three days later, Wyeth and Teva executed binding term sheets for both the U.S. and Canada.[210]  The relevant terms of the U.S. executed term sheet were consistent with Teva's proposed term sheet dated October 14, 2005.

111.    I note that Teva rejected Wyeth's initial September 16 terms and then rejected Wyeth's revised terms of September 26 improving the offer to Teva.  Teva's own proposal improved its situation further in major ways: ███████ to Wyeth, no-AG clauses, and earlier entry for both the IR and XR products.  Wyeth accepted.  The conclusion from this set of events is that Wyeth was not giving Teva enough early on in the negotiations to induce Teva to drop the legal threat to Wyeth's patents.  Eventually, Wyeth agreed to enough concessions to Teva to get Teva to sign.

---

[203]  TEVA_EFFEX_0758589-600 at 591.

[204]  TEVA_EFFEX_0758589-600 at 592.

[205]  WYEFFAT3764891-92 at 91.  The draft Novapharm-Wyeth Canadian term sheet is redacted.

[206]  WYEFFAT04675131.

[207]  WYEFFAT04682966.

[208]  WYEFFAT04815685.

[209]  WYEFFAT04815685.

[210]  TEVA_EFFEX_0619285-308 and WYEFFAT04718483-94.

112.    Earlier entry dates, no-AG clauses, and ███████████ are all terms favorable to Teva.  If the October 14, 2005 terms had not included one of the no-AG clauses, a company in Teva's position would have likely demanded an earlier entry date to restore the profit value from the proposal (to make up for the fact that it was not getting the value from the no-AG clause).  The textbox presents an analogous real-estate bargaining situation.

---

**Selling a Home and the Tradeoff Between Terms**

The buyer made you an offer of $500k for your home with a closing date of July 1, 2025.  You and the potential buyer are adverse on the price, as is typical, and on the date.  You would like to get the deal done sooner and the buyer would like later.

You reject the $500k/July 1, 2025 offer and counter with $510k/June 1, 2025, both terms better for you.  The buyer accepts.

Even though you got better terms on both price and date in comparison to the offer you rejected, you still rationally tradeoff one term for another.  Had the buyer been willing to pay $525k you may have accepted a delay until July 1, 2025.  In other words, like Teva and delay in entry, you need to be compensated to accept a delay in closing.

---

## C.    Major Provisions of the Wyeth-Teva Agreement

113.    The Wyeth-Teva Agreement was signed on November 2, 2005.[211]  The Settlement and Release Agreement refers to itself, the "U.S. License Agreement," and the "Canadian License Agreement" collectively as the "Definitive Agreements."[212]  The Settlement and Release Agreement also indicates that if the settlement was not finalized within 120 days, "this Agreement shall terminate in full and the other Definitive Agreements shall not become effective

---

[211]  WYEFFAT2405386-435 (Settlement and Release Agreement) and WYEFFAT2405436-523 (U.S. and Canada License Agreements).

[212]  WYEFFAT2405386-435 at 387.

or binding upon the Parties…"[213]  The Wyeth-Teva Agreement includes all three "Definitive Agreements."

### *The Settlement and Release Agreement*

114.    In the Settlement and Release Agreement, Wyeth and



### *Generic Effexor XR U.S. License*

115.    Wyeth granted Teva an exclusive license to sell its generic version of Effexor XR in the U.S. starting on July 1, 2010 or earlier if certain events occurred (events that did not in fact occur).[217]  The explicit exclusive license that Wyeth granted to Teva was set to expire six months after Teva first began selling its product.[218]  The Agreement specified that "until the foregoing

---

[213]  WYEFFAT2405386-435 at 388.  Additionally, the U.S. License Agreement indicates that "in connection with [the] settlement, Wyeth is willing to grant, and Teva is willing to receive … a license to enable Teva to sell certain products…"  WYEFFAT2405436-523 at 436.  The Canadian License Agreement includes similar language. WYEFFAT2405436-523 at 488.

[214]  WYEFFAT2405386-435 at 388.

[215]  WYEFFAT2405386-435 at 388.

[216]  WYEFFAT2405386-435 at 389.

[217]


[218]  WYEFFAT2405436-523 at 448.

exclusive license expires, neither Wyeth nor any of its Affiliates will market, sell, distribute or manufacture any Authorized Generic Product of XR Reference Product (in any dosage strength), or license grant a waiver or otherwise authorize or cause or allow any Third Party to do the same, for sale in the Territory."[219] ███████████████████████████████████
███████████████████████████████████████

116.    Wyeth also granted Teva a non-exclusive license effective "immediately upon expiration of the exclusive license" until the patents expired or were proven invalid or unenforceable.[221]  If Wyeth did not license a third party to sell an AG after Teva's exclusivity ended, ██████████
██████████████████████████████████████████
███████████████████████████████████
██████████████████████████████████████████
███████████████████████   ███████████████████
██████████████████████████████████████
██████  ███████████████████████████████████
██████████████████████████████████
█████████████████████████

---

[219]  WYEFFAT2405436-523 at 448.

[220]  WYEFFAT2405436-523 at 453.

[221]  WYEFFAT2405436-523 at 448.

[222]  ██████████████████████████████████████
███████████████████████████████████████
█████████████████████

[223]  ██████████████████████████████████
█████████████

[224]  WYEFFAT2405436-523 at 453-454.

[225]  WYEFFAT2405436-523 at 453-454.

---

### Generic Effexor IR U.S. License

117.    Wyeth granted Teva a license to sell generic Effexor IR *before* the expiration of the venlafaxine compound patent, starting on "the earlier of (i) June 15, 2006, or ███████████



██████████████ That is, Wyeth agreed Teva would be the only generic Effexor IR seller on the market from Teva's launch through the expiration of the venlafaxine compound patent in June 2008.

118.    ████████████████████████

### Generic Effexor XR Canada License

119.    Wyeth granted Novopharm Limited, Teva's Canadian subsidiary,[230] a license to sell a generic version of Effexor XR in Canada on the earlier of the following dates: (1) December 1,

---

[226]  WYEFFAT2405436-523 at 438-439.

[227]  WYEFFAT2405436-523 at 438 and 445.

[228]  See Table 2 above.

[229]  See WYEFFAT2405436-523 at 452-453.

[230]  Teva Press Release, "Teva Announces Completion of Novopharm Acquisition," April 5, 2000 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2000/Teva-Announces-Completion-of-Novopharm-Acquisition/default.aspx).

2006, provided that the U.S. License Agreement became effective, and Wyeth successfully obtained a formal patent listing for its Canadian Patent Application No. 2,199,778 (the Canadian Patent); (2) the day Novopharm obtained approval from Health Canada authorizing its generic product, provided Wyeth had not obtained a formal patent listing for the Canadian Patent; or (3) August 1, 2007, provided that Wyeth had obtained a formal patent listing for the Canadian Patent and the U.S. License Agreement did not become effective. ██████████████████

██████████████████████████████████████████████

██████  Wyeth also agreed that it would not sell an authorized generic product or license another generic to enter until "the date on which there are no more Valid Claims" on patents that would block the sale of Effexor XR in Canada."[232]

120.   ██████████████████████████████████████

████████████████



---

[231]  WYEFFAT2405483-524 at 490.  (For reference: "'Entry Date' shall mean the earlier to occur of the Second Generic Entry Date and the following, as applicable: (i) if Wyeth has satisfied the Listing Condition and the US Definitive Agreements become effective as set forth in the Settlement Agreement, December 1, 2006; (ii) if Wyeth has not satisfied the Listing Condition, the day Novopharm is issued a HOC for Product; or (iii) if Wyeth has satisfied the Listing Condition but the US Definitive Agreements do not become effective as set forth in the Settlement Agreement, August 1, 2007.").

[232]  WYEFFAT2405483-524 at 493 (describing how, until the "Consideration End Date," the license to sell generic Effexor XR will be exclusive to Teva and that Wyeth will not sell an AG) and 490 ("'Consideration End Date' shall mean the date on which there are no more Valid Claims of the Patents that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of the Product").

[233]  WYEFFAT2405483-524 at 497.

[234]  WYEFFAT2405483-524 at 497.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████ ██

### D.    Events Following the Wyeth-Teva Agreement

*Teva's Effexor IR ANDA*

121.    Teva, in its original filing for Effexor IR, did not include Paragraph IV certifications and there was no patent litigation, because Teva was seeking approval to launch after expiration of the venlafaxine compound patent on June 13, 2008, which is the only patent covering Effexor IR, and Teva did not challenge the venlafaxine compound patent.[236]

122.    On November 4, 2005, two days after the Wyeth-Teva Agreement was executed, Wyeth sent a letter to the FDA advising that Wyeth had "granted Teva a limited license for the purpose of filing a PIV" with respect to the '186 patent in Teva's IR ANDA.[237]  In the letter, Wyeth consented to Teva receiving final FDA approval for the Effexor IR ANDA as of June 15, 2006.[238]  Teva then converted its original Effexor IR Paragraph III certification for the '186 patent to a Paragraph IV certification.[239]  Wyeth did not pursue patent litigation related to the Teva Effexor IR ANDA since the Paragraph IV conversion was submitted to the FDA on November 4, 2005, after the Effexor IR U.S. License was granted on November 2, 2005.

---

[235]  WYEFFAT2405483-524 at 497.

[236]  Teva filed its IR ANDA on March 14, 2003, which included a Paragraph III certification with respect to the '186 patent.  TEVA_EFFEX_0022611-970 at 631 and 644.

[237]  TEVA_EFFEX_0168980-81 at 81.  Since Teva originally included a Paragraph III certification, the FDA could not approve the ANDA until the relevant patents had expired.  See Congressional Research Focus, "Patent Listing in FDA's Orange Book," *In Focus*, December 27, 2024 (https://crsreports.congress.gov/product/pdf/IF/IF12644). Teva needed to convert to a Paragraph IV certification in order to receive FDA approval and begin marketing generic Effexor IR in 2006, before expiration of the venlafaxine compound patent in June 2008.

[238]  TEVA_EFFEX_0168980-81 at 81.

[239]  TEVA-EFFEX_0701696-98 at 97.

123.    As events played out, Teva received FDA approval to launch generic Effexor IR on
August 3, 2006, and immediately launched its generic Effexor IR product.[240]  Teva sold the only
generic Effexor IR product on the market for over 22 months until the venlafaxine compound
patent expired and other generic Effexor IR competitors entered in June 2008.[241]

### Other Effexor XR ANDA Filers

124.    Sixteen other generic manufacturers also submitted Paragraph IV ANDAs challenging
Wyeth's Effexor XR patents (other than Wyeth's venlafaxine compound patent).  Wyeth sued
each of these ANDA filers in turn.  As listed in Table 3, all of these ANDA filers settled their
patent litigation with Wyeth, and all but two agreed to enter 334 days after the launch date
Wyeth and Teva had agreed upon.[242]

---

[240]  TEVA-EFFEX_0701696-98 at 97.  Teva Press Release, "Teva Announces Final Approval of Venlafaxine HCL
Tablets," August 4, 2006(https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2006/Teva-
Announces-Final-Approval-of-Venlafaxine-HCL-Tablets/default.aspx).  Also see IQVIA NSP Data.

[241]  See IQVIA NPA Data.

[242]  See agreements: WYEFFAT04639175-305 (Impax); WYEFFAT04638600-18 (Anchen); WYEFFAT04638530-
99 (Anchen); WYEFFAT04687459-509 (Lupin); SANDOZ-EFFEXOR-0000002-49 (Sandoz);
WYEFFAT04639396-455 (Mylan); WYEFFAT04641490-539 (Wockhardt); WYEFFAT04638940-82 (Biovail);
APO-EFFXR-000001-43 (Apotex); WYEFFAT04663394-443 (Torrent); WYEFFAT04640354-65 (Orgenus);
WYEFFAT04640136-71 (Orgenus); WYEFFAT04665543-83 (Aurobindo); WYEFFAT04639344-95
(Intellipharmaceutics); and WYEFFAT04638983-9020 (Dr. Reddy's).  Nostrum settled in 2012 and received a
license to enter as soon as it received FDA approval: WYEFFAT04639983-40027.

Citations for the date sued column in Table 3: WYEFFAT04074869-946 at 870 and 924 (Impax, Anchen, Lupin,
Sandoz); WYEFFAT04074541-88 at 42 (Mylan); WYEFFAT04060165-79 at 65 (Wockhardt);
WYEFFAT040623810-32 at 32 (Biovail); WYEFFAT040623874-917 at 874 (Apotex); WYEFFAT04746129-48 at
48 (Torrent); WYEFFAT07262209-11 at 10 (Zydus); Orgenus_00010234-53 at 53 (Orgenus and Orchid);
WYEFFAT06340749-51 at 50 (Aurobindo); WYEFFAT06360983-1002 at 1002 (Intellipharmaceutics);
WYEFFAT06517193 (Dr. Reddy's); WYEFFAT06361771-823 at 771 (Nostrum).

The June 2011 entry column in Table 3 was determined using IQVIA NPA data.

---

125.    Wyeth agreed to make cash payments of $1 million to Impax, $3 million to Lupin, and $2 million to Mylan.[243]  The payments were purportedly made as "reimbursement of legal expenses."[244]

**TABLE 3**
**LATER GENERIC PARAGRAPH IV FILERS FOR EFFEXOR XR**
**LAWSUITS AND SETTLEMENTS**

| Generic | Date Sued | Date Settled | Licensed Entry Date | Cash Payment | Royalty | Side Deals | June 2011 Entry |
|---------|-----------|--------------|---------------------|--------------|---------|------------|-----------------|
| Impax | 5/5/2006 | 6/9/2008 | 6/1/2011 | Y | Y | Y | |
| Anchen | 4/12/2006 | 9/26/2008 | 6/1/2011 | N | Y | Y | |
| Lupin | 3/12/2007 | 3/6/2009 | 6/1/2011 | Y | Y | N | |
| Sandoz | 6/22/2007 | 7/29/2011 | 6/1/2011 | N | Y | N | |
| Mylan | 7/6/2007 | 10/20/2009 | 6/1/2011 | Y | Y | N | X |
| Wockhardt | 8/8/2007 | 3/24/2009 | 6/1/2012 | N | Y | N | X |
| Biovail | 6/26/2008 | 11/12/2009 | 6/1/2011 | N | Y | N | |
| Apotex | 8/18/2008 | 8/11/2010 | 6/1/2011 | N | N | Y | X |
| Torrent | 1/8/2009 | 5/6/2010 | 6/1/2011 | N | Y | N | X |
| Zydus | 4/9/2009 | 1/28/2010 | 6/1/2011 | N | Y | N | X |
| Orgenus and Orchid | 7/2/2009 | 4/8/2011 | 6/1/2011 | N | Y | N | |
| Aurobindo | 4/22/2010 | 1/26/2011 | 6/1/2011 | N | Y | N | X |
| Intellipharmaceutics | 6/30/2010 | 6/7/2011 | 6/1/2011 | N | Y | N | |
| Dr. Reddy's | 9/3/2010 | 4/18/2011 | 6/1/2011 | N | Y | N | X |
| Nostrum | 4/21/2011 | 2/6/2012 | FDA Approval | N | Y | N | |

126.    Wyeth provided each generic firm a non-exclusive license to launch under its ANDA on the last to occur of 1) June 1, 2011;[245] 2) the expiration of Teva's 180-day exclusivity; or 3) final FDA approval.[246]

---

[243]  WYEFFAT04639175-305 at 180 (Impax); WYEFFAT04687459-509 at 463 (Lupin); WYEFFAT04639396-455 at 401 (Mylan).

[244]  *Ibid.*

[245]  Wockhardt is an exception with a licensed entry date of June 1, 2012.  WYEFFAT04641490-539 at 513 (Wockhardt).  Nostrum is another exception with the licensed entry date being the date that Nostrum received FDA approval.  WYEFFAT04639558-615 at 595 (Nostrum).

[246]  WYEFFAT04639136-74 at 43 (Impax); WYEFFAT04638530-99 at 37-38 (Anchen); WYEFFAT04687459-509 at 482-83 (Lupin); SANDOZ-EFFEXOR-0000002-49 at 26 (Sandoz); WYEFFAT04639396-455 at 416 (Mylan); WYEFFAT04638940-82 at 57 (Biovail); APO-EFFXR-000001-43 at 20 (Apotex); WYEFFAT04663394-443 at 415

*Line Extension Pristiq*

127.    In addition to Effexor XR, Wyeth added a second line extension, Pristiq (desvenlafaxine succinate, originally called "DSV" within Wyeth), to the Effexor family.  According to Wyeth, "Pristiq delivers the major active metabolite of Effexor XR (venlafaxine HCl) in its active state without going through the CYP2D6 metabolic pathway [which] could be beneficial when Pristiq is coadministered with other commonly prescribed medications metabolized through that pathway."[247]  Wyeth submitted an NDA for Pristiq to the FDA in December 2005.[248]  Pristiq was submitted as a "Type 1 – New Chemical Entity" NDA and would receive five years of exclusivity if approved.[249]  The NDA was approved in February 2008,[250] and Pristiq launched in April of that year.[251]

128.    As shown in Figure 7, the initial growth in sales of Pristiq mirrors a fall in sales of Effexor XR.  Wyeth's shift of prescriptions from Effexor XR to Pristiq partly shielded its sales revenues from losses after generic versions of Effexor XR became available in July 2010.[252]  In the two years before Pristiq's launch in April 2008, prescriptions for Effexor XR had averaged 1,557,252 per month; they had fallen to 1,080,6430 by April 2010.[253]  Wyeth's promotional

---

(Torrent); WYEFFAT04640136-71 at 44 (Orgenus); WYEFFAT04665543-83 at 60-61 (Aurobindo); WYEFFAT04639344-95 at 65 (Intellipharmaceutics); WYEFFAT04638983-9020 at 8992 (Dr. Reddy's).

Most agreements also included an acceleration clause allowing the generic to enter earlier in certain circumstances. Specifically, if Wyeth granted a license to a third party permitting them to enter before June 1, 2011, the later generics' ANDA entry date would be amended to the later of 1) the earlier entry date or 2) January 1, 2011.  *Ibid*. Torrent, Orgenus, Intellipharmaceutics, and Dr. Reddy's did not have acceleration clauses.

[247] Wyeth Press Release, "FDA Approves Wyeth Pharmaceutical's Pristiq for the Treatment of Adult Patients with Major Depressive Disorder," March 3, 2008 (https://www.fiercebiotech.com/biotech/fda-approves-wyeth-pharmaceuticals-s-pristiq-for-treatment-of-adult-patients-major).

[248] FDA, Approval Letter for NDA 21-992 (*Desvenlafaxine Succinate ER Tablet*), February 29, 2008, p.1 (https://www.accessdata.fda.gov/Drugsatfda_docs/nda/2008/021992s000_Approv.pdf).

[249] FDA, "Approved Drug Products with Therapeutic Equivalence Evaluations," 32nd ed., 2012, p. ADA 44.

[250] FDA (February 29, 2008), *op. cit.*

[251] IQVIA NPA data.

[252] S. Saul, "Wyeth Antidepressant is Approved," *New York Times*, February 29, 2008 (https://www.nytimes.com/2008/02/29/business/29cnd-wyeth.html).

[253] IQVIA NPA data.

---

spending on Effexor XR dropped to virtually nothing right when Pristiq launched, and was replaced by Wyeth's spending on Pristiq promotion.[254]

FIGURE 7
TOTAL PRESCRIPTIONS FOR EFFEXOR FAMILY DRUGS



Source: IQVIA NPA Data.

### Osmotica's Extended-Release Tablet

129.    On December 11, 2006, Osmotica submitted an NDA to the FDA for a *tablet* (rather than capsule) form of extended-release venlafaxine that would <u>not</u> be an AB-rated generic equivalent

---

[254] IQVIA Channel Dynamics data.  See also fn. 329.

of Effexor XR (a capsule).[255]  Osmotica's NDA certified that the claims of the '120 and '958 patents were invalid and not infringed.[256]  On April 20, 2007, Wyeth sued Osmotica for infringement of both patents.[257]  On February 8, 2008, Wyeth and Osmotica entered into a settlement agreement[258] that provided Osmotica a license to launch under its NDA on May 1, 2008.[259]  Osmotica agreed to pay Wyeth a tiered royalty based on the level of net sales ranging from 5% to 50%.[260]  Wyeth continued to profit from Osmotica's sales through the start of multiple product generic entry, earning approximately $254 million in royalty payments from Osmotica from 2008-2011.[261]

130.     On May 20, 2008, the FDA approved Osmotica's NDA for venlafaxine extended-release tablets.[262]  On October 10, 2008, Osmotica announced the availability of its venlafaxine extended-release tablets, six months after Wyeth launched Pristiq.[263]  Osmotica's venlafaxine extended-release tablets launched at a wholesale price of $3.07 per tablet, compared to Effexor XR price of $3.56 that same month.[264]

---

[255]  Osmotica used the 505(b)(2) pathway under the FD&C Act (see WYEFFAT04640809-49 at 09), which is a hybrid drug approval process that allows a sponsor to rely, in part, on existing information about an approved drug to seek approval for a new product.  It blends aspects of the traditional NDA process with elements of the ANDA pathway for generic drugs.  FDA, Letter Approving NDA 22104 (*Venlafaxine Hydrochloride ER Tablets*), May 20, 2008 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2008/022104s000ltr.pdf).

[256]  WYEFFAT3759926-53 at 30 and 32.

[257]  WYEFFAT3759926-53.

[258]  WYEFFAT04649201-62 at 01-11.

[259]  WYEFFAT04640809-49 at 17.

[260]  WYEFFAT04640809-49 at 26-27.  WYEFFAT08278330 at 47-49 at 56.

[261]  WYEFFAT2906934-35; WYEFFAT04081360; WYEFFAT2904665; WYEFFAT06601708-37; WYEFFAT08278330-70.  Osmotica's royalties to Wyeth continued at least through the start of multiple generic entry in mid-2011, and possibly as late as September, 20, 2017 (listed as the expiration date of the royalty income with Osmotica in WYEFFAT04081362.0001, tab "Roy Income," row 29).

[262]  FDA, Letter Approving NDA 22104, *op. cit.*

[263]  C. Myers, "Osmotica Pharmaceutical Corp and Upstate Pharma, LLC, a subsidiary of UCB, Inc., Announce the Availability of Venlafaxine Extended-Release Tablets," *FiercePharma*, October 10, 2008 (https://www.fierce biotech.com/biotech/osmotica-pharmaceutical-corp-and-upstate-pharma-llc-a-subsidiary-of-ucb-inc-announce).

[264]  IQVIA NSP data.  See Figure 13.

### Generic Effexor XR Entry

131.    Teva received final approval for its generic Effexor XR from the FDA on June 28, 2010[265] and announced that sales would begin on July 1, 2010, as agreed upon in the settlement agreement.[266]  Teva did in fact launch in July 2010.[267]  After Teva's entry, sales of Wyeth's Effexor XR product dropped precipitously as shown in Figure 7.  In the first six months of generic entry, prescriptions of brand Effexor XR dropped from approximately 1 million to about 250,000, a 76% decline.  In the first year of generic entry, Effexor XR prescriptions eventually declined by 90% compared to the month prior to Teva's entry.  Teva captured over an 80% share of the total sales volume of venlafaxine ER after one year on the market.

132.    As a result of settlement agreements between Wyeth and other generics, Teva initially sold the only generic version of Effexor XR for 11 months until June 2011, when Apotex, Aurobindo, Dr. Reddy's, Mylan, Torrent, Wockhardt, Zydus, and Greenstone entered. Greenstone sold an AG version of Effexor XR.  Greenstone is the generics branch of Pfizer, which had acquired Wyeth in 2009.  Greenstone's AG version of Effexor XR was sold under the same NDA as the brand Effexor XR product.[268]  By the third year of loss of exclusivity, brand Effexor XR prescriptions declined by 97% compared to the month before generic entry. However, growth in prescriptions for generic venlafaxine ER restored sales of the molecule to above 1.5 million per month by December 2014.  By then, generic venlafaxine ER had captured 98% share of the total sales volume of venlafaxine ER.

---

[265]  FDA, Letter Approving ANDA 076565 (*Venlafaxine Hydrochloride ER Capsules*), June 28, 2010 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2010/076565s000ltr.pdf).

[266]  Teva Press Release, "Teva Announces Approval of Generic Effexor XR," June 29, 2010 (https://ir.tevapharm. com/news-and-events/press-releases/press-release-details/2010/Teva-Announces-Approval-of-Generic-Effexor-XR/default.aspx).

[267]  IQVIA NPA data.  The launch date is considered the first month when prescriptions exceed 100.

[268]  See FDA, "National Drug Code Directory (Effexor)" (https://dps.fda.gov/ndc/searchresult?selection= finished_product&content=PROPRIETARYNAME&type=effexor).  Note that under the NDA for Effexor XR, Viatris is listed as the labeler instead of Greenstone.  Pfizer, the parent company of Greenstone, combined its generic business with Mylan to create Viatris in 2020.  Pfizer Press Release, "Pfizer Completes Transaction to Combine Its Upjohn Business with Mylan," November 16, 2020 (https://www.pfizer.com/news/press-release/press-release-detail/pfizer-completes-transaction-combine-its-upjohn-business).

## V.  OVERVIEW OF DIRECT AND INDIRECT EVIDENCE OF MARKET POWER

133.    Market power "is the power to raise prices above competitive levels without losing so many sales that the price increase is unprofitable."[269]  Evidence that a firm possesses market power in its position as seller of a particular good is assessed by "direct" and "indirect" evidence.[270]  Either form of evidence may be sufficient, as an economic matter, to establish a firm has substantial market power.

134.    In brief, *direct evidence* of market power consists principally of evidence that the firm has reduced output and maintained price above competitive levels, calling for a comparison of the actual price and what the price would be with competition.[271]  A large price fall when competition from multiple sellers begins is strong evidence for market power prior to competition.  High margins between price and marginal cost prior to competition also indicate market power.

135.    Direct evidence takes other forms as well.  The own-price elasticity of demand for venlafaxine ER[272] is direct evidence, as demand inelasticity creates the opportunity for a firm to profitably restrict output and raise price above competitive levels.  A large unexplained reverse payment from Wyeth to Teva in connection with an agreement about a date for generic competition is also direct evidence for market power.  An otherwise unexplained Wyeth-to-Teva reverse payment makes no business sense for Wyeth unless Wyeth was protecting market power.  Indeed, some scholarship and legal decisions regard the presence of an unexplained reverse payment in an agreement about a date as sufficient to establish market power.[273]

---

[269]  Hovenkamp (2016), p. 106.

[270]  American Bar Association (ABA) Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, 2nd ed., Chicago, IL: ABA Publishing, 2018, pp. 159-73.

[271]  *Ibid.*, pp. 166-68.

[272]  As a reminder, unless otherwise indicated, venlafaxine ER refers to the capsule form.

[273]  See *Actavis* Decision, p. 2236 (citing P. Areeda and H. Hovenkamp, *Antitrust Law*, 3rd edition, 2012, p. 338): "…where a reverse payment threatens to work unjustified anticompetitive harm, the patentee likely possesses the power to bring that harm about in practice.  At least the 'size of the payment from a branded drug manufacturer to a

136.    *Indirect evidence* begins with a definition of the relevant antitrust market and a showing that the firm had a large share of that market.  The relevant product market in pharmaceutical matters includes drugs with a positive cross-price elasticity with the drug of interest – that is, drugs to which consumers would switch if the drug's price were increased.[274]  Determining which drugs, if any, have significant positive cross-price elasticity with a drug of interest requires empirical analysis of how prescription quantities of other drugs change when the price of the drug of interest (here Effexor XR) changes.  Cross-price elasticity has a property of symmetry, so the substitutability between a drug of interest and candidate substitutes can also be studied when the price of the candidate substitute drug changes.  For example, if the price of another drug available for treating depression falls greatly when the drug goes generic, if quantity demanded of Effexor XR falls in response, the cross-price elasticity between the drugs is positive and evidence for some substitutability.

137.    Knowing that drugs are potential therapeutic alternatives for the drug is not enough;[275] they must be economic substitutes to constrain the exercise of market power.  Economic substitutability is an empirical property that needs to be assessed with data analysis.

---

prospective generic is itself a strong indicator of power'—namely, the power to charge prices higher than the competitive level" (citations omitted).  Also see Opinion, *In re Cipro Cases I & II*, Supreme Court of California, Case No. S198616, JCCP 4154/4220, May 7, 2015, pp. 1-52 at p. 42 (citing the *Actavis* Decision, p. 2236): "Logically, a patentee would not pay others to stay out of the market unless it had sufficient market power to recoup its payments through supracompetitive pricing.  Consequently, proof of a reverse payment in excess of litigation costs and collateral products and services raises a presumption that the settling patentee has market power sufficient for the settlement to generate significant anticompetitive effects."  Also see Edlin, *et al.* (2015), *op. cit.*, p. 590: "[A]nticompetitive effect and market power can be inferred from the large payment itself, if the payment was larger than the patent holder's anticipated litigation costs" (citations omitted).

[274]  "The market is established by examining both the substitutes that a consumer might employ and 'the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the cross-elasticity of demand.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 469 (1992) (referring to *du Pont,* 351 U.S. at 400, 76 S. Ct. 994).  "The relevant inquiry is … whether products are 'sufficiently substitutable that they could constrain' each other's prices."  M. Morse, "Product Market Definition in the Pharmaceutical Industry," *Antitrust Law Journal,* 71(2), 2003, pp. 633-76 at p. 663, citing *Coca-Cola Bottling Co. of the Southwest*, 118 F.T.C. 452, 541 (1994).

A firm's share of a relevant market might include other drugs in its portfolio that would otherwise be economic substitutes for the drug at issue, such as a line extension.

[275]  "Mere functional substitutability is not enough." ABA (2018), *op. cit.*, p. 161.

---

138.    There are geographical as well as product dimensions to market definition.[276]  The relevant geographic market in pharmaceutical matters "is typically the entire United States"[277] because regulatory requirements for marketing drugs in the U.S. and its territories imply that potential substitutes for a drug would have to come from among the other drugs available in the U.S. and its territories.  For this reason, the geographic market in the current case is also the U.S. and its territories.

139.    In this Report, I assess both direct and indirect evidence of Wyeth market power with respect to the sale of Effexor ER prior to multiple generic entry.  Both forms of evidence point to the same conclusion: I conclude that Wyeth possessed substantial market power and exercised it to profitably restrict output and raise price above the competitive level.  Furthermore, during the period of Teva's exclusivity, when Teva was the only generic on the market, Wyeth and Teva collectively possessed substantial market power.  Wyeth and Teva exercised their substantial market power to profit from their supracompetitive pricing of brand Effexor XR and Teva's generic Effexor XR, with generic profits shared by Wyeth and Teva.

140.    Logic of the Hypothetical Monopolist Test implies the relevant antitrust market is limited to brand and generic Effexor XR sold in the U.S. and its territories.  Wyeth controlled 100% of that market prior to generic entry, and Teva and Wyeth collectively controlled 100% of that market during Teva's exclusivity period.

## VI.    MARKET POWER: DIRECT EVIDENCE

141.    Table 4 summarizes the forms of direct evidence for market power assessed in this section.  It also summarizes my analysis, results and conclusions for each of the forms of direct evidence.

---

[276]  *Ibid.*, p. 159.

[277]  *Ibid.*, p. 160.

TABLE 4
FORMS OF DIRECT EVIDENCE OF WYETH MARKET POWER

| Form of Direct Evidence | Analysis | Results | Conclusion |
|---|---|---|---|
| Price with generic competition (Section VI.A) | Difference in price without and with competition | Price of venlafaxine ER capsules fell substantially with generic Effexor XR competition, in accord with firms' projections and industry experience | *Wyeth had substantial market power* |
| Price-cost margins; markups (Section VI.B) | Assess price in relation to marginal cost | Sustained, high price-cost margins for Effexor XR | *Wyeth had substantial market power* |
| Own-price elasticity of demand (Section VI.C) | Empirical study of change in quantity demanded of venlafaxine ER capsules in response to change in price from generic entry | Low own-price demand elasticity; Wyeth profitably raised price and restricted output | *Wyeth had substantial market power* |
| Payments to delay generic competition (Section VI.D) | Investigation of whether the Wyeth-Teva Agreement contained unexplained reverse payments | Wyeth made large otherwise unexplained reverse payments to Teva | *Wyeth had substantial market power* |

## A.    Price with Competition

142.    The competitive price for Effexor XR is, by definition, the price it sells for in the presence of competition, here, the price when the product was available from multiple suppliers after June 2011.  The price for venlafaxine ER capsules fell substantially with the introduction of generic Effexor XR competition, a fall anticipated by Wyeth and Teva, and consistent with a large body of industry experience.

### Effexor XR Price Fell with Competition

143.    The price of venlafaxine ER capsules fell dramatically after competition from multiple generics began.  As shown in Figure 8, in June 2010, on the eve of the first generic entry,

Effexor XR's average wholesale price was $4.15 per pill.[278]  In the month of Teva's generic launch, the generic's average price was $3.57 per pill – 13.8% below Effexor XR's price pre-generic launch.  The generic price remained above $3.25 per pill while Teva was the only generic supplier.  Additional generics entered in June 2011,[279] driving the price per pill down to $0.95 *in the first month*.  By December 2011, the price had fallen to $0.27 per pill, a 93.5% decline in price relative to brand Effexor XR's price before generics entered.  Price declines accelerate at each level of increased competition: Figure 8b shows the impact on price as the market goes from a single product (Effexor XR) to two products (Effexor XR and Teva's generic) to a competitive market (multiple generic products).  When Teva was the only generic on the market, its generic price averaged 15.5% below Effexor XR's pre-generic price.[280]  In the first year of multiple generic competition, the average generic price further declined to $0.33, a 90.7% decline relative to Teva's average generic price during its exclusivity period, and a 94.5% decline relative to Effexor's XR's pre-generic price.[281]  These dramatic price declines with increased competition are clear evidence that Wyeth possessed and exercised substantial market power before the onset of multiple generic competition.

---

[278]  All prices cited in this paragraph are from the IQVIA/IMS NSP data.  All NSP data used in this Report adjust for the 4-4-5 reporting of the wholesale sales data, wherein the 52 weeks of a year are divided into 13-week quarters where the first two months of each quarter include four weeks of data each and the third month consists of 5 weeks of data. IQVIA (2017), *op. cit.*  Deponents testified that Teva and Wyeth relied on IQVIA/IMS data for market analysis. Deposition of Jennifer Wodarczyk, in this matter, February 26, 2025 (hereafter "Wodarczyk Deposition") at pp. 38:18-39 and 41:15-18. (at Teva "we would use IMS, it is now called IQVIA") ("IQVIA/IMS are the gold standard of where to track how you are doing in the market for both brands and generics. And it is what [Teva] used for forecasting."); Deposition of Suneet Varma, in this matter, March 27, 2025 (hereafter "Varma Deposition") at p. 89:16-20 ("Q. And Wyeth relied on IMS data in its forecast? A. Yes, we used IMS.").

[279]  See Section IV.D and Table 3.

[280]  (1 - 3.50/4.15) = 0.155.

[281]  (1 - 0.33/3.50) = 0.907. (1 - 0.33/4.15) = 0.945.

---

**FIGURE 8**
**DECLINE IN THE PRICE OF VENLAFAXINE ER FOLLOWING GENERIC ENTRY**



In Figure 8a the price trend represents brand Effexor XR's price prior to Teva's generic entry, Teva's generic price during Teva's exclusivity period, and the average generic price following multiple generic entry. In Figure 8b, the brand Effexor XR Only price is the brand price in the month prior to Teva's generic entry, Teva's price is its average price during their exclusivity period, and the multiple generic price is the average generic price over the first year of multiple generic entry. Source: IQVIA NSP Data.

144.    The charts above illustrate the impact of competition on *wholesale prices*, specifically the price that retail and non-retail outlets paid to wholesalers and manufacturers (Wyeth, Teva, and other generic manufacturers) for venlafaxine ER capsules.[282]  Yet the picture of a dramatic decline in price following generic competition persists regardless of which price in the pharmaceutical distribution process is used as the focal price.  For instance, similar price declines are observed at the list price and net price levels.[283]  In the year before the Teva generic entered, Wyeth's net price for Effexor XR was $3.42 per pill.[284]  The net price is the price that Wyeth receives for Effexor XR after netting out their rebates, coupons, and other sales adjustments.[285]  The venlafaxine ER capsule price decline to $0.42 per pill in July 2011, one year after Teva's generic entry, and two months after multiple generic entry, still represents a price fall of 87.8% relative to brand Effexor XR's pre-generic net price.[286]  A price decrease of almost 88% in one year, with further declines thereafter, shows that Wyeth was able to maintain a monopoly price before generic entry due to its substantial market power with respect to Effexor XR.

### *Price Fall with Competition Was Consistent with Wyeth and Teva Forecasts as Well as Industry Experience*

145.    Both Wyeth and Teva anticipated that onset of multisource competition would quickly drive down the drug's price.  With one generic competitor on the market, Wyeth expected the generic to be priced at 70% of the brand's price at the 180-day mark.[287]  With two generic

---

[282]  IQVIA NSP data includes both direct sales (sales from manufacturers to outlets) and indirect sales (sales from manufacturers to wholesalers to outlets).  In other words, these data capture drug wholesalers' purchases of brand Effexor XR directly from Wyeth and of generic Effexor XR directly from Teva.  Nonetheless, the wholesale prices reported by IQVIA may not exactly equal the prices paid by the DPP Class members.

[283]  Teva's generic launched at a list price 13% lower than Effexor XR's WAC. Within six months of multiple generic entry, the average generic venlafaxine ER list price further declined to 87% below brand Effexor XR's pre-generic entry WAC.  ProspectoRx data.  See backup materials.

[284]  Net price is calculated by dividing Effexor XR net sales by total retail quantity of pills for 2009.  WYEFFAT06382990 and IQVIA NPA Data.  See backup materials.

[285]  In 2009, Wyeth's sales adjustments were 17.7% of Effexor's gross sales.  See WYEFFAT06382990.

[286]  For the wholesale transactions price from the IQVIA NSP data, the percentage change is (.95-4.15)/4.15*100= -89.9%.  For the net price, the percentage change is (.95-3.52)/3.52*100= -88.1%.

[287]  WYEFFAT3795941-946 at 941-42; WYEFFAT3609860-10024 at 9901-02.  Wyeth also analyzed its sales with different generic launch scenarios based on patent litigation outcomes.  See WYEFFAT06426692.

---

competitors on the market, Wyeth expected even greater price declines, with generics priced at 50% of the brand price at the 180-day mark.[288] ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ ██████████████████████████████████████

██████████ ██ ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████ ██ Mylan also forecast that upon multiple generic entry, the venlafaxine ER capsule price would decrease to just 2% of the brand's price.[292]

146.    A large body of economic research, reviewed in Section III.B above, establishes that drug prices fall after generic versions enter.  For example, the IMS Institute, in research mentioned previously, found for generic drugs that came on the market in 2011-2013 (as did Teva's version of Effexor XR), the average generic wholesale price was 79% below the brand's pre-entry price 12 months after the first generic entered and fell further to 90% within two and a half years.[293] Prices decline more quickly and steeply for top-selling drugs (like Effexor XR).[294]  Extensive other literature cited above finds similar price declines.[295]  Effexor XR's price history indicates

---

[288]  WYEFFAT3795941-946 at 941-42; WYEFFAT3609860-10024 at 9901-02.

[289]  TEVA_EFFEX_0440657, tabs "150mg," "37.5mg," and "75mg."  See also TEVA_EFFEX_0863427.  This later 2006 forecast projected three launch date scenarios with expectations that its price of generic venlafaxine ER would be 55% of the brand's price before generic launch at the month of generic entry; and 5% of the brand's price before generic launch by the sixth month of generic entry.

[290]  TEVA_EFFEX_0440657, tabs "150mg," "37.5mg," and "75mg."  See also TEVA_EFFEX_0863427.  This forecast projected its price would be 5% of the brand's price before generic launch at the sixth month of generic entry.

[291]  TEVA_EFFEX_0713424, tabs "150mg," "37.5mg," and "75mg."

[292]  MYL-VENLA-0000002, tab "VenlafaxineER."

[293]  Drugs had to have had at least 12 months of generic sales history to be included in the analysis.  IMS Institute, op. cit., p. 4.

[294]  Saha, et al., op. cit., pp. 29-30; Frank, McGuire, and Nason, op. cit., Table 1 and Figure 2.

[295]  See ¶¶ 47-53 above.

that Wyeth possessed substantial market power with respect to Effexor XR before loss of exclusivity.

## B.    Gross Margins

147.    Standard economic analysis establishes that in a competitive market with no barriers to entry, competition forces price to the representative firm's long-run average total cost, which is also equal to long-run marginal cost.[296]  The economics literature points out that some margin between price and cost may exist in reasonably competitive markets.[297]  One reason for this is that over the long run, more costs are variable, and long-run marginal cost exceeds short-run marginal cost.  Nonetheless, sustained and unusually high margins remain inconsistent with competitive market conditions with highly substitutable goods.

148.    The markup of price over marginal cost is the gross profit margin, or simply, gross margin, which, expressed in percentage terms, is the net revenue from sales of a good minus the cost of producing the good, divided by net revenue.  When marginal cost is roughly constant over the observed range of output, the gross margin is the percent of the product's price that represents a markup over marginal cost.[298]  The price-cost margin is sometimes expressed as the

---

[296]  In the familiar economic model of a competitive firm setting price equal to long-run marginal cost, the upward-sloping marginal cost curve intersects the U-shaped average cost curve at its minimum point (this is always true), and competitive price equals both marginal cost and the minimum of the average cost curve.  W. Nicholson and C. Synder, *Microeconomic Theory: Basic Principles and Extensions*, 12th ed., Cengage Learning, 2017, pp. 418-24.

[297]  R. Hall, "The Relation Between Price and Marginal Cost in U.S. Industry," *Journal of Political Economy*, 96(5), 1988, pp. 921-47; W. Baumol and D. Swanson, "The New Economy and Ubiquitous *Competitive* Price Discrimination: Identifying Defensible Criteria of Market Power," *Antitrust Law Journal*, 70(3), 2003, pp. 661-85. As stated by Landes and Posner: "Under perfect competition, price equals marginal cost, so if a firm's price is above its marginal cost, the implication is that the firm does not face perfect competition, *i.e.*, that it has at least some market power.  But the fact of market power must be distinguished from the amount of market power.  When the deviation of price from marginal cost is trivial, or simply reflects certain fixed costs, there is no occasion for antitrust concern, even though the firm has market power in [the technical] sense of the term."  W. Landes and R. Posner, "Market Power in Antitrust Cases," *Harvard Law Review,* 94(5), 1981, pp. 937-96 at p. 939.

[298]  If the quantity of goods sold is q, net revenues from sales are pq, and the cost of goods sold is cq, the gross margin is $\frac{(pq-cq)}{pq} = \frac{p-c}{p}$.  The gross margin and Lerner Index are the same when c reflects marginal cost.

Lerner Index of market power, defined as $\frac{p-c}{p}$.[299]  The Lerner Index ranges between 0 and 1, with lower values implying lower markups and little market power, and higher values implying relatively high markups and more market power.  For example, if a firm set its price at twice marginal cost, the Lerner Index would be 0.5 ($= \frac{2c-c}{2c}$).

149.    In markets in which supply can be expanded, by either increased capacity of incumbent producers or the entry of new ones, competition forces price toward marginal cost.[300]  Writing about drug markets, Berndt explains that in "a competitive market with free entry, one expects that entry will take place until price falls to marginal cost."[301]  In Scott Morton and Kyle's words, "Low marginal costs and price competition result in very low prices ...."[302]  Very high gross margins imply price is far above the price with competition.

150.    Information on gross margins for Effexor XR is available from Wyeth's profit-and-loss statements for Effexor XR.[303]  Effexor XR net sales equal total sales revenues minus rebates, coupons, chargebacks, other price discounts, and returns; the cost of sales equals costs of labor, materials, and other inputs into the production of Effexor XR, as well as overhead costs directly attributable to its production.  As shown in Table 5, gross margins for Effexor XR were consistently above 94% between 1998 and 2009; in the last full year before the first generic entered, Wyeth's margin on Effexor XR was 98.8%.  Wyeth's gross margins around 98% between 2005 and 2009 corresponds to a very high value (.98) of the Lerner Index of market power – almost at the top of its range.  During the first six months of Teva's exclusivity period,

---

[299]  D. Carlton and J. Perloff, *Modern Industrial Organization,* 4th ed., Pearson/Addison-Wesley, 2005, pp. 92-93; A. Lerner, "The Concept of Monopoly and the Measurement of Monopoly Power," *Review of Economic Studies*, 1(3), 1934, pp. 157-75 at p. 169.

[300]  As stated in a well-known industrial organization textbook, "A firm … has market power if it is profitably able to charge a price above that which would prevail under competition, which is usually taken to be marginal cost." Carlton and Perloff, *op. cit.*, p. 642.

[301]  E. Berndt, "Pharmaceuticals in U.S. Health Care: Determinants of Quantity and Price," *Journal of Economic Perspectives*, 16(4), 2002, pp. 45-66 at p. 63.

[302]  Scott Morton and Kyle, *op. cit.*, p. 794.

[303]  Varma Deposition, p. 49:17-19 (Wyeth "used P&L's to track the performance of the business and to measure the results."). See *e.g.*, WYEFFAT3839698, tab "Effexor XR"; Varma Ex. 4 (February 14, 2007 email attaching Wyeth Effexor XR P&L for 2005 and 2006).

Teva's gross margins on venlafaxine ER capsules were 98.0%, corresponding to an identical value of the Lerner Index.[304] In comparison, one study estimated the gross margin of large U.S. pharmaceutical companies overall at 68.6% – well below Wyeth's gross margins on Effexor XR.[305] For all large U.S. non-financial firms, the average gross margin was 33.4%.[306] Thus, even recognizing that some margin of price over marginal cost is common among brand drug manufacturers, Wyeth's margins on Effexor XR are uncommonly high, indicating the presence of substantial market power.[307]

---

[304] Teva's 2010 gross margin on venlafaxine ER capsules is calculated as (venlafaxine ER capsules annual gross profits) / (venlafaxine ER capsules annual net sales). Since Teva's generic entered in July 2010, Teva's annual gross margin for 2010 captures its gross profits over the first six months of Teva's exclusivity period: July through December 2010. See TEVA_EFFEX_0328507.

[305] Data for large publicly traded companies is presented in A. Damodaran, "Show Me the Money: January 2018 Data Update 7," p. 8 (http://stern.nyu.edu/~adamodar/pdfiles/blog/dataupdate7for2018.pdf). See "Variables used in Datasets," (http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/variable.htm) for explanation of how the estimates were compiled and "Margins by Sector (US)," (http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html) for additional detail.

[306] *Ibid.*

[307] Wyeth's expert in the patent litigation with Teva testified to the commercial success of Effexor ER. WYEFFAT2492933-3094 at 2936 (Expert Report of Dr. Henry G. Grabowski (hereafter "Grabowski Report")). "The fact that the trend for Effexor® XR steadily continues to increase, despite its premium price and the introduction of low-cost generics and additional branded competitors, is a further indicator of Effexor® XR's commercial success." Grabowski Report, at 2954.

---

**TABLE 5[308]**
**WYETH'S GROSS MARGINS FOR EFFEXOR XR**

| | |
|---|---|
| 1998 | 94.1% |
| 1999 | 94.6% |
| 2000 | 95.5% |
| 2001 | 94.8% |
| 2002 | 95.7% |
| 2003 | 96.1% |
| 2004 | 96.9% |
| 2005 | 97.5% |
| 2006 | 97.5% |
| 2007 | 98.0% |
| 2008 | 98.1% |
| 2009 | 98.8% |

151.    For further reference, I compare Wyeth's gross margins on Effexor XR to the average of large generic drug manufacturers in the years around Wyeth's final years of sales as a monopolist for Effexor XR.[309]  To calculate gross margins for generic drug companies, I utilize publicly available financial information submitted to the SEC by publicly traded generic companies.[310]  Overall gross margins for these companies are calculated as total net revenues from all drug sales, minus the total cost of goods sold, divided by total net revenue.  The overall gross margins for these generic companies are a conservative benchmark comparison, as company-wide gross margins include all products in the portfolio in various stages of the product life cycle.  Generic drug companies' product portfolios include newly launched products with exclusivities not sold under competitive conditions.  For generic companies, the newly launched

---

[308]  See Attachment C for sources and details.

[309]  Note that a few of the companies in Table 6 have specific business units dedicated to generic drug manufacturing separate from the whole business portfolio.  See Attachment C for sources and details.

[310]  See Attachment C for sources and details.

drugs make up most of their profits.[311]  For instance, as mentioned above, during Teva's regulatory exclusivity period, Teva enjoyed gross margins of 98% on sales of its venlafaxine ER– a margin almost double Teva's company-wide average gross margin reported below (Table 6).  The high gross margins that generic manufacturers earn on generic products during regulatory exclusivity periods inflates their company-wide gross margins, making those margins a highly conservative benchmark for what gross margins would be under competitive conditions. Nonetheless, as shown in Table 6, generic manufacturers' gross margins averaged between 45% and 54% between 2005 and 2009, far below the gross margins Wyeth earned on Effexor XR over the same period, and the gross margins Teva earned on its generic venlafaxine XR during its regulatory exclusivity period.

---

[311]  Public Comment from the Generic Pharmaceutical Association (GPhA) to the FTC, Re: Authorized Generic Drug Study: FTC Project No. P062105, June 27, 2006, p. 2. GPhA changed its name to the Association for Accessible Medicines in 2017. B. Berk, "GPhA Changes Name to the Association for Accessible Medicines," *Drug Store News*, February 14, 2017 (https://drugstorenews.com/pharmacy/gpha-changes-name-association-accessible-medicines).  As explained in Teva's annual financial report for 2011, "Due to the emergence and development of competing products over time, our overall profitability depends on … our ability to introduce new products in a timely manner …. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies … receive approvals and enter the market for a given product and competition intensifies … [P]articularly if we are the only company authorized to sell during the 180-day period of exclusivity in the U.S. market, … our sales, profits and profitability can be substantially increased." Teva Pharmaceutical Industries, Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended December 31, 2011," February 17, 2012, pp. 5, 6, and 8 (https://www.sec.gov/Archives/edgar/data/818686/000119312512067417/d300203d20f.htm).

**TABLE 6**[312]
**GROSS MARGINS OF GENERIC DRUG COMPANIES, 2005-2009**

| Year | Mylan | Teva | Sandoz | Impax | Wyeth Gross Margins for Effexor XR |
|------|-------|------|--------|-------|-----------------------------------|
| 2005 | 50% | 47% | 41% | 48% | 98% |
| 2006 | 52% | 51% | 44% | 48% | 98% |
| 2007 | 40% | 52% | 45% | 63% | 98% |
| 2008 | 40% | 54% | 48% | 59% | 98% |
| 2009 | 41% | 53% | 46% | 54% | 99% |
| Average | 45% | 51% | 45% | 54% | 98% |

152.    The economic difference between the markup implied by a 98% gross margin (Effexor XR) and a 50% gross margin (the approximate average of the four generic companies shown in Table 6) is much larger than it may first appear.  If marginal cost is $1, for example, the price associated with the average gross margin of 50% for generic companies is $2.00.  At the same $1 marginal cost, the price associated with the 98% gross margin for Effexor XR is $50.00, 50 times marginal cost.[313]  Figure 9 depicts the important-to-recognize exponential relationship between gross margin and the monopoly markup.

---

[312] See Attachment C for sources and details.

[313] The expression for the gross margin $gm = \frac{p-c}{p}$ can be rearranged to show price as a multiple of marginal cost, $p = \frac{c}{1-gm}$.  For a gross margin of .50 and marginal cost of $1, price is $p = \frac{\$1}{1-.50} = \$2.00$.  For a gross margin of 0.98 and marginal cost of $1, price is $p = \frac{\$1}{1-.98} = \$50.00$.

**FIGURE 9**
**RELATIONSHIP BETWEEN GROSS MARGIN AND PRICE-COST MARKUP**



## Barriers to Entry

153.    Stigler defines a barrier to entry "as a cost of producing (at some or every rate of output) which must be borne by a firm which seeks to enter an industry but is not borne by firms already

in the industry."[314]  Barriers to entry support high margins and contribute to market power.[315]  If there are no barriers to entry into the production and sale of a good, a producer's ability to charge high prices and earn high profits is transitory.  High prices and profits encourage entry, leading to competition and lower prices.  However, if there are legal, technical, or other types of barriers that raise costs or prohibit entry of other firms, high prices and profits could be sustained and a seller could exercise market power for an extended period of time.  Patent protection from valid, non-infringed patents is a classic barrier to entry.  In the quote earlier from Mankiw's textbook, "When a [pharmaceutical] firm discovers a new drug, patent laws give the firm a monopoly on the sale of the drug."[316]

154.    Legal and regulatory barriers to entry created the basis for Wyeth's substantial market power with respect to Effexor XR.  Patents and FDA regulatory exclusivity gave Wyeth a time-limited period of protection from competition during which generic drugmakers could not enter and compete for sales on the basis of price, allowing Wyeth to continue to charge prices and earn profits above a competitive level for a sustained period.  As I explained earlier, it is the purpose of the patent system to convey monopoly power in order to encourage investments in new products.[317]  It is worth noting that there may be nothing problematic about the possession of market power in and of itself.  Plaintiffs' complaint is essentially that the challenged terms in the Wyeth-Teva Agreement illegally *extended* the time period over which patent-related barriers apply, shielding monopoly profits for a longer time with Wyeth and Teva dividing the profit gains.

---

[314]  G. Stigler, *The Organization of Industry*, Richard D. Irwin, Inc, 1968, p. 67.  Similarly, Baumol and Willig define an entry barrier as "anything that requires an expenditure by a new entrant into an industry, but that imposes no equivalent cost upon an incumbent." W. Baumol and R. Willig, "Fixed Cost, Sunk Costs, Entry Barriers, and Sustainability of Monopoly," *Quarterly Journal of Economics*, 96(3), 1981, pp. 405-31 at p. 408.  See also, R. McAfee, H. Mialon, and M. Williams, "When Are Sunk Costs Barriers to Entry?  Entry Barriers in Economic and Antitrust Analysis," *American Economic Association Papers and Proceedings*, 94(2), 2004, pp. 461-65 at p. 463, where an economic barrier to entry is defined as "a cost that must be incurred by a new entrant and that incumbent do not or have not had to bear."

[315]  Landes and Posner, *op. cit.*, p. 937.

[316]  Mankiw (2004), *op. cit.*, pp. 324-35.

[317]  See Section III.B above.

---

155.    Barriers to entry can contribute to market power for generic sellers as well.  During the 180-day regulatory exclusivity period, barriers to entry of ANDA-based generics without first-to-file status are absolute.  The FDA will not approve another ANDA-based seller during an active 180-day regulatory exclusivity period.[318]  The "other" part of the generic market (the NDA-based AG) is controlled by a single firm.  There are thus only two sellers during the 180-day regulatory exclusivity period protected by absolute barriers to entry.  Teva, as the sole first filer for Effexor, enjoyed market power conveyed by regulatory barriers to entry during its first six months of sales of generic Effexor XR.

156.    Again, the possession of market power by itself may not be problematic.  In fact, it is the intention of regulation to confer market power on a first-filer generic to incentivize challenge of brand patents that should not stop competition.  However, extension of market power beyond the legal regulatory period may be anticompetitive.

## C.    Own-Price Elasticity of Demand

157.    A firm with substantial market power faces an inelastic demand curve, meaning that losses in quantity sold in response to a price increase (from around the competitive level) are relatively small.  By contrast, firms in a competitive market face a nearly horizontal demand curve because buyers can turn to close substitute products, a demand said to be highly price-elastic.  Own-price elasticities of demand are negative, reflecting the fact that the quantity sold moves in the opposite direction of a price change.  In profit maximization, a firm sets the price of the good inversely related to the elasticity of demand – the less elastic is demand, the higher is the price and the margin over cost.[319]

158.    Let q and p be quantity and price, respectively, and let subscript (e) indicate Effexor XR.

---

[318]  In addition to patent protection barriers, generics face additional barriers to entering. Obtaining regulatory approval to launch a generic and manufacturing launch quantities is difficult and time consuming.  See R. Gupta, N. Shah, and J. Ross, "Generic Drugs in the United States: Policies to Address Pricing and Competition," *Clinical Pharmacology and Therapeutics*, 105(2) 2019, pp. 329-37 ("The time and cost of FDA approval of generic drug applications can be an additional barrier to generic entry into drug markets.").

[319]  Carlton and Perloff, *op. cit.,* p. 92.

$\Delta$q and $\Delta$p refer to changes in quantity and price along a demand curve, respectively. The own-price elasticity of demand for Effexor XR is defined as:

$$\varepsilon_{ee} = \frac{\Delta q_e / q_e}{\Delta p_e / p_e}$$

I estimate the magnitude of the own-price elasticity of demand for Effexor XR in this section.

159.    As is well-known, a profit-maximizing firm prices on the elastic portion of the demand curve.[320] This simply means that a firm with market power will continue to raise price until the negative effect of the loss of customers on profits offsets the positive effect on profits of a higher price per unit sale.[321]

### Empirical Methodology

160.    My empirical strategy for estimating the own-price elasticity of demand for venlafaxine ER makes use of the large decline in its price after multiple generics entered in July 2011. As was shown in Figure 8 above, the decline in the price of venlafaxine ER after generics entered was substantial. Whereas the brand version of the drug sold at a price of $4.15 per pill in June 2010, one year after Teva entered the price of generic venlafaxine ER had fallen to $0.42 and fell further to $0.23 by July 2012.[322] In the presence of a downward-sloping demand, a decline in price increases quantity demanded of Effexor XR. Finding a downward-sloping demand is evidence that quantity would have been higher at a competitive price and a seller with market power restricted output prior to the price reduction.

---

[320] Hovenkamp (2016), *op. cit.*, p. 139. The discussion in this paragraph relates to the so-called "cellophane fallacy" where a court improperly concluded that a manufacturer of cellophane did not have market power based on evidence that there were economic substitutes for cellophane at the (high) monopoly price. This is also discussed in Carlton and Perloff, *op. cit.*, pp. 646-47. It is important to note that own-price elasticity of demand is a local property of demand, *i.e.*, elasticity can change along a demand curve. With a linear demand curve for example, demand is inelastic at low prices and elastic at high prices. For drugs this means that around the competitive price, demand may be inelastic, allowing the monopolist to profitably raise price considerably, but at higher prices, at some point, further price increases would not be profitable.

[321] As Hovenkamp (2016), *op. cit.*, p. 139, points out, a high elasticity at the profit-maximizing price is only an indication that the monopolist can profitably raise the price no further.

[322] IQVIA NSP data.

161.    The entry of generic Effexor XR represents a "natural experiment" to study how changes in price affect quantity demanded.  A natural experiment refers to a situation in which an explanatory variable of interest (here price) changes for reasons unrelated to other factors affecting demand.  This facilitates estimation of the causal effects of price on quantity demanded.[323]

162.    The effect of the price change is measured by examining how the trend in venlafaxine ER capsule quantity was affected by generic entry.  Effexor XR's quantity of sales was declining after Wyeth launched its line extension Pristiq in April 2008; the natural-experiment approach assumes this trend would have continued in the absence of the favorable price shock from generic entry.[324]  The price decline for venlafaxine ER capsule following generic entry is expected to decelerate or perhaps even reverse the downward trend in sales of the molecule/formulation, with the degree of deceleration indicating the responsiveness of demand for the drug to the changes in its price.[325]

163.    To estimate the change in the quantity trend caused by the price decline, I use IQVIA National Prescription Audit (NPA) data on monthly extended units (EUs) of venlafaxine ER (brand and generic) sold at the retail level.[326]  EUs refer to the units in which the drug is

---

[323] See B. Meyer, "Natural and Quasi-Experiments in Economics," *Journal of Business and Economic Statistics*, 13(2), 1995, pp. 151-61 and J. Angrist and A. Krueger, "Instrumental Variables and the Search for Identification: From Supply and Demand to Natural Experiments," *Journal of Economic Perspectives*, 15(4), 2001, pp. 69-85.

[324] Note that two products that are controlled by the same firm are not economic competitors.  A rational profit-maximizing firm makes pricing and strategy decisions to maximize profits for their *portfolio as a whole*.  Adding a related product (*e.g.*, Pristiq) to a portfolio of products increases a firm's market power, it does not decrease market power.

[325] This approach is preferred to simply estimating the effect of the price fall on the levels of quantity sold, which would neglect the presence of pre-existing trends.  See, for example, S. Li and A. Dor, "How Do Hospitals Respond to Market Entry?  Evidence from a Deregulated Market for Cardiac Revascularization," *Health Economics*, 24(8), 2015, pp. 990-1008 and A. Markovitz, *et al.*, "Effects of Guideline and Formulary Changes on Statin Prescribing in the Veterans Affairs," *Health Services Research*, 52(6, Part I), 2017, pp. 1996-2017.  Furthermore, an estimation based on levels would understate demand elasticity for a drug with declining sales, making the approach here conservative in the sense of leading to a higher estimated own-price elasticity of demand.

[326] The IQVIA/IMS data have been used extensively in economic research on prescription drugs; for example, see Berndt, *et al.* (1995), *op. cit.*; Rizzo, *op. cit.*; and Grabowski, *et al.* (2016), *op. cit.*  I use NPA (retail) rather than NSP (wholesale) data on quantities, because sales to wholesalers may spike after generic entry as establishments accumulate inventories, whereas retail sales rise with the drug's prescribing.

---

dispensed, which, for antidepressants, is largely tablets and capsules (for brand and generic Effexor XR, the EU is a capsule). I estimate a regression model that explains monthly EUs of venlafaxine ER as a function of a linear time trend, which is allowed to change when the generic enters in July 2010. The coefficients on the time trends are estimated using a linear spline, which connects the end of the trend in the pre-entry period to the beginning of the trend in the post-entry period.[327] I estimate the model using data from the 18 months before through the 18 months after the generic enters. The use of a relatively short "estimation window" parallels the "event-study" methodology, which uses a relatively short span of data before an event of interest to characterize the dependent variable's dynamics prior to that time, and a relatively short span after, to capture the causal effect of the event without confounding influences.[328] This method is appropriate when the variable's dynamics in the "pre" period are well-explained by the model, and there are no other factors that change discontinuously at the same time as the event of interest. One "other factor" that may change around the time of generic entry is a decline in the brand drug's promotion. In fact, Wyeth ceased promotion of Effexor XR when it introduced Pristiq, in its attempt to shift demand to the additional line extension.[329] Thus, Wyeth promotion of Effexor XR had ceased six months before the start of the 18-month "pre" period in my econometric analysis, and so does not interfere with interpretation of any shift in growth of sales at the time of generic Effexor XR entry as a price effect. Details of my empirical methodology are found in Attachment C.

### Empirical Estimate of the Own-Price Elasticity of Demand

164.    The rate of decline in venlafaxine ER capsule sales decelerated as a result of the price decline, indicating that it increased quantity demanded as is consistent with basic economic

---

[327] The regression model is explained in detail in Attachment C.

[328] A.C. MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), 1997, pp. 13-39.

[329] *E.g.*, WYEFFAT2998944-9003 at 8956-57, 8962 and 8974; WYEFFAT2513602-613 at 607; WYEFFAT2514133-147 at 134-35; WYEFFAT06449495.00001-.00014 at .00010; and WYEFFAT2513272, tab "5yr Plan Mkt."

demand theory.[330]  Because the price shock alters the trend, the estimated absolute magnitude of the effect of the price shock on the quantity of monthly sales grows over time within the time period of study.  Empirical results for the change in quantity after 12 months are shown in Figure 10.  Based on the regression results reported in Attachment C, the predicted level of monthly EUs of venlafaxine ER capsules in July 2011 would have been 41,351,676 EUs at the pre-entry price of $4.15, and the price decline of $3.73 increased monthly sales by 11,446,641 EUs by the 12th month after the generic entered, relative to what sales would have been without the price drop.  Information on the initial price/quantity pair can be combined with the information on the changes in price and quantity to derive a second price/quantity pair of $0.42 (=$4.15-3.73) per EU, and EUs of 52,798,317(=41,351,676+11,446,641).  These two data points trace out the downward-sloping demand curve, as shown in Figure 10.[331]  The graphical representation confirms visually that demand is relatively inelastic, *i.e.*, quantity demanded changes relatively little in response to the large change in price.

---

[330]  N. Mankiw, *Principles of Economics*, 7th ed., Stamford, CT: Cengage Learning, 2015, pp. 67-68.  The difference in the slopes after July 2010 is statistically significant.  See Attachment C.

[331]  This graphical representation of the demand curve assumes that its slope is constant over the relevant range.  Because I only use the endpoints for calculating the price elasticity, nonlinearity in demand would not affect the estimated price elasticity.

**FIGURE 10**
**ESTIMATED DEMAND FOR VENLAFAXINE ER AND IMPLIED 12-MONTH ELASTICITY**
**BASED ON REGRESSION RESULTS[332]**



165.    To translate this regression estimate into the own-price elasticity of demand, I calculate percent changes using the "arc" or midpoint method, which is standard for estimating price elasticities.[333]   Demand is inelastic: the own-price elasticity was -0.149 in the 12th month after the generic entered.  An estimate of -0.149 means that if price goes up by 10%, quantity

---

[332]  Note that the percentage changes are computed using the midpoint formula, consistent with standard calculations of elasticities.  See the next footnote.

[333]  It is commonly used when computing elasticities.  Mankiw (2015), *op. cit.*, p. 92.  The midpoint formula computes the percentage change in a variable as the difference between its value at the end of the period and its value at the beginning, divided by the midpoint between these two values (which is also their average).

demanded falls by 1.49%.[334]  Wyeth business documents are consistent with demand for Effexor XR being relatively insensitive to price.[335]

## D.    Wyeth-to-Teva Unexplained Reverse Payments Imply Wyeth is Defending Market Power

166.    The Wyeth-Teva Agreement signed on November 2, 2005 included large unexplained reverse payments from Wyeth to Teva, conservatively estimated to be $412.8 million (see Section VIII.A below).  The reverse payments took three forms:  no-AG clauses in the Teva Effexor XR license, the exclusive license Wyeth granted to Teva to sell a different product, Effexor IR, prior to expiry of a compound patent protecting the IR product, and the license Wyeth granted to a Teva subsidiary to sell Effexor XR in Canada earlier than it otherwise could have.  When brand-to-generic reverse payments exceed the expected future litigation costs of the brand (as they do in this case), and in the absence of any other explanation for the payments, for the brand to have rationally signed the agreement, the payments are likely delaying generic competition and anticompetitive.

167.    The presence of large unexplained payments from the brand to the generic has a closely related implication.  A rational brand company would not make a payment unless the delay in competition was protecting monopoly profits.  In one of the fundamental papers interpreting the implications of brand-to-generic reverse payments, Elhauge and Krueger write:

---

[334] Taking rebates and other retail price discounts offered by brand drug manufacturers, but not generic drug makers, hardly changes this picture.  As discussed above, discovery materials show that in 2009, the sales adjustments of Effexor XR were 17.7%.  See ¶ 144 above and WYEFFAT06382990.  Applying this discount to the $4.15 pre-generic entry wholesale brand price, the pre-generic entry net retail price would have been $3.41=((1-.177)*4.15).  Dividing the estimated change in quantity by this smaller price decrease yields an elasticity estimate of -0.156.  See Attachment C.

[335] Wyeth took annual and semi-annual price increases on Effexor XR nearly without fail from 2001 to 2009.  See *e.g.*, WYEFFAT4038391-95 at 92-93; WYEFFAT04824982-85 at 82; WYEFFAT2933536-38 at 36.  Price increases (rather than, *e.g.*, increased prescribing share or overall market growth) drove increases in net sales revenue.  WYEFFAT3915248-398 at 276; WYEFFAT3914681-736 at 683; WYEFFAT3701739-816 at 781; WYEFFAT2767970-8015 at 7976.  Wyeth business documents note that price increases had no evident negative effect on Effexor XR's prescription share.  WYEFFAT3914398-419; WYEFFAT4035345-52 at 47.  See also Varma Deposition, pp. 46:12-47:22 (Wyeth only imposed price increases for Effexor XR and the launch of other antidepressants did not cause Wyeth to reduce the price of Effexor XR).

"…. If the reverse payment amount exceeds the patent holder's anticipated litigation costs, then the patent holder must have believed it had market power that the settling entrant would uniquely constrain."[336]

168.    Hovenkamp makes the same point:

"[A] large payment to another to stay out of a market is more typical of collusion, and the payment either reflects or is intended to create power. Following this logic, the Supreme Court held in *Actavis* that market power could be inferred from a pharmaceutical manufacturer's large payment to a generic rival to stay out of its market."[337]

169.    The economics of the connection between the payment and market power is expressed forcefully in the *Aggrenox* decision: In ruling that the relevant market in the *Aggrenox* pay-for-delay case was the brand drug and its AB-rated generic, the District Court held that, "It is vanishingly unlikely … that a large reverse payment would be made [if a patented drug "faced such fierce competition from therapeutically similar drugs that it could not be sold at supracompetitive prices"], which is why a large reverse payment is such a strong indicator of market power."[338]

170.    The presence of large unexplained reverse payments in the Wyeth-Teva Agreement setting the date of generic competition for Effexor XR is evidence that Wyeth had substantial market power and was protecting it with the reverse payments in the Agreement.

## E.    Summary of Direct Evidence

171.    All forms of direct evidence assessed point to the same conclusion: Wyeth had substantial market power with respect to Effexor XR before generic entry. Based on vast industry experience, Wyeth and prospective generic entrants expected a dramatic decline in the price of generic venlafaxine ER with the onset of multisource competition, and the drug's price indeed plummeted at that time. Wyeth's gross margins on Effexor XR average 98% between

---

[336]  Elhauge and Krueger, *op. cit.*

[337]  Hovenkamp (2016), *op. cit.*, p. 184.

[338]  Memorandum of Decision and Order, *In re Aggrenox Antitrust Litigation*, 3:14-md-02516 (SRU) (D. Conn.), p. 5.

2005 and 2009, implying a Lerner Index almost at the top of the range, indicating that Wyeth exercised substantial market power prior to generic entry.[339]  The own-price elasticity of demand for venlafaxine ER was low, consistent with the profitability of a high markup of price over marginal cost.  Finally, the presence of large unexplained reverse payments in the Wyeth-Teva Agreement indicates that Wyeth had substantial market power with respect to Effexor XR and was acting to protect it.  I conclude that for purposes of assessing the impact of the alleged anticompetitive Agreement, Wyeth had substantial market power with respect to Effexor XR prior to generic launch.  Prices for venlafaxine ER were higher and output levels were lower than they would have been, had multiple generics been able to enter earlier than they did.

## VII.    MARKET POWER: INDIRECT EVIDENCE

### A.    Cross-Price Elasticity of Demand and Economic Substitutability

172.    The indirect approach to examining market power first identifies the relevant antitrust market for the product of interest and then assesses the firm's share of that market.  A large market share implies the firm possesses market power.  The relevant market for the product consists of goods that are sufficiently close economic substitutes for it that they would draw sales from the products if their prices were increased.[340]

173.    Cross-price elasticity of demand measures how demand for one product is affected by changes in the price of another and plays an important role in market definition.[341]  If demand for a product increases when the price of another product increases, the cross-price elasticity of demand is positive, and the goods are substitutes.[342]  If demand for a product decreases when the

---

[339]  See Section VI.B.

[340]  "'Definition of relevant market' is an effort to [identify] products that are sufficiently close substitutes to take business away from [a firm] that attempts to exercise market power."  R. Pitofsky, "New Definitions of Relevant Market and the Assault on Antitrust," *Columbia Law Review*, 90(7), 1990, pp. 1805-64 at p. 1806.

[341]  ABA, Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, 1ˢᵗ ed., Chicago: ABA Publishing, 2009, pp. 166-67.

[342]  The cross-price elasticity is a *ceteris paribus* property, *i.e.*, holding other factors constant.

price of the other increases, the cross-price elasticity is negative, and the goods are complements. If demand for a product is unaffected by an increase in the price of another, the cross-price elasticity is zero, and the goods are independent, or unrelated in demand. Only products with a positive and significant cross-price elasticity (*i.e.*, are substitutes) may belong in a product's antitrust market, as only they have potential to take sales away from it in response to a price increase.

174. Mathematically, the cross-price elasticity between Effexor XR and a candidate substitute product is:

$$\varepsilon_{se} = \frac{\Delta q_s / q_s}{\Delta p_e / p_e}$$

where q and p refer to quantities and prices, respectively, $\Delta q$ and $\Delta p$ refer to changes in quantities and prices, respectively, and the subscripts refer to Effexor XR (e) and some candidate substitute product (s). As a ratio of percentages, cross-price elasticity is a unit-free number, allowing comparison of the magnitude of cross-price elasticity between different pairs of products; for example, the cross-price elasticity of demand for Effexor XR and a drug with a high volume of prescriptions like fluoxetine (Prozac) or sertraline (Zoloft) can be directly compared to the cross-price elasticity between Effexor XR and a drug with lower prescription volume like duloxetine (Cymbalta) or mirtazapine (Remeron).

175. A positive and significant cross-price elasticity alone is not sufficient to put one product in another's relevant market; "the *magnitude* of the economic force of buyer substitution"[343] also matters.[344] A positive but very small cross-price elasticity may qualify the goods as "substitutes"

---

[343] B. Baker, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, 74(1), 2007, pp. 129-173 at p. 138 (emphasis added).

[344] "Where an incumbent product faces close economic substitutes, those substitutes will create competitive pressure on prices or other forms of competitive activity. Those substitutes that create such pressure belong in the relevant product market. If other products do not exert sufficient competitive pressure on a rival, those products do not belong in the relevant market." ABA (2018), *op. cit.*, pp. 160-61. See also Werden: "proportionate increases in quantities of substitutes demanded, as indicated by cross elasticities of demand, are [not] an appropriate measure of relative closeness. A substitute consumed in small quantity could experience a huge proportionate increase in its quantity demanded, even though that increase accounts for only a tiny portion of the total switching away from the

according to the economic definition, but may indicate little or no practical limitation on pricing and exercise of market power.  As stated in the 1953 Supreme Court ruling that first articulated the role of cross-price elasticity in market definition,

> "For every product, substitutes exist.  But a relevant market cannot meaningfully encompass that infinite range.  The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-price elasticities of demand' are small."[345]

176.    Cross-price elasticity can be measured from either direction; *i.e.*, the effect of a price change of another product on demand for Effexor XR, or the effect of a change in the price of Effexor XR on demand for another product.[346]  Both forms of cross-elasticity are informative with respect to the relevant market, as they both measure the same underlying properties of consumer preferences bearing on substitutability.[347]  I measure cross-price elasticity in both directions below, and find consistent results.

177.    The magnitude of the own-price elasticity estimated in Section VI.C above also has implications for the magnitude of cross-price elasticities.  A product with a low own-price elasticity of demand has few economic substitutes.  As price is raised for a product with inelastic demand, the buyers have "nowhere to go," indicating the absence of economic substitutes.

178.    Table 7 below summarizes the forms of indirect evidence assessed in this section.  In addition to the econometric analyses of cross-price elasticity, I apply reasoning associated with the Hypothetical Monopolist Test, discussed below, to define a relevant antitrust market in which to measure Wyeth's share and assess market power.

---

base product."  G. Werden, "Demand Elasticities in Antitrust Analysis," *Antitrust Law Journal,* 66(2), 1998, pp. 363-414 at p. 403.

[345]  *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 612 n.31 (1953).

[346]  In demand theory, this is referred to as the "symmetry of cross-price elasticities."  See, *e.g.*, P. Layard and A. Walters, *Microeconomic Theory*, McGraw-Hill, 1978, pp. 141-43.

[347]  DOJ and FTC, "Horizontal Merger Guidelines," August 19, 2010 (hereafter "2010 *Guidelines*"), § 4.1, Example 5 (https://www.justice.gov/atr/file/810276/dl?inline).

**TABLE 7**
**FORMS OF INDIRECT EVIDENCE OF WYETH MARKET POWER**

| Form of Indirect Evidence | Analysis | Results | Conclusion |
|---|---|---|---|
| Measurement of cross-price elasticity of demand (Section VII.C) | Empirical study of change in quantity demanded of candidate substitute products in response to change in price of venlafaxine ER capsules | No positive cross-price elasticities of demand with candidate economic substitute products | *Wyeth had substantial market power* |
| Measurement of the symmetric cross-price elasticity (Section VII.D) | Empirical study of change in quantity demanded of venlafaxine ER capsules in response to generic entry for candidate substitute products | No indication of symmetric cross-price elasticity with respect to candidate substitute products | *Wyeth had substantial market power* |
| Inference about cross-price elasticities from magnitude of own-price elasticity (Section VII.E) | Laws of demand imply that the weighted sum of all cross-price elasticities can be no greater than the own-price elasticity | Low own-price elasticity of demand implies low cross-price elasticity for candidate substitute products | *Wyeth had substantial market power* |
| Relative prices of Effexor XR and other venlafaxine products (Section VII.F) | Comparison of Effexor XR prices to Effexor IR, generic IR, and non-AB ER tablet | No evidence that IR or non-AB constrained Effexor XR pricing | *Wyeth had substantial market power* |
| Measurement of cross-price elasticity with venlafaxine IR (Section VII.F) | Empirical study of the changes in quantities demanded in response to Effexor XR generic entry on IR (cross-price elasticity) and IR generic entry on Effexor XR (symmetric cross-price elasticity) | Mixed evidence regarding cross-price elasticity between Effexor XR and IR form; Wyeth shares profits on the ER tablet | *Wyeth had substantial market power* |
| Merger Guidelines' Hypothetical Monopolist or SSNIP Test (Section VII.G | Expand hypothetical monopoly around venlafaxine ER capsules until hypothetical firm can profitably raise price and sustain the increase | Wyeth control of Effexor XR and generic venlafaxine ER capsules allows Wyeth to increase and sustain a price well above the competitive level | *The hypothetical monopolist test implies the relevant market consists of Effexor XR and its AB-rated generics. Wyeth had 100% share of the relevant market prior to generic entry and substantial market power.* |

B.     **Data and Methodology**

179.     The starting point for study of cross-price elasticity of demand for Effexor XR is identification of candidate (*i.e.*, potential) economic substitute products.  Candidate economic substitutes consist of drugs to which Effexor XR users might turn if the price of Effexor XR were increased, and are drawn from other prescription drugs used to treat depression, *i.e.*, potential therapeutic alternatives to Effexor XR.  The degree to which a candidate product is an economic substitute for Effexor (if at all) is an empirical question.

180.     To determine which drugs to include as candidate economic substitutes for Effexor XR, I reviewed prescribing guidelines for antidepressant drugs and Wyeth business documents examining prescribing trends for Effexor XR and its potential therapeutic alternatives; my review of this material is discussed in Attachment C.  Drugs that treat the same or similar conditions generally compete on therapeutic or product attributes, such as efficacy, side effects, and mechanism of action.  Competition on therapeutic attributes does not imply economic competition, however, the identification of potential therapeutic alternatives is useful in identifying the broadest category of drugs that could be candidate economic substitutes.  In brief, the antidepressant drug class is divided between "older" and "newer" drugs.[348]  The older antidepressants, primarily tricyclic/tetracyclic antidepressants and monoamine oxidase (MAO) inhibitors, date from the 1950s and 1960s; they are known for side effects and medication interactions, and so are generally not used as first-line therapeutic options.[349]  The top-prescribed newer drugs include serotonin selective reuptake inhibitors (SSRIs) like Prozac (fluoxetine), Zoloft (sertraline), Paxil (paroxetine), and Celexa (citalopram); serotonin and norepinephrine reuptake inhibitors (SNRIs) like Effexor (venlafaxine) and Cymbalta (duloxetine); and the dopamine norepinephrine reuptake inhibitor (NDRI) Wellbutrin (bupropion).  Other "newer" drugs include Desyrel (trazodone), Remeron (mirtazapine), and Serzone (nefazodone).  Wyeth's sales and marketing documents generally compare prescribing trends for Effexor with those of

---

[348]  See Attachment C.

[349]  See Attachment C.

---

the top-prescribed "newer" antidepressants.[350]  That is, Wyeth appears to believe that the top-prescribed "newer" antidepressants are potential therapeutic alternatives to Effexor XR.[351]  My analysis of cross-price elasticities considers both the "newer" and "older" type drugs as potential candidate substitutes.

181.    To conduct empirical analyses of substitutability based on price, data vendor IQVIA (formerly IMS Health) provided me with data on sales volumes and values for all antidepressant drugs.  As Attachment C discusses in detail, I identify 20 candidate economic substitutes (potential therapeutic alternatives) for Effexor XR; together representing 98.8% of all antidepressant prescriptions written between the time of Effexor XR's launch in November 1997 and entry of Teva's generic version in July 2010, other than prescriptions for the Effexor family of drugs.  A detailed list of candidate economic substitutes and their classifications (*e.g.*, SNRI, SSRI, etc.) is in Attachment C.

182.    My methodology for estimating substitutability based on price, *i.e.*, cross-price elasticity of demand, between Effexor XR and other antidepressant drugs closely parallels my analysis of the own-price elasticity from Section VI.C above.  As Figure 8 above showed, the price of venlafaxine ER declined sharply and substantially after generics entered: from $4.15 per pill in June 2010 to $3.57 per pill in July 2010 when Teva's generic entered, and further declining to $0.42 per pill by July 2011 and $0.23 per pill by July 2012.[352]  If another antidepressant were a close economic substitute for venlafaxine ER, this very large price decrease would be expected to reduce quantity demanded for the candidate substitute, relative to what it would have otherwise been, as patients who would have used the candidate substitute would use venlafaxine ER instead due to the price of venlafaxine ER dropping significantly following generic entry.  Thus, if sales of a candidate economic substitute for venlafaxine ER had been on an upward

---

[350]  See Attachment C.

[351]  Wyeth asserted that Effexor XR was clinically differentiated from other antidepressants.  WYEFFAT3260243-304; WYEFFAT4038391-95 (Varma, Ex. 1) (Effexor XR is the "First and only antidepressant proven to prevent new episodes of depression for up to two years").

[352]  As a reminder, in what follows, the term "venlafaxine ER" refers to the AB-rated generic versions of Effexor XR unless otherwise specified.

trend before July 2010, the decrease in the venlafaxine ER price would be expected to decelerate the increase, as more people are prescribed venlafaxine ER and fewer the candidate substitute. Had use of the drug been on a downward trend before July 2010, the decline in price for venlafaxine ER would have accelerated the decline for the same reason. However, if demand for the drug is independent of the price of venlafaxine ER, trends in sales would be unaffected by the price shock associated with generic entry. A drug might also be an economic complement of venlafaxine ER in which case the fall in price of venlafaxine ER would increase demand for the other drug.

183.    As before in the case of own-price elasticity, I estimate a regression model which allows the trend in unit sales to change in July 2010, when the decline in the price of venlafaxine ER begins. The regression model is estimated using IQVIA NPA data on EUs of candidate substitute drugs. As my interest is in identifying whether other *products* represent substitutes for venlafaxine ER, drugs enter the model as molecule/formulations (that is, a brand drug plus its AB-rated generics). As in the case of estimating the own-price elasticity of demand, the regression model uses data from the 18 months before July 2010 and the 18 months after. Analysis is confined to drugs without "confounding events" during the estimation window, such as their own generic entry.[353] Detailed discussion of the regression methodology can be found in Attachment C. I also consider cross-price effects between Effexor XR and other formulations of venlafaxine: namely, generic versions of the IR form, which became available in August 2006, and the non-AB-rated venlafaxine tablet that launched in October 2008.[354]

---

[353] In general, sales of newly launched drugs grow rapidly in drugs' first years on the market, with the rate of growth decelerating after the drugs' prescribing becomes established. The natural experiments therefore do not include drugs launched less than 3 years before the generic entry being studied, to avoid confusing the deceleration in sales growth for this reason with an effect of generic entry. Details of the selection of events are provided in the "events" tab of the spreadsheet, "Drug identification and events.xlsx," in the electronic backup to the current Report.

[354] See Attachment C.

---

## C.    Cross-Price Elasticities of Demand for Other Antidepressants with Respect to the Price of Venlafaxine ER

184.    The first set of natural experiments I consider is demand responses of potential economic substitutes to the fall in price of Effexor XR.  Figure 11 shows effects of the price decline for venlafaxine ER on prescribing trends for the top-prescribed "newer" antidepressants, including the SSRIs, the other SNRI (Cymbalta), and the NDRI (Wellbutrin) drugs.  To facilitate visual comparison, sales for all drugs are normalized to 100 at the date of the price fall for venlafaxine ER.[355]

**FIGURE 11**
**EFFECTS OF GENERIC ENTRY OF VENLAFAXINE ER ON DEMAND FOR OTHER TOP-PRESCRIBED "NEWER" ANTIDEPRESSANT DRUGS**[356]



---

[355]  EU levels are converted to index form by dividing the number of EU in each month by the number of EUs in July 2010.  See Attachment C.

[356]  Source: Regression analysis of IQVIA NPA data.  See Attachment C for details, including sensitivity analyses.



Note: Vertical axes show IQVIA NPA extended units indexed to 100 for the month of venlafaxine ER generic entry (July 2010).

185.    For 8 of the 10 candidate substitutes, the regression results show no significant effect of the steep decline in the price of venlafaxine ER on the trend in the drug's sales.[357]  In two cases (Paxil CR and Cymbalta), the price decline for venlafaxine ER is estimated to have had a small, <u>positive</u> effect on prescribing.  A positive effect of a price fall implies a negative cross-price elasticity and is consistent with complementarity, rather than substitutability, in demand. In other words, that the price of venlafaxine ER dropping is associated with demand <u>increasing</u> for other drugs does not suggest that these drugs are economic substitutes with Effexor XR because, if they were, then the price drop for venlafaxine ER would cause sales to decrease (not increase) for these other drugs, and move to venlafaxine ER.  But this is not what happened, when the

---

[357] Regression results are presented in the "Regression results" folder in the backup materials to this Report.

price decreased for venlafaxine ER, demand for these other drugs <u>increased</u>, suggesting that these drugs are economic complements (not substitutes). Economic complements do not belong in a product's relevant market (here the relevant market for Effexor XR) because they do not constrain the product's seller from increasing its price.[358] In no case did the price decline for venlafaxine ER have a negative and significant effect on a candidate substitute's sales, as would be expected for an economic substitute. That is, analyzing the venlafaxine ER price decline associated with generic venlafaxine ER entry shows that no other drug is an economic substitute with venlafaxine ER and no other drug exhibits significant cross-price elasticity of demand with venlafaxine ER. Regression results on which the figures are based are reported in Attachment C.

186.    Results for additional candidate economic substitute antidepressant drugs also show no significant negative response of demand for any of these drugs to the decline in the venlafaxine ER price.[359] Thus, for none of these other candidate substitutes does the dramatic decline in the price of venlafaxine ER cause a decrease in demand for the drug. Overall, the empirical evidence indicates that none of the candidate economic substitutes were actual economic substitutes for venlafaxine ER and that none of the candidate economic substitutes exhibits significant cross-price elasticity of demand with venlafaxine ER.

## D.    Cross-Price Elasticities of Demand for Effexor XR with Respect to Price of Other Antidepressants

187.    Evidence on the cross-price elasticity of demand for candidate substitute products can also be obtained by examining the symmetric cross-price effect: the effect of a change in the price of a candidate economic substitute drug on the demand for venlafaxine ER.[360] As is the

---

[358] Hovenkamp (2016), *op. cit.*, pp. 133-34. Because they are not interchangeable in use, "[a]s a general matter complements are not in the same relevant market." H. Hovenkamp, "Markets in Merger Analysis," *Antitrust Bulletin*, 57(4), 2012, pp. 887-914 at p. 892.

[359] See Figure C1 in Attachment C, which includes the "older" antidepressant drugs.

[360] Technically, the compensated cross-price effects (which hold utility constant) are symmetric. Compensated demand is identical to observed demand when income effects are absent, as would be expected in the case of a commodity making up a small share of consumers' budgets. It is the derivatives, not elasticities that are symmetric. The relation between elasticities can be shown, however, to be $\varepsilon_{se} = \varepsilon_{es} \left( \frac{p_e q_e}{p_s q_s} \right)$. See Layard and Walters, *op. cit.*,

case in study of the effects of a decline in the price of venlafaxine ER, I regard entry of generics for candidate substitute products as constituting a "natural experiment" in demand for venlafaxine ER. Information on generic entries for candidate substitute drugs that meet econometric conditions required for event analysis is discussed in Attachment C.

188. Results of the empirical analysis of symmetric cross-price elasticities are shown in Figure 12. The analysis finds that none of the generic entries for the candidate substitute drugs had a meaningful significant negative effect on demand for venlafaxine ER, as would be expected for a drug that is an economic substitute for Effexor XR. The picture from the symmetric cross-price elasticities confirms findings on cross-price elasticities with respect to the venlafaxine ER price: none of these candidate economic substitutes is an actual economic substitute for Effexor XR; none exhibits significant cross-price elasticity of demand with venlafaxine ER.

---

pp. 141-43. Econometric studies make use of this property of demand. See, for example, S. Chaudhuri, P. Goldberg, and P. Jia, "Estimating the Effects of Global Patent Protection in Pharmaceuticals: A Case Study of Quinolones in India," *American Economic Review*, 96(5), 2006, pp. 1477-1514 at p. 1488.

FIGURE 12
EFFECTS OF GENERIC ENTRY OF OTHER ANTIDEPRESSANTS ON
DEMAND FOR EFFEXOR XR[361]



Note: Vertical axes show millions of IQVIA NPA extended units of Effexor XR (brand before July 2010, brand plus generic after).

## E. Inference about Cross-Price Elasticities from the Magnitude of the Own-Price Elasticity

189. A low own-price elasticity of demand for Effexor XR, the result presented in Section VI.C above, implies that cross-price elasticities of demand are also small. My analysis of own-price elasticity showed that demand for venlafaxine ER rose just 11,446,641 EUs, relative to what it would have been had the price not fallen from $4.15 to $0.42 in the 12 months after the first generic entered. In other words, the quantity increased by just 24% despite a 163% drop in price. (Figure 10 above). The 11.4 million new Effexor XR EUs came from two different

---

[361] Source: Regression analysis of IQVIA NPA data. See Attachment C for details, including sensitivity analyses.

sources. First, some consumers may have bought venlafaxine ER at the lower price who would have not purchased venlafaxine ER or any other candidate substitute product at the higher venlafaxine ER price. These are new consumers of venlafaxine ER and new consumers of antidepressants. They do not contribute to any cross-price elasticity of demand (for a depression drug) because they had not previously been using an alternative product.[362] Second, some consumers may have purchased a different antidepressant, but moved to venlafaxine ER after the price fell. These are new consumers of venlafaxine ER but not new consumers of antidepressants. These consumers do contribute to cross-price elasticities.

190.    Because some new sales of venlafaxine ER may come from new users, the increase in sales of venlafaxine ER from the own-price elasticity is an upper bound of the total business taken from other sellers. *The total cross-price effects of a fall in the price of venlafaxine ER across all candidate substitute goods can be no more than the own-price effect on demand for venlafaxine ER.* The property that the own-price elasticity "bounds" the sum of the (weighted) cross-price elasticities follows from one of the "laws of demand" from price theory.[363] Simply, the low own-price elasticity of demand for venlafaxine ER implies small cross-price elasticities for candidate substitute products.

191.    I can illustrate the significance of this reasoning with a calculation assuming that all of the increase in sales of venlafaxine ER due to the decline in the drug's price came from SSRIs only (*i.e.*, brand and generic versions of Celexa, Lexapro, Prozac, Paxil, Paxil CR, and Zoloft). In the 12 months before generic venlafaxine ER became available, these SSRIs were selling at the rate of 463,795,723 million EUs per month.[364] If *all* of the 11.4 million increase in EUs for venlafaxine ER came from a decrease in in EUs of SSRIs (*i.e.*, none from new users and none from other antidepressants), the cross-price elasticity of demand between venlafaxine ER and

---

[362] They do contribute to a cross-price elasticity of demand with *something* for which less was spent after the venlafaxine ER price fall. But these other somethings do not belong in the relevant antitrust market. This observation illustrates why a small cross-price elasticity alone is not sufficient to justify inclusion in a relevant antitrust market.

[363] See, for example, Layard and Walters, *op. cit.*, pp. 141-43.

[364] IQVIA NPA data.

---

SSRIs would be $\frac{\Delta q_{ssri}/q_{ssri}}{\Delta p_e/p_e} = \frac{-0.025}{1.634} = -0.0153$.[365]  Under the conservative assumption that all new EUs of venlafaxine came from SSRIs, a one-percent fall in the price of venlafaxine ER leads to a trivial 0.015 percent loss of sales of SSRIs.  Increased sales of venlafaxine ER would have in fact been drawn from other products as well so the actual cross-price elasticity would have been smaller still.

192.    The low own-price elasticity implies the sum of all the cross-price elasticities is also low, confirming the empirical results above of no evidence for positive cross-price elasticity of demand for the candidate substitute products.

## F.    Other Forms of Venlafaxine: IR Generics and the Non-AB ER Tablet

193.    Two other forms of venlafaxine became available before generic Effexor XR launched: generic versions of Effexor IR and an extended-release venlafaxine tablet that is not AB-rated to Effexor XR.  For both of these products, Wyeth had profit-sharing agreements that paid Wyeth royalties from sales of these products.[366]  These profit-sharing arrangements have implications for interpretation of the competitive effect these venlafaxine products had on Wyeth's market power with respect to Effexor XR.  As per the terms of the Wyeth-Teva Agreement, Teva could market a venlafaxine IR generic after June 15, 2006, and was the only generic venlafaxine IR seller on the market until the venlafaxine compound patent expired in July 2008.[367]  Following this patent expiry, additional manufacturers launched their own versions of generic Effexor IR.

████████████████████████████████████████████████████

█████████████████████████████████████

---

[365] Via the midpoint formula, $\Delta q_{ssri}/q_{ssri} = \frac{-11.4}{(.5 * (463.8 + (463.8 - 11.4)))}$ =-0.025. The price change of 163.4% is from Figure 10 above.

[366] See ¶¶ 118 and 129 above, which describe the profit-sharing agreements that Wyeth had with Teva on its generic version of Effexor IR, and Osmotica on its non-AB rated venlafaxine extended-release tablet.

[367] As noted earlier, FDA approval for Teva's IR generic came in August 2006.

[368] See ¶ 118.

194.    In addition, Osmotica Pharmaceuticals launched an extended-release venlafaxine HCl tablet in October 2008, after the venlafaxine compound patent expired.[369]  As mentioned earlier, Wyeth and Osmotica entered into a settlement agreement prior to Osmotica's launch which required Osmotica to pay Wyeth tiered royalties based on the level of net sales ranging from 5% to 50% on Osmotica's sales of its non-AB rated extended release tablet.[370]  This royalty agreement remained in place through the start of multiple AB-rated Effexor XR generic entry in July 2011, earning Wyeth substantial royalty payments of approximately $254 million from 2008-2011.[371]

195.    ███████████████████████████████████████████

███████████████████████████████████████████

███████████████  A profit-maximizing seller evaluates the tradeoff between raising price and losing sales in response to a price rise.  When "lost sales" are not really lost, but some move to another product for which the seller has an economic interest, the tradeoff between raising price and losing sales is moderated.  Intuitively, using Osmotica as an example, Wyeth sets a price higher when it shares a financial stake in Osmotica's sales than if Osmostica were an independent competitor.

196.    This idea is well recognized in antitrust economics, with its main applications in merger analyses.  The analysis applies to joint ventures as well, when, as here, two potential competitors agree on a profit split.  "Upward pricing pressure" of a merger (or a joint venture) is affected by

---

[369] The FDA approved Osmotica's NDA for the venlafaxine ER tablet in May 2008.  FDA, Letter Approving NDA 22-104 (*Venlafaxine Hydrochloride ER Tablets*), May 20, 2008 (https://www.accessdata.fda.gov/drugsatfda_docs//2008/022104s000ltr.pdf).  Osmotica referenced Wyeth's approved NDA for Effexor XR in its NDA submission, including a Paragraph IV certification.  Wyeth then sued Osmotica.  The companies settled the litigation in February 2008, with Wyeth licensing certain patents to Osmotica until their expiration.  Osmotica Pharmaceuticals, PLC, "Form S-1, Registration Statement Under the Securities Act of 1933, As filed with the U.S. Securities and Exchange Commission on September 14, 2018," p. 132 (https://www.sec.gov/Archives/edgar/data/1739426/000104746918006231/a2236601zs-1.htm).  See Attachment C for additional information.

[370] See ¶ 129 above and WYEFFAT04649201.0001-.00062 at 01-11; WYEFFAT04640809-49 at 26-27; WYEFFAT08278330-370 at 47-49 and 56.

[371] WYEFFAT2906934-35; WYEFFAT04081360; WYEFFAT2904665; WYEFFAT06601708-37; WYEFFAT08278330-370.  Osmotica's royalties to Wyeth continued at least through the start of multiple generic entry in mid-2011, and possibly at late as September, 20, 2017 (listed as the expiration date of the royalty income with Osmotica in WYEFFAT04081362.0001, tab "Roy Income," row 29).

the diversion ratio (the share of customers from Wyeth that move to Osmotica if Wyeth were to increase its price) and the gross margin (here, the royalty share Wyeth earns on an Osmotica sale).[372]  The higher the diversion ratio and gross margin, the greater upward pricing pressure is created by the Wyeth-Osmotica agreement.

197.    Consistent with this perspective, entry of these products (for which Wyeth shared in profits) had no evident effect on Wyeth pricing of Effexor XR.  As shown in Figure 13, both generic venlafaxine IR and the Osmotica venlafaxine ER tablet had lower prices per day than Effexor XR at the end of Wyeth's brand Effexor XR exclusivity period, before generic Effexor XR launched.  If one or both drugs were close economic substitutes for Effexor XR, the availability of these lower-cost substitutes would have negatively impacted demand for Effexor XR, reducing the Effexor XR quantity sold or Wyeth's ability to price Effexor XR above a competitive level.  As Figure 13 shows, the sharp decline in the generic venlafaxine IR price starting in July 2008 when additional generic IR manufacturers launched, and the entry of Osmotica's venlafaxine tablet did not slow Wyeth's price increases for Effexor ER, evidence that these products are not economic substitutes for Effexor XR, consistent with the economic context of Wyeth's profit sharing for both products.  In light of Osmotica's ongoing profit split with Wyeth through the time of Effexor XR multiple generic entry, Osmotica's product is effectively a Wyeth joint venture, so I do not classify the Osmotica product as an economic substitute for Effexor XR.

---

[372]  R. Willig, "Unilateral Competitive Effects of Mergers: Upward Pricing Pressure, Product Quality, and Other Extensions," *Review of Industrial Organization*, 39(1/2), 2011, pp. 19-38 at p. 23.  The product of the diversion ratio and the gross margin is sometimes referred to as the Gross Upward Pricing Pressure Index (GUPPI), referred to as "gross" because it does not take into account potential cost-efficiencies of a merger.  *Ibid.*, p. 24.  J. Farrell and C. Shapiro, "Antitrust Evaluation of Horizontal Mergers:  An Economic Alternative to Market Definition," *B.E. Journal of Theoretical Economics: Policies and Perspectives*, 10(1), 2010, pp. 1-39.

**FIGURE 13**
**AVERAGE NSP PRICES PER DAY FOR**
**EFFEXOR XR, AB-RATED GENERIC IR AND NON-AB VENLAFAXINE ER**



Price per day equals the price per EU for Effexor XR and the non-AB, as their standard doses are once per day. For generic IR, the standard dose is 2-3 times per day, so price per day twice the price per EU.

198.    In terms of quantities, as shown in Figure 14, entry of the Teva generic IR in August 2006 had no evident effect on Effexor XR sales.[373]   As Figure 13 shows, when multiple generic

---

[373] Wyeth planning documents indicate that Wyeth did not expect the launch of generic IR to cause the immediate large loss of sales that typically occurs with launch of an AB-rated generic.  WYEFFAT3983921-22 (Varma Ex. 6)

IR entry occurred in July 2008, there was a second steeper decline in the venlafaxine IR price. Ideally, I would have used that second price decline as a second opportunity to assess the presence of economic substitution between generic IR and Effexor XR.  However, the proximity of other events (Pristiq launch and Osmotica ER tablet launch) would confound estimation of the impact of the IR price decline on Effexor XR demand.



FIGURE 14
EFFECT OF TEVA GENERIC IR ENTRY ON DEMAND FOR EFFEXOR XR



Note: Vertical axis shows IQVIA NPA extended units of Effexor XR.

(Jul. 12, 2006 Wyeth email approves language for a Wyeth investor filing explaining that Wyeth "anticipate[s]" that "any impact" on Effexor XR from generic Effexor IR launch "will be modest, given the significant difference in product profiles"); Varma Deposition, pp. 68:16-69:3 (Wyeth expected modest impact to Effexor XR from the launch of generic Effexor IR because "physicians and patients could tolerate the [XR] product much better. They had less nausea, if I recall. You know, less frequent dosing. So you had better compliance, better adherence . . . the XR had those advantages over the immediate-release tablets").

199.    The empirical results discussed so far indicate that there is no cross-price elasticity of demand between Osmotica's non-AB tablet and venlafaxine ER capsules or between venlafaxine IR and venlafaxine ER capsules, consistent with these products being joint ventures between Wyeth and Teva and Osmotica respectively.

200.    The entry of generic venlafaxine ER capsules provides an additional opportunity in which to test the economic relationship between generic IR and Effexor XR.  Specifically, I am able to study how the price decline that occurred at the entry of generic venlafaxine ER capsules affected demand for generic Effexor IR.  Quantity demanded for generic Effexor IR declined when generic versions of venlafaxine ER became available.  While the results are statistically significant, the implied cross-price elasticity is not large.  Results of the regression analysis (contained in Table C4 of Attachment C) imply the estimated cross-price elasticity for the IR drug is very small (0.112).[374]

201.    This small magnitude cross-price elasticity for IR is not at odds with the other direct and indirect evidence showing Wyeth to have had substantial market power with respect to Effexor XR.  As discussed above, neither the entry of multiple generic suppliers of IR venlafaxine nor the launch of the non-AB in mid-2008 deterred Wyeth from continuing to increase the Effexor XR price from its already supracompetitive level,[375] and Wyeth continued to earn extraordinary 98% gross margins on its Effexor XR sales.[376]  Thus, even if the large price differential between Effexor XR and other venlafaxine products caused some sales to shift to less expensive substitutes, Wyeth gains some profits.

202.    In the context of the totality of the evidence, including the powerful direct evidence of Wyeth's substantial market power, no evidence of cross-price elasticity at the time of IR generic entry, and a small value estimate for venlafaxine IR at the time of Effexor XR generic entry, I

---

[374]  Elasticities are estimated using the midpoint formula.

[375]  See Figure 8 above. See also Varma Deposition, p. 243:9-22 ("Q. When Cymbalta came onto the market, do you recall if Wyeth reduced the price of Effexor XR in response? A. I do recall and we did not [reduce the price of Effexor XR].") (Wyeth raised the price of Effexor XR "[b]efore and after" the launch of Cymbalta).

[376]  See Table 5 above.

conclude that prior to generic entry for Effexor XR, study of cross-price elasticities indicates that these other forms of venlafaxine do not belong in the relevant market. Wyeth possessed substantial market power with respect to Effexor XR.

203.    My conclusion that the evidence indicates that Wyeth possesses substantial market power is not affected by whether venlafaxine IR or the non-AB venlafaxine ER tablet were included in the relevant market. During the period prior to generic entry for Effexor XR Wyeth's market share was 88.8% regarding venlafaxine IR along with Wyeth's line extension Pristiq to be in the relevant market.[377]

204.    Although I have concluded that Osmotica is not an economic competitor to Effexor XR because of Wyeth's sharing of Osmotica profits, given Osmotica's relatively small sales, inclusion of Osmotica in the relevant market for Effexor XR has little effect on Wyeth's market share. Conservatively including both venlafaxine IR and Osmotica in the relevant antitrust market for Effexor XR, and conservatively assuming that Osmotica counts in the share calculation as a competitor to Wyeth, Wyeth's market share averaged 87.2% between the launch of generic Effexor IR in August 2006 and entry of generic Effexor XR in July 2010.[378]  Even

---

[377] I account for Pristiq because, as explained above, Wyeth positioned this line extension to shield revenue loss as Effexor XR's loss of exclusivity approached. See ¶¶ 127-128 above.

[378] IQVIA NPA data. The 87.2% share of prescriptions includes the Effexor XR line extension Pristiq. I include in this note some alternative share calculations in case they are helpful to the Court. Pristiq's share during this time period averaged 5.8%, though from the launch of Pristiq (April 2008) to generic entry of Effexor XR, its share was 9.9%. The share of prescriptions for Effexor XR only (with IR, Pristiq, and non-AB included in the total) during this time period averaged 81%. If the Court or factfinder were to find that the non-AB tablet, due to Wyeth's profit-sharing agreement, belongs in Wyeth's share of the relevant market, Wyeth's share averaged 89.0% during this period. In terms of extended units, Wyeth's market share averaged 84.5% between the launch of generic Effexor IR in August 2006 and entry of generic Effexor XR in July 2010, and 78.5% in the period after the non-AB entered. Note that venlafaxine IR averaged about 60 extended units per prescription, whereas venlafaxine ER averaged about 45 extended units per prescription.

All iterations of these market share calculations demonstrate that Wyeth had substantial market power. See DOJ, "Competition And Monopoly: Single-Firm Conduct Under Section 2 Of The Sherman Act : Chapter 2," March 18, 2022 (https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2) ("Some courts have stated that it is possible for a defendant to possess monopoly power with a market share of less than fifty percent. … [A]s a practical matter, a market share of greater than fifty percent has been necessary for courts to find the existence of monopoly power.").

---

limiting to the period after the non-AB entered, the average Wyeth share was 82.0%;  A market share of 82% - 87% is, as an economic matter, indicative of substantial market power.[379]

205.    A share of 82% - 87% is referred to in the literature of industrial organization as the "one-firm concentration ratio."[380]  Another common measure of market concentration based on market shares is the three- or four-firm concentration ratio, which in the case of the relevant market for Effexor XR takes on the value of 100%, the maximum possible value.  Economists also measure market concentration by the Herfindahl-Hirschman Index (HHI) equal to the sum of the square of the market shares of all firms in the relevant market.[381]  I illustrate the extremely high value of the HHI measure of concentration assuming the relevant market consists of Wyeth's Effexor XR and Pristiq, the non-AB product, and a set of small sellers of Effexor IR.  With Wyeth at 82% or more and the non-AB tablet form about one quarter of the balance of the market, the HHI takes on the value of at least 6,740.[382]  DOJ/FTC *Guidelines* refer to markets with HHIs above 1,800 as "highly concentrated."[383]  An HHI of 6,740 during the period prior to Teva generic entry for Effexor XR indicates that, according to criteria used by the FTC and the DOJ, Wyeth is selling in an extremely highly concentrated market and is in a position to exercise substantial market power.

### G.    The Hypothetical Monopolist and the SSNIP Test

206.    The *Horizontal Merger Guidelines*, published and periodically revised by the U.S.

---

[379] IQVIA NPA data.  Again, if the non-AB ER tablet is included in Wyeth's share of the relevant market, due to the profit-sharing agreement, Wyeth's share would average 86.0% during this time period.  In other words, the Osmotica non-AB ER tablet's share of the market including IR and the non-AB ER tablet is 4%, so Wyeth's share is either 82% or 86% of this market, depending on whether Wyeth's share includes the non-AB tablet, which accounts for 4% of the market defined in this way.  Market shares of 82%-87% clearly indicate that Wyeth had substantial market power.  See fn. 378.

[380] Church and Ware, *op. cit.*, p. 429.

[381] *Ibid.*

[382] Neglecting the small shares of the sellers of generic IR forms (which would only increase the value of the HHI), the HHI sums the squares of Wyeth's 82 and the non-AB's 4.  $(82)^2 + (4)^2 = 6{,}740$.

[383] DOJ and FTC, "Merger Guidelines," December 18, 2023 (hereafter "2023 *Guidelines*"), § 2.1 (https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf).

Department of Justice (DOJ) and Federal Trade Commission (FTC), provide a method to define product and geographical markets relevant to antitrust analysis and to assessing market power within those markets.[384]  The *Guidelines* are concerned with identifying a market structure likely to be associated with a firm facing an inelastic demand and the ability to exercise market power. The *Guidelines* propose the "Hypothetical Monopolist Test:"[385]

> "A market is defined as a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of those products in that area likely would impose at least a 'small but significant and nontransitory' increase in price [SSNIP], assuming the terms of sale of all other products are held constant.

> [To implement this definition], the Agency will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a 'small but significant and nontransitory' increase in price, but the terms of sale of all other products remained constant.  If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the next-best substitute for the merging firm's product. … This process will continue until a group of products is identified such that a hypothetical monopolist over that group of products would profitably impose at least a 'small but significant and nontransitory' increase. … The Agency generally will consider *the relevant product market to be the smallest group of products* that satisfies this test. [emphasis added.]

> Once defined, a relevant market must be measured in terms of its participants and concentration."

207.    The 1992 *Guidelines* take a "small but significant" price increase to be 5%.  The 2010 *Guidelines* likewise propose a 5% increase.[386]  Some authors prefer a slightly higher percent increase in price when assessing the hypothetical monopolist.  Hovenkamp recommends 10%,

---

[384]  DOJ and FTC, "Horizontal Merger Guidelines," April 2, 1992 (hereafter "1992 *Guidelines*") (https://www. justice.gov/sites/default/files/atr/legacy/2007/08/14/hmg.pdf); 2010 *Guidelines*; and 2023 *Guidelines*.

[385]  1992 *Guidelines*, §§ 1.0 and 1.11, emphasis added.  The 2010 *Guidelines* and 2023 *Guidelines* use the same Hypothetical Monopolist Test (see § 4.1.1 and § 4.3.A, respectively).

[386]  2010 *Guidelines*, § 4.1.2: "The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value."  See also 2023 *Guidelines*, § 4.3.B.

citing support from other scholars for this higher standard.[387] "Nontransitory" is not formally specified in the *Guidelines*; however, it is usually interpreted as one year or more.[388] This analysis is referred to as the SSNIP Test or Hypothetical Monopolist Test.

208.    To analyze the relevant antitrust market for Effexor XR, I conduct the Hypothetical Monopolist Test as follows.  If the producers of the generics and the branded incumbent merged and raised the price of all forms of venlafaxine ER 10% for a year (a SSNIP), assuming prices of all other possible substitutes remained constant, would that price increase be profitable to the Hypothetical Monopolist or would substitution to other drug products render that price increase unprofitable?  As directed by the *Guidelines*, the narrowest group of candidate products for an antitrust market – the incumbent brand and its generic forms – is the correct starting point for application of the test.[389]

209.    To implement the test, I draw on data characterizing the actual (but delayed) generic launch of venlafaxine ER.  Such data provide an ideal natural experiment, as the price decline that occurs upon generic entry is exogenous to other factors affecting supply and demand for the drug; this represents precisely the kind of exogenous change in price for which the quantity effect needs to be observed to implement the test, albeit in reverse.  Conceptually, I assume that the generic entrants merge with the incumbent brand and the merged entity increases prices from the levels to which they fell after multiple generic product competition.

210.    The empirical results concerning the own-price elasticities imply that a Hypothetical Monopolist that gained control of Effexor XR and its generics could profitably increase the

---

[387]  Hovenkamp (2016), *op. cit.*, p. 115: "…10% above the competitive level (generally marginal cost) is about the correct hypothesized price increase for antitrust market delineation."  See also L. White, "Antitrust and Merger Policy: A Review and Critique," *Journal of Economic Perspectives*, 1(2), 1987, pp. 13-22.

[388]  The 1984 version of the *Guidelines* specified a period of one year, allowing for some flexibility according to the "nature of the industry": "In attempting to determine objectively the effect of a 'small but significant and nontransitory' increase in price, the Department in most contexts, will use a price increase of five percent lasting for one year.  However, what constitutes a 'small but significant and nontransitory' increase in price will depend on the nature of the industry" (DOJ and FTC, "1984 Merger Guidelines," § 2.11 (https://www.justice.gov/archives/atr/1984-merger-guidelines)).  The 1992 *Guidelines* changed the period to "foreseeable future," also stating that analysis will depend on the nature of the industry (1992 *Guidelines*, § 1.11).

[389]  See ¶ 206 above.

average price of venlafaxine ER by at least 10% and sustain the increase for at least a year.

211.    The fact that Wyeth was able to maintain the price of Effexor XR at a price well above this competitive level for years until generics finally entered indicates that the Hypothetical Monopolist could profitably sustain such a price.  Thus, no additional products need to be added to the relevant antitrust market: The SSNIP test in the case of venlafaxine ER indicates that the branded product and its AB-rated generics belong in the same antitrust market, and all other drugs or other competing products do not.  To be clear, the SSNIP test implies other prescription antidepressant drugs (brand and generic) are not in the relevant antitrust market.  The inference from the SSNIP test then is that the relevant antitrust market is the molecule alone (i.e., brand Effexor XR and generic Effexor XR), and prior to generic entry, Wyeth controlled 100% of that market (then, Wyeth and Teva jointly controlled 100%).  Wyeth had substantial market power in the relevant antitrust market consisting of Effexor XR and its AB-rated generics.

## H.    Summary of Indirect Evidence

212.    Econometric estimates of cross-price elasticities show no evidence of substitution on the basis of price between Effexor XR and all other molecule/formulations used to treat depression.  Although there is mixed evidence for price-based substitution between Effexor XR and venlafaxine IR (no evidence of cross-price elasticity at the time of IR generic entry, and a small value estimate for venlafaxine IR at the time of Effexor XR generic entry) the totality of the evidence shows that venlafaxine IR should not be included in the relevant antitrust market with Effexor XR.  Osmotica is in effect a joint venture between Wyeth and Teva and does not constitute an economic competitor to Wyeth's Effexor XR product.  The reasoning associated with the FTC/DOJ's Hypothetical Monopolist Test finds the relevant product market to be Effexor XR and its AB-rated generics.  I conclude that for the purpose of assessing the impact of the defendants' alleged anticompetitive Agreement, the totality of the evidence indicates that relevant antitrust product market is no greater than Effexor XR and its AB-rated generics; Wyeth had 100% share of this market prior to Teva's generic entry in July 2010.  Even if I conservatively include other venlafaxine-based products in the relevant market, Wyeth had a 100% share of this market prior to 2006 and dominant shares thereafter until generic entry in

July 2010, which would further support a finding that Wyeth possessed substantial market power prior to Effexor XR generic entry.

213.    In summary, direct and indirect evidence point overwhelmingly to the conclusion that Wyeth possessed and exercised substantial market power in the sale of Effexor XR.  Wyeth profitably restricted output and raised price far above competitive levels.

## VIII.    ECONOMIC EVALUATION OF THE WYETH-TEVA AGREEMENT AS LIKELY DELAYING GENERIC COMPETITION FOR VENLAFAXINE ER

214.    This section conducts an empirical evaluation of three forms of evidence bearing on whether the Wyeth-Teva Agreement likely delayed generic competition:

- Large, unexplained reverse payments from Wyeth to Teva (Section A);
- Teva expected profits from the Agreement sufficient to induce Teva to agree to a delay in entry (Section B); and,
- The increase in Wyeth's stock price following public announcements regarding the Agreement (Section C).

## A.    Large, Unexplained Reverse Payments from Wyeth to Teva Imply a Likely Delay in Generic Competition

215.    One form of evidence bearing on whether the terms in the Wyeth-Teva Agreement imply a likely delay in generic competition is whether, from Wyeth's perspective, those terms constitute reverse payments.  The portions of the reverse payments that exceed Wyeth's avoided litigation expenses and the fair value of any services provided by Teva are regarded as "unexplained" by normal business considerations.[390]

216.    For a rational (*i.e.*, profit-maximizing) brand firm to make otherwise unexplained reverse payments, the brand firm must expect to increase its profits by likely delaying the start of generic

---

[390]  Edlin, *et al.* (2013), *op. cit.*; Elhauge and Krueger, *op. cit.*

entry.  Analysis of the size of the unexplained portion of the reverse payments should be based on what was reasonably known at the time the settlement was reached.[391]

217.    Wyeth's own documents are consistent with this economic inference.  For example, as explained in more detail below, Wyeth acknowledged that it took losses in the Wyeth-Teva Agreement in order to transfer value to Teva that would "keep [Teva] off XR."[392]

218.    I evaluate the magnitude of any reverse payment in three components of the Wyeth-Teva Agreement: (1) the no-AG clauses in the license Wyeth granted Teva to sell generic Effexor XR in the U.S., (2) the license Wyeth granted Teva to sell generic Effexor IR in the U.S., and (3) the license Wyeth granted Teva to sell generic Effexor XR in Canada.[393]  The evaluation is made from Wyeth's standpoint as of the time of the Agreement.

### *Wyeth Reverse Payment in the Generic Effexor XR No-AG Clauses*

219.    During Teva's 180-day regulatory exclusivity period, the Wyeth-Teva Agreement expressly prohibited Wyeth from selling an AG either directly or through a third party.  ▮▮▮▮ ▮▮▮ continued to deter Wyeth from competing with an AG after the 180-day regulatory exclusivity period.  This section deduces the magnitude of the reverse payments embedded in the no-AG clauses for generic Effexor XR.

<u>Absent the no-AG Clauses, a Firm in Wyeth's Position Likely Would Have Launched an AG</u>

220.    For large-selling drugs like Effexor XR, there would usually be two generic products during the first filer's 180-day regulatory exclusivity period: Teva's generic and Wyeth's AG. During the years around the signing of the Wyeth-Teva Agreement, the FTC reported that brand firms experiencing generic entry elected to sell an AG during the 180-day regulatory exclusivity

---

[391]  See Section III.D above.

[392]  See WYEFFAT3767261 (Wyeth "can give Teva the same value to keep them off XR but do it for cheaper") attaching WYEFFAT3767262.00001-.00003.

[393]  In this section and throughout this Report, I refer to these licenses as the Effexor XR, Effexor IR, and Effexor XR Canada licenses, *i.e.*, I only specify the relevant country for the Effexor XR Canada license.

period for 19 out of 24 of the largest-selling drugs, *i.e.*, approximately 80% of the time.[394] Excluding the drugs with potential no-AG clauses in settlement agreements moves the FTC's 80% rate to between 86% and 100%.[395]  See Figure 15.  Consistent industry-level evidence, evidence contemporaneous with the negotiation of the Agreement, indicates that, if not for the no-AG clauses, a firm in Wyeth's position would have been very likely to sell an AG during Teva's regulatory exclusivity period.

---

[394]  FTC (August 2011), *op. cit.*, pp. 26-27 and p. 30.

[395]  FTC (August 2011), *op. cit.*, p. 27, indicates that no-AG clauses affected generic entry for five drugs.  It's unclear which of these drugs were in the FTC's largest sales category so they may not have all affected the 80% rate.  Publicly available sources indicate that at least two of the five no-AG clauses affected the generic entry of large-selling drugs (Wellbutrin XL and Lamictal).  Prior to generic competition, U.S. sales of Wellbutrin XL 150g was $850 million in 2007 and Lamictal was $1,100 million in 2005.  Hemphill (2009), *op. cit.*, p. 649.  This leaves only three among the largest selling drugs not launching an AG that may or may not have been affected by a no-AG clause.

*In re Wellbutrin XL Antitrust Litigation*, 868 F.3d 132, 160 (3d Cir. 2017) ("To facilitate the settlement, GSK agreed to refrain from launching an authorized generic version of 150 mg Wellbutrin XL for the duration of Teva's exclusive license. […] Biovail and GSK similarly amended their development agreement to preclude GSK from launching an authorized generic version of 300 mg Wellbutrin XL. […]").  Generic launch of the 150 mg generic occurred in May 2008, with an authorized generic of the 150 mg and 300 mg launching 180 days later.  *Ibid.*

*In re Lamictal Direct Purchaser Antitrust Litigation*, 957 F.3d 184, 188-89 (3d Cir. 2020) ("As part of the settlement, Teva would begin selling lamotrigine on July 22, 2008 […].  In exchange, GSK promised not to launch its own generic version of Lamictal, known as an 'authorized generic.'").  Per the settlement, Teva launched its generic on July 22, 2008.  Teva Pharmaceutical Industries Ltd., "Form 6-K, Report of Private Issuer Prusuant to Rule 13a-16 or 15d-16 under the Securities Exchange Act of 1934 for the month of July 2008," July 22, 2008 (https://www.sec.gov/Archives/edgar/data/818686/000081868608000121/lamotrigine220708.htm).

**FIGURE 15**
**AUTHORIZED GENERIC-LAUNCH FREQUENCY AMONG GENERIC REGULATORY EXCLUSIVITY
PERIODS DURING 2001-2008 FOR DRUGS WITH AT LEAST $500 MILLION IN PRE-GENERIC ANNUAL
BRAND SALES**



221.    During this period, market participants and analysts expected that a brand firm in Wyeth's position would sell an AG upon generic entry. For example, in a 2004 earnings conference call, Teva's President and CEO said that "We now factor authorized generics into our plans as a given."[396] Teva's corporate representative testified that Teva "assumed during our exclusivity period that there would be one other generic in the market. . . . We typically assumed an authorized generic would enter. That was our fallback assumption."[397] A Wyeth slide deck notes that financial analysts "Assume AG with All Generic Launches."[398]

222.    Wyeth's financial planning from prior to signing the Wyeth-Teva Agreement also indicates that Wyeth was likely to sell an AG during Teva's 180-day regulatory exclusivity period if not for the no-AG clauses. Starting in 2004, Wyeth convened an internal working

---

[396] WYEFFAT3609860-10024 at 9869.

[397] Wodarczyk Deposition, pp. 121:21-122:4.

[398] WYEFFAT05606715-92 at 66.

group focused on an AG for Effexor XR. An AG was on the table: "[a]s to Effexor itself, the group saw no show-stopper issues that would preclude our pursuing an authorized generic."[399] Wyeth also contracted with IMS Management Consulting to advise them on AG strategies in June 2005.[400]

223.   Similar to many other brand drug sellers, Wyeth lacked an inhouse capability to sell a generic product,[401] so it met with potential distribution partners.[402] Wyeth met with DAVA in 2004 and Sandoz in July 2005.[403] Sandoz advised Wyeth that, when generic products become available, brand-to-generic substitution occurs rapidly and "at the same rate irrespective of the number of generic entrants,"[404] implying that a Wyeth AG would not accelerate generic erosion of brand Effexor XR. Sandoz also proposed that it would split AG profits 70% to Wyeth and 30% to Sandoz.[405]

224.   Wyeth conducted its own analysis of the profitability of selling an AG. Contradicting Sandoz's advice, some Wyeth analyses assumed that an AG launch could hasten generic erosion

---

[399] WYEFFAT3788607-08 (an email string from 2004 about Wyeth's initial efforts to learn about AGs); WYEFFAT3786419-21 (an email string from 2005 about authorized generics); and WYEFFAT3765952-55 (the "Final Agenda" for an August 2005 meeting about "Venlafaxine Asset Maximization" included the topics "Authorized Generic Options" and "TOPS considerations of authorized generic").

[400] See a June 3, 2005 slide deck prepared for Wyeth by IMS Management Consulting titled "Capabilities: Forecasting Generic Erosion and Evaluating an Authorize Generic Strategy." WYEFFAT2910740-56.

[401] See FTC (August 2011), *op. cit.*, pp. 17-19, explaining that, "brand-name and generic marketing strategies are very different" and that the majority of brand firms marketed AGs "through arrangements with external generic distributors." As described below, Wyeth sold its AG for Protonix in 2008 through such an AG distribution agreement. Also see, for example, a Wyeth email from November 2004 which noted that "we have lost our institutional knowledge of the generic area" WYEFFAT3788607-08 at 07. Wyeth sold its generic injectable products business to Baxter in 2002. Associated Press, "Company News; Baxter Healthcare to Acquire Wyeth Subsidiary," *New York Times*, June 11, 2002 (https://www.nytimes.com/2002/06/11/business/company-news-baxter-healthcare-to-acquire-wyeth-subsidiary.html).

[402] An email string from 2004 indicates that Wyeth met with DAVA "re authorized generics" and that "a number of companies want to come in and talk to us about authorized generics, Sandoz, Upsher Smith, etc. … We could easily set up meetings with 3-4 compamies [sic] if you want." WYEFFAT3788607-08 at 07.

[403] *Ibid.*; WYEFFAT3786455; and WYEFFAT3786460-92.

[404] WYEFFAT3786460-92 at 74-75.

[405] WYEFFAT05606715-92 at 41 and WYEFFAT3786460-92 at 78.

---

so that losses from brand Effexor XR would initially outweigh profits from an AG.[406] Even with an aggressive assumption about the AG hastening generic erosion, however, Wyeth's analyses indicate that Wyeth's cumulative AG profits would outweigh the initial brand losses within a year so that, overall, it would be more profitable than not to sell an AG.[407] Furthermore, Wyeth forecasted substantial long-term profits from selling an AG. For example, a September 2005 analysis indicates that Wyeth could earn $183.5 million more in profits from selling an AG (despite assuming high initial losses on the brand product) compared to not selling an AG.[408] By failing to launch an AG at the start of generic competition, Wyeth would concede a first-mover advantage to Teva, which would make it difficult for Wyeth's AG to capture a substantial share of the generic market. Wyeth would likely lose out on most of the potential AG profits.[409]

225.    Even after the Agreement was signed, Wyeth continued to regard a potential AG launch as a positive profit opportunity. On November 8, 2005, days after the Wyeth-Teva Agreement was reached, Kevin Higgins (Wyeth's Senior Director, Commercial Development) sent an internal email including the following:

> "… we will discuss what activities we should undertake […] so that Wyeth can be prepared to launch an authorized generic of both [Effexor] IR and XR. Our current thinking is that Wyeth should either launch itself or enter into a relationship with a third

---

[406]  WYEFFAT3609860-10024 at 9899-9902. As discussed below, the assumption Wyeth made in its forecast models that the generic erosion would be different if it sold an AG is generally understood to be incorrect.

[407]  WYEFFAT3609860-10024 at 9903-9904 and 9996. Wyeth found that the most profitable scenario was one in which Teva and Wyeth ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[408]  In WYEFFAT3781144, the sum of row 33 in tab "Base" totals $698.3 million. The sum of row 35 in tab "Case2" totals $881.9 million after the ▮▮▮▮▮▮▮▮ to Wyeth is applied during the entire timeline by applying the formula in cell C46 to cells D46:G46. The document's metadata indicate that it was last modified on September 23, 2005.

[409]  For example, Sandoz emphasized to Wyeth that "An authorized generic provides upside to the brand, but it must launch on day 1 … On time launch protects share and price … Failure to launch on day 1 can mean not launching at all." WYEFFAT6460-92 at 80. Wyeth's slide deck listed "Greatest Ability to Capture Share" as a "key point" about the value of authorized generics. It also listed "Potential for first to market advantage" as a success driver under "Launch own generic." WYEFFAT3609860-10024 at 09894 and 10023.

party for an authorized generic for these products at the time permitted under our agreements based on the economic opportunity represented by an authorized generic."[410]

226.    In 2008, well after the Wyeth-Teva Agreement was reached, Wyeth considered potential scenarios that might lead to a Teva at-risk launch of generic Effexor XR that would nullify the no-AG clauses specified in the Wyeth-Teva Agreement.  Wyeth identified two potential scenarios: (1) a dispute with Teva about the acceleration clauses and (2) a decision by Teva to waive its regulatory 180-day exclusivity period.[411]  In case the Agreement broke down and there was an at-risk launch, Wyeth planned to maintain a "state-of-readiness for launching of Effexor XR Own Generic (OG)"[412] in the U.S. during the period between June 2008 until Teva's expected launch in July 2010.[413]  Wyeth forecasted that what it referred to as its "Own Generic," *i.e.*, the AG, would make "incremental revenue" in the range of $50-$250 million in 2008 alone.[414]  In other words, if the Agreement failed to limit generic entry to Teva alone for the period starting in July 2010, Wyeth was prepared to launch an AG.[415]

227.    Wyeth's own experience also supports the conclusion that Wyeth was likely to sell an AG during Teva's regulatory exclusivity period if not for the terms of the Wyeth-Teva Agreement.  Protonix, a blockbuster drug with almost $2 billion in sales in 2006,[416] was Wyeth's

---

[410] WYEFFAT04649501 (Varma Ex. 16); Varma Deposition, p. 162:16-20 ("Economic opportunity" means that . . . value in revenue or IBT that could be -- could accrue to Wyeth  . . . if we were to support an authorized generic.").

[411] WYEFFAT3709177-81 at 78.

[412] WYEFFAT3650173.

[413] WYEFFAT3712553-87 at 60.  Also see WYEFFAT3613120-26.

[414] WYEFFAT3712553-87 at 80 and 84.

[415] Wyeth launched the line extension Pristiq in April 2008 and was working to convert Effexor XR sales to Pristiq prior to Teva's generic entry.  Because generic erosion occurs rapidly, selling an AG after Pristiq's launch should not substantially affect line extension sales.  In the materials I reviewed, Wyeth did not model any profit consequence of AG sales on sales of Pristiq.  Any concerns about converting Effexor XR prescriptions to Pristiq did not stop Wyeth from maintaining a state-of-readiness to sell its OG version of Effexor XR if Teva or another generic launched at risk.  Furthermore, line extensions were a common industry strategy for mitigating losses from generic entry during this time, and the high rate of AG launches indicates that line extensions did not stop other firms from selling AGs.  For example, both a line extension (Paxil CR) and an AG were sold for the drug Paxil. WYEFFAT3609860-10024 at 09876-09881.

[416] M. Iskowitz, "Wyeth Ships Generic Protonix, as Other Blockbusters Boost Income," *Medical Marketing and Media*, January 30, 2008 (https://www.mmm-online.com/home/channel/wyeth-ships-generic-protonix-as-other-

---

single opportunity to sell an AG during the time before Wyeth was acquired by Pfizer.[417] Unencumbered by a no-AG agreement, Wyeth elected to sell an AG version of Protonix shortly after Teva's generic entry.[418]  Following the pattern of other brand firms during this time period, Wyeth launched an AG when it had the opportunity and was not restricted by an anticompetitive agreement.

228.    Finally, I note that an AG version of Effexor XR was in fact launched.  As discussed below, the no-AG clauses deterred an AG-launch decision during Teva's 11-month *de facto*

---

blockbusters-boost-income).  See WYEFFAT3613120-26 at 24 indicating that one of the packing/labeling options Wyeth considered for its AG version of Effexor XR followed "the Pantoprazole OG format currently on the market."

[417]  See Wyeth, "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934, for the fiscal year ended December 31, 2005," February 27, 2006 at p. I-5 (https://www.sec.gov/Archives/edgar/data/5187/000119312506040159/d10k.htm), listing the following products as "covered" by Wyeth's patent portfolio: Altace, Benefix, rhBMP-2, Effexor/Effexor XR, Enbrel, Prempro, Prevnar, Protonix, Rapamune, Refacto, and Zosyn.

Wyeth ended its involvement promoting King Pharmaceutical's Altace prior to generic entry.  See "Wyeth Pulls the Plug on King's Altace," *PharmaTimes*, July 7, 2006 (https://pharmatimes.com/news/wyeth_pulls_the_plug_on_kings_altace_996261).

As indicated in the 10-K, pp. I-18, Enbrel and Prevnar are biologics, which are not regulated by the Hatch-Waxman Act.  BeneFIX, Refacto and rhBMP-2 are also biological products.  See FDA, "BeneFIX," April 21, 2021 (https://www.fda.gov/vaccines-blood-biologics/approved-blood-products/benefix); B. Skovrlj, *et al.*, "A Review of the Current Published Spinal Literature Regarding Bone Morphogenetic Protein-2: An Insight into Potential Bias," *Current Reviews in Musculoskeletal Medicine*, 7(3), 2014, pp. 182-88; and FDA, "CBER-Regulated Products with Supporting Documents" March 24, 2025 (https://www.fda.gov/vaccines-blood-biologics/cber-regulated-products-supporting-documents).

A generic version of Prempro has not been introduced as of the date this Report was submitted.

A generic version of Rapamune first became available in 2014, after Pfizer had acquired Wyeth, and Pfizer did launch an authorized generic version of Rapamune.  See "Dr. Reddy's Launches Generic Version of Rapamune Tablets in US," *The Economic Times*, October 28, 2014 (https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/dr-reddys-launches-generic-version-of-rapamune-tablets-in-us/articleshow/44961359.cms?from=mdr#google_vignette) and FDA, "FDA Listing of Authorized Generics as of April 1, 2025," (https://www.fda.gov/media/77725/download?attachment).

A generic version of Zosyn, an injectable product, first became available in 2010, after Pfizer had acquired Wyeth.  See "Sandoz Announces Launch of Piperacillin and Tazobactam for Injection, a Generic Version of Zosyn®," October 21, 2010 (https://www.fiercepharma.com/pharma/sandoz-announces-launch-of-piperacillin-and-tazobactam-for-injection-a-generic-version-of).

[418]  Teva launched a generic version of Protonix at risk in December 2007.  After failing to negotiate a settlement with Teva, Wyeth launched an AG version in January 2008.  Wyeth sold its AG through a distribution agreement with an external firm, Prasco.  See Iskowitz, *op. cit.*

---

exclusivity period, but the clauses no longer applied after the later-filing generics entered in June 2011.  Pfizer (which had acquired Wyeth[419]) introduced an AG version of Effexor XR at that time.[420]

229.    After considering the evidence described above, including the evidence that Wyeth expected an AG to be profitable, I conclude that a reasonable firm in Wyeth's position would have planned to launch an AG upon Teva's entry if it were not for the no-AG clauses in the Wyeth-Teva Agreement.

<u>The No-AG Clauses Prohibited and Deterred Wyeth from Selling an Effexor XR AG</u>

230.    During Teva's 180-day regulatory exclusivity period, the Agreement contained an explicit no-AG clause specifying that,

> "… neither Wyeth nor any of its Affiliates will market, sell, distribute or manufacture any Authorized Generic Product of XR Reference Product (in any dosage strength), or license, grant a waiver or otherwise authorize or cause or allow any Third Party to do the same, for sale in the Territory."[421]

231.    Wyeth also granted Teva a non-exclusive license effective "immediately upon expiration of the exclusive license" (*i.e.*, after the 180-day exclusivity period expired) until the patents expired or were proven invalid or unenforceable.[422]  The license did not expressly prohibit Wyeth from selling its AG after the regulatory exclusivity period, but it contained ████████████ that deterred Wyeth from doing so.  ████████████, particularly those contingent on an AG launch, have been recognized as a means to deter competition from an AG.[423] ████████████

████████████████████████████████████

████████████████████████

---

[419]  Pfizer Press Release, "Pfizer Completes Acquisition of Wyeth," October 14, 2009 (https://www.pfizer.com/news/press-release/press-release-detail/pfizer_completes_acquisition_of_wyeth).

[420]  See ¶ 132 above.

[421]  WYEFFAT2405436-523 at 448.

[422]  WYEFFAT2405436-523 at 448.

[423]  See Section III.D above citing Drake and McGuire (February 2024), *op. cit.* and Bureau of Competition (FY 2016), *op. cit.*

---

232. 

<u>Valuing Wyeth's Reverse Payments from the No-AG Clauses in the Generic Effexor XR License</u>

233.    The value Wyeth sacrificed with the no-AG clauses in the Agreement depends on whether Teva's royalties are credited as offsets to Wyeth losses. Whether they are credited or not does not affect the conclusion that Wyeth made large reverse payments to Teva in the XR license with the two no-AG clauses.

234.    Wyeth's expected gross profits from selling an AG total $668.7 million during a three-year period between July 2010 and June 2013.[428] This total includes gross profits from brand Effexor XR and gross profits from the AG product and it reflects Wyeth's aggressive assumption about generic erosion in the presence of an AG. On the other hand, if Wyeth did not sell its AG, Wyeth's expected gross profits from brand Effexor XR total $561.1 million.[429] Wyeth could

---

[424]  WYEFFAT2405436-523 at 453-454. "'XR Patent Termination Date' shall mean the date on which there are no more Valid Claims of U.S. Patent Rights contained in the XR IP that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of XR Reference Products (in any dosage strength)" WYEFFAT2405436-523 at 444.

[425]  WYEFFAT2405436-523 at 453. ███████████████████████████████████

[426]  WYEFFAT2405436-523 at 453-454.

[427]  WYEFFAT2405436-523 at 453-454.

[428]  See Attachment D.1. Based on Wyeth's initial meetings with potential AG distributors, Wyeth assumed it would retain 70% of the profits from its AG in a third-party distribution agreement.

[429]  See Attachment D.2.

---

expect to earn \$107.5 million less (\$668.7 million - \$561.1 million) by agreeing to give up the option to sell its AG product.[430]

235.      

236.      For the calculations above, I use Wyeth's model with minor modifications based on the actual terms of the Wyeth-Teva Agreement.  (The model was created before the Agreement was finalized and did not include the final terms.)  I consider the calculations to represent an accurate estimate of the cost from including the no-AG clauses in the Agreement to a reasonable party in Wyeth's position at the time the Agreement was signed.  Of course, alternative assumptions could be used that would affect the value of the no-AG clauses.

237.      For example, Wyeth's forecast model of AG profits from September 2005 assumed that additional generic firms would start selling generic Effexor XR after Teva's regulatory exclusivity period ended.[432]  If Wyeth instead assumed that Teva would be the only ANDA filer selling generic Effexor XR for longer than 180-days, the cost from including the no-AG clauses

---

[430]  These figures are lower than the figures described in ¶ 224 above because they account for Wyeth's expectation that brand Effexor XR sales would shrink between 2008 (the year of generic entry for the calculations above) and 2010 (the year of generic entry for these calculations).

[431]  See Attachment D.2 showing that, if the royalties from Teva are added, Wyeth could expect to make \$599.7 million in gross profits by not selling its AG.  \$668.7 million - \$599.7 million = \$68.9 million.  Attachment D.2 follows Wyeth's model in assuming that other generics are launched after the 180-day exclusivity period expires so that Teva only pays royalties to Wyeth during the exclusivity period.

[432]  WYEFFAT3781144.  Row 4 of the tabs "Base", "Case1", "Case2", and "Case3" assumes that Teva's market share would drop after the 180-day exclusivity period.

---

could be lower. This is because Wyeth would receive more in ▮▮▮▮▮ from Teva, which, if
deducted, would decrease the value of Wyeth selling its AG.[433]

238.    On the other hand, alternative assumptions could increase the cost of the no-AG clauses
to Wyeth. For example, Wyeth conservatively assumed that it would receive 70% of the profits
from its AG, a rate proposed in an initial meeting Wyeth had with a potential AG distributor.[434]
But Wyeth likely would have been able to improve on this initial offer. In fact, Wyeth
negotiated a rate that was similar to the industry standard of 90% when it sold an AG version of
another drug in 2008.[435] Assuming that Wyeth would retain 90% of the AG profits would
increase the value to Wyeth from selling its AG to $174.3 million ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮.[436]

239.    In addition, Wyeth's aggressive assumption about more rapid brand-to-generic
substitution with two generic products instead of one imposes a significant and unrealistic profit
penalty on the AG-launch option. Wyeth's assumption is at variance with industry experience
known at the time. Economic studies have supported the view, conveyed by Sandoz to Wyeth
prior to the Agreement in 2005, that brand prescriptions convert to generic prescriptions "at the
same rate irrespective of the number of generic entrants."[437] To the extent Wyeth understood

---

[433] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[434] See ¶ 223 above citing WYEFFAT05606715-92 at 41 and WYEFFAT3786460-92 at 78.

[435] See WYEFFAT3624792-94 indicating that Wyeth received 88%-94% of the net sales from its AG version of
Protonix in 2008. This translates to an even higher rate of profits because profits equal net sales less costs.

See FTC (August 2011), *op. cit.*, p 77. An October 2004 company document cited by the FTC 2011 Report (pp. 77)
indicated that "Historically, generic partners received 20-35% of the economics, but this has now been driven down
to 10% or less." Additionally, a May 24, 2007 slideshow titled "Authorized Generic Partnership: Merck-Ranbaxy"
indicated that the "[c]urrent industry standard for sharing Net Profits is 90% to the innovator company and 10% to
the generic marketer." *In re: Nexium (Esomeprazole) Antitrust Litigation*, United States District Court for the
District of Massachusetts, MDL No. 2409, Civil Action No. 112-cv-11711, Trial Exhibit 103, slide 9.

[436] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[437] For example, see FTC (August 2011), *op. cit.*, pp. 50-56; Berndt, *et al.* (2007), *op. cit.*, pp. 795-96 and H.
Grabowski, *et al.*, "Continuing Trends in U.S. Brand-Name and Generic Drug Competition," *Journal of Medical
Economics*, 24(1), 2021, pp. 908-17 at p. 909.

that its assumption about generic erosion could be too aggressive, the value from the no-AG agreement would be larger. For example, assuming the conversion rate would be unaffected by Wyeth's AG launch, and that Wyeth would retain 90% of its AG profits, then the value to Wyeth from selling its AG would increase to $300.4 million █████████████████████████████ ████████████████████████[438]

240.    To be conservative, I use $68.9 million as the cost to Wyeth of including the no-AG clauses in the Wyeth-Teva Agreement in my calculations below. This estimate is conservative because it ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████

### Wyeth's Payment in the Generic Effexor IR license with a No-AG Clause

241.    The Wyeth-Teva Agreement settling patent litigation with respect to Effexor XR included a side deal related to another drug, a license for Teva to sell a generic version of Effexor IR. At the time of the Agreement, Wyeth's Effexor IR was protected by a compound patent on the active ingredient venlafaxine which expired on June 13, 2008.[439] In practical terms, no generic, including Teva, could launch a generic Effexor IR product before the compound patent expired without a license from Wyeth.[440] Under the Effexor IR license in the Agreement, Teva could begin selling a generic version of Effexor IR in the U.S. on June 15, 2006, two years prior to the expiration of the compound patent.[441] Furthermore, Wyeth ceded the entire generic market to Teva by agreeing not to compete with its own AG or to license another generic to do so during the two-year period.[442] The Wyeth-Teva Agreement thus

---

[438] ████████████████████████████████████████████████████████ ██████████████████████████████████

[439] See Table 2 above.

[440] As noted in the Wyeth slide produced as Figure 16 below, "The Period of Pre-June 2008 Exclusivity [for Effexor IR] Teva Could Only Acquire Through Wyeth License." WYEFFAT3767262.00001-03 at 03. As shown in Tables 8 and 9 below, Wyeth's forecasts assumed that, absent the settlement, Effexor IR generics would launch in June 2008.

[441] See ¶ 117 above.

[442] WYEFFAT2405436-523 at 438 and 445.

conferred on Teva a monopoly on generic sales of a different drug than Effexor XR for two years. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ ██

Valuing the Generic Effexor IR Reverse Payment

242.    Wyeth was aware that the generic Effexor IR component of the Agreement meant losses, acknowledged it was taking those losses "to keep [Teva] off XR,"[444] and estimated the magnitude of those losses (and the value conveyed to Teva) prior to reaching the Agreement with Teva.  The September 1, 2005 and September 13, 2005 versions of a Wyeth slide deck titled "Effexor Scenario Analysis" included a figure depicting the net present value (NPV) of gross profit losses from Effexor IR by allowing Teva to launch its generic Effexor IR at different times.[445]  A replica of the slide is included here as Figure 16.[446]  The slide indicates that the generic Effexor IR license was tied to the terms of the likely delayed entry of generic Effexor XR by "[g]iving Teva 50 M of NPV to Close the XR Gap."[447]  An August 2005 e-mail commented on the slide:

> "The last slide [Figure 16] is the most important in that it shows Teva NPVs by launch date, split, and IR brand loss … There is only one way to get to about 60 M of after-tax value (37.5% rate).  That is to let Teva keep all generic profits and to let them on IR this coming January (2006).

---

[443]  WYEFFAT2405436-523 at 452-453.  Also see WYEFFAT3767261-67 at 61 (Varma Ex. 17), where the cover email explains that the attached "slides . . . [are] demonstrating the value to Teva of letting them in on IR early."

[444]  See WYEFFAT3767261 attaching WYEFFAT3767261.00001-.0003.

[445]  WYEFFAT3767262.00001-.0003 at .0003 (a draft included in an August 24, 2005 email WYEFFAT3767261); WYEFFAT3786830-56 at 51 (the September 1, 2005 version); and WYEFFAT06847939-85 at 74 (the September 13, 2005 version).  WYEFFAT3786859 provides the backup calculations that created the figure.

[446]  I use the version from WYEFFAT3767262.00001-.0003 at .0003.  For clarity, I corrected the second label on the x-axis from "Jul-0" to "Jul-06."  The tab "Charts" of WYEFFAT3786859 confirms that this was a mistake.  The note at the bottom of the slide defines incremental NPV as "Pre-Tax Value of Gross Profit For the Period From Teva Launch To June 2008.  It Represents The Period of Pre-June 2008 Exclusivity Teva Could Only Acquire Through Wyeth License."

[447]  WYEFFAT3767262.00001-.0003 at .0003.  This note at the top of the August version was removed from the later versions.

---

"A secondary message of the last slide is that it is better to take no split (if possible) and have them come on later giving them the same NPV for less of a loss on our IR franchise. **You can give Teva the same value to keep them off XR but do it for cheaper.**"[448] (Emphasis added.)

**FIGURE 16**
**WYETH SLIDE OF POTENTIAL PAYMENTS TO TEVA THROUGH EFFEXOR IR LICENSE**



243.    In Figure 16, the red bars taking negative values depict Wyeth's expected losses through a range of possible licensed entry dates for Teva to sell generic Effexor IR.  Notably, Wyeth projected not only its losses associated with Teva entry dates, but also the *positive profits gained by Teva,* shown in light and dark blue, indicating the significance to Wyeth of knowing not only how much it would sacrifice, but also how much Teva was profiting from the Effexor IR license. The Wyeth analysis depicted in Figure 16 calculates Teva's NPV based on paying ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For example, the left-

---

[448]  WYEFFAT3767261.

most side of the chart shows the results for a January 2006 Teva licensed entry date. The light blue bar indicates that Teva would gain about ████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ from the Effexor IR brand product.

244. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████
███████████

245. ███████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████ █████████████████
██████████████████████████████████
████████ █ ████████████████████████████████
████████████████ █ █████████████████████

---

[449] ██████████████████████████████████████████
████████████████████████████████████████

[450] See WYEFFAT3769148 attaching WYEFFAT3769149 (Varma Ex. 13). Wyeth used the term "Genco" to refer to "generic company" generally. For example, see WYEFFAT3781449, which is a term sheet between Teva and Wyeth referring to Teva as "Genco." See also Varma Deposition, pp. 146:21-147:9 (confirming that WYEFFAT03769149 concerns Wyeth's Effexor XR settlement with Teva).

[451] See WYEFFAT05979442 attaching WYEFFAT05979443.

[452] ██████████████████████████████████████████
████████████████████████████████████████████████



246.

[453] See WYEFFAT05979442 attaching WYEFFAT05979443. I moved the column labels (*i.e.*, the years) down and hid some rows and columns to enlarge the table.

[454] WYEFFAT06426691 attaching WYEFFAT06426692.

[455]



247. 

248.

456 

457 IQVIA NSP data.

458 IQVIA NSP data.

[black redaction bars]

249.    In material I have reviewed in this matter, I have seen no business reason, in Wyeth documents or depositions, that explain why Wyeth would cede the market for Effexor IR to Teva.[459]  The Teva Effexor IR license is a stark example of an "unexplained reverse payment."

*Wyeth's Payment in the Effexor XR Canada License with a No-AG Clause*

250.    

---

[459]  Deposition of David Manspeizer, in this matter, April 2, 2025 (hereafter "Manspeizer Deposition"), p. 76:13-16 ("Q. You can't think of any business rationale for Wyeth having offered Teva an early entry for its IR generic?  A. Not as I set here today.") and pp. 119-120.  Deposition of Arthur Cohn, in this matter, March 12, 2025 (hereafter "Cohn Deposition"), p. 49:4-9 ("Q. So why would Wyeth have been offering Teva early entry for its IR generic as part of this deal?  [Objection.]  THE WITNESS: I don't recall.").

[460]  See ¶¶ 119-120 above summarizing the Canadian License Agreement.

[461]  [black redaction bar]

[462]  *Pfizer Canada Inc. v. Teva Canada Limited*, 2016 FCA 161 (CanLII), p. 6 (Can.).

[463]  See *Ratiopharm inc. v. Wyeth et. al.*, 2008 R.C.F.447, 463 (CAN) *Wyeth Canada v. Ratiopharm inc.*, 1 FCR 447, 463 (2008) and T. Stott, "Teva Awarded Section 8 Damages Regarding Ratiopharm-Venlafaxine," *Smart & Biggar*, May 23, 2014 (https://www.smartbiggar.ca/insights/publication/teva-awarded-section-8-damages-regarding-ratiopharm-venlafaxine).

[464]  See WYEFFAT06426691 (an October 24, 2005 email) attaching WYEFFAT06426692.  Absent the Agreement, Teva assumed that generics would enter in January 2008 in its forecast model.  See TEVA_EFFEX_0906116 (a September 30, 2005 email) attaching TEVA_EFFEX_0906117, tab "Summary."

---



Valuing the Effexor XR Canada License Reverse Payment

251.    Wyeth's October 13, 2005 "Effexor XR Patent Litigation Settlement Analysis," described above, also calculates Wyeth's IBT from sales of Effexor XR in Canada.[468]  The assumptions appear to match the final terms of the Wyeth-Teva Agreement.[469]  The calculations in the Excel file indicate that Wyeth expected to lose $181 million in IBT from agreeing to the December 2006 entry date for Teva in the Effexor XR Canada license as opposed to first generic entry in Canada in January 2008.  Table 10 below reproduces Wyeth's calculations.[470]

---

[465]  Wyeth's additional patent was issued and listed on the Patent Register in December 2005 as Canadian Patent No. 2,199,778.  On December 1, 2006, pursuant to the Agreement, Teva launched its generic version of Effexor XR in Canada.  Teva sold the only generic product for over 8 months until the '778 patent was found invalid and additional generic entry occurred in August 2007.  A statutory stay prevented other generics from selling while the court considered the patent's validity.  *Pfizer Canada Inc. v. Teva Canada Limited*, 2016 FCA 161 (CanLII), p. 6-7 (Can.).; *Teva Canada Limited v. Wyeth LLC and Pfizer Canada Inc.*, 2011 FC 1169 (CanLII), p. 5.  *Teva Canada Ltd. V. Wyeth LLC*, 2012 CAF 141, pp. 3-4.

[466]  The Wyeth-Teva Agreement allowed Teva to start selling Effexor XR in Canada immediately if Wyeth failed to obtain the additional patent listing.  It also allowed Wyeth to start selling in August 2007 if that patent was listed but the Wyeth-Teva Agreement did not become effective (*e.g.*, if the FTC blocked it).  The Agreement also allowed Teva to enter earlier if a different generic manufacturer launched a generic Effexor XR product in Canada.  See Section IV.C above.

[467]  WYEFFAT2405436-523 at 493.

[468]  See WYEFFAT05979442 attaching WYEFFAT05979443.

[469]  Teva's entry is assumed to occur in December 2006 and the royalties end after 2007.

[470]  See WYEFFAT05979442 attaching WYEFFAT05979443.  I moved the column labels (*i.e.*, the years) down and hid some rows and columns to enlarge the table.

---

**TABLE 10**
**WYETH OCTOBER 13, 2005 CALCULATION OF ITS PROFIT LOSSES**
**FROM THE EFFEXOR XR LICENSE IN CANADA ($ MILLIONS)**

| Effexor XR - Canada - USD | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Cum |
|---|---|---|---|---|---|---|---|
| Wyeth Obtains New Patent; Genco Launches January 2008 | 207 | 204 | 135 | 38 | 19 | 19 | 622 |
| Settlement Scenario- Genco Launches Dec. 2006 | 207 | 148 | 29 | 19 | 19 | 19 | 441 |
| Effexor XR - Canada Differential | | (56) | (106) | (19) | - | - | (181) |

252.    The October 24, 2005 version of Wyeth's Excel file, also described above, included assumptions that appear to match the final terms of the Wyeth-Teva Agreement.[471]  Wyeth continued to assume that, absent the Wyeth-Teva Agreement, generic versions of Effexor XR in Canada would be introduced in January 2008.[472]  As shown in the bottom row of Table 11,[473] Wyeth's expected profits from generic entry in January 2008 versus allowing Teva to enter in December 2006 were similar to the previous version.  The calculations indicate that Wyeth would lose $187.3 million in IBT from agreeing to the Effexor XR Canada license.

---

[471]  WYEFFAT06426691 attaching WYEFFAT06426692.

[472]  WYEFFAT06426692.  In this version of the Excel file, Wyeth added several other scenarios.  However, in its calculation of its profits from litigation, Wyeth continued to assume that generic versions of Effexor XR would first be available in Canada in January 2008 if it did not include an earlier license in its settlement of the U.S. litigation with Teva.  See the Excel formulas in WYEFFAT06426692, rows 68-69 and 72-73.

[473]  WYEFFAT06426691 attaching WYEFFAT06426692.  I moved the column labels (*i.e.*, the years) down and hid some rows and columns to enlarge the table.  I also simplified the row names.  For example, the full label of the "Teva Launches December 2006" scenario was "Teva Launches December 2006 w 45% Royalty First 12 Months & 50% Thereafter."  I also added the "Effexor XR - Canada Differential" row, which was not in this version of Wyeth's file.

TABLE 11
WYETH OCTOBER 24, 2005 CALCULATION OF ITS PROFIT LOSSES
FROM THE EFFEXOR XR LICENSE IN CANADA ($ MILLIONS)

| Effexor XR - Canada - USD | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Cum |
|---|---|---|---|---|---|---|---|
| Generics Enter January 2008 | 207 | 218 | 128 | 34 | 19 | 19 | 625 |
| Teva Launches December 2006 | 207 | 145 | 29 | 19 | 19 | 19 | 438 |
| **Effexor XR - Canada Differential** | | (73) | (99) | (15) | (0) | (0) | (187) |

## No Explanation for Ceding the Effexor XR Canada Market to Teva

253.    As in the case of the license of Effexor IR, viewed in isolation, the Canadian license allowing Teva to start selling generic Effexor XR in December 2006 makes no business sense for Wyeth.  In the absence of the Agreement with Teva, Wyeth modeled that it could sell Effexor XR in Canada without generic competition until January 2008.  The sacrifice of its own sales at a high price for a share of Teva sales at a lower price makes no business sense for Wyeth.

254.    In material I have reviewed in this matter, I have seen no business reason, in Wyeth documents or depositions, that explain why Wyeth would license Teva to sell generic Effexor XR in Canada.[474]  The Teva Canadian license is a second stark example of an "unexplained payment."

### *Total Value of Wyeth Reverse Payments to Teva*

255.    In summary, Wyeth made reverse payments in the form of the Effexor XR no-AG clauses in the US license ($68.9 million at minimum), the Effexor IR US license ($156.6 million), and

---

[474] Manspeizer Deposition, pp. 122:22-123:1 ("Q. Okay.  What business reason would Wyeth have for granting Teva early entry for its XR generic in Canada as part of an agreement to settle a U.S. patent litigation?  A. I have no recollection.").  Cohn Deposition, p. 121:1-6 ("Q. And why would Wyeth have offered Teva an early launch date for an XR generic in Canada?  [Objection.]  THE WITNESS: I don't recall.").

the Effexor XR Canada ($187.3 million) license.  Summing, I conclude that, at minimum, the licenses represented a reverse payment from Wyeth with an expected value of $412.8 million.

***Possible Explanations for Wyeth's Reverse Payments to Teva***

256.    

257.    Avoided litigation costs are a second potential explanation for reverse payments.  A rational brand company may be willing to make a reverse payment up to the value of avoided litigation costs to settle a case.[475]  I understand from counsel that a company in Wyeth's position at the time of the Agreement could have expected future litigation costs of approximately $4.3 million to see litigation with Teva through to a conclusion.[476]  Avoided litigations costs are capable of explaining only a very small fraction of the $412.8 million in reverse payments.

258.    A payment from Wyeth might also be explained by goods or services supplied by Teva in connection with the Agreement.  In this case, Teva does not provide any goods or services that could count as an explanation for the reverse payments from Wyeth.

***Conclusion:  Wyeth's Unexplained Reverse Payments to Teva Imply a Likely Delay in the Start of Generic Competition***

259.    Wyeth's reverse payments totaled at least $412.8 million.  This includes the profits Wyeth sacrificed from providing Teva favorable terms in the Effexor XR US license, the Effexor IR US license, and the Effexor XR Canada license.  The "unexplained" reverse payment is at minimum $412.8 million less $4.3 million in avoided litigation costs, equaling $408.5 million.

---

[475]  Avoided future litigation costs are a recognized possible "explanation" for a reverse payment that is below the level of those costs. For example, see Edlin, *et al.* (2013), *op. cit.*, p. 17.

[476]  I understand from counsel that Dr. Robert Hrubiec will opine on this issue.

A rational company in Wyeth's position would not make these large and otherwise unexplained reverse payments unless Wyeth expected that the payments would likely delay the start date of generic competition for Effexor XR.[477]

## B.    Payments to Teva in the Agreement were Sufficient to Induce Teva to Agree to a Delay in Entry

260.    Sufficiently large reverse payments may induce a generic to agree to delay its entry.[478] Hemphill observed that if the brand shared a sufficient portion of the anticompetitive profit created by a pay-for-delay settlement, the generic could make more from the settlement than it could have made by winning the patent litigation.[479]  In other words, an agreement might create more profits for the settling generic than what the generic could make in an otherwise "best-case" competitive outcome.  This condition, if met, is evidence that the terms of the settlement are not a compromise based on patent strength but rather that the generic has been induced to agree to a likely delay in its entry.[480]

261.    Relevance of the size of the payments to generics in relation to a win in the patent case was stressed in the *Amicus* brief submitted by 118 Law, Economics, and Business Professors and the American Antitrust Institute to the U.S. Supreme Court during its *Actavis* case:

---

[477] Attachment D.6 shows that Wyeth's reverse payments were also large if the valuation is instead based on how events actually played out and real sales data.  Attachment D.6 also shows how accounting for the time value of money affects the values.  Attachment F.6 uses Teva's financial forecast models to calculate the value of the reverse payments received by Teva.  These alternative calculations do not affect my qualitative conclusion.

[478] This is a straightforward implication of economic models of bargaining.  For example, see S. Ghili and M. Schmitt, "A Framework for Estimating Damages in Reverse Payment Cases," *Antitrust Law Journal*, 81(3), 2017, pp. 873-901, applying a Nash bargaining model to estimate the outcome of brand-generic settlement negotiations.  In exchange for something of value, the generic will agree to a later entry date.

[479] Hemphill (2006), *op. cit.*, p. 1581.  Bulow, *op. cit.*, p. 166, shows reverse payment settlements do not necessarily satisfy this condition.  In other words, the generic with a settlement being left in a position less favorable than a win in the patent litigation does not disprove that the agreement is a pay-for-delay.

[480] For example, see *Amici Curiae*, p. 25 and *Actavis* Decision, p. 2235 ("The rationale behind a payment of this size [exceeding what the generic could have made with a win in the patent case] cannot in every case be supported by traditional settlement considerations.  The payment may instead provide strong evidence that the patentee seeks to induce the generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market."), citing Hemphill (2006), *op. cit.*, p. 1581, and *Amici Curiae*, p. 25.

---

In the AndroGel reverse payment settlement, "…the payment at least approached the amount the generics would have made even if they were completely sure they could enter the market. Payments of such large sums offer powerful evidence that the patentee thought the patent was weak indeed."[481]

262.    Payments and profits to Teva through the Agreement exceeding what Teva would make if it followed through with the patent litigation and won is evidence that the settlement is not a competitive compromise about a date, but an anticompetitive settlement to pay Teva to not compete.

263.    To make this evaluation, I compare the profits Teva could make under the Agreement to Teva's profits in a "best-case" competitive outcome. My conclusion is that the profits conferred to Teva by the Agreement were sufficient to induce Teva to agree to a likely delay in the start of generic competition.

264.    Teva's best-case scenario, in the absence of a settlement, was to win the patent litigation and begin selling generic Effexor XR in June 2008 and for 180 days thereafter without competition from another generic firm.[482] In this competitive scenario, Teva would have expected Wyeth to launch its AG around the same time as Teva's sales began.[483] In comparison, the Agreement moved Teva's generic entry date back but added profits for Teva from the early entry dates in the Effexor IR and Effexor XR Canada licenses with no-AG clauses, as well as from the explicit and implicit no-AG clauses in the Effexor XR license.

---

[481] *Amici Curiae*, p. 25.

[482] As discussed below, it was possible that Teva would win the litigation well before June 2008 so that Teva's 180-day exclusivity period would begin and expire before Teva could start selling its generic Effexor XR product. However, for the purposes of this analysis, it is conservative to assume that Teva would retain the exclusivity period if it won the litigation because it increases Teva's best-case profits.

It is possible that the Wyeth-Teva patent infringement litigation would be ongoing in June 2008 so that Teva would be at risk of paying damages to Wyeth if it entered and then lost the litigation. Teva could eliminate the risk of owing damages by deferring its entry until after the final resolution of the litigation, which would lower the value of Teva's best-case scenario. For the purposes of this analysis, it is conservative to assume that Teva would enter in June 2008, whether the patent infringement litigation was ongoing or not.

[483] As explained below, Teva's forecast model assumed that generic erosion would be the same whether or not Wyeth launched an AG version of Effexor XR. In a 2004 earnings conference call, Teva's President and CEO said that "We now factor authorized generics into our plans as a given." WYEFFAT3609860-10024 at 9869.

265.    For these calculations, I rely on Teva's modeling assumptions about generic entry, where available, including (1) how quickly Effexor XR brand sales would become generic after entry, (2) Teva's share of generic sales, and (3) the price of Teva's generic product (as a percentage of the brand price).[484]

266.    I did not find or review any Teva forecasts about the anticipated growth in Effexor XR sales dating from prior to when the Agreement with Wyeth was reached in November 2005.[485] Effexor XR sales projections would feed into Teva's evaluation of the profits from entry in June 2008 and from the Agreement. Generally, higher Effexor XR brand sales projections would increase Teva profits in both scenarios.

267.    It is my opinion as an experienced health economist that in the absence of being able to consult more complete Teva forecasts made prior to the Agreement, it is reasonable and appropriate to use the expectations of another informed market participant with incentives to produce accurate forecasts. Thus, I rely on Wyeth's forecasts in order to estimate how a company in Teva's position would have expected Effexor XR brand sales to unfold without generic entry.[486] Wyeth's forecasted sales are shown in Figure 17 below.

---

[484] See Teva's forecast models from September 13, 2006 (TEVA_EFFEX_0440656 attaching TEVA_EFFEX_0440657 (Wodarczyk Exs. 10 & 10B)) and December 21, 2006 (TEVA_EFFEX_0863426 attaching TEVA_EFFEX_0863427 (Wodarczyk Exs. 12 & 12B)). Teva's forecast models label these three factors, respectively, as (1) "Generics Market Share," (2) "Teva USA Market Share," and (3) "Teva USA Price Erosion."

[485] I reviewed Teva forecasts made 10 months after the signing of the Agreement or later, well before Teva's agreed-upon entry date of July 2010. However, these post-Agreement projections, which are summarized in Attachment E, do not model or discuss Effexor XR sales with sufficient detail to enable me to exclusively use Teva documents to formulate what a rational company in Teva's position would have forecast in sales at the time of the Agreement.

[486] I rely on the forecast from WYEFFAT06859914. If tab "Cash Flow," cell E4 and E10 are changed to 2017, these sales are then calculated in tab "Branded Inputs," as row 9 * row 51.



FIGURE 17
EXPECTED EFFEXOR XR SALES WITHOUT GENERIC ENTRY ($ MILLIONS)



268.    I recognize that the presence of the acceleration clauses based on sales volume in the Agreement is evidence that a company in Teva's position may have expected at least some chance Effexor XR sales would decline significantly.[487]  And at the time of the Agreement, it was publicly known that Wyeth planned to launch a line extension.[488]  However, the Teva materials I found and reviewed did not reveal the likelihood Teva assigned to the various

---

[487]  See fn. 217 in Section IV.C describing the acceleration clauses in the license to sell generic Effexor XR in the U.S.

[488]  For example, see WYEFFAT3781059-78 at 61, which is a May 2005 financial analyst report from Merrill Lynch "…forecasting a late 2006 launch of DVS-233, a metabolite of Effexor that is believed to have similar efficacy with a better tolerability/safety profile."

possibilities for the path of sales.  Projections made by Wyeth and Sandoz[489] indicate that, as of November 2005, it was unlikely the sales would decrease enough to trigger the acceleration clauses.[490]  And in fact, brand Effexor XR sales did not decline enough to trigger any of the acceleration clauses.

269.     As explained below, Teva's expected profits from the side deals in the Agreement alone, the Effexor IR U.S. and Effexor XR Canada licenses, were almost as valuable as Teva's expected profits from winning the litigation, meaning that the result that profits with the Agreement exceed a best-case competitive outcome is extremely robust to different assumptions about Effexor XR's path of sales.

270.     Based on the above forecasts of the evolution of Effexor XR sales, I am able to compare Teva's profit prospects in a "best-case" scenario of winning the patent litigation with those of profits from the Agreement with Wyeth.  As described below, Teva's expected profits from the Agreement exceed even a "best-case" competitive scenario, implying the Agreement is not a compromise based on patent strength in the Effexor XR litigation.  The reverse payments were sufficient to induce Teva to accept a delayed entry date for generic Effexor XR.

***Teva's Profits from its Best-Case Scenario of Winning the Patent Litigation***

271.     Teva's best-case scenario absent a settlement was winning the patent infringement litigation and launching after the compound patent expired in June 2008.  A company in Teva's position would have expected competition from a Wyeth AG.[491]

---

[489]  For example, see WYEFFAT2398379-87 at 87, which is a Sandoz forecast model.

[490]  If Teva anticipated that Wyeth's line extension would significantly erode Effexor XR sales, this would decrease the value of the Agreement to Teva, but it would also decrease the value of Teva's best-case scenario of winning the patent litigation.  In both scenarios, Teva would enter in June 2008, against a Wyeth AG in the "best-case" scenario and not against an AG with the Agreement.  Thus, if the level of sales acceleration clause were triggered, Teva would still be better off with the Agreement.

[491]  Teva's model of June 2008 entry assumes that it would face competition from an AG (TEVA_EFFEX_0440657).  Wodarczyk Deposition, p. 131:16-18 (in TEVA_EFFEX_0440657, "we were assuming an authorized generic to enter during our exclusivity period. So, it says 'Assume AG.'").  Additionally, Teva's forecasts indicate that it believed the "Generics Market Share" (which is the brand-generic conversion rate) would

272.    As shown in Figure 17 above, without generic entry, Effexor XR sales were expected to drop approximately 30% from $2,895 million in 2006 to $2,071 million in 2008.  At this level of brand sales, Teva could have expected to make $246.2 million from launching in June 2008 with competition from an AG.[492]  Teva's forecast model assumed that multiple other ANDA filers would begin selling at the end of Teva's exclusivity period.

### Teva's Profits from the Reverse Payments in the Wyeth-Teva Agreement

273.    With the Wyeth-Teva Agreement, Teva would profit from selling Effexor XR in the U.S. without competition from an AG, although its entry would occur later, in July 2010, and ███ ██████████████████████████  Teva would also expect additional profit from its license to sell Effexor IR in the U.S. and Effexor XR in Canada before other generics could enter.

274.    As shown in Figure 17 above, without generic entry, Effexor XR sales were expected to drop from $2,071 million in 2008 to $1,564 million in 2010.  At this level of brand sales, Teva could have expected to make $326.4 million from launching in July 2010 without competition from an AG.[493]

275.    I did not find or review any Teva forecasts of its profits from the Effexor IR license. However, given that Teva's sales from the Effexor IR license began less than 12 months after the Wyeth-Teva Agreement was signed, a company in Teva's position would have been well-positioned to accurately anticipate the actual path of sales.  In fact, Teva made $140.8 million from selling Effexor IR between August 2006 and June 2008 (when the compound patent expired in the U.S.).[494]

---

be the same whether there were one or two generics (see TEVA_EFFEX_0863427 and TEVA_EFFEX_0440657), so Teva would have expected an AG launch to be profitable to Wyeth.

[492] See Attachment F.2 for details.

[493] See Attachment F.2 for details.

[494] See Attachment F.5 for details.

Although the Agreement licensed Teva to launch Effexor IR on June 15, 2006, Teva did not launch until August 3, 2006 because of a last-minute issue raised by the FDA.  See Teva email strings about the FDA issue (*e.g.*, TEVA_EFFEX_0752300-302; TEVA_EFFEX_0775446-50; TEVA_EFFEX_0774195-96).  Teva would have

276.    Teva forecasted its profits from the license allowing it to sell a generic version of Effexor XR in Canada prior to other generic competition.[495]  Without the license, Teva assumed it would have introduced its generic product on January 1, 2008, alongside "3 additional players" and would earn $39.1 million in profit.[496]  With the license, Teva assumed it would sell the only generic product during 2006 and 2007 and would earn $161.7 million in profit.[497]  Teva thus expected to earn $122.6 million more in profit from having the license to sell Effexor XR in Canada prior to other generic entrants.

277.    In total, Teva could have expected to make $589.8 million from the Wyeth-Teva Agreement from selling Effexor XR in the U.S. ($326.4 million), selling Effexor IR ($140.8 million), and selling Effexor XR in Canada ($122.6 million).

### Conclusion:  Teva's Profits from the Reverse-Payment Agreement were Sufficient to Induce Teva to Delay Its Generic Entry

278.    A company in Teva's position could have expected to make $343.7 million more in profits from the Wyeth-Teva Agreement ($589.8 million) than it could have from winning the patent infringement litigation ($246.2 million).  The Agreement more than doubled Teva's profit expectations.  Paying so much more than Teva would make in a best-case competitive scenario would not be necessary to induce a competitively acting company in Teva's position to compromise on a date of entry for Effexor XR.  After all, Teva might also lose the litigation so some payment less than the profits in the best case would still increase Teva's expected profits.  Vastly overpaying Teva in relation to a best-case scenario is evidence that the reverse payments

---

earned more profits from Effexor IR if it were not for this issue making it conservative to assume Teva fully anticipated the level of Effexor IR profit it would earn at the time of the Agreement.

[495]  TEVA_EFFEX_0906116 (a September 30, 2005 email) attaching TEVA_EFFEX_0906117.

[496]  See Attachment F.3, row [7].

[497]  See Attachment F.3, row [3].

in the Wyeth-Teva Agreement were not part of a patent merits-based compromise on a date but were instead a means to induce Teva to delay generic entry.[498]

## C.    Wyeth's Stock Market Price Jumps After Announcements Regarding the Agreement are Evidence that it Delayed Generic Entry

### *The Stock Price Test*

279.    An anticompetitive agreement between a brand and a generic generates additional profits for the brand by delaying generic entry and giving the brand more time to sell its product without generic competition.  If the announcement of a pay-for-delay settlement was not fully anticipated by financial markets, new brand profits over and above what would be expected from competitive behavior will be capitalized by traders in financial markets and reflected in the brand's stock price (*i.e.*, the market will reward the brand for keeping its monopoly and associated profits in place for a longer time).[499]

280.    Stock price movements depend on the behavior of objective outside investors and their advisors, not on the parties to the agreement.  A test for an anticompetitive agreement based on stock prices is therefore less vulnerable to deal makers working to obscure (for purposes of any subsequent antitrust inquiry) the true nature of terms of the agreement, including side deals signed at the same time as the settlement of patent litigation.  Objective, anonymous, self-interested investors have no incentives other than making money as they respond to the news that a settlement with a possible "pay" and "delay" has emerged from negotiations.  The empirical implication of the anticompetitive hypothesis, that the announcement of a deal looking like pay-for-delay increases the brand's stock price, is testable with publicly available data on financial market transactions.

---

[498]  Attachment F.6 also shows that accounting for the time value of money does not affect my qualitative conclusions.

[499]  See Drake, Starr, and McGuire, *op. cit.*; McGuire *et al.* (2016), *op. cit.*; Drake and McGuire (2016), *op. cit.*; Hartman, Drake, and McGuire, *op. cit.*; and Drake and McGuire (November 2024), *op. cit.*

281.    I have coauthored two papers that applied event-study methods to 68 drug patent litigation settlements during 1993-2013 and to 64 settlements during 2014-2023, respectively.[500] Both papers found that settlements with an indication of a reverse payment from the brand to the would-be generic entrant were associated with an immediate, large, and statistically significant increase in the brand's stock price (on average and after adjustment for trends and overall market changes), whereas agreements with no indication of a reverse payment were not associated with a positive stock price change.[501]  Showing that agreements with no indication of a reverse payment have no detectable effect on brand stock prices on average contradicts theories that stock prices might go up because settlements resolve business uncertainty, as this explanation would apply to all agreements, not just those with reverse payments.  This previous empirical work also contradicts the alternative theory that investors systematically underestimate the patent strength and the compromise date is a better reflection of the patent strength.  Under this theory, the positive stock price bump for brand companies should be mirrored by stock price falls of the corresponding generic companies, but there is no evidence that this happens.  Data instead show that the settlements with reverse payments did not produce a statistically significant decrease in generic stock prices, but rather produced a statistically insignificant increase in the stock market prices of publicly traded generic companies.[502]

282.    The brand stock price test is conservative in the sense that an anticompetitive settlement creating new anticompetitive profits for the brand might not be associated with a "statistically

---

[500]  Drake, Starr, and McGuire, *op. cit.*, pp. 190-194 and Drake and McGuire (November 2024), *op. cit.*

[501]  *Ibid*.  In the earlier paper, the Wyeth-Teva Agreement related to Effexor XR was classified as not containing "indication of reverse payment" based on the first announcement not reporting the terms of the deal. Drake, Starr, and McGuire, *op. cit.*, p. 184.  In the paper we recognized that our classifications were "potentially subject to measurement error" and that "some that did not disclose information suggesting such a transfer may in fact have done so." *Ibid.*, p. 195.  Given the results described below, moving the Wyeth-Teva Agreement into the "with an indication of a reverse payment" category would strengthen the results in Drake, Starr, and McGuire, *op. cit.*  Also, as described below, financial analysts recognized the Wyeth-Teva Agreement as likely including a reverse payment even before the terms were announced.

[502]  See McGuire *et al.* (2016), *op. cit.,* p. 1588, indicating that for the settlements studied in Drake, Starr and McGuire, *op. cit.*, the average cumulative abnormal return to generics was 1.2% (p=0.42).  The Nexium settlement between AstraZeneca and Ranbaxy led to significant stock price jumps for both the brand and the generic.  See Drake and McGuire (2016), *op. cit.*, p. 745.

significant" increase in stock price around the time of the settlement, for several reasons. First, information about the settlement may have leaked earlier, and the higher anticipated profits may have been incorporated into stock values earlier as well. Second, even if the news were not leaked, investors might have anticipated at least some likelihood of a reverse-payment settlement delaying generic entry. This would tend to dampen the stock price movement around the announcement itself. Third, investors might foresee the likelihood of higher profits but also anticipate that the brand put itself at risk for antitrust litigation, weighing against new profit gains. Fourth, news of an ultimate confirmation of a delay may be spread over multiple events, making the effect more difficult to detect. Finally, the stock price jump might be there but not large enough to satisfy conventional standards of statistical significance in the presence of typical variation in stock values. The absence of a jump in a brand's stock market price thus cannot disprove anticompetitive effects. But the presence of a jump is evidence the transaction is anticompetitive.[503]

### The Stock Market's Reaction to Announcements Regarding the Wyeth-Teva Agreement

283.    As described in more detail in Attachment G, news of the Wyeth-Teva Agreement was announced and eventually finalized over four discrete events:

- On October 18, 2005, Wyeth and Teva announced that they had "reached agreement on the principal terms of a settlement" of the Effexor XR patent litigation.[504] The terms of the settlement were described as "confidential" and the parties noted that the agreement was subject to "review of the settlement by the FTC and the approval of the District Court."[505]

---

[503] McGuire, *et al.* (2016), *op. cit.*, pp. 1595-1596 and Hartman, Drake, and McGuire, *op. cit.*

[504] Wyeth, "Form 8-K, Pursuant to Section 13 OR 15(d) of the Securities and Exchange Act of 1934, date of report October 18, 2005" (sec.gov/Archives/edgar/data/5187/000000518705000056/form8k.htm). I center my analysis on October 19, 2005 because the earliest news I could find from October 18, 2005 was released after the market closed. For example, see Teva Press Release, "Teva and Wyeth Announcement Settlement of Effexor XR® Litigation," *Dow Jones Newswires*, October 18, 2005, 4:05 PM.

[505] *Ibid.* Although the generic entry date and other terms of the Agreement were not announced, financial analysts speculated that the deal likely included a reverse payment from Wyeth to Teva. For example, see S. Henry and J. Molloy, "Wyeth: WYE Puts Out First Effexor Fire," Oppenheimer, October 19, 2005, p. 1: "On first glance, [the Agreement] has the appearance of a pay-off to remove litigation risk, and thus keep cheaper generic competition off the market."

---

- On November 3, 2005, Wyeth submitted an 8-K form to the SEC indicating Wyeth and Teva had "negotiated definitive agreements for the proposed settlement" of the Effexor XR patent litigation. The 8-K form noted that the Effexor XR license would be "exclusive for a specified period and then non-exclusive." It also provided the generic entry dates for Effexor XR (July 1, 2010) and Effexor IR (June 15, 2006); noted that both were "subject to earlier launch based on specified market conditions"; and indicated that "Teva would pay Wyeth specified percentages of gross profit from sales of each of the Teva generic versions." The form noted the license for Teva to sell generic versions of Effexor XR in Canada but did not provide detail.[506]

- On December 2, 2005, Teva announced that the FTC would not challenge the Wyeth-Teva Agreement.[507]

- On January 13, 2006, Wyeth announced that the US District Court had approved the terms of the Wyeth-Teva Agreement.[508]

Each of these news events contributed to an increased expectation of profits for Wyeth from the Agreement. By the time the last event had occurred, the District Court approval, there were no barriers to the Agreement governing the terms of Teva's entry. The cumulative stock-price reaction to these four events can be used to assess the full effect of the Agreement on Wyeth's future profits.[509]

284.    The "market model," commonly used in event studies, uses regression analysis to adjust for trends in the stock itself and general market movements in order to isolate the effect of the event (here, the announcements related to the Wyeth-Teva Agreement) on the changes in stock prices. In sum, after adjustments, Wyeth's stock price went up on the day of all four events and

---

[506]  Wyeth, "Form 8-K, Pursuant To Section 13 OR 15(d) of the Securities and Exchange Act of 1934, date of the report November 2, 2005," (sec.gov/Archives/edgar/data/5187/000000518705000058/form8k.htm).

[507]  Teva Press Release, "Teva Announces FTC Will Not File Objections to Effexor® XR Settlement," December 2, 2005 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2005/Teva-Announces-FTC-Will-Not-File-Objections-to-Effexor-Xr-Settlement/default.aspx).

[508]  Wyeth Press Release, "Wyeth-Teva Pharmaceutical Industries Limited Settlement Finalized," *BioSpace*, January 13, 2006 (https://www.biospace.com/wyeth-teva-pharmaceutical-industries-limited-settlement-finalized).

[509]  I have used a similar approach to assessing the full effect of a sequence of related events in a reverse-payment agreement for the drug Provigil. See Hartman, Drake, and McGuire, *op. cit.*, p. 8.

two of these increases were statistically significant (see Table 12).[510]  The cumulative effect across all four days was also statistically significant and corresponded to an adjusted change in market capitalization of $5.6 billion.[511]  The increases in market capitalization are net present values (NPVs), the total equates to $9.3 billion in terms of 2026 dollars.[512]

TABLE 12
WYETH STOCK MARKET RETURNS AROUND
ANNOUNCEMENTS REGARDING THE WYETH-TEVA AGREEMENT

|  | Date | Cumulative Abnormal Return (%) | p-Value | Change in Market Capitalization ($ millions) |
|---|---|---|---|---|
| Agreement in principle | 10/19/05 | 2.6% | 0.01 | $1,601 |
| Agreements terms | 11/3/05 | 1.0% | 0.32 | $613 |
| No FTC challenge | 12/2/05 | 4.7% | <0.001 | $2,607 |
| Court does not block Agreement | 1/13/06 | 1.1% | 0.27 | $733 |
| Total |  | 9.5% | <0.001 | $5,554 |

285.   As described in more detail in Attachment G, my analysis and interpretation of Wyeth's stock price movements are consistent with contemporaneous financial analyst reports.  Prior to

---

[510]  Attachment G describes the event study methods and provides a full analysis of each of the four events, including sensitivity analyses.

[511]  As shown in Attachment G, Teva's stock price increase on October 19, 2005 was statistically significant at the 1% level, and its stock price did not change significantly on the other days.  Additionally, financial analysts viewed the settlement as positive for Teva; for example, see K. Cacciatore, *et al.*, "Teva Pharmaceutical: Effexor XR Litigation Settlement Terms Appear Reasonable," Cowen & Co., November 3, 2005, p. 1.  However, other concurrent events may also have favorably impacted Teva's stock price; for example, see "Court Rejects Fosamax Patent in Favor of Israeli Drug Firm," *Israel Faxx News Service*, October 18, 2005 (https://www.thefreelibrary.com/Court+Rejects+Fosamax+Patent+in+Favor+of+Israeli+Drug+Firm.-a0137644571).  The absence of a negative effect result indicates that investors were not simply surprised by how unfavorable the Agreement was to Teva.

[512]  $5.6 billion * 1.68 (multiplier calculated from consumer price index for all urban consumers (CPI-U)) = $9.3 billion.  See Attachment D.6.

the first announcement, financial analysts generally believed that Wyeth's chance of winning the litigation was low and that Teva would most likely launch in 2008.[513]  When the Agreement in principle was announced with terms held "confidential," some financial analysts viewed it as likely being a pay-for-delay agreement; for example, one report described it as having "the appearance of a pay-off to remove litigation risk, and thus keep cheaper generic competition off the market."[514]  When the Agreement terms were announced, it included a later entry date and the presence of potential reverse payments, as investors predicted.[515]  When the FTC declined to file an immediate objection to the settlement, analysts described the final risk of the Agreement not happening being removed.[516]  And finally, when the court did not object to the agreement, analysts had a smaller positive reaction.

286.    After consideration of the results of the stock-price study, it is my opinion that Wyeth's stock price jumps are confirmatory evidence that unanticipated profit flows were created by the Wyeth-Teva Agreement (at the expense of purchasers) and that the Agreement was anticompetitive.  Objective, third-party financial analysts believed that the Agreement likely delayed generic entry.  The resulting stock-price movements corroborate my opinion that the Agreement caused substantial harm to competition and was anticompetitive.[517]

---

[513]  For example, one analyst report indicated there was "less than a 10% probability" of Teva losing the trial.  J. Rubin, N. Yu, and C. Garcia-Tunon, "Wyeth: Effexor XR Extension a Long Shot, but Not Out of the Question," Morgan Stanley Equity Research, September 28, 2005, p. 1.

[514]  Henry and Molloy, *op. cit.*, p. 1.  Another analyst report summarized that: "**WYE may have agreed not to launch an authorized generic, which could have undercut Teva's profits during its 180 day exclusivity period** …. Since we were expecting Teva to prevail in court and launch its generic in 2008, any extension to Effexor XR's exclusivity is a positive for WYE" (emphasis added).  J. Rubin, N. Yu, and C. Garcia-Tunon, "Wyeth: Effexor XR Settlement an Incremental Positive," Morgan Stanley Equity Research, October 18, 2005, pp. 1-2.

[515]  *Ibid.*

[516]  For example, see J. Boris and R. Jashnani, "Wyeth: FTC Approves Win/Win Effexor Settlement," Bear Stearns Equity Research, December 2, 2005, p. 1.

[517]  I have previously characterized the stock-price study as complementing the economic analyses regarding the payment itself when assessing the anticompetitive effects of a reverse-payment settlement.  See McGuire, *et al.* (2016), *op. cit.* (a stock-price analysis of a "reverse-payment settlement can contribute to an economic analysis of the settlement's competitive effects") and Drake and McGuire (2016), *op. cit.*, p. 735 ("This paper presents and explains a complementary form of evidence…").

## IX. THE WYETH-TEVA AGREEMENT DIVIDED MARKETS

287. 

288.









Post 180 Days:  Teva's Royalty Clauses Continue to Deter Wyeth's AG





300.





301.

302.



303. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████

304. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████ ████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████

305. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████





## X.    EVALUATING PROCOMPETITIVE BENEFITS AGAINST ANTICOMPETITIVE HARMS OF THE REVERSE PAYMENTS AND MARKET DIVISION IN THE WYETH-TEVA AGREEMENT

306.    In this section, I assess whether anticompetitive harms from the reverse payments and market division are outweighed by potential procompetitive benefits.  I understand from counsel that I should assess the effects on purchasers and payors of Effexor XR in the U.S. that stem from the challenged terms in the Agreement.  I first quantify the harm to purchasers and payors of Effexor XR from the delay in first generic entry and the reduction in generic competition.  I then quantify the procompetitive effects and make the comparison.

### A.    Harms to Purchasers and Payors from the Challenged Terms in the Wyeth-Teva Agreement

307.    Harm to purchasers is the higher prices they pay because of the anticompetitive effects of the reverse payments and market division.  The challenged terms in the Wyeth-Teva Agreement harmed purchasers in at least two ways.[543]  First, purchasers were harmed by the delay in the entry of a generic product into the market for Effexor XR.  The magnitude of the harm depends on when generics would have entered, absent the anticompetitive terms in the Agreement, which I discuss in more detail in Section XI below.  Second, because the Agreement included no-AG clauses and market division, the initial number of generic competitors was reduced from two to one, increasing the generic prices purchasers would pay.

308.    Wyeth's forecast model indicates that purchasers' expected spending on *brand Effexor XR* would be $1,182.0 million less if generic entry had occurred in July 2009 instead of July

---

[542]  See WYEFFAT07645434 (an internal Pfizer email that links the timing of its AG launch to the expiration of the royalty agreement) and WYEFFAT07645438.

[543]  "Purchasers" here refers to all purchasers of the product.

2010.[544] If both Teva's generic and Wyeth's AG were available, purchasers would have saved at least 50% of this spending.[545] Thus, Wyeth's forecast model indicates that, if generic entry had occurred one year earlier, purchasers of brand Effexor XR would have saved at least $1,182.0 million * 50% = $591.0 million by instead purchasing generic Effexor XR.

309.    Additionally, Wyeth's forecast model indicates that purchasers' expected spending on *generic Effexor XR* could be substantial.  As described in more detail below, if Teva settled, Wyeth's model assumed that the later-filing generics would continue litigating and could enter in 2010, 2013, or 2017.  If Teva was the only generic seller until 2013, Teva's generic Effexor XR price would equal 70% of the brand price, and the model indicates that Teva's generic sales would total $1,860.5 million during 2010-2012.[546]  If Teva was the only generic seller until 2017, its generic sales would total $4,839.2 million during 2010-2016.[547]  Wyeth's forecast model indicates that the generic price would have been 28.6% lower if there had instead been two generics during these extended periods.[548]  Thus, if two generics had been expected instead of one, savings to generic purchasers would total $532.1 million during 2010-2012 and $1,384.0 million during 2010-2016.[549]

---

[544] WYEFFAT06859914, tab "Cash Flow."  If cells E4 and E10 are set to 2010, then cells K19 and L19 indicate Wyeth's sales of Effexor XR during 2009 and 2010 would total $2,106.8 million.  (This is the amount spent on brand Effexor XR during 2009-2010 if generic entry occurred in 2010.)  If cells E4 and E10 are set to 2009, then Wyeth's Effexor XR sales total $924.8 million.  (This is the equivalent amount if generic entry instead occurred in 2009.)  $2,106.8 million - $924.8 million = $1,182.0 million.

[545] See WYEFFAT3781144, tab "Case2," which assumes that the generic price would be 50% of the brand price if there were two generics available.  I say "at least," because the Agreement with reverse payments and market division may have also changed the competitive landscape for the later-filing generics, which also may have otherwise entered earlier.  In other words, this calculation is conservative because I assume there would only be two generics even though there might be three or more for part of this period.

[546] WYEFFAT06859914, tab "Cash Flow," set cells E4 and E10 to 2010.  Then, in tab "Generic Roll-up," the sum of cells L60:N60 is $1,860.5 million.

[547] WYEFFAT06859914, tab "Cash Flow," set cells E4 and E10 to 2010.  Then, in tab "Generic Roll-up," the sum of cells L64:R64 is $4,839.2 million.

[548] See WYEFFAT3781144, tab "Base," cell B3 and tab "Case2," cell B3 showing that the generic price would be 70% of the brand price with one generic and 50% with two.

[549] $532.1 million = $1,806.5 * 28.6%.  $1,384.0 million = $4,839.2 * 28.6%.

310.    Wyeth model initially assumed that there would be a 25% chance of a Teva-only generic market during 2010-2012 and a 25% chance of a Teva-only generic market during 2010-2016.[550] Thus, if there were two generic sellers instead of one, Wyeth's model indicates that savings to purchasers of generic Effexor XR would total $479.0 million ($532.1 million * 25% + $1,384.0 million * 25%). Based on Wyeth's later sensitivity analyses, if I instead assume there was an 18.75% chance of a Teva-only generic market during 2010-2012 and a 6.25% of a Teva-only generic market during 2010-2016,[551] savings to purchasers of generic Effexor XR would total $186.3 million ($532.1 million * 18.75% + $1,384.0 million * 6.25%).

311.    In Section XI below, I estimate that the challenged terms in the Wyeth-Teva Agreement led to a delay of more than one year. This estimate indicates that purchasers of brand and generic Effexor XR would have saved approximately $1 billion if the parties had instead reached a competitive agreement.

312.    Actual net sales of brand Effexor XR prior to generic entry totaled $2.7 billion, almost twice as large as predicted by Wyeth's forecast model.[552] In addition, Teva's generic sales totaled $1,395.7 million during the first 11 months after its entry while it sold the only generic Effexor XR product.[553] The implication of these figures is that the actual harm to purchasers was well over the $1 billion that could have been predicted at the time of the Agreement.[554]

---

[550] See the discussion of Wyeth's forecast model in Section XI.B below.

[551] See the discussion of Wyeth's forecast model in Section XI.B below. These percentages are consistent with my assumption that there would be a 75% chance of the later filers winning the litigation. 18.75% = (100% - 75% chance of entry in 2010) * 75% chance of entry in 2013. 6.25% = 100% - 75% - 18.75%.

[552] IQVIA NSP data indicate that brand sales in the year prior to generic entry were approximately $2.7 billion. Wyeth's forecast model predicted that net sales would less than $1.4 billion. For example, in WYEFFAT06859914, tab "Cash Flow", change cell E4 to 2010 and then see cell K19.

[553] Teva's net sales of generic Effexor XR totaled $1,395.7 million during the 11-month period it was the only generic seller, between July 2010 and May 2011. See Attachment D.3, row [1].

[554] This is an approximate estimate of the harm from the Agreement; it is not a calculation of damages incurred by the Direct Purchaser Class which would be calculated based on, among other things, data showing the prices and volumes purchased by Direct Purchaser Class. However, regardless of the assumptions about the generic price and rate of generic substitution, the harm is very substantial given Effexor XR's extremely large brand sales prior to generic entry.

**B.    Possible Procompetitive Benefits from the Wyeth-Teva Agreement**

*Saved Litigation Costs with the Wyeth-Teva Agreement*

313.    The first possible procompetitive justification I consider is saved litigation costs.  Both Wyeth and Teva saved future litigation costs by coming to an agreement in November 2005.  I understand that Plaintiffs' expert Dr. Hrubiec will opine that saved future litigation costs were no more than $4.3 million for Wyeth and no more than $4.3 million for Teva.  As I show in Section XI below, however, Wyeth and Teva could have come to an agreement about a date of entry without a reverse payment.  Therefore, saved litigation costs do not serve as a procompetitive justification for the reverse payment.

314.    Furthermore, saved litigation costs for Wyeth and Teva do not directly benefit purchasers.  Saving litigation costs increases the firms' profits, but it is unlikely that any savings would be passed on to purchasers in the form of lower prices.  Litigation costs do not affect production costs, demand conditions, or any factor affecting a profit-maximizing firm's decisions about pricing.[555]

315.    In any case, even if savings in litigation costs were to be counted as a procompetitive benefit, they are very small in relation to the harms imposed by the market allocation.

*Lower Prices to Purchasers of Other Drugs*

316.    Second, I consider the extent to which the Effexor IR in the U.S. and Effexor XR license in Canada were procompetitive.

317.    I understand from counsel that out-of-market price effects cannot be used to justify in-market anticompetitive effects.  In other words, any purchaser savings from Wyeth allowing Teva to sell Effexor IR in the U.S. and Effexor XR in Canada earlier than Teva otherwise could have cannot be used to justify delaying generic entry and dividing markets for Effexor XR in the U.S.  In any case, savings to purchasers from Effexor IR in the U.S. and Effexor XR in Canada

---

[555]  Profit maximization decisions depend on marginal revenue and marginal cost, not on fixed costs, such as litigation costs, independent of output.

are small compared to the harm to purchasers from delaying generic entry of Effexor XR in the U.S.

318.    Furthermore, there are less restrictive means to achieve any procompetitive benefits from these two licenses.  If licensing Teva to commence early sales of IR in the U.S. or XR in Canada were good business for Wyeth (though they do not seem to be, unless these licenses were used to pay-for-delay on generic Effexor XR entry), the licenses could have been offered without being tied to an agreement about a date of entry for Teva for Effexor XR in the U.S.

319.    Wyeth calculated that its Effexor IR net sales would be $189.1 million lower during 2006-2009 because of the license for entry before the expiration of the compound patent that it gave to Teva in the Wyeth-Teva Agreement.[556]  As the only generic seller, Teva would capture those sales at a 30% discount off of Wyeth's brand Effexor IR price.[557]  Savings to purchasers would be approximately $189.1 million * 30% = $56.7 million.[558]

320.    Wyeth calculated that its Effexor XR net sales in Canada would be $257.9 million lower during 2006-2009 because of the license for entry before January 2008 that Wyeth gave to Teva in the Wyeth-Teva Agreement.[559]  As the only generic seller, Teva would capture those sales at a 30% discount off of Wyeth's brand Effexor XR price.[560]  Savings to Canadian purchasers would be approximately $257.9 million * 30% = $77.4 million.[561]

321.    In summary, I understand that purchaser savings from Effexor IR in the U.S. and Effexor XR in Canada should not be weighed against the harm to purchasers from delaying generic entry

---

[556] See WYEFFAT06426692, the sum of cells E25:H25 versus the sum of cells E29:H29.

[557] For example, see WYEFFAT3786859, tab "100% Teva," showing that Teva's generic price of Effexor IR was expected to be approximately 70% of the brand price while Teva was the only generic seller.

[558] I estimate that the actual savings to purchasers were lower, approximately $24.2 million.  This is the difference between the row [6] and [1] totals in Attachment D.4.

[559] See WYEFFAT06426692, the sum of cells E48:H48 versus the sum of cells E56:H56.

[560] See a Wyeth forecast of Effexor XR brand and generic sales in Canada indicating that "If Generic is Exclusive it Sells at 70% of Brand Pricing." WYEFFAT06427351, tab "December Summary," row 71.

[561] I estimate that the actual savings to purchasers were lower, approximately $54.8 million.  This is the total of the differences between row [2] and [6] in Attachment D.5, multiplied by the exchange rate in row [1].

of Effexor XR in the U.S.  However, even if the out-of-market savings to purchasers of Effexor IR in the U.S. and Effexor XR in Canada were counted, they are small (approximately $134.1 million) in comparison to the in-market harm to purchasers from delaying generic entry of Effexor XR in the U.S. (approximately $1 billion).

### Licensed Entry Before Patent Expiry

322.    Licensed entry before patent expiry does not imply there are procompetitive benefits of an agreement.  Measured against the purported "scope of the patent," *i.e.*, patent expiry, any agreement with a date prior to patent expiry, even by one day, would be considered to benefit consumers, no matter how tenuous the patent involved.  The scope-of-the-patent standard was explicitly rejected by the Supreme Court in *Actavis*[562] and has been discredited in economic scholarship on reverse-payment agreements.[563]  Comparing the entry date in an agreement to a world in which there is no generic competition until patent expiry is not the relevant economic standard for assessing pro- or anticompetitive effects on consumers.

## C.    Anticompetitive Effects Vastly Outweigh Any Procompetitive Benefits

323.    As described above, evaluated as of the time of the Agreement, purchasers were expected to pay approximately $1 billion more for brand Effexor XR and its generic equivalents than they would have without the anticompetitive reverse payments in the Wyeth-Teva Agreement.  Wyeth sales of Effexor XR substantially exceeded expectations as of the time of the Agreement, implying that the actual harm from the challenged terms substantially exceeded $1 billion.  As noted above, I understand that purchaser savings from Effexor IR in the U.S. and Effexor XR in Canada should not be weighed against the harm to purchasers from delaying generic entry of Effexor XR in the U.S.  However, even if the out-of-market savings to purchasers of Effexor IR in the U.S. and Effexor XR in Canada were counted, they are dwarfed in comparison to the in-

---

[562] *Actavis* Decision, p. 2225: "Although the anticompetitive effects of the reverse settlement agreement might fall within the scope of the exclusionary potential of Solvay's patent, this does not immunize the agreement from antitrust attack.  For one thing, to refer simply to what the holder of a valid patent could do does not by itself answer the antitrust question."

[563] For example, see Hemphill (2009), *op cit.*, pp. 638-39 and Elhauge and Krueger, *op. cit.*, p. 289.

market harm to purchasers from delaying generic entry and constraining generic competition of Effexor XR in the U.S.[564]

324.    The potential procompetitive benefits identified here are questionable and in any event are small, not coming close to offsetting the massive harms.  The net harm to purchasers, even after crediting these potential procompetitive benefits, remains in the hundreds of millions of dollars (in terms of expected harm) or in excess of $1 billion (in terms of actual harm).

## XI.    TIMING OF GENERIC ENTRY IN A COMPETITIVE AGREEMENT

325.    This section investigates the competitive circumstances that likely would have unfolded had rational, competitively acting firms in the positions of Wyeth and Teva not divided markets and not included anticompetitive reverse payments in the settlement of their patent dispute. Specifically, this section determines whether it would have been in the economic interests of reasonable companies in the position of Wyeth or Teva to reach an agreement without reverse payments and without market division and finds the potential agreed-upon entry dates that were most likely to emerge from such a settlement.[565]

326.    A competitive settlement ends the litigation and includes a licensed entry date for Teva's generic product.  It does not include reverse payments of any form, including explicit and implicit no-AG clauses. ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████

---

[564] The previous subsection for quantitative evaluations.

[565] The analysis in this section is similar to the analysis presented in Ghili and Schmitt, *op. cit.*



327.    As a first step, I make use of the fact that the parties agreed to a date of Teva entry of July 1, 2010 in a settlement that included reverse payments from Wyeth to Teva.  Removing the massive reverse payments from the Wyeth-Teva Agreement benefits Wyeth at the expense of Teva.  In relation to the observed Agreement, taking away the payments, a reasonable company in Wyeth's position would be willing to give an earlier date and a company in Teva's position would demand an earlier date.  To reach an agreement without reverse payments, the parties would have to adjust the date terms in Teva's favor, advancing the generic entry date earlier in time.  Thus, the generic entry date in a payment-free settlement must be before the July 1, 2010 date specified in the Agreement.  (The textbox below contains an analogy to a home price negotiation.)[567]

<div style="border:1px solid black; padding:1em;">

**Changing the Terms of a Home Sale**

You are selling your home.  You and the buyer have agreed on a price of $500k including a clause that leaves the living room furniture for the buyer.

You decide you want to keep the furniture after all and ask for a new deal. You keeping the furniture costs the buyer and benefits you.  In the new deal, what can reasonably be expected to happen to the sale price?

The renegotiated price will likely be less than $500k, and not greater.

Similarly, Wyeth and Teva agreed on a date of July 2010 in a deal that included the challenged clauses that cost Wyeth and benefit Teva.  A hypothetical renegotiated deal without those clauses can reasonably be expected to lead to a date that is likely before July 2010, and not after.

</div>

328.    The assumption of rational behavior for Wyeth and Teva further restricts the feasible dates for a counterfactual agreement.  Specifically, the date in any feasible competitive agreement must be at least as profitable to each party as continuing with litigation (otherwise a rational party would not accept the agreement).  I identify the range of entry dates that would make settling more profitable than pursuing litigation for both parties.  Outside this range, one of

[567] ███████████████████████████████████████████

the parties would be made worse off by settling in terms of the expected value of profits in relation to litigation.  The ends of the range are determined as follows:

- Wyeth's *earliest date* is the date at which Wyeth's expected profits from settling are equal to its expected profits from litigation.  A settlement with a later date would be more profitable to Wyeth because, all else equal, Wyeth benefits from later generic competition.

- Teva's *latest date* is the date at which *Teva*'s expected profits from settling are equal to its expected profits from litigation.  A settlement with an earlier date would be more profitable to Teva because, all else equal, Teva benefits from entering earlier.

329.    Finally, within the range of feasible dates, I identify the entry date that was most likely to be included in a counterfactual no-payment competitive agreement resulting from a negotiation about a date for Teva generic entry.  The method is straightforward.  I assume reasonable companies in the positions of Wyeth and Teva would negotiate to the date that shares the (now lower) joint profit gains over litigation from a competitive agreement in the same ratio as they shared the profit gains in the observed anticompetitive Agreement containing payments.

330.    In September 2005, while negotiating with Teva, Wyeth conducted extensive analyses of its profits from settling the litigation with different terms versus its profits from not settling.[568] As described in more detail below, Wyeth's approach to analyzing settlement terms included many of the same steps as my analysis of the range of feasible entry dates and most likely entry date in a settlement without reverse payments.[569]  Thus, I can use Wyeth's own model and calculations, with only minor modifications, in order to conduct my analysis.[570]

331.    I did not find or review similar Teva documents analyzing its expected profits in settlement versus litigation.  I understand that Teva withheld its analyses as privileged.

---

[568]  For example, see WYEFFAT06847939-85 (a Wyeth slide deck dated September 13, 2005 (Varma Ex. 11)) and WYEFFAT06859914 (an Excel file last modified September 7, 2005).

[569]  Wyeth's analyses (*e.g.*, WYEFFAT06847939-85) are similar to those in Ghili and Schmitt, *op. cit.*

[570]  The calculations described below are conducted in Attachment I.

Fortunately, Wyeth also estimated Teva's expected profits in different scenarios, so I use these estimates for my analysis.[571]

332.    Below, in order to identify the range of feasible entry dates for Teva that could be included in a payment-free settlement, and the most likely date within that range, I undertake the following analysis:

- I determine each party's expected profits in the absence of a settlement, which is a weighted average calculated as the sum of the profits each party would earn from different litigation outcomes multiplied by the probability of each outcome.

- I determine each party's expected profits from settling the litigation without reverse payments or market division. I calculate different values of Wyeth and Teva profits for different potential entry dates for Teva between the expiration of the compound patent in 2008 and the expiration of the method patents in 2017.

- I calculate each party's potential settlement gains as its profits from settling minus its profits from not settling. The feasible range of settlement entry dates for Teva includes entry dates that have positive settlement gains to both parties, and that also fall before the July 1, 2010 entry date in the Wyeth-Teva Agreement.

- Finally, I determine the most likely entry date for Teva in a settlement without reverse payments or market division. I first calculate the division of settlement gains from the actual Wyeth-Teva Agreement. I then determine the entry date for Teva in a payment-free settlement that divides settlement gains in the same ratio as the actual Agreement.

## A.    Market Dynamics and Profit Payoffs Absent a Settlement

333.    Expected profits for each party in the absence of a settlement are determined by the profits each would get with a win and a loss in litigation, and the probability of each outcome.

### The Wyeth-Teva Effexor XR Patent Litigation

334.    In the absence of a settlement, Wyeth and Teva would have continued the patent litigation regarding the method of use patents (*i.e.*, the '171, '120, and '958 patents) with

---

[571]  The available Teva documents provide some, but not all, of the inputs that are needed to conduct this analysis. Attachment L shows that the results are largely consistent if I plug the inputs that are available from Teva's discovery materials into Wyeth's model.

expiration dates of September 20, 2017. Teva did not challenge the compound patent (*i.e.*, the '186 patent) with an expiration date of June 13, 2008, so Teva could not enter before then.

335.    After Teva's Paragraph IV filing in December 2002, Wyeth sued Teva for patent infringement on March 24, 2003.[572]  A *Markman* hearing about the patent claims was held in August 2005, and the trial court issued its claim construction opinion in Teva's favor on September 6, 2005.[573]  Wyeth requested a re-argument of the original *Markman* hearing, which the judge rejected on October 6, 2005.[574]  A Wyeth slide deck indicates that it expected a district court decision in the litigation between April and October 2006 and, if appealed, an appeals court decision between April and October 2007.[575]  Additional Wyeth analyses indicate that the appeals could stretch into 2008 or 2009.[576]

336.    In the event of a Teva win in the litigation, the timing of the appeals court decision implies that Teva's potential 180-day regulatory exclusivity period might or might not start and finish before the expiration of the compound patent on June 13, 2008.  In its filing with the FDA, Teva had not challenged the compound patent, so it could not receive FDA approval and begin selling a generic version of Effexor XR until after the expiration of the compound patent.[577]  Because the start of Teva's 180-day regulatory exclusivity period would be triggered by a final appellate court decision in Teva's favor, the exclusivity period could have expired before Teva could enter.[578]  Wyeth's model assumed that Teva would enter in June 2008 as one of at least

---

[572]  See Section IV.B above.

[573]  Markman Opinion, *Wyeth v. Teva Pharmaceuticals USA, Inc.*, No. 2:03-cv-01293-WJM-RJH (D.N.J), ECF No. 124 (September 6, 2005).  See Section IV. B above.

[574]  TEVA_EFFEX_0771673-75.

[575]  WYEFFAT05606715-92 at 18 and 52.  This slide deck was last modified on August 24, 2005.

[576]  WYEFFAT06847939-85 at 81-85.  This slide deck was last modified on September 13, 2005.

[577]  See Section IV.B above citing TEVA_EFFEX_0000001-267 at 29.

[578]  For example, see WYEFFAT3920078-94 at 93: "Current thought shows exclusivity period expiring before June 2008."  Also, in Wyeth's model from September 7, 2005, the option "Ruling Early – Teva burns exclusivity" is selected.  WYEFFAT06859914, tab "Cash Flow," cell B8:E8.  The model assumed Teva would enter as one of five initial generics in all scenarios for the Teva NPV calculations in Wyeth's September 13, 2005 slide deck (*e.g.*, see WYEFFAT06847939-85 at 45-46).  Also see WYEFFAT06426692, row 12 ("Multiple Generics Launch June 2008").

five generics if Teva won the litigation.[579]  However, consistent with Wyeth's later analysis, I understand from counsel that Plaintiffs' expert Dr. Hrubiec will opine that there may have been a pending appeal in June 2008, so that Teva's 180-day regulatory exclusive period would not start until its entry.

337.    Consistent with Wyeth's later analysis and with Dr. Hrubiec's opinion, I assume that an appeal would have been pending in June 2008 when the compound patent expired.  If Teva had won the district court decision, I assume that Teva would enter upon expiration of the compound patent, while the appeal was pending, and that its 180-day exclusivity period would begin when it entered.[580]  In spite of the risk of losing the appeal, based on industry patterns and Teva's own history of at-risk launches, Teva would have been very likely to introduce its generic product in June 2008 so that it could start earning generic Effexor XR profits as soon as possible.[581]

338.    If Teva lost the litigation, the Wyeth model assumed that no generics would enter in 2008 or 2009.  However, the Wyeth model assumed that other generics would pursue the litigation. Wyeth's model expected a district court decision in the litigation with some other generics between December 2008 and June 2009 and an appeals court decision between December 2009

---

[579]  See WYEFFAT06847939-85 at 64.  Teva's $133 million NPV in the 2008 entry "DON'T SETTLE" scenario can be calculated in WYEFFAT06859914.  In the tab "Cash Flow," change cell E5 to 1 (meaning no settlement) and change cell E10 to 2008, then cell G215 will equal 133.  After making these changes, the tab "Generic Roll-up," rows 7-24 and the tab "Generic Inputs," rows 26 and 31 indicate that the calculations are based on the assumption of "5 or More Generics Immediately."  Wyeth's assumption is consistent with industry patterns showing that, for top-selling oral-solid drugs like Effexor XR, there was an average of ten generic manufacturers entering during the first year of generic sales.  Frank, McGuire, and Nason, *op. cit.*, p. 840.

[580]  In Attachment J, I make the alternative assumption that, if Teva won the litigation quickly, Teva's 180-day exclusivity period would expire before it could begin selling its product.  The most likely entry date result is the same as described below.

[581]  See Drake, *et al.* (2022), *op. cit.*, showing that when first-to-file generic firms do not settle, they almost always launch their products prior to the final appeals court decision.  Teva, in particular, has a history of launching its products before litigation has been completely resolved, sometimes even before a district court decision.  For example, see Teva Press Release, "Teva Announces Approval and Launch of Gabapentin Tablets," December 15, 2004 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2004/Teva-Announces-Approval-And-Launch-Of-Gabapentin-Tablets/default.aspx); "Teva, Barr to Launch Generic Version of Allegra," *Fox News*, January 13, 2005 (https://www.foxnews.com/story/teva-barr-to-launch-generic-version-of-allegra); and M. Meland, "Teva, Sandoz Launch At-Risk Versions of Pfizer Drug," *Law360*, November 29, 2005 (https://www.law360.com/articles/4619/teva-sandoz-launch-at-risk-versions-of-pfizer-drug).

---

and June 2010.[582]  Wyeth's model indicates that if the later filing generics lost in that round, another group of later filers would pursue litigation that would reach a conclusion in 2013.  If the later filers won the litigation in either 2010 or 2013, Wyeth's model assumed that Teva would also enter as one of at least five generics.  If the later filers lost in 2010 and 2013, Wyeth's model assumed Teva would enter as one of at least five generics upon patent expiration in 2017.

339.    Table 13 shows the NPV of profits to Wyeth and Teva from generic entry in 2008, 2010, 2013, or 2017.[583]  Wyeth model's assessment of Teva's profits only includes profits from selling generic Effexor XR in the U.S. (not Effexor XR in Canada and not Effexor IR).  As described above, if Teva won the district court decision, I assume that Teva and Wyeth (as an AG) would both enter in June 2008.  In each of the other scenarios, following Wyeth's model, I assume that Teva would enter as one of at least five generics.  Wyeth model's assessment of its profits in the absence of a settlement includes profits from brand Effexor XR and from line-extension Pristiq, accounting for Wyeth's profits from the product switch.

TABLE 13
THE NET PRESENT VALUE ($ MILLIONS) OF EXPECTED PROFITS TO WYETH AND TEVA IN THE
ABSENCE OF SETTLING THE EFFEXOR XR PATENT LITIGATION

|  | First Generic: | | | |
|  | July 2008 | July 2010 | July 2013 | July 2017 |
|---|---|---|---|---|
| Wyeth | $4,354 | $5,406 | $6,457 | $7,348 |
| Teva | $244 | $81 | $45 | $16 |

*Probability of Litigation Wins, and the Timing of Generic Entry Absent a Settlement*

340.    A Wyeth slide deck from August 24, 2005 assumed that there was a 50% chance that generic entry for Effexor XR would occur upon the expiration of the compound patent in June

---

[582]  WYEFFAT05606715-92 at 19.

[583]  The 2010, 2013, and 2017 values appear directly in Wyeth's forecast model.  See WYEFFAT06859914, tab "E(NPV) For Given Settle Date," cells H10:H37.  They are also listed in Wyeth's slide deck.  For example, see WYEFFAT06847939-85 at 63-64.  For each entry year, Wyeth's values are the sum of the "DON'T SETTLE" NPVs for both EFFEXOR and DVS.  Teva's values are equal to the "DON'T SETTLE" NPVs.  The 2008 value is different because I assume that, as described above, an appeal would still be pending in 2008, which would enable Teva to sell during its exclusivity period.  See Attachment I for details.

2008. If Wyeth won the litigation with Teva, the Wyeth model assumed that there was a similar 50% chance of generic entry by the second half of 2010 as a consequence of litigation with other ANDA filers. If Wyeth escaped generic entry in the second half of 2010, the model assumed that there was an additional 50% chance of generic entry by the second half of 2013. And if Wyeth managed to win litigation at all three time periods, the model assumed generic entry would occur in any case in the second half of 2017.[584] Financial analyst reports from May and August 2005 estimated that Wyeth's chance of winning the litigation against Teva were approximately 50%.[585]

341.    On September 13, 2005, after the judge's unfavorable court order regarding the Markman hearing, Wyeth added "alternative assumptions" to its slide deck in which the Wyeth model assumed that the chance of generic entry in 2008 was 50%, 60%, or 70% and the chance of generic entry by 2010 was 100%.[586]

342.    Financial analysts also considered Wyeth and Teva's chances of winning the litigation in September 2005. The "widespread" assumption made by analysts was that Teva would launch in June 2008.[587] For example, analysts from Morgan Stanley estimated that the probability of generic entry in 2008 was 90% or more.[588] Citigroup analysts were less optimistic about the chance of generic entry in 2008, offering a 60%-70% estimate, but acknowledged that their

---

[584]  See Wyeth's August 26, 2005 slide deck titled "Effexor Scenario Analysis," WYEFFAT3781292-305 at 293: "Probability of Effexor generics > 50% in 2008, increasing to 75% by 2010, 87.5% by 2013 and 100% by end of 2017 > If don't settle, assumes possible generic entries in the years 2008, 2010, 2013 and 2017." Also see Wyeth's forecast model, WYEFFAT06859914, tab "E(NPV) For Given Settle Date," cells H10:J22.

[585]  WYEFFAT3781059-78 at 59 (a Merrill Lynch Report offering a "50% theoretical likelihood of exclusivity being maintained beyond mid-08") and WYEFFAT05967867-75 at 67 (a Lehman Brothers Report stating that Wyeth's chances were "modestly better than 50%").

[586]  WYEFFAT06847939-85 at 69: "Probability of Effexor Generics: ▫ 50% - 70%, increasing to 100% by 2010 ▫ If don't settle, assumes possible generic entries in the years 2008 and 2010."

[587]  G. Grofik, "WYE: Effexor XR Patents in Focus; A Call Option for Investors," Citigroup Equity Research, September 11, 2005, p. 3.

[588]  Rubin, Yu, and Garcia-Tunon (2008), *op. cit.*, p. 1: "We believe that the market is likely correct in its assumption that generic versions of Effexor XR will come to market in 2008, based the [sic] analysis of our legal consultants. While the upcoming trial, set to commence on October 11, could go against the generic challenger, Teva, we see less than a 10% probability of this outcome."

estimate differed from the "widespread modeling assumption of generic entry to Effexor XR in June 2008."[589]

343.    Finally, I understand that Dr. Hrubiec examined the court record and concluded that, around the time the Wyeth-Teva Agreement was reached in November 2005, a reasonable and skilled patent attorney would have concluded and advised his or her client that Teva's chance of winning the litigation with respect to all the contested patents was 70%-80%.[590]

344.    Table 14 below summarizes evidence regarding the probability of generic entry at three times: prior to the *Markman* ruling, just after the *Markman* ruling, and finally, after the rejection of Wyeth's request for reconsideration. Wyeth started using the 50% probability of generic entry in 2008, 2010, and 2013 in its model prior to the judge's *Markman* decision. After the judge's ruling, Wyeth added the less optimistic (for Wyeth) "alternative analyses" to its slide deck and financial analysts released similar estimates that favored Teva. Finally, Dr. Hrubiec's estimate incorporates the October 2005 rejection of Wyeth's request for a re-argument of the Markman hearing, which would have been known to Wyeth and Teva when they reached the Agreement.

---

[589]  Grofik, *op. cit.*, p. 1.

[590]  I understand from counsel that Dr. Hrubiec's opinion accounts for the possibility that Teva's favorable claims construction ruling could get overturned on appeal and that subsequent decisions in Wyeth's litigation with the later filers were more favorable to Wyeth.

TABLE 14
EVIDENCE ABOUT THE EXPECTED TIMING OF GENERIC ENTRY FOR EFFEXOR XR
BEFORE THE WYETH-TEVA AGREEMENT WAS REACHED

| | First Generic By: | | | |
| Source | July 2008 | July 2010 | July 2013 | July 2017 |
| --- | --- | --- | --- | --- |
| *Pre-Markman Ruling* | | | | |
| Wyeth Base | 50.0% | 75.0% | 87.5% | 100.0% |
| Merrill Lynch Report | 50% | | | |
| Lehman Brothers Report | < 50% | | | |
| *Post-Markman Ruling* | | | | |
| Wyeth Alternative #1 | 50.0% | 100.0% | | |
| Wyeth Alternative #2 | 60.0% | 100.0% | | |
| Wyeth Alternative #3 | 70.0% | 100.0% | | |
| Citigroup Report | 60%-70% | | | |
| Morgan Stanley Report | > 90% | | | |
| *Post-Rejection of Wyeth's Request to Redo Markman Hearing* | | | | |
| Dr. Hrubiec* | 70%-80% | | | |

\* Dr. Hrubiec opines about the chance of Teva winning the litigation, not the chance of generic entry

***Expected Profits Absent a Settlement***

345.     The expected (or probability-weighted) NPV (E(NPV)) of profits to Wyeth and Teva absent a settlement is calculated as their NPV from each different potential outcome multiplied by the chance of that outcome occurring.  Table 15 shows the E(NPV) calculation for a particular set of probabilities.[591]  For this "base" calculation, I assume there was a 70% chance that Teva would win the patent litigation and begin selling its generic product in July 2008.  If Teva lost the patent litigation, I assume that later filers would pursue the litigation and that there was a

---

[591] Wyeth's calculated E(NPV) in exactly the same way.  For example, see WYEFFAT06859914, tab "E(NPV)."

75% chance of entry in July 2010.[592]  If Teva and the initial later filers lost, I assume that additional later filers would pursue the litigation and there was an additional 75% chance of entry in July 2013.[593]  Based on these probabilities, Table 15 shows that Wyeth's E(NPV) is $4,761 million whereas Teva's is $188 million.[594]  (Although Wyeth's model does not account for litigation costs, I conservatively deduct $4.3 million from the expected values to account for litigation costs.[595])

TABLE 15
THE EXPECTED NET PRESENT VALUE E(NPV) OF PROFITS TO WYETH AND TEVA
IN THE ABSENCE OF SETTLING ($MILLION)

| | First Generic: | | | | |
|---|---|---|---|---|---|
| | July 2008 | July 2010 | July 2013 | July 2017 | |
| NPV ($M) | | | | | |
| Wyeth | $4,354 | $5,406 | $6,457 | $7,348 | |
| Teva | $244 | $81 | $45 | $16 | |
| Generic Entry Probability | 70.0% | 22.5% | 5.6% | 1.9% | |
| E(NPV)($M) | | | | | |
| Wyeth | | | | | $4,761 |
| Teva | | | | | $188 |

---

[592]  75% is the midpoint between Wyeth's initial assumption that there was a 50% chance of entry in 2010 and its later assumption of 100%.  This means that there was a 22.5% chance of entry in July 2010.  22.5% = (100% - 70% chance of entry in July 2008) * 75% chance of entry in July 2010.

[593]  Again, 75% is the midpoint between the two assumptions Wyeth made about the later generics.  This implies that there was a 5.6% chance of entry in July 2013.  5.6% = (100% - 70% chance of entry in July 2008 - 22.5% chance of entry in July 2010) * 75% chance of entry in July 2013.

[594]  See Attachment I.1.

[595]  I understand from counsel that Dr. Hrubiec will opine that both parties would spend approximately $4.0-4.3 million litigating the patent case if they did not settle.

346.    For the base calculations in Table 15 and in the text of this section, I selected reasonable estimates of the chances of generic entry.  Below I show how the results differ if alternative assumptions about the chance of generic entry are used.[596]

## B.    Profit Payoffs from Settling with a Competitive Agreement

347.    I use Wyeth's model to calculate Wyeth and Teva's expected profits from settling without reverse payments or market allocation agreements.  Wyeth's model assumed that, if Wyeth and Teva settled, the later filing generics would continue with the litigation and would have a chance of entering in 2010, 2013, and 2017.  The model assumed that the chance of the later filers entering in 2010 was either 50% or 100%,[597] so I use the midpoint of 75%.  Specifically, after a settlement between Wyeth and Teva, I assume there is a 75% chance the other generics win the litigation and enter in 2010.  Following Wyeth's assumptions, if they do not enter in 2010, I assume there is an additional 75% chance the other generics enter in 2013.  If they do not enter by 2013, I assume they enter in 2017.[598]

348.    Wyeth's model assumed that if the later filers won the litigation and entered, they would enter at the same time as Teva so that Teva would not benefit from a regulatory exclusivity period.  For example, if Wyeth licensed Teva to enter in 2010, but then later filers won the litigation, the model assumed that Teva would enter as one of five generics in 2010.[599]  Although the FDA and the courts later determined that a firm in Teva's position would have been able to

---

[596] The model is set up so that alternative assumptions could be made, such as if reasonable parties in the positions of Wyeth and Teva have divergent expectations about the likelihood and timing of generic entry.

[597] WYEFFAT06847939-85 at 58 ("Resulting Probability of Effexor Generics – If Settle: ▫ Generics other than Teva: 50% in 2010, additional 25 (50% x 50%) in 2013 (75% total), additional 25% in 2017 (100% total)") and 69 ("Probability of Effexor Generics … increasing to 100% by 2010").  Also see ¶ 341 above citing WYEFFAT06847939-85 at 69.

[598] In Attachment K, I make the alternative assumption that, if Teva settled the litigation with Wyeth, the later filers would enter after Teva's 180-day regulatory exclusivity period.  This alternative assumption results in earlier entry dates for Teva in an alternative, payment-free settlement that does not allocate markets.

[599] For example, in WYEFFAT06859914, tab "Cash Flow," change cells E4 and E10 to 2010.  After making these changes, the tab "Generic-Roll-up," rows 31 and 44 and the tab "Generic Inputs," rows 26 and 31 indicate that, if other generics enter in 2010, the calculations are based on the assumption of "5 or More Generics Immediately."

retain its exclusivity period in this scenario,[600] the assumption in Wyeth's model may have been reasonable at the time Wyeth and Teva settled their litigation in 2005.[601]  I use the assumption in Wyeth's model as a representation of what reasonable companies in Wyeth and Teva's position could have anticipated in 2005.

349.    If the settlement included an entry date in 2008 or 2009, Wyeth's model assumed that Teva was guaranteed to be the only ANDA filer selling generic product until 2010 at the earliest. If the later ANDA filers lost the litigation and could not enter until 2013 or 2017, Teva would be the only ANDA filer selling for an extended period.  While Teva was the only ANDA filer selling generic product, I assume that Wyeth would sell its own AG and ███████████

████████████         ██████████████████████████

350.    Table 16 shows the NPV of profits to Wyeth and Teva from including different generic entry dates for Teva in a competitive settlement.[603]  Following Wyeth's model, I calculate each party's expected profits from generic entry in July of each year.  Both parties' expected profits differ from the previous table (even for the same dates of Teva generic entry) because of different assumptions about when the other generics would enter.[604]

---

[600] For example, see "FDA Answers Ramipril Letters, Explains Why Cobalt Has 180-Day Exclusivity," *Orange Book Blog*, February 4, 2008 (https://www.orangebookblog.com/2008/02/fda-answers-ram.html).  Cobalt was the first filer of an ANDA for Altace.  After Cobalt settled its patent litigation, a different generic firm Lupin pursued its litigation and invalidated the patents.  Lupin argued that (1) Cobalt forfeited its 180-day exclusivity by settling, (2) Cobalt's settlement rendered its Paragraph IV certification inaccurate, and (3) Lupin should be able to amend its own certifications to avoid Cobalt's exclusivity.  The FDA and the Federal Circuit decided against Lupin.  But it was unclear in 2005 how this would eventually play out.

[601] *Ibid*.  The multiple acceleration clauses in the Wyeth-Teva Agreement provide further evidence that Wyeth and Teva were somewhat uncertain about the rules surrounding Teva's eligibility for the exclusivity period in different scenarios.  See WYEFFAT2405436-523 at 441-444.

[602] See Section VIII.A above where I conclude that Wyeth was likely to sell an AG if not for the no-AG clauses in the Wyeth-Teva Agreement. ██████████████████████████████████
████████████████████████████████████████████████████
████████████████████

[603] See Attachment I.2.

[604] For example, in Table 15 above, if Teva entered in July 2008 after winning a district court decision, other generics would be expected to enter soon after.  However, in Table 16, if Teva received a July 2008 entry date in a settlement, Wyeth's model assumed that other generics would not enter until July 2010, at the earliest.

---

**TABLE 16**
**THE NET PRESENT VALUE (NPV) OF EXPECTED PROFITS TO WYETH AND TEVA FROM COMPETITIVE
SETTLEMENTS WITH ALTERNATIVE DATES OF GENERIC ENTRY ($MILLIONS)**

| Teva's Licensed Generic Entry | Wyeth | Teva |
|---|---|---|
| 7/1/2008 | $4,469 | $426 |
| 7/1/2009 | $5,101 | $262 |
| 7/1/2010 | $5,510 | $143 |
| 7/1/2011 | $5,594 | $119 |
| 7/1/2012 | $5,666 | $99 |
| 7/1/2013 | $5,729 | $83 |
| 7/1/2014 | $5,743 | $79 |
| 7/1/2015 | $5,756 | $75 |
| 7/1/2016 | $5,767 | $72 |
| 7/1/2017 | $5,775 | $70 |

## C.    The Feasible Range for an Entry Date in a Settlement without Reverse Payments

351.    As described above, the feasible range includes the dates that fall prior to the July 1, 2010 entry date specified in the Agreement containing reverse payments and that are profitable to both Wyeth and Teva in relation to continued litigation.  The earliest date of the range is the date at which Wyeth's expected profits from no settlement are equal to its expected profits from settlement.  Similarly, the latest date of the range is the earlier of (a) June 2010, the month before the July 1, 2010 generic entry date specified in the Wyeth-Teva Agreement or (b) the date at which Teva's expected profits from no settlement are equal to its expected profits from settlement.

352.    Figure 19 depicts Wyeth's expected profits and illustrates how the *earliest* date of the range is calculated.  (In its analysis of the financial implications of the terms of the Agreement, Wyeth created the format of this figure.[605])  Wyeth's E(NPV) from not settling, the horizontal dashed line, falls above its NPV from settling with a generic entry date of December 1, 2008, but below its NPV from settling with an entry date of January 1, 2009 and later.  The specific date at

---

[605]  For example, see WYEFFAT06847939-85 at 60.  Ghili and Schmitt, *op. cit.*, p. 894 contains a similar figure.

which Wyeth's profits with and without settlement are equivalent is in December 2008, defining
the earliest date in the feasible range.[606]



FIGURE 19

WYETH'S NET PRESENT VALUE (NPV) OF EXPECTED PROFITS FROM SETTLING VERSUS NOT
SETTLING WITH ALTERNATIVE DATES OF GENERIC ENTRY

353.    Figure 20 illustrates Teva's expected profits and illustrates the range of dates when
profits from settlement exceed those expected from continued litigation. Teva's E(NPV) from
not settling is above its NPV from settling with a generic entry date of February 1, 2010 or
earlier, but falls below its NPV from settling with an entry date of March 1, 2010 or later. The
specific date at which Teva's profits with and without settlement are equivalent is in February
2010, defining the latest date in the feasible range.[607]

---

606   See Attachment I.4.
607   See Attachment I.4.

354.   Together, Figures 19 and 20 indicate that the feasible range includes dates between December 2008 and February 2010. Table 17 below shows how the feasible range would differ if alternative assumptions about the chance of Teva's generic entry in 2008 are used. [608]

608   See Attachment 1 for details. The ranges are calculated by modifying the probability in Attachment I.3, row [1] and examining Attachment I.4, row [3].

**TABLE 17**
**FEASIBLE RANGE FOR TEVA'S GENERIC EFFEXOR XR ENTRY IN A PAYMENT-FREE SETTLEMENT NOT DIVIDING MARKETS**

| Teva's Chance of Entry in 2008 | Feasible Range | |
|---|---|---|
| | Earliest Month | Latest Month |
| 50% | May-09 | May-10 |
| 60% | Mar-09 | Apr-10 |
| 70% | Dec-08 | Feb-10 |
| 80% | Sep-08 | Dec-09 |
| 90% | Jul-08 | Oct-09 |

**FIGURE 20**
**TEVA'S NET PRESENT VALUE (NPV) OF EXPECTED PROFITS FROM SETTLING VERSUS NOT SETTLING WITH ALTERNATIVE DATES OF GENERIC ENTRY**



**D.    Determining the Generic Entry Date in a Settlement without Reverse Payments and Market Division**

355.    The analysis above determined the range of generic entry dates that would have been profitable to both parties in a competitive, payment-free settlement.  It also establishes that the generic entry date in a competitive settlement must be before the July 2010 date specified in the Wyeth-Teva Agreement.  In this section, I apply methods from the economics of bargaining to identify the most likely date for generic entry in a competitive settlement.

*The Incremental Value or "Gains" from Settling*

356.    The analysis above indicates that both parties stood to benefit from settling.  Wyeth referred to the expected profits each party could make from settling over and above what it could make from litigating as the "incremental expected value of settling."[609]  I refer to this simply as the "gains" from settling below.

357.    The settlement gains for Wyeth and Teva can be calculated based on the values in Figures 19 and 20 above.  Specifically, the settlement gains are the expected value from each potential settlement (the bars) less the expected value from not settling (the horizontal dashed lines).  Figure 21 below illustrates the differences or gains from each potential settlement compared to the base-assumption litigation scenario.  It also illustrates the range of generic entry dates that are profitable to both parties (*i.e.*, where both lines are above the $0 dotted x-axis).  (Wyeth also created the format of this figure.[610]).

---

[609]  WYEFFAT06847939-85 at 61.

[610]  For example, see WYEFFAT06847939-85 at 61-62.

**FIGURE 21**

**WYETH AND TEVA'S SETTLEMENT GAINS FROM ALTERNATIVE DATES OF GENERIC ENTRY
IN A PAYMENT-FREE SETTLEMENT**



358.    The goal of the analysis is to determine the generic entry date within the feasible range that would be most likely to emerge in a competitive agreement. An entry date in December 2008 would technically be profitable to Wyeth, but minimally, and would result in Wyeth receiving close to 0% of the settlement gains. On the other end of the feasible range, an entry date in February 2010 would result in Teva receiving close to 0% of the gains. One benchmark is an even division of the gains, an assumption employed by some economists,[611] which would put the generic entry date in February 2009 (the intersection of the blue and orange lines where both parties gain the same absolute amount from settlement).

[611] Ghili and Schmitt, *op. cit.*, p. 885.

***Applying The Economics of Bargaining to Patent Litigation Settlements With and Without Reverse Payments***

359.    The division of gains from the actual Wyeth-Teva Agreement can be used to estimate the entry date in a competitive settlement.  The economic literature regards the outcome of bargaining as a division of the gains between the parties.  In stylized models, solutions can take simple forms such as an equal division, but more generally, the economics literature recognizes that a host of factors, such as impatience, alternative outcomes with no agreement, information and beliefs, negotiating skill, and other factors affect the division.[612]  Although many factors affect the observed split of gains between the parties, it is not necessary here to quantify these factors or to predict the individual effect of those factors in the abstract: they are already reflected in the actual division agreed to by the two parties.  In the analysis of the competitive conditions conducted here, bargaining savvy, concern for reputation, expectations about the other party's information and beliefs, and other factors are being held constant.  The only change in the conditions of bargaining is the removal of the reverse payments and market-division clauses in the Agreement.

360.    In economic terms, the analysis to assess the effect of removing a payment is a form of *ceteris paribus* (other things equal) analysis frequently applied in economics.  For example, the quantity of a good supplied and demanded in a market reflects many underlying factors, including cost and entry conditions, buyers' concerns with status, hoped-for satisfaction from the product, and so on.  With given demand and supply curves, economic methods can answer the what-if question of the effect of a single factor, such as tax on the sales of the product.  With all other factors determining supply and demand remaining the same, the effect of the tax on price and quantity can be calculated.  The same *ceteris paribus* analysis applies to characterizing the alternative payment-free agreement here too.[613]  One factor – presence of a reverse payment – changes, but other factors influencing the bargaining outcome remain the same.

---

[612]  See Binmore, Rubinstein, and Wolinsky, *op. cit.* and J.G. Sidak, *op. cit.*

[613]  ABA, Section of Antitrust Law, *Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues*, Chicago, IL, ABA Book Publishing, 2017, Part II.4.B: "A fundamental step in computing antitrust damages is to

361.    The reconstructed competitive scenario involves negotiation between competitively acting brand and generic companies operating under the same objective conditions as Wyeth and Teva.  In this case, the division of gains in a competitive agreement can be inferred from the division in the actual Wyeth-Teva Agreement.

### The Division of Gains in the Wyeth-Teva Agreement

362.    The division in the actual anticompetitive Agreement with reverse payments can be determined as follows.  Wyeth's expected NPV in the Wyeth-Teva Agreement was $5,217 million.  As described above, assuming the chance of generic entry in June 2008 was 70%, Wyeth's expected NPV of profit from litigation was $4,761 million.  Thus, the settlement gains to Wyeth created by the Wyeth-Teva Agreement with payments was $5,217 million – $4,761 million = $456 million.

363.    I determine that Teva's expected NPV from the Agreement was $382 million.  As described above, its NPV of profit from litigation was $188 million.  Thus, the settlement gains to Teva created by the Agreement with payments was $382 million - $188 million = $194 million.

364.    The expected gains in joint profits from the Wyeth-Teva Agreement total $456 million + $194 million = $650 million.  Wyeth's share of the joint gains is $456 million / $650 million = 70% and Teva's share is $194 million / $650 million = 30%.

### The Most Likely Timing of Teva's Generic Entry in a Competitive Settlement

365.    If the parties divide the gains in a competitive settlement in the same way as the Wyeth-Teva Agreement (70%-30%), then the most likely agreed upon entry date would be in or around

---

envision the manner in which a particular market would have developed, assuming that the antitrust violation did not occur and holding every other feature of the actual world constant.  The purpose of this analysis is to isolate the effects of the challenged conduct so as to ascertain what would have happened 'but for' the defendant's unlawful activities."

May 2009.  Table 18 shows how the most likely month of generic entry in a payment-free settlement varies depending on the assumption about Teva's chances of entering in July 2008.[614]

**TABLE 18**
**MOST LIKELY MONTH FOR TEVA'S GENERIC EFFEXOR XR ENTRY IN A PAYMENT-FREE SETTLEMENT NOT DIVIDING MARKETS**

| Teva's Chance of Entry in 2008 | Most Likely Entry Month |
|---|---|
| 50% | July 2009 |
| 60% | June 2009 |
| 70% | May 2009 |
| 80% | April 2009 |
| 90% | March 2009 |

## XII.    SUMMARY OF COMPETITIVE HARM

366.    This section addresses the question of whether the anticompetitive Wyeth-Teva Agreement caused antitrust injury.  In other words, were it not for the anticompetitive transaction, would reasonable pharmaceutical companies in the positions of Wyeth and Teva have engaged in actions leading to earlier generic entry and to lower prices for consumers?  I am of the opinion to a reasonable degree of certainty in the area of applied microeconomics and health economics that the answer to this question is "yes."

367.    Teva launched the first generic version of Effexor XR in July 2010.[615]  Other generics did not launch until 11 months later, in June 2011.[616]  In the absence of the reverse-payment

---

[614]  See Attachment I for details.  The entry dates in Table 18 are calculated by modifying the values in Attachment I.3, row [1] and examining the values in Attachment I.4, row [3].

[615]  IQVIA NPA data.  The launch date is considered the first month when prescriptions exceed 100.  Also see A. DeArment, "Teva Launches Generic Effexor XR," *Drug Store News*, July 1, 2010 (https://drugstorenews.com/pharmacy/teva-launches-generic-effexor-xr).

[616]  See ¶ 132 above.

agreement dividing markets and delaying generic entry, generic versions of Effexor XR would have been available earlier.

368.    As described in the previous section, in the absence of the reverse payments or market division, it still made good economic sense for rational companies in the positions of Wyeth and Teva to settle.  Without the reverse payments and market division, Wyeth and Teva would have been most likely to agree to a date in or around May 2009.  For the reasons explained above, if the parties had settled, a reasonable company in Wyeth's position would have launched an authorized generic at the same time Teva launched its generic version of Effexor XR.  Other generics, acting rationally, would have entered as early as possible thereafter.

369.    In summary, were it not for the Wyeth-Teva Agreement, reasonable companies in the parties' position would have engaged in actions leading to earlier generic entry, benefitting purchasers with lower generic Effexor XR prices.  As described above, purchasers paid over $1 billion more for Effexor XR and its generic equivalent than they would have if the alternative settlement scenario described in this section had played out.  No procompetitive benefit offsets these harms.

_____

Thomas G. McGuire, Ph.D.

May 15, 2025

**ATTACHMENT A**

**May 1, 2025**

Thomas G. McGuire

Professor of Health Economics *Emeritus*
Department of Health Care Policy
Harvard Medical School

mcguire@hcp.med.harvard.edu

**Education**:

| Year | Degree | Institution | Field |
|---|---|---|---|
| 1971 | B.A.  Summa Cum Laude | Princeton University | Economics |
| 1976 | Ph.D. | Yale University | Economics |

**Academic Appointments:**

| Year | Academic Title | Institution |
|---|---|---|
| 2022- | Professor *Emeritus* | Harvard Medical School |
| 2001-2022 | Professor | Harvard Medical School |
| 1987-2001 | Professor | Boston University |
| 1981-1996 | Visiting Professor | Brandeis University |
| 1983-1987 | Associate Professor | Boston University |
| 1980-1981 | Postdoctoral Fellow | Yale University |
| 1976-1983 | Assistant Professor | Boston University |

**Other Professional Positions:**

| Year | Position/Title | Institution |
|---|---|---|
| 2012-present | Research Associate | National Bureau of Economic Research |

**Major Committee and Association Memberships:**

| Year | Position/Title | Institution |
|---|---|---|
| 2003-2007 | Member | NIH/ National Center for Research Resources, Council |
| 1994-1998 | Member | National Institute of Mental Health Services Research Review Committee |
| 1980-84 | Member | National Institute of Mental Health Epidemiologic and Services Research Review Committee |
| 2000-present | Member | National Academies of Science, Education and Medicine/Institute of Medicine |
| 2003-2009 | Board of Directors | International Health Economics Association |

**Major Editorial Positions**:

| Year | Position/Title | Institution |
|---|---|---|
| 2001-2011 | Editor | *Journal of Health Economics* |

**Awards and Honors:**

| Year | Name of Award |
| --- | --- |
| 2023 | Impact Award from the Risk Adjustment Network |
| 2018 | Victor Fuchs Award from the American Society of Health Economics for Lifetime Contributions to the Field of Health Economics |
| 2016 | Article of the Year, *International Journal of the Economics of Business* |
| 2014 | National Institute for Health Care Management Paper of the Year |
| 2008 | National Institute for Health Care Management Paper of the Year |
| 2008 | AcademyHealth Article of the Year Award |
| 2008 | Everett Mendelsohn Excellence in Mentoring Award |
| 2006 | Emily Mumford Medal for Distinguished Contributions to Social Science In Medicine |
| 1997 | Kenneth J. Arrow Award for Best Paper published in Health Economics |
| 1994-1996 | Investigator Award in Health Policy, Robert Wood Johnson Foundation |
| 1991 | Carl A. Taube Award for outstanding contributions to mental health services research, American Public Health Association |
| 1989-1994, 1994-1999 | Research Scientist Award, National Institute for Mental Health |
| 1983 | Elizur Wright Award for an outstanding contribution to the literature on risk and insurance (*Financing Psychotherapy*), American Risk and Insurance Association |
| 1979 | Abt Prize for Research on National Policy Issues |

## BOOKS AND MONOGRAPHS:

Thomas G. McGuire. *Financing Psychotherapy: Costs, Effects and Public Policy*, Cambridge: Ballinger, 1981.

Thomas G. McGuire and Burton Weisbrod (Eds.). *Economics and Mental Health*, National Institute of Mental Health, Series EN No. 1, DHHS Publication No. (ADM) 81-114, Superintendent of Documents, USGPO, Washington, D.C., 1981.

Thomas G. McGuire and Richard Scheffler (Eds.). *Research Issues in Economics and Mental Health*, JAI Press, Vol. 8, 1987.

Thomas G. McGuire (guest editor). "Economics and Mental Health," special issue of *Administration and Policy in Mental Health*, 1990.

Thomas G. McGuire and Michael H. Riordan (guest editors). "The Industrial Organization of Health Care," *Journal of Economics & Management Strategy*, 3(1), 1994.

Albert Ma, Thomas G. McGuire, and Michael H. Riordan (guest editors) "The Industrial Organization of Health Care, II" *Journal of Economics & Management Strategy*, 1997.

Frank, Richard G. and McGuire, T.G. (guest editors) "Mental Health Economics," *Administration and Policy in Mental Health*, 24(4) (March 1997).

Albert Ma and Thomas G. McGuire (guest editors) "The Industrial Organization of Health Care, III," *Journal of Economics & Management Strategy*, 8(3), Fall 1999.

Mark V. Pauly, Thomas G. McGuire. and Pedro Pita Barros. (eds) (2012) *Handbook of Health Economics*, Vol.2, Elsevier.

Jacob Glazer and Thomas G. McGuire, (2017) *Models of Health Plan Payment and Quality Reporting*, World Scientific Press.

Thomas G. McGuire and Richard van Kleef, (eds.) "Health Plan Payment in Regulated Competition," Special Section of the *Journal of Health Economics*, Volume 56, December, 2017.

Thomas G. McGuire and Richard van Kleef, (eds.) *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets:  Theory and Practice*, Elsevier, 2018.

**PAPERS:**

**Thomas G. McGuire**.  A Note on Lindahl's Voluntary Exchange Theory.  *Public Finance*, 28(1):94-97, (1973).

Geoffrey Brennan and **Thomas G. McGuire**.  Optimal Policy Choice under Uncertainty. *Journal of Public Economics*, 4(2):204-209, 1975.

Richard Nelson, **Thomas G. McGuire** and Thomas Spavins.  Comment on Sam Peltzman's 'An Evaluation of Consumer Protection Legislation: The 1962 Drug Amendments'.  *Journal of Political Economy*, 83(3), 1975.

**Thomas G. McGuire**, Michael Coiner and Larry Spancake.  Budget-Maximizing Agencies and Efficiency in Government. *Public Choice*, 34:333-357, 1979.

**Thomas G. McGuire**.  Some Simple Projections of the Cost of National Health Insurance for the Private Practice of Psychiatry.  Egdahl, Walsh and Goldbeck (Eds.) *Mental Wellness Programs for Employees*, Springer-Verlag, 1980.

**Thomas G. McGuire**.  Markets for Psychotherapy in G. VandenBos (Ed.) *Psychotherapy: From Theory to Research to Policy*, Sage Publishing, 1980.

Wayne Dorris and **Thomas G. McGuire**.  Community Mental Health Centers and Competition in Mental Health Services.   Altman and Sapolsky (Eds.) *Federal Health Programs: Improving the Health Care Systems*, Lexington Books, 1980.

**Thomas G. McGuire** and Burton Weisbrod.  Perspectives on the Economics of Mental Health. *Journal of Human Resources*, 16(4):494-500, 1981.

**Thomas G. McGuire**.  Compulsory Insurance for Psychotherapy? *The Clinical Psychologist* 34(4):13-14,  1981.

**Thomas G. McGuire**.  Financing and Demand for Mental Health Services.  *Journal of Human Resources*, 16(4):501-522, 1981.

**Thomas G. McGuire**.  National Health Insurance for Private Psychiatric Care: A Study in the Distribution of Income. *Public Finance Quarterly*, 9(2):183-196, 1981.

**Thomas G. McGuire**.  Price and Demand for Membership in a Prepaid Group Medical Practice. *Medical Care*, 19(2):172-183, 1981.

**Thomas G. McGuire**.  Budget-Maximizing Governmental Agencies: An Empirical Test.  *Public Choice*, 36:313-322, (1981).

**Thomas G. McGuire** and John Montgomery.  Mandated Mental Health Benefits in Private Health Insurance Policies.  *Journal of Health Politics, Policy and Law*, 7(2):380-406, 1982.

**Thomas G. McGuire** and Sylvia Moore.  Private Regulation in Mental Health: The JCAH and Psychologists in Hospitals. *Journal of Law and Human Behavior*, 7(2/3):235-249, 1983.

**Thomas G. McGuire** and Linda K. Frisman.  Reimbursement Policy and Cost-Effective Mental Health Care.  *American Psychologist*, 38(8):935-940, August, 1983.

Charles A. Kiesler, **Thomas G. McGuire** (and others).  Federal Mental Health Policy Making: An Assessment of Deinstitutionalization. *American Psychologist*, 38(12):1292-1293, 1983.

**Thomas G. McGuire** and Kyle Grazier.  Markets and Bureaucracies in Mental Health Services: Implications for Management Information Systems. Bennett and Trute (Eds.) *Mental Health Information Systems: Problems and Prospects*, Edwin Mellon Press, 1983, pp. 283-302.

**Thomas G. McGuire**.  Patients' Trust and the Quality of Physicians.  *Economic Inquiry*, 21(2):203-222, 1983.

**Thomas G. McGuire**.  Economic Assessment of Treatment Programs for the Chronically Mentally Ill.  Cronholm and VonKnorring (Eds.) *Evaluation of Mental Health Services Programs*, Swedish Medical Research Council, pp. 148-160, 1984.

3

**Thomas G. McGuire**, Arnold Gurin, Linda K. Frisman, Victor L. Kane and Barbara F. Shatkin. Vendorship and Social Work in Massachusetts. *Social Service Review*, 373-383, 1984.

Randall P. Ellis and **Thomas G. McGuire**.  Cost Sharing and the Demand for Ambulatory Mental Health Services: A Comment on the Rand Health Insurance Study.  *American Psychologist*, 39:1195-1197, 1984.

**Thomas G. McGuire**.  Economics of Mental Health.  Cavenar (Ed.) *Psychiatry, Vol. 3*, Lippicott and Co., 1985.

Nancy Cannon, **Thomas G. McGuire** and Barbara Dickey.  Capital Costs in Economic Program Evaluation: The Case of Mental Health Services.  J. S. Catterall (Ed.) *Economic Evaluation of Public Programs*, San Francisco: Jossey-Bass, 1985.

**Thomas G. McGuire** and Barbara Dickey.  Payment for Mental Health Care: Economic Issues. S. Sharfstein and A. Beigel (Eds.) *The New Economics and Psychiatric Care*, American Psychiatric Association Press, 1985.

Steve Jencks, Howard Goldman, and **Thomas G. McGuire**.  Challenges in Bringing Exempt Psychiatric Services Under a Prospective Payment System. *Hospital and Community Psychiatry*, 36(7):764-769, 1985.

Linda K. Frisman, **Thomas G. McGuire** and Margo L. Rosenbach.  Costs of Mandates for Outpatient Mental Health Care in Private Health Insurance.  *Archives of General Psychiatry*, 42:558-561, 1985.

**Thomas G. McGuire**.  Prospective, Cost-Based and Mixed Reimbursement Systems:  An Economic Evaluation.  DiBlasi, Kline and Strickney (Eds.) *Pursuing Excellence in a Time of Declining Resources: The Role of Automated Information Systems*, Nathan Kline Institute, 1985.

Randall P. Ellis and **Thomas G. McGuire**.  Provider Behavior Under Prospective Reimbursement: Cost Sharing and Supply. *Journal of Health Economics*, 129-151, 1986.

Richard G. Frank and **Thomas G. McGuire**.  A Review of Studies of Demand and Utilization of Specialty Mental Health Services.  *Health Services Research*, 21(2) (Part II):241-265, 1986.

**Thomas G. McGuire**.  Financing Psychotherapy. *The Journal of Risk and Insurance*, 53(3):484-491, 1986.

Barbara Dickey, Nancy L. Cannon, **Thomas G. McGuire**, and Jon Gudeman.  The Quarterway House:  A Two-Year Cost Study of an Experimental Residential Program.  *Hospital and Community Psychiatry*, 37(11):136-143, 1986.

Barbara Dickey, Nancy Cannon, and **Thomas G. McGuire**.  Mental Health Cost Models: Refinements and Applications, *Medical Care*, 24(9):857-867, 1986.

Barbara Dickey, Nancy Cannon, and **Thomas G. McGuire**.  Mental Health Cost Studies: Some Observations on Methodology. *Administration in Mental Health*, 13(3):189-201, 1986.

**Thomas G. McGuire** and Richard Scheffler.  Summary of Issues in Research in Economics and Mental Health.  *Journal of Human Resources*, 21(3):289-292, 1986.

Barbara F. Shatkin, Linda K. Frisman and **Thomas G. McGuire**.  The Effect of Vendorship on the Distribution of Clinical Social Work Services.  *Social Services Review*, 60(3):437-448, 1986.

Randall P. Ellis and **Thomas G. McGuire**.  Cost Sharing and Patterns of Mental Health Care Utilization.  *Journal of Human Resources*, 21(3):359-380, 1986.

Alvin K. Klevorick and **Thomas G. McGuire**.  Monopolistic Competition and Pricing in Psychologists' Services. In McGuire and Scheffler (Eds.) *Research Issues in Economics and Mental Health*, JAI Press, 1987.

Sarah Hall and **Thomas G. McGuire**.  Ownership and Performance: The Case of Outpatient Mental Health Clinics.  *Medical Care*, 25(11):179-1183, 1987.

Kyle L. Grazier and **Thomas G. McGuire**.  Payment Systems and Hospital Resource Use:  A Comparative Analysis of Psychiatric, Medical and Obstetric Services.  McGuire and Scheffler (Eds.) *Research Issues in Economics and Mental Health*, JAI Press, 1987.

**Thomas G. McGuire**, Barbara Dickey, Gerald Shively, and Ira Strumwasser.  DRGs and Private Health Insurance: Implications for Design of Prospective Payment Systems.  *American Journal of Psychiatry*, 144(5):616-620, 1987.

Randall P. Ellis and **Thomas G. McGuire**.  Setting Capitation Payments in Markets for Health Services. *Health Care Financing Review*, 8(4):55-64, 1987.

Randall P. Ellis and **Thomas G. McGuire**.  Insurance Principles and Design of Prospective Payment Systems.  *Journal of Health Economics*, 7:215-237, 1988.

**Thomas G. McGuire** and Alan Fairbank. Patterns of Mental Health: Utilization over Time: Evidence from the Fee-For-Service Sector.  *American Journal of Public Health*, 78(2):134-136, 1988.

Alice Liberman, Barbara Shatkin, and **Thomas G. McGuire**. Assessing the Effect of Vendorship: A One-State Case Study.  *Journal of Independent Social Work Practice*, 2(4):59-74, 1988.

Lois Camberg and **Thomas G. McGuire**. Inpatient Psychiatric Units in General Hospitals: Response to Mental Health Policy or Hospital Economics?  *Medical Care*, 27(2): 130-139, 1989.

**Thomas G. McGuire**.  Financing and Reimbursement of Mental Health Services. Taube and Mechanic (Eds.) *The Future of Mental Health Services Research, National Institute of Mental Health*, 1989.

**Thomas G. McGuire**. Outpatient Benefits for Mental Health Services in Medicare: Alignment with the Private Sector? *American Psychologist*, 44(5):818-824, 1989.

Marc Friedman, Randall P. Ellis, and **Thomas G. McGuire**.  Provider response to Medicare's PPS: Reductions in Length of Stay for Psychiatric Patients Treated in Scatter Beds. *Inquiry*, 26 (2): 192-201, 1989.

**Thomas G. McGuire.** Combining Demand and Supply Side Cost Sharing: the Case of Inpatient Mental Health Care.  *Inquiry*, 26(2) 192-201, 1989.

Sara Bachman, **Thomas G. McGuire,** et al. Preferred Provider Organizations: Options for Medicare. *Inquiry*, 26(1):24-34, 1989.

Linda K. Frisman and **Thomas G. McGuire**.  The Economics of Long-Term Care for the Mentally Ill.  *The Journal of Social Issues*, 45(3):119-130, 1989.

Randall P. Ellis, Cynthia Gallup, and **Thomas G. McGuire**.  Should Medical Professional Liability Insurance be Experience Rated? *Journal of Risk and Insurance*, 57(1):66-78, 1990.

Randall P. Ellis and Thomas G McGuire.  Optimal Payment Systems for Health Services. *Journal of Health Economics*, 9:375-936, 1990.

David A. Lambert and **Thomas G. McGuire**.  Political and Economic Determinants of Insurance Regulation in Mental Health.  *Journal of Health Politics, Policy, and Law,* 15(1): 169-190, 1990.

**Thomas G. McGuire**. Growth of a Field of Policy Research: The Economics of Mental Health. *Journal of Administration and Policy in Mental Health.*

Richard G. Frank and **Thomas G. McGuire**.  Mandating Employer Coverage of Mental Health Care.  *Health Affairs*, 9(1):32-42, 1990.

**Thomas G. McGuire**, William S. Mosakowski, and Linda S. Radigan.  Designing a State-Level Prospective Payment System for Inpatient Psychiatric Services in Medicaid: New Hampshire's Peer Group Approach.  *Administration and Policy in Mental Health*, 19(1):43-54, 1990.

**Thomas G. McGuire** and Barbara Shatkin. Forecasting the Cost of Drug Abuse Treatment Coverage in Private Health Insurance.  In Cartwright and Kaple (Eds.) *Economic Costs,*

*Cost Effectiveness, Financing and Community-Based Drug Treatment*, National Institute on Drug Abuse Research Monograph #113, 1991.

Richard G. Frank, **Thomas G. McGuire**, and David Salkever Benefit Flexibility, Cost Shifting, and Mandated Mental Health Coverage. *Journal of Mental Health Administration*, 18(3): 264-271, 1991.

**Thomas G. McGuire**. Measuring the Economic Cost of Schizophrenia. *Schizophrenia Bulletin*, 17(3):375-388, 1991.

Jerry Cromwell, Brooke Harrow, **Thomas G. McGuire**, and Randall P. Ellis. Medicare Payment to Psychiatric Facilities: Unfair and Insufficient? *Health Affairs*, 10(2): 124-134, 1991.

Diana C. Walsh, Ralph W. Hingston, and **Thomas G. McGuire**. A Randomized Trial of Treatment Options for Alcohol-Abusing Workers. *New England Journal of Medicine*, 325:775-782, 1991.

David A. Lambert and **Thomas G. McGuire**. Determinants of Stringency of Psychologist Licensure. *International Journal of Law and Psychiatry*, 14:315-329, 1991.

**Thomas G. McGuire**. Paralyzing Medicare's Demand-Side Policies. In H.E. Frech III (Eds.) Setting Physicians' Fees, *American Institute Enterprise*, 1991.

**Thomas G. McGuire** and Mark V. Pauly. Physician Response to Fee Schedules with Multiple Payers. *Journal of Health Economics*, 10:385-410, 1991.

Marc Cohen, Nanda Kumar, **Thomas G. McGuire**, and Stanley S. Wallack. Response to Weiner et al. *Journal of Health Politics, Policy, and Law*, 17(3):435-438, 1992.

Marc Cohen, Nanda Kumar, **Thomas G. McGuire**, and Stanley S. Wallack. Financing Long-Term Care: A Practical Mix of Public and Private. *Journal of Health Politics, Policy, and Law*, 17(3):403-424, 1992.

**Thomas G. McGuire**, Christopher Ruhm, and Barbara Shatkin. Defining the Public Interest in Workplace Drug Abuse Policy. *National Institute on Drug Abuse Research Monograph*, 1992.

**Thomas G. McGuire**. Research on Economics in Mental Health: The Past and Future Prospects. In Frank and Manning (Eds.) *Economics and Mental Health*, Johns Hopkins University Press, 1992.

**Thomas G. McGuire**. Estimating Cost of a Mental Health Benefit: A Small-Employer Mandate in Connecticut. In Frank and Manning (Eds.) *Economics and Mental Health*, Johns Hopkins University Press, 1992.

Jerry Cromwell, Randall P. Ellis, Brooke Harrow, and **Thomas G. McGuire**. A Modified TEFRA System for Medicare Discharges from Psychiatric Facilities. In Frank and Manning (Eds.) *Economics and Mental Health*, Johns Hopkins University Press, 1992.

Constance Horgan and **Thomas G. McGuire**. Financing Child and Adolescent Inpatient Mental Health Care Through Private Insurance. In the *Financing of Mental Health Services for Children and Adolescents*, National Center for Education in Maternal and Child Health: Washington, DC, 1992.

**Thomas G. McGuire**, Richard G. Frank, and Howard H. Goldman. Designing a Benefit Plan for Child and Adolescent Mental Health Services. *Administration and Policy in Mental Health*, 1(3):151-157, 1992.

Richard G. Frank, Howard H. Goldman, and **Thomas G. McGuire**. A Model Mental Health Benefit in Private Insurance. *Health Affairs*, 11(3):98-117, 1992.

**Thomas G. McGuire** and Christopher Ruhm. Workplace Drug Abuse Policy. *Journal of Health Economics,* 12:19-38, 1993.

**Thomas G. McGuire**. Outcomes, Costs, and Design of Health Insurance for Depression. In B. Jonsson and J. Rosenbaum (Eds.) *Health Economics of Depression*, John Wiley & Sons, 1993.

John Schneider, Jerry Cromwell, and **Thomas G. McGuire**.  Excluded Facility Financial Status and Options for Payment System Modification. *Health Care Financing Review*, 15(2)7-30, 1993.

**Thomas G. McGuire** and Michael H. Riordan.  Contracting for Community-Based Public Mental Health Services. In Hu and Rupp (Eds.), *Economics and Mental Health*, Advances in Health Economics and Health Services Research, 14:55-69, 1993.

Randall P. Ellis and **Thomas G. McGuire**.  Supply-Side and Demand-Side Cost Sharing in Health Care. *Journal of Economic Perspectives*, 7(4):135-151, 1993.

Jacob Glazer and **Thomas G. McGuire**.  Should Physicians be Permitted to "Balance Bill" Patients? *Journal of Health Economics*, 12(3):239-258, 1993.

Albert Ma and **Thomas G. McGuire**. Paying for Joint Costs in Health Care. *Journal of Economics and Management Strategy*, 2(1):71-95, 1993.

Randall P. Ellis and **Thomas G. McGuire**. Reparto de costs en atencion sanitaria por el lado de la oferta y por ewl lado de la demanda. Pere Ibern (Ed.), Springer-Vaerlag Iberica, 1999, 127-146 translated from Supply-Side Demand and Demand-Side Cost Sharing in Health Care. *Journal of Economic Perspectives*, Fall 1993).

Dominic Hodgkin and **Thomas G. McGuire**.  Hospital response to Prospective Payment. *Journal of Health Economics*, 13:1-29, 1994.

Jacob Glazer and **Thomas G. McGuire**.  Payer Competition and Cost Shifting in Health Care. *Journal of Economics and Management Strategy*, 3(1):71-92, 1994.

**Thomas G. McGuire**.  Predicting the Costs of Mental Health Benefits.  Milbank Memorial Fund Quarterly: *Health and Society*, 72(1):3-23, 1994.

Richard G. Frank, **Thomas G. McGuire**, Darrel A Regier, Ronald Manderscheid, and Albert Woodward.  Paying for Mental Health and Substance Abuse Care. *Health Affairs*, 13(1):337-342, 1994.

Bernard S. Arons, Richard G. Frank, Howard H. Goldman, **Thomas G. McGuire**, and Sharman Stephens.  Mental Health and Substance Abuse Coverage Under Health Reform. *Health Affairs*, 13(1):337-342, 1994.

Margaret Commons, Dominic Hodgkin, **Thomas G. McGuire**, and Michael Riordan. Summaries of State Programs. In G. Denmead and B. Rouse (Eds.) *Financing Drug Treatment Through State Programs*, Services Research Monograph No. 1, National Institute on Drug Abuse, 1994.

Margaret Commons, Dominic Hodgkin, **Thomas G. McGuire**, and Michael Riordan.  Paying For Drug Abuse Services in the Six New England States.  In G. Denmead and B. Rouse (Eds.) *Financing Drug Treatment Through State Programs*, Services Research Monograph No. 1, National Institute on Drug Abuse, 1994.

Howard H. Goldman, Richard G. Frank, and **Thomas G. McGuire**.  Mental Health Care.  In E. Ginzburg (Eds.) *Critical Issues in U.S. Health Reform*, 1994.

Richard G. Frank and **Thomas G. McGuire**.  Health Care Reform and Financing of Mental Health Services: Distributional Consequences.  In R. Manderscheid (Eds.) *Mental Health*, 1994.

Richard G. Frank and **Thomas G. McGuire**.  Establishing a Capitation Policy for Mental health and Substance Abuse Services in Health Care Reform. *Behavioral Healthcare Tomorrow*, 3(4):36-39, 1994.

Richard G. Frank, Howard H. Goldman, and **Thomas G. McGuire**.  Who Will Pay For Health Reform?  Consequences of Redistribution of Funding for Mental Health Care. *Hospital and Community Psychiatry*, 45(9):906-910, 1994.

**Thomas G. McGuire** and Michael H. Riordan.  Incomplete Information and Optimal Market Structure: Public Purchases from Private Providers. *Journal of Public Economics*, 56:125-141, 1995.

**Thomas G. McGuire**, Dominic Hodgkin, and Donald Shumway.  Managing Medicaid Mental Health Costs: The Case of New Hampshire.  *Administration and Policy in Mental Health*, 23(2)98-117, 1992.

**Thomas G. McGuire** and Beverly Porter. State Mental Health Agency Spending, 1986-1990.  *Journal of Mental Health Administration*, 22(3):301-319, 1995.

**Thomas G. McGuire**.  Effectiveness, Patient Matching, and Insurance Coverage for Depression.  *Social Psychiatry and Psychiatric Epidemiology*, 30:240-243, 1995.

Richard G. Frank and **Thomas G. McGuire**.  Estimating the Costs of Mental Health and Substance Abuse Coverage for Public Policy.  *Health Affairs*, 14(3):102-115, 1995.

Richard G. Frank, **Thomas G. McGuire**, and Joseph P. Newhouse.  Risk Contacts in Managed Mental Health Care. *Health Affairs*, 14(3):102-115, 1995.

Karen Jacobsen, **Thomas G. McGuire**, and Elizabeth Notman.  Organizational Structure and State Mental Health Expenditures.  *Administration and Policy in Mental Health,* 23(6):475-492, 1996.

Richard G. Frank and **Thomas G. McGuire**.  Health Care Financing Reform and State Mental Health Systems. In Rich White (Eds.) *Health Policy*, Federalism and the American States, 1996.

Richard G. Frank, Howard Goldman, and **Thomas G. McGuire**.  Insuring Severe Mental Disorders: A Comparison of Approaches.  Massimo Moscarelli, Agnes Rupp, and Norman Sartorius (Eds.) *Vol 1 Schizophrenia of Handbook of Mental Health Economics and Policy*, 411-422, 1996.

Karen Jacobsen and **Thomas G. McGuire**. Federal Block Grants and State Spending: The ADM Block Grant and State Agency Behavior.  *Journal of Health Politics, Policy, and Law*, 21(4):753-770, 1996.

Richard G. Frank, Haiden Huskamp, **Thomas G. McGuire**, and Joseph P. Newhouse.  Some Economics of a Mental Health Carve Out.  *Archives of General Psychiatry*, 53:933-957, 1996.

Richard G. Frank and **Thomas G. McGuire**.  Managed Care for People with Disabilities: Individuals with Severe Mental Illnesses.  In S. Altman and U. Reinhardt (Eds.) *Strategic Choices for a Changing Health Care System*, 1996.

Richard G. Frank and **Thomas G. McGuire**.  Introduction to the Economics of Mental Health. In Levin and Petrila (Eds.) *Mental Health Services: A Public Health Perspective*, 1996.

Christine Spencer, Richard G. Frank, and **Thomas G. McGuire**.  How Should the Profit Motive be Used in Managed Care? In Lazarus (Eds.) *Controversies in Managed Care*, 1996.

Randall P. Ellis and **Thomas G. McGuire**.  Hospital Responses to Prospective Payment: Moral Hazard, Selection, and Practice-Style Effects.  *Journal of Health Economics*, 15:257-277, 1996.

**Thomas G. McGuire**.  Commentary on Rizzo and Blumenthal. Is the Target Income Hypothesis an Economic Heresy? *Medical Care Research and Review,* 53(3):267-277, 1996.

Ching-To Albert Ma and **Thomas G. McGuire**.  Optimal Health Insurance and Provider Payment.  *American Economic Review,* 87(4): 685-704, 1997.

Ernst R. Berndt, Richard G. Frank, and **Thomas G. McGuire**.  Alternative Insurance Arrangements and the Treatment of Depression: What Are the Facts?  The American *Journal of Managed Care*, 3(2): 243-250, 1997.

Richard G. Frank, Chris Koyangi, and **Thomas G. McGuire**.  The Politics and Economics of Mental Health Parity Laws.  *Health Affairs*, 16(4): 108-119, 1997.

Margaret Commons, Thomas G. McGuire and Michael H. Riordan.  Performance Contracting for Substance Abuse Treatment, *Health Services Research,* 32(5): 631-650. 1997.

Margaret Commons and **Thomas G. McGuire**.  Some Economics of Performance-Based Contracting for Substance-Abuse Services.  In Egertson, Fox, and Leshner (Eds.) *Treating Drug Abusers*, 223-249, 1997.

8

Richard G. Frank, **Thomas G. McGuire**, Jay Bae, and Agnes Rupp. Carve-Outs, Risk Adjustment, and Risk Sharing as Solutions for Adverse Selection in Behavioral Health Care. *Health Care Financing Review*, 18(3): 109-122, 1997.

Richard G. Frank and **Thomas G. McGuire**. Savings From a Medicaid Carve-Out for Mental Health and Substance Abuse Services in Massachusetts. *Psychiatric Services*, 48(9): 1147-1152, 1997.

Robin E. Clark, Gregory B. Teague, **Thomas G. McGuire**, et al. Cost-Effectiveness of Assertive Community Treatment versus Standard Care Management for Persons with Co-Occurring Severe Mental Illness and Substance Use Disorders. *Health Services Research*, 33(5): 1285-1308, 1998.

Ching-To Albert Ma and **Thomas G. McGuire**. Cost and Incentives in a Behavioral Health Carve Out. *Health Affairs*, 17(2):53-69, 1998.

Richard G. Frank and **Thomas G. McGuire**. The Economic Function of Carve Outs in Managed Care. *American Journal of Managed Care*, 6(4): Sp31-Sp39, 1998.

Susan L. Ettner, Richard G. Frank, **Thomas G. McGuire**, Joseph P. Newhouse, and Elizabeth Notman. Risk Adjustment of Mental Health and Substance Abuse Payments. *Inquiry*, 35: 223-239, 1998.

Richard G. Frank and **Thomas G. McGuire**. Parity for Mental Health and Substance Abuse Care Under Managed Care. *The Journal of Mental Health Policy and Economics*, 1: 153-159, 1998.

Richard G. Frank, **Thomas G. McGuire**, Sharon-Lise T. Normand, and Howard H. Goldman. The Value of Mental Health Services at the System Level: The Case of Treatment for Depression. *Health Affairs*, 18(5): 71-86, 1999.

Elaine Fleming, Ching-To Albert Ma, and **Thomas G. McGuire**. Behavioral Health Expenditures and State Organizational Structure. *Administration and Policy in Mental Health*, 27(3): 91-111, 2000.

Richard G. Frank and **Thomas G. McGuire**. Economics of Mental Health. In Culyer and Newhouse (Eds.) *Handbook of Health Economics*, 2000.

**Thomas G. McGuire**. Physician Agency. In Culyer and Newhouse (Eds.) *Handbook of Health Economics*, 2000.

Jacob Glazer and **Thomas G. McGuire**. Optimal Risk Adjustment of Health Insurance Premiums: An Application to Managed Care. *American Economic Review*, 90(4): 1055-1071, 2000.

**Thomas G. McGuire** and Richard G. Frank. The Mental Health Economy and Mental Health Economics. *Mental Health*, 2001.

Richard G. Frank, Jacob Glazer, and **Thomas G. McGuire**. Adverse Selection in Managed Health Care. *Journal of Health Economics*, 19(6): 829-854, 2001.

Jacob Glazer and **Thomas G. McGuire**. Why Don't Private Employers Use Formal Risk Adjustment? Conference Overview. *Inquiry*, 38(3): 242—244, 2001.

Jacob Glazer and **Thomas G. McGuire**. Private Employers Don't Need Formal Risk Adjustment. *Inquiry*, 38(3): 260-69, 2001.

Patricia S. Keenan, Melinda J. Beeuwkes Buntin, **Thomas G. McGuire**, and Joseph P. Newhouse. The Prevalence of Formal Risk Adjustment. *Inquiry*, 38(3): 245-259, 2001.

Susan L Ettner, Richard G. Frank, **Thomas G. McGuire**, and Richard C. Hermann. Risk Adjustment Alternatives in Paying for Behavioral Health Care Under Medicaid. *Health Services Research*, 36(4): 793-811, 2001.

Margarita Alegria, **Thomas G. McGuire**, Mildred Vera, Glorisa Canino, Daniel Freeman, Leida Matias, Carmen Albizu, Heriberto Marin, and Jose Calderon. The Impact of Managed Care on the Use of Outpatient Mental Health and Substance Abuse Services in Puerto Rico. *Inquiry*, 38(4): 381-965, 2001.

Margarita Alegria, **Thomas G. McGuire**, Mildred Vera, Glorisa Canino, Carmen Albizu, Heriberto Marin, and Leida Matias.  Does Managed Mental Health Care Reallocate Resources to Those with Greater Need for Services?  *The Journal of Behavioral Health Services and Research*, 28(4): 439-455, 2001.

Margarita Alegria, **Thomas G. McGuire**, Mildred Vera, Glorisa Canino, Leida Matias, Carmen Albizu, and Jose Calderon.  Changes in Access to Mental Health Care for the Poor and the Non-Poor with Managed Care: Results from the Health Care Reform in Puerto Rico.  *American Journal of Public Health,* 91(9):1431-1434, 2001.

Richard G. Frank, Howard H. Goldman, and **Thomas G. McGuire**.  Will Parity Coverage Result in Better Mental Health Care? *New England Journal of Medicine*, 345(23): 1701-1704, 2001.

Ann Balsa and **Thomas G. McGuire**.  Statistical Discrimination in Health Care. *Journal of Health Economics,* 20:881-907, 2001.

Mingshan Lu and **Thomas G. McGuire**.  The Productivity of Outpatient Treatment for Substance Abuse. *Journal of Human Resources*, 38(2): 309-335, 2002.

Sharon-Lise T. Normand, Richard G. Frank, and **Thomas G. McGuire**.  Using Elicitation Techniques to Estimate the Value of Ambulatory Treatments for Major Depression. *Medical Decision Making*, 22(3): 245-260, 2002.

**Thomas G. McGuire**, Kenneth B. Wells, Martha L. Bruce, Jeanne Miranda, Richard Scheffler, Mary Durham, Dan Ford, and Lydia Lewis.  Burden of Illness.  *Mental Health Services Research*, 4(4): 179-185, 2002.

Kenneth B. Wells, Jeanne Miranda, Mark S. Bauer, Martha L. Bruce, Mary Durham, Javier Escobar, Daniel Ford, Junius Gonzalez, Kimberly Hoagwood, Sarah M. Horowitz, William Lawson, Lydia Lewis, **Thomas G. McGuire**, Harold Pincus, Richard Scheffer, William A. Smith, and Jurgen Unutzer.  Overcoming Barriers to Reducing the Burden of Affective Disorders.  *Biological Psychiatry*, 52: 655-675, 2002.

Jacob Glazer and **Thomas G. McGuire**.  Setting Health Plan Premiums to Ensure Efficient Quality in Health Care: Minimum Variance Optimal Risk Adjustment.  *Journal of Public Economics.*  84(2): 153-173, 2002.

Ching-To Albert Ma and **Thomas G. McGuire**.  Network Incentives for Managed Health Care.  *Journal of Economics and Management Strategy.* 11(1): 1-35, 2002.

Jacob Glazer and **Thomas G. McGuire**.  Multiple Payers, Commonality, and Free-Riding in Health Care Medicare and Private Payers.  *Journal of Health Economics*, 21: 1049-1069, 2002.

Ching-To Albert Ma, **Thomas G. McGuire**, and Yong Weng. Monitoring and Enforcement in Federal Alcohol and Drug Abuse Block Grants.  The Economics of Health Care in Asia-Pacific Countries, *Institute of Economics*, 2002.

**Thomas G. McGuire**.  Setting prices for New Vaccines (in Advance).  *International Journal of Health Care Finance and Economics*, 3: 207-224, 2003.

Zhun Cao and **Thomas G. McGuire**.  Service-Level Selection by HMOs in Medicare.  *Journal of Health Economics*, 22: 915-931, 2003.

Richard G. Frank and **Thomas G. McGuire**.  Setting Payments in the Ticket to Work Program: Applying Experience from Capitation Payments in Health Insurance.  Paying for Results in Vocational Rehabilitation: Will Provider Incentives Work for Ticket to Work? *The Urban Institute,* 155-176, 2003.

Elaine Fleming, Hsien-Ming Lien, Ching-To Albert Ma, and **Thomas G. McGuire**.  Managed Care and Trends in Hospital Care for Mental health and Substance Abuse Treatment in Massachusetts: 1994-1997.  *The Journal of Mental Health Policy and Economics*, 6: 3-12, 2003.

Susan M. Essock, Robert E. Drake, Richard G. Frank, and **Thomas G. McGuire**. Randomized Controlled Trials in Evidence-Based Mental Health Care: Getting the Right Answer to the Right Question. *Schizophrenia Bulletin*, 29(1): 115-123, 2003.

Margarita Alegria and **Thomas G. McGuire**. Rethinking a Universal Framework in Psychiatric Symptom-Disease Relationship. *Journal of Health and Social Behavior*, 44: 257-274, 2003.

Ana I. Balsa and **Thomas G. McGuire**. Prejudice, Clinical Uncertainty, and Stereotypes as Sources of Health Disparities. *Journal of Health Economics*, 22(1) 89-116, 2003.

Jose J. Escarce and **Thomas G. McGuire**. Methods for Using Medicare Data to Compare Procedure Rates Among Asians, Blacks, Hispanics, Native Americans, and Whites. *Health Services Research*, 38(5):1303-1319, 2003.

Ana I. Balsa, Naomi Seiler, **Thomas G. McGuire**, and Gregg Bloche. Clinical Uncertainty and Healthcare Disparities. *American Journal of Law and Medicine*, 29: 203-219, 2003.

Jose J. Escarce and **Thomas G. McGuire**. Changes in Racial Differences in Use of Medical procedures and Diagnostic Test Among Elder Persons: 1986-1997. *American Journal of Public Health*, 94(10): 1795-1799, 2004.

Rena Conti, Richard G. Frank, and **Thomas G. McGuire**. Insuring Mental Health Care in the Age of Managed Care. In Levin Petrila and Hennessy (Eds), *Mental Health Services*, 15-41, 2004.

Hsien-Ming Lien, Ching-To Albert Ma, and **Thomas G. McGuire**. Provider-Client Interactions and Quantity of Health Care Use. *Journal of Health Economics,* 23(6): 1261-1283, 2004.

**Thomas G. McGuire**. DRG-Based Payment for Hospital Care: Observations from the US Experience. *Activity Based Funding for Hospitals: English Policy International Experience*, 2004.

Tracy Lieu, **Thomas G. McGuire**, and Alan R. Hinman. Overcoming Economic Barriers to the Optimal Use of Vaccines. *Health Affairs,* 24(3): 666-679. 2005.

Margarita Alegria, Richard G. Frank, and **Thomas G. McGuire**. Managed Care and Systems Cost-Effectiveness: Treatment for Depression. *Medical Care*, 43(12): 1225-1233, 2005.

Richard G. Frank and **Thomas G. McGuire**. Integrating People with Mental Illness into Health Insurance and Social Services. In Mechanic, Rogut, Colby, and Knickman (Eds.), *Policy Challenges in Modern Health Care*. 223-237, 2005.

Ana I. Balsa, **Thomas G. McGuire**, and Lisa S. Meredith. Testing for Statistical Discrimination in Health Care. *Health Services Research*, 40(1): 227-252, 2005.

Margarita Alegria, Zhun Cao, **Thomas G. McGuire**, Victoria Ojeda, Bill Sribney, Megan Woo, and David Takeuchi. Health Insurance Coverage for Vulnerable Populations: Contrasting Asian Americans and Latinos in the United States. *Inquiry*, 43(3): 231-254, 2006.

**Thomas G. McGuire**, Margarita Alegria, Benjamin L. Cook, Kenneth B. Wells, and Alan Zaslavsky. Implementing the IOM Definition of Disparities: An Application to Mental Health Care. *Health Services Research,* 41(5): 1979-2005, 2006.

Victoria Ojeda and **Thomas G. McGuire**. Gender and Racial/Ethnic Differences in Use of Outpatient Mental Health and Substance Use Services by Depressed Adults. *Psychiatric Q*, 77(3): 211-222, 2006.

Anna D. Sinaiko and **Thomas G. McGuire**. Patient Inducement, Provider Priorities, and Resource Allocation in Public Mental Health Systems. *Journal of Health Politics, Policy, and Law*, 31(6): 1075-1106, 2006.

Carla Gomes, **Thomas G. McGuire**, Jameson Foster, Sheila A. Donahue, Chip J. Felton, and Susan M. Essock. Supply of Mental Health Services in the Aftermath of 9/11: Did Project Liberty Displace Community Based Medicaid Services in New York*? Psychiatric Services*, 57(9): 1309-1312, 2006.

Colleen Barry, Richard G. Frank, and **Thomas G. McGuire**. The Cost of Mental Health Parity: Still an Impediment? *Health Affairs*, 25(3): 623-634, 2006.

Jacob Glazer and **Thomas G. McGuire**. Optimal Risk Adjustment. In Jones (Eds.) *The Elgar Companion to Health Economics*, 279-285, 2006.

Jacob Glazer and **Thomas G. McGuire**. Optimal Quality Reporting in Markets for Health Plans. *Journal of Health Economics*, 25(2): 295-310, 2006.

Jacob Glazer and **Thomas G. McGuire**. Contending with Risk Selection in Health Insurance Markets in Germany. *Perspektiven der Wirtscgaftspolitik*, 7: 75-91, 2006.

**Thomas G. McGuire**. Paying Doctors to Improve Quality of Care. In Rosen, Saltman, Shani (Eds.) *Health Systems*, 383-389. The Israel National Institute for Health Policy and Health Services Research: Jerusalem Conference on Health Policy, 2006.

Randall P. Ellis and **Thomas G. McGuire**. Predictability and Predictiveness in Health Care Spending. *Journal of Health Economics*, 26(1): 25-48, 2007.

**Thomas G. McGuire**. Risk Adjustment Systems in Competitive Health Insurance Markets: Lessons from the United States. In Wille, Ulrich, and Schneider (Eds.) *Wettnewerb und Riskikostrukturausgleich im internartonalen vergleich,* 2007.

**Thomas G. McGuire** and Sebastian Bauhoff. A Decade of Choice: Tracking the German National Experience with Consumer Choice of Sickness Fund. In P. Oberender and C. Strauss (Eds) *Auf der Suche nach der besseren Losung*, 145-160, 2007.

Ming Tai-Seale, **Thomas G. McGuire**, Christopher Colenda, David Rosen, and Mary Ann Cook. Two-Minute Mental Health Care for Elderly Patients: Inside Primary Care Visits. *Journal of the American Geriatrics Society,* 55(12): 1903-1911, 2007.

Ming Tai Seale, **Thomas G. McGuire**, and Weimin Zhang. Time Allocation in Primary Care Office Visits. *Health Research Services,* 42(5): 1871-1894, 2007.

Ana Balsa, Zhun Cao and **Thomas G. McGuire**. Does Managed Care Reduce Health Care Disparities Between Minorities and Whites? *Journal of Health Economics* 26: 101-121, 2007.

Jacob Glazer, **Thomas G. McGuire**, and Joseph P. Newhouse. Using Performance Measures to Motivate Report Averse and Report Loving Agents. *Journal of Health Economics*, 26(6): 1170-1189, 2007.

Naihua Duan, Margarita Alegria, Glorisa Canino, **Thomas G. McGuire**, and David Takeuchi. Survey Conditioning in Self-Reported Mental Health Service Use: Randomized Comparison of Alternative Instrument Formats. *Health Services Research,* 42(2): 890-907, 2007.

Benjamin L. Cook, **Thomas G. McGuire**, and Jeanne Miranda. Measuring Trends in Mental Health Care Disparities, 2000-2004. *Psychiatric Services,* 58(12): 1533-1540, 2007.

**Thomas G. McGuire** and Jeanne Miranda. Racial and Ethnic Disparities in Mental Health Care: Evidence and Policy Implications. *Health Affairs*, 27(2):393-403, 2008.

**Thomas G. McGuire**, John Z. Ayanian, Daniel, E. Ford, Rachel E.M. Henke, Kathryn M. Rost, and Alan M. Zaslavsky. Testing for Statistical Discrimination by Race/Ethnicity in Panel Data for Depression Treatment in Primary Care. *Health Services Research,* 43(2): 531-551, 2008.

Jeanne Miranda, **Thomas G. McGuire**, David R. Williams, and Phillip Wang. Mental Health in the Context of Health Disparities. *The American Journal of Psychiatry*, 165(9): 1102-1108, 2008.

Chunling Lu, Richard G. Frank, and **Thomas G. McGuire**. Demand Response of Mental Health Services to Cost Sharing under Managed Care. *The Journal of Mental Health Policy and Economics,* 11(3): 113-126, 2008.

Rachel E.M. Henke, **Thomas G. McGuire**, Alan M. Zaslavsky, Daniel E. Ford, and Jose Arbelaez. Clinician and Organizational Level Factors in the Adoption of Evidence-Based

Care for Depression in Primary Care. *Health Care Management Review,* 33(4): 289-299, 2008.

**Thomas G. McGuire** and Jeanne Miranda.  New Evidence Regarding Racial and Ethnic Disparities in Mental Health: Policy Implications.  *Health Affairs,* 27(2): 393-403, 2008.

Jacob Glazer and **Thomas G. McGuire**.  Inducing Quality from Health Care Providers in the Presence of Adverse Selection.  In Lu, Mingshan, and Jonsson (Eds.) *Financing Health Care: New Ideas for a Changing Society*, 9:223-244, 2008.

Jacob Glazer, **Thomas G. McGuire**, and Sharon-Lise T. Normand.  Mitigating the Problem of Unmeasured Outcomes in Quality Reports.  *The B.E. Journal of Economic Analysis and Policy*, 8(2): 7, 2008.

Jacob Glazer, **Thomas G. McGuire**, Zhun Cao, and Alan M. Zaslavsky.  Using Global Ratings of Health Plans to Improve the Quality of Health Care.  *Journal of Health Economics*, 27(5): 1182-1195, 2008.

**Thomas G. McGuire**.  Physician Fees and Behavior: Implications for Structuring a Fee Schedule. In Sloan and Kasper (Eds.) *Incentives and Choice in Health Care,* 263-288, 2008.

Stockdale, S. E., I. T. Lagomasino, J. Siddique, **T. McGuire**, and J. Miranda. "Racial and Ethnic Disparities in Detection and Treatment of Depression and Anxiety Among Psychiatric and Primary Health Care Visits." 1995–2005. *Medical Care* 46: 668–77, 2008.

Chunling Lu, Richard G. Frank, and **Thomas G. McGuire**.  Demand Response Under Managed Health Care.  *Contemporary Economic Policy*, 27(1): 1-15, 2009.

Benjamin L. Cook, **Thomas G. McGuire**, and Samuel H. Zuvekas.  Measuring Trends in Racial/Ethnic Health Care Disparities.  *Medical Care Research and Review*, 66: 23-48, 2009.

Victoria Ojeda, Richard G. Frank, and **Thomas G. McGuire**.  Mental illness, Nativity, Gender and Labor Supply.  *Health Economics*, 19(4): 396-421, 2009.

Jeffrey Swanson, Marvin Swartz, Richard A. Van Dorn, John Monahan, **Thomas G. McGuire**, Henry J. Steadman, and Pamela Clark Robbins.  Racial Disparities in Involuntary Outpatient Commitment: Are They Real? *Health Affairs*, 28(3): 816-826, 2009.

Benjamin L. Cook, **Thomas G. McGuire**, Ellen Meara, and Alan M. Zaslavsky.  Adjusting for Health Status in Non-Linear Models of Health Care Disparities.  *Health Services and Outcomes Research Methodology*, 9(1): 1-21, 2009.

Marcela V. Horovitz-Lennon, Richard G. Frank, **Thomas G. McGuire**, and Margarita Alegria.  Racial and Ethnic Disparities in the Treatment of a Medicaid Population with Schizophrenia. *Health Services Research*, 44(6): 2106-2122.

David C. Grabowski and **Thomas G. McGuire**.  Black-White Disparities in Care in Nursing Homes.  *Atlantic Economic Journal*, 37(3): 299-314, 2009.

Alisa B. Busch, Haiden A. Huskamp, Brian Neelon, Tim Manning, Sharon-Lise T. Normand, and **Thomas G. McGuire**.  Longitudinal Racial/Ethnic Disparities in Antimanic Medication Use in Bipolar-I Disorder.  *Medical Care*, 47(12): 1217-1228, 2009.

Richard G. Frank, **Thomas G. McGuire**, and Howard H. Goldman.  Trends in Mental Health Cost Growth: An Expanded Role for Management? *Health Affairs*, 28(3): 649-659, 2009.

Catherine Fullerton, David C. Grabowski, **Thomas G. McGuire**, and Vincent Mor.  Trends in Mental Health Admissions to Nursing Homes: 1999-2005. *Psychiatric Services*, 60(7): 965-71, 2009.

Rachel Henke and **Thomas G. McGuire**. Clinical Inertia in Depression Treatment. *Medical Care*. 47(9): 959-967, 2009.

Elizabeth L. Merrick, **Thomas G. McGuire**, et al.  Integrated Employee Assistance Program/Managed Behavioral Healthcare Benefits: Relationship with Access and Client

Characteristics. *Administration and Policy in Mental Health and Mental Health Services Research,* 36(6): 416-423, 2009.

Hsien-Ming Lien, Mingshan Lu, Ching-To Albert Ma, and **Thomas G. McGuire**. Progress and Compliance in Alcohol Abuse Treatment. *Journal of Health Economics*, 29 (2): 213-225, 2009.

Elizabeth L. Merrick, Dominic Hodgkin, Deidre Hiatt, Constance M. Horgan, Vanessa Azzone, Bernard McCann, Grant Ritter, Galima Zolotusky, **Thomas G. McGuire**, and Sharon Reif. Patterns of Service Use in Two Types of Managed Behavioral Health Care Plans. *Psychiatric Services*, 61(1): 86-90, 2010.

**Thomas G. McGuire** and Anna Sinaiko. Regulating a Health Insurance Exchange: Implications for Individuals with Mental Illness. *Psychiatric Services*, 61(11): 1074-1080, 2010.

**Thomas G. McGuire**. Introduction to Special Section on Health Reform and Mental Illness. *Psychiatric Services*, 61(11): 1073, 2010.

Richard G. Frank and **Thomas G. McGuire**. Mental Health Treatment and Criminal Justice Outcomes. In Cook, Ludwig, McCrary (Eds*.) Controlling Crime: Strategies and Tradeoffs*, 2010.

Jeffrey W. Swanson, Richard A. Van Dorn, Marvin S. Swartz, Andrew M. Cislo, Christine M. Wilder, Lorna L. Moser, Allison R. Guilbert, and **Thomas G. McGuire**. Robbing Peter to Pay Paul: Did New York State's Outpatient Commitment Program Crowd Out Voluntary Service Recipients? *Psychiatric Services*, 61(10): 888-995, 2010.

Dominic Hodgkin, Elizabeth L. Merrick, Deidre Hiatt, Constance M. Horgan, and **Thomas G. McGuire**. The Effect of Employee Assistance Plan Benefit on the Use of Outpatient Behavioral Health Care. *Journal of Mental Health Policy and Economics,* 13(4): 167-174, 2010.

Benjamin L. Cook, **Thomas G. McGuire**, Kari Lock, and Alan M. Zaslavsky. Comparing Methods of Racial and Ethnic Disparities Measurement across Different Settings of Mental Health Care. *Health Services Research* 45(2): 825-847, 2010.

**Thomas G. McGuire**. Payment Reform to Finance a Medical Home. Comment on Achieving Cost Control, Care Coordination, and Quality Improvement Through Incremental Payment System Reform. *Journal of Ambulatory Care Management*, 33(1): 35-37, 2010.

**Thomas G. McGuire** and Sebastian Bauhoff. Adoption of a Cost-Saving Innovation: Germany, UK, and Simvastatin. In Klusen, Verheyen, and Wagner (Eds.) *England and Germany in Europe – What Lessons Can We Learn From Each Other?* 11-26, 2011.

**Thomas G. McGuire**, Anna D. Sinaiko, and Joseph P. Newhouse. An Economics History of Medicare Part C. *The Millbank Quarterly*, 2(89), 2011.

David C. Grabowski, Christopher C. Afendulis, and **Thomas G. McGuire**. Medicare Prospective Payment and the Volume and Intensity of Skilled Nursing Facility Services. *Journal of Health Economics*, 30(4): 675-684, 2011.

Jacob Glazer and **Thomas G. McGuire**. Gold and Silver Health Plans: Accommodating Demand Heterogeneity in Managed Competition. *Journal of Health Economics*, 30(5):1011, 2011.

John M. McWilliams, Christopher C. Afendulis, and **Thomas G. McGuire**. Complex Medicare Advantage Choices May Overwhelm Seniors – Especially Those With Impaired Decision Making. *Health Affairs*, 30(9): 1786-1794, 2011.

Ernst R. Berndt, **Thomas G. McGuire**, and Joseph P. Newhouse. A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets. *Forum for Health Economics and Policy*, 14(2), 2011.

Benjamin L. Cook, **Thomas G. McGuire**, Margarita Alegria, and Sharon-Lise T. Normand. Crowd-out and Exposure Effects of Physical Comorbidities on Mental Health Care Use: Implications for Racial-Ethnic Disparities in Access. *Health Services Research*, 46(4): 1259-1280, 2011.

Catherine Fullerton, Alisa B. Busch, Sharon-Lise T. Normand, **Thomas G. McGuire**, and Arnold M. Epstein. Ten-Year Trends in Quality of Care and Spending for Depression: 1996-2005. *Archive of General Psychiatry*, 68(12): 1218-1226, 2012.

Catherine Fullerton, Arnold M. Epstein, Richard G. Frank, Sharon-Lise T. Normand, Christina X. Fu, and **Thomas G. McGuire**. Medication Use and Spending Trends Among Children with ADHD in Florida's Medicaid Program. *Psychiatric Services*, 63(2): 115-121, 2012.

Benjamin L. Cook, **Thomas G. McGuire**, and Alan M. Zaslavsky. Measuring Racial/Ethnic Disparities in Health Care: Methods and Practical Issues. *Health Services Research*, 2011, 45(4): 1259-1280, 2012.

Jacob Glazer and **Thomas G. McGuire**. A Welfare Measure of Offset Effects in Health Insurance. *Journal of Public Economics*, 96: 520-523, 2012.

Ming Tai-Seale and **Thomas G. McGuire**. Time is Up: The Increasing Shadow Price of Time in Primary Care Office Visits. *Health Economics*, 21: 457-476, 2012.

Jacob Glazer, Haiden Huskamp, and **Thomas G. McGuire**. A Prescription for Drug Formulary Evaluation: An Application of Price Indices. *Forum for Health Economics and Policy*, 15(2): 1558, 2012.

**Thomas G. McGuire**. Demand for Health Insurance. In Pauly, McGuire, and Barros (Eds.) *Handbook of Health Economics*, Volume 2, 2012.

Jacob Glazer and **Thomas G. McGuire**. Making MA a Middle-Class Program. *Journal of Health Economics,* 32(2): 463-473, 2013.

**Thomas G. McGuire**, Jacob Glazer, Joseph P. Newhouse, Sharon-Lise T. Normand, Julie Shi, Anna D. Sinaiko, and Samuel Zuvekas. Integrating Risk Adjustment and Enrollee Premiums in Health Plan Payment. *Journal of Health Economics*, 32(6): 1263-1277, 2013.

Jane M. Zhu, Timothy J. Layton, Anna D. Sinaiko, and **Thomas G. McGuire**. The Power of Reinsurance in Health Insurance Exchanges to Improve the Fit of the Payment System and Reduce Incentives for Adverse Selection. *Inquiry*, 50(4): 255-274, 2013.

Jeffery Swanson, Richard Van Dorn, Marvin Swartz, Pam Robbins, Henry Steadman, **Thomas G. McGuire**, and John Monahan. The Cost of Assisted Outpatient Treatment: Can it Save States Money? *American Journal of Psychiatry*, 170: 1423-1432, 2014.

Joseph P. Newhouse and **Thomas G. McGuire**. How Successful is Medicare Advantage? *Millbank Quarterly*, 92(2): 351-394, 2014.

**Thomas G. McGuire**. A Note on Income Effects and Health Care Cost Growth in Medicare. *Forum for Health Economics and Policy*. 17(1): 1, 2014.

**Thomas G. McGuire**, Joseph P. Newhouse, Sharon-Lise T. Normand, Julie Shi, and Samuel Zuvekas. Assessing Incentives for Service-Level Selection in Private Health Insurance Marketplaces. *Journal of Health Economics*, 35(1): 47-63, 2014.

Jacob Glazer and **Thomas G. McGuire**. Risk Adjustment as Mechanism Design. In Culyer (Eds.) *Encyclopedia of Health Economics*, 3: 267-271, 2014.

Benjamin L. Cook, Samuel H. Zuvekas, Nicholas Carson, Geoffrey Ferris Wayne, Andrew Vesper and **Thomas G. McGuire**. Assessing Disparities in Treatment Among Racial/Ethnic Groups During Episodes of Mental Health Care. *Health Services Research*, 49(1): 206-229, 2014.

Henry J. Steadman, Lisa Callahan, Pamela Clark Robbins, Roumen Vesselinov, **Thomas G. McGuire**, and Joseph P. Morrissey. Criminal Justice and Behavioral Health Care Costs of Mental Health Court Participants: A Six year Study. *Psychiatric Services*, 1:65(9): 1100-1104, 2014.

Richard G. Frank Sherry A. Glied, **Thomas G. McGuire**. Paying for Early Interventions in Psychoses: A Three-Part Model. *Psychiatric Services*, 66(7): 677-679, 2014.

Rudy Douven, **Thomas G. McGuire**, and J. Michael McWilliams. Avoiding Unintended Incentives in ACO Payment Models. *Health Affairs*, 34(1): 143-149, 2015.

Sherri Rose, Julie Shi, **Thomas G. McGuire**, and Sharon-Lise T. Normand.  Matching and Imputation Methods for Risk Adjustment in the Health Insurance Marketplaces. *Statistics in Bioscience,* 2015 (special issue on big data) Advance online publication. doi:10.1007/s12561-015-9135-7.

Keith M. Drake, Martha A. Starr, and **Thomas G. McGuire**.  Do Reverse Payment Settlements Constitute an Anticompetitive Pay-for-Delay? *International Journal of the Economics of Business*, 22(2): 173-200, 2015.

Benjamin L. Cook, Zimin Liu, Anna Sophia Lessios, Stephen Loder, and **Thomas G. McGuire**. The Costs and Benefits of Reducing Racial – Ethnic Disparities in Mental Health. *Psychiatric Services*, 66(4): 389-396, 2015.

Alisa B. Busch, Arnold M. Epstein, **Thomas G. McGuire**, Sharon-Lise T. Normand, and Richard G. Frank.  Thirty Day Hospital Readmission for Medicaid Enrollees with Schizophrenia: The Role of Local health Care Systems.  *The Journal of Mental Health Policy and Economics*, 18(3): 115-124, 2015.

Ezra Golberstein, Taeho Greg Rhee, and **Thomas G. McGuire**.  Geographic Variations in use of Medicaid Mental Health Services. *Psychiatric Services*, 1:66(5): 452-454, 2015.

Joseph P. Newhouse, Mary Price, J. Michael McWilliams, John Hsu, and **Thomas G. McGuire**. How Much Favorable Selection is Left in Medicare Advantage? *American Journal of Health Economics,* 1(1): 1-26, 2015.

Sherry A. Glied, Bradley D. Stein, **Thomas G. McGuire**, Rhonda Robinson Beale, Farifteh Firoozmand Duffy, Samantha Shugarman, and Howard H. Goldman.  Measuring Performance in Psychiatry: A Call to Action.  *Psychiatric Services*, 1:66(8): 872-878, 2015.

**Thomas G. McGuire**, Keith M. Drake, Einer Elhauge, Raymond Hartman, and Martha A. Starr. Resolving Reverse-Payment Settlements with the Smoking Gun of Stock Price Movements.  *Iowa Law Review*, 101(4): 1581-1599, 2016.

Dominic Hodgkin, Elizabeth L. Merrick, Peggy L. O'Brien, **Thomas G. McGuire**, Sue Lee, Thilo Desckersbach, and Andrew A. Nierenberg.  Testing for Clinical Inertia in Medication Treatment of Bipolar Disorder. *Journal of Affective Disorders*, 205: 13-19, 2016

Timothy J. Layton, **Thomas G. McGuire**, and Anna D. Sinaiko.  Risk Corridors and Reinsurance in Health Insurance Marketplaces: Insurances for Insurers.  *American Journal of Health Economics*, 2(1): 66-95, 2016.

Ellen J. Montz, Timothy J. Layton, Alisa B. Busch, Randall P. Ellis, Sherri R. Rose, and **Thomas G. McGuire**. Risk Adjustment Simulation:  Health Plans May Have Incentives to Distort Mental Health and Substance Abuse Coverage.  *Health Affairs*, 35(6): 1022-1028, 2016.

**Thomas G. McGuire.**  Achieving Mental Health Care Parity Might Require Changes in Payments and Competition. *Health Affairs*, 35(6): 1029-1035, 2016.

Michael Geruso and **Thomas G. McGuire**.  Tradeoffs in the Design of health plan payment Systems: Fit, Power, and Balance. *Journal of Health Economics*, 47: 1-19, 2016.

Yuhua Bao, **Thomas G. McGuire**, Ya-Fen Chan, Ashley A. Eggman, Andrew M. Ryan, Martha L. Bruce, Harold Alan Pincus, Erin Hafer, and Jurgen Unutzer, Value-Based Payment in Implementing Evidence- Based Care: The Mental Health Integration Program in Washington State. *American Journal of Managed Care*, 23(1):48-53, 2017.

Jacob Glazer, **Thomas G. McGuire**, and Julie Shi.  Risk Adjustment of Health Plan Payments to Correct Inefficiencies from Adverse Selection. Ana Aizcorbe, Colin Baker, Ernst Berndt and David Cutler, editors, Measuring and Modeling Health Care Costs, Chicago: University of Chicago Press for the National Bureau of Economic Research, 2017.

Keith M. Drake and **Thomas G. McGuire**, Stock-Price Evidence for Anticompetitive Effects in the Nexium "Reverse-Payment" Settlement," *Journal of Competition Law & Economics*, 12(4): 735-747, 2016.

Foo, Patricia, Ming Tai-Seale, **Thomas G. McGuire**, Alan Zaslavsky, Richard Frankel, Jennifer Lafata, "Patient and Physician Race and the Allocation of Time and Patient Engagement Efforts to Mental Health Discussions in Primary Care: An Observational Study of Audiorecorded Periodic Health Exams," *Journal of Ambulatory Care Management*, 40(3): 246-256, 2017.

Timothy J. Layton and **Thomas G. McGuire**, "Marketplace Plan Payment Options for Dealing with High-Cost Enrollees," *American Journal of Health Economics,*3(2): 1-27, 2017.

David C. Grabowski, Nina R. Joyce, **Thomas G. McGuire** and Richard G. Frank, "Passive Enrollment of Dual Eligible Beneficiaries into Medicare and Medicaid Managed Care has not met Expectations," *Health Affairs* 36(5): 846-854, 2017.

Ming Tai-Seale, Laura Hatfield, **Thomas G. McGuire**, Caroline Wilson, Cheryl Stults, Ashley Stone, Lisa Diamond, Richard Frankel, Jennifer Lafata, "Periodic Health Exams and Missed Opportunities Among Patients Likely Needing Mental Health Care," *American Journal of Managed Care*,22(10): e350-e357, 2017.

**Thomas G. McGuire** and Richard C. van Kleef, "Introduction to the Special Section on Regulated Competition," *Journal of Health Economics*, (56): 234-236, December, 2017.

Richard van Kleef, **Thomas G. McGuire**, Rene van Vliet and Wynand P. van de Ven, "Improving Risk Equalization with Constrained Regression," *The European Journal of Health Economics*, 18(9): 1137-1156, 2017.

Jacob Glazer and **Thomas G. McGuire**, "Paying Medicare Advantage Plans:  To Level or Tilt the Playing Field," *Journal of Health Economics*, (56): 281-291, December, 2017.

Anna Sinaiko, Timothy J. Layton, Sherri Rose and **Thomas G. McGuire**, "Implications of Family Risk Pooling for Individual Health Insurance Markets," *Health Services Research and Methodology*, 17(3-4), pp 219-236, December, 2017.

Timothy Layton, Randall Ellis, **Thomas G. McGuire** and Richard van Kleef, "Measuring Efficiency of Health Plan Payment Systems in Managed Competition Health Insurance Markets," *Journal of Health Economics*, (56): 237-255, December, 2017.

Laura A. Hatfield, Melissa M. Fauvreault, **Thomas G. McGuire** and Michael E. Chernew, "Modelling Health Care Spending Growth of Older Adults," *Health Services Research*, 53: 238-255, February 2018.

Nina R. Joyce, **Thomas G. McGuire**, Stephen J. Bartels, Susan L. Mitchell and David G. Grabowski, "The Impact of Dementia Special Care Units on Quality of Care:  an Instrumental Variables Analysis," *Health Services Research*, 55(5) Part I (October) 3657-3679, 2018.

**Thomas G. McGuire** and Richard C. van Kleef, "Regulated Competition in Health Insurance Markets:  Paradigms and Ongoing Issues," in McGuire and Van Kleef (eds), *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets:  Theory and Practice*, Elsevier, 2018.

**Thomas G. McGuire** and Richard C. van Kleef, "Risk Sharing" in McGuire and Van Kleef (eds), *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets:  Theory and Practice*, Elsevier, 2018.

Timothy J. Layton, Randall P. Ellis, **Thomas G. McGuire** and Richard C. van Kleef, "Evaluating the Performance of Health Plan Payment Systems," in McGuire and Van Kleef (eds), *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets:  Theory and Practice*, Elsevier, 2018.

**Thomas G. McGuire** and Joseph P. Newhouse, "Medicare Advantage:  Regulated Competition in the Shadow of a Public Option," in McGuire and Van Kleef (eds), *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets:  Theory and Practice*, Elsevier, 2018.

Timothy J. Layton, **Thomas G. McGuire** and Richard C. van Kleef, "Deriving Risk Adjustment Payment Weights to Maximize Efficiency of Health Insurance Markets," *Journal of Health Economics,* 61, 93-110, September 2018.

Savanah Bergquist, Timothy J. Layton, **Thomas G. McGuire** and Sherri Rose, "Sample Selection for Medicare Risk Adjustment with Systematically Missing Data," *Health Services Research*, September 2018. DOI: 10.1111/1475-6773.13046

Sherri Rose and **Thomas G. McGuire,** "Limitations of p-values and R-squared for Stepwise Regression Building: A Fairness Demonstration in Health Policy and Risk Adjustment," *The American Statistician*, 73: sup1, 152-156, March 2019.

Joseph P. Newhouse, Mary Beth Landrum, Mary Price, J. Michael McWilliams, John Hsu, and **Thomas G. McGuire,** "The Comparative Advantage of Medicare Advantage," *American Journal of Health Economics*, 5(2), 281-301, Spring, 2019.

Richard van Kleef, **Thomas G. McGuire**, Frederick T. Schut and Wynand P. van de Ven, "Strategies to Counteract Risk Selection in Social Health Insurance Markets," *Oxford Encyclopedia of Health and Economics*, June, 2019.

Brian E. McGarry, Nina R. Joyce, **Thomas G. McGuire**, Susan L. Mitchell, Stephen J. Bartels and David C. Grabowski, "Association between high Concentrations of Seriously Mentally Ill Nursing Home Residents and the Quality of Resident Care," *Journal of the American Geriatrics Society*, July, 2019.

**Thomas G. McGuire**, "New Models of Financing in Behavioral Health: Recipe for Efficiency or Under-Provision," in Howard H. Goldman, Richard G. Frank and Joseph P. Morrissey (eds), *Handbook of American Mental Health Policy*, Palgrave, 2019.

Christine Baugh, William Meehan, Emily Kroshus, **Thomas McGuire** and Laura Hatfield, "College Football Players Less Likely to Report Concussions and other Injuries with Increased Injury Accumulation," *Journal of Neurotrauma*, forthcoming.

Savanah Bergquist, Timothy J. Layton, **Thomas G. McGuire** and Sherri Rose, "Data Transformations to Improve the Performance of Health Plan Payment Methods," *Journal of Health Economics*, (2019) 66:195-207.

Raymond S. Hartman, Keith Drake and **Thomas G. McGuire**, Event Study Analysis in Cases with Multiple Brand-Generic Reverse-Payment Settlements, *International Journal of the Economics of Business,* published online August 16, 2019. DOI: 10.1080/13571516.2019.1651151.

**Thomas G. McGuire**, Sonja Schillo, and Richard C. van Kleef, "Reinsurance, Repayments, and Risk Adjustment in Individual Health Insurance: Germany, The Netherlands and the U.S. Marketplaces," *American Journal of Health Economics*, Winter 2020, 6(1). Pp 139-168.

Lukas Kauer, **Thomas G. McGuire**, and Konstantin Beck, "Extreme Under and Overcompensation in Morbidity-Based Health Plan Payments: The Case of Switzerland," *Health Policy*, 124 (2020) 61-68.

Christine Baugh, William Meehan, **Thomas G. McGuire**, Laura Hatfield. "Staffing, financial, and administrative oversight models and rates of injury in collegiate athletes." *Journal of Athletic Training.* 55(6):000-000. 2020. (Online ahead of print: https://natajournals.org/doi/pdf/10.4085/1062-6050-0517.19)

Keith. Drake and **Thomas G. McGuire**, "Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements," *Journal of Competition Law and Economics*, (2020) doi: 10.1093/joclec/nhaa007.

**Thomas G. McGuire**, Richard van Kleef and Suzanne van Veen, "Paying for Mental Health Care in Private Insurance in the Netherlands: Some Lessons for the U.S." *Psychiatric Services*, (2020) ps.psychiatry.online.

**Thomas G. McGuire**, Sonja Schillo, and Richard C. van Kleef, Very High and Low Residual Spenders in Private Health Insurance Markets: Germany, The Netherlands and the U.S.

Marketplaces *The European Journal of Health Economics*, published online August 2020. https://doi.org/10.1007/s10198-020-01227-3.

Konstantin Beck, Lukas Kauer, **Thomas G. McGuire** and Christian Schmidt, "Improving Risk-Equalization in Switzerland:  Effects of Alternative Reform Proposals on Allocating Public Subsidies for Hospitals," *Health Policy*, 124 (12), S. 1363-7. https://doi.org/10.1016/j.healthpol.2020.08.011; See also *Videos* (https://youtu.be/17l3Hh8sNW0)

Rudy Douven, Ron van der Heijden, **Thomas McGuire** and Erik Schut, "Premium levels and demand response in health insurance: relative thinking and zero-price effects," *Journal of Economic Behavior & Organization*, Vol 180, 2020 pp 903-923.

James T. Donahoe and **Thomas G. McGuire**, "The Vexing Relationship Between Socioeconomic Status and Health," *Israel Journal of Health Policy Research* 2020.

Christine M. Baugh, Emily Kroshus, William P. Meehan, **Thomas G. McGuire**, and Laura A. Hatfield, "Accuracy of College Football Players' Estimates of Their Risk of Concussion or Injury,". *JAMA Netw Open.* 2020; 3(12): e2031509. doi:10.1001/jamanetworkopen.2020.31509.

Richard G. Frank, Ian Nason, and **Thomas G. McGuire**, "The Evolution of Supply and Demand in Markets for Generic Drugs," *The Milbank Quarterly*, 99(3), September, 2021, pp 828-852.

Margaret Dotzel, Richard Frank, **Thomas McGuire**, Ian Nason, William Schultz, "To Improve Competition in Generic Drug Markets the FDA Should Discount Fees to Small Players," *Health Affairs Blog*, April 15, 2021. DOI: 10.1377/hblog20210412.384271

**Thomas G. McGuire**, Anna L. Zink, and Sherri Rose, "Improving the Performance of Risk Adjustment Systems:  Constrained Regression, Reinsurance, and Variable Selection," *American Journal of Health Economics*, 7(4) Fall 2021, pp 497-521.  published online Oct 4 2021: https://www.journals.uchicago.edu/doi/10.1086/716199.

Josefa Henriquez, Marica Iommi, **Thomas G. McGuire**, Emmanouil Mentzakis and Francesco Paolucci, "Designing Feasible and Effective Health Plan Payments in Countries with Data Availability Constraints," *Journal of Risk and Insurance, 2022, pp 1-25.*

Chernew ME, Carichner J, Impreso J, McWilliams JM, **McGuire TG**, Alam S, Landrum MB, Landon BE. Coding driven changes in measured risk in accountable care organizations. Health Aff (Millwood) 2022; (forthcoming).

Keith M. Drake and **Thomas G. McGuire**, "Most-Favored Entry Clauses in Drug-Patent Litigation Settlements:  Reverse Payments and Anticompetitive Effects," *Antitrust Magazine Online*, August 2022.

Alegria, M., Falgas-Bague, I., Fukuda, M., Zhen-Duan, J., Weaver, C., O'Malley, I., Layton, T., Wallace. J., Zhang, L., Markle, S., Neighbors, C., Lincourt, P., Hussain, S., Manseau, M., Stein, B.D., Rigotti, N., Wakeman, S., Kane, M., Evins, A.E., & **McGuire, T**. (2022). Performance Metrics of Substance Use Disorder Care Among Medicaid Enrollees in New York, New York. *JAMA Health Forum, 3*(7), e221771. PMCID: PMC9250047. https://jamanetwork.com/journals/jama-health-forum/fullarticle/2793909

Alegría, M., Falgas-Bague, I., Fukuda, M., Zhen-Duan, J., Weaver, C., O'Malley, I., Layton, T., Wallace, J., Zhang, L., Markle, S., Lincourt, P., Hussain, S., Lewis-Fernandez, R., John, D.A., **McGuire, T**. (2022). Racial/Ethnic Disparities in Substance Use Treatment in Medicaid Managed Care in New York City: The Role of Plan and Geography. *Medical Care,* 60(11), November 2022, pp 806-812.  https://journals.lww.com/lww-medicalcare/Abstract/9900/Racial_Ethnic_Disparities_in_Substance_Use.49.aspx

Keith M. Drake, Robert He, **Thomas G. McGuire**, & Alice Ndikumana, "No Free Launch: At-Risk Entry by Generic Drug Firms," *International Journal of the Economics of Business*, 2022, 29(3), 301-315: http://dx.doi.org/10.1080/13571516.2022.2132808.

Richard van Kleef, Mieke Reuser, **Thomas G. McGuire**, John Armstrong, Konstantin Beck, Shuli Brammli-Greenberg, Randall P. Ellis, Francesco Paolucci, Erik Schokkaert and Juergen Wasem, "Scope and Incentives for Risk Selection in Social Health Insurance Markets – A Conceptual Framework and International Comparison," *Medical Care Research and Review*, pp 1-20, 2024.  https://doi.org/10.1177/10775587231222584.

Keith Drake and **Thomas McGuire**, "The Simple Math of Royalties and Drug Competition During the 180-Day Generic Exclusivity Period," *Journal of Competition Law and Economics*, online ahead of print, 2024, pp. 1-10 (https://doi.org/10.1093/joclec/nhae001).

**Thomas McGuire:  Litigation Experience, May 2021 – Present**

*In re: National Prescription Opiate Litigation*, MDL No. 2804, United States District Court, Northern District of Ohio, Case No. 17-md-2804

>   Allegations: Defendants fraudulently marketed opioid products and did not report shipments.

>   Assignment: Calculation of damages for bellwether counties; identification and valuation of public nuisance outcomes.

>   Expert report: March 2019 (OH), August 2020 (WV)

>   Deposition: May 2019 (OH), September 2020 (WV)

>   Trial: June 2021 (WV)

*State of Washington v. McKesson Corporation, Cardinal Health Inc., and AmerisourceBergen Drug Corporation*, State of Washington, King County Superior Court, No. 19-2-06975-9

>   Allegations: Defendants fraudulently distributed and/or marketed opioid products.

>   Assignment: Identification and valuation of public nuisance outcomes.

>   Expert report: January 2021

>   Deposition: July 2021

*State of Washington v. Johnson & Johnson, et al.*, State of Washington, King County Superior Court, No. 19-2-06975-9

>   Allegations: Defendants fraudulently distributed and/or marketed opioid products.

>   Assignment: Identification and valuation of public nuisance outcomes.

>   Expert reports: January 2022, March 2022

>   Deposition: April 2022

*In re: Opana ER Antitrust Litigation*, United States District Court for the Northern District of Illinois, Eastern Division, MDL No. 2580

>   Allegations: The Endo-Impax settlement of patent litigation related to the drug Opana ER included anticompetitive reverse payments.

>   Assignment: Analysis of settlement agreements.

>   Expert reports: March 2019, November 2019

>   Deposition: May 2019, December 2019

>   Trial: June 2022

*Staley et al. v. Gilead Sciences et al.*, United States District Court for the Northern District of California, San Francisco Division, 3:19-cv-02573-EMC

Allegations: Defendants monopolized market for combination antiretroviral therapy (cART) drugs and delayed generic entry through settlement agreement.

Assignment: Analysis of market power and of the settlement agreements.

Expert report: October 2021, June 2022

Deposition: July 2022, August 2022, September 2022

Trial: June 2023

*In re: Avandia Marketing, Sales Practices and Products Liability Litigation*, United States District Court for the Eastern District of Pennsylvania, MDL No. 1871

Allegations: Defendants fraudulently marketed and/or promoted Avandia, Avandaryl, and Avandamet.

Assignment: Calculation of damages.

Expert reports: December 2022, March 2023

Deposition: July 2023

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation*, United States District Court for the Eastern District of Pennsylvania, MDL No. 2724

Allegations: Certain generic drug manufacturers conspired to increase the price of generic drugs, including the Bellwether Drugs clomipramine and clobetasol.

Assignment: Analysis of whether the conduct of the defendants in raising prices for clomipramine and/or clobetasol is indicative of collusion and/or agreement.

Expert report: November 2023, May 2024

Deposition: January 2024

*In re: Xyrem (Sodium Oxybate) Antitrust Litigation*, MDL No. 2966

Allegations: Jazz's settlements of patent litigation related to the drug Xyrem included anticompetitive market divisions and reverse payments.

Assignment: Analysis of settlement agreements.

Expert reports: September 2023, March 2024

Deposition: April 2024

*Humana v. Bausch, et al.* and *Health Care Service Corporation v. Bausch, et al.*, United States District Court of the State of California in and for the County of Alameda, HG21087971 and 22CV009583

>Allegations: The Bausch-Lupin settlement of patent litigation related to the drug Glumetza included anticompetitive reverse payments.

>Assignment: Analysis of settlement agreements.

>Expert report: April 2024

>Deposition: June 2024

**ATTACHMENT B**

ATTACHMENT B

MATERIALS CONSIDERED

**Bates Documents**

APO-EFFXR-000001.

EXPRESS_SCRIPTS_1038_000023.

MYL-VENLA-0000002.

Orgenus_00010234.

SANDOZ-EFFEXOR-0000002.

TEVA_EFFEX_0000001.

TEVA_EFFEX_0006362.

TEVA_EFFEX_0022611.

TEVA_EFFEX_0162035.

TEVA_EFFEX_0162095.

TEVA_EFFEX_0166761.

TEVA_EFFEX_0166768.

TEVA_EFFEX_0166770.

TEVA_EFFEX_0166778.

TEVA_EFFEX_0166779.

TEVA_EFFEX_0168980.

TEVA_EFFEX_0328507.

TEVA_EFFEX_0440656.

TEVA_EFFEX_0440657

TEVA_EFFEX_0443328.

TEVA_EFFEX_0443329.

TEVA_EFFEX_0617714.

TEVA_EFFEX_0619285.

TEVA_EFFEX_0713424.

TEVA_EFFEX_0752300.

TEVA_EFFEX_0752832.

TEVA_EFFEX_0752834.

TEVA_EFFEX_0755496.

TEVA_EFFEX_0755498.

TEVA_EFFEX_0758581.

TEVA_EFFEX_0758589.

TEVA_EFFEX_0771655.

TEVA_EFFEX_0771657.

TEVA_EFFEX_0771673.

TEVA_EFFEX_0774195.

TEVA_EFFEX_0775446.

TEVA_EFFEX_0863426.

TEVA_EFFEX_0863427

TEVA_EFFEX_0906116.

TEVA_EFFEX_0906117

TEVA-EFFEX_0701696.

WYEFFAT04060165.

WYEFFAT040623810.

WYEFFAT040623874.

WYEFFAT04066635.

WYEFFAT04069593.

WYEFFAT04074541.

WYEFFAT04074869.

WYEFFAT04081360.

WYEFFAT04081362.0001.

WYEFFAT04320233.

WYEFFAT04439199.

WYEFFAT04440742.

WYEFFAT04638530.

WYEFFAT04638600.

WYEFFAT04638940.

WYEFFAT04638983.

WYEFFAT04639136.

WYEFFAT04639175.

WYEFFAT04639344.

WYEFFAT04639396.

WYEFFAT04639558.

WYEFFAT04640136.

WYEFFAT04640354.

WYEFFAT04640809.

WYEFFAT04641490.

WYEFFAT04649201.0001.

WYEFFAT04649501.

WYEFFAT04663394.

WYEFFAT04665543.

WYEFFAT04675131.

WYEFFAT04682966.

WYEFFAT04687459.

WYEFFAT04718483.

WYEFFAT04746129.

WYEFFAT04751489.

WYEFFAT04751595.

WYEFFAT04751742.

WYEFFAT04752312.

WYEFFAT04753684.

WYEFFAT04815685.

WYEFFAT04824982.

WYEFFAT05397985.

WYEFFAT05601966.

WYEFFAT05606715.

WYEFFAT05967867.

WYEFFAT05979442.

WYEFFAT05979443.

WYEFFAT06340749.

WYEFFAT06360983.

WYEFFAT06361771.

WYEFFAT06382990.

WYEFFAT06426691.

WYEFFAT06426692.

WYEFFAT06427351.

WYEFFAT06449495.00001.

WYEFFAT06452251.00001.

WYEFFAT06517193.

WYEFFAT06601708.

WYEFFAT06847939.

WYEFFAT06859914.

WYEFFAT07262209.

WYEFFAT07645434.

WYEFFAT07645438.

WYEFFAT08278330.

WYEFFAT08366461.

WYEFFAT2162406.

WYEFFAT2163587.

WYEFFAT2398379.

WYEFFAT2405090.

WYEFFAT2405386.

WYEFFAT2405436.

WYEFFAT2405483.

WYEFFAT2492933.

WYEFFAT2513272.

WYEFFAT2513602.

WYEFFAT2514133.

WYEFFAT2553727.

WYEFFAT2624579.

WYEFFAT2670967.

WYEFFAT2678650.

WYEFFAT2712527.

WYEFFAT2767970.

WYEFFAT2904665.

WYEFFAT2906934.

WYEFFAT2907466.

WYEFFAT2910740.

WYEFFAT2933536.

WYEFFAT2998944.

WYEFFAT3063644.

WYEFFAT3260243.

WYEFFAT3506918.

WYEFFAT3609703.

WYEFFAT3609860.

WYEFFAT3613120.

WYEFFAT3624792.

WYEFFAT3650173.

WYEFFAT3701739.

WYEFFAT3709177.

WYEFFAT3712553.

WYEFFAT3753472.

WYEFFAT3759926.

WYEFFAT3764891.

WYEFFAT3765952.

WYEFFAT3767261.

WYEFFAT3767262.00001.

WYEFFAT3769148.

WYEFFAT3769149.

WYEFFAT3781059.

WYEFFAT3781144.

WYEFFAT3781292.

WYEFFAT3781449.

WYEFFAT3786455.

WYEFFAT3786460.

WYEFFAT3786830.

WYEFFAT3786859.

WYEFFAT3788607.

WYEFFAT3795941.

WYEFFAT3811486.

WYEFFAT3831694.

WYEFFAT3837669.

WYEFFAT3837741.

WYEFFAT3837782.

WYEFFAT3839698.

WYEFFAT3889734.

WYEFFAT3914398.

WYEFFAT3914681.

WYEFFAT3915248.

WYEFFAT3942609.

WYEFFAT3983921.

WYEFFAT3998680.

WYEFFAT4035345.

WYEFFAT4038391.

WYEFFAT4046009.

**Legal Documents in This Matter**

Direct Purchaser Class Plaintiffs' Second Amended Consolidated Class Action Complaint and Jury Demand, October 23, 2013.

Deposition of Arthur Cohn, in this matter, March 12, 2025.

Deposition of Jennifer Wodarczyk, in this matter, February 26, 2025.

Deposition of Suneet Varma, in this matter, March 27, 2025.

Deposition of David Manspeizer, in this matter, April 2, 2025.

*In re Lipitor Antitrust Litigation*, 868 F.3d 231 (3d Cir. 2017).


**Electronic Data**

FDA, "Drugs@FDA: FDA-Approved Drugs," (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm).

FDA, "National Drug Code Directory," (https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory).

FRED, "Canadian Dollars to U.S. Dollar Spot Exchange Rate," (https://fred.stlouisfed.org/graph/?g=Gb51).

IQVIA Channel Dynamics data.

IQVIA NPA data.

IQVIA NSP Data.

"Margins by Sector (US)," (http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html).

NBER, "National Drug Code," (https://www.nber.org/research/data/national-drug-code).

ProspectoRx data.

S&P Capital IQ database (https://www.spglobal.com/en).

St. Louis (FRED), "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," (https://fred.stlouisfed.org/series/CPIAUCSL).

"Variables used in Datasets," (http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/variable.htm).


**Other Documents**

21 C.F.R. § 314.

21 U.S.C. § 355.

35 U.S.C. § 156.

35 U.S.C. § 271.

AAM, "Generic Drug and Biosimilars Access & Savings in the U.S.," 2017 (https://accessiblemeds.org/wp-content/uploads/2024/12/2017-AAM-Access-Savings-Report-2017-web2.pdf).

AAM, "The U.S. Generic & Biosimilar Medicines Savings Report," September 2024 (https://accessiblemeds.org/sites/default/files/2024-09/AAM-2024-Generic-Biosimilar-Medicines-Savings-Report.pdf).

ABA, Section of Antitrust Law, *Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues*, Chicago, IL: ABA Publishing, 2017.

ABA, Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, 1st ed., Chicago, IL: ABA Publishing, 2009.

ABA, Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, 2nd ed., Chicago, IL: ABA Publishing, 2018.

Academy of Managed Care Pharmacy, "Formulary Management," (https://www.amcp.org/concepts-managed-care-pharmacy/formulary-management).

Allan, M., J. Lexchin, and N. Wiebe, "Physician Awareness of Drug Cost: A Systematic Review," *PLoS Medicine*, 4(9), 2007, pp. 1486-96.

APA, "Practice Guideline for the Treatment of Patients with Major Depressive Disorder," 3rd ed., 2010 (https://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/mdd.pdf).

Amneal Press Release, "Impax Laboratories Commences Shipment of Generic Adderall XR® Capsules, 5mg, 10mg, 15mg, 20mg, 25mg, and 30mg," October 1, 2009 (https://investors.amneal.com/news/press-releases/press-release-details/2009/Impax-Laboratories-Commences-Shipment-of-Generic-Adderall-XRR-Capsules-5mg-10mg-15mg-20mg-25mg-and-30mg/default.aspx).

Amneal Press Release, "Impax Laboratories Receives Final FDA Approval for Generic Depakote(R) Extended-Release 500mg Tablets," August 5, 2009 (https://investors.amneal.com/news/press-releases/press-release-details/2009/Impax-Laboratories-Receives-Final-FDA-Approval-for-Generic-DepakoteR-Extended-Release-500mg-Tablets/default.aspx).

Amneal Press Release, "Impax Laboratories Settles Pending Litigation for Flomax®," October 7, 2009 (https://investors.amneal.com/news/press-releases/press-release-details/2009/Impax-Laboratories-Settles-Pending-Litigation-for-FLOMAXR/default.aspx).

Angrist, J. and A. Krueger, "Instrumental Variables and the Search for Identification: From Supply and Demand to Natural Experiments," *Journal of Economic Perspectives*, 15(4), 2001, pp. 69-85.

Apotex Press Release, "Apotex Launches First Generic Plavix®," August 8, 2006 (https://www.orangebookblog.com/files/PressReleaseclopidogrelLaunch.pdf).

Apotex, Inc., "Patent Settlements Between Brand and Generic Pharmaceutical Companies," (https://www.thefdalawblog.com/wp-content/uploads/archives/docs/apotex---parked-excl.pdf).

Arcidiacono, P., *et al.*, "Pharmaceutical Followers," *International Journal of Industrial Organization*, 31(5), 2013, pp. 538-53.

Areeda, P. and H. Hovenkamp, *Antitrust Law*, 3rd edition, 2012.

Associated Press, "Company News; Baxter Healthcare to Acquire Wyeth Subsidiary," *New York Times*, June 11, 2002 (https://www.nytimes.com/2002/06/11/business/company-news-baxter-healthcare-to-acquire-wyeth-subsidiary.html).

"AstraZenca, Teva Settle Nexium, Prilosec Patent Disputes," *Generics and Biosimilars Initiative*, May 2, 2010 (https://gabionline.net/generics/news/AstraZeneca-Teva-settle-Nexium-Prilosec-patent-disputes).

"AstraZeneca Settles US Nexium Patent Litigation with Ranbaxy," *FiercePharma*, April 15, 2008 (https://www.fiercebiotech.com/biotech/astrazeneca-settles-us-nexium-patent-litigation-ranbaxy).

"Aurobindo Pharma gets USFDA Nod for Modafinil Tablets," *The Economic Times*, September 28, 2012 (https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/aurobindo-pharma-gets-usfda-nod-for-modafinil-tablets/articleshow/16588192.cms?from=mdr); National Drug Code Directory.

Azoulay, P., "Do Pharmaceutical Sales Respond to Scientific Evidence?" *Journal of Economics and Management Strategy*, 11(4), 2002, pp. 551-94.

Bagwell, K., "The Economic Analysis of Advertising," in M. Armstrong R. Porter (eds.), *Handbook of Industrial Organization*, Vol. 3, North-Holland/Elsevier, 2007, pp. 1701-1844.

Baker, B., "Market Definition: An Analytical Overview," *Antitrust Law Journal*, 74(1), 2007, pp. 129-173.

Balto, D., "Pharmaceutical Patent Settlements: The Antitrust Risks," *Food and Drug Law Journal*, 55(3), 2000, pp. 321-41.

Baum, C., M. Schaffer, and S. Stillman, "Enhanced Routines for Instrumental Variables/Generalized Method of Moments Estimation and Testing," *The Stata Journal*, 7(4), 2007, pp. 465-506.

Baumol, W. and D. Swanson, "The New Economy and Ubiquitous *Competitive* Price Discrimination: Identifying Defensible Criteria of Market Power," *Antitrust Law Journal*, 70(3), 2003, pp. 661-85.

Baumol, W. and R. Willig, "Fixed Cost, Sunk Costs, Entry Barriers, and Sustainability of Monopoly," *Quarterly Journal of Economics*, 96(3), 1981, pp. 405-31.

Beall, R., A. Kesselheim, and A. Sarpatwari, "New Drug Formulations and Their Respective Generic Entry Dates," *Journal of Managed Care & Specialty Pharmacy*, 25(2), 2019, pp. 218-24.

Berk, B., "GPhA Changes Name to the Association for Accessible Medicines," *Drug Store News*, February 14, 2017 (https://drugstorenews.com/pharmacy/gpha-changes-name-association-accessible-medicines).

Berndt, E. and M. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century after the 1984 Waxman-Hatch Legislation," *International Journal of the Economics of Business*, 18(2), 2011, pp. 177-201.

Berndt, E., "Pharmaceuticals in U.S. Health Care: Determinants of Quantity and Price," *Journal of Economic Perspectives*, 16(4), 2002, pp. 45-66.

Berndt, E., *et al.*, "Authorized Generic Drugs, Price Competition, and Consumers' Welfare," *Health Affairs*, 26(3), 2007, pp. 790-99.

Berndt, E., *et al.*, "Information, Marketing and Pricing in the U.S. Antiulcer Drug Market," *American Economic Review*, 85(2), 1995, pp. 100-05.

Berndt, E., *et al.*, "The Roles of Marketing, Product Quality, and Price Competition in the Growth and Composition of the U.S. Antiulcer Drug Industry," in T. Bresnahan and R. Gordon (eds.), *The Economics of New Goods*, University of Chicago Press for the NBER, 1996, pp. 277-322.

Berndt, E., M. Kyle, and D. Ling, "The Long Shadow of Patent Expiration: Generic Entry and Rx-to-OTC Switches," in R. Feenstra and M. Shapiro, *Scanner Data and Price Indexes*, University of Chicago Press for the NBER, 2003, pp. 229-74.

Berndt, E., R. Pindyck, and P. Azoulay, "Consumption Externalities and Diffusion in Pharmaceutical Markets: Antiulcer Drugs," *Journal of Industrial Economics*, 51(2), 2003, pp. 243-70.

Berndt, E., T. McGuire, and J. Newhouse, "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," *Forum for Health Economics & Policy*, 14(2), 2011, Article 10.

Bhattacharya, J. and W. Vogt, "A Simple Model of Pharmaceutical Price Dynamics," *Journal of Law and Economics*, 46(2), 2003, pp. 599-626.

Boris, J. and R. Jashnani, "Wyeth: FTC Approves Win/Win Effexor Settlement," Bear Stearns Equity Research, December 2, 2005.

Boris, J. and R. Jashnani, "Wyeth: Transparency on Effexor XR Settlement Increasing," Bear Stearns Equity Research, November 3, 2005.

Branstetter, L., C. Chatterjee, and M. Higgins, "Regulation and Welfare: Evidence from Paragraph IV Generic Entry in the Pharmaceutical Industry," *RAND Journal of Economics*, 47(4), 2016, pp. 857-90.

Brief Amici Curiae of 118 Law, Economics, and Business Professors and the American Antitrust Institute in Support of Petitioners, *Federal Trade Commission v. Watson Pharmaceuticals, Inc., et al.*, in the Supreme Court of the United States, No. 12-416, January 29, 2013.

Brief amicus curiae of the Federal Trade Commission, *Teva Pharmaceuticals USA, Inc v. Pfizer, Inc.*, 04-CV-1186 (https://www.ftc.gov/sites/default/files/documents/amicus_briefs/teva-pharmaceuticals-usa-inc.v.pfizer-inc./050208teva.pdf).

Bulow, J., "The Gaming of Pharmaceutical Patents," in A. Jaffe, S. Stern and J. Lerner (eds.), *Innovation Policy and the Economy*, Vol. 4, MIT Press for NBER, 2004, pp. 145-187.

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2004," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/050107medicareactrpt.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2005," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/fy2005drugsettlementsrpt.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2006," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/mmareport2006.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2007," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/mmaact.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2008," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/100113mpdim2003rpt.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Summary of Agreements Filed in FY 2009," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/mmareport2009.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2010," (https://www.ftc.gov/sites/default/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-and/1105mmaagreements.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2015," (https://www.ftc.gov/system/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-modernization/overview_of_fy_2015_mma_agreements_0.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2016," (https://www.ftc.gov/system/files/documents/reports/agreements-filled-federal-trade-commission-under-medicare-prescription-drug-improvement/mma_report_fy2016.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2017," (https://www.ftc.gov/system/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-modernization/mma_report_fy2017.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2018," (https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2018-mma-report.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2019," (https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2019-mma-report.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2020," (https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2020-mma-report.pdf).

Bureau of Competition, "Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Overview of Agreements Filed in FY 2021," (https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2021-mma-report.pdf).

Cacciatore, K., *et al.*, "Teva Pharmaceutical: Effexor XR Litigation Settlement Terms Appear Reasonable," Cowen & Co. Equity Research, November 3, 2005.

Calfee, J., "An Assessment of Direct-to-Consumer Advertising of Prescription Drugs," *Clinical Pharmacology and Therapeutics*, 82(4), 2007, pp. 357-60.

Carlton, D. and J. Perloff, *Modern Industrial Organization,* 4th ed., Pearson/Addison-Wesley, 2005, pp. 92-93.

Carrera, M., *et al.*, "Do Physicians Respond to the Costs and Cost-Sensitivity of their Patients?" *American Economic Journal: Economic Policy*, 10(1), 2018, pp. 113-52.

Carrier, M., "Payment After *Actavis*," *Iowa Law Review*, 100(1), 2014, pp. 7-49.

Caves, R., M. Whinston, and M. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economics Activity, Microeconomics*, 1991, pp. 1-66.

CBO, "The Budget and Economic Outlook: 2025-2035," January 2025 (https://www.cbo.gov/system/files/2025-01/60870-Outlook-2025.pdf)

CBO, "How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry," July 1998 (https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/6xx/doc655/pharm.pdf).

CBO, "Research and Development in the Pharmaceutical Industry," April 2021 (https://www.cbo.gov/publication/57126).

CBO, "Research and Development in the Pharmaceutical Industry," October 2006 (https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/76xx/doc7615/10-02-drugr-d.pdf).

Chaudhuri, S., P. Goldberg, and P. Jia, "Estimating the Effects of Global Patent Protection in Pharmaceuticals: A Case Study of Quinolones in India," *American Economic Review*, 96(5), 2006, pp. 1477-1514.

Ching, A., "Consumer Learning and Heterogeneity: Dynamics of Demand for Prescription Drugs after Patent Expiration," *International Journal of Industrial Organization*, 28(6), 2010, pp. 619-38.

*Coca-Cola Bottling Co. of the Southwest*, 118 F.T.C. 452 (1994).

Congressional Research Focus, "Patent Listing in FDA's Orange Book," *In Focus*, December 27, 2024 (https://crsreports.congress.gov/product/pdf/IF/IF12644).

Congressional Research Service, "Drug Pricing and Intellectual Property Law: A Legal Overview for the 116th Congress," April 4, 2019 (https://crsreports.congress.gov/product/pdf/R/R45666).

Congressional Research Service, "Drug Pricing and Pharmaceutical Patenting Practices," February 11, 2020 (https://sgp.fas.org/crs/misc/R46221.pdf).

Conrad, R. and R. Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," FDA Report, December 2019 (https://www.fda.gov/media/133509/download).

Conti, R. and E. Berndt, "Four Facts Concerning Competition in US Generic Prescription Drug Markets," *International Journal of the Economics of Business*, 27(1), 2020, pp. 27-48.

Cotter, T., "Refining the 'Presumptive Illegality' Approach to Settlements of Patent Disputes Involving Reverse Payments: A Commentary on Hovenkamp, Janis and Lemley," *Minnesota Law Review*, 87(6), 2003, pp. 1789-1816.

"Court Rejects Fosamax Patent in Favor of Israeli Drug Firm," *Israel Faxx News Service*, October 18, 2005 (https://www.thefreelibrary.com/Court+Rejects+Fosamax+Patent+in+Favor+of+Israeli+Drug+Firm.-a0137644571).

Cumby, R. and J. Huizinga, "Testing the Autocorrelation Structure of Disturbances in Ordinary Least Squares and Instrumental Variables Regressions," *Econometrica*, 60(1), 1992, pp. 185–95.

Daiichi-Sankyo Press Release, "Ranbaxy Announces Launch of Atorvastatin, Generic Lipitor®, in the U.S.," December 1, 2011 (https://www.daiichisankyo.com/files/news/pressrelease/pdf/005691/20111201_351_E.pdf).

Damodaran, A., "Show Me the Money: January 2018 Data Update 7," (http://stern.nyu.edu/~adamodar/pdfiles/blog/dataupdate7for2018.pdf).

Danzon, P., "Competition and Antitrust Issues in the Pharmaceutical Industry," Wharton Working Paper, 2014 (https://faculty.wharton.upenn.edu/wp-content/uploads/2017/06/Competition-and-Antitrust-Issues-in-the-Pharmaceutical-IndustryFinal7.2.14.pdf).

Datta, A. and D. Dave, "Effects of Physician-Directed Pharmaceutical Promotion on Prescription Behaviors: Longitudinal Evidence," *Health Economics*, 26(4), 2017, pp. 450-68.

Dave, D., "Effects of Pharmaceutical Promotion: A Review and Assessment," NBER Working Paper No. 18830, 2013 (http://www.nber.org/papers/w18830).

David, G., *et al.*, "The Effects of Pharmaceutical Marketing and Promotion on Adverse Drug Events and Regulation," *American Economic Journal: Economic Policy*, 2(4), 2010, pp. 1-25.

Davit, B., *et al.*, "Comparing Generic and Innovator Drugs: A Review of 12 Years of Bioequivalence Data from the United States Food and Drug Administration," *Annals of Pharmacotherapy*, 43(10), 2009, pp. 1583-97.

"Deal Finalized Between Sepracor and Teva on Xopenex," *US Pharmacist*, 34(5), 2009, pp. 36-38 (https://www.uspharmacist.com/article/deal-finalized-between-sepracor-and-teva-on-xopenex).

DeArment, A., "Teva Launches Generic Effexor XR," *Drug Store News*, July 1, 2010 (https://drugstorenews.com/pharmacy/teva-launches-generic-effexor-xr).

DeJong, C., *et al.*, "Pharmaceutical Industry-Sponsored Meals and Physician Prescribing Patterns for Medicare Beneficiaries," *JAMA Internal Medicine*, 176(8), 2016, pp. 1114-22.

DOJ and FTC, "1984 Merger Guidelines," (https://www.justice.gov/archives/atr/1984-merger-guidelines)

DOJ and FTC, "Horizontal Merger Guidelines," August 19, 2010 (https://www.justice.gov/atr/file/810276/dl?inline).

DOJ and FTC, "Horizontal Merger Guidelines," April 2, 1992 (https://www.justice.gov/sites/default/files/atr/legacy/2007/08/14/hmg.pdf).

DOJ and FTC, "Merger Guidelines," December 18, 2023 (https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf).

DOJ, "Competition and Monopoly: Single-Firm Conduct Under Section 2 Of The Sherman Act : Chapter 2," March 18, 2022 (https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2).

Dong-Churl, S., *et al.*, "Effect of Multiple-Source Entry on Price Competition After Patent Expiration in the Pharmaceutical Industry," *Health Services Research,* 35(2), 2000, pp. 529-47.

"Dr. Reddy's Launches Generic Version of Rapamune Tablets in US," *The Economic Times*, October 28, 2014 (https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/dr-reddys-launches-generic-version-of-rapamune-tablets-in-us/articleshow/44961359.cms?from=mdr#google_vignette).

Drake, K., *et al.*, "No Free Launch: At-Risk Entry by Generic Drug Firms," *International Journal of the Economics of Business*, 29(3), 2022, pp. 301-315.

Drake. K. and T. McGuire, "Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements," *Journal of Competition Law and Economics*, 16(2), 2020, pp. 188-219.

Drake, K. and T. McGuire, "Stock Price Evidence for Anticompetitive Effects in the Nexium 'Reverse-Payment' Settlement,'" *Journal of Competition Law & Economics*, 12(4), 2016, pp. 735-47.

Drake, K. and T. McGuire, "The Simple Math of Royalties and Drug Competition During the 180-Day Generic Exclusivity Period," *Journal of Competition Law and Economics*, February 2024, 20(1-2), pp. 50-59.

Drake, K. and T. McGuire, "Using Stock Price Movements to Estimate the Harm from Anticompetitive Drug Patent Litigation Settlements," NBER Working Paper 33196, November 2024 (https://www.nber.org/papers/w33196).

Drake, K., M. Starr and T. McGuire, "Do 'Reverse Payment' Settlements Constitute an Anticompetitive Pay-for-Delay?" *International Journal of the Economics of Business,* 22(2), 2015, pp. 173-200.

"DRL Settles Imitrex Lawsuit with GlaxoSmithKline," *The Economic Times*, October 10, 2006 (https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/drl-settles-imitrex-lawsuit-with-glaxosmithkline/articleshow/2135656.cms).

Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch Waxman Act)," Public Law 98-417, 98th Congress, 1984 (https://www.gpo.gov/fdsys/pkg/STATUTE-98/pdf/STATUTE-98-Pg1585.pdf).

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 469 (1992).

Edlin, A., *et al.*, "Activating *Actavis*," *Antitrust,* 28(1), 2013, pp. 16-23.

Edlin, A., *et al.*, "The *Actavis* Inference: Theory and Practice," *Rutgers University Law Review*, 67, 2015, pp. 585-635.

Eisenberg, R., "Patents and Regulatory Exclusivity," *Oxford Handbook on the Economics of the Biopharmaceutical Industry*, Oxford University Press, 2012, pp. 167-98.

Elhauge, E. and A. Krueger, "Solving the Patent Settlement Puzzle," *Texas Law Review*, 91, 2012, pp. 283-330.

Ellison, S. and W. Mullin, "Gradual Incorporation of Information: Pharmaceutical Stocks and the Evolution of President Clinton's Health Care Reform," *Journal of Law and Economics*, 44(1), 2001, pp. 89-129.

Ellison, S., *et al.*, "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," *RAND Journal of Economics*, 28(3), 1997, pp. 426-46.

Fama, E. and K. French, "Common Risk Factors in the Returns on Stocks and Bonds," *Journal of Financial Economics,* 33(1), 1993, pp. 3–56.

Fama, E., "Efficient Capital Markets: II," *Journal of Finance*, 46(5), 1991, pp. 1575-1617.

Farrell, J. and C. Shapiro, "Antitrust Evaluation of Horizontal Mergers:  An Economic Alternative to Market Definition," *B.E. Journal of Theoretical Economics: Policies and Perspectives*, 10(1), 2010, pp. 1-39.

"FDA Answers Ramipril Letters, Explains Why Cobalt Has 180-Day Exclusivity," *Orange Book Blog*, February 4, 2008 (https://www.orangebookblog.com/2008/02/fda-answers-ram.html).

"FDA Grants Final Approval for Impax Generic Version of Flomax," *The Gaea Times*, March 2, 2010 (https://health.gaeatimes.com/2010/03/02/fda-grants-final-approval-for-impax-generic-version-of-flomax-19995).

FDA, "Abbreviated New Drug Application (ANDA)," March 28, 2025 (https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda).

FDA, "ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs: Guidance for Industry," January 2024, (https://www.fda.gov/media/119718/download).

FDA, "Approval Date(s) and History, Letters, Labels, Reviews for NDA 020151" (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=020151).

FDA, "Approval Package for NDA 20699 [Effexor XR]," October 20, 1997 (https://www.accessdata.fda.gov/drugsatfda_docs/nda/97/020699ap_effexor_apltr.pdf).

FDA, "Approved Drug Products with Therapeutic Equivalence Evaluations," 32nd ed., 2012.

FDA, "Approved Drugs Products with Therapeutic Equivalence Evaluations," 18th ed., 1998.

FDA, "Approved Drugs Products with Therapeutic Equivalence Evaluations," 22nd ed., 2002.

FDA, "Approved Drugs Products with Therapeutic Equivalence Evaluations," 23rd ed., 2003.

FDA, "BeneFIX," April 21, 2021 (https://www.fda.gov/vaccines-blood-biologics/approved-blood-products/benefix).

FDA, "CBER-Regulated Products with Supporting Documents" March 24, 2025 (https://www.fda.gov/vaccines-blood-biologics/cber-regulated-products-supporting-documents).

FDA, "Depression Medicines," September 2019 (https://www.fda.gov/media/132665/download?attachment).

FDA, "FDA approved labeling for NDA 20-699/S-022 [Effexor XR]," February 11, 2003 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2003/020699s022lbl.pdf).

FDA, "FDA Drug Safety Communication: Updated Risk Evaluation and Mitigation Strategy (REMS) to Restrict Access to Rosiglitazone-containing Medicines including Avandia, Avandamet, and Avandaryl," February 8, 2018 (https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-updated-risk-evaluation-and-mitigation-strategy-rems-restrict-access).

FDA, "FDA Listing of Authorized Generics as of April 1, 2025," (https://www.fda.gov/media/77725/download?attachment).

FDA, "Final Approved Labeling: Effexor XR," March 11, 1999 (https://www.accessdata.fda.gov/drugsatfda_docs/label/1999/20699s1lbl.pdf).

FDA, "Frequently Asked Questions on Patents and Exclusivity," February 5, 2020 (https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079031.htm).

FDA, "Generic Competition and Drug Prices," November 20, 2017 (https://web.archive.org/web/20190914072411/https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/generic-competition-and-drug-prices).

FDA, "Highlights of Prescribing Information [Effexor XR]," revised August 2023 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020699s118lbl.pdf).

FDA, "National Drug Code Directory (Effexor)" (https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=PROPRIETARYNAME&type=effexor).

FDA, "New Drug Application (NDA)," January 21, 2022 (https://www.fda.gov/drugs/types-applications/new-drug-application-nda).

FDA, "Orange Book Preface" March 27, 2025 (https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm).

FDA, "Orange Book: Approved Drugs with Therapeutic Equivalence Evaluations," 14th ed., 1994, p. AD44.

FDA, "Paragraph IV Patent Certifications," April 28, 2025 (https://www.fda.gov/media/166048/download).

FDA, "Product label for Effexor (venlafaxine hydrochloride) Tablets," March 16, 2001 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2001/20151s17s18lbl.pdf).

FDA, "Revised label for 'Effexor® XR (venlafaxine hydrochloride) Extended-Release Capsules,'" November 18, 2005 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2005/020699s054,057lbl.pdf).

FDA, "Small Business Assistance: Frequently Asked Questions for New Drug Product Exclusivity," (http://www.fda.gov/Drugs/DevelopmentApprovalProcess/SmallBusinessAssistance/ucm069962.htm).

FDA, "Step 3: Clinical Research," January 4, 2018 (https://www.fda.gov/ForPatients/Approvals/Drugs/ucm405622.htm).

FDA, "The Drug Development Process," January 4, 2018 (https://www.fda.gov/ForPatients/Approvals/Drugs/default.htm).

FDA, "Venlaxafine (Marketed as Effexor) Information" July 10, 2015 (https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/venlafaxine-marketed-effexor-information).

FDA, Administrative Documents for NDA 20-699 [Effexor XR], August 15, 1997 (https://www.accessdata.fda.gov/drugsatfda_docs/nda/97/020699ap_effexor_clinphrmr_admindoc).

FDA, Approval Letter for NDA 21-992 (*Desvenlafaxine Succinate ER Tablet*), February 29, 2008 (https://www.accessdata.fda.gov/Drugsatfda_docs/nda/2008/021992s000_Approv.pdf).

FDA, Approval Package for ANDA 076565 (*Venlafaxine Hydrochloride Extended-Release Capsules)*, June 28, 2010 (https://www.accessdata.fda.gov/drugsatfda_docs/anda/2010/076565Orig1s000.pdf).

FDA, Center for Drug Evaluation and Research, "Manual of Policy and Procedures: NDA Classification Codes," December 8, 2022, p. 3 (https://www.fda.gov/downloads/aboutfda/centersoffices/officeofmedicalproductsand tobacco/cder/manualofpoliciesprocedures/ucm470773.pdf).

FDA, Letter Approving ANDA 076549 (*Ramipril Capsules*), October 24, 2005 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2005/076549ltr.pdf).

FDA, Letter Approving ANDA 076554 (*Sumatriptan Succinate Tablets*), August 10, 2009 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/076554s000ltr.pdf).

FDA, Letter Approving ANDA 076565 (*Venlafaxine Hydrochloride ER Capsules*), June 28, 2010 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2010/076565s000ltr.pdf).

FDA, Letter Approving ANDA 076840 (*Sumatriptan Succinate Tablets*), February 9, 2009 (https://www.accessdata. fda.gov/drugsatfda_docs/appletter/2009/076840s000ltr.pdf).

FDA, Letter Approving NDA 22-104 (*Venlafaxine Hydrochloride ER Tablets*), May 20, 2008 (https://www.accessdata.fda.gov/drugsatfda_docs//2008/022104s000ltr.pdf).

"FDA's Request for Comments on Ramipril 180-Day Exclusivity Draws Letters from Eight Generic Companies," *Orange Book Blog*, November 6, 2007 (https://www.orangebookblog.com/2007/11/fdas-request-fo.html).

*Federal Trade Commission v. Actavis, Inc.*, 133 S. Ct. 2223 (2013), p. 2237.

Ferguson, J., "SSRI Antidepressant Medications: Adverse Effects and Tolerability," *Primary Care Companion to the Journal of Clinical Psychiatry*, 3(1), 2001, pp. 22-27.

Fowler, A., "Pharmaceutical Line Extensions in the United States: A Primer on Definitions and Incentives," National Bureau of Economic Research White Paper, October 6, 2017 (https://www.nber.org/sites/default/ files/2022-09/WhitePaper-Fowler10.2017.pdf).

Frank, R. and B. Bernanke, *Principles of Economics*, 3rd ed., Worth Publishers, 2007.

Frank, R. and D. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics and Management Strategy,* 6(1), 1997, pp. 75-90.

Frank, R., T. McGuire, and I. Nason, "The Evolution of Supply and Demand for Generic Drugs," *The Milbank Quarterly*, 99(3), 2021, pp. 828-52.

FTC and DOJ, "Antitrust Enforcement and Intellectual Property Rights," April 2007 (https://www.justice.gov/sites/default/files/atr/legacy/2007/07/11/222655.pdf).

FTC and DOJ, "Antitrust Guidelines for the Licensing of Intellectual Property," January 12, 2017 (https://www.justice.gov/atr/IPguidelines/download).

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

FTC, "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact," August 2011 (https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf).

FTC, "FTC Enters Global Settlement to Resolve Reverse-Payment Charges against Teva," February 19, 2019 (https://www.ftc.gov/news-events/news/press-releases/2019/02/ftc-enters-global-settlement-resolve-reverse-payment-charges-against-teva).

FTC, "Prepared Statement of the Federal Trade Commission Before the Subcommittee on Courts and Competition Policy Committee on the Judiciary, United States House of Representatives on 'Anticompetitive Pay-for-Delay Settlements in the Pharmaceutical Industry: Why Consumers and the Federal Government Are Paying Too Much for Prescription Drugs'," June 3, 2009 (https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-anticompetitive-pay-delay-settlements-harmaceutical/p859910payfordelay.pdf).

FTC, "Thomas B. Leary, Remarks Before the Class Action Litigation Summit, Washington, D.C.," June 26, 2003.

Ganapati, S. and R. McKibbin, "Markups and Fixed Costs in Generic and Off-Patent Pharmaceutical Markets," National Bureau of Economic Research, Working Paper No. 29206, September 2021 (http://www.nber.org/papers/ w29206).

Gelbach, J., E. Helland, and J. Klick, "Valid Inference in Single-Firm, Single-Event Studies," *American Law and Economics Review*, 15(2), 2013, pp. 495-541.

"Generic-Makers Fail in Bid to Force Drug Firms to Sue Over Unresolved Patents," *S&P Global*, October 12, 2006 (https://www.spglobal.com/marketintelligence/en/mi/country-industry-forecasting.html?id=106598833).

Geruso, M., T. Layton, and D. Prinz, "Screening in Contract Design: Evidence from the ACA Health Insurance Exchanges," *American Economic Journal: Economic Policy*, 11(2), 2019, pp. 64-107.

Ghili, S. and M. Schmitt, "A Framework for Estimating Damages in Reverse Payment Cases," *Antitrust Law Journal*, 81(3), 2017, pp. 873-901.

Girotra, K., C. Terwiesch, and K. Ulrich, "Valuing R&D Projects in a Portfolio: Evidence from the Pharmaceutical Industry," *Management Science*, 53(9), 2007, pp. 1452-66.

"GlaxoSmithKline and Ranbaxy Enter into an Agreement to Settle Valacyclovir U.S. Patent Litigation," *Reuters,* August 9, 2007 (https://www.reuters.com/article/world/glaxosmithkline-and-ranbaxy-enter-into-an-agreement-to-settle-valacyclovir-us-idUSIN20070726111621GSK).

Goldman, D., G. Joyce, and Y. Zheng, "Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health," *JAMA*, 298(1), 2007, pp. 61-69.

Gönül, F., *et al.*, "Promotion of Prescription Drugs and Its Impact on Physicians' Choice Behavior," *Journal of Marketing*, 65(3), 2001, pp. 79-90.

Grabowski, H. and J. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, 35(2), 1992, pp. 331-50.

Grabowski, H. and J. Vernon, "Longer Patents for Increased Generic Competition in the US: The Waxman-Hatch Act after One Decade," *PharmacoEconomics*, 10(Suppl 2), 1996, pp. 110-23.

Grabowski, H., *et al.*, "Continuing Trends in U.S. Brand-Name and Generic Drug Competition," *Journal of Medical Economics*, 24(1), 2021, pp. 908-17.

Grabowski, H., *et al.*, "Does Generic Entry Always Increase Consumer Welfare?" *Food and Drug Law Journal*, 67(3), 2012, pp. 373-91.

Grabowski, H., *et al.*, "Updated Trends in US Brand-Name and Generic Drug Competition," *Journal of Medical Economics*, 19(9), 2016, pp. 836-44.

Grabowski, H., G. Long, and R. Mortimer, "Recent Trends in Brand-Name and Generic Drug Competition," *Journal of Medical Economics*, 17(3), 2014, pp. 207-14.

Grabowski, H., J. DiMasi, and G. Long, "The Roles of Patents and Research and Development Incentives in Biopharmaceutical Innovation," *Health Affairs*, 34(2), 2015, pp. 302-10.

Gray, N., "Ranbaxy Loses $250M While US Consumers Lose a Nexium Generic," *BioPharmaDive*, November 7, 2014 (https://www.biopharmadive.com/news/ranbaxy-loses-250m-while-us-consumers-lose-a-nexium-generic/330442).

Grofik, G., "WYE: Effexor XR Patents in Focus; A Call Option for Investors," Citigroup Equity Research, September 11, 2005.

Grofik, G., "WYE: Effexor XR Settlement; More Positive News – Reiterate Buy," Citigroup Equity Research, October 19, 2005.

Grofik, G., "WYE: Good News Continues; FTC Will Not Block Effexor XR Settlement," Citigroup Equity Research, December 4, 2005.

Gryta, T. and M. Jarzemsky, "Mylan, Pfizer Settle on Lipitor," *Wall Street Journal*, January 25, 2011 (https://www.wsj.com/articles/SB10001424052748704698004576103982823130572).

Gupta, R., N. Shah, and J. Ross, "Generic Drugs in the United States: Policies to Address Pricing and Competition," *Clinical Pharmacology and Therapeutics*, 105(2) 2019, pp. 329-37.

Hadland, S., *et al.*, "Association of Pharmaceutical Industry Marketing of Opioid Products to Physicians with Subsequent Opioid Prescribing," *JAMA Internal Medicine*, 178(6), 2018, pp. 861-63.

Hall, R., "The Relation Between Price and Marginal Cost in U.S. Industry," *Journal of Political Economy*, 96(5), 1988, pp. 921-47.

Hartman, R., K. Drake, and T. McGuire, "Event Study Analysis in Cases with Multiple Brand-Generic Reverse-Payment Settlements," *International Journal of the Economics of Business*, 26(3), 2019, pp. 399-410.

Hemphill, C. S. and M. Lemley, "Earning Exclusivity: Generic Drug Incentives and the Hatch Waxman Act,"

*Antitrust Law Journal*, 77(3), 2011, pp. 947-89.

Hemphill, C.S. and B. Sampat, "Evergreening, Patent Challenges, and Effective Market Life in Pharmaceuticals," *Journal of Health Economics*, 31(2), 2012, pp. 327-39.

Hemphill, C.S. and B. Sampat, "When Do Generics Challenge Drug Patents?" *Journal of Empirical Legal Studies*, 8(4), 2011, pp. 613-49.

Hemphill, C.S., "An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition," *Columbia Law Review*, 109(4),2009, pp. 629-87.

Hemphill, C.S., "Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem," *New York University Law Review*, 81, 2006, pp. 1553-1623.

Henry, S. and J. Molloy, "Wyeth: WYE Puts Out First Effexor Fire," Oppenheimer, October 19, 2005.

Herper, M., "Pfizer Wins Longer Life for Lipitor," *Forbes*, June 18, 2008 (https://www.forbes.com/2008/06/18/pfizer-ranbaxy-lipitor-biz-healthcare-cx_mh_0618bizpfizer.html).

Hoadley, J., *et al.*, "An In-Depth Examination of Formularies and Other Features of Medicare Drug Plans," Kaiser Family Foundation, The Medicare Drug Benefit, April 2006 (https://www.kff.org/wp-content/uploads/2013/01/7489.pdf).

Hovenkamp, H., "Markets in Merger Analysis," *Antitrust Bulletin*, 57(4), 2012, pp. 887-914.

Hovenkamp, H., *Federal Antitrust Policy: The Law of Competition and Its Practice*, Fifth Edition, West Publishing, 2016.

Hovenkamp, H., M. Janis, and M. Lemley, "Anticompetitive Settlement of Intellectual Property Disputes," *Minnesota Law Review*, 87(6), 2003, pp. 1719-66.

Impax Laboratories, Inc., "27th Annual J.P. Morgan Healthcare Conference," January 14, 2009 (https://media.corporate-ir.net/media_files/irol/67/67240/Impax_Laboratories_presentation_JPMorgan_Jan_2009.pdf).

Impax Laboratories, Inc., "Form 10/A, General Form for Registration of Securities Pursuant to Section 12(b) or (g) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 15, 2008," December 15, 2008 (https://www.sec.gov/Archives/edgar/data/1003642/000089322008003190/z67239a4e10v12gza.htm).

Impax Laboratories, Inc., "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 For the Fiscal Year Ended December 31, 2008," March 12, 2009 (https://www.sec.gov/Archives/edgar/data/1003642/000089322009000533/w73021e10vk.htm).

Impax Laboratories, Inc., "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 For the Fiscal Year Ended December 31, 2009," February 26, 2010 (https://www.sec.gov/Archives/edgar/data/1003642/000095012310017992/c96754e10vk.htm).

IMS Institute for Healthcare Informatics, "Price Declines after Branded Medicines Lose Exclusivity in the U.S.," January 2016 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/price-declines-after-branded-medicines-lose-exclusivity-in-the-us.pdf).

*In re Lamictal Direct Purchaser Antitrust Litigation*, 957 F.3d 184, 188-89 (3d Cir. 2020).

*In re Nexium (Esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2409, Civil Action No. 112-cv-11711, Trial Exhibit 103.

*In re Wellbutrin XL Antitrust Litigation*, 868 F.3d 132, 160 (3d Cir. 2017).

"India's Lupin Gets Nod for Keppra Generic," *Reuters*, January 16, 2009 (https://www.reuters.com/article/business/healthcare-pharmaceuticals/indias-lupin-gets-nod-for-keppra-generic-idUSBMA002187).

IQVIA Institute, "The Use of Medicines in the U.S.: Spending and Usage Trends and Outlook to 2025," May 2021, (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/the-use-of-medicines-in-the-us/iqi-the-use-of-medicines-in-the-us-05-21-forweb.pdf).

IQVIA, "National Sales Perspective & National Prescription Audit Overview," 2017.

Iskowitz, M., "Wyeth Ships Generic Protonix, as Other Blockbusters Boost Income," *Medical Marketing and Media*, January 30, 2008 (https://www.mmm-online.com/home/channel/wyeth-ships-generic-protonix-as-other-blockbusters-boost-income).

Jacobo-Rubio, R., J. Turner, and J. Williams, "The Distribution of Surplus in the US Pharmaceutical Industry: Evidence from Paragraph IV Patent-Litigation Decisions," *Journal of Law and Economics*, 63(2), 2020, pp. 203-38.

Jena, A. and T. Philipson, "Cost-Effectiveness as a Price Control," *Health Affairs*, 26(3), 2007, pp. 696-703.

Jena, A., *et al*., "'Me-too' Innovation in Pharmaceutical Markets," *Forum for Health Economics and Policy*, 12(1), 2009.

Kaiser Family Foundation, "Employer Health Benefits: 2020 Annual Survey" 2020 (https://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf).

Kakani, P., M. Chernew, and A. Chandra, "The Contribution of Price Growth to Pharmaceutical Revenue Growth in the United States: Evidence from Medicines Sold in Retail Pharmacies," *Journal of Health Politics, Policy and Law*, 47(6), 2022, pp. 629-48.

Karst, K., "The Last Shall Be First….The Case of Generic Flomax," *FDA Law Blog*, March 10, 2010 (https://www.thefdalawblog.com/2010/03/the-last-shall-be-first-the-case-of-generic-flomax).

Kenneth French's website (http://mba.tuck.dartmouth.edu/pages/faculty/ken.french/Data_Library/f-f_factors.html).

"King Pharma Profit Falls as Altace Sales Dive," *Reuters*, May 8, 2008 (https://www.reuters.com/article/king/update-1-kingpharma-profit-falls-as-altace-sales-dive-idUSN0834140920080508).

King Pharmaceuticals, Inc., "Form 8-K, Current Report Pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934, for the date February 27, 2006," February 27, 2006 (https://www.sec.gov/Archives/edgar/data/1047699/000095014406001586/g99849e8vk.htm).

"King Says Cobalt Plans to Launch Generic Altace," *Reuters*, November 12, 2007 (https://www.reuters.com/article/business/healthcare-pharmaceuticals/king-says-cobalt-plans-to-launch-generic-altace-idUSN11420253).

Korn, D., E. Lietzan, and S. Scott, "A New History and Discussion of 180-Day Exclusivity," *Food and Drug Law Journal*, 64(2), 2009, pp. 335-390.

Kornfield, R., *et al*., "Promotion of Prescription Drugs to Consumers and Providers, 2001-2010," *PloS One*, 8(3), 2013, e55504.

Krugman, P., R. Wells, and K. Graddy, *Essentials of Economics*, 3rd ed., Worth Publishers, 2014.

Landes, W. and R. Posner, "Market Power in Antitrust Cases," *Harvard Law Review*, 94(5), 1981, pp. 937-96.

Larkin, I., *et al*., "Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing," *Journal of the American Medical Association*, 317(17), 2017, pp. 1785-95.

Lavetti, K. and K. Simon, "Strategic Formulary Design in Medicare Part D Plans," *American Economic Journal: Economic Policy*, 10(3), 2018, pp. 154-92.

Layard, P. and A. Walters, *Microeconomic Theory*, McGraw-Hill, 1978, pp. 141-43.

Leffler, K. and C. Leffler, "Want to Pay a Competitor to Exit the Market? Settle a Patent Infringement Case: An Argument For *Per Se* Condemnation of Payments by the Patent Holder," *Economics Committee Newsletter*, 2(1), 2002, pp. 26-35.

Lemley, M. and C. Shapiro, "Probabilistic Patents," *Journal of Economic Perspectives*, 19(2), 2005, pp. 75-98.

Lerner, A., "The Concept of Monopoly and the Measurement of Monopoly Power," *Review of Economic Studies*, 1(3), 1934, pp. 157-75.

Li, S. and A. Dor, "How Do Hospitals Respond to Market Entry? Evidence from a Deregulated Market for Cardiac Revascularization," *Health Economics*, 24(8), 2015, pp. 990-1008.

Lietzan, E. and J. Post, "The Law of 180-Day Exclusivity," *Food and Drug Law Journal*, 71(3), 2016, pp. 327-400.

Lipman, M., "FTC Official Says Patent Settlement Side Deals Suspicious," *Law360*, April 16, 2015 (http://www.law360.com/articles/644134/ftc-official-says-patent-settlement-side-deals-suspicious).

Lloyd, L., "One-Time Charges Drag Down Wyeth Profits," *Philadelphia Inquirer*, October 21, 2005.

Lupin Press Release, "Lupin Pharmaceuticals, Inc. Announces Tentative Approval Of Generic ZOLOFT®," *BioSpace*, January 2, 2007 (https://www.biospace.com/lupin-pharmaceuticals-inc-announces-tentative-approval-of-generic-zoloft-r).

Ma, J., *et al.*, "A Statistical Analysis of the Magnitude and Composition of Drug Promotion in the United States in 1998," *Clinical Therapeutics*, 25(5), 2003, pp. 1503-17.

MacKinlay, A.C., "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), 1997, pp. 13-39.

Manchanda, P. and P. Chintagunta, "Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis," *Marketing Letters*, 15(2-3), 2004, pp. 129-45.

Mankiw, N., *Principles of Economics*, 3rd ed., Thompson/Southwestern, 2004, pp. 324-35.

Mankiw, N., *Principles of Economics*, 7th ed., Stamford, CT: Cengage Learning, 2015, pp. 67-68.

"Markman Hearing," Thompson Reuters Practical Law (https://content.next.westlaw.com/practical-law/document/Id4cf190ff3ad11e28578f7ccc38dcbee/Markman-Hearing).

Markman Opinion, *Wyeth v. Teva Pharmaceuticals USA, Inc.*, No. 2:03-cv-01293-WJM-RJH (D.N.J), ECF No. 124 (September 6, 2005).

Markovitz, A., *et al.*, "Effects of Guideline and Formulary Changes on Statin Prescribing in the Veterans Affairs," *Health Services Research*, 52(6, Part I), 2017, pp. 1996-2017.

Marshall, R. and L. Marx, *The Economics of Collusion*, MIT Press, 2012.

Mattingly, J., "Understanding Drug Pricing," *U.S. Pharmacist*, June 20, 2012 (https://www.uspharmacist.com/article/Understanding-drug-pricing).

McAfee, R., H. Mialon, and M. Williams, "When Are Sunk Costs Barriers to Entry?  Entry Barriers in Economic and Antitrust Analysis," *American Economic Association Papers and Proceedings*, 94(2), 2004, pp. 461-65.

McGuire, T., *et al.*, "Resolving Reverse-Payment Settlements with the Smoking Gun of Stock Price Movements," *Iowa Law Review*, 101(4), 2016, pp. 1581-99.

Meland, M., "Teva, Sandoz Launch At-Risk Versions of Pfizer Drug," *Law360*, November 29, 2005 (https://www.law360.com/articles/4619/teva-sandoz-launch-at-risk-versions-of-pfizer-drug).

Memorandum of Decision and Order, *In re Aggrenox Antitrust Litigation*, 3:14-md-02516 (SRU) (D. Conn.).

Meyer, B., "Natural and Quasi-Experiments in Economics," *Journal of Business and Economic Statistics*, 13(2), 1995, pp. 151-61.

Morse, M., "Product Market Definition in the Pharmaceutical Industry," *Antitrust Law Journal*, 71(2), 2003, pp. 633-76.

Myers, C., "Dr. Reddy's Launches Authorized Generic Version of Imitrex Tablets," *Fierce Biotech*, November 24, 2008 (https://www.fiercebiotech.com/biotech/dr-reddy-s-launches-authorized-generic-version-of-imitrex-tablets).

Myers, C., "Osmotica Pharmaceutical Corp and Upstate Pharma, LLC, a subsidiary of UCB, Inc., Announce the Availability of Venlafaxine Extended-Release Tablets," *FiercePharma*, October 10, 2008 (https://www.fierce biotech.com/biotech/osmotica-pharmaceutical-corp-and-upstate-pharma-llc-a-subsidiary-of-ucb-inc-announce).

"Mylan Inc. Receives FDA Approval for Generic Version of Migraine Treatment Imitrex®," *BioSpace*, August 11, 2009 (https://www.biospace.com/mylan-inc-receives-fda-approval-for-generic-version-of-migraine-treatment-imitrex-r).

Mylan Inc., "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2008," February 23, 2009 (https://www.sec.gov/Archives/edgar/data/69499/000095015209001668/l35088ae10vk.htm#110)

Mylan Inc., "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2009," February 26, 2010 (https://www.sec.gov/Archives/edgar/data/69499/000095012310018288/l38928e10vk.htm#111).

Mylan Inc., "Form 10-K, Transition Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Transition Period from April 1, 2007 to December 31, 2007," February 29, 2008 (https://www.sec.gov/Archives/edgar/data/69499/000095015208001583/l29616ae10vkt.htm).

Mylan Laboratories Inc., "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended March 31, 2006," May 12, 2006 (https://www.sec.gov/Archives/edgar/data/69499/000095015206004539/j2028301e10vk.htm#123).

Mylan Laboratories Inc., "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended March 31, 2007," May 30, 2007 (https://www.sec.gov/Archives/edgar/data/69499/000095015207004808/l26366ae10vk.htm#123)

Mylan Press Release, "Mylan Launches Generic Version of Lipitor®," May 29, 2012 (https://investor.mylan.com/news-releases/news-release-details/mylan-launches-generic-version-lipitorr).

Mylan Press Release, "Mylan Launches Generic Version of Xopenex(R) Inhalation Solution," March 18, 2013 (https://investor.mylan.com/news-releases/news-release-details/mylan-launches-generic-version-xopenexr-inhalation-solution).

Mylan Press Release, "Mylan Receives FDA Approval for First-to-File Generic Depakote(R) ER," January 30, 2009 (https://investor.mylan.com/news-releases/news-release-details/mylan-receives-fda-approval-first-file-generic-depakoter-er).

Mylan Press Release, "Mylan Receives Final Approval for First-to-File Generic Version of Antiepileptic Keppra(R) and Launches Immediately," November 4, 2008 (https://investor.mylan.com/static-files/176145d6-8553-4aa8-a22e-6e7eb492805d).

"Mylan to Launch Generic of Abbott's Depakote ER," *Reuters*, June 5, 2008 (https://www.reuters.com/article/business/healthcare-pharmaceuticals/mylan-to-launch-generic-of-abbotts-depakote-er-idUSN05369533).

"Mylan, UCB Agree to Settlement Over Generic Keppra," *Reuters*, October 5, 2007 (https://www.reuters.com/article/business/healthcare-pharmaceuticals/mylan-ucb-agree-to-settlement-over-generic-keppra-idUSN04401370).

National Institute of Mental Health (NIMH), "Mental Health Medications" (https://www.nimh.nih.gov/health/topics/mental-health-medications/index.shtml).

National Opinion Research Center, "Issues in the Design and Implementation of Drug Formularies and Therapeutic Classes," September 28, 2005 (https://aspe.hhs.gov/system/files/pdf/74576/report.pdf).

Newey, W. and K. West, "A Simple Positive Semi-Definite, Heteroskedasticity and Autocorrelation Consistent Covariance Matrix," *Econometrica*, 55(3), 1987, pp. 703-08.

Newey, W. and K. West, "Automatic Lag Selection in Covariance Matrix Estimation," *Review of Economic Studies*, 61(4), 1994, pp. 631-53.

Nicholson, W. and C. Synder, *Microeconomic Theory: Basic Principles and Extensions*, 12th ed., Cengage Learning, 2017, pp. 418-24.

Nicholson, W., *Microeconomic Theory: Basic Principles and Extensions*, 7th Edition, The Dryden Press, 1998.

Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2005," (https://www.sec.gov/Archives/edgar/data/1114448/00010474 6906001059/a2166684z20-f.htm).

Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2006," (https://www.sec.gov/Archives/edgar/data/1114448/000104746907000510/a2175772z20-f.htm).

Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2007," (https://www.sec.gov/Archives/edgar/data/1114448/000104746908000606/a2182117z20-f.htm).

Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2008," (https://www.sec.gov/Archives/edgar/data/1114448/0001047 46909000435/a2190064z20-f.htm).

Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2009," (https://www.sec.gov/Archives/edgar/data/1114448/000104746910000310/a2196017z20-f.htm).

Novelli, P., "Effexor (R) XR Achieved Long-Term Remission in 67 Percent of Recurring Depression Patients," Wyeth Press Release, May 21, 2002 (https://www.eurekalert.org/news-releases/476880).

O'Sullivan, J., "Medicare Part D Prescription Drug Benefit: A Primer," Congressional Research Service Report for Congress, Order Code RL34280, August 20, 2008 (https://www.everycrsreport.com/files/20080820_RL34280 _e39d4ec97b3863a3a1184d12f5aa790527fd3174.pdf).

Olson, L. and B. Wendling, "Estimating the Causal Effect of Entry on Generic Drug Prices Using Hatch-Waxman Exclusivity," *Review of Industrial Organization*, 53(1), 2018, pp. 139-72.

Opinion, *In re Cipro Cases I & II*, Supreme Court of California, Case No. S198616, JCCP 4154/4220, May 7, 2015,

Order Approving Direct Purchaser Class Plaintiffs' Motion for Distribution from the Settlement Fund, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD (D.N.J), ECF 763 (September 18, 2024).

Order, *Wyeth v. Teva Pharmaceuticals USA, Inc. et al.,* No. 2:03-cv-01293-WJM-RJH (D.N.J), ECF No. 102 (July 21, 2005).

Osmotica Pharmaceuticals, PLC, "Form S-1, Registration Statement Under the Securities Act of 1933, As filed with the U.S. Securities and Exchange Commission on September 14, 2018," (https://www.sec.gov/Archives/edgar/data/ 1739426/000104746918006231/a2236601zs-1.htm).

"Oxford Biomedica PLC – Wyeth Preclinical Data," *Regulatory News Service*, October 19, 2005.

Panattoni, L., "The Effect of Paragraph IV Decisions and Generic Entry Before Patent Expiration on Brand Pharmaceutical Firms," *Journal of Health Economics*, 30(1), 2011, pp. 126-45.

Par Pharmaceuticals, "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended December 31, 2009," February 25, 2010 (https://www.sec.gov/Archives/edgar/data/ 878088/000087808810000019/finaledgar200910k22510.htm).

Patel, A., "Delayed Access to Generic Medicine: A Comment on the Hatch-Waxman Act and the 'Approval Bottleneck'," *Fordham Law Review*, 78(2), 2009, pp. 1075-1116.

Perrett, S., "The Modified-Release Drug Delivery Landscape: The Commercial Perspective," in *Modified-Release Drug Delivery Technology*, 2nd Edition, Volume 2, 2008, pp. 1-16.

*Pfizer Canada Inc. v. Teva Canada Limited*, 2016 FCA 161 (CanLII) (Can.).

Pfizer Press Release, "Pfizer Completes Acquisition of Wyeth," October 14, 2009 (https://www.pfizer.com/news/press-release/press-release-detail/pfizer_completes_acquisition_of_wyeth).

Pfizer Press Release, "Pfizer Completes Transaction to Combine Its Upjohn Business with Mylan," November 16, 2020 (https://www.pfizer.com/news/press-release/press-release-detail/pfizer-completes-transaction-combine-its-upjohn-business).

Pharmaceutical Care Management Association, "The Value of PBMs," (https://www.pcmanet.org/the-value-of-pbms).

Picard, A., "New Birth-Control Pill Promises Freedom from Periods, PMS," *The Globe and Mail*, October 18, 2005 (https://www.theglobeandmail.com/life/new-birth-control-pill-promises-freedom-from-periods-pms/article18250375).

Pink Sheet, "Burroughs Wellcome to Relaunch Antidepressant Wellbutrin in Mid-July after Aborted Launch in 1986," July 3, 1989 (https://insights.citeline.com/PS015845/BURROUGHS-WELLCOME-TO-RELAUNCH-ANTIDEPRESSANT-WELLBUTRIN-IN-MIDJULY-AFTER-ABORTED-LAUNCH-IN-1986-FDAAPPROVED-LABELING-INCLUDES-DATA-ON-SEIZURE-RISK).

Pink Sheet, "Wyeth Effexor XR Approval Brings Dosing in Line with SSRIs; Launch Planned for Early November," October 27, 1997 (https://medtech.pharmaintelligence.informa.com/PS031049/Wyeth-Effexor-XR-approval-brings-dosing-in-line-with-SSRIs-launch-planned-for-early-November).

Pitofsky, R., "New Definitions of Relevant Market and the Assault on Antitrust," *Columbia Law Review*, 90(7), 1990, pp. 1805-64.

Pollock, M., O. Bazaldua, and A. Dobbie, "Appropriate Prescribing of Medications: An Eight-Step Approach," *American Family Physician*, 75(2), 2007, pp. 231-36.

Porter, R., "Detecting Collusion," *Review of Industrial Organization*, 26(2), 2005, pp. 147-

Pratt, L., D. Brody, and Q. Gu, "Antidepressant Use Among Persons Aged 12 and Over: United States, 2011-2014," National Center for Health Statistics Data Brief, No. 283, August 2017 (https://www.cdc.gov/nchs/data/databriefs/db283.pdf).

Public Comment from the GPhA to the FTC, Re: Authorized Generic Drug Study: FTC Project No. P062105, June 27, 2006 (https://www.ftc.gov/system/files/documents/public_comments/2006/06/062806gpha.pdf).

"Ranbaxy Announces Settlement of Possible Imitrex Litigation with GlaxoSmithKline," *FierceBiotech*, January 22, 2008 (https://www.fiercebiotech.com/biotech/ranbaxy-announces-settlement-of-possible-imitrex-litigation-glaxosmithkline).

"Ranbaxy Laboratories Launches Herpes Drug in the U.S.," *BioSpace*, November 30, 2009 (https://www.biospace.com/ranbaxy-laboratories-launches-herpes-drug-in-the-u-s).

*Ratiopharm inc. v. Wyeth et. al.,* 2008 R.C.F.447 (CAN).

Reiffen, D. and M. Ward, "Generic Drug Industry Dynamics," *Review of Economics and Statistics*, 87(1), 2005, pp. 37-49.

Rizzo, J., "Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs," *Journal of Law and Economics*, 42(1), 1999, pp. 89-116.

Rosenthal, M., *et al.*, "Demand effects of recent changes in prescription drug promotion," *Forum for Health Economics and Policy*, 6(1), 2003, pp. 1-27.

Rubin, J., N. Yu, and C. Garcia-Tunon, "Wyeth: Effexor XR Extension a Long Shot, but Not Out of the Question," Morgan Stanley Equity Research, September 28, 2005.

Rubin, J., N. Yu, and C. Garcia-Tunon, "Wyeth: Effexor XR Settlement an Incremental Positive," MorganStanley Equity Research, October 18, 2005.

Ryan, B. and R. Muken, "Wyeth Alert: WYE Announces Terms of Settlement with Teva for Effexor XR," Deutsch Bank Equity Research, November 3, 2005.

Ryan, B., "Wyeth: WYE Likely to Extend Effexor XR Exclusivity," Deutsche Bank Equity Research, October 18, 2005.

Saha, A., *et al.*, "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business*, 13(1), 2006, pp. 15-38.

Salop, S.C. and F.S. Morton, "Developing an Administrable MFN Enforcement Policy," *Antitrust*, 27(2), 2013, pp. 15-19 (https://www.nber.org/sites/default/files/2022-09/WhitePaper-Fowler10.2017.pdf).

"Sandoz Announces Launch of Piperacillin and Tazobactam for Injection, a Generic Version of Zosyn®," October 21, 2010 (https://www.fiercepharma.com/pharma/sandoz-announces-launch-of-piperacillin-and-tazobactam-for-injection-a-generic-version-of).

"Sandoz Launches Generic Version of Valtrex," *FiercePharma*, May 25, 2010 (https://www.fiercepharma.com/pharma/sandoz-launches-generic-version-of-valtrex).

Saul, S., "Wyeth Antidepressant is Approved," *New York Times*, February 29, 2008 (https://www.nytimes.com/2008/02/29/business/29cnd-wyeth.html).

Scala, S., *et al.*, "Wyeth: Effexor Deal Terms Appear Favorable for Wyeth," Cowen & Company, November 3, 2005.

Scala, S., *et al.*, "Wyeth: Settlement of the Effexor XR Patent Litigation A Material Positive Surprise," Cowen & Company, October 19, 2005.

Scherer, F., "Pharmaceutical Innovation," in N. Rosenberg and B. Hall (eds.), *Handbook of the Economics of Innovation*, Vol. 1, North Holland/Elsevier, 2010, pp. 539-74.

Scherer, F., "The Pharmaceutical Industry—Prices and Progress," *New England Journal of Medicine*, 351(9), 2004, pp. 927-32.

Scherer, F., *Industrial Market Structure and Economic Performance*, 2nd Edition, Rand McNally, 1980.

Schwartz, L. and S. Woloshin, "Medical Marketing in the United States, 1997-2016," *JAMA,* 321(1), 2019, pp. 80–96.

Scott Morton, F. and M. Kyle, "Markets for Pharmaceutical Products," in M. Pauly, T. McGuire and P. Barros (editors), *Handbook of Health Economics*, Vol. 2, Elsevier/North Holland, 2012, pp. 763-823 and pp. 792-95.

Scott Morton, F., "Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry," *International Journal of Industrial Organization*, 18(7), 2000, pp. 1085-1104.

Seiden, C., R. Patel, and G. Suvannavejh, "Wyeth: Effexor Deal, if Closed (Risks Remain) Could Remove Biggest Overhang," UBS Investment Research, October 19, 2005.

Seiden, C., R. Patel, and G. Suvannavejh, "Wyeth: Teva Settlement Delays and Shrinks Effexor Cliff – Big Positive," UBS Investment Research, November 3, 2005.

"Sepracor, Inc. Announces Final Settlement of XOPENEX(R) Inhalation Solution Patent Infringement Litigation with Breath Limited," *BioSpace*, May 1, 2008 (https://www.biospace.com/sepracor-inc-announces-final-settlement-of-xopenex-r-inhalation-solution-patent-infringement-litigation-with-b-breath-limited/).

Shapiro, C., "Antitrust Analysis of Patent Settlements Between Rivals," *Antitrust*, 2003, pp. 70-7.

Shapiro, C., "Antitrust Limits to Patent Settlements," *RAND Journal of Economics*, 34(2), 2003, pp. 391-411.

Shapiro, C., "Mergers with Differentiated Products," *Antitrust*, 10, 1996, pp. 23-30.

Shapiro, C., "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting," in A. Jaffe, J. Lerner, and S. Stern (eds.), *Innovation Policy and the Economy*, Vol. 1, MIT Press, 2001, pp. 119-150.

Sharma, A., and N. Lacey, "Linking Product Development Outcomes to Market Valuation of the Firm: The Case of the U.S. Pharmaceutical Industry," *Journal of Product Innovation Management*, 21, 2004, pp. 297-308.

Shibutani, C. and B. Hau, "Wyeth: Bifeprunox Update," JPMorgan Equity Research, November 28, 2005.

Shibutani, C. and B. Hau, "Wyeth: Clarifications and Details: Bifeprunox and Effexor XR," JPMorgan Equity Research, December 1, 2005.

Shibutani, C. and B. Hau, "Wyeth: Effexor XR Litigation Settled in Principle: Wyeth & Teva Keep Their Cards Close to the Vest," JPMorgan Equity Research, October 18, 2005.

"Shire Settles with Barr Over Adderall XR," *PharmaTimes*, August 15, 2006 (https://pharmatimes.com/news/shire_settles_with_barr_over_adderall_xr_996047).

"Shire, Barr Reach Adderall XR Settlement," *Medical Marketing and Media,* August 15, 2006 (https://www.mmm-online.com/home/channel/sales/shire-barr-reach-adderall-xr-settlement).

Shrank, W., *et al.*, "Physicians' Perceived Knowledge of and Responsibility for Managing Patients' Out-of-Pocket Costs for Prescription Drugs," *Annals of Pharmacotherapy*, 40(9), 2006, pp. 1534-40.

Shrank, W., *et al.*, "Physicians' Perceptions of Relevant Prescription Drug Costs: Do Costs to the Individual Patient or to the Population Matter Most?" *American Journal of Managed Care*, 12(9), 2006, pp. 545-51.

Singh, K., "Ranbaxy Gets USFDA Approval for Migraine Drug," *The Economic Times*, February 10, 2009 (https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/ranbaxy-gets-usfda-approval-for-migraine-drug/articleshow/4110649.cms?from=mdr).

Skovrlj, B., *et al.*, "A Review of the Current Published Spinal Literature Regarding Bone Morphogenetic Protein-2: An Insight into Potential Bias," *Current Reviews in Musculoskeletal Medicine*, 7(3), 2014, pp. 182-88.

Sloan, C., *et al.*, "Accuracy of Physician Estimates of Out-of-Pocket Costs for Medication Filling," *JAMA Network Open*, 4(11), 2021, pp. 1-11.

Smith, S., "When Most-Favored is Disfavored: A Counselor's Guide to MFNs," *Antitrust*, 27(2), 2013, pp. 10-14.

Song, Y. and D. Barthold, "The Power of Not Asking: How Do Generic Drug Substitution Laws Affect Patient's Demand for Generic Drugs?" Working Paper version, January 27, 2015, pp. 11-12.

Sorkin, A. and D. Wilson, "Pfizer Agrees to Pay $68 Billion for Rival Drug Maker Wyeth," *New York Times*, January 25, 2009 (https://www.nytimes.com/2009/01/26/business/worldbusiness/26iht-26drugB.19675793.html).

Spurling, G., *et al.*, "Information from Pharmaceutical Companies and the Quality, Quantity, and Cost of Physicians' Prescribing: A Systematic Review," *PLoS Medicine*, 7(10), 2010, e1000352.

Staton, T., "Ranbaxy Flubs Launch of Generic Flomax," *FiercePharma*, March 3, 2010 (https://www.fiercepharma.com/pharma/ranbaxy-flubs-launch-of-generic-flomax).

Stigler, G., *The Organization of Industry*, Richard D. Irwin, Inc, 1968.

Stock, J. and M. Watson, *Introduction to Econometrics*, Pearson, 2020.

Stott, T., "Teva Awarded Section 8 Damages Regarding Ratiopharm-Venlafaxine," *Smart & Biggar*, May 23, 2014 (https://www.smartbiggar.ca/insights/publication/teva-awarded-section-8-damages-regarding-ratiopharm-venlafaxine).

Tenn, S. and B. Wendling, "Entry Threats and Pricing in the Generic Drug Industry," *Review of Economics and Statistics*, 96(2), 2014, pp. 214-28.

*Teva Canada Limited v. Wyeth LLC and Pfizer Canada Inc.*, 2011 FC 1169 (CanLII).

*Teva Canada Ltd. V. Wyeth LLC*, 2012 CAF 141.

"Teva Debuts Generic Zoloft in the USA," *PharmaTimes*, August 15, 2006 (https://pharmatimes.com/news/teva_debuts_generic_zoloft_in_usa_996050).

"Teva Pharm Announces Settlement of Generic Avandia, Avandamet, and Avandaryl Litigation with GlaxoSmithKline," *Reuters*, September 27, 2007 (https://www.reuters.com/article/inPlayBriefing/idUSIN200709 27170530TEVA20070927).

Teva Pharmaceutical Industries Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2005," March 17, 2006 (https://www.sec.gov/Archives/edgar/data/818686/000119312506058501/d20f.htm).

Teva Pharmaceutical Industries Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2006," February 28, 2007 (https://www.sec.gov/Archives/edgar/data/818686/000119312507042849/d20f.htm).

Teva Pharmaceutical Industries Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2007," February 28, 2008 (https://www.sec.gov/Archives/edgar/data/818686/000119312508042215/d20f.htm).

Teva Pharmaceutical Industries Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2008," February 27, 2009 (https://www.sec.gov/Archives/edgar/data/818686/000119312509041018/d20f.htm).

Teva Pharmaceutical Industries Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2009," February 22, 2010 (https://www.sec.gov/Archives/edgar/data/818686/000119312510036435/d20f.htm).

Teva Pharmaceutical Industries Ltd., "Form 6-K, Report of Private Issuer Prusuant to Rule 13a-16 or 15d-16 under the Securities Exchange Act of 1934 for the month of July 2008," July 22, 2008 (https://www.sec.gov/Archives/edgar/data/818686/000081868608000121/lamotrigine220708.htm).

Teva Pharmaceutical Industries, Ltd., "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended December 31, 2011," February 17, 2012 (https://www.sec.gov/Archives/edgar/data/818686/000119312512067417/d300203d20f.htm).

*Teva Pharmaceuticals USA, Inc. v. Pfizer*, Inc., 395 F.3d 1324 (Fed. Cir. 2005).

Teva Press Release, "FDA Decides Teva is Sole First-to-File on Provigil," April 5, 2012 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2012/FDA-Decides-Teva-is-Sole-First-to-File-on-Provigil).

Teva Press Release, "Teva and Wyeth Announcement Settlement of Effexor XR® Litigation," *Dow Jones Newswires*, October 18, 2005, 4:05 PM.

Teva Press Release, "Teva Announces Approval and Launch of Gabapentin Tablets," December 15, 2004 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2004/Teva-Announces-Approval-And-Launch-Of-Gabapentin-Tablets/default.aspx).

Teva Press Release, "Teva Announces Approval and Launch of Generic Imitrex® Tablets," February 11, 2009 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2009/Teva-Announces-Approval-and-Launch-of-Generic-Imitrex-Tablets/default.aspx).

Teva Press Release, "Teva Announces Approval of Generic Effexor XR," June 29, 2010 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2010/Teva-Announces-Approval-of-Generic-Effexor-XR/default.aspx).

Teva Press Release, "Teva Announces Completion of Novopharm Acquisition," April 5, 2000 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2000/Teva-Announces-Completion-of-Novopharm-Acquisition/default.aspx).

Teva Press Release, "Teva Announces Final Approval of Venlafaxine HCL Tablets," August 4, 2006(https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2006/Teva-Announces-Final-Approval-of-Venlafaxine-HCL-Tablets/default.aspx).

Teva Press Release, "Teva Announces FTC Will Not File Objections to Effexor® XR Settlement," December 2, 2005 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2005/Teva-Announces-FTC-Will-Not-File-Objections-to-Effexor-Xr-Settlement/default.aspx).

Teva Press Release, "Teva Announces Launch of Authorized Generic of Provigil," March 30, 2012 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2012/Teva-Announces-Launch-of-Authorized-Generic-of-Provigil).

Teva Press Release, "Teva Announces Launch of Generic Flomax®," April 28, 2010 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2010/Teva-Announces-Launch-of-Generic-Flomax/default.aspx).

Teva Press Release, "Teva Introduces First Generic Adderall XR Capsules in the United States," April 2, 2009 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2009/Teva-Introduces-First-Generic-Adderall-XR-Capsules-in-the-United-States/default.aspx).

"Teva, Barr to Launch Generic Version of Allegra," *Fox News*, January 13, 2005 (https://www.foxnews.com/story/teva-barr-to-launch-generic-version-of-allegra).

*Times-Picayune Publishing Co. v. United States,* 345 U.S. 594 (1953).

Tirole, J., *The Theory of Industrial Organization*, The MIT Press, 1989, Chapter 6.

Trivedi, M., *et al,* "Medication Augmentation after the Failure of SSRIs for Depression," *New England Journal of Medicine*, 354(12), 2006, pp. 1243–52.

Tseng, C., *et al*., "Health Information Technology and Physicians' Knowledge of Drug Costs," *American Journal of Managed Care*, 16(4), 2010, pp. e105-10.

U.S. Agency for Healthcare Research and Quality (AHRQ), "Second-Generation Antidepressants in the Pharmacologic Treatment of Adult Depression: An Update of the 2007 Comparative Effectiveness Review," Comparative Effectiveness Review, No. 46, 2011 (https://www.ncbi.nlm.nih.gov/books/NBK83442/pdf/Bookshelf_NBK83442.pdf).

U.S. Centers for Medicare and Medicaid Studies, "Antidepressant Medications: Use in Adults," October 2015 (https://www.cms.gov/Medicare/Medicare-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Pharmacy-Education-Materials/Downloads/ad-adult-factsheet11-14.pdf).

U.S. Pharmacopeial Convention, "Final Report, Summary of Methodology and Approach: USP Medicare Model Guidelines v6.0," February 3, 2014 (https://www.usp.org/sites/default/files/usp/document/our-work/healthcare-quality-safety/2014-02-03_final_report_uspmmg_v6_0_rev140415.pdf).

Ubel, P., *et al*., "Study of Physician and Patient Communication Identifies Missed Opportunities to Help Reduce Patients' Out-of-Pocket Spending," *Health Affairs*, 35(4), 2016, pp. 654-661.

Van Arnum, P., "BMS, Sanofi-Aventis Settle Over Generic Plavix," *PharmaTech*, March 24, 2006 (https://www.pharmtech.com/view/bms-sanofi-aventis-settle-over-generic-plavix).

Vivian, J., "Generic-Substitution Laws," *U.S. Pharmacist*, 33(6), 2008, pp. 30-34.

Vokinger, K., *et al.*, "Strategies That Delay Market Entry of Generic Drugs," *JAMA Internal Medicine*, 177(11), 2017, pp. 1665-69.

"Watson Launches Generic Xopenex(R)," *FiercePharma*, August 20, 2012 (https://www.fiercepharma.com/pharma/watson-launches-generic-xopenex%C2%AE).

WebMD, "Imipramine - Uses, Side Effects, and More." August 7, 2024 (https://www.webmd.com/drugs/2/drug-57091/imavate-oral/details).

WebMD, "Marplan (Isocarboxazid) - Uses, Side Effects, and More," October 13, 2024 (https://www.webmd.com/drugs/2/drug-11985/marplan-oral/details).

Werden, G., "Demand Elasticities in Antitrust Analysis," *Antitrust Law Journal,* 66(2), 1998, pp. 363-414.

Whinston, M., *Lectures on Antitrust Economics*, The MIT Press, 2006, Chapter 2.

White, L., "Antitrust and Merger Policy: A Review and Critique," *Journal of Economic Perspectives*, 1(2), 1987, pp. 13-22.

Wilbur, E. and K. McCrea, "Teva Pharmaceutical: Settles Effexor XR Patent Challenge; A Positive (We Think) But How Much & When?" CIBC World Markets Equity Research, October 18, 2005.

Willig, R., "Unilateral Competitive Effects of Mergers: Upward Pricing Pressure, Product Quality, and Other Extensions," *Review of Industrial Organization*, 39(1/2), 2011, pp. 19-38.

Wooldridge, J., *Introductory Econometrics: A Modern Approach, 5th Edition*, South-Western Pub, Mason, 2013, Chapter 10.

*Wyeth Canada v. Ratiopharm inc.,* 1 FCR 447 (2008).

"Wyeth Pharmaceuticals Wins $31.82 Million Contract," *US Fed News*, October 19, 2005.

Wyeth Press Release, "FDA Approves Wyeth Pharmaceutical's Pristiq for the Treatment of Adult Patients with Major Depressive Disorder," March 3, 2008 (https://www.fiercebiotech.com/biotech/fda-approves-wyeth-pharmaceuticals-s-pristiq-for-treatment-of-adult-patients-major).

Wyeth Press Release, "Wyeth-Teva Pharmaceutical Industries Limited Settlement Finalized," *BioSpace*, January 13, 2006 (https://www.biospace.com/wyeth-teva-pharmaceutical-industries-limited-settlement-finalized).

"Wyeth Pulls the Plug on King's Altace," *PharmaTimes*, July 7, 2006 (https://pharmatimes.com/news/wyeth_pulls_the_plug_on_kings_altace_996261).

Wyeth, "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934, for the fiscal year ended December 31, 2005," February 27, 2006 (https://www.sec.gov/Archives/edgar/data/5187/000119312506040159/d10k.htm).

Wyeth, "Form 8-K, Pursuant to Section 13 OR 15(d) of the Securities and Exchange Act of 1934, date of report October 18, 2005" (sec.gov/Archives/edgar/data/5187/000000518705000056/form8k.htm).

Wyeth, "Form 8-K, Pursuant To Section 13 OR 15(d) of the Securities and Exchange Act of 1934, date of the report November 2, 2005," (sec.gov/Archives/edgar/data/5187/000000518705000058/form8k.htm).

Wyeth, "Form 8-K, Pursuant to Section 13 OR 15(d) of the Securities Exchange Act of 1934, Date of Report January 13, 2006," (https://www.sec.gov/Archives/edgar/data/5187/000000518706000002/form8k.htm).

Yeung, K., *et al.*, "Price Elasticities of Pharmaceuticals in a Value Based-Formulary Setting," *Health Economics*, 27(11), 2018, pp. 1788-1804.

ATTACHMENT C

# ATTACHMENT C
## GROSS MARGINS AND CROSS-PRICE ELASTICITY OF DEMAND STUDIES

### C.I.    GROSS MARGINS DATA SOURCES AND CALCULATIONS

1.      This Section of Attachment C describes the sources and methodology used to calculate gross margins.

**Effexor XR Gross Margins: Calculation Notes for Table 5**

2.      Effexor XR gross margins for 1998-2009 are calculated from Wyeth profit and loss (P&L) statements.[1]  Gross margins are calculated as: (net sales – cost of goods sold) / (net sales).

**Generic Manufacturer Gross Margins: Calculation Notes for Table 6**

*Mylan*

3.      Mylan's gross margins are calculated as (gross profit) / (gross profit + cost of sales) using financial data reported in Mylan's annual 10-K filings to the SEC. [2]

*Teva*

4.      Teva's gross margins are calculated as (gross profit) / (gross profit + cost of sales) using financial data reported in Teva's annual 20-F filings to the SEC.[3]

---

[1] WYEFFAT06382990, tabs "PCA-XR 1998 to 2004" and "Z2-XR 2005 to 2009."

[2]  Mylan Laboratories Inc., "Form 10-K: Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended March 31, 2006," p. 26 (https://www.sec.gov/Archives/edgar/data/69499/ 000095015206004539/j2028301e10vk.htm#123); Mylan Laboratories Inc., "Form 10-K: Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended March 31, 2007," p. 31 (https://www.sec.gov/Archives/edgar/data/69499/000095015207004808/l26366ae10vk.htm);  Mylan Inc., "Form 10-K: Transition Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Transition Period from April 1, 2007 to December 31, 2007," p. 44 (https://www.sec.gov/Archives/edgar/data/69499/ 000095015208001583/l29616ae10vkt.htm); Mylan Inc., "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2008," February 23, 2010, p. 53 (https://www.sec.gov/Archives/edgar/data/69499/000095015209001668/l35088ae10vk.htm);  Mylan Inc., "Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2009," February 25, 2010, p. 48 (https://www.sec.gov/Archives/edgar/data/69499/ 000095012310018288/l38928e10vk.htm).

[3]  Teva Pharmaceuticals, "Form 20-F: Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for fiscal year ending December 31, 2005," p. 3 (https://d18rn0p25nwr6d.cloudfront.net/CIK-0000818686/0dcc5bd5-caaf-4e06-b90e-072305c40b2f.pdf); Teva Pharmaceuticals, "Form 20-F: Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for fiscal year ending December 31, 2006," p. 2 (https://www.sec.gov/Archives/edgar/data/818686/000119312507042849/d20f.htm);  Teva Pharmaceuticals, "Form 20-F, Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for fiscal year ending December 31, 2007," February 29, 2008, p. 3 (https://www.sec.gov/Archives/edgar/data/ 818686/000119312508042215/)

*Impax*

5.  Impax's gross margins are calculated as (net revenues - cost of revenues) / (net revenues) using financial data reported in Impax Laboratories' annual 10-K filings to the SEC.[4]

*Sandoz*

6.  Sandoz is the generic division of Novartis. Sandoz's gross margins are calculated as (gross profit) / (gross profit + cost of goods sold) using financial data reported in Novartis's annual 20-F filings to the SEC.[5]

---

d20f.htm); Teva Pharmaceuticals, "Form 20-F, Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for fiscal year ending December 31, 2008," p. 3 (https://www.sec.gov/Archives/edgar/data/818686/000119312509041018/d20f.htm); Teva Pharmaceuticals, "Form 20-F, Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for fiscal year ending December 31, 2009," p. 2 (https://www.sec.gov/Archives/edgar/data/818686/000119312510036435/d20f.htm).

[4] Impax Laboratories Inc., "Form 10/A, General Form for Registration of Securities Pursuant to Section 12(b) or (g) of the Securities Exchange Act of 1934," December 15, 2008, p. F-56 of F-93 (https://www.sec.gov/Archives/edgar/data/1003642/000089322008003190/z67239a4e10v12gza.htm); Impax Laboratories, Inc., "Form 10-K, Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2008," p. F-50 of F-58 (https://www.sec.gov/Archives/edgar/data/1003642/000089322009000533/w73021e10vk.htm); Impax Laboratories, Inc., "Form 10-K, Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2009," p. 63 (https://www.sec.gov/Archives/edgar/data/1003642/000095012310017992/c96754e10vk.htm).

[5] Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2005," p. F-21 (https://www.sec.gov/Archives/edgar/data/1114448/000104746906001059/a2166684z20-f.htm); Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2006," p. F-21 (https://www.sec.gov/Archives/edgar/data/1114448/000104746907000510/a2175772z20-f.htm); Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2007," p. F-22 (https://www.sec.gov/Archives/edgar/data/1114448/000104746908000606/a2182117z20-f.htm). Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2008," p. F-25 (https://www.sec.gov/Archives/edgar/data/1114448/000104746909000435/a2190064z20-f.htm); Novartis AG, "Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2009," p. F-25 (https://www.sec.gov/Archives/edgar/data/1114448/000104746910000310/a2196017z20-f.htm).

**C.II.   ESTIMATION OF OWN- AND CROSS-PRICE ELASTICITIES OF DEMAND**

7.     This Section of Attachment C describes the data and methodology used to estimate own- and cross-price elasticities of demand for venlafaxine ER.  It also provides an overview of the regression results.

**Identification of Candidate Substitutes for Effexor XR**

8.     The starting point for the study of price competition and cross-price elasticity of demand for Effexor XR is the identification of candidate economic substitute products.  Candidate economic substitutes consist of drugs to which Effexor XR users might turn if the price of Effexor XR were increased from a competitive level.  Candidate economic substitutes are drawn from other prescription drugs used to treat depression, *i.e.*, potential therapeutic alternatives to Effexor XR.  Therapeutic alternatives are drugs that treat the same or similar conditions, at the same point in the typical treatment pathway.  Therapeutic alternatives generally compete on therapeutic or product attributes, such as efficacy, side effects, and mechanism of action.  Competition on therapeutic attributes does *not* imply competition on price.  However, the identification of potential therapeutic alternatives is useful in identifying the broadest category of drugs that could be candidate economic substitutes.  The degree to which a candidate product is an economic substitute for Effexor XR (if at all) is assessed empirically.

9.     To identify candidate economic substitutes for Effexor XR, this section first provides a brief overview of the antidepressant drug class.  I then review Wyeth documents identifying the products it views as potential therapeutic substitutes for Effexor XR.  I then describe the IQVIA data I use to analyze economic substitutability between Effexor XR and other antidepressant drugs.

*Overview of antidepressant drugs*

10.    Antidepressants are one of the most commonly prescribed drug types.[6]  According to the U.S. Centers for Disease Control and Prevention (CDC), 12.7% of the U.S. population aged 12 and above took an antidepressant drug in 2011-14, up from 7.7% in 1999-2002.[7]

11.    Table C1 provides an overview of antidepressant drug types compiled from the American Psychiatric Association (APA)'s "Practice Guideline for the Treatment of Patients with Major Depressive Disorder"[8] and federal government sources, taken from around the time of the Agreement.[9]  Broadly, antidepressant drugs are divided between "older" and "newer" drug types.[10]  The "older" types consist of tricyclic/tetracyclic drugs and monoamine oxidase (MAO) inhibitors.  Coming on the market from the 1950s on, the older drugs have side effects and risks such that, although they continue to be prescribed for some patients and remain a clinical option, they are not generally viewed as a first-line therapeutic choice.[11]

---

[6]  L. Pratt, D. Brody, and Q. Gu, "Antidepressant Use Among Persons Aged 12 and Over: United States, 2011-2014," National Center for Health Statistics Data Brief, No. 283, August 2017 (https://www.cdc.gov/nchs/data/databriefs/db283.pdf).

[7]  *Ibid.*  The rate for 2011-14 is computed by pooling respondents to the 2011-12 and 2013-14 waves of the National Health and Nutrition Examination Surveys (NHANES).  The rate for 1999-2002 is computed by pooling the 1999-2000 and 2001-02 NHANES.

[8]  American Psychiatric Association (APA), "Practice Guideline for the Treatment of Patients with Major Depressive Disorder," 3rd ed., 2010, p. 34 (https://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/ guidelines/mdd.pdf).

[9]  See the footnote to Table C1.

[10]  U.S. Agency for Healthcare Research and Quality (AHRQ), "Second-Generation Antidepressants in the Pharmacologic Treatment of Adult Depression: An Update of the 2007 Comparative Effectiveness Review," Comparative Effectiveness Review, No. 46, 2011 (https://www.ncbi.nlm.nih.gov/books/NBK83442/pdf/ Bookshelf_NBK83442.pdf).

[11]  As stated by the APA, "For most patients, the effectiveness of antidepressant medications is generally comparable between classes and within classes of medications [but they differ in terms of side effects, risk profiles and medication interactions].  On the basis of these considerations, the following medications are optimal for most patients: SSRIs, SNRIs, mirtazapine, and bupropion."  APA, *op. cit.,* p. 31.  Although the effectiveness of antidepressants is comparable at the population level, the effectiveness can differ at the patient level.  Initial treatment choices may fail to achieve results calling for the clinician to consider alternatives.  See M. Trivedi, *et al,* "Medication Augmentation after the Failure of SSRIs for Depression," *New England Journal of Medicine*, 354(12), 2006, pp. 1243–52.  Switching medications for reasons of effectiveness is distinct from substituting on the basis of price.

## TABLE C1
## OVERVIEW OF ANTIDEPRESSANT DRUGS[12]

| Molecule/formulation | Brand name(s) | Initial FDA approval |
|---|---|---|
| *Selective serotonin reuptake inhibitors* | | |
| Citalopram HBR | Celexa | 1998 |
| Escitalopram Oxal | Lexapro | 2002 |
| Fluvoxamine MAL, MAL ER | Luvox, Luvox CR | 1994 |
| Paroxetine HCl, HCl ER | Paxil, Paxil CR | 1992 |
| Fluoxetine HCl | Prozac | 1987 |
| Sertraline HCl | Zoloft | 1991 |
| *Serotonin and norepinephrine reuptake inhibitors* | | |
| Duloxetine HCl | Cymbalta | 2004 |
| Venlafaxine HCl, HCl ER | Effexor, Effexor XR | 1993 |
| Desvenlafaxine SUC ER | Pristiq | 2008 |
| *Other 'newer' antidepressants* | | |
| Bupropion IR, SR, XL[A] | Wellbutrin, Wellbutrin SR, Wellbutrin XL | 1989 |
| Mirtazapine[B] | Remeron | 1996 |
| Nefazodone HCl[C] | Serzone | 1994 |
| Trazodone HCl[C,D] | Desyrel | 1981 |
| *Tricyclic and tetracyclic* | | |
| Amitriptyline HCl | Elavil | 1961 |
| Chlordiazepoxide | Limbitrol | 1977 |
| Clomipramine HCl | Anafranil | 1989 |
| Desipramine HCl | Norpramin | 1964 |
| Doxepin HCl | Sinequan | 1969 |
| Imipramine HCl | Tofranil | 1959 |
| Nortriptyline HCl | Pamelor | 1977 |
| Perphenazine/amitriptyline HCl | Etrafon | 1969 |
| *MAO inhibitors* | | |
| Phenelzine | Nardil | 1961 |
| Tranylcypromine | Parnate | 1961 |
| Isocarboxazid | Marplan | 1959 |
| Selegiline | Emsam | 2006 |

[A] Dopamine norepinephrine reuptake inhibitors. [B] Norepinephrine-serotonin modulator. [C] Serotonin modulators. [D] Although first approved in 1981, trazodone is classified as a 'newer' antidepressant because its mechanism of action resembles that of the newer drugs.

12.     The first "newer" antidepressant on the U.S. market was Prozac (fluoxetine), a serotonin selective reuptake inhibitor (SSRI) approved by FDA in 1987.[13]  Approvals for other SSRIs

---

[12]  APA, *op. cit.*, p. 34; FDA, "Depression Medicines," September 2019, pp. 1-14 (https://www.fda.gov/media/132665/download?attachment); National Institute of Mental Health (NIMH), "Mental Health Medications" (https://www.nimh.nih.gov/health/topics/mental-health-medications/index.shtml); AHRQ, *op. cit.*, p. 4;  U.S. Centers for Medicare and Medicaid Studies, "Antidepressant Medications: Use in Adults," October 2015 (https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Pharmacy-Education-Materials/Downloads/ad-adult-factsheet11-14.pdf).   References for FDA approval dates are listed in the spreadsheet, "FDA drug approval dates.xlsx" in the electronic backup materials to this report.

[13]  NIMH, *op. cit.*; J. Ferguson, "SSRI Antidepressant Medications: Adverse Effects and Tolerability," *Primary Care Companion to the Journal of Clinical Psychiatry*, 3(1), 2001, pp. 22-27.  Wellbutrin was approved by the FDA

followed: Zoloft (sertraline) in 1991, Paxil (paroxetine) in 1992, Luvox (fluvoxamine) in 1994, and Celexa (citalopram) in 1998.[14]  Also coming on the market were other drugs that inhibit reuptake of brain chemicals, including the serotonin and norepinephrine reuptake inhibitors (SNRIs), like Effexor (venlafaxine) and Cymbalta (duloxetine), and the dopamine norepinephrine reuptake inhibitor (NDRI) Wellbutrin (bupropion).[15]  A number of the newer drugs had one or more "line extensions," *i.e.*, follow-on drugs with sustained- or extended-release formulations (*e.g.*, Effexor and Effexor XR) or that modified the original active ingredient (*e.g.*, citalopram/escitalopram and venlafaxine/desvenlafaxine).

### *Review of Wyeth business documents*

13.     Wyeth business documents compare Effexor XR prescribing patterns to those of other "newer" antidepressants; older antidepressants are rarely mentioned.  The drugs appearing regularly in Wyeth analyses, which I refer to as "top-prescribed new antidepressants," were SSRIs Celexa/Lexapro, Paxil/Paxil CR, Prozac, and Zoloft; the other major SNRI Cymbalta; and the NDRI Wellbutrin/Wellbutrin SL/Wellbutrin XR.[16]  Wyeth regularly compiled "competitive backgrounder" documents on these drugs, which aimed to help detailers position Effexor XR advantageously relative to these therapeutic alternatives.[17]  Wyeth regularly tracked prescribing

---

in 1985 but voluntarily withdrawn from the market in 1986 after a study found an elevated risk of seizures in nondepressed bulimic patients; it was relaunched in 1989.  Pink Sheet, "Burroughs Wellcome to Relaunch Antidepressant Wellbutrin in Mid-July after Aborted Launch in 1986," July 3, 1989 (https://insights.citeline.com/PS015845/BURROUGHS-WELLCOME-TO-RELAUNCH-ANTIDEPRESSANT-WELLBUTRIN-IN-MIDJULY-AFTER-ABORTED-LAUNCH-IN-1986-FDAAPPROVED-LABELING-INCLUDES-DATA-ON-SEIZURE-RISK).

[14]  See the spreadsheet, "FDA drug approval dates.xlsx" in the electronic backup materials to this report for references.  As stated in the previous footnote, Wellbutrin was initially approved by FDA in 1985 but was withdrawn from the market in 1986 and re-launched in 1989.

[15]  *Ibid.*

[16]  WYEFFAT04066635-795 at 657; WYEFFAT3811486-532 at 502 and 507; WYEFFAT3831694-783 at 701 and 741; WYEFFAT3889734; WYEFFAT3998680-828 at 710; WYEFFAT3942609-950 at 632.  A 2004 document identifies Lexapro, Wellbutrin XL, Paxil CR, Zoloft and "soon-to-be-launched Cymbalta" as "Five Key Competitors" of Effexor and Effexor XR.  WYEFFAT05397985-92 at 85-86.

[17]  WYEFFAT3837741-58 (Lexapro); WYEFFAT2553727-51 (Wellbutrin XL); WYEFFAT3837782-801 (Zoloft); WYEFFAT2712527-48 (Cymbalta); WYEFFAT05397985-92.

trends for these drugs using IQVIA NPA data.[18]  Although other drugs appear in Wyeth analyses at times,[19] the primary focus was on these top-prescribed "newer" antidepressant drugs.

14.    In line with the position taken in the APA prescribing guidelines,[20] Wyeth analyses state that, although "[n]o one brand is seen as predominantly delivering on efficacy,"[21] the various antidepressants have recognized differences in other characteristics that affect when they are prescribed, including efficacy in addressing specific symptoms, efficacy in addressing the needs of specific patient types,[22] prevalence and severity of side effects (*e.g.*, weight gain, insomnia, depressed libido), and risks of adverse events.[23]  Wyeth portrayed Effexor XR as having "enjoyed a very unique profile"[24] among other therapeutic options due to its ability to achieve and maintain remission among the "still depressed" – *i.e.*, patients who have been under treatment but continue to experience symptoms, which Wyeth estimated to be a large group.[25] Whereas Lexapro was known for its high tolerability, Wellbutrin for its low incidence of sexual dysfunction, and Lexapro and Paxil CR for their efficacy in treating anxiety as well as depression, for example,[26] Wyeth situated Effexor XR's unique benefits in its ability to "break the cycle of unresolved depression … by achieving, sustaining, and going beyond remission to

---

[18]  WYEFFAT04066635-795 at 645; WYEFFAT3811486-531 at 502; WYEFFAT04439199-323 at 299.

[19]  Other drugs mentioned include Remeron, Serzone, Desyrel, and doxepin HCl.  WYEFFAT04066635-795 at 658; WYEFFAT4046009-94; WYEFFAT3942609-950 at 706.

[20]  APA, *op. cit.*, p. 33.

[21]  WYEFFAT3811486-532 at 489 and 526.  Similarly, "no brand distinguishes on efficacy."  WYEFFAT3831694-783 at 728.

[22]  Notably, generalized anxiety disorder, social anxiety disorder, panic disorder, and obsessive-compulsive disorder. Some Wyeth documents compare the commonly prescribed newer antidepressants with respect to their FDA-approved indications besides major depressive disorder (MDD) (*e.g.*, WYEFFAT04066635-795 at 680).  Effexor XR was initially indicated for treatment of MDD only but later acquired additional indications to treat generalized anxiety disorder (FDA, "Final Approved Labeling: Effexor XR," March 11, 1999 (https://www.accessdata.fda.gov/drugsatfda_docs/ label/1999/20699s11bl.pdf); social anxiety disorder (FDA, "FDA approved labeling for NDA 20-699/S-022 [Effexor XR]," February 11, 2003, pp. 8-9 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2003/020699s022lbl.pdf)); and panic disorder (FDA, "Revised label for 'Effexor® XR (venlafaxine hydrochloride) Extended-Release Capsules,'" November 18, 2005, p. 9 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2005/020699s054,057lbl.pdf)).

[23]  WYEFFAT3998680-828 at 760-61; APA, *op. cit.*, pp. 33-44.

[24]  WYEFFAT2624579-703 at 607.

[25]  WYEFFAT3063644-659 at 644-45; WYEFFAT3837669-695 ("Body of Evidence Sales Representative Backgrounder" sheet); WYEFFAT05601966-2029 at 1975-78.

[26]  As one document put it, "Lexapro, Wellbutrin XL, and Cymbalta remain entrenched in their respective areas of perceived advantage: Lexapro = tolerability; Wellbutrin XL = low sexual side effects; Cymbalta = pain." WYEFFAT3811486-532 at 490; WYEFFAT3831694-783 at 728 and 729; WYEFFAT3998680-828 at 736.

---

reduce recurrence."[27]  Thus, as Wyeth explained it,  "Effexor XR is the antidepressant of choice for patients currently on therapy with unresolved symptoms of depression or previously on therapy and experiencing a new episode."[28]  Wyeth surveys showed physicians came to share this view of Effexor XR.  For example, one survey asked physicians to score Effexor XR, Cymbalta (the other SNRI), Wellbutrin XL, and Lexapro, on their value for addressing the needs of specific types of patients or treating specific types of depression.  Physicians rated Effexor XR more highly than other drugs on: appropriateness for "patients whose symptoms are uncontrolled on their current therapy," efficacy in addressing "treatment resistant depression," efficacy in achieving "remission of symptoms of depression," efficacy in treating moderate to severe depression,  proven ability to resolve "key emotional symptoms of depression," and appropriateness for patients who were "previously on therapy but are now experiencing a new episode of depression."[29]  Altogether, Wyeth business documents depict Effexor XR as well-differentiated from other antidepressants in terms of its product characteristics.

15.    Wyeth also tracked possible launches of "non-ABs" – *i.e.*, extended-release venlafaxine drugs that were not AB-rated to Effexor XR.[30]  Osmotica Pharmaceutical submitted an NDA for such a drug, which was approved by the FDA in May 2008 and launched in October 2008. Osmotica paid royalties to Wyeth for use of Wyeth patents.[31]

*Formulary Placement*

16.    As is common among brand manufacturers, Wyeth also tracked Effexor XR's placement on drug formularies, comparing its placement to other antidepressant drugs.  Business documents remark on Effexor XR's "high formulary acceptance & low [formulary] restriction."[32]  In 2001,

---

[27] WYEFFAT3063644-659 at 644-45.  "We need to passionately convey the fact that EFFEXOR XR offers patients the best chance of achieving remission from depression, depression with associated anxiety, or [generalized anxiety disorder]." WYEFFAT4046009-94 at 70.  Wyeth estimated that, because unresolved symptoms are common among people with depression, the scope for increasing Effexor XR prescribing was relatively large.  WYEFFAT3831694-783 at 720; WYEFFAT3811486-532 at 497-98.

[28]  WYEFFAT3831694-783 at 729 and 754.

[29]  WYEFFAT3811486-532 at 528.

[30]  WYEFFAT2670967-979 at 968 and 970.

[31] See Section IV.D. for discussion of the Osmotica product.

[32]  WYEFFAT04066635-795 at 724; WYEFFAT2998944-9003 at 8999.

Effexor XR was placed in Tier 2 or better in 95% of health plans tracked.[33]  In 2004, Wyeth called Effexor XR the "#1 Antidepressant" in terms of access to preferred formulary status, with 97% of plans giving it Tier 2 status or better.[34]  In 2005, over 90% of plans had Effexor XR on Tier 2 without access restrictions, which was above the shares of all the other antidepressants Wyeth tracked.[35]  Wyeth noted that Effexor benefited from the requirement in Medicare Part D plans that all antidepressant drugs be covered and that at least one drug per antidepressant drug class be placed in a "preferred" position;[36] as there were limited numbers of SNRIs, Effexor drugs had especially good prospects of securing Tier 2 placement.[37]  In 2007, Wyeth continued to note that "Effexor XR has great formulary coverage."[38]  In 2008, Effexor XR enjoyed "preferred access" on 93% of commercial plans and 78% of Medicare plans.[39]  Altogether, Effexor XR had favorable coverage compared to other antidepressants.

17.    As mentioned in the main body of this Report, clinical factors generally predominate in formulary placement.[40]  After clinical considerations, health plans may also consider economic

---

[33] WYEFFAT04066635-795 at 718.  Generally, Tier 2 is about as good as a brand drug can do.  Tier 1 is often reserved for generics.  In a three-tier formulary, Tier 2 (with lower cost sharing than Tier 3) might be referred to as the "preferred-brand" tier.

[34] WYEFFAT3998680-828 at 731.

[35] WYEFFAT3831694-783 at 741; WYEFFAT04439199-323 at 222; WYEFFAT2998944-9003 at 8999; WYEFFAT04440742-827 at 763.

[36] J. O'Sullivan, "Medicare Part D Prescription Drug Benefit: A Primer," Congressional Research Service Report for Congress, Order Code RL34280, August 20, 2008, pp. 21-33 (https://www.everycrsreport.com/files/20080820_RL34280_e39d4ec97b3863a3a1184d12f5aa790527fd3174.pdf).

[37] WYEFFAT3998680-828 at 732.  SSRIs and SNRIs were initially categorized separately. For example, see National Opinion Research Center, "Issues in the Design and Implementation of Drug Formularies and Therapeutic Classes," September 28, 2005, p. 11 (https://aspe.hhs.gov/system/files/pdf/74576/report.pdf) and J. Hoadley, et al., "An In-Depth Examination of Formularies and Other Features of Medicare Drug Plans," Kaiser Family Foundation, The Medicare Drug Benefit, April 2006, p. 30 (https://www.kff.org/wp-content/uploads/2013/01/7489.pdf). They were combined into a SSRI/SNRI category in a subsequent revision of the formulary model. U.S. Pharmacopeial Convention, "Final Report, Summary of Methodology and Approach: USP Medicare Model Guidelines v6.0," February 3, 2014 (Revised April 15, 2014), p. 19 (https://www.usp.org/sites/default/files/usp/document/our-work/healthcare-quality-safety/2014-02-03_final_report_uspmmg_v6_0_rev140415.pdf).

[38] WYEFFAT3506918-939 at 926.

[39] WYEFFAT2678650-690 at 679.

[40] A May 2008 white paper by Express Scripts on how they develop their formularies notes that "[c]linical appropriateness of the drug, not cost, is Express Scripts' foremost consideration" and describes that "The [National Pharmacy & Therapeutics] Committee does not have access to, nor does it consider, any information regarding Express Scripts' rebates/negotiated discounts, or the net cost of the drug after application of all discounts. The Committee does not use price, in any way, to make formulary placement decisions." EXPRESS_SCRIPTS_1038_000023-58 at 54-55.

factors, such as rebates.[41]  Drug manufacturers often pay higher rebates for drugs that have a
preferred formulary placement.[42]  Rebates are anchored to a list price set by the manufacturer,
and net price to a purchaser depends on both list price and the percentage rebate.  For example,
as rebates and other sales adjustments increased over time for Effexor XR, Wyeth also increased
the Effexor XR list price by 60% between 2004 and its loss of exclusivity.[43]

***Drugs to be studied as potential economic competitors***

18.    Based on my review of published literature and Wyeth business documents, I instructed
my staff to ask data vendor IQVIA to provide me with wholesale and retail sales information on
all drugs classified by IQVIA as antidepressants, covering the period from 1997 through 2019.[44]

19.    Under my direction, my staff reviewed the IQVIA National Prescription Audit (NPA)
data on antidepressants and prepared it for analysis as follows:

a.    "Drugs" in the IQVIA data were identified as all brand and generic versions of the
same molecule/formulation (*e.g.*, Effexor and Effexor XR are defined as different
drugs).  For convenience, the name of the brand drug is used to refer to both brand

---

[41] "After first taking into account clinical considerations, plan sponsors consider cost in making their formulary
choices." EXPRESS_SCRIPTS_1038_000023-058 at 57.

[42] "Generally, the fewer the drugs offered on the formulary and the greater the incentives to use the formulary's
preferred drugs, the higher the discounts available from manufacturers and, therefore, the lower the cost to the plan
sponsor. …A rebate is simply a retrospective payment that is paid to ESI pursuant to rebate contracts negotiated
independently by ESI with pharmaceutical manufacturers and directly attributable to the utilization of certain
pharmaceuticals by our client's members.  Many factors can affect the amount of the rebate, but in general, higher
rebates are achieved when a plan sponsor adopts a formulary and plan design that provides greater incentives to its
participants to use a formulary (preferred) drug." EXPRESS_SCRIPTS_1038_000023-058 at 57.

[43] 2004 is the earliest list price available in the data.  ProspectoRx data.  Over the same period, Wyeth's rebates and
other sales adjustments only increased by 25% (from 14% in 2004 to 18% in 2009).  WYEFFAT06382990, tabs
"Z2-XR 2005 to 2009" and "PCA-XR 1998 to 2004".  See backup materials.

[44] The USC5 code of "64300 ANTIDEPRESSANTS" identifies antidepressant drugs in the IQVIA data.  The latest
available period was March 2019 (nearly nine years after generic Effexor XR launched) at the time IQVIA filled the
data request. As mentioned in my report, IQVIA data are used extensively to study the economics of the
pharmaceutical industry, including market-wide analyses of changes in prescription drug utilization, as I do in this
report. Third parties Humana and Centene produced claims data in this matter (and I understand additional claims
data may be produced). I reviewed these claims data and found that they are not appropriate for assessing economic
competition nor for defining the relevant market and are inferior to the IQVIA data for several reasons: First, these
data are for specific payers only, rather than the market-wide data from IQVIA.  Second, these data have no
information on whether patient drug discontinuations or switches are for therapeutic or economic reasons.  Third,
these data do not have patient-level eligibility data that would allow me to control for changes in prescribing that are
caused by changes to the number of covered lives, rather than changes in drug utilization trends. Fourth, without
eligibility data it is not possible to limit data to patients who have been enrolled for a given length of time, which is
standard in claims data analyses.

and generic versions of the drug unless otherwise specified.  Details are provided in the spreadsheet, "drug identification & events.xlsx," in the electronic backup materials to this report.

b.  I first singled out 10 top-prescribed "newer" antidepressants regularly analyzed in Wyeth business documents as candidate economic substitutes for the Effexor drugs, as discussed above.  These drugs are shown in the top panel of Table C2; together they accounted for 71.5% of all prescriptions for antidepressants (other than the Effexor family drugs) from November 1997 when Effexor XR launched, until its loss of exclusivity in July 2010.

c.  I then identified another 10 antidepressants in the IQVIA data, including both "older" antidepressants and "newer" drugs outside of the top-prescribed group; MAOI drugs are analyzed as a group, as prescriptions for individual MAOIs are low.[45]  This second set of candidate economic substitutes is shown in the lower panel of Table C2; together they accounted for another 27.4% of all prescriptions over this period.

d.  This results in a list of 20 candidate economic substitutes, shown in Table C2.  Taken together, the two sets of drugs represent 98.8% of all antidepressant prescriptions from November 1997 to July 2010 (excluding prescriptions for the Effexor family drugs).

---

[45]  Together, the MAOI drugs represent one-tenth of one percent of all antidepressant prescriptions (other than those for the Effexor family drugs) in the 1997-2010 period.

TABLE C2
CANDIDATE ECONOMIC SUBSTITUTES FOR EFFEXOR XR

| Brand name | Molecule/formulation | Type |
|---|---|---|
| *Top-prescribed "newer" antidepressants* | | |
| Celexa | Citalopram HBR | SSRI |
| Lexapro | Escitalopram Oxal | SSRI |
| Cymbalta | Duloxetine HCl | SNRI |
| Paxil | Paroxetine HCL | SSRI |
| Paxil CR | Paroxetine HCL ER | SSRI |
| Prozac | Fluoxetine HCL | SSRI |
| Wellbutrin | Bupropion | DNRI |
| Wellbutrin SR | Bupropion SR | DNRI |
| Wellbutrin XL | Bupropion XL | DNRI |
| Zoloft | Sertraline HCL | SSRI |
| *Other antidepressants* | | |
| Luvox | Fluvoxamine MAL | SSRI |
| Desyrel | Trazodone HCL | Serotonin modulator |
| Remeron | Mirtazapine | Norepinephrine-serotonin modulator |
| Serzone | Nefazadone HCL | Serotonin modulator |
| Elavil | Amitriptyline HCL | Tricyclic |
| Pamelor | Nortriptyline HCL | Tricyclic |
| Sinequan | Doxepin HCL | Tricyclic |
| Tofranil | Imipramine HCL | Tricyclic |
| All MAO inhibitors | Various[46] | MAOI |
| *Other form of venlafaxine* | | |
| Effexor IR | Venlafaxine IR | SNRI |

---

[46] See the spreadsheet, "drug identification & events.xlsx," in the electronic backup materials to this report.

**Econometric Methodology and Data**

***Econometric approach for estimating effects of price declines on demand for antidepressant drugs***

20.    The following regression specification was used to estimate the effect of generic entry of drug j on the trend in demand for drug s:

$$q_{st} = a_s + b_s \, time_t + c_s \, months_{jt} + \varepsilon_{st} \qquad [1]$$

where:
| | |
|---|---|
| $q_{st}$ | quantity of drug s sales in month t |
| $time_t$ | number of months since the outset of the estimation period |
| $months_{jt}$ | number of months of generic competition for drug j |
| $\varepsilon_{st}$ | error term |

21.    The base model [1] is estimated using an 18-month "pre" period before the generic enters and an 18-month "post" period after entry occurs.  When drug j is the same as drug s, the specification can be used to estimate the own-price elasticity of demand.  When drug j is different than drug s, the specification can be used to estimate the cross-price elasticity.  This general approach is used:

- To estimate the own-price elasticity of demand for venlafaxine ER (Figure 10 of the main Report and Table C3 of the current attachment);

- To estimate the cross-price elasticities of demand for the candidate economic substitutes with respect to the entry and price decline of venlafaxine ER (Figure 11 in the main Report and Figure C2 in the current attachment);

- To estimate the cross-price elasticities of demand for venlafaxine ER with respect to declines in prices of candidate economic substitutes when their generics entered (Figures 12 and 14 of the main Report)

The model is also estimated using alternative specifications as described below.

***Selection of events to be studied***

22.    For the econometric approach to identify causal effects of a price decline for one drug on demand another, the "pre" trend should provide a reliable projection of what the "post" trend would have been without the price decline of interest.  One implication of this criterion is that no other events should occur in the pre period or post periods (sometimes referred to as the "estimation window") that could be expected to have a discrete and significant effect on the

trend in the drug's prescribing.  Events of the latter type are known as "confounding events" in the event-study literature;[47] examples in the current context include generic entries for other drugs or launch of a line extension.

23.    To ensure that events studied here satisfy these conditions, I first reviewed information on the timing of brand launches and generic entries for the candidate economic substitutes; drugs with confounding events were excluded from the analysis.[48]  For the analysis of symmetric cross-price elasticities (*i.e.*, effects on demand for venlafaxine ER of price declines for other drugs), I analyze generic entries for Prozac, Zoloft, Wellbutrin XL, Lexapro, Cymbalta, and Luvox CR, as these drugs had large price declines upon generic entry and no confounding events affecting Effexor XR demand during the relevant estimation windows.[49]

### Data

24.    To estimate the regression model, I used monthly data from IQVIA's National Prescription Audit (NPA), which reports on drugs dispensed by prescription through retail channels.  As described by IQVIA, the "National Prescription Audit (NPA) is the industry standard for measuring the retail outflow of prescriptions … into the hands of consumer."[50] Channels represented in the NPA data include chain and independent pharmacies; pharmacies in grocery, mass-merchandise, and discount stores; long-term care facilities; and standard and specialty mail-order pharmacies.[51]  The IQVIA data are widely used in economic research on the

---

[47] A.C. MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), 1997, pp. 13-39.

[48] For drug-specific details, see the spreadsheet, "drug identification & events.xlsx," in the electronic backup materials to this report.

[49] *Ibid.*

[50] IQVIA, "National Sales Perspective and National Prescription Audit," 2017, p. 21.

[51] *Ibid.*, p. 23.

pharmaceutical industry[52] and widely used by drug companies, including Wyeth,[53] to track drug sales.

25.    As noted, "drugs" are defined as individual molecule/formulations, *i.e.* brand drugs, plus their generic equivalents if the latter are available.  In the case of the regular cross-price elasticities (Figure 11 in the main Report and Figure C1 in the current attachment), quantity is measured by normalized total extended units (EUs) expressed in an index form to facilitate comparisons across drugs.[54]  Normalization is unnecessary for own-price elasticity and symmetric cross-price elasticities (Figure 12 in the main Report and Table C3 in this current attachment) so quantities in these regressions are measured in natural units.

**Regression Results**

*Own-price elasticity*

26.    Results of the base regression model and related calculations for own-price elasticity, corresponding to the analyses presented in Figure 10 of the report, are shown in Table C3.

---

[52]  For example, E. Berndt, *et al.*, *op. cit.* (1995); S. Ellison, *et al.*, "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," *RAND Journal of Economics*, 28(3), 1997, pp. 426-46; J. Rizzo, *op. cit.*; M. Rosenthal*, et al.*, "Demand effects of recent changes in prescription drug promotion," *Forum for Health Economics and Policy*, 6(1), 2003, pp. 1-27; E. Berndt, M. Kyle, and D. Ling, "The Long Shadow of Patent Expiration: Generic Entry and Rx-to-OTC Switches," in R. Feenstra and M. Shapiro, eds., *Scanner Data and Price Indexes*, University of Chicago Press, 2003, pp. 229-73; A. Ching, "Consumer Learning and Heterogeneity: Dynamics of Demand for Prescription Drugs after Patent Expiration," *International Journal of Industrial Organization*, 28(6), 2010, pp. 619-38; P. Arcidiacono, *et al.*, "Pharmaceutical Followers," *International Journal of Industrial Organization*, 31(5), 2013, pp. 538-53; L. Branstetter, C. Chatterjee, and M. Higgins, "Regulation and Welfare: Evidence from Paragraph IV Generic Entry in the Pharmaceutical Industry," *RAND Journal of Economics*, 47(4), 2016, pp. 857-90.

[53]  *E.g.*, WYEFFAT04069593-709 at 596-603; WYEFFAT04320233-270 at 240 and 256; WYEFFAT04439199-323 at 207-09; WYEFFAT04753684-716 at 687-688; WYEFFAT04066635-795 at 645; WYEFFAT3811486-532 at 502.

[54]  The index of the drug's quantity is equal to the actual quantity, divided by the quantity in the month of the generic entry being studied, times 100.  Thus, the index equals 100 in the month of the generic entry. Quantity is also adjusted to account for the different number of days in a month and year.

---

**TABLE C3**
**REGRESSION RESULTS FOR OWN-PRICE ELASTICITY OF DEMAND**

|  | *Regression Estimates* |
|---|---|
| Initial level (total EUs)[1] | 50,535,308 |
| Monthly trend | -706,433** |
| Change in monthly trend with generic entry | 953,887** |
| Adjusted r-squared | 0.865 |
|  | *Own-Price Elasticity Calculations* |
| *June 2010* | |
| Price per Effexor XR EU prior to generic entry[2] | $4.15 |
| *July 2011* | |
| Quantity of Effexor XR EUs[3] | 52,798,317 |
| Predicted but-for quantity of Effexor XR EUs | 41,351,676 |
| *12-Month Elasticity* | |
| Change in price per EU[4] | -$3.73 |
| Change in quantity of EUs[5] | 11,446,641 |
| Arc elasticity[6] | -0.149 |

_____

Statistical significance:  * p-value of <0.10; ** p-value <0.05.

[1] Fitted value of EUs in June 2010, one month before generic entry.

[2] Last Effexor XR price per EU prior to generic entry, June 2010.

[3] Fitted value of EUs in July 2011.

[4] Change is from June 2010 to July 2011.

[5] Change is fitted actual EUs minus predicted but-for EUs in July 2011.

[6] Arc elasticity = %Δq/%Δp = (Δq/average q)/(Δp/average p).

*Cross-price elasticities*

27.     Figure C1 shows estimated effects of the decline in the price of venlafaxine ER on demand for antidepressants outside of the group of top-prescribed "newer" drugs.  Results for the top-prescribed "newer" drugs were presented in the main Report (Figure 11).  Regression results for all candidate substitutes meeting requirements of the event study are shown in Table C4.

## FIGURE C1
## EFFECTS OF GENERIC ENTRY OF VENLAFAXINE ER ON DEMAND FOR
## OTHER ANTIDEPRESSANT DRUGS[55]



Note: Vertical axes show IQVIA NPA extended units indexed to 100 for the month of generic entry (July 2010).

---

[55] Source: Regression analysis of IQVIA NPA data.

TABLE C4
**ESTIMATED CHANGE IN PRESCRIBING TREND FOR POTENTIAL SUBSTITUTE
DRUGS AFTER ENTRY OF GENERIC EFFEXOR ER**

| | Estimated change in trend[A] | p-value of estimated coefficient |
|---|---|---|
| *Top-prescribed "newer" antidepressants* | | |
| Celexa | 0.223 | 0.282 |
| Lexapro | -0.174 | 0.264 |
| Paxil | 0.311 | 0.134 |
| Paxil CR | 0.378** | 0.009 |
| Prozac | 0.246 | 0.209 |
| Zoloft | -0.023 | 0.865 |
| Cymbalta | 0.539** | 0.003 |
| Wellbutrin | 0.001 | 0.993 |
| Wellbutrin SR | -0.056 | 0.699 |
| Wellbutrin XL | 0.194 | 0.184 |
| *Other antidepressants* | | |
| Luvox | 0.195 | 0.191 |
| Desyrel | 0.020 | 0.909 |
| Remeron | 0.081 | 0.571 |
| Serzone | 0.133 | 0.383 |
| Elavil | 0.090 | 0.635 |
| Pamelor | -0.116 | 0.464 |
| Sinequan | 0.669** | 0.000 |
| Tofranil | -0.097 | 0.487 |
| MAO Inhibitors | 0.163 | 0.319 |
| *Other form of venlafaxine* | | |
| Venlafaxine IR | -1.643** | 0.000 |

[A] Estimate of coefficient c in equation [1].
Statistical significance:  * p-value of <0.10; ** p-value <0.05.

28.     Recall that evidence for economic substitutability in these regressions takes the form of a negative and statistically significant estimated coefficient on the change in trend in sales in response to the price fall associated with generic entry for venlafaxine ER.  Among the top-prescribed newer antidepressants in Table C4, there are no negative and statistically significant coefficients for the change in trend.  Among the other antidepressants in Table C4 there are also

no negative statistically significant coefficients with the exception of venlafaxine IR, results for which are discussed in the body of the Report.[56]

### *Symmetric cross-price elasticities*

29.     Regression results for the candidate substitutes meeting the requirements for an event study are shown in Table C5.  Evidence for substitutability similarly takes the form of a negative and statistically significant estimated coefficient on the trend in Effexor XR sales in response to a price fall from generic entry for a candidate substitute drug.  Table C5 reports no statistically significant negative coefficients except for Wellbutrin XL with a borderline statistical significance of 0.07.  This weak result does not constitute meaningful evidence for economic substitutability when interpreted in the context of Wellbutrin XL's null results in Table C4 (the effect of generic Effexor XR entry on Wellbutrin XL sales), and the null results for two alternative specifications of symmetric cross-price elasticities below (Table C8).

TABLE C5
ESTIMATED CHANGE IN PRESCRIBING TREND FOR EFFEXOR ER AFTER
GENERIC ENTRIES FOR OTHER ANTIDEPRESSANT DRUGS

|  | Estimated change in trend[A] | p-value of estimated coefficient |
|---|---|---|
| *Top-prescribed "newer" antidepressants* | | |
| Prozac | 416,699.8** | 0.000 |
| Zoloft | 32,156.6 | 0.742 |
| Wellbutrin XL | -161,124.5* | 0.070 |
| Lexapro | 179,355.7** | 0.007 |
| Cymbalta | 152,567.4** | 0.047 |
| *Other antidepressants* | | |
| Luvox CR | -17,181.8 | 0.808 |
| *Other form of venlafaxine* | | |
| Venlafaxine IR | 20,068.5 | 0.832 |
| [A] Estimate of coefficient c in equation [1].  Statistical significance:  * p-value of <0.10; ** p-value <0.05. | | |

---

[56]  I also tested the effect of Effexor XR generic entry on sales of the Osmotica non-AB product and found a negative and statistically significant relationship.  The estimated equation is included in the backup materials.  In the context of a profit split for the Osmotica product with Wyeth, the negative relationship is evidence for a "diversion ratio" – a share of Wyeth Effexor XR sales are diverted to Osmotica in response to a price increase for Effexor XR.

*Sensitivity analyses*

30.     As sensitivity analyses, three variants of the base model [1] are estimated.  First, I re-estimate the main specification using an estimation window of 12 months before and after the month of generic entry, instead of 18 months as in the base model.  Compared to the main specification, there are no meaningful differences in results when the estimation period is changed (Tables C6-C8 below).

31.     Second, whereas my main specification, referred to as a linear spline, only allows the slope to change at the time of generic entry, I estimate an alternate specification, referred to as an Interrupted Time Series Analysis (ITSA), which allows the intercept of the regression to change when the generic enters in addition to the change in the slope.  In addition to evaluating the slope and level changes separately, the ITSA allows calculation of the combined effect of any change in the intercept and slope of the time trend.  The following ITSA regression specification was used to estimate the effect of generic entry of drug j on the trend in demand for drug s:

$$q_{st} = a_s + b_s \, time_t + c_s \, post_{jt} + d_s \, (post_{jt} * time_t) + \varepsilon_{st} \qquad [2]$$

where:
| | |
|---|---|
| $q_{st}$ | quantity of drug s sales in month t |
| $time_t$ | number of months since generic competition |
| $post_{jt}$ | binary variable indicating post-generic competition for drug j |
| $\varepsilon_{st}$ | error term |

Compared to the main specification, there are no meaningful differences in results when an ITSA is used instead of the linear spline (Tables C6-C8 below).

32.     Third, to account for potential autocorrelation, I re-estimate the base model [1] using the "newey" procedure in Stata 18.0, which provides Newey-West standard errors that are robust to heteroskedasticity and autocorrelation.  Autocorrelation refers to a correlation between a variable's error terms – that is, if there is autocorrelation, a variable's current value is related to its prior value, and thus its residuals are related over time.[57]  Note that autocorrelation (if present) does not impact the coefficient estimates, it only impacts the standard errors, and thus has the potential to impact the statistical significance of the results.  Newey-West standard errors

---

[57]  J. Wooldridge, *Introductory Econometrics: A Modern Approach, 5th Edition*, South-Western Pub, Mason, 2013, Chapter 10, p. 353.

are a robust and well-established control for autocorrelation in time-series data.[58]  To properly control for autocorrelation, one needs first to specify the pattern of autocorrelation.[59]

33.    The Newey-West method requires specifying the numbers of "lags" up to which it will correct for autocorrelation of the errors.  A lag of one represents that the error term of each value is correlated to the error term of the previous value in the time series; a lag of two represents that the error term of each value is correlated to the error term of the value two back in the time series; and so on.  Econometric literature provides guidelines to determine the appropriate number of maximum lags to specify for a Newey-West analysis given the sample size available for estimation.  Generally, the shorter the time series, the fewer lags can be reasonably accounted for.  Based on this literature, I calculated that, when analyzing 37 months of data with the Newey-West method, two to three lags is a reasonable maximum.[60]  Of course if there is no autocorrelation in the data, there is no need to correct for it.  The Cumby-Huizinga (C-H) test is the standard econometric approach to assessing the presence of autocorrelation.[61]  I used this test to determine the number of lags to use (up to 3) for the Newey-West analysis of each drug of interest.  Results of the Newey-West estimation of the models are minimally different from those of the base model, as shown in Tables C6-C8 below.

*Own-price elasticity*

34.    The sensitivity analyses for the own-price elasticity of demand calculations are presented in Table C6 below.  Comparing these results to the main specification reported in Table C3 shows that the results are robust to these alternative specifications of the model (shorter

---

[58] W. Newey and K. West, "A Simple Positive Semi-Definite, Heteroskedasticity and Autocorrelation Consistent Covariance Matrix," *Econometrica*, 55(3), 1987, pp. 703-08 (hereafter "Newey and West 1987"); W. Newey and K. West, "Automatic Lag Selection in Covariance Matrix Estimation," *Review of Economic Studies*, 61(4), 1994, pp. 631-53.

[59] C. Baum, M. Schaffer, and S. Stillman, "Enhanced Routines for Instrumental Variables/Generalized Method of Moments Estimation and Testing," *The Stata Journal*, 7(4), 2007, pp. 465-506.

[60] Newey and West 1987 suggests a lag of $4(n/100)^{2/9}$.  J. Stock, and M. Watson, *Introduction to Econometrics*, Pearson, 2020 (Equation 16.17) suggests a lag choice of $0.75(n^{1/3})$. Section 12.4, page 432 in Wooldridge, *op. cit.* suggests 12 or 24 lags, *assuming the data allows for it*, and presents the following formulas that accounts for sample size (n): $4(n/100)^{2/9}$ or $n^{1/4}$.  Using our sample size of n=37 and rounding to the nearest integer, the formula $4(n/100)^{2/9}$ yields 3 as the appropriate number of lags, $0.75(n^{1/3})$ yields 2, and $n^{1/4}$ yields 2.  The application of these formulas concludes that two to three lags are appropriate for a sample of this size.

[61] R. Cumby and J. Huizinga, "Testing the Autocorrelation Structure of Disturbances in Ordinary Least Squares and Instrumental Variables Regressions," *Econometrica*, 60(1), 1992, pp. 185–95.  The C-H test was conducted at three lags using STATA command *actest*.

estimation period of 12-months pre/post generic entry, ITSA model, and Newey-West models to allow autocorrelation corrections).  As compared to the main specification, the shorter estimation window reduces the estimated own-price elasticity of demand.  The ITSA specification estimates a slightly larger change in quantity of EUs relative to the but-for quantity than that estimated by the main specification (13.6 million versus 11.4 million), but the own-price elasticity is very similar.  For the Newey-West models, as expected the regression coefficients are identical, but the standard errors are slightly different, but these differences do not impact the interpretation of the results.

**TABLE C6**
**SENSITIVITY ANALYSES : OWN-PRICE ELASTICITY OF DEMAND**

| | *Regression Estimates* | | |
|---|---|---|---|
| | *12-month* | *ITSA* | *Newey-West* |
| Initial level (total EUs)[1] | 51,336,449 | 49,537,118 | 50,535,308 |
| Monthly trend | -469,358** | -794,509** | -706,433** |
| Overall impact of generic entry | N/A | 10,700,339** | N/A |
|     Change in monthly trend with generic entry | 534,484** | 971,038** | 953,887** |
|     Change in level with generic entry | N/A | 1,960,995** | N/A |
| Adjusted r-squared | 0.655 | 0.879 | 0.865 |

| | *Own-Price Elasticity Calculations* | | |
|---|---|---|---|
| ***June 2010*** | | | |
| Price per Effexor XR EU prior to generic entry[2] | $4.15 | $4.15 | $4.15 |
| ***July 2011*** | | | |
|     Quantity of Effexor XR EUs[3] | 51,648,609 | 52,821,958 | 52,798,317 |
|     Predicted but-for quantity of Effexor XR EUs | 45,234,800 | 39,208,504 | 41,351,676 |
| ***12-Month Elasticity*** | | | |
| Change in price per EU[4] | -$3.73 | -$3.73 | -$3.73 |
| Change in quantity of EUs[5] | 6,413,809 | 13,613,454 | 11,446,641 |
| Arc elasticity[6] | -0.081 | -0.181 | -0.149 |

---

Statistical significance:  * p-value of <0.10; ** p-value <0.05.

[1] Fitted value of EUs in June 2010, one month before generic entry.

[2] Last Effexor XR price per EU prior to generic entry, June 2010.

[3] Fitted value of EUs in July 2011.

[4] Change is from June 2010 to July 2011.

[5] Change is fitted actual EUs minus predicted but-for EUs in July 2011.

[6] Arc elasticity = %Δq/%Δp = (Δq/average q)/(Δp/average p).

*Cross-price elasticities*

35.     Table C7 below shows the sensitivity analyses for the estimated effects of the decline in the price of venlafaxine ER at the time of Effexor XR generic entry on demand for other antidepressants.  Comparing these results to the main specification reported in Table C4 shows that the results are robust to these alternative specifications of the model (shorter estimation period of 12-months pre/post generic entry, the ITSA model specification, and Newey-West autocorrelation corrections.  In the shorter estimation model, Pamelor is negative and marginally statistically significant (with a p-value of 0.096, it's just below the 0.10 cut-off for assessing statistical significance at the 10% confidence level), however, the main specification and the other sensitivity specifications do not find a statistically significant cross-price elasticity between Pamelor and Effexor XR.  This weak result in Table C7 does not constitute material evidence for economic substitutability in the context of the other null results in Tables C4 and C7 and all the other evidence showing Wyeth had substantial market power with respect to Effexor XR.

TABLE C7
SENSITIVITY ANALYSES: ESTIMATED CHANGE IN PRESCRIBING TREND FOR POTENTIAL
SUBSTITUTE DRUGS AFTER ENTRY OF GENERIC EFFEXOR ER[62]

| | Estimated impact of generic entry | | | | | |
|---|---|---|---|---|---|---|
| | 12-month[A] | p-value | ITSA[B] | p-value | Newey-West[A] (lag months) | p-value |
| Top-prescribed "newer" antidepressants | | | | | | |
| Celexa | 0.131 | 0.684 | 1.152 | 0.660 | 0.223 (1) | 0.192 |
| Lexapro | -0.199 | 0.531 | -0.301 | 0.915 | -0.174 (3) | 0.143 |
| Paxil | -0.039 | 0.900 | 1.200 | 0.662 | 0.311* (1) | 0.079 |
| Paxil CR | -0.034 | 0.911 | 4.290 | 0.147 | 0.378** (3) | 0.000 |
| Prozac | -0.139 | 0.672 | 0.546 | 0.845 | 0.246 (3) | 0.100 |
| Zoloft | -0.264 | 0.415 | -0.873 | 0.741 | -0.023 (3) | 0.778 |
| Cymbalta | 0.358 | 0.292 | 2.276 | 0.435 | 0.539** (3) | 0.000 |
| Wellbutrin | -0.382 | 0.248 | 0.380 | 0.899 | 0.001 (3) | 0.991 |
| Wellbutrin SR | -0.414 | 0.239 | 1.586 | 0.604 | -0.056 (3) | 0.626 |
| Wellbutrin XL | -0.356 | 0.273 | 1.049 | 0.719 | 0.194* (3) | 0.092 |
| Other antidepressants | | | | | | |
| Luvox | 0.010 | 0.975 | 1.950 | 0.490 | 0.195** (3) | 0.048 |
| Desyrel | -0.380 | 0.323 | 1.079 | 0.714 | 0.020 (3) | 0.888 |
| Remeron | -0.081 | 0.816 | 2.203 | 0.386 | 0.081 (3) | 0.508 |
| Serzone | -0.306 | 0.373 | 0.797 | 0.802 | 0.133 (3) | 0.232 |
| Elavil | -0.422 | 0.219 | 0.081 | 0.978 | 0.090 (3) | 0.556 |
| Pamelor | -0.606* | 0.096 | -0.620 | 0.834 | -0.116 (3) | 0.328 |
| Sinequan | 0.363 | 0.331 | 5.222* | 0.080 | 0.669** (3) | 0.000 |
| Tofranil | -0.441 | 0.155 | -0.845 | 0.766 | -0.097 (3) | 0.303 |
| MAO Inhibitors | 0.051 | 0.876 | 1.530 | 0.565 | 0.163* (3) | 0.088 |
| Other form of venlafaxine | | | | | | |
| Venlafaxine IR | -1.853** | 0.000 | -18.650** | 0.000 | -1.643** (3) | 0.000 |

[A] Estimate of coefficient c in equation [1].
[B] Estimate of overall differential effect of generic entry, accounting for level and trend changes.
Statistical significance:  * p-value of <0.10; ** p-value <0.05.

---

[62] See backup materials for full regression results.

*Symmetric cross-price elasticities*

36.     Table C8 below shows the sensitivity analyses for the estimated effects on venlafaxine ER of other antidepressants' generic entries.  Comparing these results to the main specification reported in Table C5 shows that the results are robust to these alternative specifications of the model (shorter estimation period of 12-months pre/post generic entry, ITSA model, and Newey-West models to allow autocorrelation corrections).  The magnitude of the estimated impact of generic entry is impacted by the shorter specification, and especially by the ITSA, but the conclusions are unchanged in those models.  Specifically, as with the main specification, the 12-month and the ITSA specification do not find any negative and statistically significant estimated coefficients, indicating a lack of finding of economic substitutability. For the Newey-West models, only the p-values are affected, and the impact to the statistical significance conclusions is very similar.  As with the main specification of symmetric cross-price elasticities (Table C5), I estimate that Wellbutrin XL has a negative and statistically significant coefficient, however, the significance is slightly increased in the Newey-West model as compared to the main specification (in the main specification the finding is only marginally statistically significant).[63] The other sensitivity specifications for symmetric cross-price elasticities do not find a statistically significant result for Wellbutrin XR (Table C8: 12-month and ITSA models). Additionally, both the main specification and sensitivity analyses for *direct* cross-price elasticity analyses (the impact of Effexor XR generic entry on demand of Wellbutrin XL) find no evidence of economic substitution between Wellbutrin XL and Effexor XR (Tables C4 and C7).  In fact, the Newey-West specification estimates that there is statistically significant *positive* effect of Effexor XR generic entry on Wellbutrin XL (Table C7), implying that Wellbutrin XL and Effexor XR are economic *complements*, rather than substitutes.  Taken together, these results do not constitute meaningful evidence for economic substitutability.

---

[63]  See ¶ 29 in this Attachment.

TABLE C8
SENSITIVITY ANALYSES: ESTIMATED CHANGE IN PRESCRIBING TREND FOR EFFEXOR ER
AFTER GENERIC ENTRIES FOR OTHER ANTIDEPRESSANT DRUGS[64]

| | Estimated impact of generic entry | | | | | |
|---|---|---|---|---|---|---|
| | 12-month[A] | p-value | ITSA[B] | p-value | Newey-West[A] (lag months) | p-value |
| Top-prescribed "newer" antidepressants | | | | | | |
| Prozac | 536,337.5** | 0.000 | 3,534,464.6** | 0.000 | 416,699.8** (1) | 0.000 |
| Zoloft | -107,874.5 | 0.539 | 747,155.7 | 0.654 | 32,156.6 (0) | 0.742 |
| Wellbutrin XL | -181,300.3 | 0.153 | -817,605.5 | 0.568 | -161,124.5** (1) | 0.019 |
| Lexapro | 19,333.8 | 0.852 | 3,462,823.8** | 0.001 | 179,355.7** (3) | 0.011 |
| Cymbalta | 240,138.9 | 0.165 | 1,370,828.2 | 0.171 | 152,567.4** (3) | 0.002 |
| Other antidepressants | | | | | | |
| Luvox CR | -146,891.4 | 0.209 | -837,443.3 | 0.364 | -17,181.8 (3) | 0.761 |
| Other form of venlafaxine | | | | | | |
| Venlafaxine IR | -50,968.5 | 0.731 | 1,619,951.1 | 0.349 | 20,068.5 (0) | 0.832 |

[A] Estimate of coefficient c in equation [1].
[B] Estimate of overall differential effect of generic entry, accounting for level and trend changes.
Statistical significance: * p-value of <0.10; ** p-value <0.05.

[64] See backup materials for full regression results.

**ATTACHMENT D**













**ATTACHMENT E**

**ATTACHMENT E**
**SUMMARY OF TEVA'S FORECASTS OF GENERIC ENTRY**

| Forecast Date | Assumed Generic Entry Date | Assumed Effexor XR Sales at Generic Entry (millions) | Notes |
|---|---|---|---|
| 7/9/2003 | June 2008 | [not legible] | The forecast assumes Teva would face competition from an AG. |
| 9/13/2006 | June 2008 | $1,903 | The e-mail attaching the forecast indicates Teva "decided to adjust the forecast down 30% based on the information we have for desvenlafaxine."<br><br>The forecast assumes Teva would face competition from an AG even though the Agreement did not permit Wyeth to launch an AG. Again, contradicting the forecast, the Agreement did not permit Teva to enter in June 2008 unless Effexor XR sales were substantially smaller (<$500 million) or another generic entered. These assumptions may have been vestiges from forecasting efforts from before the Agreement. |
| 12/21/2006 | June 2008 | $500 | Entry dates and sales totals match the acceleration clause trigger level from the Agreement. |
| | October 2009 | $1,000 | Consistent with the Agreement, both scenarios assume Teva would not face competition from an AG. |
| | July 2010 | $2,600 | Entry date matches the Agreement. Consistent with the Agreement, the scenario assumes Teva would not face competition from an AG. |
| 3/4/2008 | July 2010 | $2,778 | The model notes that this "assumes 15% of the market will have been canabalized [sic] due to entrance of nonAB rated sun product and pristiq."<br><br>Teva did not model its profits from launching through the acceleration clauses in this forecast nor in later forecasts.<br><br>Entry date matches the Agreement. Consistent with the Agreement scenarios assume Teva would not face competition from an AG. |

Notes

See WYEFFAT2163587 (7/9/2003 model); TEVA_EFFEX_0440656 attaching TEVA_EFFEX_0440657 (9/13/2006 model - sum D11* S18 from each tab to calculate the market size); TEVA_EFFEX_0863426 attaching TEVA_EFFEX_0863427 (12/21/2006 model – see cell G24 in each tab describing the market size); TEVA_EFFEX_0443328 attaching TEVA_EFFEX_0443329 (3/4/2008 model- sum D11* S18 from each tab to calculate the market size).

In addition to the quote in the notes tab, the 3/4/2008 model notes further that "Doc's [sic] are stating that they do not see added value of pristiq over venla xr … Wyeth has had problems with getting it approved. Will launch pristiq in 2Q08, only for MDD but will not get menopausal symptom indication until 2009. Therefore may not get managed care buy in until sometime in 2009. In addition this is assumed to expand the mkt vs canabalize [sic] it. The sun product at this point 2/2008 has not launched. Wyeth is not concerned with this product and has deciced [sic] not to sue. Sun stated that they really don't have a strategy at this point and will wait and see once they launch what to persue [sic] … For the above reasons the mkt has been increased."

**ATTACHMENT F**





**ATTACHMENT G**

ATTACHMENT G
STOCK PRICE STUDY

*Event Study Methods*

1.      I have applied this event study methodology in several published peer-reviewed papers.[1] The methodology is based on MacKinlay[2] and other literature as indicated in the notes below. The methodology (i) follows general principles of applied microeconomics, (ii) has been widely used and accepted in a variety or contexts,[3]  and (iii) has been applied to Paragraph IV litigation and settlement outcomes.[4]

2.      The logic of the stock price study is based on the observation that if patent litigation settlement had not been fully anticipated by investors, the announcement of an agreement delaying generic entry should push the brand firm's stock price up as investors incorporate the new information about additional anticompetitive profits into their expectations about earnings.[5]

---

[1]  K. Drake, M. Starr and T. McGuire, "Do 'Reverse Payment' Settlements Constitute an Anticompetitive Pay-for-Delay?" *International Journal of the Economics of Business,* 22(2), 2015, pp. 173-200; T. McGuire, *et al.*, "Resolving Reverse-Payment Settlements with the Smoking Gun of Stock Price Movements," *Iowa Law Review*, 101(4), 2016, pp. 1581-99; K. Drake and T. McGuire, "Stock Price Evidence for Anticompetitive Effects in the Nexium 'Reverse-Payment' Settlement,'" *Journal of Competition Law & Economics*, 12(4), 2016, pp. 735-47; and R. Hartman, K. Drake, and T. McGuire, "Event Study Analysis in Cases with Multiple Brand-Generic Reverse-Payment Settlements," *International Journal of the Economics of Business*, 26(3), 2019, pp. 399-410.  I have also coauthored a recently released working paper updating the Drake, Starr and McGuire (2015) paper above. See K. Drake and T. McGuire, "Using Stock Price Movements to Estimate the Harm from Anticompetitive Drug Patent Litigation Settlements," NBER Working Paper 33196, November 2024 (https://www.nber.org/papers/w33196).

[2]  A.C. MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), 1997, pp. 13-39.

[3]  For example, Fama reviewed "a smattering of the rich results produced by event studies in corporate finance." See E. Fama, "Efficient Capital Markets: II," *Journal of Finance*, 46(5), 1991, pp. 1575-1617.  For more recent applications in the pharmaceutical industry, see K. Girotra, C. Terwiesch, and K. Ulrich, "Valuing R&D Projects in a Portfolio: Evidence from the Pharmaceutical Industry," *Management Science*, 53(9), 2007, pp. 1452-66; A. Sharma, and N. Lacey, "Linking Product Development Outcomes to Market Valuation of the Firm: The Case of the U.S. Pharmaceutical Industry," *Journal of Product Innovation Management*, 21, 2004, pp. 297-308; and S. Ellison, and W. Mullin, "Gradual Incorporation of Information: Pharmaceutical Stocks and the Evolution of President Clinton's Health Care Reform," *Journal of Law and Economics*, 44(1), 2001, pp. 89-129.

[4]  See L. Panattoni, "The Effect of Paragraph IV Decisions and Generic Entry Before Patent Expiration on Brand Pharmaceutical Firms," *Journal of Health Economics*, 30(1), 2011, pp. 126-45; R. Jacobo-Rubio, J. Turner, and J. Williams, "The Distribution of Surplus in the US Pharmaceutical Industry: Evidence from Paragraph IV Patent-Litigation Decisions," *Journal of Law and Economics*, 63(2), 2020, pp. 203-38; Drake, Starr, and McGuire, *op. cit.*; McGuire, *et al.* (2016), *op. cit.*; Drake and McGuire (2016), *op. cit.*; and Hartman, Drake, and McGuire, *op. cit.*  The Drake, Starr and McGuire publication was recognized as the "Article of the Year" for 2015 in the *International Journal of the Economics of Business*.

[5]  For example, see McGuire, *et al.* (2016), *op. cit.*, pp. 1582-83 and Drake and McGuire (2016), *op. cit.*, p. 741 and 747.

3.      An "event window" defines the day or days during which the market is assumed to react to new information.  Event windows are characterized by a pair of integers with the first indicating the day the window opens in relation to the event day and the second indicating the day the window closes.  Thus, a (-1,1) window includes three days:  the day before (-1), the day of the event (0), and the day after (1).

4.      In the main text of this report and in Tables G.1-G.4 below, event study results for Wyeth are shown for single trading days (*i.e.*, a (0,0) event window).  However, in Attachment G.1-G.4, I conduct sensitivity analyses using six alternative event windows (for a total of seven) as was done in my published research.[6]  Specifically, I check stock price movements for a window defined as the date of the event, and then a series of symmetric windows that begin one, two or three days before the event and end one, two or three days after the event, and finally, asymmetric windows that begin on the event day and extend up to three days after.

5.      Defining "abnormal returns" requires taking a difference between the actual return and the expected return. The expected return is calculated after estimating each of the following three regression models with OLS and based on the estimation window sample of data from the 120 trading days ending 30 days prior to the event (a period of time referred to as the "estimation window" in event studies):

Equation 1 (Comparison Period Model): $R^t = \mu + \varepsilon$

Equation 2 (Market Model): $R^t = \alpha + \beta(MR^t) + \varepsilon$

Equation 3 (Fama-French Model)[7]: $R^t_{FFM} = \gamma + \theta(MR^t - RF^t) + s(SMB^t) + h(HML^t) + \varepsilon$

where $R^t$ is the daily Wyeth's actual stock price return at date t – without dividends; $MR^t$ is the overall market return at day t measured by changes in the S&P 500; $RF^t$ is the risk free return;[8] $R^t_{FFM} = R^t$- $RF^t$; $SMB^t$ is the excess return of small-cap over large-cap stocks and $HML^t$ is the excess return of value over growth stocks.  Data for $RF^t$, $SMB^t$, and $HML^t$ were downloaded from the financial data library compiled by French.[9]  $\mu$, $\alpha$, $\beta$, $\gamma$, $\theta$, s, and h are parameters to be estimated; and $\varepsilon$ is an error term.

---

[6] Drake, Starr and McGuire (2015), *op. cit.*

Attachment G.5 includes the combined Wyeth results for all four events.  Attachment G.6-G.9 include results for Teva.  I use stock price data for Wyeth, Teva, and the S&P 500 from the S&P Capital IQ database (https://www.spglobal.com/en).

[7] This model is also known as the Three-Factor Model and is widely used in event studies.  See E. Fama and K. French, "Common Risk Factors in the Returns on Stocks and Bonds," *Journal of Financial Economics,* 33(1), 1993, pp. 3–56.

[8] The risk-free rate is the return on a short-term government bond; here the one-month U.S Treasury bill.

[9] See Kenneth French's website (http://mba.tuck.dartmouth.edu/pages/faculty/ken.french/Data_Library/f-f_factors.html) accessed April 16, 2025.

6.    Expected returns are calculated in three different ways based on specifications in Equations 1, 2, and 3.  From Equation 1, the expected return, $\hat{R}^t = \hat{\mu}$, is simply the estimated mean return to Wyeth stock during the estimation period.

7.    From Equation 2, I calculate the expected return as $\hat{R}^t = \hat{\alpha} + \hat{\beta}(MR^t)$ where $\hat{\alpha}$ and $\hat{\beta}$ are coefficient estimates.

8.    From Equation 3, I calculate the expected return as $\hat{R}^t_{FFM} = \hat{\gamma} + \hat{\theta}(MR^t - RF^t) + \hat{s}(SMB^t) + \hat{h}(HML^t)$. $\hat{\gamma}$, $\hat{\theta}$, $\hat{s}$, and $\hat{h}$ are coefficient estimates.

9.    Using the corresponding expected returns from each model, I then calculate abnormal returns during the event window as the difference between the Wyeth actual stock return at time t, $R^t$, and the estimated expected return at time t.  For specifications using multiday event windows, the abnormal return is calculated on a cumulative basis ("cumulative abnormal return") by adding together the abnormal returns on the days in the event window.

10.    Daily stock price returns are assumed to be approximately normally distributed, so I calculate a t-statistic for each event window to conduct a parametric statistical test of the abnormal returns.  The t-statistic is the ratio of the abnormal return over the standard error of the abnormal returns.  For the single-day event window, the standard error is equal to the estimated standard deviation of the daily abnormal returns in the estimation window;[10] for multiday event windows, the standard error is the estimated standard deviation of the daily abnormal returns in the estimation window multiplied by the square root of the number of days in the event window.[11]

### Wyeth Situation Prior to the Agreement

11.    As described in the main text of my report, Judge Martini ruled against Wyeth after a pretrial Markman hearing related to patent claim construction.  Financial analysts believed Wyeth was likely to lose the patent litigation because of the ruling.  For example:

- Citigroup (September 11, 2005): "Our detailed (yet preliminary) analysis of the Effexor XR patent challenge suggests a 30%-40% probability of [Wyeth] prevailing in the District Court.  Following the August 29 Markman hearing, it appears Teva took the early lead in the litigation.  Surprisingly, the Judge ruled in favor of Teva's narrow interpretation of 'extended release formulation'.  While our legal consultants believe the ruling will likely be overturned, this setback incrementally increases the probability Teva may have designed around the

---

[10]  For the single-day event window results reported below, I also determine statistical significance using a "Samples Quantiles" (SQ) test.  An SQ test is a non-parametric test of whether the observed change in stock price falls in the usual range of values.  See J. Gelbach, E. Helland, and J. Klick, "Valid Inference in Single-Firm, Single-Event Studies," *American Law and Economics Review*, 15(2), 2013, pp. 495-541.  For the SQ test, I rank the absolute value of each abnormal return for all trading days starting 150 days before the first event date (10/19/2005) through the 99th day after the first event.  This period includes all the events.  P-values are calculated as the rank for each day divided by the total number of days (*i.e.*, 250).

[11]  MacKinlay, *op. cit.*, p. 21.

patents; if overturned, the prospects of a [Wyeth] win increase to ~50%/50% …. Interestingly, relative to expectations embedded in the stock, we believe a 30%-40% probability is actually a positive for shares of [Wyeth], given the widespread modeling assumption of generic entry to Effexor XR in June 2008."[12]

- Morgan Stanley (September 28, 2005): "We believe that the market is likely correct in its assumption that generic versions of Effexor XR will come to market in 2008, based the [sic] analysis of our legal consultants.  While the upcoming trial, set to commence on October 11, could go again the generic challenger, Teva, we see less than a 10% probability of this outcome."[13]

### *Wyeth and Teva Announce Agreement on Principle Terms of Settlement*

12.    On October 18, 2005, Wyeth and Teva announced that they had "reached agreement on the principal terms of a settlement" of the Effexor XR patent litigation.[14]  The terms of the settlement were described as "confidential" and the parties noted that the agreement depended on the "review of the settlement by the FTC and the approval of the District Court."[15]

13.    Although no terms were disclosed, financial analysts generally viewed the announcement as a positive for Wyeth compared to litigation with little prospect of winning.  For example:

- Deutsche Bank (October 18, 2005): "We suspect that WYE is settling [the patent litigation] now to extend exclusivity by 18 months to 2 years, and that Teva is willing to do so, for the certainty of a launch well before 2017, and of 180 days of exclusivity."[16]

- JPMorgan (October 18, 2005): "Settlement announcement – a modest positive. Overall, we believe that investors have valued Wyeth with the expectation of a loss on the infringement action and generic competition consequently beginning in June 2008.  Our models (and we believe, Street consensus) have also reflected this view.  The settlement therefore can only create upside, in the form of avoided litigation and appeals costs, and the possibility that Wyeth obtains some value in

---

[12]  G. Grofik, "WYE: Effexor XR Patents in Focus; A Call Option for Investors," Citigroup Equity Research, September 11, 2005, p. 1.

[13]  J. Rubin, N. Yu, and C. Garcia-Tunon, "Wyeth: Effexor XR Extension a Long Shot, but Not Out of the Question," Morgan Stanley Equity Research, September 28, 2005, p. 1.

[14]  Wyeth, "Form 8-K, Pursuant to Section 13 OR 15(d) of the Securities and Exchange Act of 1934, date of report October 18, 2005" (sec.gov/Archives/edgar/data/5187/000000518705000056/form8k.htm).

[15]  Teva Press Release, "Teva and Wyeth Announcement Settlement of Effexor XR® Litigation," *Dow Jones Newswires*, October 18, 2005, 4:05 PM.

[16]  B. Ryan, "Wyeth: WYE Likely to Extend Effexor XR Exclusivity," Deutsche Bank Equity Research, October 18, 2005.

the settlement, possibly up to the equivalent of a few months' earnings from Effexor XR – an amount that would not significantly change our valuation."[17]

- Cowen & Company (October 19, 2005): "We raised our investment opinion on Wyeth post yesterday's surprise settlement between Wyeth and Teva regarding the Effexor XR patent litigation."[18]

- UBS (October 19, 2005): "Although no details have been provided on this 'agreement in principal,' such a settlement would very likely delay, or ease the erosion of Effexor XR vs. our current (and we believe consensus) projections for full-scale generic competition in 2008."[19]

14.    Some analysts speculated that the deal might include a reverse payment from Wyeth to Teva in the form of a no-AG clause:

- Morgan Stanley (October 18, 2005):  "While terms were not disclosed and the deal is subject to approval by the FTC and the court, there seems to be plenty of room for a win-win agreement …. **WYE may have agreed not to launch an authorized generic, which could have undercut Teva's profits during its 180 day exclusivity period** …. Since we were expecting Teva to prevail in court and launch its generic in 2008, any extension to Effexor XR's exclusivity is a positive for WYE" (emphasis added).[20]

- CIBC (October 18, 2005): "Deal likely has two real benefits-date certain early entry and **avoidance of authorized generic by WYE** assuming court victory by Teva" (emphasis added).[21]

- Citigroup (October 19, 2005): "We have previously characterized this litigation as a call option (at little, if any, cost) for investors since the Street has widely assumed Effexor XR loses exclusivity in June '08.  **Although speculative, assuming a deal structured similar to the recent BRL/KOSP settlemt.**, Effexor's exclusivity could be extended past June '08, potentially providing out-

---

[17]  C. Shibutani and B. Hau, "Wyeth: Effexor XR Litigation Settled in Principle: Wyeth & Teva Keep Their Cards Close to the Vest," JPMorgan Equity Research, October 18, 2005, p. 2.

[18]  S. Scala, *et al.*, "Wyeth: Settlement of the Effexor XR Patent Litigation A Material Positive Surprise," Cowen & Company, October 19, 2005, p. 1.

[19]  C. Seiden, R. Patel, and G. Suvannavejh, "Wyeth: Effexor Deal, if Closed (Risks Remain) Could Remove Biggest Overhang," UBS Investment Research, October 19, 2005, p. 1.

[20]  J. Rubin, N. Yu, and C. Garcia-Tunon, "Wyeth: Effexor XR Settlement an Incremental Positive," MorganStanley Equity Research, October 18, 2005.

[21]  E. Wilbur and K. McCrea, "Teva Pharmaceutical: Settles Effexor XR Patent Challenge; A Positive (We Think) But How Much & When?" CIBC World Markets Equity Research, October 18, 2005, p. 1.

year EPS upside, and lengthening the conversion window to DVS-233 [Pristiq]" (emphasis added).[22]

15.     As described above, the "market model" uses regression analysis to adjust for trends in the stock itself and general market movements in order to isolate the effect of the event (here, the announcement of the Wyeth-Teva Agreement) on the changes in stock prices.  Figure G.1 shows the adjusted change in market capitalization[23] derived from using the market model in the days leading up to and following the announcement of the Wyeth-Teva Agreement.  As shown in Table G.1 below, the market model indicates that Wyeth's stock price increased by 2.65% after adjusting for movements in the overall market.[24]  The percentage increase is statistically significant and corresponds to a change of +$1.6 billion in Wyeth's market capitalization.

---

[22]  G. Grofik, "WYE: Effexor XR Settlement; More Positive News – Reiterate Buy," Citigroup Equity Research, October 19, 2005.  The "KRL/KOSP" settlement referred to in the quote resolved patent litigation related to the drug Niaspan.  The Niaspan settlement has been described as including a "possible" reverse payment.  See S. Hemphill, "An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition," *Columbia Law Review*, 109(4),2009, pp. 629-87 at pp. 648-49.

[23]  Market capitalization is equal to the stock price multiplied by the number of outstanding shares and represents the total value of a firms' shares.

[24]  Although the agreement was announced on October 18, 2005, I center my analysis on October 19, 2005 because the announcement was made after the market close. See Fn. 15 above.

**FIGURE G.1**
**ADJUSTED CHANGE IN WYETH'S MARKET CAPITALIZATION**
**AROUND THE WYETH-TEVA AGREEMENT**



TABLE G.1
WYETH STOCK PRICE MOVEMENTS AROUND THE ANNOUNCEMENT OF AGREEMENT OVER
"PRINCIPAL TERMS" OF A WYETH-TEVA SETTLEMENT

| Date | Days From Event | Abnormal Return | Standard p-value | SQ Test p-value | Adjusted Market Cap Change ($M) |
|------|-----------------|-----------------|------------------|-----------------|----------------------------------|
| 10/14/2005 | -3 | -1.31% | 0.21 | 0.14 | -$797 |
| 10/17/2005 | -2 | 0.29% | 0.78 | 0.74 | $174 |
| 10/18/2005 | -1 | -0.01% | 1.00 | 1.00 | -$3 |
| 10/19/2005 | 0 | 2.65% | 0.01 | 0.03 | $1,601 |
| 10/20/2005 | 1 | -0.38% | 0.72 | 0.65 | -$236 |
| 10/21/2005 | 2 | -2.88% | 0.01 | 0.02 | -$1,785 |
| 10/24/2005 | 3 | -0.08% | 0.94 | 0.95 | -$50 |

16.     Analysts viewed the FTC's review of the settlement as a potential roadblock.  For example, a report from Oppenheimer noted that the "FTC could still nix this deal as anti-competitive.  On first glance, it has the appearance of a pay-off to remove litigation risk, and thus keep cheaper generic competition off the market."[25]

17.     Several other events occurred around October 19, 2005 that may have had a positive influence on Wyeth's stock price.  For example, Wyeth released scientific data related to a low-dose contraceptive it was developing;[26] a Wyeth scientist presented preclinical data of a potential cancer treatment;[27] and Wyeth won a $31 million contract from U.S. Health & Human Services to develop vaccines to prevent HIV.[28]  However, financial analysts ignored these other events and instead wrote extensively about how the agreement with Teva on principal settlement terms impacted Wyeth's stock price, indicating the stock price movements were largely due to the settlement announcement.

18.     As shown in Table G.1, Wyeth's stock price significantly decreased on October 21, 2005, two days after the agreement with Teva on principal settlement terms.  Wyeth reported its quarterly earnings to investors on this day, which by some accounts were below expectations.[29]

---

[25]  S. Henry and J. Molloy, "Wyeth: WYE Puts Out First Effexor Fire," Oppenheimer, October 19, 2005, p. 1.

[26]  A. Picard, "New Birth-Control Pill Promises Freedom from Periods, PMS," *The Globe and Mail*, October 18, 2005 (https://www.theglobeandmail.com/life/new-birth-control-pill-promises-freedom-from-periods-pms/article18250375).

[27]  "Oxford Biomedica PLC – Wyeth Preclinical Data," *Regulatory News Service*, October 19, 2005.

[28]  "Wyeth Pharmaceuticals Wins $31.82 Million Contract," *US Fed News*, October 19, 2005.

[29]  For example, see L. Lloyd, "One-Time Charges Drag Down Wyeth Profits," *Philadelphia Inquirer*, October 21, 2005.

***Wyeth and Teva Announce Terms of the Wyeth-Teva Agreement***

19.     On November 3, 2005, Wyeth submitted an 8-K form to the SEC indicating Wyeth and Teva had "negotiated definitive agreements for the proposed settlement" of the Effexor XR patent litigation.  The form 8-K noted that the Effexor XR license would be "exclusive for a specified period and then non-exclusive."  It also provided the generic entry dates for Effexor XR (July 1, 2010) and Effexor IR (June 15, 2006); noted that both were "subject to earlier launch based on specified market conditions"; and indicated that "Teva would pay Wyeth specified percentages of gross profit from sales of each of the Teva generic versions."  The form noted the license for Teva to sell generic versions of Effexor XR in Canada but did not provide detail.[30]

20.     Financial analysts generally viewed the settlement terms as a positive for Wyeth.  For example:

- Deutsche Bank (November 3, 2005): "WYE Settlement Adds Two Years to Effexor XR exclusivity… in line with our previously stated expectation that the settlement would extend the exclusivity period by 18-24 months.  This is clearly a positive for WYE, although expectations on the Street may have assumed an even longer extension."[31]

- Bear Stearns (November 3, 2005): "WIN/WIN SCENARIO FOR WYE; DCF VALUE OF SETTLEMENT PEGGED AT $3/SHARE CONTINGENT ON ROYALTY RATE.  The IR generic in '06 was a surprise, but we do not expect any EPS impact since IR formulation has $160M in annual sales and WYE's royalty likely neutralizes generic impact.  We do not expect an IR generic to impact branded XR volume."[32]

- Cowen & Co (November 3, 2005): "The basis for our recent raised investment opinion of Wyeth was reduced risk of generics to Effexor XR in 6/08.  The news today suggests that generics to Effexor XR will not launch until July 2010, giving Wyeth plenty of time to establish DVS-233.  We reiterate our positive view on Wyeth…"[33]

---

[30]  Wyeth, "Form 8-K, Pursuant To Section 13 OR 15(d) of the Securities and Exchange Act of 1934, date of the report November 2, 2005," (sec.gov/Archives/edgar/data/5187/000000518705000058/form8k.htm).  Financial analysts described the Canada license as "largely irrelevant given the product size in that market and anticipated patent expiry of January 2006 in Canada and likely additional competition." K. Cacciatore, *et al.*, "Teva Pharmaceutical: Effexor XR Litigation Settlement Terms Appear Reasonable," Cowen & Co. Equity Research, November 3, 2005, p. 1.

[31]  B. Ryan and R. Muken, "Wyeth Alert: WYE Announces Terms of Settlement with Teva for Effexor XR," Deutsch Bank Equity Research, November 3, 2005.

[32]  J. Boris and R. Jashnani, "Wyeth: Transparency on Effexor XR Settlement Increasing," Bear Stearns Equity Research, November 3, 2005, p. 1.

[33]  S. Scala, *et al.*, "Wyeth: Effexor Deal Terms Appear Favorable for Wyeth," Cowen & Company, November 3, 2005, p. 1.

- UBS (November 3, 2005): "This would meaningfully reduce the biggest risk for WYE (we assumed WYE would lose the patent defense) by delaying the Effexor XR 'cliff' by 2 yrs (mid '08 to mid '10), and reducing the size of the cliff by allowing DVS-233 (Effexor's successor) 2 more yrs of pre-generic marketing. Earlier generics for immediate release Effexor (mid '06) is not significant (about 5% of franchise)."[34]

21.    As shown in Table G.2, Wyeth's stock price increased by 1.04% after adjusting for movements in the overall market, which is not statistically significant at conventional levels. It corresponds to a change of +$613 million in Wyeth's market capitalization. The market's reaction to the earlier announcement about the agreement in principal may have incorporated some anticipation of the actual terms.[35]

TABLE G.2
WYETH STOCK PRICE MOVEMENTS AROUND THE ANNOUNCEMENT
OF THE TERMS OF THE WYETH-TEVA AGREEMENT

| Date | Days From Event | Abnormal Return | Standard p-value | SQ Test p-value | Adjusted Market Cap Change ($M) |
|---|---|---|---|---|---|
| 10/31/2005 | -3 | -0.89% | 0.39 | 0.30 | -$535 |
| 11/1/2005 | -2 | -1.56% | 0.14 | 0.09 | -$930 |
| 11/2/2005 | -1 | -0.19% | 0.86 | 0.82 | -$110 |
| 11/3/2005 | 0 | 1.04% | 0.32 | 0.24 | $613 |
| 11/4/2005 | 1 | 0.54% | 0.61 | 0.51 | $324 |
| 11/7/2005 | 2 | -0.33% | 0.75 | 0.70 | -$197 |
| 11/8/2005 | 3 | -0.61% | 0.56 | 0.44 | -$368 |

22.    Although the settlement terms were generally viewed positively for Wyeth, financial analysts noted that the FTC's approval was still a risk. For example:

- UBS (November 3, 2005): "FTC approval" is one of the "main risks that could still potentially preclude [Wyeth] from benefitting from this settlement."[36]

- Bear Stearns (November 3, 2005): "We note WYE/TEVA designed the settlement to receive FTC approval and that FTC review is a fluid process. However, a

---

[34]  C. Seiden, R. Patel, and G. Suvannavejh, "Wyeth: Teva Settlement Delays and Shrinks Effexor Cliff – Big Positive," UBS Investment Research, November 3, 2005, p. 1.

[35]  For example, one report concluded that "we believe this settlement is a strong positive for WYE (albeit one which was signaled when the existence of this deal was first announced about 2 weeks ago)…" *Ibid.*, p. 2.

[36]  *Ibid.*

negative FTC decision is still a risk, especially in light of SGP's K-DUR settlement, where the FTC is pushing for a review by the Supreme Court."[37]

- JPMorgan (December 1, 2005): "If the FTC objects to the settlement, Wyeth and Teva can amend the agreement and resubmit it for review …. In what we believe to be a very unlikely event, the parties might be unable to agree on how to amend the settlement to address FTC concerns.  If this happens, Wyeth and Teva would return to the courtroom to resolve their dispute.  But after having decided on a settlement and negotiated a full agreement, we think the chances are low that the two companies would fail to agree on a resolution of any FTC concerns.  Nonetheless, we note that Wyeth shares have been under pressure recently, in what could be excess caution about this unlikely worst-case scenario.  We think such concerns are overblown."[38]

### The FTC Chooses Not to Challenge the Wyeth-Teva Agreement

23.     On December 2, 2005, the FTC decided that it would not challenge Wyeth-Teva Agreement.[39]  Financial analysts viewed this as a positive for Wyeth.  For example:

- Bear Sterns (December 2, 2005): "WIN/WIN OPPORTUNITY REALIZED AS FTC DOES NOT OBJECT TO EFFEXOR XR SETTLEMENT W/ TEVA.  We previously raised our 5-yr EPD CAGR +9% from +4% as WYE preserves exclusivity through 2010 on its most important brand ….  The approval removes a significant overhang."[40]

- Citigroup (December 4, 2005): Today's news will likely extend Effexor XR's exclusivity an additional 2 years (through mid-2010).  As a result, we increase our Effexor sales forecasts, which raises our 2007-10 EPS & revenue…"[41]

24.     As shown in Table G.3, Wyeth's stock price increased by 4.71% after adjusting for movements in the overall market.  The percentage increase is statistically significant and corresponds to a change of +$2.6 billion in Wyeth's market capitalization.

---

[37]  Boris and Jashnani, *op. cit.*, p. 1.

[38]  C. Shibutani and B. Hau, "Wyeth: Clarifications and Details: Bifeprunox and Effexor XR," JPMorgan Equity Research, December 1, 2005, pp. 1-2.

[39]  The FTC has a broad mandate and limited resources, thomso practically cannot challenge every agreement it views as problematic.  For example, see FTC, "Thomas B. Leary, Remarks Before the Class Action Litigation Summit, Washington, D.C.," June 26, 2003, p. 1 (https://www.ftc.gov/news-events/news/speeches/ftc-class-actions), describing how the FTC had about 500 lawyers and economists and responsibility "for enforcement of federal laws prohibiting false and deceptive practices" in "virtually the entire economy."

[40]  J. Boris and R. Jashnani, "Wyeth: FTC Approves Win/Win Effexor Settlement," Bear Stearns Equity Research, December 2, 2005, p. 1.

[41]  G. Grofik, "WYE: Good News Continues; FTC Will Not Block Effexor XR Settlement," Citigroup Equity Research, December 4, 2005, p. 1.

TABLE G.3
WYETH STOCK PRICE MOVEMENTS AROUND THE ANNOUNCEMENT OF THE FTC'S DECISION
NOT TO CHALLENGE THE WYETH-TEVA AGREEMENT

| Date | Days From Event | Abnormal Return | Standard p-value | SQ Test p-value | Adjusted Market Cap Change ($M) |
|------|------|------|------|------|------|
| 11/29/2005 | -3 | -2.45% | 0.02 | 0.03 | -$1,412 |
| 11/30/2005 | -2 | -0.59% | 0.57 | 0.46 | -$335 |
| 12/1/2005 | -1 | -1.76% | 0.09 | 0.07 | -$984 |
| 12/2/2005 | 0 | 4.71% | 0.00 | 0.00 | $2,607 |
| 12/5/2005 | 1 | -1.08% | 0.30 | 0.21 | -$626 |
| 12/6/2005 | 2 | -0.18% | 0.86 | 0.84 | -$102 |
| 12/7/2005 | 3 | 0.13% | 0.90 | 0.90 | $75 |

25.     There was a significant decline in Wyeth's stock in two days leading up to the FTC's decision.  On November 29, 2005, Wyeth's development partners announced that a product launch in Europe would be delayed by approximately two years, which some analysts interpreted as a negative for Wyeth.[42]

### District Court Accepts the Wyeth-Teva Agreement

26.     On January 13, 2006, Wyeth announced that the US District Court had accepted the terms of the Wyeth-Teva Agreement.[43]  Financial analysts seemed to place little significance on this event.[44]  As shown in Table G.4, Wyeth's stock price increased by 1.15% after adjusting for movements in the overall market.  The percentage increase is significant at the 0.27 level (and 0.18 level for the SQ test) and corresponds to a change of +$733 million in Wyeth's market capitalization.

---

[42]  For example, see C. Shibutani and B. Hau, "Wyeth: Bifeprunox Update," JPMorgan Equity Research, November 28, 2005.

[43]  Wyeth, "Form 8-K, Pursuant to Section 13 OR 15(d) of the Securities Exchange Act of 1934, Date of Report January 13, 2006," (https://www.sec.gov/Archives/edgar/data/5187/000000518706000002/form8k.htm).

[44]  I could not find any analyst reports which mentioned it.

### TABLE G.4
### WYETH STOCK PRICE MOVEMENTS AROUND THE ANNOUNCEMENT OF THE DISTRICT COURT'S DECISION TO ACCEPT THE TERMS OF THE WYETH-TEVA AGREEMENT

| Date | Days From Event | Abnormal Return | Standard p-value | SQ Test p-value | Adjusted Market Cap Change ($M) |
|------|------|------|------|------|------|
| 1/10/2006 | -3 | 0.51% | 0.62 | 0.54 | $328 |
| 1/11/2006 | -2 | -1.05% | 0.31 | 0.22 | -$676 |
| 1/12/2006 | -1 | 0.64% | 0.54 | 0.41 | $408 |
| 1/13/2006 | 0 | 1.15% | 0.27 | 0.18 | $733 |
| 1/17/2006 | 1 | -0.28% | 0.79 | 0.74 | -$182 |
| 1/18/2006 | 2 | -0.22% | 0.83 | 0.77 | -$144 |
| 1/19/2006 | 3 | -0.35% | 0.74 | 0.68 | -$226 |

Attachment G.1. Wyeth Stock Price Analysis of the Announcement of Agreement Over "Principal Terms" of a Wyeth-Teva Settlement

| | | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | 10/19/2005 | 3.58% | 3.18 | 0.00 | $2,168 |
| | | (-1,1) | 1.55% | 0.80 | 0.43 | $945 |
| | | (-2,2) | -0.79% | -0.31 | 0.75 | -$479 |
| | | (-3,3) | -0.62% | -0.21 | 0.83 | -$380 |
| | | (0,1) | 2.22% | 1.40 | 0.17 | $1,345 |
| | | (0,2) | -0.58% | -0.30 | 0.77 | -$350 |
| | | (0,3) | 0.39% | 0.17 | 0.86 | $237 |
| | Market Model | 10/19/2005 | 2.65% | 2.53 | 0.01 | $1,601 |
| | | (-1,1) | 2.26% | 1.25 | 0.21 | $1,378 |
| | | (-2,2) | -0.33% | -0.14 | 0.89 | -$197 |
| | | (-3,3) | -1.72% | -0.62 | 0.54 | -$1,046 |
| | | (0,1) | 2.27% | 1.54 | 0.13 | $1,374 |
| | | (0,2) | -0.61% | -0.34 | 0.74 | -$368 |
| | | (0,3) | -0.69% | -0.33 | 0.74 | -$418 |
| | Fama-French 3-Factor Model | 10/19/2005 | 2.42% | 2.40 | 0.02 | $1,463 |
| | | (-1,1) | 1.15% | 0.66 | 0.51 | $700 |
| | | (-2,2) | -1.21% | -0.54 | 0.59 | -$733 |
| | | (-3,3) | -2.45% | -0.92 | 0.36 | -$1,489 |
| | | (0,1) | 1.45% | 1.02 | 0.31 | $877 |
| | | (0,2) | -1.24% | -0.71 | 0.48 | -$751 |
| | | (0,3) | -1.00% | -0.50 | 0.62 | -$608 |

Attachment G.2. Wyeth Stock Price Analysis of the Announcement of the Terms of the Wyeth-Teva Agreement

| | | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | 11/3/2005 | 1.29% | 1.14 | 0.25 | $761 |
| | | (-1,1) | 2.25% | 1.15 | 0.25 | $1,321 |
| | | (-2,2) | 0.24% | 0.09 | 0.92 | $142 |
| | | (-3,3) | -1.07% | -0.36 | 0.72 | -$641 |
| | | (0,1) | 1.82% | 1.14 | 0.26 | $1,075 |
| | | (0,2) | 1.61% | 0.83 | 0.41 | $952 |
| | | (0,3) | 0.76% | 0.34 | 0.74 | $448 |
| | Market Model | 11/3/2005 | 1.04% | 0.99 | 0.32 | $613 |
| | | (-1,1) | 1.39% | 0.77 | 0.44 | $817 |
| | | (-2,2) | -0.49% | -0.21 | 0.83 | -$295 |
| | | (-3,3) | -2.00% | -0.72 | 0.47 | -$1,196 |
| | | (0,1) | 1.58% | 1.07 | 0.29 | $932 |
| | | (0,2) | 1.25% | 0.69 | 0.49 | $739 |
| | | (0,3) | 0.64% | 0.31 | 0.76 | $378 |
| | Fama-French 3-Factor Model | 11/3/2005 | 0.68% | 0.67 | 0.50 | $400 |
| | | (-1,1) | 0.42% | 0.24 | 0.81 | $245 |
| | | (-2,2) | -1.44% | -0.64 | 0.52 | -$862 |
| | | (-3,3) | -3.19% | -1.20 | 0.23 | -$1,915 |
| | | (0,1) | 0.72% | 0.51 | 0.61 | $428 |
| | | (0,2) | 0.18% | 0.10 | 0.92 | $104 |
| | | (0,3) | -0.68% | -0.34 | 0.74 | -$400 |

Attachment G.3. Wyeth Stock Price Analysis of the Announcement of the FTC's Decision Not to Challenge the Wyeth-Teva Agreement

| | | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | 12/2/2005 | 4.71% | 4.19 | 0.00 | $2,606 |
| | | (-1,1) | 2.45% | 1.26 | 0.21 | $1,369 |
| | | (-2,2) | 1.31% | 0.52 | 0.60 | $738 |
| | | (-3,3) | -1.37% | -0.46 | 0.65 | -$789 |
| | | (0,1) | 3.46% | 2.17 | 0.03 | $1,914 |
| | | (0,2) | 3.34% | 1.71 | 0.09 | $1,849 |
| | | (0,3) | 3.13% | 1.39 | 0.17 | $1,732 |
| | Market Model | 12/2/2005 | 4.71% | 4.51 | 0.00 | $2,607 |
| | | (-1,1) | 1.87% | 1.03 | 0.30 | $1,043 |
| | | (-2,2) | 1.10% | 0.47 | 0.64 | $617 |
| | | (-3,3) | -1.22% | -0.44 | 0.66 | -$705 |
| | | (0,1) | 3.63% | 2.46 | 0.02 | $2,010 |
| | | (0,2) | 3.46% | 1.91 | 0.06 | $1,911 |
| | | (0,3) | 3.59% | 1.72 | 0.09 | $1,983 |
| | Fama-French 3-Factor Model | 12/2/2005 | 4.38% | 4.34 | 0.00 | $2,422 |
| | | (-1,1) | 1.47% | 0.84 | 0.40 | $821 |
| | | (-2,2) | 0.21% | 0.09 | 0.92 | $120 |
| | | (-3,3) | -2.10% | -0.79 | 0.43 | -$1,210 |
| | | (0,1) | 3.20% | 2.24 | 0.03 | $1,769 |
| | | (0,2) | 2.92% | 1.67 | 0.10 | $1,614 |
| | | (0,3) | 2.91% | 1.44 | 0.15 | $1,611 |

Attachment G.4. Wyeth Stock Price Analysis of the Announcement of the District Court's Decision to Accept the Terms of the Wyeth-Teva Agreement

|  |  | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | 1/13/2006 | 1.20% | 1.07 | 0.29 | $769 |
|  |  | (-1,1) | 0.88% | 0.45 | 0.65 | $563 |
|  |  | (-2,2) | -0.46% | -0.18 | 0.85 | -$297 |
|  |  | (-3,3) | -0.01% | 0.00 | 1.00 | -$6 |
|  |  | (0,1) | 0.67% | 0.42 | 0.68 | $427 |
|  |  | (0,2) | 0.17% | 0.09 | 0.93 | $110 |
|  |  | (0,3) | 0.16% | 0.07 | 0.94 | $100 |
|  | Market Model | 1/13/2006 | 1.15% | 1.10 | 0.27 | $733 |
|  |  | (-1,1) | 1.51% | 0.83 | 0.41 | $959 |
|  |  | (-2,2) | 0.23% | 0.10 | 0.92 | $146 |
|  |  | (-3,3) | 0.39% | 0.14 | 0.89 | $249 |
|  |  | (0,1) | 0.87% | 0.59 | 0.56 | $553 |
|  |  | (0,2) | 0.64% | 0.35 | 0.72 | $410 |
|  |  | (0,3) | 0.29% | 0.14 | 0.89 | $186 |
|  | Fama-French 3-Factor Model | 1/13/2006 | 0.96% | 0.95 | 0.34 | $615 |
|  |  | (-1,1) | 0.96% | 0.55 | 0.58 | $613 |
|  |  | (-2,2) | -0.62% | -0.28 | 0.78 | -$399 |
|  |  | (-3,3) | -1.01% | -0.38 | 0.71 | -$642 |
|  |  | (0,1) | 0.65% | 0.45 | 0.65 | $414 |
|  |  | (0,2) | 0.49% | 0.28 | 0.78 | $311 |
|  |  | (0,3) | -0.18% | -0.09 | 0.93 | -$114 |

Attachment G.5. Wyeth Stock Price Analysis of All Four News Events

| | | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | (0,0) | 10.79% | 4.79 | 0.00 | $6,304 |
| | | (-1,1) | 7.14% | 1.83 | 0.07 | $4,198 |
| | | (-2,2) | 0.30% | 0.06 | 0.95 | $105 |
| | | (-3,3) | -3.07% | -0.52 | 0.61 | -$1,817 |
| | | (0,1) | 8.17% | 2.57 | 0.01 | $4,761 |
| | | (0,2) | 4.55% | 1.17 | 0.25 | $2,561 |
| | | (0,3) | 4.44% | 0.99 | 0.33 | $2,516 |
| | Market Model | (0,0) | 9.54% | 4.57 | 0.00 | $5,554 |
| | | (-1,1) | 7.03% | 1.94 | 0.05 | $4,196 |
| | | (-2,2) | 0.51% | 0.11 | 0.91 | $272 |
| | | (-3,3) | -4.55% | -0.82 | 0.41 | -$2,698 |
| | | (0,1) | 8.35% | 2.83 | 0.01 | $4,869 |
| | | (0,2) | 4.74% | 1.31 | 0.19 | $2,693 |
| | | (0,3) | 3.83% | 0.92 | 0.36 | $2,130 |
| | Fama-French 3-Factor Model | (0,0) | 8.44% | 4.18 | 0.00 | $4,900 |
| | | (-1,1) | 4.00% | 1.14 | 0.25 | $2,379 |
| | | (-2,2) | -3.06% | -0.68 | 0.50 | -$1,873 |
| | | (-3,3) | -8.75% | -1.64 | 0.10 | -$5,257 |
| | | (0,1) | 6.02% | 2.11 | 0.04 | $3,489 |
| | | (0,2) | 2.34% | 0.67 | 0.50 | $1,278 |
| | | (0,3) | 1.05% | 0.26 | 0.79 | $489 |

Attachment G.6. Teva Stock Price Analysis of the Announcement of Agreement Over "Principal Terms" of a Wyeth-Teva Settlement

| | | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | 10/19/2005 | 5.07% | 4.00 | 0.00 | $1,069 |
| | | (-1,1) | 4.35% | 1.98 | 0.05 | $917 |
| | | (-2,2) | 8.86% | 3.13 | 0.00 | $1,842 |
| | | (-3,3) | 11.65% | 3.48 | 0.00 | $2,416 |
| | | (0,1) | 4.35% | 2.43 | 0.02 | $918 |
| | | (0,2) | 7.52% | 3.43 | 0.00 | $1,588 |
| | | (0,3) | 10.14% | 4.01 | 0.00 | $2,140 |
| | Market Model | 10/19/2005 | 3.77% | 3.35 | 0.00 | $796 |
| | | (-1,1) | 5.33% | 2.74 | 0.01 | $1,124 |
| | | (-2,2) | 9.50% | 3.78 | 0.00 | $1,975 |
| | | (-3,3) | 10.14% | 3.41 | 0.00 | $2,103 |
| | | (0,1) | 4.42% | 2.77 | 0.01 | $932 |
| | | (0,2) | 7.48% | 3.84 | 0.00 | $1,579 |
| | | (0,3) | 8.65% | 3.84 | 0.00 | $1,825 |
| | Fama-French 3-Factor Model | 10/19/2005 | 3.72% | 3.38 | 0.00 | $784 |
| | | (-1,1) | 4.68% | 2.45 | 0.02 | $986 |
| | | (-2,2) | 9.07% | 3.69 | 0.00 | $1,886 |
| | | (-3,3) | 10.00% | 3.43 | 0.00 | $2,073 |
| | | (0,1) | 3.95% | 2.54 | 0.01 | $834 |
| | | (0,2) | 7.26% | 3.81 | 0.00 | $1,533 |
| | | (0,3) | 8.72% | 3.96 | 0.00 | $1,839 |

Attachment G.7. Teva Stock Price Analysis of the Announcement of the Terms of the Wyeth-Teva Agreement

| | | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | 11/3/2005 | 1.45% | 1.14 | 0.26 | $336 |
| | | (-1,1) | -0.50% | -0.23 | 0.82 | -$117 |
| | | (-2,2) | 0.20% | 0.07 | 0.94 | $45 |
| | | (-3,3) | 3.92% | 1.17 | 0.24 | $882 |
| | | (0,1) | 0.23% | 0.13 | 0.90 | $54 |
| | | (0,2) | -0.50% | -0.23 | 0.82 | -$117 |
| | | (0,3) | 1.08% | 0.43 | 0.67 | $250 |
| | Market Model | 11/3/2005 | 1.10% | 0.98 | 0.33 | $255 |
| | | (-1,1) | -1.69% | -0.86 | 0.39 | -$394 |
| | | (-2,2) | -0.81% | -0.32 | 0.75 | -$187 |
| | | (-3,3) | 2.64% | 0.89 | 0.38 | $595 |
| | | (0,1) | -0.10% | -0.06 | 0.95 | -$23 |
| | | (0,2) | -1.00% | -0.51 | 0.61 | -$232 |
| | | (0,3) | 0.92% | 0.41 | 0.68 | $213 |
| | Fama-French 3-Factor Model | 11/3/2005 | 0.86% | 0.78 | 0.43 | $201 |
| | | (-1,1) | -2.08% | -1.09 | 0.28 | -$487 |
| | | (-2,2) | -1.08% | -0.44 | 0.66 | -$249 |
| | | (-3,3) | 2.36% | 0.81 | 0.42 | $531 |
| | | (0,1) | -0.64% | -0.41 | 0.68 | -$148 |
| | | (0,2) | -1.60% | -0.84 | 0.40 | -$371 |
| | | (0,3) | 0.12% | 0.06 | 0.96 | $28 |

Attachment G.8. Teva Stock Price Analysis of the Announcement of the FTC's Decision Not to Challenge the Wyeth-Teva Agreement

|  |  | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | 12/2/2005 | 1.73% | 1.36 | 0.18 | $433 |
|  |  | (-1,1) | 2.20% | 1.00 | 0.32 | $546 |
|  |  | (-2,2) | 3.11% | 1.10 | 0.27 | $782 |
|  |  | (-3,3) | 4.63% | 1.38 | 0.17 | $1,158 |
|  |  | (0,1) | 1.16% | 0.65 | 0.52 | $292 |
|  |  | (0,2) | 3.56% | 1.62 | 0.11 | $892 |
|  |  | (0,3) | 4.68% | 1.85 | 0.07 | $1,173 |
|  | Market Model | 12/2/2005 | 1.73% | 1.53 | 0.13 | $433 |
|  |  | (-1,1) | 1.40% | 0.72 | 0.48 | $346 |
|  |  | (-2,2) | 2.81% | 1.12 | 0.27 | $707 |
|  |  | (-3,3) | 4.83% | 1.62 | 0.11 | $1,209 |
|  |  | (0,1) | 1.40% | 0.88 | 0.38 | $352 |
|  |  | (0,2) | 3.71% | 1.91 | 0.06 | $931 |
|  |  | (0,3) | 5.31% | 2.36 | 0.02 | $1,331 |
|  | Fama-French 3-Factor Model | 12/2/2005 | 1.55% | 1.41 | 0.16 | $388 |
|  |  | (-1,1) | 1.34% | 0.70 | 0.48 | $331 |
|  |  | (-2,2) | 2.76% | 1.12 | 0.26 | $694 |
|  |  | (-3,3) | 4.95% | 1.70 | 0.09 | $1,237 |
|  |  | (0,1) | 1.16% | 0.74 | 0.46 | $290 |
|  |  | (0,2) | 3.46% | 1.82 | 0.07 | $867 |
|  |  | (0,3) | 5.00% | 2.27 | 0.02 | $1,253 |

Attachment G.9. Teva Stock Price Analysis of the Announcement of the District Court's Decision to Accept the Terms of the Wyeth-Teva Agreement

| | | Event Window | Cumulative Abnormal Return (%) | t-Statistic | p-Value | Change in Market Cap ($ Millions) |
|---|---|---|---|---|---|---|
| 120-Day Estimation Window (-150,-31) | Comparison period Model | 1/13/2006 | -0.57% | -0.45 | 0.65 | -$150 |
| | | (-1,1) | -2.42% | -1.11 | 0.27 | -$642 |
| | | (-2,2) | -3.21% | -1.13 | 0.26 | -$856 |
| | | (-3,3) | -2.26% | -0.67 | 0.50 | -$597 |
| | | (0,1) | -2.13% | -1.19 | 0.24 | -$563 |
| | | (0,2) | -2.15% | -0.98 | 0.33 | -$568 |
| | | (0,3) | -1.89% | -0.74 | 0.46 | -$498 |
| | Market Model | 1/13/2006 | -0.65% | -0.57 | 0.57 | -$171 |
| | | (-1,1) | -1.57% | -0.80 | 0.42 | -$415 |
| | | (-2,2) | -2.26% | -0.90 | 0.37 | -$602 |
| | | (-3,3) | -1.71% | -0.57 | 0.57 | -$451 |
| | | (0,1) | -1.86% | -1.17 | 0.25 | -$491 |
| | | (0,2) | -1.50% | -0.77 | 0.44 | -$397 |
| | | (0,3) | -1.70% | -0.76 | 0.45 | -$450 |
| | Fama-French 3-Factor Model | 1/13/2006 | -0.67% | -0.61 | 0.54 | -$177 |
| | | (-1,1) | -1.73% | -0.91 | 0.37 | -$457 |
| | | (-2,2) | -2.45% | -0.99 | 0.32 | -$653 |
| | | (-3,3) | -1.81% | -0.62 | 0.54 | -$479 |
| | | (0,1) | -1.88% | -1.21 | 0.23 | -$498 |
| | | (0,2) | -1.32% | -0.69 | 0.49 | -$348 |
| | | (0,3) | -1.47% | -0.67 | 0.51 | -$388 |

**ATTACHMENT H**

## ATTACHMENT H

### THE TIMING OF ENTRY FOR LATER-FILING GENERICS FOR DRUGS SIMILAR TO EFFEXOR XR

1.      In this Attachment, I examine the timing of entry of later-filing generic firms for drugs that are similar to Effexor XR, *i.e.*, top-selling drugs with a retained 180-day regulatory exclusivity period for a first-filing generic (or multiple generics).  I find that the 11-month period with only one generic version of Effexor XR is an outlier.  For each of the other drugs I examined, the later-filing generics either entered soon after the regulatory exclusivity period expired or had a license to do so and presumably would have (had the first filer not forfeited its regulatory exclusivity period because of regulatory problems with the FDA).

2.      To conduct this empirical study, I started with a list of 37 drugs with patent litigation settlements that were reached between 2002 and 2008 (around the time of the Wyeth-Teva Agreement), in which the agreement allowed a first filer to retain its regulatory exclusivity period (at the time they settled).[1]  Of these 37 drugs, I examined the experience of 14 top-selling drugs (other than Effexor XR) with at least $500 million in annual pre-generic brand sales.[2]

3.      I searched the internet for news of settlements and generic entry.  I also examined ANDA approval letters that were available on the FDA's Drugs@FDA database.[3]  I confirmed the generic launch dates using the FDA's National Drug Code Directory, which has a field containing the company-reported start marketing dates.[4]

4.      Of the 14 drugs with at least $500 million in pre-generic annual sales, the generic entry experiences for the 12 drugs listed in Table H.1 are informative as to how generic entry for Effexor XR likely would have played out absent the reverse payments and market division.  For each of the drugs, a later-filing generic either launched soon after the expiration of the first filer's regulatory exclusivity period or had a license to do so and presumably would have (had the first filer not forfeited its regulatory exclusivity because of regulatory problems with the FDA).  Details for each of these drugs are included below.  I also provide an explanation for why the experience of two of the 14 drugs is not informative.

---

[1]  See Tables 2 and 3 of S. Hemphill, "An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition," *Columbia Law Review*, 109(4), 2009, pp. 629-88.  Table 2 identifies 12 drugs where the settlement allows for retained exclusivity, and Table 3 identifies 25 drugs with retained exclusivity.

[2]  I use the sales figures reported in *ibid*.

[3]  FDA, "Drugs@FDA: FDA-Approved Drugs," (hereafter "Drugs@FDA") (https://www.accessdata.fda.gov/ scripts/cder/daf/index.cfm).

[4]  FDA, "National Drug Code Directory," (hereafter "National Drug Code Directory") (https://www.fda.gov/drug-approvals-and-databases/national-drug-code-directory). Archived versions of this database are available from the National Bureau of Economic Research (NBER).  See NBER, "National Drug Code," (https://www.nber.org/research/data/national-drug-code).

TABLE H.1
GENERIC ENTRY DATES FROM SETTLEMENTS, LAUNCHES, AND DAY 181 ENTRY

| Brand Drug | Sales (millions) | First Filer Settlement Entry Date | First Filer Generic Launch | Later Generic Launch |
|---|---|---|---|---|
| Zoloft | 3,000 | Teva/Ivax, 6/30/2006 | Teva/IVAX, 8/14/2006 | 2/6/2007 |
| Altace | 700 | Cobalt, unspecified | Cobalt, 12/10/2007 | 6/10/2008 |
| Keppra | 900 | Mylan, 11/1/2008 | Mylan, 11/4/2008 | 1/14/2009 |
| Imitrex Tablets | 900 | Ranbaxy, December 2008 | Ranbaxy and Teva, 2/9/2009 | 8/11/2009 |
| Depakote ER (500mg) | 700 | Mylan, 1/1/2009 | Mylan, 2/2/2009 | 8/05/2009 |
| Adderall XR | 900 | Barr/Teva, 4/1/2009 | Barr/Teva, 4/2/2009 | 10/1/2009 |
| Valtrex | 1,350 | Ranbaxy, Late 2009 | Ranbaxy, 11/25/2009 | 5/24/2010 |
| Flomax | 1,200 | Ranbaxy, 3/2/2010 | * | * |
| Provigil | 700 | Shared, 4/1/2012 | Teva, 3/30/2012 | 9/28/2012 |
| Lipitor | 7,200 | Ranbaxy, 11/30/2011 | Ranbaxy, 11/30/2011 | 5/29/2012 |
| Xopenex | 500 | Breath, 8/20/2012 | Watson, 8/20/2012 | 3/18/2013 |
| Nexium | 3,400 | Ranbaxy, 5/27/2014 | * | * |

\* At least one later-filing generic received a license to launch directly after first filer Ranbaxy's exclusivity period expired. However, Ranbaxy forfeited its exclusivity period for both Flomax and Nexium.

### Included Drugs

5.    **Zoloft**: In 2002, first filer Zenith settled with brand Pfizer and was granted a license to sell its generic product on June 30, 2006.[5] No additional lawsuits for patent infringement were filed by Pfizer.[6] Teva (which had acquired Zenith) launched on August 14, 2006, immediately

---

[5] Brief amicus curiae of the Federal Trade Commission, *Teva Pharmaceuticals USA, Inc v. Pfizer, Inc.*, 04-CV-1186 (https://www.ftc.gov/sites/default/files/documents/amicus_briefs/teva-pharmaceuticals-usa-inc.v.pfizer-inc./050208teva.pdf); *Teva Pharmaceuticals USA, Inc. v. Pfizer*, Inc., 395 F.3d 1324 (Fed. Cir. 2005)

[6] "Generic-Makers Fail in Bid to Force Drug Firms to Sue Over Unresolved Patents," *S&P Global*, October 12, 2006 (https://www.spglobal.com/marketintelligence/en/mi/country-industry-forecasting.html?id=106598833).

after receiving FDA approval.[7]  Later-filing generic Lupin entered soon after Teva's exclusivity period expired.[8]

6.    **Altace**: In 2006, first filer Cobalt settled with brand King Pharmaceuticals and also entered into a generic distribution agreement.[9]  The settlement terms required Cobalt to provide King with 30-days' notice prior to launching generic Altace.  Later-filing generic Lupin successfully challenged Altace's patent protection, with the Federal Circuit invalidating King's patent in September 2007.[10]  In October 2007, Cobalt notified King of its intention to launch its generic.[11]  The FDA issued a letter in February 2008, clarifying that Cobalt retained 180-day exclusivity status to sell generic Altace, and identifying December 10th, 2007, as the start of Colbalt's exclusivity period.  Cobalt launched soon after the FDA's clarification, and Lupin entered the market soon after Cobalt's exclusivity period expired.[12]

7.    **Keppra**: In October 2007, first filer Mylan settled with UCB.  The settlement allowed Mylan to begin selling its generic product on November 1, 2008.[13]  Mylan received FDA approval on November 4, 2008 and immediately launched its generic version of Keppra.[14]

---

[7]  "Teva Debuts Generic Zoloft in the USA," *PharmaTimes*, August 15, 2006 (https://pharmatimes.com/news/teva_debuts_generic_zoloft_in_usa_996050); see also Drugs@FDA page for ANDA 077670 (Sertraline Hydrochloride) (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm).

[8]  National Drug Code Directory; Lupin Press Release, "Lupin Pharmaceuticals, Inc. Announces Tentative Approval Of Generic ZOLOFT®," *BioSpace*, January 2, 2007 (https://www.biospace.com/lupin-pharmaceuticals-inc-announces-tentative-approval-of-generic-zoloft-r).

[9]  King Pharmaceuticals, Inc., "Form 8-K, Current Report Pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934, for the date February 27, 2006," February 27, 2006 (https://www.sec.gov/Archives/edgar/data/1047699/000095014406001586/g99849e8vk.htm).

[10]  "FDA's Request for Comments on Ramipril 180-Day Exclusivity Draws Letters from Eight Generic Companies," *Orange Book Blog*, November 6, 2007 (https://www.orangebookblog.com/2007/11/fdas-request-fo.html).

[11]  "King Says Cobalt Plans to Launch Generic Altace," *Reuters*, November 12, 2007 (https://www.reuters.com/article/business/healthcare-pharmaceuticals/king-says-cobalt-plans-to-launch-generic-altace-idUSN11420253).

[12]  "FDA Answers Ramipril Letters, Explains Why Cobalt Has 180-Day Exclusivity," *Orange Book Blog*, February 4, 2008 (https://www.orangebookblog.com/2008/02/fda-answers-ram.html); see also FDA, Letter Approving ANDA 076549 (*Ramipril Capsules*), October 24, 2005 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2005/076549ltr.pdf); National Drug Code Directory; "King Pharma Profit Falls as Altace Sales Dive," *Reuters*, May 8, 2008 (https://www.reuters.com/article/king/update-1-kingpharma-profit-falls-as-altace-sales-dive-idUSN0834140920080508). See also the approval date for ANDA077626 at Drugs@FDA; and Apotex, Inc., "Patent Settlements Between Brand and Generic Pharmaceutical Companies," (https://www.thefdalawblog.com/wp-content/uploads/archives/docs/apotex---parked-excl.pdf).

[13]  "Mylan, UCB Agree to Settlement Over Generic Keppra," *Reuters*, October 5, 2007 (https://www.reuters.com/article/business/healthcare-pharmaceuticals/mylan-ucb-agree-to-settlement-over-generic-keppra-idUSN04401370).

[14]  Mylan Press Release, "Mylan Receives Final Approval for First-to-File Generic Version of Antiepileptic Keppra(R) and Launches Immediately," November 4, 2008 (https://investor.mylan.com/static-files/176145d6-8553-4aa8-a22e-6e7eb492805d).

Mylan's 180-day exclusivity period expired when the last patent listed for Keppra expired,[15] and additional generics launched soon after.[16]

8.    **Imitrex tablets**: In 2008, first filer Ranbaxy settled with GlaxoSmithKline.  The terms allowed Ranbaxy to sell a generic version of Imitrex beginning in December 2008.[17] GlaxoSmithKline did not bring patent infringement litigation in the 45-day statutory period against Teva, which shared first-filer status with Ranbaxy.[18]  Ranbaxy only gained FDA approval for its 100 mg tablets in February 2009, and approval for the 25 mg and 50 mg tablets followed in August 2009.[19]  Teva received FDA approval to launch all strengths of generic Imitrex in February 2009.[20]  Teva and Ranbaxy, sharing exclusivity on 100mg Imitrex, both launched immediately following FDA approval, with Teva also launching 25 and 50mg generic Imitrex.[21]  The later-filing generic Mylan launched soon after the Ranbaxy-Teva shared exclusivity period expired.[22]

9.    **Depakote ER (500mg)**: In 2008, first filer Mylan settled with Abbott Laboratories and received a license to sell its generic beginning on a date no later than January 1, 2009.[23]  Mylan received FDA approval on January 30, 2009 and immediately launched its generic version of

---

[15]  *Ibid.*

[16]  "India's Lupin Gets Nod for Keppra Generic," *Reuters*, January 16, 2009 (https://www.reuters.com/article/ business/healthcare-pharmaceuticals/indias-lupin-gets-nod-for-keppra-generic-idUSBMA002187).

[17]  "Ranbaxy Announces Settlement of Possible Imitrex Litigation with GlaxoSmithKline," *FierceBiotech*, January 22, 2008 (https://www.fiercebiotech.com/biotech/ranbaxy-announces-settlement-of-possible-imitrex-litigation-glaxosmithkline).

[18]  FDA, Letter Approving ANDA 076840 (*Sumatriptan Succinate Tablets*), February 9, 2009 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/076840s000ltr.pdf).  In 2006, GlaxoSmithKline settled with later-filer Dr. Reddy's.  Dr. Reddy's received exclusive rights to distribute the authorized generic of Imitrex beginning in the fourth quarter of 2008. "DRL Settles Imitrex Lawsuit with GlaxoSmithKline," *The Economic Times*, October 10, 2006 (https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmac euticals/drl-settles-imitrex-lawsuit-with-glaxosmithkline/articleshow/2135656.cms).

[19]  FDA, Letter Approving ANDA 076554 (*Sumatriptan Succinate Tablets*), August 10, 2009 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/076554s000ltr.pdf); K. Singh, "Ranbaxy Gets USFDA Approval for Migraine Drug," *The Economic Times*, February 10, 2009 (https://economictimes. indiatimes.com/industry/healthcare/biotech/pharmaceuticals/ranbaxy-gets-usfda-approval-for-migraine-drug/articleshow/4110649.cms?from=mdr).

[20]  FDA, Letter Approving ANDA 076840, *op. cit.*

[21]  Teva Press Release, "Teva Announces Approval and Launch of Generic Imitrex® Tablets," February 11, 2009 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2009/Teva-Announces-Approval-and-Launch-of-Generic-Imitrex-Tablets/default.aspx).  Dr. Reddy's launched the authorized generic version of Imitrex in November 2008.

[22]  See "Mylan Inc. Receives FDA Approval for Generic Version of Migraine Treatment Imitrex®," *BioSpace*, August 11, 2009 (https://www.biospace.com/mylan-inc-receives-fda-approval-for-generic-version-of-migraine-treatment-imitrex-r).  Also see C. Myers, "Dr. Reddy's Launches Authorized Generic Version of Imitrex Tablets," *Fierce Biotech*, November 24, 2008 (https://www.fiercebiotech.com/biotech/dr-reddy-s-launches-authorized-generic-version-of-imitrex-tablets).

[23]  "Mylan to Launch Generic of Abbott's Depakote ER," *Reuters*, June 5, 2008 (https://www.reuters.com/article/ business/healthcare-pharmaceuticals/mylan-to-launch-generic-of-abbotts-depakote-er-idUSN05369533).

Depakote ER.[24]  Pursuant to a settlement with Abbott, [25]  later-filing generic Impax entered the market soon after Mylan's exclusivity period expired.[26]

10.     **Adderall XR**: In 2006, first filer Barr settled with Shire and received exclusive rights to sell Adderall XR beginning on April 1, 2009.[27]  Later-filing generic Impax Laboratories and Shire also entered into a settlement, under which Shire granted Impax a license to launch a generic 181 days after Barr's launch.[28]  Teva (which had acquired Barr) launched generic Adderall XR on April 2, 2009.[29]  Impax launched the second generic version of Adderall XR soon after Teva's exclusivity period expired.[30]

11.     **Valtrex**: In 2007, first filer Ranbaxy settled with GlaxoSmithKline and was granted a license to sell its generic product "in late 2009."[31]  Ranbaxy launched on November 25, 2009, and later-filing generics entered soon after Ranbaxy's exclusivity period expired.[32]

12.     **Flomax**: In 2007, Astellas and Boehringer Ingelheim settled with first filer Ranbaxy and agreed to allow Ranbaxy to sell its generic on March 2, 2010.[33]  In 2009, Astellas and Boehringer

---

[24]  Mylan Press Release, "Mylan Receives FDA Approval for First-to-File Generic Depakote(R) ER," January 30, 2009 (https://investor.mylan.com/news-releases/news-release-details/mylan-receives-fda-approval-first-file-generic-depakoter-er).

[25]  IMPAX Laboratories, Inc., "27th Annual J.P. Morgan Healthcare Conference," January 14, 2009 (https://media.corporate-ir.net/media_files/irol/67/67240/Impax_Laboratories_presentation_JPMorgan_Jan_2009.pdf).

[26]  Amneal Press Release, "Impax Laboratories Receives Final FDA Approval for Generic Depakote(R) Extended-Release 500mg Tablets," August 5, 2009 (https://investors.amneal.com/news/press-releases/press-release-details/2009/Impax-Laboratories-Receives-Final-FDA-Approval-for-Generic-DepakoteR-Extended-Release-500mg-Tablets/default.aspx).

[27]  "Shire, Barr Reach Adderall XR Settlement," *Medical Marketing and Media,* August 15, 2006 (https://www.mmm-online.com/home/channel/sales/shire-barr-reach-adderall-xr-settlement).

[28]  "Shire Settles with Barr Over Adderall XR," *PharmaTimes*, August 15, 2006 (https://pharmatimes.com/news/shire_settles_with_barr_over_adderall_xr_996047).

[29]  Teva Press Release, "Teva Introduces First Generic Adderall XR Capsules in the United States," April 2, 2009 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2009/Teva-Introduces-First-Generic-Adderall-XR-Capsules-in-the-United-States/default.aspx).

[30]  Amneal Press Release, "Impax Laboratories Commences Shipment of Generic Adderall XR® Capsules, 5mg, 10mg, 15mg, 20mg, 25mg, and 30mg," October 1, 2009 (https://investors.amneal.com/news/press-releases/press-release-details/2009/Impax-Laboratories-Commences-Shipment-of-Generic-Adderall-XRR-Capsules-5mg-10mg-15mg-20mg-25mg-and-30mg/default.aspx).

[31]  "GlaxoSmithKline and Ranbaxy Enter into an Agreement to Settle Valacyclovir U.S. Patent Litigation," *Reuters,* August 9, 2007 (https://www.reuters.com/article/world/glaxosmithkline-and-ranbaxy-enter-into-an-agreement-to-settle-valacyclovir-us-idUSIN20070726111621GSK).

[32]  "Ranbaxy Laboratories Launches Herpes Drug in the U.S.," *BioSpace*, November 30, 2009 (https://www.biospace.com/ranbaxy-laboratories-launches-herpes-drug-in-the-u-s); "Sandoz Launches Generic Version of Valtrex," *FiercePharma*, May 25, 2010 (https://www.fiercepharma.com/pharma/sandoz-launches-generic-version-of-valtrex).

[33]  T. Staton, "Ranbaxy Flubs Launch of Generic Flomax," *FiercePharma*, March 3, 2010 (https://www.fiercepharma.com/pharma/ranbaxy-flubs-launch-of-generic-flomax).  This would allow Ranbaxy 8-weeks of exclusivity prior to the expiration of the '063 patent's pediatric exclusivity period.  K. Karst, "The Last

---

Ingelheim settled with the later-filing generic Impax. Under the terms of that settlement, Impax was allowed to sell its generic on March 2, 2010.[34] Impax's entry would have been blocked by Ranbaxy's 180-day generic exclusivity period, except that Ranbaxy forfeited its eligibility.[35] Impax launched its generic on March 2, 2010.[36] Additional generic versions of Flomax entered the market in April 2010, after the expiry of the '063 patent.[37]

13.    **Provigil**: Between December 2005 and February 2006, brand manufacturer Celphalon settled the patent litigation with four first filers: Teva, Ranbaxy, Mylan, and Barr, providing each of them with a license to sell generic Provigil in April 2012.[38] Teva later acquired Cephalon, and the rights to branded Provigil. Subsequently, Teva launched an authorized generic on March 30, 2012, under the original NDA.[39] The FDA determined that this launch triggered Teva's 180-day exclusivity period.[40] Later-filing generic Aurobindo launched soon after the shared exclusivity period expired.[41]

14.    **Lipitor**: In 2008, first filer Ranbaxy settled with Pfizer and was granted a license to sell its generic product on November 30, 2011.[42] In 2011, Pfizer settled with the later-filing generic Mylan, which agreed to an entry date of May 30, 2012 (181 days after Ranbaxy).[43] Pursuant to

---

Shall Be First….The Case of Generic Flomax," *FDA Law Blog*, March 10, 2010 (https://www.thefdalawblog.com/2010/03/the-last-shall-be-first-the-case-of-generic-flomax).

[34]  Amneal Press Release, "Impax Laboratories Settles Pending Litigation for Flomax®," October 7, 2009 (https://investors.amneal.com/news/press-releases/press-release-details/2009/Impax-Laboratories-Settles-Pending-Litigation-for-FLOMAXR/default.aspx).

[35]  FDA, "Paragraph IV Patent Certifications," April 28, 2025 (https://www.fda.gov/media/166048/download).

[36]  "FDA Grants Final Approval for Impax Generic Version of Flomax," *The Gaea Times*, March 2, 2010 (https://health.gaeatimes.com/2010/03/02/fda-grants-final-approval-for-impax-generic-version-of-flomax-19995).

[37]  Teva Press Release, "Teva Announces Launch of Generic Flomax®," April 28, 2010 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2010/Teva-Announces-Launch-of-Generic-Flomax/default.aspx)

[38]  R. Hartman, K. Drake, and T. McGuire, "Event Study Analysis in Cases with Multiple Brand-Generic Reverse-Payment Settlements," *International Journal of the Economics of Business*, 26(3), 2019, pp. 399-410.

[39]  Teva Press Release, "Teva Announces Launch of Authorized Generic of Provigil," March 30, 2012 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2012/Teva-Announces-Launch-of-Authorized-Generic-of-Provigil).

[40]  Teva Press Release, "FDA Decides Teva is Sole First-to-File on Provigil," April 5, 2012 (https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2012/FDA-Decides-Teva-is-Sole-First-to-File-on-Provigil).

[41]  "Aurobindo Pharma gets USFDA Nod for Modafinil Tablets," *The Economic Times*, September 28, 2012 (https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/aurobindo-pharma-gets-usfda-nod-for-modafinil-tablets/articleshow/16588192.cms?from=mdr); National Drug Code Directory.

[42]  M. Herper, "Pfizer Wins Longer Life for Lipitor," *Forbes*, June 18, 2008 (https://www.forbes.com/2008/06/18/pfizer-ranbaxy-lipitor-biz-healthcare-cx_mh_0618bizpfizer.html).

[43]  T. Gryta and M. Jarzemsky, "Mylan, Pfizer Settle on Lipitor," *Wall Street Journal*, January 25, 2011 (https://www.wsj.com/articles/SB10001424052748704698004576103982823130572).

---

the settlements, Ranbaxy launched on November 30, 2011 and Mylan (and others) entered soon after Ranbaxy's regulatory exclusivity period expired.[44]

15.  **Xopenex**:  In 2008, first filer Breath settled with Sepracor and was granted a license to sell its generic Xopenex product (1.25mg/3ml, .63mg/3ml, and .31mg/3ml strengths) on August 20, 2012.[45]  In 2009, Sepracor also settled with Teva, granting Teva a license to sell its generic on February 17, 2013.[46]  In May 2012, Sepracor also settled with Mylan.  Watson (which had acquired Breath) launched on August 20, 2012.[47]  Mylan entered soon after Watson's regulatory exclusivity period expired.[48]

16.  **Nexium**: In 2008, first filer Ranbaxy entered into a settlement with AstraZeneca.[49] AstraZeneca granted Ranbaxy a license to sell generic Nexium beginning on May 27, 2014.   In May 2010, AstraZeneca also settled with Teva, granting Teva a license to sell its generic beginning on the same date (the regulatory exclusivity assigned to Ranbaxy would require Teva's effective date to be 181 days later).[50]  However, Ranbaxy forfeited its regulatory exclusivity after failing to obtain timely FDA approval for its generic.[51]

### Excluded Drugs

17.  **Avandia**: In 2007, first filer Teva settled with GlaxoSmithKline and was granted a license to sell its generic product in "late Q1, 2012."[52]  In 2010, the brand drug was withdrawn from the

---

[44] Daiichi-Sankyo Press Release, "Ranbaxy Announces Launch of Atorvastatin, Generic Lipitor®, in the U.S.," December 1, 2011 (https://www.daiichisankyo.com/files/news/pressrelease/pdf/005691/20111201_351_E.pdf); Mylan Press Release, "Mylan Launches Generic Version of Lipitor®," May 29, 2012 (https://investor.mylan.com/ news-releases/news-release-details/mylan-launches-generic-version-lipitorr); National Drug Code Directory.

[45]  "Sepracor, Inc. Announces Final Settlement of XOPENEX(R) Inhalation Solution Patent Infringement Litigation with Breath Limited," *BioSpace*, May 1, 2008 (https://www.biospace.com/sepracor-inc-announces-final-settlement-of-xopenex-r-inhalation-solution-patent-infringement-litigation-with-b-breath-limited-b).

[46] "Deal Finalized Between Sepracor and Teva on Xopenex," *US Pharmacist*, 34(5), 2009, pp. 36-38 (https://www.uspharmacist.com/article/deal-finalized-between-sepracor-and-teva-on-xopenex).

[47] "Watson Launches Generic Xopenex(R)," *FiercePharma*, August 20, 2012 (https://www.fiercepharma.com/pharma/watson-launches-generic-xopenex%C2%AE).

[48] Mylan Press Release, "Mylan Launches Generic Version of Xopenex(R) Inhalation Solution," March 18, 2013 (https://investor.mylan.com/news-releases/news-release-details/mylan-launches-generic-version-xopenexr-inhalation-solution).

[49] "AstraZeneca Settles US Nexium Patent Litigation with Ranbaxy," *FiercePharma*, April 15, 2008 (https://www.fiercebiotech.com/biotech/astrazeneca-settles-us-nexium-patent-litigation-ranbaxy).

[50] "AstraZenca, Teva Settle Nexium, Prilosec Patent Disputes," *Generics and Biosimilars Initiative*, May 2, 2010 (https://gabionline.net/generics/news/AstraZeneca-Teva-settle-Nexium-Prilosec-patent-disputes).

[51] N. Gray, "Ranbaxy Loses $250M While US Consumers Lose a Nexium Generic," *BioPharmaDive*, November 7, 2014 (https://www.biopharmadive.com/news/ranbaxy-loses-250m-while-us-consumers-lose-a-nexium-generic/330442).

[52] "Teva Pharm Announces Settlement of Generic Avandia, Avandamet, and Avandaryl Litigation with GlaxoSmithKline," *Reuters*, September 27, 2007 (https://www.reuters.com/article/inPlayBriefing/idUSIN200709 27170530TEVA20070927).

market prior to Teva's entry because of safety concerns.[53]  No other settlements were publicly announced and the generic version was never launched.  I excluded this drug because it is unclear how generic entry would have played out if the drug was not withdrawn.

18.    **Plavix**: In March 2006, first filer Apotex settled with Bristol-Myers Squibb/Sanofi-Aventis.  Apotex received a license to launch generic Plavix on September 17, 2011.[54]  After the proposed settlement was blocked by regulators, Apotex launched a generic version of the 75mg strength "at risk" on August 8, 2006.[55]  I excluded this drug because it is unclear how generic entry would have played out if it the settlement had not been blocked.

---

[53]  FDA, "FDA Drug Safety Communication: Updated Risk Evaluation and Mitigation Strategy (REMS) to Restrict Access to Rosiglitazone-containing Medicines including Avandia, Avandamet, and Avandaryl," February 8, 2018 (https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-updated-risk-evaluation-and-mitigation-strategy-rems-restrict-access).

[54]  P. Van Arnum, "BMS, Sanofi-Aventis Settle Over Generic Plavix," *PharmaTech*, March 24, 2006 (https://www.pharmtech.com/view/bms-sanofi-aventis-settle-over-generic-plavix).

[55]  Apotex Press Release, "Apotex Launches First Generic Plavix®," August 8, 2006 (https://www.orangebookblog.com/files/PressReleaseclopidogrelLaunch.pdf).

**ATTACHMENT I**







**ATTACHMENT J**





**ATTACHMENT K**



**ATTACHMENT L**