# Exhibit 3
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE EFFEXOR XR ANTITRUST LITIGATION | C.A. No. 11-05479-ZNQ-JBD |
| This Document Relates To: | |
| Direct Purchaser Class Actions | |

**EXPERT REPORT OF DAISY RIVERA-MUZZIO**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Highly Confidential—
Attorneys' Eyes Only

## TABLE OF CONTENTS

I.    INTRODUCTION .......................................................................................1

    A.    Scope of Assignment ....................................................................1

    B.    Summary of Opinions ...................................................................2

    C.    Experience and Qualifications ......................................................3

    D.    Publications ...................................................................................6

    E.    Prior Testimony ............................................................................7

    F.    Compensation ...............................................................................7

II.    MATERIALS REVIEWED .........................................................................7

III.    COMPONENTS OF AN ANDA ..................................................................7

IV.    BACKGROUND ......................................................................................11

V.    REGULATORY CHRONOLOGY ............................................................12

    A.    Teva Chronology ........................................................................12

    B.    Mylan Chronology ......................................................................25

VI.    OPINIONS ................................................................................................28

    A.    Teva Did Not Act Like a First to File Generic Manufacturer Motivated to Obtain FDA Approval of its ANDA as Quickly as Possible. ...........................................................28

        1.    A First to File Generic is Typically Motivated and Incentivized to Obtain FDA Approval of Its ANDA and Launch Its Product as Quickly as Possible. ......................................................29

        2.    Teva's Actions From June 2006–June 2009 Were Indicative of a Generic Manufacturer That Was Not Incentivized and Motivated to Obtain FDA Approval as Quickly as Possible .............................................31

    B.    Teva's Actions Between June 2006 and June 2009 Delayed FDA Approval of Teva's ANDA .................................................40

    C.    Teva Would Have Been Able to Launch its Generic Effexor XR Shortly After Received FDA Approval ..........................................41

    D.    Mylan Would Have been Able to Obtain Final FDA Approval and Launch Its Generic Effexor XR Eleven Months After an Earlier Launch by Teva. ................42

Highly Confidential—
Attorneys' Eyes Only

# I.  INTRODUCTION

1.      My name is Daisy Rivera-Muzzio.  I make this expert report in conjunction with *In re Effexor XR*, Civil Action No. 11-cv-5479 (D.N.J.), pending in the U.S. District Court for the District of New Jersey.

2.      I submit this report on behalf of Direct Purchaser Class Plaintiffs and Retailer Plaintiffs (collectively, "Plaintiffs")[1] in the above referenced action.  I understand that Plaintiffs brought suit against the following defendants: Wyeth LLC; Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; Wyeth Pharmaceuticals Company (together "Wyeth"); Teva Pharmaceuticals USA, Inc.; and Teva Pharmaceutical Industries Ltd. (together "Teva").   I understand from counsel for Plaintiffs that Plaintiffs have reached a settlement with Wyeth and that Wyeth is no longer a party to this litigation.

## A.      Scope of Assignment

3.      I understand that, among other things, Plaintiffs allege that in November 2005, Wyeth made payments to Teva to delay the onset of competition from generic venlafaxine hydrochloride extended-release capsules (generic Effexor XR) until July 1, 2010.  Direct Purchaser Class Plaintiffs' Second Amended Consolidated Complaint ¶¶ 270-278.

4.      I understand that other experts retained by Plaintiffs will be opining that, absent Wyeth's payments to Teva, Wyeth and Teva would have reached an agreement permitting Teva to enter the market earlier than July 1, 2010. I am not offering any opinions on this issue.

---

[1] The Direct Purchaser Class Representatives are Direct Purchaser Class Plaintiffs Rochester Drug Co-Operative, Inc., Stephen L. LaFrance Holdings, Inc. d/b/a SAJ Distributors, and Uniondale Chemists, Inc.).  The Retailer Plaintiffs are Walgreen Co., The Kroger Co. (including Peytons), Safeway, Inc., United Natural Foods, Inc. f/k/a Supervalu Inc., H-E-B, L.P. f/k/a HEB Grocery Company, L.P., American Sales Company, Inc., Rite Aid Corporation, Rite Aid Hdqtrs. Corporation, JCG (PJC) USA, LLC, Maxi Drug, Inc. d/b/a/ Brooks Pharmacy, Eckerd Corporation, Meijer, Inc., Meijer Distribution, Inc., Giant Eagle, Inc., and CVS Caremark Corporation

Highly Confidential—
Attorneys' Eyes Only

5.     I have been retained by counsel for the Plaintiffs to determine if Teva would have been able to obtain FDA approval to launch generic Effexor XR earlier than July 1, 2010, and thereafter launch its AB-rated generic version of Effexor XR, and if so, when.

6.     I have also been asked by counsel for Plaintiffs to determine if Teva had obtained final FDA approval and launched its generic versions of Effexor XR earlier than July 1, 2010, whether Mylan Inc. ("Mylan") would have been able to obtain FDA approval and been able to commercially launch its generic Effexor XR products eleven months after Teva's launch, assuming it had a license from Wyeth to do so.[2]

**B.     Summary of Opinions**

7.     Based upon the documents and testimony I have reviewed, as well as my over 40 years of experience in the pharmaceutical industry, it is my opinion that absent Teva's agreement not to launch its generic Effexor XR until July 1, 2010, Teva or a reasonable generic company in Teva's position would have been incentivized and able to obtain final approval by no later than March 2009 and commercially launch its generic Effexor XR product by no later than April 2009.

8.     In my experience, motivated generic manufacturers with an imminent launch opportunity typically act with urgency to obtain FDA approval of their ANDAs so that they can launch their products at their earliest allowed opportunity, especially where, as with Teva here, they have the potential to obtain a period of generic exclusivity on a drug where the reference listed drug (RLD) has substantial sales.

---

[2] For my opinions regarding Mylan, I was asked by Plaintiffs' counsel to assume: (a) Teva launched its generic Effexor XR products earlier than July 1, 2010; and (b) Mylan obtained a patent settlement with Wyeth that included a license entitling Mylan to enter the market 11 months after Teva entered the market (as it actually obtained).

Highly Confidential—
Attorneys' Eyes Only

9.      From June 2006 to June 2009, after its agreement with Wyeth and knowing that it could not launch until mid-2010, Teva did not demonstrate the level of urgency in responding FDA deficiency letters that one would expect of a generic manufacturer with an imminent launch opportunity seeking to obtain FDA approval of its ANDA as quickly as possible, and especially not of a generic manufacturer asserting a claim for generic exclusivity on a drug where the RLD (Effexor XR) had large sales.

10.     It is also my opinion that Mylan or a reasonable generic company in Mylan's position would have been able to obtain final approval, and would have been able to commercially launch its product, 11 months after Teva's launch, if, as I was asked by Plaintiffs' counsel to assume: (a) Teva launched its generic Effexor XR products earlier than July 1, 2010; and (b) Mylan obtained a patent settlement with Wyeth that included a license entitling Mylan to enter the market 11 months after Teva entered the market (as it actually obtained).

