# Exhibit 14
# (Filed Under Seal)

# GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE

### A PROFESSIONAL CORPORATION

**ATTORNEYS AT LAW**

**KEVIN J. MCKENNA**
Director
(973) 596-4729

ONE RIVERFRONT PLAZA
NEWARK, N.J. 07102-5497
973-596-4500

DIRECT FACSIMILE
(973) 639-8279
KMcKenna@gibbonslaw.com

WEB SITE
http://www.gibbonslaw.com

December 6, 2005

**VIA HAND DELIVERY**

Honorable William J. Martini, U.S.D.J.
United States District Court
Martin Luther King, Jr. Federal
   Building and Courthouse
50 Walnut Street
Newark, NJ 07102

   Re:   *Wyeth v. Teva Pharmaceuticals USA, Inc. et al.*
         *Civil Action No.:   03-1293 (WJM)*

Dear Judge Martini:

   In connection with the settlement of the above-referenced matter, we enclose the following on behalf of our client Wyeth and counsel for Teva:

1. Joint Motion to Vacate *Markman* Rulings, To Enter Dismissal Order, and To Enter Stipulated Order;

2. Order Vacating Markman Rulings;

3. Dismissal Order;

4. Stipulated Order with attached Redacted Settlement and Release Agreement;

5. Notice of Joint Motion to Seal;

6. Certification of David A. Manspeizer, Esq. In Support of Motion to Seal;

7. Certification of David Marshall In Support of Motion to Seal;

8. Proposed Order Granting Motion to Seal;

9. Unredacted Settlement and Release Agreement and attached Exhibits (Confidential for Court's eyes only);

   In conformance with the Local Rules, the Joint Motion to Seal was electronically filed via CM/ECF on this date. If the Vacating Markman Rulings, Dismissal and Stipulated Orders

#1037317 v1
104419-49018

NEW YORK OFFICE • ONE PENNSYLVANIA PLAZA, 37TH FLOOR, NEW YORK, NY 10119-3701 • 212-649-4700

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                    WYEFFAT2405314

GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE

Honorable William J. Martini, U.S.D.J.
December 6, 2005
Page 2

meet Your Honor's approval, kindly enter same and forward to the Clerk for docketing. Upon receipt of Your Honor's ruling on the Motion to Seal, the Redacted Settlement Agreement will be electronically filed via CM/ECF.

The parties remain available to address any aspect of the litigation and its settlement at Your Honor's convenience, and thank you for your kind consideration throughout.

Respectfully,

Kevin J. McKenna

cc:     Allyn Z. Lite, Esq. (via hand)
        Daryl Wiesen, Esq. (via facsimile)
        Henry C. Dinger, Esq. (via facsimile)
        Basil J. Lewris, Esq. (via facsimile)
        Linda A. Wadler, Esq. (via facsimile)
        Eileen Quinn Steiner, Esq.

#1037317 v1
t04419-49018

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405315

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYETH,<br><br>Plaintiff,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC., and<br>TEVA PHARMACEUTICAL INDUSTRIES LTD.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No.: 03-1293 (WJM) |

## JOINT MOTION TO VACATE MARKMAN RULINGS,
## TO ENTER DISMISSAL ORDER, AND TO ENTER STIPULATED ORDER

The parties in the above-captioned action have executed a Settlement And Release
Agreement dated November 2, 2005 (hereinafter referred to as the "Agreement").

Under paragraph 2(C) of the Agreement, the entire Agreement does not become effective
and binding unless certain Settlement Conditions are satisfied. Pursuant to those Settlement
Conditions, the parties hereby jointly request that the September 6, 2005 Markman Opinion and
Order, and the October 6, 2005 Letter Opinion and Order denying Wyeth's request for
reconsideration of the Markman Opinion and Order, be vacated; that the above-captioned action
be dismissed under the conditions specified in the attached Dismissal Order; and that a
permanent injunction in the form specified in the attached Stipulated Order be entered.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Accordingly, the parties respectfully request that the Court enter the attached (1) Order

Vacating Markman Rulings, (2) Dismissal Order, and (3) Stipulated Order.

_Kevin J. McKenna/SES_

Kevin J. McKenna, Esq.
Eileen Q. Steiner, Esq.
GIBBONS, DEL DEO, DOLAN,
   GRIFFINGER & VECCHIONE, P.C.
One Riverfront Plaza
Newark, New Jersey  07102-5496
(973) 596-4500

_Attorneys for Plaintiff Wyeth_

Allyn Z. Lite, Esq.
Michael E. Patunas, Esq.
LITE DEPALMA GREENBERG & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, NJ  07102-5003
(973) 623-3000

_Attorneys for Defendants Teva Pharmaceuticals_
_USA, Inc., and Teva Pharmaceutical Industries Ltd._

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYETH,<br><br>    Plaintiff,<br><br>   v.<br><br>TEVA PHARMACEUTICALS USA, INC., and<br>TEVA PHARMACEUTICAL INDUSTRIES LTD.,<br><br>    Defendants. | Civil Action No.: 03-1293 (WJM) |

## ORDER VACATING MARKMAN RULINGS

Having considered the parties Joint Motion to Vacate Markman Rulings, and as a result of the parties' having executed the Settlement and Release Agreement dated November 2, 2005, the Court hereby Orders that:

The September 6, 2005 Markman Opinion and Order, and the October 6, 2005, Letter Opinion and Order denying Wyeth's Request for Reconsideration of the Markman Opinion and Order, are hereby vacated.

SO ORDERED THIS _____ day of December, 2005.

_____
William J. Martini, U.S.D.J.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WYETH,<br><br>    Plaintiff,<br><br>     v.<br><br>TEVA PHARMACEUTICALS USA, INC., and<br>TEVA PHARMACEUTICAL INDUSTRIES LTD.,<br><br>    Defendants. | Civil Action No.: 03-1293 (WJM) |

## DISMISSAL ORDER

As a result of the parties having executed the Settlement and Release Agreement dated November 2, 2005 and the License Agreement (as defined in the Settlement and Release Agreement), the Court hereby Orders:

1) Until the expiration of United States Patent Nos. 6,274,171 B1; 6,403,120 B1; and 6,419,958 B2; or the termination of the License Agreement, Defendants shall not make, use, sell, offer for sale, or import XR Product, as that term is defined in the License Agreement, for use in the Territory, except as licensed under the License Agreement.

2) Defendants' Counterclaim(s) of patent invalidity and unenforceability are dismissed with prejudice. Defendants' Counterclaim(s) of non-infringement are dismissed without prejudice.

3) The Settlement and Release Agreement and the License Agreement entered into between the parties, which have been filed with this Court under seal, are adopted by the Court as part of this Order.

4) This Court retains jurisdiction to enforce this Order and the parties' Settlement and Release Agreement and License Agreement.

SO ORDERED.

             _____
             William J. Martini, U.S.D.J.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY            WYEFFAT2405319

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYETH, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 03-1293 (WJM) |
| | ) |
| TEVA PHARMACEUTICALS USA, INC., and | ) |
| TEVA PHARMACEUTICAL INDUSTRIES LTD., | ) |
| Defendants. | ) |

### STIPULATED ORDER

The parties hereby stipulate and agree that the Court may enter a permanent injunction in the following form:

It is hereby Ordered that Wyeth and Teva shall abide by the terms of the Settlement and Release Agreement, dated November 2, 2005, a redacted copy of which is attached hereto as Exhibit 1.

TEVA PHARMACEUTICALS USA, INC. and
TEVA PHARMACEUTICAL INDUSTRIES LTD.

By their attorneys,
LITE DEPALMA GREENBERG & RIVAS, LLC

By: _____
Allyn Z. Lite
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, New Jersey 07102-5003
(973) 623-3000

WYETH

By its attorneys,
GIBBONS, DEL DEO, DOLAN, GRIFFINGER
AND VECCHIONE

By: _Kevin J. McKenna /SQS_

Kevin McKenna
Eileen Q. Steiner
One Riverfront Plaza
Newark, New Jersey 07102
(973) 596-4500

SO ORDERED.

_____
William J. Martini, U.S.D.J.

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405322



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405323



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405324



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405325

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405326



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405327



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405328



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405329



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY     WYEFFAT2405330



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405331



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405333

**Exhibit B**
**U.S. License Agreement**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405334

CONFIDENTIAL – EXECUTION VERSION

LICENSE AGREEMENT

BY AND AMONG

WYETH, ACTING THROUGH ITS WYETH PHARMACEUTICALS DIVISION;

WYETH PHARMACEUTICALS COMPANY, INC.;

WYETH-WHITEHALL PHARMACEUTICALS INC.;

and

WYETH PHARMACEUTICALS COMPANY

(on the one hand)

AND

TEVA PHARMACEUTICAL INDUSTRIES LTD.

and

TEVA PHARMACEUTICALS USA, INC.

(on the other hand)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# TABLE OF CONTENTS

[REDACTED]

i

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405336

# [REDACTED]

## LICENSE AGREEMENT
### (United States)

This License Agreement (this "Agreement") is entered into as of December __, 2005 (the "Effective Date"), by and among Wyeth, acting through its Wyeth Pharmaceuticals Division, having a place of business at 500 Arcola Road, Collegeville, Pennsylvania 19426 ("Wyeth Pharmaceuticals"), Wyeth Pharmaceuticals Company, Inc., having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("WPCI"), Wyeth-Whitehall Pharmaceuticals Inc., having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("Wyeth-Whitehall") and Wyeth Pharmaceuticals Company, having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("WPC") on the one hand, and Teva Pharmaceutical Industries Ltd. ("Teva Ltd."), having a place of business at 5 Basel St. Petach Tikva 49131, Israel and Teva Pharmaceuticals USA, Inc. ("Teva USA"), having a place of business at 1090 Horsham Road, North Wales, PA 19454, on the other hand. Wyeth Pharmaceuticals, WPCI, Wyeth-Whitehall and WPC may be referred to herein collectively as "Wyeth". Teva Ltd. and Teva USA may be referred to herein collectively as "Teva". Wyeth and Teva may each be referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, the Parties have agreed to amicably settle patent litigation currently ongoing between them and on October 18, 2005 entered into a Binding Term Sheet (the "Term Sheet") in connection therewith; and

WHEREAS, in connection with such settlement, Wyeth is willing to grant, and Teva is willing to receive, subject to the terms and conditions set forth in this Agreement, a license to enable Teva to sell certain products in the Territory (as defined below) to its distributors and other customers for ultimate sale to consumers in the Territory; and

WHEREAS, the Term Sheet requires the Parties to negotiate and enter into a number of definitive agreements, including this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and stipulations set forth herein, and in the Settlement Agreement (as defined hereinafter),the receipt and legal sufficiency of which are hereby mutually acknowledged, Wyeth and Teva hereby agree as follows:

1.   **DEFINITIONS.**

As used in this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

WYEFFAT2405337

1.1. **"AB Rated"** shall mean "therapeutically equivalent" as evaluated by FDA, applying the definition of "therapeutically equivalent" set forth in the Preface to the current edition of the FDA publication "APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS" (the "Orange Book"), as such requirements may be amended in the future.

1.2. **"Affiliate"** shall mean with respect to any person or entity, any other person or entity which controls, is controlled by or is under common control with such person or entity. A person or entity shall be regarded as in control of another entity if it owns or controls at least fifty percent (50%) of the equity securities of the subject entity entitled to vote in the election of directors (or, in the case of an entity that is not a corporation, for the election of the corresponding managing authority), , *provided, however,* that if local law restricts foreign ownership, control shall be established by both (i) having direct or indirect ownership of the maximum ownership percentage that may, under such local law, be owned by foreign interests and (ii) having the power to direct and control the management and policies of such foreign entity, *and provided further, however,* that the term "Affiliate" shall not include subsidiaries or other entities in which a Party or its Affiliates owns a majority of the ordinary voting power necessary to elect a majority of the board of directors or other governing board, but is restricted from electing such majority by contract or otherwise, until such time as such restrictions are no longer in effect.

1.3. **"ANDA"** shall mean an Abbreviated New Drug Application as defined in the U.S. Federal Food, Drug and Cosmetic Act, as amended, and all applicable regulations promulgated thereunder.

1.4. **"Applicable Law"** shall mean all applicable provisions of all statutes, laws, rules, regulations, administrative codes, ordinances, decrees, orders, decisions, guidance documents (including FDA guidance documents), injunctions, awards judgments, and permits and licenses of or from governmental authorities relating to the use or regulation of the subject item.

1.5. **"Audit Period"** shall have the meaning set forth in Section 3.7.

1.6. **"Authorized Generic Product"** shall mean, with respect to IR Reference Product or XR Reference Product (in any dosage strength), as applicable, any product marketed or sold by or under license, waiver or other actual or effective authorization of, or supplied by or on behalf of, Wyeth or any of Wyeth's Affiliates or licensees, as IR Reference Product or XR Reference Product, as applicable, as a generic in the Territory (other than by Teva or Teva's Affiliates pursuant to this Agreement) not under the Effexor® trademark.

2

1.7. **"Business Day" or "business day"** shall mean any day other than a day which is a Saturday, a Sunday or a day on which banks in New York City, New York or Israel are authorized or obligated by law or executive order to not open or remain closed.

1.8. **"Compound"** shall mean venlafaxine hydrochloride and any form thereof including polymorphs and solvates, and other pharmaceutically acceptable salts of venlafaxine and any form thereof including polymorphs and solvates.

1.9. **"Compound Patent Termination Date"** shall mean the date on which [**].

1.10. **"Confidential Information"** shall mean any and all confidential information regarding, related to, or associated with the Compound, any Product, the IR Reference Product, the XR Reference Product, the Wyeth IP and/or this Agreement (other than the terms and conditions hereof, which shall be subject to Section 7.4) that (i) is disclosed by the Disclosing Party to the Receiving Party or otherwise obtained by the Receiving Party from the Disclosing Party as of and after the Signing Date or before the Signing Date in connection with the Litigation or settlement thereof or (ii) was disclosed by or on behalf of the Disclosing Party to the Receiving Party or the Receiving Party's attorneys in connection with the Litigation, whether or not covered by a protective order or other similar order issued with respect thereto.

1.11. **"Cost of Goods Sold"** shall mean, as applicable, (i) the costs incurred by Teva in manufacturing IR Products sold by Teva or its Affiliates in the Territory under this Agreement, *provided, however*, [**], or (ii) the costs incurred by Teva in manufacturing XR Products sold by Teva or its Affiliates in the Territory under this Agreement (including all applicable [**]). In calculating costs incurred in manufacturing IR Products or XR Products only those cost elements described in Exhibit 1.11 shall be included.

1.12. **"Disclosing Party"** shall mean the Party who is disclosing its Confidential Information to the Receiving Party.

1.13. **"FDA"** shall mean the United States Food and Drug Administration or any successor agency thereto.

1.14. **[**]**

1.15. **"IR ANDA"** shall mean ANDA No. 76-690 filed with the FDA by Teva, which ANDA seeks approval to market the IR Product.

1.16. **"IR Entry Date"** shall mean the earlier of (i) June 15, 2006, or [**].

3

1.17. **"IR IP"** shall mean (i) Patent Rights under U.S. Patent No. 4,535,186, (ii) all other U.S. Patent Rights owned or controlled as of the Signing Date or as of the Settlement Effective Date by Wyeth or any of its Affiliates that, but for the licenses contained herein, would be infringed by, the manufacture, use, sale, offer for sale or importation of any IR Product (including Compound to the extent necessary to manufacture IR Product), and (iii) all U.S. Patent Rights, claiming (directly or indirectly) priority to such U.S. patent and U.S. Patent Rights identified in clause (i) and (ii) or any of the applications to which any such U.S. patent or U.S. Patent Rights claim (directly or indirectly) priority, that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of any IR Product (including Compound to the extent necessary to manufacture IR Product).

1.18. **"IR New Indication"** shall have the meaning set forth in Section 2.1.5.

1.19. **"IR Product"** shall mean the immediate release tablet, which tablet contains venlafaxine hydrochloride as its sole active ingredient and is marketed by Teva or any of its Affiliates as a generic product AB Rated to IR Reference Product (in any dosage strength) in the Territory. For the sake of clarity, IR Product shall not include any IR Reference Product.

1.20. **"IR Reference Product"** shall mean the immediate release tablet containing, as its sole active ingredient, venlafaxine hydrochloride equivalent to either 25mg, 37.5mg, 50mg, 75mg or 100mg of venlafaxine (or other approved dosage strengths) which tablet is marketed in the Territory by Wyeth or any of its Affiliates or licensees as Effexor® under NDA No. 20-151.

1.21. **"Liability"** shall have the meaning set forth in Section 11.1.2.

1.22. **"Litigation"** shall mean that certain civil action for patent infringement brought by Wyeth against Teva in the United States District Court for the District of New Jersey which is referenced as Wyeth v. Teva, et al. (Civil Action No. 03-CV-1293(WJM)) and is the subject of the Settlement Agreement.

1.23. **"MDD"** shall mean major depressive disorder.

4

WYEFFAT2405340

1.24. "**Net Sales**" shall mean the aggregate gross sales of the amounts invoiced for the sale of XR Products and IR Products by Teva or any of its Affiliates in arm's length transactions with Third Parties ("Gross Sales") for use in the Territory, less [**]. Net Sales shall be determined using the accrual method of accounting determined in a manner consistent with Teva's practice for its other pharmaceutical products. Sales of Product(s) by and between Teva and its Affiliates are not sales to Third Parties and shall be excluded from Net Sales calculations for all purposes, it being understood that the sale of a Product by Teva or any of its Affiliates to a Third Party shall be utilized in calculating Net Sales under this Agreement.

1.25. [**]

1.26. [**]

1.27. [**]

1.28. [**]

1.29. "**Other Patent Rights**" shall mean [**].

1.30. "**Patent Rights**" shall mean all patents and patent applications, including all provisional applications, substitutions, continuations, continuations-in-part, divisions, and renewals, all patents granted thereon, and all patents-of-addition, reissues, reexaminations, extensions and extended exclusivities (including supplementary protection certificates and pediatric extensions) or restorations by existing or future extension or restoration mechanisms.

1.31. "**Patents In Suit**" shall mean U.S. Patents 6,274,171 B1, 6,403,120 B1, and 6,419,958 B2.

1.32. "**Product**" shall mean the IR Product and/or the XR Product, as the context requires.

1.33. "**Profits**" shall mean, with respect to any Product sold by Teva or any of Teva's Affiliates, Net Sales of such Product less the Costs of Goods Sold for such Product.

1.34. "**Receiving Party**" shall mean the Party who is receiving Confidential Information from the Disclosing Party.

1.35. [**]

1.36. [**]

1.37. [**]

5

1.38. [**]

1.39. **"Settlement Agreement"** shall mean that certain Settlement and Release Agreement entered into by the Parties and dated November 2, 2005.

1.40. **"Settlement Effective Date"** shall mean the date on which all of the Settlement Conditions set forth in the Settlement Agreement have occurred such that this Agreement and the settlement becomes effective as provided in the Settlement Agreement.

1.41. **"Signing Date"** shall mean October 18, 2005.

1.42. **"Territory"** shall mean the United States and its territories and possessions.

1.43. **"Teva DMF"** shall mean the drug master file submitted by Teva to the FDA on December 2, 2002 relating to the manufacture of venlafaxine hydrochloride and identified as DMF No. 16281.

1.44. **"Teva Indemnitees"** shall have the meaning set forth in Section 11.1.2.

1.45. **"Third Party"** shall mean any person or entity other than Wyeth, Teva or any of their respective Affiliates.

1.46. [**]

1.47. **"Transaction Agreements"** shall mean this Agreement and the Settlement Agreement.

1.48. **"Valid Claim"** shall mean either (a) a claim of an issued and unexpired Patent Right which has not been revoked or held unenforceable or invalid by a decision of a court or other governmental agency of competent jurisdiction, which revocation or holding is unappealable or unappealed within the time allowed for appeal, and which has not been disclaimed, denied or admitted to be invalid or unenforceable through reissue or disclaimer or otherwise, or (b) a claim of a pending application for a Patent Right which claim was filed in good faith and has not been abandoned or finally disallowed without the possibility of appeal or refiling of said application.

1.49. **"Wyeth Indemnitees"** shall have the meaning set forth in Section 11.1.3.

1.50. **"Wyeth IP"** shall mean the IR IP and the XR IP.

1.51. **"XR ANDA"** shall mean ANDA No. 76-565 filed with the FDA by Teva, which ANDA seeks approval to market the XR Product.

1.52. [**]

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1.53. **"XR Entry Date"** shall mean the earlier of (i) July 1, 2010, [**].

1.54. **"XR IP"** shall mean the IR IP, plus (i) U.S. Patent Nos. 5,916,923, 6,274,171, 6,403,120, 6,419,958, and 6,444,708, (ii) all other U.S. Patent Rights owned or controlled as of the Signing Date or as of the Settlement Effective Date by Wyeth or any of its Affiliates that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of any XR Product (including Compound to the extent necessary to manufacture XR Product), and (iii) all U.S. Patent Rights, claiming (directly or indirectly) priority to such U.S. patents and U.S. Patent Rights identified in clause (i) and (ii) or any of the applications to which any such U.S. patents or U.S. Patent Rights claim (directly or indirectly) priority, that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of any XR Product (including Compound to the extent necessary to manufacture XR Product).

1.55. **"XR New Indication"** shall have the meaning set forth in Section 2.2.7.

1.56. **"XR Patent Termination Date"** shall mean the date on which [**].

1.57. **"XR Product"** shall mean once-daily extended release capsule, which capsule contains venlafaxine hydrochloride as its sole active ingredient and is marketed by Teva or any of its Affiliates as a generic product AB Rated to XR Reference Product (in any dosage strength) in the Territory. For the sake of clarity, XR Product shall not include XR Reference Product.

1.58. **"XR Reference Product"** shall mean the once-daily extended release capsule containing, as its sole active ingredient, venlafaxine hydrochloride equivalent to either 37.5mg, 75mg or 150mg of venlafaxine (or other approved dosage strengths) which capsule is marketed in the Territory by Wyeth or any of its Affiliates or licensees as Effexor® XR under NDA No. 20-699.

2. **RIGHTS GRANTED.**

   2.1. **IR Product Rights.**

      2.1.1. **Exclusive Commercialization License.** Effective as of the IR Entry Date, Wyeth hereby grants to Teva and its Affiliates an exclusive, non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under the IR IP, to use, offer for sale, sell, import and have imported IR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to

7

WYEFFAT2405343

consumers for use in the Territory. From the Signing Date until the Compound Patent Termination Date, neither Wyeth nor any of its Affiliates will market, sell, supply, distribute or manufacture any Authorized Generic Product of IR Reference Product (in any dosage strength), or license, grant a waiver or otherwise authorize or cause or allow any Third Party to do the same, for sale in the Territory. The license granted under this Section 2.1.1 shall remain in effect until such time as there are no more Valid Claims contained in the IR IP.

2.1.2. **Manufacturing License.** Effective as of the IR Entry Date, Wyeth hereby grants to Teva and its Affiliates a non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under all IR IP and those foreign counterparts to the IR IP in the territories next specified, to manufacture and have manufactured IR Products (including Compound to the extent necessary to manufacture IR Products) in the United States [**], but if outside the Territory, only for the importation of such IR Products and Compound (solely for the purposes of manufacturing IR Products) into the Territory and the other activities in the Territory permitted by the license granted in Section 2.1.1. The license granted under this Section 2.1.2 shall remain in effect until such time as there are no more Valid Claims contained in the IR IP.

2.1.3. **Regulatory Licenses and Waivers.** Wyeth hereby grants to Teva a non-transferable (except to the extent permitted in Section 13.2) license or waiver (as applicable), without the right to grant sublicenses, under any regulatory exclusivities that Wyeth or any of its Affiliates has for the IR Products in the Territory, but only to the extent required for Teva and its Affiliates to exercise in full the licenses contained in Sections 2.1.1 and 2.1.2 and the covenant not to sue contained in Section 2.1.5 (as may be expanded under Section 2.1.6). Such license or waiver will be exclusive for the same period of time as the corresponding license, and shall remain in effect until such time as there are no more Valid Claims subject to the licenses contained in Sections 2.1.1 or 2.1.2 or the covenant not to sue contained in Section 2.1.5 (as may be expanded under Section 2.1.6).

2.1.4. **Preparation for Launch.** The licenses contained in Sections 2.1.1 to 2.1.3 (other than any license to sell or distribute the IR Products) may be exercised [**] to enable Teva and its Affiliates to undertake reasonably necessary preparations to sell IR Product for use in the Territory as of the IR Entry Date (but not before), *provided, however,* that solely with respect to manufacturing and shipping to Teva or its Affiliates or Third Party warehouses under

8

Teva's or Teva's Affiliates' control launch amounts of IR Product, the licenses contained in Sections 2.1.1 to 2.1.3 may be exercised from [**]. Wyeth will notify Teva as soon as practicable of the expected and actual occurrence of the IR Entry Date. Teva shall not sell or distribute IR Product before the IR Entry Date.

**2.1.5. Covenant Not To Sue.** From such time as Teva and its Affiliates may exercise the licenses contained in Sections 2.1.1 to 2.1.4 with respect to the IR Products (including Compound for the purposes of manufacturing IR Products), Wyeth hereby covenants that Wyeth and its Affiliates will not sue, or cause or support any licensee or other Third Party to sue, any of Teva or its Affiliates, their manufacturers and importers, or their distributors and customers or their consumers, claiming that the manufacture, use, sale, offer for sale or importation of IR Products (including Compound for the purposes of manufacturing IR Products), within the scope of permitted activities covered by such licenses, infringes any Patent Rights which

   (i)    are not included in the IR IP but are owned [**] as of the Signing Date or thereafter by Wyeth or any of its Affiliates, and

   (ii)   cover (a) the compositions or formulations of IR Reference Product or IR Product or Compound for the purposes of manufacturing IR Product, or any of their use (including product-by-process claims), or (b) manufacture of IR Product or Compound by or on behalf of Teva or any of its Affiliates using manufacturing processes that (x) are identified or described in the IR ANDA or the Teva DMF as they exist on the Signing Date, or are materially the same thereto, and (y) were conceived prior to the Settlement Effective Date,

*provided, however,* that this covenant not to sue shall not extend to any Valid Claim claiming any (A) manufacturing process used or useful for IR Reference Product, IR Product or Compound for the purposes of manufacturing IR Products, other than those expressly identified in clause (ii)(b) above, or (B) subject to Section 2.1.6, IR New Indication. The foregoing covenant not to sue shall remain in effect until such time as there are no more Valid Claims contained in Patent Rights subject to such covenant not to sue. For sake of clarity, the foregoing covenant not to sue shall be in addition to and shall not limit any of the licenses provided for in Sections 2.1.1 to 2.1.4. Wyeth will impose the foregoing covenant not to sue on any Third Party to which Wyeth or any of its Affiliates may assign, license or otherwise transfer any Patent Rights subject to the foregoing covenant not to sue.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405345

2.1.6. **IR New Indications.** Wyeth shall notify Teva reasonably in advance of listing any Patent Rights on the Orange Book for IR Reference Product. If Wyeth or any of its Affiliates has or obtains any rights to Patent Rights claiming any additional, new or supplemental indication (other than MDD or an equivalent of MDD) for IR Reference Product not already approved as of the Signing Date (an "IR New Indication"), and any such Patent Rights are listed in the Orange Book for IR Reference Product, Wyeth hereby extends the covenant not to sue provided in Section 2.1.5 to such Patent Rights [**].

2.2. **XR Product Rights.**

2.2.1. **Exclusive Commercialization License.** Effective as of the XR Entry Date, subject to Section 2.2.5 below, Wyeth hereby grants to Teva and its Affiliates an exclusive non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under the XR IP, to use, offer for sale, sell, import and have imported XR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory. Such exclusive license will expire [**] after the XR Entry Date. From the Signing Date until the foregoing exclusive license expires, neither Wyeth nor any of its Affiliates will market, sell, distribute or manufacture any Authorized Generic Product of XR Reference Product (in any dosage strength), or license, grant a waiver or otherwise authorize or cause or allow any Third Party to do the same, for sale in the Territory.

2.2.2. **Nonexclusive Commercialization License.** Effective immediately upon expiration of the exclusive license granted under Section 2.2.1, subject to Section 2.2.5 below, Wyeth hereby grants to Teva and its Affiliates a non-exclusive non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under the XR IP, to use, offer for sale, sell, import and have imported XR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory. The license granted under this Section 2.2.2 shall remain in effect until such time as there are no more Valid Claims contained in the XR IP.

2.2.3. **Manufacturing License.** Effective as of the XR Entry Date, Wyeth hereby grants to Teva and its Affiliates a non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under the XR IP and those foreign counterparts to the XR IP in the territories next specified, to

10

manufacture and have manufactured XR Products (including Compound to the extent necessary to manufacture XR Products) in the United States [**], but if outside the Territory, only for the importation of such XR Products and Compound (for the purposes of manufacturing XR Products) into the Territory and the other activities in the Territory permitted by the licenses granted in Section 2.2.1 and 2.2.2. Such license shall be exclusive for [**] after the XR Entry Date and thereafter shall be nonexclusive. The license granted under this Section 2.2.3 shall remain in effect until such time as there are no more Valid Claims contained in the XR IP.

**2.2.4. Regulatory Licenses and Waivers.** Wyeth hereby grants to Teva a non-transferable (except to the extent permitted in Section 13.2) license or waiver (as applicable), without the right to grant sublicenses, under any regulatory exclusivities that Wyeth or any of its Affiliates has for the XR Products in the Territory, but only to the extent required for Teva and its Affiliates to exercise in full the licenses contained in Sections 2.2.1 to 2.2.3 and the covenant not to sue contained in Section 2.2.7 (as may be expanded under Section 2.2.8). Such license or waiver will be exclusive and non-exclusive for the same period of time as the corresponding license, and shall remain in effect until such time as there are no more Valid Claims subject to the licenses contained in Sections 2.2.1, 2.2.2 or 2.2.3 or the covenant not to sue contained in Section 2.2.7.

**2.2.5. Limitation on Licenses.** [**]

**2.2.6. Preparation for Launch.** The licenses contained in Sections 2.2.1 to 2.2.5 (other than any license to sell or distribute the XR Products) may be exercised [**] to enable Teva and its Affiliates to undertake reasonably necessary preparations to sell XR Product for use in the Territory as of the XR Entry Date (but not before), *provided, however,* that with respect to manufacturing and shipping to Teva or its Affiliates or Third Party warehouses under Teva's control launch amounts of product, the licenses contained in Sections 2.2.1 to 2.2.5 may be exercised [**]. Wyeth will notify Teva as soon as practicable of the expected and actual occurrence of the XR Entry Date. Teva shall not sell or distribute XR Product before the XR Entry Date.

**2.2.7. Covenant Not To Sue.** From such time as Teva and its Affiliates may exercise the licenses contained in Sections 2.2.1 to 2.2.6 with respect to the XR Products (including Compound for the purposes of manufacturing XR Products), Wyeth hereby covenants that Wyeth and its Affiliates will not sue, or cause or support any licensee or other Third Party to sue, any of Teva or its Affiliates,

11

WYEFFAT2405347

their manufacturers and importers, or their distributors and customers or their consumers, claiming that the manufacture, use, sale, offer for sale or importation of XR Products (including Compound for the purposes of manufacturing XR Products), within the scope of permitted activities covered by such licenses, infringes any Patent Rights which

(i) are not included in the XR IP but are owned [**] as of the Signing Date or thereafter by Wyeth or any of its Affiliates, and

(ii) cover (a) the compositions or formulations of XR Reference Product or XR Product or Compound for the purposes of manufacturing XR Product, or any of their use (including product-by-process claims), or (b) manufacture of XR Product or Compound by or on behalf of Teva or any of its Affiliates using manufacturing processes that (x) are identified or described in the XR ANDA or the Teva DMF as they exist on the Signing Date, or are materially the same thereto, and (y) were conceived prior to the Settlement Effective Date,

*provided, however*, that this covenant not to sue shall not extend to any Valid Claim claiming any (A) manufacturing process used or useful for XR Reference Product, XR Product or Compound for the purposes of manufacturing XR Products, other than those expressly identified in clause (ii)(b) above, or (B) subject to Section 2.2.8, XR New Indication. The foregoing covenant not to sue shall remain in effect until such time as there are no more Valid Claims contained in Patent Rights subject to such covenant not to sue. For sake of clarity, the foregoing covenant not to sue shall be in addition to and shall not limit any of the licenses provided for in Sections 2.2.1 to 2.2.6. Wyeth will impose the foregoing covenant not to sue on any Third Party to which Wyeth or any of its Affiliates may assign, license or otherwise transfer any Patent Rights subject to the foregoing covenant not to sue.

2.2.8. **XR New Indications.** Wyeth shall notify Teva reasonably in advance of listing any Patent Rights on the Orange Book for XR Reference Product. If Wyeth or any of its Affiliates has or obtains rights to any Patent Rights claiming any additional, new or supplemental indication (other than MDD or an equivalent to MDD) for XR Reference Product not already approved as of the Signing Date (an "XR New Indication"), and any such Patent Rights are listed in the Orange Book for XR Reference Product, Wyeth hereby extends the covenant not to sue provided in Section 2.2.7 to such Patent Rights [**].

12

**2.3.** **Sales Outside of Licensed Territory.** Teva acknowledges and agrees that the licenses granted to it in Sections 2.1 and 2.2 above each only provide Teva with the right to sell or distribute the IR Products or the XR Products, as applicable, sold under Teva's applicable ANDAs for use in the Territory. Accordingly, before the Compound Patent Termination Date or XR Patent Termination Date with respect to the IR Products or the XR Products sold under Teva's applicable ANDAs, respectively, Teva agrees to and to cause its Affiliates to:

(i) use all commercially reasonable efforts to impose upon its distributors and customers within the Territory for such IR Product or XR Product, as applicable, contractual obligations not to seek or accommodate consumers outside the Territory for such IR Product or XR Product, as applicable;

(ii) restrict its marketing, promotion, advertisement, sale and distribution of such IR Product or XR Product, as applicable, solely within the Territory;

(iii) not intentionally sell, market, promote, advertise, or distribute such IR Product or XR Product, as applicable, for use outside the Territory, and Teva shall use all commercially reasonable efforts to impose upon its distributors and customers a contractual obligation to observe the same;

(iv) not knowingly, directly or indirectly, sell such IR Product or XR Product, as applicable, to any Third Party for use in the Territory for resale outside the Territory; and exercise its reasonable commercial efforts to ensure its distributors and customers do not ship, sell or otherwise distribute such IR Product or XR Product, as applicable, for ultimate use by patients outside the Territory; and

(v) not sell such IR Product or XR Product, as applicable, via the Internet outside the Territory, or sell such IR Product or XR Product, as applicable, via mail order outside of the Territory, and Teva shall use all commercially reasonable efforts to impose, as an essential condition of doing business, upon its distributors and customers a contractual obligation to observe same.

[**]

13

**2.4.** **Retained Rights.** Other than the licenses and rights expressly set forth above, this Agreement will provide either Party no other right, title or interest, either express or implied, by estoppel or otherwise, in or to any of the other Party's intellectual property rights, including any patent right, trademark, copyright, trade secret or know-how. Without limiting the foregoing, Teva hereby acknowledges and agrees that, except as expressly set forth in this Agreement (including Article 2 and Section 13.2), it may not sublicense, subcontract or delegate to any Third Party all or part of the rights and obligations of Teva under this Agreement.

### 3. CONSIDERATION.

**3.1.** **Payments.**

**3.1.1.** **IR Product.** In consideration of Wyeth entering into this Agreement, Teva shall pay to Wyeth [**] of all Profits obtained by Teva or its Affiliates from the sale of IR Products for use in the Territory. [**] The consideration to be paid by Teva under this Section 3.1.1 will be payable for all IR Product sold prior to the Compound Patent Termination Date, but not thereafter. [**]

**3.1.2.** **XR Product.** In consideration of Wyeth entering into this Agreement, Teva will pay to Wyeth consideration at the rates set forth below on all Profits obtained by Teva or its Affiliates from the sale of XR Products for use in the Territory, for all XR Product sold prior to (but not after) the XR Patent Termination Date:

[**]

14

WYEFFAT2405350

**3.2.** [**]

**3.3.** [**]

**3.4.** **Reports and Payments.** For sales of IR Product by Teva or its Affiliates, within [**], and for sales of XR Product by Teva and its Affiliates, within [**], Teva will provide Wyeth with a written report of all sales of IR Products and XR Products, as applicable, for use in the Territory made by Teva or its Affiliates during such [**], and all Gross Sales, Net Sales and Profits obtained as a result of such sales. Payment of all amounts due to Wyeth shall be made by wire transfer simultaneously with the submission of each such report. The payments to be made by Teva to Wyeth pursuant to this Agreement shall be made in United States dollars.

**3.5.** **Late Payments.** Any payment due to Wyeth from Teva that is not paid on or before the date such payment is due under this Agreement shall bear interest at a rate of [**] per annum.

**3.6.** **Taxes.** Teva and Wyeth shall be responsible for and shall pay all taxes payable on any income to Teva and Wyeth, respectively, arising from any payments by Teva. Each of Teva and Wyeth shall bear sole responsibility for payment of compensation to their respective personnel, employees or subcontractors and for all employment taxes and withholding with respect to such compensation pursuant to Applicable Law. Teva shall have the right to withhold income taxes in the event that the revenue authorities in the applicable country require the withholding of such taxes on amounts paid hereunder to Wyeth. Any such tax paid or required to be withheld by Teva on account of any payments payable to Wyeth under this Agreement shall be deducted from the amount of payments due Wyeth. Teva shall secure and promptly send to Wyeth, as applicable, proof of such taxes withheld and paid by Teva for the benefit of Wyeth. Each Party agrees to cooperate with the other Parties in claiming exemptions from such taxes under any statute or regulation from time to time in effect.

15

**3.7. Record Keeping by Teva; Audits.** Teva shall keep and shall cause each of its Affiliates to keep accurate books and accounts of record in connection with the sale of the IR Products and XR Products in sufficient detail to permit accurate determination of all figures necessary for verification of payments required to be paid hereunder [**]. All such records shall be maintained for a period of [**] ("Wyeth Audit Period") after the end of the year in which they were generated. Upon reasonable prior notice, for the sole purpose of determining whether Teva is in compliance with the payment provisions of this Agreement, Wyeth shall have the right to have an independent public accounting firm, reasonably acceptable to Teva and not paid in whole or in part by a contingent fee arrangement, access the books and records of Teva and each of its Affiliates as may be reasonably necessary to verify the accuracy of the reports and payments paid hereunder during regular business hours at Teva's offices and in such a manner as not to interfere unreasonably with Teva's normal business activities. In no event shall such audits be conducted hereunder more frequently than [**]. Prior to commencing any such inspection and audit, any such independent auditor shall have entered into a reasonable and customary agreement with Teva which prohibits the disclosure of any information relating to Teva to any party, including Wyeth, except that such auditor may issue a report to Wyeth, which report shall also be provided to Teva, the sole purpose of which shall be to report to Wyeth whether Teva is in compliance with the payment provisions of this Agreement, including a summary of and sufficient detail regarding the scope, quality, and methodology of such compliance or lack thereof. If such independent accountant concludes that additional payments were owed to Wyeth during such period hereunder, Teva shall pay the additional consideration plus all interest payments due thereon within [**] after the date Wyeth delivers to Teva such accountant's written report so concluding. If such independent accountant concludes that Teva overpaid Wyeth hereunder with respect to such period, Wyeth shall reimburse the overpaid amounts within [**] after such date. Costs for the audit will be paid by Wyeth unless there is a discrepancy in the amount paid of greater than [**] in which case Teva shall reimburse Wyeth for the costs of the audit. In the event that Wyeth does not request to exercise its audit right during the Wyeth Audit Period all of Teva's reports and payments for which the Wyeth Audit Period has expired will be deemed final and binding. Wyeth shall treat all information received from Teva and/or the independent auditor under Sections 3.3 and 3.4 and this Section 3.7 as Confidential Information of Teva pursuant to Article 7.

16

WYEFFAT2405352

**3.8.** **Record Keeping by Wyeth; Audits.** In the event that Teva is required to pay to Wyeth any [**] as a result of Section 3.2 hereof, Teva, Wyeth shall keep and shall cause each of its Affiliates to keep accurate books and accounts of record in connection with any [**] that Teva is required to reimburse Wyeth for pursuant to Section 3.2 in sufficient detail to permit accurate determination of all figures necessary for verification of [**] required to be paid by Teva under Section 3.2. All such records shall be maintained for a period [**] ("Teva Audit Period") after the end of the year in which they were generated. Upon reasonable prior notice, for the sole purpose of determining whether Wyeth is correctly invoicing Teva for such [**] in compliance with the requirements of this Agreement, Teva shall have the right to have an independent public accounting firm, reasonably acceptable to Wyeth and not paid in whole or in part by a contingent fee arrangement, access the books and records of Wyeth and each of its Affiliates as may be reasonably necessary to verify the accuracy of the invoices submitted by Wyeth under Section 3.2 during regular business hours at Wyeth's offices and in such a manner as not to interfere unreasonably with Wyeth's normal business activities. In no event shall such audits be conducted hereunder more frequently than [**]. Prior to commencing any such inspection and audit, any such independent auditor shall have entered into a reasonable and customary agreement with Wyeth which prohibits the disclosure of any information relating to Wyeth to any party, including Teva, except that such auditor may issue a report to Teva, which report shall also be provided to Wyeth, the sole purpose of which shall be to report to Teva whether Wyeth is appropriately invoicing Teva for such [**]. If such independent accountant concludes that the amounts invoiced by Wyeth were in excess of the amounts properly due during such period hereunder and Teva paid such excess amounts, Wyeth, within [**] after the date Teva delivers to Wyeth such accountant's written report so concluding shall provide a refund to Teva in the amount of such excess payments, unless such errors in invoicing were due to errors in Teva's [**], whereupon Wyeth will issue a credit to Teva for such amount. If such independent accountant concludes that the amounts invoiced by Wyeth were less than the amounts properly due during such period, whether because of an error by Wyeth or an error by Teva [**], any amount underpaid by Teva as a result thereof with respect to such period, shall be paid by Teva within [**] after Teva receives such accountant's report. Costs for the audit will be paid by Teva unless there is a discrepancy (other than as a result of errors in Teva's [**]) in the amount paid of greater than [**] in which case Wyeth shall reimburse Teva for the costs of the audit. In the event that Teva does not request to exercise its audit right during the Teva Audit Period all of Wyeth's invoices for which the Teva Audit Period has expired will be deemed final and binding. Teva shall treat all information received from Wyeth and/or the independent auditor under Section 3.2 and this Section 3.8 as Confidential Information of Wyeth pursuant to Article 7. [**]

17

## 4. REGULATORY MATTERS; COMMERCIALIZATION.

### 4.1. ANDA Approvals.

**4.1.1.** **IR Product.** Teva may advise the FDA in connection with the IR ANDA (as the same may be converted from a Paragraph III ANDA to a Paragraph IV ANDA as provided in Section 2.E. of the Settlement Agreement) filed by it for the IR Product that the IR ANDA is approvable as a result of the license granted by Wyeth to Teva under Section 2.1, *provided, however*, [**]. As Teva may reasonably request, Wyeth shall submit appropriate and reasonable documentation to the FDA evidencing the licenses, covenants not to sue and waivers granted to it under this Agreement and the Settlement Agreement for the IR Product. Without limiting the generality of the foregoing, no later than the earlier of (i) June 15, 2006 or [**], Wyeth and Teva each shall send a letter to the FDA advising the FDA that Wyeth has granted a license to Teva for the IR Product and, as such, that the FDA may make approval of ANDA No. 76-690 effective on or after the IR Entry Date, assuming such ANDA is otherwise approvable, in order to authorize Teva to market and distribute IR Product in the Territory on and after the IR Entry Date.

**4.1.2.** **XR Product.** Teva may advise the FDA in connection with the XR ANDA filed by it for the XR Product that the XR ANDA is approvable as a result of the license granted by Wyeth to Teva under Section 2.2, [**]. As Teva may reasonably request, Wyeth shall submit appropriate and reasonable documentation to the FDA evidencing the licenses and waivers granted to it under this Agreement for the XR Product. Without limiting the generality of the foregoing, no later than the earlier of (i) June 1, 2010 or [**], Wyeth and Teva each shall send a letter to the FDA advising the FDA that Wyeth has granted a license to Teva for the XR Product and, as such, that the FDA may make approval of ANDA No. 76-565 effective on or after the XR Entry Date, assuming such ANDA is otherwise approvable, in order to authorize Teva to market and distribute XR Product in the Territory on and after the XR Entry Date.

### 4.2. Regulatory Reporting; Pharmacovigilance.

**4.2.1.** **IR Product.** Wyeth shall be solely responsible for all pharmacovigilance activities for the IR Reference Product and all Authorized Generic Products regarding IR Reference Product, including: AE/ADR reporting including literature review and

18

WYEFFAT2405354

associated reporting; AE/ADR follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (*e.g,* Dear Doctor Letters, restriction on distribution). Teva shall be solely responsible for all pharmacovigilance activities for the IR Product, including: AE/ADR reporting including literature review and associated reporting; AE/ADR follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (*e.g,* Dear Doctor Letters, restriction on distribution).

4.2.2. **XR Product.** Wyeth shall be solely responsible for all pharmacovigilance activities for the XR Reference Product and all Authorized Generic Products regarding XR Reference Product, including: AE/ADR reporting including literature review and associated reporting; AE/ADR follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (*e.g,* Dear Doctor Letters, restriction on distribution). Teva shall be solely responsible for all pharmacovigilance activities for the XR Product, including: AE/ADR reporting including literature review and associated reporting; AE/ADR follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (*e.g,* Dear Doctor Letters, restriction on distribution).

19

4.3. **Regulatory Approvals.** Teva shall designate NDC numbers for each presentation of IR Product and XR Product which bear Teva's or an Affiliate of Teva's labeler code and a product code which is not confusingly similar to any of the product codes utilized by Wyeth or any of its Affiliates as of the Signing Date for any IR Reference Product or any XR Reference Product (that is, as the product code portion of the NDC number utilized for the IR Reference Product contains either "0701", "0703", "0704", "0705" or "0781" and the product code portion of the NDC numbers utilized for the XR Reference Product contains either "0833", "0836" or "0837", neither Teva nor any of its Affiliates shall include any of string of numbers which is identical or confusingly similar to any of the foregoing as the product code portion of the NDC numbers utilized for the IR Product or the XR Product). Wyeth shall have no obligation to obtain, maintain or assist Teva in obtaining or maintaining any (except to the extent expressly provided in Section 4.1) regulatory and governmental permits, licenses and approvals for any IR Product or any XR Product.

5. **MANUFACTURING.**

5.1. **Manufacturing Responsibility.** Teva shall be solely responsible for manufacturing IR Product and XR Product in order to supply its demand therefor in the Territory in connection with its exercise of the rights and licenses granted to it hereunder.

20

## 6.  INTELLECTUAL PROPERTY.

**6.1.  Prosecution and Maintenance of Patent Rights.**  Wyeth shall have the right, but not the obligation, to file, prosecute and maintain in the Territory, the Wyeth IP owned in whole or in part by Wyeth and licensed to Teva under this Agreement.  Wyeth shall use its commercially reasonable efforts to conduct such prosecution and maintenance efforts.

**6.2.  Enforcement of Patent Rights.**  From the Signing Date until the end of the period during which Teva and its Affiliates have an exclusive license under Sections 2.1.1 or 2.2.1, as applicable, Wyeth and Teva will each promptly notify the other Party of any actual or potential infringement of IR IP or XR IP, as applicable, of which it becomes aware arising from any Third Party making, having made, using, selling, offering for sale or importing or having imported (including any infringement arising from any ANDA filing) any generic equivalent to IR Reference Product or XR Reference Product, respectively.  Any such notice shall include the then reasonably available evidence to support an allegation of infringement by such Third Party.  Wyeth shall have the sole right, and shall use its commercially reasonable efforts, to address such infringement, and Teva will consult with Wyeth in such efforts.  Any recovery or damages derived from any suit or other action seeking to enforce or otherwise to cause the discontinuation of any infringement of the IR IP or the XR IP or any other Patent Rights owned or controlled by Wyeth shall be retained exclusively by Wyeth.

21

**6.3.** **Patent Rights.** Teva admits that the Patents In Suit and U.S. Patent No. 4,535,186 (including any extension thereof) are valid and enforceable. Teva agrees not to and to cause each of its Affiliates not to oppose or challenge the validity or enforceability of, or assert any other claim or defense in patent litigation concerning, the Patents In Suit, or aid or assist any Third Party in challenging, opposing or causing to be challenged, directly or indirectly, the validity or enforceability of, or asserting any other claim or defense against the enforcement of, any of the Patents In Suit in any court or tribunal or in the United States Patent and Trademark Office, and waives any and all invalidity and unenforceability defenses in any future litigation, arbitration or other proceeding with respect to the Patents In Suit. As to the patents included within the IR IP or the XR IP (other than the Patents In Suit), Teva waives any and all invalidity and unenforceability defenses in any future litigation, arbitration or other proceeding. Teva further agrees not to and to cause each of its Affiliates not to oppose or challenge the validity, enforceability or infringement of, or aid or assist any Third Party in challenging, opposing or causing to be challenged, directly or indirectly, the validity, enforceability or infringement of any patent or patent application included within the IR IP or any patent or patent application included within the XR IP (other than the Patents In Suit) in any court or tribunal or in the United States Patent and Trademark Office. The two preceding sentences of this Section 6.3 shall not apply to the extent that any such actions by Teva or any of its Affiliates concern the making, using, selling, offering for sale or importation of any product which is neither an IR Product nor an XR Product. [**] Nothing in this Agreement will be construed as an admission of infringement by Teva, or an admission of non-infringement by Wyeth, of any Patents In Suit.

**6.4.** **Trademarks.** Teva will not use, any of Wyeth's trademarks, trade names or trade dress or any trademarks, trade names or trade dress which are confusingly similar to any of Wyeth's trademarks, trade names or trade dress, in connection with its sale, distribution or promotion of any IR Product or XR Product. For the sake of clarity and without limiting the foregoing, any IR Product tablet shall be of a different shape than is any tablet of the IR Reference Product as of the Signing Date, and such IR Product tablets and any XR Product capsules and the packaging therefor shall not bear any markings, trademarks, trade names or other trade dress that are confusingly similar to that used by Wyeth or any of its Affiliates for the IR Reference Product or the XR Reference Product.

22

7.  **CONFIDENTIALITY.**

7.1.  **Nondisclosure and Nonuse Obligations.** Each of Teva and Wyeth shall use Confidential Information of the Disclosing Party only in accordance with and as expressly permitted by this Agreement and shall not disclose to any Third Party any Confidential Information of the Disclosing Party, in each case without the prior written consent of the Disclosing Party, which consent may be provided or withheld in the Disclosing Party's sole discretion. The foregoing obligations shall survive the expiration or earlier termination of this Agreement for a period of [**]. The foregoing non-disclosure and non-use obligations shall not apply to specific Confidential Information of a Disclosing Party that the Receiving Party can demonstrate

    (i)   is known by the Receiving Party at the time of its receipt other than through a prior disclosure by the Disclosing Party, as documented by business records;

    (ii)   is at the time of disclosure or thereafter becomes published or otherwise part of the public domain without breach of this Agreement by the Receiving Party;

    (iii)   is subsequently disclosed to the Receiving Party by a Third Party who has the right to make such disclosure not in confidence;

    (iv)   is developed by the Receiving Party independently of access to or use of any Confidential Information received from the Disclosing Party and such independent development can be documented by the Receiving Party; or

    (v)   is required by law, regulation, rule, act or order of any governmental authority or agency to be disclosed by the Receiving Party to a Third Party, *provided* that to the extent practicable notice is promptly delivered to the Disclosing Party and the Receiving Party agrees to reasonably assist the Disclosing Party in order to provide an opportunity to seek a protective order or other similar order with respect to such Confidential Information and thereafter the Receiving Party discloses to the requesting entity only the minimum Confidential Information required to be disclosed in order to comply with the request, whether or not a protective order or other similar order is obtained by the Disclosing Party.

23

WYEFFAT2405359

Case 3:11-cv-05479-ZNQ-JBD   Document 555-10   Filed 11/06/25   Page 48 of 211
PageID: 19039

**7.2.** **Permitted Disclosures.** The Receiving Party may disclose specific Confidential Information of the Disclosing Party to its (or its Affiliate's) employees, consultants or professional advisors, only to the extent reasonably required to accomplish the purposes of this Agreement and only if the Receiving Party obtains prior written agreement from such employees, consultants and professional advisors (other than legal counsel who are otherwise required to maintain confidentiality) to hold in confidence and not make use of such Confidential Information for any purpose other than those permitted by this Agreement. The Receiving Party will use at least the same standard of care (but in no event less than a reasonable standard of care) as it uses to protect its own proprietary or confidential information of a similar nature to ensure that such employees, agents, consultants or suppliers do not disclose or make any unauthorized use of the Confidential Information of the Disclosing Party. Additionally, a Receiving Party may use or disclose specific Confidential Information of the Disclosing Party to the extent it is necessary to do so to take action against the Receiving Party to enforce its rights under this Agreement.

**7.3.** **Return of Confidential Information.** If this Agreement is terminated for any reason, then the Receiving Party, upon the request of the Disclosing Party, shall return to the Disclosing Party all copies of the Confidential Information received from the Disclosing Party hereunder, *provided, however,* that the Receiving Party's legal counsel may retain one copy of such Confidential Information in a secure location solely for purposes of determining the Receiving Party's continuing obligations under this Article 7.

**7.4.** **Disclosure of Agreement.** The Parties agree disclosure of the terms and conditions of this Agreement shall be subject to and governed by Section 7.D of the Settlement Agreement.

## 8. REPRESENTATIONS, WARRANTIES AND COVENANTS.

**8.1.** **Representations and Warranties of Both Parties.** Each of Teva and Wyeth hereby represents, warrants and covenants to the other Party that, as of the Signing Date and the Settlement Effective Date:

(a) it and each of its Affiliates is a corporation or entity duly organized and validly existing under the laws of the state or other jurisdiction of incorporation or formation;

(b) the execution, delivery and performance of this Agreement by such Party have been duly authorized by all requisite corporate action and do not require any shareholder action or approval;

(c) it has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

24

(d)    the execution, delivery and performance by such Party of this Agreement and its compliance with the terms and provisions hereof do not and will not conflict with or result in a breach of any of the terms and provisions of or constitute a default under any other agreement to which it or its Affiliates is a party;

(e)    this Agreement is a binding obligation of it and its Affiliates, enforceable in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy and similar laws affecting creditors' rights, and, generally, to general equitable principles; and

(f)    it shall at all times comply with all Applicable Law relating to its activities under this Agreement.

**8.2.    Representations and Warranties of Wyeth.** In addition to the representations and warranties set forth in Section 8.1, Wyeth represents and warrants to Teva as of the Signing Date and the Settlement Effective Date that neither it nor any of its Affiliates has granted any licenses, authorizations, waivers or other rights concerning any Authorized Generic Product.

**8.3.    Representation by Legal Counsel.** Each Party hereto represents that it has been represented by legal counsel in connection with this Agreement and the other Transaction Agreements and acknowledges that it has participated in the drafting hereof. In interpreting and applying the terms and provisions of this Agreement and the other Transaction Agreements, the Parties agree that no presumption shall exist or be implied against the Party which drafted such terms and provisions.

**8.4.    No Other Warranties.** EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE COMPOUND, THE IR PRODUCTS OR THE XR PRODUCTS OR TEVA'S USE THEREOF OR THAT THE COMPOUND, ANY IR PRODUCT OR XR PRODUCT OR TEVA'S USE OF ANY OF THE FOREGOING OR PRACTICE OF ANY OF THE RIGHTS LICENSED TO TEVA HEREUNDER WILL NOT INFRINGE ANY PATENT OWNED OR CONTROLLED BY ANY THIRD PARTY.

25

    WYEFFAT2405361

Case 3:11-cv-05479-ZNQ-JBD   Document 355-10   Filed 11/06/15   Page 50 of 211   PageID: 19041

## 9. TERM AND TERMINATION.

**9.1. Term.** This Agreement shall become effective as of the Settlement Effective Date and, unless earlier terminated, shall continue in full force and effect (i) with respect to IR Products, until such time as there are no more Valid Claims of Patent Rights either contained in the IR IP (and foreign counterparts thereof) or subject to the covenant not to sue contained in Section 2.1.5 (as may be expanded under Section 2.1.6), and (ii) with respect to XR Products, until such time as there are no more Valid Claims of Patent Rights either contained in the XR IP (and foreign counterparts thereof) or subject to the covenant not to sue contained in Section 2.2.7 (as may be expanded under Section 2.2.8).

**9.2. Termination.**

**9.2.1. Material Breach.** Either Party may terminate this Agreement by written notice in the event of a material breach by the other Party, which breach remains uncured for a period of [**] after the non-breaching Party provides written notice of such breach to the allegedly breaching Party.

**9.2.2. Bankruptcy.** Either Party may terminate this Agreement if, at any time, the other Party shall file in any court or agency pursuant to any statute or regulation of any state or country, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of the Party or of its assets, or if the other Party proposes a written agreement of composition or extension of its debts, or if the other Party shall be served with an involuntary petition against it, filed in any insolvency proceeding, and such petition shall not be dismissed with [**] after the filing thereof, or if the other Party shall propose or be a party to any dissolution or liquidation, or if the other Party shall make an assignment for the benefit of creditors.

26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**9.3.   Effects of Termination.**  Upon termination of this Agreement by Wyeth pursuant to Section 9.2.1 or 9.2.2, all of the rights and obligations under [**]. Termination or expiration of this Agreement shall have no effect on the Settlement Agreement. Termination or expiration of this Agreement shall not affect any rights or liabilities of the Parties which may have accrued prior to the effective date of such termination, including any liability Teva may have to make any payment that may be due with respect to activities occurring prior to the effective date of such termination.    Upon termination or expiration of this Agreement, Sections [**] and Articles [**] of this Agreement will survive and continue in full force and effect.

**9.4.   Effects of Bankruptcy.**

All rights and licenses granted under or pursuant to this Agreement by Wyeth and its Affiliates are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the United States Bankruptcy Code. The Parties agree that Teva and its Affiliates, as licensees of such rights under this Agreement, shall retain and may fully exercise all of their rights and elections under the United States Bankruptcy Code.

**10.   [**]**

**11.   INDEMNIFICATION AND INSURANCE.**

**11.1.   Indemnification.**

**11.1.1. Responsibility.**  As between Wyeth and Teva, Wyeth shall be solely responsible for all product liability claims filed by any Third Party to the extent that they claim injury from the IR Reference Product or the XR Reference Product or any Authorized Generic Products manufactured, sold or distributed by Wyeth or its Affiliates or any of their licensees. As between Teva and Wyeth, Teva shall be solely responsible for all product liability claims filed by any Third Party to the extent that they claim injury from the IR Product or the XR Product manufactured, sold or distributed by Teva or its Affiliates.

**11.1.2. Indemnification by Wyeth.**  Wyeth shall indemnify, defend and hold harmless Teva, its Affiliates and their respective officers, directors, shareholders, employees, agents, representatives, successors and assigns, heirs, administrators, executors, suppliers and manufacturers (collectively, the "Teva Indemnitees") from any claims, losses, liabilities, costs, expenses (including reasonable

27

Case 3:11-cr-05479-ZNQ-JBD   Document 855-10   Filed 11/06/15   Page 52 of 211
PageID: 19043

attorney fees) and damages related to personal injury of any Third Party (collectively, a "Liability"), arising out of any product liability claim made by such Third Party to the extent that such product liability claim results from such Third Party being injured by the IR Reference Product or the XR Reference Product or any Authorized Generic Product. Notwithstanding the foregoing, Wyeth shall have no obligations to any Teva Indemnitee under this Section unless Teva (i) gives Wyeth prompt notice of any claim or lawsuit or other action for which it seeks to be indemnified under this Agreement (ii) gives Wyeth sole control of the defense and all related settlement negotiations and (iii) cooperates fully with Wyeth and its agents in defense of the claims or lawsuit or other action. Teva shall have the right to participate in the defense of any such claim, complaint, suit, proceeding or cause of action referred to in this section utilizing attorneys of its choice. However, Teva shall bear the costs associated with its participation.

11.1.3. **Indemnification by Teva.** Teva shall indemnify, defend and hold harmless Wyeth, its Affiliates and their respective officers, directors, shareholders, employees, agents, representatives, successors and assigns, heirs, administrators, executors, suppliers and manufacturers (collectively, the "Wyeth Indemnitees") from any Liability (as defined in Section 11.1.2) arising out of any product liability claim made by such Third Party to the extent that such product liability claim results from such Third Party being injured by the IR Product or the XR Product. Notwithstanding the foregoing, Teva shall have no obligations to any Wyeth Indemnitee under this Section unless Wyeth (i) gives Teva prompt notice of any claim or lawsuit or other action for which it seeks to be indemnified under this Agreement (ii) gives Teva sole control of the defense and all related settlement negotiations and (iii) cooperates fully with Teva and its agents in defense of the claims or lawsuit or other action. Wyeth shall have the right to participate in the defense of any such claim, complaint, suit, proceeding or cause of action referred to in this section utilizing attorneys of its choice. However, Wyeth shall bear the costs associated with its participation.

28

11.2. **Insurance.** Teva shall obtain and maintain at all times during the term of this Agreement Commercial General Liability Insurance, including Products Liability, with limits of liability of not less than [**] per occurrence and [**] in the aggregate. Teva USA shall provide Wyeth with a Certificate of Insurance evidencing this coverage within [**] after the Settlement Effective Date. Such insurance policy shall name Wyeth as an additional insured and Teva shall use its reasonable efforts to ensure such insurance policy contains a provision requiring [**] advance notification to Wyeth in the event of its cancellation or termination. Teva shall secure coverage with insurers having [**]. Wyeth acknowledges that Teva may elect at any time during the term of this Agreement to replace such third party insurance with a self-insurance program sufficient to meet the foregoing insurance obligations of Teva. Wyeth shall maintain a self-insurance program sufficient to meet the foregoing insurance obligations of Teva as if those obligations applied to Wyeth.

11.3. **Limitation of Liability.** WITH RESPECT TO ANY CLAIM BY ONE PARTY AGAINST THE OTHER ARISING OUT OF THE PERFORMANCE OR FAILURE OF PERFORMANCE OF THE OTHER PARTY UNDER THIS AGREEMENT, THE PARTIES EXPRESSLY AGREE THAT IN NO EVENT SHALL A PARTY BE LIABLE FOR PUNITIVE DAMAGES.

29

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Case 3:11-cv-05479-ZNQ-JBD   Document 855-10   Filed 11/06/15   Page 54 of 211
PageID: 19045

## 12. GOVERNING LAW; DISPUTE RESOLUTION.

**12.1. Governing Law; Jurisdiction.** This Agreement is subject to and governed by the laws of the State of New York, excluding its conflict of laws provisions. Each of the Parties hereby submits to the exclusive general jurisdiction of the courts of the State of New Jersey and the courts of the United States of America for the District of New Jersey in any action or proceeding arising out of or relating to this Agreement and to the jurisdiction of the appellate courts to which appeals are required to be taken from any of the foregoing. Each of the Parties irrevocably waives (i) any defense of inconvenient forum to the maintenance of any such action or proceeding and (ii) its right to a jury trial.

**12.2. Dispute Resolution.** The Parties recognize that a bona fide dispute as to certain matters under this Agreement may from time to time arise during the term of this Agreement. In the event of the occurrence of such a dispute, either Party may, by written notice to the other Party, have such dispute referred to their respective officers (designated below) or their successors or designees for attempted resolution by good faith negotiations within [**] after such notice is received. Said designated officers are as follows:

<div style="margin-left:2em">

For Wyeth:   [**]

For Teva:    [**]

</div>

In the event the designated officers are not able to resolve such dispute through good faith negotiations within such [**], either Party may pursue any legal or equitable remedies available to it by filing a claim in the state or federal courts designated in Section 12.1. Notwithstanding the foregoing, nothing in this Section 12.2 shall prohibit a Party from seeking temporary or injunctive relief from a state or federal court in New Jersey pending the resolution of a dispute in accordance with the provisions of this Section 12.2.

### 12.3. Injunctive Relief.

**12.3.1. Against Wyeth.** Wyeth agrees that in the event of any breach of Wyeth's obligations under [**], Teva will be irreparably harmed and that Teva will have no adequate remedy at law and that Teva will be entitled to seek and obtain and Wyeth will agree to the imposition of temporary and permanent injunctive relief causing Wyeth to immediately discontinue any actions that result in such breach and to not take any such actions in the future.

**12.3.2. Against Teva.** Teva agrees that in the event of any breach of Teva's obligations under [**], Wyeth will be irreparably harmed and that Wyeth will have no adequate remedy at law and that

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405366

Wyeth will be entitled to seek and obtain and Teva will agree to the imposition of temporary and permanent injunctive relief causing Teva to immediately discontinue any actions that result in such breach and to not take any such actions in the future.

13. **MISCELLANEOUS.**

13.1. [**]

13.2. **Assignment.**

13.2.1. **Assignment by Teva.** Teva shall not assign this Agreement or any of its rights or obligations hereunder to any Third Party without the prior written consent of Wyeth, which consent may not be unreasonably withheld. Notwithstanding the foregoing, Teva may assign this Agreement in whole together to (i) any of its Affiliate for so long as they remain Affiliates, or (ii) in connection with the merger, reorganization or consolidation, or the sale of all or substantially all of the assets, of Teva Ltd. or Teva USA; *provided, however,* that any such assignment shall not relieve Teva of any of its responsibilities for performance of its obligations under this Agreement. Teva shall promptly provide Wyeth with written notice of any such assignment.

13.2.2. **Assignment by Wyeth.** Wyeth shall not assign this Agreement or any of its rights or obligations hereunder to any Third Party without the prior written consent of Teva, which consent may not be unreasonably withheld. Notwithstanding the foregoing, Wyeth may assign this Agreement in whole to (i) any of its Affiliate for so long as they remain Affiliates, or (ii) in connection with its merger, reorganization or consolidation or the sale of all or substantially all of its assets to which this Agreement relates; *provided, however,* that (i) any such assignment shall not relieve Wyeth of any of its responsibilities for performance of its obligations under this Agreement, and (ii) in the event of any such assignment, no Patent Rights of the assignee shall be included in the Patent Rights licensed to Teva hereunder if such Patent Rights were not so licensed prior to such assignment. Wyeth shall promptly provide Teva with written notice of any such assignment.

13.2.3. **Binding Nature of Assignment.** This Agreement shall be binding upon and inure to the benefit of the legal representatives, successors and permitted assigns of the Parties. Any assignment not in accordance with this Section 13.2 shall be void.

31

WYEFFAT2405367

Case 3:11-cr-05479-ZNQ-JBD   Document 855-10   Filed 11/06/25   Page 56 of 211
PageID: 19047

**13.3.** **No Waiver.** The failure of either Party to require performance by the other Party of any of that other Party's obligations hereunder shall in no manner affect the right of such Party to enforce the same at a later time. No waiver by any Party of any condition, or of the breach of any provision, term, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach, or of any other condition or of the breach of any other provision, term, representation or warranty hereof.

**13.4.** **Severability.** If any provision of this Agreement or the application thereof to any Party or circumstance will, to any extent, be held to be invalid or unenforceable, then (i) the remainder of this Agreement, or the application of such provision to Parties or circumstances other than those as to which it is held invalid or unenforceable, will not be affected thereby and each provision of this Agreement will be valid and be enforced to the fullest extent permitted by law, and (ii) the Parties covenant and agree to renegotiate any such provision in good faith in order to provide a reasonably acceptable alternative to such provision or the application thereof that is invalid or unenforceable, it being the intent of the Parties that the basic purposes and business intent of this Agreement are to be effectuated, with the consequence that this Agreement shall terminate in full if the Parties are unable to renegotiate and agree on such provision.

**13.5.** **Relationship Between The Parties.** Wyeth and Teva are independent contractors under this Agreement. Nothing herein contained shall be deemed to create an employment, agency, joint venture or partnership relationship between the Parties hereto or any of their agents or employees, or any other legal arrangement that would impose liability upon one Party for the act or failure to act of the other Party. Neither Party shall have any express or implied power to enter into any contracts or commitments or to incur any liabilities in the name of, or on behalf of, the other Party, or to bind the other Party in any respect whatsoever.

**13.6.** **Correspondence and Notices.** All notices given under this Agreement shall be in writing and delivered by hand or sent by nationally recognized overnight delivery service, prepaid registered or certified air mail, or by facsimile confirmed by prepaid first class, registered or certified mail letter, and shall be deemed to have been properly served to the addressee upon receipt of such written communication.

Notices to Wyeth shall be sent to:

> Wyeth Pharmaceuticals
> 500 Arcola Road
> Collegeville, Pennsylvania 19426
> Attn: Senior Vice President, Corporate Business Development
> Fax: [**]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405368

with a copy to:

> Wyeth
> 5 Giralda Farms
> Madison, New Jersey 07940
> Attn: General Counsel
> Fax: [**]

Notices to Teva shall be sent to:

> Teva North America
> 425 Privet Road
> PO Box 1005
> Horsham, PA 19044-8005 1090
> Attention: General Counsel
> Fax: [**]

and:

> Teva Pharmaceutical Industries Ltd.
> 5 Basel Street
> P.O. Box 3190
> Petach Tikva 49131, Israel
> Attn: Corporate Legal Department —General Counsel
> Fax: [**]

In the event that either Party changes its address, such Party shall promptly notify and update the other Party in writing as to such change.

33

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**13.7. Entire Agreement; Amendments.** This Agreement (including all of the attached Exhibits), together with the other Transaction Agreements, and all the covenants, promises, agreements, warranties, representations, conditions and understandings contained herein and therein, sets forth the complete, final and exclusive agreement between the Parties with respect to the subject matter hereof and supersedes and terminates all prior and contemporaneous agreements and understandings between the Parties, whether oral or in writing, including the Term Sheet, with respect to the subject matter hereof. There are no covenants, promises, agreements, warranties, representations, conditions or understandings, either oral or written, between the Parties with respect to the subject matter of this Agreement other than as are set forth in this Agreement and the other Transaction Agreements. No subsequent alteration, amendment, change, waiver or addition to this Agreement shall be binding upon the Parties unless reduced to writing and signed by an authorized officer of each Party. No understanding, agreement, representation or promise, not explicitly set forth herein, has been relied on by either Party in deciding to execute this Agreement.

**13.8. Headings; Defined Terms.** The headings and captions used in this Agreement are solely for the convenience of reference and shall not affect its interpretation. The term "including" means "including, without limitation," and "herein", "hereof", and "hereunder" refer to this Agreement as a whole. The word "will" shall be construed to have the same meaning and effect as the word "shall".

**13.9. Counterparts.** This Agreement may be executed in one or more counterparts each of which shall be an original and all of which shall constitute together the same document. Facsimile execution and delivery of this Agreement by either Party shall constitute a legal, valid and binding execution and delivery of this Agreement.

**13.10. Further Actions.** Each Party agrees to execute, acknowledge and deliver such further instruments, and to do all other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement.

**13.11. References to ANDAs and NDAs.** References to any NDA or ANDA in this Agreement include, unless expressly indicated otherwise, all replacements and successors and all amendments and supplements to the foregoing.

34

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405370

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have caused this Agreement to be executed as of the Effective Date by their duly authorized representatives.

**WYETH, ACTING THROUGH ITS**
**Wyeth PHARMACEUTICALS DIVISION**

By: _____
Name:
Title:

**TEVA PHARMACEUTICALS USA, INC.**

By: _____
Name:
Title:

**WYETH PHARMACEUTICALS COMPANY, INC.**

By: _____
Name:
Title:

**TEVA PHARMACEUTICAL INDUSTRIES LTD.**

By: _____
Name:
Title:

By: _____
Name:
Title:

**WYETH -WHITEHALL PHARMACEUTICALS INC.**

By: _____
Name:
Title:

**WYETH PHARMACEUTICALS COMPANY**

By: _____
Name:
Title:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT 1.11

## ELEMENTS OF COSTS OF GOODS SOLD

[**]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405372

LICENSE AGREEMENT

LIBC/2647218.4

WYEFFAT2405373

Kevin J. McKenna, Esq.
Eileen Quinn Steiner, Esq.
GIBBONS, DEL DEO, DOLAN,
    GRIFFINGER & VECCHIONE, P.C.
One Riverfront Plaza
Newark, NJ 07102-5496
Tel: (973) 596-4500
Fax: (973) 596-0545

*Attorneys for Plaintiff Wyeth*

Allyn Z. Lite, Esq.
Michael E. Patunas, Esq.
LITE, DePALMA, GREENBERG &
    RIVAS, LLC
Two Gateway Center
Newark, NJ 07102
(973) 623-3000

*Attorneys for the Teva Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYETH, <br><br> Plaintiff, <br><br> v. <br><br> TEVA PHARMACEUTICALS USA, INC. <br> TEVA PHARMACEUTICAL INDUSTRIES LTD., <br><br> Defendants. | ) ) ) ) ) ) ) Civil Action No.: 03-CV-1293 (WJM) ) ) ) ) ) ) |

## NOTICE OF JOINT MOTION TO SEAL MATERIALS

**PLEASE TAKE NOTICE** that on January 9, 2006 at 10:00 a.m., or at such other time

as the Court may set, Plaintiff Wyeth and the Teva Defendants will move before the Honorable

William J. Martini, U.S.D.J., at the Martin Luther King Federal Building and United States

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405374

Courthouse, 50 Walnut Street, Newark, New Jersey, for an Order pursuant to Local Civil Rules

5.3(c) and 7.1 to Seal the Settlement and Release Agreement, dated November 2, 2005, and the

Exhibits annexed thereto including the United States License Agreement.

    **PLEASE TAKE FURTHER NOTICE** that the moving parties shall rely upon the

accompanying Certifications of David A. Manspeizer, Esq., and David Marshall as well as all

other pleadings and memoranda on file in this matter.

    Respectfully submitted,

Dated:  December 6, 2005
       Newark, New Jersey

| | |
|---|---|
| By: *Kevin J. McKenna/Eas*<br><br>Kevin J. McKenna, Esq.<br>Eileen Q. Steiner, Esq.<br>GIBBONS, DEL DEO, DOLAN,<br>  GRIFFINGER & VECCHIONE, P.C.<br>One Riverfront Plaza<br>Newark, New Jersey 07102-5496<br>(973) 596-4500<br><br>*Attorneys for Plaintiff Wyeth* | By: _____<br><br>Allyn Z. Lite, Esq.<br>Michael E. Patunas, Esq.<br>LITE, DePALMA, GREENBERG &<br>  RIVAS, LLC<br>Two Gateway Center<br>Newark, NJ 07102<br>(973) 623-3000<br><br>*Attorneys for the Teva Defendants* |
| *Of Counsel:*<br><br>Basil J. Lewris, Esq.<br>Linda A. Wadler, Esq.<br>Barbara R. Rudolph, Esq.<br>FINNEGAN, HENDERSON, FARABOW,<br>  GARRETT & DUNNER, L.L.P.<br>901 New York Avenue, N.W.<br>Washington, D.C. 20001-4413<br>(202) 408-4000 | *Of Counsel:*<br><br>Thomas L. Creel, PC<br>Henry C. Dinger, PC<br>Daryl L. Wiesen, Esq.<br>GOODWIN PROCTER LLP<br>53 State Street<br>Boston, MA 02109<br>(617) 570-1000 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Kevin J. McKenna, Esq.
Eileen Quinn Steiner, Esq.
GIBBONS, DEL DEO, DOLAN,
    GRIFFINGER & VECCHIONE, P.C.
One Riverfront Plaza
Newark, NJ 07102-5496
Tel: (973) 596-4500
Fax: (973) 596-0545

*Attorneys for Plaintiff Wyeth*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYETH,<br><br>          Plaintiff,<br><br>vs.<br><br>TEVA PHARMACEUTICALS USA, INC., and<br>TEVA PHARMACEUTICAL INDUSTRIES LTD.,<br><br>          Defendants. | Civil Action No. 03-1293 (WJM)<br><br>**CERTIFICATION OF**<br><br>David A. Manspeizer, Esq. |

I, David A. Manspeizer, of full age, hereby certify as follows:

1.      I am employed by Wyeth as Vice President, Intellectual Property, and Associate General Counsel. I make this Certification based on my personal knowledge. The statements contained in this Certification are true and correct to the best of my knowledge and belief.

2.      I submit this Certification in support of the Parties' Joint Motion, pursuant to Local Civil Rule 5.3, for an order sealing certain documents filed in connection with the settlement of this matter. In particular, Plaintiff seeks to seal the unredacted versions of: the Settlement and Release Agreement, including all exhibits thereto, which contain highly confidential business information

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

concerning royalty rates, details concerning certain contingencies, and other details concerning the agreement between the parties.

3.     This information is not publicly known, and Wyeth maintains such information as confidential. Wyeth restricts access to all of the information listed above, even within the company, to those who must have such access to perform their duties for Wyeth. Public disclosure of this information would be detrimental to Wyeth because, for example, the terms would provide competitors with a competitive advantage over Wyeth in negotiating the terms of future license agreements or settlement agreements.

4.     It is my understanding that an agreed upon redacted copy of the Settlement and Release Agreement and Exhibits thereto will be filed with the Clerk of the Court. Such redacted information includes but is not limited to exhibits and information that is no longer relevant or material to the terms of the Settlement and Release Agreement, such as the now-expired Term Sheet.

5.     The United States License Agreement between the parties is included as an Exhibit to the Settlement and Release Agreement. The material redacted from this agreement is confidential and Wyeth maintains the terms of its license agreements, such as royalty rates and the details of the future contractual relationship between the parties, in strictest confidence. Moreover, contingencies outlined in the agreement that may not come to pass are similarly maintained as confidential because they disclose economic terms of the transaction. It is my understanding that a redacted copy of the United States License Agreement which does not contain the confidential information will also be filed on the public docket, thus giving the public all necessary information regarding the settlement while protecting Wyeth's highly confidential business information.

- 2 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405377

6.    The interests of Wyeth that warrant continued confidential treatment of the Settlement and Release Agreement, and the Exhibits thereto, include the fact that business competitors would gain an unfair advantage over Wyeth if such competitors were to gain access to the commercially sensitive and proprietary information contained within the Settlement and Release Agreement and the Exhibits thereto.

7.    The confidential information does not have public health or safety implications and is not of concern to the public at large.

8.    Public disclosure of the confidential Settlement and Release Agreement and the Exhibits thereto would be detrimental to Wyeth as competitor generic pharmaceutical companies could use this information for competitive advantage. Wyeth's confidential business plans and strategies would be revealed to its competitors and such competitors would unjustly gain the ability to thwart, anticipate, or usurp those plans and strategies to the competitors' advantage and Wyeth's loss.

9.    The filing of a redacted Settlement and Release Agreement and the Exhibits annexed thereto is the least restrictive alternative to sealing the entirety of the subject documents.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false I am subject to punishment.

David A. Manspeizer, Esq.

Dated: December 6, 2005

- 3 -

**LITE DEPALMA GREENBERG & RIVAS, LLC**
Allyn Z. Lite
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, New Jersey 07102-5003
(973) 623-3000

**GOODWIN PROCTER LLP**
Thomas L. Creel
Henry C. Dinger
Daryl L. Wiesen
53 State Street
Boston, MA 02109
(617) 570-1000

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYETH,<br><br>             Plaintiff,<br><br>        vs.<br><br>TEVA PHARMACEUTICALS USA, INC.,<br>and<br>TEVA PHARMACEUTICAL INDUSTRIES<br>LTD.,<br>             Defendants. | Civil Action No. 03-1293 (WJM)<br><br>**CERTIFICATION OF<br>DAVID MARSHALL** |

I, David Marshall, of full age, hereby certify as follows:

1.    I am the Vice President, Sales and Marketing of Defendant Teva Pharmaceuticals USA, Inc.

2.    I make this Certification on my personal knowledge in support of Defendants' motions, pursuant to Local Civil Rule 5.3, for an order sealing certain documents filed in

-1-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

connection with the settlement of this matter. In particular, Defendants seek to seal the unredacted versions of: the Settlement and Release Agreement, including all exhibits thereto, all of which contain highly confidential business information concerning royalty rates, details concerning certain contingencies, and other details concerning the agreement between the parties.

3.     This information is not publicly known, and Teva maintains such information as confidential. Teva restricts access to all of the information listed above, even within the company, to those who must have such access to perform their duties for Teva. Public disclosure of this information would be detrimental to Teva because, for example, the terms would provide competitors with a competitive advantage over Teva in negotiating the terms of future agreements. I understand that most Exhibits to the Settlement Agreement will be redacted, as is customary with such documents. These exhibits include information that is no longer relevant or material to the terms of the Settlement Agreement, such as the now-expired Term Sheet. I understand that a redacted version of the United States License Agreement will be provided. The material redacted from this agreement is confidential and Teva maintains terms of its license agreements, such as royalty rates and the details of the future contractual relationship between the parties, in strictest confidence. Moreover, contingencies outlined in the agreement that may not come to pass are similarly maintained as confidential because they disclose economic terms of the transaction. I understand that Teva intends to file on the public docket redacted versions of the documents which do not contain this information, thus giving the public all necessary information regarding the settlement while protecting Teva's highly confidential business information. This is the least restrictive alternative to sealing the entirety of the subject documents.

-2-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false I am subject to punishment.

David Marshall

Dated: December 5, 2005

LIBA/1652990.1

-3-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405381

Kevin J. McKenna, Esq.
Eileen Quinn Steiner, Esq.
GIBBONS, DEL DEO, DOLAN,
    GRIFFINGER & VECCHIONE, P.C.
One Riverfront Plaza
Newark, NJ 07102-5496
Tel: (973) 596-4500
Fax: (973) 596-0545

*Attorneys for Plaintiff Wyeth*

Allyn Z. Lite, Esq.
Michael E. Patunas, Esq.
LITE, DePALMA, GREENBERG &
    RIVAS, LLC
Two Gateway Center
Newark, NJ 07102
(973) 623-3000

*Attorneys for the Teva Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYETH,<br><br>      Plaintiff,<br><br>    v.<br><br>TEVA PHARMACEUTICALS USA, INC. and<br>TEVA PHARMACEUTICAL INDUSTRIES LTD.,<br><br>      Defendants. | Civil Action No.: 03-CV-1293 (WJM) |

**[Proposed] ORDER GRANTING
THE JOINT MOTION TO SEAL MATERIALS**

This matter having been brought before the Court through a Joint Motion to Seal the

Settlement and Release Agreement and Exhibits thereto submitted by counsel for Plaintiff Wyeth

and counsel for the Teva Defendants pursuant to Local Civil Rule 5.3(c) and 7.1 filed on

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

December 6, 2005, and the Court having considered the submissions of the parties in Support of the Motions to Seal, the Certifications of David A. Manspeizer and David Marshall in support thereof, as well as the materials the parties seek to file under seal, and the parties having consented to the relief requested, and the Court having received no other opposition to the application, and the Court having reviewed the submissions of counsel and decided the matter thereon pursuant to Federal Rule of Civil Procedure 78 and Local Rule of Civil Procedure 5.3(c)(2); and the Court having determined:

## FINDINGS OF FACT

1.     This is a complex pharmaceutical patent infringement action brought by Wyeth under the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355 (the "Hatch-Waxman Act"). As such, the vast majority of materials exchanged between the parties and subsequently filed with the Court in connection with pretrial proceedings contains proprietary and confidential research, development and business information of the parties.

2.     In the instant motion, the materials the parties seek to seal consists of the Confidential Settlement and Release Agreement and Exhibits thereto which the parties maintain contain confidential business information concerning royalty rates, details concerning certain contingencies, and other details concerning the agreement between the parties.

3.     The information the parties seek to seal is not publicly known, and is maintained by each party as confidential information. The parties restrict access to all of the information sought to be sealed, even within their respective companies, to those who must have such access to perform their duties.

4.     Public disclosure of this information would be detrimental to the parties because, for example, the terms would provide competitors with a competitive advantage over the parties in negotiating the terms of future license or settlement agreements.

- 2 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## CONCLUSIONS OF LAW

5.     In addition to the foregoing findings of fact, the Court makes the following conclusions of law.

6.     Upon consideration of the Certifications submitted by the parties and the materials that the parties seek to have the Court seal, the Court concludes that the parties have met their burden of proving, pursuant to L.Civ.R. 5.3 and applicable case law, that the unredacted Settlement and Release Agreement and Exhibits thereto should be filed under seal. Specifically, the Court concludes that the parties have demonstrated (a) the unredacted Settlement and Release Agreement and Exhibits thereto clearly contain confidential information to which the parties restrict access even within their respective companies; (b) that the parties have a legitimate interest in maintaining the confidentiality of the materials in order to protect against their disclosure to potential competitors who could use the materials and the information contained therein to gain competitive advantage over the parties; (c) that the parties have shown that public disclosure of the materials would result in clearly defined and serious injury to the parties, including the use of the materials to the advantage of competitors and to the detriment of the parties; and (d) that the parties have provided a redacted copy of the materials to be filed under seal and demonstrated that that no less restrictive alternative to sealing the unredacted materials is available.

7.     The foregoing conclusions are supported by relevant case law holding that although the federal courts recognize a right of access to documents filed with the Court throughout the course of litigation, the Court is mindful that it should not permit its files to serve as sources of business information that might harm a litigant's competitive standing. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978). The Court also recognizes that arguably confidential materials should not be "transmuted into materials presumptively subject to public access." *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 143 n.8 (2d Cir. 2004).

- 3 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405384

BASED UPON the foregoing findings of facts and conclusions of law,

IT IS on this _____ day of _____, 200___,

ORDERED that the parties Joint Motion to Seal the unredacted Settlement and Release Agreement and Exhibits thereto be and hereby is **GRANTED**; and it is further

ORDERED that any unredacted copies of the Settlement and Release Agreement and Exhibits thereto are to be maintained under seal in paper format by the Clerk of the Court; and it is further

ORDERED that the agreed upon redacted copy of the Settlement and Release Agreement and Exhibits thereto is to be electronically filed via CM/ECF pursuant to L. Civ. R. 5.3; and it is further

ORDERED a copy of this Order be served on all parties within seven (7) days of the entry thereof.

_____
Hon. William J. Martini, U.S.D.J.

- 4 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405385

CONFIDENTIAL — EXECUTION VERSION

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (this "Agreement") is made on November 2, 2005 by and among on the one hand Wyeth, a Delaware corporation with offices located at 5 Giralda Farms, Madison, NJ 07940 ("Wyeth"), and on the other hand Teva Pharmaceuticals USA, Inc. ("Teva USA"), a Delaware corporation with offices located at 1090 Horsham Road, North Wales, PA 19454, and Teva Pharmaceutical Industries Limited ("Teva Ltd."), an Israeli corporation, with offices located at 5 Basel St. Petach Tikva 49131, Israel (collectively, "Teva"). Each of Wyeth and Teva is a "Party" and together they are the "Parties" hereunder. All capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the License Agreement (whether or not such agreement becomes effective and binding upon the Parties).

WHEREAS, Wyeth and Teva are Parties to a lawsuit captioned *Wyeth v. Teva, et al.* (Civil Action No. 03-CV-1293(WJM)) pending in the United States District Court for the District of New Jersey (the "Court" and the "Litigation");

WHEREAS, the Litigation generally concerns allegations of infringement, invalidity and unenforceability pertaining to U.S. Patent Nos. 6,274,171 B1, 6,403,120 B1 and 6,419,958 B2 ("Patents In Suit");

WHEREAS, the Parties and certain Affiliates of Wyeth (which Affiliates possess certain rights with respect to IR Reference Product and/or XR Reference Product) have entered into that certain binding Term Sheet (the "Term Sheet") dated October 18, 2005 (the "Signing Date"), a copy if which is attached hereto as Exhibit A;

WHEREAS, as provided in the Term Sheet, the Parties agreed to use their respective commercially reasonable efforts to enter into this Agreement by November 2, 2005, and a License Agreement, and such collateral agreements as the Parties deem necessary, which agreements the Parties agreed would contain terms implementing and consistent (except to the extent otherwise agreed by the Parties or their Affiliates) with those contained in the Term Sheet and such other provisions customary for agreements of such type on which the Parties mutually agree;

WHEREAS, Wyeth and Teva wish to settle and compromise the Litigation and all other claims, demands, and controversies between them relating to the Patents In Suit, the XR Products, and the transactions and occurrences that gave rise to the Litigation on the terms and conditions set forth below;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the Parties covenant and agree as follows:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405386

1.     The Orders and Definitive Agreements.

A.     Orders.  Simultaneously with the execution of this Agreement, the Parties shall execute, or cause their attorneys of record in the Litigation to execute, the Orders (as defined in Section 2.C).  The Parties shall deliver the fully executed Orders to Teva's local counsel in New Jersey to be held in escrow until such time as both Parties, in writing, direct such counsel to submit those Orders to the Court for its approval in accordance with the Schedule and as otherwise provided by Section 2.  Further, the Parties shall update and shall execute replacement Orders arising from any modifications made in accordance with Section 2.A below or as may be otherwise mutually agreed by the Parties.

B.     Definitive Agreements.  Simultaneously with the execution of this Agreement, the Parties hereby acknowledge and agree, subject to any modifications made in accordance with Section 2.A below or as may be otherwise mutually agreed to by the Parties, that the versions of the following agreements attached hereto as Exhibits shall be the final and binding agreements between the Parties and/or their Affiliates once all of the Settlement Conditions have been satisfied as provided in Section 2:

(i)     U.S. License Agreement in the form attached hereto as Exhibit B (the "License Agreement"); and

(ii)     Canadian License Agreement in the form attached hereto as Exhibit C;

(all of the agreements identified in Sections 1.B(i) to 1.B(ii), together with this Agreement, collectively the "Definitive Agreements").

2.     Effectiveness; Settlement Conditions.

A.     Effectiveness.  This Section 2 and Sections 1, 6 and 7 of this Agreement shall be effective and binding upon the Parties as of the Signing Date.  The remainder of this Agreement and the other Definitive Agreements shall become effective and binding upon the Parties only upon the satisfaction of all of the Settlement Conditions (as defined below) (the date of such occurrence, the "Settlement Date").  The Parties shall use their reasonable best efforts to cause the Settlement Conditions to be fulfilled as promptly as possible and to make the notifications and filings and obtain the approvals and orders contemplated thereby, including coordinating all filings with the applicable regulatory agencies and courts and any responses thereto.  The Court issued a scheduling order on October 24, 2005, a copy of which is attached to Exhibit D (the "Scheduling Order").  If the Court seeks to modify the Scheduling Order, or if, before the Settlement Date, any of such agencies or courts objects in writing to this Agreement, the Orders submitted to the Court or the other Definitive Agreements or the transactions contemplated hereby or thereby, then the Parties shall promptly meet and, in good faith and consistent with the Scheduling Order, negotiate modifications to the Scheduling Order, the Orders, the terms of this Agreement or the other Definitive Agreements, in each case to try to resolve such objections by such agency or court, provided that neither Party shall have any obligation to agree to any such modifications that would materially change the economic value to either Party or business intent of the transactions contemplated hereunder or otherwise materially

2

affect the basic purposes of this Agreement or the other Definitive Agreements or the Parties' rights under the immediately following sentence. If the Parties are unable to reach agreement on such modifications resolving such objections within fifteen (15) days of receipt of such written objections, either Party (by written notice to the other Party at any time prior to the Settlement Date) may, absent such agreement, immediately terminate this Agreement with the consequences specified in Section 2.B.

B.   <u>Stay of Litigation until Settlement Date; No Settlement Date</u>.   Except as expressly provided in this Agreement, the Parties shall seek to maintain the status quo of the Litigation as of the Signing Date until the Settlement Date. In the event the Settlement Date has not occurred within one hundred and twenty (120) days of the Signing Date or such longer period of time on which the Parties may mutually agree, or this Agreement is earlier terminated pursuant to the last sentence of Section 2.A, then (1) the Parties shall seek to have the Litigation reopened and any stay lifted, (2) Teva's local counsel, if still holding the execution copies of the Orders in escrow as provided in Section 1.A, shall destroy them, (3) this Agreement shall terminate in full and the other Definitive Agreements shall not become effective or binding upon the Parties, save that this Section 2.B and Section 7 shall survive any such termination, and (4) if converted as provided in Section 2.E, the license granted in Section 2.E below shall terminate and Teva will immediately take all actions necessary or otherwise requested by Wyeth to convert the Paragraph IV Certification contemplated in Section 2.E back into a Paragraph III Certification. Teva agrees that in the event it fails to convert such Paragraph IV Certification back into a Paragraph III Certification upon any such termination, Wyeth shall have the right to seek and obtain specific performance of such Teva obligation and that Teva shall not oppose any claim or other attempt of Wyeth or any of its Affiliates to seek such specific performance. Each Party shall be responsible for the costs and expenses incurred by it in connection with the Litigation and any filings required by this Agreement.

C.   <u>Settlement Conditions</u>.   All of this Agreement (subject to Section 2.A) and the other Definitive Agreements shall be effective and binding upon the Parties only after satisfaction of all of the following conditions (collectively, the "<u>Settlement Conditions</u>"):

(i)   Absent the mutual agreement of the Parties, the Court shall not have modified in any material respects the Scheduling Order;

(ii)   The Parties shall have jointly moved in the Litigation to vacate the Court's September 6, 2005 Markman Order and Markman Opinion and the Court's denial of Wyeth's motion for reconsideration of the Markman Order and Markman Opinion, and the Court grants such motion;

(iii)   The Parties shall have jointly moved to dismiss with prejudice Teva's counterclaims for invalidity and unenforceability and to dismiss without prejudice Teva's counterclaim for non-infringement in the Litigation and to have the Court enter the order in the form attached hereto as <u>Exhibit E-1</u> with such changes as the Parties may mutually agree and the Court shall have granted such motion and entered such order (the "<u>Dismissal Order</u>");

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(iv)    the Parties shall have filed all notifications required to be filed under applicable law as required for this Agreement and the other Definitive Agreements to become effective, if any;

(v)    the Parties shall have submitted a proposed order in the form attached hereto as Exhibit E-2 with such changes as the Parties may mutually agree pursuant to the procedures identified in the Consent Order entitled In re Schering Plough Corp., et al. Docket No. 9297, after providing thirty (30) days' prior notice to the Federal Trade Commission as required under that Consent Order, and such order shall have been granted in a form that complies with the Consent Order (the "Stipulation Order", together with the Dismissal Order, the "Orders"); and

(vi)    the Parties shall have received all required regulatory approvals and court orders and all required waiting periods shall have expired under any of the foregoing or under any applicable law as required for this Agreement and the other Definitive Agreements to become effective.

D.    Exchange of Executed Definitive Agreements. At such time as all of the Settlement Conditions have been satisfied, such that all of this Agreement and the other Definitive Agreements have become effective and binding upon the Parties and/or their Affiliates as provided in Section 2.A, the Parties, as soon as practicable thereafter, shall exchange and/or cause their respective Affiliates to exchange, fully executed facsimile signatures pages for all of the Definitive Agreements, followed by delivery of one fully executed original signature page for each of those Definitive Agreements by overnight courier. Notwithstanding the foregoing, if the Settlement Conditions have been satisfied, whether or not the Parties have exchanged signature pages for the other Definitive Agreements as provided by this Section 2.D, then all of this Agreement and the other Definitive Agreements shall become effective and binding upon the Parties as of the Settlement Date (in their most recently modified form as provided in Section 1.B, if any).

E.    Conversion. Teva may convert its existing Paragraph III Certification under ANDA No. 76-960 for the IR Product into a Paragraph IV Certification with respect to U.S. Patent No. 4,535,186 by filing a Paragraph IV Certification with respect thereto, but only on the basis of the following limited license contained in this Agreement and the licenses to be granted in the License Agreement. Wyeth hereby grants to Teva a limited, non-exclusive license under U.S. Patent No. 4,535,186 solely to the extent necessary to permit Teva to convert its Certification status as described above, which license shall be effective as of the Signing Date. In the event that the FDA requests any confirmation of Wyeth's grant of permission or license pursuant to this Section 2.E, Wyeth shall promptly provide such confirmation to the FDA. As of the date first written above, to Wyeth's knowledge Wyeth has not received any notice of any Paragraph IV Certification with respect to U.S. Patent No. 4,535,186. Wyeth shall promptly notify Teva if it receives any such Paragraph IV Certification. In the event that any party (other than any Affiliate of Teva) files a Paragraph IV Certification with respect to U.S. Patent No. 4,535,186 with regard to the IR Reference Product before Teva files a Paragraph IV Certification with respect to such U.S. patent as provided above in this Section 2.E, such that approval of ANDA No. 76-960 is blocked by such exclusivity arising from such party's filing, then each of the Parties hereby agrees to negotiate and enter into, and to cause their respective Affiliates to

4

enter into as appropriate, a supply agreement whereby Wyeth will supply to Teva and its Affiliates "Wyeth IR Supplied Product" for Teva and its Affiliates to market and sell as IR Product under the License Agreement, substantially on the terms set forth in the Term Sheet and otherwise as mutually agreed to by the Parties , provided that Wyeth shall continue to supply Wyeth IR Supplied Product to Teva and its Affiliates until such time as such party's exclusivity no longer blocks approval of ANDA No. 76-960 (it being understood and agreed that such terms would need to be modified to address the commercially reasonable time lines necessary for Wyeth to supply such Wyeth Supplied IR Product to Teva and the pricing beyond the first year of supply, which pricing would be on commercially reasonable terms to be negotiated by the parties). In such an event, the Parties will revise the License Agreement to include the Wyeth Supplied IR Product therein.

   F.   Confidential Treatment of Court Filings. The Parties shall jointly request that all settlement documents filed with the Court be filed under seal and be afforded confidential treatment. To the extent the Court declines to file under seal any such document, the Parties shall seek to have the Court enter the appropriate redacted versions of such document in the form attached hereto as Exhibit F or as the Parties may otherwise mutually agree.

   G.   Termination of the Term Sheet. The Parties hereby acknowledge and agree that the Term Sheet shall be terminated in full as of the date first written above, and further that any rights or liabilities of either of the Parties accrued as of such date under the Term Sheet shall be subject to and based upon only this Agreement in lieu of the Term Sheet.

   H.   Data Sources. The Parties will by November 5, 2005 memorialize the oral understanding that they agreed to on November 2, 2005 with respect to the treatment of data sources referred to in Section 13.1 of the License Agreement, whereupon the Parties will replace the existing Section 13.1 with that memorialized understanding.

  3.   Releases and Indemnities.

   A.   Release of Teva by Wyeth. Wyeth, for itself and on behalf of all of its Affiliates, together (as applicable) with each of their respective officers, directors, agents, trustees, attorneys, parents, subsidiaries, heirs, administrators, executors, successors and assigns (collectively, the "Wyeth Releasing Parties"), hereby, jointly and severally, fully, finally and forever releases and discharges (and to the extent such actions cannot be taken at present, each of them hereby agrees to do so effective as of the Settlement Date) Teva and its Affiliates, together with each of their respective officers, directors, agents, trustees, attorneys, parents, subsidiaries, heirs, administrators, executors, successors and assigns and customers, suppliers and manufacturers (collectively, the "Released Teva Entities"), of and from any and all actions, causes of action, claims, counterclaims, damages, debts, demands, liabilities, costs, expenses, liens and obligations of whatsoever name and nature (hereinafter, the "claims"), whether at law or in equity, whether or not the facts giving rise to such claims are now known or unknown, from the beginning of the world to the Settlement Date (but not thereafter), arising out of any acts, facts, omissions or matters that is or are the subject matter of the Litigation or relating to the XR Products, except with respect to the rights and obligations of the Parties under this Agreement and any of the other Definitive Agreements. It is the intention of the Wyeth Releasing Parties

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY           WYEFFAT2405390

fully, finally and forever to release the Released Teva Entities from the claims released by this Section 3.A.

B. **Wyeth's Representation, Warranty and Indemnity as to Released Matters.** Wyeth warrants and represents to the Released Teva Entities, on behalf of itself and each of the other Wyeth Releasing Parties, that it has not heretofore assigned, transferred or purported to assign or transfer, and that it shall not hereafter assign or transfer or purport to assign or transfer, to any Third Party any matter released in Section 3.A, and it agrees, jointly and severally, to indemnify and hold harmless the Released Teva Entities from and against all claims arising out of any such assignment or transfer or purported or claimed assignment or transfer of any such matter.

C. **Release of Wyeth by Teva.** Teva, for itself and on behalf of all of its Affiliates, together (as applicable) with each of their respective officers, directors, agents, trustees, attorneys, parents, subsidiaries, heirs, administrators, executors, successors and assigns (collectively, the "Teva Releasing Parties"), hereby, jointly and severally, fully, finally and forever releases and discharges (and to the extent such actions cannot be taken at present, each of them hereby agrees to do so effective as of the Settlement Date) Wyeth and its Affiliates, together with each of their respective officers, directors, agents, trustees, attorneys, parents, subsidiaries, heirs, administrators, executors, successors and assigns and customers, suppliers and manufacturers (collectively, the "Released Wyeth Entities"), of and from any and all claims, whether at law or in equity, whether or not the facts giving rise to such claims are now known or unknown, from the beginning of the world to the Settlement Date (but not thereafter), arising out of any acts, facts, omissions or matters that is or are the subject matter of the Litigation or relating to the XR Products, except with respect to the rights and obligations of the Parties under this Agreement and any of the other Definitive Agreements. It is the intention of the Teva Releasing Parties fully, finally and forever to release the Released Wyeth Entities from the claims released by this Section 3.C.

D. **Teva's Representation, Warranty and Indemnity as to Released Matters.** Teva warrants and represents to the Released Wyeth Entities, on behalf of itself and each of the other Teva Releasing Parties, that it has not heretofore assigned, transferred or purported to assign or transfer, and that it shall not hereafter assign or transfer or purport to assign or transfer, to any Third Party any matter released in Section 3.C, and it agrees, jointly and severally, to indemnify and hold harmless the Released Wyeth Entities from and against all claims arising out of any such assignment or transfer or purported or claimed assignment or transfer of any such matter.

4. **Discovery Materials.** Within thirty (30) days of the Settlement Date, each Party agrees to return or cause to be returned to the other Party, or destroy, at the option of the Party under such obligation, all confidential originals and all copies of all such documents obtained from the other Party or its Affiliates in the discovery process of the Litigation (the "Discovery Materials"). Subject to any protective order that may be in place and any confidentiality obligations that the Parties may have agreed to, the Parties may, however, maintain their attorney-work product, briefs, expert reports and other such materials that may contain or reference confidential materials of the other Party. Each Party shall certify to the other Party such return and destruction and that no such Discovery Materials remain in the possession of the

6

Party, its Affiliates, or any of their attorneys, agents or representatives. Each Party shall not use and shall cause its Affiliates and each of their respective attorneys, agents and representatives not to use any information obtained, directly or indirectly, from such Discovery Materials without the express written consent of the other Party, for any purpose whatsoever from and after the Settlement Date, except in connection with any dispute arising out of this Agreement or any of the other Definitive Agreements or any dealings between Wyeth and Teva in connection with this Agreement and the other Definitive Agreements.

5.     Cooperation After the Settlement Date.  After the Settlement Date, the Parties shall use commercially reasonable efforts to consult with and provide cooperation to each other if any regulatory agency or other Third Party objects to or challenges this Agreement or any other Definitive Agreement or the transactions contemplated hereby or thereby; *provided, however,* that the foregoing shall not require either Party to take any action or position that is contrary to or adversely affects its own interests.

6.     Representations and Warranties.  Each of Wyeth and Teva represents and warrants to the other as of the Signing Date and as of the Settlement Date that (1) it is an entity duly organized, validly existing and in good standing under the laws of the state of its organization, and has full corporate power and authority and the legal right to own and operate its property and assets and to carry on its business as it is now being conducted and as it is contemplated to be conducted by this Agreement and the other Definitive Agreements, (2) this Agreement and each of the other Definitive Agreements does not and shall not conflict with any other agreements to which it or any of its Affiliates may be a party, (3) this Agreement and each of the other Definitive Agreements is a binding obligation of it and its Affiliates, enforceable in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy and similar laws affecting creditors' rights, and, generally, to general equitable principles, and (4) it has the authority to enter into this Agreement and the other Definitive Agreements and to undertake and perform fully its obligations and to grant the licenses and rights contained hereunder and thereunder.

7.     Miscellaneous.

A.     Governing Law; Jurisdiction.  This Agreement is subject to and governed by the laws of the State of New York, excluding its conflict of laws provisions. Each of the Parties hereby submits to the exclusive general jurisdiction of the courts of the State of New Jersey and the courts of the United States of America for the District of New Jersey in any action or proceeding arising out of or relating to this Agreement and to the jurisdiction of the appellate courts to which appeals are required to be taken from any of the foregoing. Each of the Parties irrevocably waives (i) any defense of inconvenient forum to the maintenance of any such action or proceeding and (ii) its right to a jury trial.

B.     Assignment.

(i)     Assignment by Teva.  Teva shall not assign this Agreement or any of its rights or obligations hereunder to any Third Party without the prior written consent of Wyeth, which consent may not be unreasonably withheld. Notwithstanding the foregoing, Teva may assign this Agreement in whole together with the License Agreement to (i) any of its

7

Affiliates for so long as they remain Affiliates, or (ii) in connection with the merger, reorganization or consolidation, or the sale of all or substantially all of the assets, of Teva Ltd. or Teva USA; *provided, however*, that any such assignment shall not relieve Teva of any of its responsibilities for performance of its obligations under this Agreement, *and provided further, however*, that no assignment by Teva of this Agreement shall operate to substitute any assignee (other than an Affiliate of Teva) for Teva or a Released Teva Entity for purposes of either (a) the release set forth in Section 3.A, such that any claim by Wyeth would be released against any such assignee, or (b) the indemnification set forth in Section 3.B, it being understood that such release and such indemnification are personal to the Released Teva Entities. Teva shall promptly provide Wyeth with written notice of any such assignment.

(ii) _Assignment by Wyeth_. Wyeth shall not assign this Agreement or any of its rights or obligations hereunder to any Third Party without the prior written consent of Teva, which consent may not be unreasonably withheld. Notwithstanding the foregoing, Wyeth may assign this Agreement in whole to (i) any of its Affiliate for so long as they remain Affiliates, or (ii) in connection with its merger, reorganization or consolidation or the sale of all or substantially all of its assets to which this Agreement relates (*i.e.*, rights in the IR Reference Product or the XR Reference Product, but not manufacturing facilities or assets); *provided, however*, that such assignment shall not relieve Wyeth of any of its responsibilities for performance of its obligations under this Agreement, *and provided further, however*, that no assignment by Wyeth of this Agreement shall operate to substitute any assignee (other than an Affiliate of Wyeth) for Wyeth or a Released Wyeth Entity for purposes of either (a) the release set forth in Section 3.C, such that any claim by Teva would be released against any such assignee, or (b) the indemnification set forth in Section 3.D, it being understood that such release and such indemnification are personal to the Released Wyeth Entities. Wyeth shall promptly provide Teva with written notice of any such assignment. Any assignment not in accordance with this Section 7.B shall be void.

C. _Binding Nature of Assignment_. This Agreement shall inure to the benefit of, and be binding upon, the legal representatives, successors and permitted assigns of the Parties. There shall be no third party beneficiaries, either express or implied, to this Agreement, provided that Section 3 is intended to benefit, and to be enforceable by, in addition to the Parties, the other Released Wyeth Entities and Released Teva Entities as if they were "Parties" hereto.

D. _Public Announcements_. The Parties agree that any public announcement of this Agreement and the other Definitive Agreements and its contents shall be in the form of the press release attached hereto as Exhibit G-1, and thereafter each Party shall be entitled to make or publish any public statement consistent with the contents of such press release, or any other press release approved by the Parties as specified below, without complying with the requirements of this Section 7.D. Additionally, the Parties agree that either Party, upon signature of this Agreement, may file an 8-K containing a disclosure in the form attached hereto as Exhibit G-2. Neither Teva nor Wyeth shall release to any Third Party or publish in any way any non-public information with respect to the terms of this Agreement or the other Definitive Agreements (unless and only to the extent that any such terms are already public) or concerning the transactions contemplated hereunder and thereunder without the prior written consent of the other, which consent shall not be unreasonably withheld or delayed, *provided, however*, that (i) either Party may disclose the terms of this Agreement or the other Definitive Agreements to the

8

extent required to comply with applicable laws, including the rules and regulations promulgated by the United States Securities and Exchange Commission and any national securities exchange or as required by any court or governmental agency, (ii) either Party may disclose the IR Entry Date and XR Entry Date and other material terms of this Agreement or the other Definitive Agreements relating to such entry dates (but not the percentage of Profits to be paid by Teva to Wyeth) at any time as it may deem necessary in order to ensure full and fair dissemination of material information regarding such Party, provided that for this clause (ii) the Parties shall provide prior notice of such intended disclosure in order to provide the other Party with a reasonable opportunity to coordinate any such disclosure to the extent reasonably practicable, and (iii) either Party may disclose the terms of this Agreement or the other Definitive Agreements (a) to the extent it is necessary to do so to take action to enforce its rights under this Agreement, (b) to the SEC or FDA with a request for confidentiality, or (c) in each case under confidentiality obligations, to acquirers and assignees of the business to which this agreement relates, investment advisors, investors, lenders, underwriters and credit and rating agencies in connection with any debt or equity financing, credit facility or other financing vehicle, or acquisition, partnership, joint venture or similar arrangement, or permitted assignment or other transfer in accordance with Section 7.B, or otherwise to Affiliates or third parties as may be necessary to exercise the licenses and other rights granted herein and therein or as otherwise reasonably required to accomplish the purposes of this Agreement and the other Definitive Agreements. Notwithstanding the foregoing, before disclosing this Agreement, the other Definitive Agreements or any of the terms hereof or thereof pursuant to clause (i) or (iii)(b) of the preceding sentence, (x) the Parties shall consult with one another on the terms of this Agreement and the other Definitive Agreements to be redacted in making any such disclosure, and (y) to the extent permitted by applicable law, such disclosing Party agrees, at its own expense, to seek confidential treatment of portions of this Agreement, the other Definitive Agreements or such terms, as may be reasonably requested by the other Party. The provisions of this Section 7.D shall apply to the Term Sheet as well.

   E. <u>Severability</u>.  In addition to Section 2, if any provision of this Agreement or the application thereof to any Party or circumstance will, to any extent, be held to be invalid or unenforceable, then (i) the remainder of this Agreement, or the application of such provision to Parties or circumstances other than those as to which it is held invalid or unenforceable, will not be affected thereby and each provision of this Agreement will be valid and be enforced to the fullest extent permitted by law, and (ii) the Parties covenant and agree to renegotiate any such provision in good faith in order to provide a reasonably acceptable alternative to such provision or the application thereof that is invalid or unenforceable, it being the intent of the Parties that the basic purposes and business intent of this Agreement are to be effectuated, with the consequence that this Agreement shall terminate in full if the Parties are unable to renegotiate and agree on such provision.

   F. <u>Entire Agreement; Amendment</u>.  This Agreement (including all of the attached <u>Exhibits</u>), together with the other Definitive Agreements, and all the covenants, promises, agreements, warranties, representations, conditions and understandings contained herein and therein, sets forth the complete, final and exclusive agreement between the Parties with respect to the subject matter hereof and supersedes and terminates all prior and contemporaneous agreements and understandings between the Parties, whether oral or in writing, including the Term Sheet as provided in Section 2.G, with respect to the subject matter hereof.

9

There are no covenants, promises, agreements, warranties, representations, conditions or understandings, either oral or written, between the Parties with respect to the subject matter of this Agreement other than as are set forth in this Agreement and the other Definitive Agreements. No subsequent alteration, amendment, change, waiver or addition to this Agreement shall be binding upon the Parties unless reduced to writing and signed by an authorized officer of each Party. No understanding, agreement, representation or promise, not explicitly set forth herein, has been relied on by either Party in deciding to execute this Agreement.

G. <u>Waiver</u>. The failure of either Party to require performance by the other Party of any of that other Party's obligations hereunder shall in no manner affect the right of such Party to enforce the same at a later time. No waiver by any Party of any condition, or of the breach of any provision, term, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach, or of any other condition or of the breach of any other provision, term, representation or warranty hereof.

H. <u>Notices</u>. All notices given under this Agreement shall be in writing and delivered by hand or sent by nationally recognized overnight delivery service, prepaid registered or certified air mail, or by facsimile confirmed by prepaid first class, registered or certified mail letter, and shall be deemed to have been properly served to the addressee upon receipt of such written communication.

Notices to Wyeth shall be sent to:

> Wyeth Pharmaceuticals
> 500 Arcola Road
> Collegeville, Pennsylvania 19426
> Attn: Senior Vice President, Corporate Business Development
> Fax: (484) 865-6476

with a required copy to:

> Wyeth
> 5 Giralda Farms
> Madison, New Jersey 07940
> Attn: General Counsel
> Fax: (973) 660-7156

Notices to Teva shall be sent to:

> Teva Pharmaceuticals North America
> 425 Privet Road
> PO Box 1005
> Horsham, PA 19044-8005 1090
> Attention: General Counsel
> Facsimile: (215) 293-6499

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405395

and:

> Teva Pharmaceutical Industries Ltd.
> 5 Basel Street
> P.O. Box 3190
> Petach Tikva 49131, Israel
> Attention: Corporate Legal Department – Attention General Counsel
> Facsimile: 011 972-3-926-7429

    I.    <u>No Agency or Joint Venture Relationship</u>. Nothing herein contained shall be deemed to create an employment, agency, joint venture or partnership relationship between the Parties or any of their agents or employees, or any other legal arrangement that would impose liability upon one Party for the act or failure to act of the other Party. Neither Party shall have any express or implied power to enter into any contracts or commitments or to incur any liabilities in the name of, or on behalf of, the other Party, or to bind the other Party in any respect whatsoever.

    J.    <u>Parties Advised by Counsel</u>. Each Party represents that it has been represented by legal counsel in connection with this Agreement and the other Definitive Agreements and acknowledges that it has participated in the drafting hereof. In interpreting and applying the terms and provisions of this Agreement and the other Definitive Agreements, the Parties agree that no presumption shall exist or be implied against the Party which drafted such terms and provisions.

    K.    <u>Headings</u>. The headings and captions used in this Agreement are solely for the convenience of reference and shall not affect its interpretation.

    L.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts each of which shall be an original and all of which shall constitute together the same document. Facsimile execution and delivery of this Agreement by either Party shall constitute a legal, valid and binding execution and delivery of this Agreement.

    M.    <u>General</u>. The term "including" means "including, without limitation," and "herein", "hereof", and "hereunder" refer to this Agreement as a whole. The word "will" shall be construed to have the same meaning and effect as the word "shall". Reference to U.S. patents by number include all extensions and extended exclusivities (including pediatric extensions) with respect to such U.S. patent.

*[remainder of this page intentionally left blank]*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY      WYEFFAT2405396

SETTLEMENT AND RELEASE AGREEMENT

IN WITNESS WHEREOF, each of the Parties has caused its duly authorized
representative to execute this Agreement as of the date first written above, to be binding and
effective as provided in Section 2.

TEVA PHARMACEUTICALS USA, INC.

By: _____
Name: Mark W. Durand
Title: Chief Financial Officer and Sr. Vice President,
Finance and Business Development


TEVA PHARMACEUTICAL INDUSTRIES LTD.

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


WYETH

By: _____
Name: _____
Title: _____

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SETTLEMENT AND RELEASE AGREEMENT

IN WITNESS WHEREOF, each of the Parties has caused its duly authorized representative to execute this Agreement as of the date first written above, to be binding and effective as provided in Section 2.

TEVA PHARMACEUTICALS USA, INC.

By:_____

Name:_____

Title:_____


TEVA PHARMACEUTICAL INDUSTRIES LTD.

By:_____

Name:___William S. Marth_____

Title:___President & CEO_____


By:_____

Name:_____

Title:_____


WYETH

By:_____

Name:_____

Title:_____

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SETTLEMENT AND RELEASE AGREEMENT

IN WITNESS WHEREOF, each of the Parties has caused its duly authorized representative to execute this Agreement as of the date first written above, to be binding and effective as provided in Section 2.

TEVA PHARMACEUTICALS USA, INC.

By:_____
Name:_____
Title:_____


TEVA PHARMACEUTICAL INDUSTRIES LTD.

By:_____
Name:_____
Title:_____

By:_____
Name:    Richard S. Egosi
Title:    Senior Vice President and General Counsel


WYETH

By:_____
Name:_____
Title:_____

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SETTLEMENT AND RELEASE AGREEMENT

IN WITNESS WHEREOF, each of the Parties has caused its duly authorized representative to execute this Agreement as of the date first written above, to be binding and effective as provided in Section 2.

TEVA PHARMACEUTICALS USA, INC.

By: _____
Name: _____
Title: _____


TEVA PHARMACEUTICAL INDUSTRIES LTD.

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____


WYETH

By: _____
Name: Bernard J. Poussot
Title: Executive Vice President

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SETTLEMENT AND RELEASE AGREEMENT

**Exhibit A**
**Term Sheet**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

BINDING TERM SHEET
BY AND AMONG
WYETH, ACTING THROUGH ITS WYETH PHARMACEUTICALS DIVISION, WYETH PHARMACEUTICALS
COMPANY INC., WYETH-WHITEHALL PHARMACEUTICALS INC. AND WYETH PHARMACEUTICALS
COMPANY (COLLECTIVELY, "WYETH")
AND
TEVA PHARMACEUTICAL INDUSTRIES LTD. AND TEVA PHARMACEUTICALS USA, INC.
(COLLECTIVELY, "TEVA")
DATED AS OF OCTOBER 18, 2005 (THE "SIGNING DATE")

## 1. Summary:

**A. Definitive Agreements.** Wyeth and Teva will negotiate in good faith and use commercially reasonable efforts to enter into, within fourteen (14) days of the Signing Date or such longer period of time on which the parties may mutually agree (the "Deadline"), (i) a Settlement and Release Agreement for Wyeth v. Teva, et al. (Civil Action No. 03-CV-1293(WJM)) pending in the United States District Court for the District of New Jersey (the "Court" and the "Litigation"), and (ii) a License Agreement, Supply Agreement (if Teva has not elected its option to supply specified in Section 6) and such collateral agreements as the parties deem necessary (together with the Settlement and Release Agreement, the "Definitive Agreements"). The Definitive Agreements will contain terms implementing and consistent with those contained in this Term Sheet and such other provisions customary for agreements of such type on which the parties mutually agree. Certain defined terms used in this Term Sheet are set forth in Appendix A attached hereto.

**B. Binding Effect and Settlement Date.** This Section 1 and Sections 6, 9 and 11 to 17 of this Term Sheet will be effective and binding upon the parties as of the Signing Date. The Definitive Agreements, or, if the parties fail to enter into the Definitive Agreements by the Deadline, the remainder of this Term Sheet instead of the Definitive Agreements, will become effective and binding upon the parties upon the occurrence of all of the Settlement Conditions (as defined below) (the "Settlement Date"), including a court order pursuant to the Decision and Order issued by the U.S. Federal Trade Commission, Docket No. 9297, in the matter of Schering-Plough Corporation, et. al and American Home Products Corporation. The parties will use their reasonable best efforts to cause the Settlement Conditions to be fulfilled as promptly as possible and to make the notifications and filings and obtain the approvals and orders contemplated thereby, including coordinating all filings with the applicable regulatory agencies and courts and any responses thereto. On the Signing Date or as soon as practicable thereafter, the parties shall petition the Court to adopt a schedule for the completion of the Settlement Condition set forth in clause (v) of Section 2.A, which schedule shall be substantially consistent with the timeline set forth on Appendix F (the "Schedule"). Each party will be responsible for the costs and expenses incurred by it in connection with any such filings and the Litigation. If the Court objects to the Schedule, or any of such agencies or courts objects in writing before the Settlement Date to this Term Sheet, the Orders submitted to the Court or the Definitive Agreements or the transactions contemplated hereby or thereby, then the parties will promptly meet and, in good faith and consistent with the Schedule, negotiate modifications to the Schedule, the Orders, terms of this Term Sheet or the Definitive Agreements to try to resolve such objections by such agency or court, provided that neither party shall have any obligation to agree to any such modifications that would materially change the economic value or business intent of the transactions contemplated hereunder or otherwise materially affect the basic purposes of this Term Sheet or the Definitive Agreements or the parties' rights under the immediately following sentence. If the parties are unable to reach agreement on such modifications resolving such objections within fifteen (15) days of receipt of such written objections, either party (by written notice to the other party at any time prior to the Settlement Date) may, absent such agreement, immediately terminate this Term Sheet and the Definitive Agreements.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

C. <u>Stay of Litigation until Settlement Date; No Settlement Date.</u>  Immediately after the Signing Date, the parties will seek to have the Litigation stayed or administratively closed to maintain the status quo of the Litigation until the Settlement Date.  In the event the Settlement Date has not occurred within one hundred and twenty (120) days of the Signing Date or such longer period of time on which the parties may mutually agree, or this Term Sheet is earlier terminated pursuant to Section 1.B, then the parties will seek to have the Litigation reopened and any stay lifted, and this Term Sheet and the Definitive Agreements (if any) will terminate in full, save that this Section 1.C and Sections 11 to 17 of this Term Sheet will survive.

2.  **Settlement Conditions; Litigation after Settlement Date:**

A.  <u>Settlement Conditions.</u>  The settlement will become effective only after all of the following (the "Settlement Conditions") occur:

(i)      the Court enters an order adopting the Schedule in all material respects and with such changes as the parties may mutually agree;

(ii)     Wyeth and Teva will jointly move in the Litigation to vacate the Court's September 6, 2005 Markman Order and Markman Opinion and the Court's denial of Wyeth's motion for reconsideration of the Markman Order and Markman Opinion and the Court grants such motion;

(iii)    Wyeth and Teva will jointly move to dismiss with prejudice Teva's counterclaim for invalidity and to dismiss without prejudice Teva's counterclaim for non-infringement in the Litigation and to have the Court enter the order in the form attached hereto as <u>Appendix B-1</u> with such changes as the parties may mutually agree and the Court grants such motion and enters such order (the "Dismissal Order");

(iv)     the parties will file all notifications required to be filed under applicable law as required for this Term Sheet to become effective, if any;

(v)      the parties will submit a proposed order in the form attached hereto as <u>Appendix B-2</u> with such changes as the parties may mutually agree pursuant to the procedures identified in the Consent Order entitled In re Schering Plough Corp., et al. Docket No. 9297, after providing thirty (30) days' prior notice to the Federal Trade Commission as required under that Consent Order, and such order is granted in a form that complies with the Consent Order (the "Stipulation Order", together with the Dismissal Order, the "Orders") and

(vi)     the receipt by the parties of all required regulatory approvals and court orders and the expiration of all required waiting periods under any of the foregoing or under any applicable law as required for this Term Sheet to become effective.

B.  <u>General Mutual Releases.</u>  Effective as of the Settlement Date, each of Teva and Wyeth, for each of its respective affiliates, predecessors, successors and assigns, fully, finally and forever hereby releases and discharges (and to the extent such actions cannot be taken at present, each of them hereby agrees to do so effective as of the Settlement Date) the other party and its affiliates, predecessors, successors and assigns from any and all claims, damages and liabilities, known or unknown, asserted or

2

WYEFFAT2405403

unasserted, in law or equity, from the beginning of the world to the Settlement Date, arising out of any acts, facts, omissions, or matters that is or were the subject matter of the Litigation or the IR Products or the XR Products, except with respect to the rights and obligations of the parties under this Term Sheet and any Definitive Agreements.

C. Documents. The parties will jointly request that all settlement documents filed with the Court be filed under seal and be afforded confidential treatment. To the extent the Court declines to file under seal all those documents, the parties shall seek to redact such portions of those documents as the Court may allow. Within thirty (30) days of the Settlement Date, each party agrees to return or cause to be returned to the other party, or destroy, at the option of the party under such obligation, all confidential originals and all copies of all such documents obtained from the other party or its affiliates in the discovery process of the Litigation (the "Discovery Materials"). Each party shall certify to the other party such return and destruction and that no such Discovery Materials, remain in the possession of the party, its affiliates, or any of their attorneys, agents or representatives. Each party shall not use and shall cause its affiliates and each of their respective attorneys, agents and representatives not to use any information obtained, directly or indirectly, from such Discovery Materials without the express written consent of the other party, for any purpose whatsoever from and after the Settlement Date, except in connection with any dispute arising out of this Term Sheet or any dealings between Wyeth and Teva in connection with this Term Sheet.

**3. License Grants:**

A. IR Products: Effective as of the IR Entry Date, Wyeth hereby grants to Teva and its affiliates an exclusive non-transferable (except to the extent permitted in Section 14) license, without the right to grant sublicenses, under the IR IP, to use, offer for sale, sell, import and have imported IR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory. From the Signing Date until the Compound Patent Termination Date, neither Wyeth nor any of its affiliates will market, sell, supply, distribute or manufacture any Authorized Generic Product of IR Reference Product (in any dosage strength), or license, grant a waiver or otherwise authorize or cause or allow any third party to do the same, for sale in the Territory.

B. XR License: Effective as of the XR Entry Date, Wyeth hereby grants to Teva and its affiliates an exclusive non-transferable (except to the extent permitted in Section 14) license, without the right to grant sublicenses, under the XR IP, to use, offer for sale, sell, import and have imported XR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory. Such exclusive license will expire six (6) months after the XR Entry Date. From the Signing Date until the foregoing exclusive license expires, neither Wyeth nor any of its affiliates will market, sell, distribute or manufacture any Authorized Generic Product of XR Reference Product (in any dosage strength), or license, grant a waiver or otherwise authorize or cause or allow any third party to do the same, for sale in the Territory.

Effective immediately upon expiration of the exclusive license granted under the preceding paragraph, Wyeth hereby grants to Teva and its affiliates a non-exclusive non-transferable (except to the extent permitted in Section 14) license, without the right to grant sublicenses, under the XR IP, to use, offer for sale, sell, import and have imported XR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory.

Notwithstanding the foregoing, if the XR Entry Date occurs prior to July 1, 2010 as a result of the occurrence of a Second XR Generic Entry Date (but for no other reason specified in the definition of XR

3

WYEFFAT2405404

Entry Date), then until July 1, 2010 the licenses granted under this Section 3.B would be limited to the using, offering for sale, selling, importing and having imported of XR Product that is in the same dosage strength(s) as is any Second Generic XR Product then being sold by a third party in the Territory, provided that if any of the other triggers specified in the XR Entry Date occur, this paragraph shall no longer apply.

Wyeth agrees that in the event of any breach of Wyeth's obligations under this Section 3, Teva will be irreparably harmed and that Teva will have no adequate remedy at law and that Teva will be entitled to seek and obtain and Wyeth will agree to the imposition of temporary and permanent injunctive relief causing Wyeth to immediately discontinue any actions that result in such breach and to not take any such actions in the future.

The term of each license set forth in this Section 3, unless terminated, shall be from its applicable effective date until the last-to-expire patent subject to such license.

C. Enforcement and Defense. From the Signing Date until the end of the period during which Teva and its affiliates have an exclusive license under Sections 3.A and 3.B, Wyeth and Teva will each promptly notify the other party of any actual or potential infringement of IR IP or XR IP of which it becomes aware arising from any third party making, using, selling, offering for sale or importing (including any infringement arising from any ANDA filing) any generic equivalent to IR Reference Product or XR Reference Product, respectively. Wyeth will use commercially reasonable efforts to cause such infringement to terminate, and Teva will consult with Wyeth in such efforts.

D. Manufacturing License for IR and XR Products: Effective as of the IR Entry Date, Wyeth hereby grants to Teva and its affiliates a non-transferable (except to the extent permitted in Section 14) license, without the right to grant sublicenses, under all IR IP and all foreign counterparts to the IR IP in the territories next specified, to manufacture and have manufactured Teva IR Products (including Compound to the extent necessary to manufacture Teva IR Products) in the United States, Canada and Israel and such other countries as the parties may mutually agree upon in writing (after Teva's request for consent to expand the territory of the license set forth in this sentence which consent will not be unreasonably withheld by Wyeth), but if outside the Territory, only for the importation of such Teva IR Products and Compound (for the purposes of manufacturing Teva IR Products) into the Territory and the other activities permitted by the license granted in Section 3.A. Such license will be exclusive until the Compound Patent Termination Date. Effective as of the XR Entry Date, Wyeth hereby grants to Teva and its affiliates a non-transferable (except to the extent permitted in Section 14) license, without the right to grant sublicenses, under XR IP and all foreign counterparts to the XR IP in the territories next specified, to manufacture and have manufactured XR Products (including Compound to the extent necessary to manufacture XR Products) in the United States, Canada and Israel and such other countries as the parties may mutually agree upon in writing (after Teva's request for consent to expand the territory of the license set forth in this sentence which consent will not be unreasonably withheld by Wyeth), but if outside the Territory, only for the importation of such XR Products and Compound (for the purposes of manufacturing XR Products) into the Territory and the other activities permitted by the license granted in Section 3.B. Such license shall be exclusive for the first six (6) months after the XR Entry Date and thereafter shall be nonexclusive.

E. Regulatory Licenses and Waivers: Wyeth hereby grants to Teva a license or waiver (as applicable), without the right to grant sublicenses, under any regulatory exclusivities that Wyeth or any of its affiliates has for the IR Products and XR Products in the Territory, but only to the extent required for Teva and its affiliates to exercise in full the licenses contained in Sections 3.A to 3.D. Such license or waiver will be exclusive and non-exclusive for the same period of time as the corresponding license. As Teva may reasonably request, Wyeth will submit appropriate and reasonable documentation to the FDA

4

evidencing such licenses and waivers to assist Teva in effecting the foregoing licenses and waivers and otherwise in obtaining approvals of ANDAs for IR Product and XR Product.

F. Preparation for Launch: The licenses contained in Sections 3.A to 3.B (other than any license to sell or distribute the IR Products or the XR Products) may be exercised up to one (1) week before the IR Entry Date and XR Entry Date, as applicable, to enable Teva and its affiliates to undertake reasonably necessary preparations to sell IR Product and XR Product, respectively, for use in the Territory as of the applicable entry date (but not before), *provided, however*, that (i) with respect to the Teva IR Product, the license in Section 3.D shall not take effect before three (3) months prior to the expiration of Wyeth's obligation to supply the Wyeth Supplied IR Product, unless Wyeth fails to supply the Wyeth Supplied IR Product as provided in Section 6 or Teva has exercised its option to manufacture Teva IR Product set forth in Section 6, and (ii) with respect to manufacturing and shipping to Teva or its affiliates or third-party warehouses under Teva's control launch amounts of product, the licenses contained in Sections 3.A to 3.E may be exercised for up to ninety (90) days before the IR Entry Date and XR Entry Date, as applicable. Wyeth will notify Teva as soon as practicable of the expected and actual occurrence of the IR Entry Date and XR Entry Date. Teva shall not sell or distribute IR Product or XR Product before the IR Entry Date or XR Entry Date, respectively.

G. Covenant Not To Sue: At such time as Teva and its affiliates may exercise the licenses contained in Sections 3.A to 3.F with respect to the IR Products and XR Products (including Compound for the purposes of manufacturing IR Products and XR Products), respectively, Wyeth hereby covenants that Wyeth and its affiliates will not sue, or cause or support any licensee or other third party to sue, any of Teva or its affiliates, their manufacturers and importers, or their distributors and customers or their consumers claiming that the manufacture, use, sale, offer for sale or importation of IR Products or XR Products (including Compound for the purposes of manufacturing IR Products and XR Products), within the scope of such licenses (as applicable), infringes any patent rights owned or controlled (with the right to grant at least a covenant not to sue, which Wyeth shall use commercially reasonable efforts to obtain) now or hereafter by Wyeth or any of its affiliates covering the compositions or formulations of IR Reference Product or XR Reference Product or IR Product or XR Product (including Compound for the purposes of manufacturing IR Products and XR Products) (including product-by-process claims), provided, however, that this covenant not to sue shall not extend to any patent claim claiming any (a) manufacturing process used or useful for IR Reference Product or XR Reference Product or IR Product or XR Product (including Compound for the purposes of manufacturing IR Products and XR Products) or (b) New Indication (as defined below) (with the understanding that an equivalent of major depressive disorder ("MDD") shall not be such a use for this clause (b)). For sake of clarity, the foregoing covenant not to sue shall be in addition to and shall not limit any of the licenses provided for in Sections 3.A to 3.F. Wyeth will impose the foregoing covenant not to sue on any third party to which Wyeth or any of its affiliates may assign, license or otherwise transfer any patent rights subject to the foregoing covenant not to sue.

In the event that Wyeth incurs any royalties or other payment obligation to any third party based on sales of XR Product or IR Product by Teva or its affiliates as a result of any patent rights (other than IR IP, XR IP or any foreign counterparts thereof) in-licensed after the Settlement Date by Wyeth or any of its affiliates (but not owned by Wyeth or any of its affiliates) because such patent rights are subject to the foregoing covenant not to sue, Teva shall reimburse Wyeth for those royalties and payments within thirty (30) days of Wyeth incurring such payment obligations and invoicing Teva therefor, provided that Wyeth first notify Teva of the specific patent rights and the amount of the reimbursement obligation before Teva has any obligation to make any such reimbursements and Teva has the option to forego the covenant not to sue for such patent rights and as a result has no obligation to reimburse Wyeth. Wyeth represents and warrants to Teva as of the Signing Date that Wyeth is not aware of any patent rights that

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405406

would require Teva to pay any such reimbursement subject to the foregoing covenant not to sue if such patent rights are or if such patent rights were to be in-licensed as of the Settlement Date.

If (1) Wyeth or any of its affiliates has or obtains any patent rights claiming any additional, new or supplemental indication or use of XR Reference Product or IR Reference Product not already approved as of the Signing Date (a "New Indication"), and (2) if Teva has used commercially reasonable efforts to obtain a "carve out" of the New Indication from the label of IR Product and XR Product, respectively, for such New Indication, and (3) such carve-out is insufficient to overcome any refusal of the FDA to approve the applicable Teva ANDAs for IR Product or XR Product, then Wyeth hereby extends the foregoing covenant not to sue to such patent rights.

**4. Patent Rights:** Teva admits that the Patents in Suit are valid and enforceable. Teva agrees not to and to cause each of its affiliates not to oppose or challenge the validity or enforceability of, or assert any other claim or defense in patent litigation concerning the Patents in Suit, or aid or assist any third party in challenging, opposing or causing to be challenged, directly or indirectly, the validity or enforceability of, or asserting any other claim or defense against the enforcement of, any of the Patents in Suit in any court or tribunal or in the United States Patent and Trademark Office and waives any and all invalidity and unenforceability defenses in any future litigation, arbitration or other proceeding with respect to the Patents in Suit. As to the patents included within the IR IP or the XR IP (other than the Patents in Suit), Teva waives any and all invalidity and unenforceability defenses in any future litigation, arbitration or other proceeding. Teva further agrees not to and to cause each of its affiliates not to oppose or challenge the validity, enforceability or infringement of, or aid or assist any third party in challenging, opposing or causing to be challenged, directly or indirectly, the validity, enforceability or infringement of any patent or patent application included within the IR IP or any patent or patent application included within the XR IP (other than the Patents in Suit) in any court or tribunal or in the United States Patent and Trademark Office. The two preceding sentences of this Section 4 shall not apply to the extent that any such actions by Teva or any of its affiliates concern the making, using, selling, offering for sale or importation of any product which is neither an IR Product nor an XR Product. Notwithstanding the foregoing, Teva and its affiliates may file or maintain Paragraph IV Certifications on patents listed on the Orange Book now or in the future for the IR Product and XR Product on the basis only of the licenses and covenants not to sue, as applicable, contained in Section 3. Teva agrees that in the event of any breach of Teva's obligations under this Section 4, Wyeth will be irreparably harmed and that Wyeth will have no adequate remedy at law and that Wyeth will be entitled to seek and obtain and Teva will agree to the imposition of temporary and permanent injunctive relief causing Teva to immediately discontinue any actions that result in such breach and to not take any such actions in the future. Nothing in this Term Sheet will be construed as an admission of infringement by Teva, or an admission of non-infringement by Wyeth, of any Patents in Suit in the Litigation.

**5. Consideration:**

A. _IR Products:_ In consideration of Wyeth entering into this Term Sheet, Teva will pay to Wyeth twenty percent (20%) of all Profits obtained by Teva or its affiliates from the sale of IR Products for use in the Territory. Such consideration will be payable for all IR Product sold prior to the Compound Patent Termination Date. Notwithstanding the foregoing, during such period that at least one Second Generic IR Product is being sold by a third party (who has no relation to Teva directly or indirectly with respect to such Second Generic IR Product, other than potentially with respect to purchasing Compound for use in the manufacture thereof) in the Territory, the payment required under this Section 5.A shall be suspended and there shall be no obligation on Teva to make any such payment.

B. _Wyeth Supplied IR Product:_ In consideration of Wyeth supplying Wyeth Supplied IR Product, Teva will purchase Wyeth Supplied IR Product from Wyeth at a purchase price of one hundred

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405407

ten percent (110%) of Wyeth's fully allocated cost of manufacturing such Wyeth Supplied IR Product, which cost is set forth on <u>Appendix C</u> and payable by wire transfer within thirty (30) days of invoice received by Teva sent upon product shipment, plus eight (8%) of all Profits obtained by Teva or its affiliates from the sale of such Wyeth Supplied IR Products in the Territory payable as provided in Section 5.D.

   C. <u>XR Product</u>:  In consideration of Wyeth entering into this Term Sheet, Teva will pay to Wyeth consideration at the rates set forth below on all Profits obtained by Teva or its affiliates from the sale of XR Products for use in the Territory, for all XR Product sold prior to the XR Patent Termination Date:

| Period | % of Profits Attributable to XR Products |
|---|---|
| 1.  From the XR Entry Date to the six (6) month anniversary of the XR Entry Date, 15%, unless both (i) Teva launches XR Product for use in the Territory upon an XR Entry Date attributable to clause (v) of such definition (but for no other reason specified in the definition of XR Entry Date), and (ii) as a result of such launch, Teva enjoys the benefit of 180-day exclusivity under the Hatch-Waxman Act, as amended, then the % of Profits during such six-month period will not be 15% but 50% until the earlier of such time (if any) during such six-month period that (a) Teva no longer enjoys the benefit of such 180-day exclusivity or (b) July 1, 2010, whereupon for the remainder of such six-month period the % of Profits will be 15%; | 15% or 50% as provided in the Period description |
| 2.  On or after the six (6) month anniversary and prior to the twelve (12) month anniversary of the XR Entry Date | 50% |
| 3.  On or after the twelve (12) month anniversary of the XR Entry Date until the XR Patent Termination Date | 65% |

In the event that Wyeth grants a license to one third party to sell an Authorized Generic Product to the XR Reference Product in the Territory after the licenses granted to Teva in Section 3 for XR Product become nonexclusive, the payments thereafter payable by Teva for the XR Product will be no greater than the lesser of (i) the rate at which payments are paid to Wyeth by such third party based on sales of such Authorized Generic Product to the XR Reference Product (as certified by an independent third party reasonably acceptable to both parties), or (ii) forty percent (40%) of Profits attributable to XR Product. Notwithstanding the foregoing, during such period of time that at least one Second Generic XR Product is being sold in the Territory by a third party (who has no relation to Teva directly or indirectly with respect to such Second Generic XR Product, other than potentially with respect to purchasing Compound, and other than one third party selling an Authorized Generic Product as provided in the immediately preceding sentence), the payment obligation for Teva's sale of XR Products shall be suspended and there shall be no obligation on Teva to make any such payment.  Further notwithstanding the foregoing, if (1) Teva launches XR Product for use in the Territory upon an XR Entry Date attributable to clause (iii) of such definition (but for no other reason specified in the definition of XR Entry Date), and (2) Wyeth is able to require the third party responsible for such clause (iii) Teva entry to stop selling and distributing a Second Generic XR Product after launch, and (3) such date occurs within the first six months after the XR Entry Date when Teva first launched such XR Product, then the 15% specified in row #1 of the foregoing table shall be replaced with 50%, with the remaining rows #2 and #3 and the foregoing of Section 5.C applying to XR Product without change.

7

WYEFFAT2405408

D. Reports and Payments: For sales of IR Product by Teva and its affiliates, within forty-five (45) days after the end of each calendar quarter, and for sales of XR Product by Teva and its affiliates, within thirty (30) days after the end of each calendar month, Teva will provide Wyeth with a written report of all sales of IR Products and XR Products as applicable for use in the Territory made by or on behalf of its or its affiliates during such calendar month and all Gross Sales, Net Sales and Profits obtained as a result of such sales. Payment of all amounts due to Wyeth shall be made by wire transfer simultaneously with the submission of each such report.

E. Late Payments. Any payment due to Wyeth from Teva that is not paid on or before the date such payment is due under this Term Sheet shall bear interest at a rate of twelve percent (12%) per annum.

F. Record Keeping and Audits. Teva shall keep and shall cause each of its affiliates to keep accurate books and accounts of record in connection with the sale of the IR Products and XR Products in sufficient detail to permit accurate determination of all figures necessary for verification of payments required to be paid hereunder (other than Costs of Goods Sold for Teva IR Product (but Costs of Goods Sold for XR Product is auditable hereunder)). All such records shall be maintained for a period of at least three (3) years ("Audit Period") after the end of the year in which they were generated. Upon reasonable prior notice, for the sole purpose of determining whether Teva is in compliance with the payment provisions of this Term Sheet Wyeth shall have the right, to have an independent public accounting firm, reasonably acceptable to Teva and not paid in whole or in part by a contingent fee arrangement, access the books and records of Teva and each of its affiliates as may be reasonably necessary to verify the accuracy of the reports and payments paid hereunder during regular business hours at Teva's offices and in such a manner as not to interfere unreasonably with Teva's normal business activities. In no event shall such audits be conducted hereunder more frequently than once every twelve (12) months. Prior to commencing any such inspection and audit, any such independent auditor shall have entered into a reasonable and customary agreement with Teva which prohibits the disclosure of any information relating to Teva to any party, including Wyeth, except that such auditor may issue a report to Wyeth, which report shall also be provided to Teva, the sole purpose of which shall be to report to Wyeth whether Teva is in compliance with the payment provisions of this Term Sheet, including a summary of and sufficient detail regarding the scope, quality, and methodology of such compliance or lack thereof. If such independent accountant concludes that additional payments were owed to Wyeth during such period hereunder, Teva shall pay the additional consideration plus all interest payments due thereon within thirty (30) days of the date Wyeth delivers to Teva such accountant's written report so concluding. If such independent accountant concludes that Teva overpaid Wyeth hereunder during such period, Wyeth shall reimburse the overpaid amounts within thirty (30) days of such date. Costs for the audit will be paid by Wyeth unless there is a discrepancy in the amount paid of greater than seven and one-half percent (7.5%) in which case Teva shall reimburse Wyeth for the costs of the audit. In the event that Wyeth does not request to exercise its audit right during the Audit Period all of Teva's reports and payments for which the Audit Period has expired will be deemed final and binding. Wyeth shall treat all information received from Teva and/or the independent auditor under this Section 5.F and Section 5.D as confidential information of Teva.

G. Taxes. Teva and Wyeth shall be responsible for and shall pay all taxes payable on any income to Teva and Wyeth, respectively, arising from any payments by Teva. Each of Teva and Wyeth shall bear sole responsibility for payment of compensation to their respective personnel, employees or subcontractors and for all employment taxes and withholding with respect to such compensation pursuant to applicable law. Teva shall have the right to withhold income taxes in the event that the revenue authorities in the applicable country require the withholding of such taxes on amounts paid hereunder to Wyeth. Any such tax paid or required to be withheld by Teva on account of any payments payable to

8

Wyeth under this Term Sheet shall be deducted from the amount of payments due Wyeth. Teva shall secure and promptly send to Wyeth, as applicable, proof of such taxes withheld and paid by Teva for the benefit of Wyeth. Each party agrees to cooperate with the other parties in claiming exemptions from such taxes under any statute or regulation from time to time in effect. The parties will use commercially reasonable efforts to structure the transactions contemplated by this Term Sheet in order to minimize the likelihood that withholding would apply.

6. **Supply of Wyeth Supplied IR Product:** At any time following the Signing Date and subject to Teva's timely provision to Wyeth of molds and camera ready art work, upon receipt of a firm purchase order from Teva, Wyeth will supply to Teva Wyeth Supplied IR Product in such quantities, not to exceed those specified on Appendix E, and on such schedule as the parties mutually agree upon; provided that (A) with respect to the first such order, (1) the maximum quantity of the Wyeth Supplied IR Product shall be the quantity specified in the "Launch" column on such Appendix E, and (2) Wyeth shall ship such first order on the date specified in such purchase order, which date shall not be less than one hundred twenty (120) days after receipt of such order by Wyeth unless the IR Entry Date occurs within such 120 day period, then Wyeth will use commercially reasonable efforts to ship ordered Wyeth Supplied IR Product as expeditiously as possible, and (B) for all other orders (the first of which other orders may not be made within thirty (30) days of such first order), Wyeth shall ship such first order on the date specified in such purchase order, which date shall not be less than ninety (90) days after receipt of such order by Wyeth, and (C) the shelf life for such tablets is at least twenty (20) months at the time of shipment. In the event that Teva places such a firm purchase order and the Settlement Date does not occur, Wyeth shall not be obligated to ship such product and Teva shall pay Wyeth, within thirty (30) days after the date on which this Term Sheet terminates as a result of no Settlement Date, Wyeth's fully allocated manufacturing costs for work actually performed and materials used plus ten percent (10%) (which shall not exceed the one hundred and ten percent (110%) cost specified in Section 5.B), subject to, with respect to materials, Wyeth's use of any such materials for other suitable purposes. Wyeth will supply the Wyeth Supplied IR Product in the form of fully packaged tablets to Teva pursuant to a Supply Agreement to be entered into by the parties as one of the Definitive Agreements, or absent such a Supply Agreement, this Term Sheet. Under the Supply Agreement or this Term Sheet, (i) the initial supply term will expire on the one (1) year anniversary of the IR Entry Date, *provided, however,* that Teva and Wyeth may mutually agree in writing to extend the term, (ii) subject to the above, Wyeth will supply Wyeth Supplied IR Products in such amounts and at such times as the parties may, in good faith, mutually agree, (iii) Teva agrees not to sell any Teva IR Product during the term of Wyeth's supply obligation except to the extent that Wyeth fails to supply Teva with Wyeth Supplied IR Product as provided above, and (iv) Wyeth will represent and warrant to Teva upon delivery of Wyeth Supplied IR Product that all such product has been manufactured in accordance with the specifications provided for in the applicable NDA and cGMP requirements, is free from defects, and is packaged and labeled in accordance with Teva's written specifications. Teva acknowledges and agrees that prior to the supply of an Wyeth Supplied IR Product, Teva and Wyeth shall enter into a standard quality agreement.

In lieu of purchasing Wyeth Supplied IR Product as provided above, Teva shall have an option, exercisable by written notice to Wyeth within thirty (30) days after the Signing Date (but in no event after Teva having sent Wyeth a purchase order for Wyeth Supplied IR Product), to manufacture Teva IR Product. Upon exercising that option, Teva shall have the right to begin manufacturing Teva IR Product in preparation of the IR Entry Date, and Wyeth shall have no further obligation under this Term Sheet to supply Teva with Wyeth Supplied IR Product. As a result of exercising such option and manufacturing Teva IR Product, for the first year after the IR Entry Date, instead of Teva paying to Wyeth pursuant to Section 5.A twenty percent (20%) of Profits obtained by Teva or its affiliates from the sale of Teva IR Product for use in the Territory, Teva shall pay twenty-eight percent (28%), but only for such first year and subject to all the terms of this Term Sheet (including Section 5.A itself).

9

7.  **Trademarks:** Other than the license rights expressly set forth above, this Term Sheet will provide either party no other right, title or interest, either express or implied, in or to any of the other party's intellectual property rights, including any patent right, trademark, copyright, trade secret or know-how. Teva will not use in connection with its sale, distribution or promotion of any IR Product or XR Product, any of Wyeth's trademarks, trade names or trade dress or any trademarks, trade names or trade dress which are confusingly similar to any of Wyeth's trademarks, trade names or trade dress.

8.  **Other Agreements.** Teva acknowledges and agrees that the licenses granted to it in Section 3 above each only provide Teva with the right to sell or distribute the IR Products or the XR Products sold under Teva's ANDAs for use in the Territory. Accordingly, before the Compound Patent Termination Date or XR Patent Termination Date with respect to the IR Products or the XR Products sold under Teva's ANDAs, respectively, Teva agrees to and to cause its affiliates to:

(i)     use all commercially reasonable efforts to impose upon its distributors and customers within the Territory for such Product contractual obligations not to seek or accommodate consumers outside the Territory for such Product;

(ii)    restrict its marketing, promotion, advertisement, sale and distribution of such Product solely within the Territory;

(iii)   not intentionally sell, market, promote, advertise, or distribute such Product for use outside the Territory, and Teva shall use all commercially reasonable efforts to impose upon its distributors and customers a contractual obligation to observe the same;

(iv)    not knowingly, directly or indirectly, sell such Product to any third party for use in the Territory for resale outside the Territory; and exercise its reasonable commercial efforts to ensure its distributors and customers do not ship, sell or otherwise distribute such Product for ultimate use by patients outside the Territory; and

(v)     not sell such Product via the Internet outside the Territory, or sell such Product via mail order outside of the Territory, and Teva shall use all commercially reasonable efforts to impose, as an essential condition of doing business, upon its distributors and other customers a contractual obligation to observe same.

In the event of a breach of the foregoing, Teva would reimburse Wyeth for the lost profits that Wyeth would have realized had Wyeth sold the product equivalent to the IR Reference Product or the XR Reference Product in question in the country into which such Product was imported in violation of such obligations.

9.  **Termination:** After the Settlement Date, either party will have the right to terminate the License Agreement and the Supply Agreement (if in effect) and this Term Sheet in the event of a material breach by the other party, which breach remains uncured for a period of ninety (90) days after notice thereof is given to such other party. No termination of this Term Sheet shall affect any rights or liabilities of the parties which may have accrued prior to the date of termination. Sections 11 to 17 of this Term Sheet will survive termination. Upon such termination by Wyeth for Teva's material uncured breach, Wyeth will have no further obligation to supply any Wyeth Supplied IR Product to Teva, all of the corresponding rights and obligations under Sections 3, 4, 5 (other than Section 5.F), 6, 7 and 8 shall terminate, and all rights and licenses granted to Teva shall be immediately terminated. The parties shall mutually agree on the other termination scenarios to be contained in the Definitive Agreements.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405411

**10. Representations and Warranties:** Each of Wyeth and Teva represents and warrants to the other as of the Signing Date that (i) this Term Sheet does not and will not conflict with any other agreements to which it or any of its affiliates may be a party, (ii) this Term Sheet is a binding obligation of it and its affiliates, enforceable in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy and similar laws affecting creditors' rights, and, generally, to general equitable principles, and (iii) that it has the authority to enter into this Term Sheet and to undertake and perform fully its obligations and to grant the licenses and rights contained hereunder. Wyeth further represents and warrants to Teva as of the Signing Date that neither it nor any of its affiliates has granted any licenses, authorizations, waivers or other rights concerning any Authorized Generic Product.

**11. Governing Law:** This Term Sheet will be governed by and construed in accordance with the laws of the State of New York, without reference to its internal conflicts of law principles. Either party may pursue any legal or equitable remedies available to it by filing a claim in the state or federal courts located in the state of New Jersey and each party hereby consents to the exclusive jurisdiction of such courts. This Term Sheet will inure to the benefit of, and be binding upon, the legal representatives, successors and assigns of the parties.

**12. Public Announcements:** The parties agree that any public announcement of this Term Sheet and its contents will be in the form of a press release attached hereto as Appendix D, and thereafter each party will be entitled to make or publish any public statement consistent with the contents of such press release without complying with the requirements of this Section. Neither Teva nor Wyeth shall release to any third party or publish in any way any non-public information with respect to the terms of this Term Sheet or concerning the transactions contemplated hereunder without the prior written consent of the other, which consent will not be unreasonably withheld or delayed, *provided, however,* that (i) either party may disclose the terms of this Term Sheet to the extent required to comply with applicable laws, including without limitation the rules and regulations promulgated by the United States Securities and Exchange Commission and any national securities exchange, and (ii) either party may disclose the IR Entry Date and XR Entry Date and other material terms of this Term Sheet relating to such entry dates (but not the percentage of Profits to be paid by Teva to Wyeth) at any time as it may deem necessary in order to ensure full and fair dissemination of material information regarding such party, provided that for this clause (ii) the parties shall provide prior notice of such intended disclosure in order to provide the other party with a reasonable opportunity to coordinate any such disclosure to the extent reasonably practicable. Notwithstanding the foregoing, before disclosing this Term Sheet or any of the terms hereof pursuant to clause (i) of the preceding sentence, (x) the parties will consult with one another on the terms of this Term Sheet to be redacted in making any such disclosure, and (y) to the extent permitted by applicable law, such disclosing party agrees, at its own expense, to seek confidential treatment of portions of this Term Sheet or such terms, as may be reasonably requested by the other party.

**13. Severability:** In addition to Section 1, if any provision of this Term Sheet or the application thereof to any party or circumstance will, to any extent, be held to be invalid or unenforceable, then (i) the remainder of this Term Sheet, or the application of such provision to parties or circumstances other than those as to which it is held invalid or unenforceable, will not be affected thereby and each provision of this Term Sheet will be valid and be enforced to the fullest extent permitted by law, and (ii) the parties covenant and agree to renegotiate any such provision in good faith in order to provide a reasonably acceptable alternative to such provision or the application thereof that is invalid or unenforceable, it being the intent of the parties that the basic purposes and business intent of this Term Sheet are to be effectuated, with the consequence that this Term Sheet shall terminate in full if the parties are unable to renegotiate and agree on such provision.

**14. Entire Agreement:** This Term Sheet (including all of the attached Appendices) constitutes and expresses the final and exclusive agreement between the parties with respect to its subject matter and

11

supersedes all previous communications with respect to such subject matter. This Term Sheet may not be assigned by either party without the prior written consent of the other party; provided, however, that either party may assign this Term Sheet in whole or in part to any of its affiliates or in connection with its merger, reorganization or consolidation or the sale of all or substantially all of its assets to which this Term Sheet relates.

**15. Amendment and Waiver.** No amendment, waiver or termination of any provision of this Term Sheet will be binding unless contained in a writing executed by the party to be bound thereby.

**16. Notices.** All notices given under this Term Sheet shall be in writing and delivered by hand or sent by nationally recognized overnight delivery service, prepaid registered or certified air mail, or by facsimile confirmed by prepaid first class, registered or certified mail letter, and shall be deemed to have been properly served to the addressee upon receipt of such written communication.

Notices to Wyeth shall be sent to:

 Wyeth Pharmaceuticals
  500 Arcola Road
  Collegeville, Pennsylvania 19426
  Attn: Senior Vice President, Corporate Business Development
  Fax: (484) 865-6476

with a copy to:

  Wyeth
  5 Giralda Farms
  Madison, New Jersey 07940
  Attn: General Counsel
  Fax: (973) 660-7156

Notices to Teva shall be sent to:

  Teva Pharmaceuticals North America
  425 Privet Road
  PO Box 1005
  Horsham, PA 19044-8005 1090
  Attention: General Counsel
  Facsimile: (215) 293-6499

and:

  Teva Pharmaceutical Industries Ltd.
  5 Basel Street
  P.O. Box 3190
  Petach Tikva 49131, Israel
  Attention: Corporate Legal Department – Attention General Counsel
  Facsimile: 011 972-3-926-7429

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**17. Miscellaneous:** This Term Sheet may be executed in counterparts with the same force and effect as if each of the signatories had executed the same instrument. The term "including" means "including, without limitation,". All extended unit sales and gross sales of product in this Term Sheet will be determined by reference to applicable National Prescription Audit ("NPA"), or National Sales Perspective ("NSP"), Moving Annual Total ("MAT") data provided by IMS Health Incorporated. References to any NDA or ANDA in this Term Sheet include, unless expressly indicated otherwise, all replacements and successors and all amendments and supplements to the foregoing.

*[remainder of this page intentionally left blank]*

13

IN WITNESS WHEREOF, each of the parties has caused its duly authorized representative to execute this Binding Term Sheet as of the Signing Date, to be binding and effective as provided in Section 1.

. WYETH PHARMACEUTICALS

By:_____
Name:_____
Title:_____

TEVA PHARMACEUTICALS USA, INC.

By:_____
Name:  Mark W. Durand
Title:  CFO & Sr. VP, Finance & Bus. Dev.

TEVA PHARMACEUTICAL INDUSTRIES LTD.

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, each of the parties has caused its duly authorized representative to execute this Binding Term Sheet as of the Signing Date, to be binding and effective as provided in Section 1.

WYETH PHARMACEUTICALS

By: _____
Name: _____
Title: _____

TEVA PHARMACEUTICALS USA, INC.

By: _____
Name: _____
Title: _____

TEVA PHARMACEUTICAL INDUSTRIES LTD.

By: _____
Name: William S. Marth
Title: President + CEO Teva USA

By: _____
Name: Richard S Egosi
Title: SVP Esq + Gen+Sec / TNA

WYETH, ACTING THROUGH ITS
WYETH PHARMACEUTICALS DIVISION

By:
Name:  Bernard J. Poussot
Title:  President

WYETH PHARMACEUTICALS COMPANY INC.

By:
Name:  Bernard J. Poussot
Title:  President

WYETH-WHITEHALL PHARMACEUTICALS INC.

By:
Name:  Bernard J. Poussot
Title:  President

WYETH PHARMACEUTICALS COMPANY

By:
Name:  Bernard J. Poussot
Title:  President

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    WYEFFAT2405417

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405418

## APPENDIX A
### Certain Defined Terms for this Term Sheet

"Authorized Generic Product" means, with respect to IR Reference Product or XR Reference Product (in any dosage strength), any product marketed or sold by or under license, waiver or other actual or effective authorization of, or supplied by or on behalf of, Wyeth or any of Wyeth's affiliates or licensees, as Reference Product sold as a generic in the Territory (other than by Teva or Teva's affiliates pursuant to the Definitive Agreements or this Term Sheet) not under the Effexor® trademark.

"Compound" means venlafaxine hydrochloride and any form thereof including polymorphs and solvates, and other pharmaceutically acceptable salts of venlafaxine and any form thereof including polymorphs and solvates.

"Compound Patent Termination Date" means the earliest to occur of (i) the expiration of U.S. Patent No. 4,535,186, including pediatric extension (June 13, 2008) (which type of extension shall be treated as a "patent right" for purposes of this Term Sheet), (ii) such patent is held unenforceable, or (iii) all claims covering venlafaxine therein are held invalid, in each case of clause (ii) or (iii) by a final decision by a court of last resort from which no appeal or other review has been or can be taken.

"Cost of Goods Sold" means the costs incurred by Teva in manufacturing Teva IR Products or XR Products, provided, however, that in no event will the Cost of Goods Sold for a Teva IR Product be greater than twelve percent (12%) of the gross selling price of such Teva IR Product.

"IR Entry Date" means the earlier of (i) June 15, 2006, or (ii) if it occurs, the day in which there is a decrease in extended unit sales of IR Reference Product (in all dosage strengths) over the preceding fifty-two (52) week period of at least seventeen and ½ percent (17.5%) as compared to extended unit sales of IR Reference Product (in all dosage strengths) for the fifty-two (52) week period ending on October 31, 2005, as measured by IMS NPA retail MAT weekly reporting.

"IR IP" means (i) U.S. Patent No. 4,535,186, (ii) all other U.S. patent rights owned or controlled as of the Signing Date by Wyeth or any of its affiliates that the manufacture, use, sale, offer for sale or importation of any IR Product but for the license grant would infringe, and (iii) all U.S. patent rights claiming (directly or indirectly) priority to such U.S. patent and U.S. patent rights identified in clause (i) and (ii) or any of the applications to which such U.S. patent or U.S. patent rights claim (directly or indirectly) priority.

"IR Products" means the Teva IR Product and/or the Wyeth Supplied IR Product, as the context requires. For the sake of clarity, IR Products will not include the IR Reference Product.

"IR Reference Product" means immediate release tablet containing, as its sole active ingredient, venlafaxine hydrochloride equivalent to either 25mg, 37.5mg, 50mg, 75mg or 100mg of venlafaxine (or other approved dosage strengths) which tablet is marketed in the United States by Wyeth or any of its affiliates or licensees as Effexor® under NDA No. 20-151.

"Net Sales" means the aggregate gross sales of the amounts invoiced for the sale of XR Products and IR Products by Teva or any of its affiliates in arm's length transactions with third parties ("Gross Sales") in the Territory, less reasonable estimates for the following: (i) cash discounts (ii) adjustments on account of price adjustments, billing adjustments, or shelf stock adjustments (iii) returns, shortages or rejected/damaged goods (iv) chargebacks (v) rebates, promotional allowances, administrative fee arrangements, and similar payments to all direct and indirect customers, including wholesalers and other distributors, buying groups, health care insurance carriers, pharmacy benefit management companies,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

health maintenance organizations, Medicaid or Medicare or similar type programs.  In the event that Teva sells XR Product or IR Product as part of a bundle or group sale with other products not covered by this Term Sheet, and Teva provides a discount, allowance or rebate to the purchaser of such XR Product or IR Product based on the invoiced prices for all products sold, such discount must be allocated pro rata based on the selling prices of all such products.  Net Sales shall be determined using the accrual method of accounting determined in a manner consistent with Teva's practice for its other pharmaceutical products.

"Next Generation XR Entry Date" means the first day by when both of the following have occurred: (i) Rolling Gross XR Sales is less than U.S. $500 million, and (ii) Next Generation XR Product is first sold for use in the Territory.

"Next Generation XR Product" means extended release formulation of the compound designated by Wyeth as DVS-233, a metabolite of venlafaxine, or a compound substantially similar to venlafaxine with the same active pharmacophore as venlafaxine, which formulation is marketed in the Territory pursuant to an approved NDA for the treatment of major depressive disorder or any equivalent thereof.

"Patents In Suit" means U.S. Patent Nos. 6,274,171, 6,403,120 and 6,419,958.

"Profits" means, with respect to IR Product or XR Product sold by Teva or any of its affiliates, Net Sales less Costs of Goods Sold for such product.

"Rolling Gross XR Sales" means gross sales of XR Reference Product (in all dosage strengths) for use in the Territory sold by Wyeth and Wyeth's affiliates during the preceding twelve (12) month period as measured by IMS NSP MAT monthly sales dollar reporting.

"Second Generic IR Product" means (i) immediate release tablet as defined by an ANDA filed by a third party (who is not related to Teva or Teva's affiliates in any way and who is not, directly or indirectly, operating under any license, right or waiver granted by Teva or Teva's affiliates and is not, directly or indirectly, purchasing any IR Product from Teva or Teva's affiliates), which tablet contains as its sole active ingredient Compound and is marketed as a generic product A/B rated to IR Reference Product (in any dosage strength) in the Territory, or (ii) an Authorized Generic Product of IR Reference Product (in any dosage strength).

"Second Generic XR Product" means (i) once-daily extended release capsule as defined by an ANDA filed by a third party (who is not related to Teva or Teva's affiliates in any way and who is not, directly or indirectly, operating under any license, right or waiver granted by Teva or Teva's affiliates and is not, directly or indirectly, purchasing any XR Product from Teva or Teva's affiliates), which capsule contains as its sole active ingredient Compound and is marketed as a generic product A/B rated to XR Reference Product (in any dosage strength) in the Territory, or (ii) an Authorized Generic Product of XR Reference Product (in any dosage strength).

"Second XR Generic Entry Date" means the date on which a Second Generic XR Product is first sold for use in the Territory (such first sale including any re-launch of a Second Generic XR Product), provided that if Wyeth is able to require the end of selling and distributing of such Second Generic XR Product before Teva or any of its affiliates is able to first sell a XR Product, then such first sale of Second Generic XR Product shall not constitute a "Second XR Generic Entry Date" hereunder.

"Territory" means the United States and its territories and possessions.

"Teva IR Product" means immediate release tablet, which tablet contains, as its sole active ingredient, venlafaxine hydrochloride, and is marketed by Teva or any of its affiliates or licensees as a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

generic product A/B rated to IR Reference Product (in any dosage strength) in the Territory. For the sake of clarity, Teva IR Product shall not include any Wyeth Supplied IR Product or any IR Reference Product.

"Wyeth Supplied IR Product" means immediate release tablet, which tablet (i) contains, as its sole active ingredient, venlafaxine hydrochloride, (ii) using molds supplied by Teva (which molds are compatible with Wyeth's manufacturing equipment), is manufactured by Wyeth or one of Wyeth's affiliates for supply to Teva, and (iii) is marketed as an authorized generic product for IR Reference Product (in any dosage strength) in the Territory. For the sake of clarity, Wyeth Supplied IR Product shall not include any Teva IR Product or any IR Reference Product.

"XR Early Entry Date" means the first day when Rolling Gross XR Sales is less than U.S. $1 billion, unless such first day is before October 1, 2009, whereupon the "XR Early Entry Date" will be October 1, 2009.

"XR Entry Date" means the earlier of (i) July 1, 2010, (ii) if it occurs, the XR Early Entry Date, (iii) if it occurs, the Second XR Generic Entry Date, (iv) if it occurs, the Next Generation XR Entry Date, or (v) if it occurs, other than by patent litigation with Teva or its affiliates as a named party in respect of XR Product (and no other product), the earlier of either (a) a decision of the Court of Appeals for the Federal Circuit, or a final decision by a court of last resort from which no appeal or other review has been or can be taken (other than a petition for a writ of certiorari to the U.S. Supreme Court), holding that the patents listed on the Orange Book for the XR Reference Product are unenforceable, not infringed or invalid, or (b) without derogating the foregoing, a court decision on such patents that triggers exclusivity under the Hatch-Waxman Act, as amended, provided that in no event shall the XR Entry Date be earlier than the Compound Patent Termination Date.

"XR IP" means the IR IP, plus (i) U.S. Patent Nos. 5,916,923, 6,274,171, 6,403,120, 6,419,958, and 6,444,708, (ii) all other U.S. patent rights owned or controlled as of the Signing Date by Wyeth or any of its affiliates that the manufacture, use, sale, offer for sale or importation of any XR Product but for the license grant would infringe, and (iii) all U.S. patent rights claiming (directly or indirectly) priority to such U.S. patents and U.S. patent rights identified in clause (i) and (ii) or any of the applications to which such U.S. patents or U.S. patent rights claim (directly or indirectly) priority.

"XR Patent Termination Date" means the earliest to occur of (i) the expiration of the last to expire XR IP, (ii) all such U.S. patents are held unenforceable, or (iii) all claims covering the manufacture, use, sale or importation of XR Reference Products (in any dosage strength) contained in such U.S. patents are held invalid or unenforceable, in each case of clause (ii) or (iii) by either (a) a decision of the Court of Appeals for the Federal Circuit or (b) a final decision by a court of last resort from which no appeal or other review has been or can be taken.

"XR Product" means once-daily extended release capsule, which capsule contains, as its sole active ingredient, venlafaxine hydrochloride, and is marketed by Teva or any of its affiliates or licensees as a generic product A/B rated to XR Reference Product (in any dosage strength) in the Territory. For the sake of clarity, XR Product does not include XR Reference Product.

"XR Reference Product" means once-daily extended release capsule containing, as its sole active ingredient, venlafaxine hydrochloride equivalent to either 37.5mg, 75mg or 150mg of venlafaxine (or other approved dosage strengths) which capsule is marketed in the United States by Wyeth or any of its affiliates or licensees as Effexor® XR under NDA No. 20-699.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405422

## APPENDIX B-1 & B-2
### Orders

### B-1 – DISMISSAL ORDER

As a result of the parties having executed an Agreement dated _____, 2005, the Court hereby Orders:

1) Until the expiration of United States Patent Nos. 6,274,171 B1; 6,403,120 B1; and 6,419,958 B1; or the termination of the Agreement, Defendants shall not make, use, sell, offer for sale, or import either an IR Product or an XR Product, as those terms are defined in the Term Sheet dated October 18, 2005 and in the Agreement, for use in the Territory, except as licensed under the Agreement.

2) Defendants' Counterclaim(s) of patent invalidity are dismissed with prejudice. Defendants' Counterclaim of non-infringement is dismissed without prejudice.

3) The Agreement entered into between the parties, which has been filed with this Court under seal, is adopted by the Court as part of this Order.

4) This Court retains jurisdiction to enforce this Order and the parties' Agreement.

### B-2 – STIPULATION ORDER

The parties hereby stipulate and agree that the Court may enter a permanent injunction in the following form:

1) The Court finds that Wyeth has complied with the terms of the Decision and Order of the Federal Trade Commission, Docket No. 9297, issued April 2, 2002.

2) It is hereby Ordered that Wyeth and Teva shall abide by the terms of the Settlement Agreement, dated _____, 2005, attached hereto as Exhibit 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405424

EXECUTION COPY

## APPENDIX C
### Cost of Wyeth Supplied IR Product as Provided in Section 6

CONFIDENTIAL

Wyeth Supplied IR Product

| Product Description | Cost per Tab ($) |
| --- | --- |
| Effexor Tablet 25 mg | 0.028 |
| Effexor Tablet 50 mg | 0.039 |
| Effexor Tablet 75 mg | 0.049 |
| Effexor Tablet 100 mg | 0.059 |
| Effexor Tablet 37.5 mg | 0.032 |

Does not include 10% cost plus

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405426

EXECUTION COPY

## APPENDIX D
### Press Release

[TO BE ADDED]

Plus each party's customary legends

WYEFFAT2405427

EXECUTION COPY

## APPENDIX E
### Supply of Wyeth Supplied IR Product

| IR Launch Quantities | | |
|---|---|---|
| Dosage | Quantity 1st 12 Mos.* | Launch Quantity |
| 25 mg | 80,000 | 25,000 |
| 37.5 mg | 261,000 | 82,000 |
| 50 mg | 43,000 | 14,000 |
| 75 mg | 531,000 | 167,000 |
| 100 mg | 79,000 | 25,000 |

Bottles of 100

*Includes Launch Quantity.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405428

EXECUTION COPY

**APPENDIX F**
Schedule

**Proposed Schedule**

| | | |
|---|---|---|
| 1. | Completion of Execution-Ready Drafts of Definitive Agreements | Within 14 Days of Signing Date |
| 2. | Filing of Execution-Ready Definitive Agreements with FTC | Promptly upon completion of Execution-Ready Definitive Agreements |
| 3. | FTC Objections, if any, filed with the Court (if no Objections, proceed to item 7 below) | Within 30 Days of Filing of Execution-Ready Definitive Agreements with FTC |
| 4. | Parties' Briefs in Response to FTC Objections | Within 15 Days of Filing of FTC Objections with the Court |
| 5. | FTC's Reply Brief | Within 7 Days of Filing of Parties' Briefs |
| 6. | Court Hearing/Oral Argument on FTC Objections | Within 7 Days of Filing of FTC's Reply Brief |
| 7. | Court Order fulfilling the Settlement Condition in clause (iv) of Section 2.A. of the Term Sheet | As determined by the Court |
| 8. | Execution of Definitive Agreements | Settlement Date |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                        WYEFFAT2405429

## Exhibit B
## U.S. License Agreement

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405430

CONFIDENTIAL -- EXECUTION VERSION

LICENSE AGREEMENT

BY AND AMONG

WYETH, ACTING THROUGH ITS WYETH PHARMACEUTICALS DIVISION;

WYETH PHARMACEUTICALS COMPANY, INC.;

WYETH-WHITEHALL PHARMACEUTICALS INC.;

and

WYETH PHARMACEUTICALS COMPANY

(on the one hand)

AND

TEVA PHARMACEUTICAL INDUSTRIES LTD.

and

TEVA PHARMACEUTICALS USA, INC.

(on the other hand)

NOVEMBER 2, 2005

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### TABLE OF CONTENTS

**Page**

1.  DEFINITIONS...................................................................................1
    1.1.   "AB Rated" ...........................................................................1
    1.2.   "Affiliate" ..............................................................................2
    1.3.   "ANDA" ................................................................................2
    1.4.   "Applicable Law" ...................................................................2
    1.5.   "Audit Period" ........................................................................2
    1.6.   "Authorized Generic Product" ..................................................2
    1.7.   "Business Day" or "business day" ............................................2
    1.8.   "Compound" ...........................................................................3
    1.9.   "Compound Patent Termination Date" .......................................3
    1.10.  "Confidential Information" .......................................................3
    1.11.  "Cost of Goods Sold" ...............................................................3
    1.12.  "Disclosing Party" ...................................................................3
    1.13.  "FDA" ....................................................................................3
    1.14.  "IMS" .....................................................................................3
    1.15.  "IR ANDA" .............................................................................3
    1.16.  "IR Entry Date" .......................................................................3
    1.17.  "IR IP" ....................................................................................4
    1.18.  "IR New Indication" .................................................................4
    1.19.  "IR Product" ............................................................................4
    1.20.  "IR Reference Product" .............................................................4
    1.21.  "Liability" ...............................................................................4
    1.22.  "Litigation" .............................................................................4
    1.23.  "MDD" ....................................................................................4
    1.24.  "Net Sales" ..............................................................................4
    1.25.  "Next Generation XR Entry Date" ..............................................5
    1.26.  "Next Generation XR Product" ...................................................5
    1.27.  "NPA MAT" .............................................................................5
    1.28.  "NSP MAT" ..............................................................................5
    1.29.  "Other Patent Rights" ...............................................................5
    1.30.  "Patent Rights" ........................................................................6
    1.31.  "Patents In Suit" ......................................................................6
    1.32.  "Product" .................................................................................6
    1.33.  "Profits" ..................................................................................6
    1.34.  "Receiving Party" .....................................................................6
    1.35.  "Rolling Gross XR Sales" ..........................................................6
    1.36.  "Second Generic IR Product" .....................................................6
    1.37.  "Second Generic XR Entry Date" ...............................................6
    1.38.  "Second Generic XR Product" ....................................................6
    1.39.  "Settlement Agreement" .............................................................7
    1.40.  "Settlement Effective Date" ........................................................7
    1.41.  "Signing Date" .........................................................................7
    1.42.  "Territory" ...............................................................................7
    1.43.  "Teva DMF" .............................................................................7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                              WYEFFAT2405432

| | | |
|---|---|---|
| 1.44. | "Teva Indemnitees" | 7 |
| 1.45. | "Third Party" | 7 |
| 1.46. | "Third Party Royalties" | 7 |
| 1.47. | "Transaction Agreements" | 8 |
| 1.48. | "Valid Claim" | 8 |
| 1.49. | "Wyeth Indemnitees" | 8 |
| 1.50. | "Wyeth IP" | 8 |
| 1.51. | "XR ANDA" | 8 |
| 1.52. | "XR Early Entry Date" | 9 |
| 1.53. | "XR Entry Date" | 9 |
| 1.54. | "XR IP" | 9 |
| 1.55. | "XR New Indication" | 9 |
| 1.56. | "XR Patent Termination Date" | 9 |
| 1.57. | "XR Product" | 10 |
| 1.58. | "XR Reference Product" | 10 |
| 2. | RIGHTS GRANTED. | 10 |
| 2.1. | IR Product Rights. | 10 |
| 2.1.1. | Exclusive Commercialization License. | 10 |
| 2.1.2. | Manufacturing License. | 10 |
| 2.1.3. | Regulatory Licenses and Waivers. | 11 |
| 2.1.4. | Preparation for Launch. | 11 |
| 2.1.5. | Covenant Not To Sue. | 11 |
| 2.1.6. | IR New Indications. | 12 |
| 2.2. | XR Product Rights. | 13 |
| 2.2.1. | Exclusive Commercialization License. | 13 |
| 2.2.2. | Nonexclusive Commercialization License. | 13 |
| 2.2.3. | Manufacturing License. | 13 |
| 2.2.4. | Regulatory Licenses and Waivers. | 14 |
| 2.2.5. | Limitation on Licenses. | 14 |
| 2.2.6. | Preparation for Launch. | 14 |
| 2.2.7. | Covenant Not To Sue. | 15 |
| 2.2.8. | XR New Indications. | 16 |
| 2.3. | Sales Outside of Licensed Territory. | 16 |
| 2.4. | Retained Rights. | 17 |
| 3. | CONSIDERATION. | 17 |
| 3.1. | Payments. | 17 |
| 3.1.1. | IR Product | 17 |
| 3.1.2. | XR Product | 18 |
| 3.2. | Payments to Third Parties. | 20 |
| 3.3. | Third Party Royalties. | 21 |
| 3.4. | Reports and Payments. | 21 |
| 3.5. | Late Payments. | 21 |
| 3.6. | Taxes. | 21 |
| 3.7. | Record Keeping by Teva; Audits. | 21 |
| 3.8. | Record Keeping by Wyeth; Audits. | 22 |
| 4. | REGULATORY MATTERS; COMMERCIALIZATION. | 24 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405433

| | | |
|---|---|---|
| 4.1. | ANDA Approvals. | 24 |
| 4.1.1. | IR Product. | 24 |
| 4.1.2. | XR Product. | 24 |
| 4.2. | Regulatory Reporting; Pharmacovigilance. | 25 |
| 4.2.1. | IR Product. | 25 |
| 4.2.2. | XR Product. | 25 |
| 4.3. | Regulatory Approvals. | 26 |
| 5. | MANUFACTURING. | 26 |
| 5.1. | Manufacturing Responsibility. | 26 |
| 6. | INTELLECTUAL PROPERTY. | 26 |
| 6.1. | Prosecution and Maintenance of Patent Rights. | 26 |
| 6.2. | Enforcement of Patent Rights. | 26 |
| 6.3. | Patent Rights. | 27 |
| 6.4. | Trademarks. | 28 |
| 7. | CONFIDENTIALITY. | 28 |
| 7.1. | Nondisclosure and Nonuse Obligations. | 28 |
| 7.2. | Permitted Disclosures. | 29 |
| 7.3. | Return of Confidential Information. | 29 |
| 7.4. | Disclosure of Agreement. | 29 |
| 8. | REPRESENTATIONS, WARRANTIES AND COVENANTS. | 30 |
| 8.1. | Representations and Warranties of Both Parties. | 30 |
| 8.2. | Representations and Warranties of Wyeth. | 30 |
| 8.3. | Representation by Legal Counsel. | 30 |
| 8.4. | No Other Warranties. | 30 |
| 9. | TERM AND TERMINATION. | 31 |
| 9.1. | Term. | 31 |
| 9.2. | Termination. | 31 |
| 9.2.1. | Material Breach. | 31 |
| 9.2.2. | Bankruptcy. | 31 |
| 9.3. | Effects of Termination. | 32 |
| 9.4. | Effects of Bankruptcy. | 32 |
| 10. | OTHER PATENT RIGHTS. | 32 |
| 10.1. | Licensing or Acquisition of Other Patent Rights. | 32 |
| 10.1.1. | Obligation. | 32 |
| 10.1.2. | Notice and Consultation. | 32 |
| 10.1.3. | Agreements with Third Parties. | 33 |
| 10.1.4. | Entry Into Agreements By Teva. | 34 |
| 10.2. | Third Party Claims. | 34 |
| 10.2.1. | Notice. | 34 |
| 10.2.2. | Cooperation. | 34 |
| 10.2.3. | Control of Litigation. | 35 |
| 11. | INDEMNIFICATION AND INSURANCE. | 35 |
| 11.1. | Indemnification. | 35 |
| 11.1.1. | Responsibility. | 35 |
| 11.1.2. | Indemnification by Wyeth. | 36 |
| 11.1.3. | Indemnification by Teva. | 36 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405434

| | | |
|---|---|---|
| 11.2. | Insurance. | 36 |
| 11.3. | Limitation of Liability | 37 |
| 12. | GOVERNING LAW; DISPUTE RESOLUTION. | 37 |
| 12.1. | Governing Law; Jurisdiction | 37 |
| 12.2. | Dispute Resolution. | 37 |
| 12.3. | Injunctive Relief. | 38 |
| 12.3.1. | Against Wyeth. | 38 |
| 12.3.2. | Against Teva. | 38 |
| 13. | MISCELLANEOUS. | 38 |
| 13.1. | Data Sources. | 38 |
| 13.2. | Assignment. | 39 |
| 13.2.1. | Assignment by Teva. | 39 |
| 13.2.2. | Assignment by Wyeth. | 39 |
| 13.2.3. | Binding Nature of Assignment. | 39 |
| 13.3. | No Waiver. | 39 |
| 13.4. | Severability. | 39 |
| 13.5. | Relationship Between The Parties. | 40 |
| 13.6. | Correspondence and Notices. | 40 |
| 13.7. | Entire Agreement; Amendments. | 41 |
| 13.8. | Headings; Defined Terms. | 41 |
| 13.9. | Counterparts. | 42 |
| 13.10. | Further Actions. | 42 |
| 13.11. | References to ANDAs and NDAs. | 42 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405435

## LICENSE AGREEMENT
### (United States)

This License Agreement (this "Agreement") is entered into as of December __, 2005 (the "Effective Date"), by and among Wyeth, acting through its Wyeth Pharmaceuticals Division, having a place of business at 500 Arcola Road, Collegeville, Pennsylvania 19426 ("Wyeth Pharmaceuticals"), Wyeth Pharmaceuticals Company, Inc., having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("WPCI"), Wyeth-Whitehall Pharmaceuticals Inc., having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("Wyeth-Whitehall") and Wyeth Pharmaceuticals Company, having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("WPC") on the one hand, and Teva Pharmaceutical Industries Ltd. ("Teva Ltd."), having a place of business at 5 Basel St. Petach Tikva 49131, Israel and Teva Pharmaceuticals USA, Inc. ("Teva USA"), having a place of business at 1090 Horsham Road, North Wales, PA 19454, on the other hand. Wyeth Pharmaceuticals, WPCI, Wyeth-Whitehall and WPC may be referred to herein collectively as "Wyeth". Teva Ltd. and Teva USA may be referred to herein collectively as "Teva". Wyeth and Teva may each be referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, the Parties have agreed to amicably settle patent litigation currently ongoing between them and on October 18, 2005 entered into a Binding Term Sheet (the "Term Sheet") in connection therewith; and

WHEREAS, in connection with such settlement, Wyeth is willing to grant, and Teva is willing to receive, subject to the terms and conditions set forth in this Agreement, a license to enable Teva to sell certain products in the Territory (as defined below) to its distributors and other customers for ultimate sale to consumers in the Territory; and

WHEREAS, the Term Sheet requires the Parties to negotiate and enter into a number of definitive agreements, including this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and stipulations set forth herein, and in the Settlement Agreement (as defined hereinafter),the receipt and legal sufficiency of which are hereby mutually acknowledged, Wyeth and Teva hereby agree as follows:

1. **DEFINITIONS.**

   As used in this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

   1.1. **"AB Rated"** shall mean "therapeutically equivalent" as evaluated by FDA, applying the definition of "therapeutically equivalent" set forth in the Preface to the current edition of the FDA publication "APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS" (the "Orange Book"), as such requirements may be amended in the future.

**1.2.** "Affiliate" shall mean with respect to any person or entity, any other person or entity which controls, is controlled by or is under common control with such person or entity. A person or entity shall be regarded as in control of another entity if it owns or controls at least fifty percent (50%) of the equity securities of the subject entity entitled to vote in the election of directors (or, in the case of an entity that is not a corporation, for the election of the corresponding managing authority), , *provided, however,* that if local law restricts foreign ownership, control shall be established by both (i) having direct or indirect ownership of the maximum ownership percentage that may, under such local law, be owned by foreign interests and (ii) having the power to direct and control the management and policies of such foreign entity, *and provided further, however,* that the term "Affiliate" shall not include subsidiaries or other entities in which a Party or its Affiliates owns a majority of the ordinary voting power necessary to elect a majority of the board of directors or other governing board, but is restricted from electing such majority by contract or otherwise, until such time as such restrictions are no longer in effect.

**1.3.** "ANDA" shall mean an Abbreviated New Drug Application as defined in the U.S. Federal Food, Drug and Cosmetic Act, as amended, and all applicable regulations promulgated thereunder.

**1.4.** "Applicable Law" shall mean all applicable provisions of all statutes, laws, rules, regulations, administrative codes, ordinances, decrees, orders, decisions, guidance documents (including FDA guidance documents), injunctions, awards judgments, and permits and licenses of or from governmental authorities relating to the use or regulation of the subject item.

**1.5.** "Audit Period" shall have the meaning set forth in Section 3.7.

**1.6.** "Authorized Generic Product" shall mean, with respect to IR Reference Product or XR Reference Product (in any dosage strength), as applicable, any product marketed or sold by or under license, waiver or other actual or effective authorization of, or supplied by or on behalf of, Wyeth or any of Wyeth's Affiliates or licensees, as IR Reference Product or XR Reference Product, as applicable, as a generic in the Territory (other than by Teva or Teva's Affiliates pursuant to this Agreement) not under the Effexor® trademark.

**1.7.** "Business Day" or "business day" shall mean any day other than a day which is a Saturday, a Sunday or a day on which banks in New York City, New York or Israel are authorized or obligated by law or executive order to not open or remain closed.

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY          WYEFFAT2405437

**1.8.** "**Compound**" shall mean venlafaxine hydrochloride and any form thereof including polymorphs and solvates, and other pharmaceutically acceptable salts of venlafaxine and any form thereof including polymorphs and solvates.

**1.9.** "**Compound Patent Termination Date**" shall mean the date on which there are no more Valid Claims of U.S. Patent No. 4,535,186 that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of IR Product.

**1.10.** "**Confidential Information**" shall mean any and all confidential information regarding, related to, or associated with the Compound, any Product, the IR Reference Product, the XR Reference Product, the Wyeth IP and/or this Agreement (other than the terms and conditions hereof, which shall be subject to Section 7.4) that (i) is disclosed by the Disclosing Party to the Receiving Party or otherwise obtained by the Receiving Party from the Disclosing Party as of and after the Signing Date or before the Signing Date in connection with the Litigation or settlement thereof or (ii) was disclosed by or on behalf of the Disclosing Party to the Receiving Party or the Receiving Party's attorneys in connection with the Litigation, whether or not covered by a protective order or other similar order issued with respect thereto.

**1.11.** "**Cost of Goods Sold**" shall mean, as applicable, (i) the costs incurred by Teva in manufacturing IR Products sold by Teva or its Affiliates in the Territory under this Agreement, *provided, however,* that in no event will the Cost of Goods Sold for IR Product be greater than the sum of twelve percent (12%) of the gross selling price of such IR Product, plus all applicable Third Party Royalties, or (ii) the costs incurred by Teva in manufacturing XR Products sold by Teva or its Affiliates in the Territory under this Agreement (including all applicable Third Party Royalties). In calculating costs incurred in manufacturing IR Products or XR Products only those cost elements described in Exhibit 1.11 shall be included.

**1.12.** "**Disclosing Party**" shall mean the Party who is disclosing its Confidential Information to the Receiving Party.

**1.13.** "**FDA**" shall mean the United States Food and Drug Administration or any successor agency thereto.

**1.14.** "**IMS**" shall have the meaning set forth in Section 13.1.

**1.15.** "**IR ANDA**" shall mean ANDA No. 76-690 filed with the FDA by Teva, which ANDA seeks approval to market the IR Product.

**1.16.** "**IR Entry Date**" shall mean the earlier of (i) June 15, 2006, or (ii) if it occurs, the day in which extended unit sales of IR Reference Product (in all dosage strengths) over the preceding fifty-two (52) week period have

3

decreased by at least seventeen and one-half percent (17.5%) as compared to extended unit sales of IR Reference Product (in all dosage strengths) for the fifty-two (52) week period ending on November 4, 2005, as measured by IMS NPA retail MAT weekly reporting.

1.17. "IR IP" shall mean (i) Patent Rights under U.S. Patent No. 4,535,186, (ii) all other U.S. Patent Rights owned or controlled as of the Signing Date or as of the Settlement Effective Date by Wyeth or any of its Affiliates that, but for the licenses contained herein, would be infringed by, the manufacture, use, sale, offer for sale or importation of any IR Product (including Compound to the extent necessary to manufacture IR Product), and (iii) all U.S. Patent Rights, claiming (directly or indirectly) priority to such U.S. patent and U.S. Patent Rights identified in clause (i) and (ii) or any of the applications to which any such U.S. patent or U.S. Patent Rights claim (directly or indirectly) priority, that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of any IR Product (including Compound to the extent necessary to manufacture IR Product).

1.18. "IR New Indication" shall have the meaning set forth in Section 2.1.5.

1.19. "IR Product" shall mean the immediate release tablet, which tablet contains venlafaxine hydrochloride as its sole active ingredient and is marketed by Teva or any of its Affiliates as a generic product AB Rated to IR Reference Product (in any dosage strength) in the Territory. For the sake of clarity, IR Product shall not include any IR Reference Product.

1.20. "IR Reference Product" shall mean the immediate release tablet containing, as its sole active ingredient, venlafaxine hydrochloride equivalent to either 25mg, 37.5mg, 50mg, 75mg or 100mg of venlafaxine (or other approved dosage strengths) which tablet is marketed in the Territory by Wyeth or any of its Affiliates or licensees as Effexor® under NDA No. 20-151.

1.21. "Liability" shall have the meaning set forth in Section 11.1.2.

1.22. "Litigation" shall mean that certain civil action for patent infringement brought by Wyeth against Teva in the United States District Court for the District of New Jersey which is referenced as Wyeth v. Teva, et al. (Civil Action No. 03-CV-1293(WJM)) and is the subject of the Settlement Agreement.

1.23. "MDD" shall mean major depressive disorder.

1.24. "Net Sales" shall mean the aggregate gross sales of the amounts invoiced for the sale of XR Products and IR Products by Teva or any of its Affiliates in arm's length transactions with Third Parties ("Gross Sales") for use in the Territory, less reasonable estimates for the following: (i)

4

cash discounts (ii) adjustments on account of price adjustments, billing adjustments, or shelf stock adjustments (iii) returns, shortages or rejected/damaged goods (iv) chargebacks (v) rebates, promotional allowances, administrative fee arrangements, and similar payments to all direct and indirect customers, including wholesalers and other distributors, buying groups, health care insurance carriers, pharmacy benefit management companies, health maintenance organizations, Medicaid or Medicare or similar type programs. In the event that Teva sells XR Product or IR Product as part of a bundle or group sale with other products not covered by this Agreement, and Teva provides a discount, allowance or rebate to the purchaser of such XR Product or IR Product based on the invoiced prices for all products sold, such discount must be allocated pro rata based on the selling prices of all such products. Net Sales shall be determined using the accrual method of accounting determined in a manner consistent with Teva's practice for its other pharmaceutical products. Sales of Product(s) by and between Teva and its Affiliates are not sales to Third Parties and shall be excluded from Net Sales calculations for all purposes, it being understood that the sale of a Product by Teva or any of its Affiliates to a Third Party shall be utilized in calculating Net Sales under this Agreement.

1.25. **"Next Generation XR Entry Date"** shall mean the first day by when both of the following have occurred: (i) Rolling Gross XR Sales is less than five hundred million U.S. dollars (US$500,000,000), and (ii) Next Generation XR Product is first sold for use in the Territory.

1.26. **"Next Generation XR Product"** shall mean extended release formulation of (i) the compound designated by Wyeth as DVS-233, (ii) a metabolite of venlafaxine, or (iii) a compound substantially similar to venlafaxine with the same active pharmacophore as venlafaxine, in each case, which formulation is marketed by or under license from Wyeth or any of its Affiliates in the Territory pursuant to an approved NDA for the treatment of MDD or any equivalent thereof.

1.27. **"NPA MAT"** shall have the meaning set forth in Section 13.1.

1.28. **"NSP MAT"** shall have the meaning set forth in Section 13.1.

1.29. **"Other Patent Rights"** shall mean those Patent Rights owned or controlled by a Third Party that, if they were to come into Wyeth's control (with the right to either sublicense or grant a covenant not to sue thereunder to Teva) after the Settlement Effective Date, would be subject to either or both of the covenants not to sue set forth in Sections 2.1.5 (as may be expanded under Section 2.1.6) and/or 2.2.7 (as may be expanded under Section 2.2.8).

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405440

1.30. **"Patent Rights"** shall mean all patents and patent applications, including all provisional applications, substitutions, continuations, continuations-in-part, divisions, and renewals, all patents granted thereon, and all patents-of-addition, reissues, reexaminations, extensions and extended exclusivities (including supplementary protection certificates and pediatric extensions) or restorations by existing or future extension or restoration mechanisms.

1.31. **"Patents In Suit"** shall mean U.S. Patents 6,274,171 B1, 6,403,120 B1, and 6,419,958 B2.

1.32. **"Product"** shall mean the IR Product and/or the XR Product, as the context requires.

1.33. **"Profits"** shall mean, with respect to any Product sold by Teva or any of Teva's Affiliates, Net Sales of such Product less the Costs of Goods Sold for such Product.

1.34. **"Receiving Party"** shall mean the Party who is receiving Confidential Information from the Disclosing Party.

1.35. **"Rolling Gross XR Sales"** shall mean gross sales of XR Reference Product (in all dosage strengths) for use in the Territory sold by Wyeth and Wyeth's Affiliates during the preceding twelve (12) month period as measured by IMS NSP MAT monthly sales dollar reporting.

1.36. **"Second Generic IR Product"** shall mean (i) immediate release tablet as defined by an approved ANDA filed by a Third Party (who is not related to Teva or Teva's Affiliates in any way and who is not, directly or indirectly, operating under any license, right or waiver granted by Teva or Teva's Affiliates and is not, directly or indirectly, purchasing any IR Product from Teva or Teva's Affiliates), which tablet contains Compound as its sole active ingredient and is marketed as a generic product AB Rated to IR Reference Product (in any dosage strength) in the Territory, or (ii) an Authorized Generic Product of IR Reference Product (in any dosage strength).

1.37. **"Second Generic XR Entry Date"** shall mean the date on which a Second Generic XR Product is first sold for use in the Territory (such first sale including any re-launch of a Second Generic XR Product), provided that if Wyeth is able to require the end of selling and distributing of such Second Generic XR Product before Teva or any of its Affiliates is able to first sell a XR Product, then such first sale of Second Generic XR Product shall not constitute a "Second Generic XR Entry Date" hereunder.

1.38. **"Second Generic XR Product"** shall mean (i) once-daily extended release capsule as defined by an approved ANDA filed by a Third Party (who is not related to Teva or Teva's Affiliates in any way and who is not,

6

directly or indirectly, operating under any license, right or waiver granted by Teva or Teva's Affiliates and is not, directly or indirectly, purchasing any XR Product from Teva or Teva's Affiliates), which capsule contains Compound as its sole active ingredient and is marketed as a generic product AB Rated to XR Reference Product (in any dosage strength) in the Territory, or (ii) an Authorized Generic Product of XR Reference Product (in any dosage strength).

1.39. "**Settlement Agreement**" shall mean that certain Settlement and Release Agreement entered into by the Parties and dated November 2, 2005.

1.40. "**Settlement Effective Date**" shall mean the date on which all of the Settlement Conditions set forth in the Settlement Agreement have occurred such that this Agreement and the settlement becomes effective as provided in the Settlement Agreement.

1.41. "**Signing Date**" shall mean October 18, 2005.

1.42. "**Territory**" shall mean the United States and its territories and possessions.

1.43. "**Teva DMF**" shall mean the drug master file submitted by Teva to the FDA on December 2, 2002 relating to the manufacture of venlafaxine hydrochloride and identified as DMF No. 16281.

1.44. "**Teva Indemnitees**" shall have the meaning set forth in Section 11.1.2.

1.45. "**Third Party**" shall mean any person or entity other than Wyeth, Teva or any of their respective Affiliates.

1.46. "**Third Party Royalties**" shall mean, on a Product-by-Product basis, collectively:

    (i)    all payments made by Teva or any of its Affiliates to Wyeth pursuant to Section 3.2 with respect to such Product, and

    (ii)    all payments (other than those covered by clause (i) above) based on sales of IR Product or XR Product, as applicable, which payments are made by Teva or any of its Affiliates to any Third Party for a license or covenant not to sue, under Patent Rights owned or controlled (with the right to sublicense or grant a covenant not to sue) by such Third Party, to make, use, sell, offer for sale or import such Product, or Compound for the purposes of manufacturing such Product, which Patent Rights cover

        (a)    the compositions or formulations of such Product or Compound for the purposes of manufacturing such Product, or any of their use (including product-by-process claims), or

7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

    (b)    manufacture of such Product or Compound using manufacturing processes that (x) are identified or described in the XR ANDA or IR ANDA, as applicable, or the Teva DMF as they exist on the Signing Date, or are materially the same thereto, and (y) were conceived prior to the Settlement Effective Date,

*provided, however*, that such Patents Rights shall not include any Valid Claim claiming any (A) manufacturing process used or useful for such Product or Compound for the purposes of manufacturing such Product, other than those expressly identified in clause (ii)(b) above, or (B) IR New Indication or XR New Indication, as applicable, for such Product, unless under Section 2.1.6 or 2.2.8, respectively, no "carve out" of such New Indication is possible, whereupon all payments corresponding to such Patent Rights covering such New Indication shall be treated as "Third Party Royalties" hereunder. For the sake of clarity, Patent Rights that could give rise to Third Party Royalties hereunder include, without limitation, (i) Other Patent Rights and (ii) those Patent Rights covered by the covenant not to sue provided in Sections 2.1.5 or 2.2.7 (as may be expanded under Sections 2.1.6 or 2.2.8, respectively) but excluded from the representation and warranty made by Wyeth in the last sentence of Section 3.2.

**1.47.** **"Transaction Agreements"** shall mean this Agreement and the Settlement Agreement.

**1.48.** **"Valid Claim"** shall mean either (a) a claim of an issued and unexpired Patent Right which has not been revoked or held unenforceable or invalid by a decision of a court or other governmental agency of competent jurisdiction, which revocation or holding is unappealable or unappealed within the time allowed for appeal, and which has not been disclaimed, denied or admitted to be invalid or unenforceable through reissue or disclaimer or otherwise, or (b) a claim of a pending application for a Patent Right which claim was filed in good faith and has not been abandoned or finally disallowed without the possibility of appeal or refiling of said application.

**1.49.** **"Wyeth Indemnitees"** shall have the meaning set forth in Section 11.1.3.

**1.50.** **"Wyeth IP"** shall mean the IR IP and the XR IP.

**1.51.** **"XR ANDA"** shall mean ANDA No. 76-565 filed with the FDA by Teva, which ANDA seeks approval to market the XR Product.

8

LICENSE AGREEMENT

1.52. "XR Early Entry Date" shall mean the first day when Rolling Gross XR Sales is less than one billion U.S. dollars (US$1,000,000,000), unless such first day is before October 1, 2009, whereupon the "XR Early Entry Date" will be October 1, 2009.

1.53. "XR Entry Date" shall mean the earlier of (i) July 1, 2010, (ii) if it occurs, the XR Early Entry Date, (iii) if it occurs, the Second Generic XR Entry Date, (iv) if it occurs, the Next Generation XR Entry Date, or (v) if it occurs, other than by patent litigation with Teva or its Affiliates as a named party in respect of XR Product (and no other product), the earlier of either (a) a decision of the Court of Appeals for the Federal Circuit, or a final decision by a court of last resort from which no appeal or other review has been or can be taken (other than a petition for a writ of certiorari to the U.S. Supreme Court), holding that all of the then asserted claims of the Patents In Suit listed in the Orange Book for the XR Reference Product are unenforceable or invalid, or not infringed by an AB Rated generic to XR Reference Product as part of a Paragraph IV patent litigation under the Hatch-Waxman Act, or (b) without derogating the foregoing, a court decision that triggers the start of Teva's exclusivity period under the Hatch-Waxman Act, as amended, provided that in no event shall the XR Entry Date be earlier than the Compound Patent Termination Date.

1.54. "XR IP" shall mean the IR IP, plus (i) U.S. Patent Nos. 5,916,923, 6,274,171, 6,403,120, 6,419,958, and 6,444,708, (ii) all other U.S. Patent Rights owned or controlled as of the Signing Date or as of the Settlement Effective Date by Wyeth or any of its Affiliates that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of any XR Product (including Compound to the extent necessary to manufacture XR Product), and (iii) all U.S. Patent Rights, claiming (directly or indirectly) priority to such U.S. patents and U.S. Patent Rights identified in clause (i) and (ii) or any of the applications to which any such U.S. patents or U.S. Patent Rights claim (directly or indirectly) priority, that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of any XR Product (including Compound to the extent necessary to manufacture XR Product).

1.55. "XR New Indication" shall have the meaning set forth in Section 2.2.7.

1.56. "XR Patent Termination Date" shall mean the date on which there are no more Valid Claims of U.S. Patent Rights contained in the XR IP that, but for the licenses contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of XR Reference Products (in any dosage strength).

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY   WYEFFAT2405444

1.57.   "XR Product" shall mean once-daily extended release capsule, which capsule contains venlafaxine hydrochloride as its sole active ingredient and is marketed by Teva or any of its Affiliates as a generic product AB Rated to XR Reference Product (in any dosage strength) in the Territory. For the sake of clarity, XR Product shall not include XR Reference Product.

1.58.   "XR Reference Product" shall mean the once-daily extended release capsule containing, as its sole active ingredient, venlafaxine hydrochloride equivalent to either 37.5mg, 75mg or 150mg of venlafaxine (or other approved dosage strengths) which capsule is marketed in the Territory by Wyeth or any of its Affiliates or licensees as Effexor® XR under NDA No. 20-699.

## 2.   RIGHTS GRANTED.

### 2.1.   IR Product Rights.

2.1.1.   **Exclusive Commercialization License.**  Effective as of the IR Entry Date, Wyeth hereby grants to Teva and its Affiliates an exclusive, non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under the IR IP, to use, offer for sale, sell, import and have imported IR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory.  From the Signing Date until the Compound Patent Termination Date, neither Wyeth nor any of its Affiliates will market, sell, supply, distribute or manufacture any Authorized Generic Product of IR Reference Product (in any dosage strength), or license, grant a waiver or otherwise authorize or cause or allow any Third Party to do the same, for sale in the Territory.  The license granted under this Section 2.1.1 shall remain in effect until such time as there are no more Valid Claims contained in the IR IP.

2.1.2.   **Manufacturing License.**  Effective as of the IR Entry Date, Wyeth hereby grants to Teva and its Affiliates a non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under all IR IP and those foreign counterparts to the IR IP in the territories next specified, to manufacture and have manufactured IR Products (including Compound to the extent necessary to manufacture IR Products) in the United States, Canada and Israel and such other countries as the Parties may mutually agree upon in writing (after Teva's request for consent to expand the territory of the license set forth in this sentence which consent will not be unreasonably withheld by

10

Wyeth), but if outside the Territory, only for the importation of such IR Products and Compound (solely for the purposes of manufacturing IR Products) into the Territory and the other activities in the Territory permitted by the license granted in Section 2.1.1. The license granted under this Section 2.1.2 shall remain in effect until such time as there are no more Valid Claims contained in the IR IP.

**2.1.3.** **Regulatory Licenses and Waivers.** Wyeth hereby grants to Teva a non-transferable (except to the extent permitted in Section 13.2) license or waiver (as applicable), without the right to grant sublicenses, under any regulatory exclusivities that Wyeth or any of its Affiliates has for the IR Products in the Territory, but only to the extent required for Teva and its Affiliates to exercise in full the licenses contained in Sections 2.1.1 and 2.1.2 and the covenant not to sue contained in Section 2.1.5 (as may be expanded under Section 2.1.6). Such license or waiver will be exclusive for the same period of time as the corresponding license, and shall remain in effect until such time as there are no more Valid Claims subject to the licenses contained in Sections 2.1.1 or 2.1.2 or the covenant not to sue contained in Section 2.1.5 (as may be expanded under Section 2.1.6).

**2.1.4.** **Preparation for Launch.** The licenses contained in Sections 2.1.1 to 2.1.3 (other than any license to sell or distribute the IR Products) may be exercised up to one (1) week before the IR Entry Date to enable Teva and its Affiliates to undertake reasonably necessary preparations to sell IR Product for use in the Territory as of the IR Entry Date (but not before), *provided, however,* that solely with respect to manufacturing and shipping to Teva or its Affiliates or Third Party warehouses under Teva's or Teva's Affiliates' control launch amounts of IR Product, the licenses contained in Sections 2.1.1 to 2.1.3 may be exercised from the Settlement Date and thereafter. Wyeth will notify Teva as soon as practicable of the expected and actual occurrence of the IR Entry Date. Teva shall not sell or distribute IR Product before the IR Entry Date.

**2.1.5.** **Covenant Not To Sue.** From such time as Teva and its Affiliates may exercise the licenses contained in Sections 2.1.1 to 2.1.4 with respect to the IR Products (including Compound for the purposes of manufacturing IR Products), Wyeth hereby covenants that Wyeth and its Affiliates will not sue, or cause or support any licensee or other Third Party to sue, any of Teva or its Affiliates, their manufacturers and importers, or their distributors and customers or their consumers, claiming that the manufacture, use, sale, offer for sale or importation of IR Products (including Compound for the purposes of manufacturing IR Products), within

11

the scope of permitted activities covered by such licenses, infringes any Patent Rights which

(i)    are not included in the IR IP but are owned or controlled (and with respect to controlled, with the right to grant at least a covenant not to sue, which Wyeth shall use reasonable efforts to obtain) as of the Signing Date or thereafter by Wyeth or any of its Affiliates, and

(ii)    cover (a) the compositions or formulations of IR Reference Product or IR Product or Compound for the purposes of manufacturing IR Product, or any of their use (including product-by-process claims), or (b) manufacture of IR Product or Compound by or on behalf of Teva or any of its Affiliates using manufacturing processes that (x) are identified or described in the IR ANDA or the Teva DMF as they exist on the Signing Date, or are materially the same thereto, and (y) were conceived prior to the Settlement Effective Date,

*provided, however,* that this covenant not to sue shall not extend to any Valid Claim claiming any (A) manufacturing process used or useful for IR Reference Product, IR Product or Compound for the purposes of manufacturing IR Products, other than those expressly identified in clause (ii)(b) above, or (B) subject to Section 2.1.6, IR New Indication. The foregoing covenant not to sue shall remain in effect until such time as there are no more Valid Claims contained in Patent Rights subject to such covenant not to sue. For sake of clarity, the foregoing covenant not to sue shall be in addition to and shall not limit any of the licenses provided for in Sections 2.1.1 to 2.1.4. Wyeth will impose the foregoing covenant not to sue on any Third Party to which Wyeth or any of its Affiliates may assign, license or otherwise transfer any Patent Rights subject to the foregoing covenant not to sue.

**2.1.6. IR New Indications.** Wyeth shall notify Teva reasonably in advance of listing any Patent Rights on the Orange Book for IR Reference Product. If Wyeth or any of its Affiliates has or obtains any rights to Patent Rights claiming any additional, new or supplemental indication (other than MDD or an equivalent of MDD) for IR Reference Product not already approved as of the Signing Date (an "IR New Indication"), and any such Patent Rights are listed in the Orange Book for IR Reference Product, Wyeth hereby extends the covenant not to sue provided in Section 2.1.5 to such Patent Rights so that Teva and its Affiliates may file a Paragraph IV Certification with respect to such Patent Rights, but only on the basis of the foregoing covenant not to sue (in the form of a limited license as provided in Section 6.3). After such filing,

12

    WYEFFAT2405447

Teva shall use commercially reasonable efforts to determine if the IR New Indication may be "carved out" from the label of IR Product and if no such "carve out" is possible (*i.e.*, the FDA is not reasonably expected to approve Teva's ANDA seeking approval of the IR Product in the absence of the inclusion of such IR New Indication), then the foregoing covenant not to sue shall continue to apply to such Patent Rights, *provided, however,* that, if such "carve out" is possible, such covenant not to sue shall no longer apply to such Patent Rights, and Teva shall change such Paragraph IV Certification with respect to such Patent Rights to a "little section VIII" statement filed under 21 U.S.C. § 355(j)(2)(A)(viii).

## 2.2. XR Product Rights.

### 2.2.1. Exclusive Commercialization License.
Effective as of the XR Entry Date, subject to Section 2.2.5 below, Wyeth hereby grants to Teva and its Affiliates an exclusive non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under the XR IP, to use, offer for sale, sell, import and have imported XR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory. Such exclusive license will expire six (6) months after the XR Entry Date. From the Signing Date until the foregoing exclusive license expires, neither Wyeth nor any of its Affiliates will market, sell, distribute or manufacture any Authorized Generic Product of XR Reference Product (in any dosage strength), or license, grant a waiver or otherwise authorize or cause or allow any Third Party to do the same, for sale in the Territory.

### 2.2.2. Nonexclusive Commercialization License.
Effective immediately upon expiration of the exclusive license granted under Section 2.2.1, subject to Section 2.2.5 below, Wyeth hereby grants to Teva and its Affiliates a non-exclusive non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under the XR IP, to use, offer for sale, sell, import and have imported XR Products, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory. The license granted under this Section 2.2.2 shall remain in effect until such time as there are no more Valid Claims contained in the XR IP.

### 2.2.3. Manufacturing License.
Effective as of the XR Entry Date, Wyeth hereby grants to Teva and its Affiliates a non-transferable (except to the extent permitted in Section 13.2) license, without the right to grant sublicenses, under the XR IP and those foreign

13

counterparts to the XR IP in the territories next specified, to manufacture and have manufactured XR Products (including Compound to the extent necessary to manufacture XR Products) in the United States, Canada and Israel and such other countries as the Parties may mutually agree upon in writing (after Teva's request for consent to expand the territory of the license set forth in this sentence which consent will not be unreasonably withheld by Wyeth), but if outside the Territory, only for the importation of such XR Products and Compound (for the purposes of manufacturing XR Products) into the Territory and the other activities in the Territory permitted by the licenses granted in Section 2.2.1 and 2.2.2. Such license shall be exclusive for the first six (6) months after the XR Entry Date and thereafter shall be nonexclusive. The license granted under this Section 2.2.3 shall remain in effect until such time as there are no more Valid Claims contained in the XR IP.

**2.2.4. Regulatory Licenses and Waivers.** Wyeth hereby grants to Teva a non-transferable (except to the extent permitted in Section 13.2) license or waiver (as applicable), without the right to grant sublicenses, under any regulatory exclusivities that Wyeth or any of its Affiliates has for the XR Products in the Territory, but only to the extent required for Teva and its Affiliates to exercise in full the licenses contained in Sections 2.2.1 to 2.2.3 and the covenant not to sue contained in Section 2.2.7 (as may be expanded under Section 2.2.8). Such license or waiver will be exclusive and nonexclusive for the same period of time as the corresponding license, and shall remain in effect until such time as there are no more Valid Claims subject to the licenses contained in Sections 2.2.1, 2.2.2 or 2.2.3 or the covenant not to sue contained in Section 2.2.7.

**2.2.5. Limitation on Licenses.** If the XR Entry Date occurs prior to July 1, 2010 as a result of the occurrence of a Second Generic XR Entry Date (but for no other reason specified in the definition of XR Entry Date), then until July 1, 2010 the licenses granted under this Section 2.2 shall be limited to the using, manufacturing, offering for sale, selling, importing and having imported of XR Product that is in the same dosage strength(s) as is any Second Generic XR Product then being sold by a Third Party in the Territory, provided that if any of the other triggers specified in the XR Entry Date occur, this Section 2.2.5 shall no longer apply.

**2.2.6. Preparation for Launch.** The licenses contained in Sections 2.2.1 to 2.2.5 (other than any license to sell or distribute the XR Products) may be exercised up to one (1) week before the XR Entry Date to enable Teva and its Affiliates to undertake reasonably necessary preparations to sell XR Product for use in the

14

WYEFFAT2405449

Territory as of the XR Entry Date (but not before), *provided, however*, that with respect to manufacturing and shipping to Teva or its Affiliates or Third Party warehouses under Teva's control launch amounts of product, the licenses contained in Sections 2.2.1 to 2.2.5 may be exercised for up to six (6) months before the XR Entry Date. Wyeth will notify Teva as soon as practicable of the expected and actual occurrence of the XR Entry Date. Teva shall not sell or distribute XR Product before the XR Entry Date.

2.2.7. **Covenant Not To Sue.** From such time as Teva and its Affiliates may exercise the licenses contained in Sections 2.2.1 to 2.2.6 with respect to the XR Products (including Compound for the purposes of manufacturing XR Products), Wyeth hereby covenants that Wyeth and its Affiliates will not sue, or cause or support any licensee or other Third Party to sue, any of Teva or its Affiliates, their manufacturers and importers, or their distributors and customers or their consumers, claiming that the manufacture, use, sale, offer for sale or importation of XR Products (including Compound for the purposes of manufacturing XR Products), within the scope of permitted activities covered by such licenses, infringes any Patent Rights which

(i) are not included in the XR IP but are owned or controlled (and with respect to controlled, with the right to grant at least a covenant not to sue, which Wyeth shall use reasonable efforts to obtain) as of the Signing Date or thereafter by Wyeth or any of its Affiliates, and

(ii) cover (a) the compositions or formulations of XR Reference Product or XR Product or Compound for the purposes of manufacturing XR Product, or any of their use (including product-by-process claims), or (b) manufacture of XR Product or Compound by or on behalf of Teva or any of its Affiliates using manufacturing processes that (x) are identified or described in the XR ANDA or the Teva DMF as they exist on the Signing Date, or are materially the same thereto, and (y) were conceived prior to the Settlement Effective Date,

*provided, however*, that this covenant not to sue shall not extend to any Valid Claim claiming any (A) manufacturing process used or useful for XR Reference Product, XR Product or Compound for the purposes of manufacturing XR Products, other than those expressly identified in clause (ii)(b) above, or (B) subject to Section 2.2.8, XR New Indication. The foregoing covenant not to sue shall remain in effect until such time as there are no more Valid Claims contained in Patent Rights subject to such covenant not to sue. For sake of clarity, the foregoing covenant not to sue

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

shall be in addition to and shall not limit any of the licenses provided for in Sections 2.2.1 to 2.2.6. Wyeth will impose the foregoing covenant not to sue on any Third Party to which Wyeth or any of its Affiliates may assign, license or otherwise transfer any Patent Rights subject to the foregoing covenant not to sue.

**2.2.8. XR New Indications.** Wyeth shall notify Teva reasonably in advance of listing any Patent Rights on the Orange Book for XR Reference Product. If Wyeth or any of its Affiliates has or obtains rights to any Patent Rights claiming any additional, new or supplemental indication (other than MDD or an equivalent to MDD) for XR Reference Product not already approved as of the Signing Date (an "XR New Indication"), and any such Patent Rights are listed in the Orange Book for XR Reference Product, Wyeth hereby extends the covenant not to sue provided in Section 2.2.7 to such Patent Rights so that Teva and its Affiliates may file a Paragraph IV Certification with respect to such Patent Rights, but only on the basis of the foregoing covenant not to sue (in the form of a limited license as provided in Section 6.3). After such filing, Teva shall use commercially reasonable efforts to determine if the XR New Indication may be "carved out" from the label of XR Product and if no such "carve out" is possible (i.e., the FDA is not reasonably expected to approve Teva's ANDA or any supplement thereto seeking approval of the XR Product in the absence of the inclusion of such XR New Indication), then the foregoing covenant not to sue shall continue to apply to such Patent Rights; *provided, however,* that, if such "carve out" is possible, such covenant not to sue shall no longer apply to such Patent Rights, and Teva shall change such Paragraph IV Certification with respect to such Patent Rights to a "little section VIII" statement filed under 21 U.S.C. § 355(j)(2)(A)(viii).

**2.3. Sales Outside of Licensed Territory.** Teva acknowledges and agrees that the licenses granted to it in Sections 2.1 and 2.2 above each only provide Teva with the right to sell or distribute the IR Products or the XR Products, as applicable, sold under Teva's applicable ANDAs for use in the Territory. Accordingly, before the Compound Patent Termination Date or XR Patent Termination Date with respect to the IR Products or the XR Products sold under Teva's applicable ANDAs, respectively, Teva agrees to and to cause its Affiliates to:

(i) use all commercially reasonable efforts to impose upon its distributors and customers within the Territory for such IR Product or XR Product, as applicable, contractual obligations not to seek or accommodate consumers outside the Territory for such IR Product or XR Product, as applicable;

16

(ii) restrict its marketing, promotion, advertisement, sale and distribution of such IR Product or XR Product, as applicable, solely within the Territory;

(iii) not intentionally sell, market, promote, advertise, or distribute such IR Product or XR Product, as applicable, for use outside the Territory, and Teva shall use all commercially reasonable efforts to impose upon its distributors and customers a contractual obligation to observe the same;

(iv) not knowingly, directly or indirectly, sell such IR Product or XR Product, as applicable, to any Third Party for use in the Territory for resale outside the Territory; and exercise its reasonable commercial efforts to ensure its distributors and customers do not ship, sell or otherwise distribute such IR Product or XR Product, as applicable, for ultimate use by patients outside the Territory; and

(v) not sell such IR Product or XR Product, as applicable, via the Internet outside the Territory, or sell such IR Product or XR Product, as applicable, via mail order outside of the Territory, and Teva shall use all commercially reasonable efforts to impose, as an essential condition of doing business, upon its distributors and customers a contractual obligation to observe same.

In the event of a breach of the foregoing, Teva shall reimburse Wyeth for the lost profits that Wyeth would have realized had Wyeth sold the product equivalent to the IR Reference Product or the XR Reference Product in question in the country into which such IR Product or XR Product, as applicable, was imported in violation of such obligations.

2.4. **Retained Rights.** Other than the licenses and rights expressly set forth above, this Agreement will provide either Party no other right, title or interest, either express or implied, by estoppel or otherwise, in or to any of the other Party's intellectual property rights, including any patent right, trademark, copyright, trade secret or know-how. Without limiting the foregoing, Teva hereby acknowledges and agrees that, except as expressly set forth in this Agreement (including Article 2 and Section 13.2), it may not sublicense, subcontract or delegate to any Third Party all or part of the rights and obligations of Teva under this Agreement.

## 3. CONSIDERATION.

3.1. **Payments.**

3.1.1. **IR Product.** In consideration of Wyeth entering into this Agreement, Teva shall pay to Wyeth twenty percent (20%) of all Profits obtained by Teva or its Affiliates from the sale of IR Products for use in the Territory. In addition to the payments to be

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405452

made under the preceding sentence, as incentive for Wyeth to reserve capacity for the manufacture of IR Product for Teva as may be required under Section 2.E. of the Settlement Agreement and further in consideration for Wyeth's agreement to, if necessary, negotiate and enter into a supply agreement in connection therewith, Teva shall pay to Wyeth until the one-year anniversary of the IR Entry Date, eight percent (8%) of all Profits obtained by Teva or its Affiliates from the sale of IR Products for use in the Territory. The consideration to be paid by Teva under this Section 3.1.1 will be payable for all IR Product sold prior to the Compound Patent Termination Date, but not thereafter. Notwithstanding the foregoing, during such period that at least one Second Generic IR Product is being sold by a Third Party (who has no relation to Teva or its Affiliates, directly or indirectly, with respect to such Second Generic IR Product, other than potentially with respect to purchasing Compound for use in the manufacture thereof) in the Territory, the payment required under this Section 3.1.1 shall be suspended and there shall be no obligation on Teva to make any such payment.

**3.1.2. XR Product.** In consideration of Wyeth entering into this Agreement, Teva will pay to Wyeth consideration at the rates set forth below on all Profits obtained by Teva or its Affiliates from the sale of XR Products for use in the Territory, for all XR Product sold prior to (but not after) the XR Patent Termination Date:

| Period | % of Profits Attributable to XR Products |
|---|---|
| 1. From the XR Entry Date to the six (6) month anniversary of the XR Entry Date, 15%, unless both (i) Teva or any Affiliate of Teva launches XR Product for use in the Territory upon an XR Entry Date attributable to clause (v) of such definition (but for no other reason specified in the definition of XR Entry Date), and (ii) as a result of such launch, Teva or any Affiliate of Teva enjoys the benefit of 180-day exclusivity under the Hatch-Waxman Act, as amended, then the % of Profits during such six-month period will not be 15% but 50% until the earlier of such time (if any) during such six-month period that (a) Teva and its Affiliates no longer enjoy the benefit of such 180-day exclusivity or (b) July 1, 2010, whereupon for the remainder of such | 15% or 50% as provided in the Period description |

18

WYEFFAT2405453

| | |
|---|---|
| six-month period the % of Profits will be 15%; | |
| 2. On or after the six (6) month anniversary and prior to the twelve (12) month anniversary of the XR Entry Date | 50% |
| 3. On or after the twelve (12) month anniversary of the XR Entry Date until the XR Patent Termination Date | 65% |

In the event that Wyeth grants a license to any Third Party to sell an Authorized Generic Product to the XR Reference Product in the Territory after the license granted to Teva in Section 2.2.1 for XR Product becomes nonexclusive, then (A) when the first such Third Party begins to sell such an Authorized Generic Product to the XR Product in the Territory, the payments thereafter payable by Teva for the XR Product will be no greater than the lesser of (i) the rate at which payments are paid to Wyeth by such Third Party based on sales of such Authorized Generic Product to the XR Reference Product (as certified by an independent Third Party reasonably acceptable to both Parties, and which may be audited by Teva pursuant to the process outlined in Section 3.8), or (ii) forty percent (40%) of Profits obtained by Teva or its Affiliates from the sale of XR Products for use in the Territory and (B) when the second such Third Party begins to sell such an Authorized Generic Product to the XR Product in the Territory, the payments thereafter payable by Teva for the XR Product will be no greater than the lesser of (i) the rate at which payments are paid to Wyeth by such Third Party based on sales of such Authorized Generic Product to the XR Reference Product (as certified by an independent Third Party reasonably acceptable to both Parties, and which may be audited by Teva pursuant to the process outlined in Section 3.8), or (ii) ten percent (10%) of Profits obtained by Teva or its Affiliates from the sale of XR Products for use in the Territory. Notwithstanding the foregoing, during such period of time that at least one Second Generic XR Product is being sold in the Territory by a Third Party (which Third Party (i) is not one (1) of the two (2) Third Parties selling an Authorized Generic as provided in the immediately preceding sentence and (ii) has no relation to Teva or Teva's Affiliates, directly or indirectly, with respect to such Second Generic XR Product, other than potentially with respect to purchasing Compound), the payment obligation for Teva's sale of XR Products shall be suspended and there shall be no obligation on Teva to make any such payment. Further notwithstanding the foregoing, if (1) Teva launches XR Product for use in the Territory upon an XR Entry Date attributable to clause (iii) of such definition (but for no other reason specified in the definition of XR

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405454

Entry Date), and (2) Wyeth is able to require the Third Party responsible for such clause (iii) Teva entry to stop selling and distributing a Second Generic XR Product after launch, and (3) such date occurs within the first six (6) months after the XR Entry Date when Teva first launched such XR Product, then the fifteen percent (15%) specified in the first row of the foregoing table shall be replaced with fifty percent (50%), unless such six-month period includes July 1, 2010, in which case from July 1, 2010 until the end of such six-month period the fifteen percent (15%) specified in the first row of the foregoing table shall apply, with the remaining two rows of the foregoing table applying to XR Product without change.

3.2. **Payments to Third Parties.** In the event that Wyeth incurs any royalties or other payment obligation to any Third Party based on sales of XR Product or IR Product by Teva or its Affiliates as a result of any Patent Rights (other than IR IP, XR IP or any foreign counterparts thereof) in-licensed after the Settlement Effective Date by Wyeth or any of its Affiliates (but not owned by Wyeth or any of its Affiliates) because such Patent Rights are subject to the covenant not to sue set forth in Section 2.1.5 (as may be expanded under Section 2.1.6) or Section 2.2.7 (as may be expanded under Section 2.2.8), Teva, in addition to making the payments required under Section 3.1, shall reimburse Wyeth for those royalties and payments within thirty (30) days after Wyeth incurring such payment obligations and invoicing Teva therefor. Teva shall have no obligation to so reimburse Wyeth prior to the time that Wyeth notifies Teva of the specific Patent Rights and the amount or rate of the reimbursement obligation (and the scope of the covenant if less than the full scope of that provided in this Agreement). Within ten (10) business days of such notice, Teva may elect, by written notice provided to Wyeth, to irrevocably waive all rights it or an Affiliate of Teva has under any such covenant not to sue with respect to such Patent Rights so noticed. In the event that Teva makes such election, Teva shall have no obligation to reimburse Wyeth in connection therewith and shall have no right, title or interest under this Agreement with respect to such Patent Rights, it being understood and agreed that nothing in this Agreement shall after such election (but not before) prevent Wyeth, any of Wyeth's Affiliates or any of Wyeth's licensors, licensees or collaborators from taking any action against Teva or Teva's Affiliates to enforce such Patent Rights subject to such election by Teva. Wyeth represents and warrants to Teva as of October 18, 2005 that, except for any Patent Rights that Wyeth has disclosed to Teva on or before the Signing Date or that Teva had actual knowledge of on or before the Signing Date, Wyeth is not aware of any Patent Rights that would require Teva to pay any such reimbursement subject to the foregoing covenants not to sue if such Patent Rights are or if such Patent Rights were to be in-licensed as of the Settlement Effective Date.

20

WYEFFAT2405455

3.3. **Third Party Royalties.** Teva shall notify Wyeth if Teva or any of its Affiliates enters into any agreement with a Third Party that is reasonably expected to give rise to Third Party Royalties, and the amount or rate of the Third Party Royalties arising therefrom.

3.4. **Reports and Payments.** For sales of IR Product by Teva or its Affiliates, within forty-five (45) days after the end of each calendar quarter, and for sales of XR Product by Teva and its Affiliates, within thirty (30) days after the end of each calendar month, Teva will provide Wyeth with a written report of all sales of IR Products and XR Products, as applicable, for use in the Territory made by Teva or its Affiliates during such calendar quarter or calendar month, as applicable, and all Gross Sales, Net Sales and Profits obtained as a result of such sales. Payment of all amounts due to Wyeth shall be made by wire transfer simultaneously with the submission of each such report. The payments to be made by Teva to Wyeth pursuant to this Agreement shall be made in United States dollars.

3.5. **Late Payments.** Any payment due to Wyeth from Teva that is not paid on or before the date such payment is due under this Agreement shall bear interest at a rate of twelve percent (12%) per annum.

3.6. **Taxes.** Teva and Wyeth shall be responsible for and shall pay all taxes payable on any income to Teva and Wyeth, respectively, arising from any payments by Teva. Each of Teva and Wyeth shall bear sole responsibility for payment of compensation to their respective personnel, employees or subcontractors and for all employment taxes and withholding with respect to such compensation pursuant to Applicable Law. Teva shall have the right to withhold income taxes in the event that the revenue authorities in the applicable country require the withholding of such taxes on amounts paid hereunder to Wyeth. Any such tax paid or required to be withheld by Teva on account of any payments payable to Wyeth under this Agreement shall be deducted from the amount of payments due Wyeth. Teva shall secure and promptly send to Wyeth, as applicable, proof of such taxes withheld and paid by Teva for the benefit of Wyeth. Each Party agrees to cooperate with the other Parties in claiming exemptions from such taxes under any statute or regulation from time to time in effect.

3.7. **Record Keeping by Teva; Audits.** Teva shall keep and shall cause each of its Affiliates to keep accurate books and accounts of record in connection with the sale of the IR Products and XR Products in sufficient detail to permit accurate determination of all figures necessary for verification of payments required to be paid hereunder (other than Costs of Goods Sold for IR Product (but Costs of Goods Sold for XR Product, and Third Party Royalties included in Cost of Goods Sold for either the IR Product or the XR Product, are auditable hereunder)). All such records shall be maintained for a period of at least three (3) years ("Wyeth Audit Period") after the end of the year in which they were generated. Upon

21

   WYEFFAT2405456

reasonable prior notice, for the sole purpose of determining whether Teva is in compliance with the payment provisions of this Agreement, Wyeth shall have the right to have an independent public accounting firm, reasonably acceptable to Teva and not paid in whole or in part by a contingent fee arrangement, access the books and records of Teva and each of its Affiliates as may be reasonably necessary to verify the accuracy of the reports and payments paid hereunder during regular business hours at Teva's offices and in such a manner as not to interfere unreasonably with Teva's normal business activities. In no event shall such audits be conducted hereunder more frequently than once every twelve (12) months. Prior to commencing any such inspection and audit, any such independent auditor shall have entered into a reasonable and customary agreement with Teva which prohibits the disclosure of any information relating to Teva to any party, including Wyeth, except that such auditor may issue a report to Wyeth, which report shall also be provided to Teva, the sole purpose of which shall be to report to Wyeth whether Teva is in compliance with the payment provisions of this Agreement, including a summary of and sufficient detail regarding the scope, quality, and methodology of such compliance or lack thereof. If such independent accountant concludes that additional payments were owed to Wyeth during such period hereunder, Teva shall pay the additional consideration plus all interest payments due thereon within thirty (30) days after the date Wyeth delivers to Teva such accountant's written report so concluding. If such independent accountant concludes that Teva overpaid Wyeth hereunder with respect to such period, Wyeth shall reimburse the overpaid amounts within thirty (30) days after such date. Costs for the audit will be paid by Wyeth unless there is a discrepancy in the amount paid of greater than seven and one-half percent (7.5%) in which case Teva shall reimburse Wyeth for the costs of the audit. In the event that Wyeth does not request to exercise its audit right during the Wyeth Audit Period all of Teva's reports and payments for which the Wyeth Audit Period has expired will be deemed final and binding. Wyeth shall treat all information received from Teva and/or the independent auditor under Sections 3.3 and 3.4 and this Section 3.7 as Confidential Information of Teva pursuant to Article 7.

3.8.    **Record Keeping by Wyeth; Audits.** In the event that Teva is required to pay to Wyeth any Third Party Royalties as a result of Section 3.2 hereof, Teva, Wyeth shall keep and shall cause each of its Affiliates to keep accurate books and accounts of record in connection with any Third Party Royalties that Teva is required to reimburse Wyeth for pursuant to Section 3.2 in sufficient detail to permit accurate determination of all figures necessary for verification of Third Party Royalty Payments required to be paid by Teva under Section 3.2. All such records shall be maintained for a period of at least three (3) years ("Teva Audit Period") after the end of the year in which they were generated. Upon reasonable prior notice, for the sole purpose of determining whether Wyeth is correctly invoicing Teva for

22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405457

such Third Party Royalties in compliance with the requirements of this Agreement, Teva shall have the right to have an independent public accounting firm, reasonably acceptable to Wyeth and not paid in whole or in part by a contingent fee arrangement, access the books and records of Wyeth and each of its Affiliates as may be reasonably necessary to verify the accuracy of the invoices submitted by Wyeth under Section 3.2 during regular business hours at Wyeth's offices and in such a manner as not to interfere unreasonably with Wyeth's normal business activities. In no event shall such audits be conducted hereunder more frequently than once every twelve (12) months. Prior to commencing any such inspection and audit, any such independent auditor shall have entered into a reasonable and customary agreement with Wyeth which prohibits the disclosure of any information relating to Wyeth to any party, including Teva, except that such auditor may issue a report to Teva, which report shall also be provided to Wyeth, the sole purpose of which shall be to report to Teva whether Wyeth is appropriately invoicing Teva for such Third Party Royalties. If such independent accountant concludes that the amounts invoiced by Wyeth were in excess of the amounts properly due during such period hereunder and Teva paid such excess amounts, Wyeth, within thirty (30) days after the date Teva delivers to Wyeth such accountant's written report so concluding shall provide a refund to Teva in the amount of such excess payments, unless such errors in invoicing were due to errors in Teva's reporting of Net Sales and Profits to Wyeth, whereupon Wyeth will issue a credit to Teva for such amount. If such independent accountant concludes that the amounts invoiced by Wyeth were less than the amounts properly due during such period, whether because of an error by Wyeth or an error by Teva in reporting Net Sales and Profits to Wyeth, any amount underpaid by Teva as a result thereof with respect to such period, shall be paid by Teva within thirty (30) days after Teva receives such accountant's report. Costs for the audit will be paid by Teva unless there is a discrepancy (other than as a result of errors in Teva's reports of Net Sales and Profits) in the amount paid of greater than seven and one-half percent (7.5%) in which case Wyeth shall reimburse Teva for the costs of the audit. In the event that Teva does not request to exercise its audit right during the Teva Audit Period all of Wyeth's invoices for which the Teva Audit Period has expired will be deemed final and binding. Teva shall treat all information received from Wyeth and/or the independent auditor under Section 3.2 and this Section 3.8 as Confidential Information of Wyeth pursuant to Article 7. This Section shall apply, with reasonable modifications to this Section, to permit verification of the rates and payments under Third Party Authorized Generic Products agreements referred to in Section 3.1.2.

23

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405458

4.    **REGULATORY MATTERS; COMMERCIALIZATION.**

    4.1.    **ANDA Approvals.**

        4.1.1.    **IR Product.** Teva may advise the FDA in connection with the IR ANDA (as the same may be converted from a Paragraph III ANDA to a Paragraph IV ANDA as provided in Section 2.E. of the Settlement Agreement) filed by it for the IR Product that the IR ANDA is approvable as a result of the license granted by Wyeth to Teva under Section 2.1, *provided, however*, that in the event that Teva obtains final approval of the IR ANDA more than one (1) week prior to the IR Entry Date, Teva, upon Wyeth's request and subject to the Parties agreeing as required by Section 7.4, shall issue a press release or, in the absence of such press release, otherwise communicate to its customers and potential customers that inquire about IR Product, that Teva will not and has no right to sell or distribute any IR Product prior to the IR Entry Date. As Teva may reasonably request, Wyeth shall submit appropriate and reasonable documentation to the FDA evidencing the licenses, covenants not to sue and waivers granted to it under this Agreement and the Settlement Agreement for the IR Product. Without limiting the generality of the foregoing, no later than the earlier of (i) June 15, 2006 or (ii) five (5) Business Days after it is determined by the Parties that the IR Entry Date is expected to occur prior to June 15, 2006, Wyeth and Teva each shall send a letter to the FDA advising the FDA that Wyeth has granted a license to Teva for the IR Product and, as such, that the FDA may make approval of ANDA No. 76-690 effective on or after the IR Entry Date, assuming such ANDA is otherwise approvable, in order to authorize Teva to market and distribute IR Product in the Territory on and after the IR Entry Date.

        4.1.2.    **XR Product.** Teva may advise the FDA in connection with the XR ANDA filed by it for the XR Product that the XR ANDA is approvable as a result of the license granted by Wyeth to Teva under Section 2.2, *provided, however*, that in the event that Teva obtains final approval of the XR ANDA more than one (1) week prior to the XR Entry Date, Teva, upon Wyeth's request and subject to the Parties agreeing as required by Section 7.4, shall issue a press release or, in the absence of such press release, otherwise communicate to its customers and potential customers that inquire about XR Product, that Teva will not and has no right to sell or distribute any IR Product prior to the XR Entry Date. As Teva may reasonably request, Wyeth shall submit appropriate and reasonable documentation to the FDA evidencing the licenses and waivers granted to it under this Agreement for the XR Product. Without limiting the generality of the foregoing, no later than the

24

earlier of (i) June 1, 2010 or (ii) five (5) Business Days after it is determined by the Parties that the XR Entry Date is expected to occur prior to July 1, 2010, Wyeth and Teva each shall send a letter to the FDA advising the FDA that Wyeth has granted a license to Teva for the XR Product and, as such, that the FDA may make approval of ANDA No. 76-565 effective on or after the XR Entry Date, assuming such ANDA is otherwise approvable, in order to authorize Teva to market and distribute XR Product in the Territory on and after the XR Entry Date.

4.2. **Regulatory Reporting; Pharmacovigilance.**

4.2.1. **IR Product.** Wyeth shall be solely responsible for all pharmacovigilance activities for the IR Reference Product and all Authorized Generic Products regarding IR Reference Product, including: AE/ADR reporting including literature review and associated reporting; AE/ADR follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (*e.g.* Dear Doctor Letters, restriction on distribution). Teva shall be solely responsible for all pharmacovigilance activities for the IR Product, including: AE/ADR reporting including literature review and associated reporting; AE/ADR follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (*e.g.* Dear Doctor Letters, restriction on distribution).

4.2.2. **XR Product.** Wyeth shall be solely responsible for all pharmacovigilance activities for the XR Reference Product and all Authorized Generic Products regarding XR Reference Product, including: AE/ADR reporting including literature review and associated reporting; AE/ADR follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (*e.g.* Dear Doctor Letters, restriction on distribution). Teva shall be solely responsible for all pharmacovigilance activities for the XR Product, including: AE/ADR reporting including

25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

literature review and associated reporting; AE/ADR follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (*e.g.* Dear Doctor Letters, restriction on distribution).

4.3.  **Regulatory Approvals.**  Teva shall designate NDC numbers for each presentation of IR Product and XR Product which bear Teva's or an Affiliate of Teva's labeler code and a product code which is not confusingly similar to any of the product codes utilized by Wyeth or any of its Affiliates as of the Signing Date for any IR Reference Product or any XR Reference Product (that is, as the product code portion of the NDC number utilized for the IR Reference Product contains either "0701", "0703", "0704", "0705" or "0781" and the product code portion of the NDC numbers utilized for the XR Reference Product contains either "0833", "0836" or "0837", neither Teva nor any of its Affiliates shall include any of string of numbers which is identical or confusingly similar to any of the foregoing as the product code portion of the NDC numbers utilized for the IR Product or the XR Product). Wyeth shall have no obligation to obtain, maintain or assist Teva in obtaining or maintaining any (except to the extent expressly provided in Section 4.1) regulatory and governmental permits, licenses and approvals for any IR Product or any XR Product.

## 5.  MANUFACTURING.

5.1.  **Manufacturing Responsibility.**  Teva shall be solely responsible for manufacturing IR Product and XR Product in order to supply its demand therefor in the Territory in connection with its exercise of the rights and licenses granted to it hereunder.

## 6.  INTELLECTUAL PROPERTY.

6.1.  **Prosecution and Maintenance of Patent Rights.**  Wyeth shall have the right, but not the obligation, to file, prosecute and maintain in the Territory, the Wyeth IP owned in whole or in part by Wyeth and licensed to Teva under this Agreement. Wyeth shall use its commercially reasonable efforts to conduct such prosecution and maintenance efforts.

6.2.  **Enforcement of Patent Rights.**  From the Signing Date until the end of the period during which Teva and its Affiliates have an exclusive license

26

  WYEFFAT2405461

under Sections 2.1.1 or 2.2.1, as applicable, Wyeth and Teva will each promptly notify the other Party of any actual or potential infringement of IR IP or XR IP, as applicable, of which it becomes aware arising from any Third Party making, having made, using, selling, offering for sale or importing or having imported (including any infringement arising from any ANDA filing) any generic equivalent to IR Reference Product or XR Reference Product, respectively. Any such notice shall include the then reasonably available evidence to support an allegation of infringement by such Third Party. Wyeth shall have the sole right, and shall use its commercially reasonable efforts, to address such infringement, and Teva will consult with Wyeth in such efforts. Any recovery or damages derived from any suit or other action seeking to enforce or otherwise to cause the discontinuation of any infringement of the IR IP or the XR IP or any other Patent Rights owned or controlled by Wyeth shall be retained exclusively by Wyeth.

**6.3.** **Patent Rights.** Teva admits that the Patents In Suit and U.S. Patent No. 4,535,186 (including any extension thereof) are valid and enforceable. Teva agrees not to and to cause each of its Affiliates not to oppose or challenge the validity or enforceability of, or assert any other claim or defense in patent litigation concerning, the Patents In Suit, or aid or assist any Third Party in challenging, opposing or causing to be challenged, directly or indirectly, the validity or enforceability of, or asserting any other claim or defense against the enforcement of, any of the Patents In Suit in any court or tribunal or in the United States Patent and Trademark Office, and waives any and all invalidity and unenforceability defenses in any future litigation, arbitration or other proceeding with respect to the Patents In Suit. As to the patents included within the IR IP or the XR IP (other than the Patents In Suit), Teva waives any and all invalidity and unenforceability defenses in any future litigation, arbitration or other proceeding. Teva further agrees not to and to cause each of its Affiliates not to oppose or challenge the validity, enforceability or infringement of, or aid or assist any Third Party in challenging, opposing or causing to be challenged, directly or indirectly, the validity, enforceability or infringement of any patent or patent application included within the IR IP or any patent or patent application included within the XR IP (other than the Patents In Suit) in any court or tribunal or in the United States Patent and Trademark Office. The two preceding sentences of this Section 6.3 shall not apply to the extent that any such actions by Teva or any of its Affiliates concern the making, using, selling, offering for sale or importation of any product which is neither an IR Product nor an XR Product. Notwithstanding the foregoing, Teva and its Affiliates (i) may file or maintain Paragraph IV Certifications on patents listed in the Orange Book now or in the future for the IR Product and XR Product, but only on the basis of the licenses and covenants not to sue, as applicable, contained in Sections 2.1 and 2.2 and (ii) shall not be precluded from asserting the licenses or covenants not to sue and other rights granted to Teva and its

27

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405462

Affiliates under this Agreement and the Settlement Agreement as a defense against any claim of patent infringement in connection with the manufacture, use, sale, offer for sale or importation of the IR Products or XR Products by or on behalf of Teva or any of its Affiliates as permitted under this Agreement. Wyeth hereby grants to Teva a limited license under the Patent Rights subject to such covenants not to sue for Teva and its Affiliates to file or maintain such Paragraph IV Certifications. Nothing in this Agreement will be construed as an admission of infringement by Teva, or an admission of non-infringement by Wyeth, of any Patents In Suit.

**6.4.** **Trademarks.** Teva will not use, any of Wyeth's trademarks, trade names or trade dress or any trademarks, trade names or trade dress which are confusingly similar to any of Wyeth's trademarks, trade names or trade dress, in connection with its sale, distribution or promotion of any IR Product or XR Product. For the sake of clarity and without limiting the foregoing, any IR Product tablet shall be of a different shape than is any tablet of the IR Reference Product as of the Signing Date, and such IR Product tablets and any XR Product capsules and the packaging therefor shall not bear any markings, trademarks, trade names or other trade dress that are confusingly similar to that used by Wyeth or any of its Affiliates for the IR Reference Product or the XR Reference Product.

## 7. CONFIDENTIALITY.

**7.1.** **Nondisclosure and Nonuse Obligations.** Each of Teva and Wyeth shall use Confidential Information of the Disclosing Party only in accordance with and as expressly permitted by this Agreement and shall not disclose to any Third Party any Confidential Information of the Disclosing Party, in each case without the prior written consent of the Disclosing Party, which consent may be provided or withheld in the Disclosing Party's sole discretion. The foregoing obligations shall survive the expiration or earlier termination of this Agreement for a period of ten (10) years. The foregoing non-disclosure and non-use obligations shall not apply to specific Confidential Information of a Disclosing Party that the Receiving Party can demonstrate

(i) is known by the Receiving Party at the time of its receipt other than through a prior disclosure by the Disclosing Party, as documented by business records;

(ii) is at the time of disclosure or thereafter becomes published or otherwise part of the public domain without breach of this Agreement by the Receiving Party;

(iii) is subsequently disclosed to the Receiving Party by a Third Party who has the right to make such disclosure not in confidence;

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY WYEFFAT2405463

(iv)   is developed by the Receiving Party independently of access to or use of any Confidential Information received from the Disclosing Party and such independent development can be documented by the Receiving Party; or

(v)   is required by law, regulation, rule, act or order of any governmental authority or agency to be disclosed by the Receiving Party to a Third Party, *provided* that to the extent practicable notice is promptly delivered to the Disclosing Party and the Receiving Party agrees to reasonably assist the Disclosing Party in order to provide an opportunity to seek a protective order or other similar order with respect to such Confidential Information and thereafter the Receiving Party discloses to the requesting entity only the minimum Confidential Information required to be disclosed in order to comply with the request, whether or not a protective order or other similar order is obtained by the Disclosing Party.

7.2.   **Permitted Disclosures.**  The Receiving Party may disclose specific Confidential Information of the Disclosing Party to its (or its Affiliate's) employees, consultants or professional advisors, only to the extent reasonably required to accomplish the purposes of this Agreement and only if the Receiving Party obtains prior written agreement from such employees, consultants and professional advisors (other than legal counsel who are otherwise required to maintain confidentiality) to hold in confidence and not make use of such Confidential Information for any purpose other than those permitted by this Agreement. The Receiving Party will use at least the same standard of care (but in no event less than a reasonable standard of care) as it uses to protect its own proprietary or confidential information of a similar nature to ensure that such employees, agents, consultants or suppliers do not disclose or make any unauthorized use of the Confidential Information of the Disclosing Party. Additionally, a Receiving Party may use or disclose specific Confidential Information of the Disclosing Party to the extent it is necessary to do so to take action against the Receiving Party to enforce its rights under this Agreement.

7.3.   **Return of Confidential Information.**  If this Agreement is terminated for any reason, then the Receiving Party, upon the request of the Disclosing Party, shall return to the Disclosing Party all copies of the Confidential Information received from the Disclosing Party hereunder, *provided, however,* that the Receiving Party's legal counsel may retain one copy of such Confidential Information in a secure location solely for purposes of determining the Receiving Party's continuing obligations under this Article 7.

7.4.   **Disclosure of Agreement.**  The Parties agree disclosure of the terms and conditions of this Agreement shall be subject to and governed by Section 7.D of the Settlement Agreement.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY         WYEFFAT2405464

8.    **REPRESENTATIONS, WARRANTIES AND COVENANTS.**

8.1.   **Representations and Warranties of Both Parties.**  Each of Teva and Wyeth hereby represents, warrants and covenants to the other Party that, as of the Signing Date and the Settlement Effective Date:

(a)    it and each of its Affiliates is a corporation or entity duly organized and validly existing under the laws of the state or other jurisdiction of incorporation or formation;

(b)    the execution, delivery and performance of this Agreement by such Party have been duly authorized by all requisite corporate action and do not require any shareholder action or approval;

(c)    it has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

(d)    the execution, delivery and performance by such Party of this Agreement and its compliance with the terms and provisions hereof do not and will not conflict with or result in a breach of any of the terms and provisions of or constitute a default under any other agreement to which it or its Affiliates is a party;

(e)    this Agreement is a binding obligation of it and its Affiliates, enforceable in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy and similar laws affecting creditors' rights, and, generally, to general equitable principles; and

(f)    it shall at all times comply with all Applicable Law relating to its activities under this Agreement.

8.2.   **Representations and Warranties of Wyeth.**  In addition to the representations and warranties set forth in Section 8.1, Wyeth represents and warrants to Teva as of the Signing Date and the Settlement Effective Date that neither it nor any of its Affiliates has granted any licenses, authorizations, waivers or other rights concerning any Authorized Generic Product.

8.3.   **Representation by Legal Counsel.**  Each Party hereto represents that it has been represented by legal counsel in connection with this Agreement and the other Transaction Agreements and acknowledges that it has participated in the drafting hereof. In interpreting and applying the terms and provisions of this Agreement and the other Transaction Agreements, the Parties agree that no presumption shall exist or be implied against the Party which drafted such terms and provisions.

8.4.   **No Other Warranties.**  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY

30

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    WYEFFAT2405465

REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE COMPOUND, THE IR PRODUCTS OR THE XR PRODUCTS OR TEVA'S USE THEREOF OR THAT THE COMPOUND, ANY IR PRODUCT OR XR PRODUCT OR TEVA'S USE OF ANY OF THE FOREGOING OR PRACTICE OF ANY OF THE RIGHTS LICENSED TO TEVA HEREUNDER WILL NOT INFRINGE ANY PATENT OWNED OR CONTROLLED BY ANY THIRD PARTY.

9. **TERM AND TERMINATION.**

9.1. **Term.** This Agreement shall become effective as of the Settlement Effective Date and, unless earlier terminated, shall continue in full force and effect (i) with respect to IR Products, until such time as there are no more Valid Claims of Patent Rights either contained in the IR IP (and foreign counterparts thereof) or subject to the covenant not to sue contained in Section 2.1.5 (as may be expanded under Section 2.1.6), and (ii) with respect to XR Products, until such time as there are no more Valid Claims of Patent Rights either contained in the XR IP (and foreign counterparts thereof) or subject to the covenant not to sue contained in Section 2.2.7 (as may be expanded under Section 2.2.8).

9.2. **Termination.**

9.2.1. **Material Breach.** Either Party may terminate this Agreement by written notice in the event of a material breach by the other Party, which breach remains uncured for a period of ninety (90) days after the non-breaching Party provides written notice of such breach to the allegedly breaching Party.

9.2.2. **Bankruptcy.** Either Party may terminate this Agreement if, at any time, the other Party shall file in any court or agency pursuant to any statute or regulation of any state or country, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of the Party or of its assets, or if the other Party proposes a written agreement of composition or extension of its debts, or if the other Party shall be served with an involuntary petition against it, filed in any insolvency proceeding, and such petition shall not be dismissed with sixty (60) days after the filing thereof, or if the other Party shall propose or be a party to any dissolution or liquidation, or if the other Party shall make an assignment for the benefit of creditors.

31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405466

**9.3.** **Effects of Termination.** Upon termination of this Agreement by Wyeth pursuant to Section 9.2.1 or 9.2.2, all of the rights and obligations under Articles 2, 3 (other than a final report under Section 3.4, Section 3.7, and Section 3.5 if applicable), 4, 5 and 6 shall terminate, and all rights and licenses granted to Teva shall be immediately terminated. Termination or expiration of this Agreement shall have no effect on the Settlement Agreement. Termination or expiration of this Agreement shall not affect any rights or liabilities of the Parties which may have accrued prior to the effective date of such termination, including any liability Teva may have to make any payment that may be due with respect to activities occurring prior to the effective date of such termination. Upon termination or expiration of this Agreement, Sections 3.8, 8.3 and 8.4 and Articles 1, 7, 9, 11, 12 and 13 of this Agreement will survive and continue in full force and effect.

**9.4.** **Effects of Bankruptcy.**
All rights and licenses granted under or pursuant to this Agreement by Wyeth and its Affiliates are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the United States Bankruptcy Code. The Parties agree that Teva and its Affiliates, as licensees of such rights under this Agreement, shall retain and may fully exercise all of their rights and elections under the United States Bankruptcy Code.

## 10. OTHER PATENT RIGHTS.

**10.1.** **Licensing or Acquisition of Other Patent Rights.**

**10.1.1. Obligation.** Neither Party shall have any obligation hereunder to seek or obtain a license or other rights from any Third Party with respect to any Other Patent Rights, provided, however, that if, after the Settlement Date, a Party does seek or obtain, or continues previous efforts to seek or obtain, a license or any such other rights, the remainder of this Section 10.1 shall apply.

**10.1.2. Notice and Consultation.** If a Party or any of its Affiliates (the "Negotiating Party") has initiated negotiations with a Third Party concerning Other Patent Rights, such Negotiating Party shall notify the other Party and identify the Other Patent Rights involved, whereupon the Parties shall meet in person and consult regarding licensing or acquiring such Other Patent Rights for both of their benefit. The Negotiating Party shall keep the other Party reasonably apprised of the negotiations' progress. Any requirement to disclose information under this Section 10.1.2 shall

32

be subject to any confidentiality obligations between the Negotiating Party and such Third Party.

**10.1.3. Agreements with Third Parties.** Notwithstanding anything contained in this Article 10, each of the Parties acknowledges and agrees that neither it nor any of its Affiliates should enter into any agreement with a Third Party concerning any Other Patent Rights that would reasonably be expected by such Party to materially adversely harm the business interests in the Territory of the other Party or any of such other Party's Affiliates, in the case of Teva and/or its Affiliates, with respect to the IR Product or the XR Product, and, in the case of Wyeth and/or its Affiliates, with respect to the IR Reference Product or the XR Reference Product. Without limiting the generality of the immediately preceding sentence, neither Party nor any of its Affiliates, without the consent of the other Party, which consent may not be unreasonably withheld,

(a) shall enter into an agreement with a Third Party which both (i) prohibits such Party from granting a sublicense or a covenant not to sue to the other Party, and (ii) prohibits such Third Party from licensing or granting a covenant not to sue under such Other Patent Rights to the other Party, in either case, in connection with, with respect to Teva, the IR Product or the XR Product and, with respect to Wyeth, the IR Reference Product or the XR Reference Product; and

(b) shall enter into any agreement or understanding with such Third Party containing terms that creates any incentives for such Third Party to, or otherwise increase the likelihood that such Third Party would, (i) enforce such any Other Patent Rights against such other Party in connection with, where Teva is such other Party, the IR Products or the XR Products or, where Wyeth is such other Party, the IR Reference Product or the XR Reference Product (for example, by providing for an increase in the royalties paid to such Third Party if such Third Party prevents such other Party from distributing or selling, for Wyeth, IR Reference Product or XR Reference Product, and for Teva, IR Product or XR Product, as applicable), or (ii) refuse to grant a license or sublicense or covenant not to sue to such other Party under any Other Patent Rights in connection with the IR Products or the XR Products where Teva is such other Party or the IR Reference Product or the XR Reference Product where Wyeth is such other Party (for example, by restricting the terms that such Third Party may offer and

33

enter into with the other Party regarding any Other Patent Rights). For the sake of clarity, Wyeth shall be obligated to use reasonable efforts to obtain a covenant not to sue as provided Sections 2.1.5 and 2.2.7 (as such Sections may be expanded by Sections 2.1.6 and 2.2.8, respectively) with respect to any agreement Wyeth or any of its Affiliates enters into regarding any Other Patent Rights.

**10.1.4. Entry Into Agreements By Teva.** If Teva or any of its Affiliates enters into any agreement regarding such Other Patent Rights, Teva shall use commercially reasonable efforts to obtain the right to grant a covenant not to sue to Wyeth as provided in each of Sections 2.1.5 and 2.2.7, such covenant not to sue to be of the same scope as that specified in those Sections (as such Sections may be expanded by Sections 2.1.6 and 2.2.8, respectively) and otherwise subject to all the terms of this Agreement with the roles of the Parties reversed under those Sections and this Agreement, provided that in all events Section 3.2 shall apply to any covenant not to sue that Teva may grant Wyeth pursuant to this Agreement, again with the roles of the Parties reversed under that Section (including the right not to waive such rights and incur no payment obligation as a result of such waiver).

**10.2. Third Party Claims.**

**10.2.1. Notice.** In the event that at any time during the term of this Agreement (i) Wyeth or any of Affiliate of Wyeth is sued or threatened with suit by a Third Party wherein such Third Party alleges that the manufacture, use, sale, offer for sale or importation of either the IR Reference Product or the XR Reference Product in the Territory infringes Other Patent Rights owned or controlled by such Third Party or (ii) Teva or any Affiliate of Teva is sued or threatened with suit by a Third Party wherein such Third Party alleges that the manufacture, use, sale, offer for sale or importation of either the IR Product or the XR Product in the Territory infringes Other Patent Rights owned or controlled by such Third Party, the Party so sued or threatened with suit (the "Sued Party") shall notify the other Party (the "Cooperating Party") of such allegations.

**10.2.2. Cooperation.** Upon the Sued Party's request, such request not to be made prior to the provision of the notice required under Section 10.2.1, the Cooperating Party shall, at no out of pocket expense to the Cooperating Party, provide reasonable assistance to the Sued Party in defending against or preparing to defend against such allegations. Such assistance may include (a) providing access to relevant documents and other evidence, including, prior art that may impact the validity of the Other Patent Rights under which such allegations were made, (b) making its employees,

34

representatives and agents reasonably available at reasonable business hours, *provided, however,* that (x) neither Party shall be obligated to provide to the other Party any privileged information, provided, however, if a Party elects to disclose any privileged information, such Party shall not be required to disclose privileged information prior to the time that the Parties enter into a mutually acceptable and customary joint defense agreement with respect thereto, (y) the Sued Party shall treat all information provided by the Cooperating Party as the Cooperating Party's Confidential Information pursuant to Article 7 and the terms of any such joint defense agreement that may be entered into by the Parties and further agrees that it shall not use any such documents, evidence or other information obtained from the Cooperating Party, directly or indirectly, against the Cooperating Party in any materially adverse manner or otherwise in any manner which may reasonably be considered to be materially adverse to the Cooperating Party's business interests, and (z) the Cooperating Party shall not be required to provide any assistance to the Sued Party or to take any action or assist the Sued Party in taking any action, in each case, that may be materially adverse to the Cooperating Party's own business interests (it being understood that solely for purposes of this clause (z), the continued marketing, distribution and/or sale of the IR Reference Product or the XR Reference Product shall not be considered to be materially adverse to Teva's business interests and the continued marketing, distribution and/or sale of the XR Product or the XR Product pursuant to the licenses and rights granted under this Agreement shall not be considered to be materially adverse to Wyeth's business interests).

**10.2.3. Control of Litigation.** Nothing in this Section 10.2 shall give the Cooperating Party any right to control any litigation brought by a Third Party against the Sued Party.

## 11.  INDEMNIFICATION AND INSURANCE.

### 11.1.  Indemnification.

**11.1.1. Responsibility.** As between Wyeth and Teva, Wyeth shall be solely responsible for all product liability claims filed by any Third Party to the extent that they claim injury from the IR Reference Product or the XR Reference Product or any Authorized Generic Products manufactured, sold or distributed by Wyeth or its Affiliates or any of their licensees. As between Teva and Wyeth, Teva shall be solely responsible for all product liability claims filed by any Third Party to the extent that they claim injury from the IR Product or the XR Product manufactured, sold or distributed by Teva or its Affiliates.

35

**11.1.2. Indemnification by Wyeth.** Wyeth shall indemnify, defend and hold harmless Teva, its Affiliates and their respective officers, directors, shareholders, employees, agents, representatives, successors and assigns, heirs, administrators, executors, suppliers and manufacturers (collectively, the "Teva Indemnitees") from any claims, losses, liabilities, costs, expenses (including reasonable attorney fees) and damages related to personal injury of any Third Party (collectively, a "Liability"), arising out of any product liability claim made by such Third Party to the extent that such product liability claim results from such Third Party being injured by the IR Reference Product or the XR Reference Product or any Authorized Generic Product. Notwithstanding the foregoing, Wyeth shall have no obligations to any Teva Indemnitee under this Section unless Teva (i) gives Wyeth prompt notice of any claim or lawsuit or other action for which it seeks to be indemnified under this Agreement (ii) gives Wyeth sole control of the defense and all related settlement negotiations and (iii) cooperates fully with Wyeth and its agents in defense of the claims or lawsuit or other action. Teva shall have the right to participate in the defense of any such claim, complaint, suit, proceeding or cause of action referred to in this section utilizing attorneys of its choice. However, Teva shall bear the costs associated with its participation.

**11.1.3. Indemnification by Teva.** Teva shall indemnify, defend and hold harmless Wyeth, its Affiliates and their respective officers, directors, shareholders, employees, agents, representatives, successors and assigns, heirs, administrators, executors, suppliers and manufacturers (collectively, the "Wyeth Indemnitees") from any Liability (as defined in Section 11.1.2) arising out of any product liability claim made by such Third Party to the extent that such product liability claim results from such Third Party being injured by the IR Product or the XR Product. Notwithstanding the foregoing, Teva shall have no obligations to any Wyeth Indemnitee under this Section unless Wyeth (i) gives Teva prompt notice of any claim or lawsuit or other action for which it seeks to be indemnified under this Agreement (ii) gives Teva sole control of the defense and all related settlement negotiations and (iii) cooperates fully with Teva and its agents in defense of the claims or lawsuit or other action. Wyeth shall have the right to participate in the defense of any such claim, complaint, suit, proceeding or cause of action referred to in this section utilizing attorneys of its choice. However, Wyeth shall bear the costs associated with its participation.

**11.2. Insurance.** Teva shall obtain and maintain at all times during the term of this Agreement Commercial General Liability Insurance, including

36

Products Liability, with limits of liability of not less than **Three Million Dollars ($3,000,000)** per occurrence and **Five Million Dollars ($5,000,000)** in the aggregate. Teva USA shall provide Wyeth with a Certificate of Insurance evidencing this coverage within thirty (30) days after the Settlement Effective Date. Such insurance policy shall name Wyeth as an additional insured and Teva shall use its reasonable efforts to ensure such insurance policy contains a provision requiring ten (10) day advance notification to Wyeth in the event of its cancellation or termination. Teva shall secure coverage with insurers having an A.M. Best Rating of A-VII or better. Wyeth acknowledges that Teva may elect at any time during the term of this Agreement to replace such third party insurance with a self-insurance program sufficient to meet the foregoing insurance obligations of Teva. Wyeth shall maintain a self-insurance program sufficient to meet the foregoing insurance obligations of Teva as if those obligations applied to Wyeth.

11.3. **Limitation of Liability.** WITH RESPECT TO ANY CLAIM BY ONE PARTY AGAINST THE OTHER ARISING OUT OF THE PERFORMANCE OR FAILURE OF PERFORMANCE OF THE OTHER PARTY UNDER THIS AGREEMENT, THE PARTIES EXPRESSLY AGREE THAT IN NO EVENT SHALL A PARTY BE LIABLE FOR PUNITIVE DAMAGES.

12. **GOVERNING LAW; DISPUTE RESOLUTION.**

12.1. **Governing Law; Jurisdiction.** This Agreement is subject to and governed by the laws of the State of New York, excluding its conflict of laws provisions. Each of the Parties hereby submits to the exclusive general jurisdiction of the courts of the State of New Jersey and the courts of the United States of America for the District of New Jersey in any action or proceeding arising out of or relating to this Agreement and to the jurisdiction of the appellate courts to which appeals are required to be taken from any of the foregoing. Each of the Parties irrevocably waives (i) any defense of inconvenient forum to the maintenance of any such action or proceeding and (ii) its right to a jury trial.

12.2. **Dispute Resolution.** The Parties recognize that a bona fide dispute as to certain matters under this Agreement may from time to time arise during the term of this Agreement. In the event of the occurrence of such a dispute, either Party may, by written notice to the other Party, have such dispute referred to their respective officers (designated below) or their successors or designees for attempted resolution by good faith negotiations within thirty (30) days after such notice is received. Said designated officers are as follows:

37

   WYEFFAT2405472

For Wyeth:    Senior    Vice    President,    Corporate
              Development, Wyeth

For Teva:     Senior Vice President and General Counsel,
              Teva North America

In the event the designated officers are not able to resolve such dispute through good faith negotiations within such thirty (30) day period, either Party may pursue any legal or equitable remedies available to it by filing a claim in the state or federal courts designated in Section 12.1. Notwithstanding the foregoing, nothing in this Section 12.2 shall prohibit a Party from seeking temporary or injunctive relief from a state or federal court in New Jersey pending the resolution of a dispute in accordance with the provisions of this Section 12.2.

**12.3.  Injunctive Relief.**

**12.3.1. Against Wyeth.**  Wyeth agrees that in the event of any breach of Wyeth's obligations under Section 2.1 or 2.2 or Article 7, Teva will be irreparably harmed and that Teva will have no adequate remedy at law and that Teva will be entitled to seek and obtain and Wyeth will agree to the imposition of temporary and permanent injunctive relief causing Wyeth to immediately discontinue any actions that result in such breach and to not take any such actions in the future.

**12.3.2. Against Teva.**  Teva agrees that in the event of any breach of Teva's obligations under Sections 2.1.4, 2.2.6 or 6.3 or Article 7, Wyeth will be irreparably harmed and that Wyeth will have no adequate remedy at law and that Wyeth will be entitled to seek and obtain and Teva will agree to the imposition of temporary and permanent injunctive relief causing Teva to immediately discontinue any actions that result in such breach and to not take any such actions in the future.

**13.    MISCELLANEOUS.**

**13.1.  Data Sources.**  All extended unit sales of IR Reference Product will be determined by reference to applicable National Prescription Audit Moving Annual Total ("NPA MAT") data provided by IMS Health Incorporated ("IMS"). All gross sales of XR Reference Product referred to in this Agreement will be determined by reference to National Sales Perspective Moving Annual Total ("NSP MAT") data provided by IMS.

38

**13.2.  Assignment.**

    **13.2.1. Assignment by Teva.**  Teva shall not assign this Agreement or any of its rights or obligations hereunder to any Third Party without the prior written consent of Wyeth, which consent may not be unreasonably withheld.  Notwithstanding the foregoing, Teva may assign this Agreement in whole together to (i) any of its Affiliate for so long as they remain Affiliates, or (ii) in connection with the merger, reorganization or consolidation, or the sale of all or substantially all of the assets, of Teva Ltd. or Teva USA; *provided, however,* that any such assignment shall not relieve Teva of any of its responsibilities for performance of its obligations under this Agreement.  Teva shall promptly provide Wyeth with written notice of any such assignment.

    **13.2.2. Assignment by Wyeth.**  Wyeth shall not assign this Agreement or any of its rights or obligations hereunder to any Third Party without the prior written consent of Teva, which consent may not be unreasonably withheld.  Notwithstanding the foregoing, Wyeth may assign this Agreement in whole to (i) any of its Affiliate for so long as they remain Affiliates, or (ii) in connection with its merger, reorganization or consolidation or the sale of all or substantially all of its assets to which this Agreement relates; *provided, however,* that (i) any such assignment shall not relieve Wyeth of any of its responsibilities for performance of its obligations under this Agreement, and (ii) in the event of any such assignment, no Patent Rights of the assignee shall be included in the Patent Rights licensed to Teva hereunder if such Patent Rights were not so licensed prior to such assignment.  Wyeth shall promptly provide Teva with written notice of any such assignment.

    **13.2.3. Binding Nature of Assignment.**  This Agreement shall be binding upon and inure to the benefit of the legal representatives, successors and permitted assigns of the Parties.  Any assignment not in accordance with this Section 13.2 shall be void.

**13.3.  No Waiver.**  The failure of either Party to require performance by the other Party of any of that other Party's obligations hereunder shall in no manner affect the right of such Party to enforce the same at a later time.  No waiver by any Party of any condition, or of the breach of any provision, term, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach, or of any other condition or of the breach of any other provision, term, representation or warranty hereof.

**13.4.  Severability.**  If any provision of this Agreement or the application thereof to any Party or circumstance will, to any extent, be held to be

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    WYEFFAT2405474

invalid or unenforceable, then (i) the remainder of this Agreement, or the application of such provision to Parties or circumstances other than those as to which it is held invalid or unenforceable, will not be affected thereby and each provision of this Agreement will be valid and be enforced to the fullest extent permitted by law, and (ii) the Parties covenant and agree to renegotiate any such provision in good faith in order to provide a reasonably acceptable alternative to such provision or the application thereof that is invalid or unenforceable, it being the intent of the Parties that the basic purposes and business intent of this Agreement are to be effectuated, with the consequence that this Agreement shall terminate in full if the Parties are unable to renegotiate and agree on such provision.

13.5. **Relationship Between The Parties.** Wyeth and Teva are independent contractors under this Agreement. Nothing herein contained shall be deemed to create an employment, agency, joint venture or partnership relationship between the Parties hereto or any of their agents or employees, or any other legal arrangement that would impose liability upon one Party for the act or failure to act of the other Party. Neither Party shall have any express or implied power to enter into any contracts or commitments or to incur any liabilities in the name of, or on behalf of, the other Party, or to bind the other Party in any respect whatsoever.

13.6. **Correspondence and Notices.** All notices given under this Agreement shall be in writing and delivered by hand or sent by nationally recognized overnight delivery service, prepaid registered or certified air mail, or by facsimile confirmed by prepaid first class, registered or certified mail letter, and shall be deemed to have been properly served to the addressee upon receipt of such written communication.

Notices to Wyeth shall be sent to:

    Wyeth Pharmaceuticals
    500 Arcola Road
    Collegeville, Pennsylvania 19426
    Attn: Senior Vice President, Corporate Business Development
    Fax: (484) 865-6476

with a copy to:

    Wyeth
    5 Giralda Farms
    Madison, New Jersey 07940
    Attn: General Counsel
    Fax: (973) 660-7156

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405475

Notices to Teva shall be sent to:

> Teva North America
> 425 Privet Road
> PO Box 1005
> Horsham, PA 19044-8005 1090
> Attention: General Counsel
> Fax: (215) 293-6499

and:

> Teva Pharmaceutical Industries Ltd.
> 5 Basel Street
> P.O. Box 3190
> Petach Tikva 49131, Israel
> Attn: Corporate Legal Department –General Counsel
> Fax: 011 972-3-926-7429

In the event that either Party changes its address, such Party shall promptly notify and update the other Party in writing as to such change.

13.7. **Entire Agreement; Amendments.** This Agreement (including all of the attached Exhibits), together with the other Transaction Agreements, and all the covenants, promises, agreements, warranties, representations, conditions and understandings contained herein and therein, sets forth the complete, final and exclusive agreement between the Parties with respect to the subject matter hereof and supersedes and terminates all prior and contemporaneous agreements and understandings between the Parties, whether oral or in writing, including the Term Sheet, with respect to the subject matter hereof. There are no covenants, promises, agreements, warranties, representations, conditions or understandings, either oral or written, between the Parties with respect to the subject matter of this Agreement other than as are set forth in this Agreement and the other Transaction Agreements. No subsequent alteration, amendment, change, waiver or addition to this Agreement shall be binding upon the Parties unless reduced to writing and signed by an authorized officer of each Party. No understanding, agreement, representation or promise, not explicitly set forth herein, has been relied on by either Party in deciding to execute this Agreement.

13.8. **Headings; Defined Terms.** The headings and captions used in this Agreement are solely for the convenience of reference and shall not affect its interpretation. The term "including" means "including, without limitation," and "herein", "hereof", and "hereunder" refer to this Agreement as a whole. The word "will" shall be construed to have the same meaning and effect as the word "shall".

41

**13.9.** **Counterparts.** This Agreement may be executed in one or more counterparts each of which shall be an original and all of which shall constitute together the same document. Facsimile execution and delivery of this Agreement by either Party shall constitute a legal, valid and binding execution and delivery of this Agreement.

**13.10.** **Further Actions.** Each Party agrees to execute, acknowledge and deliver such further instruments, and to do all other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement.

**13.11.** **References to ANDAs and NDAs.** References to any NDA or ANDA in this Agreement include, unless expressly indicated otherwise, all replacements and successors and all amendments and supplements to the foregoing.

*(remainder of page intentionally left blank)*

42

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405477

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have caused this Agreement to be executed as of the Effective Date by their duly authorized representatives.

**WYETH, ACTING THROUGH ITS**
**Wyeth PHARMACEUTICALS DIVISION**

By: _____
Name:
Title:

**TEVA PHARMACEUTICALS USA, INC.**

By: _____
Name:
Title:

**WYETH PHARMACEUTICALS**
**COMPANY, INC.**

By: _____
Name:
Title:

**TEVA PHARMACEUTICAL INDUSTRIES LTD.**

By: _____
Name:
Title:

By: _____
Name:
Title:

**WYETH -WHITEHALL**
**PHARMACEUTICALS INC.**

By: _____
Name:
Title:

**WYETH PHARMACEUTICALS**
**COMPANY**

By: _____
Name:
Title:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405479

## EXHIBIT 1.11
## ELEMENTS OF COSTS OF GOODS SOLD

The following expenses are included in Costs of Goods Sold for purposes of this Agreement:

1.  **Direct Materials**

    Actual costs of the materials used in the manufacturing process that are traced directly to the completed Product and Compound to the extent necessary to manufacture Product, and include:

    - Inert raw materials or excipients
    - Active substances/ingredients at actual prices (without any mark-up if supplied by Teva Israel or any Affiliate of Teva), provided such prices are no greater than market prices
    - Packaging components such as bottles, caps, labels, etc.

2.  **Direct Labor**

    The actual allocable cost of employees engaged in production activities which are directly identifiable with manufacturing the Product and Compound to the extent necessary to manufacture Product, but solely for *pro rata* costs allocable to the time such employees are working on Product or such Compound manufacturing. Excludes supervision and production support activities such as inspection, plant and equipment maintenance labor, and material handling personnel. Direct Labor cost includes the allocable amounts of the following:

    - Base pay, overtime, vacation and holidays, illness, personal time with pay and shift differential.
    - Cost of employee fringe benefits such as health and life insurance, payroll taxes, welfare, pension and profit sharing.

3.  **Allocated Costs**

    Non-direct costs which are allocable to manufacturing the Product and Compound to the extent necessary to manufacture Product based on standard direct labor hours of the manufacturing process. These allocated costs include:

    - Utilities - expenses incurred for fuel, electricity and water in providing power for production and other plant equipment
    - Maintenance and repairs - amount of expense incurred in-house or purchased to provide services for plant maintenance and repairs of facilities and equipment.

WYEFFAT2405480

- Depreciation - of plant and equipment utilizing the straight-line method of calculation.
- Insurance - cost of comprehensive and other insurance necessary for the safeguard of manufacturing plant and equipment.
- Permits and Licenses - fees payable to governmental agencies or authorities to obtain or maintain permits or licenses that are necessary for the operation of facilities used to manufacture the materials or Product or such Compound, as applicable.
- Costs of the following manufacturing services
  - Purchasing and Accounting
  - Production Scheduling
  - Inventory Management
  - Plant Materials Management
  - Supervision and Production Support

Various bases may be used for allocating these costs to manufacturing operating departments including headcount, square feet, metered utilities use, estimated services rendered, EDP computer hours, etc. For purposes of clarity, no overhead will be included in the calculation of Cost of Goods Sold for unutilized or underutilized facilities (*i.e.*, allowable overhead costs for a facility shall be allocated proportionately over the entire manufacturing capacity and other uses of the facility whether or not the entire manufacturing capacity or facility is being utilized).

4. Testing Costs - direct labor costs for Quality Assurance ("QA") testing and approving materials used in manufacturing and completed manufacturing batches and finished Products and Compound to the extent necessary to manufacture Product. This includes all manufacturing in-process testing and testing of finished materials. Excluded costs are QA costs related to research and development, except as they relate to the ongoing support of the manufacture of the Product and such Compound hereunder.

5. Third Party Royalties, as applicable.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Exhibit C
## Canadian License Agreement

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405482

LICENCE AGREEMENT

(CANADA)

BY AND AMONG

WYETH, ACTING THROUGH ITS

WYETH PHARMACEUTICALS DIVISION;

WYETH PHARMACEUTICALS COMPANY, INC.;

WYETH-WHITEHALL PHARMACEUTICALS INC.;

and

WYETH PHARMACEUTICALS COMPANY

(on the one hand)

AND

NOVOPHARM LIMITED.

(on the other hand)

NOVEMBER 2, 2005

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405483

EXECUTION COPY

## TABLE OF CONTENTS

**Page**

1   DEFINITIONS............................................................................................. 1

   1.1   "Affiliate"............................................................................................. 2

   1.2   "ANDS"................................................................................................ 2

   1.3   "Applicable Law".................................................................................. 2

   1.4   "Audit Period"...................................................................................... 2

   1.5   "Authorized Generic Product"............................................................. 2

   1.6   "Business Day" or "business day"...................................................... 2

   1.7   "Compound"........................................................................................ 2

   1.8   "Confidential Information".................................................................... 2

   1.9   "Consideration End Date".................................................................... 3

   1.10  "Cost of Goods Sold".......................................................................... 3

   1.11  "DIN".................................................................................................... 3

   1.12  "Disclosing Party"............................................................................... 3

   1.13  "Entry Date"......................................................................................... 3

   1.14  "Health Canada".................................................................................. 3

   1.15  "Listing Condition"............................................................................... 3

   1.16  "Net Sales".......................................................................................... 3

   1.17  "NOC".................................................................................................. 4

   1.18  "Novopharm Indemnitees"................................................................... 4

   1.19  "Patents".............................................................................................. 4

   1.20  "Patent Rights".................................................................................... 4

   1.21  "Product".............................................................................................. 4

   1.22  "Profits"................................................................................................ 4

   1.23  "Receiving Party"................................................................................. 5

   1.24  "Reference Product"............................................................................ 5

   1.25  "Sales Period"...................................................................................... 5

   1.26  "Second Generic Entry Date".............................................................. 5

i

Licence Agreement (Canada)

1.27    "Second Generic NOC Date" ................................................................... 5

1.28    "Second Generic Product" ...................................................................... 5

1.29    "Settlement Agreement" ......................................................................... 5

1.30    "Territory" ............................................................................................. 5

1.31    "Third Party" ......................................................................................... 5

1.32    "Third Party Royalties" ......................................................................... 5

1.33    "US Definitive Agreements" ................................................................. 5

1.34    "Valid Claim" ........................................................................................ 6

1.35    "Wyeth Indemnitees" ........................................................................... 6

2      RIGHTS GRANTED. ..................................................................................... 6

2.1     Product Rights ...................................................................................... 6

2.1.1    Exclusive Commercialization Licence. ...................................... 6

2.1.2    Manufacturing Licence. ............................................................. 6

2.1.3    Regulatory Matters ..................................................................... 7

2.2     Covenant Not To Sue. ........................................................................... 8

2.3     Sales Outside of Licensed Territory. .................................................... 9

2.4     Retained Rights. .................................................................................... 9

3      CONSIDERATION. ....................................................................................... 10

3.1     Payments. .............................................................................................. 10

3.2     Payments to Third Parties. .................................................................... 10

3.3     Third Party Royalties. ........................................................................... 11

3.4     Reports and Payments. .......................................................................... 11

3.5     Late Payments. ...................................................................................... 11

3.6     Taxes. .................................................................................................... 11

3.7     Record Keeping by Novopharm; Audits. .............................................. 11

3.8     Record Keeping by Wyeth; Audits. ...................................................... 12

4      REGULATORY MATTERS; COMMERCIALIZATION. ............................. 13

4.1     Regulatory Approvals. ........................................................................... 13

4.2     Pharmacovigilance. ............................................................................... 13

5      INTELLECTUAL PROPERTY. ..................................................................... 14

5.1     Enforcement and Defence. .................................................................... 14

5.2     No Challenge. ........................................................................................ 15

5.3     General Mutual Release. ........................................................................ 15

ii

| | | |
|---|---|---|
| 5.4 | No Other Rights; Trade-marks. | 15 |
| 6 | CONFIDENTIALITY. | 15 |
| 6.1 | Nondisclosure and Nonuse Obligations. | 15 |
| 6.2 | Permitted Disclosures. | 16 |
| 6.3 | Return of Confidential Information. | 17 |
| 6.4 | Disclosure of Agreement. | 17 |
| 7 | REPRESENTATIONS, WARRANTIES AND COVENANTS. | 17 |
| 7.1 | Representations and Warranties of Both Parties. | 17 |
| 7.2 | Representations and Warranties of Wyeth. | 18 |
| 7.3 | Representation by Legal Counsel. | 18 |
| 7.4 | No Other Warranties. | 18 |
| 8 | TERM AND TERMINATION. | 18 |
| 8.1 | Term. | 18 |
| 8.2 | Termination. | 18 |
| 8.2.1 | Material Breach. | 18 |
| 8.2.2 | Bankruptcy. | 18 |
| 8.3 | Effects of Termination. | 18 |
| 9 | INDEMNIFICATION AND INSURANCE. | 19 |
| 9.1 | Indemnification. | 19 |
| 9.1.1 | Responsibility. | 19 |
| 9.1.2 | Indemnification by Wyeth. | 19 |
| 9.1.3 | Indemnification by Novopharm. | 19 |
| 9.2 | Insurance. | 20 |
| 9.3 | Limitation of Liability. | 20 |
| 10 | GOVERNING LAW; DISPUTE RESOLUTION. | 20 |
| 10.1 | Governing Law; Jurisdiction. | 20 |
| 10.2 | Dispute Resolution. | 20 |
| 11 | MISCELLANEOUS. | 20 |
| 11.1 | Assignment. | 20 |
| 11.1.1 | Assignment by Novopharm. | 20 |
| 11.1.2 | Assignment by Wyeth. | 21 |
| 11.2 | Binding Nature of Assignment. | 21 |
| 11.3 | No Waiver. | 21 |

iii

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Licence Agreement (Canada)

| 11.4 | Severability. | 21 |
| 11.5 | Relationship Between The Parties. | 21 |
| 11.6 | Correspondence and Notices. | 22 |
| 11.7 | Entire Agreement; Amendments. | 24 |
| 11.8 | Headings; Defined Terms. | 24 |
| 11.9 | Counterparts. | 24 |
| 11.10 | Further Actions. | 24 |
| 11.11 | References to ANDSs and NOCs. | 24 |

iv

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405487

EXECUTION COPY

## LICENCE AGREEMENT

## (Canada)

This Licence Agreement (the "Agreement") is entered into as of November __, 2005 (the "Signing Date"), by and among Wyeth, acting through its Wyeth Pharmaceuticals Division, having a place of business at 500 Arcola Road, Collegeville, Pennsylvania 19426 USA ("Wyeth Pharmaceuticals"), Wyeth Pharmaceuticals Company, Inc., having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("WPCI"), Wyeth-Whitehall Pharmaceuticals Inc., having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("Wyeth-Whitehall") and Wyeth Pharmaceuticals Company, having a place of business at Road No. 3, KM. 142.1, Guayama, Puerto Rico 00784 ("WPC") on the one hand, and Novopharm Limited ("Novopharm"), having a place of business at 30 Novopharm Court, Toronto, Ontario, Canada M1B 2K9, on the other hand. Wyeth Pharmaceuticals, WPCI, Wyeth-Whitehall and WPC, together with their Affiliates, may be referred to herein collectively or individually as "Wyeth". Wyeth and Novopharm may each be referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, the Parties have agreed to amicably resolve certain patent-related discussions ongoing between them and on October 18, 2005 entered into a Binding Term Sheet (the "Term Sheet") in connection therewith; and

WHEREAS, in connection with such discussions Wyeth is willing to grant, and Novopharm is willing to receive, subject to the terms and conditions set forth in this Agreement, a licence to enable Novopharm to sell certain products in the Territory (as defined below) to its consumers, distributors and other customers for ultimate sale to consumers in the Territory; and

WHEREAS Novopharm is willing not to file any further opposition to CA Patent Application No. 2,199,778; and

WHEREAS, the Term Sheet requires the Parties to negotiate and enter into a number of definitive agreements, including this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and stipulations set forth herein, and in the Settlement Agreement (as defined hereinafter), the receipt and legal sufficiency of which are hereby mutually acknowledged, Wyeth and Novopharm hereby agree as follows:

## 1    DEFINITIONS.

As used in this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405488

**1.1**    "**Affiliate**" shall mean with respect to any person or entity, any other person or entity which controls, is controlled by or is under common control with such person or entity. A person or entity shall be regarded as in control of another entity if it owns or controls at least fifty percent (50%) of the equity securities of the subject entity entitled to vote in the election of directors (or, in the case of an entity that is not a corporation, for the election of the corresponding managing authority), *provided, however,* that if local law restricts foreign ownership, control shall be established by both (i) having direct or indirect ownership of the maximum ownership percentage that may, under such local law, be owned by foreign interests and (ii) having the power to direct and control the management and policies of such foreign entity, *and provided further, however,* that the term "Affiliate" shall not include subsidiaries or other entities in which a Party or its Affiliates owns a majority of the ordinary voting power necessary to elect a majority of the board of directors or other governing board, but is restricted from electing such majority by contract or otherwise, until such time as such restrictions are no longer in effect.

**1.2**    "**ANDS**" shall mean an Abbreviated New Drug Submission as defined in the Canadian Food and Drugs Act, the Canadian Food and Drug Regulations, and other applicable regulations promulgated thereunder, as the foregoing laws and regulations may be amended from time to time.

**1.3**    "**Applicable Law**" shall mean all applicable provisions of all statutes, laws, rules, regulations, administrative codes, ordinances, decrees, orders, decisions, guidance documents (including Health Canada guidance documents), injunctions, awards, judgments, and permits and licences of or from governmental authorities relating to the use or regulation of the subject item.

**1.4**    "**Audit Period**" shall have the meaning set forth in Section 3.7.

**1.5**    "**Authorized Generic Product**" shall mean, with respect to Reference Product (in any dosage strength), any product marketed or sold by or under licence, waiver or other actual or effective authorization of, or supplied by or on behalf of, Wyeth or any of Wyeth's Affiliates or licensees, as a generic product the ANDS for which makes reference to the Reference Product (other than by Novopharm or Novopharm's Affiliates pursuant to this Agreement or any other agreement between Wyeth or its Affiliates and Novopharm and its Affiliates), not under the Effexor® trade-mark.

**1.6**    "**Business Day**" or "**business day**" shall mean any day other than a day which is a Saturday, a Sunday or a day on which banks in New York City, New York, Ontario or Israel are authorized or obligated by law or executive order to not open or remain closed or any day defined as a "Holiday" in subsection 35(1) of the *Interpretation Act*.

**1.7**    "**Compound**" shall mean venlafaxine hydrochloride and any form thereof including polymorphs and solvates, and other pharmaceutically acceptable salts of venlafaxine and any form thereof including polymorphs and solvates.

**1.8**    "**Confidential Information**" except as otherwise provided for in this agreement, shall mean any and all confidential information regarding, related to, or

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    WYEFFAT2405489

associated with the Compound, any Product, the Patents, the Reference Product, and/or this Agreement (other than the terms and conditions hereof, which shall be subject to Section 6.4) that is disclosed by the Disclosing Party to the Receiving Party or otherwise obtained by the Receiving Party as of or after the Signing Date.

**1.9** "**Consideration End Date**" shall mean the date on which there are no more Valid Claims of the Patents that, but for the licences contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of the Product.

**1.10** "**Cost of Goods Sold**" shall mean the costs incurred by Novopharm in manufacturing Product sold by or on behalf of Novopharm or its Affiliates in the Territory under the Agreement, including all applicable Third Party Royalties, provided, however, that in no event will the Cost of Goods Sold for Product be greater than the sum of ten percent (10%) of the price per capsule of Reference Product listed in the Ontario Drug Benefit Formulary at the relevant time that Cost of Goods Sold is being determined plus all applicable Third Party Royalties. In calculating costs incurred in manufacturing Product, only those cost elements described in Exhibit 1.9 shall be included.

**1.11** "**DIN**" shall mean, with respect to a product, the Drug Identification Number issued by Health Canada for such product.

**1.12** "**Disclosing Party**" shall mean the Party who is disclosing its Confidential Information to the Receiving Party.

**1.13** "**Entry Date**" shall mean the earlier to occur of the Second Generic Entry Date and the following, as applicable: (i) if Wyeth has satisfied the Listing Condition and the US Definitive Agreements become effective as set forth in the Settlement Agreement, December 1, 2006; (ii) if Wyeth has not satisfied the Listing Condition, the day Novopharm is issued a NOC for Product; or (iii) if Wyeth has satisfied the Listing Condition but the US Definitive Agreements do not become effective as set forth in the Settlement Agreement, August 1, 2007.

**1.14** "**Health Canada**" shall mean Health Canada or any successor agency thereto.

**1.15** "**Listing Condition**" shall mean that Wyeth has obtained formal listing of the patent issuing from Canadian Patent Application No. 2,199,778 on the Patent Register maintained by Health Canada (the "Patent Register") prior to the issuance of a NOC in respect of a Second Generic Product and prior to the first commercial sale of Product by Novopharm in the Territory.

**1.16** "**Net Sales**" shall mean the aggregate gross sales of the amounts invoiced for the sale of Product by Novopharm or any of its Affiliates in arm's length transactions with Third Parties ("Gross Sales") for use in the Territory, less reasonable estimates for the following: (i) cash discounts, (ii) adjustments on account of price adjustments, billing adjustments, or shelf stock adjustments, (iii) returns, shortages or rejected/damaged goods, (iv) chargebacks, (v) rebates, promotional allowances, administrative fee arrangements, and similar payments to all direct and indirect customers, including wholesalers and other distributors, buying groups, health care insurance carriers, pharmacy benefit management companies, and provincial

3

formularies . In the event that Novopharm sells Product as part of a bundle or group sale with other products not covered by this Agreement, and Novopharm provides a discount, allowance or rebate to the purchaser of such Product based on the invoiced prices for all products sold, such discount must be allocated pro rata based on the selling prices of all such products. Net Sales shall be determined using the accrual method of accounting determined in a manner consistent with Novopharm's practice for its other pharmaceutical products. Sales of Product by and between a Novopharm and its Affiliates are not sales to Third Parties and shall be excluded from Net Sales calculations for all purposes, it being understood that the sale of a Product by Novopharm or any of its Affiliates to a Third Party shall be utilized in calculating Net Sales under this Agreement.

**1.17** "NOC" shall mean, with respect to any product, a Notice of Compliance issued by Health Canada authorizing the sale of such product in Canada, and all replacements and successors and all amendments and supplements to the foregoing.

**1.18** "Novopharm Indemnitees" shall have the meaning set forth in Section **9.1.2.**

**1.19** "Patents" shall mean (i) Patent Rights under Canadian Patent No. 1,248,540, (ii) Patent Rights under Canadian patent applications 2,305,242, 2,126,305; 2,141,774, 2,199,778, 2,414,938, 2,467,593, 2,467,614, 2,485,736, 2,502,120, 2,502,027, 2,502,032 and any patents issuing therefrom, (iii) all other Canadian Patent Rights owned or controlled as of the Signing Date by Wyeth or any of its Affiliates that, but for the licences contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of any Product (including Compound to the extent necessary to manufacture Product), (iv) all Canadian Patent Rights owned or controlled (with the right to sublicense) by Wyeth or its Affiliates, claiming (directly or indirectly) priority to such Canadian Patent Rights identified in clauses (i), (ii) and (iii) or any of the applications to which such Canadian Patent Rights claim (directly or indirectly) priority that, but for the licences contained herein, would be infringed by the manufacture, use, sale, offer for sale or importation of any Product (including Compound to the extent necessary to manufacture Product).

**1.20** "Patent Rights" shall mean all patents and patent applications, including all provisional applications, substitutions, continuations, continuations-in-part, divisions, and renewals, all patents granted thereon, and all patents-of-addition, reissues, reexaminations, extensions and extended exclusivities (including pediatric extensions) or restorations by existing or future extension or restoration mechanisms.

**1.21** "Product" shall mean any once-daily extended release capsule, which capsule contains, as its sole active ingredient, Compound, and is marketed by Novopharm or any of its Affiliates as a generic product and the ANDS for such Product makes reference to the Reference Product (in any dosage strength). in the Territory. For the sake of clarity, Product shall not include Reference Product.

**1.22** "Profits" shall mean, with respect to Product sold by Novopharm or any of Novopharm's Affiliates, Net Sales of such Product less the Costs of Goods Sold for such Product.

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405491

**1.23** "Receiving Party" shall mean the Party who is receiving Confidential Information from the Disclosing Party.

**1.24** "Reference Product" shall mean a once-daily extended release capsule containing, as its sole active ingredient, venlafaxine hydrochloride, equivalent to either 37.5mg, 75mg or 150mg of venlafaxine (or other approved dosage strengths), which capsule is currently marketed in the Territory by Wyeth or its Affiliates as Effexor® XR under DIN numbers 2237279, 2237280, 2237281 or 2237282.

**1.25** "Sales Period" shall mean the period commencing on the Entry Date and ending on the Consideration End Date.

**1.26** "Second Generic Entry Date" shall mean the date on which a Second Generic Product is first sold for use in the Territory pursuant to a NOC, provided that if Wyeth is able to require the end of selling and distributing of such Second Generic Product before Novopharm or any of its Affiliates is able to first sell a Product in the Territory, then such first sale of Second Generic Product shall not constitute a "Second Generic Entry Date" hereunder, and provided, further, that a sale of only a nominal amount of Product in the Territory made solely for purposes of filing a drug notification form in satisfaction of the requirements of Part C, Section C.01.014.3 of the Food and Drugs Act shall not constitute a "Second Generic Entry Date."

**1.27** "Second Generic NOC Date" shall mean the date on which a NOC is issued with respect to a Second Generic Product.

**1.28** "Second Generic Product" shall mean any once-daily extended release capsule the ANDS for which makes reference to the Reference Product (in any dosage strength), and which was the subject of a NOC issued to any person who is not related to Novopharm or its Affiliates, in any way and who is not, directly or indirectly, operating under any licence, right or waiver granted by Novopharm or Novopharm's Affiliates and is not, directly or indirectly, purchasing any Product from Novopharm or Novopharm's Affiliates, which capsule contains Compound as its sole active ingredient. For the sake of clarity, for purposes of this Section 1.28 the purchase of Compound from Novopharm or its Affiliates by any such person is not the purchase of Product.

**1.29** "Settlement Agreement" shall mean that certain Settlement Agreement and Release entered into by Wyeth and Teva Pharmaceuticals Industries Ltd. And Teva Pharmaceuticals USA, Inc. (together, "Teva") dated November 2, 2005.

**1.30** "Territory" shall mean Canada, including all of its provinces, territories and possessions and expressly further including Quebec.

**1.31** "Third Party" shall mean any person or entity other than Wyeth, Novopharm or any of their respective Affiliates.

**1.32** "Third Party Royalties" shall mean any and all payments made by Novopharm and any of its Affiliates to Wyeth pursuant to Section 3.2, with respect to Product.

**1.33** "US Definitive Agreements" shall mean the License Agreement dated as of the date hereof between Wyeth and Teva relating to, among other things, the grant of

5

WYEFFAT2405492

licences by Wyeth to Teva with respect to the United States (the "US License Agreement") and the Settlement Agreement.

**1.34** "Valid Claim" shall mean either (a) a claim of an issued and unexpired Patent Right which has not been revoked or held unenforceable or invalid by a decision of a court or other governmental agency of competent jurisdiction, which revocation or holding is unappealable or unappealed within the time allowed for appeal, and which has not been disclaimed, denied or admitted to be invalid or unenforceable through reissue or disclaimer or otherwise, or (b) a claim of a pending application for a Patent Right which claim was filed in good faith and has not been abandoned or finally disallowed without the possibility of appeal or refiling of said application.

**1.35** "Wyeth Indemnitees" shall have the meaning set forth in Section 9.1.3.

## 2   RIGHTS GRANTED.

### 2.1   Product Rights.

**2.1.1   Exclusive Commercialization Licence.** Effective as of the Signing Date but subject to the next sentence, Wyeth hereby grants to Novopharm and its Affiliates an exclusive, non-transferable (except to the extent permitted in Section 11.1) licence, without the right to grant sublicences, under the Patents, to use, offer for sale, sell, import and have imported Product, solely for sale to their distributors and customers in the Territory for ultimate resale by such distributors and customers to consumers for use in the Territory. The enjoyment and exercise by Novopharm and its Affiliates under said licence to sell and have sold Product to distributors and customers in the Territory shall be postponed until the Entry Date and until the Entry Date Novopharm and its Affiliates shall not exercise rights under such licence to sell and have sold Product. From the Signing Date until the Consideration End Date, neither Wyeth nor any of its Affiliates will market, sell, supply, distribute or manufacture any Authorized Generic Product of Reference Product (in any dosage strength), or license, sublicense, grant a waiver or otherwise authorize, directly or indirectly, or cause or allow any Third Party to do the same, for sale in the Territory. The licence granted under this Section 2.1.1 shall expire on the Consideration End Date.

In order to apply, register or record Novopharm's right, title and interests in Patents under this Agreement in the Canadian Intellectual Property Office pursuant to section 50(2) of the *Patent Act*, from and after the execution of this Agreement, Wyeth will sign such documents, the content of which is to be agreed upon by the Parties, and provide such other cooperation, at no additional cost to Novopharm, as Novopharm may reasonably request but without requiring Wyeth to incur any out-of-pocket costs or expenses.

**2.1.2   Manufacturing Licence.** Effective as of the Signing Date, Wyeth hereby grants to Novopharm and its Affiliates a non-exclusive, non-transferable (except to the extent permitted in Section 11.1) licence, without the right to grant sublicences, under the Patents and those foreign counterparts to the Patents in the territories next specified, to manufacture and have manufactured Product

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405493

(including Compound solely for the purpose of manufacturing Product) in the United States, Canada and Israel and such other countries as the Parties may mutually agree upon in writing (after Novopharm's request for consent to expand the territory of the licence set forth in this sentence which consent will not be unreasonably withheld by Wyeth), but if outside the Territory, only for the importation of such Product and Compound (solely for the purposes of manufacturing Product) into the Territory and the other activities in the Territory permitted by the licence granted in Section **2.1.1.** The licence granted under this Section **2.1.2** shall expire on the Consideration End Date.

**2.1.3 Regulatory Matters.** Commencing on the Signing Date, Novopharm may take all acts necessary to obtain its NOC for Product and all acts necessary to seek listing of Product on applicable formularies, subject to the following provisions of this Section 2.1.3:

(A) If the Listing Condition is met and the US Definitive Agreements become fully effective as set forth in the Settlement Agreement, Novopharm will not take any actions to seek listing of Product on applicable formularies until the earlier of the Second Generic NOC Date and October 15, 2006. If the Listing Condition is met and the US Definitive Agreements do not become effective as set forth in the Settlement Agreement, Novopharm will not take any actions to seek listing of Product on applicable formularies until the earlier of the Second Generic NOC Date and July 1, 2007.

(B) Wyeth agrees that, subject to the following sentences of this clause (B), until Novopharm's NOC for Product has issued, each time one of the Patents is formally listed on the Patent Register, Wyeth will, on the day of such listing, provide Novopharm written consent to the making, constructing, using or selling of Product in Canada by Novopharm in accordance with the terms of this Agreement, pursuant to section 7(3) of the Patented Medicines (Notice of Compliance) Regulations (the "Letter"). Novopharm may, at its option, submit the Letter to Health Canada. If the Listing Condition is met and the US Definitive Agreements become fully effective as set forth in the Settlement Agreement, Wyeth's obligation to provide the Letter will not commence until the earlier of (a) the Second Generic NOC Date; and (b) October 1, 2006. If the Listing Condition is met but the US Definitive Agreements do not become effective as set forth in the Settlement Agreement, Wyeth's obligation to provide the Letter will commence on the earlier of (a) the Second Generic NOC Date; and (b) July 1, 2007. On the date the obligation to provide the Letter commences pursuant to the preceding sentences, Wyeth will provide Novopharm the Letter with respect to all Patents then listed on the Patent Register.

7

Licence Agreement (Canada)

(C) If Wyeth fails to provide the Letter in accordance with its obligation under clause (B) above, Novopharm will have the right to seek the remedy of specific performance of this obligation.

(D) In addition to Wyeth's obligation under clause (B) above, as Novopharm may reasonably request, Wyeth will submit appropriate and reasonable documentation to the appropriate Canadian regulatory authorities evidencing such licences and waivers to assist Novopharm in effecting the foregoing licences and waivers and otherwise in obtaining a NOC for Product.

(E) Wyeth will refrain from filing any Notice of Application to seek to prohibit the issue to Novopharm of any NOC for Product to be manufactured and sold by Novopharm or its Affiliates pursuant to the licences granted under this Agreement. Novopharm will not file any Notice of Allegation with respect to any Patent in connection with obtaining a NOC for Product other than a Notice of Allegation only based on the licences and covenants not to sue, as applicable, contained in Sections 2.1 and 2.2, or seek to challenge any Patents to the extent that, but for the right and licence granted in Section 2.1, such Patents would prevent Novopharm from making, using, selling, offering for sale, importing or having imported Product. Wyeth hereby grants to Novopharm a limited licence under the Patent Rights subject to the covenant not to sue set forth in Section 2.2 for Novopharm and its Affiliates to file or maintain such NOC.

(F) Wyeth will promptly inform Novopharm if it receives a Notice of Allegation containing an allegation of non-infringement or invalidity from any person seeking a NOC for a Second Generic Product.

2.2     **Covenant Not To Sue.** Wyeth hereby covenants that Wyeth and its Affiliates will not sue, or cause or support any licensee or other Third Party to sue, any of Novopharm or its Affiliates, their manufacturers and importers, or their distributors and customers or their consumers claiming that the manufacture, construction, use, sale, offer for sale or importation of Product (including Compound for the purpose of manufacturing Product for sale in the Territory), within the scope of permitted activities covered by the licences hereunder infringes any Patent Right which

(i) are not included in the Patents but are owned or controlled (and with respect to controlled, with the right to grant at least a covenant not to sue, which Wyeth shall use commercially reasonable efforts to obtain) as of the Signing Date or thereafter by Wyeth or any of its Affiliates, and

(ii) cover (a) the composition or formulation of Reference Product or Product as defined in Novopharm's ANDS for Product or Compound for the purposes of manufacturing such product (including product-by-process claims) or any of their uses, or (b) manufacturing of such Products or Compound by or on behalf of Novopharm or its Affiliates using manufacturing processes that (x) are identified or designated in the

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405495

Product ANDS as it exists on the Signing Date or are materially the same thereto and
(y) were conceived prior to the Signing Date.

*provided, however,* that this covenant shall not extend to any Valid Claim claiming any
manufacturing process used or useful for Reference Product, Product or Compound for
the purposes of manufacturing Product, other than those expressly identified in clause
(ii)(b) above. The foregoing covenant not to sue shall remain in effect until such time
as there are no more Valid Claims contained in such Patent Rights subject to such
covenant not to sue. Wyeth will impose the foregoing covenant not to sue on any Third
Party to which Wyeth or any of its Affiliates may assign, licence or otherwise transfer
any Patent Rights subject to the foregoing covenant not to sue. For sake of clarity, the
foregoing covenant not to sue shall be in addition to and shall not limit any of the
licences provided for in Section 2.1.1 and 2.1.2.

**2.3     Sales Outside of Licensed Territory.** Novopharm acknowledges and agrees
that the licences granted to it in Section 2.1.1 above each only provide Novopharm
with the right to sell or distribute Product sold under Novopharm's applicable NOC
for use in the Territory. Accordingly, during the Sales Period, with respect to
Product, Novopharm agrees to and to cause its Affiliates to:

(i) use all commercially reasonable efforts to impose upon its distributors and
customers within the Territory for such Product contractual obligations not to seek or
accommodate consumers outside the Territory for such Product;

(ii) restrict its marketing, promotion, advertisement, sale and distribution of such
Product solely within the Territory;

(iii) not intentionally sell, market, promote, advertise, or distribute such Product for use
outside the Territory, and Novopharm shall use all commercially reasonable efforts to
impose upon its distributors and customers a contractual obligation to observe the
same;

(iv) not knowingly, directly or indirectly, sell such Product to any Third Party for use
in the Territory for resale outside the Territory; and exercise its reasonable commercial
efforts to ensure its distributors and customers do not ship, sell or otherwise distribute
such Product for ultimate use by patients outside the Territory; and

(v) not sell such Product via the Internet outside the Territory or sell such Product via
mail order outside of the Territory, and Novopharm shall use all commercially
reasonable efforts to impose, as an essential condition of doing business, upon its
distributors and customers a contractual obligation to observe same.

Novopharm shall reimburse Wyeth or any Affiliate of Wyeth for the lost profits that
Wyeth or such Affiliate of Wyeth would have realized had Wyeth or such Affiliate
of Wyeth sold the product equivalent to the Reference Product in the country into
which Product was imported in violation of the foregoing obligations in this Section
4.

**2.4     Retained Rights.** Other than the licences and rights expressly set forth
above, this Agreement will provide either Party no other right, title or interest, either
express or implied, by estoppel or otherwise, in or to any of the other Party's
intellectual property rights, including any patent right, trade-mark, copyright, trade

9

WYEFFAT2405496

secret or know-how. Novopharm hereby acknowledges and agrees that, except as expressly set forth in this Agreement, it may not sublicense, subcontract, or delegate to any Third Party all or part of the rights and obligations of Novopharm under this Agreement.

## 3    CONSIDERATION.

### 3.1    Payments.

(A) Provided that Wyeth has satisfied the Listing Condition and the US Definitive Agreements become fully effective as set forth in the Settlement Agreement, Novopharm will pay to Wyeth a sum equal to forty-five percent (45%) of all Profits from the sales of Product from December 1, 2006 to November 30, 2007, paying to Wyeth fifty percent (50%) of Profits from the sales of Product thereafter.

(B) Provided that Wyeth has satisfied the Listing Condition and the US Definitive Agreements do not become effective as set forth in the Settlement Agreement, Novopharm will pay to Wyeth a sum equal to fifteen percent (15%) of all Profits from the sales of Product.

(C) The obligation to pay any sum described in the foregoing will end in any event by the Consideration End Date, other than any obligation to pay any sum that has accrued through the Consideration End Date.

Notwithstanding the foregoing, during such period that at least one Second Generic Product is being sold by a person (who has no relation to Novopharm directly or indirectly with respect to such Second Generic Product, other than potentially with respect to purchasing Compound used in the manufacture thereof), in the Territory, the payment required under this Section 3.1 shall be suspended and there shall be no obligation on Novopharm to make such payments.

### 3.2    Payments to Third Parties.
In the event that Wyeth incurs any royalties or other payment obligation to any Third Party based on sales of Product by Novopharm or its Affiliates as a result of any Patent Rights (other than the Patents or any foreign counterparts thereof) in-licensed after the Signing Date by Wyeth or any of its Affiliates (but not owned by Wyeth or any of its Affiliates) because such Patent Rights are subject to the covenant not to sue set forth in Sections 2.2 hereof, Novopharm, in addition to making the payments required under Section 3.1 above, shall reimburse Wyeth for those royalties and payments within thirty (30) days after Wyeth incurring such payment obligations and invoicing Novopharm therefor. Novopharm shall have no obligation to so reimburse Wyeth prior to the time that Wyeth notifies Novopharm of the specific Patent Rights and the amount or rate of the reimbursement obligation. Within ten (10) business days after such notice, Novopharm may elect, by written notice provided to Wyeth, to irrevocably waive all rights it or any Affiliate of Novopharm has under any such covenant not to sue under this Agreement with respect to such Patent Rights. In the event that Novopharm makes such election, Novopharm shall have no obligation to reimburse Wyeth in connection therewith and shall have no right, title or interest under this Agreement or any of the other US Definitive Agreements with respect to such Patent Rights, it being understood and agreed that nothing in this Agreement shall thereafter prevent

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Licence Agreement (Canada)

Wyeth, any of Wyeth's Affiliates or any of Wyeth's licensors, licensees or collaborators from taking any action against Novopharm or Novopharm's Affiliates to enforce such Patent Rights subject to such election by Novopharm. Wyeth represents and warrants to Novopharm as of October 18, 2005 that, except for any Patent Rights that Wyeth has otherwise disclosed to Novopharm or its Affiliates on or before October 18, 2005 or that Novopharm or its Affiliates had actual knowledge of on or before October 18, 2005, Wyeth is not aware of any Patent Rights that would require Novopharm to pay any such reimbursement subject to the foregoing covenant not to sue if such Patent Rights are or if such Patent Rights were to be in-licensed as of October 18, 2005.

**3.3    Third Party Royalties.** Novopharm shall notify Wyeth if Novopharm or any of its Affiliates enters into any agreement with a Third Party that is reasonably expected to give rise to Third Party Royalties, and the amount or rate of the Third Party Royalties arising therefrom.

**3.4    Reports and Payments.** Within thirty (30) days after the end of each calendar month, Novopharm will provide Wyeth with a written report of all sales of Product in the Territory made by or on behalf of it or its Affiliates during such calendar month and all Gross Sales, Net Sales and Profits obtained as a result of such sales. Payment of all amounts due to Wyeth shall be made by wire transfer simultaneously with the submission of each such report. The payments to be made by Novopharm to Wyeth pursuant to this Agreement shall be made on the date each such payment is due and payable in Canadian dollars or such other currency as may be mutually agreed to by the Parties.

**3.5    Late Payments.** Any payment due to Wyeth from Novopharm that is not paid on or before the date such payment is due under this Agreement shall bear interest at a rate of twelve percent (12%) per annum.

**3.6    Taxes.** Novopharm and Wyeth shall be responsible for and shall pay all taxes payable on any income to Novopharm and Wyeth, respectively, arising from any payments by Novopharm. Each of Novopharm and Wyeth shall bear sole responsibility for payment of compensation to their respective personnel, employees or subcontractors and for all employment taxes and withholding with respect to such compensation pursuant to Applicable Law. Novopharm shall have the right to withhold income taxes in the event that the revenue authorities in the applicable country require the withholding of such taxes on amounts paid hereunder to Wyeth. Any such tax paid or required to be withheld by Novopharm on account of any payments payable to Wyeth under this Agreement shall be deducted from the amount of payments due Wyeth. Novopharm shall secure and promptly send to Wyeth, as applicable, proof of such taxes withheld and paid by Novopharm for the benefit of Wyeth. Each Party agrees to cooperate with the other Party in claiming exemptions from, and otherwise minimizing, such taxes under any statute or regulation from time to time in effect.

**3.7    Record Keeping by Novopharm; Audits.** Novopharm shall keep and shall cause each of its Affiliates to keep accurate books and accounts of record in connection with the sale of the Products in sufficient detail to permit accurate

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

determination of all figures necessary for verification of payments required to be paid hereunder. All such records shall be maintained for a period of at least three (3) years ("Audit Period") after the end of the year in which they were generated. Upon reasonable prior notice, for the sole purpose of determining whether Novopharm is in compliance with the payment provisions of this Agreement, Wyeth shall have the right to have an independent public accounting firm, reasonably acceptable to Novopharm and not paid in whole or in part by a contingent fee arrangement, access the books and records of Novopharm and each of its Affiliates as may be reasonably necessary to verify the accuracy of the reports and payments paid hereunder during regular business hours at Novopharm's offices and in such a manner as not to interfere unreasonably with Novopharm's normal business activities. In no event shall such audits be conducted hereunder more frequently than once every twelve (12) months. Prior to commencing any such inspection and audit, any such independent auditor shall have entered into a reasonable and customary agreement with Novopharm which prohibits the disclosure of any information relating to Novopharm to any party, including Wyeth, except that such auditor may issue a report to Wyeth, which report shall also be provided to Novopharm, the sole purpose of which shall be to report to Wyeth whether Novopharm is in compliance with the payment provisions of this Agreement, including a summary of and sufficient detail regarding the scope, quality, and methodology of such compliance or lack thereof. If such independent accountant concludes that Novopharm underpaid Wyeth during the period hereunder, Novopharm shall pay the additional payments plus all interest payments due thereon within thirty (30) days after the date Wyeth delivers to Novopharm such accountant's written report so concluding. If such independent accountant concludes that Novopharm overpaid Wyeth hereunder with respect to such period, Wyeth shall reimburse the overpaid amounts within thirty (30) days after such date. Costs for the audit will be paid by Wyeth unless there is a discrepancy in the amount paid of greater than seven and one half percent (7.5 %) in which case Novopharm shall reimburse Wyeth for the costs of the audit. In the event that Wyeth does not request to exercise its audit right during the Audit Period all of Novopharm's reports and payments for which the audit period has expired will be deemed final and binding. Wyeth shall treat all information received from Novopharm and/or the independent auditor under Section 3.3 and this Section 3.6 as Confidential Information of Novopharm pursuant to Article 6.

**3.8** **Record Keeping by Wyeth; Audits.** In the event that Novopharm is required to pay to Wyeth any Third Party Royalties as a result of Section 3.2 hereof, Wyeth shall keep and shall cause each of its Affiliates to keep accurate books and accounts of record in connection with any Third Party Royalties that Novopharm is required to reimburse Wyeth for pursuant to Section 3.2 in sufficient detail to permit accurate determination of all figures necessary for verification of Third Party Royalties required to be paid by Novopharm under Section 3.2. All such records shall be maintained for a period of at least three (3) years ("Audit Period") after the end of the year in which they were generated. Upon reasonable prior notice, for the sole purpose of determining whether Wyeth is correctly invoicing Novopharm for such Third Party Royalties in compliance with the requirements of this Agreement, Novopharm shall have the right to have an independent public accounting firm,

12

reasonably acceptable to Wyeth and not paid in whole or in part by a contingent fee arrangement, access the books and records of Wyeth and each of its Affiliates as may be reasonably necessary to verify the accuracy of the invoices submitted by Wyeth under Section 3.2 during regular business hours at Wyeth's offices and in such a manner as not to interfere unreasonably with Wyeth's normal business activities. In no event shall such audits be conducted hereunder more frequently than once every twelve (12) months. Prior to commencing any such inspection and audit, any such independent auditor shall have entered into a reasonable and customary agreement with Wyeth which prohibits the disclosure of any information relating to Wyeth to any party, including Novopharm, except that such auditor may issue a report to Novopharm, which report shall also be provided to Wyeth, the sole purpose of which shall be to report to Novopharm whether Wyeth is appropriately invoicing Novopharm for such Third Party Royalties. If such independent accountant concludes that the amounts invoiced by Wyeth were in excess of the amounts properly due during such period hereunder and Novopharm paid such excess amounts, Wyeth, within thirty (30) days after the date Novopharm delivers to Wyeth such accountant's written report so concluding shall provide a refund to Novopharm in the amount of such excess payments, unless such errors in invoicing were due to errors in Novopharm's reporting of Net Sales and Profits to Wyeth, whereupon Wyeth will issue a credit to Novopharm for such amount. If such independent accountant concludes that the amounts invoiced by Wyeth were less than the amounts properly due during such period, whether because of an error by Wyeth or an error by Novopharm in reporting Net Sales and Profits to Wyeth, any amount underpaid by Novopharm as a result thereof with respect to such period, shall be paid by Novopharm within thirty (30) days after Novopharm receives such accountant's report. Costs for the audit will be paid by Novopharm unless there is a discrepancy (other than as a result of errors in Novopharm's reports of Net Sales and Profits) in the amount paid of greater than seven and one-half percent (7.5%) in which case Wyeth shall reimburse Novopharm for the costs of the audit. In the event that Novopharm does not request to exercise its audit right during the Audit Period all of Wyeth's invoices for which the Audit Period has expired will be deemed final and binding. Novopharm shall treat all information received from Wyeth and/or the independent auditor under Section 3.2 and this Section 3.8 as Confidential Information of Wyeth pursuant to Article 6.

4   **REGULATORY MATTERS; COMMERCIALIZATION.**

**4.1    Regulatory Approvals.** Wyeth shall have no obligation to obtain, maintain or assist Novopharm in obtaining or maintaining any (except to the extent expressly provided in this Agreement) regulatory and governmental permits, licences and approvals for any Product.

**4.2    Pharmacovigilance.** Wyeth shall be solely responsible for all pharmacovigilance activities for the Reference Product, including: Adverse Event/Adverse Drug Reaction reporting including literature review and associated reporting; Adverse Event/Adverse Drug Reaction follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (e.g., Dear Doctor Letters, restriction on distribution).

Novopharm shall be solely responsible for all pharmacovigilance activities for the Product, including: Adverse Event/Adverse Drug Reaction reporting including literature review and associated reporting; Adverse Event/Adverse Drug Reaction follow-up reporting; preparation and submission of all safety reports to the regulatory authorities as required by local laws and/or regulations in the Territory; maintaining the local safety database; all interactions with health authorities regarding safety; periodic submissions; labeling modifications; safety monitoring and detection; and safety measures (e.g., Dear Doctor Letters, restriction on distribution).

## 5    INTELLECTUAL PROPERTY.

**5.1**    Enforcement and Defence. From the Signing Date through the end of the Sales Period, Wyeth and Novopharm will each promptly notify the other Party of any actual or potential infringement of the Patents arising from any Third Party making, using, selling, offering for sale, or importing or having imported any generic equivalent to Reference Product. Wyeth shall have the sole right, and shall use its commercially reasonable efforts, to address any such infringement. Novopharm will consult with Wyeth in such efforts. In addition, Wyeth will:

(i) Make all commercially reasonable efforts to maintain all Patents in good standing;

(ii) Make all commercially reasonable efforts to maintain the listing on the Patent Register of all Patents which are listed on the Patent Register; and

(iii) Make all commercially reasonable efforts to seek listing of Patents on the Patent Register.

Any such notice of actual or potential infringement shall include the then reasonably available evidence to support an allegation of infringement by such Third Party. Any recovery or damages derived from any suit or other action seeking to enforce or otherwise to cause the discontinuation of any infringement of the Patents or any other Patent Rights owned or controlled by Wyeth shall be retained exclusively by Wyeth.

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405501

**5.2    No Challenge.** As of the Signing Date, Novopharm and its Affiliates will not file any further opposition to CA Patent Application No. 2,199,778, and during the term of the licences granted hereunder will not challenge the patentability of any pending patent application of Patents to the extent that, but for the right and licence granted in Section 2.1, such Patents, if issued and successfully asserted, would prevent Novopharm from making, using, selling, offering for sale, importing or having imported Product. Nothing in this Agreement will be construed as an admission of any fact or of liability by any Party (including any admission by Novopharm as to the validity or enforceability of Patents or infringement thereof by any Product or its manufacture or use).

**5.3    General Mutual Release.** Effective as of the Signing Date, each of Novopharm and Wyeth, for each of its Affiliates, predecessors, successors and assigns, fully, finally and forever hereby releases and discharges the other Party and its Affiliates, predecessors, successors and assigns from any and all claims, damages and liabilities, known or unknown, asserted or unasserted, in law or equity, from the beginning of the world to the Signing Date, arising out of the Patents (or foreign counterparts thereof) or Product, other than with respect to the rights and obligations of the parties hereunder and under the US Definitive Agreements. This Section 5.3 shall survive expiration or termination of this Agreement.

**5.4    No Other Rights; Trade-marks.** Other than the licence rights expressly set forth above, this Agreement provides neither Party any right, title or interest, either express or implied, in or to any of the other Party's intellectual property rights, including any patent right, trade-mark, copyright, trade secret or know-how. Novopharm will comply with, and will not violate any rights of Wyeth under, any Applicable Laws relating to trade-marks, trade names or trade dress. Nothing in this Section 5.4 shall prevent Novopharm from referring to Wyeth's trade-marks, trade names, trade dress, label or product monograph solely for purposes of referring to Reference Product to obtain a NOC for Product.

# 6    CONFIDENTIALITY.

**6.1    Nondisclosure and Nonuse Obligations.** Each of Novopharm and Wyeth shall use Confidential Information of the Disclosing Party only in accordance with and as expressly permitted by this Agreement and shall not disclose to any Third Party any Confidential Information of the Disclosing Party, in each case without the prior written consent of the Disclosing Party, which consent may be provided or withheld in the Disclosing Party's sole discretion. The foregoing obligations shall survive the expiration or earlier termination of this Agreement for a period of ten (10) years. The foregoing non-disclosure and non-use obligations shall not apply to specific Confidential Information of a Disclosing Party that the Receiving Party can demonstrate

(i) is known by the Receiving Party at the time of its receipt other than through a prior disclosure by the Disclosing Party, as documented by business records;

(ii) is at the time of disclosure or thereafter becomes published or otherwise part of the public domain without breach of this Agreement by the Receiving Party;

15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405502

(iii) is subsequently disclosed to the Receiving Party by a Third Party who has the right to make such disclosure not in confidence;

(iv) is developed by the Receiving Party independently of access to or use of any Confidential Information received from the Disclosing Party and such independent development can be documented by the Receiving Party; or

(v) is required by law, regulation, rule, act or order of any governmental authority or agency to be disclosed by a Party to a Third Party, provided that to the extent practicable notice is promptly delivered to the Disclosing Party and the Receiving Party agrees to reasonably assist the Disclosing Party in order to provide an opportunity to seek a protective order or other similar order with respect to such Confidential Information and thereafter the Receiving Party discloses to the requesting entity only the minimum Confidential Information required to be disclosed in order to comply with the request, whether or not a protective order or other similar order is obtained by the other Party.

**6.2    Permitted Disclosures.** The Receiving Party may disclose specific Confidential Information of the Disclosing Party to its (or its Affiliate's) employees, consultants or professional advisors, only to the extent reasonably required to accomplish the purposes of this Agreement and only if the Receiving Party obtains prior written agreement from such employees and consultants and professional advisors (other than legal counsel who are otherwise obligated to maintain confidentiality) to hold in confidence and not make use of such Confidential Information for any purpose other than those permitted by this Agreement. The Receiving Party will use at least the same standard of care (but in no event less than a reasonable standard of care) as it uses to protect its own proprietary or confidential information of its own to ensure that such employees, agents, consultants or suppliers do not disclose or make any unauthorized use of the Confidential Information of the Disclosing Party. Additionally, a Receiving Party may use or disclose specific Confidential Information of the Disclosing Party to the extent it is necessary to do so to take action against the Receiving Party to enforce its rights under this Agreement.

Nothing in this Agreement shall prevent the Parties from disclosing to the Canadian Patent Office (for purposes of complying with section 50(2) of the *Patent Act*) or to Health Canada (for purposes of obtaining a NOC for Product) the fact that Novopharm is licensed under the Patents hereunder, but the foregoing shall not permit the disclosure of this Agreement or any other terms hereof.

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                      WYEFFAT2405503

**6.3** **Return of Confidential Information.** If this Agreement is terminated for any reason, then the Receiving Party, upon the request of the Disclosing Party, shall return to the Disclosing Party all copies of the Confidential Information received from the Disclosing Party hereunder, *provided, however,* that the Receiving Party's legal counsel may retain one copy of such Confidential Information in a secure location solely for purposes of determining such Party's continuing obligations under this Article 6.

**6.4** **Disclosure of Agreement.** The Parties agree that disclosure of the terms and conditions of this Agreement shall be subject to and governed by Section 7.D of the Settlement Agreement.

## 7 REPRESENTATIONS, WARRANTIES AND COVENANTS.

**7.1** **Representations and Warranties of Both Parties.** Each of Novopharm and Wyeth hereby represents, warrants and covenants to the other Party that, as of the Signing Date:

(a) it is a corporation or entity duly organized and validly existing under the laws of the state, province, country or other jurisdiction of incorporation or formation;

(b) the execution, delivery and performance of this Agreement by such Party have been duly authorized by all requisite corporate action and do not require any shareholder action or approval;

(c) it has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

(d) the execution, delivery and performance by such Party of this Agreement and its compliance with the terms and provisions hereof do not and will not conflict with or result in a breach of any of the terms and provisions of or constitute a default under any other agreement to which it or its Affiliates is a party;

(e) this Agreement is a binding obligation of it and its Affiliates, enforceable in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy and similar laws affecting creditors' rights, and, generally, to general equitable principles; and

(f) it shall at all times comply with all Applicable Laws relating to its activities under this Agreement.

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405504

**7.2 Representations and Warranties of Wyeth.** In addition to the representations and warranties set forth in Section 7.1, Wyeth represents and warrants to Novopharm as of the Signing Date that neither it nor any of its Affiliates has granted any licences, authorizations, waivers or other rights concerning any Authorized Generic Product.

**7.3 Representation by Legal Counsel.** Each Party represents that it has been represented by legal counsel in connection with this Agreement and acknowledges that it has participated in the drafting hereof. In interpreting and applying the terms and provisions of this Agreement, the Parties agree that no presumption shall exist or be implied against the Party which drafted such terms and provisions.

**7.4 No Other Warranties.** EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT , NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO . THE COMPOUND, THE PRODUCT OR NOVOPHARM'S USE THEREOF OR THAT THE COMPOUND, ANY PRODUCT OR NOVOPHARM'S USE OF ANY OF THE FOREGOING OR PRACTICE OF ANY OF THE RIGHTS LICENSED TO NOVOPHARM HEREUNDER WILL NOT INFRINGE ANY PATENT OWNED OR CONTROLLED BY ANY THIRD PARTY.

## 8 TERM AND TERMINATION.

**8.1 Term.** This Agreement shall become effective as of the Signing Date and, unless earlier terminated, shall continue in full force and effect until the Consideration End Date.

**8.2 Termination.**

**8.2.1 Material Breach.** Either Party may terminate this Agreement by written notice in the event of a material breach by the other Party, which breach remains uncured for a period of ninety (90) days after the non-breaching Party provides written notice of such breach to the allegedly breaching Party.

**8.2.2 Bankruptcy.** Either Party may terminate this Agreement if, at any time, the other Party shall file in any court or agency pursuant to any statute or regulation of any state or country, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of the Party or of its assets, or if the other Party proposes a written agreement of composition or extension of its debts, or if the other Party shall be served with an involuntary petition against it, filed in any insolvency proceeding, and such petition shall not be dismissed with sixty (60) days after the filing thereof, or if the other Party shall propose or be a party to any dissolution or liquidation, or if the other Party shall make an assignment for the benefit of creditors.

**8.3 Effects of Termination.** Upon termination of this Agreement, all of the corresponding rights and obligations under Articles 2, 3 (other than a final report under Section 3.4, Section 3.7 and Section 3.5 if applicable), 4, and 5 shall terminate,

18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY WYEFFAT2405505

and all rights and licences granted to Novopharm shall be immediately terminated. Termination of this Agreement shall have no effect on the Settlement Agreement. Termination of this Agreement shall not affect any rights or liabilities of the Parties which may have accrued prior to the effective date of such termination, including any liability Novopharm may have to make any payment that may be due with respect to activities occurring prior to the effective date of such termination. Upon termination or expiration of this Agreement, Sections 7.3 and 7.4 and Articles 1, 6, 8, 9, 10 and 11 of this Agreement will survive and continue in full force and effect.

**9    INDEMNIFICATION AND INSURANCE.**

**9.1    Indemnification.**

**9.1.1    Responsibility.** As between Wyeth and Novopharm, Wyeth shall be solely responsible for all product liability claims filed by any Third Party to the extent that they claim injury from the Reference Product or any Authorized Generic Products manufactured, sold or distributed by Wyeth or its Affiliates or any of their licensees. As between Wyeth and Novopharm, Novopharm shall be solely responsible for all product liability claims filed by any Third Party to the extent that they claim injury from the Product manufactured, sold or distributed by Novopharm or its Affiliates.

**9.1.2    Indemnification by Wyeth.** Wyeth shall indemnify, defend and hold harmless Novopharm, its Affiliates and their respective officers, directors, shareholders, employees, agents, representatives, successors and assigns, heirs, administrators, executors, suppliers and manufacturers (collectively, the "Novopharm Indemnitees") from any claims, losses, liabilities, costs, expenses (including reasonable attorney fees) and damages related to personal injury of any Third Party (collectively, a "Liability"), arising out of any product liability claim made by such Third Party to the extent that such product liability claim results from such Third Party being injured by the Reference Product or any Authorized Generic Product. Notwithstanding the foregoing, Wyeth shall have no obligations to any Novopharm Indemnitee under this Section unless Novopharm (i) gives Wyeth prompt notice of any claim or lawsuit or other action for which it seeks to be indemnified under this Agreement (ii) gives Wyeth sole control of the defence and all related settlement negotiations and (iii) cooperates fully with Wyeth and its agents in defence of the claims or lawsuit or other action. Novopharm shall have the right to participate in the defence of any such claim, complaint, suit, proceeding or cause of action referred to in this section utilizing attorneys of its choice. However, Novopharm shall bear the costs associated with its participation.

**9.1.3    Indemnification by Novopharm.** Novopharm shall indemnify, defend and hold harmless Wyeth, its Affiliates and their respective officers, directors, shareholders, employees, agents, representatives, successors and assigns, heirs, administrators, executors, suppliers and manufacturers (collectively, the "Wyeth Indemnitees") from any Liability (as defined in Section 9.1.2 above) arising out of any product liability claim made by such Third Party to the extent that such product liability claim results from such Third Party being injured by the Product.

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405506

Licence Agreement (Canada)

Notwithstanding the foregoing, Novopharm shall have no obligations to any Wyeth Indemnitee under this Section unless Wyeth (i) gives Novopharm prompt notice of any claim or lawsuit or other action for which it seeks to be indemnified under this Agreement (ii) gives Novopharm sole control of the defence and all related settlement negotiations and (iii) cooperates fully with Novopharm and its agents in defence of the claims or lawsuit or other action. Wyeth shall have the right to participate in the defence of any such claim, complaint, suit, proceeding or cause of action referred to in this section utilizing attorneys of its choice. However, Wyeth shall bear the costs associated with its participation.

**9.2     Insurance.** Wyeth acknowledges that Novopharm has insurance or maintains a self-insurance program sufficient to meet Novopharm's obligations under this article 9.2. Novopharm acknowledges that Wyeth maintains a self-insurance program sufficient to meet Wyeth obligations under this Article 9.2.

**9.3     Limitation of Liability.** WITH RESPECT TO ANY CLAIM BY ONE PARTY AGAINST THE OTHER ARISING OUT OF THE PERFORMANCE OR FAILURE OF PERFORMANCE OF THE OTHER PARTY UNDER THIS AGREEMENT, THE PARTIES EXPRESSLY AGREE THAT IN NO EVENT SHALL A PARTY BE LIABLE FOR PUNITIVE DAMAGES.

## 10  GOVERNING LAW; DISPUTE RESOLUTION.

**10.1     Governing Law; Jurisdiction.** This Agreement is subject to and governed by the laws of the Province of Ontario, and the laws of Canada applicable therein.

**10.2     Dispute Resolution.** The Parties recognize that a bona fide dispute as to certain matters under this Agreement may from time to time arise during the term of this Agreement. In the event of the occurrence of such a dispute either Party may, by written notice to the other Party, have such dispute referred to their respective officers (designated below) or their successors or designees for attempted resolution by good faith negotiations within thirty (30) calendar days after such notice is received. Said designated officers are as follows:

For Wyeth: Senior Vice President, Corporate Development, Wyeth

For Novopharm: Senior Vice President and General Counsel

In the event the designated officers are not able to resolve such dispute through good faith negotiations within such thirty (30) day period, either Party may pursue any legal or equitable remedies available to it by filing a claim in the Province of Ontario or the Federal Court of Canada as designated in Section 10.1. Notwithstanding the foregoing, nothing in this Section 10.2 shall prohibit a Party from seeking temporary or injunctive relief pending the resolution of a dispute in accordance with the provisions of this Section 10.2.

## 11  MISCELLANEOUS.

**11.1     Assignment.**

**11.1.1  Assignment by Novopharm.** Novopharm shall not assign this Agreement or any of its rights or obligations hereunder to any Third Party without the prior written consent of Wyeth, which consent may not be unreasonably withheld .

20

Notwithstanding, the foregoing, Novopharm may assign this Agreement in whole to any of its Affiliates, for so long as they remain Affiliates, or in connection with its merger, reorganization or consolidation or the sale of all or substantially all of its assets; *provided, however,* that such assignment shall not relieve Novopharm of any of its responsibilities for performance of its obligations under this Agreement. Novopharm shall promptly provide Wyeth with written notice of any such assignment.

**11.1.2  Assignment by Wyeth.** Wyeth shall not assign this Agreement or any of its rights or obligations hereunder to any Third Party without the prior written consent of Novopharm, which consent may not be unreasonably withheld. Notwithstanding the foregoing, Wyeth may assign this Agreement in whole to any of its Affiliates for so long as they remain Affiliates or in connection with its merger, reorganization or consolidation of the sale of all or substantially all of its assets to which this Agreement relates; *provided, however,* that (i) any such assignment shall not relieve Wyeth of any of its responsibilities for performance of its obligations under this Agreement, and (ii) in the event of any such assignment, no Patent Rights of the assignee shall be included in the Patent Rights licensed to Novopharm hereunder if such Patent Rights were not so licensed prior to such assignment.

**11.2  Binding Nature of Assignment.** This Agreement shall be binding upon and inure to the benefit of the legal representatives, successors and permitted assigns of the Parties. Any assignment not in accordance with this Section 11.1 shall be void.

**11.3  No Waiver.** The failure of either Party to require performance by the other Party of any of that other Party's obligations hereunder shall in no manner affect the right of such Party to enforce the same at a later time. No waiver by any Party of any condition, or of the breach of any provision, term, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach, or of any other condition or of the breach of any other provision, term, representation or warranty hereof.

**11.4  Severability.** If any provision of this Agreement or the application thereof to any Party or circumstance will, to any extent, be held to be invalid or unenforceable, then (i) the remainder of this Agreement, or the application of such provision to Parties or circumstances other than those as to which it is held invalid or unenforceable, will not be affected thereby and each provision of this Agreement will be valid and be enforced to the fullest extent permitted by law, and (ii) the Parties covenant and agree to renegotiate any such provision in good faith in order to provide a reasonably acceptable alternative to such provision or the application thereof that is invalid or unenforceable, it being the intent of the Parties that the basic purposes and business intent of this Agreement are to be effectuated, with the consequence that this Agreement shall terminate in full if the Parties are unable to renegotiate and agree on such provision.

**11.5  Relationship Between The Parties.** Wyeth and Novopharm are independent contractors under this Agreement. Nothing herein contained shall be deemed to

21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

create an employment, agency, joint venture or partnership relationship between the Parties or any of their agents or employees, or any other legal arrangement that would impose liability upon one Party for the act or failure to act of the other Party. Neither Party shall have any express or implied power to enter into any contracts or commitments or to incur any liabilities in the name of, or on behalf of, the other Party, or to bind the other Party in any respect whatsoever.

**11.6    Correspondence and Notices.** All notices given under this Agreement shall be in writing and delivered by hand or sent by nationally recognized overnight delivery service, prepaid registered or certified air mail, or by confirmed by prepaid first class, registered or certified mail letter, and shall be deemed to have been properly served to the addressee upon receipt of such written communication.

Notices to Wyeth shall be sent to:


Wyeth Pharmaceuticals
500 Arcola Road
Collegeville, Pennsylvania 19426
Attn: Senior Vice President, Corporate Business Development
Fax: (484) 865-6476


with a copy to:


Wyeth
5 Giralda Farms
Madison, New Jersey 07940
Attn: General Counsel
Fax: (973) 660-7156


and to:


Wyeth Pharmaceuticals
50 Minthorn Boulevard
Markham, Ontario
L3T 7Y2
Canada
Attn: Vice President Business & Corporate Affairs
Fax: (905) 470-4390


Notices to Novopharm shall be sent to:


Teva Pharmaceuticals North America

22

425 Privet Road
PO Box 1005
Horsham, PA 19044-8005 1090
Attention: General Counsel
Fax: (215) 293-6499

with a copy to:

Novopharm Limited
30 Novopharm Court
Toronto, Ontario
Canada
M1B 2K9
Attn: Director, Legal Affairs
Fax: (416) 291-0608

In the event that either Party changes its address, such Party shall promptly notify
and update the other Party in writing as to such change.

23

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405510

**11.7   Entire Agreement; Amendments.** This Agreement (including all of the attached Exhibits) and all the covenants, promises, agreements, warranties, representations, conditions and understandings contained herein, sets forth the complete, final and exclusive agreement between the Parties with respect to the subject matter hereof and supersedes and terminates all prior and contemporaneous agreements and understandings between the Parties with respect to the subject matter hereof, whether oral or in writing, including the Term Sheet, with respect to the subject matter hereof. There are no covenants, promises, agreements, warranties, representations, conditions or understandings, either oral or written, between the Parties with respect to the subject matter of this Agreement other than as are set forth in this Agreement . No subsequent alteration, amendment, change, waiver or addition to this Agreement shall be binding upon the Parties unless reduced to writing and signed by an authorized officer of each Party. No understanding, agreement, representation or promise, not explicitly set forth herein, has been relied on by either Party in deciding to execute this Agreement.

**11.8   Headings; Defined Terms.** The headings and captions used in this Agreement are solely for the convenience of reference and shall not affect its interpretation. The term "including" means "including, without limitation," and "herein", "hereof", and "hereunder" refer to this Agreement as a whole. The word "will" shall be construed to have the same meaning and effect as the word "shall".

**11.9   Counterparts.** This Agreement may be executed in one or more counterparts each of which shall be an original and all of which shall constitute together the same document. Facsimile execution and delivery of this Agreement by either Party shall constitute a legal, valid and binding execution and delivery of this Agreement.

**11.10   Further Actions.** Each Party agrees to execute, acknowledge and deliver such further instruments, and to do all other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement including any filings with any antitrust agency which may be required.

**11.11   References to ANDSs and NOCs.** References to any ANDS or NOC in this Agreement include, unless expressly indicated otherwise, all replacements, refilings, resubmissions, successors and all amendments, changes, additions and supplements to the foregoing.

24

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Agreement to be executed as of the Signing Date by their duly authorized representatives.

WYETH, ACTING THROUGH ITS                         NOVOPHARM LTD
WYETH PHARMACEUTICALS DIVISION


By: _____              By: _____
Name: Bernard J. Poussot                 Name:
Title: President                         Title:


                                         By: _____
                                         Name:
                                         Title:


WYETH PHARMACEUTICALS COMPANY,
INC.


By: _____
Name: Bernard J. Poussot
Title: President


WYETH-WHITEHALL
PHARMACEUTICALS INC.


By: _____
Name: Bernard J. Poussot
Title: President


WYETH PHARMACEUTICALS COMPANY


By: _____
Name: Bernard J. Poussot
Title: President


25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    WYEFFAT2405512

Licence Agreement (Canada)

**EXHIBIT 1.9**

## ELEMENTS OF COSTS OF GOODS SOLD

The following expenses are included in Costs of Goods Sold for purposes of this Agreement:

**1. Direct Materials**

Actual costs of the materials used in the manufacturing process that are traced directly to the completed Product, and include:

- Inert raw materials or excipients

- Active substances/ingredients at actual prices (without any mark-up if supplied by Teva Israel or any Affiliate of Teva), provided such prices are no greater than market prices

- Packaging components such as bottles, caps, labels, etc.

**2. Direct Labor**

The actual allocable cost of employees engaged in production activities which are directly identifiable with manufacturing the Product, but solely for *pro rata* costs allocable to the time such employees are working on Product manufacturing. Excludes supervision and production support activities such as inspection, plant and equipment maintenance labor, and material handling personnel. Direct Labor cost includes the allocable amounts of the following:

- Base pay, overtime, vacation and holidays, illness, personal time with pay and shift differential.

- Cost of employee fringe benefits such as health and life insurance, payroll taxes, welfare, pension and profit sharing.

**3. Allocated Costs**

Non-direct costs which are allocable to manufacturing the Product based on standard direct labor hours of the manufacturing process. These allocated costs include:

- Utilities - expenses incurred for fuel, electricity and water in providing power for production and other plant equipment

26

WYEFFAT2405513

Licence Agreement (Canada)

- <u>Maintenance and repairs</u> - amount of expense incurred in-house or purchased to provide services for plant maintenance and repairs of facilities and equipment.

- <u>Depreciation</u> - of plant and equipment utilizing the straight-line method of calculation.

- <u>Insurance</u> - cost of comprehensive and other insurance necessary for the safeguard of manufacturing plant and equipment.

- <u>Permits and Licences</u> - fees payable to governmental agencies or authorities to obtain or maintain permits or licences that are necessary for the operation of facilities used to manufacture the materials or Product, as applicable.

- <u>Costs of the following manufacturing services</u>

° Purchasing and Accounting

° Production Scheduling

° Inventory Management

° Plant Materials Management

° Supervision and Production Support

Various bases may be used for allocating these costs to manufacturing operating departments including headcount, square feet, metered utilities use, estimated services rendered, EDP computer hours, etc. For purposes of clarity, no overhead will be included in the calculation of Cost of Goods Sold for unutilized or underutilized facilities (*i.e.*, allowable overhead costs for a facility shall be allocated proportionately over the entire manufacturing capacity and other uses of the facility whether or not the entire manufacturing capacity or facility is being utilized).

4. Testing Costs - direct labor costs for Quality Assurance ("QA") testing and approving materials used in manufacturing and completed manufacturing batches and finished Products. This includes all manufacturing in-process testing and testing of finished materials. Excluded costs are QA costs related to research and development, except as they relate to the ongoing support of the manufacture of the Product hereunder.

5. Third Party Royalties, as applicable.

27

WYEFFAT2405514

SETTLEMENT AND RELEASE AGREEMENT

**Exhibit D**
**Scheduling Order**

[ATTACH ORDER]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Case 3:11-cv-05478-ZNQ-JBD    Document 856-10    Filed 11/06/25    Page 204 of 211
PageID: 19195

**LITE DEPALMA GREENBERG & RIVAS, LLC**
Allyn Z. Lite
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, New Jersey 07102-5003
(973) 623-3000

**GOODWIN PROCTER LLP**
Thomas L. Creel
Henry C. Dinger
Daryl L. Wiesen
Lana A. Shvartsman
Melissa L. Paddock
Exchange Place
Boston, MA 02109
(617) 570-1000

Attorneys For Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| WYETH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 03-1293 (WJM) |
| v. | ) |
| | ) |
| TEVA PHARMACEUTICALS USA, INC. and | ) |
| TEVA PHARMACEUTICAL INDUSTRIES | ) |
| LTD., | ) |
| | ) |
| Defendants. | ) |

### SCHEDULING ORDER

The parties having conferred with the Court regarding a proposed schedule,

IT IS this 24th day of _October_ 2005:

ORDERED that:

1.    Completion of execution-ready drafts of Definitive Agreements shall be

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                          WYEFFAT2405516

submitted to the Court not later than November 2, 2005;

    2.    The execution-ready Definitive Agreements shall be delivered to the Federal

Trade Commission for its review not later than November 2, 2005;

    3.    If the Federal Trade Commission has any objection to the Definitive Agreements,

it shall file such objection with the Court not later than December 2, 2005;

    4.    The parties may file briefs in response to any Federal Trade Commission

objection not later than December 17, 2005;

    5.    The Federal Trade Commission may file a reply brief, if any, not later December

24, 2005; and

    6.    The Court will schedule a hearing on any objection by the Federal Trade

Commission.

Honorable William J. Martini, U.S.M.J.

G:\Law\L34176\03\Pleading\Proposed Scheduling Order.wpd

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SETTLEMENT AND RELEASE AGREEMENT

Exhibit E
Orders
E-1 – DISMISSAL ORDER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WYETH,

Plaintiff,

v.

TEVA PHARMACEUTICALS USA, INC.
and
TEVA PHARMACEUTICAL INDUSTRIES
LTD.

Defendants.

No. 03-CV-1293 (WJM)

ORDER

As a result of the parties having executed the Settlement and Release Agreement dated November 2, 2005 and the License Agreement (as defined in the Settlement and Release Agreement), the Court hereby Orders:

1) Until the expiration of United States Patent Nos. 6,274,171 B1; 6,403,120 B1; and 6,419,958 B2; or the termination of the License Agreement, Defendants shall not make, use, sell, offer for sale, or import XR Product, as that term is defined in the License Agreement, for use in the Territory, except as licensed under the License Agreement.

2) Defendant's Counterclaim(s) of patent invalidity and unenforceability are dismissed with prejudice. Defendant's Counterclaim(s) of non-infringement are dismissed without prejudice.

3) The Settlement and Release Agreement and the License Agreement entered into between the parties, which have been filed with this Court [under seal], are adopted by the Court as part of this Order.

4) This Court retains jurisdiction to enforce this Order and the parties' Settlement and Release Agreement and License Agreement.

SO ORDERED.

_____
William J. Martini, U.S.D.J.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit E**
**Orders**

**E-2 – STIPULATION ORDER**

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WYETH,** | |
| **Plaintiff,** | |
| **v.** | No. 03-CV-1293 (WJM) |
| **TEVA PHARMACEUTICALS USA, INC.** and **TEVA PHARMACEUTICAL INDUSTRIES LTD.** | |
| **Defendants.** | |

**STIPULATED ORDER**

The parties hereby stipulate and agree that the Court may enter a permanent injunction in the following form:

1) The Court finds that Wyeth has complied with the terms of the Decision and Order of the Federal Trade Commission, Docket No. 9297, issued April 2, 2002.

2) It is hereby Ordered that Wyeth and Teva shall abide by the terms of the Settlement and Release Agreement, dated November 2, 2005, attached hereto as Exhibit 1.

SETTLEMENT AND RELEASE AGREEMENT

**TEVA PHARMACEUTICALS USA, INC. and
TEVA PHARMACEUTICAL INDUSTRIES LTD.**

By their attorneys,
LITE DEPALMA GREENBERG & RIVAS, LLC

By: _____

      Allyn A. Lite (AL-6774)
      Michael E. Patunas (MP-2306)
      Two Gateway Center, 12th Floor
      Newark, New Jersey 07102-5003
      (973) 623-3000

**WYETH**

By its attorneys,
GIBBONS, DEL DEO, DOLAN, GRIFFINGER
AND VECCHIONE

By: _____

      Kevin McKenna (KM 7530)
      One Riverfront Plaza
      Newark, New Jersey  07102
      (973) 596-4500

SO ORDERED.

_____
William J. Martini, U.S.D.J.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WYEFFAT2405520

SETTLEMENT AND RELEASE AGREEMENT

**Exhibit F**
**Redacted Forms of this Agreement and the Other Definitive Agreements**

To be prepared and mutually agreed to by the Parties as provided in Section 2.F.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SETTLEMENT AND RELEASE AGREEMENT

**Exhibit G-1**
**Press Releases**

Issued as of the Signing Date:

Teva and Wyeth Announce Settlement of Effexor XR® Litigation

Teva Pharmaceutical Industries Ltd. (Nasdaq: TEVA) and Wyeth (NYSE: WYE) today announced that they have reached agreement on the principal terms of a settlement of the U.S. patent infringement litigation pertaining to Teva's generic version of Wyeth's Effexor XR® antidepressant pending in the United States District Court for the District of New Jersey. The parties are currently drafting definitive agreements and intend to submit the settlement agreements to the Federal Trade Commission ("FTC"). The terms of the settlement are confidential and are subject to a number of conditions, including review of the settlement by the FTC and the approval of the District Court.

Plus each Party's customary legends

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SETTLEMENT AND RELEASE AGREEMENT

## Exhibit G-2
## Form of 8-K

On November 2, 2005, Wyeth and Teva Pharmaceutical Industries Ltd. announced that they have negotiated definitive agreements for the proposed settlement of the U.S. patent litigation pertaining to Teva's generic version of Wyeth's Effexor® XR antidepressant pending in the United States District Court for the District of New Jersey.

The proposed settlement is subject to a number of conditions, including review by the Federal Trade Commission ("FTC") and approval of the District Court. Wyeth and Teva will be submitting the definitive agreements to the FTC and the District Court shortly.

The patent rights involved in the pending litigation, which expire in 2017, relate to methods of using extended-release formulations of venlafaxine HCl, the active ingredient used in Effexor® XR. Teva has not challenged the Company's patent rights covering the compound, venlafaxine, which expire in June 2008.

Under the terms of the proposed settlement, the pending litigation would be dismissed and Teva would be permitted to launch generic versions of Effexor® XR (extended release capsules) and Effexor® (immediate release tablets) in the United States pursuant to the following licenses to be granted by Wyeth as part of the proposed settlement:

- a license (exclusive for a specified period and then non-exclusive) under Wyeth's United States patent rights permitting Teva to launch an AB rated, generic version of Effexor® XR in the United States beginning on July 1, 2010, subject to earlier launch based on specified market conditions or developments regarding the applicable patent rights, including the outcome of any future generic challenges to such patent rights; and

- an exclusive license under Wyeth's United States patent rights permitting Teva to launch an AB rated, generic version of Effexor® in the United States beginning on June 15, 2006, subject to earlier launch based on specified market conditions.

In connection with each of these licenses, Teva would pay Wyeth specified percentages of gross profit from sales of each of the Teva generic versions. These sharing percentages are subject to adjustment or suspension based on market conditions and developments regarding the applicable patent rights.

The parties also have negotiated arrangements with respect to generic versions of Effexor® XR in Canada, the terms of which remain confidential.

The above description is not intended to be a complete summary of all of the terms and conditions of the proposed settlement. Many of the terms and conditions of the proposed settlement remain confidential. There can be no assurance that the FTC and the District Court will not raise objections to, or request modifications to, the proposed settlement; that any such modifications will be acceptable to the parties; that the proposed settlement will be approved by the District Court; or that the proposed settlement will become effective on the terms currently proposed or at all.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY