William H. Trousdale
Tompkins, McGuire, Wachenfeld &
Barry LLP
3 Becker Farm Road, Fourth Floor
Roseland, New Jersey 07068-1726
Tel. (973) 622-3000
Fax (973) 623-7780
wtrousdale@tompkinsmcguire.com

Devora W. Allon, P.C.
Kevin M. Neylan, Jr.
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Tel: 212-446-4800
devora.allon@kirkland.com
kevin.neylan@kirkland.com

*Attorneys for Defendants Teva
Pharmaceutical Industries Ltd. and Teva
Pharmaceuticals USA, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Effexor XR Antitrust Litigation | Master Docket No. |
| | 3:11-cv-05479 (ZNQ/JBD) |
| This Document Relates To: | |
| All Direct Purchaser Class Actions | |

## TEVA'S OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

FACTS ......................................................................................................................... 3

ARGUMENT .............................................................................................................. 7

I.     DPPs Cannot Satisfy Rule 23(A)(1) Because They Fail To Show that Joinder Is Impracticable. ................................................................................ 9

     A.     This Court Must Conduct a "Rigorous" Analysis of Whether the Purported Class Is So Numerous That Joinder Is Impracticable. ................................................................................ 9

     B.     DPPs Fail to Show Joinder Is Impracticable Under *Modafinil*. ......... 12

          1.     Judicial Economy Supports Joinder ................................................ 12

          2.     The Proposed Class Members Have the Ability and Motivation to Litigate as Joined Plaintiffs. .................................. 17

          3.     Remote Participation Minimizes Geographic Dispersion ............ 23

          4.     Significant Financial Resources of Absent Class Members. ........ 24

     C.     The Proposed Class Includes No More Than 19 Members. ................. 25

          1.     Related Corporate Entities Should Be Combined. ........................ 26

          2.     28 Purchasers Are Uninjured ........................................................ 27

II.     DPPs Fail the Predominance Standard of Rule 23(B)(3). ............................. 31

     A.     DPPs' Expert Improperly Relies on Unsupported Hypothetical Assumptions from Counsel to Show Class-wide Impact. .................... 33

     B.     Dr. Leitzinger's Common Evidence Does Not Fit the Facts. .............. 36

     C.     Dr. Leitzinger's Use of Averages Masks Individualized Issues. ......... 39

III.     A Class Is Not the Superior Method of Adjudication ..................................... 40

CONCLUSION ........................................................................................................ 40

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Ollie's Bargain Outlet*,
  37 F.4th 890 (3d Cir. 2022) .................................................................................1, 10, 11, 12

*Am. Sales. Co. v. Pfizer, Inc.*,
  2017 WL 3669604 (E.D. Va. July 28, 2017), *report and recommendation
  adopted*, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017)...................................................25, 30

*In re AndroGel Antitrust Litig.*,
  2018 WL 3424612 (N.D. Ga. July 16, 2018).......................................................16, 20, 23, 26

*Burlington Drug Co. v. Merck & Co.*,
  No. 2:22-cv-00269 (E.D. Va. June 30, 2022), Dkt. No. 1 .....................................................15

*Gen. Tel. Co. v. Falcon*,
  457 U.S. 147 (1982)...........................................................................................................9, 10

*Gonzalez v. Corning*,
  885 F.3d 186 (3d Cir. 2018).................................................................................................8, 9

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)...............................................................................1, 10, 25, 32

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
  426 F.3d 694 (3d Cir. 2005)..................................................................................................11

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
  2017 WL 3705715 (E.D. Pa. Aug. 28, 2017) ...........................................................20, 23, 26

*In re Lamictal Direct Purchaser Antitrust Litig.*,
  2021 WL 2349828 (D.N.J. June 7, 2021)..........................................................30, 36, 39, 40

*In re Lamictal Direct Purchaser Antitrust Litig.*,
  957 F.3d 184 (D.N.J. 2020) ...........................................................................14, 16, 32, 33

*In re Lipitor Antitrust Litig.*,
  2024 WL 2866650 (D.N.J. June 6, 2024) ..................................................................... *passim*

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012)..................................................................................1, 7, 8, 9

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016)..................................................................................... *passim*

*In re Nexium Antitrust Litig.*,
  296 F.R.D. 47 ...................................................................................................26

*In re Niaspan Antitrust Litig.*,
  397 F. Supp. 3d 668 (E.D. Pa. Aug. 14, 2019) ........................................23

*In re Niaspan Antitrust Litig.*,
  464 F. Supp. 3d 678 (E.D. Pa. 2020) ........................................................28

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016).....................................................................................37

*Value Drug Co. v. Takeda Pharms, U.S.A., Inc.*,
  2022 WL 17177267 (E.D. Pa. Nov. 23, 2022) ............................... *passim*

*Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*,
  2023 WL 2314911 (E.D. Pa. Feb. 28, 2023) .................................. *passim*

*Wyeth v. Teva Pharms. USA, Inc.*,
  No. 2:03-cv-01293-WJM-RJH (D.N.J. Mar. 24, 2003)...........................5

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  2022 WL 1577219 (E.D. Va. Jan. 25, 2022) .................................. *passim*

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  7 F.4th 227 (4th Cir. 2021) .......................................................................13

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012).......................................................................38

**Rules**

Fed. R. Civ. P. 23 ....................................................................................... *passim*

## **INTRODUCTION**

This case should not proceed as a class action.  That procedural device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248 (3d Cir. 2016).  It follows that "not every group of plaintiffs should be granted class action status"; certification is proper only "if the trial court, is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).  "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012).  Direct Purchaser Plaintiffs ("DPPs") do not come close.

*First*, DPPs fail to prove by a preponderance of the evidence that the class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1). Lacking evidence specific to this case showing that absent class members could not practically join the case, DPPs ask the Court to apply an amorphous "relaxed burden" because the proposed class has more than 40 members.  But that is not the law. Although the "number of class members is the starting point of [the] numerosity analysis," *Modafinil*, 837 F.3d at 250, it is merely a "guidepost" and "showing the number of class members exceeds forty is neither necessary nor always sufficient" to satisfy Rule 23(a)(1), *Allen v. Ollie's Bargain Outlet*, 37 F.4th 890, 896 (3d Cir.

2022)—what matters is whether joinder is impracticable. That's why Judge Sheridan recently denied class certification to a similar group of plaintiffs (represented by the same counsel, who made the exact same arguments that DPPs make here) because joinder was not impracticable for a class of 63 members, *In re Lipitor Antitrust Litig.*, 2024 WL 2866650, at *4 (D.N.J. June 6, 2024), *appeal filed*, No. 24-2203 (3d Cir. July 8, 2024)—larger than the proposed class here (excluding Retailer Plaintiffs, who will surely opt out).

Whether a proposed class—whatever its size—is "so numerous" that joinder is "impracticable" under Rule 23(a)(1) requires a rigorous analysis of the facts and of the *Modafinil* factors. DPPs fail to engage in that analysis by pointing to evidence in this case, and instead speculate about what certain purported class members might do here based on what has happened in *other* antitrust cases. DPPs fail to present evidence that (1) proceeding as a class action would be substantially more efficient than joinder of all parties; or (2) absent class members lack the ability, motivation, and financial resources to litigate as joined plaintiffs. Rather than articulate why the circumstances of these particular plaintiffs would render joinder impracticable, DPPs' primary argument is that proceeding as a class is always going to be more efficient than joinder. Even if that's right, this does not support impracticability (as distinct from inconvenience) of joinder; it is instead a challenge to this Circuit's numerosity requirement itself, as DPPs' argument applies just the same to the joinder

of 10 or 20 plaintiffs, a number that presumptively fails the numerosity threshold. Worse still, DPPs inflate the size of the class by improperly including entities that lack antitrust injury—which is improper for numerosity purposes—or are otherwise improperly counted. When uninjured and improperly counted entities are excluded, the proposed class totals 19, a number that can easily proceed via joinder.

