# EXHIBIT 3
# (Filed Under Seal)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

IN RE: EFFEXOR XR ANTITRUST
LITIGATION

This Document Relates To:

Direct Purchaser Class Actions

Lead Case No. 3:11-cv-05479 (Direct)

**EXPERT REPORT OF STEVEN K. GALSON, M.D., M.P.H.**

**July 17, 2025**

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

    A.    Qualifications ................................................................................ 1

    B.    Case Background ........................................................................... 3

    C.    Assignment ................................................................................... 9

    D.    Compensation ............................................................................. 10

II.   SUMMARY OF OPINIONS ................................................................... 10

III.  REGULATORY CONTEXT .................................................................... 12

    A.    The Hatch-Waxman Amendments and Abbreviated New Drug Applications  12

    B.    FDA's Review of Abbreviated New Drug Applications ................ 17

    C.    Tentative and Final Approval of Abbreviated New Drug Applications ......... 21

    D.    Quality by Design and Question-based Review ............................... 25

    E.    Abbreviated New Drug Applications Are Extensive and Complex, and Therefore May Require Considerable Time for FDA Review ........................ 38

IV.   MS. RIVERA-MUZZIO'S CLAIM THAT FDA WOULD HAVE APPROVED TEVA'S GENRIC EFFEXOR XR ANDA BEFORE JUNE 28, 2010 IS BASELESS .............................................................................................. 43

    A.    Ms. Rivera-Muzzio's Opinion That Teva Did Not Act Like a Motivated First-to-File Generic Manufacturer To Obtain FDA Approval of its Generic Effexor XR ANDA as Quickly as Possible Is Incorrect ................................................ 44

        1.    Ms. Rivera-Muzzio Offers an Oversimplified Assessment of Generic Manufacturers' Motivations and Incentives ......................................... 44

        2.    Ms. Rivera-Muzzio's Claim That Teva's Actions from June 2006 to June 2009 Were Indicative of a Generic Manufacturer That Was Not Incentivized and Motivated To Obtain FDA Approval as Quickly as Possible Is Unfounded ........................................................................ 54

    B.    Ms. Rivera-Muzzio's Opinion That Teva's Actions Between June 2006 and June 2009 Delayed FDA Approval of its Generic Effexor XR ANDA Lacks Supporting Evidence ...................................................................... 105

V.    MS. RIVERA-MUZZIO'S ASSUMPTION THAT MYLAN WOULD HAVE OBTAINED FDA APPROVAL OF ITS GENERIC EFFEXOR XR ANDA AND LAUNCHED SIXTEEN MONTHS EARLIER IS UNFOUNDED ................... 112

    A.    Ms. Rivera-Muzzio's Opinion Regarding FDA Approval and Launch of Mylan's Generic Effexor XR ANDA Hinges on Whether Teva Would Have Launched Before July 1, 2010 ...................................................... 112

B.    Ms. Rivera-Muzzio Speculates as to What Mylan and Wyeth Would Have
Agreed to in a Licensing Agreement and When FDA Would Have Approved
Mylan's Generic Effexor XR ANDA............................................................ 113

## APPENDICES

Appendix A: Curriculum Vitae ............................................................................... A-1

Appendix B: Materials Considered ....................................................................... B-1

Appendix C: Timeline of Events ........................................................................... C-1

## I.    INTRODUCTION

### A.    Qualifications

1.    My name is Steven K. Galson, M.D., M.P.H. I have over 40 years of experience in the fields of medicine, public health, pharmaceutical development and regulatory affairs. I obtained my medical doctorate from the Mount Sinai School of Medicine and earned a Master of Public Health from the Harvard School of Public Health. I also completed a fellowship in Epidemiology at the Centers for Disease Control and Prevention. Currently, I am a Senior Advisor at Boston Consulting Group, a Consultant to Amgen, and a Board Member of BioCryst Pharmaceuticals and Elephas Biosciences.

2.    My professional experience includes more than 20 years of government service. Between 2001 and 2009, I held several senior leadership positions within the U.S. Department of Health & Human Services ("HHS"), including Acting Surgeon General from 2007 to 2009 and Acting Assistant Secretary of Health in 2009. Prior to these roles, I served in multiple senior leadership positions at the Center for Drug Evaluation and Research ("CDER") within the Food and Drug Administration ("FDA"). I was Deputy Director of CDER from 2001 to 2003 before becoming the Acting Director of CDER from 2003 to 2005, and I subsequently served as the Center Director for CDER between 2005 and 2007.

3.    During my tenure at FDA, I oversaw CDER's core functions of reviewing new and generic drug applications to ensure that safe and effective drugs are available to the public and that the benefits of new drugs outweigh any known risks. I have extensive knowledge of FDA's approach to reviewing New Drug Applications ("NDAs") and Abbreviated New Drug Applications ("ANDAs") in accordance with the requirements set forth by the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act"), the latter of which was amended in the Hatch-Waxman Amendments in the 2003 Medicare Modernization Act.

4.    Prior to my service in senior leadership at HHS, I also held several roles and senior leadership positions at other U.S. government agencies between 1986 and 2001, including the U.S. Environmental Protection Agency ("EPA") and the U.S. Department of Energy ("DOE"). At both of these agencies, I was the Chief Medical Officer. I was also at the U.S.

National Institute for Occupational Safety and Health ("NIOSH"), and the U.S. Centers for Disease Control ("CDC").

5.  Following my government service, I have held various senior roles for pharmaceutical and technology companies, and served on multiple boards for non-profit, pharmaceutical, and biotechnology companies. Upon leaving HHS I was the Senior Vice President of Civilian Health Operations and Chief Health Scientist at Science Applications International Corporation until I joined Amgen in 2010. Prior to my current Consultant position at Amgen, I was Vice President of Global Regulatory Affairs, Senior Vice President of Global Regulatory Affairs & Safety, and Senior Vice President of Research & Development between 2010 and 2021. I also served as Chair of Amgen's COVID-19 Incident Executive Management Team from 2020 to 2021.

6.  In my role managing Amgen's regulatory affairs and research and development departments, I oversaw the filing of several new drug applications for brand and generic drugs with FDA. I also coordinated communications or communicated directly with FDA during its review of new drug products for marketing approval. These communications included, among other things, responding to FDA requests with minor and major amendments when the agency requested additional documents and data.

7.  I have been published in a wide range of academic and practice-related journals such as *The New England Journal of Medicine*, *The Journal of Biopharmaceutical Statistics*, *National Academies of Science, Engineering and Medicine*, *Public Health Reports*, *Environmental Health Perspectives*, and *Health Affairs*. My publications span several topics in public health, including drug development and FDA review processes. For example, while I was Center Director at CDER, I co-authored a letter to the editor of *The New England Journal of Medicine* to provide clarity on how FDA reviewed Ketek (telithromycin) in response to an article published by the journal concerning safety issues associated with the drug. On another occasion I authored a letter to the editor of *The New England Journal of Medicine* regarding FDA's commitment to drug safety following a report that FDA commissioned from the Institute of Medicine ("IOM").

8.  I have also published on public health topics including drug development and regulatory review since leaving HHS and FDA. For example, I co-authored a paper in 2017 for the

*National Academies of Science, Engineering and Medicine* discussing the challenges and opportunities related to inventing and regulating new medicines, vaccines, and devices, as well as integrating these advances into clinical practices. Most recently in 2025, I co-authored three papers in *The New England Journal of Medicine* and *The Journal of Biopharmaceutical Statistics* related to drug development and regulatory review for rare diseases.

9. My current curriculum vitae, which includes a complete list of my publications in the last ten years, is attached to this report as **Appendix A**. I have not testified in the last four years.

## B. Case Background

10. Wyeth (a/k/a Wyeth LLC, f/k/a Wyeth, Inc., f/k/a American Home Products)[1] is a pharmaceutical and health care products company that develops, manufactures, and markets pharmaceutical products.[2] I understand that Wyeth and its subsidiaries Wyeth Pharmaceuticals, Inc., Wyeth-Whitehall Pharmaceuticals, and Wyeth Pharmaceuticals Company (collectively "Wyeth") are named as Defendants in this matter.[3]

11. Wyeth developed immediate-release venlafaxine hydrochloride, which is an antidepressant that was approved by FDA in 1993 and was marketed by Wyeth as Effexor ("Effexor IR").[4] Wyeth then developed an extended-release formulation of Effexor that was approved in 1997 and marketed as Effexor XR.[5] Pfizer and Wyeth announced in January 2009 that

---

[1] Direct Purchaser Class Plaintiffs' Second Amended Consolidated Class Action Complaint and Jury Demand, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, October 23, 2013 ("Second Amended DPP Complaint"), ¶ 21.

[2] "Pfizer to Acquire Wyeth, Creating the World's Premier Biopharmaceutical Company," *Pfizer*, January 25, 2009, https://www.pfizer.com/news/press-release/press-release-detail/pfizer_to_acquire_wyeth_creating_the_world_s_premier_biopharmaceutical_company ("Wyeth is one of the world's largest research-driven pharmaceutical and health care products companies. It is a leader in the discovery, development, manufacturing and marketing of pharmaceuticals, vaccines, biotechnology products, nutritionals and non-prescription medicines that improve the quality of life for people worldwide.").

[3] Second Amended DPP Complaint, ¶¶ 21-24.

[4] Mechcatie, Elizabeth, "Generic Version of Venlafaxine FDA Approved," *MDedge*, October 1, 2006, https://www.mdedge.com/content/generic-version-venlafaxine-fda-approved.

[5] Mechcatie, Elizabeth, "Generic Version of Venlafaxine FDA Approved," *MDedge*, October 1, 2006, https://www.mdedge.com/content/generic-version-venlafaxine-fda-approved.

Pfizer would acquire Wyeth, and the acquisition was completed in October 2009.[6] As of December 10, 2002, Wyeth listed six U.S. Patents claiming Effexor XR Capsules in the Orange Book.[7] As of March 14, 2003, Wyeth listed one U.S. Patent claiming Effexor IR Tablets in the Orange Book.[8] **Figure 1** and **Figure 2** summarize Wyeth's Orange Book-listed patents referenced by Teva in ANDA 76-565 (generic Effexor XR) and ANDA 76-690 (generic Effexor IR), and their exclusivity periods.

---

[6]    "Pfizer to Acquire Wyeth, Creating the World's Premier Biopharmaceutical Company," *Pfizer*, January 25, 2009, https://www.pfizer.com/news/press-release/press-release-detail/pfizer_to_acquire_wyeth_creating_the_world_s_premier_biopharmaceutical_company; "Pfizer Completes Acquisition of Wyeth," *Pfizer*, October 14, 2009, https://www.pfizer.com/news/press-release/press-release-detail/pfizer_completes_acquisition_of_wyeth.

[7]    "Teva ANDA 76-565 for Venlafaxine HCl XR Capsules, 150 mg," January 22, 2003, TEVA_EFFEX_0000001-267 at 029 ("The undersigned certifies that to the best of our knowledge and in TEVA Pharmaceuticals USA's opinion there are six listed patents which claim the reference drug Effexor XR Capsules."); "Approved Drug Products With Therapeutic Equivalence Evaluations (Orange Book)," *U.S. Food and Drug Administration*, 2003, https://www.thefdalawblog.com/wp-content/uploads/2020/06/OB-Annual-2003-23rd-Ed.pdf, ADA91.

[8]    "Teva ANDA 76-690 for Venlafaxine HCl IR Tablets, 25 mg, 37.5 mg, 50 mg, 75 mg, and 100 mg," April 10, 2003, TEVA_EFFEX_0022611-970 at 613, 644 ("The undersigned hereby certifies that to the best of our knowledge and in TEVA Pharmaceuticals USA's opinion there is one listed patent which claims the reference drug Effexor Tablets."); "Approved Drug Products With Therapeutic Equivalence Evaluations (Orange Book)," *U.S. Food and Drug Administration*, 2003, https://www.thefdalawblog.com/wp-content/uploads/2020/06/OB-Annual-2003-23rd-Ed.pdf, ADA91.

**Figure 1**
**Patents Listed in the Orange Book by Wyeth, Referenced in Teva's ANDA 76-565**
**(Effexor XR)[9]**

| Patent Number | Expiration Date | Pediatric Exclusivity Expiration Date |
| --- | --- | --- |
| 4,535,186 | 12/13/2007 | 06/13/2008 |
| 6,444,708 | 06/28/2013 | 12/28/2013 |
| 5,916,923 | 06/28/2013 | 12/28/2013 |
| 6,274,171 | 03/20/2017 | 09/20/2017 |
| 6,403,120 | 03/20/2017 | 09/20/2017 |
| 6,419,958 | 03/20/2017 | 09/20/2017 |

**Figure 2**
**Patent Listed in the Orange Book by Wyeth, Referenced in Teva's ANDA 76-690**
**(Effexor IR)[10]**

| Patent Number | Expiration Date | Pediatric Exclusivity Expiration Date |
| --- | --- | --- |
| 4,535,186 | 12/13/2007 | 06/13/2008 |

12. Teva Pharmaceuticals USA, Inc. is a pharmaceutical and health care products company that develops, manufactures, and markets pharmaceutical products in the United States.[11] Teva Pharmaceuticals USA, Inc. is a subsidiary of Teva Pharmaceutical Industries Ltd., which is headquartered in Israel and develops, manufactures, and markets pharmaceutical products globally. [12] I understand that Teva Pharmaceuticals USA, Inc. and Teva

---

9    "Teva ANDA 76-565 for Venlafaxine HCl XR Capsules, 150 mg," January 22, 2003, TEVA_EFFEX_0000001-267 at 029; "Approved Drug Products With Therapeutic Equivalence Evaluations (Orange Book)," *U.S. Food and Drug Administration*, 2003, https://www.thefdalawblog.com/wp-content/uploads/2020/06/OB-Annual-2003-23rd-Ed.pdf, ADA91.

10   "Teva ANDA 76-690 for Venlafaxine HCl IR Tablets, 25 mg, 37.5 mg, 50 mg, 75 mg, and 100 mg," April 10, 2003, TEVA_EFFEX_0022611-970 at 644; "Approved Drug Products With Therapeutic Equivalence Evaluations (Orange Book)," *U.S. Food and Drug Administration*, 2003, https://www.thefdalawblog.com/wp-content/uploads/2020/06/OB-Annual-2003-23rd-Ed.pdf, ADA91.

11   "Teva Generics: Who We Are," *Teva Pharmaceuticals*, https://www.tevausa.com/our-products/tevagenerics/who-we-are/, accessed June 9, 2025; "Teva Pharmaceuticals USA," *Drugs.com*, https://www.drugs.com/manufacturer/teva-pharmaceuticals-usa-inc-140.html, accessed June 6, 2025.

12   "Teva Generics: Who We Are," *Teva Pharmaceuticals*, https://www.tevausa.com/our-products/tevagenerics/who-we-are/, accessed June 9, 2025; "Teva Pharmaceutical Industries Limited (TEVA)," *Yahoo Finance*, https://finance.yahoo.com/quote/TEVA/profile/, accessed June 6, 2025.

Pharmaceutical Industries Ltd. (collectively, "Teva") are named as Defendants in this matter.[13]

13. On March 14, 2003, Teva submitted an ANDA to FDA for a generic immediate-release venlafaxine hydrochloride product ("generic Effexor IR").[14] FDA granted Teva final approval for its generic Effexor IR product on August 4, 2006.[15] On December 10, 2002, Teva submitted ANDA 76-565 to FDA for a generic extended-release venlafaxine hydrochloride 150 mg product ("generic Effexor XR"), and Teva was entitled to a period of 180 days of marketing exclusivity because it was the first to file an ANDA containing a Paragraph IV certification for generic extended-release venlafaxine hydrochloride.[16] On February 13, 2003, Teva amended its ANDA for generic Effexor XR to include a 37.5 mg strength product and a 75 mg strength product.[17] FDA granted Teva final approval for its generic Effexor XR product on June 28, 2010.[18]

14. The Direct Purchaser Class Plaintiffs are Professional Drug Company, Inc., Rochester Drug Co-Operative, Inc., Stephen L. LaFrance Holdings, Inc., and Uniondale Chemists, Inc.[19] Plaintiffs or their assignees purchased Effexor XR directly from Wyeth and/or generic Effexor XR from Teva during the class period.[20] The Retailer Plaintiffs are

---

[13] Second Amended DPP Complaint, ¶¶ 27-28.

[14] "Teva ANDA 76-690 for Venlafaxine HCl IR Tablets, 25 mg, 37.5 mg, 50 mg, 75 mg, and 100 mg," April 10, 2003, TEVA_EFFEX_0022611-970 at 612.

[15] "Teva Announces Final Approval of Venlafaxine HCL Tablets," *Teva Pharmaceuticals*, August 4, 2006, https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2006/Teva-Announces-Final-Approval-of-Venlafaxine-HCL-Tablets/default.aspx.

[16] "Teva ANDA 76-565 for Venlafaxine HCl XR Capsules, 150 mg," January 22, 2003, TEVA_EFFEX_0000001-267 at 002, 005, 017; "Teva Introduces First Generic Effexor XR® Capsules in the United States; Awarded 180-Day Period of Marketing Exclusivity," *Fierce Pharma*, July 1, 2010, https://www.fiercepharma.com/pharma/teva-introduces-first-generic-effexor-xr%c2%ae-capsules-united-states-awarded-180-day-period-of. FDA acknowledged receipt of Teva's ANDA 76-565 on January 22, 2003. "Teva ANDA 76-565 for Venlafaxine HCl XR Capsules, 150 mg," January 22, 2003, TEVA_EFFEX_0000001-267 at 002.

[17] "Teva Unsolicited Amendment to ANDA 76-565, Addition of 37.5 mg and 75 mg Strength Capsules (Book 1 of 3)," February 13, 2003, TEVA_EFFEX_0005072-530 at 073.

[18] "FDA Approval Letter Sent to Teva for ANDA 76-565," June 28, 2010, TEVA_EFFEX_0018544-550 at 544-545.

[19] Second Amended DPP Complaint, ¶¶ 17-20.

[20] Second Amended DPP Complaint, ¶¶ 17-20.

Walgreen Co., The Kroger Co, Safeway, Inc., f/k/a Supervalu Inc., f/k/a HEB Grocery Company, L.P., American Sales Company, Inc., Rite Aid Corporation, Rite Aid Hdqtrs. Corporation, JCG (PJC) USA, LLC, Maxi Drug, Inc. d/b/a/ Brooks Pharmacy, Eckerd Corporation, Meijer, Inc., Meijer Distribution, Inc., Giant Eagle, Inc., and CVS Caremark Corporation.[21] Retailer Plaintiffs for their assignees purchased Effexor XR directly from Wyeth during the relevant period of sales.[22] I refer to the Direct Purchaser Class Plaintiffs and Retailer Plaintiffs collectively as the "Plaintiffs" for the purpose of this report.

15. I understand that Plaintiffs allege that Defendants Wyeth and Teva entered into an unlawful settlement agreement under which Wyeth provided inducements to Teva in exchange for Teva delaying its launch of generic Effexor XR until as late as July 1, 2010, despite Wyeth's marketing exclusivity for its venlafaxine compound patent expiring on June 13, 2008.[23] I understand from counsel that Wyeth has settled with the Plaintiffs and is no longer a party to this litigation.

16. Teva's ANDA 76-565 for 150 mg generic Effexor XR, filed December 10, 2002, contained paragraph IV certifications to Wyeth's U.S. Patent Nos. 6,444,708 ("'708 patent"), 6,274,171 ("'171 patent"), 6,419,958 ("'958 patent"), and 6,403,120 ("'120 patent").[24] Teva also included a paragraph III certification to Wyeth's U.S. Patent No. 4,535,186

---

[21] Complaint and Demand for Jury Trial, *Walgreen Co., the Kroger Co., Safeway Inc., Supervalu Inc., HEB Grocery Company LP and American Sales Company, Inc., v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, No. 3:33-av-00001, November 30, 2011; Complaint and Demand for Jury Trial, *Meijer, Inc. and Meijer Distribution, Inc., v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, No. 2:33-av-00001, December 23, 2011; Complaint, *Giant Eagle, Inc., v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, No. 3:12-cv-03116, May 24, 2012; Complaint and Demand for Jury Trial, *Rite Aid Corporation, Rite Aid Hdqtrs. Corp., JCG (PJC) USA, LLC, Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation, and CVS Caremark Corporation, v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, No. 3:12-cv-03523, June 12, 2012 ("Rite Aid Complaint").

[22] *See, for example*, Rite Aid Complaint, ¶ 14.

[23] Second Amended DPP Complaint, ¶¶ 2, 12-14, 276; "Teva Patent Amendment to ANDA 76-565 - Status of Patent Litigation," January 29, 2008, TEVA_EFFEX_0010211-217 at 211 ("[…] Wyeth will send to the Agency in due course, under separate cover, a letter stating that Wyeth has no objection to FDA approving TEVA's ANDA 76-565 for Venlafaxine HCl Extended-Release Capsules on or after July 1, 2010 but not as of any earlier date until Wyeth informs FDA separately in writing of such earlier date.").

[24] "Teva ANDA 76-565 for Venlafaxine HCl XR Capsules, 150 mg," January 22, 2003, TEVA_EFFEX_0000001-267 at 029; "Approval Package for Application Number: ANDA 076565," *Center for Drug Evaluation and Research*, June 28, 2010, https://www.accessdata.fda.gov/drugsatfda_docs/anda/2010/076565Orig1s000.pdf, PDF p. 363.

("'186 patent"), as well a labeling carve out related to a method of use for Wyeth's U.S. Patent No. 5,916,923 ("'923 patent").[25, 26] On February 6, 2003, Teva provided notice to Wyeth of Teva's paragraph IV certifications to Wyeth's '708, '171, '958, and '120 patents contained in Teva's ANDA 76-565 for the 150 mg strength generic Effexor XR.[27] Subsequently, on February 12, 2003, Teva provided notice to Wyeth of Teva's ANDA 76-565 amendment adding the 37.5 mg and 75 mg strengths of generic Effexor XR capsules, which included paragraph IV certifications to the aforementioned patents: Wyeth's '708, '171, '958, and '120 patents.[28] Wyeth filed a complaint against Teva on March 24, 2003, alleging infringement of Wyeth's '171, '958, and '120 patents and requesting that Teva be enjoined from receiving FDA approval for ANDA 76-565 until the expiration of these three patents and their relevant exclusivities.[29] Wyeth and Teva entered into a Settlement and License agreement ("Wyeth-Teva Settlement Agreement") on November 2, 2005.[30] Pursuant to the agreement, the patent infringement suit was closed on January 20, 2006.[31] Teva informed FDA of the Wyeth-Teva Settlement Agreement on January 29, 2008.[32] Plaintiffs claim that generic Effexor XR products would have been approved by FDA and

---

[25]  "Teva ANDA 76-565 for Venlafaxine HCl XR Capsules, 150 mg," January 22, 2003, TEVA_EFFEX_0000001-267 at 029.

[26]  On January 17, 2003, Teva submitted a revised patent certification to FDA that added labeling carve outs for methods of use listed for Wyeth's '958 and '120 patents related to the treatment of generalized anxiety disorder. "Teva Revised Patent Certification Statement to FDA for ANDA 76-565," January 17, 2003, TEVA_EFFEX_0005061-071 at 065.

[27]  "Teva Letter to Wyeth Regarding Paragraph IV Certifications for ANDA 76-565," February 6, 2003, WYEFFAT04601592-605 at 592.

[28]  "Teva Letter to Wyeth Regarding Amended Paragraph IV Certifications for ANDA 76-565," February 12, 2003, WYEFFAT4022462-475 at 462.

[29]  "Teva Letter to FDA Acknowledging Patent Infringement Lawsuit Filed by Wyeth Regarding ANDA 76-565," April 1, 2003, TEVA_EFFEX_0006362-386 at 363 ("We [Teva] hereby inform the Agency of a suit filed by Wyeth-Ayerst against Teva Pharmaceuticals USA concerning U.S. Patent Nos. 6,274,171, 6,403,120, and 6,419,958. The suit, Civil Action No. 03cv1293 was filed on March 24, 2003 in the United States District Court for the District of New Jersey. The aforementioned suit was filed within the 45-day period. [...] Please note that, for all three strengths, suit was not filed concerning U.S. Patent No. 6,444,708 within the 45 day period, therefore, Wyeth has waived its right to pursue future legal action under the scope of the Waxman-Hatch Act."), 374-386.

[30]  "Wyeth-Teva Settlement and License Agreement," November 2, 2005, WYEFFAT0000001-139 at 001. *See also*, "Wyeth-Teva License Agreement" November 2, 2005, TEVA_EFFEX_0272584-641 at 584.

[31]  Second Amended DPP Complaint, ¶ 271.

[32]  "Teva Patent Amendment to ANDA 76-565 - Status of Patent Litigation," January 29, 2008, TEVA_EFFEX_0010211-217 at 211.

launched, and that Wyeth would have launched an authorized generic Effexor XR product, by May 2009 or November 2009 absent the alleged Wyeth-Teva conspiracy.[33]

### C.    Assignment

17.    On May 15, 2025, Plaintiffs submitted an expert report from Daisy Rivera-Muzzio, R.Ph., MS, MBA.[34] I have been asked by counsel for Teva to review and respond to Ms. Rivera-Muzzio's report as it relates to my area of expertise. Specifically, I have been asked to offer an opinion regarding FDA's review of Teva's ANDA for generic Effexor XR and Ms. Rivera-Muzzio's opinions supporting Plaintiffs' claim that Teva and Mylan's generic Effexor XR products would have been approved by FDA and launched earlier absent the alleged conduct. To the extent I do not address certain of Ms. Rivera-Muzzio's opinions that are not related to my area of expertise, this should not be construed as my tacit agreement with those opinions.

