# Exhibit 39
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**TO BE FILED UNDER SEAL**
**SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **In re EFFEXOR XR ANTITRUST LITIGATION**<br><br>**This Document Relates To:**<br>**Direct Purchaser Actions** | **Master Docket No.**<br>**3:11-cv-05479 (ZNQ-JBD)** |

**REBUTTAL REPORT OF JEFFREY J. LEITZINGER, PH.D.**

**Econ ONE Research, Inc.**

**September 18, 2025**

550 South Hope St., Suite 1085

Los Angeles, CA 90071

# TABLE OF CONTENTS

I.    Introduction .................................................................1

II.   Class Member Impact and Overcharges ....................................3

      A. The Nature of Impact......................................................... 3

      B. The Manufacturer Forecasts ................................................ 4

      C. Classwide Average Prices and Conversion Rates................................. 7

      D. Dr. Stangle's Claims Regarding Uninjured Class Members ................... 15

          1. Actual Prices Versus Average But-For Prices................................ 15

          2. Late Generic Purchasers ............................................... 19

          3. Generic Only Purchasers ............................................... 23

      E. Post Generic Launch Branded Overcharges....................................... 26

      F. Brand-Brand Overcharges ............................................... 28

      G. Dr. Stangle's Claims Regarding Prices Used in My Overcharge Model .... 29

III.  Number of Class Members.................................................32

IV.   Updated Overcharges and Accounting for Opt-Out
      Assignments..............................................................33

V.    Dr. Stangle's Claims Regarding Class Members Being
      Dissimilar Business Entities ...............................................37

VI.   Dr. Stangle's Claims Regarding Evidence Relevant for Joinder 38



i

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                9/18/2025

## I.    Introduction

1.    I am the same Jeffrey J. Leitzinger that previously submitted a report in this case.[1]  A summary of my experience and qualifications was contained in my previous report. An updated summary of my training, past experience, and prior testimony is shown in Exhibit 1.  I have been asked by Counsel for the Direct Purchaser Class[2] ("Direct Purchaser Plaintiffs") in this matter to prepare this Rebuttal Report in response to the criticisms directed at my work in the report of Defendants' expert, Dr. Bruce Stangle.[3]

2.    Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $995 per hour.  Econ One also is being compensated for time spent by my research staff on this matter at their normal and customary hourly rates. A list of new materials my staff and I have reviewed since my Report is attached as Exhibit 2.

3.    In my Report I concluded that:[4]

> a.    The delay in, and limits on, generic competition for Effexor XR alleged by Plaintiffs would have substantially increased the amounts paid by Class members for extended release venlafaxine capsules (including capsules purchased as Effexor XR and its generic form).

> b.    Assuming that absent the challenged conduct, generic entry for Effexor XR would have occurred earlier as shown in Exhibit 10 [of my Report],

---

[1] See Expert Report of Jeffrey J. Leitzinger, Ph.D., dated May 15, 2025 ("Report" or "Leitzinger Report").

[2] As noted in my prior Report, I understand from counsel that the Class is defined as:  All persons or entities in the United States and its territories who purchased Effexor XR and/or AB-rated generic versions of Effexor XR directly from Wyeth or Teva at any time during the period June 14, 2008 through and until May 31, 2011 (the "Class Period").

Excluded from the Direct Purchaser Class are Wyeth and Teva and their officers, directors, management, employees, subsidiaries, or affiliates, all governmental entities, and all persons or entities that purchased Effexor XR directly from Wyeth during the Class Period that did not also purchase generic Effexor XR directly.

[3] Expert Report of Bruce E. Stangle, Ph.D., dated July 17, 2025 ("Stangle Report").

[4] Leitzinger Report, ¶ 8.a-e.



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                              9/18/2025

there is evidence common to the proposed Class members which shows that the diminished generic competition Plaintiffs allege as a result of the challenged conduct highly likely caused each Class member to pay at least some overcharge on its Effexor XR purchases (brand or generic or both).

c. The aggregate overcharges incurred by the Class are approximately $2.26 billion with generic entry on May 15, 2009 (Plaintiffs' base case).

d. The overcharges range from approximately $1.07 billion to approximately $2.42 billion under the alternative generic entry patterns I have been asked to consider.

e. Based upon assumed individual litigation costs of $3.7 million, 30 of the 59 Class members (excluding Retailer Plaintiffs) would have a negative value associated with individual litigation; 11 of the 59 have trebled claims worth less than $1 million; and 8 have trebled claims worth less than $500,000.

4. As stated in ¶¶ 43 and 55 of my Report, I also have concluded that a formulaic approach utilizing classwide evidence and methodology can be used here to reliably estimate aggregate classwide overcharges.

5. Defendants have submitted a reply report from Dr. Stangle. While it contains a number of criticisms (discussed below), he apparently has no disagreement with some key elements within my Report. These elements include my observation that existing literature pertaining to generic competition shows broad market-wide pricing benefits from generic competition, pricing benefits that increase as the number of generic competitors increase; the fact that documents produced by Wyeth, Teva, and Mylan in this case projected similar competitive benefits from generic Effexor XR; my finding that the vast majority of Class members paid lower prices for generic Effexor XR than for the brand; and my finding that Class members paid lower generic prices when there were more generic competitors.

6. Dr. Stangle's criticisms focus on four areas: i) the prospect that some Class members were not impacted by the challenged conduct; ii) potential overstatements in overcharges; iii) the number of Class members; and iv) the prospects for joinder among Class members absent Class certification. Some of what he raises on these



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                          9/18/2025

topics ultimately involves legal questions outside the scope of economics and, accordingly, I have little to say by way of response except to note the legal nature of the issue.[5]  Where he raises what are truly matters of economic facts, logic or analysis, I provide my responses below.  I note at the outset that none of Dr. Stangle's opinions lead to any significant changes in my opinions[6] from my Opening Report.  Also where I do not specifically address an argument made by Dr. Stangle, this does not mean that I agree with him.

## II.    Class Member Impact and Overcharges

### A. The Nature of Impact

7.    As stated in my Report, I concluded that each Class member that purchased brand Effexor XR very likely incurred some overcharge on its brand purchases--particularly during the Delay Period where generic conversion was completely blocked by the challenged conduct.  I also concluded that each Class member that purchased generic Effexor XR from Teva during the period in which the challenged conduct blocked other generic sellers very likely incurred some overcharges on those purchases.

8.    Dr. Stangle apparently misread my conclusions in this regard.  At various places in his report he criticizes parts of my analysis as failing to show that Class members were "harmed in the same way or to the same degree,"[7] or that there was the "same impact…across all direct purchasers."[8]  I have not opined that each Class member

---

[5] Dr. Stangle criticizes my report for lack of support as to the entry scenarios I have modeled.  Those entry dates are not the result of an expert opinion on my part.  I have been instructed to use those dates as part of my assignment.  Should alternative entry dates be deemed more appropriate in this matter, I could readily model and calculate aggregate overcharges under those dates, using the same classwide methodology and evidence (and indeed I have already calculated overcharges under various scenarios using the same common, classwide methodology and evidence).

[6] I do make some small changes to the Class member list (per instructions from counsel regarding distinct entities for these purposes) and a minor change in the overcharge calculation as described below.

[7] Stangle Report, ¶ 19.

[8] Stangle Report, ¶ 35.



Page 3

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                     9/18/2025

experienced or paid the same amount of overcharge, though I did opine that each was impacted by paying an overcharge of some amount.

9.    One source of information I utilized in my analysis was manufacturer forecasts. In a similar vein, while Dr. Stangle acknowledges that, "Dr. Leitzinger is correct that the forecasts generally show that average generic prices decrease as the number of competitors increase,"[9] he goes on to say that since the forecasts were not customer-specific:

> [they] do not demonstrate that the entry of additional generic competitors would have the same impact on prices across all direct purchasers and further do not support Dr. Leitzinger's conclusion that 'it is highly likely that each Class member paid at least some overcharge on its Effexor XR purchases (brand or generic or both) as a result of the diminished generic competition.[10]

10.   I have not opined that unrestricted generic entry would have had precisely the same impact on prices across all direct purchasers. I conclude only that each Class member very likely incurred at least some impact in the form of an overcharge on its brand and/or generic purchases by virtue of the restricted generic competition.

### B. The Manufacturer Forecasts

11.   A second problem with the critique referenced immediately above is that it implies that manufacturer forecasts were the sole basis for my impact conclusions. Dr. Stangle is wrong about that. The forecasts show that 90 percent or more of the brand volume converts to generics with lower prices following generic entry and that generic prices decline with increasing numbers of generic competitors.[11] This is true

---

[9] Stangle Report, ¶ 35.

[10] Stangle Report, ¶ 35. (Citations omitted.) See also, Stangle Report, ¶ 37.

[11] A point that Dr. Stangle agrees with; see Stangle Report, ¶ 35 ("Dr. Leitzinger is correct that the forecasts generally show average generic prices decrease as the number of competitors increases"). Wyeth, Teva, and Mylan forecasts all show that generic Effexor XR competition would significantly lower prices and that prices would fall even lower with more generics on the market.

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                      9/18/2025

across forecasts and supports my conclusions that every Class member that bought Effexor XR during the generic delay period very likely paid more for at least some of that prescription volume than it would have paid had generics been available sooner, and that every Class member that purchased generic Effexor XR during the Teva Exclusivity Period (July 1 2010 to May 31, 2011) likely incurred overcharges.[12]

12.     This forecast evidence was buttressed by the other evidence set forth in my Report showing that every Class member that purchased Effexor XR during the Delay Period (May 15, 2009 – June 30, 2010) and later bought the generic when it finally did come to market, paid lower prices for the generic as compared to the brand and that each Class member that purchased generic both during Teva's Exclusivity Period and then later when there were more generic competitors paid lower generic prices with more competitors.[13]

13.     Dr. Stangle raises an additional issue regarding one set of Teva forecasts.  He claims that two of the nine Teva forecasts are not reliable because they "were developed for production planning purposes only, and that pricing was not their focus."[14]  I used the forecasts in question only as support (along with other forecasts, literature and studies) for the downward effect of added generic sellers on prices.  I do not rely on the specific prices contained in the two forecasts for my analysis of classwide impact.[15]  I also note that the generic price discounts shown in the two forecasts were

---

[12] A Class member need only have incurred an overcharge on a single purchase to have experienced antitrust injury.  Even if a Class member would have continued to purchase some brand Effexor XR after earlier generic entry or would not have paid lower prices on every single generic purchase, it is still injured because (a) it would have converted some of its brand purchases to lower-priced generic purchases, and/or (b) it would have paid lower prices for at least some of its generic Effexor XR purchases in the but-for world, with more generics on the market.

[13] Leitzinger Report, ¶¶ 39 – 40, Exhibit 8, Exhibit 9.

[14] Stangle Report, ¶ 36.

[15] In its Opposition Brief Teva argues that "the academic literature used by Dr. Leitzinger does not fit the actual world results regarding Effexor XR, so is not probative of the but-for world" and that "like the literature discussed above, some forecasts did not reflect what happened in the real world[.]"  Teva's Opposition to Direct Purchaser Class Plaintiffs' Motion for Class Certification, dated July 24, 2025 ("Teva's Opposition"), pp. 37 – 38.  Teva misunderstands the purpose for which I use the literature and forecasts. Neither is used to predict exactly what would have happened absent the challenged conduct.  Rather, as to my analysis of classwide impact, both are compelling evidence that prices would be lower following generic



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                          9/18/2025

in line with discounts shown in another Teva presentation described by a Teva executive as showing "how [Teva] would typically forecast" pricing.[16]  I further note that Dr. Stangle has identified no Teva forecasts that do not reflect lower generic prices with more generic competitors on the market, and I am aware of none. Therefore, Dr. Stangle's argument as to the two Teva forecasts is not relevant to my conclusions regarding classwide impact.

14.     I also used forecasts as one input into the but-for generic price in my calculation of overcharges.  Had I excluded the two Teva forecasts that Dr. Stangle criticizes from these calculations, the calculated overcharges would have increased by 8 – 12 percent (depending on the generic entry scenario).[17]

15.     Having found four Wyeth forecast scenarios in WYEFFAT3610090 that I did not include in the set of forecasts I used to calculate the but-for generic price in my overcharge calculations, Dr. Stangle claims that I "cherry-picked" select Wyeth

---

Effexor XR entry, and lower still with more generics on the market, regardless of whether prices or conversion in the market for Effexor XR unfolded at precisely the same numerical rates shown in the literature and forecasts.  In addition, as to my overcharge calculations, the starting point for my calculation of the but-for generic price and the but-for generic conversion rate was the actual experience following generic Effexor XR entry, as described in my Report.

