# Exhibit 40
# (Filed Under Seal)

1        UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF NEW JERSEY

3    _____

4    IN RE: EFFEXOR XR              )

5    ANTITRUST LITIGATION           )Master Docket No.

6                                   )3:11-cv-05479(ZNQ)(JBD)

7                                   )

8    This Document Relates to:      )

9    All Actions                    )

10   _____)

11

12      **** CONFIDENTIAL/ATTORNEYS' EYES ONLY ****

13      VIDEOTAPED DEPOSITION OF DR. BRUCE STANGLE

14               APPEARING REMOTELY

15               September 9, 2025

16                  9:29 a.m.

17

18   Reported by: Eileen Mulvenna, CSR/RMR/CRR

19   Job No. 00168974

20   _____

21            DIGITAL EVIDENCE GROUP
             1730 M Street, NW, Suite 812
22            Washington, D.C. 20036
                 (202) 232-0646

**Page 2**

1         REMOTE VIDEOTAPED DEPOSITION of

2  DR. BRUCE STANGLE, an expert witness on behalf of

3  Teva in the above-titled action, held on Tuesday,

4  September 9, 2025, commencing at approximately

5  9:26 a.m., before Eileen Mulvenna, CSR/RMR/CRR/RDR,

6  Certified Shorthand Reporter, Registered Merit

7  Reporter, Certified Realtime Reporter, Registered

8  Diplomate Reporter, and Notary Public of the State

9  of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

**Page 3**

1  A P P E A R A N C E S :

2

3  ON BEHALF OF DIRECT PURCHASER PLAINTIFFS:

4

5  CAITLIN COSLETT, ESQUIRE

6  Berger Montague

7  1818 Market Street, Suite 3600

8  Philadelphia, Pennsylvania 19103

9  215.875.3000

10  ccoslett@bergermontague.com

11

12

13  ON BEHALF OF RETAILER PLAINTIFFS:

14  BY:  SCOTT E. PERWIN, ESQUIRE

15  SPERLING KENNY NACHWALTER

16  Four Seasons Tower

17  1441 Brickell Avenue, Suite 1100

18  Miami, Florida 33131

19  305-373-1000

20  sep@sperlingkenny.com

21

22

**Page 4**

1  A P P E A R A N C E S (Continued):

2

3  ON BEHALF OF TEVA:

4  BY:  GILAD BENDHEIM, ESQUIRE

5  KIRKLAND & ELLIS LLP

6  The Atrium

7  601 Lexington Avenue

8  New York, New York 10022

9  212-446-4800

10  gilad.bendheim@kirkland.com

11

12

13  Also Present:

14  DeAndrae Shivers, Videographer/Document Technician

15  Jonathan Baker, Analysis Group

16

17

18

19

20

21

22

**Page 5**

1         I N D E X

2  WITNESS          EXAMINATION BY      PAGE

3

4  DR. BRUCE STANGLE

5         MS. COSLETT          7

6         MR. PERWIN          55

7         E X H I B I T S

8               PAGE

9

10  Exhibit 1    Stangle Report          29

11  Exhibit 2    Litigation Services          29

12         Handbook Weil

13  Exhibit 3    Pharmaceutical Industry      32

14         Antitrust Handbook

15

16

17

18

19

20

21

22

09/09/2025        In Re: Effexor XR        Dr. Bruce Stangle
Attorneys Eyes Only

Page 6

```
1        THE VIDEOGRAPHER:  This is the
2   beginning of the videotape of Dr. Bruce
3   Stangle in the matter of In re Effexor.
4        Today's date is September 9, 2025, and
5   the time is 9:29 a.m. Eastern.
6        Counsel, please introduce yourselves,
7   after which our court reporter will swear in
8   the witness.
9        MS. COSLETT:  Good morning.  Caitlin
10  Coslett for Berger Montague PC for the direct
11  purchaser class plaintiffs.
12        MR. PERWIN:  Scott Perwin, Sperling
13  Kenny Nachwalter, for the retailer
14  plaintiffs.
15        MR. BENDHEIM:  Gilad Bendheim,
16  Kirkland & Ellis, for the defendant, Teva.
17        (Witness sworn.)
18
19
20
21
22
```

Page 7

```
1   DR. BRUCE STANGLE,
2     having been duly sworn by Eileen Mulvenna,
3     a Notary Public of the State of New York,
4     was examined and testified as follows:
5   EXAMINATION
6   BY MS. COSLETT:
7        Q.    Okay.  Dr. Stangle, good morning
8   again.  Caitlin Coslett from Berger Montague.  Nice
9   to see you again.
10        Before we get started, I'll just note
11  there's somebody on the Zoom, Jonathan Baker, with
12  Analysis Group.
13        Is he with your office, Dr. Stangle?
14        A.    Yes, he is.
15        Q.    Is he in the room with you?
16        A.    No.  No one's in the room with me.
17        Q.    Okay.  Thank you.
18        So, Dr. Stangle, can you just please
19  state your name and -- and date of birth for the
20  record, sir.
21        A.    Bruce Stangle, January 28, 1948.
22        Q.    And you've been deposed several times;
```

Page 8

```
1   correct, sir?
2        A.    Yes.
3        Q.    And you've --
4        MR. PERWIN:  Sorry.  I was going to
5   say by the same lawyers in some cases.
6        MS. COSLETT:  Same lawyers; right.
7        THE WITNESS:  Correct.
8        MS. COSLETT:  Yeah.
9        THE WITNESS:  Nice to see some old
10  faces.
11        MR. PERWIN:  Older than they were.
12        MS. COSLETT:  Yeah.
13  BY MS. COSLETT:
14        Q.    So you've been deposed remotely as
15  well; correct, sir?
16        A.    Yes, I have.
17        Q.    So you understand generally how this
18  works; right?
19        A.    Yes.
20        Q.    And I'll just say briefly, you know,
21  can we agree that if you don't understand a question
22  that I've asked, that you'll ask for clarification?
```

Page 9

```
1        A.    Agreed.
2        Q.    And I'll tell you, sir, that I
3   represent the direct purchaser class plaintiffs.
4   Mr. Perwin represents the retailer plaintiffs, the
5   sort of opt-outs, as they're sometimes called.  So
6   if I ask a question about the plaintiffs, I'll try
7   to use direct purchaser plaintiffs.  But I do need
8   to refer to the direct purchaser plaintiffs unless I
9   specify the retailer plaintiffs.  But if there's any
10  question about, you know, what group of plaintiffs
11  I'm referring to, please just let me know and I'll
12  try to clean it up.
13        A.    Okay.
14        Q.    When were you retained in this case?
15        A.    Several years ago.  I don't remember
16  exactly when.  Pre-COVID.
17        Q.    You were retained by Teva in this
18  case; correct?
19        A.    Yes.  And Pfizer.
20        Q.    Okay.  So back when you were --
21        A.    Oh, right.
22        Q.    -- retained by Wyeth, who was then a
```

09/09/2025                          In Re: Effexor XR                          Dr. Bruce Stangle
                                   Attorneys Eyes Only

Page 10

1 defendant in the case; is that right?
2        A.       Correct, both -- both parties.
3        Q.       And did you -- did you start work back
4 when you were retained, pre-COVID, on your report?
5        A.       No.
6        Q.       As part of your work in this case,
7 have you talked to anybody at Teva?
8        A.       No.
9        Q.       Have you talked -- did you talk to
10 anybody at Wyeth or Pfizer as part of your work?
11       A.       No.
12       Q.       Have you talked to any of Teva's other
13 experts in connection with your work in this case?
14       A.       No.
15       Q.       Have you been retained by Teva in
16 other cases?
17       A.       Yes.
18       Q.       And which cases are those?
19       A.       I'd have to look at my -- my expert
20 report, which lists some of the cases I've worked
21 on.
22       Q.       Do you have a copy of your expert

Page 11

1 report -- report in front of you, sir?
2        A.       There's -- there's a blank one in the
3 room, but --
4        Q.       Yes.  If you can --
5        A.       I also have --
6        Q.       Yes.
7        A.       I also have this thing that you sent
8 me, so...
9        Q.       I did not -- well, that -- maybe your
10 lawyer sent you a clean copy, but I did not.
11              MS. COSLETT:  I don't know, Gilad, if
12        you know if that's a clean copy or...
13              MR. BENDHEIM:  I think that's from
14        you.
15              MS. COSLETT:  It's not in there.  Yes.
16        If you could -- yes, sorry.
17              MR. BENDHEIM:  You should have a clean
18        copy.
19              Dr. Stangle, if you brought us a clean
20        copy --
21              THE WITNESS:  I did.
22              MR. BENDHEIM:  -- just saying, you can

Page 12

1 grab it.
2              MS. COSLETT:  Yes, that would be
3        great.
4              THE WITNESS:  All right.
5              This is a clean copy of my --
6              MS. COSLETT:  Thanks.
7              THE WITNESS:  -- expert report in this
8        case.
9              MS. COSLETT:  I appreciate it.
10        Thanks.
11 BY MS. COSLETT:
12       Q.       So Appendix A lists your -- your work
13 in -- your testimony in other cases, I believe.
14       A.       Correct.
15       Q.       Look -- could you look at that for a
16 minute and tell me which cases you have -- if
17 that refreshes your memory as to which cases you
18 offered testimony on behalf of Teva -- on behalf of
19 Teva?
20       A.       Right.
21              On page A-3, Lipitor, I think is --
22 Teva was a party that retained me.