11.     I reached all of these opinions to a reasonable degree of professional certainty.

## C.      Experience and Qualifications

12.     My expertise is based on my educational training and professional experience of over 40 years in the pharmaceutical industry including direct participation in developing and manufacturing of generic pharmaceuticals including Paragraph IV ("PIV") Abbreviated New Drug Applications ("ANDAs").

13.     I am an industrial pharmacist by training. I attended the University of Puerto Rico School of Pharmacy, Medical Sciences Campus and graduated in 1981 obtaining a bachelor (professional) degree in Pharmaceutical Sciences. In 1991, I obtained a master's in industrial pharmacy also from the University of Puerto Rico School of Pharmacy. I am a registered and licensed pharmacist in the Commonwealth of Puerto Rico and the Commonwealth of

Highly Confidential—
Attorneys' Eyes Only

Massachusetts. My master's thesis title was "Design of a Manufacturing Process to Prolong the Release of Phenylpropanolamine Tablets by Fluid Bed Dryer Granulator Technique." In 1993, I graduated from the Sloan School of Business, Massachusetts Institute of Technology (MIT), with a master's degree in Management of Technology.  The MBA program was a dual school program from the MIT School of Engineering and the Sloan School of Management. My MIT thesis title was "Adoption of Innovation in the Pharmaceutical Manufacturing Process," which analyzed the adoption of innovation, in particular the impact of regulatory systems in the investment of manufacturing technology in Europe, Japan and U.S.

14.     In December 2014, I completed The Entrepreneurship Pioneers Initiative Program from The Center of Urban Entrepreneurship & Economic Development at Rutgers University Business School.

15.     I have over 40 years of experience in the pharmaceutical industry. I have been employed by major brand and generic pharmaceutical companies for approximately 30 years and have been a consulting services provider to the industry for the last 14 years. Throughout my career I have been directly involved in all major operational areas in the industry covering development and manufacturing operations of active pharmaceutical ingredients (API) as well as final dosage forms including tablets, capsules, solutions, inhalers, films, and injectables. I have held high level positions in major branded companies such as Sterling Pharmaceuticals (Quality, cGMP and Validation areas), Warner Lambert (Technology Transfer) and Pfizer Pharmaceuticals (Supply Chain of External Manufacturers and Manufacturing Supply Contract negotiations). While at Pfizer I was responsible for leading Contract Manufacturing Operations for Latin America and Canada; my team was responsible for qualification of contract manufacturers, management and negotiation of supply agreements and production planning and

Highly Confidential—
Attorneys' Eyes Only

supply chain activities for the markets of Human Health, Consumer Health and Animal health products in Latin America and Canada.

16.    My experience with the generic pharmaceutical industry included serving as Schein Pharmaceuticals[3] Director of Technical Services responsible for Manufacturing Technology Transfer and Product Validation and Equipment/Systems Qualification and then, following a promotion, Director of Pharmaceutical Product Development responsible for Pre-formulation and Formulation activities for the development of solid dosage generic pharmaceuticals including ANDAs. In these roles I contributed to, and led, efforts that resulted in several ANDA and Prior Approval Supplement ("PAS") submissions and FDA approvals. I supervised a team of approximately 40 scientists, chemists, and engineers who were directly involved in the development of formulations, product development, technology transfer, and the validation of new products. My team's responsibilities included compiling information and assembling the CMC section of ANDAs, as well as reviewing and addressing ANDA deficiency letters and any communications from the FDA related to the CMC section of the ANDA.

17.    My current firm also offers technical consulting services to the pharmaceutical industry which includes trouble shooting of manufacturing issues, supporting new product NDA and ANDA issues as well as commercial manufacturing.

18.    While at Pfizer I also served as Senior Director of Global Licensing for the Established Products Business Unit, leading multidisciplinary teams for the qualification (manufacturing /marketing/IP/regulatory/quality assessment) of generic pharmaceuticals manufacturers, negotiation of licensing and Manufacturing Supply Agreements and alliance

---

[3] Schein Pharmaceuticals was a generic pharmaceutical manufacturer company that was acquired by Watson in May 2000.

Highly Confidential—
Attorneys' Eyes Only

management (deployment and implementation of contracts with generic manufacturers). I was

hired at the inception of the Established Products Business Unit to be responsible for the

identification and negotiation of licensing opportunities of PIV and 505-B-2 assets to build a

portfolio of mature and generic products for Pfizer Pharmaceuticals.

19.    Since 2011, I have been the owner of Acumen BioPharma, a consulting firm

providing services in two key areas: technical consulting services to the pharmaceutical industry

(branded and generics) and expert witness referral and laboratory services for IP and antitrust

litigation in pharmaceuticals. I also serve as Chief Operating Officer responsible for the

management of contractual relationships for Integra Continuous Manufacturing Systems, a firm

engaged in the business of providing consulting services related to advanced pharmaceutical

manufacturing technologies integrating services of equipment manufacturers, PAT (process

analytical technologies) controls and formulation expertise in the development and

implementation of continuous manufacturing technologies in the life science industries.

20.    My full resume is attached as Exhibit A to this report.

## D.    Publications

21.    My published articles are as follows:

- Sakr, A., Rivera, D. and Jimenez, W., "Formulation of a Directly Compressed Antigonadotropic Tablet: 1. Effect of Excipients and Disintegrants", Pharm. Ind., 48 (5), 522-525 (1986)

- Sakr, A., Rivera, D., and Jimenez, W., "Formulation Factors Affecting the Characteristics of Directly Compressed Danazol Tablets", 39th National Meeting and Exposition of the American Pharmaceutical Association Academy of Pharmaceutical Sciences, Minneapolis, Minnesota, October, 1985

- Factorial Design of Phenylpropanolamine Prolonged Release Tablets Formulations Using Fluid Bed Dryer Granulator, Drug Development and Industrial Pharmacy, Volume 20, 1994- Issue 1. Mounir S. Mesiha & Daisy Rivera

Highly Confidential—
Attorneys' Eyes Only

### E.    Prior Testimony

22.    Within the last four years, I have testified as an expert witness in *In re Glumetza Antitrust Litigation*, Case No. 3:19-cv-5822 (N.D. Cal.) and *In re Tracleer Antitrust ,Litigation,* Case No. 1:18-cv-3560 (D. Md.).

### F.    Compensation

23.    I am being compensated in this case at a rate of $600 per hour for regular consulting and $700 for deposition and trial, which is my usual and customary rate, and am being reimbursed for reasonable expenses. My compensation is unrelated to the outcome of this case.

## II.    MATERIALS REVIEWED

24.    Counsel for Plaintiffs have made available to me all relevant court papers, documents, and deposition testimony in this case. At my request, counsel for the Plaintiffs has provided me with, and I have reviewed, court papers, documents, and deposition testimony relevant to the opinions in this report. Counsel for Plaintiffs have been timely and responsive in my requests for supplemental documentation. Additionally, I have reviewed trade publications and other publicly available materials. All such materials considered are listed in Exhibit B to this report.