*Second*, DPPs fail to prove that Rule 23(b)(3)'s predominance requirement is satisfied. DPPs rely exclusively on the expert opinion of Dr. Jeffrey Leitzinger to argue that there is common proof of class-wide antitrust impact. But Dr. Leitzinger's impact opinion is fatally flawed for at least three reasons. *First,* Dr. Leitzinger's opinion is predicated entirely on *counsel-supplied* assumptions about but-for generic entry. Because Dr. Leitzinger's opinion is based on unsupported counsel-supplied assumptions, DPPs fail to carry their burden of demonstrating with factual evidence that that Rule 23(b)'s predominance requirement is satisfied. *Second*, Dr. Leitzinger relies on class-wide evidence that fails to accurately represent the market for Effexor XR and is thus incapable of establishing injury to *any* class members. And *third,* Dr. Leitzinger's methodology for calculating overcharges relies on the use of averages, which masks the presence of uninjured purchasers in the class and further shows that common issues do not predominate over individual ones.

## FACTS

***Class representatives and proposed class.*** DPPs seek to represent a proposed

direct purchaser class consisting of wholesalers and retailers that purchased Effexor XR from Wyeth and/or generic Effexor XR from Teva. DPPs' Memo. in Supp. of Mot. for Class Cert. (hereinafter "Mot.") at 1. DPPs allege Wyeth and Teva violated federal antitrust laws through an alleged reverse-payment patent settlement agreement that delayed market entry of generic Effexor XR. *Id.* at 5-9.

The three class representatives, Mot. at 1, 30 n.94, do not include the so-called "Big 3" wholesalers (Cardinal Health, AmerisourceBergen, and McKesson) that account for more than 85% of the alleged overcharges in this case. *See* Ex. 1, Expert Report of J. Leitzinger (May 15, 2025) ("Leitzinger Rpt.") Ex. 13.

***Patent litigation and settlement.*** When Wyeth launched Effexor XR in 1997, Effexor XR's active ingredient, venlafaxine, was protected through June 13, 2008 by the "Husbands" patent.[1] Three other patents—set to expire on March 20, 2017— also protected the extended-release form of venlafaxine and certain methods-of-use.[2] In December 2002, Teva filed an Abbreviated New Drug Application ("ANDA") seeking approval for generic Effexor XR. Teva's ANDA included a Paragraph IV certification challenging the 2017 patents, but not the Husbands patent.[3] In response,

---

[1]  Ex. 5, U.S. Patent No. 4,535,186 (filed Dec 30, 1983) (issued Aug. 13, 1985).

[2]  Ex. 6, U.S. Patent No. 6,274,171 (filed Dec. 30, 1999) (issued Aug. 14, 2001); Ex. 7, U.S. Patent No. 6,419,958 (filed May 19, 2000) (issued July 16, 2002); Ex. 8, U.S. Patent No. 6,403,120 (filed June 1, 2000) (issued June 11, 2002).

[3]  FDA, Approval Package for Venlafaxine Hydrochloride Extended Release Capsules, issued June 28, 2010, available at https://www.accessdata.fda.gov/

Wyeth sued Teva for patent infringement. *See Wyeth v. Teva Pharms. USA, Inc.*, No. 2:03-cv-01293-WJM-RJH (D.N.J. Mar. 24, 2003).

In November 2005, Wyeth and Teva settled the litigation. ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ The settlement agreement did not include a payment from Wyeth to Teva.

*DPPs' contentions regarding unlawful conduct and early entry.*  DPPs' Motion presents a liability theory supported only by bare allegations.  For example, DPPs argue that but for alleged "payments" from Wyeth to Teva, Teva would have launched generic Effexor XR "on or around May 15, 2009."  Mot. at 8.  But DPPs offer no factual support for that claim; they rely entirely on so-called expert opinion. *Id.*  At bottom, DPPs offer no proof that Wyeth and Teva would have agreed to an earlier licensed entry date in the absence of the alleged unlawful conduct.

*DPPs' class certification expert.*  DPPs' Motion relies almost exclusively on the report of Dr. Leitzinger, who opines: (1) that "[t]he delay in, and limits on,

---

drugsatfda_docs/anda/2010/076565Orig1s000.pdf.

4    Ex. 4, WYEFFAT2299808 (Wyeth and Teva U.S. Licensing Agreement dated November 2, 2005, ("U.S. Licensing Agreement")), at -9817, -9822-23, -9826. Note that Teva's generic version of Effexor IR was not an AG.

generic competition for Effexor XR alleged by Plaintiffs would have substantially increased the amounts paid by Class members" for Effexor XR and generic Effexor XR; (2) based on counsel-provided hypothetical but-for world generic entry patterns, that there is "evidence common to the proposed Class members" showing that the challenged conduct "highly likely caused each Class member to pay at least some overcharge" on its Effexor XR and generic Effexor XR purchases; (3) that "aggregate overcharges" for the class are approximately ███████ assuming a May 15, 2009 entry, and amounts lower than that for "alternative generic entry patterns" that counsel asked him to consider; and (4) that based on "assumed individual litigation costs of $3.7 million," 30 of the 59 purported class members (excluding Retailer Plaintiffs) would have negative value associated with individual litigation, and others would have claims of less than $1 million.  Leitzinger Rpt. ¶ 8.

Dr. Leitzinger's antitrust impact opinion—that there is common evidence of each class member paying an overcharge due to assumed delayed generic entry— *rests entirely on entry-date assumptions provided to him by counsel.  Id.* ¶¶ 28 ("Based upon the generic entry scenario I have been given from Counsel . . . ."), 41 ("I find it highly likely that under the generic entry scenario I've been asked to assume . . . each Class member paid at least some overcharge as a result of the challenged conduct.").  So, in addition to assuming that the settlement agreement illegally delayed generic entry, Dr. Leitzinger relies solely on assumptions from

6

counsel for the but-for world generic entry pattern. *Id.* ¶¶ 8(d), 28, 41. He thus limits his work to analyzing ten assumed generic entry "scenarios"—a "base" case scenario and nine alternatives—all provided by counsel in a bid to throw a bunch of entry dates against the wall to see what sticks. *Id.* Ex. 10. He then uses those assumed scenarios to calculate alleged aggregate overcharges. *Id.* at Exs. 12A, 12B.

Dr. Leitzinger also generally fails to probe key facts relevant to any antitrust impact analysis. For example, he ignores that different purchasers pay divergent prices for pharmaceutical products, and instead uses averages that obscure this significant disparity and so which fail to account for individualized impact. Further, to reach his impact conclusions, he relies on forecasts without analyzing their relevance or reliability and academic literature regarding general price and generic substitution rates that deviate from Effexor XR real-world experience. *See* Ex. 2, Expert Report of B. Stangle (July 17, 2025) ("Stangle Rpt.") ¶¶ 35-38 & n.55.

## <u>ARGUMENT</u>

"[T]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Modafinil*, 837 F.3d at 242. "[T]o justify this exception to the rule, 'every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3).'" *Id.* (quoting *Marcus*, 687 F.3d at 590).

Under Rule 23(a), a court may certify a class "only if":

7

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Pursuant to Rule 23(b)(3), the only provision of Rule 23(b) under which DPPs seek certification, the Court also must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

DPPs "bear[] the burden of establishing each element of Rule 23 by a preponderance of the evidence."  *Modafinil*, 837 F.3d at 248 (quoting *Marcus*, 687 F.3d at 591).  The Third Circuit has "repeatedly emphasized that actual, not presumed conformance with Rule 23 requirements is essential."  *Gonzalez v. Corning*, 885 F.3d 186, 192 (3d Cir. 2018) (cleaned up).  Thus, "the decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met" and "factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."  *Modafinil*, 837 F.3d at 248-49 (cleaned up).  Additionally, "a court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action."  *Id.* at 249.  Class certification is therefore "proper only if the trial court is satisfied, after a

*rigorous analysis*, that the prerequisites of Rule 23 are met." *Id.* (emphasis added);

*Gonzalez*, 885 F.3d at 192 ("A class action 'may only be certified if the trial court

is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been

satisfied.'" (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982))).

Here, the Court should deny DPPs' class certification motion because: (1) the

purported class is not so numerous as to make joinder impracticable;

(2) individualized issues regarding antitrust impact predominate; and (3) a class

action is not superior to other methods of litigating.