18.    I have been asked by counsel for Teva to limit my opinions to Ms. Rivera-Muzzio's opinions and Plaintiffs' allegations against Teva regarding what Plaintiffs refer to as "Wyeth and Teva's Conspiracy" stemming from the Wyeth-Teva Settlement Agreement, and the implications of those allegations for Mylan's generic Effexor launch.[35] I do not address Plaintiffs' claims regarding Wyeth's alleged conduct preceding the Wyeth-Teva Settlement Agreement.

19.    I have prepared this report based on the documents and other evidence made available to me. A list of the materials I have considered is included in **Appendix B**. I reserve the right to supplement this report if additional information or data become available to me.

---

[33]    *See, for example*, Expert Report of Professor Thomas G. McGuire, Ph.D., *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, May 15, 2025, ¶ 12 ("Teva would have entered in or around May 2009 in the absence of the challenged terms."); Expert Report of Keith Leffler, Ph.D., *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, May 15, 2025, ¶ 98 ("[…] I conclude that November 2009 is a reasonable estimate of an alternative nopayment settlement entry date that would be in the economic interests of both Wyeth and Teva."), ¶ 103 ("I have been asked by counsel for Plaintiffs to estimate overcharges for generic entries for each month May 2009-June 2010.").

[34]    Expert Report of Daisy Rivera-Muzzio, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, May 15, 2025 ("Rivera-Muzzio Report").

[35]    *See, for example*, Second Amended DPP Complaint, ¶12.

### D.    Compensation

20. I am being compensated at my usual hourly rate of $1,300 per hour for time spent on this matter. My compensation is not contingent upon the nature of my findings or on the outcome of this litigation. Part of the work for this report was performed, under my supervision and direction, by professional staff at Analysis Group, Inc.

## II.    SUMMARY OF OPINIONS

21. I have reached the following opinions based on 40 years of experience in the fields of medicine, public health, pharmaceutical development and regulatory affairs, as well as my review and analysis of the information identified herein:

22. Ms. Rivera-Muzzio offers an oversimplified assessment of generic manufacturers' motivations and incentives. While I agree that generic companies with "first filer" status would prefer to obtain FDA's approval as fast as they can, Ms. Rivera-Muzzio overlooks the fact that generic companies that are equally motivated to obtain FDA's approval as quickly as possible may act differently from one another based on their individual circumstances, the business considerations they must contemplate, and their view of how to be responsive to FDA's feedback. Instead, she adopts an overly simplistic and narrow view of how a reasonable generic company in Teva's position would act and then evaluates Teva's actions through that distorted lens. Based on my experience, generic companies would not risk delaying the FDA review process in an attempt to align the approval date with a settlement agreement date, given the unpredictability of FDA's review timing and the possibility that such tactics could result in additional delays in obtaining FDA approval. Ms. Rivera-Muzzio also ignores that Teva had an incentive to obtain final FDA approval before July 2010, as the Wyeth-Teva Settlement Agreement included acceleration clauses that would have allowed Teva to enter the market earlier if any of those clauses had been triggered. *See* **Section IV.A.1**.

23. Ms. Rivera-Muzzio's claim that Teva's actions from June 2006 to June 2009 were indicative of a generic manufacturer that was not incentivized and motivated to obtain approval as quickly as possible is unfounded. Ms. Rivera-Muzzio applies her excessively narrow definition of what a reasonable generic company in Teva's position would do to

claim that Teva's actions from June 2006 to June 2009 reflect a lack of incentive to obtain FDA's approval as quickly as possible, but she fails to review and analyze relevant evidence and context that undermines her opinion. A closer analysis of the evidence reveals critical context that was relevant to Teva's decision-making and response timing, including substantial developments in FDA's review framework reflected by the implementation of Quality by Design ("QbD") and Question-based Review ("QbR"), variations in FDA's requests across deficiency letters, and other considerations that Teva faced while amending its generic Effexor XR ANDA for FDA. **Section IV.A.2**.

24. Based on my review of the evidence, I do not find Teva's actions between June 2006 and June 2009 to be inconsistent with those of a motivated company. Ms. Rivera-Muzzio not only fails to provide any evidence establishing a causal link between the Wyeth-Teva Settlement Agreement and Teva's actions, but she also fails to offer any evidence suggesting that Teva's actions during that period led to any delay in FDA's approval process. On the contrary, Teva's regulatory personnel testified that settlement terms did not influence their motivation to gain FDA approval at the earliest opportunity, and that testimony is consistent with the decisions and actions Teva took while prosecuting its ANDA. Thus, I disagree with Ms. Rivera-Muzzio's assertion that had Teva acted like a motivated and incentivized generic manufacturer, it would have obtained FDA's approval for its generic Effexor XR earlier than June 28, 2010, when Teva actually obtained approval in the real world. *See* **Section IV.B**.

25. I also disagree with Ms. Rivera-Muzzio's assertion that Mylan would have been able to obtain FDA approval and launch generic versions of Effexor eleven months after an earlier launch by Teva. As a threshold matter, Ms. Rivera-Muzzio's opinion regarding Mylan's hypothetical entry date hinges on her conclusion that Teva would have launched its generic Effexor XR product before July 1, 2010, which is incorrect for the reasons described in this report. Additionally, Ms. Rivera-Muzzio relies on the unsupported assumption that Mylan would have obtained a license from Wyeth to launch 11 months after Teva's launch, and she fails to account for how regulatory hurdles Mylan faced in the actual world would have impacted her hypothetical timeline. Therefore, Ms. Rivera-Muzzio's opinion regarding Mylan's hypothetical entry date for its generic Effexor XR product is speculative. *See* **Section V**.

### III.    REGULATORY CONTEXT

26. In this section of my report, I provide context on the regulatory issues that are critical to my opinions in this matter.

#### A.    The Hatch-Waxman Amendments and Abbreviated New Drug Applications

27. FDA is responsible for reviewing and approving applications for both brand name and generic drugs to ensure each product is safe and effective for use before it can be marketed.[36] Approval of a new drug requires a thorough FDA review to confirm its safety and efficacy, often requiring animal or human testing which can take considerable time to review.[37] Prior to 1984, generic drugs were subject to the same rigorous approval process as new brand-name drugs.[38] In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, which was later amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), and are referred to collectively as the "Hatch-Waxman Act" or "Hatch-Waxman Amendments."[39] The Hatch-Waxman Amendments established a more efficient approval pathway for generic drugs by allowing manufacturers to submit "an abbreviated new drug application ("ANDA") under section 505(j) of the Federal Food, Drug, and Cosmetic Act ("FD&C Act").[40] This process is

---

[36] "Generic Drugs: Questions & Answers," *U.S. Food and Drug Administration*, March 16, 2021, https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers.

[37] "The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective," *U.S. Food and Drug Administration*, November 24, 2017, https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective ("An NDA includes all animal and human data and analyses of the data[.] […] 'It's the clinical trials that take so long [to review]--usually several years,' says Sandra Kweder, M.D., deputy director of the Office of New Drugs in the CDER.").

[38] "40th Anniversary of the Generic Drug Approval Pathway," *U.S. Food and Drug Administration*, September 23, 2024, https://www.fda.gov/drugs/cder-conversations/40th-anniversary-generic-drug-approval-pathway.

[39] *Public Law 98–417*; *Public Law 108–173*. *See also*, "Hatch-Waxman Letters," *U.S. Food and Drug Administration*, February 3, 2022, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/hatch-waxman-letters.

[40] "Hatch-Waxman Letters," *U.S. Food and Drug Administration*, February 3, 2022, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/hatch-waxman-letters. Enacted in 1938, the Federal Food, Drug, and Cosmetic Act ("FD&C Act") established a framework to regulate the safety of food, drugs, and other consumer products. Among its key provisions, the FD&C Act "mandated pre-market approval of all new drugs, such that a manufacturer would have to prove to FDA that a drug were safe

considered "abbreviated" because ANDA applicants are "generally not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness," as is required for new brand drugs, and may instead rely on the FDA's existing finding that the brand reference listed drug ("RLD") is safe and effective.[41] A generic manufacturer can obtain approval for their generic drug product without requiring additional clinical trials through the ANDA pathway if they can demonstrate that their generic product is "the *same* as the RLD in certain ways."[42] In particular, a generic manufacturer must demonstrate that their proposed generic product is bioequivalent to the existing RLD.[43]

28. While the ANDA pathway can streamline approval of generic drugs, the timing of a final ANDA approval depends in part on the patent and exclusivity protections associated with the RLD, as FDA cannot grant final approval if the RLD is protected by an active exclusivity period.[44] Under the Hatch-Waxman Amendments, brand drug manufacturers

---

before it could be sold." *See* "Part II: 1938, Food, Drug, Cosmetic Act," *U.S. Food and Drug Administration*, November 27, 2018, https://www.fda.gov/about-fda/changes-science-law-and-regulatory-authorities/part-ii-1938-food-drug-cosmetic-act.

[41]  "Abbreviated New Drug Application (ANDA)," *U.S. Food and Drug Administration*, March 28, 2025, https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda. *See also*, "Referencing Approved Drug Products in ANDA Submissions Guidance for Industry," *U.S. Food and Drug Administration*, October 2020, https://www.fda.gov/media/102360/download, p. 3.

[42]  "Referencing Approved Drug Products in ANDA Submissions Guidance for Industry," *U.S. Food and Drug Administration*, October 2020, https://www.fda.gov/media/102360/download, p. 3 ("Instead, the applicant relies on FDA's finding that a previously approved drug product, i.e., the RLD, is safe and effective, and must demonstrate, among other things, that the proposed generic drug is the *same* as the RLD in certain ways. Specifically, with limited exceptions […], a drug product for which an ANDA is submitted must have, among other things, the same active ingredient(s), conditions of use, route of administration, dosage form, strength, and (with certain permissible differences) labeling as the RLD[.]") (Emphasis in original).

[43]  "Abbreviated New Drug Application (ANDA)," *U.S. Food and Drug Administration*, March 28, 2025, https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda ("One way [ANDA] applicants demonstrate that a generic product performs the same way as the innovator drug is to measure the time it takes the generic drug to reach the bloodstream in healthy volunteers. This demonstration of 'bioequivalence' gives the rate of absorption, or bioavailability, of the generic drug, which can then be compared to that of the innovator drug. To be approved by FDA, the generic version must deliver the same amount of active ingredients into a patient's bloodstream in the same amount of time as the innovator drug."). *See also*, *21 CFR 314.94*(a)(7) "Bioequivalence."

[44]  "Conversion of ANDA Approval to Tentative Approval Because of Court Order," *Center for Drug Evaluation and Research*, June 11, 2020, https://www.fda.gov/media/138828/download, p. 1 ("The timing of ANDA approval depends on, among other things, the patent and exclusivity protections for reference listed drug (RLD) on which the applicant relies in seeking approval."), p. 5 ("Tentative approval: notification that an NDA or ANDA otherwise meets the requirements for approval under the FD&C Act, but cannot be approved because […] there is a period of exclusivity for the listed drug under § 314.108[.]"). *See*

are required to list all eligible patents covering an RLD in FDA's Orange Book, a public database that identifies FDA-approved drug products and provides certain corresponding patent information.[45]

29. ANDA applicants must include certifications to all patents listed in the Orange Book for the RLD in their application.[46] There are four patent certification types. If no patents are listed for the RLD, the applicant must certify that such patent information has not been submitted to FDA by the NDA holder (Paragraph I certification).[47] For each listed patent, the ANDA applicant must certify either: that the patent has expired (Paragraph II certification); the date on which the patent will expire (Paragraph III certification); or that the patent is "invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the drug product for which the ANDA is submitted." (Paragraph IV certification).[48]

30. To submit an ANDA for an RLD with an active patent, the applicant must thus include either a Paragraph III or Paragraph IV certification. A Paragraph III certification indicates that the ANDA filer agrees to wait until expiration of a relevant patent to seek final FDA

---

*also,* "The Listing of Patent Information in the Orange Book " *U.S. Food and Drug Administration*, January 5, 2022, https://www.fda.gov/media/155200/download, p. 8 ("The timing of approval for […] an ANDA […] is subject to certain patent and exclusivity protections."); *21 CFR 314.105* "Approval of an NDA and an ANDA."

[45] "The Listing of Patent Information in the Orange Book " *U.S. Food and Drug Administration*, January 5, 2022, https://www.fda.gov/media/155200/download, p. 2 ("The Hatch-Waxman Amendments require the U.S. Food and Drug Administration (FDA or Agency) to, among other things, make publicly available, with monthly supplements, a list of approved drug products. FDA's Approved Drug Products With Therapeutic Equivalence Evaluations publication (commonly known as the Orange Book) and this publication's monthly Cumulative Supplements satisfy this requirement. The Orange Book identifies drug products approved by FDA under section 505(c) and 505(j) of the FD&C Act. […] The Addendum to the Orange Book identifies drugs that have qualified under the FD&C Act for periods of exclusivity and provides patent information concerning certain approved drug products listed in the Orange Book. […] NDA holders must submit required patent information for listing in the Orange Book (see section 505(c)(2) of the FD&C Act and 21 CFR 314.53).")*. See also,* "Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations," *U.S. Food and Drug Administration*, https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm, accessed June 9, 2025.

[46] *21 CFR 314.94*(a)(12)(i)(A) "Patent Certification." *See also,* "Small Business Assistance | 180-Day Generic Drug Exclusivity," *U.S. Food and Drug Administration*, October 26, 2023, https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-assistance-180-day-generic-drug-exclusivity.

[47] *21 CFR 314.94*(a)(12)(i)(A)(1).

[48] *21 CFR 314.94*(a)(12)(i)(A)(2)-(4).

approval.[49] In contrast, a Paragraph IV certification applies when the ANDA filer seeks final approval for their generic product by challenging the validity of a relevant patent prior to its expiration.[50] To file an ANDA containing a Paragraph IV certification, the applicant must notify the NDA holder and each patent owner and provide its legal and factual basis for challenging the patent.[51] If a patent holder files a patent infringement lawsuit within 45 days of receiving the Paragraph IV notice, FDA approval of the ANDA is typically subject to a 30-month stay while the patent infringement litigation is ongoing.[52] During this stay period, no other generic product can be approved or marketed.[53]

---

[49] "ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs Guidance for Industry," *U.S. Food and Drug Administration*, January 2024, https://www.fda.gov/media/119718/download, accessed May 5, 2025, p. 3 ("If an applicant submits a paragraph III certification, the applicant agrees to wait until the relevant patent has expired before seeking final approval of its ANDA.").

[50] "ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs Guidance for Industry," *U.S. Food and Drug Administration*, January 2024, https://www.fda.gov/media/119718/download, accessed May 5, 2025, p. 3 ("If, however, an applicant wishes to seek final approval of its ANDA before a listed patent has expired by challenging the validity of that patent, by claiming that the patent would not be infringed by the generic drug product proposed in the ANDA, or by claiming that the patent is unenforceable, the applicant must submit a paragraph IV certification to FDA").

[51] "ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs Guidance for Industry," *U.S. Food and Drug Administration*, January 2024, https://www.fda.gov/media/119718/download, accessed May 5, 2025, pp. 3-4 ("An applicant submitting a paragraph IV certification to a listed patent must provide the NDA holder and each patent owner with notice of its paragraph IV certification, including a description of the legal and factual basis for the ANDA applicant's assertion that the patent is invalid, unenforceable, or will not be infringed.").

[52] "Patent Certifications and Suitability Petitions," *U.S. Food and Drug Administration*, April 23, 2025, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/patent-certifications-and-suitability-petitions ("If the brand product sponsor or patent holder files an infringement suit against the generic applicant within 45 days of the ANDA notification, FDA approval to market the generic drug is generally postponed for 30 months unless the patent expires or is judged to be invalid or not infringed before that time."). *See also*, Kannappan, Sunand, et al., "The Timing of 30-Month Stay Expirations and Generic Entry: A Cohort Study of First Generics, 2013–2020," *Clinical and Translational Science*, Vol. 14, 2021, pp. 1917-1923, p. 1918 ("If the [30 month] stay expires before [patent] litigation ends, the FDA can approve the generic drug product and its manufacturer can launch 'at-risk,' entering the market while risking substantial damages if a court rules that the relevant patents are valid and infringed.").

[53] Kannappan, Sunand et al., "The Timing of 30-Month Stay Expirations and Generic Entry: A Cohort Study of First Generics, 2013–2020," *Clinical and Translational Science*, Vol. 14, 2021, pp. 1917-1923, p. 1917 ("Assuming the brand-name manufacturer responds with litigation within 45 days, a 30-month stay period is triggered, which bars the FDA from authorizing generic entry until the stay period expires or litigation is resolved in favor of the generic manufacturer.").

31. Defending against patent infringement lawsuits can be time-consuming and costly for generic applicants.[54] To incentivize ANDA applicants to file Paragraph IV certifications and take on the potential risk of patent litigation, FDA may grant a 180-day generic exclusivity period to the first applicant that submits a "substantially complete ANDA containing a paragraph IV certification to a listed patent."[55] During this period, the applicant holds exclusive marketing rights to the generic drug and FDA generally will not approve any other ANDA for the same RLD.[56] This exclusivity framework was modified by the MMA in 2003. Under the MMA, FDA outlined certain conditions that would trigger forfeiture of an ANDA applicant's granted 180-day generic exclusivity, such as the failure

---

[54] *See, for example*, Deposition of William S. Marth, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-5479-ZNQ-JBD, February 26, 2025 ("Marth Deposition"), 213:2-6 ("Q. Okay. And it takes time and money and resources to develop a Paragraph IV certification and to litigate a patent infringement case in court, correct? A. Yes.").

[55] "Guidance for Industry: 180-Day Exclusivity: Questions and Answers," *U.S. Food and Drug Administration*, January 2017, https://www.fda.gov/media/102650/download, p. 4. *See also*, "Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs are Submitted on the Same Day," *U.S. Food and Drug Administration*, July 2003, https://www.fda.gov/media/71304/download, p. 3 ("The 180-day period of generic drug exclusivity provides a very strong financial incentive for an ANDA applicant to challenge a patent that it believes it does not infringe or that it believes is invalid or unenforceable. […] With less [generic] competition, an ANDA holder is able to derive higher profits. Thus, the opportunity to be the sole competitor to the innovator for up to 6 months is aggressively pursued.").

[56] "Patent Certifications and Suitability Petitions," *U.S. Food and Drug Administration*, April 23, 2025, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/patent-certifications-and-suitability-petitions. *See also*, "Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs are Submitted on the Same Day," *U.S. Food and Drug Administration*, July 2003, https://www.fda.gov/media/71304/download, pp. 2-3 ("[I]n certain circumstances, an applicant who submits the ANDA containing the first paragraph IV certification to a patent is *protected from competition* from other generic versions of the same drug product for 180 days after the earliest of either the initial marketing of the first [ANDA] applicant's drug or a court decision that holds that the [RLD] patent that is the subject of the paragraph IV certification is invalid or not infringed.") (Emphasis in original); *21 CFR 314.107*(c)(1) "Timing of approval of subsequent ANDA" ("If an ANDA contains a paragraph IV certification for a relevant patent and the ANDA is not that of a first applicant, the ANDA is regarded as the ANDA of a subsequent applicant. The ANDA of a subsequent applicant will not be approved during the period when any first applicant is eligible for 180-day exclusivity or during the 180-day exclusivity period of a first applicant."); "Cost of Generic Drug Development and Approval," *Eastern Research Group, Inc.*, December 31, 2021, https://aspe.hhs.gov/sites/default/files/documents/20e14b66420440b9e726c61d281cc5a5/cost-of-generic-drugs-erg.pdf, footnote 4 ("The 180-day exclusivity only blocks other [Paragraph IV] filers but not those ANDAs with a 'section viii' carve-out (i.e., a submission in accordance with 21 U.S.C.§ 355(j)(2)(A)(viii) in which the applicant has 'carved out' the protected condition of use from its product labeling).").

to market the drug within a defined timeframe,[57] withdrawal of the application, amendment of patent certifications, failure to obtain tentative approval, entry into agreements with another applicant, the NDA holder, or a patent owner, or expiration of all RLD patents.[58] These forfeiture provisions do not apply to ANDAs submitted before the MMA,[59] including Teva's ANDA for generic Effexor XR.[60] As such, Teva, as the first applicant that filed a substantially complete ANDA with a Paragraph IV certification, was entitled to 180-day exclusivity upon approval and was not required to begin commercial marketing within a specified period to retain that exclusivity.[61]

**B.    FDA's Review of Abbreviated New Drug Applications**

32. Once an applicant submits an ANDA, the Division of Filing Review ("DFR") within FDA's Office of Generic Drugs ("OGD") first evaluates the submission to determine whether the ANDA is "sufficiently complete," meaning that the application "contains all the information required under section 505(j)(2)(A) of the FD&C Act and does not contain

---

[57] The "failure to market" forfeiture provision applies if the first generic applicant does not begin commercial marketing by the later of: (1) the earlier of 75 days after FDA approval or 30 months after ANDA submission; and (2) 75 days after a triggering event, such as a final court decision of patent invalidity or non-infringement, a settlement or consent decree, or a patent withdrawal. *See* "Guidance for Industry: 180-Day Exclusivity: Questions and Answers," *U.S. Food and Drug Administration*, January 2017, https://www.fda.gov/media/102650/download, pp. 15-16.

[58] *21 U.S.C. §355*(j)(5)(D). *See also*, "Guidance for Industry: 180-Day Exclusivity: Questions and Answers," *U.S. Food and Drug Administration*, January 2017, https://www.fda.gov/media/102650/download, pp. 4-5.

[59] "Guidance for Industry: 180-Day Exclusivity: Questions and Answers," *U.S. Food and Drug Administration*, January 2017, https://www.fda.gov/media/102650/download, p. 5 ("[T]he MMA 180-day exclusivity provisions are effective only with respect to an ANDA filed after the date of enactment (i.e., December 8, 2003) for a listed drug for which no paragraph IV certification was made before that date.").

[60] Teva submitted ANDA 76-565 for 150 mg generic Effexor XR to FDA on December 10, 2002. *See* "Teva ANDA 76-565 for Venlafaxine HCl XR Capsules, 150 mg," January 22, 2003, TEVA_EFFEX_0000001-267 at 002.

[61] "FDA Approval Letter Sent to Teva for ANDA 76-565," June 28, 2010, TEVA_EFFEX_0018544-550 at 547 ("[…] TEVA was the first ANDA applicant to submit a substantially complete ANDA with a paragraph IV certification to the '171, '120, and '958 patents. […] TEVA is eligible for 180 days of generic drug exclusivity for Venlafaxine Hydrochloride Extended-Release Capsules […]."), footnote 1 ("Because your ANDA was filed before the date of enactment of the Medicare Prescription Drug, Improvement and Modernization Act (MMA) […] on December 8, 2003, this reference to the 180-day exclusivity provision is to the section of the Act as in effect prior to December 8, 2003.").

a deficiency described in 21 CFR 314.101(d) and (e)."[62, 63] If the ANDA is deemed sufficiently complete, it may be "received" by FDA and proceed to a substantive review.[64]

33. In 2002, the year that Teva filed its ANDA for generic Effexor XR,[65] FDA outlined four key review sections in its ANDA evaluation: bioequivalence review, chemistry/microbiology review, labeling review, and plant inspection.[66]

- *Bioequivalence review*: the applicant must demonstrate that the generic drug "has the same active ingredient, dosage form, strength, route of administration and conditions of use" as the RLD, and that there is "no significant difference in the rate and extent of absorption of the [active] ingredient" compared to the RLD.[67] FDA requires detailed evidence to establish bioequivalence, which may be demonstrated through *in vivo*

---

[62]  "Filing Review of Abbreviated New Drug Applications," *Center for Drug Evaluation and Research*, October 3, 2023, https://www.fda.gov/media/144976/download, pp. 1-2.

[63]  DFR Reviewers use an ANDA Filing Checklist that follows the Common Technical Document ("CTD") format. "DFR will update the checklist as necessary. The updates may reflect, for example, revised recommendations and/or guidances pertaining to technical reviews that are conducted for an ANDA." *See* "Filing Review of Abbreviated New Drug Applications," *Center for Drug Evaluation and Research*, October 3, 2023, https://www.fda.gov/media/144976/download, p. 2, Attachment 1.

[64]  "Filing Review of Abbreviated New Drug Applications," *Center for Drug Evaluation and Research*, October 3, 2023, https://www.fda.gov/media/144976/download, pp. 1-3 ("The receipt of an ANDA means that FDA made a threshold determination that the ANDA is a substantially complete application, that is, an ANDA that on its face is sufficiently complete to permit a substantive review. […] At the conclusion of the filing review, the DFR Reviewer will determine whether to receive the ANDA, issue an Information Request (IR) to the applicant providing an opportunity to remedy identified deficiencies, or refuse-to-receive the ANDA."). *See also*, "Refuse to File Letter Issued," *U.S. Food and Drug Administration*, https://web.archive.org/web/20020813202212/http://www.fda.gov/cder/handbook/refusegn.htm, archived by the Wayback Machine on August 13, 2002 ("If the application is missing on or more essential components, a 'Refuse to File' letter is sent to the applicant. The letter documents the missing component(s) and informs the applicant that the application will not be filed until it is complete.").

[65]  "Teva ANDA 76-565 for Venlafaxine HCl XR Capsules, 150 mg," January 22, 2003, TEVA_EFFEX_0000001-267 at 002.

[66]  "Generic Drug (ANDA) Review Process," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021017004659/http://www.fda.gov/cder/handbook/anda.htm, archived by the Wayback Machine on October 17, 2002. *See also*, "Approval Package for Application Number: ANDA 076565," *Center for Drug Evaluation and Research*, June 28, 2010, https://www.accessdata.fda.gov/drugsatfda_docs/anda/2010/076565Orig1s000.pdf, PDF p. 2.

[67]  "Guidance for Industry: Bioequivalence Recommendations for Specific Products," *U.S. Food and Drug Administration*, June 2010, https://www.fda.gov/media/71401/download, pp. 1-2. *See also*, *21 CFR 314.94*(a)(7) "Bioequivalence."