[16] Wodarczyk Deposition, p. 76.

[17]




*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                 9/18/2025

forecasts and "ignored other available forecasts."[18]  There was no cherry picking.  These were simply inadvertent omission.  Indeed, if one were to add the four forecast scenarios to my analysis, this would not change the estimated overcharges (nor would it change any of my impact results, for the reasons set forth above).[19]

16.    Elsewhere, Dr. Stangle notes that "Dr. Leitzinger relies on forecasts, while Dr. Leffler relies on a single published paper [to calculate but-for prices]."[20]  Had I used the paper[21] that Dr. Leffler relied on instead of the forecasts as an input to my calculation of the but-for generic price, the amount of total classwide overcharges would have increased by 2.6 percent or less for Scenarios 1 – 9 and decreased by approximately 1 percent for Scenario 10.  My opinions regarding classwide impact would not change.

### C.  Classwide Average Prices and Conversion Rates

17.    Dr. Stangle claims that my use of classwide averages for prices and conversion rates "fails to assess the importance of individualized issues, which leads [me] to overstate damages and ignore the diverse characteristics across proposed class members.  Due to the complexity of payment flows in the pharmaceutical space, not all proposed class members were harmed in the same way or to the same degree."[22]  He simply

---

[18] Stangle Report, ¶ 38.

[19] As Dr. Stangle points out, the Wyeth forecasts used in my Report projected a discount of 30 percent with one generic competitor and 50 percent with two generic competitors.  Stangle Report, ¶ 38.  In WYEFFAT3610090, Wyeth projected a discount of 20 percent with one generic competitor and 40 percent with two generic competitors.  However, as discussed in my Report, I calculated the average *incremental* difference in forecasted generic price discounts when there were two generic competitors instead of one and then used that difference to adjust upward the generic discount (based on actual experience) for one generic competitor.  (Leitzinger Report, ¶ 49.)  Here, all of the Wyeth forecasts show the same incremental price discount when there were two generic competitors instead of one (20 percentage point incremental price discount with two generic competitors instead of one).  Therefore, including the four additional forecast scenarios shown in WYEFFAT3610090 makes no difference to the but-for generic prices I derived for two and three generic competitors absent the challenged conduct which were used in my overcharge calculations.

[20] Stangle Report, ¶ 31.

[21] U.S. Food and Drug Administration, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," December 2019.  Available at https://www.fda.gov/media/133509/download.  This paper is among the common classwide evidence I considered as part of my analysis of classwide impact.

[22] Stangle Report, ¶ 19.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

asserts that this "…heterogeneity of the buyers undermines the claim that class-wide injury can be proven with common evidence and makes class-wide treatment inappropriate."[23]

18.     I note here again that I have not opined and don't understand the question of classwide impact (whether evidence common to the proposed Class members can be used to show classwide impact from the challenged conduct) to require that "all proposed class members were harmed in the same way or to the same degree."

19.     Conceptually, the classwide impact at issue in this case does not in any way require that Class members pay the same prices or convert brand to generic purchases at the same rate.  Impact occurs here when the price paid by a Class member exceeds the price that would have been paid absent the challenged conduct.  Logically then, common impact can occur even where every Class member pays a different price. All that is needed is that, for each Class member, those prices are higher than they would have been absent the challenged conduct.

20.     As set forth in my Report, following generic entry i) the vast majority (approximately 90 percent) of the brand prescription base is typically converted to generics; ii) at greatly reduced prices (indeed, in this case, generic Effexor XR ultimately captured more than 95 percent of extended release venlafaxine capsule sales and was priced well below the price of Effexor XR itself); and (iii) generic prices are even lower once there are more generics on the market.  Hence, while there certainly were differences across Class members in the prices they paid, both for Effexor XR and its generic version, and variation in the rate that Class members converted brand purchases to the generic, the common outcome across all Class members that bought both Effexor XR and its generic is that the price paid for the generic was lower.  Inasmuch then as the challenged conduct kept generics out of the market for some period of time and therefore limited overall generic conversion, all of the Class members that purchased Effexor XR and experienced limits in their generic conversion as a result, were impacted notwithstanding any differences among them in the prices they paid for the brand or the generic or in their respective generic conversion rates.  All that

---

[23] Stangle Report, ¶¶ 19, 40.



Page 8

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

matters for this source of impact is that there was some loss of conversion to lower priced generic.[24]

21.    Exhibit 8 of my Report provides Class member specific prices over time.  As shown in that exhibit, all Class members that purchased Effexor XR during the Delay Period (May 15, 2009 – June 30, 2010) and later bought the generic when it finally did come to market in July 2010, paid lower prices for the generic as compared to the pre-generic brand price--irrespective of variation in brand and generic prices across those Class members.  In short, prices were variable but the fact of impact was not.

22.    Similarly, Class members who purchased generics following generic entry in July 2010 through May 31, 2011 did so, by virtue of the challenged conduct, in a market environment with more limited generic competition.  The literature, manufacturer forecasts, and the actual Effexor XR generic experience all clearly show that fewer generic competitors mean less favorable prices.  Indeed, as shown in Exhibit 9 of my Report, every Class member who purchased generic Effexor XR during Teva's Exclusivity Period (July 1, 2010 to May 31, 2011) and later on (beginning June 1, 2011) when more generic competitors entered the market paid lower prices with more generics on the market (all of these Class members paid prices that were at least 80 percent lower with more generic competitors).  This supports the conclusion that each Class member who purchased generics between July 2010 and June 2011 was highly likely impacted by virtue of the challenged conduct irrespective of the fact that those Class members paid different prices from one another.

23.    Dr. Stangle also claims that my use of average prices and average conversion rates causes me to overstate overcharges "because the mix of purchasers changes significantly after generic entry."[25]  With respect to the calculation of classwide overcharges, the variation across Class members in prices and generic conversion rates that Dr. Stangle highlights is similarly irrelevant.  Mathematically, there is no

---

[24] Class members who only purchased generics were injured by virtue of the higher generic prices they paid as a result of fewer generic competitors.  Here again though, impact in this circumstance stems from the broad effect of generic competition on generic prices--as documented in my Report.  It does not depend in any way on Class members paying the same prices for generics.

[25] Stangle Report, ¶¶ 51 – 52, 55 – 56.



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                9/18/2025

increase in overcharges from doing so, and Dr. Stangle provides no evidence showing that there is. The numerical questions that are relevant to the calculation of classwide overcharges are, absent the challenged conduct, i) how much additional generic conversion would have occurred classwide, ii) how much lower would average classwide generic prices have been than the average prices actually paid for classwide brand purchases, iii) how much lower would the classwide average generic price have been than the amounts the Class actually paid for generic purchases, and iv) how much lower would the classwide average brand price have been than the amounts the Class actually paid for brand purchases? These are all questions about average results which are unrelated to the degree of variation behind those averages.[26] In short, the price and conversion variation identified by Dr. Stangle simply doesn't matter to the calculation of classwide overcharges.

24.    Because of "customer heterogeneity" and changes over time in the customer mix, Dr. Stangle claims that the average prices and conversion rates I use in calculating classwide overcharges are problematic. As he describes it:

> [t]he dramatic variation in purchasing patterns across members of the proposed class shows that Dr. Leitzinger's use of averages is inappropriate. Specifically, Dr. Leitzinger computes average prices and generic penetration rates across wholesalers and pharmacies during the period after generic entry but applies those averages to proposed class member purchases prior to generic

---

[26] Inputs based on classwide averages are appropriate for calculating classwide overcharges. I have used the same methodology to calculate aggregate Class overcharges associated with delayed generic entry for direct purchaser classes where the direct purchaser class has been certified. *In re Glumetza Antitrust Litigation*, No. 3:19-cv-05822 (N.D. Cal); *In re Intuniv Antitrust Litigation*, No. 16-cv-12653 (D. Mass.); *In re Opana ER Antitrust Litigation*, MDL No. 2580 (N.D. Ill.); *In re Loestrin 24 FE Antitrust Litigation*, MDL No. 2472 (D.R.I.); *In re Niaspan Antitrust Litigation*, MDL No. 2460 (E.D. Pa.); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-md-2503-DJC (D. Mass.); *In re Celebrex (Celecoxib) Antitrust Litigation*, No. 2:14-cv-00361 (E.D. Va.); *In re Lidoderm Antitrust Litigation*, No. 14-md-2521 (N.D. Cal.); *In re Prograf Antitrust Litigation*, No. 1:11-cv-10344-RWZ (D. Mass.); *In re Wellbutrin XL Antitrust Litigation*, No. 08-2431 (E.D. Pa.); *In re Relafen Antitrust Litigation*, Master File No. 01-12239-WGY (D. Mass.); *In re Tricor Direct Purchaser Antitrust Litigation*, C.A. No. 05-340 KAJ (D. Del.); *Meijer, Inc. et al. v. Warner Chilcott Holdings III, Ltd., et al.*, No. 05 Civ. 2195 CKK (D.D.C.) (involving the drug Ovcon 35); *In re Nifedipine Antitrust Litigation*, No. 03-MS-223 (D.D.C.); *In re K-Dur Antitrust Litigation*, No. 2:01-cv-01652 (D.N.J.); *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis, et al.* No. 1:07-cv-07343-HB (S.D.N.Y.) (involving the drug Arava); and *In re Flonase Direct Purchaser Antitrust Litigation*, Master File No. 2:08-cv-03149 (E.D. Pa.).



Page 10

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    9/18/2025

> entry, ignoring that the shares of purchases made by individual class members changed dramatically between those two periods.[27]

> Which, according to Dr. Stangle, causes me to "understate[ ] but-for prices and overstate[ ] damages."[28]

25.    Dr. Stangle contends that there is a change in customer mix following generic entry which makes the classwide generic conversion rate following generic entry inappropriate for estimating total classwide overcharges for the pre-generic customer mix.  The problem as he describes it is that use of the post-generic average conversion rate "overstates the number of generic purchases assigned to brand-generic purchasers in the but-for world, thereby overestimating brand-generic damages."[29]  The reason for this change in composition is that, following generic entry, certain brand-generic purchasers (e.g. wholesalers) are to some degree "bypassed" in the generic conversion process--some of their customers (e.g., retailers) buy generic directly from manufacturers (instead of from wholesalers).[30, 31]  And so, these wholesalers show lower rates of generic conversion (that is, they don't buy as much generic in place of the brand because the retailers have "bypassed" them, and in effect, done it for them).

---

[27] Stangle Report, ¶ 50.  See also, Stangle Report, ¶¶ 53 – 57.

[28] Stangle Report, ¶ 52.  See also, Stangle Report, ¶¶ 92 – 93.

[29] Stangle Report, ¶ 55.  See also, Stangle Report, ¶¶ 53 – 54, 56 – 57.

[30] Throughout this section I will use the term "wholesaler" to refer to brand-generic purchasers that purchase the brand directly during the Delay Period and are bypassed by some of their customers after generic entry.  I will use the term "retailer" to refer to entities that purchase the generic directly, bypassing the wholesalers.

[31] Stangle Report, ¶ 46 ("Brand product generally flows from brand manufacturers to wholesalers that hold those products in inventory and distribute them to downstream entities such as pharmacies.  For generic pharmaceuticals, however, instead of purchasing through wholesalers, large retail pharmacies like CVS, Walmart, and Rite-Aid often 'bypass' wholesalers and purchase directly from generic manufacturers. … which causes wholesalers to have a lower share of purchases after generic entry occurs.").  See also, Stangle Report, ¶ 48 ("…generic bypass occurred when Teva began marketing generic Effexor XR on July 1, 2010. … After generic entry, the Big 3's share of brand and generic Effexor XR purchases dropped dramatically…In contrast, pharmacies and other non-wholesalers increased their share of Effexor XR purchases… .").



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

26.    The problem this poses for my analysis, according to Dr. Stangle, is that the conversion rate I apply to the wholesalers during the Delay Period is too large because it is based on an overall post-generic conversion experience that includes wholesalers and retailers combined.[32]  And since wholesalers show lower generic conversion rates (in their post-generic buying) than retailers that are "bypassing" the wholesalers, applying that average post-generic conversion (which includes retailers) to calculate brand-generic overcharges incurred by wholesalers during the Delay Period results in brand-generic overcharges that are too high.