Page 13

1              On page A-4, Niaspan is a case that
2 Teva was involved with.
3              Just below that, Lamictal.
4              I think those are the ones.
5        Q.       Okay.  So in Lipitor, the defendants
6 were Pfizer and Ranbaxy, but I think the parties who
7 retained you were Kirkland & Ellis.  Does that sound
8 right?
9        A.       Ranbaxy, yes.  That was with Teva
10 also, but there was no deposition.
11       Q.       Okay.  So in Lipitor, Lamictal and
12 Niaspan, you were retained by the same law firm that
13 retained you here, Kirkland & Ellis; is that fair?
14       A.       Yes.
15       Q.       And if we just stick with your -- your
16 list of prior testimony, which is in Appendix A,
17 there are several pharmaceutical antitrust cases
18 listed here; correct?
19       A.       Yes.
20       Q.       So you offered testimony in Lipitor,
21 Niaspan, Lamictal, Modafinil, Flonase, and
22 [inaudible]; correct?

09/09/2025                    In Re: Effexor XR                    Dr. Bruce Stangle
                           Attorneys Eyes Only

Page 14

1       A.      That's correct.
2       Q.      And in all those cases, you were
3   retained by the defendants; correct?
4       A.      Yes.
5       Q.      And in all of those cases, you offered
6   testimony and opinion -- and gave opinions that the
7   damages calculations by the plaintiffs in those
8   cases were -- were too high; correct?
9       A.      No.
10      Q.      In which case did you not offer such
11  an opinion?
12      A.      I believe Flonase, I did not offer
13  that opinion.
14      Q.      So Flonase, you just addressed
15  certification but not damages; is that your point?
16      A.      Correct.
17      Q.      Okay.  And in Flonase, you were
18  retained by the defendant; correct?
19      A.      Yes.
20      Q.      So your -- did you offer an opinion in
21  Flonase that certification was not appropriate?
22      A.      Yes.

Page 15

1       Q.      And then in the other cases I
2   mentioned -- Lipitor, Niaspan and Modafinil -- did
3   you offer opinions that the damages calculations by
4   the plaintiffs' experts were too high?
5       A.      I'd have to go back and look at each
6   one of them.  I would say most of them, yes, but
7   maybe not all of them.
8       Q.      And Lipitor, you offered an opinion
9   that class certification was not appropriate;
10  correct?
11      A.      Yes.
12      Q.      And as part of that work, you
13  evaluated the plaintiffs' calculation of damages and
14  identified what you believed were problems with the
15  plaintiffs' damages calculations; correct?
16      A.      Yes.
17      Q.      And then in Lamictal and Modafinil,
18  you addressed damages on behalf of the defendants;
19  correct?
20      A.      Which case did you say?
21      Q.      Sorry.  What did I say?  Lamictal,
22  Niaspan and Modafinil.

Page 16

1       A.      Like I -- I just mentioned I'd have to
2   go back to the cases to verify exactly what the
3   topics were.
4       Q.      Okay.  But your Appendix A says that
5   you addressed damages; correct?
6       A.      I'm having a little trouble hearing
7   you.
8       Q.      Okay.
9       A.      Can you talk into the microphone a
10  little better.
11          MS. COSLETT:  Let me -- can we go off
12      the record for a second, please, so I can try
13      to fix this.
14          THE VIDEOGRAPHER:  All right.  The
15      time is 9:39 a.m.  We're off the record.
16          (Pause.)
17          THE VIDEOGRAPHER:  The time is
18      9:42 a.m.  We're back on the record.
19  BY MS. COSLETT:
20      Q.      Dr. Stangle, did you start preparing
21  your report before or after you received the reports
22  from Dr. Leffler and Dr. Leitzinger in this case?

Page 17

1       A.      I started preparing my report after I
2   received those two reports.
3       Q.      Approximately how many hours have you
4   spent -- did you spend working on your report?
5       A.      I haven't gone back and looked at
6   that.  Quite a few.  I really don't know exactly how
7   many.
8       Q.      More than -- more than a hundred
9   hours?
10      A.      Well, I haven't counted it up.  I
11  don't know.  More than 50, but I don't know if it's
12  more than a hundred.
13      Q.      And do you know how much Teva has paid
14  for your work in this case altogether, including the
15  work of your staff?
16      A.      No, I don't.
17      Q.      Do you have an estimate?
18      A.      No.  I don't see the invoices.
19      Q.      All right.  Could you please turn to
20  Appendix B of your report.  And just for the record,
21  this is the July 17th, 2025, report you issued in
22  this case, in the Effexor XR case.

Page 18

1      A.    Okay.

2      Q.    Okay.  Appendix B lists the materials
3  you considered in reaching your opinions; is that
4  correct?

5      A.    Yes.

6      Q.    Okay.  And if you look at page B4 of
7  this appendix, you list Bates-stamped documents that
8  you considered; is that correct?

9      A.    Yes.

10      Q.    And you did not cite any Bates-stamped
11  documents that were purchased data files that were
12  produced by the direct purchaser class plaintiffs in
13  this case; correct?

14      A.    I didn't cite -- what did you say it
15  was?  What kind of document?

16      Q.    Well, I'll just start with this.

17      Are you aware that the direct
18  purchaser class plaintiffs produced purchase data
19  files, data showing their purchases of branded
20  generic Effexor XR?

21      A.    Oh.  I think those are the documents
22  that are cited in the plaintiff experts' reports.

Page 19

1  And so I'm -- I'm including the review of -- you
2  know, when I cite that I reviewed the Leffler and
3  Leitzinger reports, it includes all of the data
4  cited by them.

5      Q.    Dr. Leitzinger used manufacturer sales
6  data for his calculations; correct?

7      A.    Yes.

8      Q.    And he did not use, for his
9  calculations, purchase data files produced by the
10  direct purchaser class plaintiffs; correct?

11      A.    I believe that's correct, yes.

12      Q.    Okay.  So you used the same -- your
13  testimony is you used and considered the same data
14  files that Dr. Leitzinger used, which were the
15  manufacturer sales data files; correct?

16      A.    No.  Dr. Leffler used the purchaser
17  data.  And so I used both datasets.

18      Q.    Okay.  Okay.  That's fair.

19      Okay.  So for purposes of responding
20  to Dr. Leitzinger and his opinions on behalf of the
21  direct purchaser class plaintiffs, you used and
22  considered the manufacturer sales data; is that

Page 20

1  correct?

2      A.    I saw the data that Dr. Leitzinger
3  relied on plus some of the data that Dr. Leffler
4  relied on, because at -- at certain points in my
5  report, as I'm sure you noticed, I compare the
6  approaches of the two plaintiffs' experts.

7      Q.    So the data that Dr. Leffler relied on
8  relates to purchases by the national wholesalers and
9  purchases by the retailer plaintiffs; correct?

10      A.    I believe so, yes.

11      Q.    But he didn't -- he didn't -- excuse
12  me.

13      But Dr. Leffler did not go look at
14  data files produced by the proposed class
15  representatives, Rochester Drug, for example;
16  correct?

17      A.    No, I don't think he did.

18      Q.    Okay.  And so you, as part of your
19  work, you didn't go look at the purchase data files
20  produced by the proposed class representatives, such
21  as Rochester Drug; correct?