25.    In considering these materials, I have drawn upon my experience in the pharmaceutical industry and particularly with generic products.

## III.    COMPONENTS OF AN ANDA

26.    Since 1984, the Drug Price Competition and Term Restoration Act (Hatch-Waxman and its amendments)[4] has allowed FDA to use a simplified approval process for generic

---

[4] Drug Price Competition and Patent Restoration Act of 1984, Pub. L. No. 98- 417, 98 Stat. 1585 (1984).

Highly Confidential—
Attorneys' Eyes Only

drugs, the abbreviated new drug application (ANDA) process. Under this process, a generic

drug product must meet compendial, bioequivalence, and good manufacturing standards.[5] This

means that FDA's approval process for generic drugs evaluates chemistry, manufacturing and

controls, bioequivalence, labeling, and in vitro dissolution (if applicable), and includes

inspection and auditing of all facilities.

27.    Manufacturers seeking FDA approval to market and sell a generic drug product in

the U.S. must file an Abbreviated New Drug Application (ANDA) with the FDA demonstrating

that their ANDA product is bioequivalent to the RLD product.[6]

28.    If two drug products are pharmaceutically equivalent (same API, dosage form,

route of administration, strength/concentration) and their bioavailability (rate and extent of

availability) after administration in the same molar dose are similar to such a degree that their

effects, with respect to both efficacy and safety, can be expected to be essentially the same, then

they are considered to be bioequivalent.[7]

29.    In addition to data generated through in vitro (dissolution testing in a laboratory)

and/or in vivo (human testing in a clinical setting) to support bioequivalence, generic sponsors

are required to satisfy the same exacting standards for good manufacturing that brand companies

are required to meet, i.e., FDA's approval process of generic drugs evaluates chemistry,

manufacturing, and controls and includes inspection and auditing of manufacturing, packaging

testing and drug substance and drug product storage facilities. The ANDA must include the same

drug substance and drug-product Chemistry, Manufacturing, and Controls ("CMC") information

---

[5] See 21 C.F.R. § 314.94.

[6] Benet, L.Z., *Understanding Bioequivalence Testing*, 7S-9S Transplantation Proc. 31 3A Suppl. (1999).

[7] *Id.*

Highly Confidential—
Attorneys' Eyes Only

for approval as NDA applicants, as well as a full description of the drug substance, including its physical and chemical characteristics and stability; the method of synthesis (or isolation) and purification of the drug substance; the process controls used during manufacture and packaging; and specifications needed to ensure the identity, strength, quality and purity of the drug substance.[8]

30.     As a result, the FDA has repeatedly stated that FDA-approved generic drugs are as safe and effective as their brand name counterparts. FDA's website explains that:

> FDA-approved generic medicines work in the same way and provide the same clinical benefit and risks as their brand-name counterparts. A generic medicine is required to be the same as a brand-name medicine in dosage, safety, effectiveness, strength, stability, and quality, as well as in the way it is taken. Generic medicines also have the same risks and benefits as their brand name counterparts.[9]

31.     The requirements for approval of generic drugs mirror those for approval of brand drugs, except that bioequivalence (BE) studies are performed instead of the animal studies, clinical efficacy/safety, and dose finding studies.[10]

32.     ANDA applicants must also submit to FDA a list of all components used in the manufacture of the drug product; specifications for each component to ensure its quality; product design and development, manufacturing, and process controls; and specifications needed to ensure the identity, strength, quality, and purity (including impurities) of the drug product.[11]

33.     One required section of an ANDA is the Chemistry, Manufacturing, and Controls (CMC) section.  The purpose of the CMC section is to provide FDA with information

---

[8] 21 C.F.R. §§ 314.50(d)(1); 314.94(a)(9)(i) (2002).

[9] *Generic Drug Facts, FDA* (Nov. 1, 2022). Available at https://www.fda.gov/drugs/generic-drugs/generic-drug-facts.

[10] 21 C.F.R. §§ 314.50(d)(1); 314.50(d)(2); 314.50(d)(3); 314.50(d)(5); 314.94(a)(7) (2002).

[11] 21 C.F.R. §§ 314.50(d)(1); 314.94(a)(9) (2002).

Highly Confidential—
Attorneys' Eyes Only

demonstrating that the drug product at issue has quality attributes similar to those of a previously

approved Reference Listed Drug (RLD).[12]

34.    The CMC package includes a description of physical and chemical characteristics,

evidence supporting the structure and identity of the API, as well as a description of the general

method of preparation of the drug substance, including a list of the reagents and solvents.  The

acceptable limits and analytical methods used to ensure the identity, strength, quality, and purity

of the drug substance and descriptions of the test methods are also required.[13]

35.    Another important component of the CMC package is the drug product.  A list of

all components and composition used in the manufacturing process is required. This includes

both those components intended to appear in the drug product and those that may not appear, but

are used in the manufacturing process, a summary of the quantitative composition of the drug

product, including any reasonable variations, a description of the manufacturing process, and

packaging procedure, as well as other relevant tests, as appropriate for the product.  Final

specifications for the drug product must be included, as well as information about the acceptable

limits and analytical methods used to ensure the identity, strength, quality, stability, and purity of

the drug product, as well as their validation and quality control procedures.[14]

36.    Finally, ANDA applicants must submit proposed generic drug labeling.  The

labeling generic drug's label must be the "same as" the last approved reference listed drug

(RLD) labeling except for permissible differences (e.g., manufacturer/packer/distributor

information, package size, inactive ingredients, omission of information protected by patent or

---

[12] 21 C.F.R. § 314.94(a)(9) (2002).

[13] 21 C.F.R. §§ 314.50(d)(1)(i); 314.94(a)(9)(i) (2002).

[14] 21 C.F.R. §§ 314.50(d)(1)(ii)(a); 314.94(a)(9)(i) (2002).

Highly Confidential—
Attorneys' Eyes Only

exclusivity, differences due to an approved suitability petition).[15] ANDA holders are expected to promptly update their generic drug labeling (ANDA labeling) after FDA has approved changes to the associated RLD labeling.

37.     The FDA required content of the ANDA, the ANDA review process, requirements to implement changes pre- and post-ANDA approval are included in the Code of Federal regulations (CFR), and there are numerous FDA guidances related to changes pre- and post-approval of an ANDA.

## IV.    BACKGROUND

38.     Teva's Venlafaxine HCL ER capsules formulation has a different formulation composition than Effexor ER, Wyeth's RLD, Effexor ER capsules. Teva's formulation included Venlafaxine HCl, sugar spheres (Suglets) Povidone K-30, Alcohol 95%, Talc, Ethylcelullose NF, Polyethylene Glycol 400 NF, Dibutyl Sebacate NF.  Wyeth Effexor ER capsules formulation included Venlafaxine HCl, and inactive ingredients consist of cellulose, ethylcellulose, gelatin, hypromellose, iron oxide, and titanium dioxide.[16]

39.     Teva's manufacturing process is a standard, commonly known procedure for extended-release formulations consisting of coating sugar spheres with drug and sustained release agents in a Fluid Bed Dryer (FBD) – Wurster Column, Dry blending and Encapsulation. Sugar spheres have been used in the pharmaceutical industry since the 1960s as a carrier pellet that can be coated with active substance and sustained release additives.[17] Standard key quality parameters for this type of process that are expected to be monitored are coating uniformity

---

[15] 21 C.F.R. § 314.94(a)(8) (2002).
[16] https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/020699s081lbl.pdf.
[17] https://www.pharmaexcipients.com/news/sanaq-sugar-spheres-mcc-pellet/.