## I.    DPPS CANNOT SATISFY RULE 23(A)(1) BECAUSE THEY FAIL TO SHOW THAT JOINDER IS IMPRACTICABLE.

DPPs argue that joinder is impracticable because there are 59 purported class

members (excluding the eight Retailer Plaintiffs who will undoubtedly opt-out of

any class in all events).  Mot. at 16-18, Dkt. No. 819.  Each of DPPs' arguments fail.

### A.    This Court Must Conduct a "Rigorous" Analysis of Whether the Purported Class Is So Numerous That Joinder Is Impracticable.

*First*, DPPs try to skirt their burden "to show why joinder is impracticable,"

*Modafinil*, 837 F.3d at 259 (citing *Marcus*, 687 F.3d at 591, 595) (emphasis omitted).

At bottom, DPPs argue that because they have put forth a proposed class of more

than 40 members, they face a "relaxed burden," and this Court can simply rubber-

stamp that the numerosity requirement under Rule 23(a)(1) is satisfied based on the

purported size alone and without engaging in a detailed analysis of the *Modafinil*

9

factors.  Mot. at 17.  That is not the law.  DPPs misread *Allen*, which did not (and could not) overrule *Modafinil* and instead simply reiterated the standard that the Third Circuit laid out in *Modafinil* and earlier precedent: (1) for purported classes *over* 40 members, a court must ensure—through its baseline rigorous analysis—that a putative class plaintiff carried his or her burden to demonstrate by a preponderance of the evidence impracticability of joinder; and (2) for classes *under* 40 members, a court's analysis must be "particularly rigorous" in determining whether a plaintiff has demonstrated by a preponderance of the evidence the impracticability of joinder.

The law has long required that courts conduct a "rigorous analysis" of all Rule 23 prerequisites to class certification, regardless of the putative class's size. *Hydrogen Peroxide*, 552 F.3d at 309 ("Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met.") (quoting *Gen. Tel.*, 457 U.S. at 161).  In *Modafinil*, the Third Circuit reaffirmed that class certification is "only" proper if the court, after a "rigorous analysis," is satisfied that the party seeking certification has proven the Rule 23 prerequisites by a preponderance of the evidence.  837 F.3d at 249.  With respect to the Rule 23(a)(1) numerosity requirement, *Modafinil* recognized that purported classes with more than 40 members have often satisfied "the first prong of Rule 23(a)" under the facts of those cases.  *Id.* at 249-50.  But the panel reiterated that "courts are always under an obligation to ensure that joinder is impracticable" and "the number of class members

10

is the starting point"—not the *entirety* of—that rigorous analysis.  *Id.* at 250.  Under *Modafinil*, purported classes of more than 40 members are subject to Rule 23's typical rigorous scrutiny, which turns "particularly rigorous" for classes under 40 members.  *Id.*  Nothing in *Modafinil* suggested that the panel was changing the Third Circuit's Rule 23 rigorousness standard to craft some a bright-line rule only for Rule 23(a)(1), and only for classes larger than 40.[5]

In *Allen*, the Third Circuit again reaffirmed *Modafinil*'s class certification standard.  Citing *Modafinil*, the court in *Allen* recognized that a class of more than 40 putative class members does not "automatically satisfy Rule 23(a)(1)," but "faces a relaxed burden under our precedent."  37 F.4th at 896.  The court continued: "By contrast, the 'inquiry into impracticability should be particularly rigorous when the putative class consists of fewer than forty members.'"  *Id.* (quoting *Modafinil*, 837 F.3d at 250).  Read in context, it is clear that *Allen*'s reference to a "relaxed burden" was simply reiterating the *Modafinil* standard—albeit in inverse—that, whereas classes of less than 40 receive the heightened "particularly rigorous" analysis, classes of more than 40 members are subject to the relatively "relaxed" baseline rigorous standard.  *See id.*  *Allen* relied on *Modafinil* and surely did not purport to articulate a new, relaxed standard for classes of 41 or more members that would

---

[5] And, of course, it could not have done so.  *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 704 (3d Cir. 2005) ("[A] three-judge panel may not overrule a decision by an earlier panel.").

conflict with *Modafinil*.[6]  DPPs' suggestion that they can carry their burden to prove impracticability of joinder with some lesser showing is wrong.

### B.    DPPs Fail to Show Joinder Is Impracticable Under *Modafinil*.

To assess the impracticability of joinder under Rule 23(a)(1), courts consider: (1) judicial economy, (2) the ability and motivation to litigate as joined plaintiffs, (3) financial resources of class members, (4) the geographic dispersion of class members, (5) the ability to identify future claimants, and (6) whether the claims are for injunctive relief or for damages.  *Modafinil*, 837 F.3d at 253.[7]  Determining whether joinder is impracticable under the *Modafinil* factors calls for an "inherently fact-based analysis" that "requires a district court judge to take into account the context of the particular case." *Id.* at 249.  That in-depth analysis cannot be satisfied with a cursory inquiry limited to class size.

### 1.    Judicial Economy Supports Joinder

The focus of the judicial economy factor is "on whether the class action mechanism is substantially more efficient than joinder of all parties." *Modafinil*,

---

[6]  Nor would such a taxonomy make sense.  Under DPPs' position that *Allen* set a lower standard of review for over-40 classes, Rule 23(a)(1) would require *particularly* rigorous review for under-40 classes, *relaxed* review for over-40 classes, and would reserve standard rigorous review just for classes of *exactly* 40 members.  DPPs never explain why such a bizarre scheme would be appropriate.

[7]  The fifth factor (ability to identify claimants) and sixth factor (whether the claims are for injunctive relief) are not relevant here because DPPs' expert has identified all potential claimants who could join the class, and DPPs do not seek injunctive relief.  *See* Leitzinger Rpt. Ex. 6.

837 F.3d at 254. To do that, a court "examines the administrative burden that multiple or aggregate claims place upon the courts." *Lipitor*, 2024 WL 2866650, at *5. In assessing this factor, courts "are primarily concerned with 'docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record.'" *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, 2023 WL 2314911, at *9 (E.D. Pa. Feb. 28, 2023) (quoting *Modafinil*, 837 F.3d at 256-57). "Knowledge of existence, names, and addresses of all class members is critical to rendering joinder practical." *Id.* "Rule 23(a) imposes a 'high standard' when analyzing 'judicial economy as a factor.'" *Lipitor*, 2024 WL 2866650, at *5 (quoting *Value Drug*, 2023 WL 2314911, at *9); *accord In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 1577219, at *16 (E.D. Va. Jan. 25, 2022), *R. & R. adopted*, 342 F.R.D. 95 (E.D. Va. 2022); *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 235 n.5 (4th Cir. 2021) ("[I]n analyzing [the judicial economy] factor, district courts should bear in mind Rule 23(a)'s high standard, which asks whether a variety of factors make joinder not only uneconomical but also economically *impracticable*.").

DPPs offer no evidence showing that a class action would be substantially more efficient than joinder. Instead, they make two arguments, both of which are wrong. First, DPPs argue that the judicial economy factor weighs in favor of certification because "discovery into new plaintiffs results in myriad discovery disputes and related motion practice," pointing to the fact that when purported

13

classes were denied certification in *Value Drug*, *Zetia*, and *Lamictal*, those courts needed to resolve some discovery issues. Mot. at 20-21. But the Third Circuit is unequivocal that the judicial economy factor "does not permit consideration of . . . the need to conduct further discovery if the class is not certified." *Modafinil*, 837 F.3d at 256. This Court thus cannot consider the potential need to conduct further discovery as part of the judicial economy analysis. *See Lipitor*, 2024 WL 2866650, at *5 ("[T]he judicial economy prong . . . does not permit the consideration of the need to conduct future discovery in a Rule 23(a) numerosity analysis.").