(human) testing, or, in certain cases, through bioavailability data such as formulation comparisons or comparative dissolution studies.[68]

- *Chemistry and microbiology review*: FDA evaluates manufacturing practices, raw material controls, sterilization, container and closure systems, and stability data to ensure that the generic drug is consistently manufactured under controlled, reproducible conditions.[69]

- *Labeling review*: FDA confirms that all labels, inserts, and patient information for the generic drug match those of the RLD, except for allowable differences related to the manufacturer, distributor, or patent exclusivity.[70] This review also addresses potential issues that could lead to medication errors, such as similar sounding drug names or illegible drug strengths.[71]

- *Plant inspection*: FDA evaluates each facility involved in the manufacturing, testing, or packaging of the generic drug to verify compliance with current Good Manufacturing Practice ("cGMP")

---

[68]   "Bioequivalence Review," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021122143733/http://www.fda.gov/cder/handbook/bioequiv.htm, archived by the Wayback Machine on November 22, 2002. Comparative dissolution is a lab-based test that measures the rate and extent to which the active ingredient in the generic drug dissolves. It may be used to demonstrate bioequivalence by showing that the generic drug and the RLD have sufficiently similar dissolution profiles. *See, for example*, Diaz, Dorys Argelia, et al., "Dissolution Similarity Requirements: How Similar or Dissimilar Are the Global Regulatory Expectations?," *The AAPS Journal*, Vol. 18, No. 1, 2016, pp. 15-22, pp. 15-16 ("Dissolution tests are used to guide the development of new formulations, monitor the quality of drug products, assess the potential impact of post-approval changes on product performance, and, in some cases, predict the in vivo performance of the drug product. […] Dissolution profiles may be considered similar by virtue of (1) overall profile similarity and (2) similarity at every dissolution sample time point."); "Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations," *U.S. Food and Drug Administration*, September 1997, https://www.fda.gov/media/70939/download, pp. 1-2, 12-13.

[69]   "Chemistry/Microbiology Review," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021024155351/http://www.fda.gov/cder/handbook/chemistg.htm, archived by the Wayback Machine on October 24, 2002.

[70]   "Labeling Review," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021024161054/http://www.fda.gov/cder/handbook/labelogd.htm, archived by the Wayback Machine on October 24, 2002.

[71]   "Labeling Review," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021024161054/http://www.fda.gov/cder/handbook/labelogd.htm, archived by the Wayback Machine on October 24, 2002.

regulations in 21 CFR 211, which outline the "minimum" manufacturing regulations for the preparation of drug products intended for human or animal use.[72] As part of this, FDA may also conduct a preapproval product specific inspection to verify the integrity of the data included in the application.[73]

34. At any stage during its review, FDA may identify deficiencies in an ANDA and communicate them to the applicant through a deficiency letter.[74] For example, if deficiencies are identified during the bioequivalence review, FDA will issue a Bioequivalence Deficiency Letter outlining the issues and requesting the data and information needed to resolve them;[75] if deficiencies are identified during the chemistry and microbiology review, FDA will issue a deficiency letter detailing them and instructing the applicant on how to amend their application accordingly.[76]

35. These deficiency letters may fall into one of two main categories: Major deficiencies are, in FDA's judgement, "significant in nature," such as certain deficiencies outlined in 21 CFR 314.101(d) and (e).[77] Minor deficiencies involve less significant issues that can be

---

[72] "Request for Plant Inspection," *U.S. Food and Drug Administration*, https://web.archive.org/web/20020805141424/http://www.fda.gov/cder/handbook/inspecpl.htm, archived by the Wayback Machine on August 5, 2002; *21 CFR 211.1.*

[73] "Request for Plant Inspection," *U.S. Food and Drug Administration*, https://web.archive.org/web/20020805141424/http://www.fda.gov/cder/handbook/inspecpl.htm, archived by the Wayback Machine on August 5, 2002.

[74] "Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions," *U.S. Food and Drug Administration*, October 26, 2022, https://www.fda.gov/media/71735/download, pp. 2-3.

[75] "Bioequivalence Review Acceptable?," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021228071247/fda.gov/cder/handbook/bioaccep.htm, archived by the Wayback Machine on December 28, 2002.

[76] "Chemistry/Micro/Labeling Review Acceptable?," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021024161337/http://www.fda.gov/cder/handbook/labaccep.htm, accessed May 4, 2025, archived by the Wayback Machine on October 24, 2002.

[77] "ANDA Submissions – Refuse-to-Receive Standards: Guidance for Industry," *U.S. Food and Drug Administration*, December 2016, https://www.fda.gov/media/86660/download, p. 3. This FDA guidance also notes that numerous minor deficiencies may constitute a major deficiency. CFR 314.101(d) outlines deficiencies on ANDAs and NDAs, including failure to provide a completed application form, failure to submit the application in the required format under the FD&C Act, and failure to provide an accurate and complete English translation of each part of the application that is not in English. CFR 314.101(e) outlines regulatory deficiencies, such as the drug product being subject to FDA licensing under the Public Health Service Act, or submission of an application barred by FD&C provisions. *See 21 CFR 314.101* (d)(1)-(3), (5); *21 CFR 314.101*(e) "Regulatory deficiencies."

"easily remedied," but still require correction to meet regulatory requirements or prevent potential misbranding or adulteration of the drug product.[78] While FDA issues deficiency letters to communicate major deficiencies, minor deficiencies are often addressed by phone, fax, or email to allow for quicker resolution.[79]

36. Any deficiencies identified by FDA must be fully resolved before the application can be approved. In some cases, this may include a re-inspection of the manufacturing facility or additional review to verify that the manufacturer has addressed all concerns.[80] As such, receiving and resolving a deficiency letter from FDA can result in delays in the overall approval timeline for a given ANDA.[81]

### C.    Tentative and Final Approval of Abbreviated New Drug Applications

37. Once an ANDA has successfully completed all stages of FDA review, it may receive either a tentative or final approval letter.[82] FDA may grant tentative approval to an applicant if

---

[78]   "ANDA Submissions – Refuse-to-Receive Standards: Guidance for Industry," *U.S. Food and Drug Administration*, December 2016, https://www.fda.gov/media/86660/download, p. 3; "Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions," *U.S. Food and Drug Administration*, October 26, 2022, https://www.fda.gov/media/71735/download, p. 6 ("Minor deficiencies are FDA requests that can be resolved in a straightforward manner, but that need to be addressed to meet regulatory requirements or to prevent potential misbranding or adulteration.").

[79]   "The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles; Final Guidance for FDA and Industry," *U.S. Food and Drug Administration*, October 4, 2002, https://www.fda.gov/files/medical%20devices/published/The-Least-Burdensome-Provisions-of-the-FDA-Modernization-Act-of-1997--Concept-and-Principles---Final-Guidance-for-FDA-and-Industry.pdf, p. 7 ("Whenever possible, FDA and industry should attempt to resolve minor questions/issues by phone, fax, or e-mail. The Agency should use deficiency letters to resolve the more complicated issues (i.e., major deficiencies) and include only those minor deficiencies that have not been adequately addressed by phone, fax, or e-mail. Industry should promptly respond to questions regarding minor deficiencies to avoid unnecessarily prolonging the review time.").

[80]   "Preapproval Inspection Acceptable?," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021228073727/http://www.fda.gov/cder/handbook/preaccep.htm, archived by the Wayback Machine on December 28, 2002 ("If an unsatisfactory recommendation is received, a not approvable letter may be issued. In such a case, approval of the generic drug product will be deferred pending a satisfactory re-inspection and an acceptable recommendation.").

[81]   "Preapproval Inspection Acceptable?," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021228073727/http://www.fda.gov/cder/handbook/preaccep.htm, archived by the Wayback Machine on December 28, 2002 ("[A]pproval of the generic drug product will be deferred pending a satisfactory re-inspection and an acceptable recommendation.").

[82]   At the time Teva submitted its ANDA for generic extended-release venlafaxine hydrochloride, FDA defined approval or tentative approval as being granted when "all components of the application are found to be acceptable." *See* "ANDA Approved," *U.S. Food and Drug Administration*,

their ANDA satisfies all requirements of the FD&C Act, but cannot be granted final approval because there still exist unexpired patents or exclusivities for the RLD.[83] Final approval of the ANDA cannot occur until the resolution of all patent or exclusivity concerns.[84] Further, tentative approval letters are predicated upon the information provided by the applicant at the time of the tentative approval.[85] Applicants may submit amendments to request final approval, propose changes to the application, or do both.[86] As cautioned by FDA, any amendment to the application "may delay FDA's final approval of the ANDA until after the earliest lawful ANDA approval date."[87] Importantly, a tentative approval alone does not allow the applicant to market the generic drug product.[88]

---

https://web.archive.org/web/20021024153542/http://www.fda.gov/cder/handbook/andaappr.htm, archived by the Wayback Machine on October 24, 2002. On October 6, 2016, FDA issued a final rule to update the definition of "tentative approval" to provide clarity "that a drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter after any necessary additional review of the NDA or ANDA." *See* "Abbreviated New Drug Applications and 505(b)(2) Applications," *Federal Register Vol. 81, No. 194*, October 6, 2016, https://www.govinfo.gov/content/pkg/FR-2016-10-06/pdf/2016-22690.pdf, p. 69595.

[83]  "Guidance for Industry: 180-Day Exclusivity: Questions and Answers," *U.S. Food and Drug Administration*, January 2017, https://www.fda.gov/media/102650/download, p. 4 ("If an ANDA meets the substantive requirements for approval, but cannot be finally approved due to unexpired patents or exclusivities, FDA will tentatively approve the ANDA. *Tentative approval* 'means notification to an applicant by [FDA] that an [ANDA] meets the requirements of [section 505(j)(2)(A) of the FD&C Act] but cannot receive effective approval because the application does not meet the requirements of this subparagraph, there is a period of exclusivity for the listed drug under subparagraph (F) or section 505A, or there is a 7-year period of exclusivity for the listed drug under section 527.'") (Emphasis in original). *See also*, *21 CFR 314.3*(b) "Tentative approval."

[84]  "Drugs@FDA Glossary of Terms," *U.S. Food and Drug Administration*, November 14, 2017, https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms ("FDA delays final approval of the generic drug product until all patent exclusivity issues have been resolved.").

[85]  *21 CFR 314.105*(d) ("FDA's tentative approval of a drug product is based on information available to FDA at the time of the tentative approval letter (i.e., information in the ANDA and the status of current good manufacturing practices of the facilities used in the manufacturing and testing of the drug product) and is therefore subject to change on the basis of new information that may come to FDA's attention.").

[86]  "ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs Guidance for Industry," *U.S. Food and Drug Administration*, January 2024, https://www.fda.gov/media/119718/download, accessed May 5, 2025, p. 5.

[87]  "ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs Guidance for Industry," *U.S. Food and Drug Administration*, January 2024, https://www.fda.gov/media/119718/download, accessed May 5, 2025, p. 5.

[88]  "Drugs@FDA Glossary of Terms," *U.S. Food and Drug Administration*, November 14, 2017, https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms. *See also*, *21 CFR 314.105*(d).

38. Tentative approval letters are meant to communicate the patent and exclusivity issues that are preventing an ANDA from receiving final approval in instances where the ANDA has otherwise met the requirements for final approval. By definition, a tentative approval cannot be granted if the ANDA does not "meet[] the substantive requirements for approval," as outlined by FDA.[89] FDA is not required to issue a tentative approval before a final approval for any drug product.[90]

39. Although Teva sought and expected to receive tentative approval for its generic Effexor XR in the 2005-2006 period,[91] the ANDA did not satisfy all requirements during this period and was never granted tentative approval.[92] Teva's generic Effexor ANDA ultimately received final approval on June 28, 2010, only after Teva satisfied all requirements set forth by FDA's deficiency letters.[93]

40. Both new drug and generic drug development costs are substantial. An economic evaluation study estimates that the mean cost of developing a new drug from 2000 to 2018

---

[89] "ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs Guidance for Industry," *U.S. Food and Drug Administration*, January 2024, https://www.fda.gov/media/119718/download, accessed May 5, 2025, p. 4.

[90] *21 CFR 314.105*(d) ("FDA will approve an ANDA and send the applicant an approval letter if none of the reasons in § 314.127 for refusing to approve the ANDA applies. **FDA will issue a tentative approval letter if an ANDA otherwise meets the requirements for approval under the Federal Food, Drug, and Cosmetic Act**, but cannot be approved because there is a 7-year period of orphan exclusivity for the listed drug under section 527 of the Federal Food, Drug, and Cosmetic Act and § 316.31 of this chapter, or cannot be approved until the conditions in § 314.107(b)(3) or (c) are met; because there is a period of exclusivity for the listed drug under § 314.108; because there is a period of pediatric exclusivity for the listed drug under section 505A of the Federal Food, Drug, and Cosmetic Act; or because there is a period of exclusivity for the listed drug under section 505E of the Federal Food, Drug, and Cosmetic Act.") (Emphasis added).

[91] *See, for example*, "Teva Internal Emails Regarding Expected Tentative Approval Timeline for ANDA 76-565," May 9, 2005, TEVA_EFFEX_0039631-632 at 631 ("Venlafaxine ER- we are working on response to a minor deficiency letter. Could see tentative approval in the next 3-4 months[.]"). In January 2006, Teva internally maintained a draft press release for the planned announcement of tentative approval for their generic Effexor XR. *See* "Teva Draft Press Release for Tentative Approval of Venlafaxine HCl XR Capsules," January 13, 2006, TEVA_EFFEX_0039474.

[92] Deposition of Philip Eric Erickson, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD, January 30, 2025 ("Erickson Deposition") at 248:10-12 ("Q. Now, did Teva, in fact, ever obtain tentative approval for its generic Effexor ANDA? A. Not that I recall.").

[93] "FDA Approval Letter Sent to Teva for ANDA 76-565," June 28, 2010, TEVA_EFFEX_0018544-550.

was $172.7 million (in 2018 dollars).[94] Depending on the type of drug product and studies conducted, new drug products (specifically, new chemical entities that have not been previously approved by FDA) are generally entitled to five years of exclusivity from the date of NDA approval.[95] An NDA holder may receive an additional six months of pediatric exclusivity if their drug development included pediatric studies.[96] While ANDA applicants may be able to obviate the costs of replicating clinical trials, development of generic drug products can still be a costly endeavor.[97] Both NDA exclusivity periods and first-to-file ANDA 180-day exclusivity periods (discussed in **Section III.A**) are designed to incentivize drug manufacturers to incur the significant costs of drug development, as they provide a marketing exclusivity window to help recuperate development costs.[98] It follows that NDA and ANDA applicants are incentivized to reach final approval for their drug products as soon as feasible to begin recuperating their development costs.

---

[94] When accounting for the costs of new drug development failures, this figure increased to $515.8 million, on average. When accounting for the costs of new drug development failure and capital costs, this figure increased to $879.3 million, on average. *See* Sertkaya, Aylin, et al., "Costs of Drug Development and Research and Development Intensity in the US, 2000-2018," *JAMA Network Open*, Vol. 7, No. 6, 2024, pp. 1-13.

[95] *21 CFR 314.108*(b)(2) ("If a drug product that contains a new chemical entity was approved after September 24, 1984, in an NDA submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act, no person may submit a 505(b)(2) application or ANDA under section 505(j) of the Federal Food, Drug, and Cosmetic Act for a drug product that contains the same active moiety as in the new chemical entity for a period of 5 years from the date of approval of the first approved NDA, except that the 505(b)(2) application or ANDA may be submitted after 4 years if it contains a certification of patent invalidity or noninfringement[.]").

[96] "Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act: Frequently Asked Questions on Pediatric Exclusivity (505A)," March 1, 2022, https://www.fda.gov/drugs/development-resources/qualifying-pediatric-exclusivity-under-section-505a-federal-food-drug-and-cosmetic-act-frequently.

[97] *See, for example*, Reiffen, David and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1, 2005, pp. 37-49, p. 38 ("[Generic] Entry still requires significant up-front expenditure, with a payoff that depends both on the FDA's decisions with respect to a firm's [ANDA] application, and the timing of FDA approval of rivals' ANDA applications.").

[98] "Research and Development in the Pharmaceutical Industry," *Congressional Budget Office*, April 2021, https://www.cbo.gov/publication/57126, accessed June 25, 2025 ("[T]he patent system and certain statutory provisions that delay FDA approval of generic drugs provide pharmaceutical companies with a period of market exclusivity, when competition is legally restricted. During that time, they can maintain higher prices on a patented product than they otherwise could, which makes new drugs more profitable and thereby increases drug companies' incentives to invest in R&D.").

### D.    Quality by Design and Question-based Review

41. In August 2002, FDA announced a new initiative, "Pharmaceutical Current Good Manufacturing Practices for the 21st Century — A Risk-Based Approach," (the "cGMP initiative") to "enhance and modernize the regulation of pharmaceutical manufacturing and product quality."[99] Under the cGMP initiative, FDA encouraged the pharmaceutical industry to adopt new technologies and implement modern quality management techniques and risk-based approaches. The initiative aimed to establish science-based policies for regulatory review, compliance, and inspection and to promote consistent and coordinated oversight of FDA's drug quality regulatory programs. Over the next two years, FDA formed a number of multidisciplinary working groups to create what it described as "a new framework for the regulatory oversight of manufacturing quality that is based on quality systems and risk management approaches."[100]

42. As part of the cGMP initiative, FDA developed and provided a framework and guidance for implementing the concept of Quality by Design ("QbD").[101] One of these working groups was the Quality Systems Guidance Development working group, which on October 4, 2004, issued draft guidance on the "Quality Systems Approach to Pharmaceutical Current Good Manufacturing Practice Regulations," providing "a contemporary framework for implementing quality by design, continuous improvement and risk management in the drug manufacturing process."[102] This guidance was made available on October 2, 2006.[103] Additionally, FDA, as a member of the International Conference on

---

[99]   "Pharmaceutical CGMPs for the 21st Century — A Risk-Based Approach," *U.S. Food and Drug Administration*, September 2004, https://www.fda.gov/media/77391/download, p. 1.

[100]  "Pharmaceutical CGMPs for the 21st Century — A Risk-Based Approach," *U.S. Food and Drug Administration*, September 2004, https://www.fda.gov/media/77391/download, pp. 1-2, 23.

[101]  "Pharmaceutical CGMPs for the 21st Century — A Risk-Based Approach," *U.S. Food and Drug Administration*, September 2004, https://www.fda.gov/media/77391/download, pp. 1-2.

[102]  "Pharmaceutical CGMPs for the 21st Century — A Risk-Based Approach," *U.S. Food and Drug Administration*, September 2004, https://www.fda.gov/media/77391/download, pp. 22-23; "Guidance for Industry on Quality Systems Approach to Pharmaceutical Current Good Manufacturing Practice Regulations; Availability," *Federal Register*, October 2, 2006, https://www.govinfo.gov/content/pkg/FR-2006-10-02/pdf/E6-16215.pdf at 57980.

[103]  "Guidance for Industry on Quality Systems Approach to Pharmaceutical Current Good Manufacturing Practice Regulations; Availability," *Federal Register*, October 2, 2006, https://www.govinfo.gov/content/pkg/FR-2006-10-02/pdf/E6-16215.pdf at 57980.

Harmonisation of the Technical Requirements for Registration of Pharmaceuticals ("ICH"), collaborated with other global regulatory authorities in November 2003 to establish two expert working groups on pharmaceutical development, one of which aimed to "incorporate elements of risk and *quality by design* throughout the life-cycle of the product." [104] In November 2005, the ICH Steering Committee endorsed the ICH Harmonised Tripartite Guideline on Pharmaceutical Development for adoption in the U.S., the European Union, and Japan, which was published in May 2006.[105] In November 2008 it endorsed an annex, which was issued in June 2009 and further clarified the definition and principles of QbD.[106]

43. QbD is a "systematic approach to development that begins with predefined objectives and emphasizes product and process understanding and process control, based on sound science and quality risk management" to "enhance achieving the desired quality of the product[.]"[107] Thus, the QbD approach goes "beyond the traditional Quality By Testing (QbT) approach where the quality is mainly tested in the final product," and requires manufacturers to provide "far more" information in the pre-approval phase, making the process significantly more labor-intensive and therefore time-consuming.[108] Under the

---

[104] "Pharmaceutical CGMPs for the 21st Century — A Risk-Based Approach," *U.S. Food and Drug Administration*, September 2004, https://www.fda.gov/media/77391/download, pp. 9, 13.

[105] "Guidance for Industry: Q8 Pharmaceutical Development," *U.S. Food and Drug Administration*, May 2006, https://www.govinfo.gov/content/pkg/GOVPUB-HE20_4000-PURL-LPS112066/pdf/GOVPUB-HE20_4000-PURL-LPS112066.pdf, p. 1.

[106] ICH Expert Working Group, "Pharmaceutical Development Q8(R2)," *International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use*, 2009, PDF pp. 2, 9, 16; "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, pp. 1, 10, 18.

[107] "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, pp. 10, 18; "New Drug Quality," *FDA/CDER Small Business Chronicles*, September 18, 2012, https://www.fda.gov/media/84457/download, PDF p. 1.

[108] Grangeia, Helena Bigares, et al., "Quality by Design in Pharmaceutical Manufacturing: A Systematic Review of Current Status, Challenges and Future Perspectives," *European Journal of Pharmaceutics and Biopharmaceutics*, Vol. 147, 2020, pp. 19-37, p. 19 ("The guiding principle is that [q]uality should begin before manufacturing starts and capital allocations are made. In practice, this means that companies should start establishing their quality goals, develop products features that attain these goals, develop processes capable to deliver such products and establish controls that enable operations to be conducted consistently. [...] QbD advocates that quality should be built into the process and product during development, going beyond the traditional Quality By Testing (QbT) approach where the quality is mainly tested in the final product[.]"); Erickson Deposition at 185:13.

new guidance, applicants became required to explain how their pre-approval processes were designed to result in the production of a consistently acceptable product.[109] A transition to a QbD approach requires significant up-front investments from the applicant.[110] Companies making this shift may need to recruit additional, specialized staff to enable them to sufficiently conduct additional scientific studies and generate additional data.[111] They may also make changes to manufacturing processes to include, for example,

---

[109]  Erickson Deposition at 180:10-181:2 ("It introduces a new concept from FDA […] presenting their new initiative of […] QBD, quality by design, and the expansion of information and testing that an applicant had to do in order to gain approval. So, this was a, a reset from FDA as to what they expected to see in the application. […] [M]aking sure that a company were to comply with the QBR or QBD initiative would take a significant amount of time."), 185:12-186:10 ("[T]he QBD initiative from FDA […] required manufacturers to provide far more information and data to represent that they understand how to make the product, why the product worked in manufacture. Historically, companies could make a batch of product, test it, and if it passed, they would send it to FDA for review. FDA would then take time to review it, approve it. And I'm sure if we looked back through history, that there are a number of products that were approved that never came to market because the company could not reproduce it. […] QBD was FDA's way of ensuring that their reviews were not done in vein [sic]. That the time was not wasted and safe effective product in a reproducible manner was going to come to market. So, all of that work, yes, is going to take a significant amount of time.").

[110]  Moscariello, John, "Quality by Design: Transforming 21st Century Pharmaceutical Manufacturing," *American Pharmaceutical Review*, July 29, 2016, https://www.americanpharmaceuticalreview.com/Featured-Articles/190726-Quality-by-Design-Transforming-21st-Century-Pharmaceutical-Manufacturing/ ("[QbD] does, however, require significant upfront investment at the earliest stages of drug discovery and development. It also necessitates sustained commitment and tight collaboration from cross-disciplinary teams of R&D, formulation, process engineering, and regulatory affairs. Most understand that at the beginning of product development, knowledge regarding product and process is limited, particularly for first-in-class drugs. For companies with a tight budget and operational resources, these hurdles can be extremely challenging to clear while racing to market with a promising compound.").

[111]  FDA guidance from September 2006 recommended that companies adopting a QbD approach should allocate sufficient resources and employ personnel with specialized expertise and qualifications. *See, for example*, "Guidance for Industry: Quality Systems Approach to Pharmaceutical CGMP Regulations," *U.S. Food and Drug Administration*, September 2006, https://www.fda.gov/media/71023/download, p. 3 ("A quality system can provide the necessary framework for implementing *quality by design* (building in quality from the development phase and throughout a product's life cycle)[.]"), p. 12 ("[…] Under a robust quality system, sufficient resources should be allocated for quality system and operational activities."), p. 13 ("In a quality system, personnel should be qualified to do the operations that are assigned to them in accordance with the nature of, and potential risk of, their operational activities. […] Although QU [quality unit] personnel should not take on the responsibilities of other units of the organization, these personnel should be selected based on their scientific and technical understanding, product knowledge, process knowledge and/or risk assessment abilities to appropriately execute certain quality functions.[…] Under a quality system, continued training is critical to ensure that the employees remain proficient in their operational functions and in their understanding of CGMP regulations. Typical quality systems training should address the policies, processes, procedures, and written instructions related to operational activities, the product/service, the quality system, and the desired work culture (e.g., team building, communication, change, behavior). Under a quality system (and the CGMP regulations), training should focus on both the

the ability to monitor product quality throughout the manufacturing process. The QbD approach encourages applicants to submit the knowledge they have gained about the product and its manufacturing process, supported by appropriate data, rather than simply submitting large amounts of data without accompanying context.[112]

44. The QbD initiative is driven by FDA's understanding that increased testing does not necessarily result in improved product quality.[113] The applicant's knowledge of their products and manufacturing process, which must be shared under the QbD approach, helps FDA better understand the applicant's manufacturing strategy and enables the agency to conduct science- and risk-based evaluations, rather than relying on the volume of data submitted.[114]

45. Before and after the formal introduction of QbD guidance, FDA launched a series of pilot programs designed to engage applicants and enhance the agency's own understanding of QbD principles. While companies were already incorporating QbD principles into their

---

employees' specific job functions and the related CGMP regulatory requirements."), p. 19 ("Evaluating the effects of a [process] change can entail additional tests or examinations of subsequent batches (e.g. additional in-process testing or additional stability studies).").