27.    He is wrong about this, largely it would appear because he fails to look at the entire picture.  First, as a conceptual matter, the bypass that drives both the decline in wholesaler purchases and lower wholesaler conversion rates in the post-generic period goes hand in hand with increased direct purchases by retailers with high rates of generic conversion.  Backcasting the post-generic conversion rate to the Delay Period provides the correct answer.

28.    Dr. Stangle's claim that it is inappropriate to use the classwide conversion rate for all wholesalers during the Delay Period amounts to a claim that Class members buying brand during the Delay Period are not entitled to overcharges associated with brand volumes that would have been converted to lower-priced generics purchased by those who did not buy the brand directly during the Delay Period.  In other words, Dr. Stangle is arguing that generic conversion (and the corresponding overcharges) associated with bypass should not be included in overcharges.[33]  As stated in my Report,

---

[32] In fn. 132 Dr. Stangle also claims that "[f]laws in [my] data processing results in generic conversion rates greater than 100% in some quarters for generic-only purchasers."  Dr. Stangle is incorrect.  The analysis Dr. Stangle presents to prove this claim in no way represents my overcharge calculation.  He performs his own (flawed) calculation, which he incorrectly calls my method, thereby manufacturing the error he incorrectly attributes to me.  Dr. Stangle is calculating generic conversion for Class members that he labels as generic-only purchasers.  However, he includes returns for brand Effexor XR in his calculation which results in generic conversion rates of over 100 percent since his numerator is equal to total generic purchases and his denominator is equal to total generic purchases less the brand Effexor XR returns.  This calculation is not sound or meaningful.

[33] Dr. Stangle states that bypass "causes wholesalers to have a lower share of purchases after generic entry occurs."  Stangle Report, ¶ 46.  See also, Stangle Report, ¶ 48.



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

> [A]ssuming that the legal objective in calculating overcharges is to determine the total overcharges actually incurred by Class members as a result of the challenged conduct, it would be a mistake as an economic matter to exclude overcharges associated with Class member purchases simply because the Class member wouldn't have made those purchases absent the challenged behavior. The overcharge is incurred in the act of purchasing a product with an illegally inflated price. Whether or not that buyer would have made those same purchases absent the illegal behavior doesn't in any way change the fact that by purchasing products at an inflated price, the Class member paid the overcharge, thereby incurring the harm created by the illegal behavior.[34]

29.    It would not make economic sense to exclude these overcharges. To see the economic logic here, assume Defendant sellers acted illegally creating overcharges on their products. Firm A bought the product (paying the overcharge). However, absent the illegal behavior by Defendant sellers, Firm B would have purchased those same volumes at competitive prices. In buying the product, Firm A paid the overcharge to the Defendant sellers. In that way Firm A bore the injury. If Firm A is not entitled to the overcharge, what are the alternatives? Firm B did not pay the overcharge in the first place, so it shouldn't be entitled to the overcharge. In that case, the Defendant sellers would get to keep the overcharge they illegally created.

30.    In effect, this is exactly the outcome Dr. Stangle is advocating in this criticism of my overcharge analysis. As he puts it:

> [w]hen calculating his but-for generic price, … Dr. Leitzinger relies on prices reflective of a relatively balanced mix of generic purchases from wholesalers and retailers during the Teva Exclusivity Period. [Effectively, prices during the post-conduct period when Firm B would have been the buyer.]

---

[34] Leitzinger Report, ¶ 57.



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

> However, Dr. Leitzinger applies this average but-for generic price
> to purchases made primarily by wholesalers, which typically pay
> higher prices than retailers [these are buyers like Firm A who paid
> the higher inflated prices engineered by the Defendant seller.][35]

31.    He concludes that "[a]s a result, the average but-for price Dr. Leitzinger applies to
       wholesalers is overweighted by lower retailer prices and therefore biased downward"
       which according to Dr. Stangle "exaggerates [my] estimate of brand-generic
       damages."[36]  Dr. Stangle's claim in the end is that the correct way to calculate
       overcharges would have been to ignore a big part of the post-conduct competitive
       price picture by ignoring the low generic prices that the retailers obtained as they
       bypassed the wholesalers.  This would achieve little more than allowing Defendants
       to retain a large portion of their illegal overcharge due to the retailers' "bypass".

32.    This is the wrong answer as an economic matter.  The lower generic prices paid once
       generics entered the market were paid in part by retailers who bypassed the
       wholesalers.  That would have happened earlier, during the Delay Period but for the
       challenged conduct.  Consequently, in the context of a classwide overcharge
       calculation, that is the price that should be used to determine the overcharge
       embedded in wholesalers' Delay Period purchases (as well as those of any other Class
       members).

33.    As an aside, if required by the Court to recalculate overcharges with the changes to
       the but-for generic prices and/or generic conversion rates that Dr. Stangle proposes,
       I could readily do so within my existing classwide overcharge model using classwide
       evidence.  Dr. Stangle's proposed adjustments would only cause certain inputs in my
       overcharge calculations to be adjusted, and so would yield different overcharge totals
       but would not cause me to change any of my opinions regarding classwide impact or
       the ability to reliably calculate classwide overcharges with evidence and methodology
       that is common to the Class.

---

[35] Stangle Report, ¶ 52.

[36] Stangle Report, ¶ 52.



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

### D. Dr. Stangle's Claims Regarding Uninjured Class Members

34.    Dr. Stangle claims that my "assertion that all direct purchasers were harmed is demonstrably false."[37]  Specifically, he says:

> …the data do not support that Medco experienced an overcharge on its purchases of brand product because its actual net brand price falls below Dr. Leitzinger's average but-for generic price. The data further do not support that Medco, Express Scripts, and Aetna experienced an overcharge on their purchases of generic product because for each entity, its actual net generic price falls below Dr. Leitzinger's average but-for generic price.  …Dr. Leitzinger's aggregate approach masks these material variations in prices and demonstrates that his claim that all or nearly all proposed class members were damaged cannot be justified without individualized inquiry.[38]

35.    He also claims that "brand-only purchasers" and generic-only purchasers are uninjured.[39]  By way of overall summary, there is nothing in Dr. Stangle's report that causes me to change my opinion that it is highly likely that each Class member paid at least some overcharge as a result of the challenged conduct.

### 1.  Actual Prices Versus Average But-For Prices

36.    Dr. Stangle compares (a) each Class member's actual average price (whether for brand or generic) during Teva's Exclusivity Period, when there was one generic on the market, to (b) the average classwide generic but-for price with three generic competitors ($1.54) embedded in my classwide overcharge model.  Based on this comparison, he concludes that three Class members (Aetna, Express Scripts, and Medco) are not injured because the three Class members paid lower prices during

---

[37] Stangle Report, ¶ 45.

[38] Stangle Report, ¶ 45.

[39] Stangle Report, ¶¶ 67 – 72.


*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

Teva's Exclusivity Period than the classwide but-for (three-generic) price for this period.[40]

37.    I disagree. Dr. Stangle conflates the role played in my opinions by the overcharge calculation with the role played by other evidence presented in my Report regarding classwide impact. The overcharge model shows the manner in which aggregate Class overcharges can be quantified in a formulaic manner; it is not offered as evidence of common impact, though it certainly confirms classwide impact. In his "impact" comparisons, Dr. Stangle assigns the <u>average</u> classwide generic price embedded in my overcharge model for Teva's Exclusivity Period to each Class member as the price it would have paid but for the challenged conduct. He offers no basis for making this (obviously incorrect) assumption, nor is there any conclusion or assumption to that effect in my Report. He then evaluates likely impact by comparing that <u>average</u> but-for price to the actual prices Class members paid--which given the price variability will rarely if ever be equal to the actual but-for price paid by a Class member.[41]

38.    Consequently the two sides of his impact comparison are inconsistent with each other and provide no meaningful information about impact. Furthermore, noting again the variability in actual prices--which will certainly persist in the but-for world-- the comparison of actual prices to a but-for average price will necessarily be prone to false readings of "no impact" where you have Class members buying below the but-for classwide average.

39.    Figure 1 illustrates this problem with hypothetical prices. It shows prices paid by each of five Class members in the actual world (the blue bars) and in the but-for world (the red bars). In each case, by design (for purposes of this illustration) the Class member paid an overcharge (albeit in different amounts). The horizontal dashed red line reflects the average price paid in the but-for world. If, as Dr. Stangle does in making this criticism, one compares that average but-for price (the dashed red line) with the actual price paid by each Class member (the blue bars) to assess impact,

---

[40] Stangle Report, ¶¶ 96, 100, Exhibit 3. These three Class members taken together account for less than 9 percent of purchase volumes (Scenario 1). See Exhibit 8A.

[41] Stangle Report, Exhibit 3.

                                                                            Page 16

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

one would wrongly conclude that Class members D and E were not injured. Clearly, the prices paid by Class members D and E were below the average but-for price. But just as clearly, this comparison is irrelevant with respect to the question of impact as to Class members D and E. This is exactly the mistake that Dr. Stangle makes in claiming through his price comparisons that Aetna, Medco and Express Scripts were not injured.



40.     What happened here is that these three Class members all purchased generic Effexor XR when there was just one generic competitor and, absent the challenged conduct, would instead have purchased generic Effexor XR in a market with three generic competitors. We know from the experience described in my Report that when Class members bought generic when there was just one seller (Teva) and then later with more generic competitors, they always paid lower prices.[42] More broadly, as is also noted in my Report, the forecasts and the literature pertaining to generic competition

---

[42] Leitzinger Report, Exhibit 9.



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        9/18/2025

consistently show that generic prices are lower when there are more competitors. In fact, Express Scripts and Medco purchased generic Effexor XR when there was one generic seller and then later when there were multiple generic competitors. As shown in Table 1 (below), both of these Class members (like every other Class member with experience in this regard) paid lower prices for generic Effexor XR when there were more generic competitors.

41.    Hence, the fact that (under the but-for entry scenarios I have been asked to assume for this analysis) their purchases of generics from Teva in the actual world (when it was the only competitor) would have occurred, but for the challenged conduct, in a market with three competitors is sufficient in itself to establish with high likelihood their impact.



Source: Manufacturer data.

42.    We don't have actual generic purchases we can point to with multiple competitors in Aetna's case. But the point is still the same. It did buy generic in the actual world from Teva as the sole seller. But for the challenged conduct, those purchases would have occurred in a market with three generic competitors. The actual experience here, as well as the literature and forecasts, provides more than adequate basis for a conclusion that those purchases very likely would have occurred at lower prices.[43] As

---

[43] As discussed in more detail below, I used brand list prices (WAC) in the quarter preceding generic entry as the reference point Teva would have used in setting prices upon entry in my analysis. With generic entry in

Page 18

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                9/18/2025

stated in my Report, based on all of the evidence presented therein, it is highly likely that the reduced numbers of generic competitors allegedly caused by the challenged conduct would have caused each generic purchaser--including Express Scripts, Medco, and Aetna--to incur an overcharge on at least some (if not all) of its generic purchases.

43.    As is also discussed in my Report, there is yet another source of impact as to Medco based on the fact that, absent the challenged conduct, some of its actual brand Effexor XR purchases very likely would have been converted to generic purchases instead--at much lower prices.  Medco purchased brand Effexor XR during Teva's Exclusivity Period at an average price of ███ /capsule.  As shown in Table 1, Medco paid less (███ /capsule) for generic Effexor XR during Teva's Exclusivity Period and it paid significantly less (███ /capsule) for generic Effexor XR with multiple generic competitors.  Had generic entry occurred earlier as Plaintiffs allege, generic conversion would have started earlier.  Given that, the overlap between actual brand purchases and generic availability would have occurred sooner, as would the conversion to lower priced generics.  Medco would have participated in this generic conversion sooner--converting more of its brand Effexor XR purchases to generic Effexor XR purchases at lower prices.  Hence Medco would have paid less for extended release venlafaxine capsules in the but-for world and therefore experienced overcharges as a result of the delay in generic entry caused by the challenged conduct.  Hence, Dr. Stangle's analysis does not cast any doubt on my conclusion that it is highly likely that these three Class members suffered overcharges and so were impacted.