22      A.    I -- I don't know.  I may have.  You

Page 21

1  know, when I say "I," I'm referring to my team.  We
2  may have.  I don't know.

3      Q.    Okay.  But if you did, it would be
4  listed here, correct, on your -- in your Appendix B?

5      A.    No, because that data that you're
6  referring to, I believe, is referenced in the
7  Leffler and Leitzinger reports.

8      Q.    Oh, I -- okay.  Okay.

9      A.    And to the extent that they relied on
10  it, we looked at all of that data that they relied
11  on.

12      Q.    Fair enough.

13      So, in other words, if one of the two
14  experts you were responding to, Dr. Leitzinger or
15  Dr. Leffler, relied on or looked at, you know,
16  Rochester Drug purchase data, then you would have
17  looked at it too; is that your testimony?

18      A.    Yes.

19      Q.    But if they did not look at Rochester
20  Drug-produced purchase data and it's not listed in
21  your Appendix B, then you would not have looked at
22  it; is that correct?

09/09/2025                          In Re: Effexor XR                    Dr. Bruce Stangle
                                 Attorneys Eyes Only

Page 22

1      A.      Yes.

2      Q.      Okay.  Can you please turn to your
3   Exhibit 3, which is near the end of your report.

4      A.      Yes.

5      Q.      So you have a source on Exhibit 3 that
6   says Dr. Leitzinger manufacturer data.

7              Do you see that?

8      A.      Yes.

9      Q.      And you have a similar source on, for
10  example, Exhibit 9 of your report.  I'll let you
11  take a second to get there.

12     A.      Correct.

13     Q.      Okay.  And I think that source is
14  used, you know, elsewhere in your report; is that
15  fair?

16     A.      Yes.

17     Q.      Okay.  And what you mean by that is
18  that for purposes of putting together the exhibits
19  in your report that cite as a source
20  Dr. Leitzinger's manufacturer data, that you
21  essentially took the manufacturer data that
22  Dr. Leitzinger used and took the way that he sort of

Page 23

1   processed the data to calculate net prices and you
2   used that process data in your analysis; is that
3   correct?

4      A.      Yes.

5      Q.      Okay.  And you didn't make any changes
6   to how Dr. Leitzinger calculated the net prices that
7   class members actually paid from the manufacturer
8   data produced by Wyeth and Teva and the other
9   manufacturers; is that correct?

10     A.      Well, I'm glad you brought that up,
11  because I have a footnote in my report, Footnote 75.
12  And I say that for purposes of examining the net
13  prices paid and volumes purchased by direct
14  purchasers, I used Dr. Leitzinger's methodology.
15  But I don't attempt to match charge-backs and
16  rebates and other credits to sales transactions.  So
17  I wasn't trying to dispute Dr. Leitzinger's or
18  challenge Dr. Leitzinger's calculation of net
19  prices.

20             But as I say here in this footnote, I
21  reserve the right to do that later in this
22  litigation, because I think that he hasn't actually

Page 24

1   done it correctly.  He hasn't properly accounted for
2   charge-backs, rebates and other credits.  But I
3   thought for purposes at this stage of the
4   litigation, I wouldn't engage in a full-scale data
5   cleaning.

6      Q.      Okay.  So at this point, you have not
7   offered any opinion as to the cleaning of the -- and
8   the processing of the manufacturer data by
9   Dr. Leitzinger; correct?

10     A.      Well, yeah, I've looked at it.  I
11  don't think he did it correctly.  And given more
12  time, I would probably be asked to look into that
13  more carefully and perhaps render new opinion, but
14  we haven't gotten there yet.

15     Q.      And so you haven't offered such an
16  opinion at this point about Dr. Leitzinger's data
17  processing; correct?

18     A.      No, other than I don't think he did it
19  correctly.

20     Q.      But you didn't even offer that opinion
21  in the -- in your report in this case; isn't that
22  correct, sir?

Page 25

1      A.      That's right.

2      Q.      So at this point, you reserve the
3   right to offer such an opinion, but you have not
4   offered any opinion related to the cleaning of --
5   Dr. Leitzinger's cleaning or processing of the
6   manufacturer data; correct?

7      A.      Correct.

8              MR. BENDHEIM:  Objection to form.

9              THE WITNESS:  That's correct.

10  BY MS. COSLETT:

11     Q.      Okay.  And then just going back to --
12  when you say the source of Dr. Leitzinger's
13  manufacturer data, that's referring -- manufacturer
14  data refers to the data produced by Wyeth, Teva and
15  other manufacturers of branded generic Effexor XR
16  showing sales and discounts to direct purchasers;
17  correct?

18     A.      Yes.

19     Q.      And that's distinct -- when you cite
20  that, you're saying that -- I'm sorry.

21             When your source says -- start over.
22  Strike that.

Page 26

1          When you list as a source
2  Dr. Leitzinger's manufacturer data, that's referring
3  to, you know, manufacturer data and not to the data
4  I was asking you about earlier, data produced by
5  specific class members showing their specific
6  purchases; correct?
7      A.    Different -- that's different dataset.
8      Q.    At a high level, Dr. Stangle, do you
9  agree that the net prices that class members paid
10 are the basis for evaluating class member injury and
11 damages as opposed to the gross prices that class
12 members paid?
13     A.    Yes, provided you calculate those
14 prices correctly.
15     Q.    Okay.  But -- so correctly calculated
16 net prices are the proper thing to consider for --
17 for evaluating class member injury and damages;
18 correct?
19         MR. BENDHEIM:  Objection to form.
20         You can answer.
21         THE WITNESS:  Yes.
22

Page 27

1  BY MS. COSLETT:
2      Q.    Is that correct?  Okay.
3      A.    Yes.
4      Q.    Okay.  Do you agree that the
5  overcharge represents the difference between the net
6  price paid by the plaintiffs and the net price the
7  plaintiffs would have paid absent the antitrust
8  violation?
9      A.    The way I like to put it is the
10 difference between the but-for price and the actual
11 price, with the actual -- both prices being stated
12 on a net basis.
13     Q.    Okay.  And the but-for price is the
14 price that would have been paid absent the antitrust
15 violation?
16     A.    Correct.
17     Q.    Okay.  I do want to use an exhibit.
18 So you can open up, Dr. Leitzinger -- Dr. -- excuse
19 me, Dr. Stangle, you can open up the envelope.
20     A.    Okay.  Let the record show that this
21 was not previously open.
22     Q.    Appreciate it, sir.  Thank you.

Page 28

1      A.    It arrived yesterday.
2          Okay.  There are many manila folders
3  here.
4      Q.    Yes.  If you could please --
5      A.    They're labeled A, B -- no.  There're
6  four, A, B, C and D.
7      Q.    Okay.  That's funny, because I have
8  numbered ones.  Let's try B, I guess.
9      A.    This -- the label says B, pages from
10 ABA pharmaceutical industry.
11     Q.    Okay.  No, I want the Weil -- I want
12 an excerpt from the Weil, "The role of financial
13 expert in litigation services."
14     A.    Okay.  That's C.  Yes.
15     Q.    So I have uploaded these to the -- the
16 potential exhibits to the link.
17         MS. COSLETT:  I also -- Gilad, if it's
18 easiest, I can drop the document -- I'll just
19 put it in the chat.
20         MR. BENDHEIM:  I have the link, but
21 I'm not seeing an updated.
22         MS. COSLETT:  Okay.  Well, that might

Page 29

1  be because I put it -- it's also in the chat.
2          MR. PERWIN:  Okay.  I got it.  I got
3  it in the chat.
4          MS. COSLETT:  Okay.  So let's -- for
5  the record, I'm going to mark as Exhibit 1
6  the Stangle report dated July 17th, 2025,
7  which is also in the chat, also the link.
8  And everybody has that.
9          (Exhibit 1, Stangle Report, received
10 and marked.)
11         MS. COSLETT:  Exhibit 2 to today's
12 deposition will be this Litigation Services
13 Handbook, the Role of the Financial Expert,
14 authored by Weil, et al.  And this is just an
15 excerpt of the handbook.
16         (Exhibit 2, Litigation Services
17 Handbook Weil, received and marked.)
18 BY MS. COSLETT:
19     Q.    Okay.  So, Dr. Stangle, you have it
20 before you?
21     A.    I do.  I have this document.
22     Q.    Okay.  Thank you.