Highly Confidential—
Attorneys' Eyes Only

(measured by weight gain, assay, content uniformity and particle size of the spheres), dissolution and moisture impact on product stability, among others.

## V.    REGULATORY CHRONOLOGY

### A.    Teva Chronology

40.    █████████████████████████████████████

████████████████████████████

█    █████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

█    █████████████████████████████████████

███████████████████████████████████████████

███████

█    █████████████████████████████████████

███████████████████████████████

█    █████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only

Highly Confidential—
Attorneys' Eyes Only

Highly Confidential—
Attorneys' Eyes Only

Highly Confidential—
Attorneys' Eyes Only



Highly Confidential—
Attorneys' Eyes Only

Highly Confidential—
Attorneys' Eyes Only



Highly Confidential—
Attorneys' Eyes Only



Highly Confidential—
Attorneys' Eyes Only

Highly Confidential—
Attorneys' Eyes Only

Highly Confidential—
Attorneys' Eyes Only

Highly Confidential—
Attorneys' Eyes Only

Highly Confidential—
Attorneys' Eyes Only

**B.    Mylan Chronology**

41.    The following is a summary of background facts relating to Mylan's Effexor XR

ANDA approval and launch:

Highly Confidential—
Attorneys' Eyes Only

a.       On January 15, 2007, Mylan submitted ANDA 078789 to the FDA seeking

approval to market generic Effexor XR that included a Paragraph IV certification asserting

Wyeth's '708,' 171, '120 and '958 patents were invalid or not infringed.[18] MYL-VENLA-

0000005 at 06. On May 23, 2007, Wyeth received Mylan's Paragraph IV Notice. Within 45 days

of receiving Mylan's notice, Wyeth filed a complaint against Mylan alleging patent infringement

on July 6, 2007, staying approval of ANDA for 30 months. See Wyeth's Complaint in Wyeth v.

Mylan Pharma., 07-cv-91 (N.D. W.Va.), ECF 1. The 30 month stay related to Mylan's ANDA

expired in January 2010.

b.       Between May 2007 and October 2008, Mylan and FDA exchanged various

communications regarding the bioequivalence, CMC and labeling sections of Mylan's ANDA.

Mylan effectively addressed the FDA's requests outlined in the deficiency letters.

c.       On November 13, 2008, within 23 months of filing, the FDA tentatively approved

Mylan's generic Effexor XR ANDA. MYL-VENLA-0000039.

d.       On October 20, 2009, Mylan and Wyeth settled their patent litigation. The Wyeth-

Mylan settlement included a licensed entry date of June 1, 2011.[19]

---

[18] These were the same patents to which Teva filed its Paragraph IV certification.

[19] Mylan's licensed entry date was the same as the licensed entry date that prior ANDA filers, Impax and Anchen, had previously negotiated to settle their patent litigations with Wyeth. WYEFFAT 04649442 (11/10/08 email where, during settlement negotiations, Mylan's counsel asks Wyeth's counsel for "a draft settlement agreement that includes the same entry date provisions as you have reached with Impax and Anchen [i.e., June 1, 2011]." WYEFFAT 06599755 (10/13/09 term sheet adopting June 1, 2011 entry date); AMN_EFFEX0010838 at 45 (Wyeth-Impax licensing agreement setting June 1, 2011 entry date); Wyeffat0955271 at 92-93 (Wyeth-Anchen licensing agreement setting June 1, 2011 entry date).

Highly Confidential—
Attorneys' Eyes Only

e.     On May 6, 2011, Mylan requested FDA to grant final for final approval to grant its generic Effexor XR ANDA final approval on June 1, 2011, which Mylan noted was the "effective date of the license" Mylan received from Wyeth. MYL-VENLA-0004009.

f.     FDA granted Final Approval to Mylan's ANDA on June 1, 2011. MYL-VENLA-0000049.

g.     Mylan launched on June 1, 2011. March 25, 2025 Declaration of Bradley Matta (the "Mylan Declaration") ¶ 15.

h.     Mylan generally strives to launch its generic products as soon as possible after obtaining final approval FDA. Mylan Declaration. ¶ 5.

i.     According to the Mylan Declaration:

- In response to a document subpoena issued in this case, Mylan did not produce documents indicating that its designated manufacturer, Mylan Laboratories Limited: (i) was unavailable to manufacture Mylan's generic Effexor XR between November 13, 2008 and June 1, 2011; (ii) received an FDA warning letter; (iii) lacked equipment needed to manufacture Mylan's generic Effexor XR between November 13, 2008 and June 1, 2011; or (iv) did not have laboratory facilities and resources to test and release Mylan's generic Effexor XR between November 13, 2008 and June 1, 2011. Mylan Declaration. ¶ 9. I understand that Mylan did not refuse to produce such documents, and, I understand, did not produce a privilege log identifying any such documents withheld as privileged.

- Mylan produced documents indicating that it was able to increase manufacturing batch size for its generic Effexor XR.  See MYL-VENLA-0003712. Mylan Declaration ¶ 10.

Highly Confidential—
Attorneys' Eyes Only

- Mylan did not produce documents indicating that the venlafaxine hydrochloride active pharmaceutical ingredient for Mylan's generic Effexor XR was not available (according to the product forecasts) from the designated supplier, Matrix Laboratories Inc., a Mylan affiliate, between November 13, 2008 and June 1, 2011.  March 25, 2025 Mylan Declaration ¶ 11.

- Mylan did not produce documents indicating that the formula components excipients and packaging materials to produce and package Mylan's generic Effexor XR were not available to launch and commercialize the final product. March 25, 2025 Mylan Declaration ¶ 12.

- Mylan did not produce documents that show any quality test issues nor manufacturing deviation reports that demonstrate any inconsistencies that may have affected product release. Mylan Declaration ¶ 13.

## VI.    OPINIONS

**A.    Teva Did Not Act Like a First to File Generic Manufacturer Motivated to Obtain FDA Approval of its ANDA as Quickly as Possible.**

42.    Based on my review of the regulatory documents produced by Teva, including FDA's deficiency letters related to Teva's ANDA, Teva's responses to some of these deficiencies, the extensive time that Teva took to respond to some of those deficiency letters, especially those received during the period of June 2006 to June 2009, and the riskiness of the operational strategies Teva chose to employ, it is my opinion, to a reasonable degree of professional certainty, that after it entered into the agreement with Wyeth with a licensed entry date for its generic Effexor XR product in July 2010, Teva did not act like a first to file generic manufacturer motivated to obtain FDA approval of its venlafaxine ER capsule ANDA as quickly as possible.