That leaves DPPs with their only other argument: that—despite pointing to no evidentiary support in the record—judicial economy favors certification because "if all Class members had filed ***their own individual cases***" it could result in "the filing of multiple complaints"—"sometimes" with appearances of new counsel—and some plaintiffs "may" file in other jurisdictions. Mot. at 19-20 (emphasis added). This argument is a *non sequitur* that the Third Circuit has rejected: "The numerosity rule does not envision the alternative of individual suits; it considers only the alternative of joinder." *Modafinil*, 837 F.3d at 258; *see also id.* at 256 n.16 ("The possibility of individual suits filed in separate jurisdictions is not a consideration that a district court should entertain in deciding numerosity."). DPPs' argument speaks to supposed inefficiencies caused by absent class members electing to file new *non-joinder* actions—even filing new cases in new jurisdictions. The possibility that

14

absent class members will make strategic choices that intentionally burden the courts says nothing about the only relevant consideration under this prong: whether—if plaintiffs instead sought to preserve efficiency—they could practicability *join* the existing suit.[8] That absent class members might make different choices "do[es] not show why joinder is 'impracticable'; [it] simply show[s] that joinder may not be the preferred method of proceeding with the case." *Id.* at 258 n.24.

Regardless, even if DPPs' argument were on point (and not precluded by Third Circuit precedent), DPPs fail to explain why the 22 "experienced lawyers . . . who already entered appearances for [the putative class] would not be able to adequately represent joined parties." *Value Drug*, 2023 WL 2314911, at *11.[9] Additionally, there is no evidence that the "known [59] purchasers are not easily subject to service of process and notice, which eases the burden of joinder." *Id.* at *10; *see also Lipitor*, 2024 WL 2866650, at *6 (same).

---

[8]  For instance, by a motion for permissive joinder under Rule 20(a)(1) or for permissive intervention under Rule 24(b).

[9]  In all of DPPs' exemplar class-certification-denial cases but *Zetia*, every joinder plaintiff was represented by counsel who had already appeared for named plaintiffs. *See* cases cited at Mot. n.37-39, 44, 47, 49, 56. Even in *Zetia*, 70% of plaintiffs in the joinder action were represented by counsel for named plaintiffs. *Compare* Compl. at 92-95, *Zetia*, No. 2:18-md-02836 (E.D. Va. June 27, 2019), Dkt. No. 315, *with* Am. Joinder Compl. at 92-97, *Zetia*, No. 2:18-md-02836 (E.D. Va. Aug. 3, 2022), Dkt. No. 1642, *and* Joinder Compl. at 68-69, *Burlington Drug Co. v. Merck & Co.*, No. 2:22-cv-00269 (E.D. Va. June 30, 2022), Dkt. No. 1.

At bottom, DPPs' argument relies on evergreen issues that would favor certification *in all conceivable class cases*, irrespective of size or legal issue. DPPs say nothing at all about the particular difficulty or inefficiency of a joinder action comprising the number of absent class members here; they simply complain that joinder is always harder than class treatment. Perhaps so, but "not every group of plaintiffs" deserves class treatment, *Modafinil*, 837 F.3d at 242, so DPPs' position is a barely concealed facial challenge to this Circuit's numerosity requirement itself, *see* Mot. at 20 (listing supposed inefficiencies from "[d]enial of class certification on the basis of numerosity," but referencing cases where the class was below 40 members—*Lamictal* (32 members), *Zetia* (35 members), and *AndroGel* (33 members)). But "[t]he issue is whether joinder is impracticable; it is not whether class treatment is easier for counsel or the Court. It would almost always be easier to work with one party and lawyer as a matter [of] judicial economy." *In re Lipitor*, 2024 WL 2866650, at *6 (quoting *Value Drug*, 2023 WL 2314911, at *1).

"Given that DPPs have not shown 'the actual, practical difficulties of joining all the potential class members' by inquiring whether joinder 'would be expensive, time-consuming, and logistically unfeasible,' DPPs have not demonstrated by a preponderance of the evidence that judicial economy would be served by certifying the class." *Id.* (quoting *Modafinil*, 837 F.3d at 254). Judicial economy strongly supports joinder and does not support class certification.

### 2. The Proposed Class Members Have the Ability and Motivation to Litigate as Joined Plaintiffs.

The second *Modafinil* factor is whether the claimants have the ability and motivation to be joined as plaintiffs. "The purpose of this factor is to broaden the larger goal of Rule 23 to provide small claims plaintiffs with access to the judicial system." *Lipitor*, 2024 WL 2866650, at *6 (citing *Modafinil*, 837 F.3d at 257).

This "is not the typical class action where hundreds or thousands of claims are aggregated in order to ensure that the wrongdoer is held accountable and that small claims are vindicated." *Modafinil*, 837 F.3d at 259. Instead, just as in *Modafinil* and *Lipitor*, the proposed class here is dominated by the Big 3 wholesalers. Each is an absent class member and the trio accounts for more than 85% of the alleged damages. *See* Leitzinger Rpt. Ex. 13. The Third Circuit in *Modafinil* questioned the propriety of allowing the "Big 3" (making up 97% of total claims there) to "sit on the sidelines as unnamed class members." *Modafinil*, 837 F.3d at 259. Judge Sheridan in *Lipitor* similarly "harbor[ed] serious reservations" that the "Big 3" (making up 91% of total claims there) "can hardly be considered candidates who need the aggregative advantages of the class device." *Lipitor*, 2024 WL 2866650, at *7 (quoting *Modafinil*, 837 F.3d at 258). This Court should recognize this proposed class for what it is (a class dominated by the three largest wholesalers who are trying to remain on the sidelines despite claiming a supermajority of the alleged damages) and not

permit the subversion of "the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Modafinil*, 837 F.3d at 259.

Joinder is further practicable when "a number of the proposed class members share corporate ownership and a number of the class members work with one another through different aspects of their business." *Lipitor*, 2024 WL 2866650, at *8. Here, twelve proposed class members[10] are merged entities subject to common ownership with incentives for cooperation. Stangle Rpt. ¶¶ 61-66 & Exs. 1, 8. Given that the costs associated litigation are typically absorbed by the parent company, subsidiaries under common ownership can join the case with little to no added cost. *Id.* ¶ 76. As such, entities under common ownership can be consolidated as a single class member. *Id.* And several proposed class members have experience working together in aspects of their business, such as through group purchasing organizations and trade associations. *Id.* ¶¶ 79-84. Such coordination and relationships across a "broad time period" demonstrate the absent class members' "willingness and ability to cooperate" as joined plaintiffs. *Lipitor*, 2024 WL 2866650, at *8.

DPPs' arguments that certain absent class members would not be motivated or have the ability to join this suit are predicated on rank speculation piled on top of a methodology that has been repeatedly repudiated by this Circuit.

---

[10] H.D. Smith Wholesale; Valley Wholesale Drug; Harvard Drug; Burlington Drug; Schnucks Pharmacy; Bartell Drug Company; Duane Reade; Kerr Drug; Aetna; Express Scripts; Medco; and Kash n' Karry Food Stores.

*First,* DPPs' assertion that many class members have "small claims" relative to the cost of litigating this case uses the wrong dollar figure for a comparator and is thus irrelevant. Despite having this exact same argument rejected in *Modafinil*, *Value Drug*, and *Lipitor* (to name a few), DPPs' counsel directed their expert to compare each proposed class member's prospective recovery[11] against the (supposed) cost of each plaintiff litigating their own case individually, as opposed to the shared costs of all members collectively litigating one joinder action. *But see Modafinil*, 837 F.3d at 258 ("the numerosity rule does not envision the alternative of individual suits"); *Lipitor*, 2024 WL 2866650, at *7 (rejecting same argument because it went to "the economic feasibility of these individual entities bringing individual actions, not the economic feasibility of these entities being joined as parties in a traditional lawsuit"). DPPs have no evidence regarding "projected costs of litigation through joinder for each purchaser and how those costs compare to the size of the claims," *Value Drug*, 2023 WL 2314911, at *12-13, and absent such a "benchmark against which to evaluate the negative claims argument" this Court should refuse to "speculate as to these costs," *Lipitor*, 2024 WL 2866650, at *7.[12]

---

[11] Even these values are of dubious provenance, as they rely on Dr. Leitzinger's damages calculations, *see* Leitzinger Rpt. ¶¶ 59-61, which depend on speculative counsel-provided generic entry dates with no factual basis, *see* Stangle Rpt. § III.