[112] ICH Expert Working Group, "Pharmaceutical Development Q8(R2)," *International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use*, 2009, p. 9; "New Drug Quality," *FDA/CDER Small Business Chronicles*, September 18, 2012, https://www.fda.gov/media/84457/download, p. 2.

[113] "New Drug Quality," *FDA/CDER Small Business Chronicles*, September 18, 2012, https://www.fda.gov/media/84457/download, p. 1 ("It is important to recognize that quality cannot be tested into products; it should be built by design"); "Guidance for Industry: PAT — A Framework for Innovative Pharmaceutical Development, Manufacturing and Quality Assurance," *U.S. Food and Drug Administration*, September 2004, https://www.fda.gov/media/71012/download, p. 4 ("The goal of PAT is to enhance understanding and control the manufacturing process, which is consistent with our current drug quality system: *quality cannot be tested into products; it should be built-in or should **be** by design*.") (Emphasis in original). The QbD approach "has been widely adopted as a standard of practice for manufacturers" across various industries. *See* Moscariello, John, "Quality by Design: Transforming 21st Century Pharmaceutical Manufacturing," *American Pharmaceutical Review*, July 29, 2016, https://www.americanpharmaceuticalreview.com/Featured-Articles/190726-Quality-by-Design-Transforming-21st-Century-Pharmaceutical-Manufacturing/. The QbD approach in the pharmaceutical industry intends to "achieve meaningful product quality specifications that are based on clinical performance, […] [t]o increase process capability and reduce product variability and defects by enhancing product and process design, understanding, and control, […] [t]o increase product development and manufacturing efficiencies," and "[t]o enhance root cause analysis and postapproval change management." *See* Yu, Lawrence X., et al., "Understanding Pharmaceutical Quality by Design," *The AAPS Journal*, Vol. 16, No. 4, 2014, pp. 771-783, p. 771.

[114] "New Drug Quality," *FDA/CDER Small Business Chronicles*, September 18, 2012, https://www.fda.gov/media/84457/download, p. 2.

operations and submissions to FDA,[115] these pilot programs aimed to promote the adoption of the QbD approach and inform the development of regulatory guidance.[116] In 2005, FDA launched a chemistry, manufacturing, and controls ("CMC") pilot program to provide participating pharmaceutical companies the opportunity to demonstrate their understanding of "quality by design, product knowledge, and process understanding of the drug substance and drug product in a new drug application."[117] Through this program, FDA intended to develop a guidance framework and gained practical experience reviewing QbD submissions for small molecule drugs.[118] Building on this effort, FDA initiated another pilot program in 2008, focused on original applications and supplemental submissions for biotechnology products. This program aimed to refine regulatory review

---

[115] *See, for example,* "A Pharma Manufacturer's View of Quality by Design," *PharmTech*, August 1, 2011, https://www.pharmtech.com/view/pharma-manufacturers-view-quality-design ("[I]n 2006, Pfizer established an internal Quality by Design Limited Duration Team […] [c]harged with developing guidelines for the implementation of QbD throughout Pfizer[.]"). FDA reported receiving new drug applications incorporating QbD components as early as 2005. *See also,* "Quality by Design – FDA Lessons Learned and Challenges for International Harmonization," *U.S. Food and Drug Administration*, February 28, 2012, https://www.ibcinfo.com/Uploads/qbd/COMPLIANCE%2051_%5bmoore.christine%5d%5bicdd%5d%5d%5b0 2.28.12%5d.pdf at slide 9, at slide 14 ("The science and risk based approaches in QbD are being embraced by most innovator pharma companies for development.").

[116] Moscariello, John, "Quality by Design: Transforming 21st Century Pharmaceutical Manufacturing," *American Pharmaceutical Review*, July 29, 2016, https://www.americanpharmaceuticalreview.com/Featured-Articles/190726-Quality-by-Design-Transforming-21st-Century-Pharmaceutical-Manufacturing/ ("[S]everal pilot programs were initiated by the FDA to encourage communications between the industry and agency, facilitate pharmaceutical companies' initial embrace of QbD and gain regulatory compliance experience."); Van Arnum, Patricia, "A FDA Perspective on Quality by Design," *PharmTech*, December 5, 2007, https://www.pharmtech.com/view/fda-perspective-quality-design ("Chen then shared some observations made from the [2005] CMC pilot as they relate to CQAs, risk assessment, design space, and control strategy. The lessons learned from the CMC pilot are being considered in the revision of ICH Q8.").

[117] "Submission of Chemistry, Manufacturing, and Controls Information in a New Drug Application Under the New Pharmaceutical Quality Assessment System; Notice of Pilot Program," *Federal Register*, July 14, 2005, https://www.govinfo.gov/content/pkg/FR-2005-07-14/pdf/05-13829.pdf.

[118] "Submission of Quality Information for Biotechnology Products in the Office of Biotechnology Products; Notice of Pilot Program," *Federal Register*, July 2, 2008, https://www.govinfo.gov/content/pkg/FR-2008-07-02/pdf/E8-14999.pdf at 37973 ("This [2005] pilot was extremely useful in helping identify appropriate information to be shared regarding quality by design for small molecules"). The pharmaceutical companies that participated in the pilot program submitted NDAs "containing more information on product development and formulation than in typical filings." *See* Wechsler, Jill, "FDA Encourages Quality by Design Initiatives," *BioPharm International*, March 1, 2008, https://www.biopharminternational.com/view/fda-encourages-quality-design-initiatives. *See also*, "Submission of Chemistry, Manufacturing, and Controls Information in a New Drug Application Under the New Pharmaceutical Quality Assessment System; Notice of Pilot Program," *Federal Register*, July 14, 2005, https://www.govinfo.gov/content/pkg/FR-2005-07-14/pdf/05-13829.pdf.

processes and further the development and implementation of QbD guidance for complex drug products.[119] Then, in 2011, FDA launched a joint pilot program with European Medicines Agency ("EMA") to "facilitate the consistent implementation of QbD concepts introduced through [ICH] Q8, Q9 and Q10 documents."[120] This initiative aimed to align FDA and EMA review practices to ensure consistent feedback on QbD submissions across the regulatory agencies, and continued through 2016.[121]

46. Even while FDA was still finalizing the QbD guidance, it strongly encouraged pharmaceutical companies to adopt the QbD approach and initiated a paradigm shift such that the agency increasingly expected applications to incorporate QbD elements.[122]

---

[119] "Submission of Quality Information for Biotechnology Products in the Office of Biotechnology Products; Notice of Pilot Program," *Federal Register*, July 2, 2008, https://www.govinfo.gov/content/pkg/FR-2008-07-02/pdf/E8-14999.pdf at 37972-973 ("The OBP pilot described in this document focuses on defining clinically relevant attributes for complex products and linking them to the manufacturing process. In addition to considering quality by design for an entire original application, this pilot also will consider quality-by-design approaches to unit operations in supplements. […] Based on experience gained during the pilot program and prior knowledge, FDA will develop procedures to facilitate implementing a quality-by-design, risk-based approach for complex products. In addition, the experience gained by FDA under this pilot is expected to facilitate the development of guidance for industry.").

[120] "Report From the EMA-FDA QbD Pilot Program," *European Medicines Agency*, April 19, 2017, https://www.fda.gov/media/104371/download, PDF p. 1.

[121] "Report From the EMA-FDA QbD Pilot Program," *European Medicines Agency*, April 19, 2017, https://www.fda.gov/media/104371/download.

[122] Grangeia, Helena Bigares et al., "Quality by Design in Pharmaceutical Manufacturing: A Systematic Review of Current Status, Challenges and Future Perspectives," *European Journal of Pharmaceutics and Biopharmaceutics*, Vol. 147, 2020, pp. 19-37, pp. 1-2 ("The formal start for this new wave in the way pharmaceutical businesses are conducted and managed, was given by the Food and Drug Administration (FDA) initiative of calling for a serious change, in the rise of the 21st century, on how patient's safety can be enhanced by integrating science and risk assessment/management into development and manufacturing activities. This represented a major paradigm change, formally established in 2004, when FDA issued the report "Pharmaceutical Quality for the 21st Century: A Risk Based Approach"); Yu, Lawrence X. et al., "Understanding Pharmaceutical Quality by Design," *The AAPS Journal*, Vol. 16, No. 4, 2014, pp. 771-783, p.771 ("The US Food and Drug Administration (FDA) encourages risk-based approaches and the adoption of QbD principles in drug product development, manufacturing, and regulation. FDA's emphasis on QbD began with the recognition that increased testing does not necessarily improve product quality."). FDA guidance recommending the use of QbD approach itself does not establish legally enforceable responsibilities in the absence of specific regulatory or statutory requirements, as it represents the agency's current thinking rather than a regulation. However, based on my experience, pharmaceutical companies were expected to adopt the QbD principles and framework. Accordingly, based on my experience, in response to FDA's adoption of QbD and the release of relevant guidance documents, industry groups expressed their concerns about increased workload and pressured timelines to implement the new initiative and sought clarification. *See* "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, p. 1 ("This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or

Although FDA does not mandate that pharmaceutical companies adopt a one-size-fits-all QbD approach (i.e., FDA allows for flexibility using empirical approaches, a more systematic, QbD approach to product development, or a combination of both),[123] FDA uses the policies in guidance documents to take enforcement actions and make approval decisions, and explicitly indicates that pharmaceutical development should, at minimum, include the following QbD principles:

- Define the quality target product profile ("QTPP"), considering factors such as the route of administration, dosage form, bioavailability, strength, and stability; [124]

- Identify the drug product's potential critical quality attributes ("CQAs") to examine and control the characteristics that could affect its quality;[125]

- Determine the CQAs of the drug substance, excipients, and other components to select the appropriate type and amount of excipients required for achieving the desired quality of the drug product; [126]

---

confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations."), p. 2 ("FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word should in Agency guidances means that something is suggested or recommended, but not required.").

[123]  "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, p. 10; "New Drug Quality," *FDA/CDER Small Business Chronicles*, September 18, 2012, https://www.fda.gov/media/84457/download, p. 1.

[124]  A quality target product profile is a "prospective summary of the quality characteristics of a drug product that ideally will be achieved to ensure the desired quality, taking into account safety and efficacy of the drug product." *See* "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, pp. 10, 18.

[125]  A critical quality attribute is a "physical, chemical, biological, or microbiological property or characteristic that should be within an appropriate limit, range, or distribution to ensure the desired product quality." *See* "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, pp. 11, 18; "New Drug Quality," *FDA/CDER Small Business Chronicles*, September 18, 2012, https://www.fda.gov/media/84457/download, p. 2.

[126]  "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, p. 11.

- Select an appropriate manufacturing process; [127]

- Define a control strategy designed to consistently produce a product with the required quality.[128]

47. To implement QbD as well as the other underlying concepts and principles of the Pharmaceutical cGMP for the 21st Century, specifically in the CMC assessment of ANDAs, the OGD designed a general framework known as Question-based Review ("QbR").[129] First proposed in 2005 by FDA, the primary objective of QbR was to bridge the gap between the goals of the cGMP initiative and the then-current CMC review practices, as well as to reduce FDA's workload.[130]

48. Before the implementation of QbR, CMC review practices were misaligned with the goals of the cGMP initiative in several ways. For example, the existing practices were predominantly focused on end product testing to ascertain product quality and performance.[131] They placed little emphasis on the manufacturing process, which often

---

[127] "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, p. 11.

[128] "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, pp. 11-14.

[129] "Chemistry Review of Question-Based Review (QbR) Submissions," *Center for Drug Evaluation and Research*, November 18, 2014, https://www.fda.gov/files/about%20fda/published/Chemistry-Review-of-Question-based-Review-%28QbR%29-Submissions.pdf, p. 2; "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system. *See also*, "FDA's Pharmaceutical Quality Initiatives: Implementation of a Modern Risk-based Approach," *Pharmaceutical Technology*, May 2, 2008, https://www.pharmtech.com/view/fdas-pharmaceutical-quality-initiatives-implementation-modern-risk-based-approach ("Based on early experiences and initial feedback, participants found that QbR has encouraged generic sponsors to use QbD elements and principles[.]").

[130] FDA noted that the total number of ANDAs received increased from 361 in 2002 and 449 in 2003 to 563 in 2004. *See* "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system.

[131] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http://www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006 ("When one compares these [cGMP] goals to the current CMC review practice, it becomes apparent that in the present system: Product quality and performance are predominantly ascertained by end product testing.").

resulted in a failure to account for the complexities of process scale-up, particularly for complex dosage forms like extended-release drugs.[132] Further, FDA's review process prior to the implementation of QbR allowed ANDA applicants to use test data from one batch to derive product specifications and treated low-risk products (e.g., immediate release solid oral products) and high-risk products (e.g., modified release products) equally. With the introduction of QbR, FDA aimed to support "an efficient review of low-risk products and an in-depth review of more complex dosage forms and [narrow therapeutic index ("NTI")] drugs."[133] FDA sought to resolve these discrepancies between the cGMP initiatives and CMC review practices and also encourage ANDA applicants to implement "continuous improvement of manufacturing processes and strategies" to achieve "real time" assurance of quality and regulatory compliance.[134]

49.    FDA's efforts to invest more resources in reviewing complex dosage forms, such as generic Effexor XR, were reflected in its QbR questions for these products. These questions sought more detailed information about the development of manufacturing processes and scale-up plan, and were intended to "encourage critical thinking and promote a mechanistic understanding of how formulation and manufacturing process variables

---

[132]  "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http:/www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006 ("The present review system places little or no scrutiny on how the design of an effective and efficient manufacturing process can ensure product quality. This also has the effect of not recognizing the many complexities of process scale-up, particularly for complex dosage forms.").

[133]  "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http:/www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006; Jiang, Wenlei, "FDA Drug Topics: Understanding Generic Narrow Therapeutic Index Drugs," *U.S. Food and Drug Administration*, March 2015, https://www.fda.gov/media/162779/download, p. 5 ("Narrow therapeutic index (NTI) drugs are drugs where small differences in dose or blood concentration may lead to serious therapeutic failures and/or adverse drug reactions that are life-threatening or result in persistent or significant disability or incapacity.").

[134]  "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http:/www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006 ("The first reason for developing the QbR was the discrepancy between the objectives of FDA's cGMPs for the 21st Century Initiative and current CMC review practices."). In my experience, this regulatory shift resulted in an increase in data and information submitted by manufacturers in response to FDA requests.

affect[ed] pharmaceutical quality."[135] FDA's additional questions for complex dosage forms asked applicants to explain the rationale for selecting a particular manufacturing process, describe how manufacturing steps were linked to drug product quality, and detail how critical process parameters were identified, monitored, and controlled, among other requests.[136] The agency also sought evidence supporting the scale-up to commercial manufacturing and an explanation of how operating parameters would be adjusted during scale-up "to ensure the product meets all in-process and final product specifications."[137] These requests were not made for simple dosage forms.

50. QbR introduced two new practices into the ANDA review process: (1) consideration of a product development report to show reviewers how drug substance and formulation variables affect the performance and stability of the drug product, and (2) a "critical"

---

[135] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http://www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006. *See also*, "Question-Based Review for Generic Drugs: An Enhanced Quality Assessment System Presentation," *U.S. Food and Drug Administration*, June 29, 2005, https://web.archive.org/web/20070111233001/http://www.fda.gov/cder/ogd/QbR20050629.ppt, archived by the Wayback Machine on December 8, 2006 ("[The] [g]oal of risk assessment is to allocate scarce reviewer resources to benefit the public [with] [m]ore emphasis on […] '[c]omplex' dosage forms/delivery systems[.]").

[136] I note that for extended-release oral dosage forms in particular, like Effexor XR, FDA has had specific and detailed guidance in place since 1997 on developing and evaluating common bioequivalence testing methods. *See* "Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations," *U.S. Food and Drug Administration*, September 1997, https://www.fda.gov/media/70939/download.

[137] For instance, as outlined in the question list for the "QbR-Quality Overall Summary" available on FDA's website as of September 2006, FDA requested additional information regarding the manufacturing process and operating parameters for a non-simple (i.e., complex) dosage form, which reflected FDA's then-current thinking on the QbR framework. "Questions to be Completed by ANDA Sponsors for the Preparation of a QbR-Quality Overall Summary," *U.S. Food and Drug Administration*, https://web.archive.org/web/20060929075121/http://www.fda.gov/cder/ogd/QbR-Quality_Overall_Summary_Outline.doc, archived by the Wayback Machine on September 29, 2006, pp. 2-3 ("(If the Product is a NTI Drug or a Non-Simple Dosage Form) Why was the manufacturing process described in 2.3.P.3 selected for this drug product? How are the manufacturing steps (unit operations) related to the drug product quality? How were the critical process parameters identified, monitored, and/or controlled? What is the scale-up experience with the unit operations in this process? […] In the proposed scale-up plan what operating parameters will be adjusted to ensure the product meets all in-process and final product specifications? What evidence supports the plan to scale up the process to commercial scale?") Despite responding thoroughly to FDA's October 2006 deficiency letter, Teva did not include a quality overall summary in its submission because it was not required to. *See* "Teva Major Amendment Response to October 12, 2006 FDA Deficiency Letter for ANDA 76-565 (Book 1 of 3)," August 19, 2008, TEVA_EFFEX_0010218-683 at 226 ("Please note that the original ANDA for this product was submitted [in] […] 2002. As such, a quality overall summary is not available for this file.").

comparison of the proposed generic drug and the RLD to ensure therapeutic equivalence, which was particularly important for complex dosage forms like Effexor XR.[138] QbR also incorporates a review of the process development report, where applicants are expected to identify critical steps, determine process parameters, and establish process controls to "help[] ensure that after process scale-up, the commercial manufacturing process will reliably produce a product that retains its critical quality attributes."[139] While this new review format was intended to support a "more efficient" use of FDA resources in reviewing ANDAs,[140] it placed additional burden on manufacturers to provide more detailed information to demonstrate that the drug product could be consistently produced at a commercial scale.[141]

---

[138] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http:/www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006 ("QbR incorporates two new practices into the review to ensure more relevant performance-based specifications. The first practice will include a consideration of a product development report from which reviewers will learn how drug substance and formulation variables affect the performance and stability of the drug product. The second practice will include a critical comparison of the proposed generic drug product and RLD formulations, which will contribute to ensuring the approval of therapeutically equivalent products, particularly in the case of complex dosage forms.").

[139] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http:/www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006 ("With respect to manufacturing, the QbR includes a review of the process development report. From the process development report, reviewers learn how the sponsor identifies the critical steps, determines critical process parameters, and establishes appropriate controls to the process, particularly for the more complex dosage forms. This process knowledge helps ensure that after process scale-up, the commercial manufacturing process will reliably produce a product that retains its critical quality attributes.").

[140] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http:/www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006 ("Therefore, it is essential to change our CMC review system to one that can more effectively utilize limited review resources in a more efficient and risk-based manner.").

[141] Erickson Deposition at 185:11-186:8 ("[T]he QBD initiative from FDA […] required manufacturers to provide far more information and data to represent that they understand how to make the product, why the product worked in manufacture. Historically, companies could make a batch of product, test it, and if it passed, they would send it to FDA for review. FDA would then take time to review it, approve it. And I'm sure if we looked back through history, that there are a number of products that were approved that never came to market because the company could not reproduce it. So, QBR, QBD was FDA's way of ensuring that their reviews were not done in vein [sic]. That the time was not wasted and safe effective product in a reproducible manner was going to come to market."), 249:15-250:17 ("During that time period, the agency

51. In 2006, FDA began the gradual implementation of the QbR framework for reviewing ANDAs and fully adopted it by January 2007.[142] FDA expected that the framework, which incorporates the concepts of QbD, risk-based assessment, standardized review questions, and question-based quality overall summary, would "encourage reviewers to identify which key specifications and manufacturing controls are necessary to ensure product quality." [143] The framework is implemented through a submission format containing "important scientific and regulatory review questions related to product and process design and understanding, product performance, and control strategy."[144] While drug sponsors are not legally required to file NDAs or ANDAs using QbR standard submission *formats*, FDA's implementation of the QbR *framework* in its assessment resulted in more stringent reviews and requests by FDA regardless of the submission format, including for NDAs

---

was implementing their new initiative, which was Quality Based Review, which was Quality Based Design for your product. And, it required all applicants to know the product far better than they had in the past. [...] [A]n application in the past could have been submitted to the agency with the successful pivotal batch but not be able to be reproduced commercially. That would waste FDA's time, waste everyone's time. Going to a QBR review, the agency would be able to see that a company had full knowledge of how to make a product, reproducibly. And that is where the questions with regard to in-process testing, reproducibility of a batch really started to come about. And that was a new initiative from FDA. So that those were basically new requirements layered on to the ANDA world.").

[142] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system; "Incorporating the Concepts of QbR in the Assessment of Generic Drugs," *U.S. Food and Drug Administration*, October 5, 2005, https://web.archive.org/web/20070111233001/http://www.fda.gov/cder/ogd/QbRbuehler.ppt, p. 10; "Chemistry Review of Question-Based Review (QbR) Submissions," *Center for Drug Evaluation and Research*, November 18, 2014, https://www.fda.gov/files/about%20fda/published/Chemistry-Review-of-Question-based-Review-%28QbR%29-Submissions.pdf, p. 2.

[143] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system.

[144] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http:/www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006; "Chemistry Review of Question-Based Review (QbR) Submissions," *Center for Drug Evaluation and Research*, November 18, 2014, https://www.fda.gov/files/about%20fda/published/Chemistry-Review-of-Question-based-Review-%28QbR%29-Submissions.pdf, p. 2; "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system.

and ANDAs that were filed before 2007 and were under review in the transition period leading up to FDA's official adoption of the QbR framework.[145]

52. FDA's adoption of QbD and QbR, which overlapped with FDA's review of Teva's ANDA for generic Effexor XR, marked a significant shift towards a more knowledge- and science-based regulatory review of generic drug applications.[146] These initiatives introduced more thorough guidelines for manufacturers, as FDA began asking for detailed information on the in-process controls and the scale-up process, including the applicant's plans to transition the manufacturing procedure to the commercial level.[147] For drug sponsors initiating new applications, this new regulatory regime meant greater upfront planning,

---

[145] For example, on October 12, 2006, FDA sent a deficiency letter to Teva where the agency asked Teva to note and acknowledge that "OGD [was] changing its CMC review process through [its] question based review (QbR) initiative[.]" It further asked Teva to acknowledge that "OGD's QbR was designed with the expectation that ANDA applications would be organized according to the Common Technical Document (CTD), a submission format adopted by multiple regulatory bodies including the FDA" and "[g]eneric firms [were] strongly recommended to submit their ANDAs in the CTD format (either eCTD or paper) to facilitate the implementation of the QbR and to avoid undue delays in the review of their applications." *See* "FDA Major Deficiency Letter Sent to Teva for ANDA 76-565," October 12, 2006, TEVA_EFFEX_0772776-779 at 777-778. Mr. Erickson testified that, to meet the new requirements of FDA's QbD and QbR initiatives, drug sponsors with an "existing file […] had to go back in time basically and recreate [data][,]" and in some cases, "had to make new batches and represent that to the agency." *See* Erickson Deposition at 250:20-251:4. According to FDA's Manual of Policies and Procedures for Chemistry Review of Question-based Review (QbR) Submissions, effective November 18, 2014, it is FDA policy that drug substance and drug product review divisions within the Office of Pharmaceutical Science "will use a QbR review template when evaluating NDAs, ANDAs, and DMFs that are submitted using a QbR format[,]" and "may choose to use a QbR review template for applications that are not submitted in the QbR format." *See* "Chemistry Review of Question-Based Review (QbR) Submissions," *Center for Drug Evaluation and Research*, November 18, 2014, https://www.fda.gov/files/about%20fda/published/Chemistry-Review-of-Question-based-Review-%28QbR%29-Submissions.pdf, p. 3.

[146] *See, for example*, ICH Expert Working Group, "Pharmaceutical Development Q8(R2)," *International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use*, 2009; "Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download, p. 10; "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system; "FDA Major Deficiency Letter Sent to Teva for ANDA 76-565," October 12, 2006, TEVA_EFFEX_0772776-779 at 777-778; Grangeia, Helena Bigares et al., "Quality by Design in Pharmaceutical Manufacturing: A Systematic Review of Current Status, Challenges and Future Perspectives," *European Journal of Pharmaceutics and Biopharmaceutics*, Vol. 147, 2020, pp. 19-37, pp. 1-2.