### 2.  Late Generic Purchasers

44.    One source of Class member impact associated with delayed generic entry is delayed generic purchases resulting in more brand purchases at higher prices.  Seven Class members did not make their first generic purchases until there were competing

---

2009 or earlier and lower corresponding brand WAC at the time of generic entry, generic prices during the Teva Exclusivity Period (where I measure GG overcharges) would have been lower in the but-for world than the actual world.  This is a source of impact for Class members that purchased generic during Teva's Exclusivity Period even in a but-for world without an AG or earlier entry of a third generic.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

generic manufacturers in the market.  Dr. Stangle wrongly describes those seven proposed Class members as "brand-only" purchasers, even though he was well aware and acknowledges that they did in fact buy generics.[44]  He then maintains that because these seven Class members made their first generic purchase outside the Class Period, it is "speculative" to claim that with earlier generic entry these seven would have begun purchasing the generic at an earlier date, thereby replacing their brand purchases with lower-price generic purchases.  Accordingly, in his view, there is no evidence of impact for these seven and they should be excluded from the Class.[45]

45.    Teva makes a similar argument in its Opposition Brief, stating that:

> DPPs present no evidence that these seven purchasers who did not switch to generic Effexor XR in the year that Teva's generic was available [that is, the period prior to market entry by multiple competing generic suppliers] would have switched to purchase generic Effexor XR in the but-for world…[46]

Teva further claims that the market environment in the but-for world preceding the actual generic purchases by these seven late generic buyers would have had,

> at most three generics… and a per-pill price that was at least 10-times higher than the actual price that finally got these purchasers to switch to generic.[47]

---

[44] Stangle Report, ¶ 67.  Dr. Stangle also claims that since Uniondale Chemists is a Class member by assignment from QK Healthcare which he incorrectly claims is a brand-only purchaser, then Uniondale Chemists is a brand-only purchaser.  Stangle Report, ¶ 68.  However, Dr. Stangle is incorrect, since, as he notes, QK Healthcare purchases generic Effexor XR.  Furthermore, Uniondale Chemist purchases generic Effexor XR during Teva's Exclusivity Period and after multiple generic entrants through AmerisourceBergen.

[45] Stangle Report, ¶ 67.  See also, Stangle Report, ¶ 97.

[46] Teva's Opposition, p. 29.

[47] Teva's Opposition, p. 29.  I note that it is not clear how Teva comes to the (incorrect) conclusion that in the but-for world the "per-pill price [would have been] at least 10-times higher than the actual price that finally got these purchasers to switch to generic."  There is no support for this statement in my work papers and Dr. Stangle provides no support.



Page 20

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                   9/18/2025

Teva maintains that proof that these seven Class members would have purchased generics at an earlier date requires individualized inquiry.[48]

46.   I disagree.  The evidence presented in my Report supports my conclusion that, like the other proposed Class members, these seven late generic purchasers would have purchased lower-price generic Effexor XR earlier had generic entry not been delayed (and therefore paid higher prices as a result of the delay) is as follows:

- All seven of these Class members in fact purchased generic Effexor XR.[49]

- In fact, each of these Class members paid significantly lower prices for generic Effexor XR than they paid for brand Effexor XR (just as all Class members who purchased the brand and the generic paid lower prices for the generic).

- In the but-for world in Scenario 1, there would have been three generic competitors in the market more than a year earlier than when multiple generics actually entered in June 2011.[50]

- In the but-for world in Scenario 1, during the period extending from the initial entry of three generic competitors until the date at which, in the actual world, these seven buyers first purchased generics (i.e., during Teva's Exclusivity Period and earlier), average generic prices would have been nearly 50 percent lower than they actually were during Teva's Exclusivity Period.[51]  Hence, these seven late generic purchasers would have faced the same incentives to purchase the lower-priced generic Effexor XR in the but-for world as they did in the actual world, but earlier.

---

[48] Teva's Opposition, p. 29.

[49] Manufacturer data.

[50] Leitzinger Report, Exhibit 10.

[51] Leitzinger Report, Exhibit 11.  For all of the Scenarios I modeled, the generic prices during Teva's Exclusivity Period would have been more than 30 percent lower.

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                      9/18/2025

47.    There is nothing unusual, surprising or indicative of different priorities in the fact that
       it took some time for these seven Class members to start buying generics.  As
       discussed in my Report:

> It can take years for generic competition to bring the market from
> protected monopoly pricing to a new competitive equilibrium
> (i.e., the point at which prices and conversion or substitution
> rates stabilize following entry of generic competition).  During
> the first eleven months following market launch in July 2010,
> generic Effexor XR accounted for approximately 60 percent of
> the total extended release venlafaxine capsule volume.
> Approximately 86 percent of demand for extended release
> venlafaxine capsules was filled with generic the fifth quarter
> following generic entry.  The generic ultimately accounted for
> over 95 percent of extended release venlafaxine capsule volume.
> That is, it took almost five years for generics to generate the full
> extent of the competitive benefit they create.[52]

48.    Based on all of the evidence I presented in my Report, it is likely that the seven late
       generic purchasers would have purchased generic Effexor XR earlier absent the
       challenged conduct at prices below the brand price.  Thus, each of these Class
       members likely incurred overcharges as a result of generic delay.  In any case, if it is
       determined for some reason that any of these seven Class members should be
       removed from overcharges I can readily do so within my existing classwide
       overcharge model.  Their combined purchases accounted for less than 0.1 percent of
       purchase volume.[53]

---

[52] Leitzinger Report, ¶ 52.  (Citations omitted.)  Dr. Stangle appears to agree.  Deposition of Bruce Stangle, p.
65.  In addition to this form of impact, these Class members may have purchased the generic indirectly during
Teva's Exclusivity period.  Because the data needed to fully identify all generic indirect purchasers are not
complete, we don't know that these buyers didn't in fact purchase generics during Teva's Exclusivity Period.
These Class members may additionally have incurred overcharges on their brand purchases given that Wyeth
increased discounts on Effexor XR after generic entry and would have done so earlier had generic entry
occurred earlier absent the challenged conduct.

[53] See Exhibit 8A (Scenario 1).  I note that Dr. Stangle's calculations show that removing these purchasers
reduces overcharges by 0.01 percent.  Stangle Report, ¶ 97.

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                              9/18/2025

### 3. Generic Only Purchasers

49.    Dr. Stangle assumes in his report that neither the authorized generic nor an additional
       generic would have been in the market in the but-for world during the Teva
       Exclusivity Period absent the challenged conduct.  He therefore claims that generic-
       only purchasers were not injured.  I was instructed to assume that Teva, an
       authorized generic, and a third generic would have been in the market absent the
       challenged conduct.[54]  Dr. Stangle's contrary assumptions don't change my opinion
       that under the but for entry assumptions I was instructed to use, it is highly likely that
       each Class member paid at least some overcharge as a result of the challenged
       conduct and therefore there would have been widespread impact as to generic-only
       buyers.[55]  This conclusion is based on the literature, forecasts, and actual Effexor XR
       experience, and is further confirmed by the fact that, generic prices during Teva's
       Exclusivity Period would have been nearly 50 percent lower than they actually were
       due to the delay in generic competition, according to my overcharge calculations for
       Scenario 1.[56]

50.    I note, however, my conclusions regarding the ability to show classwide impact (and
       calculate overcharges) using common evidence remain the same across a number of
       but-for entry scenarios.  This includes scenarios where Teva would have launched
       sometime in 2009 (or earlier) without an AG.[57]

51.    But-for generic prices (and hence, the likelihood of overcharges on actual generic
       purchases under Dr. Stangle's contrary assumptions) are based on Teva's experience
       when it actually entered with a generic in July 2010.  As described in my Report,
       when Teva was the sole generic supplier its net price was approximately 37 percent
       off the Effexor XR list price (or WAC) that existed just prior to Teva's entry.  With
       generic entry in 2009 or earlier, the brand WAC would have been lower and thus,
       Teva's price in the but-for world would have been lower than its actual price (even

---

[54] Leitzinger Report, Exhibit 10.

[55] Leitzinger Report, ¶¶ 8, 40 – 41.

[56] Leitzinger Report, Exhibit 11.  As noted above, for all of the scenarios I modeled, the generic prices during
Teva's Exclusivity Period would have been more than 30 percent lower.

[57] This corresponds to assumed initial but-for generic entry dates for Scenarios 1 – 8 and 10.



Page 23

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                              9/18/2025

holding the 37 percent discount the same).[58]  In that case, there would have been overcharges paid on purchases of Teva's generic during the Teva Exclusivity Period even if, as Dr. Stangle posits, Teva would not have faced competition from additional generics during the Teva Exclusivity Period.

52.    Apparently in anticipation of this very point, Dr. Stangle claims that:

> Plaintiffs may claim that, even if Teva was the only generic entrant, the but-for generic price would still be lower than actual generic prices because Teva would have launched in May 2009 when brand WAC was $3.39, as opposed to July 2010, when Wyeth had increased brand WAC to $4.43, and in Dr. Leitzinger's model Teva launches at a fixed 37 percent discount from brand WAC (see Leitzinger Report, Exhibit 11).  This ignores the pattern in WAC price increases in this case. … Specifically, the data show that the average WAC increase prior to Teva's actual entry was $0.08/capsule (three percent), while the average WAC increase after Teva's entry rose to $0.58/capsule (nine percent). Had the acceleration in WAC increases begun earlier, WAC would have been higher in the but-for world, Teva would have launched at a higher generic price, and any difference between actual generic price with one generic and but-for generic price with one generic under Dr. Leitzinger's model would likely be eliminated.[59]

53.    When Dr. Stangle writes, "[h]ad the acceleration in WAC increases begun earlier…" it is unclear what "earlier" means.  In order for any such "acceleration" to have affected the prices charged by Teva one supposes that earlier must mean at or before the time it entered the market (in my analysis I used brand prices in the quarter preceding generic entry as the reference point Teva would have used in setting prices).  One can test Dr. Stangle's claim that brand WAC increases would have accelerated at or around the time of but-for generic entry and therefore would have

---

[58] To illustrate, a 37 percent discount below a WAC of $10 would equal a price of $6.30.  If the WAC were $8 instead of $10, the same 37 percent discount would result in a price of $5.04.

[59] Stangle Report, fn. 106.

                                                                              Page 24

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                          9/18/2025

served in themselves to generate higher generic prices by examining whether any such price acceleration occurred in advance of actual generic entry. Figure A below shows WAC increases for brand Effexor XR over time along with generic entry dates. As shown in the figure, there wasn't any appreciable acceleration of brand WAC increases until three years after Teva's entry. Hence, contrary to Stangle's claim, there is no basis to accelerate brand WAC price increases in advance of but-for generic entry and WAC prices at the time of but-for entry would not have been higher in the but-for world. Given that, with generic entry in 2009 or earlier, but-for generic prices would have been lower than actual generic prices even if there was no AG and no additional generic competitor because they would have been based on a lower Effexor XR WAC, the real world Effexor XR WAC from 2009 or earlier.



**Figure A**
**WAC Increase by Year**
**Effexor XR 75mg**

Note: This chart depicts the sum of all WAC increases in each calendar year.
Results are similar for the 37.5mg and 150mg strengths.

Source: WAC data.

54.     Dr. Stangle also claims that the "theory of harm is different" for generic-only purchasers and brand purchasers and since it "requires a different formula for calculating overcharges, including generic-only purchasers in a class with brand-



Page 25

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    9/18/2025

generic purchasers does not make economic sense."[60]  I disagree with this
characterization.  The theory of harm for generic-only purchasers and brand
purchasers is the same--generic competition leads to lower prices for extended release
venlafaxine capsules, and therefore a delay in that competition results in overcharges
on both brand and generic purchases.  In addition, many Class members incurred
overcharges on both brand and generic purchases from the same conduct.  There is
good reason to conclude--both as a matter of the evidence I set forth in my Report
and the underlying economics--that conduct which delays and limits generic
competition creates common effects which generally inflate prices paid for the brand
and the generic versions of the drug.  As reflected in the literature, the company
forecasts and the experience with Effexor XR once generic competition finally did
emerge, both brand Effexor XR purchasers and generic Effexor XR purchasers see
the benefits of increased generic competition.[61]

### E.  Post Generic Launch Branded Overcharges

55.    Dr. Stangle maintains that overcharges on Effexor XR purchases should end with
generic entry in July 2010 because "purchasers who bought the brand had the option
to purchase the generic but elected not to do so."[62]  His view here, as I understand it,
is that once generic Effexor XR became available, the effects of delayed generic entry
on market behavior immediately cease.  This is incorrect.  As discussed in my Report:

> It can take years for generic competition to bring the market from
> protected monopoly pricing to a new competitive equilibrium
> (i.e., the point at which prices and conversion or substitution
> rates stabilize following entry of generic competition).  During

---

[60] Stangle Report, ¶ 71.  (Citations omitted.)  See also, Stangle Report, ¶ 101.