Page 30

```
1              So you cite this document in
2    Footnote 32 of your report; correct, sir?
3         A.   Yes.
4         Q.   And if you look at the handbook,
5    page 11 of Chapter 24, which is the excerpt I sent
6    to you, I'd like to draw your attention to
7    Section 24.5, which discusses a calculation of
8    antitrust damages and specifically the discussion of
9    how to calculate overcharge damages.
10             And just let me know when you've had a
11   second to review.
12             (Document review.)
13             THE WITNESS:  Okay.  I've looked at
14   it.
15   BY MS. COSLETT:
16        Q.   Okay.  And my question is just whether
17   you agree or disagree with the sentence, the
18   third full sentence of that section, that the
19   overcharge is the difference between the price paid
20   by the plaintiff and the price the plaintiffs would
21   have paid after the antitrust violation.
22        A.   I do not disagree with that.
```

Page 31

```
1         Q.   Okay.  You can put that aside.
2              And I'd like to turn now to
3    paragraph 51 of your report, please.
4              So in paragraph 51, you discuss
5    Exhibit 5 of your report, which you say shows the
6    gross price for Teva's generic Effexor XR in its
7    first -- first month of sales for the 35 -- 37.5, 75
8    and 150-milligram strengths.
9              Do you see that?
10        A.   Yes.
11        Q.   Why are you looking at gross prices
12   when you explain the net prices are the relevant
13   measure of antitrust injury and damages?
14        A.   This Exhibit 5 and paragraph 51, we're
15   not prepared to show how to calculate the but-for
16   price.  They were prepared to show that prices vary
17   considerably when you look across both strength and
18   type of purchaser.
19             Exhibit 5, for example, shows that
20   wholesalers tend to pay dramatically higher prices
21   than pharmacies and PBMs and insurers.  And I
22   criticize Dr. Leitzinger for not taking account of
```

Page 32

```
1    this extreme variation.
2         Q.   But Exhibit 5 doesn't show -- does not
3    show variation in net prices, correct?  It shows
4    variation gross prices.
5         A.   That's correct.
6              MS. COSLETT:  Okay.  I'd like to mark
7    as Exhibit 3 the antitrust handbook, the
8    pharmaceutical industry antitrust handbook.
9              (Exhibit 3, Pharmaceutical Industry
10   Antitrust Handbook, received and marked.)
11             THE WITNESS:  I have that.
12             MS. COSLETT:  Okay.  And this is also,
13   for the record, an excerpt of the handbook,
14   which is a book.
15             Gilad, let me know when you're ready
16   and have it.
17             MR. BENDHEIM:  I'm ready.
18             MS. COSLETT:  Thanks, excellent.
19   BY MS. COSLETT:
20        Q.   Okay.  Your report cites this handbook
21   that I've marked as Exhibit 3, this pharmaceutical
22   industry antitrust handbook; correct?
```

Page 33

```
1         A.   Yes, some -- at some point.  I
2    don't --
3         Q.   Okay.
4         A.   I don't recall which footnote.
5         Q.   Yeah.  No problem.  And the details
6    are not important.
7              Okay.  So let's please turn to page 24
8    of the excerpt.
9         A.   Yes.
10        Q.   And this handbook has a whole section
11   on generics, quote, compete based on price; is that
12   correct, sir?
13        A.   Yes.
14        Q.   You can put that -- put that aside.
15             Okay.  Dr. Stangle, we discussed this
16   earlier, the sort of -- the fact that there are
17   proposed class representatives in this case.  There
18   are three -- three named proposed direct purchaser
19   class plaintiffs in this case.  And there're
20   Rochester Drug Co-Operative, Stephen LaFrance
21   Holdings dba SAJ Distributors, and Uniondale
22   Chemists; is that correct, sir?
```

09/09/2025
In Re: Effexor XR
Attorneys Eyes Only
Dr. Bruce Stangle

Page 34

```
1          A.      Yes.
2          Q.      You did not identify either Rochester
3   Drug or the SAJ Distributors class representatives
4   as among the purportedly uninjured class members
5   that you identified; correct?
6          A.      That's correct.
7          Q.      Okay.  You also don't -- don't--
8   strike that.
9                  You also did not identify the national
10  wholesalers as among the purportedly uninjured class
11  members that you identified; correct?
12         A.      Could you repeat that question.
13         Q.      Sure.  Are you aware of the national
14  wholesalers, meaning Cardinal Health; McKesson; and
15  Amerisource drug -- AmerisourceBergen Drug
16  Corporation, which is now known as Cencora?
17         A.      I refer to them as the big three.
18         Q.      Okay.  So the big three.  I'll use
19  your terminology.  No problem.
20                 The big three, meaning
21  AmerisourceBergen, McKesson and Cardinal Health,
22  those are not -- none of those three is among the
```

Page 35

```
1   purportedly uninjured class members that you
2   identified in your report; correct?
3          A.      That's correct.
4          Q.      Can you turn to page 61 of your
5   report, please.  I'm sorry.  Paragraph 61.
6   Paragraph 61.
7          A.      I'm there.
8          Q.      Okay.  So starting at paragraph 61,
9   you discuss consolidation as between and among
10  members of the direct purchaser class; correct?
11         A.      Yes.
12         Q.      And you also identify and discuss, you
13  know, retailer plaintiffs that, in your view, should
14  not be counted as direct purchaser class plaintiffs
15  because you anticipate that they will opt out of the
16  class; is that correct?
17         A.      Yes.
18         Q.      Okay.  So I just want to go to a basic
19  point.  Starting with, you know, Dr. Leitzinger
20  identified in his report a list of 67 class members.
21  I understand you have the criticisms that we just
22  discussed, the consolidation --
```

Page 36

```
1                  THE REPORTER:  I'm sorry.  I'm sorry.
2          MS. COSLETT:  Yes.  Okay.  I'll start
3      over.  Let me start over.
4   BY MS. COSLETT:
5          Q.      So Dr. Leitzinger provided a list of
6   67 class members in his report; correct, sir?
7          A.      He started out with that number, yes.
8          Q.      Right.
9                  And setting aside for a moment the two
10  arguments you have as to why that class size should
11  be reduced, as well as your other arguments about
12  uninjured class members, setting those arguments
13  aside, you don't dispute that each of the
14  67 entities listed on Dr. Leitzinger's class list
15  appears in the sales data produced by Wyeth and Teva
16  as a direct purchaser during the class period;
17  correct?
18         A.      I don't dispute that there're direct
19  purchasers?  Is that what you're saying?
20         Q.      That they appear in the sales data --
21  yes, I don't dispute that there're direct purchasers
22  based on the sales data produced by Wyeth and Teva
```

Page 37

```
1   in this case.
2          A.      Well, Uniondale actually never bought
3   a single pill.  They only appear as a direct
4   purchaser as the result of assignment.
5          Q.      Okay.  And what about the other 66,
6   you agree, don't you, that they appear as a direct
7   purchaser -- each appears as a direct purchaser in
8   the sales data produced by Wyeth and Teva?
9          A.      I -- that's -- I believe that's true,
10  yes.
11         Q.      Okay.  And the exception is Uniondale,
12  who's listed as a class member based on an
13  assignment from the direct purchaser; correct?
14         A.      Correct.
15         Q.      As part of your work, you
16  identified -- well, just look at paragraph 61 a. of
17  your report.  You say, "AmerisourceBergen now owns
18  American Health Packaging, Bellco, Valley Wholesale
19  Drug, and H.D. Smith Wholesale."
20                 Do you see that, sir?
21         A.      Yes.
22         Q.      As part of your work in this case,
```

09/09/2025 | In Re: Effexor XR | Dr. Bruce Stangle
Attorneys Eyes Only

Page 38

1    what, if any, investigation did you do regarding
2    whether Valley Wholesale Drug, for example, exists
3    as a separate legal entity today?
4          A.    The work I did is mentioned in the
5    tables and backup papers to my report.  So I -- I
6    tracked down transactions involving the class
7    members.  And Valley Wholesale Drug is a
8    wholly-owned subsidiary of AmerisourceBergen.  That
9    transaction occurred in January 2018.  And --
10         Q.    But you don't know -- I'm sorry,
11   finish.
12         A.    As I mention in Exhibit 8, Valley
13   Wholesale Drug is a subsidiary of AmerisourceBergen.
14         Q.    Do you know, sitting here today,
15   whether Valley Wholesale Drug is a separate legal
16   entity or not?
17               MR. BENDHEIM:  Objection to form.
18               THE WITNESS:  Well --
19               MS. COSLETT:  Yeah.  It's a bad
20         question.  Let me start over.
21   BY MS. COSLETT:
22         Q.    Do you know whether Valley Wholesale