Highly Confidential—
Attorneys' Eyes Only

**1.      A First to File Generic is Typically Motivated and Incentivized to Obtain FDA Approval of Its ANDA and Launch Its Product as Quickly as Possible.**

43.      Teva was the first generic company to file a substantially complete ANDA with a Paragraph IV certification. As a result, Teva was considered a "first filer," and under Hatch-Waxman, Teva had a claim to a generic exclusivity for a period of 180 days.[20] This meant that FDA could not approve another ANDA seeking approval to market a generic version of Effexor XR until after Teva's 180-day exclusivity period expired.

44.      In my experience, a generic company with "first filer" status is typically highly incentivized to obtain final FDA approval of its ANDA, and launch its generic products, as quickly as possible.

45.      A first filer PIV designation is a significant achievement for a generic company. Absent extenuating circumstances, such as a patent litigation settlement where the first filer agrees not to launch its generic product for a significant period of time, it is the top priority for first filers to get ANDA approval and launch such products at the earliest allowed opportunity – particularly where, as here, the opportunity relates to a generic drug with an RLD with large sales.[21]

46.      When a reasonable generic company believes it has an opportunity to be the first filer of an ANDA which could provide a period of generic exclusivity, the company typically establishes an accelerated product development program, in which it seeks to generate data sufficient for the FDA to accept the ANDA for filing as early as possible, in order to beat the competition and achieve the first filer designation.

---

[20] TEVA_EFFEX_0795156 at 58**.**

[21] I understand from Plaintiffs' counsel that, at the time Teva was developing its generic Effexor XR product and prosecuting its ANDA, annual sales of the RLD Effexor XR exceeded $2 billion.

Highly Confidential—
Attorneys' Eyes Only

47.     Once the ANDA is accepted for filing by the FDA, the focus of a reasonable generic company is typically to obtain FDA approval of its ANDA at the earliest possible date. Product Development, Manufacturing, Quality and Regulatory teams at generic pharmaceutical companies are trained to react efficiently and expeditiously to answer deficiency letters and communications from the FDA, and meet the well-known deadlines established by the FDA. Activities required to answer the FDA's deficiency letters are typically prioritized over on-going product development activities related to other products.

48.     In my experience, a motivated generic company with an imminent opportunity to launch products for which it has first filer status would avoid making any changes to its ANDA, or adopting any operational strategies that create unnecessary and foreseeable risks that the FDA may reject their positions, which consequently could result in significant delays in FDA approving the company's ANDA.  This is especially so when the proposed action could be implemented post-FDA approval (consistent with regulatory guidance such as SUPAC - Scale Up and Post-Approval Changes).

49.     In my opinion, a motivated and incentivized generic company in Teva's position would analyze each potential change, consider the FDA requirements to implement the change, and avoid proposing any action that would create an unnecessary risk that FDA approval of its ANDA would be delayed.

50.     As discussed below, Teva's actions, particularly between June 2006 and June 2009, were inconsistent with the actions that a motivated generic company in Teva's position with an imminent launch opportunity would take in order to avoid potential delays in obtaining FDA approval, and to obtain FDA approval as quickly as possible.

Highly Confidential—
Attorneys' Eyes Only

2.    **Teva's Actions From June 2006–June 2009 Were Indicative of a Generic Manufacturer That Was Not Incentivized and Motivated to Obtain FDA Approval as Quickly as Possible.**

51.    When a generic company cannot launch a product until years later (as is the case with Teva here, given that it agreed not to launch generic Effexor XR until July 2010), it often shifts its priorities away from that product and prioritize the development of other drugs that it can launch sooner (and thus earn sales revenues on sooner) and put resources (which are always finite) into getting approval for those other drugs.  Additionally, when the first filer agrees to a licensed entry date years into the future, the first filer may adopt different or riskier strategic initiatives – such as proposing equipment, process and site changes during the prosecution of the ANDA – than it would otherwise would have adopted.

52.    ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████

53.    ████████████████████████████████████

████████████████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

███████

███████████████████████████████

████████████

█████████████████████████

██████████████

███████

███████████

█████████████████████

█████████████████████

54.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

55.  ████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only



56.

---

[22] See ¶ 40h above.

███

57. ███████████████████████████████

█████████████████████████████

████████████████████████████████

███████████████████████████████

████████████████████████████████

██████████████████████████████

58. ████████████████████████████████

█████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████████████████████

████████████████

59. ███████████████████████████

█████████████████████████████████

████████

60. ███████████████████████████

████████████████████████████████

███████████████████████████████

████████

61. ████████████████████████████████

███████████████████████████████

██████████████████████████████

Highly Confidential—
Attorneys' Eyes Only

62.

63.

_____

[23] The FDA letter only required Teva to manufacture a 150 mg demonstration batch with the implementation of standard in-process controls (weight gain of drug coated and ER coated pellets, yield, particle size, dissolution of coated beads) and requests of explanation for loss of potency observed in original ANDA batches. The batch was manufactured and packaged over the course of 3 weeks as follows: Dispensing materials 2-17 to 2-18, 2007; drug coating of sugar pellets 2-21; ER coating 2-25-2-26; Sieving and Final blend -2-28, encapsulation March 7-8 ; Packaging and placement on Stability March 17-18, 2025. It should be noted that validation batches manufactured at commercial batch size in 2010, which required significantly more sampling than this demonstration batch took approximately one week per batch.

Highly Confidential—
Attorneys' Eyes Only

64.

65.

66.

67.

68.



---

24 While Mr. Vincent went on to say that the 3 month stability data "should be generated so that it may be provided when available upon request," he stated that the stability data did not need to be generated before Teva responded to the October 12, 2006 deficiency letter, and explained that "We will state [in the response to the October 12, 2006 deficiency letter] that since the process/formula has not changed from the original ANDA, that the stability would not be impacted." *Id.*

69. ██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

70. ██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

71. ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

37

72. ███████████████████████████████████

███████████████████████████████████████

████████████████

73. ████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████

74. ████████████████████████████████████

███████████████████████████████████████

████████████████  ████████████████  ███████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████  ████████████████

███████████████████████████████████████

███████████████████████████████████████

████████  ██████████████

75. ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only

76. ████████████████████████████████

77. ████████████████████████████████

78. ████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only



79.

80.

81.

---

[25] The April 2007 response date itself is conservative. A motivated generic manufacturer with an imminent launch opportunity would have manufactured the batches requested by the FDA in the October 2006 deficiency in two months. Teva took four months (February 2007) to manufacture such batches.

Highly Confidential—
Attorneys' Eyes Only



82.

83.

84.

---

[26] See, e.g., Teva Pharmaceutical Industries Ltd. - Teva Reports Record Full Year 2008 and Fourth Quarter Results Press Release, dated February 17, 2009 ("2008 was a year of record-breaking results and major strategic achievements for Teva. During the year we extended our leadership in the U.S. and globally, had a record number of Paragraph IV launches…"); Teva Pharmaceutical Industries Ltd. - Teva Reports Record Full Year 2009 And Fourth Quarter Results Press Release, dated February 16, 2010, ("Record quarterly and annual net sales of $3.8 billion and $13.9 billion, up 33% and 25%, respectively, compared to the comparable period in 2008.").