[12] Even if the methodology were appropriate, DPPs—without explaining why it is an apt benchmark—use *Nexium*'s $3.7 million in fees as the comparator for class member recovery. But roughly 80% of *Nexium*'s sum was for expert fees, which DPPs already incurred and are easily shared, *see* Leitzinger. Rpt. ¶ 59 n.70, and

More fundamentally, DPPs' premise that an entity with a negative value claim necessarily lacks ability or motivation to litigate via joinder is refuted by DPPs' own conduct here (and elsewhere). Here, *named plaintiff* Uniondale Chemists is the class member with the smallest potential recovery, just ████ trebled. Stangle Rpt. ¶ 86; Leitzinger Rpt. Ex. 13. Similarly, in *Lipitor*, named plaintiff Professional Drug Company had the seventh-lowest damages, just $23,000 trebled. Br. of Appellees, *In re Lipitor Antitrust Litig.*, No. 24-2203 (3d Cir. Dec. 30, 2024), Dkt. No. 66 at 41-42. Given that, if anything, named plaintiffs bear *a heavier* economic burden than joinder plaintiffs because they cannot share costs among dozens of plaintiffs, as joinder plaintiffs can, *see* Stangle Rpt. ¶¶ 86-87, DPPs cannot credibly insist that claims worth less than $3.7 million render litigation impracticable. Under DPPs' approach, named plaintiffs *in this case* (and in similar cases) never would have sued. Plainly, DPPs' framework is wrong, or prospective plaintiffs have different motivations for filing suit (or both). Either way, the possibility that class members have negative-value claims is not predictive of their decision to join suit.

*Second*, DPPs suggest that the fact that 30 class members here were absent class members in one or more previous cases where class certification was denied,

---

fee burdens are minimized where attorneys' fees are available and the case can be litigated on contingency. *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2017 WL 3705715, at *9-10 (E.D. Pa. Aug. 28, 2017) (contingency fee "undermines" negative value claims); *In re AndroGel Antitrust Litig.*, 2018 WL 3424612, at *3 (N.D. Ga. July 16, 2018) (similar).

and did not thereafter file suit, is "powerful evidence that, if the proposed Class here were not certified, at least 30 Class members (nearly half of the Class) lack the "ability and motivation to litigate as joined plaintiffs." Mot. at 22; *see also id.* at 10-16. In truth, one would be hard pressed to find *less* powerful evidence. A cursory review of the 30 listed entities confirms that DPPs' position flunks the smell test. Among the entities DPPs insist categorically "lack the ability" to litigate here are— incredibly—Walmart (#1 on 2025 Fortune 500), Optum Rx (subsidiary of #3 ranked UnitedHealth), Cigna and subsidiaries Express Scripts and Medco (#13), Humana (#39), and Henry Schein (#333); Delhaize America, subsidiary of Ahold Delhaize (€89.4 billion 2024 revenue); Schnucks ($3.1 billion); and WakeFern Food ($20.1 billion).[13] DPPs offer no basis to believe that the biggest companies in the country lack the financial or institutional wherewithal to join this litigation; if anything, the makeup of DPPs' list confirms that many considerations, apart from finances, go into a company's decision to litigate. But more fundamentally, DPPs' premise (that declining to sue after class certification denial is an immutable characteristic) is a logical fallacy. Evidence that an absent class member did not file a joinder action in a different case, involving different drugs, and unknown claims values is not evidence of the entity's lack of motivation in this action. *See Value Drug*, 2023 WL

---

[13] Ex. 9, Fortune 500 Data at 1-3, 19; Ex. 10, Press Release at 2; Ex. 11, Forbes Company Overview at 1; Ex. 12, Press Release at 1.

2314911, at *12; *Zetia*, 2022 WL 1577219, at *21 (rejecting same argument (from same counsel) because the "fact that some putative class members 'did not pursue litigation in a different case' does not prove 'that they would find it economically impracticable to pursue . . . claims in this case'" and "any inference that joinder was impracticable in those cases is insupportable as other factors may have contributed to their decision."). This is especially so because DPPs offer no evidence that these 30 entities have lower-value claims here, or that, accounting for cost sharing among joined plaintiffs, any lower-value claimant would not litigate jointly *here*.[14]

*Third*, DPPs speculate with no factual support that some absent class members may forego filing individual suits due to fear of retaliation. Again, DPPs rely on no evidence from this case, and instead point to affidavits filed by absent class members in *other* cases (*Modafinil* and *Zetia*), in which courts *denied* class certification notwithstanding those affidavits. Mot. at 23. Absent class members may forego an individual action for many reasons, including the assessment that the case has no merit or competing priorities internal to the class member. The Court should decline

---

[14] DPPs point to affidavits filed by two class members who did not join suit in *Zetia* saying they would "likely not be able to pursue [their] clam" in a joinder action. Mot. at 23. Yet this "real-world evidence" refutes DPPs' argument. DPPs highlight that one of the affiants—Pharmacy Buying Association—is a class member here, and invite the Court to infer that this entity would refuse to join here for the same reasons. But DPPs omit that their expert tallies Pharmacy Buying Association's damages *here* to exceed ███████, well above even DPPs' incorrect negative value threshold. DPPs' evidence proves that class member decisions in different cases have no probative value for how they would act here.

DPPs' invitation to speculate about what absent class members might do here, or why, and should join the host of courts that routinely reject generalized arguments about wholesalers' supposed class-wide fear of retaliation. *Value Drug*, 2023 WL 2314911, at *12 ("Value Drug points to fear of retaliation and lack of joined parties following the denial of class certification in *In re Modafinil*, *In re Zetia*, and *AndroGel*, but we cannot extrapolate or speculate those same realizations are true here."); *In re Niaspan Antitrust Litig.*, 397 F. Supp. 3d 668, 678 (E.D. Pa. Aug. 14, 2019) ("DPPs do not provide any evidence that the putative class members in this case fear retaliation or that participation through joinder sparks greater fear of retaliation than does participation through a class action."); *King Drug Co.*, 2017 WL 3705715, at *10 (same); *In re Zetia*, 2022 WL 1577219, at *18 (same).

DPPs have not presented any evidence to support their speculation that some absent class members may not have the ability and/or motivation to litigate this case as joined plaintiffs. And the facts suggest the opposite is true. This factor strongly weighs in favor of joinder and denying class certification.

### 3.    Remote Participation Minimizes Geographic Dispersion.

The third *Modafinil* factor asks courts to look at the geographic location of the putative class members. But this factor is given little weight when "addressing known large-scale entity drug purchasers in an antitrust claim." *Value Drug*, 2023 WL 2314911, at *11. And "this factor standing alone does not outweigh the power

of the first two impracticability factors nor does it address technological advancements after the COVID-19 pandemic that permit courts to regularly conduct remote proceedings." *In re Lipitor*, 2024 WL 2866650, at *8. DPPs ignore that practical reality. *Value Drug*, 2023 WL 2314911 at *5 (explaining that courts "have proven their ability to facilitate remote participation throughout the COVID-19 pandemic"). This Court has already held remote conferences, and nothing indicates it could not continue to do so if this case proceeds as a joinder action. *See, e.g.*, Dkt. No. 804 (ordering a telephone status conference). This factor is neutral.

### 4. Significant Financial Resources of Absent Class Members.

DPPs present no evidence that absent class members do not have the financial resources needed to litigate through joinder. That is not surprising. The Big 3 wholesalers—who account for more than 85% of the total damages—"have annual revenue in the billions." *Zetia*, 2022 WL 1577219, at *22; Stangle Rpt. ¶ 83. And, as courts have found in similar cases dealing with similar plaintiffs (many of which overlap here), the other "proposed class members are all sophisticated entities." *Value Drug*, 2023 WL 2314911, at *13; *Zetia*, 2022 WL 157719, at *22 (same). Because DPPs do not even try to argue that any class member does not have the needed financial resources required to litigate jointly, this factor strongly weighs against class certification. *See Lipitor*, 2024 WL 2866650, at *8.