[147] *See, for example*, "Office of Generic Drugs QbR Quality Overall Summary Outline," *U.S. Food and Drug Administration*, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/office-generic-drugs-qbr-quality-overall-summary-outline, accessed July 3, 2025 ("In the proposed scale-up plan what operating parameters will be adjusted to ensure the product meets all in-process and final product specifications? What evidence supports the plan to scale up the process to commercial scale?").

testing, and data collection.[148] Drug sponsors with existing ANDAs now had to conduct additional testing to address the new requirements or even manufacture new batches.[149]

### E. Abbreviated New Drug Applications Are Extensive and Complex, and Therefore May Require Considerable Time for FDA Review

53. Given the complexity of the processes required to approve an ANDA, FDA's review of these applications can require substantial amounts of time, and review times can vary substantially across ANDAs. In 2002, the year that Teva submitted its ANDA for generic Effexor XR, FDA's review time for ANDA submissions ranged from 3.3 months to 115.5 months, or nearly ten years.[150] In some cases, ANDAs may take longer to review and approve than NDAs. Indeed, between 1997 and 2002, the median review period for an ANDA was found to be "significantly longer than that for an NDA[.]"[151]

---

[148] Erickson Deposition at 250:8-20 ("Going to a QBR review, the agency would be able to see that a company had full knowledge of how to make a product, reproducibly. And that is where the questions with regard to in-process testing, reproducibility of a batch really started to come about. And that was a new initiative from FDA. So that those were basically new requirements layered on to the ANDA world. So, if you were doing a new application, you built that in upfront at that time."). For drug sponsors seeking approval of complex dosage forms like Effexor XR, FDA expected the applicants to address additional questions. In the QbR Quality Overall Summary, FDA asked applicants with complex dosage form drugs questions like "[w]hat is the scale-up experience with the unit operations in this process?" and "[w]hat evidence supports the plan to scale up the [manufacture] process to commercial scale?" *See* "Questions to be Completed by ANDA Sponsors for the Preparation of a QbR-Quality Overall Summary," *U.S. Food and Drug Administration*, https://web.archive.org/web/20060929075121/http://www.fda.gov/cder/ogd/QbR-Quality_Overall_Summary_Outline.doc, archived by the Wayback Machine on September 29, 2006, p. 3.

[149] Erickson Deposition at 250:20-251:4 ("[I]f you had an existing file, you had to go back in time basically and recreate that for them. And in some cases the original batches were too old to recapture that data, so you had to make new batches and represent that to the agency."); "Questions to be Completed by ANDA Sponsors for the Preparation of a QbR-Quality Overall Summary," *U.S. Food and Drug Administration*, https://web.archive.org/web/20060929075121/http://www.fda.gov/cder/ogd/QbR-Quality_Overall_Summary_Outline.doc, archived by the Wayback Machine on September 29, 2006; "Office of Generic Drugs," *U.S. Food and Drug Administration*, https://web.archive.org/web/20061005213522/http:/www.fda.gov/cder/ogd/, archived by the Wayback Machine on October 5, 2006; "FDA Major Deficiency Letter Sent to Teva for ANDA 76-565," October 12, 2006, TEVA_EFFEX_0772776-779 at 779.

[150] Kros, John F. and Jingxia Qian, "Analysis of US Food and Drug Administration Review Intervals for Drugs Approved During the Period 1997–2002," *American Journal of Therapeutics*, Vol. 11, 2004, pp. 337-343, Table 1. An internal Teva analysis for the period between 2008 and 2009 also shows that industry ANDA review times ranged from 3 months to 111 months across certain companies. *See* "Teva Internal Analysis: Teva vs. Competition 2008-2009 YTD through May Average ANDA Review Times," TEVA_EFFEX_0325003, "Sheet2".

[151] Kros, John F. and Jingxia Qian, "Analysis of US Food and Drug Administration Review Intervals for Drugs Approved During the Period 1997–2002," *American Journal of Therapeutics*, Vol. 11, 2004, pp. 337-343, p. 339.

54. While FDA aims to review and approve applications in a timely manner,[152] it does not do so at the expense of providing a complete and thorough review, as its top priority is ensuring that a drug is safe, effective, and ready for market at the time of approval.[153] Manufacturers may estimate launch dates based on factors such as brand drug patent expirations or settlement agreements,[154] but FDA has not established formal guidelines for incorporating these projections into its internal review timeline.[155, 156] The FDA review process for ANDAs is complex and often time-consuming.[157] As described in **Section III.B**, an ANDA must be evaluated across several review sections, including assessments of bioequivalence, chemistry and microbiology, and labeling. An application becomes

---

[152] "Review Order of Original ANDAs, Amendments, and Supplements," *U.S. Food and Drug Administration*, October 18, 2006, https://web.archive.org/web/20061024100757/http://www.fda.gov/cder/mapp/5240-3R.pdf, archived by the Wayback Machine on October 24, 2006, p. 3 ("The review staff in each discipline will conduct reviews as efficiently as possible, using mechanisms that will assure a full assessment of the applications.").

[153] "Generic Drugs: Questions & Answers," *U.S. Food and Drug Administration*, March 16, 2021, https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers ("When a generic drug application is submitted, FDA conducts a thorough examination […] to ensure that every generic drug is safe, effective, high quality, and substitutable to the brand name drug.").

[154] *See, for example*, "Teva List of Pending ANDAs, Tentative Approvals and Final Approvals," May 1, 2003, TEVA_EFFEX_0039708-714 at 710 ("Venlafaxine ER Capsules 150 mg […] Limiting Patent Date Jun 13 2008 PED […] Anticipated Launch Date Jun 13 2008[.]").

[155] A review of historical FDA guidelines confirms that no formal guidelines have been established for incorporating patent expiration dates or settlement agreements into FDA's internal review timelines for ANDAs. *See* "Restatement of the Office of Generic Drugs' 'First-In, First-Reviewed' Policy and Modification of the Exceptions to the Policy Regarding Minor Amendments," *U.S. Food and Drug Administration*, November 1, 1995, https://web.archive.org/web/20001027100400/http://www.fda.gov/cder/mapp/5240-3.pdf, archived by the Wayback Machine on October 27, 2000; "Review Order of Original ANDAs, Amendments, and Supplements," *U.S. Food and Drug Administration*, October 18, 2006, https://web.archive.org/web/20061024100757/http://www.fda.gov/cder/mapp/5240-3R.pdf, archived by the Wayback Machine on October 24, 2006; "MAPP 5240.3 - Prioritization of the Review of Original ANDAs, Amendments, and Supplements," *U.S. Federal Drug Administration*, October 5, 2022, https://www.fda.gov/media/89061/download.

[156] Likewise, internal estimated launch dates had no bearing on Teva's regulatory team's timeline. *See, for example*, Deposition of Jill Pastore, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD, March 6, 2025 ("Pastore Deposition") at 143:1-144:10 ("Q. There's a column to the right of that that says [as read]: 'Early Launch Date.' Do you see that? A. Yes. Q. And are you familiar with that term? A. Yes. Q. And what does that mean in this context here? A. It was not a regulatory term […] Whereas the launch date was just not – it's not a regulatory date. Our goal was to get the approval. We had to have the approval to then launch. Q. And what information – was that information used by you at regulatory affairs, the early as launch date? A. No.").

[157] Reiffen, David and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1, 2005, pp. 37-49, p. 38 ("The time it takes the FDA to process applications can be both considerable and variable.").

eligible for approval only once all of these requirements have been fully reviewed and satisfied, regardless of any timelines a manufacturer may be planning around for the drug.[158] In the "vast majority of cases," manufacturers are required to amend their ANDA or conduct subsequent testing to meet FDA requests, which can result in additional delays and variability in approval timelines.[159]

55. Even before the substantive review begins, an application and any of its amendments may face delays awaiting review from FDA. FDA adheres to a "first-in, first-review" process for ANDAs and their related submissions, meaning that application files are reviewed in the order they are received.[160] Although FDA introduced criteria in 2006 under which certain applications could qualify for an expedited review and effectively jump this queue, this status is only determined during the initial review done at the time of submission.[161] As such, at the time of Teva's ANDA submission in 2002, the application

---

[158] *See* **Section III.C**.

[159] Reiffen, David and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1, 2005, pp. 37-49, p. 38 ("The time it takes the FDA to process applications can be both considerable and variable. In the vast majority of cases, the initial ANDA application is found deficient, requiring the applicant to conduct additional tests, or submit additional material. […] Hence, from the applicant's perspective, the time between the initial submission and FDA approval is quite variable.").

[160] "Review Order of Original ANDAs, Amendments, and Supplements," *U.S. Food and Drug Administration*, October 18, 2006, https://web.archive.org/web/20061024100757/http://www.fda.gov/cder/mapp/5240-3R.pdf, archived by the Wayback Machine on October 24, 2006, p. 1 ("Since 1990, OGD has been reviewing ANDAs (and related submissions) on a 'first-in, first-reviewed' basis as a means to assure fair and even-handed treatment of applicants. This approach established that, to the extent possible, chemists would review original ANDAs in the order in which they were received."). I note that in certain scenarios OGD has discretion to alter the review process. *See* "Review Order of Original ANDAs, Amendments, and Supplements," *U.S. Food and Drug Administration*, October 18, 2006, https://web.archive.org/web/20061024100757/http://www.fda.gov/cder/mapp/5240-3R.pdf, archived by the Wayback Machine on October 24, 2006, pp. 2-3 ("Other approaches to review order will be used as necessary to enhance efficiency, productivity, and/or to incorporate new understanding of the product's risk-based assessment.").

[161] "Review Order of Original ANDAs, Amendments, and Supplements," *U.S. Food and Drug Administration*, October 18, 2006, https://web.archive.org/web/20061024100757/http://www.fda.gov/cder/mapp/5240-3R.pdf, archived by the Wayback Machine on October 24, 2006, p. 2 ("The initial review done at the time of submission may identify instances when an exception to the 'first-in, first-reviewed' approach is appropriate and the review should be expedited. Certain applications may be identified at the time of submission for expedited review. These include products to respond to current and anticipated public health emergencies, products under special review programs such as the President's Emergency Plan for AIDS Relief (PEPFAR), products for which a nationwide shortage has been identified, and first generic products for which there are no blocking patents or exclusivities on the reference listed drug. These applications will be the highest priority in a reviewer's work queue."). These expedited review criteria for ANDA applications

---

and any subsequent amendments, including Teva's, were not and would not be eligible for any such expedited review and instead were subject to the first-in, first-review policy.

56. Through the early 2000s, there was a growing volume of generic drug submissions to FDA, which strained FDA's resources and contributed to an accumulation, or backlog, of pending ANDAs awaiting review.[162] OGD received an increasing number of applications throughout the period between Teva's initial ANDA submission and final approval, with 361 ANDAs in 2002, 449 in 2003, and 563 in 2004.[163] By June 2010, when Teva's ANDA received final FDA approval, FDA had over 2,100 pending ANDAs under review.[164]

57. The variability of ANDA approval timing is further exacerbated by the fact that FDA is not subject to any strict deadlines for its review. Recognizing the need for a more efficient approval cycle and for additional resources to help alleviate the application backlog, FDA outlined goals to improve this process in the Generic Drug User Fee Amendments

---

were not articulated by FDA until the 2006 revision of MAPP 5240.3. *See* "Restatement of the Office of Generic Drugs' 'First-In, First-Reviewed' Policy and Modification of the Exceptions to the Policy Regarding Minor Amendments," *U.S. Food and Drug Administration*, November 1, 1995, https://web.archive.org/web/20001027100400/http://www.fda.gov/cder/mapp/5240-3.pdf, archived by the Wayback Machine on October 27, 2000.

[162] Woodcock, Janet, "Implementation of the Generic Drug User Fee Amendments of 2012 (GDUFA) - House Testimony," *U.S. Food and Drug Administration*, April 1, 2016, https://www.fda.gov/news-events/congressional-testimony/implementation-generic-drug-user-fee-amendments-2012-gdufa-house-testimony, testimony provided before the House Committee on Oversight and Government Reform on February 4, 2016 ("Over the last several decades, the generic industry, the number of generic drug applications […] submitted to FDA for review, and the number of foreign facilities making generic drugs grew substantially. As a result, FDA's generic drug program became increasingly under-resourced. Its staffing did not keep pace with the growth of the industry. […] Because the program could not keep up with its workload, a backlog of submitted ANDAs developed and grew. It overwhelmed the FDA staff and created unpredictability and delay for industry.").

[163] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system. *See also*, Woodcock, Janet, "Implementation of the Generic Drug User Fee Amendments of 2012 (GDUFA) - House Testimony," *U.S. Food and Drug Administration*, April 1, 2016, https://www.fda.gov/news-events/congressional-testimony/implementation-generic-drug-user-fee-amendments-2012-gdufa-house-testimony, testimony provided before the House Committee on Oversight and Government Reform on February 4, 2016, Chart 2 Number of ANDAs Submitted Per Year and Number of Staff Over Time.

[164] "ASPE Issue Brief: Expanding the Use of Generic Drugs," *U.S. Department of Health and Human Services*, December 1, 2010, https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//43501/ib.pdf, p. 10.

("GDUFA") of 2012, two years *after* FDA approved Teva's generic Effexor XR.[165] Enacted on July 9, 2012 and reauthorized every five years,[166] GDUFA authorized FDA to collect user fees to support a "more efficient" generic drug review program.[167] Among its key goals, GDUFA set targets for FDA to review 90% of complete ANDAs within 10 months of receipt, eliminate 90% of the ANDA backlog by FY 2017, balance the frequency of site inspections for domestic and foreign manufacturers, and advance regulatory science initiatives.[168] For amendments to ANDAs, under GDUFA, FDA aimed to assess and respond to 90 percent of standard major amendments within eight months of submission, or within ten months if a preapproval inspection was required.[169] While GDUFA introduced some timeline goals for FDA, its proposed deadlines were not enforced by law or statute and instead reflected an internal "commit[ment]" to improving the efficiency of ANDA approvals.[170] Prior to GDUFA's enactment in 2012, there were no statutory deadlines or publicly stated internal goals to set expectations for FDA's review timeline for generic drug applications.[171]

---

[165] Teva's generic extended-release venlafaxine hydrochloride received final FDA approval on June 28, 2010. *See* "FDA Approval Letter Sent to Teva for ANDA 76-565," June 28, 2010, TEVA_EFFEX_0018544-550. GDUFA was signed into law on July 9, 2012. *See* "GDUFA I," *U.S. Food and Drug Administration*, May 8, 2024, https://www.fda.gov/industry/generic-drug-user-fee-amendments/gdufa-i.

[166] "GDUFA I," *U.S. Food and Drug Administration*, May 8, 2024, https://www.fda.gov/industry/generic-drug-user-fee-amendments/gdufa-i.

[167] "FY 2015 Performance Report to Congress for the Generic User Fee Amendments," *U.S. Food and Drug Administration*, 2015, https://www.fda.gov/media/97128/download, PDF p. 4.

[168] "Generic Drug User Fee Act Program Performance Goals and Procedures," *U.S. Food and Drug Administration*, https://www.fda.gov/media/82022/download, p. 5.

[169] "ANDA Submissions – Amendments to Abbreviated New Drug Applications Under GDUFA: Guidance for Industry," *U.S. Food and Drug Administration*, September 2024, https://www.fda.gov/media/89258/download, p. 5 ("FDA will assess and act on 90 percent of standard major ANDA amendments within 8 months of the amendment submission date if FDA does not require a preapproval inspection. FDA will assess and act on 90 percent of standard major ANDA amendments within 10 months of the amendment submission date if FDA requires a preapproval inspection.").

[170] "Generic Drug User Fee Act Program Performance Goals and Procedures," *U.S. Food and Drug Administration*, https://www.fda.gov/media/82022/download, pp. 2-3.

[171] I do note that prior to GDUFA being enacted in 2012, FDA acknowledged goals to review major amendments within 180 days of receipt and minor amendments within 30-60 days of receipt. These goals were not statutorily binding. *See* "Guidance for Industry: Major, Minor, and Telephone Amendments to Abbreviated New Drug Applications," *U.S. Food and Drug Administration*, December 2001, https://permanent.fdlp.gov/websites/www.fda.gov/pdf-archive/ucm072888.pdf, p. 4 ("OGD attempts to

## IV.    MS. RIVERA-MUZZIO'S CLAIM THAT FDA WOULD HAVE APPROVED TEVA'S GENRIC EFFEXOR XR ANDA BEFORE JUNE 28, 2010 IS BASELESS

58.  Ms. Rivera-Muzzio opines that:

- Teva did not act like a first-to-file generic manufacturer motivated to obtain FDA approval of its ANDA as quickly as possible;[172]

- Teva's actions between June 2006 and June 2009 delayed FDA's approval of Teva's ANDA;[173]

- Teva could have obtained final FDA approval of its ANDA by no later than March 2009, and would have been able to launch its generic Effexor XR product in April 2009, after receiving FDA approval;[174] and

- Mylan would have been able to obtain final FDA approval and launch its generic Effexor XR product eleven months after an earlier launch by Teva.[175]

59.  Ms. Rivera-Muzzio's opinion that Teva would have been able to obtain final FDA approval by March 2009 and commercially launched its generic Effexor XR product by no later than April 2009, absent the Wyeth-Teva Settlement Agreement[176] is baseless, as this opinion hinges on unreliable assumptions and is inconsistent with the facts in this matter. The following sections of my report discuss how:

---

review major amendments within 180 days and to review minor amendments within 30 to 60 days. However, not all minor amendments can be reviewed within 60 days. The response to a telephone amendment is reviewed upon receipt.").

[172]  Rivera-Muzzio Report, Section VI.A.

[173]  Rivera-Muzzio Report, Section VI.B.

[174]  Rivera-Muzzio Report, ¶ 7, Section VI.C.

[175]  Rivera-Muzzio Report, Section VI.D.

[176]  Rivera-Muzzio Report, ¶ 4 ("[A]bsent Wyeth's payments to Teva, Wyeth and Teva would have reached an agreement permitting Teva to enter the market earlier than July 1, 2010."), ¶ 7 ("[…] Teva or a reasonable generic company in Teva's position would have been incentivized and able to obtain final approval by no later than March 2009 and commercially launch its generic Effexor XR product by no later than April 2009.").

- Ms. Rivera-Muzzio's opinion regarding how motivated companies should act is overly simplistic and, even on its own terms, does not support her conclusions in this case (**Section IV.A.1**);

- Ms. Rivera-Muzzio's opinion that Teva did not act like a generic company motivated to obtain FDA approval as quickly as possible is unfounded (**Section IV.A.2**); and

- Ms. Rivera-Muzzio's opinion regarding Teva's actions that allegedly delayed FDA's approval of Teva's ANDA lacks supporting evidence (**Section IV.B**).

**A.    Ms. Rivera-Muzzio's Opinion That Teva Did Not Act Like a Motivated First-to-File Generic Manufacturer To Obtain FDA Approval of its Generic Effexor XR ANDA as Quickly as Possible Is Incorrect**

*1.    Ms. Rivera-Muzzio Offers an Oversimplified Assessment of Generic Manufacturers' Motivations and Incentives*

60.  Ms. Rivera-Muzzio claims that "motivated generic manufacturers with an imminent launch opportunity typically act with urgency to obtain FDA approval of their ANDAs so that they can launch their products at their earliest allowed opportunity, especially where […] they have the potential to obtain a period of generic exclusivity on a drug where the reference listed drug (RLD) has substantial sales."[177] Ms. Rivera-Muzzio then concludes that "Teva's actions […] were inconsistent with the actions that a motivated generic company in Teva's position with an imminent launch opportunity would take in order to avoid potential delays in obtaining FDA approval, and to obtain FDA approval as quickly as possible."[178]

61.  Ms. Rivera-Muzzio's opinion regarding the motivations and incentives of first-to-file generic companies suffers from two key flaws:

- First, Ms. Rivera-Muzzio offers an overly simplistic and narrow conception of how a reasonable generic company would act in Teva's

---

[177]  Rivera-Muzzio Report, ¶ 8.

[178]  Rivera-Muzzio Report, ¶ 50.

position if it were motivated and incentivized to obtain FDA approval as quickly as possible. Her flawed and overly narrow view fails to properly consider that generic companies do not control FDA's review timeline, that both FDA and generic companies manage and balance complex sets of business considerations with finite resources, and that, as a result, ANDAs take time, and sometimes substantial amounts of time, to receive FDA approval, regardless of the generic company's motivation.

- Second, Ms. Rivera-Muzzio erroneously attempts to contrast Teva's actions with her flawed model of what a "reasonable generic company" would do. In doing so, she fails to acknowledge that every company must consider a different set of factors that must be weighed as part of the decision-making process, and thus reasonable generic companies may act differently from one another while still being motivated to obtain FDA approval as quickly as possible. Not only does Ms. Rivera-Muzzio incorrectly infer and speculate as to Teva's motivations, but her speculation also highlights her inability to establish any causal link between the Wyeth-Teva Settlement Agreement and Teva's actions.

62. I agree with Ms. Rivera-Muzzio that, as a general principle, generic companies with first filer status would prefer to obtain FDA approval as quickly as possible.[179] As discussed in

---

[179]  Rivera-Muzzio Report, ¶¶ 44-45, 47 ("In my experience, a generic company with 'first filer' status is typically highly incentivized to obtain final FDA approval of its ANDA, and launch its generic products, as quickly as possible. […] Absent extenuating circumstances, such as a patent litigation settlement where the first filer agrees not to launch its generic product for a significant period of time, it is the top priority for first filers to get ANDA approval and launch such products at the earliest allowed opportunity – particularly where, as here, the opportunity relates to a generic drug with an RLD with large sales. […] Once the ANDA is accepted for filing by the FDA, the focus of a reasonable generic company is typically to obtain FDA approval of its ANDA at the earliest possible date."). *See* **Section III.B**. *See also*, Deposition of Deborah Jaskot, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD, February 4, 2025 ("Jaskot Deposition") at 27:3-28:7 ("A. In regulatory, as was our mission and we had incentive goals applied to achieving a timely submission and a timely approval, whether it be tentative or final, and so yes, we worked diligently toward either one of those. […] [T]entative approval was incentivized, and so the execution of the application or the back-and-forth with FDA to get a tentative approval was the priority. **And that was not dependent on any launch date.**") (Emphasis added), at 29:13-30:17 ("[A.] [A]s I said before, the review process and terminating that review process, whether it be a tentative approval or a final approval, was

**Section III.C**, it is desirable to obtain ANDA approval with 180-day exclusivity as early as possible because, among other reasons, pharmaceutical development involves significant costs, risks, and long development timelines, so obtaining FDA approval as early as possible allows generic companies to realize a return on their investments as quickly as possible.[180]

63. However, Ms. Rivera-Muzzio fails to properly consider that while generic companies certainly play a role in FDA's review process, the development and regulatory review of ANDAs is a complex and uncertain process, and the speed at which FDA reviews an ANDA is not purely determined by a generic company's actions.[181] Not only does FDA aim to approve safe and effective drugs as efficiently as possible, but they must fulfill this mandate with finite resources and in the context of other priorities that may affect the speed at which they review a given ANDA.[182] Therefore, regardless of motivation, generic companies are not in control of FDA's review process and, particularly in the context of

---

priority. I mean, a tentative approval is irrespective of any litigation or license agreement. It is totally controlled by the review of the application. So getting that review completed was incentivized. […] [Tentative approval is] incentivized because regulatory affairs' main objective is to submit, negotiate, develop data, submit more data, and draw it to a conclusion. And the first step in that may or may not be a tentative approval. But that's what would be incentivized to complete the execution of the review of the application."); Pastore Deposition at 50:19-51:7 ("Q. And did Teva have an expectation about how quickly it would want to respond to a major amendment? A. So Teva's regulatory team, our goal was always to respond as quickly as we could, whether it was a telephone amendment or a major. […] [W]e strove to address FDA's questions as soon as we could. It was in our best interest to do so."), at 118:12-20 ("[A.] I would say [for] any application that was pending, we all worked very hard, very diligently to move those applications to approval as soon as possible. Whether it was a tentative approval or a final approval, it was our best interest to move them to the approval state as soon as possible."), at 325:17-22 ("[A.] [I]n general, I can tell you, if there was something that needed to be submitted to the FDA, we were willing and we did burn the midnight oil to submit as soon as we could. We always wanted to get our approval as soon as possible.").

[180] *See*, *for example*, "Research and Development in the Pharmaceutical Industry," *Congressional Budget Office*, April 2021, https://www.cbo.gov/publication/57126, accessed June 25, 2025 ("[T]he patent system and certain statutory provisions that delay FDA approval of generic drugs provide pharmaceutical companies with a period of market exclusivity, when competition is legally restricted. During that time, they can maintain higher prices on a patented product than they otherwise could, which makes new drugs more profitable and thereby increases drug companies' incentives to invest in R&D.").

[181] *See* **Section III.E**. *See also*, Reiffen, David and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1, 2005, pp. 37-49, p. 38 ("[Generic] [e]ntry still requires significant up-front expenditures, with a payoff that depends both on the FDA's decisions with respect to a firm's application, and the timing of FDA approval of rivals' ANDA applications. The time it takes the FDA to process applications can be both considerable and variable.").

[182] *See* **Section III.E**.

shifting regulatory requirements like those discussed in **Section III.D** and further below in **Section IV.A.2**, generic companies may face unexpected responses from FDA that affect the overall review timeline of an ANDA.

64. Similarly, generic companies, particularly large multinational companies like Teva, are complex organizations that must balance their pipeline of drugs in development, other business considerations, and their finite resources. For example, Teva, an Israel-based multinational company operating in 57 markets, manages several lines of business, including generics, biosimilars, innovative medicines, over-the-counter products, a distribution business, active pharmaceutical ingredient ("API") manufacturing, and contract manufacturing.[183] As of December 31, 2006, Teva oversaw approximately 315 generic products with 1,079 dosage strengths and packaging sizes available in the U.S. market.[184] In 2006, Teva manufactured approximately 37 billion tablets and capsules and over 450 million sterile units across 36 finished dosage pharmaceutical plants in 16 countries.[185] Then, as of February 14, 2007, Teva had 162 product applications awaiting FDA approval, and was the first to file for 45 of these applications.[186] These particularities highlight the complexity of Teva's operations and business considerations.

65. Ms. Rivera-Muzzio alludes to generic companies' finite resources and competing priorities in the context of "[w]hen a generic company cannot launch a product until years later[,]" but she fails to acknowledge that generic companies like Teva are *always* encountering and managing these challenges regardless of any particular ANDA's anticipated approval and

---

[183] Teva Pharmaceutical Industries, Teva 2024 Annual Report (Form 10-K), filed February 5, 2025, https://s24.q4cdn.com/720828402/files/doc_financials/2024/ar/2024-10-K-final-bannerless-ADA-tagged.pdf, pp. 2, 5. Teva acquired IVAX on June 26, 2006, which resulted in additional generic and proprietary products in its pipeline. *See* "Teva-IVAX Merger Creates 'Exceptional Pipeline'," *Forbes*, January 30, 2006, https://www.forbes.com/2006/01/30/teva-ivax-0130markets13.html.