[61] In ¶ 73, Dr. Stangle claims Discount Drug Mart was not injured because it purchased brand Effexor XR
prior to but-for generic entry so it is therefore a generic-only purchaser.  However, it purchased generic
Effexor XR during the Teva Exclusivity Period where there would have been additional competitors absent
the challenged conduct.  As shown in Exhibit 9 of my Report, Discount Drug Mart paid lower prices when
there were more generic competitors.  Hence, it is very likely that Discount Drug Mart (just as the other Class
members that purchased generic Effexor XR during the Teva Exclusivity Period) incurred overcharges on its
purchases of generic Effexor XR because, by virtue of the challenged agreement, the number of competing
generic sellers was limited to one rather than two or three.

[62] Stangle Report, ¶ 94.



Page 26

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                          9/18/2025

the first eleven months following market launch in July 2010, generic Effexor XR accounted for approximately 60 percent of the total extended release venlafaxine capsule volume. Approximately 86 percent of demand for extended release venlafaxine capsules was filled with generic the fifth quarter following generic entry. The generic ultimately accounted for over 95 percent of extended release venlafaxine capsule volume. That is, it took almost five years for generics to generate the full extent of the competitive benefit they create.[63]

Hence, overcharges on Effexor XR stemming from a delay in generic entry do not stop on the day that generic entry finally occurs, but rather continue through June 2015. As is shown in Figure 2, for some time afterwards, while the adjustment to competitive equilibrium is still underway, generic conversion will be lower than it would have been but for the generic delay, and thus overcharges will continue to accrue on brand purchases.[64]

---

[63] Leitzinger Report, ¶ 52.  (Citations omitted.)

[64] Leitzinger Report, ¶ 53.



Page 27

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025



**Figure 2**
**Actual vs. But-For Generic Conversion**
**But-For Generic Entry: Scenario 1 (May 15, 2009)**

### F. Brand-Brand Overcharges

56.   Dr. Stangle argues that "[f]or there to be any basis for brand-brand overcharges, there would need to be evidence that purchasers of brand-product would have received discounts on brand purchases in the but-for world that they did not receive in the actual world."[65]  He claims I have "made no attempt at showing whether Wyeth's discounting strategy persists" and that "net prices for Effexor XR decline temporarily after generic entry, only to rebound and eventually rise about pre-generation entry levels."[66]

57.   As discussed in my Report, "[i]n modeling brand prices absent the challenged conduct during the Delay Period…I backcast the discount that generic entry yielded

---

[65] Stangle Report, ¶ 98.

[66] Stangle Report, ¶ 98.  (Citations omitted.)


Page 28

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                9/18/2025

in brand prices relative to the brand WAC to the period following the alternative generic entry dates."[67]  The data show that discounts relative to WAC granted to Class members for branded Effexor XR purchases increased after generic entry.  Prior to generic entry Class members paid an average price for Effexor XR that was approximately half of a percent below the Effexor XR WAC.  Following generic entry, that discount increased to approximately 18 percent during Teva's Exclusivity Period and approximately 23 percent after multiple generics entered the market.[68]  The data show that discounts for brand Effexor XR persist through at least the end of the overcharge period and in fact grow larger over time.  These brand discounts would have started earlier with earlier generic entry, hence, contrary to Dr. Stangle's claims, "brand-brand" overcharges are appropriate.

58.    However, I note that should the Court rule brand-brand overcharges inappropriate, I can readily remove them from my classwide calculation of overcharges.  Brand-brand overcharges account for approximately 7 to 9 percent of classwide overcharges depending on Scenario.

### G. Dr. Stangle's Claims Regarding Prices Used in My Overcharge Model

59.    Dr. Stangle claims I use incorrect prices in calculating overcharges.[69]  Dr. Stangle first claims that I use "an actual generic price that is too low when calculating generic-generic overcharges during the Teva Exclusivity period by incorporating actual generic prices in the period following multiple generic entry."[70]  Which, according to him, causes me to "*understate* generic-generic overcharges."[71]  Dr. Stangle then states that I use a "but-for generic price that is too high when calculating overcharges on actual generic units during the period following mass generic entry" which he says

---

[67] Leitzinger Report, ¶ 51.  (Citations omitted.)

[68] Manufacturer data.  Measured over the multiple generic competitor period June 2011 – August 2016.

[69] Stangle Report, ¶ 90.

[70] Stangle Report, ¶ 90.

[71] Stangle Report, ¶ 90.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

causes me to "*overstate* brand-generic overcharges."[72]  Dr. Stangle speculates "[w]hile it is not entirely clear why Dr. Leitzinger makes these errors, it could be a consequence of the fact that the calculations he undertakes in his production materials do not follow the formulas he outlined in his report."[73]  I address his claims about understated generic-generic (GG) overcharges and overstated brand-generic (BG) overcharges below, but first I address his supposition that I somehow failed to apply the formulaic representation of overcharges set forth in paragraphs 43 – 45 of my Report.  This supposition is simply wrong.  The overcharges set forth in my Report represent exactly what the formulas describe.[74]

60.  With regard to his claims about incorrectly calculated GG and BG overcharges, the source of the problem rests with Dr. Stangle's analysis.  His effort to reproduce overcharges following my methodology is incorrect, and the differences he describes as GG understatements and BG overstatements are simply the product of his errors.  As reflected in his work papers, Dr. Stangle wrongly calculates <u>negative</u> overcharges on generic units purchased during Teva's Exclusivity Period because he wrongly compares prices from different time periods.  Figure 3 below illustrates this error.  Dr. Stangle calculates an actual generic price of ▮▮▮ over the entire post-generic entry period which includes Teva's Exclusivity Period and the period that follows with multiple generic competitors.  In his GG overcharge calculation he compares this ▮▮▮ to a but-for price (▮▮▮) calculated solely from the Teva Exclusivity Period.[75]  And so, he states, my calculations show negative GG overcharges during this period.

---

[72] Stangle Report, ¶ 90.

[73] Stangle Report, fn. 129.

[74] For ease of exposition, the formulas presented in my Report provide a mathematical description of overcharges for brand units and generic units separately.  For programming efficiency, the computer code utilized to calculate overcharges combines the brand and generic effects in a mathematically equivalent way.  Overcharges can be calculated on (a) the brand and the generic separately or (b) the brand and generic combined.  I provide results in my work papers that show that the result one obtains by programming brand and generic overcharges separately--as described in the Report--are identical to the overcharges I obtained by combining the two formulas.

[75] See Dr. Stangle work papers, Exhibit 12.sas program at dataset ov.



Page 30

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

61.  However, embedded in my actual GG overcharge calculations during Teva's Exclusivity Period, is an actual generic price of ▮▮▮ (not the ▮▮▮ Dr. Stangle uses, which is the actual price for the entire post-generic period) and a but-for generic price of ▮▮▮ .[76]  Hence, there are no negative GG overcharges embedded in my overcharge calculations during Teva's Exclusivity Period.

**Figure 3**
**Dr. Stangle's GG Overcharge Calculation Error**
**Scenario 1 (May 15, 2009)**



62.  As noted above, Dr. Stangle also claims that I used a "but-for generic price that is too high when calculating overcharges on actual generic units during the period following mass generic entry" which he says causes me to "*overstate* brand-generic overcharges."[77]  This is obviously wrong, a but-for generic price that is too high would understate BG overcharges.[78]

63.  Looking at Dr. Stangle's calculations, he divides the post generic period into two sub-periods (the Teva Exclusivity Period and the multiple-generic competitor period).[79] In my analysis, I combined the Teva Exclusivity Period with the multiple-generic competitor period into a single post-generic period.  His use of two separate periods

---

[76] Leitzinger Report, Exhibit 11 (Scenario 1).

[77] Stangle Report, ¶ 90.

[78] BG overcharges are the difference between the brand price and the but-for generic price (multiplied by the relevant volumes).  If the but-for generic price is higher, then the gap between the brand price and the but-for generic price, the overcharge, would be lower.

[79] See Dr. Stangle work papers, Exhibit 12.sas program at dataset ov_corr_base.

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                          9/18/2025

reduces overcharges (by effectively changing the average prices across the two periods) by approximately 5 – 11 percent depending on scenario. I agree with this change in the overcharge calculation and have incorporated it in the revised overcharges reported below.

## III.    Number of Class Members

64.    Dr. Stangle claims that "[I] overstate[ ] the size of the proposed class because [I] ignore[ ] certain mergers and acquisitions and fail[ ] to consider the purchasing patterns of other proposed class members."[80] In particular he claims I have ignored that the Class includes purportedly uninjured Class members and merger activity. After excluding these purportedly uninjured Class members and purportedly accounting for mergers and corporate affiliations, he argues there are 19 Class members rather than the 59 I identified in my Report.[81]

65.    I address Dr. Stangle claims that certain Class members are purportedly uninjured above. As I concluded in my Report, each of the Class members identified in my Report very likely incurred an overcharge. I note that I can exclude any Class members the Court deems should be excluded and still calculate overcharges using classwide methodologies.

66.    Dr. Stangle maintains that 12 of the separate Class member entities that I identified should be combined with other Class members by virtue of corporate affiliations.[82] What does or does not constitute a legally distinct entity for purposes of these claims is a legal matter. For my part, I used the transaction data to identify separate direct purchasers--each of the 12 Class members Dr. Stangle would combine with other Class members are shown in the transaction data as separate direct purchasers. I was then given instructions by Counsel as to which purchasers should be combined for purposes of identifying separate Class members.[83]

---

[80] Stangle Report, ¶ 20. See also, Stangle Report, ¶¶ 61 – 66.

[81] Stangle Report, ¶ 74.

[82] Stangle Report, ¶¶ 63 – 66, 74.

[83] Leitzinger Report, Table 1.



Page 32

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                           9/18/2025

67.   Counsel has now instructed me to also combine Kash n' Karry with Winn Dixie.
      Whether or not other entities identified by Dr. Stangle also should be combined for
      these purposes is a legal matter, not an economic matter, and therefore not a matter
      for economic opinion.  The 66 Class members are shown in Exhibit 3.

68.   Dr. Stangle argues that five of the 12 Class members should be consolidated with a
      Retailer Plaintiff.[84]  Counsel has instructed me to treat one of the five (Duane Reade)
      as a Retailer Plaintiff, and to remove it from the Class list that identifies Class
      members excluding the Retailer Plaintiffs.[85]  If the Retailer Plaintiffs are permitted to
      opt out, then there would be 57 Class members, shown in Exhibit 4.[86]  Exhibit 5
      shows the geographic dispersion of these Class members; they are located in 23 states
      and Puerto Rico.

## IV.   Updated Overcharges and Accounting for Opt-Out Assignments

69.   I have recalculated overcharges to account for:

      a.      The treatment of Duane Reade as a Retailer Plaintiff;

      b.      Combining Kash n' Karry with Winn Dixie;

      c.      I have incorporated additional forecasts identified in responding to Dr.
              Stangle's criticisms regarding my use of Wyeth forecasts; and

      d.      Breaking the post-generic period into two sub-periods as discussed in
              paragraph 63.

---

[84] Stangle Report, ¶ 65.

[85] Dr. Leffler's work papers show the Retailer Plaintiffs' overcharges include Duane Reade purchases.

[86] Walgreen Co., The Kroger Co. (including Peytons), Safeway, Inc., United Natural Foods, Inc. f/k/a
Supervalu Inc., H-E-B, L.P. f/k/a HEB Grocery Company, L.P., American Sales Company, Inc., Rite Aid
Corporation, Rite Aid Hdqtrs. Corporation, JCG (PJC) USA, LLC, Maxi Drug, Inc. d/b/a/ Brooks
Pharmacy, Eckerd Corporation, Meijer, Inc., Meijer Distribution, Inc., Giant Eagle, Inc., CVS Caremark
Corporation (including Caremark and Omnicare), and Duane Reade (collectively, "Retailer Plaintiffs").  Some
Retailer Plaintiffs (e.g., Safeway and Giant Eagle) do not appear in Exhibit 3 because they do not meet the
Class definition.