Page 39

1    Drug is a separate legal entity today?
2          A.    It may well be, but that's immaterial
3    to my opinion.
4          Q.    It's immaterial.  So you didn't -- you
5    did not undertake any investigation as to whether
6    Valley Wholesale Drug or the other consolidated
7    entities you identified are separate legal entities
8    today; is that correct?
9                MR. BENDHEIM:  Objection to form.
10               THE WITNESS:  That's irrelevant.
11               MR. BENDHEIM:  Objection to form.
12               THE WITNESS:  Yeah.  That's
13         irrelevant.  If there're a wholly-owned
14         subsidiary, from an economic perspective,
15         they're -- whether or not there're a legal
16         entity -- separate legal entity is
17         meaningless to me because AmerisourceBergen
18         controls them.  The parent company controls
19         the subsidiary.
20   BY MS. COSLETT:
21         Q.    Okay.  I understand your opinion.
22               But sitting here today, you have not

Page 40

1    done any investigation -- is it fair to say you have
2    not investigated whether the class members listed on
3    Dr. Leitzinger's class list are separate legal
4    entities today?
5                MR. BENDHEIM:  Objection to form.
6                THE WITNESS:  As I stated, that's
7          irrelevant to my opinion.
8    BY MS. COSLETT:
9          Q.    So you did not undertake that work;
10   correct?
11         A.    That's right.
12         Q.    Can you turn to paragraph 76 of your
13   report, please.
14         A.    Okay.
15         Q.    Paragraph 76, you offer the opinion --
16   well, you tell me.
17               What opinion are you offering in
18   paragraph 76?
19         A.    That M&A activity is an indicia of the
20   ability to cooperate.  And there's considerable M&A
21   activity in this industry.
22               And, furthermore, many of the proposed

Page 41

1    class members participate in litigation together.
2    So these -- these companies, the -- the proposed
3    class members often interact one way or another to
4    collaborate, cooperate and pursue joint goals.
5                And then I say -- say at the end that
6    it's economically inappropriate to treat affiliates
7    as independent participants, because the parent
8    company is the controlling entity.  The subs should
9    be consolidated under the parent as an economic
10   matter.
11         Q.    Okay.  Are you aware that fortune --
12   you're aware that in cases where class certification
13   has been denied in these types of direct purchaser
14   antitrust cases, that some class members have sued
15   in subsequent joinder actions; correct, sir?
16         A.    Yes.
17         Q.    Okay.  And are you aware that in those
18   cases where there are joinder actions following the
19   denial of class certification, that the defendants
20   have required each separate legal entity to sit for
21   a deposition and produce documents on its own?
22         A.    I -- I wasn't previously aware of

Page 42

1   that.  I wasn't previously aware.  But I suppose it
2   doesn't surprise me.
3         Q.      I just want to go back to the
4   consolidation point for a second before we move on,
5   which is can you identify, sitting here today, any
6   entity listed on the 67-member class list included
7   in Dr. Leitzinger's report that you contend is not a
8   separate legal entity today?
9         A.      I haven't looked at the issue of legal
10  entity.
11        Q.      Okay.  So you can't identify any
12  entity like that on Dr. Leitzinger's class list,
13  correct, because you haven't looked at it?
14        A.      I haven't looked at that yet.
15        Q.      Okay.  In paragraph -- starting at
16  paragraph 77, you consider -- you discuss the fact
17  that when certification has been denied, certain
18  former putative class members have filed joinder
19  actions; correct?
20        A.      Yes.
21        Q.      Okay.  And you're aware, aren't you,
22  that in those cases following the denial of

Page 43

1   certification, that not all class members have filed
2   joinder actions; correct?
3         A.      I'll take your word for that.
4         Q.      Okay.  Can you please turn to
5   paragraph 114 of your report.
6         A.      Okay.
7         Q.      Okay.  So I just want to reorient you
8   here.  You're discussing, in this section,
9   Dr. Leffler's calculations related to the retailer
10  plaintiffs.  As I have mentioned, you know, I
11  represent the direct purchaser class plaintiffs, not
12  the retailer plaintiffs.
13              And so my questions really relate to
14  the relevance of your discussion in your
15  paragraphs 114 and 115, you know, and any
16  calculations that Dr. Leitzinger does or may do to
17  remove the damages related to assignment purchases.
18  So that's just -- that's just a statement to sort of
19  orient ourselves.  I'll ask you a question in a
20  second.
21              You know, you say in paragraph 114
22  that Dr. Leffler should calculate assignment damages

Page 44

1   using the assigner's purchase price.
2         Q.      Do you see that?
3         A.      Yes.
4         Q.      And, in your opinion, would that --
5   the same also go for Dr. Leitzinger if and when he
6   removes assignment damages from the direct purchaser
7   class damages total?
8         A.      Well, I think the principle is if --
9   if you have a direct purchaser who's clearly a
10  direct purchaser, then the first price they pay to
11  the alleged price fixer or antitrust defendant
12  should be the -- should be the transaction's price
13  that is used for analytical purposes.
14        Q.      Okay.  So when Dr. Leitzinger -- if
15  and when Dr. Leitzinger removes assignment damages
16  in connection with the retailer plaintiffs being
17  removed from the class or potentially being removed,
18  you're saying those assignment damages that
19  Dr. Leitzinger's removing should be calculated based
20  on the assigners' purchase price; is that correct?
21        A.      Correct.
22        Q.      Okay.  What do you mean by assigner's

Page 45

1   purchase price?  Is that the average price paid by
2   the assigner to the manufacturer for the units of
3   purchase?
4         A.      That's a direct purchaser.  The
5   assigner is the direct purchaser.
6         Q.      Right.  So -- okay.
7               So if I'm looking at a direct
8   purchaser assigner and I want to remove the damages
9   associated with -- let's just use McKesson as an
10  example.  McKesson is an assigner.  It assigns part
11  of its claim to one of the retailer plaintiffs.  And
12  the assignment damages, you're saying, should be
13  removed from the direct purchaser class plaintiffs'
14  damages total; correct?
15        A.      Yes.
16        Q.      And in removing those -- those damages
17  that were McKesson damages that have been assigned
18  to McKesson's assigner -- assignee, one of the
19  retailer plaintiffs, the price that should be used
20  in the calculation of the assignment damages that
21  are being removed is McKesson's average price paid;
22  is that correct?

Page 46

1        A.        Not the price, the overcharge.

2        Q.        The overcharge.  Okay.

3                  But the overcharge that McKesson

4    incurred -- so you would remove damages based on the

5    overcharges that McKesson incurred; is that correct?

6        A.        That McKesson incurred but have been

7    assigned to, say, CVS.

8        Q.        Right.  So you remove the overcharges.

9                  And to calculate those overcharges

10   that are being removed because of the assignment

11   from McKesson to CVS, for example, you would use as

12   a basis for that calculation the average price that

13   McKesson paid for all of its purchases; correct?

14                  MR. BENDHEIM:  Objection to form.

15                  THE WITNESS:  No, I wouldn't use the

16            average price.  I'd use the actual

17            transaction.

18   BY MS. COSLETT:

19       Q.        What do you mean by that?

20       A.        Well, if you have transaction data --

21   you know, for example, on August 15th, 2009, were

22   McKesson arguably bought something that they were

Page 47

1    overcharged for, a single transaction involving, you

2    know, multiple tablets, but then they assigned that

3    transaction to CVS.  The overcharges on that

4    transaction should be removed from Dr. Leitzinger's

5    damages total.  There's no -- there's no average

6    here.  It's what was the price for that transaction.

7        Q.        So the transaction meaning the price

8    paid for the units by McKesson that are then resold

9    to CVS.  Is that what you're saying?

10       A.        No.  I don't -- I don't know if by

11   assigning that claim to CVS there had to be a

12   transaction between McKesson and CVS.  I'm not sure

13   that's part of the contract.  It's just an

14   assignment.

15       Q.        Okay.  Okay.  Yeah, that's fair

16   enough.  Okay.  Let me start over.