Highly Confidential—
Attorneys' Eyes Only

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**D.    Mylan Would Have been Able to Obtain Final FDA Approval and Launch Its
Generic Effexor XR Eleven Months After an Earlier Launch by Teva.**

85.    It is also my opinion, to a reasonable degree of professional certainty, that if Teva
had obtained final FDA approval and launched its generic versions of Effexor XR earlier than
July 1, 2010, Mylan would have been able to obtain FDA approval and commercially
manufacture its generic Effexor XR products 11 months after Teva's launch, assuming it had a
license from Wyeth to do so.[27]

86.    FDA tentatively approved Mylan's ANDA on November 13, 2008.  This tentative
approval indicates that there were no technical or scientific impediments preventing
FDA's approval of Mylan's ANDA at that point.[28] The FDA's approval was tentative and not
final only because of the existence of unexpired legal and regulatory impediments to final
approval, i.e., Teva's 180 days of first to file exclusivity, the 30 month stay, and Wyeth's patents
that were the subject of the patent litigation between Mylan and Wyeth.  I have reviewed the
documents Mylan produced and the declaration it provided and there is no indication that Mylan

---

[27] I am not offering an opinion on whether Mylan would have obtained such a license, and have been
asked by counsel to assume that the jury will be presented with facts that support this assumption.

[28] MYL-VENLA-0000039

FDA only grants tentative approval when it determines that an application satisfies all technical and
scientific requirements and would be granted final approval were it not for the existence of an external
impediment such as unexpired exclusivity which does not reflect on the underlying quality or
approvability of the application. legal or regulatory exclusivities, none of which affect the underlying
quality of the drug or application. § 21 CFR 314.3(b).

Highly Confidential—
Attorneys' Eyes Only

had regulatory issues relating to its Effexor XR ANDA that arose between the time it received

tentative approval in November 2008 and the time it received final approval in June 2011.

Accordingly, assuming that Wyeth and Mylan settled the patent litigation for a licensed entry

date that was eleven months after Teva's (earlier) licensed entry date and that Teva's 180 days of

exclusivity has expired, as Plaintiffs' counsel asked me to assume, Mylan would have been able

to obtain FDA final approval of its ANDA no later than eleven months after Teva launched its

generic.

87.     It is also my opinion that Mylan would have been able to commercially launch its

generic Effexor ER products immediately after obtaining FDA final approval.  At all times

relevant to this report, Mylan was a large, sophisticated, experienced generic company with

substantial resources, significant manufacturing capabilities, and a history of successful generic

launches.[29] Additionally, Mylan was able to launch its generic Effexor XR products in June

2011.  Further, the Mylan Declaration states that there were no manufacturing or supply

constraints that would have prevented it from launching between November 13, 2008, the date of

tentative approval, and June 1, 2011.

88.     I hold the above opinions to a reasonable degree of professional certainty. I

reserve all rights to modify this opinion if more information comes to light over the course of

this litigation.

---

[29] See, e.g., Mylan 2008 Form 10K ("we have successfully introduced generic products with high barriers to entry, including our launches of, among others, extended phenytoin sodium, carbidopa and levodopa, buspirone and levothyroxine sodium. Several of these products continued to be meaningful contributors to our business several years after their initial launch due to their high barriers to entry. Additionally, we expect to achieve growth in our U.S. business by launching new products for which we may attain FDA first-to-file status with Paragraph IV certification.")

Highly Confidential—
Attorneys' Eyes Only

Dated: May 15, 2025

/s/ _____

Daisy Rivera-Muzzio

# EXHIBIT A

# DAISY RIVERA-MUZZIO, R.PH , MS, MBA

9 Bay Ave, Long Branch, NJ 07740▪609-285-8344 ▪ drmuzzio@acumenbiopharma.com
https://www.linkedin.com/in/daisyrmuzzio/

## SENIOR EXECUTIVE| INTERNATIONAL BUSINESS DEVELOPMENT|PRODUCT DEVELOPMENT |MANUFACTURING OPERATIONS

Results-oriented pharmaceutical business executive with global capabilities in licensing, in sourcing and outsourcing, cross-functional due diligence, product development and manufacturing operations. Global experience in establishing business collaborations and leading strategic initiatives to support business growth for Pharmaceuticals (Branded and Generic Products), Animal Health and Consumer (OTC),

- ✓ Proven track record as a strong negotiator of complex partnerships
- ✓ Designed and implemented a cross functional due diligence risk assessment for product licensing
- ✓ Strong operational background covering full cycle of a product from Development to Commercialization

## KEY EXPERTISE

- Product In-Licensing/ Out- licensing
- Contract Negotiations
- Cross functional Due Diligence
- Team Building and Leadership
- Revenue and Profit Maximization
- Mentoring

- Business Case (opportunities valuation)
- Product Design and Development
- Technology Licensing
- Project/Program Management
- Alliance Management

## PROFESSIONAL BACKGROUND

**Acumen BioPharma, LLC**
**President & Co-Founder**                                         **2011-Present**
Responsible for building the infrastructure, driving the strategy and execution of a full service provider of scientific expert witness and consulting services for intellectual property and antitrust litigations in the biopharmaceutical field. Acumen BioPharma serves Intellectual Property Law Firms, Regulatory Agencies and Bio-Pharmaceutical companies with access to laboratory testing services and the premier network of experts in pharmaceutical processing/ formulation, particle science technology and biotechnology. It also serves antitrust litigation law firms seeking for analysis of manufacturing, regulatory, pricing and commercial operations in the  pharmaceutical industry.
*Reference : www.AcumenBioPharma.com.*

**Integra Continuous Manufacturing Systems (Integra CMS)**            **2015-Present**
**Chief Operating Officer**

**Responsible for all business operations and management of contractual alliances.** Integra CMS is the leading provider of engineering consulting services dedicated to advanced pharmaceutical manufacturing technologies integrating services of equipment manufacturers, PAT controls and formulation expertise in the development and implementation of continuous manufacturing technologies in the life science industries. *Reference :www.integracms-pharma.com*

**DRM BioPharm Source, LLC**
**Managing Partner**                                             **2011- 2015**
Independent consulting practice dedicated to serve corporate leaders within the Healthcare and Life Sciences industries on business growth strategies.  Assists developers of innovative technology and entrepreneurs to implement collaborative partnerships and accelerate the commercialization of their intellectual property**.**
***Key areas of expertise*:** Generics Pharmaceuticals, Biosimilars, Drug Delivery Systems, Animal Health, and Consumer Health, Emerging Markets