24

All factors either weigh in favor of joinder or are neutral, so DPPs have not carried their burden to prove impracticability of joinder. Under any standard, but especially under the rigorous review mandated here, DPPs have not established the requirements of Rule 23(b)(3). The Court should deny class certification.[15]

### C.    The Proposed Class Includes No More Than 19 Members.

Plaintiffs have failed to show that joinder is impracticable even if the proposed class has 59 members (or 67 if it includes the Retailer Plaintiffs who will surely opt out). In reality, the proposed class is far smaller—numbering no more than 19— when entities with common ownership are properly accounted for and uninjured entities are excluded. Of DPPs' putative class, (1) 12 proposed class members should be consolidated with entities with which they share common ownership, *see* Stangle Rpt. ¶¶ 61-66; (2) and 28 proposed class members must be excluded as uninjured, *see id.* ¶¶ 67-73, so cannot be counted for numerosity purposes, *see Hydrogen Peroxide.*, 552 F.3d at 311 ("Every class member must prove at least some antitrust impact."); *Am. Sales. Co. v. Pfizer, Inc.*, 2017 WL 3669604, at *6–7, *9 (E.D. Va. July 28, 2017), *R. & R. adopted*, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017) (excluding for numerosity entities with insufficient evidence of injury).[16]

---

[15]    The fact that the Court approved a similar class for purposes of DPPs' settlement with Wyeth is of no help to DPPs. *See* Mot. at 27-28. DPPs' motion to certify the Wyeth settlement class was, by agreement, unopposed, and cannot control the outcome of this opposed motion. *See* Dkt. No. 729-2 at 7.

[16]    DPPs' failure to offer evidence of injury for many of the purported class members

The result: a class of only 19, a number no court has certified in a case alleging generic delay. *See Lipitor*, 2024 WL 2866650, *2 (63-member class denied); *Value Drug*, 2023 WL 2314911, at *7 (49-member class denied); *King Drug*, 2017 WL 3705715, at *7-11 (24- or 25-member class denied); *AndroGel*, 2018 WL 3424612, at *2 (33-member class denied); *Zetia*, 342 F.R.D. at 98 (35-member class denied).

## 1. Related Corporate Entities Should Be Combined.

Plaintiffs cannot artificially inflate the class size by attempting to double-count related corporate entities. *See In re Nexium Antitrust Litig*., 296 F.R.D. 47, 51 (D. Mass. 2013) (excluding, for numerosity, entities combined "with their parent corporations"). Conceding this, DPPs instructed Dr. Leitzinger to combine certain related entities for numerosity purposes. Leitzinger Rpt. ¶ 33. However, an additional 12 proposed class members share common corporate ownership and should be combined, too. Stangle Rpt. ¶¶ 61-66; *see also supra* note 10.

DPPs argue that these 12 entities should not be merged with their corporate parents because each is a "distinct legal entity." Mot. at 18. That misses the point. Whether joinder is practicable, the Circuit has made clear, is not a counting game. Entities that share common ownership and exist in the same corporate apparatus—

---

is likewise fatal under the Rule 23(b)(3) predominance inquiry. *See infra* § II.B. Although some courts have noted that the class size analysis is best addressed under the predominance framework, *e.g.*, *Lipitor*, 2024 WL 2866650, at *4, it is equally relevant to the numerosity inquiry because the class size is meaningfully smaller than DPPs say, so joinder is even more practicable.

even if technically separate legal entities—likely use the same counsel and decision makers, and share expenses. Stangle Rpt. ¶ 76. And, from an economic perspective, merged entities should be considered as a single entity because any alleged overcharges would be collected by the consolidated entity. *Id.* From a practicability of joinder perspective, it makes sense to treat them as a single entity.[17]

## 2.    **28 Purchasers Are Uninjured**

DPPs' proposed class is further inflated because it includes 28 class members for whom injury cannot be established on class-wide basis through common evidence, and who must thus be excluded from the class. These entities can be split into four categories: (1) 7 class members are "brand-only" purchasers who cannot prove injury because there is no evidence they would have purchased generic Lipitor had it been available earlier during the class period; (2) 1 class member, Uniondale Chemists, is a direct purchaser only by assignment from QK Healthcare—itself an uninjured brand-only purchaser—so is likewise uninjured; (3) 19 class members are "generic-only" purchasers for which DPPs provide no evidence of a generic entry pattern that would have allowed them to purchase generic Effexor at a lower price, but instead rely entirely on speculative entry dates conjured by counsel without

---

[17]    In addition to being merged entities, three class members—MedCo, Express Scripts, and Aetna—paid lower generic prices than Dr. Leitzinger's average but-for generic price, so were not injured by the challenged conduct. Stangle Rpt. ¶45 & Ex. 3. These entities should be excluded from the class on that basis alone.

factual support; and (4) 1 class member, Discount Drug Mart, is a brand-generic purchaser that only purchased brand Effexor XR prior to May 15, 2009, when no generic was available in either the actual or but-for worlds, and thus could not have been harmed during this time.  Stangle Rpt. ¶¶ 67-74.

*Brand-Only Purchasers.*  A brand-only purchaser only ever bought brand Effexor XR or continued to buy only brand Effexor XR even after a generic version was available during the Class Period.  *See In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 715 (E.D. Pa. 2020).  DPPs do not claim that the price of Effexor XR was inflated so do not seek overcharges for brand purchases in the Class Period that would have stayed brand purchases in the but-for world.  Leitzinger. Rpt. ¶ 38 n.56.

DPPs concede that certain brand-only purchasers were uninjured, so expressly define them out of the proposed class.  Mot. at 1.  Nevertheless, contrary to DPPs' class definition, Dr. Leitzinger includes the seven brand-only purchasers identified by Defendants by speculating that in the but-for world they would have substituted some generic Lipitor for brand purchases.  This conjecture discards the actual evidence that these entities *never* purchased generic Effexor XR when it was available during the Class Period or for months and even years thereafter—until after mass entry on June 1, 2011, at which point there were *nine* generic Effexor XR manufacturers and the per-pill price was around 95% below the brand price.  Leitzinger Rpt. ¶ 21.  Dr. Leitzinger offers no support for his position.  Nor is his

position internally consistent: Dr. Leitzinger acknowledges that direct purchasers who continued to buy only Effexor XR even after Teva's generic Effexor XR entered the market are not part of the class because they have not suffered injury, *id*. ¶ 5 n.5, and he also excludes Giant Eagle from his class list because it only purchased generic Effexor XR after mass generic entry on June 1, 2011, *see id*. Ex. 5; Stangle Rpt. ¶ 12 n.27.[18]  Indeed, DPPs present no evidence that these seven purchasers who did not switch to generic Effexor XR in the year that Teva's generic was available would have switched to purchase generic Effexor XR in the but-for world that, even under DPPs' concocted but-for generic entry pattern, would have at most *three* generics (as compared to the nine actually selling when these purchasers finally switched) and a per-pill price that was at least 10-times higher than the actual price that finally got these purchasers to switch to generic.  Leitzinger Rpt. ¶ 21 & Ex. 11.  Regardless, such a specific counter-factual would require an individualized inquiry into each purchasers' practices, itself unsuited for class treatment.

    ***Uniondale Chemists.***  Uniondale Chemists did not make any direct purchases; its claim to class membership is based solely on an assignment from QK Healthcare.

---

[18]  Although Giant Eagle did not directly buy brand product during the class period, that fact is irrelevant to class membership:  if a direct purchaser did not buy generic Effexor XR during the class period, it cannot have suffered harm.

Stangle Rpt. ¶ 68.  Because QK Healthcare is a brand-only purchaser, Uniondale

Chemists should be excluded for the same reasons.[19]

*Generic-Only Purchasers.*  A generic-only purchaser is one that purchased

only generic Effexor directly from Teva during the alleged class period.  DPPs fail

to show that generic-only purchasers suffered any antitrust injury.  *See Am. Sales*,

2017 WL 3669604, at *6–7, *9 (excluding generic-only purchasers because of

insufficient evidence of antitrust injury); *In re: Lamictal Direct Purchaser Antitrust*

*Litig.*, 2021 WL 2349828, at *1 (D.N.J. June 7, 2021) (declining to certify class as

to generic-only purchasers because no class-wide evidence of injury).