[184] Teva Pharmaceutical Industries, Teva 2006 Annual Report (Form 20-F), filed February 28, 2007, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000818686/630981ec-1d3d-498b-b760-a325066fb4d1.pdf, p. 11.

[185] Teva Pharmaceutical Industries, Teva 2006 Annual Report (Form 20-F), filed February 28, 2007, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000818686/630981ec-1d3d-498b-b760-a325066fb4d1.pdf, pp. 34-35.

[186] Teva Pharmaceutical Industries, Teva 2006 Annual Report (Form 20-F), filed February 28, 2007, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000818686/630981ec-1d3d-498b-b760-a325066fb4d1.pdf, p. 11.

launch timing.[187] Her failure to acknowledge the complexity of Teva's business considerations reflects her superficial assessment of FDA's approval timeline for Teva's generic Effexor XR. Taken together, managing and balancing these complexities (both internally and between generic companies and FDA) can contribute to delays and unpredictability in the review process for ANDA approval.[188]

66. Ms. Rivera-Muzzio's opinion on Teva's "motivation" is purportedly based on her belief and experience regarding what a "motivated," "incentivized," and "reasonable" generic company's actions would do in Teva's position.[189] However, Ms. Rivera-Muzzio fails to acknowledge that there is no standard industry definition or established criteria for what constitutes a "reasonable" or "motivated" generic company. Instead, Ms. Rivera-Muzzio offers her own view, stating that a "reasonable generic company" in Teva's position would prioritize actions required to respond to FDA's deficiency letters "over on-going product development activities related to other products," and that a "motivated generic company" in Teva's position would "avoid making any changes to its ANDA, or adopting any operational strategies" without first analyzing how such changes might "create an unnecessary risk that FDA approval of its ANDA would be delayed."[190]

67. While Ms. Rivera-Muzzio supposedly bases this opinion on her professional roles and consulting experience, she fails to acknowledge that every company must consider a

---

[187] Rivera-Muzzio Report, ¶ 51 ("When a generic company cannot launch a product until years later (as is the case with Teva here, given that it agreed not to launch generic Effexor XR until July 2010), it often shifts its priorities away from that product and prioritize [sic] the development of other drugs that it can launch sooner (and thus earn sales revenues on sooner) and put resources (which are always finite) into getting approval for those other drugs.").

[188] Rivera-Muzzio Report, ¶ 51. *See* **Section III.B**.

[189] *See, for example*, Rivera-Muzzio Report, ¶ 8 ("**In my experience, motivated generic manufacturers** with an imminent launch opportunity typically act with urgency to obtain FDA approval of their ANDAs so that they can launch their products at their earliest allowed opportunity […]."), ¶ 50 ("[…] Teva's actions, particularly between June 2006 and June 2009, **were inconsistent with the actions that a motivated generic company in Teva's position with an imminent launch opportunity would take** in order to avoid potential delays in obtaining FDA approval, and to obtain FDA approval as quickly as possible."), ¶ 52 ("[…] Teva did not demonstrate the level of urgency in responding FDA deficiency letters **that one would expect of an incentivized and motivated generic manufacturer** seeking to obtain FDA approval of its ANDA as quickly as possible[.] […] Teva made decisions and took risks when prosecuting its ANDA that **were inconsistent with a reasonable generic company** seeking FDA approval as quickly as possible.") (Emphasis added).

[190] Rivera-Muzzio Report, ¶¶ 47-49.

different set of factors that must be weighed as part of its decision making, and thus reasonable generic companies may act differently from one another based on various factors. Further, without complete data on the organizational considerations that may have been competing for its resources, Ms. Rivera-Muzzio's conclusions regarding Teva's motivation and whether Teva was appropriately prioritizing decisions and actions are unfounded. In my experience, in the ordinary course of business, generic companies need to assess various aspects of their business, especially when they are operating multiple lines of business and have competing goals with limited resources. Merely disagreeing with Teva's decisions or actions, and framing Teva as lacking "laser focus" or being inconsistent with a motivated generic company is not a sound assessment of Teva's motivation (and these charges are baseless for the reasons discussed below).[191] Nor does it establish any causal link between the Wyeth-Teva Settlement Agreement and Teva's decisions and actions.

68. Moreover, according to Ms. Rivera-Muzzio, "a motivated and incentivized generic company in Teva's position would analyze each potential change, consider the FDA requirements to implement the change, and avoid proposing any action that would create an unnecessary risk that FDA approval of its ANDA would be delayed."[192] However, she fails to acknowledge that Teva did indeed conduct the steps that she associates with what a reasonable, motivated, and incentivized generic company would do. As I discuss in **Section IV.A.2**, Teva analyzed FDA's requests and deficiency letters carefully, assessed risks and the regulatory landscape, discussed internally, and took actions accordingly.

69. Based on my experience, I would not expect generic companies to risk delaying the FDA review process in hopes of securing FDA approval closer to a license agreement date. First, as discussed in **Section III.E**, before 2012, when GDUFA was enacted, FDA did not have any strict target review timelines and it was extremely difficult to predict FDA's review timing for any given ANDA. Without knowing the review timeline, it would have been extremely risky for a company to delay its response to any of FDA's requests during the

---

[191] *See, for example*, Rivera-Muzzio Report, ¶¶ 50, 52, 59, 63, 64, 76.

[192] Rivera-Muzzio Report, ¶ 49.

approval process because the company could not necessarily predict whether or when FDA might communicate additional deficiencies. My experience is consistent with evidence in this case indicating that Teva failed (through no fault of its own) to predict FDA's approval timeline for its generic Effexor XR ANDA. On May 9, 2005, Teva internally projected that FDA could potentially grant tentative approval for its generic Effexor XR product within three to four months.[193] However, instead of receiving tentative approval, Teva received unforeseen deficiency letters—many of them owing to changes in FDA's review framework rather than flaws in Teva's ANDA.[194] Attempting to delay responses to FDA or otherwise impede FDA's review could result in delays *beyond* any agreed-upon entry date from a settlement agreement. Furthermore, Ms. Rivera-Muzzio offers no evidence, nor have I encountered any such evidence, showing that Teva deliberately delayed its responses to FDA.

70. 





71.



72.



73.











80.





81.





83.







███████████████████████████████████████████
████████████████

87.  ███████████████████████████████████████████
███████████████████████████████ ██ ██████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████ ██ ███████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████



88.







89.

90.





91.





92.





93.



94.



95.









99.











102. 





103.









107.

108.







109. 



110.



















119.







122.







125.





126.



127.





128.





129.



130. 







133.





134. 

135.



136.





137.













140.

141.



142.



earliest possible opportunity; isn't that correct? A. That is absolutely correct. Q. And, was that true with



143.

144.







147.

148.





149. For all the reasons described above, I disagree with Ms. Rivera-Muzzio's claim that Teva's decisions and actions while prosecuting its ANDA for generic Effexor XR indicate it was not sufficiently motivated to obtain FDA approval. The timeline and content of the communication between Teva and FDA demonstrate a pattern of the company adjusting to changing FDA expectations for the manufacture and quality control of generic drugs, and Teva's efforts to provide FDA with the most complete and robust data possible. Even so, FDA never granted Teva tentative approval for its generic Effexor XR ANDA, demonstrating that FDA was not satisfied with its review of Teva's application until it ultimately granted final approval. Despite Ms. Rivera-Muzzio's assertions to the contrary,



I do not find the decisions and actions Teva took while prosecuting its ANDA to be unreasonable, and Ms. Rivera-Muzzio has not established any causal link to the Wyeth-Teva Settlement Agreement. Any suggestion that Teva could have responded faster to satisfy FDA, or that FDA would have reviewed and approved Teva's generic Effexor XR ANDA sooner, is speculative at best and at odds with the evidence in the record.

## V.    MS. RIVERA-MUZZIO'S ASSUMPTION THAT MYLAN WOULD HAVE OBTAINED FDA APPROVAL OF ITS GENERIC EFFEXOR XR ANDA AND LAUNCHED SIXTEEN MONTHS EARLIER IS UNFOUNDED

### A.    Ms. Rivera-Muzzio's Opinion Regarding FDA Approval and Launch of Mylan's Generic Effexor XR ANDA Hinges on Whether Teva Would Have Launched Before July 1, 2010

150. Ms. Rivera-Muzzio argues that "if Teva had obtained final FDA approval and launched its generic versions of Effexor XR earlier than July 1, 2010, Mylan would have been able to obtain FDA approval and commercially manufacture its generic Effexor XR products 11 months after Teva's launch, assuming it had a license from Wyeth to do so."[453] This claim relies on several unreliable assumptions, as is evident from the statement itself.

151. As a threshold matter, Ms. Rivera-Muzzio's opinion regarding Mylan hinges on her flawed conclusion that Teva acted to delay FDA's review process and that Teva would have been able to expedite the review process if it were motivated to do so. These claims are unfounded for several reasons. First, as discussed in **Section IV.A**, there is no evidence to suggest that Teva intended to delay the FDA approval process or that its actions actually delayed the process. Second, she assumes that if Teva had somehow expedited the process, FDA would have approved the drug sooner. However, Ms. Rivera-Muzzio ignores that a generic applicant cannot control the FDA ANDA review process and she fails to provide any evidence to the contrary. Lastly, while Ms. Rivera-Muzzio claims that she is not offering an opinion on whether "Wyeth and Teva would have reached an agreement

---

[453]  Rivera-Muzzio Report, ¶ 85.

permitting Teva to enter the market earlier than July 1, 2010[,]"[454] her argument regarding Mylan's generic Effexor XR approval and launch timing is dependent on whether such an agreement would have been reached. Because of Ms. Rivera-Muzzio's overreaching assumptions and flawed conclusions regarding an earlier hypothetical approval and launch of Teva's generic Effexor XR, I disagree with her opinion regarding an earlier approval and launch date for Mylan's generic Effexor XR product.

**B.     Ms. Rivera-Muzzio Speculates as to What Mylan and Wyeth Would Have Agreed to in a Licensing Agreement and When FDA Would Have Approved Mylan's Generic Effexor XR ANDA**

152. Although Ms. Rivera-Muzzio claims that she is not offering any opinion on whether Mylan would have obtained a license from Wyeth to launch its generic Effexor XR,[455] her conclusion nonetheless relies on the assumption that Mylan would have entered into an agreement with Wyeth for a "licensed entry date that was eleven months after Teva's (earlier) licensed entry date and that Teva's 180 days of exclusivity has expired[.]"[456] Ms. Rivera-Muzzio explicitly notes that she "ha[s] been asked by counsel to assume that the jury will be presented with facts that support this assumption."[457]

153. Ms. Rivera-Muzzio further speculates that "Mylan would have been able to obtain FDA final approval of its ANDA no later than eleven months after Teva launched its generic."[458] Her claim presumes that Mylan had no regulatory issues "relating to its Effexor XR ANDA that arose between the time it received tentative approval in November 2008 and the time it received final approval in June 2011."[459] However, this was not the case. Specifically,

---

454  Rivera-Muzzio Report, ¶ 4 ("I understand that other experts retained by Plaintiffs will be opining that, absent Wyeth's payments to Teva, Wyeth and Teva would have reached an agreement permitting Teva to enter the market earlier than July 1, 2010. I am not offering any opinions on this issue."), footnote 27 ("I am not offering an opinion on whether Mylan would have obtained such a license, and have been asked by counsel to assume that the jury will be presented with facts that support this assumption.").

455  Rivera-Muzzio Report, footnote 27 ("I am not offering an opinion on whether Mylan would have obtained such a license, and have been asked by counsel to assume that the jury will be presented with facts that support this assumption.").

456  Rivera-Muzzio Report, ¶ 86.

457  Rivera-Muzzio Report, footnote 27.

458  Rivera-Muzzio Report, ¶¶ 85-86.

459  Rivera-Muzzio Report, ¶ 86.

on April 13, 2011, FDA issued a bioequivalence deficiency letter to Mylan requiring in vitro dissolution testing to ensure a lack of alcohol-induced dose dumping.[460] Mylan generated the necessary data and responded on April 29, 2011, then requested final approval on May 6, 2011.[461] As discussed in **Section IV.A.2.d**, this requirement was implemented by FDA after it granted Osmotica Pharmaceutical's citizen petition on February 16, 2010. Consequently, any hypothetical timeline for Mylan's final approval must account for this requirement. Ms. Rivera-Muzzio offers no explanation for how Mylan could have anticipated, conducted, or submitted the required studies, nor when FDA would have requested and reviewed them, within the eleven-month window she postulates in her hypothetical world.

154. Under Ms. Rivera-Muzzio's hypothetical world, which assumes Teva would have received final approval by no later than March 2009 and would have commercially launched its generic Effexor XR product by no later than April 2009,[462] the earliest that Teva could have launched its generic Effexor XR ANDA is also March 2009. Consequently, the earliest that Mylan could have received final approval would have been February 2010.[463] Yet, since FDA's alcohol-induced dose dumping requirement was implemented on February 16, 2010,[464] and because Mylan did not receive FDA's bioequivalence deficiency letter until April 13, 2011, Mylan's original ANDA did not contain the required alcohol-induced dose dumping in vitro testing.[465] The timing of this requirement thus casts doubt on the eleven-month schedule assumed by Ms. Rivera-Muzzio. She does not acknowledge this requirement to conduct in vitro dissolution testing regarding alcohol-induced dose

---

[460] "FDA Bioequivalence Deficiency Letter Sent to Mylan for ANDA 78-789 " April 13, 2011, MYL-VENLA-0000045-048.

[461] "Mylan Bioequivalence Amendment Regarding Alcohol-Induced Dose Dumping," April 29, 2011, MYL-VENLA-0003911-915; "Mylan Notification to FDA of License Agreement with Pfizer for Generic Effexor XR," May 6, 2011, MYL-VENLA-0004009-010 at 009.

[462] Rivera-Muzzio Report, ¶ 7.

[463] Rivera-Muzzio Report, ¶ 80 ("Teva could and would have obtained final FDA approval of its generic Effexor XR ANDA by no later than March 2009[.]"). If Teva subsequently launched its generic Effexor XR ANDA in March 2009, Mylan's final approval eleven months later would occur in February 2010.

[464] "FDA Response to Osmotica Citizen Petition," February 16, 2010, TEVA_EFFEX_0797020-027 at 024.

[465] "FDA Bioequivalence Deficiency Letter Sent to Mylan for ANDA 78-789 " April 13, 2011, MYL-VENLA-0000045-048.

dumping in her hypothetical world, nor does she offer any analysis regarding the potential impact of these requirements on Mylan's hypothetical approval timeline.

155. In summary, Ms. Rivera-Muzzio's claim that Mylan could have obtained final approval for its generic Effexor XR ANDA eleven months after Teva's generic Effexor XR launch date is speculative and does not contend with the regulatory hurdles impacting Mylan's final approval timeline in a hypothetical world.

Steven K. Galson, M.D., M.P.H.

July 17, 2025

**APPENDIX A**

**CURRICULUM VITAE**

**STEVEN K. GALSON, M.D., M.P.H.**

Former Senior Vice President, Research & Development, Amgen

Currently Senior Advisor, Boston Consulting Group

Contact Info: 805.490.5693; steven@galson.us

**Current Corporate Boards:**

Independent Director, Biocryst Pharmaceuticals, 2021 – present

Independent Director, Elephas Biosciences, 2022- present

**Current Non-Profit Boards:**

Member, College of Arts and Sciences Advisory Council, Stony Brook University, 2021 - present

Member, Board on Health Sciences Policy, National Academic of Sciences, Engineering and Medicine

**Recent Non-Profit Boards:**

Board of Trustees, Keck Graduate Institute, Claremont, CA, 2019 to 2024, https://www.kgi.edu

Member, Executive Committee of the Clinical Trials Transformation Initiative (FDA and Duke University partnership), 03/2019 – 12/2024, https://ctti-clinicaltrials.org

**PROFESSIONAL HISTORY**

**AMGEN, INC.**

| | |
|---|---|
| Consultant | 06/21-07/22; 03/24-current |
| Senior Vice President, Research & Development | 01/21-06/21 |
| Chair, COVID-19 Incident Executive Management Team | 03/20-06/21 |
| Senior Vice President, Global Regulatory Affairs & Safety | 05/14-01/21 |
| Vice President, Global Regulatory Affairs | 09/10-05/14 |

**SCIENCE APPLICATIONS INTERNATIONAL CORPORATION**

| | |
|---|---|
| Senior Vice President, Civilian Health Operations & Chief Health Scientist | 02/10-09/10 |

**WARBURG PINCUS**

| | |
|---|---|
| Advisor | 12/09-09/10 |

**U.S DEPARTMENT OF HEALTH & HUMAN SERVICES** · 05/01-10/09

| | |
|---|---|
| Acting Surgeon General of the United States | 10/07-10/09 |
| Acting Assistant Secretary of Health | 01/09-06/09 |
| Center Director, Center for Drug Evaluation and | 07/05-09/07 |

Research (CDER), Food and Drug Administration (FDA)

| | |
|---|---|
| Acting Director, CDER, FDA | 10/03-07/05 |
| Deputy Director, CDER, FDA | 05/01-10/03 |
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** | 06/97-04/01 |
| Director, Office of Science Coordination and Policy, Office of Prevention, Pesticides and Toxic Substances (OPPTS) | 01/99-04/01 |
| Scientific Director and Advisor to the Administrator, Office of Children's Health Protection | 06/97-12/98 |
| **U.S. DEPARTMENT OF ENERGY** | 03/94-05/97 |
| Counselor on Science and Health and Chief Medical Officer, Office of the Secretary | 04/96-05/97 |
| Chief Medical Officer, Office of Environment, Safety & Health | 03/94-04/96 |
| **NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), CENTERS FOR DISEASE CONTROL (CDC)** | 07/86-02/94 |
| Deputy Director, Division of Standards Development and Technology Transfer | 03/93-02/94 |
| Chief, Medical Section, Hazard Evaluations and Technical Assistance Branch (HETAB), Division of Surveillance, Hazard Evaluations and Field Studies (DSHEFS) | 04/91-03/93 |
| Supervisory Medical Officer, HETAB, DSHEFS | 06/90-04/91 |
| NIOSH/CDC Career Development Award | 06/89-06/90 |
| Masters in Public Health, Harvard School of Public Health | Awarded 06/90 |
| Consultant, World Health Organization, CDC Preventive Medicine Residency Program, Geneva, Switzerland | 03/89-06/89 |
| Medical Epidemiologist, CDC Preventive Medicine Residency Program, New York State Department of Health, Albany, NY | 06/88-03/89 |
| Epidemic Intelligence Service Officer, Medical Section, HETAB, DSHEFS, NIOSH, CDC, Cincinnati, OH | 07/86-06/88 |

## DEGREES AND TRAINING

M.P.H. Harvard School of Public Health, 1990 (Centers for Disease Control Career Development Award)

Internal Medicine Residency, Hospitals of the Medical College of Pennsylvania, PA, 06/83 - 06/86

M.D., Mt. Sinai School of Medicine, 1983

B.S. Biochemistry, State University of New York at Stony Brook, 1978

Preventive Medicine Residency, US Centers for Disease Control, Atlanta, 07/87-07/89

## HONORARY DEGREE

Doctor of Public Service, Drexel University School of Public Health, 2008

## MEDICAL BOARD SPECIALTY CERTIFICATIONS

Certified in General Preventive Medicine, Public Health and Occupational Medicine by the American

Board of Preventive Medicine, unrestricted license to practice medicine in Maryland

## PAST BOARDS

Independent Director, Insilico Medicine, 2021- 2022

Member, Commissioned Officers Foundation Board of Trustees, 06/2018- 07/2021

Member, Institute of Medicine Forum on Drug Discovery, Development, and Translation, 01/2018 - present

Co-Chair, Institute of Medicine Forum on Drug Discovery, Development, and Translation, 01/2012-12/2017

Member, Board of Directors, Vanda Pharmaceuticals, 07/2010-07/2015

Ad-hoc Member, National Children's Study Advisory Committee, Eunice Kennedy Shriver

National Institute of Child Health and Human Development, 2010-2013

Exercise is Medicine Executive Committee, American College of Sports Medicine, 2009-2012

Honorary

Honorary Trustee, Public Health Service Commissioned Officer Foundation, 2009-current

Ex-officio Member, Board of Regents, Uniformed Services University of the Health Sciences, 10/2007-09/2009

Executive Advisory Council, Association of Military Surgeons of the United States, (President, 11/2007-11/2008; Member, 10/2007, 12/2008-09/2009)

Chair, US Government Interagency Committee on Smoking and Health, 10/2007-09/2009

Member, Board of Governors, Armed Forces Institute of Pathology 10/2007-09/2009

Ex-officio Member, Board of Regents, National Library of Medicine, 10/2007-09/2009

Public Health Service Liaison Member, National Board of Medical Examiners, 2004-2007

**SELECTED AWARDS AND HONORS**

2018 Health Leader of the Year, Commissioned Officers Association of the United States Public Health Office

2015 Jacobi Medallion Award, Icahn Mount Sinai School of Medicine

2010 Alpha Omega Alpha Visiting Professor, Stony Brook University Medical Center

2009 Distinguished Alumni Award, University of New York at Stony Brook

2008 President's Lecture, University of New York at Stony Brook

2008 Founders Medal, Association of Military Surgeons of the US

2008 Robert Brutsche Award, Commissioned Officer Association of the USPHS

2007 Commissioner's Special Citation – Pandemic Influenza Preparedness Task Force Member

2005 Secretary of DHHS Award for Distinguished Service (Ephedrine Alkaloids Rule)

2004 Annual Max Kutzer Lectureship at Upstate Medical University in Syracuse, New York. (honors excellence in teaching general internal medicine).

2003 FDA Leveraging/Collaboration Award (European Commission & European Medicines Evaluation Agency Bilateral Team)

1986 – 2009 12 Public Health Service Awards, including the Surgeon General Medallion

1997 3 Secretary of Energy Gold Awards

**SELECTED PUBLICATIONS**

Toole M., Galson S., Brady W., War and Mass Migration in Former Yugoslavia: Public Health Consequences. Lancet 341:1193-6 (1993)

Boudreau A.Y., Baron S.L., Steenland N.K., van Gilder, T.J., Decker, J.A., Galson, S.K., Seitz T., Occupational Risk of Mycobacterium Tuberculosis Infection in Hospital Workers. American Journal of
Industrial Medicine 32 (5):528-534 (1997)

Galson, S.K. editor, Preventable Causes of Cancer in Children, Environmental Health Perspectives,
106 Supp 3, 865-885 (1998)

Sieber S.M., Galson S.K., Cooperating on childhood cancer, Science, 287(5456):1205-6 (2000)

Galson S., Kweder S., Houn S., Raczkowski, V. and Honig, P., The FDA and The Lancet: an exchange, Lancet, 358 (9279): 415 (2001)

Soreth J., Cox E., Kweder S., Jenkins J., Galson S., Ketek - the FDA Perspective, N Engl J Med, Apr 19;356(16):1675-6 (2007)

Galson, S.K., The FDA and the IOM report, N Engl J Med. Dec 13; 357(24):2520-1 (2007)

Galson S.K., Childhood overweight and obesity prevention, Public Health Rep. 2008 May-Jun;123(3):258-9

Galson S.K.., Preterm birth as a public health initiative, Public Health Rep. 2008 Sep-Oct;123(5):54850.

Galson S.K., Prevention of deep vein thrombosis and pulmonary embolism, Public Health Rep. 2008 Jul-Aug;123(4):420-1

Galson S.K., Rice Elman J. NIH, ACM expand childhood nutrition research, Nephrol News Issues. 2008 Jan; 22(1):33.

Galson S.K., The Need for Wider HIV Testing, Public Health Rep. 2008 Nov-Dec:123(5): 688-689

Galson S.K., Mental Health Matters, Public Health Rep. 2009 Jan-Feb: 124(1): 2-4

Galson S.K., Preventing and reducing underage drinking, Public Health Rep. 2009 Jan-Feb;124(1):24.

Galson S.K., The 25th anniversary of the Surgeon General's Workshop on Breastfeeding and Human Lactation: the status of breastfeeding today, Public Health Rep. 2009 May-Jun;124(3):356-8

Galson S.K., Self-Management Programs: One Way to Promote Healthy Aging, Public Health Rep. 2009 July-August;124(4):478-480

Galson S.K., USPHS Commissioned Corps: A Global Emergency Preparedness and Response Asses, Public Health Rep. 2009 Sept-Oct; 124)(5):622-3

Rosenblatt M., Austin C., Boutin M., Chin W., Galson S.K.,Woodcock J., (2017) Innovation in

Development, Regulatory Review, and Use of Clinical Advances, in Vital Directions for Health & Health Care, National Academies of Science, Engineering and Medicine, 369-393

Galson S, Austin CP, Khandekar E, Hudson LD, DiMasi JA, Califf R, Wagner JA, The failure to fail smartly, From the Analyst's Couch, Nature Reviews Drug Discovery, 23 Sept 2020, https://www.nature.com/articles/d41573-020-00167-0

Krofah, E, Galson SK, Califf RM, Simon G, Clinical Trials in Crisis: Building on COVID-19's Lessons Toward a Better Future, Health Affairs, https://www.healthaffairs.org/do/10.1377/forefront.20210819.331020

S.S. Dhruva, H.-G. Eichler, and S.K. Galson
Supporting the Development of Drugs for Rare Diseases – The Importance of Regulatory Transparency https://www.nejm.org/doi/full/10.1056/NEJMp2413309

Shein-Chung Chow, Anne Pariser, and Steven Galson, The role of regulatory flexibility in the review and approval process of rare disease drug development, The Journal of Biopharmaceutical Statistics, 11 April 2025
https://www.tandfonline.com/doi/full/10.1080/10543406.2025.2489290

Shein-Chung Chow, Anne Pariser, and Steven Galson, Use of alternative and confirmatory data in support of rare disease drug development, The Journal of Biopharmaceutical Statistics, 11 April 2025
https://www.tandfonline.com/doi/full/10.1080/10543406.2025.2489279

**APPENDIX B**

**MATERIALS CONSIDERED**

## Legal Documents

Complaint and Demand for Jury Trial, *Meijer, Inc. and Meijer Distribution, Inc., v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, No. 2:33-av-00001, December 23, 2011.