Page 33

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                9/18/2025

Revised classwide overcharges are shown in Exhibits 6A and 6B.[87]

70.    Additionally, since filing my Report, my staff and I have reviewed the report and
work papers provided by Keith Leffler, the expert for the Retailer Plaintiffs.[88] As
discussed in paragraph 56 of my Report, and in response to Dr. Stangle,[89] I have now
provided calculations that remove Retailer Plaintiffs' overcharges based on
assignments from certain Class members.[90]

71.    The base case entry scenario I was asked to model in my Report assumes Teva and an
AG would have entered on May 15, 2009, with a third generic entrant on April 15,
2010 (Scenario 1).[91] Dr. Leffler's Scenario S1-1 assumes essentially the same pattern
of generic entry that I was asked to assume for Leitzinger Scenario 1.[92] I therefore
use the overcharge per unit from Dr. Leffler's work papers (Leffler Scenario S1-1) to
remove the overcharges associated with the Retailer Plaintiffs' assignments from
Leitzinger Scenario 1.[93] I do so because Dr. Leffler's calculations provide an estimate
of Retailer Plaintiffs' overcharges as well as the volume assigned to the Retailer
Plaintiffs. Moreover, since this approach aligns Retailer Plaintiff claims for

---

[87] For the Class excluding Retailer Plaintiffs shown in Exhibit 4. These figures do not include overcharges on direct purchases by Retailer Plaintiffs, but do include overcharges on volumes assigned to Retailer Plaintiffs from Class members.

[88] Expert Report of Keith Leffler, Ph.D., dated 5/15/2025; Table 1 – Effexor XR Errata, Second Errata to the May 15, 2025 Expert Report of Keith Leffler, Ph.D., dated 7/9/2025 ("Leffler Report").

[89] Stangle Report, ¶ 107.

[90] I have removed overcharges on Retailer Plaintiffs' purchases from Class members AmerisourceBergen, Cardinal Health, McKesson, and Frank W. Kerr that were covered by assignment from those Class members. It is my understanding that Class members AmerisourceBergen, Cardinal Health, McKesson, and Frank W. Kerr have assigned to certain of the Retailer Plaintiffs overcharges corresponding to the volumes of brand and generic Effexor XR AmerisourceBergen, Cardinal Health, McKesson, and Frank W. Kerr resold to these assignees, and these volumes were included in Dr. Leffler's overcharge calculations for the Retailer Plaintiffs. I remove overcharges associated with the assigned volumes shown in Dr. Leffler's overcharge calculations.

[91] I understand that Plaintiffs' experts Professor McGuire and Ms. Rivera-Muzzio provide the support for the May 2009 generic scenario I modeled. See Expert Report of Professor Thomas G. McGuire, Ph.D., dated 5/15/2025, ¶ 368; Expert Report of Daisy Rivera-Muzzio, dated 5/15/2025, ¶¶ 10, 85 – 87.

[92] Leffler Report, ¶ 103; Leffler May 15, 2025 and July 9, 2025 work papers.

[93] Leffler May 15, 2025 and July 9, 2025 work papers.

---



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

overcharges on their purchases with the overcharges imputed to those purchases for purposes of adjusting the Class overcharges, it protects Defendants against any double claims for the same overcharges.  I remove the overcharges associated with the Retailer Plaintiffs' assignments from Leitzinger Scenarios 3 through 10 using the same methodology.[94]

72.    Class overcharges excluding Retailer Plaintiffs' overcharges on assignments[95] for each entry scenario included in Exhibit 10 of my Report are shown in Exhibits 7A and 7B.[96]

73.    Counsel has also asked that I translate these estimates of aggregate overcharges into prospective recoveries for individual Class members under Scenarios 1 and 9; and then determine the number of Class members for whom that recovery, after trebling, falls short of the $3.7 million expenses incurred in the *Nexium* case, which was litigated through trial (giving rise to what are sometimes described as "negative value claims").[97]  Counsel has also asked me to determine the number of Class members for which the prospective claim value, after trebling, is under $1 million and $500,000.  In this context, I find it reasonable to use the allocation method put forward for the Wyeth settlement (and used in my Report) as a means of translating my classwide overcharge estimates into anticipated Class member recoveries, before trebling.[98]

---

[94] Leitzinger Scenario 2 (which assumes Teva and an AG enter on April 15, 2009, with a third generic entrant on March 16, 2010) is the only scenario without a close analogue in Dr. Leffler's work papers.  I therefore removed the percentage of overcharges attributed to the Retailer Plaintiffs' assignments under Leitzinger Scenario 1.

[95] Overcharges shown in Exhibits 7A and 7B also exclude overcharges on Retailer Plaintiffs' direct purchases.

[96] I can adjust my calculations should additional or different Class members opt out of the Class, should Dr. Leffler's calculations change in any way, or should the court rule that I should use a different methodology to remove overcharges.

[97] In the Nexium case, expert expenses were approximately $2.97 million and total expenses were approximately $3.7 million.  *In re Nexium (Esomeprazole) Antitrust Litigation*, Plaintiffs' Motion for Reimbursement of Expenses (Doc. No. 1580) 9/28/2015; *In re Nexium (Esomeprazole) Antitrust Litigation*, Joint Dec re Reimbursement of Expenses (Doc. No. 1582-1) 9/28/2015, at 2.

[98] Indeed, I recommended the same allocation approach approved by the Court for purposes of the



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

74.    Exhibit 8A shows these shares for each Class member (excluding the Retailer
       Plaintiffs) under Scenario 1 (Plaintiffs' base case).[99]  Applying these shares to the
       corresponding aggregate overcharge figure shown in Exhibits 7A and 7B, I obtained
       the prospective recoveries shown for each Class member.  As shown in Exhibit 8A,
       30 Class members have trebled prospective recoveries that are less than expenses in
       Nexium; 13 Class members have trebled prospective recoveries that below $1 million;
       and 9 Class members have trebled prospective recoveries below $500,000.[100]

75.    Exhibit 8B shows these shares for each Class member (excluding the Retailer
       Plaintiffs) under Scenario 9.[101]  Applying these shares to the corresponding aggregate
       overcharge figure shown in Exhibits 7A and 7B, I obtained the prospective
       recoveries shown for each Class member.  As shown in Exhibit 8B, 34 Class
       members have trebled prospective recoveries that are less than expenses in Nexium;
       17 Class members have trebled prospective recoveries that below $1 million; and 10
       Class members have trebled prospective recoveries below $500,000.

76.    I was also asked to estimate claim values assuming a 50 percent or 33 percent chance
       that the Class would prevail and obtain overcharges equal to three times the
       overcharges I calculated, assuming each Class member's trebled prospective claim
       would be 50 percent or 33 percent of these amounts, respectively, as shown in
       Exhibits 8A and 8B.[102]  In addition, I was asked to estimate claim values assuming a
       hypothetical total recovery of $117 million (equal to three times the $39 million in

---

settlement with Wyeth.  See, Declaration of Jeffrey J. Leitzinger, Ph.D. Related to Proposed Allocation Plan
and Net Settlement Fund Allocation, dated April 8, 2024.  However, here I have used Class purchases during
the overcharge period corresponding to Plaintiffs' base case (Scenario 1).  Dr. Stangle offers no criticism of
my allocation approach.

[99] Dr. Stangle offers no criticism of my share calculations which I presented in my Report Exhibit 13.  I use
the same methodology to calculate Class member shares here.

[100] I was asked by Counsel to compare Class members' prospective recoveries to Nexium expenses
(approximately $3.7 million), $1 million, and $500, 000.  Any benchmark can be applied to the prospective
recoveries I've calculated.

[101] As discussed in my Report at fn. 58, QK Healthcare Inc. and its assignee Uniondale Chemists Inc. have no
relevant purchases under Scenario 9.

[102] I could perform similar calculations with varying percentages if asked to do so.



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

settlement reached with Wyeth, which would now be achieved by a settlement with Teva of $78 million), and those results are shown in Exhibit 8C.

## V.   Dr. Stangle's Claims Regarding Class Members Being Dissimilar Business Entities

77.   Dr. Stangle argues that "[t]he proposed class is highly diverse and includes members with economic incentives and characteristics that are not shared by the Named Plaintiffs."[103]  He claims that these "differing incentives among proposed class members"[104] require individualized inquiry and "pharmacies and wholesalers should not be grouped within the same class due to inherent business differences and potentially conflicting interests."[105]

78.   The impact question is whether Class members suffered some overcharge as a result of the challenged conduct.  Based on the evidence presented in my Report, it is highly likely that each Class member paid at least some overcharge in connection with its brand and/or generic Effexor XR purchases.  Indeed, each named plaintiff very likely paid at least some overcharge in connection with its brand Effexor XR purchases and/or its generic purchases.  None of the opinions Dr. Stangle gives in this regard is relevant to the question of whether each Class member (including the named plaintiffs) paid at least some overcharge in connection with its brand and/or generic Effexor XR purchases.  I further note that all Class members share an interest in proving the earliest possible but-for generic entry dates, which will maximize overcharges for the Class and the allocated share of overcharges for each Class member.  I also note that, in calculating Class members prices paid, I netted out (subtracted) all discounts in the manufacturer data, including any administrative or DSA fees.  Finally, I note that, in my opinion, it is highly likely that the named plaintiffs incurred overcharges on their brand and/or generic purchases, just as all other Class members did.

---

[103] Stangle Report, ¶ 58.

[104] Stangle Report, ¶ 59.

[105] Stangle Report, ¶ 60.



*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/18/2025

## VI.   Dr. Stangle's Claims Regarding Evidence Relevant for Joinder

79.   Dr. Stangle concludes that "[p]roposed class member interrelationships demonstrate sufficient evidence of economic incentive for Plaintiffs to pursue joinder.  Members of the proposed class have demonstrated a willingness and ability to cooperate among themselves."[106]  According to Dr. Stangle,

> there is a demonstrated history of mergers, litigation partnerships, and participation in GPOs and industry alliances among proposed class members.  This widespread and routine coordination strongly suggests that neither transaction costs nor coordination costs pose a meaningful barrier to pursuing joint litigation through joinder in this matter.[107]

80.   Dr. Stangle seems to imply that transaction costs and coordination costs are the only factors to consider in determining whether it's worthwhile to litigate on their own or join together with other similarly situated plaintiffs; he fails to provide a basis for making that claim.  Joinder could well involve various questions regarding among other things, cost uncertainty, fear of retaliation, claim values, and potential sharing of confidential information--most of which lie well outside the realm of economic expertise.

Jeffrey J. Leitzinger, Ph.D.
September 18, 2025

---

[106] Stangle Report, ¶ 21.

[107] Stangle Report, ¶ 84.


Page 38

*Effexor XR* • Rebuttal Report of Jeffrey J. Leitzinger, Ph.D.

Exhibit 1
Page 1 of 9



**Dr. JEFFREY J. LEITZINGER**
*Managing Director*
**Los Angeles, California**
**Tel: 213 624 9600**

## EDUCATION

Ph.D., Economics, University of California, Los Angeles
M.A., Economics, University of California, Los Angeles
B.S., Economics, Santa Clara University

## WORK EXPERIENCE

*Econ One Research, Inc.*, 1997 to date
Board Chairman and Managing Director, 2018 to date
Management Committee Chair, 2012-2018
President and CEO, 1997-2011
Founder, 1997

*Micronomics, Inc.,* 1988-1997
President and CEO, 1994-1997
Executive Vice President, 1988-1994
Cofounder, 1988

*National Economic Research Associates, Inc. 1980-1988*
(Last position was Senior Vice President and member of the Board
of Directors)

*California State University, Northridge*, Lecturer, 1979-1980

## BOARD EXPERIENCE

Board of Visitors, UCLA Department of Economics, 2018-present
California United Bank, 2015-2017
Advisory Board Member, American Antitrust Institute, 2013-present
Bolton & Company, 2006-present
First Enterprise Bank, 2006-2015
Blind Children's Center, 2005-present

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                      **Page 2 of 9**

## AREAS OF EXPERTISE

Has offered expert testimony regarding:

- Competition economics

- Commercial damages

- Econometrics and statistics

- Intellectual property

- Valuation

## INVITED PRESENTATIONS

Some Implications of Tyson for Econometric Models in Class Action Antitrust Cases, *American Bar Association,* 65th Antitrust Law Spring Meeting, March 2017.

Where Are We on Class Certification? Examples from Health Care and Pharmaceutical Cases, *ABA Section of Antitrust Law, Health Care and Pharmaceuticals and Civil Practice and Procedure and Trial Practice Committees*, March 2016.

Corporations & Cartels: Should You Be a Plaintiff?, *American Bar Association,* 62nd Antitrust Law Spring Meeting, March 2014.

Developments in Antitrust Cases Alleging Delayed Generic Competition in the Pharmaceutical Industry, *American Antitrust Institute,* 5th Annual Future of Private Antitrust Enforcement Conference, December 2011.