17                  So when you say, in paragraph 114 of

18   your report, the damages should be calculated using

19   the assigner's purchase price, right, and then

20   you've testified that should also be used by

21   Dr. Leitzinger when he removes assignments damages,

22   you're saying in the example we've been using with

Page 48

1    the McKesson assignment to CVS Pharmacy, the

2    purchaser's price that should be used to calculate

3    the assignment damages that are removed from

4    Dr. Leitzinger's calculations, that price should be

5    the price that the assigner, McKesson, paid to the

6    manufacturer for units of branded generic Effexor XR

7    for which, you know, that was then assigned to CVS

8    by operation of the assignment agreement; is that

9    correct?

10                  MR. BENDHEIM:  Objection to form.

11                  THE WITNESS:  That was such a long

12            question.

13   BY MS. COSLETT:

14       Q.        Yes, yeah.

15                  (Cross talk.)

16                  THE WITNESS:  I think you got it

17            right.

18                  MS. COSLETT:  Yes.

19                  THE WITNESS:  I think you got it

20            right.

21   BY MS. COSLETT:

22       Q.        I want to make sure, because it was --

Page 49

1    let me -- let me try again, because I -- I want to

2    know that I got it correct.  Let me try again.

3                  So you're with me on the -- on the

4    sort of example that we're using here, the McKesson

5    assigned to CVS --

6        A.        Yes.

7        Q.        -- pharmacy; correct?  Okay.

8        A.        Yes.

9        Q.        And there's purchases that are covered

10   by that assignment; correct?

11       A.        Yes.

12       Q.        And those purchases were initially

13   made by the direct purchaser, McKesson, who

14   purchased the assigned volumes of branded generic

15   Effexor XR from either Wyeth or Teva; correct?

16       A.        Yes.

17       Q.        Okay.  And you're saying when your --

18   Dr. Leitzinger removed the assignment damages, what

19   he should be doing is looking at the price that

20   McKesson paid for those units to Wyeth and Teva;

21   correct?

22       A.        Yes.

Page 50

1          MR. BENDHEIM:  Objection to form.
2  BY MS. COSLETT:
3       Q.    Okay.
4       A.    I cover this in paragraph 107 of my
5  report.  And I give an example of using CVS, just as
6  we have been here.  And I mention that
7  Dr. Leitzinger only removes CVS's direct purchases,
8  not any purchases made by its assigner.  So this is
9  the nature of the problem.
10      Q.    Yeah.  Yeah.  No, no.  I understand.
11  And I'm -- I mean, yeah, I understand.  I understand
12  your concern.
13      A.    I think it's better stated in
14  paragraph 107 than 114, which you were directing me
15  to.
16      Q.    Yeah.  I hear you.  I guess I just
17  wasn't sure from paragraph 107 how to -- how, in
18  your opinion, those double counted damages should be
19  removed.  So 115 should provide a little more
20  information, but --
21      A.    Okay.
22      Q.    Yeah.  Anyway, we don't need to have a

Page 51

1  conversation.  That's why I was directing you to
2  115, but I understand.  Okay.  Or 114 and 115.
3          So, you know, sticking with, I guess,
4  if you can go to paragraph 115 of your report.  And
5  I understand that this all in the context of 107,
6  which is where you talk about removal.
7       A.    Yes.
8       Q.    I just -- I did not understand if we
9  were -- you know, again, my focus is removing the
10  assignment volumes from Dr. Leitzinger's damages
11  calculations from the direct purchaser class.
12          But, you know, as part of that work,
13  is the difference -- is there any relevance to the
14  difference you highlight between the --
15  Dr. Leffler's per-unit brand generic overcharge
16  charged during the delay period and -- you know,
17  which is -- you say is ████ a capsule, and the fact
18  that the overcharge that Dr. Leitzinger calculated
19  during the same period to be ████ per capsule,
20  what's the --
21      A.    The reason?
22      Q.    Yeah.

Page 52

1       A.    Go ahead.  What's your question again?
2       Q.    My question is, what -- does that
3  sentence, this comparison that you have in
4  paragraph 115 of the ████ per capsule, which is
5  higher than the ████ per capsule, was that -- what,
6  if any, relevance does that have to any work that
7  Dr. Leitzinger may do with respect to removing --
8          THE REPORTER:  I'm sorry.  Repeat the
9          end, please.  Removing?
10         MS. COSLETT:  Yes.
11  BY MS. COSLETT:
12      Q.    What, if any, relevance does the
13  comparison that is included in paragraph 115 of your
14  report of the ████ per capsule that Dr. Leffler
15  calculated as the brand generic overcharge during
16  the delay period to the ████ per capsule overcharge
17  that Dr. Leitzinger calculated over the same period,
18  what, if any, impact does that have to any
19  calculation Dr. Leitzinger may do to remove
20  assignment volumes and damages?
21         MR. BENDHEIM:  Objection to form.
22         THE WITNESS:  I'm sorry, Caitlin.

Page 53

1  These are hard.
2  BY MS. COSLETT:
3       Q.    Well, let's see.  Dr. Stangle, do you
4  understand the question or --
5       A.    Yes, I do.
6       Q.    I just really want to understand the
7  sentence that starts out "I found Dr. Leffler's
8  per-unit brand generic over" -- I'll read the
9  sentence and then I'll ask you a question.  Maybe
10  that will be better.
11         The sentence I'm asking about is "I
12  found Dr. Leffler's per-unit brand generic
13  overcharge during the delay period, ████ per
14  capsule, to be materially higher than the ████ per
15  capsule per-unit brand generic overcharge estimated
16  by Dr. Leitzinger over the same period."
17         What, if any, relevance does that
18  observation or sentence have on any work that
19  Dr. Leitzinger may do, remove assignment volumes and
20  damages from his calculation of total direct
21  purchaser class overcharge damages?
22      A.    Okay.  This -- that sentence and this

**Page 54**

1  paragraph is mainly about Dr. Leffler and problems
2  that he has, but I don't want to imply that I
3  believe the ▮▮ and ▮▮ are correct.  So there's
4  other adjustments that Dr. Leitzinger should make
5  based upon other criticisms that I've had.  And I
6  think he should reduce that ▮▮ considerably.  But
7  this is more about Dr. Leffler using the wrong price
8  data.
9         Q.    Okay.  So that observation is not
10 relevant to Dr. Leitzinger -- any work that
11 Dr. Leitzinger may do in connection with removing
12 assignment volumes and damages; is that correct?
13        A.    It doesn't directly relate to that.
14        Q.    Okay.  Okay.
15              THE WITNESS:  I'd like to take a --
16 yeah.  I'd like to take a break --
17              MS. COSLETT:  Yeah.
18              THE WITNESS:  -- if not now --
19              MS. COSLETT:  That's -- let's do it.
20 Let's take a break.
21              THE VIDEOGRAPHER:  All right.  The
22 time is 10:33 a.m.  We're off the record.

**Page 55**

1              (Recess from the record.)
2              THE VIDEOGRAPHER:  The time is
3  10:57 a.m.  We are back on the record.
4              MS. COSLETT:  Dr. Stangle, thank you
5  for your time.  I have no further questions
6  at this time, subject to any questions your
7  counsel may have.
8              Anything else?
9              THE WITNESS:  Thank you.
10             MR. PERWIN:  I just have a few,
11 Dr. Stangle.  I guess it's going to be an
12 early day.
13 EXAMINATION
14 BY MR. PERWIN:
15        Q.    Let me ask you to take a look at
16 paragraph 112 of your report just for context.
17             And you say in paragraph 112 that one
18 of the defendants' experts, Steve Galson -- I think
19 it's Dr. Galson -- will offer an opinion that it
20 would have been unlikely for Teva to have received
21 final approval from the FDA earlier than June 28th,
22 2010.