# DAISY RIVERA-MUZZIO, R.PH , MS, MBA

**Pfizer, Inc.,** Peapack, New Jersey/ New York, New York                                    **2002-2011**
**Senior Director Product Licensing - Established Products Business Unit,** 2009-2011
Primary accountability for the negotiation of deal terms and completion of licensing, partnerships and
supply agreement transactions. Led cross-functional teams to build business case and value drivers to
support the investment. Developed and implemented strategy for cross-functional due diligence to
complete risk assessment.
Accomplishments

- Completed negotiations of six licensing and supply agreements in the generic business with a 5-
  year projected incremental net revenue of **$300M.**
- Concluded cross-functional team assessments and led negotiations for twelve additional
  licensing initiatives with projected sales potential of over **$1B.**
- Conducted cross-functional evaluations of seven major platform technologies for generic
  formulations.
- Completed screening of 40+ additional partnering opportunities.
- Managed negotiation and cross functional evaluations for eight licensing opportunities (POST
  LOE) with a 5 year estimated potential revenue generation of $**700M**

**Director / Team Leader Global Contract Manufacturing Latin America,** 2006-2008
**Director of Global Contract Manufacturing for Latin America and Canada,** 2002-2006

Directed and coordinated activities of cross-functional direct reports and peers, providing strategic
management to 60 contract manufacturers with an annual expenditure of $105M and oversaw sales of more
than $1B for 20 markets in Latin America and Canada regions.

- Created and executed various strategic plans to expand outsourcing operations to meet business
  needs, increase revenue, and minimize risk.
- Defined and implemented a multidisciplinary due diligence / risk assessment program to develop and
  maintain contractual partnerships to supply products for Animal Health, Pharmaceuticals, and
  Consumer Health business organizations.
- Negotiated and settled multiple product supply agreements with third parties in launching new
  products, product line extensions, and business growth in the region.
- Performed continuous improvement strategies to improve customer service metrics while switching
  sub-optimal suppliers into strategic sourcing sites to ensure product supply and improve business
  performance.
- Delivered superior leadership functions in buy side operations from Pfizer to J&J for Cali, Columbia
  having an annual expenditure of $16M and sales of $140M annually.
- Managed four planning and supply chain professionals, responsible for supplier relationship
  management, production planning, project management for the resolution of financial, supply and
  quality issues.

**DRA Consulting, LLC**                                                              **2001-2002**
**Technical / Management Consultant**

Independent consulting providing technical and managerial expertise to the pharmaceutical and chemical
industry.
 (Pfizer Animal Health - Lincoln, NE)

- Executed scientific expertise and leadership/coordination concerning change management, technical
  services, product and process transfers, manufacturing process optimization, validation, QA/QC, and
  regulatory compliance.

(Watson Pharmaceuticals / Schein Pharmaceuticals - Danbury, CT)

- Consulted for Watson after the acquisition of Schein Pharmaceuticals in August 2000. Co-led the
  development of a strategic plan for the newly created Product Development organization resulting

# DAISY RIVERA-MUZZIO, R.PH , MS, MBA

from the merger. Continued to provide direction and advisory counsel to the Product Development Solid Dose Operations.

**Watson Pharmaceuticals / Schein Pharmaceuticals** - Danbury, CT
**1997-2001**
**Director of Product and Process Development**

Led all new product and process development activities for solid dose products; supervised cross-functional team of 30 direct reports; and prepared business model structure of four units including materials characterization and pre-formulation, formulation and process development, compliance, and project management.

- Established the product development organizational structure to achieve quality standards and develop ANDA submissions, which led to the identification of FDA requirements and attainment of business growth through steady flow of new product launches.
- Developed and trained a team of 30 Scientists and Engineers; mentored and supervised a scientific staff responsible for the establishment of an effective dual ladder succession plan and developed the engagement of technical and managerial professionals.
- Built and maintained collaborative relationships among interdepartmental groups such as scientific and regulatory affairs, quality operations, business development, and marketing to support corporate goals while launching three new products annually.

## EARLIER CAREER

Director of Technical Services, Watson Pharmaceuticals/Schein Pharmaceuticals - Danbury, CT
Team Leader (Pharmaceutical Technology), Warner Lambert - Vega Baja, Puerto Rico
Quality Assurance / Regulatory Manager, Bolar, Inc. - Humacao, Puerto Rico
Quality Assurance Coordinator, Sterling Pharmaceuticals -Barceloneta, Puerto Rico

## FORMAL EDUCATION

**MBA / Management of Technology** (Sloan School of Business and MIT School of Engineering): 1993
Massachusetts Institute of Technology -Boston, MA

**Master of Science in Industrial Pharmacy**: 1990
**Bachelor of Science in Pharmaceutical Sciences (Magna Cum Laude):**
University of Puerto Rico (School of Pharmacy) –Rio Piedras, Puerto Rico

## LICENSES

Registered Pharmacist in the Commonwealth of Massachusetts
Registered Pharmacist in the Commonwealth of Puerto Rico

## AFFILIATIONS

MIT Educational Council- NJ Chapter
Licensing Executive Society (LES)-NJ
- o Co-Chair NJ Chapter
- o 2019-2020 Member Advisory Board

Colegio de Farmaceuticos de PR
Bio NJ
MIT Sloan Alumni Network Group
MIT Alumni Association NJ
- • 2011 Board Member – VP of Programs

Latinas in STEM
Healthcare Businesswomen Association
Women in Bio (WIB)
MIT Alumni Association's Strategic Change
Implementation Committee (SCIC)
Pharmaceutical Engineering Program Industrial
Advisory Board, Rutgers University
MIT Alumni Advisory Hub
The Alumni Society
Latinas in STEM

# DAISY RIVERA-MUZZIO, R.PH , MS, MBA
### INVITED SPEAKER/PRESENTATIONS AND CONFERENCES

**Business, Intellectual Property and Regulatory Clinical Strategies for Expansion into Latin America with Branded Generics, (Chairperson, Speaker and Panel Moderator)**
Branded Generics: New Avenue for Rx Expansion into Emerging Markets Conference, February 27-28, 2012, Hub Cira Center, and Philadelphia, PA, organized by Cypin Productions

**Getting the Most of your Alliance Internationally by Maximizing your Partner's Resources**
**Pharmaceutical Licensing Partnerships and Alliance Management Conference– Speaker**
July 18-19, 2011, Philadelphia, PA. Organized by Q1 Productions

**How Does the Licensing Process Differ for In-licensing and Out-licensing Companies? - Panel Speaker -**
**Pharma & Biotech Licensing & Partnering Conference,** Filling the Pipeline & Growing Market Share Through Strategic Deal-Making. **March 2-3, 2011,** Double Tree Hotel, San Diego, CA. Organized by iiBIG

**Creating Innovation through Partnering – Conference on Global Supplier & Partnership Management,** December 1-2, 2010, Kempinski Hotel Bristol, and Berlin, Germany. Organized by CPhI Conferences

**Strategies and Opportunities for Outsourcing of Product Development and Manufacturing Services from Latin America – Conference on Drug Development in Latin America**, March 9-10, 2009, Hyatt Regency, Miami, Florida. Organized by Cambridge Healthtech Institute