As discussed below, *infra* § II.A, Dr. Leitzinger opines that generic-generic

overcharges arise because DPPs bought generic Effexor XR at higher prices than

they would have in his but-for world in which more generics would have been on

the market earlier.  Stangle Rpt. ¶ 69.  That contention fails because it depends

entirely on unsupported, hypothetical generic entry scenarios provided by counsel,

which assume that Teva, Mylan, and an authorized generic would have entered

earlier than they actually did.  *Id.*  DPPs offer no factual proof that *any* generic would

have been willing or able to launch earlier than it did in the real world.  *Am. Sales*,

2017 WL 3669604, at *6–7 (excluding generic-only purchasers as uninjured where

---

[19]  For this reason, Uniondale Chemists is also not an adequate representative of the
proposed class and does not meet the prerequisite of Rule 23(a)(4).

Dr. Leitzinger crafted a but-for world based only on forecasts for a hypothetical four-generics market, when the real world had five generics in such period). As Dr. Leitzinger's antitrust impact opinion is based on such earlier entry, there is no evidentiary support for antitrust impact on generic-only purchasers. *Infra* § II.A. Generic-only purchasers should thus be excluded from the purported class.

**Discount Drug Mart.** Discount Drug Mart is a generic-generic purchaser that bought brand Effexor XR only *before* Dr. Leitzinger's but-for entry date for Teva (May 15, 2009). Because even in the imagined but-for world, Discount Drug Mart could not have substituted Effexor XR purchases for a lower-cost generic, it could not have been injured on its brand purchases. This leaves just its generic purchases during the class period, for which DPPs cannot show injury for the reasons explained above regarding generic-only purchasers. *See* Stangle Rpt. ¶ 73.

*    *    *

Subtracting out these 40 additional entities (12 of which have been merged and 28 of which are uninjured) means that, at best, the proposed class contains 19 members, an amount far too low to warrant class certification under any standard.

## II.    DPPS FAIL THE PREDOMINANCE STANDARD OF RULE 23(B)(3).

DPPs also fail to prove that "questions of law or fact common to class members predominate over . . . questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance tests whether a proposed class is sufficiently

31

cohesive to warrant adjudication by representation and imposes a hurdle far more demanding than Rule 23(a)'s commonality element. *Hydrogen Peroxide*, 552 F.3d at 310-11. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Id*. at 311.

DPPs fail the predominance test. To prove antitrust impact, DPPs must prove that each class member can show injury (*i.e.*, that it paid an overcharge) due to the allegedly unlawful conduct. *Id*. DPPs therefore must show that "antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id*. at 311-12. The Third Circuit directs district courts to apply a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Id*. Part of this rigorous analysis involves considering and "weigh[ing] conflicting expert testimony." *Lamictal*, 957 F.3d at 188. "[W]here an expert's model is the basis for a plaintiff's claim of classwide impact and causation, a court is obliged to rigorously examine the soundness of that model at the class certification stage. A court may certify a class under these circumstances only where the Court finds the model methodologically sound." *Value Drug*, 2022 WL 17177267, at *10.

DPPs' flawed predominance arguments fail to satisfy the required "rigorous assessment" regarding antitrust impact because they lack evidentiary proof. DPPs rely entirely on expert testimony from Dr. Leitzinger. Mot. 34-37. But his antitrust

32

impact opinions cannot carry that water for DPPs because: (1) his conclusion is entirely built on unsupported counsel-supplied generic entry dates; (2) his class-wide evidence does not fit the case, so cannot prove injury for any class member; and (3) his reliance on average prices improperly masks uninjured class members. Courts have rejected class certification in similar antitrust cases on these grounds. *See Lamictal*, 957 F.3d at 189-94; *Value Drug*, 2022 WL 17177267, at *8-11.

## A.    DPPs' Expert Improperly Relies on Unsupported Hypothetical Assumptions from Counsel to Show Class-wide Impact.

Dr. Leitzinger's antitrust impact opinion is unreliable as the key input to his analysis—the timing of but-for generic entry—is based on unsupported hypothetical scenarios provided by counsel. *See* Leitzinger Rpt. ¶¶ 28 ("Based upon the generic entry scenario I have been given from Counsel, absent the challenged conduct there would have been three generic competitors (including an AG) during that same time period instead of only one (two generics would have launched initially, and then one additional generic would have launched before July 1, 2010)."); 41 ("I find it highly likely that under the generic entry scenario I've been asked to assume . . . each Class member paid at least some overcharge as a result of the challenged conduct.").

"To determine whether the putative class has satisfied predominance (indeed, all applicable Rule 23 requirements)," courts in the Third Circuit "must conduct a 'rigorous analysis' of the evidence and arguments presented." *Lamictal*, 957 F.3d at 190–91. This "rigorous analysis" requires the court to "carefully examine, at the

33

class certification stages, the soundness of an expert's model relied upon to establish classwide impact." *Value Drug*, 2022 WL 17177267, at *10. DPPs' "proof of antitrust impact and calculation of damages relies on assumptions [DPPs] cannot confirm are plausible," so fails to show that common issues predominate. *Id.* at *11.

*Value Drug* is on all fours. There, Judge Kearney denied class certification on predominance grounds, where (as here) plaintiffs' expert relied "almost entirely" on "counsel-supplied assumptions" for the but-for entry pattern, rather than evidence the expert independently confirmed. *Id*. at *9-10. Applying bedrock Third Circuit precedent, the court held that it could not simply accept assumptions to satisfy its rigorous analysis of the Rule 23 elements. *Id*. at *1, 9. Because "[t]he predominance requirement of Rule 23(b)(3) requires evidentiary proof" and plaintiff's theory of antitrust impact was based only on counsel-supplied assumptions (not evidence), the court found that plaintiff failed to satisfy the predominance requirement, and declined to certify the class. *Id*. at *12-13. The same results should follow here.

***The but-for generic entry pattern is central to Dr. Leitzinger's antitrust impact opinion***. Dr. Leitzinger's antitrust impact analysis relies on entry patterns for generic competition in DPPs' but-for world. According to Dr. Leitzinger, delaying the initial entry of generic Effexor XR caused brand-generic damages, *i.e.*, absent class members paid higher prices for Effexor XR because the ability to switch to cheaper generic Effexor XR was delayed. Leitzinger Rpt. ¶¶ 38-39. Further,

delaying the entry of subsequent generic competition—which limited the number of generics on the market—allegedly caused generic-generic damages, *i.e.*, it delayed additional declines in generic prices.  Leitzinger Rpt. ¶ 40.  For Dr. Leitzinger to determine (1) whether antitrust injury can be shown by class-wide evidence and (2) which putative class members suffered antitrust impact, a necessary input for his analysis is the pattern of generic entry in the but-for world.  Stangle Rpt. ¶¶ 28-30.

*The timing of generic entry alters the antitrust impact assessment and class membership.*  Dr. Leitzinger's assessment of antitrust impact changes dramatically depending on the generic entry scenario.  He concedes that if "generic Effexor XR entry would have occurred July 15, 2009 or later, then QK Healthcare Inc. and its assignee Uniondale Chemists Inc. would not have been injured since QK Healthcare Inc. has no direct purchases during the overcharge period in the transaction data provided by Wyeth and Teva, July 15, 2009 or later."  Leitzinger Rpt. ¶ 42 n.58.

Dr. Leitzinger's opinion on common evidence of class-wide antitrust impact, and by extension class membership, thus does not follow from all hypothetical generic entry patterns, but is limited to certain hypotheticals he implemented without any assessment.  *See* Stangle Rpt. ¶¶ 35-38.  His results can (and do) change depending on the assumed but-for generic entry scenario.  His guesswork cannot form the basis on which this Court could certify the class.  *See Value Drug*, 2022

WL 17177267, at *10 (denying class certification where expert's impact conclusions "could 'very well change'" if but-for assumptions "change or are disproved").