Complaint and Demand for Jury Trial, *Rite Aid Corporation, Rite Aid Hdqtrs. Corp., JCG (PJC) USA, LLC, Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation, and CVS Caremark Corporation, v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, No. 3:12-cv-03523, June 12, 2012.

Complaint and Demand for Jury Trial, *Walgreen Co., the Kroger Co., Safeway Inc., Supervalu Inc., HEB Grocery Company LP and American Sales Company, Inc., v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, No. 3:33-av-00001, November 30, 2011.

Complaint for Patent Infringement, *Wyeth v. Mylan Pharmaceuticals Inc.*, CA No. 1:07-cv-00091-IMK-JSK, July 6, 2007.

Complaint, *Giant Eagle, Inc., v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, No. 3:12-cv-03116, May 24, 2012.

Declaration of Bradley A. Matta, *In re: Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, March 25, 2025.

Direct Purchaser Class Plaintiffs' Second Amended Consolidated Class Action Complaint and Jury Demand, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, October 23, 2013.

## Expert Reports and Related Backup

Expert Report of Daisy Rivera-Muzzio, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, May 15, 2025.

Expert Report of Keith Leffler, Ph.D., *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, May 15, 2025.

Expert Report of Professor Thomas G. McGuire, Ph.D., *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, May 15, 2025.

## Depositions and Related Exhibits

Deposition of David Stark, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD, March 20, 2005.

Deposition of Deborah Jaskot, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD, February 4, 2025.

Deposition of Jill Pastore, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD, March 6, 2025.

Deposition of Philip Eric Erickson, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-05479-ZNQ-JBD, January 30, 2025.

Deposition of William S. Marth, *In re Effexor XR Antitrust Litigation*, No. 3:11-cv-5479-ZNQ-JBD, February 26, 2025.

**Bates-Stamped Documents**

| | |
|---|---|
| AMN-EFFEX0010838-876. | TEVA_EFFEX_0010211-217. |
| MYL-VENLA-0000005-009. | TEVA_EFFEX_0010218-683. |
| MYL-VENLA-0000039-043. | TEVA_EFFEX_0010684-1073. |
| MYL-VENLA-0000045-048. | TEVA_EFFEX_0011074-543. |
| MYL-VENLA-0000049-053. | TEVA_EFFEX_0011544-913. |
| MYL-VENLA-0000832-881. | TEVA_EFFEX_0011914-2296. |
| MYL-VENLA-0000957-992. | TEVA_EFFEX_0012297-682. |
| MYL-VENLA-0002259-744. | TEVA_EFFEX_0012880-894. |
| MYL-VENLA-0003705-709. | TEVA_EFFEX_0012897-907. |
| MYL-VENLA-0003712. | TEVA_EFFEX_0012910-915. |
| MYL-VENLA-0003911-915. | TEVA_EFFEX_0012916. |
| MYL-VENLA-0004009-010. | TEVA_EFFEX_0013464. |
| MYL-VENLA-0004592. | TEVA_EFFEX_0013471-507. |
| TEVA_EFFEX_0000001-267. | TEVA_EFFEX_0013508-544. |
| TEVA_EFFEX_0003838-4181. | TEVA_EFFEX_0014100-112. |
| TEVA_EFFEX_0005061-071. | TEVA_EFFEX_0014118-119. |
| TEVA_EFFEX_0005072-530. | TEVA_EFFEX_0014202-203. |
| TEVA_EFFEX_0005531-6050. | TEVA_EFFEX_0014204-206. |
| TEVA_EFFEX_0006051-348. | TEVA_EFFEX_0014246-252. |
| TEVA_EFFEX_0006349-361. | TEVA_EFFEX_0014254. |
| TEVA_EFFEX_0006362-386. | TEVA_EFFEX_0014255-258. |
| TEVA_EFFEX_0009664-775. | TEVA_EFFEX_0015801-806. |
| TEVA_EFFEX_0009776-791. | TEVA_EFFEX_0015812-814. |
| TEVA_EFFEX_0009792-868. | TEVA_EFFEX_0017943-946. |
| TEVA_EFFEX_0009869-892. | TEVA_EFFEX_0017956-973. |
| TEVA_EFFEX_0009893-894. | TEVA_EFFEX_0018448-449. |
| TEVA_EFFEX_0009896-907. | TEVA_EFFEX_0018454-455. |
| TEVA_EFFEX_0009908-911. | TEVA_EFFEX_0018544-550. |
| TEVA_EFFEX_0009912-925. | TEVA_EFFEX_0019487-515. |

TEVA_EFFEX_0022611-970.

TEVA_EFFEX_0028040-444.

TEVA_EFFEX_0029332-338.

TEVA_EFFEX_0029532-949.

TEVA_EFFEX_0029950-30239.

TEVA_EFFEX_0030456-467.

TEVA_EFFEX_0034116.

TEVA_EFFEX_0034117-152.

TEVA_EFFEX_0034261.

TEVA_EFFEX_0034388-390.

TEVA_EFFEX_0034686-691.

TEVA_EFFEX_0034692.

TEVA_EFFEX_0035505-512.

TEVA_EFFEX_0035516-520.

TEVA_EFFEX_0035633-640.

TEVA_EFFEX_0035686-689.

TEVA_EFFEX_0035698-701.

TEVA_EFFEX_0035702-705.

TEVA_EFFEX_0035753-760.

TEVA_EFFEX_0035761-762.

TEVA_EFFEX_0035763-768.

TEVA_EFFEX_0035769-774.

TEVA_EFFEX_0035775-777.

TEVA_EFFEX_0035875-876.

TEVA_EFFEX_0036095-108.

TEVA_EFFEX_0038329-331.

TEVA_EFFEX_0038347.

TEVA_EFFEX_0038387-391.

TEVA_EFFEX_0038700-703.

TEVA_EFFEX_0038708-710.

TEVA_EFFEX_0038717-814.

TEVA_EFFEX_0039069-070.

TEVA_EFFEX_0039082-085.

TEVA_EFFEX_0039086-167.

TEVA_EFFEX_0039168-249.

TEVA_EFFEX_0039250-331.

TEVA_EFFEX_0039343-344.

TEVA_EFFEX_0039433-435.

TEVA_EFFEX_0039440-441.

TEVA_EFFEX_0039442.

TEVA_EFFEX_0039455-456.

TEVA_EFFEX_0039465-466.

TEVA_EFFEX_0039474.

TEVA_EFFEX_0039631-632.

TEVA_EFFEX_0039708-714.

TEVA_EFFEX_0040903-908.

TEVA_EFFEX_0040939-943.

TEVA_EFFEX_0040990-991.

TEVA_EFFEX_0043762-4179.

TEVA_EFFEX_0044241-242.

TEVA_EFFEX_0044402-403.

TEVA_EFFEX_0044404.

TEVA_EFFEX_0044413.

TEVA_EFFEX_0044416-417.

TEVA_EFFEX_0049412-413.

TEVA_EFFEX_0049415.

TEVA_EFFEX_0049545-552.

TEVA_EFFEX_0050254-261.

TEVA_EFFEX_0050273-276.

TEVA_EFFEX_0050926.

TEVA_EFFEX_0051051-058.

TEVA_EFFEX_0051068-071.

TEVA_EFFEX_0051072-083.

TEVA_EFFEX_0051519-521.

TEVA_EFFEX_0051555-557.

TEVA_EFFEX_0051820-821.

TEVA_EFFEX_0052058-060.

TEVA_EFFEX_0052146.

TEVA_EFFEX_0053659-665.

TEVA_EFFEX_0054744-745.

TEVA_EFFEX_0071606-612.

TEVA_EFFEX_0079569-572.

TEVA_EFFEX_0080014-015.

TEVA_EFFEX_0083029-031.

TEVA_EFFEX_0083368-370.

TEVA_EFFEX_0083977-978.

TEVA_EFFEX_0093213-214.

TEVA_EFFEX_0093854.

TEVA_EFFEX_0094447.

TEVA_EFFEX_0094554-570.

TEVA_EFFEX_0094571-572.

TEVA_EFFEX_0094582-584.

TEVA_EFFEX_0094734.

TEVA_EFFEX_0094735-737.

TEVA_EFFEX_0094738-739.

TEVA_EFFEX_0094740.

TEVA_EFFEX_0094744-752.

TEVA_EFFEX_0094753-761.

TEVA_EFFEX_0096689-702.

TEVA_EFFEX_0096703-707.

TEVA_EFFEX_0097850-851.

TEVA_EFFEX_0097852-854.

TEVA_EFFEX_0098003-005.

TEVA_EFFEX_0128411-417.

TEVA_EFFEX_0130513-514.

TEVA_EFFEX_0134769-771.

TEVA_EFFEX_0138402-416.

TEVA_EFFEX_0138527-528.

TEVA_EFFEX_0140526-528.

TEVA_EFFEX_0229734-735.

TEVA_EFFEX_0234722-724.

TEVA_EFFEX_0236224-227.

TEVA_EFFEX_0236228-234.

TEVA_EFFEX_0236718-720.

TEVA_EFFEX_0237011-012.

TEVA_EFFEX_0237233-234.

TEVA_EFFEX_0237528-529.

TEVA_EFFEX_0237530-565.

TEVA_EFFEX_0237566-573.

TEVA_EFFEX_0253370-373.

TEVA_EFFEX_0254424-431.

TEVA_EFFEX_0254457.

TEVA_EFFEX_0255298-302.

TEVA_EFFEX_0269707.

TEVA_EFFEX_0270889-893.

TEVA_EFFEX_0272584-641.

TEVA_EFFEX_0319286-288.

TEVA_EFFEX_0321639-642.

TEVA_EFFEX_0321913-918.

TEVA_EFFEX_0321938-940.

TEVA_EFFEX_0325003.

TEVA_EFFEX_0440656-657.

TEVA_EFFEX_0440657.

TEVA_EFFEX_0454210-300.

TEVA_EFFEX_0772772-775.

TEVA_EFFEX_0772776-779.

TEVA_EFFEX_0772798-801.

TEVA_EFFEX_0773524-537.

TEVA_EFFEX_0773600-603.

TEVA_EFFEX_0773604-607.

TEVA_EFFEX_0773619-620.

TEVA_EFFEX_0773841-842.

TEVA_EFFEX_0774574-577.

TEVA_EFFEX_0777650-663.

TEVA_EFFEX_0777718.

TEVA_EFFEX_0777719-731.

TEVA_EFFEX_0779852-868.

TEVA_EFFEX_0780280.

TEVA_EFFEX_0780281-297.

TEVA_EFFEX_0780570-584.

TEVA_EFFEX_0780690-691.

TEVA_EFFEX_0782950-964.

TEVA_EFFEX_0783714-719.

TEVA_EFFEX_0783900-910.

TEVA_EFFEX_0785297-301.

TEVA_EFFEX_0785303-310.

TEVA_EFFEX_0785311-316.

TEVA_EFFEX_0792512.

TEVA_EFFEX_0795155-161.

TEVA_EFFEX_0795622.

TEVA_EFFEX_0797019.

TEVA_EFFEX_0797020-027.

TEVA_EFFEX_0801461-462.

TEVA_EFFEX_0805199.

TEVA_EFFEX_0805200-217.

TEVA_EFFEX_0805242-257.

TEVA_EFFEX_0805323-336.

TEVA_EFFEX_0813602-603.

TEVA_EFFEX_0819992-20006.

TEVA_EFFEX_0823324-783.

TEVA_EFFEX_0824396-813.

TEVA_EFFEX_0828947-950.

TEVA_EFFEX_0828958-959.

TEVA_EFFEX_0828967-969.

TEVA_EFFEX_0830321-323.

TEVA_EFFEX_0830845-847.

TEVA_EFFEX_0832240-244.

TEVA_EFFEX_0832305-312.

WYEFFAT0000001-139.

WYEFFAT04601592-605.

WYEFFAT04649442-443.

WYEFFAT06452251.00001.

WYEFFAT06599755-757.

WYEFFAT07261584-590.

WYEFFAT0955271-405.

WYEFFAT2161418-431.

WYEFFAT2303731-743.

WYEFFAT4022462-475.

**Academic Literature**

Benet, Leslie Z., "Understanding Bioequivalence Testing," *Transplantation Proceedings* Vol. 31, No. Supplement 3a, 1999, pp. 7S-9S.

Diaz, Dorys Argelia, Stephen T. Colgan, Connie S. Langer, Nagesh T. Bandi, Michael D. Likar, and Leslie Van Alstine, "Dissolution Similarity Requirements: How Similar or Dissimilar Are the Global Regulatory Expectations?," *The AAPS Journal*, Vol. 18, No. 1, 2016, pp. 15-22.

Grangeia, Helena Bigares, Claudia Silva, Sergio Paulo Simoes, and Marco S. Reis, "Quality by Design in Pharmaceutical Manufacturing: A Systematic Review of Current Status, Challenges and Future Perspectives," *European Journal of Pharmaceutics and Biopharmaceutics*, Vol. 147, 2020, pp. 19-37.

ICH Expert Working Group, "Pharmaceutical Development Q8(R2)," *International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use*, 2009.

Kannappan, Sunand, Jonathan J. Darrow, Aaron S. Kesselheim, and Reed F. Beall, "The Timing of 30-Month Stay Expirations and Generic Entry: A Cohort Study of First Generics, 2013–2020," *Clinical and Translational Science*, Vol. 14, 2021, pp. 1917-1923.

Kros, John F., and Jingxia Qian, "Analysis of US Food and Drug Administration Review Intervals for Drugs Approved During the Period 1997–2002," *American Journal of Therapeutics*, Vol. 11, 2004, pp. 337-343.

Reiffen, David, and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1, 2005, pp. 37-49.

Sertkaya, Aylin, Trinidad Beleche, Amber Jessup, and Benjamin D. Sommers, "Costs of Drug Development and Research and Development Intensity in the US, 2000-2018," *JAMA Network Open*, Vol. 7, No. 6, 2024, pp. 1-13.

Yu, Lawrence X., Gregory Amidon, Mansoor A. Khan, Stephen W. Hoag, James Polli, G. K. Raju, and Janet Woodcock, "Understanding Pharmaceutical Quality by Design," *The AAPS Journal*, Vol. 16, No. 4, 2014, pp. 771-783.

**Public Documents**

*21 CFR 211.1.*

*21 CFR 211.84.*

*21 CFR 314.101.*

*21 CFR 314.105.*

*21 CFR 314.107.*

*21 CFR 314.108.*

*21 CFR 314.3.*

*21 CFR 314.94.*

*21 U.S.C. §335a.*

*21 U.S.C. §335c.*

*21 U.S.C. §355.*

"40th Anniversary of the Generic Drug Approval Pathway," *U.S. Food and Drug Administration*, September 23, 2024, https://www.fda.gov/drugs/cder-conversations/40th-anniversary-generic-drug-approval-pathway.

"A Pharma Manufacturer's View of Quality by Design," *PharmTech*, August 1, 2011, https://www.pharmtech.com/view/pharma-manufacturers-view-quality-design.

"Abbreviated New Drug Application (ANDA)," *U.S. Food and Drug Administration*, March 28, 2025, https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda.

"Abbreviated New Drug Applications and 505(b)(2) Applications," *Federal Register Vol. 81, No. 194*, October 6, 2016, https://www.govinfo.gov/content/pkg/FR-2016-10-06/pdf/2016-22690.pdf.

"ANDA Approved," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021024153542/http://www.fda.gov/cder/handbook/andaappr.htm, archived by the Wayback Machine on October 24, 2002.

"ANDA Submissions – Amendments to Abbreviated New Drug Applications Under GDUFA: Guidance for Industry," *U.S. Food and Drug Administration*, September 2024, https://www.fda.gov/media/89258/download.

"ANDA Submissions – Refuse-to-Receive Standards: Guidance for Industry," *U.S. Food and Drug Administration*, December 2016, https://www.fda.gov/media/86660/download.

"ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs Guidance for Industry," *U.S. Food and Drug Administration*, January 2024, https://www.fda.gov/media/119718/download, accessed May 5, 2025.

"Approval Package for Application Number: ANDA 076565," *Center for Drug Evaluation and Research*, June 28, 2010, https://www.accessdata.fda.gov/drugsatfda_docs/anda/2010/076565Orig1s000.pdf.

"Approved Drug Products With Therapeutic Equivalence Evaluations (Orange Book)," *U.S. Food and Drug Administration*, 2003, https://www.thefdalawblog.com/wp-content/uploads/2020/06/OB-Annual-2003-23rd-Ed.pdf.

"ASPE Issue Brief: Expanding the Use of Generic Drugs," *U.S. Department of Health and Human Services*, December 1, 2010, https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//43501/ib.pdf.

"Bioequivalence Review Acceptable?," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021228071247/fda.gov/cder/handbook/bioaccep.htm, archived by the Wayback Machine on December 28, 2002.

"Bioequivalence Review," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021122143733/http://www.fda.gov/cder/handbook/bioequiv.htm, archived by the Wayback Machine on November 22, 2002.

"CDER Manual of Policies and Procedures (MaPP)," *U.S. Food and Drug Administration*, https://web.archive.org/web/20060930161938/http://www.fda.gov/cder/mapp.htm, archived by the Wayback Machine on September 30, 2006.

"Chemistry Review of Question-Based Review (QbR) Submissions," *Center for Drug Evaluation and Research*, November 18, 2014, https://www.fda.gov/files/about%20fda/published/Chemistry-Review-of-Question-based-Review-%28QbR%29-Submissions.pdf.

"Chemistry/Micro/Labeling Review Acceptable?," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021024161337/http://www.fda.gov/cder/handbook/laba ccep.htm, accessed May 4, 2025, archived by the Wayback Machine on October 24, 2002.

"Chemistry/Microbiology Review," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021024155351/http://www.fda.gov/cder/handbook/che mistg.htm, archived by the Wayback Machine on October 24, 2002.

"Conversion of ANDA Approval to Tentative Approval Because of Court Order," *Center for Drug Evaluation and Research*, June 11, 2020, https://www.fda.gov/media/138828/download.

"Cost of Generic Drug Development and Approval," *Eastern Research Group, Inc.*, December 31, 2021, https://aspe.hhs.gov/sites/default/files/documents/20e14b66420440b9e726c61d281cc5 a5/cost-of-generic-drugs-erg.pdf.

"Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions," *U.S. Food and Drug Administration*, October 26, 2022, https://www.fda.gov/media/71735/download.

"Drugs@FDA Glossary of Terms," *U.S. Food and Drug Administration*, November 14, 2017, https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms.

"FDA Approval Letter for ANDA 076565," *U.S. Food and Drug Administration*, June 28, 2010, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2010/076565s000ltr.pdf.

"FDA Label for Effexor XR - Venlafaxine Hydrochloride Capsule, Extended Release," *Wyeth Pharmaceuticals*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/020699s081lbl.pdf, accessed July 1, 2025.

"FDA's Pharmaceutical Quality Initiatives: Implementation of a Modern Risk-based Approach," *Pharmaceutical Technology*, May 2, 2008, https://www.pharmtech.com/view/fdas-pharmaceutical-quality-initiatives-implementation-modern-risk-based-approach.

"Filing Review of Abbreviated New Drug Applications," *Center for Drug Evaluation and Research*, October 3, 2023, https://www.fda.gov/media/144976/download.

"FY 2015 Performance Report to Congress for the Generic User Fee Amendments," *U.S. Food and Drug Administration*, 2015, https://www.fda.gov/media/97128/download.

"GDUFA I," *U.S. Food and Drug Administration*, May 8, 2024, https://www.fda.gov/industry/generic-drug-user-fee-amendments/gdufa-i.

"Generic Drug (ANDA) Review Process," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021017004659/http://www.fda.gov/cder/handbook/and a.htm, archived by the Wayback Machine on October 17, 2002.

"Generic Drug Facts," November 1, 2021, https://www.fda.gov/drugs/generic-drugs/generic-drug-facts.

"Generic Drug User Fee Act Program Performance Goals and Procedures," *U.S. Food and Drug Administration*, https://www.fda.gov/media/82022/download.

"Generic Drugs: Questions & Answers," *U.S. Food and Drug Administration*, March 16, 2021, https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers.

"Guidance for Industry on Quality Systems Approach to Pharmaceutical Current Good Manufacturing Practice Regulations; Availability," *Federal Register*, October 2, 2006, https://www.govinfo.gov/content/pkg/FR-2006-10-02/pdf/E6-16215.pdf.

"Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs are Submitted on the Same Day," *U.S. Food and Drug Administration*, July 2003, https://www.fda.gov/media/71304/download.

"Guidance for Industry: 180-Day Exclusivity: Questions and Answers," *U.S. Food and Drug Administration*, January 2017, https://www.fda.gov/media/102650/download.

"Guidance for Industry: Bioequivalence Recommendations for Specific Products," *U.S. Food and Drug Administration*, June 2010, https://www.fda.gov/media/71401/download.

"Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations," *U.S. Food and Drug Administration*, September 1997, https://www.fda.gov/media/70939/download.

"Guidance for Industry: Major, Minor, and Telephone Amendments to Abbreviated New Drug Applications," *U.S. Food and Drug Administration*, December 2001, https://permanent.fdlp.gov/websites/www.fda.gov/pdf-archive/ucm072888.pdf.

"Guidance for Industry: PAT — A Framework for Innovative Pharmaceutical Development, Manufacturing and Quality Assurance," *U.S. Food and Drug Administration*, September 2004, https://www.fda.gov/media/71012/download.

"Guidance for Industry: Q8 Pharmaceutical Development," *U.S. Food and Drug Administration*, May 2006, https://www.govinfo.gov/content/pkg/GOVPUB-HE20_4000-PURL-LPS112066/pdf/GOVPUB-HE20_4000-PURL-LPS112066.pdf.

"Guidance for Industry: Q8(R2) Pharmaceutical Development," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/71535/download.

"Guidance for Industry: Quality Systems Approach to Pharmaceutical CGMP Regulations," *U.S. Food and Drug Administration*, September 2006, https://www.fda.gov/media/71023/download.

"Guidance for Industry: Residual Solvents in Drug Products Marketed in the United States," *U.S. Food and Drug Administration*, November 2009, https://www.fda.gov/media/70928/download.

"Hatch-Waxman Letters," *U.S. Food and Drug Administration*, February 3, 2022, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/hatch-waxman-letters.

"Incorporating the Concepts of QbR in the Assessment of Generic Drugs," *U.S. Food and Drug Administration*, October 5, 2005, https://web.archive.org/web/20070111233001/http://www.fda.gov/cder/ogd/QbRbuehler.ppt.

Jiang, Wenlei, "FDA Drug Topics: Understanding Generic Narrow Therapeutic Index Drugs," *U.S. Food and Drug Administration*, March 2015, https://www.fda.gov/media/162779/download.

"Labeling Review," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021024161054/http://www.fda.gov/cder/handbook/labelogd.htm, archived by the Wayback Machine on October 24, 2002.

"Leadership," *Kamada Pharmaceuticals*, https://www.kamada.com/leadership/, accessed July 11, 2025.

"MAPP 5240.3 - Prioritization of the Review of Original ANDAs, Amendments, and Supplements," *U.S. Federal Drug Administration*, October 5, 2022, https://www.fda.gov/media/89061/download.

Mechcatie, Elizabeth, "Generic Version of Venlafaxine FDA Approved," *MDedge*, October 1, 2006, https://www.mdedge.com/content/generic-version-venlafaxine-fda-approved.

Moscariello, John, "Quality by Design: Transforming 21st Century Pharmaceutical Manufacturing," *American Pharmaceutical Review*, July 29, 2016, https://www.americanpharmaceuticalreview.com/Featured-Articles/190726-Quality-by-Design-Transforming-21st-Century-Pharmaceutical-Manufacturing/.

Mylan Inc., Mylan 2008 Annual Report (Form 10-K), filed February 16, 2009, https://investor.mylan.com/static-files/67a35bd9-f89b-4cca-8491-344dbc2a5295.

"New Drug Quality," *FDA/CDER Small Business Chronicles*, September 18, 2012, https://www.fda.gov/media/84457/download.

"Office of Generic Drugs QbR Quality Overall Summary Outline," *U.S. Food and Drug Administration*, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/office-generic-drugs-qbr-quality-overall-summary-outline, accessed July 3, 2025.

"Office of Generic Drugs," *U.S. Food and Drug Administration*, https://web.archive.org/web/20061005213522/http:/www.fda.gov/cder/ogd/, archived by the Wayback Machine on October 5, 2006.

"Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations," *U.S. Food and Drug Administration*, https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm, accessed June 9, 2025.

"Part II: 1938, Food, Drug, Cosmetic Act," *U.S. Food and Drug Administration*, November 27, 2018, https://www.fda.gov/about-fda/changes-science-law-and-regulatory-authorities/part-ii-1938-food-drug-cosmetic-act.

"Patent Certifications and Suitability Petitions," *U.S. Food and Drug Administration*, April 23, 2025, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/patent-certifications-and-suitability-petitions.

"Pfizer Completes Acquisition of Wyeth," *Pfizer*, October 14, 2009, https://www.pfizer.com/news/press-release/press-release-detail/pfizer_completes_acquisition_of_wyeth.