Class Certification and Calculation of Damages, *American Bar Association*, Section of Antitrust Law and *International Bar Association*, 8th International Cartel Workshop, February 2010.

Class Certification Discussion and Demonstration, *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2007.

Antitrust Injury and the Predominance Requirement in Antitrust Class Actions, *American Bar Association*, Houston Chapter, April 2007.

Class Certification Discussion and Demonstration, *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2005.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                **Page 3 of 9**

**INVITED PRESENTATIONS** (cont'd.)

What Can an Economist Say About the Presence of Conspiracy?, *American Bar Association,* Antitrust Law, The Antitrust Litigation Course, October 2003.

Lessons from Gas Deregulation, *International Association for Energy Economics,* Houston Chapter*,* December 2002.

A Retrospective Look at Wholesale Gas Industry Restructuring, *Center for Research in Regulated Industries*, 20th Annual Conference of the Advanced Workshop in Regulation and Competition, May 2001.

The Economic Analysis of Intellectual Property Damages, *American Conference Institute,* 6th National Advanced Forum, January 2001.

Law and Economics of Predatory Pricing Under Federal and State Law, *Golden State Antitrust and Unfair Competition Law Institute*, 8th Annual Meeting, October 2000.

Non-Price Predation--Some New Thinking About Exclusionary Behavior*, Houston Bar Association*, Antitrust and Trade Regulation Section, October 2000.

After the Guilty Plea:  Does the Defendant Pay the Price in the Civil Damage Action, *American Bar Association*, Section of Antitrust Law, 48th Annual Spring Meeting, April 2000.

Economics of Restructuring in Gas Distribution, *Center for Research in Regulated Industries*, 12th Annual Western Conference, July 1999.

A Basic Speed Law for the Information Superhighway, *California State Bar Association*, December 1998.

Innovation in Regulation, *Center for Research in Regulated Industries*, 11th Annual Western Conference, July/September 1998.

Electric Industry Deregulation: What Does the Future Hold?, *Los Angeles Headquarters Association,* November 1996.

Why Deregulate Electric Utilities?, *National Association of Regulatory Utility Commissioners*, November 1995.

Restructuring U.S. Power Markets: What Can the Gas Industry's Experience Tell Us?,  *National Association of Regulatory Utility Commissioners*, July 1995.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                      **Page 4 of 9**

**INVITED PRESENTATIONS** (cont'd.)

Natural Gas Restructuring: Lessons for Electric Utilities and Regulators, *International Association for Energy Economics*, May 1995.

Techniques in the Direct and Cross-Examination of Economic, Financial, and Damage Experts, *The Antitrust and Trade Regulation Law Section of the State Bar of California and The Los Angeles County Bar Association*, 2nd Annual Golden State Antitrust and Trade Regulation Institute, October 1994.

Demonstration: Deposition of Expert Witnesses and Using Legal Technology, *National Association of Attorneys General*, 1994 Antitrust Training Seminar, September 1994.

Direct and Cross Examination of Financial, Economic, and Damage Experts, *The State Bar of California, Antitrust and Trade Regulation Law Section,* May 1994.

Price Premiums in Gas Purchase Contracts, *International Association for Energy Economics,* October 1992.

Valuing Water Supply Reliability, *Western Economic Association,* Natural Resources Section, July 1992.

Transportation Services After Order 636: "Back to the Future" for Natural Gas, Seminar sponsored by Jones, Day, Reavis & Pogue, May 1992.

The Cost of an Unreliable Water Supply for Southern California, Forum presented by Micronomics, Inc., May 1991.

Market Definition: It's Time for Some "New Learning", *Los Angeles County Bar Association,* Antitrust and Corporate Law Section, December 1989.

Market Definition in Antitrust Cases: Some New Thinking, *Oregon State Bar,* Antitrust Law Section, March 1987.

Future Directions for Antitrust Activity in the Natural Gas Industry, *International Association of Energy Economists*, February 1987.

Information Externalities in Oil and Gas Leasing, *Western Economic Association Meetings*, Natural Resources Section, July 1983.

Economic Analysis of Offshore Oil and Gas Leasing, *Western States Land Commissioners Association*, December 1982.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                    **Page 5 of 9**


## PUBLISHED ARTICLES

"Statistical Significance and Statistical Error in Antitrust Analysis," *Antitrust Law Journal*, Volume 81, Issue 2, July 2017.

"The Predominance Requirement for Antitrust Class Actions--Can Relevant Market Analysis Help?," American Bar Association, Section of Antitrust Law, *Economics Committee Newsletter*, Volume 7, No. 1, Spring 2007.

"A Retrospective Look at Wholesale Gas: Industry Restructuring," *Journal of Regulatory Economics,* January 2002.

"Balance Needed in Operating Agreements as Industry's Center of Gravity Shifts to State Oil Firms," *Oil & Gas Journal*, October 2000.

"What Can We Expect From Restructuring In Natural Gas Distribution?" *Energy Law Journal*, January 2000.

"Gas Experience Can Steer Power Away from Deregulation Snags," *Oil & Gas Journal,* August 1996.

"Anatomy of FERC Order 636: What's out, What's in," *Oil & Gas Journal*, June 1992.

"Antitrust II – Future Direction for Antitrust in the Natural Gas Industry," *Natural Gas*, November 1987.

"Information Externalities in Oil and Gas Leasing," *Contemporary Policy Issues*, March 1984.

"Regression Analysis in Antitrust Cases:  Opening the Black Box," *Philadelphia Lawyer*, July 1983.

"Foreign Competition in Antitrust Law," *The Journal of Law & Economics*, April 1983.


## REGULATORY SUBMISSIONS

<u>In the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) Under its Experimental Gas Cost Incentive Mechanism and Related Gas Supply Matters; A.00-06-023</u>, Public Utilities Commission of the State of California, November 2001.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                          **Page 6 of 9**

## REGULATORY SUBMISSIONS (cont'd.)

Sempra Energy and KN Energy, Incorporation; Docket No. EC99-48-000 (Affidavit and Verified Statement), Federal Energy Regulatory Commission, March/May 1999.

Rulemaking on the Commission's Own Motion to Assess and Revise the Regulatory Structure Governing California's Natural Gas Industry (Market Conditions Report), Public Utilities Commission of the State of California, July 1998.

In the Matter of the Application of Pacific Enterprises, Enova Corporation, et al. for Approval of a Plan of Merger Application No. A. 96-10-038, Public Utilities Commission of the State of California, August/October 1997.

In re: Koch Gateway Pipeline Company; Docket No. RP 97-373-000, Federal Energy Regulatory Commission, May/October 1997 and February 1998.

In the Matter of the Application of Sadlerochit Pipeline Company for a Certificate of Public Convenience and Necessity; Docket No. P-96-4, Alaska Public Utilities Commission, May 1996.

Public Funding of Electric Industry Research, Development, and Demonstration (RD&D) Under Partial Deregulation, California Energy Commission, January 1995.

NorAm Gas Transmission Company; Docket No. RP94-343-000, Federal Energy Regulatory Commission, August 1994/June 1995.

Natural Gas Vehicle Program; Investigation No. 919-10-029, California Public Utilities Commission, July 1994.

Transcontinental Gas Pipe Line Corporation; Docket No. RP93-136-000 (Proposed Firm-to-the-Wellhead Rate Design), Federal Energy Regulatory Commission, January 1994.

In re: Sierra Pacific's Proposed Nomination for Service on Tuscarora Gas Pipeline; Docket No. 93-2035, The Public Service Commission of Nevada, July 1993.

Employment Gains in Louisiana from Entergy-Gulf States Utilities Merger, Louisiana Public Utilities Commission, December 1992.

Employment Gains to the Beaumont Area from Entergy-Gulf States Utilities Merger, Texas Public Utilities Commission, August 1992.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                                    **Page 7 of 9**

## REGULATORY SUBMISSIONS (cont'd.)

Transcontinental Gas Pipe Line Corporation; Docket No. RS 92-86-000 (Affidavit regarding Transco's Proposed IPS Service), Federal Energy Regulatory Commission, June 1992.

In Re: Pipeline Service Obligations; Docket No. RM91-11-000; Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; Docket No. RM91-3-000; Revisions to the Purchased Gas Adjustment Regulations; Docket No. RM90-15-000, Federal Energy Regulatory Commission, May 1991.

In the Matter of Natural Gas Pipeline Company of America; Docket No. CP89-1281 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, January 1990.

In the Matter of United Gas Pipeline Company, UniSouth, Cypress Pipeline Company; Docket No. CP89-2114-000 (Proposed Certificate of Storage Abandonment by United Gas Pipeline Company), Federal Energy Regulatory Commission, December 1989.

In the Matter of Tennessee Gas Pipeline Company; Docket No. CP89-470 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, July 1989.

In the Matter of Take-Or-Pay Allocation Proposed by Mississippi River Transmission Corporation, Federal Energy Regulatory Commission, March 1988.

In the Matter of Natural Gas Pipeline Company of America: Docket No.RP87-141-000 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, December 1987.

In the Matter of Application of Wisconsin Gas Company for Authority to Construct New Pipeline Facilities; 6650-CG-104, Public Service Commission, State of Wisconsin, August 1987.

Trans-Alaska Pipeline System: Docket Nos. OR 78-1-014 and OR 78-1-016 (Phase 1 Remand), Federal Energy Regulatory Commission, October 1983.

**Econ One Research, Inc.**
**Los Angeles, California**
**Page 8 of 9**

**Dr. Jeffrey Leitzinger**
**October 2021 – September 2025**

| | Proceeding | Court/Commission/ Agency | Docket or File |
|---|---|---|---|
| 1. | In Re: Rail Freight Surcharge Antitrust Litigation | U.S. District Court, District of Columbia | Case No. 1:07-MC-00489 |
| 2. | In re: Opana ER Antitrust Litigation | U.S. District Court, Northern District of Illinois | Civil Action No. 14-cv-10150 |
| 3. | In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | U.S. District Court, Southern District of New York | No. 1:14-md-02542 (VSB) (SLC) No. 1:19-cv-00325 (VSB) |
| 4. | International Construction Products, LLC v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC doing business as Cat Auction Services. | U.S. District Court, District of Delaware | C.A. No. 15-108-RGA |
| 5. | In re: Novartis and Par Antitrust Litigation | U.S. District Court, Southern District of New York | Case No. 1:18-cv-04361-AKH |
| 6. | Toll Brothers, Inc. and Porter Ranch Development Company v. Sempra Energy, Southern California Gas Company, et al. | Superior Court of the State of California, County of Los Angeles, Central Civil West | Case No. BC674622 |
| 7. | David, et. al. v. Bread Company, Limited, et. al. | Ontario Supreme Court of Justice | CV-17-586063-00CP |
| 8. | Pacific Steel Group v. Commercial Metals Company, et al. | U.S. District Court, Northern District of California, Oakland Division | No. 4:20-cv-07683-HSG |
| 9. | In re: Generic Pharmaceuticals Pricing Antitrust Litigation | U.S. District Court, Eastern District of Pennsylvania | MDL 2724 16-MD-724 |
| 10. | Panini America, Inc. v. National Football League Players Incorporated | American Arbitration Association | AAA Case No. 01-23-0003-7163 |

**Econ One Research, Inc.**
**Los Angeles, California**
**Page 9 of 9**

**Dr. Jeffrey Leitzinger**
**October 2021 – September 2025**

| | Proceeding | Court/Commission/ Agency | Docket or File |
|---|---|---|---|
| 11. | Giang Bui, v. Cargill Incorporated, et al. | Supreme Court of British Columbia | No. S-221365 |
| 12. | Team Schierl Companies, et al. v Aspirus, Inc. and Aspirus Network, Inc. | U.S. District Court, Western District Court of Wisconsin | Civil Action No. 3:22-cv-00580-jdp |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 2**
**List of Materials Reviewed Since the May 15, 2025 Report**

*Includes all documents, studies, and articles cited in the Report.*

**Pleadings and Motions**

Teva's Opposition to Direct Purchaser Class Plaintiffs' Motion for Class Certification, dated 7/24/2025

**Expert Reports and Work Papers**

Expert Report of Bruce E. Stangle, Ph.D., dated 7/17/2025
Expert Report of Daisy Rivera-Muzzio, dated 5/15/2025
Expert Report of Keith Leffler, Ph.D., dated 5/15/2025, Second Errata, dated 7/9/2025
Expert Report of Professor Thomas G. McGuire, Ph.D., dated 5/15/2025