**Page 56**

1              Do you see that?
2        A.    Yes.
3        Q.    That's not an opinion that you're
4  offering yourself; is that correct?
5        A.    That's correct.
6        Q.    And you are similarly not offering any
7  opinion as to whether Dr. Galson's testimony is more
8  persuasive or reliable than the expert that the
9  plaintiffs hired on this -- on that issue; correct?
10        A.    That's correct.
11        Q.    And the same is true for the issue of
12 whether Mylan could have received FDA approval
13 earlier than it actually did.
14             You're not offering an opinion on that
15 issue; right?
16        A.    Only to the extent that neither
17 plaintiff expert has any factual support for their
18 assumption that Mylan or any other generic would
19 have entered earlier than it actually did.
20        Q.    Well, I'm just limiting my question to
21 FDA approval.
22             You're not an expert on when companies

**Page 57**

1  can or can't get FDA approval; right?
2        A.    I'm not.
3        Q.    Okay.  And so you're not offering an
4  opinion about whether Mylan could have gotten FDA
5  approval sooner than it did; right?
6        A.    I'm not opining on that, just the
7  credibility of the assumptions around that topic.
8        Q.    Are you an expert on credibility?
9        A.    I'm -- I include in my expertise the
10 ability to ascertain whether economic models have
11 valid assumptions underlying them.
12        Q.    But one of those assumptions has to do
13 with FDA approval, which is not something you're an
14 expert in; right?
15        A.    Well, I can look at whether or not
16 there's factual support for that assumption.  And in
17 this case, there is none.
18        Q.    Have you read Dr. Galson's report?
19        A.    Yes.
20        Q.    Have you read Dr. Daisy
21 Rivera-Muzzio's report?
22        A.    No, I have not.

Page 58

1              Q.      So you would not be in a position to
2    opine on whether Dr. Galson's report is more
3    reliable than Dr. Daisy Rivera-Muzzio's; right?
4              A.      That's correct.
5              Q.      Let me switch to another subject.
6              I'm going to just read you a sentence
7    from paragraph 77 of Dr. Leffler's report, not --
8    not your report.  This is Dr. Leffler's --
9              A.      I have a clean copy of that here in
10   the room.  Could I --
11             Q.      You can.  But why don't you let me ask
12   the question first and see if you need -- need to
13   look at it.
14



Page 59

1                      My question is:  Do you have any
2    disagreement with that calculation?
3              A.      As part of my assignment, I didn't
4    look at that.
5

12                     Am I correct that you don't have any
13   disagreement with that calculation either?
14             A.      As part of my assignment, I didn't
15   look at that.
16             Q.      And just in general, as an economist,
17   would you expect a firm to take actions that
18   increased its profits?
19             A.      As a general matter, that sounds
20   reasonable.
21             Q.      Switching topics again, are you aware
22   of any rebates paid to retailers on branded Effexor

Page 60

1    XR purchases?  In other words, when retailers
2    purchase branded XR, Effexor XR, are you aware of
3    any instances in which they would receive a rebate
4    from the manufacturer?
5              A.      As part of my assignment, I didn't
6    look at rebates yet.
7              Earlier in this deposition, I referred
8    to a footnote where I reserve the right to look at
9    rebates should there be time and it becomes
10   necessary.
11             Q.      But you have not done that yet.
12             A.      I haven't looked at that yet.
13             Q.      Is it your understanding that
14   wholesalers typically purchase branded drugs like
15   Effexor XR at WACC wholesale acquisition cost?
16             A.      That's my understanding, yes.
17             Q.      And is it your understanding that
18   wholesalers typically resell branded drugs to large
19   retailers, like the ones in our group, at WACC minus
20   some relatively small percentage?
21             A.      That's my understanding.
22             The general description of this in the

Page 61

1    industry that I saw in a -- I think it was in a 10-K
2    or a deposition of one of the big three is "We buy
3    at WACC and we sell at WACC."
4              Q.      Okay.  And so how do they make money?
5              A.      They charge a distribution fee on
6    volume.
7              Q.      That's paid by the brand manufacturer?
8              A.      Correct.  And they also -- they
9    receive charge-backs from the manufacturer.
10             Q.      The wholesalers don't receive
11   charge-backs on purchases of branded drugs that they
12   resell to retailers typically.
13             Do you agree with that?
14             A.      Well, if they ever sell a product at
15   less than WACC, there're normally going to receive a
16   charge-back, no matter who there're selling to.
17             Q.      So your testimony is that if a
18   wholesaler sells to CVS at WACC minus 2.5 percent,
19   they would get a charge-back?
20             A.      No, I'm not saying that.
21             MR. BENDHEIM:  Objection to form.
22

Page 62

BY MR. PERWIN:

Q.    Okay.  Typically, if wholesalers purchase a branded drug at WACC and sell to a retailer at WACC minus 2 percent or two and a half percent or 3 percent, they don't get a charge-back; right?

A.    That would typically be true.

Q.    Now, you criticized Dr. Leffler for including overcharges in his calculations that occur after actual generic entry; right?

A.    That's correct.

Q.    But you don't dispute that it takes some period of time after actual generic entry for generic substitution rates to reach their highest level or their equilibrium level; right?

A.    Well, you're conflating two things there with your second question.

Q.    Well, just focus on the second question then and not the first.  You already answered the first.

You are aware that -- that it takes some time -- it doesn't happen instantaneously for

Page 63

generic substitution rates to reach their peak after generic entry; right?

A.    It takes some time for generic penetration rates to increase to their maximum.  But that says nothing -- that says nothing about the presence of antitrust injury, which is the key point about why damages should end when mass generic entry occurred.

Q.    Right.

But you understand antitrust injury is a legal concept; right?

THE REPORTER:  I'm sorry.  You understand --

MR. BENDHEIM:  Objection to form.

MR. PERWIN:  Antitrust injury is a legal concept; right?

THE WITNESS:  It's a concept that economists deal with and offer testimony on.

BY MR. PERWIN:

Q.    But just as a matter of arithmetic, given that it takes some time for generic substitution rates to reach their maximum, there

Page 64

will be a time after actual generic entry when there are fewer units of -- fewer generic units being purchased in the actual world than in the but-for world; right?

A.    I don't understand your question. You'll have to elaborate.

Q.    Okay.

A.    What's your but-for world?

Q.    My but-for world is when -- all right -- is when generic entry occurred many years earlier and -- and substitution rates have already reached their peak.  In the actual world, generic entry occurs later and it takes some period of time, could be months or years, for generic substitution rates to reach their maximum.

So during that period of time, just as a matter of arithmetic, there will be fewer -- other things being equal, there will be fewer generic units purchased in the actual world than in the but-for world.

MR. BENDHEIM:  Objection to form.

THE WITNESS:  I don't really

Page 65

understand your question.

I mean, I agree with you that the generic substitution rate increases over time, but the rest of what you're asking doesn't make any sense to me.

BY MR. PERWIN:

Q.    Okay.  Do you have an opinion as to how long it took for generic Effexor substitution rates to reach their maximum?

A.    I think Dr. Leffler has a Figure 2 in his report that pertains to that -- Dr. Leitzinger.

Q.    Do you have an opinion yourself?

A.    No.  I didn't -- I didn't address that question.  I think the relevant question is when does antitrust injury end?  And it ends when mass generic entry occurs.

Q.    Well, it wasn't mass generic entry in this case when generic entry occurred, right?  There was one -- one generic occurred -- entry entered 11 months before mass generic entry; right?

A.    That's correct.

Q.    So your criticism of Dr. Leffler for

Page 66

1  including post actual generic entry overcharges is a
2  conceptual one, not a disagreement with his
3  calculation?
4          MR. BENDHEIM:  Objection to form.
5          THE WITNESS:  Well, I disagree with
6      his calculation because I don't agree on the
7      economics.  He's -- he's assuming that people
8      are injured after they have the free ability
9      to purchase the generic.  And that doesn't
10     make economic sense to me.
11         If you're no longer constrained from
12     buying a product that you want to buy and you
13     choose not to buy it, that's your choice.  It
14     doesn't mean you're injured by some alleged
15     antitrust conduct.
16 BY MR. PERWIN:
17     Q.    But you don't dispute that the
18 retailer plaintiffs paid more for this drug in the
19 months after actual generic entry than they would
20 have paid if generic entry had occurred two years
21 earlier?
22     A.    Well, that has a lot of assumptions