# EXHIBIT B

**MATERIALS CONSIDERED**

**Bates-numbered Documents:**

AMN-EFFEX0010838
MYL-VENLA-0000005
MYL-VENLA-0000039
MYL-VENLA-0000049
MYL-VENLA-0000832
MYL-VENLA-0000957
MYL-VENLA-0002259
MYL-VENLA-0003712
MYL-VENLA-0004009
MYL-VENLA-0004592
TEVA_EFFEX_0000001
TEVA_EFFEX_0003838
TEVA_EFFEX_0005072
TEVA_EFFEX_0005531
TEVA_EFFEX_0006051
TEVA_EFFEX_0006362
TEVA_EFFEX_0009776
TEVA_EFFEX_0009792
TEVA_EFFEX_0009869
TEVA_EFFEX_0009893
TEVA_EFFEX_0009896
TEVA_EFFEX_0009908
TEVA_EFFEX_0009912 (Pastore Ex. 6)
TEVA_EFFEX_0010211 (Erickson Ex. 5)
TEVA_EFFEX_0010218 (Pastore Ex. 23a)
TEVA_EFFEX_0010684 (Pastore Ex. 23b)
TEVA_EFFEX_0011074 (Pastore Ex. 23c)
TEVA_EFFEX_0011544 (Erickson Ex. 24)
TEVA_EFFEX_0011914
TEVA_EFFEX_0012297
TEVA_EFFED_0012880 (Pastore Ex. 28)
TEVA_EFFEX_0012897
TEVA_EFFEX_0012910 (Erickson Ex. 21)
TEVA_EFFEX_0013464
TEVA_EFFEX_0014100
TEVA_EFFEX_0014118
TEVA_EFFEX_0014204
TEVA_EFFEX_0014246
TEVA_EFFEX_0014254
TEVA_EFFEX_0014255
TEVA_EFFEX_0015801
TEVA_EFFEX_0015812
TEVA_EFFEX_0017943
TEVA_EFFEX_0017956
TEVA_EFFEX_0018448
TEVA_EFFEX_0018454
TEVA_EFFEX_0019487

TEVA_EFFEX_0028040
TEVA_EFFEX_0029332
TEVA_EFFEX_0030456
TEVA_EFFEX_0034388
TEVA_EFFEX_0034686
TEVA_EFFEX_0035505 (Pastore Ex. 25)
TEVA_EFFEX_0035516
TEVA_EFFEX_0035753
TEVA_EFFEX_0035763
TEVA_EFFEX_0035769
TEVA_EFFEX_0035775
TEVA_EFFEX_0035875
TEVA_EFFEX_0038329
TEVA_EFFEX_0038347
TEVA_EFFEX_0038700
TEVA_EFFEX_0038708
TEVA_EFFEX_0038717
TEVA_EFFEX_0039069
TEVA_EFFEX_0039082
TEVA_EFFEX_0039086
TEVA_EFFEX_0039168
TEVA_EFFEX_0039250
TEVA_EFFEX_0039343
TEVA_EFFEX_0039455
TEVA_EFFEX_0039708
TEVA_EFFEX_0040903
TEVA_EFFEX_0040939
TEVA_EFFEX_0040990
TEVA_EFFEX_0043762
TEVA_EFFEX_0049412
TEVA_EFFEX_0049415
TEVA_EFFEX_0050926
TEVA_EFFEX_0051068
TEVA_EFFEX_0051072
TEVA_EFFEX_0051555
TEVA_EFFEX_0051820
TEVA_EFFEX_0052058
TEVA_EFFEX_0052146
TEVA_EFFEX_0053659
TEVA_EFFEX_0054744
TEVA_EFFEX_0071606
TEVA_EFFEX_0079569
TEVA_EFFEX_0083368
TEVA_EFFEX_0093213
TEVA_EFFEX_0094582
TEVA_EFFEX_0096689
TEVA_EFFEX_0096703
TEVA_EFFEX_0097850 (Erickson Ex. 22)
TEVA_EFFEX_0097852
TEVA_EFFEX_0098003
TEVA_EFFEX_0128411

TEVA_EFFEX_0130513
TEVA_EFFEX_0138527
TEVA_EFFEX_0140526 (Pastore Ex. 32)
TEVA_EFFEX_0229734
TEVA_EFFEX_0236224
TEVA_EFFEX_0236228
TEVA_EFFEX_0236718
TEVA_EFFEX_0237011 (Pastore Ex. 20)
TEVA_EFFEX_0237233 (Pastore Ex. 16)
TEVA_EFFEX_0237528
TEVA_EFFEX_0237530
TEVA_EFFEX_0237566
TEVA_EFFEX_0270889 (Pastore Ex. 30)
TEVA_EFFEX_0319286
TEVA_EFFEX_0321639
TEVA_EFFEX_0321913
TEVA_EFFEX_0321938
TEVA_EFFEX_0325003
TEVA_EFFEX_0773524
TEVA_EFFEX_0773600 (Pastore Ex. 9)
TEVA_EFFEX_0774574 (Pastore Ex. 7)
TEVA_EFFEX_0777650
TEVA_EFFEX_0777718 (Pastore Ex. 11a)
TEVA_EFFEX_0777719 (Pastore Ex. 11b)
TEVA_EFFEX_0785297
TEVA_EFFEX_0785303
TEVA_EFFEX_0785311
TEVA_EFFEX_0795155
TEVA_EFFEX_0797019 (Erickson Ex. 30)
TEVA_EFFEX_0801461
TEVA_EFFEX_0805323 (Pastore Ex. 14b)
TEVA_EFFEX_0813602
WYEFFAT02161418
WYEFFAT04649442
WYEFFAT06599755
WYEFFAT07261584
WYEFFAT0955271

**Deposition Transcripts and Exhibits:**
Erickson, Phillip - January 30, 2025 Deposition and Exhibits
Jaskot, Deborah - February 4, 2025 Deposition and Exhibits
Pastore, Jill - March 6, 2025 Deposition and Exhibits

**Other Documents:**
Benet, L.Z., Understanding Bioequivalence Testing, 7S-9S Transplantation Proc. 31 3A Suppl. (1999)
Generic Drug Facts, FDA (Nov. 1, 2022).

Pharma Excipients News: "Pharmatrans SANAQ® Sugar Spheres and MCC Pellet Excipients for Controlled Release"

Direct Purchaser Plaintiffs' Second Amended Consolidated Complaint

Complaint for Patent Infringement (Wyeth v. Mylan Pharma., 07-cv-91 (N.D. W.Va.) ECF 1)

Declaration of Bradley Matta dated March 25, 2025

Drug Price Competition and Patent Restoration Act of 1984, Pub. L. No. 98- 417, 98 Stat. 1585 (1984)

https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/020699s081lbl.pdf.

Teva Pharmaceutical Industries Ltd. - Teva Reports Record Full Year 2008 and Fourth Quarter Results Press Release, dated February 17, 2009

Teva Pharmaceutical Industries Ltd. - Teva Reports Record Full Year 2008 and Fourth Quarter Results Press Release, dated February 16, 2010

Mylan 2008 Form 10-K