***DPPs offer no evidence to support Dr. Leitzinger's hypothetical generic entry patterns.***  DPPs have no evidence—fact or expert—that the hypothetical entry dates counsel gave Dr. Leitzinger are plausible.  For example, to support earlier entry by Teva, DPPs would have to show that FDA would have approved Teva's ANDA by that earlier date.  No such facts exist.[20]  And to support earlier entry by a Wyeth AG or a third generic, DPPs would have to show that FDA would have approved the third generic's ANDA and that the third generic and Wyeth would be ready, willing, and able to enter the market on those dates.  DPPs have no such factual support.  It is not enough simply to say that there theoretically exist earlier entry dates that, had they occurred, might have led to lower prices.  DPPs and their experts must first provide sufficient factual basis to believe that entry on those earlier dates plausibly would have occurred.  Were the rule otherwise, proving antitrust impact would just be a math exercise, unmoored from the facts.  Third Circuit law requires more.  *See Lamictal*, 2021 WL 2349828, at *20; *Value Drug*, 2022 WL 17177267, at *12-13.

### B.  Dr. Leitzinger's Common Evidence Does Not Fit the Facts.

Dr. Leitzinger relies on three types of supposed common evidence as capable of proving class-wide injury: (1) academic literature; (2) manufacturer forecasts of

---

[20]  *See* Ex. 3, Expert Report of S. Galson (July 17, 2025) ¶¶ 59, 138–49.

the expected effects of competition from generic Effexor XR; and (3) Effexor XR and generic Effexor XR sales data. Leitzinger Rpt. ¶ 36. None of these categories fit the facts here because they do not accurately reflect the actual—or even but-for—market for Effexor XR. Because no class member "could have relied on" the types of evidence "to establish liability if he or she had brought an individual action," these non-probative types of evidence cannot serve as common evidence to prove class-wide impact. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016).

First, the academic literature used by Dr. Leitzinger does not fit the actual world results regarding Effexor XR, so is not probative of the but-for world. Dr. Leitzinger cites academic studies as common evidence to bolster his assumptions about pricing and generic conversion rates. Leitzinger Rpt. ¶ 37. Yet what happened in the real world for Effexor XR does not match what the literature predicts. For example, Dr. Leitzinger cites an FTC study finding that generics "captured between approximately 72 and 85 percent of the brand's sales in the first six months," *id*. ¶ 15, but in the real world, generic substitution rates for Effexor XR were around 60% after the first eleven months, *id.* ¶ 25. Because the market dynamics for Effexor XR are *sui generis*, the generalized literature on which Dr. Leitzinger relies cannot reliably predict antitrust impact to any class member in a but-for Effexor XR market that would necessarily share the same fundamental characteristics.

Similarly, there is no evidence that the manufacturer forecasts Dr. Leitzinger

cites are relevant or reliable for the use he makes of them.  *See* Stangle Rpt. ¶¶ 35-38.  Dr. Leitzinger uses forecasts to support his conclusions about the cost savings from earlier generic entry.  Leitzinger Rpt. ¶ 36.  Setting aside that he cites select Wyeth forecasts while ignoring others with less DPP-favorable generic price erosion rates, *see* Stangle Rpt. ¶ 38, he never considered who prepared those forecasts, when or why they were made, or other considerations (like whether it was a draft version) to determine whether those forecasts were fit for his purpose, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292-94 (3d Cir. 2012) (affirming rejection of expert who relied on projections "without knowing the circumstances under which such projections were created or the assumptions on which they were based").  Nor are these forecasts tailored to specific purchasers such that they could provide insights into individualized or class-wide impact—instead, they merely reflect generalized market expectations.  *See* Stangle Rpt. ¶ 37.  And, like the literature discussed above, some forecasts did not reflect what happened in the real world.  *Compare* Leitzinger Rpt. ¶ 27 (discussing forecast showing "generics would capture 90 percent of the brand volume within two months"), *with id.* ¶ 25 (explaining that generic Effexor XR captured 60% of brand volume in first eleven months).  This evidence, too, cannot sufficiently prove injury to any purchaser in the but-for world.

Finally, the actual Effexor XR sales are not probative of DPPs' but-for assumptions because, in the real world, the Effexor XR market went from no

38

generics, to one generic for eleven months, to mass-generic entry of 8 more generics. Stangle Rpt. ¶ 6. As the district court in *Lamictal* held on almost perfectly analogous facts, when denying class certification on remand, the relevance of sales data "is diminished" for DPPs' imagined generic entry pattern, in which two or three generics—but never just one generic—would be on the market prior to mass generic entry, so cannot support any particular class member's overcharge claim under their hypothetical, anti-factual generic entry assumption. *See Lamictal*, 2021 WL 2349828, at *18 (rejecting plaintiff's reliance on actual data as "common evidence" where, as here, "there was no period when two generics competed on the market; instead, the number of generics increased from one to eight once Teva's exclusivity ended" such that the "evidence does not provide any indication as to the [drug] price that would have existed for all class members in the but-for, two-generic world").

## C. Dr. Leitzinger's Use of Averages Masks Individualized Issues.

Dr. Leitzinger's methodology for calculating overcharges—which he concludes were paid by each purported class member, Leitzinger Rpt. ¶ 41—relies on the use of a class-wide average price across all purchasers during the period of Teva's exclusivity, although different purchasers paid different actual prices during that period, *see* Stangle Rpt. ¶ 51. Insurers like MedCo and Aetna, for example, often pay much less for brand drugs than the Big 3 wholesalers. *Id.* By averaging the prices paid by all entities, Dr. Leitzinger not only overstates damages, but masks

the fact that certain class members may be uninjured because they actually paid *less* for Effexor XR during the alleged period of delayed entry. *See id.* ¶¶ 51-52. MedCo, for example, paid less for brand Effexor XR than Dr. Leitzinger's average but-for generic price, confirming that whether all or nearly all proposed class members suffered harm cannot be shown without individualized inquiry. *See id.* ¶ 45.

Where averages sweep in uninjured class members, and fail to account for individualized issues, a class should not be certified. *Lamictal*, 2021 WL 2349828, at *20 (expert's "use of averages" hid more than *de minimis* uninjured purchasers).

## III.   A CLASS IS NOT THE SUPERIOR METHOD OF ADJUDICATION

DPPs have failed to show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Like numerosity, "[t]he superiority analysis . . . calls for an inquiry into judicial economy and places great weight on whether the individual members can bring their own claims." *Modafinil*, 837 F.3d at 253 n.11. Here, such an analysis shows that it would be practical and judicially efficient for the purported class members to pursue individual claims in a joinder action. *See supra* § I.B. Class certification should be denied for this reason too. *Modafinil*, 837 F.3d at 253 n.11.

## <u>CONCLUSION</u>

The Court should deny DPPs' Motion for Class Certification.

40

Dated: July 24, 2025                     Respectfully submitted,


                                         */s/ William H. Trousdale*
                                         William H. Trousdale
                                         Tompkins, McGuire, Wachenfeld &
                                         Barry LLP
                                         3 Becker Farm Road, Fourth Floor
                                         Roseland, New Jersey 07068-1726
                                         Tel. (973) 622-3000
                                         Fax (973) 623-7780
                                         wtrousdale@tompkinsmcguire.com

                                         Devora W. Allon, P.C.
                                         Kevin M. Neylan, Jr.
                                         KIRKLAND & ELLIS LLP
                                         601 Lexington Avenue
                                         New York, New York 10022
                                         Tel: 212-446-4800
                                         devora.allon@kirkland.com
                                         kevin.neylan@kirkland.com


                                         *Attorneys for Defendants Teva
                                         Pharmaceutical Industries Ltd. and Teva
                                         Pharmaceuticals USA, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 24, 2025, a copy of the foregoing Teva's Opposition to Direct Purchaser Class Plaintiffs' Motion for Class Certification, Certification of Kevin M. Neylan, Jr. in Support of Direct Purchaser Class Plaintiffs' Motion for Class Certification and accompanying exhibits, and this Certificate of Service were filed electronically.

Those attorneys who are registered with the Electronic Filing System may access this filing through the Court's System, and notice of this filing will be sent to these parties by operation of the Court's Electronic Filing System. Additionally, copies of any documents filed under seal will be conveyed via electronic mail to counsel of record.

Dated: July 24, 2025

*/s/ William H. Trousdale*

William H. Trousdale
Tompkins, McGuire, Wachenfeld &
Barry LLP
3 Becker Farm Road, Fourth Floor
Roseland, New Jersey 07068-1726
Tel. (973) 622-3000
Fax (973) 623-7780
wtrousdale@tompkinsmcguire.com