"Pfizer to Acquire Wyeth, Creating the World's Premier Biopharmaceutical Company," *Pfizer*, January 25, 2009, https://www.pfizer.com/news/press-release/press-release-detail/pfizer_to_acquire_wyeth_creating_the_world_s_premier_biopharmaceutical_company.

"Pharmaceutical CGMPs for the 21st Century — A Risk-Based Approach," *U.S. Food and Drug Administration*, September 2004, https://www.fda.gov/media/77391/download.

"Pharmatrans SANAQ® Sugar Spheres and MCC pellet excipients for controlled release," *Pharma Excipients*, https://www.pharmaexcipients.com/news/sanaq-sugar-spheres-mcc-pellet/, accessed June 30, 2025.

"Preapproval Inspection Acceptable?," *U.S. Food and Drug Administration*, https://web.archive.org/web/20021228073727/http://www.fda.gov/cder/handbook/preaccep.htm, archived by the Wayback Machine on December 28, 2002.

*Public Law 108–173*.

*Public Law 98–417*.

"Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act: Frequently Asked Questions on Pediatric Exclusivity (505A)," March 1, 2022, https://www.fda.gov/drugs/development-resources/qualifying-pediatric-exclusivity-under-section-505a-federal-food-drug-and-cosmetic-act-frequently.

"Quality by Design – FDA Lessons Learned and Challenges for International Harmonization," *U.S. Food and Drug Administration*, February 28, 2012, https://www.ibcinfo.com/Uploads/qbd/COMPLIANCE%2015_%5bmoore.christine%5d%5bicdd%5d%5b02.28.12%5d.pdf.

"Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system.

"Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," *U.S. Food and Drug Administration*, August 31, 2005, https://web.archive.org/web/20060918040645/http:/www.fda.gov/cder/ogd/QbR_white_paper.htm, archived by the Wayback Machine on September 18, 2006.

"Question-Based Review for Generic Drugs: An Enhanced Quality Assessment System Presentation," *U.S. Food and Drug Administration*, June 29, 2005, https://web.archive.org/web/20070111233001/http://www.fda.gov/cder/ogd/QbR20050629.ppt, archived by the Wayback Machine on December 8, 2006.

"Questions to be Completed by ANDA Sponsors for the Preparation of a QbR-Quality Overall Summary," *U.S. Food and Drug Administration*, https://web.archive.org/web/20060929075121/http://www.fda.gov/cder/ogd/QbR-Quality_Overall_Summary_Outline.doc, archived by the Wayback Machine on September 29, 2006.

"Referencing Approved Drug Products in ANDA Submissions Guidance for Industry," *U.S. Food and Drug Administration*, October 2020, https://www.fda.gov/media/102360/download.

"Refuse to File Letter Issued," *U.S. Food and Drug Administration*, https://web.archive.org/web/20020813202212/http://www.fda.gov/cder/handbook/refusegn.htm, archived by the Wayback Machine on August 13, 2002.

"Report From the EMA-FDA QbD Pilot Program," *European Medicines Agency*, April 19, 2017, https://www.fda.gov/media/104371/download.

"Request for Plant Inspection," *U.S. Food and Drug Administration*, https://web.archive.org/web/20020805141424/http://www.fda.gov/cder/handbook/inspecpl.htm, archived by the Wayback Machine on August 5, 2002.

"Research and Development in the Pharmaceutical Industry," *Congressional Budget Office*, April 2021, https://www.cbo.gov/publication/57126, accessed June 25, 2025.

"Restatement of the Office of Generic Drugs' 'First-In, First-Reviewed' Policy and Modification of the Exceptions to the Policy Regarding Minor Amendments," *U.S. Food and Drug Administration*, November 1, 1995, https://web.archive.org/web/20001027100400/http://www.fda.gov/cder/mapp/5240-3.pdf, archived by the Wayback Machine on October 27, 2000.

"Review Order of Original ANDAs, Amendments, and Supplements," *U.S. Food and Drug Administration*, October 18, 2006, https://web.archive.org/web/20061024100757/http://www.fda.gov/cder/mapp/5240-3R.pdf, archived by the Wayback Machine on October 24, 2006.

"Small Business Assistance | 180-Day Generic Drug Exclusivity," *U.S. Food and Drug Administration*, October 26, 2023, https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-assistance-180-day-generic-drug-exclusivity.

"Submission of Chemistry, Manufacturing, and Controls Information in a New Drug Application Under the New Pharmaceutical Quality Assessment System; Notice of Pilot Program," *Federal Register*, July 14, 2005, https://www.govinfo.gov/content/pkg/FR-2005-07-14/pdf/05-13829.pdf.

"Submission of Quality Information for Biotechnology Products in the Office of Biotechnology Products; Notice of Pilot Program," *Federal Register*, July 2, 2008, https://www.govinfo.gov/content/pkg/FR-2008-07-02/pdf/E8-14999.pdf.

"Summary Minutes of the Advisory Committee for Pharmaceutical Science and Clinical Pharmacology," *ACPS-CP*, July 26, 2011, http://web.archive.org/web/20111028203556/http://www.fda.gov/downloads/Advisory Committees/CommitteesMeetingMaterials/Drugs/AdvisoryCommitteeforPharmaceuti calScienceandClinicalPharmacology/UCM272111.pdf, archived by the Wayback Machine on October 28, 2011.

"Teva Announces Final Approval of Venlafaxine HCL Tablets," *Teva Pharmaceuticals*, August 4, 2006, https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2006/Teva-Announces-Final-Approval-of-Venlafaxine-HCL-Tablets/default.aspx.

"Teva Generics: Who We Are," *Teva Pharmaceuticals*, https://www.tevausa.com/our-products/tevagenerics/who-we-are/, accessed June 9, 2025.

"Teva Introduces First Generic Effexor XR® Capsules in the United States; Awarded 180-Day Period of Marketing Exclusivity," *Fierce Pharma*, July 1, 2010, https://www.fiercepharma.com/pharma/teva-introduces-first-generic-effexor-xr%c2%ae-capsules-united-states-awarded-180-day-period-of.

"Teva Pharmaceutical Industries Limited (TEVA)," *Yahoo Finance*, https://finance.yahoo.com/quote/TEVA/profile/, accessed June 6, 2025.

Teva Pharmaceutical Industries, Preliminary Prospectus Supplement to Prospectus Dated December 20, 2005, filed January 25, 2006, https://www.sec.gov/Archives/edgar/data/818686/000119312506011946/d424b5.htm.

Teva Pharmaceutical Industries, Teva 2006 Annual Report (Form 20-F), filed February 28, 2007, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000818686/630981ec-1d3d-498b-b760-a325066fb4d1.pdf.

Teva Pharmaceutical Industries, Teva 2024 Annual Report (Form 10-K), filed February 5, 2025, https://s24.q4cdn.com/720828402/files/doc_financials/2024/ar/2024-10-K-final-bannerless-ADA-tagged.pdf.

"Teva Pharmaceuticals USA," *Drugs.com*, https://www.drugs.com/manufacturer/teva-pharmaceuticals-usa-inc-140.html, accessed June 6, 2025.

"Teva Reports Record Full Year 2008 and Fourth Quarter Results," February 17, 2009, https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2009/Teva-Reports-Record-Full-Year-2008-and-Fourth-Quarter-Results/default.aspx.

"Teva Reports Record Full Year 2009 And Fourth Quarter Results," *Teva Pharmaceuticals*, February 16, 2010, https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2010/Teva-Reports-Record-Full-Year-2009-And-Fourth-Quarter-Results/default.aspx.

"Teva-IVAX Merger Creates 'Exceptional Pipeline'," *Forbes*, January 30, 2006, https://www.forbes.com/2006/01/30/teva-ivax-0130markets13.html.

"The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective," *U.S. Food and Drug Administration*, November 24, 2017, https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

"The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles; Final Guidance for FDA and Industry," *U.S. Food and Drug Administration*, October 4, 2002, https://www.fda.gov/files/medical%20devices/published/The-Least-Burdensome-Provisions-of-the-FDA-Modernization-Act-of-1997--Concept-and-Principles---Final-Guidance-for-FDA-and-Industry.pdf.

"The Listing of Patent Information in the Orange Book " *U.S. Food and Drug Administration*, January 5, 2022, https://www.fda.gov/media/155200/download.

Van Arnum, Patricia, "A FDA Perspective on Quality by Design," *PharmTech*, December 5, 2007, https://www.pharmtech.com/view/fda-perspective-quality-design.

"Venlafaxine Hydrochloride Extended-Release Capsules," *United States Pharmacopeial Convention*, March 1, 2021, https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/revisions/venlafaxine-hcl-erc-rb-notice-20210226.pdf.

Wechsler, Jill, "FDA Encourages Quality by Design Initiatives," *BioPharm International*, March 1, 2008, https://www.biopharminternational.com/view/fda-encourages-quality-design-initiatives.

Woodcock, Janet, "Implementation of the Generic Drug User Fee Amendments of 2012 (GDUFA) - House Testimony," *U.S. Food and Drug Administration*, April 1, 2016, https://www.fda.gov/news-events/congressional-testimony/implementation-generic-drug-user-fee-amendments-2012-gdufa-house-testimony, testimony provided before the House Committee on Oversight and Government Reform on February 4, 2016.

**APPENDIX C**

**TIMELINE OF EVENTS RELATED TO**

**FDA'S REVIEW OF TEVA'S GENERIC EFFEXOR XR ANDA**

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**December 2002 – January 2006**

Legend:
- Internal Teva Communication
- Communication Between FDA and Teva
- FDA Question-Based Review Framework
- Alleged But-For Dates
- Other Events

**December 10, 2002**
Teva submits ANDA 76-565 for 150 mg generic Effexor XR; includes Paragraph IV certifications to Wyeth's '708, '171, '120, and '958 patents

**January 17, 2003**
Teva submits revised patent certification adding labeling carve outs for Wyeth's '958 and '120 method of use patents related to the treatment of generalized anxiety disorder

**February 13, 2003**
Teva submits an amendment to ANDA 76-565 adding 37.5 mg and 75 mg generic Effexor XR

**March 24, 2003**
Wyeth files complaint against Teva alleging infringement of '171, '120, and '958 patents

**January 2005**
FDA proposes QbR to bridge gap between cGMP initiative and then-current CMC review practices and reduce workload

**January 1, 2006**
FDA begins implementing QbR framework

**January 12, 2005**
Teva Israel proposes tightening PSD limit for raw materials and using drug suspension for drug coating process to "contribute to a more efficient and robust process"

**May 9, 2005**
Teva internally projects that FDA could grant tentative approval within three to four months

**November 2, 2005**
Wyeth and Teva enter into settlement and license agreement

Timeline axis: 12/2002, 4/2003, 8/2003, 12/2003, 3/2004, 7/2004, 11/2004, 3/2005, 7/2005, 11/2005

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**June 2006 - August 2006**

| | | | | |
|---|---|---|---|---|
| Internal Teva Communication | Communication Between FDA and Teva | FDA Question-Based Review Framework | Alleged But-For Dates | Other Events |

**June 26, 2006**
FDA requests additional in-process manufacturing controls, physical samples of finished product, and clarification on intention to use Assia API site

**July 27, 2006**
Teva evaluates potential benefits and potential risks of changing production for modified-release products from Kfar Saba to Jerusalem; notes that amendment could be withdrawn to "prevent delay in approval" of ANDA

**June 29, 2006**
Mr. Erickson clarifies to FDA that there was no documentation to suggest that Teva "requested withdrawal of Assia from either file [the IR and XR ANDAs]"

**August 7, 2006**
Teva continues to evaluate advantages of transferring operations from Kfar Saba to Jerusalem; site transfer to offer "[f]lexibility to manufacture [modified release] products"

**July 6, 2006**
Teva submits proposal for blend uniformity testing, finished product samples, and a statement attesting to continue use of Assia API

**August 14, 2006**
Teva submits telephone amendment with additional in-process controls; provides only blend uniformity data as executed batches are expired

**July 24, 2006**
FDA issues minor deficiency finding Teva's proposal inadequate; requests suitable acceptance criteria and additional in-process testing of the drug layering and XR coating

7/2006                                      8/2006

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**October 2006 - January 2007**

Legend:
- Internal Teva Communication (green)
- Communication Between FDA and Teva (blue)
- FDA Question-Based Review Framework (yellow)
- Alleged But-For Dates (red)
- Other Events (black)

**October 12, 2006**
FDA issues major deficiency letter concluding Teva's proposed in-process specifications "were not adequate due to lack of available data"; requests another 150 mg demonstration batch

**November 16, 2006**
Teva to manufacture "batch identical to the original pivotal batches" and additional "new process" batch to resolve deficiencies and make efficiency changes considered since January 2005

**January 1, 2007**
Following gradual implementation, FDA fully adopts QbR framework; urges drug sponsors to file ANDAs using QbR standard submission format

**October 17, 2006**
Ms. Jaskot notes that FDA letter "exemplifies FDA's current [QbD] and [QbR] thinking"; Ms. Leska responds that deficiency was "like starting the review process from the beginning"

**November 2006**
Teva begins manufacturing, acquiring, and testing raw materials to be used for new batches; completes process in March 2007

**January 23, 2007**
Ms. Shallem emails a list of in-process controls for "new" batch; results to be used to determine controls incorporated into manufacturing procedure

**November 2006**
Teva Israel outlines plan for shifting operations from Kfar Saba to Jerusalem; includes submitting site transfer amendments for drug files to launch starting in 2008

**November 14, 2006**
Teva Israel proposes revisions to manufacturing process to resolve deficiencies related to low potency results and capsule fill weight; discusses including additional efficiency changes considered since January 2005

10/2006        11/2006            12/2006        1/2007

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**February 2007 - October 2007**

Internal Teva Communication    Communication Between FDA and Teva    FDA Question-Based Review Framework    Alleged But-For Dates    Other Events

February 12, 2007
Mr. Vincent states that Teva needs to submit 3-month stability data and documentation for "new process" batch; Teva to submit materials for "new" batch in case FDA requests it

February 16, 2007
Teva begins manufacturing and packaging "new" batches and "new process" batches; completes production March 18-19, 2007

March 7, 2007
Target response date set to June 2007

April 2007
Alleged date by which Teva could have responded to October 12, 2006 major deficiency letter

April 2007
Dissolution tests for some packaging configurations in "new batches" are out of specification

July 12, 2007
Teva begins repackaging batches "to include silica gel bags"; begins new stablity study on July 19, 2007

July 23, 2007
Teva updates target response date to November 2007 "based on 3 month stability on new packaging"

September 10, 2007
Teva Israel proposes addition of RDL site in India to manufacture Venlafaxine Base for "increased efficiency"

October 24, 2007
Mr. Vincent notes supplemental documentation would need to be submitted for proposed manufacturing process at RDL site; could be included in major amendment

October 29, 2007
Teva begins conducting 3-month accelerated stability tests

3/2007    4/2007    6/2007    7/2007    9/2007    10/2007

C-5

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**January 2008 - August 2008**

Internal Teva Communication | Communication Between FDA and Teva | FDA Question-Based Review Framework | Alleged But-For Dates | Other Events

**January 24, 2008**
Stability test results for July 2007 silica gel bag batches within specification; Teva produces official reports between February 14, 2008 and February 20, 2008

**April 8, 2008**
Teva gathers documentation to support adding RDL site; considers including site change in major amendment

**June 20, 2008**
Mr. Sanders sends Teva Israel comments on draft major amendment and notes "[a]dditional questions may come after it is reviewed by management"; iterates with Ms. Shallem until August 4, 2008

**January 28, 2008**
Mr. Vincent advises that "it should be acceptable" to not submit stability summaries for original packaging configurations "not be[ing] pursued for commercial marketing"

**April 29, 2008**
Teva conducts 9-month stability study analysis for July 2007 batch packaged with silica gel bags

**July 15, 2008**
Teva USA's regulatory affairs department sends comments to Teva Israel; updates target response date to July 2008

**May 1, 2008**
Teva Israel sends Teva USA draft of major amendment for review; audits and sends manufacturing procedure and stability reports on June 4, 2008

**August 19, 2008**
Teva submits major amendment in response to FDA's October 12, 2006 major deficiency letter

**May 27, 2008**
Teva Israel sends a near-final draft of major amendment to Teva USA

**June 10, 2008**
Mr. Sanders suggests including amendment adding 15-count packaging configuration in major amendment

1/2008    3/2008    5/2008    7/2008    8/2008

C-6

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**November 2008 - March 2009**

☐ Internal Teva Communication    ☐ Communication Between FDA and Teva    ☐ FDA Question-Based Review Framework    ☐ Alleged But-For Dates    ☐ Other Events

**November 12, 2008**
Teva remains undecided on timing of unsolicited site transfer amendment; Ms. Pastore suggests proceeding with re-dose report by January 9, 2009 if amendment is submitted prior to generic Effexor XR approval

**January 8, 2009**
Ms. Pinchuk tells Ms. Pastore that Teva Israel is evaluating an additional site change

**March 2009**
Alleged final approval date for Teva's generic Effexor XR

**November 13, 2008**
Mylan receives tentative approval for its generic Effexor XR ANDA

**January 9, 2009**
Ms. Pastore recommends waiting to submit second site change until "after final approval of [generic Effexor XR] ANDA"

**November 17, 2008**
Teva Israel pushes to submit Jerusalem site change by the end of 2008; Ms. Pastore notes that Teva USA could not "get to the site change until early 2009"

**January 28, 2009**
Teva submits unsolicited amendment to add production site in Jerusalem; includes bioequivalence study using batches produced at new site

**February 4, 2009**
FDA informs Teva that August 2008 major amendment is "in the queue [to be reviewed] behind several other minor amendments"

11/2008          1/2009          2/2009          3/2009

C-7

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**June 2009 - December 2009**

☐ Internal Teva Communication    ☐ Communication Between FDA and Teva    ☐ FDA Question-Based Review Framework    ☐ Alleged But-For Dates    ☐ Other Events

June 11, 2009
FDA issues major deficiency letter listing CMC deficiencies, including those related to testing at Jerusalem site; requests sample batches related to August 19, 2008 and January 28, 2009 amendments

September 24, 2009
Teva withdraws site transfer amendment "[i]n the interest of completion of a timely review"; requests reclassification of June 11, 2009 major deficiency letter to minor deficiency letter

December 8, 2009
FDA reclassifies Teva's September 24, 2009 major amendment to a minor amendment

June 17, 2009
Teva discusses reclassifying FDA deficiency letter from major to minor using data from batches "manufactured in [Kfar Saba] and Jerusalem, […] assuming that [Teva] would not need to submit [an] additional batch"

August 2009
Teva Israel and Teva USA iterate on a draft response to FDA's deficiency letter and work on addressing deficiencies

September 2, 2009,
Ms. Zwicker notes that FDA has been requiring Residual Solvent Assessment for drug products with submissions since 2008, resulting in deficiencies to ANDAs prior to approval

6/2009                8/2009                10/2009                12/2009

# Appendix C
## Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA
## January 2010 – June 2010

Internal Teva Communication  |  Communication Between FDA and Teva  |  FDA Question-Based Review Framework  |  Alleged But-For Dates  |  Other Events

**January 2010**
New validation batches for all strengths manufactured in late January and early February 2010

**March 14, 2010**
Teva conducts alcohol-induced dose dumping studies for all three strengths and completes them on March 24, 2010

**May 11, 2010**
FDA issues major deficiency requesting demonstration batches, product samples at commercial scale, and an-in process data summary

**February 16, 2010**
FDA grants Osmotica's citizen petition requesting that FDA not approve a generic Effexor XR ANDA unless it includes "results of in vitro testing that ensures a lack of any [alcohol-induced] dose dumping"

**April 2010**
Teva compiles COAs and batch records for validation batches with PSD limits for 37.5mg and 150mg strengths; distributes validation reports confirming process meets specifications and demonstrates reproducibility

**May 17, 2010**
Teva submits telephone amendment in response to FDA's major deficiency letter as it had "ample batch data" and necessary documentation readily available

**February 24, 2010**
Mr. Vincent drafts alcohol dose dumping dissolution procedure stating "[i]n the interest of saving time it may be worth considering performing this testing" in case FDA requires it

**April 21, 2010**
Teva receives confirmation from FDA that generic Effexor XR ANDAs required to include in vitro dissolution studies

**June 28, 2010**
FDA grants Teva final approval for its generic Effexor XR product

**March 2010**
Teva prepares submission of unsolicited amendment containing additional validation data

**April 23, 2010**
Teva submits bioequivalence amendment providing in vitro alcohol-induced dose dumping studies

1/2010          3/2010                    5/2010                    6/2010

# Appendix C
## Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA
## Notes and Sources

**Notes:**

[1] This timeline does not contain an exhaustive list of all events related to the FDA approval history of Teva's generic Effexor XR.

[2] The sources below are listed in chronological order based on the earliest event each one supports.

**Sources:**

[A] "Approval Package for Application Number: ANDA 076565," Center for Drug Evaluation and Research, June 28, 2010, https://www.accessdata.fda.gov/drugsatfda_docs/anda/2010/076565Orig1s000.pdf, PDF pp. 317-318, 350, 363.

[B] TEVA_EFFEX_0000001-267 at 029.

[C] TEVA_EFFEX_0005061-071 at 065.

[D] TEVA_EFFEX_0005072-530 at 073.

[E] WYEFFAT2303731-743 at 731.

[F] TEVA_EFFEX_0006362-386 at 363.

[G] "Question-Based Review (QbR) for Generic Drugs: An Enhanced Pharmaceutical Quality Assessment System," U.S. Food and Drug Administration, September 30, 2016, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/question-based-review-qbr-generic-drugs-enhanced-pharmaceutical-quality-assessment-system, accessed June 1, 2025.

[H] TEVA_EFFEX_0254424-431 at 431.

[I] TEVA_EFFEX_0039631-632 at 631.

[J] WYEFFAT0000001-139 at 001.

[K] TEVA_EFFEX_0039440-441 at 440.

[L] TEVA_EFFEX_0039433-435 at 433, 435.

[M] TEVA_EFFEX_0038708-710 at 709-710.

[N] TEVA_EFFEX_0097850-851 at 850-851.

[O] TEVA_EFFEX_0138527-528 at 527-528.

[P] TEVA_EFFEX_0009912-925 at 913-914.

[Q] TEVA_EFFEX_0772776-779 at 777-778.

[R] TEVA_EFFEX_0772772-775 at 774.

[S] TEVA_EFFEX_0454210-300 at 247-248.

[T] TEVA_EFFEX_0773619-620 at 619.

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**Notes and Sources**

**Sources (continued):**

[U] TEVA_EFFEX_0773600-603 at 600, 603.

[V] TEVA_EFFEX_0010218-683 at 221, 265-341, 613, 682.

[W] TEVA_EFFEX_0096703-707 at 703-704.

[X] TEVA_EFFEX_0010684-1073 at 757, 963-1072,

[Y] TEVA_EFFEX_0777650-663 at 651.

[Z] Rivera-Muzzio Expert Report, ¶¶ 7, 66-68, 80.

[AA] TEVA_EFFEX_0773524-537 at 524.

[AB] TEVA_EFFEX_0094734.

[AC] TEVA_EFFEX_0780690-691 at 690.

[AD] TEVA_EFFEX_0237233-234 at 233.

[AE] TEVA_EFFEX_0828967-969 at 967-968.

[AF] TEVA_EFFEX_0236224-227 at 224.

[AG] TEVA_EFFEX_0035698-701 at 700.

[AH] TEVA_EFFEX_0780281-297 at 283.

[AI] TEVA_EFFEX_0237011-012 at 011.

[AJ] TEVA_EFFEX_0832305-312 at 305.

[AK] TEVA_EFFEX_0035763-768 at 763.

[AL] TEVA_EFFEX_0051519-521 at 519.

[AM] TEVA_EFFEX_0035633-640 at 633-640.

[AN] TEVA_EFFEX_0094554-570 at 555.

[AO] TEVA_EFFEX_0779852-868 at 854.

[AP] TEVA_EFFEX_0011074-543.

[AQ] TEVA_EFFEX_0035516-521 at 516.

[AR] MYL-VENLA-0003705-709.

[AS] TEVA_EFFEX_0051051-058 at 051.

[AT] TEVA_EFFEX_0828958-959 at 958-959.

[AU] TEVA_EFFEX_0011544-913 at 545, 548.

**Appendix C**
**Timeline of Events Related to FDA's Review of Teva's Generic Effexor XR ANDA**
**Notes and Sources**

**Sources (continued):**

[AV] TEVA_EFFEX_0093854 at 854.

[AW] TEVA_EFFEX_0012910-915 at 911, 913-914.

[AX] TEVA_EFFEX_0050926.

[AY] TEVA_EFFEX_0783900-910.

[AZ] TEVA_EFFEX_0049545-552.

[BA] TEVA_EFFEX_0083029-031 at 030.

[BB] TEVA_EFFEX_0012880-894 at 880.

[BC] TEVA_EFFEX_0034261.

[BD] TEVA_EFFEX_0824396-813 at 398.

[BE] TEVA_EFFEX_0040990-991 at 990.

[BF] TEVA_EFFEX_0797020-027 at 023-024.

[BG] TEVA_EFFEX_0830845-847 at 846-847.

[BH] TEVA_EFFEX_0044416-417 at 416.

[BI] TEVA_EFFEX_0034117-152 at 117, 129, 144.

[BJ] TEVA_EFFEX_0044241-242 at 241.

[BK] TEVA_EFFEX_0044402-403 at 402.

[BL] TEVA_EFFEX_0014204-206 at 204.

[BM] TEVA_EFFEX_0014255-258 at 255, 257.

[BN] TEVA_EFFEX_0080014-015.

[BO] TEVA_EFFEX_0014246-252 at 246, 251.

[BP] TEVA_EFFEX_0801461-462 at 462.

[BQ] TEVA_EFFEX_0795622.

[BR] TEVA_EFFEX_0080014-015.

[BS] TEVA_EFFEX_0018544-550 at 544-545.