**Depositions and/or Exhibits**

Stangle, Bruce E. (09/09/2025)

**Documents**

WYEFFAT Prefix

| | | | | | |
|---|---|---|---|---|---|
| 3610080 | - 3610081 | 3767301 | | 08230679 | |
| 3610082 | | 3767302 | | 08230681 | 08230683 |
| 3610088 | - 3610089 | 3767303 | | 08230685 | |
| 3610090 | | 3767304 | | 08231737 | 08231739 |
| 3712858 | - 3712859 | 3767305 | | 08249403 | - 08249405 |
| 3712860 | | 3767306 | | 08249411 | |
| 3721502 | - 3721503 | 3769716 | - 3769721 | 08249412 | |
| 3721504 | | 3769722 | | 08249413 | - 08249414 |
| 3730876 | - 3730877 | 3773288 | - 3773289 | 08249415 | |
| 3730878 | | 3773290 | | 08264242 | |
| 3755540 | - 3755545 | 3775736 | - 3775737 | 08264243 | - 08264244 |
| 3755547 | | 3775738 | | 08264245 | |
| 3765191 | - 3765196 | 3775740 | - 3775745 | 08305613 | - 08305614 |
| 3765198 | | 3775746 | | 08305615 | |
| 3767291 | | 04739371.00001 | - 04739371.00006 | 08305618 | - 08305620 |
| 3767293 | | 04739373.00001 | | 08305621 | |
| 3767295 | | 05979805.00001 | - 05979805.00002 | 08307439 | |
| 3767296 | | 05979806.00001 | | 08307440 | - 08307441 |
| 3767297 | | 05979809.00001 | - 05979809.00003 | 08307442 | |
| 3767298 | | 05979810.00001 | | 08316620 | - 08316622 |
| 3767299 | | 08230676 | | 08316624 | |
| 3767300 | | 08230677 | - 08230678 | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Exhibit 3
## List of Class Members

1. AETNA
2. AMERICAN SALES COMPANY
3. AMERISOURCEBERGEN
4. ASSOCIATED PHARMACIES
5. ATLANTIC APOTHECARY
6. AUBURN PHARMACEUTICALS
7. BARTELL DRUG COMPANY
8. BLOODWORTH WHOLESALE
9. BURLINGTON DRUG
10. CAPITAL WHOLESALE
11. CARDINAL HEALTH
12. CESAR CASTILLO INC
13. CIGNA
14. CVS CAREMARK
15. DAKOTA DRUG
16. DELHAIZE AMERICA
17. DISCOUNT DRUG MART
18. DMS PHARMACEUTICAL
19. DROGUERIA BETANCES
20. DRUGS UNLIMITED
21. DUANE READE
22. EXPRESS SCRIPTS
23. FRANK W KERR
24. GENETCO
25. GOLUB
26. H. D. SMITH WHOLESALE
27. HARVARD DRUG
28. HE BUTT
29. HENRY SCHEIN
30. HUMANA
31. J M SMITH CORPORATION D/B/A SMITH DRUG
32. KERR DRUG
33. KPH HEALTHCARE SERVICES INC
34. KROGER COMPANY
35. LOUISIANA WHOLESALE
36. MCKESSON
37. MEDCO
38. MEIJER
39. MIAMI LUKEN
40. MORRIS & DICKSON
41. NORTH CAROLINA MUTUAL WHOLESALE DRUG
42. OPTUM RX
43. PHARMACY BUYING ASSOCIATION
44. PRESCRIPTION SUPPLY
45. PRIME THERAPEUTICS
46. PUBLIX SUPER MARKETS
47. QK HEALTHCARE INC
48. QUALITY CARE PRODUCTS
49. QUEST PHARMACEUTICALS
50. R & S NORTHEAST
51. RDC
52. RICHIE PHARMACAL
53. RITE AID
54. SCHNUCKS PHARMACY
55. STEPHEN L. LAFRANCE PHARMACY, INC. D/B/A SAJ DISTRIBUTORS
56. SUPERVALU
57. THRIFTY WHITE
58. TOP RX
59. UNIONDALE CHEMISTS, INC
60. VALLEY WHOLESALE DRUG
61. VALUE DRUG
62. WAKEFERN FOOD CORP
63. WALGREENS
64. WALMART
65. WEIS MARKETS
66. WINN DIXIE

Source: Manufacturer data.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Exhibit 4
## List of Class Members Excluding Retailer Plaintiffs

1. AETNA
2. AMERISOURCEBERGEN
3. ASSOCIATED PHARMACIES
4. ATLANTIC APOTHECARY
5. AUBURN PHARMACEUTICALS
6. BARTELL DRUG COMPANY
7. BLOODWORTH WHOLESALE
8. BURLINGTON DRUG
9. CAPITAL WHOLESALE
10. CARDINAL HEALTH
11. CESAR CASTILLO INC
12. CIGNA
13. DAKOTA DRUG
14. DELHAIZE AMERICA
15. DISCOUNT DRUG MART
16. DMS PHARMACEUTICAL
17. DROGUERIA BETANCES
18. DRUGS UNLIMITED
19. EXPRESS SCRIPTS
20. FRANK W KERR
21. GENETCO
22. GOLUB
23. H. D. SMITH WHOLESALE
24. HARVARD DRUG
25. HENRY SCHEIN
26. HUMANA
27. J M SMITH CORPORATION D/B/A SMITH DRUG
28. KERR DRUG
29. KPH HEALTHCARE SERVICES INC
30. LOUISIANA WHOLESALE
31. MCKESSON
32. MEDCO
33. MIAMI LUKEN
34. MORRIS & DICKSON
35. NORTH CAROLINA MUTUAL WHOLESALE DRUG
36. OPTUM RX
37. PHARMACY BUYING ASSOCIATION
38. PRESCRIPTION SUPPLY
39. PRIME THERAPEUTICS
40. PUBLIX SUPER MARKETS
41. QK HEALTHCARE INC
42. QUALITY CARE PRODUCTS
43. QUEST PHARMACEUTICALS
44. R & S NORTHEAST
45. RDC
46. RICHIE PHARMACAL
47. SCHNUCKS PHARMACY
48. STEPHEN L. LAFRANCE PHARMACY, INC. D/B/A SAJ DISTRIBUTORS
49. THRIFTY WHITE
50. TOP RX
51. UNIONDALE CHEMISTS, INC
52. VALLEY WHOLESALE DRUG
53. VALUE DRUG
54. WAKEFERN FOOD CORP
55. WALMART
56. WEIS MARKETS
57. WINN DIXIE

Source: Manufacturer data.

HIGHLY CONFIDENTIAL − ATTORNEYS' EYES ONLY

# Exhibit 5
## Class Member Locations



REBUTTTAL REPORT

Source: Manufacturer data; internet research.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REBUTTAL REPORT

REBUTTAL REPORT

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



REBUTTAL REPORT



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Appendix A
## Manufacturer Forecasts Used in Overcharge Calculation

Mylan:  MYL-VENLA-0000002.
        MYL-VENLA-0000004.

Teva:   Wodarczyk Exhibit 10B (TEVA_EFFEX_0440657).
        Wodarczyk Exhibit 12B (TEVA_EFFEX_0863426);
            Wodarczyk Exhibit 13B (TEVA_EFFEX_0440841; duplicate);
            TEVA_EFFEX_0440650 (duplicate);
            TEVA_EFFEX_0440838 (duplicate);
            TEVA_EFFEX_0863425 (duplicate);
            TEVA_EFFEX_0863427 (duplicate).
        TEVA_EFFEX_0440759.
        TEVA_EFFEX_0440792;
            TEVA_EFFEX_0450646 (duplicate);
            TEVA_EFFEX_0891442 (duplicate);
            TEVA_EFFEX_0893212 (duplicate).
        TEVA_EFFEX_0443329.
        TEVA_EFFEX_0447422.
        TEVA_EFFEX_0631603;
            TEVA_EFFEX_0713070 (duplicate);
            TEVA_EFFEX_0713201 (duplicate);
            TEVA_EFFEX_0713203 (duplicate);
            TEVA_EFFEX_0713206 (duplicate).
        TEVA_EFFEX_0713424.
        TEVA_EFFEX_0716249.

Wyeth:  WYEFFAT08230676;
            WYEFFAT08249412 (duplicate);
            WYEFFAT08264242 (duplicate);
            WYEFFAT08307439 (duplicate).
        WYEFFAT08249403 - WYEFFAT08249405 at WYEFFAT08249403.
        WYEFFAT08249411.
        WYEFFAT08249413 - WYEFFAT08249414 at WYEFFAT08249414;
            WYEFFAT05979805.00001 - WYEFFAT05979805.00002 at WYEFFAT05979805.00002  (duplicate);
            WYEFFAT08230677 - WYEFFAT08230678 at WYEFFAT08230678 (duplicate);
            WYEFFAT08264243 - WYEFFAT08264244 at WYEFFAT08264244 (duplicate);
            WYEFFAT08305613 - WYEFFAT08305614 at WYEFFAT08305614 (duplicate);
            WYEFFAT08307440 - WYEFFAT08307441 at WYEFFAT08307441 (duplicate).
        WYEFFAT08305615;
            WYEFFAT05979806.00001 (duplicate);
            WYEFFAT08230679 (duplicate);
            WYEFFAT08249415 (duplicate);
            WYEFFAT08264245 (duplicate);
            WYEFFAT08307442 (duplicate).
        WYEFFAT08305618 - WYEFFAT08305620 at WYEFFAT08305619;
            WYEFFAT05979809.00001 - WYEFFAT05979809.00003 at WYEFFAT05979809.00002 (duplicate);
            WYEFFAT08230681 - WYEFFAT08230683 at WYEFFAT08230682 (duplicate);
            WYEFFAT08231737 - WYEFFAT08231739 at WYEFFAT08231738 (duplicate);
            WYEFFAT08316620 - WYEFFAT08316622 at WYEFFAT08316621 (duplicate).
        WYEFFAT3609860 - WYEFFAT3610024 at WYEFFAT3609901.
        WYEFFAT3610080 - WYEFFAT3610081 at WYEFFAT3610081;
            WYEFFAT3610088 - WYEFFAT3610089 at WYEFFAT3610089 (duplicate);
            WYEFFAT3712858 - WYEFFAT3712859 at WYEFFAT3712859 (duplicate);
            WYEFFAT3721502 - WYEFFAT3721503 at WYEFFAT3721503 (duplicate);
            WYEFFAT3730876 - WYEFFAT3730877 at WYEFFAT3730877 (duplicate);
            WYEFFAT3773288 - WYEFFAT3773289 at WYEFFAT3773289 (duplicate);
            WYEFFAT3775736 - WYEFFAT3775737 at WYEFFAT3775737 (duplicate).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Appendix A**
**Manufacturer Forecasts Used in Overcharge Calculation**

WYEFFAT3610090;
    WYEFFAT3610082 (duplicate);
    WYEFFAT3712860 (duplicate);
    WYEFFAT3721504 (duplicate);
    WYEFFAT3730878 (duplicate);
    WYEFFAT3773290 (duplicate);
    WYEFFAT3775738 (duplicate).
WYEFFAT3755540 - WYEFFAT3755545 at WYEFFAT3755544;
    WYEFFAT04739371.00001 - WYEFFAT04739371.00006 at WYEFFAT04739371.00005 (duplicate);
    WYEFFAT3765191 - WYEFFAT3765196 at WYEFFAT3765195 (duplicate);
    WYEFFAT3769716 - WYEFFAT3769721 at WYEFFAT3769720 (duplicate);
    WYEFFAT3775740 - WYEFFAT3775745 at WYEFFAT3775744 (duplicate).
WYEFFAT3755547;
    WYEFFAT04739373.00001 (duplicate);
    WYEFFAT05979810.00001 (duplicate);
    WYEFFAT08230685 (duplicate);
    WYEFFAT08305621 (duplicate);
    WYEFFAT08316624 (duplicate);
    WYEFFAT3765198 (duplicate);
    WYEFFAT3769722 (duplicate);
    WYEFFAT3775746 (duplicate).
WYEFFAT3767291
WYEFFAT3767293
WYEFFAT3767295
WYEFFAT3767296
WYEFFAT3767297
WYEFFAT3767298
WYEFFAT3767299
WYEFFAT3767300
WYEFFAT3767301
WYEFFAT3767302
WYEFFAT3767303
WYEFFAT3767304
WYEFFAT3767305
WYEFFAT3767306
WYEFFAT3795941 - WYEFFAT3795946 at WYEFFAT3795941.