Page 67

1  layered into it.  I mean, are you assuming also
2  that, like Leffler, that there were two additional
3  generics beyond Teva that entered earlier?
4      Q.    Let's just focus on the first three
5  months after Teva's actual entry.
6          Do you dispute that during that time
7  period, the retailer plaintiffs paid more for this
8  drug than they would have paid if generic entry by
9  Teva or anybody else had occurred much earlier?
10     A.    It's possible that -- you know, given
11 that prices fall when you have -- have generic
12 entry, it's possible that if generic entry occurred
13 earlier, then you would pay less at an earlier date
14 than you paid at a later date.
15     Q.    Okay.  And that discrepancy between
16 what you actually paid and what you would have paid
17 continues to exist after actual generic entry, in
18 this case by Teva; right?
19         MR. BENDHEIM:  Objection to form.
20         THE WITNESS:  No, I can't agree with
21     that.  I was agreeing with the hypothetical.
22     I don't think the case has been proven as you

Page 68

1  state it by your two experts.  And I can't
2  agree with their conclusions, so, no.
3  BY MR. PERWIN:
4      Q.    You understand the case is proven when
5  we go to trial; right?
6          MR. BENDHEIM:  Objection to form.
7          THE WITNESS:  The judge -- the judge
8      and if there's a jury will decide, not you or
9      me.
10 BY MR. PERWIN:
11     Q.    Understood.  I agree.  All right.
12         Do you recall that Ms. Coslett asked
13 you some questions about the ████ per capsule
14 overcharge calculation versus the ████ per capsule
15 overcharge calculation of Dr. Leitzinger, as you --
16 as you describe it in paragraph 115 of your report?
17     A.    I recall those questions, yes.
18     Q.    Okay.  And you're aware that some of
19 the retailer plaintiffs purchased generic Effexor XR
20 directly from the manufacturer rather than through a
21 wholesaler; right?
22     A.    Yes.

Page 69

1      Q.    And assuming that the retailer
2  plaintiffs, as large pharmacy chains, the ones who
3  purchased directly, got a lower price for generic
4  Effexor XR than the market as a whole, that would
5  account for some portion of the discrepancy between
6  the ████ overcharge and the ████ overcharge;
7  right?
8      A.    No.  That goes in the opposite
9  direction.
10     Q.    If you have lower generic prices, you
11 have bigger overcharges; right?
12     A.    Okay.  I see what you're saying.
13     Q.    So would you --
14     A.    You're saying -- you're saying that --
15 let's take CVS as an example -- that because they
16 buy at a lower price --
17     Q.    Yes.  Assuming --
18     A.    -- there're overcharge -- their
19 overcharge is going to be greater?
20     Q.    Yes.  Assuming that they bought some
21 of the generic directly and they bought it at a
22 lower price, so it's not -- it doesn't have anything

09/09/2025                        In Re: Effexor XR                        Dr. Bruce Stangle
                               Attorneys Eyes Only

---

Page 70

1  to do with assignments -- this is a direct
2  purchaser -- and they bought it at a lower price
3  than the market as a whole, they would have higher
4  overcharges; right?
5        A.    Well, you have to assume that the
6  but-for price is also --
7        Q.    Lower.
8        A.    -- lower.
9        Q.    Right.
10       A.    And I don't think Leffler does that.
11 So you'd have to look into the numbers.  I can't
12 agree with your -- your suggestion there.
13       Q.    Well, if Dr. Leffler used
14 plaintiff-specific generic prices to calculate
15 overcharges and some of those purchases were direct
16 and some of them were at lower prices than the
17 market as a whole, that would account for some
18 portion of the discrepancy between what Dr. Leffler
19 calculated as overcharges per capsule and what
20 Dr. Leitzinger calculated as overcharges per
21 capsule; right?
22             MR. BENDHEIM:  Objection to form.

---

Page 71

1             THE WITNESS:  I really -- I really
2        don't know.  I'd have to look into it
3        further.  And it -- and it doesn't really
4        deal with the critique that I have of
5        Dr. Leffler using the wrong prices.
6  BY MR. PERWIN:
7        Q.    I understand that.  I'm not --
8        A.    He simply used the wrong prices.  So
9  he should use the right price when he redoes his
10 work.
11       Q.    I understand that.  I understand your
12 opinion on that.
13             I'm trying to just understand whether,
14 assuming he used the right prices and in making the
15 other assumptions, that is, that some of the
16 purchases were direct and they were at lower prices,
17 that would tend to mean that the retailer plaintiffs
18 would have a higher overcharge per capsule than,
19 say, the market as a whole; right?
20             MR. BENDHEIM:  Objection to form.
21             THE WITNESS:  I'd have to look into
22       this further to answer that question and how

---

Page 72

1  Dr. Leffler actually implemented this.
2             MR. PERWIN:  Okay.  That's all I have.
3        Anybody?
4             MR. BENDHEIM:  Just five or six hours
5  of questions from me, if you're all ready.  I
6  have nothing.
7             MR. PERWIN:  I guess we're done.
8             THE VIDEOGRAPHER:  The time is
9  11:16 a.m.  We're off the record.
10            (Examination concluded.  The time is
11 11:16 a.m.)

---

Page 73

1  STATE OF NEW YORK          )
2                             ss:
3  COUNTY OF WESTCHESTER      )
4
5        I, EILEEN MULVENNA, CSR/RMR/CRR/RDR, a
   Certified Court Reporter, Registered Merit Reporter,
6  Certified Realtime Reporter, Registered Diplomate
   Reporter, and Notary Public in and for the State of
7  New York, do hereby certify:
8
9        That I reported the taking of the
   deposition of the witness, DR. BRUCE STANGLE,
10 commencing on the 9th day of September, 2025, at the
   hour of 9:26 a.m.
11       That prior to being examined, the witness
   was duly sworn by me to testify to the truth, the
12 whole truth, and nothing but the truth.
         That I thereafter transcribed my said
13 shorthand notes into typewriting and that the
   typewritten transcript of said deposition is a
14 complete, true and accurate transcription of my
   said shorthand notes taken down at said time, and
15 that a request has been made to review the
   transcript.
16       I further certify that I am not a relative
   or employee of an attorney or counsel of any of the
17 parties, nor a relative or employee of any attorney
   or counsel involved in said action, nor a person
18 financially interested in the action.
         IN WITNESS WHEREOF, I have hereunto
19 set my signature this 9th day of September, 2025.
20
21
22       EILEEN MULVENNA, CSR/RMR/CRR

---

09/09/2025                          **In Re: Effexor XR**                          Dr. Bruce Stangle
                                 **Attorneys Eyes Only**

---

**Page 74**

1   Case: In Re: Effexor XR

2   Witness Name:  Dr. Bruce Stangle

3   Deposition Date:  09/09/2025

4

5

6   Please be advised that the transcript in the above

7   referenced matter is now complete and ready for signature.

8   The deponent may come to this office to sign the transcript,

9   a copy may be purchased for the witness to review and sign,

10  or the deponent and/or counsel may waive the option of

11  signing. Please advise us of the option selected.

12  Please forward the errata sheet and the original signed

13  signature page to counsel noticing the deposition, noting the

14  applicable time period allowed for such by the governing

15  Rules of Procedure. If you have any questions, please do

16  not hesitate to call our office at (202)-232-0646.

17

18  Sincerely,

19  Digital Evidence Group

20  Copyright 2025 Digital Evidence Group

21  Copying is forbidden, including electronically, absent

22  express written consent.

23

24

25

---

**Page 75**

1   Digital Evidence Group, L.L.C.

2   1730 M Street, NW, Suite 812

3   Washington, D.C. 20036

4   (202) 232-0646

5

6   SIGNATURE PAGE

7   Case: In Re: Effexor XR

8   Witness Name:  Dr. Bruce Stangle

9   Deposition Date: 09/09/2025

10  I do hereby acknowledge that I have read

11  and examined the foregoing pages

12  of the transcript of my deposition and that:

13  (Check appropriate box):

14  (  ) The same is a true, correct and

15  complete transcription of the answers given by

16  me to the questions therein recorded.

17  (  ) Except for the changes noted in the

18  attached Errata Sheet, the same is a true,

19  correct and complete transcription of the

20  answers given by me to the questions therein

21  recorded.

22

23  _____    _____
         DATE              WITNESS SIGNATURE

24

25  _____    _____
         DATE                   NOTARY

---

**Page 76**

1                        Errata Sheet

2   NAME OF CASE:        In Re: Effexor XR

3   DATE OF DEPOSITION: 09/09/2025

4   NAME OF WITNESS:      Dr. Bruce Stangle

5   Reason Codes:  1. To clarify the record.

6                  2. To conform to the facts.

7                  3. To correct transcription errors.

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24                         _____

25                         DR. BRUCE STANGLE

---