# Exhibit 41
# (Filed Under Seal)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| In Re: Effexor XR Antitrust Litigation | Master Docket No. 3:11-cv-05479 |

## EXPERT REPORT OF BRUCE E. STANGLE, PH.D.
## JULY 17, 2025

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.     INTRODUCTION AND QUALIFICATIONS ...................................................................1

    A.    Qualifications ..............................................................................................................1

    B.    Case background, allegations, and assignment .........................................................1

II.    SUMMARY OF OPINIONS ........................................................................................9

III.   PLAINTIFFS' EXPERTS ASSESS ANTITRUST INJURY BASED ON
      SPECULATIVE ASSUMPTIONS ABOUT THE BUT-FOR WORLD ...........................14

    A.    Dr. Leitzinger and Dr. Leffler's assumptions about but-for generic
        entry dates are speculative and inconsistent with the factual record .........................16

        1.   Dr. Leitzinger's and Dr. Leffler's but-for worlds rest on
            speculative assumptions .................................................................. 16

        2.   Differences between Plaintiffs' experts' but-for worlds
            highlight the speculative nature of their assumptions ............................... 18

    B.    The forecasts that Dr. Leitzinger relies on are based on average prices
        and therefore say nothing about whether antitrust impact can be
        assessed on a class-wide basis ....................................................................................21

    C.    The literature that Dr. Leffler relies on is based on average prices and
        therefore says nothing about whether a particular entity suffered
        antitrust impact ..........................................................................................................24

IV.   DR. LEITZINGER FAILS TO ASSESS THE IMPORTANCE OF
      INDIVIDUALIZED ISSUES IN THIS CASE .............................................................24

    A.    Dr. Leitzinger ignores that pharmaceutical payments are complex and
        generally require individualized analysis ...................................................................25

    B.    Following generic entry wholesalers' share of purchases decreases
        dramatically while pharmacies' share increases .......................................................30

    C.    Dr. Leitzinger ignores that wholesaler and pharmacy price variation
        supports the need for individual inquiry ....................................................................33

    D.    Dr. Leitzinger's use of an average generic penetration rate hides
        substantial variation across proposed class members and overstates the
        but-for generic penetration rate by mixing wholesalers and pharmacies
        in a single class ..........................................................................................................35

    E.    There is substantial variation in the economic characteristics of
        proposed class members ............................................................................................37

V.    DR. LEITZINGER OVERSTATES THE SIZE OF THE PROPOSED
      CLASS .......................................................................................................................39

    A.    Dr. Leitzinger overstates the number of proposed class members by
        ignoring common ownership .......................................................................................39

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

B.    Many proposed class members should be excluded based on their
unique purchasing pattern ........................................................................42
    1.    Brand-only purchasers ............................................................. 42
    2.    Named Plaintiff Uniondale Chemists is a direct purchaser
only by assignment ................................................................. 43
    3.    Generic-only purchasers .......................................................... 43
    4.    Brand-generic purchasers that only purchased brand prior
to but-for generic entry .......................................................... 45

C.    Summary of adjustments to the number of proposed class members ..........................46

VI.    THERE IS SUFFICIENT EVIDENCE OF ECONOMIC INCENTIVES
FOR PLAINTIFFS TO PURSUE JOINDER ..........................................................47

    A.    Proposed class members have a history of collaboration ...............................47

    B.    Dr. Leitzinger's prospective value claims lack foundation ...........................52

VII.    Dr. Leitzinger's overcharge analyses are based on unsupported assumptions
and suffer from numerous errors that render his results unreliable and
overstated ..........................................................................................54

    A.    Baseline corrections ..........................................................................54
        1.    Dr. Leitzinger uses incorrect but-for prices in his
overcharge analysis ................................................................. 54
        2.    Dr. Leitzinger applies a class-wide average price and
generic penetration rate that overstates damages ...................... 56

    B.    Dr. Leitzinger lacks a valid basis for including damages for certain
time periods and direct purchasers ..........................................................57
        1.    Brand-generic overcharges from the period after generic
entry should be excluded ........................................................ 57
        2.    Medco likely did not experience any brand-generic
overcharge ............................................................................. 58
        3.    Dr. Leitzinger fails to exclude all brand-only purchasers ....................... 58
        4.    Brand-brand overcharges are unjustified ................................ 58
        5.    Direct purchasers with actual generic prices below but-for
generic prices likely did not experience any generic-generic
overcharge ............................................................................. 60
        6.    Generic-only purchasers have a different theory of harm ...................... 60

    C.    Dr. Leitzinger's but-for world is speculative and unsupported ................................61
        1.    Generic-generic and brand-generic damages are overstated
if Teva would have been the only generic ................................ 61
        2.    Using assumptions from Dr. Leffler's but-for scenarios
reduces Dr. Leitzinger's damages ........................................... 61
        3.    Evidence suggests that Teva could not have entered earlier
than it did ............................................................................. 62

    D.    Cumulative impact of corrections ..........................................................63

    E.    Dr. Leitzinger fails to remove opt-out assignments from overcharges ........................64

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

VIII. Dr. Leffler's overcharge analyses are flawed and overstated ...............................65

   A.   Corrections to Dr. Leffler's estimates .........................................................65

          1.   Dr. Leffler extends his generic-generic overcharges beyond
his cut-off date of May 31, 2011 ............................................... 65

          2.   Dr. Leffler's estimates of brand-generic overcharges after
generic entry should be excluded ............................................... 65

          3.   Dr. Leffler's generic-generic and brand-generic damages
are overstated if Teva would have been the only generic ........................ 66

          4.   Evidence suggests that Teva would not have entered earlier
than it did ................................................................. 66

   B.   Cumulative impact of corrections .............................................................67

   C.   Dr. Leffler uses the wrong price when calculating assignment claims .......................68

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# I.    INTRODUCTION AND QUALIFICATIONS

## A.    Qualifications

1.      My name is Bruce E. Stangle. I am an economist with more than 40 years of experience with issues relating to antitrust and other areas of economic analysis. I am a co-founder of Analysis Group, Inc., an international economic consulting firm with over 1,500 professionals in fifteen offices in North America, Europe, and Asia. Over the course of my career, I have provided testimony on a number of topics in antitrust and competition policy, including class certification, entry conditions, competitive effects, and damages.

2.      I am a member of the American Economic Association and served as a member of the Board of Directors of Wellington Trust Company, NA, a money management firm. I have a B.A. from Bates College, and an S.M. in Management and a Ph.D. in Applied Economics from the Sloan School of Management at Massachusetts Institute of Technology. **Appendix A** includes my curriculum vitae and a list of my testimony over the past four years.

## B.    Case background, allegations, and assignment

3.      This case concerns Effexor XR, an extended release serotonin-norepinephrine reuptake inhibitor ("SNRI") indicated for the treatment of major depressive disorder and other anxiety-related conditions.[1] Defendant Wyeth received the patent for the underlying active ingredient of Effexor XR, venlafaxine hydrochloride, in August 1985 (known as the Husbands patent after the name of the inventor)[2] and after FDA approval in December 1993, Wyeth began

---

[1]    "Venlafaxine (oral route)", *Mayo Clinic,* available at https://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379.

[2]    United States Patent No. 4,535,186, August 13, 1985.

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

marketing instant-release venlafaxine tablets under the brand name Effexor (referred to below as

Effexor IR).[3] Wyeth's patent covering venlafaxine expired on June 13, 2008.[4] Wyeth later

developed an extended-release capsule version of Effexor, Effexor XR, which received FDA

approval in October 1997.[5] Wyeth secured three additional method-of-use patents for Effexor

XR, the '171, '120, and '958 patents, all expiring on March 20, 2017.[6]

4.      In December 2002, defendant Teva became the first generic manufacturer to

submit an Abbreviated New Drug Application ("ANDA") seeking approval for an AB-rated

generic version of Effexor XR.[7] The application included Paragraph IV certifications challenging

the validity and/or applicability of Wyeth's '171, '120, and '958 patents, therefore entitling Teva

to 180 days of generic exclusivity.[8] In March 2003, Wyeth sued Teva for infringement of the

'171, '120, and '958 patents.[9] In November 2005, Wyeth and Teva reached a settlement.[10] ███

████████████████████████████████████████████████████████████

███████████████████████████████████████ ██ ██████████████

█████████████████████████████████████████████████████████

---

[3]  Direct Purchaser Class Plaintiffs' Second Amended Consolidated Class Action Complaint and Jury Demand, *In re: Effexor XR Antitrust Litigation*, Case No. 3:11-cv-05479, United States District Court for the District of New Jersey, October 23, 2013 ("Complaint"), ¶ 63.

[4]  Complaint, ¶ 64.

[5]  Complaint, ¶ 97.

[6]  These are referred to as the '171, '120, and '958 patents. See, United States Patent No. US 6,274,171, August 14, 2001; United States Patent No. US 6,403,120, June 11, 2002; and United States Patent No. US 6,419,958, July 16, 2002. See also, Complaint, ¶ 104, 108, 106.

[7]  Complaint, ¶ 264.

[8]  Complaint, ¶ 264. "180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act," *United States Food & Drug Administration*, June 1998, available at https://www.fda.gov/media/72414/download, p. 2.

[9]  Complaint, ¶¶ 266, 268. Specifically, Wyeth sued Teva for infringement of claims 20-25 of the '171 patent, claims 1, 2, 13, and 14 of patent '120, and claims 1-6 of the '958 patent.

[10]  Complaint, ¶ 271.

[11]  Complaint, ¶ 276.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



5.      Between April 2006 and April 2011, Wyeth sued and subsequently settled with 15 additional generic manufacturers who filed ANDAs for generic Effexor XR, including Apotex, Aurobindo, Dr. Reddy's, Impax, Mylan, Torrent, and Wockhardt.[14] During this time, in 2009, Pfizer acquired Wyeth and then in April 2024, settled all claims brought against it by Plaintiffs related to this matter.[15]

6.      Teva launched generic Effexor IR in August 2006[16] and subsequently launched Effexor XR in July 2010.[17] Additional manufacturers launched generic Effexor XR in June 2011, including Impax, Mylan, Apotex (as an authorized generic), Torrent, Cadila, Aurobindo,

---

[12]   Complaint, ¶¶ 273, 274.

[13]   WYEFFAT2299808 (Wyeth and Teva U.S. License Agreement). Royalties for generic Effexor XR covered Teva's 180-day exclusivity period and extended until the launch of a third-party generic. For generic Effexor IR, royalties were paid over a two-year period.

[14]   Complaint, ¶ 257. The settlements provided that these generics would not launch generic Effexor XR until the March 2017 expiration of the '171, '120, and '958 patents, though each agreement also included a license, which may have allowed for earlier entry on or after June 1, 2011, or earlier in limited circumstances under certain undisclosed conditions. See Complaint, Section V.C.

[15]   "Pfizer to Pay $25.5 mln to Settle Remaining Effexor XR Antitrust Claims," *Reuters,* April 29, 2024, available at https://www.reuters.com/legal/litigation/pfizer-pay-255-mln-settle-remaining-effexor-xr-antitrust-claims-2024-04-29/.

[16]   Complaint, ¶ 294.

[17]   Complaint, ¶ 277. I understand that Teva never received tentative approval of its ANDA for generic Effexor XR and received final approval on June 28, 2010. See TEVA_EFFEX_0018544-550 (Teva ANDA 076565 for generic Effexor XR approval letter).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Wockhardt, and Dr. Reddy's.[18] In parallel, Pfizer launched an authorized generic of Effexor XR in June 2011 through its subsidiary, Greenstone.[19] **Table 1** contains a timeline of these events.

### Table 1 – Timeline of events

| Date | Event |
| --- | --- |
| December 10, 2002 | Teva files an ANDA with the FDA seeking to market generic version of Effexor XR |
| March 24, 2003 | Wyeth sued Teva for infringement of the the '171, '120, and '958 patents |
| November 2, 2005 | Wyeth and Teva settle the '171, '120, and '958 patent litigation |
| June 28, 2010 | FDA's final approval of Teva's ANDA |
| July 1, 2010 | Teva's actual generic entry date |
| June 1, 2011 | Actual mass generic entry: Wockhardt, Cadila, Aurobindo, Dr. Reddy's, Mylan, Torrent, Apotex (authorized generic), and Greenstone (authorized generic) |

Source: Appendix C

7.      Plaintiffs allege that Wyeth and Teva's November 2005 settlement agreement delayed generic versions of Effexor XR "from at least June 2008 through at least June 2010." As a result, Plaintiffs allege that "[d]irect purchasers paid significantly more for extended release venlafaxine hydrochloride capsules."[20]

8.      I have been retained by Counsel for Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva" or "Defendants") to evaluate the Expert

---

[18]    Complaint, Sections V.C.1, 7, 9-11, 15-16.. Pursuant to terms of the settlement agreement dated August 11, 2010, Wyeth granted Apotex the right to market extended-release venlafaxine as an authorized generic. See, WYEFFAT0954314-4342 (Wyeth and Apotex License Agreement), at 4323.

[19]    In announcing the availability of its generic Effexor XR, Greenstone stated that the product is bioequivalent to the branded version and is "manufactured under NDA #20-699 using the innovator's facilities and processes," indicating it is an authorized generic. See, e.g., SAJ0000175-0191 (Greenstone's Product Fact Sheet on Generic Effexor XR), at 0175. See also, "Authorized Generics: Q&A with Greenstone's Jim Cannon," *Drug Store News,* August 3, 2016, available at https://drugstorenews.com/pharmacy/authorized-generics-qa-greenstones-jim-cannon.

[20]    Complaint, ¶ 14.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Report of Jeffrey J. Leitzinger, Ph.D. submitted on behalf of Direct Purchaser Plaintiffs, and the Expert Report of Keith Leffler, submitted on behalf of Retailer Plaintiffs.[21]

      9.     Dr. Leitzinger had a four-part assignment where he was asked to:

      a.     "form an opinion about the impact of Defendants' alleged conduct on the prices Class members paid for extended release venlafaxine capsules;"

      b.     "analyze whether proof of widespread antitrust injury (i.e., the payment of at least some overcharge) among members of the Class can be accomplished in this case with evidence that is common and classwide;"

      c.     "calculate the aggregate amount of overcharges incurred by the Class;" and

      d.     "use [his] classwide overcharge estimates and, under various assumptions about the cost of individual litigation, evaluate the numbers of Class members that would face 'negative value claims' associated with individual litigation."[22]

      10.     The proposed class definition Dr. Leitzinger was provided by Plaintiffs' Counsel was:

> "All persons or entities in the United States and its territories who purchased Effexor XR and/or AB-rated generic versions of Effexor XR directly from Wyeth or Teva at any time during the period June 14, 2008 through and until May 31, 2011 (the "Class

---

[21]  Expert Report of Jeffrey J. Leitzinger, Ph.D., *In Re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-05479, May 15, 2025 ("Leitzinger Report"); Expert Report of Keith Leffler, Ph.D., *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-05479-ZNQ-JBD, United States District Court for the District of New Jersey, May 15, 2025 (including errata dated May 20, 2025 and July 9, 2025) ("Leffler Report").

[22]  Leitzinger Report, ¶ 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Period"). Excluded from the Direct Purchaser Class are Wyeth and Teva and their officers, directors, management, employees, subsidiaries, or affiliates, all governmental entities, and all persons or entities that purchased Effexor XR directly from Wyeth during the Class Period that did not also purchase generic Effexor XR directly."[23]

11.     Plaintiffs' proposed class therefore contains two types of entities:

- *Brand-generic purchasers*: direct purchasers, typically wholesalers, that directly purchased both Effexor XR and generic Effexor XR; and

- *Generic-only purchasers*: direct purchasers, typically pharmacies, that directly purchased only generic Effexor XR.

12.     Dr. Leitzinger's proposed class list includes 67 class members.[24] **Exhibit 1**, which I discuss in more detail in **Section V**, shows Dr. Leitzinger's proposed class members organized by their purchasing patterns and my assessment of their purchaser type (i.e., pharmacy versus wholesaler versus other), after correcting for certain mergers and acquisitions ("M&A") ignored by Dr. Leitzinger.[25] Dr. Leitzinger assumes that Walgreens, Kroger, Safeway, Supervalu, HEB, American Sales Company, Rite Aid, Meijer, Giant Eagle, and CVS may opt out of the proposed direct purchaser class.[26] In this report I refer to these entities as the

---

[23]    Leitzinger Report, footnote 5. See also, Complaint, ¶ 398.

[24]    Leitzinger Report, Exhibit 5.

[25]    See **Section V.A** for more details on the M&A consolidation among proposed class members ignored by Dr. Leitzinger.

[26]    Leitzinger Report, ¶ 35 ("I understand that certain Retailer Plaintiffs may request exclusion from the Class. If they do request exclusion and are permitted to opt out, then there would be 59 Class members, shown in Exhibit

'opt out' entities. In Exhibit 6 of his report, Dr. Leitzinger removes these opt-out entities, leaving 59 proposed class members.[27]

13.    Dr. Leffler offers opinions on behalf of the ten opt-out Retailer Plaintiffs.[28] Specific to my opinions, Dr. Leffler was asked to "estimate the overcharge damages incurred by Retailer Plaintiffs if the Settlement Agreement is found to have delayed the entry of generic Effexor XR."[29]

14.    Both Dr. Leitzinger and Dr. Leffler categorize alleged overcharge damages based on differences between actual prices paid and hypothetical "but-for" prices that would have prevailed had generic Effexor XR launched earlier. Dr. Leitzinger addresses three categories of overcharges for the proposed direct purchaser class,[30] while Dr. Leffler models two categories of overcharges on behalf of the ten opt-outs.[31] These categories are summarized below:

---

6."). See also, Complaint and Demand for Jury Trial, *Walgreen Co., The Kroger Co., Safeway Inc., SuperValu Inc., HEB Grocery Company LP and American Sales Company, Inc., Plaintiffs, vs. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc., Defendants.,* Docket No.: 3:33-av-00001; Complaint and Demand for Jury Trial, *Meijer, Inc. and Meijer Distribution, Inc., Plaintiffs, vs. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc., Defendants.*, Docket No.: 2:33-av-00001; Complaint and Demand for Jury Trial, *Rite Aid Corporation, Rite Aid HDQTRS. Corp., JCG (PJC) USA, LLC, Maxi Drug, Inc. D/B/A Brooks Pharmacy, Eckerd Corporation, and CVS Caremark Corporation, Plaintiffs, vs. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc., Defendants.*, Docket No.: 3:12-cv-03523-PGS-LHG; Complaint and Demand for Jury Trial, *Giant Eagle, Inc., Plaintiffs, vs. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc., Defendants.*, Docket No.: 3:12-cv-03116-PGS-LHG.

[27]   While there are 10 opt-out Retailer Plaintiffs, Dr. Leitzinger's proposed class size only falls by eight because he already does not include two of the opt-outs, Giant Eagle and Safeway, in his list of 67 proposed class members. He excludes these two because neither met any of the three criteria that he considers for assigning a purchaser to his proposed class (these criteria are: (i) purchased brand during the Class Period and purchased generic at any time; (ii) purchased generic during the Class Period; or (iii) are either SAJ or Uniondale, see Leitzinger backup). Giant Eagle did not purchase brand product directly and only purchased generic product outside the proposed Class Period (June 14, 2008, through May 31, 2011). Safeway did not make any direct purchases of either the brand or generic product during the proposed Class Period. See Reliance materials.

[28]   Leffler Report, ¶ 4.

[29]   Leffler Report, ¶ 11. Dr. Leffler's assignment included additional components that are beyond the scope of my report.

[30]   See Leitzinger Report, Section VIII.A (particularly the formulas in ¶¶ 43 and 45).

[31]   See Leffler Report, Section IX.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- *Brand-brand overcharges (Dr. Leitzinger only):* Dr. Leitzinger claims proposed class members would have been able to purchase lower-priced brand Effexor XR had the generic launched earlier. He therefore claims that because brand Effexor XR would allegedly have been less expensive, direct purchasers of Effexor XR that would have purchased brand in the but-for world experienced overcharge damages on these brand purchases.

- *Brand-generic overcharges (both Dr. Leitzinger and Dr. Leffler)*: Both experts claim that purchasers would have been able to substitute brand Effexor XR for the lower-priced generic Effexor XR had the generic launched earlier. They therefore claim that because generic Effexor XR would allegedly have been less expensive, direct purchasers of Effexor XR that would have otherwise purchased generic in the but-for world experienced overcharge damages on these brand purchases.

- *Generic-generic overcharges (both Dr. Leitzinger and Dr. Leffler)*: Both experts claim that earlier generic entry would have induced earlier price competition among generic manufacturers, which would have led to lower generic prices. They therefore claim that direct purchasers of generic Effexor XR experienced overcharge damages on these generic purchases because they allegedly paid higher prices for generic Effexor XR than they otherwise would have.

15. Defense Counsel has asked me to assess:

- Whether the damages models proposed by both Dr. Leitzinger and Dr. Leffler are valid and rely on reasonable assumptions;

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Whether Dr. Leitzinger has been able to demonstrate injury to individual direct purchasers on a class-wide basis using common proof;

- Whether the number of class members proposed by Dr. Leitzinger is correct and appropriate;

- Whether there is evidence of economic incentives for Plaintiffs to pursue joinder;

- Whether Dr. Leitzinger's estimation of aggregate class-wide overcharge damages is correct and appropriate; and

- Whether Dr. Leffler's estimation of overcharge damages for opt-out Retailer Plaintiffs is correct and appropriate.

16.    The opinions contained in this report are based on the information that has been made available to me to date. I reserve the right to supplement this report in the event that new information becomes available to me. A list of the materials I have relied upon in preparing this report is included as **Appendix B**.

17.    Analysis Group is being compensated for my work in this case at my customary rate of $1,400 per hour. This compensation is not contingent on the nature of my findings or the outcome of this litigation. I was assisted in the preparation of this report by other professional staff at Analysis Group working under my direction.

## II.    SUMMARY OF OPINIONS

18.    **Dr. Leitzinger and Dr. Leffler make speculative assumptions regarding economic effects in Plaintiffs' alleged but-for world**. Both Dr. Leitzinger and Dr. Leffler assess antitrust injury based on assumptions about generic entry in their but-for worlds that are inconsistent with the factual record in this matter. First, both assume that Teva would have been

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

able to begin marketing generic Effexor XR in mid-2009, when the facts of this case show that Teva never received tentative approval of its ANDA for generic Effexor XR and did not receive final approval of its ANDA until June 28, 2010. Second, both experts accept as true from Plaintiffs' Counsel that an authorized generic would have entered with Teva, despite evidence in the record that Wyeth was not planning to launch an authorized generic version of Effexor XR and Teva did not expect them to. Third, both experts accept as true that a third generic competitor would have entered 11 months after Teva and the authorized generic, despite the third competitor's entry being contingent on their assumption of 2009 entry for Teva. Finally, neither Dr. Leitzinger nor Dr. Leffler's but-for worlds have any competitive analog to the actual world. Rather than analyzing whether any particular entity suffered antitrust impact or damages, they inappropriately rely on averages that fail to address that critical question. Notably, despite relying on the same factual record, Dr. Leitzinger's and Dr. Leffler's but-for worlds diverge from each other in important respects, underscoring the speculative nature of their analyses. (See **Section III**)

19.     **Dr. Leitzinger's formulaic approach fails to assess the importance of individualized issues, which leads him to overstate damages and ignore the diverse characteristics across proposed class members**. Due to the complexity of payment flows in the pharmaceutical space, not all proposed class members were harmed in the same way or to the same degree. Damages clearly vary by the ability of purchasers to negotiate prices and secure discounts, in part because large buyers like Cardinal, McKesson, and AmerisourceBergen or large retail chains can negotiate much more favorable prices. The heterogeneity of the buyers undermines the claim that class-wide injury can be proven with common evidence and makes class-wide treatment inappropriate. By using averages, Dr. Leitzinger fails to account for

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

class members who likely did not experience overcharges, understates but-for prices, and overstates generic penetration, thereby overstating damages. Furthermore, the proposed class is highly diverse and includes members with differing characteristics, suggesting that pharmacies and wholesalers should not be grouped within the same class. (See **Section IV**)

20.     **Dr. Leitzinger overstates the size of the proposed class because he ignores certain mergers and acquisitions and fails to consider the purchasing patterns of other proposed class members**. Many proposed class members have merged with or been acquired by other proposed class members. While Dr. Leitzinger accounts for some consolidation based on an instruction from Plaintiffs' Counsel, he inexplicably fails to consider others. Similarly, although Dr. Leitzinger claims to have excluded brand-only purchasers, he fails to identify and remove seven additional brand-only purchasers that are part of his proposed class. Furthermore, Dr. Leitzinger inappropriately includes generic-only purchasers. Accounting for all these issues reduces the proposed class size from 59 to 19. (See **Section V**)

21.     **Proposed class member interrelationships demonstrate sufficient evidence of economic incentive for Plaintiffs to pursue joinder**. Members of the proposed class have demonstrated a willingness and ability to cooperate among themselves. Not only have proposed class members merged together over time, but they have also frequently acted as joint plaintiffs in prior matters. Proposed class members also cooperate in other ways, demonstrating that neither transaction costs nor coordination costs pose a meaningful barrier to pursuing joint litigation through joinder in this matter. Furthermore, Dr. Leitzinger claims that many proposed class members have potential claims that fall below a certain benchmark but his benchmark is meaningless and inconsistent with proposed class members' historical and current behavior. (See **Section VI**)

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

22.    **Dr. Leitzinger grossly overstates the magnitude of damages incurred by the proposed class**. Dr. Leitzinger employs an economic model that relies on average behavior and injury across all purchasers. His model fails to account for variations in pricing, purchasing patterns, and contractual arrangements between direct purchasers and suppliers and fails to capture the complex and individualized nature of the alleged harm. These and other flaws lead him to make several errors in his estimation of damages experienced by proposed class members:

    a.  His calculations do not follow the damages model that he presents in his report;

    b.  He applies a class-wide average price and generic penetration rate that overstates damages;

    c.  Dr. Leitzinger extends brand-generic damages beyond the date of Teva's actual entry, even though he has no basis for doing so;

    d.  Medco's actual brand price falls below Dr. Leitzinger's but-for generic price, making it unlikely that Medco experienced brand-generic overcharge;

    e.  Dr. Leitzinger fails to exclude all brand-only purchasers;

    f.  Dr. Leitzinger's estimate of brand-brand overcharges are unjustified and should be excluded;

    g.  Medco, ESI, and Aetna's actual generic price falls below Dr. Leitzinger's but-for generic price, making it unlikely that these three entities experienced generic-generic overcharge;

    h.  Dr. Leitzinger inappropriately includes generic-only purchasers with a different theory of harm;

    i.   Dr. Leitzinger overstates generic-generic and brand-generic overcharges if Teva were the only generic in the but-for world;

    j.   Despite operating with the same factual record, Dr. Leffler uses different assumptions about the but-for world that, when applied to Dr. Leitzinger's model, substantially reduce the damages calculated by Dr. Leitzinger; and

    k.   Dr. Leitzinger's damages model relies on the unproven assumption that Teva would have entered earlier than it actually did.

23.    Accounting for these issues together reduces Dr. Leitzinger's estimates of damages by between 81 and 100 percent. Dr. Leitzinger also fails to appropriately account for claims assigned to opt-out Plaintiffs, leading him and Dr. Leffler to double-count damages on these assigned claims (damages that amount to over $400 million). (See **Section VII**)

24.    **Dr. Leffler grossly overstates the magnitude of damages incurred by opt-out Plaintiffs**. Dr. Leffler makes several errors in his estimation of damages experienced by the opt-out retailers, including:

    a.   Dr. Leffler inappropriately extends generic-generic overcharges for 12 instead of 11 months;

    b.   Dr. Leitzinger extends brand-generic damages beyond the date of Teva's actual entry, even though he has no basis for doing so;

    c.   Dr. Leffler overstates generic-generic and brand-generic overcharges if Teva would have been the only generic in the but-for world; and

    d.   Dr. Leffler's damages model relies on the unproven assumption that Teva would have entered earlier than it actually did.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

25.    Accounting for these issues together reduces Dr. Leffler's estimates of damages by between 52 and 100 percent. Dr. Leffler also uses the wrong price when calculating assignment claims. (See **Section VIII**)

## III.    PLAINTIFFS' EXPERTS ASSESS ANTITRUST INJURY BASED ON SPECULATIVE ASSUMPTIONS ABOUT THE BUT-FOR WORLD

26.    In order to assess the economic effects of the challenged conduct on the members of the proposed class, one must apply reliable, tested, and supported theories grounded in professional economic, financial, and industry principles that relate to the facts and circumstances of the case.[32] Dr. Leitzinger states that he was "asked to assume" that "absent the challenged conduct, generic entry by Teva and an [authorized generic] would have occurred on May 15, 2009, with a third generic entrant entering prior to July 2010,"[33] and he merely accepts these but-for entry dates from Plaintiffs' Counsel as true. Dr. Leffler similarly relies on unsupported assumptions regarding but-for generic entry. These assumptions are the cornerstone of their findings regarding overcharges to direct purchasers, yet both experts ignore that these assumptions are inconsistent with the factual record in this case, including:

    a.    the assumption that Teva would have launched generic Effexor XR on May 15, 2009; and

---

[32]    Hall, Robert E. and Victoria A. Lazear, "Reference Guide on Estimation of Economic Losses in Damages Awards" in *Reference Manual on Scientific Evidence*, 2011, pp. 277–332 ("Hall and Lazear, 2011"), at pp. 282–283. See also, Weil, Roman, et. al. with Frank, P. et. al., "Chapter 1, The Role of the Financial Expert in Litigation Services," in *Litigation Services Handbook*, 2007 ("Weil et al., 2007").

[33]    Leitzinger Report, ¶ 41. See also, Leitzinger Report, ¶ 28 ("Based upon the generic entry scenario I have been given from Counsel, absent the challenged conduct there would have been three generic competitors (including an authorized generic) during that same time period instead of only one (two generics would have launched initially, and then one additional generic would have launched before July 1, 2010."). Further, Dr. Leitzinger's overcharge estimates are based on these assumptions. Leitzinger Report, ¶ 8.d.

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

    b.  the assumptions that Teva, an authorized generic, and a third generic entrant would have launched on dates earlier than they did in the actual world.

27.    Neither expert has cited any facts or data supporting these assumptions, and it does not appear that they have conducted any analysis to test the plausibility of such assumptions, which serve as the basis for their conclusions of antitrust injury. **Table 2** presents the but-for entry dates proposed by Dr. Leitzinger and Dr. Leffler, which notably contain key differences in assumptions about their but-for worlds, which only further underscores the speculative nature of the Plaintiffs' experts' analyses.[34]

---

[34]  Dr. Leitzinger's scenario assumes that Teva would have launched generic Effexor XR 13.5 months earlier than in the actual world, while Dr. Leffler assumes Teva would have launched 8 months earlier. Both Dr. Leitzinger and Dr. Leffler assume an additional generic entrant would enter 11 months after Teva. In the actual world, all generics aside from Teva entered in June 2011. Accordingly, both Dr. Leitzinger's and Dr. Leffler's assumptions imply that this additional generic would have entered 13.5 months and 8 months earlier, respectively, than the actual date of additional generic entry. See **Table 2**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table 2 – Timeline of actual and but-for events (see also Appendix C)**

| Date | Event |
|---|---|
| December 10, 2002 | Teva files an ANDA with the FDA seeking to market generic version of Effexor XR. |
| March 24, 2003 | Wyeth sued Teva for infringement of the the '171, '120, and '958 patents |
| November 2, 2005 | Wyeth and Teva settle the '171, '120, and '958 patent litigation. |
| June 14, 2008 | Class period begins (Leitzinger) |
| May 15, 2009 | Teva and authorized generic but-for entry date (Leitzinger) |
| November 1, 2009 | Teva and authorized generic but-for entry date (Leffler) |
| April 15, 2010 | Additional generic entrant's but-for entry date (Leitzinger) |
| June 28, 2010 | FDA's final approval of Teva's ANDA |
| July 1, 2010 | Teva's actual generic entry date |
| October 1, 2010 | Mylan's but-for entry date (Leffler) |
| May 31, 2011 | Class period ends (Leitzinger) |
| June 1, 2011 | Actual and but-for mass generic entry: Wockhardt, Cadila, Aurobindo, Dr. Reddy's, Mylan, Torrent, Apotex (authorized generic), and Greenstone (authorized generic) |

A. **Dr. Leitzinger and Dr. Leffler's assumptions about but-for generic entry dates are speculative and inconsistent with the factual record**

1. *Dr. Leitzinger's and Dr. Leffler's but-for worlds rest on speculative assumptions*

28.    Dr. Leitzinger's assessment of the economic effects of the challenged conduct on Plaintiffs depends critically on three assumptions about but-for generic entry dates provided to him by Plaintiffs' Counsel. First, he assumes that Teva would have launched generic Effexor XR on May 15, 2009, in the but-for world, 13.5 months earlier than it did in the actual world. Second, he assumes that an authorized generic would have entered on the same day. And third, he assumes that a third generic entrant would have begun marketing generic Effexor XR 11 months following Teva's entry.[35] All three assumptions are crucial to the definition of two

---

[35]    Leitzinger Report, ¶¶ 28, 41.

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

subperiods during which Dr. Leitzinger purports to assess overcharges. Dr. Leitzinger defines these subperiods as follows:

    a.  an alleged "Delay Period" between (1) the date on which he assumed Teva and a manufacturer of the authorized generic would have launched generic Effexor XR but for the alleged conduct and (2) the date on which they actually launched (May 15, 2009, to June 30, 2010, in Dr. Leitzinger's base case); and

    b.  the "Teva Exclusivity Period," during which Teva marketed generic Effexor XR in the actual world, but during which Dr. Leitzinger assumes Teva would have done so alongside an authorized generic and an additional generic manufacturer but for the alleged conduct (July 1, 2010, to May 31, 2011, in Dr. Leitzinger's base case).[36]

29.    Dr. Leffler similarly relies on an earlier but-for Teva entry date, the speculative assumptions taken from Plaintiffs' Counsel that an authorized generic would have been launched on the same day as Teva's but-for entry, and that entry of a third generic would have occurred 11 months following Teva's earlier entry.[37]

30.    Dr. Leitzinger and Dr. Leffler's assumptions, however, are inconsistent with the factual record in this case. First, I understand that Teva never received tentative approval of its ANDA for generic Effexor XR and received final approval on June 28, 2010, three days prior to its launch on July 1, 2010.[38] This fact is inconsistent with the assumption that Teva could have

---

[36]   Leitzinger Report, ¶ 28.

[37]   Leffler Report, ¶ 103 ("I have also been asked to assume that Mylan would have entered the market, alternatively, after eleven months of Teva's exclusivity, or at the time that Mylan and others entered in June 2011.")

[38]   TEVA_EFFEX_0018544-8550 (Teva ANDA 076565 for generic Effexor XR approval letter).

entered nearly one year earlier.[39] Second, there is no evidence that Wyeth intended to launch an authorized generic. Indeed, David Manspeizer, Wyeth's former Vice President of Intellectual Property and Associate General Counsel, testified that at the time of the settlement, Wyeth never intended to launch an authorized generic.[40] Similarly, Teva fact witness testimony confirms that Teva never expected Wyeth to launch an authorized generic.[41] And third, I note that Dr. Leitzinger and Dr. Leffler's assumption regarding a third entrant 11 months after Teva relies on the assumption that Teva would have entered earlier. Had Teva entered when it actually did, there would be no basis to assume a third generic entrant prior to the entry of multiple generics in June 2011.[42]

> 2.    *Differences between Plaintiffs' experts' but-for worlds highlight the speculative nature of their assumptions*

31.    Dr. Leitzinger and Dr. Leffler both purport to estimate harm due to the same alleged conduct. However, as I show in **Exhibit 2**, they cannot even agree on the specific nature of the alleged conduct. For example, while Dr. Leitzinger assumes that Teva and the manufacturer of an authorized generic would have launched generic Effexor XR on May 15,

---

[39]    I understand that Defendant expert Steve Galson will offer the opinion that it would have been unlikely for Teva to have received final approval from FDA earlier than June 28, 2010.

[40]    Deposition of David Manspeizer, Former VP of Intellectual Property and Associate General Counsel, Wyeth, April 2, 2025, p. 122:17-20 ("Wyeth was not in the authorized generic business in November of 2005 so certainly weren't giving Teva anything of value."); p. 131:6-10 ("Q. Who was responsible for making decisions as to whether or not to launch an [authorized generic]? A. It wasn't ever – Wyeth never considered an [authorized generic] until Teva launched at risk in Protonix, which was several years later.").

[41]    Deposition ofWilliam Marth, former President and CEO, Teva Americas, February 26, 2025, pp. 217:7–218:2 ("Q. […] if you knew, "you" being Teva, if you knew that a brand company was planning to launch a next-generation product, would you expect them to also launch an authorized generic? […] A. No. I mean, that would be self-defeating. You would get fired probably pretty quick."); p. 219:4-8 ("Q. And Wyeth didn't tell you that they were planning to launch a next-generation product, correct? A. Wyeth didn't tell me that, but I believe that was apparent in the documents.").

[42]    Furthermore, I understand that Defendant expert Steve Galson will offer opinions that show it would be unlikely for Mylan to have been able to enter prior to June 2011, regardless of the terms of Wyeth and Teva's settlement.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2009, Dr. Leffler assumes the launch of generic Effexor XR would have occurred almost six months later, on November 1, 2009. In fact, Dr. Leffler claims that generic entry could not have occurred earlier than August 2009,[43] which stands in contrast to Dr. Leitzinger's unsupported assumption that Teva would have entered in May 2009. This would have a material impact on Dr. Leitzinger's proposed class, as he acknowledges that for alternative but-for generic entry dates on or after July 15, 2009, QK Healthcare and Uniondale would not be part of the proposed class because they made no direct purchases after that date.[44] Furthermore, Dr. Leitzinger and Dr. Leffler cannot even agree on how to calculate but-for prices. As I explain further below, Dr. Leitzinger relies on forecasts, while Dr. Leffler relies on a single published paper.[45]

32.    Indeed, between the two experts there are 38 distinct scenarios featuring a wide range of but-for entry dates, underscoring the inherent uncertainty and speculative nature of Plaintiffs' experts' but-for worlds.[46] Dr. Leitzinger presents a total of ten but-for generic entry

---

[43]    Leffler Report, ¶ 93 ("From the analysis of the expected profits to Wyeth from continuing the litigation and the expected profits from a settlement without payment, I conclude that Wyeth would find any generic entry date after August 2009 to be more profitable than continuing the litigation.").

[44]    As Dr. Leitzinger explains in his report, "Class members (under the current Class definition) that purchased the brand before the alternative generic entry date and did not purchase the generic directly during the Class Period would not be injured. Accordingly, if it is determined that those entry dates are what would have happened absent the challenged conduct, and if the Class definition is not amended to account for that, those Class members would not have been injured." Specifically, under his Scenarios 4 to 9, "QK Healthcare Inc. and its assignee Uniondale Chemists Inc. would not have been injured since QK Healthcare Inc. has no direct purchases during the overcharge period in the transaction data provided by Wyeth and Teva, July 15, 2009, or later." Leitzinger Report, footnote 58.

[45]    Furthermore, the two experts calculate the but-for generic price differently such that even if they were to rely on identical data they would calculate different but-for prices when there were two or three but-for generic competitors available. For example, Dr. Leitzinger calculates the generic price of three but-for generics by first calculating the actual percent off WAC of Teva's price and then adding to that percentage difference the percentage point difference between the discount for one and three generics that he derived from the forecasts. Dr. Leffler, however, calculates the generic price of three but-for generics by first calculating the actual percent off WAC of Teva's price, and then multiplies this percent difference by the percent change in the discount between one and three generics that he derived from the FDA study. See Leitzinger Report, Exhibit 11 and Leffler production materials (EFFEXOR WTD $$ ERRATA.xlsx, Sheet "AdjustPGen").

[46]    Because Dr. Leffler assumes entry on the 1st of the month and Dr. Leitzinger assumes entry on the 15th of the month, none of their scenarios precisely align. This results in 38 distinct scenarios across the two experts. See Leffler and Leitzinger production materials.

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

scenarios, including his base case scenario, all of which are provided by Plaintiffs' Counsel.[47] May 15, 2009, is the but-for generic entry date used in his base case and one other scenario. Dr. Leitzinger uses April 15, 2009, June 15, 2009, July 15, 2009, August 15, 2009, September 15, 2009, October 15, 2009, December 15, 2009, and January 15, 2010, in another eight scenarios. In nine of his ten scenarios (including his base case scenario), Dr. Leitzinger assumes a third generic would have launched earlier than in the actual world. He provides no justification for his use of any of these dates.

33.    Similarly, Dr. Leffler presents a total of 28 but-for generic entry scenarios, all of which are provided by Plaintiffs' Counsel.[48] Dr. Leffler uses November 1, 2009, as his baseline but-for generic entry date[49] but also implements scenarios with but-for entry dates spanning May 1, 2009, through June 1, 2010.[50] In 14 scenarios, Dr. Leffler assumes Mylan would have launched earlier than in the actual world. However, in another 14 scenarios, Dr. Leffler assumes Mylan would not have launched earlier and instead would have entered with other generics in June 2011.[51] He provides no justification for this, nor does he offer further support to show which entry date for Mylan, if either, is plausible, which underscores the speculative nature of his but-for world.

34.    The inability of Plaintiffs' own experts to converge on a consistent but-for world, despite relying on the same factual record, demonstrates that their analyses are not grounded in

---

[47]    Leitzinger Report, ¶ 42, Exhibit 10. Notably in six scenarios (Scenarios 4 to 9), Dr. Leitzinger's but-for entry date is on or after July 15, 2009. As such, neither QK Healthcare nor Named Plaintiff Uniondale would be in the proposed class under these scenarios.

[48]    Leffler Report, ¶ 103.

[49]    Leffler Report, ¶ 115, Table 1.

[50]    Leffler Report, ¶ 103.

[51]    Leffler Report, ¶ 103.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reliable economic, financial, or industry principles, and lack the methodological rigor required to credibly support Plaintiffs' claims. Speculative assumptions lacking basis in the factual record are not a reliable foundation for the assessment of antitrust impact and damages.[52] If these critical assumptions are found to be speculative, unreasonable, or incorrect by the Court, there is no basis for the Plaintiffs' experts to claim that the challenged conduct had any economic effect.

**B.    The forecasts that Dr. Leitzinger relies on are based on average prices and therefore say nothing about whether antitrust impact can be assessed on a class-wide basis**

35.    Dr. Leitzinger readily acknowledges that not one of his ten alternative scenarios have a competitive analog in the actual world.[53] Therefore, to approximate but-for average prices, Dr. Leitzinger cannot rely on actual world experience. Instead, he relies on forecasts produced by Wyeth, Teva, and Mylan and uses generic price erosion rates included in those forecasts to estimate average but-for prices.[54] Dr. Leitzinger claims that these manufacturer forecasts show that "additional generic competitors would have reduced generic prices" for all or nearly all proposed class members.[55] Although Dr. Leitzinger is correct that the forecasts generally show that average generic prices decrease as the number of competitors increase, none of the forecasts he cites are customer-specific. The forecasts, therefore, do not demonstrate that the entry of additional generic competitors would have the same impact on prices across all

---

[52]    Hall and Lazear, 2011, at pp. 289–291, 322, 324.

[53]    Leitzinger Report, ¶ 48 ("The entry scenario contains periods with two and three generic competitors which have no counterpart in actual experience.")

[54]    Leitzinger Report, ¶¶ 48-50.

[55]    Leitzinger Report, ¶¶ 16-28. Dr. Leitzinger also claims that the general academic literature "shows that the pricing benefits created by generic competition increase with the number of competitors" (Leitzinger Report, ¶ 14). While true in aggregate, these studies likewise rely on average prices and cannot be used to show that the entry of additional generic manufacturers uniformly reduces generic prices for all or nearly all direct purchasers.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

direct purchasers and further do not support Dr. Leitzinger's conclusion that "it is highly likely that each Class member paid at least some overcharge on its Effexor XR purchases (brand or generic or both) as a result of the diminished generic competition."[56]

36.    Teva's own fact witnesses confirm that the Teva forecasts Dr. Leitzinger relied on were not designed to provide meaningful pricing estimates for specific purchasers, or even for specific drugs. Jennifer Wodarczyk, former Director of New Product Forecasting at Teva USA, testified that two of the nine distinct Teva forecast documents used by Dr. Leitzinger[57] were developed for production planning purposes only, and that pricing was not their focus.[58] She explained that the forecasts were neither client-specific nor drug-specific (as "99.999 percent of the times they were never individualized for a particular product"), and that any price erosion figures in the forecast reflected management modeling decisions rather than realistic pricing expectations.[59] Mrs. Wodarczyk further described the price erosion component of the forecast as

---

[56]    Leitzinger Report, ¶ 42.

[57]    TEVA_EFFEX_0440657 (Teva Sales Forecast); TEVA_EFFEX_0863426 (Email Communication about Teva Sales Forecast). See also, Deposition of Jennifer Wodarcyzk, Former Director of New Product Forecasting, Teva, February 26, 2025 ("Wodarcyzk Deposition"), p. 132:9-12 ("I mean this is a production forecast […] not a lot of attention was paid to it.").

[58]    Wodarcyzk Deposition, p. 129:17-22 (discussing TEVA_EFFEX_0440657) ("Q. Now, looking back up at the top of this, up in Row 1, do you see that this is Teva USA Sales Forecast? A. That is what it says. But, if this was attached to the e-mail, it was obviously a production forecast."); p. 155:9-17 (discussing TEVA_EFFEX_0863426) ("Q. And then in the last column in this table at Rows 21 to 36, it is Teva USA Price Erosion, right? A. […] But, again, if you go down and look at Column J, those are all zeroed out, so I definitely took [price erosion figures] out because that was not any purpose of this spreadsheet or this model.").

[59]    Wodarcyzk Deposition, p. 135:1-136:1 (discussing TEVA_EFFEX_0440657) ("Q. And how are net sales arrived at? […] A. […] You are going to have your, you know, your Ts and Cs, with your commercial partners that would dictate certain discounts, allowances, rebates, you know, any kind of terms. And then you take all of that out and then you get to your net sales. […] we don't forecast at the customer level in New Products. […] it just wouldn't take into account all of those individual customer level details that we didn't really care about."); p. 156:7-157:15 (discussing TEVA_EFFEX_0863426) ("Q. The numbers that we see in Column E from Rows 23 down to 36, those aren't just random numbers. Someone at Teva made an effort to think about what price erosion would be in this scenario and entered those in, right? […] A. […] 99.999 percent of the times they were never individualized for a particular product. And, what I can say is the 5 percent of brand WAC that was within our model matrix, irregardless if it is in the spreadsheet, we knew not to be actually as low as price goes. But, it was a management decision not to reflect pricing any lower than that in our models. The 55 percent of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

having "sloppiness," noting that they were "a lot of times … overwritten" and that "not a lot of attention was paid to [the erosion rate]."[60] This testimony calls into question the reliability of Teva forecasts as a basis for assessing antitrust impact and damages across members of the proposed class.

37.     The Wyeth and Mylan forecasts Dr. Leitzinger relies on suffer from the same fundamental flaw: they are not tailored to any specific class member or purchaser and therefore provide no insight into individualized or class-wide impact. These forecasts reflect generalized market expectations rather than pricing effects experienced by proposed class members.[61]

38.     Additionally, Dr. Leitzinger cherry-picked select Wyeth forecasts, and ignored other available forecasts, offering no explanation for their exclusion. He relies on two completely identical forecast documents,[62] which both projected a generic price erosion of 30 percent with one generic entrant and 50 percent with two generics. However, he ignores four forecast scenarios that projected a generic price erosion of 20 percent with one generic and 40 percent with two generics, indicating a lower erosion rate than the forecasts he relied upon.[63] Dr.

---

brand WAC pricing was the absolute highest, but we also knew at the same time that would, that would also limit our penetration rate, which we don't necessarily reflect in these models.").

[60]   Wodarcyzk Deposition, p. 132:5-12 (discussing TEVA_EFFEX_0440657) ("Q. And how is [the assumption of an authorized generic] reflected in the price erosion? A. So -- well, I see a mistake in the price erosion here, first of all. But, second of all, I mean this is a production forecast. So, that is probably why the mistake was there because not a lot of attention was paid to it."); p.155:18-156:6 (discussing TEVA_EFFEX_0863426) ("Q. In the price erosion numbers that we see in Column E from Rows 23 down to 36, who would have input those here? A. Well, I mean, that—irregardless, if I put them in or not, it was made very clear that that was—that is not the intent of this forecast. And like we stated earlier, a lot of times these forecasts were overwritten. So, unfortunately, there is sloppiness in the forecasts.").

[61]   WYEFFAT3609860-10024 (Wyeth Generic Mitigation Project Status Update) at 09901; WYEFFAT3795941-95946 (Wyeth Effexor XR Authorized Generic Forecast) at 5941; MYL-VENLA-0000002; MYL-VENLA-0000004 (Mylan Sales Forecast).

[62]   WYEFFAT3609860-10024 (Wyeth Generic Mitigation Project Status Update) at 09901; WYEFFAT3795941-95946 (Wyeth Effexor XR Authorized Generic Forecast) at 941.

[63]   WYEFFAT3610090 (Wyeth Effexor XR Sales Forecast).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Leitzinger does not address these alternative forecasts or explain why he excluded them from his analysis.

### C.    The literature that Dr. Leffler relies on is based on average prices and therefore says nothing about whether a particular entity suffered antitrust impact

39.    Similar to Dr. Leitzinger, none of Dr. Leffler's alternative scenarios have a competitive analog in the actual world. To approximate average prices Dr. Leffler does not rely on actual world experience. He instead relies on estimates produced by the FDA of the effect of generic competition on average prices, not customer-specific or product-specific prices.[64] The study does not show how entry of additional generic manufacturers reduces generic prices for any one individual direct purchaser, which may have its own unique bargaining position and consequent ability to negotiate low prices (see **Section IV**).[65] Thus, the literature Dr. Leffler relies on does not support his conclusion that all opt-outs experienced an overcharge.

## IV.    DR. LEITZINGER FAILS TO ASSESS THE IMPORTANCE OF INDIVIDUALIZED ISSUES IN THIS CASE

40.    Due to the complexity of payment flows in the pharmaceutical space, not all proposed class members were harmed in the same way or to the same degree. Damages clearly vary by the ability of purchasers to negotiate prices and secure discounts. Large buyers like Cardinal, McKesson, and AmerisourceBergen (the "Big 3"), or large retail chains can negotiate

---

[64]    In fact, the study does not even cover Effexor, but rather "[g]eneric drug products with initial generic entry from 2015-2017." See, Conrad, Ryan and Randall Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Prices," *U.S. Food & Drug Administration*, pp. 1–9, at p. 2.

[65]    Leitzinger Report, ¶¶ 13–15, 30.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

much more favorable prices. The heterogeneity of the buyers undermines the claim that class-wide injury can be proven with common evidence and makes class-wide treatment inappropriate.

### A. Dr. Leitzinger ignores that pharmaceutical payments are complex and generally require individualized analysis

41.    The flow of payments for pharmaceutical products is complex, extends from end payors at the end of the supply chain to drug manufacturers at the beginning, and is characterized by individualized negotiation at all levels.[66] **Figure 1** below depicts relevant brand product and payment flows in the pharmaceutical supply chain. The participants include brand drug manufacturers, wholesalers/distributors, retail pharmacies, mail-order pharmacies, pharmacy benefit managers ("PBMs"), and end payors (e.g., insurance providers, also referred to as third party payors, and patients). Brand manufacturers generally sell product directly to wholesalers/distributors, which then sell to pharmacies. Pharmacies, both retail and mail order, sell pharmaceutical products to consumers, generally health plan beneficiaries purchasing pursuant to their prescription drug coverage.

---

[66]    Various 30(b)(6) deposition testimonies confirm individualized negotiations in the downstream channel. See e.g., Deposition of Dick Derks, Lead of Pharmacy Procurement, Kroger Co., *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-5479(ZNQ)(JBD), February 20, 2025, pp. 146:6–16 ("Q. Is the prompt pay discount an industry standard or is it individually negotiated? […] A. Prompt pay discount is an industry standard. […] The numbers are not standard. That will be individually negotiated.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 1 – Illustration of the brand pharmaceutical supply chain[67]**



42.    Beginning at the top of the supply chain, drug manufacturers set list prices in the form of wholesale acquisition cost ("WAC") for their products, but offer various discounts to wholesalers in exchange for bulk purchases or prompt payment of invoices.[68] Manufacturers

---

67    The figure depicts a "[c]onceptual model of the flow of products, services and funds for non-specialty drugs covered under private insurance and purchased in a retail setting." Sood, Neeraj, et al., "The Flow of Money Through the Pharmaceutical Distribution System," *USC Leonard D. Schaeffer Center for Health Policy & Economics*, June 2017, pp. 1–8 ("The Flow of Money Report"), at p. 2. See also, American Bar Association Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, Second Edition, ABA Book Publishing, 2018, p. 556.

68    See, e.g., "Follow the Dollar: Understanding How the Pharmaceutical Distribution and Payment System Shapes the Prices of Brand Medicines," *Pharmaceutical Research and Manufacturers of America*, November 2017 ("Follow the Dollar Report"), at p. 3 ("WAC is the price manufacturers charge to wholesalers or other direct purchasers before any discounts, rebates, or other price reductions are applied. […] Contracts between manufacturers and wholesalers may also include bulk-purchasing discounts and discounts for prompt payment. In total, these fees, discounts, and rebates are negotiated individually between manufacturers and wholesalers and can vary as a percentage of WAC."). See also, Berndt, Ernst R. and Joseph P. Newhouse, "Pricing and Reimbursement in U.S. Pharmaceutical Markets," *National Bureau of Economic Research*, August 2010, available at http://www.nber.org/papers/w16297, Working Paper 16297, pp.1–74, at p. 8 ("The price at which brand manufacturers sell to wholesalers and chain warehouses is generally the Wholesale Acquisition Cost (WAC), a published list price, minus a few percent discount for prompt payment and other incentives."); Dolan, Rachel and Marina Tian, "Pricing and Payment for Medicaid Prescription Drugs," *Kaiser Family Foundation*, January 2020, available at https://files.kff.org/attachment/Issue-Brief-Pricing-and-Payment-for-Medicaid-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

may also offer discounts in the form of *rebates* to retailers, PBMs, and third-party payors. Manufacturers pay some of these rebates in exchange for favorable formulary placement, in particular for branded products.[69] Rebates reduce the net prices paid by direct purchasers and the net prices received by the manufacturer. Manufacturers, particularly generic manufacturers, may also negotiate discounts directly with pharmacies. Whether such pharmacies take delivery of product directly from the manufacturer or through wholesalers, the pharmacies generally pay their negotiated prices. Because wholesalers typically purchase and sell the product at list price, when product flows through the wholesaler, the wholesaler will submit an invoice to the manufacturer for any difference between the list price and the price paid by the pharmacy and negotiated separately with the manufacturer.[70] These payments are known as *chargebacks*, which reimburse the wholesaler for selling to retailers at the retailers' contract prices.[71]

43.    Rebate and chargeback payments are generally made by manufacturers after the initial sale has taken place.[72] Without individualized inquiry, it is generally not possible to

---

Prescription-Drugs, at p. 2 ("The WAC represents manufacturers' published catalog, or list, price for sales of a drug (brand-name or generic) to wholesalers.").

[69]    Favorable formulary placement can drive market share and increase the volume sold of the manufacturer's drugs. American Bar Association Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, Second Edition, ABA Book Publishing, 2018, at pp. 37, 56, 59, 68, 81–84.

[70]    AmerisourceBergen notes that while it is not true that "[w]holesalers make money by selling product to pharmacies and physician practices at marked-up prices," it is true that "[p]harmaceutical distributors purchase product from manufacturers at list price, and [they] sell it to customers at list price." See "The High Cost of Access: Fact or Fiction?" *AmerisourceBergen*, available at https://www.amerisourcebergen.com/brand-stories/mythbusting-the-high-cost-of-access. See also, "2016 Janssen U.S. Transparency Report," *Janssen*, 2017, available at https://policyresearch.jnj.com/download/2016-janssen-us-transparency-report-pdf, pp. 7, 8 ("We also pay fees to pharmaceutical wholesalers to distribute our medicines." "We pay fees to pharmaceutical wholesalers and distributors, which are companies that buy medicines in bulk and distribute them to pharmacies and other health care providers.").

[71]    American Bar Association Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, Second Edition, ABA Book Publishing, 2018, at p. 198.

[72]    Berndt, Ernst R. and Joseph P. Newhouse, "Pricing and Reimbursement in U.S. Pharmaceutical Markets," *National Bureau of Economic Research*, August 2010, available at http://www.nber.org/papers/w16297, Working Paper 16297, pp. 1–74, at pp. 9–10. Plaintiffs discussed various individual discounts they received in their depositions. See, for example, Deposition of Dick Derks, Lead of Pharmacy Procurement, Kroger Co., *In*

determine the precise price paid by an individual purchaser for any given transaction because of these timing issues. Strategies to address this issue include creating algorithms to match invoice sales to chargebacks and rebates, or by defining a "price" to include all of a purchaser's payment flows over some period of time (say, a quarter or six months). For revenue reporting purposes, manufacturers may make accrual estimates of the chargebacks, rebates, and other discounts anticipated at the time of the sale in order to report the anticipated revenue associated with the sale.[73]

44.    To compute his average net prices across his proposed class, Dr. Leitzinger aggregated all payment flows across all capsule strength-bottle size combinations over four separate time periods.[74]

     a.   Delay Period (with two generic competitors): May 15, 2009, to April 14, 2010;

     b.   Delay Period (with three generic competitors): April 15, 2010, to June 30, 2010;

---

*re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-5479(ZNQ)(JBD), February 20, 2025, p. 165:14-165:20. ("Q. […] Does Econdisc receive rebates from Teva that it passes along to Kroger for generic Effexor XR? A: Potentially. The rebate covers the entire Teva book of business through Econdisc. There may be venlafaxine purchases within that, but not necessarily."). See also, Deposition of Matthew Paulson, Brand Pharmacy Buyer, Meijer, *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-5479(ZNQ)(JBD), March 19, 2025, pp. 144:19–145:15. ("[…] Q: Does that mean Meijer was receiving a 6 percent rebate on its purchases of generic Effexor XR during the third quarter of 2012? A: Yes, through Teva, I believe we had a standing agreement. […] I believe we had an existing agreement with Teva that gave us 6 percent rebate of purchases of generic products through that manufacturer.") See also, Deposition of Dominic Pagnotta, Former Chief Information Officer, RDC, *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-5479(ZNQ)(JBD), March 27, 2025, pp. 105:18–106:7. ████████████████████████

████████████████████████████████

[73] For example, a KPMG article outlines two methods manufacturers may use to estimate rebates, chargebacks, and other discounts. See "Revenue for the Life Sciences Industry," *KPMG*, March 2018, available at https://kpmg.com/kpmg-us/content/dam/kpmg/frv/pdf/2018/revenue-for-life-sciences-industry.pdf, p. 4.

[74] See Leitzinger production materials.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

    c.  Teva Exclusivity Period: July 1, 2010 to May 31, 2011; and

    d.  Multiple Generic Competitor Period: June 1, 2011 to June 30, 2015.

    45.    In **Exhibit 3**, I show direct purchaser-level net prices over Dr. Leitzinger's Teva Exclusivity Period and find that Dr. Leitzinger's assertion that all direct purchasers were harmed is demonstrably false.[75] For example, the data do not support that Medco experienced an overcharge on its purchases of brand product because its actual net brand price falls below Dr. Leitzinger's average but-for generic price. The data further do not support that Medco, Express Scripts, and Aetna experienced an overcharge on their purchases of generic product because for each entity, its actual net generic price falls below Dr. Leitzinger's average but-for generic price. The fact that some customers paid on average less than Dr. Leitzinger's but-for price reveals that some purchasers have received significant discounts from Wyeth and Teva thereby mitigating any potential overcharge. The rebate and discount patterns would need to be individually analyzed because overcharges could be highly varied, making it difficult to demonstrate class-wide impact. Dr. Leitzinger's aggregate approach masks these material variations in prices and demonstrates that his claim that all or nearly all proposed class members were damaged cannot be justified without individualized inquiry.

---

[75] For the purposes of examining the net prices paid and volumes purchased by direct purchasers in this report, I use Dr. Leitzinger's methodology for calculating net prices, and in particular do not attempt to match chargebacks, rebates, and other credits to sales transactions. I do not offer an opinion at this time on Dr. Leitzinger's processing of the manufacturer data or his methodology for calculating volumes or net prices. I reserve the right to evaluate and critique his methodology for calculating volumes and net prices and to use a different approach for calculating direct purchaser-level volumes and net prices if I submit other reports or am asked to opine on other issues in this matter in the future.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**B.    Following generic entry wholesalers' share of purchases decreases dramatically while pharmacies' share increases**

46.    Brand product generally flows from brand manufacturers to wholesalers that hold those products in inventory and distribute them to downstream entities such as pharmacies. For generic pharmaceuticals, however, instead of purchasing through wholesalers, large retail pharmacies like CVS, Walmart, and Rite-Aid often "bypass" wholesalers and purchase directly from generic manufacturers. Generic bypass refers to the bypassing of the wholesaler by a downstream entity after generic entry, so that the downstream entity purchases directly from the generic manufacturer. **Figure 2** below illustrates this concept of generic bypass, which causes wholesalers to have a lower share of purchases after generic entry occurs.

**Figure 2 – Illustration of wholesaler role in the pharmaceutical supply chain**



47.    Research on the pharmaceutical industry supply chain acknowledges the concept of bypass as noted in the following industry report:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Pharmaceutical wholesalers are the primary channel for generic

drugs sold to smaller customers – independents, supermarkets,

regional chain pharmacies, healthcare providers, and mass

merchants without self-warehousing capabilities. Most wholesaler

profits from generic drugs […] come from sales to this subset of

the market. In contrast, the six largest chain and mail-order

pharmacies – CVS Caremark, Walgreens, Medco Health Solutions,

Rite-Aid, Walmart, and Express Scripts – use their negotiating

power and in-house warehousing capabilities to bypass wholesaler

intermediaries and buy directly from generic manufacturers."[76]

48.    Data in this matter confirm that generic bypass occurred when Teva began

marketing generic Effexor XR on July 1, 2010.[77] **Exhibit 4** shows all sales of brand and generic

Effexor XR by Wyeth and Teva from the start of Dr. Leitzinger's period of purported damages

on May 15, 2009 through May 31, 2011, right before additional generic entered (see **Table 1**).[78]

---

[76]    Fein, Adam J., "2010-11 Economic Report on Pharmaceutical Wholesalers," *Pembroke Consulting Inc.*, June 2010, pp. 1–71, at p. 15. See also, Lekraj, Vishnu, "Amerisource, Cardinal, and McKesson Have Procured Wide Economic Moats," *Morningstar Healthcare Observer*, April 2014, pp. 1,4 ("[m]ass retail pharmacies usually have sophisticated procurement operations and source most of their generic supply directly from manufacturers."); Fitch Ratings, "Dynamics of the Drug Channel are Changing," *BusinessWire*, March 20, 2013 ("[M]ost of the largest retail and mail-order pharmacies in the U.S., as well as some mass merchandisers with pharmacy operations, source most generics and some specialty drugs on their own. These players often self-distribute generics in order to retain as much of the more favorable profit dynamics as possible.").

[77]    Dr. Leitzinger acknowledges that bypass occurs. However, he claims, "should it be determined legally that overcharges associated with bypassed volumes must be removed from the analysis, the adjustment is straightforward and can be done using the same class wide common data used in the overcharge calculation itself." Leitzinger Report, ¶ 58. Dr. Leitzinger ignores however that bypass is only relevant for wholesalers and that there are also pharmacies in the proposed class. Therefore, he fails to explain how one can use class-wide data to account for bypass when wholesalers and pharmacies are in the same proposed class.

[78]    **Exhibit 4** includes capsules bought by entities who are not proposed class members, including opt-out Plaintiffs, which accounted for 15.8 percent of total Effexor XR and generic Effexor XR capsules purchased between May 15, 2009 and May 31, 2011 (the end of Dr. Leitzinger's proposed Class Period), and direct purchasers that only directly bought brand product between May 15, 2009 and May 31, 2011 (Cesar Castillo

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

As **Exhibit 4** shows, the Big 3 wholesalers purchased over 95 percent of all Effexor XR capsules from May 15, 2009, until generic entry on July 1, 2010.[79] After generic entry, the Big 3's share of brand and generic Effexor XR purchases dropped dramatically to 41 percent during the July 1, 2010 to May 31, 2011, period (Dr. Leitzinger's 'Teva Exclusivity Period'). Not only did the Big 3 wholesalers' share of total Effexor XR purchases fall, but the total volume of brand and generic Effexor XR purchased by the Big 3 also fell. Specifically, the Big 3 wholesalers' purchases fell from 708 million capsules during the May 15, 2009 to June 30, 2010 period to 256 million capsules during July 1, 2010, to May 31, 2011.[80] In contrast, pharmacies and other non-wholesalers increased their share of Effexor XR purchases from 0.5 percent before generic entry (May 15, 2009, until June 30, 2010) to 55.1 percent after generic entry (July 1, 2010, to May 31, 2011).[81] As discussed below, these large, dramatic shifts in purchasing patterns are largely ignored in Dr. Leitzinger's analysis.

49.    Bypass contributes to important differences between wholesalers and pharmacies. These differing purchasing patterns suggest that individualized analysis, or at a minimum separate analysis of wholesalers and pharmacies, is required when assessing the effect of an alleged delay in generic entry on direct purchasers.

---

Inc, DMS Pharmaceutical, Henry Schein, QK Healthcare Inc, Quality Care Products, R&S Northeast, and Associated Pharmacies), which accounted for an additional 0.1 percent of total capsules purchased during the period. See backup to **Exhibit 4.**

[79]    The Big 3 wholesalers also account for 85 percent of overcharges, based on Dr. Leitzinger's calculations presented in his Exhibit 13 (18.48 percent for AmerisourceBergen, 32.74 percent for Cardinal, and 33.82 percent for McKesson).

[80]    Put differently, the Big 3 were purchasing on average 1.7 million capsules per day prior to generic entry, but after generic entry this fell to 0.8 million capsules per day. See backup to **Exhibit 4**.

[81]    "Other non-wholesalers" include PBMs operating mail order pharmacies (such as Optum), insurers (such as Cigna and Humana), and pharmacy cooperatives (such as Pharmacy Buying Association). See **Exhibit 1**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

50.     The dramatic variation in purchasing patterns across members of the proposed class shows that Dr. Leitzinger's use of averages is inappropriate. Specifically, Dr. Leitzinger computes average prices and generic penetration rates across wholesalers and pharmacies during the period after generic entry but applies those averages to proposed class member purchases prior to generic entry, ignoring that the shares of purchases made by individual class members changed dramatically between those two periods. I discuss this issue further below.

### C.     Dr. Leitzinger ignores that wholesaler and pharmacy price variation supports the need for individual inquiry

51.     Dr. Leitzinger's class-wide approach masks material variation in prices paid among proposed class members. Dr. Leitzinger assumes a uniform generic price across all purchasers during the Teva Exclusivity Period, but actual prices during the Teva Exclusivity Period varied significantly by purchaser type. **Exhibit 5** shows the gross price for Teva's generic Effexor XR in its first month of sales for the 37.5, 75, and 150 mg strengths. Across all strengths, wholesalers that purchased directly from Teva tended to pay about 25 percent more for Effexor XR than pharmacies and other direct purchasers. ██████████

████████████████████████████████

███████▌██████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████

████████████████████████████████████

---

[82]     For the 37.5 mg strength, most wholesalers paid $3.05 while most pharmacies paid $2.45. For the 150 mg strength, most wholesalers paid $3.72 while most pharmacies paid $3.00. See **Exhibit 5**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ The fact that certain direct purchasers have identical gross prices in clusters demonstrates that the proposed class members have individualized differences that lead to substantial variation in prices. Thus, even before introducing discounts to calculate net prices, gross prices are highly varied and dependent on purchaser type.

52.    By ignoring this price variation across proposed class members and instead applying average prices across time periods, Dr. Leitzinger understates but-for prices and overstates damages. This is because the mix of purchasers changes significantly after generic entry, and these purchasers pay different prices. While pharmacies and other non-wholesalers accounted for only 0.5 percent of the capsules purchased during the Delay Period, they accounted for 55.1 percent of capsules purchased during the Teva Exclusivity Period.[84] When calculating his but-for generic price, therefore, Dr. Leitzinger relies on prices reflective of a relatively balanced mix of generic purchases from wholesalers and retailers during the Teva Exclusivity Period. However, Dr. Leitzinger applies this average but-for generic price to purchases made primarily by wholesalers, which typically pay higher prices than retailers (see **Exhibit 5**). As a result, the average but-for price Dr. Leitzinger applies to wholesalers is overweighted by lower retailer prices and therefore biased downward. This has the further effect of inflating the spread between the actual brand price and the but-for generic price, which exaggerates Dr. Leitzinger's estimate of brand-generic damages. I quantify the effect of Dr. Leitzinger's inappropriate aggregation of prices in **Section VII.A.2**.

---

[83]    See **Exhibit 5**.

[84]    See **Exhibit 4**.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

D.    **Dr. Leitzinger's use of an average generic penetration rate hides substantial variation across proposed class members and overstates the but-for generic penetration rate by mixing wholesalers and pharmacies in a single class**

53.    The phenomenon of bypass, discussed above, highlights another individualized issue: the substantial variation in the degree to which any individual purchaser substitutes generic for brand purchases upon generic entry (referred to as "generic penetration"). For example, some purchasers continue to purchase only branded product after generic entry, while other purchasers purchase only generic products and do not buy branded product directly from manufacturers. Still other purchasers purchase a mix of both. As I discuss in more detail below, the degree of generic penetration can vary widely among proposed class members. This variability undermines Dr. Leitzinger's class-wide approach to estimating damages and suggests the need for individualized inquiry.

54.    Dr. Leitzinger uses a class-wide generic penetration rate, effectively assuming that each proposed class member substitutes the generic for the brand at the same rate. This, however, is far from accurate. Brand-only purchasers have a zero percent generic penetration rate, while generic-only purchasers have a 100 percent generic penetration rate. Although brand-only purchasers account for less than one percent of total capsule sales during Teva's exclusivity period, generic-only purchasers (which are primarily retailers) account for 18 percent.[85] By including generic-only purchasers with a 100 percent generic penetration rate, Dr. Leitzinger artificially inflates the average generic penetration rate for brand-generic purchasers (primarily wholesalers).

---

[85]    See backup to **Exhibit 6**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

55.    **Exhibit 6** compares Dr. Leitzinger's class-wide average generic penetration rate to the generic penetration rates for brand-only, brand-generic, and generic-only direct purchaser types, and shows that Dr. Leitzinger's class-wide generic penetration rate is above the generic penetration rate for brand-generic customers. Using an inflated average generic penetration rate overstates the number of generic purchases assigned to brand-generic purchasers in the but-for world, thereby overestimating brand-generic damages. Because the difference between actual brand price and but-for generic price is typically large, brand-generic damages often account for a material share of total damages. As a result, Dr. Leitzinger's overestimation of brand-generic damages substantially inflates his overall damages estimate. In addition, Dr. Leitzinger's approach implicitly assigns brand-generic damages to brand-only purchasers, which is inappropriate given that these purchasers' behavior gives no indication that they would purchase generic in the but-for world. Dr. Leitzinger's method of calculating an average generic penetration rate is therefore flawed. I quantify the effect of Dr. Leitzinger's inappropriate use of an average generic penetration rate in **Section VII.A.2**.

56.    Furthermore, Dr. Leitzinger's use of an average generic penetration rate masks material variation across purchasers. **Exhibit 7** summarizes the average generic penetration rate by individual direct purchaser over the July 1, 2010, to May 31, 2011, period (the Teva Exclusivity Period), revealing substantial heterogeneity. For example, all pharmacies had generic penetration rates of 100 percent, considerably above the average of 59 percent across all proposed class members.

57.    Conversely, direct purchasers with below average generic penetration rates tend not to be pharmacies. ███████████████████████████████████████████
███████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████ Thus, the use of averages in a proposed

class consisting of wholesalers and pharmacies masks substantial individualized issues regarding

the proper generic penetration rate.

### E. There is substantial variation in the economic characteristics of proposed class members

58.    The Named Plaintiffs in this matter are Rochester Drug Co-Operative, Inc.

("RDC"), Stephen L. LaFrance Holdings, Inc. d/b/a SAJ Distributors, and Uniondale Chemists,

Inc.[86] The proposed class is highly diverse and includes members with economic incentives and

characteristics that are not shared by the Named Plaintiffs. For example, Uniondale Chemists, a

pharmacy, did not make any direct purchases of Effexor XR or its generic equivalents; its

standing relies solely on an assignment from QK Healthcare, a wholesaler.[87] Moreover, the

Named Plaintiffs account for only a small portion of overall purchases. Collectively, they

represent just 0.3 percent of all direct purchases of Effexor XR and generic Effexor XR from the

start of Dr. Leitzinger's damages estimates (May 15, 2009) through the end of his Class Period.[88]

---

[86]    Complaint, ¶¶ 17–20. See also Leitzinger Report, ¶ 5. I understand that Professional Drug Company has dismissed its claims.

[87]    During the proposed Class Period, Uniondale Chemists purchased a total of 720 dosage units of brand Effexor XR from QK. See Reliance materials.

[88]    Dr. Leitzinger's manufacturer data suggests that RDC and SAJ Distributors accounted for 0.2 percent and 0.1 percent of the total gross dosage units directly purchased, respectively, between May 15, 2009, and May 31, 2011 (the end of Dr. Leitzinger's proposed Class Period). See backup to **Exhibit 4**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

This is particularly noteworthy given that the Big 3 wholesalers purchased 71 percent of all capsules during same period, despite none being Named Plaintiffs.[89]

59.    In addition, some proposed class members negotiated fee-for-service agreements (sometimes called distribution service agreements, or DSAs[90]) for distributing Effexor XR, indicating that distribution fees are relevant not only generally as described above, but in this specific case as well.[91] The agreements I reviewed indicate that Wyeth negotiated distribution fees of a little over one percent off list price, and prompt-payment discounts of about two percent off list price with Cardinal, McKesson, and AmerisourceBergen.[92] These DSAs can cause

---

[89]    See Reliance materials.

[90]    Deposition of Heather Odenwelder, Vice President of Global Generic Sourcing, Cencora (formerly AmerisourceBergen), *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-5479, April 15, 2025, pp. 62:24–63:9 ("[…] Q: Did ABDC enter into distribution service agreements with any generic manufacturers from whom it purchased generic Effexor XR? A: Yes. Q: Do you know which manufacturers? A: We have -- we – we've always had a generic agreement with Teva, for example, you know, that governs the overall relationship; not specific to that product, but we do have agreements with hundreds of generic manufacturers.").

[91]    WYEFFAT06391759-1785 (Wyeth Wholesaler Service Agreement, Wyeth and Cardinal, June 1, 2005). See additional DSAs between Wyeth and AmerisourceBergen and McKesson: WYEFFAT06391397-1438 (Wyeth Wholesaler Service Agreement, Wyeth and AmeriSource Health Services Corporation, June 1, 2005) and WYEFFAT06391481-1522 (Wyeth Wholesaler Service Agreement, Wyeth and AmeriSource Health Services Corporation, June 1, 2005); WYEFFAT06391439-1480 (Wyeth Wholesaler Service Agreement, Wyeth and AmerisourceBergen Drug Corporation, June 1, 2005); WYEFFAT06392727-2747 (Wyeth Wholesaler Service Agreement, Wyeth and McKesson Corporation, June 1, 2005); WYEFFAT06392693-2726; and WYEFFAT06392748-2781 (Wyeth Wholesaler Service Agreement, Wyeth and McKesson Corporation, September 1, 2008); WYEFFAT06392840-2844 (Wyeth Wholesaler Distribution Services Agreement First Amendment, Pfizer and McKesson Corporation, July 1, 2010).

[92]    WYEFFAT06391759-1785 (Wyeth Wholesaler Service Agreement, Wyeth and Cardinal, June 1, 2005); WYEFFAT06391397-1438and WYEFFAT06391481-1522 (Wyeth Wholesaler Service Agreement, Wyeth and AmeriSource Health Services Corporation, June 1, 2005); WYEFFAT06391439-1480 (Wyeth Wholesaler Service Agreement, Wyeth and AmerisourceBergen Drug Corporation, June 1, 2005); WYEFFAT06392727-2747 (Wyeth Wholesaler Service Agreement, Wyeth and McKesson Corporation, June 1, 2005); WYEFFAT06392693-2726 and WYEFFAT06392748-2781 (Wyeth Wholesaler Service Agreement, Wyeth and McKesson Corporation, September 1, 2008); WYEFFAT06392840-2844 (Wyeth Wholesaler Distribution Services Agreement First Amendment, Pfizer and McKesson Corporation, July 1, 2010). These agreements also include other performance-based criteria, including but not limited to maintaining adequate inventory, servicing a high enough percentage of orders, submitting timely and accurate financial data, submitting accurate chargebacks, not taking unauthorized deductions. See, e.g., WYEFFAT06392840-2844 at 2844. See also

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

differing incentives among proposed class members, but it would require individualized inquiry to resolve which other proposed class members may have negotiated DSAs with Wyeth, the terms of any such DSAs, and how this would affect proposed class members' incentives.

60.     Furthermore, Dr. Leitzinger notes that Walgreens, Kroger, Safeway, Supervalu, HEB, American Sales Company, Rite Aid, Meijer, Giant Eagle, and CVS, all major retail pharmacy chains, may request to opt out of the class. The decision of these large pharmacy purchasers to exclude themselves from a class led by wholesalers underscores the economic divergence between these types of entities. This pattern of opt-outs is consistent with the opinion that pharmacies and wholesalers should not be grouped within the same class due to inherent business differences and potentially conflicting interests.

## V.     DR. LEITZINGER OVERSTATES THE SIZE OF THE PROPOSED CLASS

### A.     Dr. Leitzinger overstates the number of proposed class members by ignoring common ownership

61.     The pharmaceutical industry has undergone and continues to experience consolidation. Many proposed class members have merged with or been acquired by other proposed class members. For example:

a.   AmerisourceBergen now owns American Health Packaging, Bellco, Valley Wholesale Drug, and H. D. Smith Wholesale;

b.   Cardinal Health now owns Dik Drug, Kinray, ParMed, Whitmire Distribution, Harvard Drug, Great Lakes Wholesale, and Major Pharmaceuticals; and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

     c.  McKesson now owns Masters Pharmaceutical, PSS World Medical, and Rebel

         Distributors.[93]

62.    From an economic perspective, it is inappropriate to treat entities that have been

combined through mergers or acquisitions as more than a single entity for purposes of analyzing

economic incentives and the economic effects of the challenged conduct. Dr. Leitzinger's

analysis implicitly acknowledges this, but the way he accounts for industry consolidation is

incomplete. Rather than conduct his own independent assessment, Dr. Leitzinger explained that

"Counsel instructed me to combine certain entities" in his report.[94] As a result of this instruction,

Dr. Leitzinger combines 21 entities, yet, as I show in **Exhibit 8**, he inexplicably ignores 12 other

entities that were merged or acquired.

63.    Seven of the 12 consolidated entities that Dr. Leitzinger ignores were acquired by

other proposed class members. Specifically, while Dr. Leitzinger combines American Health

Packaging and Bellco into AmerisourceBergen, he ignores that AmerisourceBergen acquired H.

D. Smith Wholesale and its subsidiary Valley Wholesale Drug in January 2018.[95] Similarly, Dr.

Leitzinger combines Major Pharmaceuticals and Great Lakes Wholesale with Harvard Drug, but

he omits Cardinal Health's acquisition of Harvard Drug in July 2015.[96] Dr. Leitzinger also failed

to account for:

     a.  Express Scripts' acquisition of Medco in 2012;

---

[93]  See **Exhibit 8** for a complete list of the relevant mergers and acquisitions involving Dr. Leitzinger's proposed class members.

[94]  Leitzinger Report, ¶ 33.

[95]  **Exhibit 8**.

[96]  **Exhibit 8**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

      b.   Cigna's acquisition of Express Scripts in 2018;

      c.   J M Smith Corporation's acquisition of Burlington Drug in 2017; and

      d.   Kash n' Karry's eventual consolidation under Winn Dixie in 2014.[97]

64.     Accounting for these seven merged and/or acquired entities reduces Dr. Leitzinger's proposed class size from 59 to 52.[98]

65.     Five of the 12 entities that Dr. Leitzinger ignores consolidated under an opt-out. Specifically, CVS Health[99] acquired Aetna in November 2018 and Schnucks Pharmacy in July 2020, Rite-Aid acquired Bartell Drug Company in December 2020, and Walgreens acquired Duane Reade in April 2010 and Kerr Drug in November 2013.[100] As a matter of economics, CVS Health, Rite Aid Corp., and Walgreens have economic incentives to pursue any claims for overcharges associated with their subsidiaries, and therefore, including their subsidiaries in the proposed class increases the risk of double-counting those claims. Accounting for these five consolidated entities further reduces Dr. Leitzinger's proposed class size from 52 to 47.

66.     By ignoring common ownership beyond what Plaintiffs' Counsel instructed him to do, Dr. Leitzinger has not only improperly identified the proposed class but has also overestimated the number of entities in the proposed class. In short, Dr. Leitzinger's proposed

---

[97]  **Exhibit 8**.

[98]  Note that I make my adjustments to Dr. Leitzinger's proposed class size starting from his list that excludes the opt-outs. See Leitzinger's Exhibit 6.

[99]  The name "CVS Health" reflects the renaming of opt-out "CVS Caremark," consistent with the company's 2014 name change. See, "CVS Caremark Announces Corporate Name Change to CVS Health to Reflect Broader Health Care Commitment," *Pharmacy Times*, September 3, 2014, available at https://www.pharmacytimes.com/view/cvs-caremark-announces-corporate-name-change-to-cvs-health--to-reflect-broader-health-care-commitment. ("CVS Caremark Corporation […] announced today that it is changing its corporate name to CVS Health to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health.")

[100]  **Exhibit 8**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

class member list suggests there to be more entities than there actually are.[101] After accounting

for mergers and acquisitions, the number of members in Dr. Leitzinger's proposed class reduces

from 59 to 47.

### B. Many proposed class members should be excluded based on their unique purchasing pattern

#### 1. Brand-only purchasers

67.     Dr. Leitzinger claims to exclude brand-only purchasers from the class.[102] He

ignores, however, seven entities that are brand-only purchasers during the period relevant for this

case. Specifically, Dr. Leitzinger misclassifies Cesar Castillo Inc, DMS Pharmaceutical, Henry

Schein, QK Healthcare Inc, Quality Care Products, R & S Northeast, and Associated Pharmacies

as brand-generic purchasers.[103] While these seven entities did purchase generic Effexor XR, they

did not do so until after the end of the Class Period (May 31, 2011).[104] Given that these direct

purchasers only purchased Effexor XR throughout the entire Class Period, it is speculative for

Dr. Leitzinger to claim that had Teva entered earlier, these purchasers would have purchased

generic Effexor XR earlier. Excluding these seven direct purchasers that were brand-only

purchasers throughout the Class Period further reduces the proposed class size from 47 to 40.

---

[101]  I note that many of these acquisitions took place on or after June 1, 2011 (the date of mass generic entry), however as explained below, the key issue is the current ownership structure for the purposes of recovering damages and considering the economic incentives to pursue joinder. See **Section VI**. Furthermore, Dr. Leitzinger accounts for acquisitions that occur as late as 2018. See **Exhibit 8**.

[102]  Leitzinger Report, footnote 5, citing to the Complaint, ("Excluded from the Direct Purchaser Class are […] all persons or entities that purchased Effexor XR directly from Wyeth during the Class Period that did not also purchase generic Effexor XR directly.")

[103]  See **Exhibit 1**.

[104]  The seven entities' first generic purchases are: Cesar Castillo Inc on June 29, 2011; DMS Pharmaceutical on December 12, 2011; Henry Schein on September 10, 2013; QK Healthcare Inc on March 12, 2014; Quality Care Products on December 27, 2012; R&S Northeast on October 4, 2011; and Associated Pharmacies on June 2, 2011. See Reliance materials.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 2. *Named Plaintiff Uniondale Chemists is a direct purchaser only by assignment*

68.     Dr. Leitzinger includes Named Plaintiff Uniondale Chemists in his list of proposed class members. However, Uniondale Chemists did not make any direct purchases of Effexor XR or generic Effexor XR; its inclusion is based solely on an assignment from QK Healthcare, Inc.[105] Because QK Healthcare is a brand-only purchaser that should be excluded from the class (see **Section V.B.1**), Uniondale is also a brand-only purchaser (through its assignment) that should be excluded from the class. Excluding Uniondale reduces the number of Dr. Leitzinger's proposed class members from 40 to 39.

### 3. *Generic-only purchasers*

69.     Dr. Leitzinger claims that generic-generic overcharges arise because direct purchasers purchased generic Effexor XR at higher prices than they would have in his but-for world. This claim is based on Dr. Leitzinger's speculative assumptions that an authorized generic and an additional generic would have entered earlier than they actually did. Even if Teva had entered when Plaintiffs claim, if an authorized generic and additional generic did not enter earlier but rather entered when they actually did in June 2011, the generic price in the actual world and but-for world would be the same, leaving no basis for generic-generic overcharges. As a result, generic-only purchasers would not experience any overcharge.[106]

---

[105]    Leitzinger Report, footnote 52 ("The only Class member that does not appear in the data as a direct purchaser is Uniondale Chemists. I understand that Uniondale Chemists is a Class member by assignment from QK Healthcare, Inc."); QK_0001687 (Agreement for Assignment of Claims between Uniondale and QK, effective June 21, 2011).

[106]    Plaintiffs may claim that, even if Teva was the only generic entrant, the but-for generic price would still be lower than actual generic prices because Teva would have launched in May 2009 when brand WAC was $3.39, as opposed to July 2010, when Wyeth had increased brand WAC to $4.43, and in Dr. Leitzinger's model Teva launches at a fixed 37 percent discount from brand WAC (see Leitzinger Report, Exhibit 11). This ignores the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

70.    Even if the Court finds that generic-only purchasers have experienced overcharge, the cause and quantification of that overcharge is very different from those purchasers, primarily wholesalers, that bought the brand. To the extent wholesalers and other purchasers of brand product experience overcharge, it is caused by the alleged delay of lower-priced generic product. However, purchasers of generic product do not experience overcharge due to delay. Rather, their overcharge begins once actual generic entry has commenced and flows from a reduction in the intensity of generic competition allegedly caused by the challenged conduct. Purchasers of generic product generally engage in highly individualized negotiations with generic manufacturers, and the prices they pay reflect that by exhibiting a substantial degree of variability. Prices for generic product paid by direct purchasers in this case reflects this general principle. As I show in **Exhibit 9**, net generic prices paid varied considerably, from $0.47/capsule to $3.49/capsule, an over seven-fold difference. Assessing overcharges for such purchasers requires analyzing the manner in which those negotiations would have played out in the absence of the challenged conduct, which requires highly individualized analysis not amenable to Dr. Leitzinger's use of averages.

71.    It is also notable that pharmacies make up the majority of generic-only purchasers. Given the theory of harm is different for these two groups, and it requires a different

---

pattern in WAC price increases in this case. Dr. Leitzinger assumes that net brand prices would change earlier in his but-for world (which forms the basis for his claims of brand-brand overcharges) but he neglects to extend that analysis to the effect of generic entry on list prices (that is, WAC), in spite of the data in his own reliance materials showing that WAC increases accelerated after generic entry. Specifically, the data show that the average WAC increase prior to Teva's actual entry was $0.08/capsule (three percent), while the average WAC increase after Teva's entry rose to $0.58/capsule (nine percent). Had the acceleration in WAC increases begun earlier, WAC would have been higher in the but-for world, Teva would have launched at a higher generic price, and any difference between actual generic price with one generic and but-for generic price with one generic under Dr. Leitzinger's model would likely be eliminated. See Reliance materials.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

formula for calculating overcharges,[107] including generic-only purchasers in a class with brand-generic purchasers does not make economic sense.

72.    As I show in **Exhibit 1**, there are 19 proposed class members that only purchased generic product during the Class Period after accounting for common ownership. Excluding these remaining 19 generic-only purchasers further reduces the proposed class size from 39 to 20.

### 4.    *Brand-generic purchasers that only purchased brand prior to but-for generic entry*

73.    Dr. Leitzinger includes Discount Drug Mart in his proposed class based on its purchases of brand Effexor XR between June 14, 2008 (the beginning of his alleged Class Period) and July 2008 and its purchases of generic Effexor XR between July 2010 and November 2018.[108] Discount Drug Mart's purchases of brand Effexor XR, however, are not relevant because they occur prior to May 15, 2009, the date when Dr. Leitzinger claims that direct purchases began to experience overcharge damages. In other words, it makes no sense to classify a direct purchaser based on purchases for which it could not have experienced any overcharge and is furthermore inconsistent for Dr. Leitzinger to define a class period that begins before his damage estimates begin.[109] Dropping Discount Drug Mart's purchases prior to May 15, 2009, leaves only Discount Drug Mart's generic purchases. Discount Drug Mart is therefore a generic-only purchaser, and for the same reasons as I discussed above in **Section V.B.3**, should

---

[107]    Leitzinger Report, ¶ 45.

[108]    See Leitzinger production materials.

[109]    I note that Dr. Leitzinger's time period for brand-generic damages is also inconsistent with his defined Class Period. Dr. Leitzinger's Class Period ends on May 31, 2011, but he calculates brand-generic damages through June 2015.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

be excluded from the proposed class. Excluding Discount Drug Mart accordingly reduces the proposed class size from 20 to 19.

### C.    Summary of adjustments to the number of proposed class members

74.    In sum, Dr. Leitzinger's proposed class of 67 entities (including opt-out Retailer Plaintiffs) is reduced to 19 based on the following adjustments (see **Appendix D**):

    a.    8 opt-out entities are removed that Dr. Leitzinger himself excludes from his damages estimate, reducing the proposed class size to 59;

    b.    7 entities are removed due to consolidation through mergers and acquisitions with another proposed class member, further reducing the proposed class size to 52;

    c.    5 entities are removed due to consolidation through mergers and acquisitions with an opt-out retailer, further reducing the proposed class size to 47;

    d.    8 brand-only purchasers are removed because they were not injured, (including Uniondale via assignment to QK), further reducing the proposed class size to 39; and

    e.    20 generic-only purchasers, including Discount Drug Mart, are removed (these entities have a different theory of harm and furthermore Dr. Leitzinger has not demonstrated there to be any basis for overcharges), further reducing the proposed class size to 19.[110]

---

[110]    If the Court finds that M&A does not adjust the number of class members, I find that the proposed class size falls to 22. The proposed class size still falls by a large amount because many of the entities that were consolidated under M&A are generic-only entities that should still be removed if M&A is ignored. Indeed,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## VI.    THERE IS SUFFICIENT EVIDENCE OF ECONOMIC INCENTIVES FOR PLAINTIFFS TO PURSUE JOINDER

### A.    Proposed class members have a history of collaboration

75.    Members of the proposed class have demonstrated a willingness and ability to cooperate among themselves. As I discuss in **Section V.A**, several proposed class members have combined through mergers and acquisitions. For example, H.D. Smith and Valley Wholesale Drug Company are now owned by AmerisourceBergen. Likewise, Harvard Drug is now owned by Cardinal Health. These mergers and acquisitions occurred over many years, with AmerisourceBergen's acquisitions falling between 2007 and 2018 and Cardinal's acquisition occurring in 2015. The same is true of other mergers as well, with Kash n' Karry's eventual consolidation under Winn-Dixie in 2014 and Cigna acquiring Express Scripts in 2018. The broad time period over which these mergers and acquisitions have taken place demonstrates that these entities' willingness and ability to cooperate cannot be attributed to a single point in time, but rather that incentives for cooperation among proposed class members have existed for some time and continue to be present.

76.    Merger and acquisition activity creates economic incentives for the consolidated entity to pursue recovery and share costs in litigation across the merged parties. For example, if a parent company such as AmerisourceBergen decides to participate in litigation, it has substantial economic incentives to consolidate the costs of participation across all formerly separate entities

---

ignoring M&A consolidation leads to 28 generic-only entities that should be excluded. In addition, though I exclude Medco due to M&A consolidation, Medco should still be excluded if I ignore M&A consolidation. This is because it is unlikely that Medco suffered either brand-generic or generic-generic overcharge (see **Section IV.A**) and furthermore Medco could not have experienced any brand-brand damages because it did not make any purchases during the period over which Dr. Leitzinger calculates brand-brand damages. See **Appendix D.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and to pursue claims incurred by all of those entities.[111] Accordingly, it is economically inappropriate to treat affiliates as independent participants; consolidated entities should instead be grouped under the parent for analytical purposes.

77.     While mergers and acquisitions represent a more formal and enduring form of cooperation, proposed class members have also demonstrated a strong capacity to work together through litigation. As further evidence of their ability to pursue joinder in this matter, **Exhibit 10** shows that several of Dr. Leitzinger's proposed class members have acted as joint plaintiffs in prior matters, including class actions and direct actions. For example, Named Plaintiff RDC has jointly pursued litigation with at least one other proposed class member in no fewer than six separate matters. Similarly, the Big 3 wholesalers have jointly pursued litigation in at least five cases. Burlington Drug and Value Drug have both also jointly pursued litigation with at least one other proposed class member in at least seven different cases. In at least four separate cases, ten or more proposed class members jointly pursued litigation, including 18 proposed class members in the *In re Zetia* matter.

78.     Moreover, I understand that following the Third Circuit's finding that certification of a direct purchaser class in the *In re Modafinil* case was not appropriate, proposed class

---

[111]  This is consistent with wholesaler's financial reporting, where settlements of antitrust litigation are reported in the firms' consolidated financial statements. See, e.g. Cencora, Inc., (formerly AmerisourceBergen) "Form 10-K for the Fiscal Year Ended September 30, 2024," November 26, 2024, Note 14, which states: "Numerous lawsuits have been filed against certain brand pharmaceutical manufacturers alleging that the manufacturer, by itself or in concert with others, took improper actions to delay or prevent generic drugs from entering the market. These lawsuits are generally brought as class actions. The Company has not been named a plaintiff in any of these lawsuits, but has been a member of the direct purchasers' class (i.e., those purchasers who purchase directly from these pharmaceutical manufacturers). None of the lawsuits has gone to trial, but some have settled in the past with the Company receiving proceeds from the settlement funds. During the fiscal years ended September 30, 2022, 2021, and 2020, the Company recognized gains relating to these lawsuits of $1.8 million, $168.8 million, and $9.1 million, respectively. These gains, which are net of attorney fees and estimated payments due to other parties, were recorded as reductions to cost of goods sold in the Company's Consolidated Statements of Operations."

members Burlington Drug, Rochester Drug Cooperative, SAJ Distributors, and J M Smith

Corporation, decided to proceed with that case as joint plaintiffs.[112] More recently, in the *MLI Rx*

*LLC et al. v. GlaxoSmithKline et al.* ("*Lamictal*") matter, 15 proposed class members

(AmerisourceBergen, H.D. Smith Wholesale, Valley Wholesale Drug, Harvard Drug, Cardinal

Health, McKesson, Miami Luken (via MLI RX), Burlington Drug, Dakota Drug, North Carolina

Mutual Wholesale Drug, Prescription Supply, J M Smith Corporation, Value Drug, Morris &

Dickson, and Frank W Kerr) coordinated to file suit collectively in a case involving alleged

delayed generic competition for Lamictal.[113] These and other examples demonstrate that

members of the proposed class have both the incentive and ability to cooperate in legal matters,

and that joinder is a practical and proven alternative to class treatment in this context.

79.    This willingness to litigate collectively reflects a broader pattern of coordination

among proposed class members that extends well beyond legal matters. In the ordinary course of

business, these entities routinely collaborate through strategic partnerships, group purchasing

organizations, and industry alliances, demonstrating both the economic rationale and operational

feasibility of joint action.

80.    The Big 3 wholesalers have partnered with large retail pharmacy chains to

develop generic sourcing programs that concentrate the sales of generic drugs through a linked

---

[112]  See, Status Report Pursuant to the Court's Order of Nov. 30, 2017, *King Drug Co. of Florence et al. v.
Cephalon, Inc., et al.*, Case No. 2:06-cv-01797, District Court for the Eastern District of Pennsylvania, January
23, 2018; Motion to Join Additional Plaintiffs, *King Drug Co. of Florence et al. v. Cephalon, Inc., et al.*, No.
2:06- cv-01797, District Court for the Eastern District of Pennsylvania, March 20, 2018, pp. 1–2; Motion to
Intervene of Additional Plaintiffs, *King Drug Co. of Florence et al. v. Cephalon, Inc., et al.*, Case No. 2:06-cv-
01797, District Court for the Eastern District of Pennsylvania March 20, 2018, pp. 1–2.

[113]  See, Complaint, *MLI Rx LLC, et al. v. GlaxoSmithKline LLC, et al.*, No. 2:23-cv-02960, District Court for the
Eastern District of Pennsylvania, February 2, 2023; Complaint, *FWK Holdings, LLC. v. GlaxoSmithKline LLC,
et al.*, No. 2:23-cv-02956, District Court for the Eastern District of Pennsylvania, February 27, 2023;
Complaint, *Morris & Dickson Co., LLC v. GlaxoSmithKline LLC, et al.,* No. 2:23-cv-02958, District Court for
the Eastern District of Pennsylvania, February 7, 2023.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

distributor-pharmacy pipeline. For example, in 2016, Walmart and McKesson announced a partnership in which Walmart agreed to source its generic drug purchases through McKesson.[114] In fact, since 2014, over 75 percent of annual generic drug purchases by pharmacies have been through a generic sourcing program (90 percent in 2018), which has contributed to generic price declines.[115]

81.    Another means of cooperation is the use of group purchasing organizations ("GPOs"). GPOs allow their members to negotiate more favorable rebates and discounts with manufacturers based on higher purchase volume.[116] Several proposed class members have joined GPOs. For example, Capital Wholesale, Dakota Drug, Drogueria Betances, Frank W Kerr, Louisiana Wholesale, Miami Luken, Prescription Supply, Quality Care Products, RDC, J M Smith Corporation (and its subsidiary, Burlington Drug), and Value Drug Company are current or past members of Optisource, a GPO for generic purchasing.[117] In **Exhibit 11**, I show the various GPOs to which Dr. Leitzinger's proposed class members have belonged or currently

---

[114] "McKesson and Walmart Announce Sourcing Agreement for Generic Pharmaceuticals," *Walmart,* May 16, 2016, available at https://corporate.walmart.com/news/2016/05/16/mckesson-and-walmart-announce-sourcing-agreement-for-generic-pharmaceuticals.

[115] "The Role of Distributors in the US Health Care Industry: 2019 Report," *Deloitte*, 2019, available at https://www.hda.org/getmedia/88288d13-f0b2-430d-9771-b71db1497f35/HDA-Role-of-Distributors-in-the-US-Health-Care-Industry.pdf ("Deloitte 2019"), p. 14.

[116] The Healthcare Distribution Alliance ("HDA") explains that a GPO "negotiates buying contracts for healthcare products at discounted fees for hospitals and health plans." See, "93rd Edition HDA Factbook: The Facts, Figures and Trends in Healthcare (2022-2023)," *HDA Research Foundation*, 2022, p. 88. A Deloitte industry report further defines GPOs as "entit[ies] created to leverage the purchasing power of a group of businesses to obtain discounts from vendors through collective buying power." The report states that GPOs "[help] providers and pharmacies save money by aggregating purchasing volume to negotiate discounts from manufacturers and other ecosystem participants, resulting in lower-priced medications." "Distributors manage contracts between GPOs and manufacturers, enabling GPOs to use the bargaining power of their members to earn discounts. Distributors monitor sales between these [industry participants] and facilitate the payment of chargebacks from the manufacturer in the amount of the difference between the prices negotiated by the GPOs and the wholesaler acquisition cost (WAC)." Deloitte 2019, pp. 7, 10, 27. GPOs vary in size and specialization, while providing their members cost savings by offering economies of scale to the healthcare supply chain. "FAQ," *Healthcare Supply Chain Association*, available at https://www.supplychainassociation.org/about-us/faq/.

[117] See **Exhibit 11**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

belong. In particular, after correcting for Plaintiffs' overstatement of the proposed class, 11 out of 19 remaining members have participated or currently participate across four GPOs.

82.     Class members have joined other groups together as well, such as the National Association of Chain Drug Stores ("NACDS") and the Healthcare Distribution Alliance ("HDA"), an organization whose members include both manufacturers and wholesalers (e.g., AmerisourceBergen, Cardinal, and McKesson) that hire experts to develop industry outlooks.[118] These collaborative structures further demonstrate that, even absent formal mergers, proposed class members have both the incentive and capacity to coordinate activity. Their long-standing and diverse forms of cooperation reveal that joint action is not only feasible but already embedded in their commercial behavior.

83.     Furthermore, proposed class members have sufficient financial resources to make joint action feasible. According to Dr. Leitzinger, the Big 3 wholesalers account for over 85 percent of total overcharges.[119] McKesson, Cardinal, and AmerisourceBergen are large organizations, with annual revenues of approximately $359 billion, $227 billion, and $294 billion in their most recent 10-K filings, respectively.[120] Their substantial financial resources suggest that these entities, representing the primary source of overcharge claims, are unlikely to encounter significant financial obstacles in pursuing litigation independently.

84.     In sum, there is a demonstrated history of mergers, litigation partnerships, and participation in GPOs and industry alliances among proposed class members. This widespread

---

[118]   "About HDA," *Healthcare Distribution Alliance,* available at https://www.hda.org/about/; "Mission," *National Association of Chain Drug Stores,* available at https://www.nacds.org/about/mission/.

[119]   Leitzinger Report, Exhibit 13.

[120]   McKesson Corporation, "Form 10-K for the year ended March 31, 2025," May 8, 2025, at p. 60; Cardinal Health, Inc. "Form 10-K for the year ended June 30, 2024," August 14, 2024, at p. 52; Cencora, Inc. (formerly AmerisourceBergen), "Form 10-K for the year ended September 30, 2024," November 26, 2024, at p. 50.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and routine coordination strongly suggests that neither transaction costs nor coordination costs pose a meaningful barrier to pursuing joint litigation through joinder in this matter.

### B.    Dr. Leitzinger's prospective value claims lack foundation

85.    Dr. Leitzinger suggests that proposed class members with claims below a certain benchmark would lack the incentive to litigate individually. In support of this, he estimates litigation costs of $3.7 million derived from the *Nexium* matter as a benchmark, assuming that each proposed class member in this case would incur those costs on a "go it alone" basis.[121] Under this framework, he categorizes claims falling below the *Nexium* benchmark as "negative value."[122]

86.    Dr. Leitzinger's use of the *Nexium* benchmark fails to explain proposed class members' behavior in this matter, thereby demonstrating the unreliability of his analysis. Specifically, Uniondale, a Named Plaintiff in this case, has by far the lowest estimated trebled overcharges among all proposed class members. According to Dr. Leitzinger's Exhibit 13, Uniondale's trebled overcharges amount to just ████, compared to the next lowest at ████ and the highest at ████. Serving as a Named Plaintiff entails substantial litigation obligations, including responding to discovery, working with counsel, and potentially testifying.[123] Nonetheless, Uniondale chose to serve as a Named Plaintiff. This indicates that Dr. Leitzinger's claim value analysis is wrong, as it fails to explain Uniondale's conduct.

---

[121]    Leitzinger Report, ¶¶ 59-61, Exhibit 13.

[122]    Leitzinger Report, ¶ 59, Exhibit 13.

[123]    See, "Protecting Awards for Named Plaintiffs; Other Class Action Practice Tips," *National Consumer Law Center,* January 11, 2023, available at https://library.nclc.org/article/protecting-awards-named-plaintiffs-other-class-action-practice-tips.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

87.     Moreover, Dr. Leitzinger's analysis fails to consider that plaintiffs can and routinely do share costs by litigating jointly. Class members are not required to proceed individually; they can pursue claims collectively through joinder. This is precisely what the 16 wholesalers did in the *Lamictal* matter. Prescription Supply provides a concrete example. According to Dr. Leitzinger's Exhibit 13, Prescription Supply's estimated trebled overcharges in this matter are ████████, well below the *Nexium*-based benchmark for a positive-value claim.[124] Its claims in *Lamictal* were likely similar to its potential claims here, given similarities in the overall sales of the two products.[125] Yet despite this, and in direct contradiction to Dr. Leitzinger's claim value analysis based on his *Nexium* benchmark, Prescription Supply still opted to proceed with direct action as part of a coordinated group in *Lamictal*. Prescription Supply's decision to pursue joint litigation demonstrates that entities with modest prospective recoveries can, and do, find it worthwhile to litigate outside the class mechanism. Not only does this fact undermine Dr. Leitzinger's assumption that proposed class members in this matter would forgo recovery absent class certification, it also shows the baselessness of Dr. Leitzinger's *Nexium* benchmark based on proposed class members' own revealed behavior.

88.     Given the examples discussed in this section, Dr. Leitzinger's claim value analysis is not reliable. Moreover, he fails to account for the funding mechanisms that are

---

[124]   Leitzinger Report, Exhibit 13.

[125]   See, Leitzinger Report, ¶ 19. See also, "Teva Introduces First Generic Lamictal® Tablets in the United States," *Teva,* July 23, 2008, available at https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2008/Teva-Introduces-First-Generic-Lamictal-Tablets-in-the-United-States/default.aspx. Because Prescription Supply is a national wholesaler without a known specialization in any therapeutic class or region, it is reasonable to assume that its claims would be similar across the two products. See, "Frequently Asked Questions," *Prescription Supply, Inc.* available at https://prescriptionsupply.com/frequently-asked-questions/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

available to plaintiffs today, including contingency fee-based arrangements that can significantly reduce or eliminate out-of-pocket litigation costs.[126]

## VII.    DR. LEITZINGER'S OVERCHARGE ANALYSES ARE BASED ON UNSUPPORTED ASSUMPTIONS AND SUFFER FROM NUMEROUS ERRORS THAT RENDER HIS RESULTS UNRELIABLE AND OVERSTATED

89.    Dr. Leitzinger employs an economic model that relies on average behavior and injury across all purchasers. His model fails to account for variations in pricing, purchasing patterns, and contractual arrangements between direct purchasers and suppliers and fails to capture the complex and individualized nature of the alleged harm. These and other flaws lead him to overstate damages to proposed class members by upwards of 100 percent.

### A.    Baseline corrections

#### 1.    Dr. Leitzinger uses incorrect but-for prices in his overcharge analysis

90.    In his expert report, Dr. Leitzinger presents explicit formulas for calculating damages.[127] However he does not actually apply these formulas, and instead calculates his alleged damages by multiplying total brand and generic volume purchased by the difference between a single blended-average actual price and a single blended-average but-for price

---

[126]    "What to Expect Regarding Fees and Billing," *The State Bar of California*, available at https://www.calbar.ca.gov/Public/Free-Legal-Information/Working-with-an-Attorney/What-to-Expect-Regarding-Fees-and-Billing; "Transactional Contingency Fee Agreements," *California Lawyers Association*, available at https://calawyers.org/california-lawyers-association/transactional-contingency-fee-agreements/.

[127]    Leitzinger Report, ¶¶ 43-45.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

calculated across his Delay Period, Teva Exclusivity Period, and a period with multiple generic competitors.[128] In computing these blended-average prices, Dr. Leitzinger makes two errors:[129]

a. Dr. Leitzinger uses an actual generic price that is too low when calculating generic-generic overcharges during the Teva Exclusivity period by incorporating actual generic prices in the period following multiple generic entry. This causes him to *understate* generic-generic overcharges; and

b. Dr. Leitzinger uses a but-for generic price that is too high when calculating overcharges on actual generic units during the period following mass generic entry by incorporating actual generic prices from the period when Teva was the only generic available. This causes him to *overstate* brand-generic overcharges. This error is larger than the first, leading to a net reduction in overall overcharge damages. See **Exhibit 12**.

91. I show the cumulative impact of both corrections in the Baseline [II] row in **Exhibit 12**. Making these corrections reduces damages from ████████ to ████████, which represents a 5 percent reduction.[130]

---

[128] Leitzinger Report, ¶¶ 43-45; Leitzinger production materials.

[129] While it is not entirely clear why Dr. Leitzinger makes these errors, it could be a consequence of the fact that the calculations he undertakes in his production materials do not follow the formulas he outlined in his report. In his production materials, Dr. Leitzinger attempts to calculate the difference between a single blended average but-for price from a single blended average actual price and multiply this difference by the overcharge volume. The blended average approach, however, obscures the mistake he makes.

[130] While generic-generic damages increase from negative ████████ to positive ████████ (an increase in ████████, brand-generic damages fall by more than that, from ████████ to ████████, a decrease of ████████. See backup to **Exhibit 12**.

> 2.    *Dr. Leitzinger applies a class-wide average price and generic penetration rate that overstates damages*

92.    As shown in **Exhibit 12** and discussed in **Section IV**, Dr. Leitzinger's use of a single, class-wide average but-for price and generic penetration rate inflates damages by masking that different types of customers pay very different prices and have very different generic penetration rates. Dr. Leitzinger's use of an average but-for generic price that incorporates prices from wholesalers and retailers makes the but-for price too low and therefore inflates brand-generic overcharges (**Section IV.C**). Similarly, Dr. Leitzinger's use of an average generic penetration rate that includes generic-only purchasers overstates the generic penetration rates for direct purchasers of the brand and inappropriately assigns brand-generic damages to generic-only purchasers, which inflates brand-generic overcharges. Finally, brand-only purchasers by definition have zero generic penetration. Applying a non-zero generic penetration rate to brand-only purchasers inappropriately estimates brand-generic damages for brand-only purchasers by inappropriately assuming brand-only purchasers made but-for generic purchases. This, too, overestimates brand-generic damages. It is not appropriate to estimate brand-generic damages for brand-only purchasers because purchasers that revealed a preference for only the brand would be very unlikely to have purchased a generic product in the but-for world (**Section IV.D**).

93.    I correct Dr. Leitzinger's damages estimates by calculating damages separately for brand-generic purchasers, brand-only purchasers, and generic-only purchasers, including applying separate generic penetration rates and prices.[131] Because brand-only purchasers only purchased brand, my correction implicitly means that brand-only purchasers only contribute to

---

[131]    When applying Dr. Leitzinger's damages separately for the three categories of customers, I reclassify Discount Drug Mart from brand-generic to generic-only. This is because Dr. Leitzinger defined Discount Drug Mart based on its purchases during the Class Period (June 14, 2008, through May 31, 2011). However, as I explain in **Section V.B.4**, it is not appropriate to consider purchases prior to Teva's but-for entry.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

brand-brand damages. Similarly, because generic-only purchasers only purchased generic, my correction leads to generic-only purchasers only contributing to generic-generic damages.[132] As shown in **Exhibit 12**, this correction reduces damages from ███████ to ███████ for a further reduction of 11 percent.[133] I make all further adjustments starting from this corrected estimate of alleged damages. First, I discuss each correction and its impact individually, and then I report the cumulative impact of all corrections taken together.

### B. Dr. Leitzinger lacks a valid basis for including damages for certain time periods and direct purchasers

#### 1. Brand-generic overcharges from the period after generic entry should be excluded

94.    Dr. Leitzinger calculates brand-generic damages through June 30, 2015, five years after actual generic entry.[134] After actual generic entry, however, purchasers who bought the brand had the option to purchase the generic but elected not to do so. As a matter of economics, entities that continued to purchase the brand when the generic was available cannot be assumed to have been "overcharged" on their brand purchases because, after actual generic entry, those entities were no longer precluded from purchasing the generic. However, Dr. Leitzinger calculates considerable brand-generic damages after actual generic entry. In **Exhibit 12**, I correct Dr. Leitzinger's damages estimates by removing brand-generic damages after actual generic entry, which reduces damages from ███████ to ███████ for a reduction of 25 percent.

---

[132]    Flaws in Dr. Leitzinger's data processing results in generic conversion rates greater than 100% in some quarters for generic-only purchasers. For the purposes of this correction I assume a generic conversion rate of 100% in all quarters. See backup to **Exhibit 12**.

[133]    $1 - (1.91/2.15) \times 100\% = 11.1\%$.

[134]    Leitzinger Report, ¶ 53. See also, **Exhibit 2**.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

   2. *Medco likely did not experience any brand-generic overcharge*

  95. Dr. Leitzinger claims that purchasers would have been able to substitute brand Effexor XR for the lower-priced generic Effexor XR had the generic launched earlier. He therefore claims direct purchasers of Effexor XR thus suffered overcharge damages because generic Effexor XR would allegedly have been less expensive.

  96. However, as shown in **Exhibit 3**, the actual price paid by direct purchaser Medco for brand Effexor XR was lower than Dr. Leitzinger's average but-for generic price. As a result, Medco likely did not experience any overcharge and should be excluded from any calculation of brand-generic damages. Removing Medco purchases from the calculation of brand-generic damages reduces damages from ▮▮▮▮▮▮ to ▮▮▮▮▮▮ for a reduction of 4 percent (see **Exhibit 12**).

   3. *Dr. Leitzinger fails to exclude all brand-only purchasers*

  97. As discussed in **Section V.B.1**, while Dr. Leitzinger claims to exclude brand-only purchasers from the class, he fails to exclude seven brand-only purchasers.[135] Excluding these seven direct purchasers that were brand-only purchasers throughout the Teva Exclusivity Period reduces damages by 0.01 percent.

   4. *Brand-brand overcharges are unjustified*

  98. For there to be any basis for brand-brand overcharges, there would need to be evidence that purchasers of brand-product would have received discounts on brand purchases in

---

[135] Associated Pharmacies, Cesar Castillo Inc, DMS Pharmaceutical, Henry Schein, QK Healthcare Inc, Quality Care Products, and R & S Northeast. See **Section V.B.1**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the but-for world that they did not receive in the actual world. For this to be true, any brand-discounting strategy would need to persist, thereby ensuring that the but-for brand price falls below the actual brand price for longer than in the actual world. Dr. Leitzinger has made no attempt at showing whether Wyeth's discounting strategy persists. Rather, he mechanically calculates a but-for brand price that is lower than the actual brand price during his Delay Period, but he does not examine how the brand price develops after the Delay Period. In fact, net prices for Effexor XR decline temporarily after generic entry, only to rebound and eventually rise above pre-generic entry levels.[136] This temporary decline in net brand prices undermines Dr. Leitzinger's damages approach because it shows that purchasers of brand product did not receive a discount in the but-for world that they would not otherwise have received in the actual world.[137] Further undermining Dr. Leitzinger's brand-brand overcharges, Dr. Leffler does not attempt to calculate brand-brand overcharges, focusing instead on brand-generic and generic-

---

[136] For Dr. Leitzinger's proposed class, the average net brand price in the month before Teva's entry, June 2010, was approximately ███. Following Teva's entry in July 2010, the price dropped to approximately ███. By July 2011, the price had risen above the pre-generic price, to approximately ███. See Reliance materials. Furthermore, the academic literature supports the view that price reductions for the brand following generic entry are often temporary. See, e.g., Frank, Richard G., and David S. Salkever, "The Regulation of Prescription Drug Competition and Market Responses: Patterns in Prices and Sales Following Loss of Exclusivity," *National Bureau of Economic Research*, 1995, available at https://www.nber.org/system/files/working_papers/w5306/w5306.pdf, Working Paper 5306, pp. 1–19, at p. 2. See also, Aitken, Murray L., et al., "The Regulation of Prescription Drug Competition and Market Responses: Patterns in Prices and Sales Following Loss of Exclusivity," *National Bureau of Economic Research*, 2013, available at https://www.nber.org/system/files/chapters/c13094/c13094.pdf, Working Paper 19487, pp. 243–271, at p. 245.

[137] Consider the analogy to Dr. Leitzinger's brand-generic damages. Those damages flow from his assumption that the generic would have been available for 13.5 more months in the but-for world than it was in the actual world (because he assumes Teva would have entered on May 15, 2009, 13.5 months earlier than it actually entered on July 1, 2010). His brand-brand damages do not flow from an assumption that brand discounts would have similarly been available for a longer period in the but-for world, but rather from the fact that he artificially truncates the analysis and ignores data showing that the brand-brand discounts did not persist after the entry of additional generic manufacturers. At most, Dr. Leitzinger might claim that brand purchasers suffered damage due to delayed receipt of the temporary discount in brand prices, but then damages would be based on the time value of money, not overcharge. And because each brand purchaser would likely have a different time value of money, assessing any brand-brand overcharges would require individualized inquiry. Furthermore, Dr. Leitzinger calculates his but-for brand price based on the percentage discount of the actual net brand price off WAC (Leitzinger Report, ¶ 51), but he fails to consider whether, when applying this discount to WAC in the earlier period, Wyeth may have accelerated its WAC increases earlier under earlier generic entry (see **Section V.B.3**).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

generic overcharges.[138] Dr. Leitzinger, therefore, lacks sufficient economic justification for claiming brand-brand damages. Removing brand-brand damages reduces damages from ███ to █████, for a reduction of 12 percent (see **Exhibit 12**).

       *5.    Direct purchasers with actual generic prices below but-for generic prices likely did not experience any generic-generic overcharge*

99.    Dr. Leitzinger claims that if generic competitors launched earlier, that would have triggered earlier price competition among generic manufacturers, leading to lower prices for generic Effexor XR. Relying on this assumption, he concludes that direct purchasers incurred overcharge damages by paying more for generic Effexor XR than they purportedly would have in the absence of the alleged delay.

100.    However, as demonstrated in **Exhibit 3**, the actual prices paid by direct purchasers Express Scripts, Medco, and Aetna for generic Effexor XR were lower than the but-for generic prices estimated by Dr. Leitzinger. As a result, these entities likely did not incur any overcharge and should be excluded from any calculation of generic-generic damages. Removing Express Scripts, Medco, and Aetna from generic-generic overcharges reduces damages from █████████ to ████████ for a reduction of 2 percent (see **Exhibit 12**).

       *6.    Generic-only purchasers have a different theory of harm*

101.    As discussed in **Section V.B.3**, generic-only purchasers have a different theory of harm from brand-generic purchasers and therefore including generic-only purchasers in a class with brand-generic purchasers does not make economic sense. I show the impact of this error by

---

[138]   Leffler Report, ¶¶ 101-102

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

removing generic-only purchasers. Applying this correction reduces damages from █████████

to ███████ for a reduction of 4 percent (see **Exhibit 12**).

### C.    Dr. Leitzinger's but-for world is speculative and unsupported

   *1.    Generic-generic and brand-generic damages are overstated if Teva would
   have been the only generic*

102.    Dr. Leitzinger's but-for scenarios rely on the speculative assumption that other

generic manufacturers would have been ready and able to launch prior to mass generic entry on

June 1, 2011. As discussed in **Section III.A**, Dr. Leitzinger relies on speculative assumptions for

his but-for scenario that lack basis in the factual record. If Teva was the only manufacturer

marketing generic Effexor XR, Dr. Leitzinger would have no basis for estimating generic-

generic overcharges and would overstate brand-generic overcharges. This is because there would

be no difference in the number of generic competitors in the actual and but-for worlds, and the

generic price in the actual world would therefore be equivalent to the generic price in but-for

world (see **Section V.B.3**). This eliminates the basis for generic-generic overcharges, and

narrows the gap between the actual brand price and but-for generic price, thereby attenuating

brand-generic damages. The removal of generic-generic overcharges and the attenuation of

brand-generic overcharges together reduce damages from ██████████ to █████████ for a

reduction of 35 percent (see **Exhibit 12**).

   *2.    Using assumptions from Dr. Leffler's but-for scenarios reduces Dr.
   Leitzinger's damages*

103.    As discussed in **Section III.A.2**, Dr. Leitzinger and Dr. Leffler construct different

but-for worlds, even though they rely on the same underlying factual record (see **Exhibit 2**). For

example, Dr. Leffler claims that Teva's generic entry would have occurred on November 1,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2009, 5.5 months later than Dr. Leitzinger's assumed entry date of May 15, 2009.[139] Using Dr.

Leffler's estimated but-for generic entry date of November 1, 2009, in Dr. Leitzinger's damages

analysis reduces damages from ████████ to ████████ for a reduction of 37 percent (see

**Exhibit 12**).

### 3.  *Evidence suggests that Teva could not have entered earlier than it did*

104.    I understand that Defendant expert Steve Galson will offer an opinion that it

would have been unlikely for Teva to have received final approval from the FDA earlier than

June 28, 2010, meaning there is no basis that Teva would have entered earlier in the but-for

world. This has a substantial impact on Dr. Leitzinger's damage estimates. If the FDA would

have approved Teva's ANDA at the same time in the but-for world as it did in the actual world,

then Dr. Leitzinger would have no basis to claim that Teva could have entered earlier than it did

in July 2010 and his Delay Period would no longer exist. With no Delay Period, Dr. Leitzinger

has no further basis to estimate brand-brand damages, since he only estimated brand-brand

damages during the Delay Period. Furthermore, Dr. Leitzinger can at most argue for a but-for

world in which Teva enters in July 2010 alongside an authorized generic. He no longer has any

basis to claim that a third generic would have entered *prior* to June 2011, because that is 11

months after Teva's actual entry in July 2010. Eliminating the Delay Period and recalculating Dr.

Leitzinger's model assuming Teva and an authorized generic enter in July 2010 reduces damages

from ████████ to ████████ for a reduction of 90 percent (see **Exhibit 12**).[140]

---

[139]    See, Leffler Report, ¶ 115, Table 1; Leitzinger Report ¶ 22.

[140]    I note that this correction does not take into account the fact that there is no basis for brand-generic damages
beyond the Delay Period. Had I further included that correction, there would only be generic-generic
overcharges due to the addition of the authorized generic in the but-for world.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

D.    **Cumulative impact of corrections**

105.    The cumulative impact of Dr. Leitzinger's errors and unsupported assumptions has a large effect on his overall damage estimates. For example, if I remove:

    a.  brand-brand overcharges;

    b.  brand-generic overcharges beyond Teva's Delay Period;

    c.  brand-generic and generic-generic overcharges associated with Medco;

    d.  and overcharges associated with all generic-only customers,[141]

106.    Dr. Leitzinger's damages fall from ▮▮▮▮▮ to ▮▮▮▮▮ for a reduction of 44 percent. If I further correct for Dr. Leitzinger's unsupported assumptions about the number of but-for generic competitors and apply Dr. Leffler's later but-for entry date, Dr. Leitzinger no longer has any basis for claiming generic-generic damages and his brand-generic damages fall substantially since now the but-for generic price is only influenced by one generic competitor instead of three. Dr. Leitzinger's estimate of alleged damages therefore falls even further to ▮▮▮▮▮, for a reduction of 81 percent. Finally, if I further adjust Dr. Leitzinger's damage estimates to eliminate the Delay Period, Dr. Leitzinger no longer has any basis to claim brand-generic damages, and his damage estimates fall to zero, for a reduction of 100 percent (see **Exhibit 12**).

---

[141]  Because removing generic-only customers will remove generic-generic overcharges for Aetna and ESI, for my cumulative corrections, I do not need to apply the correction I described in **Section VII.B.5** for Aetna and ESI. I further note that the impact of removing the brand-only purchasers that Dr. Leitzinger failed to identify is incorporated into my removal of brand-brand damages.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### E.    Dr. Leitzinger fails to remove opt-out assignments from overcharges

107.    Dr. Leitzinger also fails to adequately address opt-outs. In particular, while he
removes direct purchases from opt-out entities, he ignores that such entities were assigned claims
by proposed class members. For example, opt-out CVS was assigned claims by McKesson and
Cardinal Health.[142] CVS would have an incentive to bring its assigned claims itself to increase its
individual claim and potential damage award. Dr. Leffler apparently recognizes this fact because
when he calculates damages for CVS, he includes estimates of damages based on both CVS's
direct claims as well as its assigned claims. Dr. Leitzinger, however, only removes CVS's direct
purchases, not any purchases made by its assignor. Dr. Leitzinger and Dr. Leffler have therefore
double-counted damages by both estimating damages on the claims assigned to CVS. This is not
just true of CVS, however: all opt-outs are bringing claims through assignments, and therefore
Dr. Leitzinger and Dr. Leffler have double-counted damages for all opt-out assignments.[143]
Indeed, all of Dr. Leffler's brand-generic damages derive exclusively from opt-outs' assignment
claims and therefore are already accounted for by Dr. Leitzinger. These brand-generic damages
total ▮▮▮▮▮▮▮, which is over 60 percent of Dr. Leffler's total damage claims.[144] Plaintiffs'

---

[142]    CVS-EFX-0013962-3963 (CVS-McKesson Assignment Agreement Dated February 22, 2019); CVS-EFX-0000069-0070 (CVS-Cardinal Health assignment agreement dated September 26, 2018).

[143]    American Sales Company had assignment agreements with Cardinal Health (ASC-EFFEXOR-00000002-0004, ASC-EFFEXOR-00000007-0010) and McKesson (ASC-EFFEXOR-00000005-0006); CVS Health had assignment agreements with Cardinal Health (CVS-EFX-0000069-0070, CVS-EFX-0000006-0007) and McKesson (CVS-EFX-0013962-3963, CVS-EFX-0000004-05); Giant Eagle had assignment agreements with McKesson (GE000005-0006, GE000007-0008); HEB had assignment agreements with Cardinal Health (HEB-EFFEXOR-00000002-0003) and McKesson (HEB-EFFEXOR-00000004-0005); Kroger had assignment agreements with Cardinal Health (KRG-EFFEXOR-00000002-0003); Meijer had assignment agreements with Frank W Kerr (MEI-EFFEX-0001323-1324, MEI-EFFEX-0027440-7452) and McKesson (MEI-EFFEX-0195030-5032); Rite Aid had assignment agreements with McKesson (RA-EFX-0029650-9651, RA-EFX-0000003-0004); Safeway had assignment agreements with McKesson (SFW-EFFEXOR-00000002-0003); SuperValu had assignment agreements with McKesson (SUP-EFFEXOR-00000002-0003); Walgreen had assignment agreements with AmerisourceBergen (WLG-EFFEXOR-00000003-0004) and Cardinal Health (WLG-EFFEXOR-00000005-06).

[144]    See Reliance materials.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

experts clearly need to eliminate this double counting. Since Dr. Leitzinger does not address assignment claims, I do not address this matter further, but I reserve the right to respond to any updated calculations that Dr. Leitzinger performs.

## VIII.  DR. LEFFLER'S OVERCHARGE ANALYSES ARE FLAWED AND OVERSTATED

108.    Dr. Leffler's overcharge analyses for the Retailer Plaintiffs contain errors and rely on unsupported assumptions. In this section, I present corrections to his overcharge estimates—first addressing each correction individually in **Section VIII.A**, and then assessing their cumulative impact in **Section VIII.B**.

### A.    Corrections to Dr. Leffler's estimates

#### 1.    *Dr. Leffler extends his generic-generic overcharges beyond his cut-off date of May 31, 2011*

109.    In Dr. Leffler's report, he states that he calculates overcharges on actual generic purchases for "the first eleven months of generic entry or until June 2011."[145] However, in his actual calculations, he calculates damages for an additional twelfth month, *through* June 30, 2011. Removing this additional month reduces damages from ▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮ for a reduction of 6 percent (see **Exhibit 13**).

#### 2.    *Dr. Leffler's estimates of brand-generic overcharges after generic entry should be excluded*

110.    Similar to Dr. Leitzinger, Dr. Leffler calculates considerable brand-generic damages after actual generic entry, despite purchasers having the ability to purchase the generic

---

[145]    Leffler Report, ¶ 114.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

beginning on this date. In fact, Dr. Leffler calculates brand-generic damages for three years after actual generic entry, until October 31, 2012.[146] I correct Dr. Leffler's damages estimates by removing brand-generic damages after actual generic entry, which reduces damages from ███ to ███ for a reduction of 17 percent (see **Exhibit 13**).

       3.     *Dr. Leffler's generic-generic and brand-generic damages are overstated if Teva would have been the only generic*

111.    Dr. Leffler's but-for scenarios rely on the speculative assumption that other generic manufacturers would have been ready and able to launch prior to multiple generic entry on June 1, 2011. Like Dr. Leitzinger, Dr. Leffler provides no justification for the additional generic competitors in his but-for scenario and simply states that he was asked by Plaintiffs' Counsel to calculate overcharges for that scenario. As I described above, if Teva were to have been the only manufacturer of generic Effexor XR, Dr. Leffler has no basis to claim generic-generic overcharges, and his estimates of brand-generic overcharges would be significantly reduced (which are also being double-counted by Dr. Leitzinger; see **Section VII.E**). Removing the speculative assumption of additional generic entrants prior to June 2011 reduces damages from ███ to ███ for a reduction of 37 percent (see **Exhibit 13**).

       4.     *Evidence suggests that Teva would not have entered earlier than it did*

112.    As I explained in **Section VII.C.3**, I understand that Defendant expert Steve Galson will offer an opinion that it would have been unlikely for Teva to have received final approval from the FDA earlier than June 28, 2010. As it did for Dr. Leitzinger's damages estimates, this has a substantial impact on Dr. Leffler's damage estimates, and for the same

---

[146]  Leffler Report, footnote 167. See also **Exhibit 2**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reasons. Had the FDA approved Teva's ANDA at the same time in the but-for world as it did in the actual world, Dr. Leffler has no basis to claim that Teva could have entered earlier than it did in July 2010, nor does he have any basis to assume a third generic entrant. Eliminating Dr. Leffler's delay and recalculating his damages model assuming Teva and an authorized generic enter in July 2010 reduces damages from ████████ to ████████ for a reduction of 77 percent (see **Exhibit 13**).[147]

### B.    Cumulative impact of corrections

113.    **Exhibit 13** shows the cumulative impact of applying the corrections discussed above. Eliminating brand-generic damages beyond Teva's actual generic entry and dropping the unsupported assumptions of additional generic entrants prior to July 2011 (the corrections discussed in **Sections VIII.A.1** through **VIII.A.3**) substantially reduces brand-generic damages and eliminates generic-generic damages. These adjustments result in damages falling from ████ to ████ for a reduction of 52 percent. If I further adjust Dr. Leffler's damage estimates to eliminate the alleged delay in Teva's entry (the correction discussed in **Section VIII.A.4**), there is no more basis for Dr. Leffler to claim any brand-generic damages, and Dr. Leffler's damage estimates as a result fall to zero, for a reduction of 100 percent (see **Exhibit 13**).

---

[147]   Note that this correction does not take into account the fact that there is no basis for brand-generic damages beyond generic entry. Had I further included that correction, there would only be generic-generic overcharges due to the addition of the authorized generic in the but-for world.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C.     Dr. Leffler uses the wrong price when calculating assignment claims

114.     When calculating overcharges due to opt-out assignment claims, Dr. Leffler appears to use the sale price from the assignor to the opt-out assignee. However, I understand that the claim the assignor may assign relates to its purchase of the product, not its sale. Therefore, Dr. Leffler should calculate assignment damages using the assignor's purchase price. While Dr. Leffler may claim that it makes little difference which price he uses, the assignor-to-assignee transaction prices he used do not reflect the actual prices the assignor paid to the manufacturers, and therefore may exclude applicable chargebacks, rebates, discounts, or other post-sale adjustments.

115.     Because Dr. Leitzinger bases his overcharges on prices paid by direct purchasers to manufacturers, I can compare per-unit brand-generic overcharges calculated by Dr. Leitzinger to Dr. Leffler's per-unit brand-generic overcharges. For the purposes of this comparison, I assess Dr. Leffler's per-unit brand-generic overcharges for CVS. I found Dr. Leffler's per-unit brand-generic overcharge during the Delay Period, ███/capsule, to be materially higher than the ███/capsule per-unit brand-generic overcharge estimated by Dr. Leitzinger over the same period.[148] As such, Dr. Leffler's approach of using assignor sales rather than purchase price likely inflates overcharge damages by attributing economic harm based on prices that assignors did not actually pay. I reserve the right to respond to any revised calculations Dr. Leffler may provide.

*Bruce E. Stangle*

Bruce E. Stangle, Ph.D.

---

[148]     See Reliance materials.

Appendix A
## BRUCE E. STANGLE, PH.D.
**Co-founder**

Phone: 617 425 8110                                                                    111 Huntington Avenue
bruce.stangle@analysisgroup.com                                                                      14th Floor
www.analysisgroup.com                                                                        Boston, MA 02199

A co-founder of Analysis Group, Inc., Dr. Stangle is an economist specializing in the fields of industrial organization and finance. He has over 40 years of experience directing large research projects in numerous industries on issues related to antitrust, regulation, bankruptcy, ERISA, and securities matters, and has consulted to firms on various management, strategy, and policy issues. Dr. Stangle has provided testimony on class certification, market definition, entry conditions, competitive effects, securities valuation, and damages. He is a trustee emeritus of Bates College and a former outside member of the board of directors of Wellington Trust Company, NA, a money management firm. Dr. Stangle also occasionally serves on the boards of startup firms, and was formerly a director of a mutual fund and a venture capital firm.

## EDUCATION

| | |
|---|---|
| 1978 | Ph.D., Applied Economics, MIT Sloan School of Management |
| 1974 | S.M., Management, MIT Sloan School of Management |
| | *Thesis: "An Analysis of Computer Security in an Ambulatory Medical Care Facility"* |
| 1970 | B.A., English, Bates College |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1981–Present | Analysis Group, Inc. |
| | *Co-founder* |
| 2001–2023 | Wellington Trust Company, NA |
| | *Member, Board of Directors* |
| 2010–2017 | The Marsico Investment Fund |
| | *Independent Trustee* |
| 1998–2012 | Bates College |
| | *Trustee* |
| 1998–2010 | Massachusetts Institute of Technology, Economics Department |
| | *Member, Visiting Committee* |
| 1994–1998 | Massachusetts Technology Development Corporation |
| | *Member, Board of Directors* |

1978–1980        Arthur D. Little, Inc.
                 *Senior Economist*


**DISSERTATION**

"Price Determination in the Markets for Beef," Committee: M.A. Adelman (Chair), Paul L. Joskow, Lester C. Thurow


**SELECTED PUBLICATIONS AND PRESENTATIONS**

"Calculating Cartel Overcharges," guest lecturer, Fordham University School of Law (November 2007–2024)

"Validation of Real-World Case Definitions for COVID-19 Diagnosis and Severe COVID-19 Illness Among Patients Infected with SARS-CoV-2: Translation of Clinical Trial Definitions to Real-World Settings," with Mei Sheng Duh, Catherine Nguyen, Heather Rubino, Christopher Herrick, Rose Chang, Maral DerSarkissian, Yichuan Grace Hsieh, Azeem Banatwala, Louise H. Yu, Gregory Belsky, Marykate E. Murphy, Janet Boyle-Kelly, Andrew Cagan, Pierre Y. Cremieux, Francesca Kolitsopoulos, and Shawn N. Murphy, *medRxiv* (September 12, 2023)

"State vs. Local Management of Pension Assets: Effects of the Massachusetts Chapter 68 Public Pension Reform," with D. Lee Heavner, Yao Lu, Alex Iselin, and Priyanka Singh, *The Journal of Retirement* 8(2): 50–75 (Fall 2020)

"Keeping Covenants: Getting Debt Ratios Right," with John Drum and Richard Starfield, *Journal of Accountancy* (June 2018)

"Back to the Future: Revisiting Class Certification in In Re: Visa Check/MasterMoney Antitrust Litigation Under the Standards Enunciated in In Re: Initial Public Offering Securities Litigation," participant in mock hearing at New York State Bar Association, Antitrust Law Section Annual Meeting (January 26, 2012)

"Risk of hepatotoxicity-related hospitalizations among patients treated with opioid/acetaminophen combination prescription pain medications," with Mei Sheng Duh, Francis Vekeman, Caroline Korves, Patrick Lefebvre, Ellison Dial, Dominick Latrémouille-Viau, Robert S. Wei, Marie-Hélène Lafeuille, Edward Michna, and Paul E. Greenberg, *Pain Medicine* 11; 11(11): 1718–1725 (2010)

"Securities class action doesn't suit us," with Gaurav Jetley, guest op-ed column, *The Economic Times – India* (May 20, 2010)

"What Did Satyam Investors Lose?" with Gaurav Jetley, guest op-ed column, *The Economic Times* (February 25, 2009)

*An Assessment of Competition in California Title Insurance and Escrow Markets*, with Bruce A. Strombom, report prepared for First American Title Insurance Company (August 30, 2006)

*Evaluation of Proposed Regulations for the California Title Insurance and Escrow Industry*, with Bruce A. Strombom, report prepared for First American Title Insurance Company (August 30, 2006)

*Competition and Title Insurance Rates in California*, with Bruce A. Strombom, report prepared for First American Title Insurance Company (January 23, 2006)

"Market Efficiency Versus Behavioral Finance," with Burton Malkiel and Sendhil Mullainathan, *Journal of Applied Corporate Finance* 17(3):74–84 (Summer 2005)

"Is Competitive Entry Free? Bypass and Partial Deregulation in Natural Gas Markets," with Paul W. MacAvoy and Daniel F. Spulber, *Yale Journal on Regulation* (1989)

"Economics of U.S. and Pacific Rim Insurance Markets," invited paper presented at the American Bar Association annual meeting, Hawaii (August 8, 1989)

"How Much Is Your Bank Worth?" with Michael F. Koehn and Laura Stiglin, *1988 Bank Performance Annual*, Edwin B. Cox, ed., Boston, MA: Warren, Gorham & Lamont (1988)

"Market Share and Profitability," with M.A. Adelman, *Antitrust and Regulation: Essays in Memory of John J. McGowan*, Franklin M. Fisher, ed., Cambridge, MA: MIT Press (1985)

"New Antitrust Chief and Herfindahl Index," with William C. Pelster, *New York Law Journal* (1981)

"The Effect of Deposit-Rate Ceilings on Bank Risk: A Comment," with Michael F. Koehn, *Journal of Banking & Finance* 4(5):381–386 (December 1980)

*The Determinants of Systematic Risk and the Cost of Capital for the Regulated Electric Utility Industry*, working paper, MIT Sloan School of Management (1976)

"Federal Regulation of Energy, 1972–1974," with Paul W. MacAvoy, presented at the American Association for the Advancement of Science Annual Meeting, Session on Regulation, chaired by Professor George J. Stigler, New York (January 1975); also published in *Technology Review* (1975)


**TESTIMONY (covering at least the past five years)**

- **Allstate 401(k) Plan ERISA litigation**
  *US District Court, Northern District of Illinois*
  Expert Report and deposition testimony in an ERISA case regarding the selection and monitoring of a target date fund as a 401(k) plan investment option.

- **Lipitor antitrust litigation**
  *US District Court, District of New Jersey*

*Bruce E. Stangle, Ph.D., Page 4 of 5*

Deposition testimony regarding class certification in a case involving alleged delay of generic entry.

- **DST Systems, Inc. ERISA litigation**
  *Arbitration*
  Expert report, deposition testimony, and arbitration testimony in several hundred arbitrations regarding claims under ERISA of breach of fiduciary duty and failure to monitor by the DST 401(k) retirement plan committee.

- **SunTrust 401(k) Plan Affiliated Funds ERISA litigation**
  *US District Court, Northern District of Georgia*
  Deposition testimony in an ERISA case regarding damages and breach of fiduciary duty of a retirement plan committee.

- **Niaspan antitrust litigation**
  *US District Court, Eastern District of Pennsylvania*
  Deposition testimony regarding damages in a case involving alleged delay of generic entry.

- **Lamictal direct purchaser antitrust litigation**
  *US District Court, District of New Jersey*
  Deposition testimony regarding damages in a case involving alleged delay of generic entry.

- ***US Department of Labor v. WPN Corporation***
  *US District Court, Western District of Pennsylvania*
  Deposition testimony in an ERISA case regarding duty to monitor for members of a retirement plan committee.

- **JP Morgan Stable Value Fund ERISA litigation**
  *US District Court, Southern District of New York*
  Deposition testimony regarding whether, from an economic standpoint, liability, causation, and damages can be determined on a class-wide basis.

- **Modafinil antitrust litigation**
  *US District Court, Eastern District of Pennsylvania*
  Deposition testimony (on two occasions) regarding damages in a case involving alleged delay of generic entry.

- ***Merrimon, et al. v. Unum Life Insurance Company of America***
  *US District Court, District of Maine*
  Deposition and trial testimony regarding the reasonableness of the interest rate provided by Unum for its Retained Asset Account.

- ***Class v. Genworth Financial Wealth Management, Inc., et al.***
  *US District Court, Eastern District of New York*
  Deposition testimony regarding class-wide injury and damages in a Rule 10b-5 securities case involving mutual funds.

▪ **Flonase antitrust litigation**
   *US District Court, Eastern District of Pennsylvania*
   Deposition and evidentiary hearing testimony regarding indirect purchaser class certification in a case involving alleged delay of generic entry.

▪ ***Charters v. John Hancock Life Insurance Company***
   *US District Court, District of Massachusetts*
   Deposition testimony in an ERISA case regarding fees charged to 401(k) plans.

▪ ***AT&T Inc. v. United States of America***
   *US District Court, Western District of Texas, San Antonio Division*
   Deposition testimony in a tax case regarding interpretation of Universal Service Fund payments.

▪ ***Class v. Bechtel Corporation, et al.***
   *US District Court, Northern District of California, San Francisco Division*
   Deposition testimony regarding damages in an ERISA case regarding a 401(k) plan.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Appendix B
## Materials Considered

### Court Documents

**Plaintiffs' Expert Reports (including supporting materials)**

Expert Report of Donald S. Allen, Ph.D., *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-05479-ZNQ-JBD, United States District Court for the District of New Jersey, May 15, 2025.

Expert Report of Jeffrey J. Leitzinger, Ph.D., *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-05479-ZNQ-JBD, United States District Court for the District of New Jersey, May 15, 2025.

Expert Report of Keith Leffler, Ph.D., *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-05479-ZNQ-JBD, United States District Court for the District of New Jersey, May 15, 2025 (including errata dated May 20, 2025 and July 9, 2025).

Expert Report of Thomas G. McGuire, Ph.D., *In re: Effexor XR Antitrust Litigation*, Master Docket No. 3:11-cv-05479-ZNQ-JBD, United States District Court for the District of New Jersey, May 15, 2025.

### Legal Filings

*Retailer Plaintiff ("Opt-out") Complaints*

Complaint and Demand for Jury Trial, *Giant Eagle, Inc. v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, Case No. 3:12-cv-03116-PGS-LHG, United States District Court for the District of New Jersey, May 24, 2012.

Complaint and Demand for Jury Trial, *Meijer, Inc. and Meijer Distribution, Inc. v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, Case No. 2:33-av-00001, United States District Court for the District of New Jersey, December 23, 2011.

Complaint and Demand for Jury Trial, *Rite Aid Corporation, Rite Aid HDQTRS. Corp., JCG (PJC) USA, LLC, Maxi Drug, Inc. D/B/A Brooks Pharmacy, Eckerd Corporation, and CVS Caremark Corporation v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, Case No. 3:12-cv-03523-PGS-LHG, United States District Court for the District of New Jersey, June 12, 2012.

Complaint and Demand for Jury Trial, *Walgreen Co., The Kroger Co., Safeway Inc., SuperValu Inc., HEB Grocery Company LP, and American Sales Company, Inc. v. Wyeth, Inc. and Teva Pharmaceuticals USA, Inc.*, Case No. 3:33-av-00001, United States District Court for the District of New Jersey, November 30, 2011.

*Direct Purchaser Class Complaint*

Direct Purchaser Class Plaintiffs' Second Amended Consolidated Class Action Complaint and Jury Demand, *In re: Effexor XR Antitrust Litigation*, Case No. 3:11-cv-05479, United States District Court for the District of New Jersey, October 23, 2013.

*Other Matters*

Amended and Consolidated Complaint and Demand for Jury Trial, *In re: Lantus Direct Purchaser Antitrust Litigation*, Case No. 1:16-cv-12652-JGD-LTS, U.S. District Court District of Massachusetts, March 6, 2023.

Complaint, *FWK Holdings, LLC. v. GlaxoSmithKline LLC, et al.,* Case No. 2:23-cv-02956, United States District Court for the District of Pennsylvania, February 27, 2023.
Complaint, *King Drug Company of Florence, Inc., et al. v. Abbott Laboratories, et al.,* Case No. 2:19-cv-03565-HB, U.S. District Court for the Eastern District of Pennsylvania, August 7, 2019.

Complaint, *MLI Rx LLC, et al. v. GlaxoSmithKline LLC, et al.*, Case No. 2 :23-cv-02960, District Court for the Eastern District of Pennsylvania, February 2, 2023.

Complaint, *Morris & Dickson Co., LLC v. GlaxoSmithKline LLC, et al.*, Case No. 2:23-cv-02958, United States District Court for the District of Pennsylvania, February 7, 2023.

Direct Purchaser Class Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Certification of a Settlement Class, Appointment of Class Counsel, Preliminary Approval of Proposed Settlement, Approval of the Form and Manner of Notice to the Class and Proposed Schedule for a Fairness Hearing, *King Drug Company of Florence, Inc., et al. v. Cephalon, Inc., et al.*, Case No. 2:06-cv-01797, U.S. District Court for the Eastern District of Pennsylvania, February 3, 2017.

Direct Purchaser Class Plaintiffs-Appellants' Petition for Rehearing and Rehearing En Banc, *In re: Nexium (Esomeprazole) Antitrust Litigation*, Case No. 15-2005, U.S. Court of Appeals for the First Circuit, December 12, 2016.

Direct Purchaser Plaintiffs' Memorandum of Law in Support of Unopposed Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Service Awards for the Class Representatives, *In re: Asacol Antitrust Litigation*, Case No. 1:15-cv-12730, U.S. District Court District of Massachusetts, October 5, 2017.

First Amended Complaint, *McKesson Corporation, et al. v. Hembree, et al.,* Case No. 4:17-cv-00323-TCK-FHM, U.S. District Court for the Northern District of Oklahoma, June 27, 2017.

Motion to Intervene of Additional Plaintiffs, *King Drug Co. of Florence et al. v. Cephalon, Inc., et al.*, Case No. 2:06-cv-01797, District Court for the Eastern District of Pennsylvania, March 20, 2018.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Motion to Join Additional Plaintiffs, *King Drug Co. of Florence et al. v. Cephalon, Inc. et al.*, Case No. 2:06-cv-01797, District Court for the Eastern District of Pennsylvania, March 20, 2018.

Order Granting Plaintiffs' Motion for Reimbursement of Expenses, Payment of Administration and Notice Costs, and Awarding Incentive Awards to the Class Representatives for the Direct Purchaser Class and End-Payor Class, *In re: Nexium (Esomeprazole) Antitrust Litigation*, Case No. 1:12-md-02409, U.S. District Court District of Massachusetts, October 5, 2015.

Pretrial Order No. 11, *In re: Zetia (Ezetimibe) Antitrust Litigation*, Case No. 2:18-md-2836-RBS-DEM, U.S. District Court for the Eastern District of Virginia Norfolk Division, October 26, 2022.

Status Report Pursuant to the Court's Order of Nov. 30, 2017, *King Drug Co. of Florence et al. v. Cephalon, Inc. et al.*, Case No. 2:06-cv-01797, District Court for the Eastern District of Pennsylvania, January 23, 2018.

**Depositions (including exhibits)**

*Plaintiff Depositions*

Deposition of Christian Gordon, Vice President of Purchasing, McKesson, April 18, 2025.

Deposition of Dick Derks, Lead of Pharmacy Procurement, Kroger Co. (30b6 witness), February 20, 2025.

Deposition of Dominic Pagnotta, Former Chief Information Officer, RDC (30b6 witness), March 27, 2025.

Deposition of Heather Odenwelder, Vice President of Global Generic Sourcing, Cencora (formerly Amerisource Bergen), April 15, 2025.

Deposition of Matthew Paulson, Brand Pharmacy Buyer, Meijer (30b6 witness), March 19, 2025.

*Defendant Depositions*

Deposition of David Manspeizer, Former VP of Intellectual Property and Associate General Counsel, Wyeth, April 2, 2025.

Deposition of Jennifer Wodarcyzk, Former Director of New Product Forecasting, Teva, February 26, 2025.

Deposition of Suneet Varma, Vice President for Neuroscience, Wyeth, March 27, 2025.

Deposition of William Marth, Former President and CEO, Teva Americas, February 26, 2025.


**Bates Stamped Documents**

ASC-EFFEXOR-00000002-0004 (Assignment of claims from Ahold to American Sales).
ASC-EFFEXOR-00000005-0006 (Assignment of claims from McKesson to American Sales).
ASC-EFFEXOR-00000007-0010 (Assignment of claims from Cardinal Health American Sales Company).
CVS-EFX-0000004-0005 (Assignment of claims from McKesson to CVS).
CVS-EFX-0000006-0007 (Assignment of claims from Cardinal Health to CVS).
CVS-EFX-0000069-0070 (Assignment of claims from Cardinal Health to CVS).
CVS-EFX-0013962-3963 (CVS-McKesson Assignment Agreement Dated February 22, 2019).
GE000005-0006 (Assignment of claims from McKesson to Giant Eagle).
GE000007-0008 (Assignment of claims from McKesson to Giant Eagle).
HEB-EFFEXOR-00000002-0003 (Assignment of claims from Cardinal Health to HEB).
HEB-EFFEXOR-00000004-0005 (Assignment of claims from Cardinal Health to HEB).
KRG-EFFEXOR-00000002-0003 (Assignment of claims from Cardinal Health to Kroger).
MEI-EFFEX-0001323-1324 (Assignment of claims from Frank W Kerr to Meijer).
MEI-EFFEX-0027440-7452 (Assignment of claims from Frank W Kerr to Meijer).
MEI-EFFEX-0195030-5032 (Assignment of claims from McKesson to Meijer).
MYL-VENLA-0000002 (Mylan Sales Forecast).
MYL-VENLA-0000004 (Mylan Sales Forecast).
QK_0001687 (Agreement for Assignment of Claims between Uniondale and QK, effective June 21, 2011).
RA-EFX-0000003-0004 (Assignment of claims from McKesson to Rite Aid).
RA-EFX-0029650-9651 (Assignment of claims from McKesson to Rite Aid).
SAJ0000175-0191 (Greenstone's Product Fact Sheet on Generic Effexor XR).
SFW-EFFEXOR-00000002-0003 (Assignment of claims from McKesson to Safeway).
SUP-EFFEXOR-00000002-0003 (Assignment of claims McKesson to Supervalu).
TEVA_EFFEX_0018544-8550 (Teva ANDA 076565 for generic Effexor XR approval letter).
TEVA_EFFEX_0440657 (Teva Sales Forecast).
TEVA_EFFEX_0863426 (Email Communication about Teva Sales Forecast).
WLG-EFFEXOR-00000003-0004 (Assignment of claims from AmerisourceBergen to Walgreen).
WLG-EFFEXOR-00000005-0006 (Assignment of claims from Cardinal Health to Walgreen).
WYEFFAT05391481 (Wyeth Wholesaler Service Agreement, Wyeth and AmeriSource Health Services Corporation, June 1, 2005).
WYEFFAT06391397-1438 (Wyeth Wholesaler Service Agreement, Wyeth and AmeriSource Health Services Corporation, June 1, 2005).
WYEFFAT06391439-1480 (Wyeth Wholesaler Service Agreement, Wyeth and AmerisourceBergen Drug Corporation, June 1, 2005).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
Page ID: 19793

WYEFFAT06391481-1522 (Wyeth Wholesaler Service Agreement, Wyeth and AmeriSource Health Services Corporation, June 1, 2005).
WYEFFAT06391759-1785 (Wyeth Wholesaler Service Agreement, Wyeth and Cardinal, June 1, 2005).
WYEFFAT06392693-2726 (Wyeth Wholesaler Service Agreement, Wyeth and McKesson Corporation, September 1, 2008).
WYEFFAT06392727-2747 (Wyeth Wholesaler Service Agreement, Wyeth and McKesson Corporation, June 1, 2005).
WYEFFAT06392748-2781 (Wyeth Wholesaler Service Agreement, Wyeth and McKesson Corporation, September 1, 2008).
WYEFFAT06392840-2844 (Wyeth Wholesaler Distribution Services Agreement First Amendment, Pfizer and McKesson Corporation, July 1, 2010).
WYEFFAT0954314-4342 (Wyeth and Apotex License Agreement).
WYEFFAT2299808-9865 (Wyeth and Teva U.S. License Agreement).
WYEFFAT3609860-10024 (Wyeth Generic Mitigation Project Status Update).
WYEFFAT3610090 (Wyeth Effexor XR Sales Forecast).
WYEFFAT3795941-5946 (Wyeth Effexor XR Authorized Generic Forecast).

## Books and Academic Articles

"93rd Edition HDA Factbook: The Facts, Figures, and Trends in Healthcare (2022-2023)," *HDA Research Foundation*, 2022.

Aitken, Murray L., et al., "The Regulation of Prescription Drug Competition and Market Responses: Patterns in Prices and Sales Following Loss of Exclusivity," *National Bureau of Economic Research*, Working Paper 19487, 2013.

American Bar Association Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, Second Edition, ABA Book Publishing, 2018.

Berndt, Ernst R., and Joseph P. Newhouse, "Pricing and Reimbursement in U.S. Pharmaceutical Markets," *National Bureau of Economic Research*, Working Paper 16297, 2010.

Fein, Adam J., "2010-11 Economic Report on Pharmaceutical Wholesalers," *Pembroke Consulting, Inc.*, 2010, pp. 1–71.

Frank, Richard G., and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *National Bureau of Economic Research*, Working Paper 5306, 1995, pp. 1-19.

Hall, Robert E., and Victoria A. Lazear, "Reference Guide on Estimation of Economic Losses in Damages Awards," *Reference Manual on Scientific Evidence*, 2011.

Sood, Neeraj, et al., "The Flow of Money Through the Pharmaceutical Distribution System," *USC Leonard D. Schaeffer Center for Health Policy & Economics*, 2017.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PageID: 19792

Weil, Roman L., et al., "Chapter 1, The Role of the Financial Expert in Litigation Services" in *Litigation Services Handbook*, Second Edition, John Wiley & Sons, 2007.

**Publicly Available Sources**

"180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act," *United States Food & Drug Administration*, June 1998, available at https://www.fda.gov/media/72414/download.

"2016 Janssen U.S. Transparency Report," *Janssen*, 2017, available at https://policyresearch.jnj.com/download/2016-janssen-us-transparency-report-pdf.

"About HDA," *Healthcare Distribution Alliance*, available at https://www.hda.org/about/.

"About Us," *Premier Generics,* available at https://www.premiergenerics.com.

"AmerisourceBergen Completes Acquisition of H. D. Smith," *Cencora*, January 3, 2018, available at https://investor.amerisourcebergen.com/news/news-details/2018/AmerisourceBergen-Completes-Acquisition-of-H-D-Smith/default.aspx.

"Authorized Generics: Q&A with Greenstone's Jim Cannon," *Drug Store News*, August 3, 2016, available at https://drugstorenews.com/pharmacy/authorized-generics-qa-greenstones-jim-cannon.

"Backlash Against Drug Prices Hits Manufacturers and Middlemen," *Wall Street Journal*, October 28, 2016, available at https://www.wsj.com/articles/backlash-against-drug-prices-hit-manufacturers-and-middlemen-1477684366.

"Burlington Drug Company Overview," *Pitchbook,* available at https://pitchbook.com/profiles/company/172918-45.

"Cardinal Health Buys Harvard Drug Group: Perspectives on Wholesaler Consolidation," *Drug Channels,* June 5, 2015, available at https://www.drugchannels.net/2015/06/cardinal-health-buys-harvard-drug-group.html.

"Cardinal Health Completes Acquisition of The Harvard Drug Group For $1.115 Billion," *Cardinal Health*, July 6, 2015, available at https://newsroom.cardinalhealth.com/2015-07-06-Cardinal-Health-Completes-Acquisition-Of-The-Harvard-Drug-Group-For-1-115-Billion.

"Chain Drug Consortium Launches Pharmacy Alliance," *Progressive Grocer,* August 25, 2010, available at https://progressivegrocer.com/chain-drug-consortium-launches-pharmacy-alliance.

"Cigna Completes Combination with Express Scripts, Establishing a Blueprint to Transform the Health Care System," *The Cigna Group*, December 1, 2018, available at

https://newsroom.thecignagroup.com/Cigna-Completes-Combination-with-Express-Scripts-Establishing-a-Blueprint-to-Transform-the-Health-Care-System.

Conrad, Ryan and Randall Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Prices," *U.S. Food & Drug Administration*, pp. 1–9.

"CVS Caremark Announces Corporate Name Change to CVS Health to Reflect Broader Health Care Commitment," *Pharmacy Times*, September 3, 2014, available at https://www.pharmacytimes.com/view/cvs-caremark-announces-corporate-name-change-to-cvs-health--to-reflect-broader-health-care-commitment.

"CVS Health Completes Acquisition of Aetna, Marking Start of Transforming Consumer Health Experience," *CVS Health*, November 28, 2018, available at https://www.cvshealth.com/news/company-news/cvs-health-completes-acquisition-of-aetna-marking-start-of.html.

"CVS Opens 98 Midwest Schnucks Locations," *The Telegraph,* July 9, 2020, available at https://www.thetelegraph.com/news/article/CVS-opens-98-Midwest-Schnucks-locations-15396926.php.

"Delhaize, Bi-Lo Complete Deal," *Supermarket News,* June 2, 2014, available at https://www.supermarketnews.com/finance/delhaize-bi-lo-complete-deal.

Dolan, Rachel and Marina Tian, "Pricing and Payment for Medicaid Prescription Drugs," *Kaiser Family Foundation*, January 2020, available at https://files.kff.org/attachment/Issue-Brief-Pricing-and-Payment-for-Medicaid-Prescription-Drugs.

"FAQ," *Healthcare Supply Chain Association*, available at https://www.supplychainassociation.org/about-us/faq/.

Fitch Ratings, "Dynamics of the Drug Channel are Changing," *BusinessWire*, 2013.

"Follow the Dollar: Understanding How the Pharmaceutical Distribution and Payment System Shapes the Prices of Brand Medicines," *Pharmaceutical Research and Manufacturers of America*, November 2017.

"Frequently Asked Questions," *Prescription Supply, Inc.,* available at https://prescriptionsupply.com/frequently-asked-questions/.

"F.T.C. Approves Merger of 2 of the Biggest Pharmacy Benefit Managers," *The New York Times*, April 2, 2012, available at https://www.nytimes.com/2012/04/03/business/ftc-approves-merger-of-express-scripts-and-medco.html.

"Harvard Drug Group Wins Reversal on Suspension to Sell Some Controlled Substances,"

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
PageID: 19794

*Crain's Detroit Business,* June 21, 2010, available at
https://www.crainsdetroit.com/article/20100621/HEALTH/306219997/harvard-drug-group-
wins-reversal-on-suspension-to-sell-some.

"H.D. Smith wraps up Valley Wholesale Drug purchase," *Chain Drug
Review,* November 5, 2012, available at https://chaindrugreview.com/h-d-smith-wraps-up-
valley-wholesale-drug-purchase/.

"Label: Effexor XR - Venlafaxine Hydrochloride Capsule, Extended Release," *DailyMed*,
August 29, 2022, available at
https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=53c3e7ac-1852-4d70-d2b6-
4fca819acf26.

Lekraj, Vishnu, "Amerisource, Cardinal, and McKesson Have Procured Wide Economic
Moats," *Morningstar Healthcare Observer*, 2014.

"McKesson and Walmart Announce Sourcing Agreement for Generic Pharmaceuticals,"
*Walmart*, May 16, 2016, available at
https://corporate.walmart.com/news/2016/05/16/mckesson-and-walmart-announce-sourcing-
agreement-for-generic-pharmaceuticals.

"Mission," *National Association of Chain Drug Stores*, available at
https://www.nacds.org/about/mission/.

"Mylan Announces Settlement Agreement Related to Antidepressant Effexor XR(R),"
*Mylan*, December 08, 2009, available at https://investor.mylan.com/news-releases/news-
release-details/mylan-announces-settlement-agreement-related-antidepressant.

"OptiSource LLC," *SAP Business Network,* available at
https://portal.us.bn.cloud.ariba.com/profile/public?anId=AN01014679739.

"Our Members," *TopCo,* available at https://www.topco.com/Members.

"Pfizer to Pay $25.5 mln to Settle Remaining Effexor XR Antitrust Claims," *Reuters*, April
29, 2024, available at https://www.reuters.com/legal/litigation/pfizer-pay-255-mln-settle-
remaining-effexor-xr-antitrust-claims-2024-04-29/.

"Pricing and Payment for Medicaid Prescription Drugs," *Kaiser Family Foundation*, January
2020, available at https://files.kff.org/attachment/Issue-Brief-Pricing-and-Payment-for-
Medicaid-Prescription-Drugs.

"Protecting Awards for Named Plaintiffs; Other Class Action Practice Tips," *National
Consumer Law Center*, January 11, 2023, available at
https://library.nclc.org/article/protecting-awards-named-plaintiffs-other-class-action-practice-
tips.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"PSS World Medical Overview," *Pitchbook,* available at
https://pitchbook.com/profiles/company/12082-15#overview.

"Revenue for the Life Sciences Industry," *KPMG,* March 2018, available at
https://kpmg.com/kpmg-us/content/dam/kpmg/frv/pdf/2018/revenue-for-life-sciences-
industry.pdf.

"Sweetbay Becoming a Winn-Dixie," *Gainesville Sun*, March 5, 2014, available at
https://www.gainesville.com/story/news/guardian/2014/03/05/sweetbay-becoming-a-
winndixie/31120888007/.

"Teva Introduces First Generic Lamictal® Tablets in the United States," *Teva*, July 23, 2008,
available at https://ir.tevapharm.com/news-and-events/press-releases/press-release-
details/2008/Teva-Introduces-First-Generic-Lamictal-Tablets-in-the-United-
States/default.aspx.

"The High Cost of Access: Fact or Fiction?" *AmerisourceBergen*, available at
https://www.amerisourcebergen.com/brand-stories/mythbusting-the-high-cost-of-access.

"The Role of Distributors in the US Health Care Industry: 2019 Report," *Deloitte*, 2019,
available at https://www2.deloitte.com/content/dam/Deloitte/us/ Documents/life-sciences-
health-care/us-hda-role-of-distributors-in-the-us-health-care-industry.pdf.

"Timeline: A History of Sweetbay," *Supermarket News*, June 3, 2013, available at
https://www.supermarketnews.com/finance/timeline-a-history-of-sweetbay.

"Transactional Contingency Fee Agreements," *California Lawyers Association*, available at
https://calawyers.org/california-lawyers-association/transactional-contingency-fee-
agreements/.

"Venlafaxine (Oral Route)," *Mayo Clinic*, available at https://www.mayoclinic.org/drugs-
supplements/venlafaxine-oral-route/description/drg-20067379.

"Walgreens Completes Acquisition of Kerr Drug's Retail Drugstores and Specialty Pharmacy
Business," *Walgreens Boots Alliance,* November 8, 2013, available at
https://www.walgreensbootsalliance.com/news-media/press-releases/2013/walgreens-
completes-acquisition-of-kerr-drugs-retail-drugstores-and-specialtypharmacy-
business.

"Walgreens Wraps Up Duane Reade Acquisition," *Chain Drug Review,* April 9, 2010,
available at https://chaindrugreview.com/walgreens-wraps-up-duane-reade-acquisition/.

"What to Expect Regarding Fees and Billing," *The State Bar of California*, available at
https://www.calbar.ca.gov/Public/Free-Legal-Information/Working-with-an-Attorney/What-
to-Expect-Regarding-Fees-and-Billing.

"Winn-Dixie, BI-LO Parent Takes New Corporate Name," *Supermarket News,* May 18, 2015, available at https://www.supermarketnews.com/finance/winn-dixie-bi-lo-parent-takes-new-corporate-name.

## Financial Filings

Cardinal Health, Inc., "Form 10-K for the Fiscal Year Ended June 30, 2014," August 13, 2014.

Cardinal Health, Inc., "Form 10-K for the Fiscal Year Ended June 30, 2024," August 14, 2024.

Cencora, Inc. (formerly AmerisourceBergen), "Form 10-K for the Fiscal Year Ended September 30, 2024," November 26, 2024.

CVS Health Corporation, "Form 10-K for the Fiscal Year Ended December 31, 2014," February 10, 2015.

McKesson Corporation, "Form 10-K for the Fiscal Year Ended March 31, 2014," May 13, 2014.

McKesson Corporation, "Form 10-K for the Fiscal Year Ended March 31, 2025," May 8, 2025.

Rite Aid Corporation, "Form 10-K for the Fiscal Year Ended March 2, 2013," October 11, 2013.

Rite Aid Corporation "Form 10-K for Fiscal Year Ended February 26, 2022," April 22, 2022.

Walgreens Boots Alliance, Inc., "Form 10-K for the Fiscal Year Ended August 31, 2015," October 28, 2015.

## Patents

United States Patent No. US 4,535,186, August 13, 1985.

United States Patent No. US 6,274,171, August 14, 2001.

United States Patent No. US 6,403,120, June 11, 2002.

United States Patent No. US 6,419,958, July 16, 2002.

Appendix C
Timeline of events
1983 - 2019



**Notes:**

[1] Wyeth is granted the '171, '120, and '958 patents on 8/14/2001, 6/11/2002, and 7/16/2002, respectively.

[2] Apotex, Aurobindo, Cadila, Dr. Reddy, Impax, Torrent, and Wockhardt launched generic Effexor XR in June 2011.

**Sources:**

[1] Direct Purchaser Class Plaintiff's Second Amended Consolidated Class Action Complaint and Jury Demand, In re: Effexor XR Antitrust Litigation, Case No. 3:11-cv-05479, United States District Court for the District of New Jersey, October 23, 2013.

[2] "Label: Effexor XR - Venlafaxine Hydrochloride Capsule, Extended Release," *DailyMed*, August 29, 2022, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=53c3e7ac-1852-4d70-d2b6-4fca819acf26.

[3] "Teva Introduces First Generic Effexor XR® Capsules in the United States; Awarded 180-Day Period of Marketing Exclusivity," *Teva*, July 1, 2010, available at: https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2010/Teva-Introduces-First-Generic-Effexor-XR-Capsules-in-the-United-States-Awarded-180-Day-Period-of-Marketing-Exclusivity/default.aspx.

[4] Leitzinger report.

[5] Leffler report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appendix D**

**Summary of how Dr. Leitzinger overstates the size of his proposed class of 59 direct purchasers**

<table>
<tr><td></td><td style="background:#fbe4d5"></td><td colspan="6">Exclusions independent of whether class member consolidation is considered - 36 members</td></tr>
<tr><td></td><td style="background:#dbe5f1"></td><td colspan="6">Additional exclusions when class member consolidation is considered - 4 members</td></tr>
<tr><td></td><td style="background:#e2efd9"></td><td colspan="6">Additional exclusions when class member consolidation is not considered - 1 member</td></tr>
</table>

| No. | Proposed class member | Class member consolidation | | Purchasing pattern | | | Exclusion from class |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Consolidated with another proposed class member | Consolidated with opt-out | Brand-only purchaser [1] | Generic-only purchaser [2] | Paid less than class average | |
| 1 | Aetna | | ✓ | | ✓ | ✓ | ✓ |
| 2 | AmerisourceBergen | | | | | | |
| 3 | Associated Pharmacies | | | ✓ | | | ✓ |
| 4 | Atlantic Apothecary | | | | ✓ | | ✓ |
| 5 | Auburn Pharmaceuticals | | | | ✓ | | ✓ |
| 6 | Bartell Drug Company | | | | ✓ | | ✓ |
| 7 | Bloodworth Wholesale | | | | ✓ | | ✓ |
| 8 | Burlington Drug | ✓ | | | | | ✓ |
| 9 | Capital Wholesale | | | | | | |
| 10 | Cardinal Health | | | | | | |
| 11 | Cesar Castillo Inc | | | ✓ | | | ✓ |
| 12 | Cigna [3] | | | | ✓ | | ✓ |
| 13 | Dakota Drug | | | | | | |
| 14 | Delhaize America | | | | ✓ | | ✓ |
| 15 | Discount Drug Mart | | | | ✓ | | ✓ |
| 16 | DMS Pharmaceutical | | | ✓ | | | ✓ |
| 17 | Drogueria Betances | | | | | | |
| 18 | Drugs Unlimited | | | | | | |
| 19 | Duane Reade | | ✓ | | ✓ | | ✓ |
| 20 | Express Scripts | ✓ | | | ✓ | ✓ | ✓ |
| 21 | Frank W Kerr | | | | | | |
| 22 | Genetco | | | | ✓ | | ✓ |
| 23 | Golub | | | | ✓ | | ✓ |
| 24 | H. D. Smith Wholesale | ✓ | | | | | ✓ |
| 25 | Harvard Drug | ✓ | | | | | ✓ |
| 26 | Henry Schein | | | ✓ | | | ✓ |
| 27 | Humana | | | | ✓ | | ✓ |
| 28 | J M Smith Corporation D/B/A Smith Drug | | | | | | |
| 29 | Kash N Karry Food Stores | ✓ | | | ✓ | | ✓ |
| 30 | Kerr Drug | | ✓ | | ✓ | | ✓ |
| 31 | KPH Healthcare Services Inc | | | | ✓ | | ✓ |
| 32 | Louisiana Wholesale | | | | | | |
| 33 | McKesson | | | | | | |
| 34 | Medco | ✓ | | | | ✓ | ✓ |
| 35 | Miami Luken | | | | | | |
| 36 | Morris & Dickson | | | | | | |
| 37 | North Carolina Mutual Wholesale Drug | | | | | | |
| 38 | Optum Rx | | | | ✓ | | ✓ |
| 39 | Pharmacy Buying Association | | | | | | |
| 40 | Prescription Supply | | | | | | |
| 41 | Prime Therapeutics | | | | ✓ | | ✓ |
| 42 | Publix Super Markets | | | | ✓ | | ✓ |
| 43 | QK Healthcare Inc | | | ✓ | | | ✓ |
| 44 | Quality Care Products | | | ✓ | | | ✓ |
| 45 | Quest Pharmaceuticals | | | | ✓ | | ✓ |
| 46 | R & S Northeast | | | | ✓ | | ✓ |
| 47 | RDC | | | | | | |
| 48 | Richie Pharmacal | | | | ✓ | | ✓ |
| 49 | Schnucks Pharmacy | | ✓ | | ✓ | | ✓ |
| 50 | SAJ Distributors [4] | | | | | | |
| 51 | Thrifty White | | | | ✓ | | ✓ |
| 52 | Top Rx | | | | ✓ | | ✓ |
| 53 | Uniondale Chemists, Inc | | | ✓ | | | ✓ |
| 54 | Valley Wholesale Drug | ✓ | | | | | ✓ |
| 55 | Value Drug | | | | | | |
| 56 | Wakefern Food Corp | | | | ✓ | | ✓ |
| 57 | Walmart | | | | ✓ | | ✓ |
| 58 | Weis Markets | | | | ✓ | | ✓ |
| 59 | Winn Dixie | | | ✓ | | | ✓ |
| | **Net exclusion when consolidation is considered** | 7 | 5 | 8 | 20 out of 28 *7 already consolidated and Cigna reclassified* | 0 out of 3 *All already consolidated* | 40 |
| | **Remaining** | 52 | 47 | 39 | 19 | 19 | 19 |
| | **Net exclusion when consolidation is not considered** | - | - | 8 | 28 | 1 out of 3 *2 generic-only already removed* | 37 |
| | **Remaining** | 59 | 59 | 51 | 23 | 22 | 22 |

**Notes:**
[1] Exclusion of brand-only purchasers includes Uniondale Chemists via assignment from QK Healthcare.
[2] Exclusion of generic-only purchasers includes Discount Drug Mart, a brand-generic purchaser that did not make brand purchases during the May 15, 2009 - May 31, 2011 period.
[3] Cigna is a generic-only purchaser, but its subsidiary Medco is brand-generic. With class member consolidation, Cigna remains in the class as brand-generic; without it, Cigna is excluded from the class as generic-only.
[4] Proposed class member SAJ Distributors is classified as a brand-generic purchaser based on brand purchases via an assignment from McKesson and its own direct generic purchases.

**Sources:**
[1] Leitzinger report, Exhibit 6.
[2] Dr. Leitzinger's manufacturer data.
[3] Exhibit 8.

**Exhibit 1**

**Dr. Leitzinger's list of proposed class members after correcting for all merger & acquisition consolidation by purchaser pattern and purchaser type [1]**

*Members of the proposed class represent a diverse set of categories and purchasing patterns. Dr. Leitzinger fails to consider the implications of industry consolidation and purchasing patterns in his analysis.*

| | |
|---|---|
| ☐ | M&A consolidations |
| (blue) | "Brand-only" purchasers when generic purchases are limited to proposed Class Period only |
| (orange) | "Generic-only" purchaser when brand purchases prior to May 15, 2009 (when Dr. Leitzinger claims damages begin) are ignored |
| (green) | Opt-outs and their subsidiaries |

**47 Total**

| Brand-only purchaser | Generic-only purchaser | Brand-generic purchaser |
|---|---|---|
| **0 Total** | **19 Total** | **28 Total** |

**Wholesalers** — 28 Total

| Brand-only | Generic-only | Brand-generic |
|---|---|---|
| | 1 AUBURN PHARMACEUTICALS | 1 AMERISOURCEBERGEN |
| | 2 BLOODWORTH WHOLESALE |    H. D. SMITH WHOLESALE |
| | 3 GENETCO |    VALLEY WHOLESALE DRUG |
| | 4 QUEST PHARMACEUTICALS | 2 CAPITAL WHOLESALE |
| | 5 RICHIE PHARMACAL | 3 CARDINAL HEALTH |
| | 6 TOP RX |    HARVARD DRUG |
| | | 4 CESAR CASTILLO INC |
| | | 5 DAKOTA DRUG |
| | | 6 DMS PHARMACEUTICAL |
| | | 7 DROGUERIA BETANCES |
| | | 8 DRUGS UNLIMITED |
| | | 9 FRANK W KERR |
| | | 10 HENRY SCHEIN |
| | | 11 J M SMITH CORPORATION D/B/A SMITH DRUG |
| | |    BURLINGTON DRUG |
| | | 12 LOUISIANA WHOLESALE |
| | | 13 MCKESSON |
| | | 14 MIAMI LUKEN |
| | | 15 MORRIS & DICKSON |
| | | 16 NORTH CAROLINA MUTUAL WHOLESALE DRUG |
| | | 17 PRESCRIPTION SUPPLY |
| | | 18 QK HEALTHCARE INC |
| | | 19 QUALITY CARE PRODUCTS |
| | | 20 R & S NORTHEAST |
| | | 21 RDC |
| | | 22 SAJ DISTRIBUTORS |

**Pharmacies** — 11 Total

| Brand-only | Generic-only | Brand-generic |
|---|---|---|
| | 1 AMERICAN SALES COMPANY | 1 DISCOUNT DRUG MART |
| |   ATLANTIC APOTHECARY | 2 UNIONDALE CHEMISTS, INC |
| | 2 CVS HEALTH [2] | |
| |   SCHNUCKS PHARMACY | |
| | 3 DELHAIZE AMERICA | |
| |   GOLUB | |
| | 4 HE BUTT | |
| |   KROGER COMPANY | |
| |   MEIJER | |
| |   PUBLIX SUPER MARKETS | |
| | 5 RITE AID | |
| |   BARTELL DRUG COMPANY | |
| |   SUPERVALU | |
| |   THRIFTY WHITE | |
| | 6 WAKEFERN FOOD CORP | |
| |   WALGREENS | |
| |   DUANE READE | |
| |   KERR DRUG | |
| | 7 WALMART | |
| | 8 WEIS MARKETS | |
| | 9 WINN DIXIE | |
| |   KASH N KARRY FOOD STORES | |

**PBMs** — 4 Total

| Brand-only | Generic-only | Brand-generic |
|---|---|---|
| | CIGNA | CIGNA [3] |
| |   EXPRESS SCRIPTS | 1 MEDCO |
| | 1 KPH HEALTHCARE SERVICES INC | |
| | 2 OPTUM RX | |
| | 3 PRIME THERAPEUTICS | |

**Others** — 4 Total

| Brand-only | Generic-only | Brand-generic |
|---|---|---|
| | 1 CVS HEALTH | 1 ASSOCIATED PHARMACIES |
| |   AETNA | 2 PHARMACY BUYING ASSOCIATION |
| | 2 HUMANA | 3 VALUE DRUG |

**Notes:**
[1] I classify proposed class members as brand-only if they only purchased brand during the Class Period, brand-generic if they purchased brand during the Class Period and generic at any time, and generic only if they purchased only generic product during the Class Period.
[2] The name "CVS Health" reflects the renaming of the proposed class member "CVS Caremark," consistent with the company's 2014 name change.
[3] Proposed class member Cigna is a generic-only purchaser, but is reclassified as brand-generic due to its ownership of Medco, which purchased both brand and generic Effexor XR.

**Sources:**
[1] Leitzinger report, Exhibit 5.
[2] Dr. Leitzinger's manufacturer data.
[3] Exhibit 8.
[4] "CVS Caremark Announces Corporate Name Change to CVS Health to Reflect Broader Health Care Commitment," *Pharmacy Times* , September 3, 2014, available at https://www.pharmacytimes.com/view/cvs-caremark-announces-corporate-name-change-to-cvs-health-to-reflect-broader-health-care-commitment.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PageID: 19800



HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
PageID: 19804

**Exhibit 6**
**Class-wide generic penetration rate by purchasing pattern**
**compared to Dr. Leitzinger's average generic conversion rate**

*Dr. Leitzinger overestimates brand-generic damages by inappropriately using a class-wide aggregate generic penetration rate (the blue line) to estimate but-for generic penetration rather than the generic penetration rate specific to brand-generic purchasers (the yellow line). He artificially inflates the average generic penetration rate for brand-generic purchasers by including generic-only purchasers with a 100 percent generic penetration rate.*



**Notes:**
[1] This exhibit does not reflect mergers and acquisitions I noted in **Exhibit 8**.
[2] Generic penetration rates are calculated based on net dosage units purchased, consistent with Dr. Leitzinger's calculations.
[3] Purchasing patterns are determined based on brand and generic net purchases during the May 15, 2009 - May 31, 2011 period.
[4] Percentages of total net dosage units purchased are calculated over the Teva Exclusivity Period (July 1, 2010 - May 31, 2011). Excluded from the calculation are QK Healthcare (only returns), Associated Pharmacies (no purchases and returns), and Uniondale Chemists (no purchases and returns).

**Source**: Dr. Leitzinger's manufacturer data.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Exhibit 8**
**Summary of merger & acquisition consolidation Dr. Leitzinger accounted for and failed to account for in his list of proposed class members**

*While Dr. Leitzinger consolidates some direct purchasers based on instructions from Plaintiffs' Counsel, he fails to consolidate additional direct purchasers in his list of proposed class members.*

| | |
|---|---|
| ▇ | Proposed class member that Dr. Leitzinger should have consolidated with another proposed class member |
| ▇ | Proposed class member that Dr. Leitzinger should have consolidated with an opt-out |
| ▇ | Direct purchaser correctly consolidated by Dr. Leitzinger based on instructions from Plaintiffs' Counsel [1] |
| ▇ | Direct purchaser incorrectly consolidated by Dr. Leitzinger based on instructions from Plaintiffs' Counsel |

| Pre-M&A name in Leitzinger report | Corrected post-M&A consolidated name | Date of M&A [2] | Notes |
|---|---|---|---|
| H. D. SMITH WHOLESALE | AMERISOURCEBERGEN | January 2018 | AmerisourceBergen acquired H. D. Smith in January 2018, which had operated Valley Wholesale Drug as a subsidiary. |
| VALLEY WHOLESALE DRUG | | | |
| AMERICAN HEALTH PACKAGING | | May 2003 | |
| BELLCO | | October 2007 | |
| HARVARD DRUG | CARDINAL HEALTH | July 2015 | Cardinal Health acquired Harvard Drug (formerly Great Lakes Wholesale) in July 2015, which operated Major Pharmaceuticals as its private-label generics brand. |
| GREAT LAKES WHOLESALE | | | |
| MAJOR PHARMACEUTICALS | | | |
| DIK DRUG | | July 2012 | |
| KINRAY | | December 2010 | |
| PARMED | | March 2006 | |
| WHITEMIRE DISTRIBUTION | | February 1994 | |
| EXPRESS SCRIPTS | CIGNA | December 2018 | Cigna acquired Express Scripts in December 2018, which had operated Medco as a subsidiary. |
| MEDCO | | | |
| AETNA | CVS HEALTH | November 2018 | |
| SCHNUCKS PHARMACY | | July 2020 | |
| CAREMARK | | March 2007 | |
| OMNICARE | | August 2015 | |
| PRICE CHOPPERS | GOLUB | - | |
| GENERAL INJECTABLES & VACCINES | HENRY SCHEIN | December 1998 | |
| BURLINGTON DRUG | J M SMITH CORPORATION D/B/A SMITH DRUG | January 2017 | |
| J M SMITH CORPORATION | | - | |
| SMITH DRUG | | - | |
| KINNEY DRUGS | KPH HEALTHCARE SERVICES INC | - | |
| PEYTONS | KROGER COMPANY | - | |
| MASTERS PHARMACEUTICAL | MCKESSON | January 2018 | McKesson acquired PSS World Medical in February 2013, which had operated Rebel Distributors as a subsidiary. Rebel Distributors did not make direct purchases. |
| PSS WORLD MEDICAL | | February 2013 | |
| REBEL DISTRIBUTORS | | | |
| DIXON SHANE | R & S NORTHEAST | - | |
| BARTELL DRUG COMPANY | RITE AID | December 2020 | |
| KASH N KARRY FOOD STORES | WIN DIXIE | June 2014 | Kash N Karry was sold to Delhaize in 1996 and rebranded as Sweetbay in 2007. Sweetbay was later sold to Southeastern Grocers (formerly BI-LO Holdings) in June 2014 and converted to Winn Dixie. |
| SAJ DISTRIBUTORS | STEPHEN L. LAFRANCE PHARMACY, INC. D/B/A SAJ DISTRIBUTORS | - | |
| DUANE READE | WALGREENS | April 2010 | |
| KERR DRUG | | November 2013 | |

**Notes:**
[1] M&A sources are not shown for entities that Dr. Leitzinger correctly consolidated.
[2] Entities with an empty "Date of M&A" field did not undergo a merger or acquisition; name variations reflect rebranding, doing-business-as designations, or divisions of the same parent company.

**Sources:** Leitzinger report, Table 1. For additional consolidations, see M&A Sources below.

**M&A Sources:**
[1] "AmerisourceBergen Completes Acquisition of H. D. Smith," *Cencora* , January 3, 2018, available at https://investor.amerisourcebergen.com/news/news-details/2018/AmerisourceBergen-Completes-Acquisition-of-H-D-Smith/default.aspx; See also, "H.D. Smith wraps up Valley Wholesale Drug purchase," *Chain Drug Review,* November 5, 2014, available at https://chaindrugreview.com/h-d-smith-wraps-up-valley-wholesale-drug-purchase/.
[2] "Cardinal Health Completes Acquisition of The Harvard Drug Group For $1.115 Billion," *Cardinal Health* , July 6, 2015, available at https://newsroom.cardinalhealth.com/2015-07-06-Cardinal-Health-Completes-Acquisition-Of-The-Harvard-Drug-Group-For-1-115-Billion (confirming acquisition closing date); See also, "Cardinal Health Buys Harvard Drug Group: Perspectives on Wholesaler Consolidation," *Drug Channels,* June 5, 2015, available at https://www.drugchannels.net/2015/06/cardinal-health-buys-harvard-drug-group.html (confirming that the acquisition included Major Pharmaceuticals); See also, "Harvard Drug Group Wins Reversal on Suspension to Sell Some Controlled Substances," *Crain's Detroit Business,* June 21, 2010, available at https://www.crainsdetroit.com/article/20100621/HEALTH/306219997/harvard-drug-group-wins-reversal-on-suspension-to-sell-some (confirming Harvard Drug Group originated from Great Lakes Wholesale).
[3] "Cigna Completes Combination with Express Scripts, Establishing a Blueprint to Transform the Health Care System," *The Cigna Group* , December 1, 2018, available at https://newsroom.thecignagroup.com/Cigna-Completes-Combination-with-Express-Scripts-Establishing-a-Blueprint-to-Transform-the-Health-Care-System; See also, "F.T.C. Approves Merger of 2 of the Biggest Pharmacy Benefit Managers," *The New York Times* , April 2, 2012, available at https://www.nytimes.com/2012/04/03/business/ftc-approves-merger-of-express-scripts-and-medco.html.
[4] "CVS Health Completes Acquisition of Aetna, Marking Start of Transforming Consumer Health Experience," *CVS Health* , November 28, 2018, available at https://www.cvshealth.com/news/company-news/cvs-health-completes-acquisition-of-aetna-marking-start-of.html.
[5] "CVS Opens 98 Midwest Schnucks Locations," *The Telegraph,* July 9, 2020, available at https://www.thetelegraph.com/news/article/CVS-opens-98-Midwest-Schnucks-locations-15396926.php.
[6] "Burlington Drug Company Overview," *Pitchbook,* available at https://pitchbook.com/profiles/company/172918-45.
[7] "PSS World Medical Overview," *Pitchbook,* available at https://pitchbook.com/profiles/company/12082-19/overview.
[8] Rite Aid Corporation Form 10-K for the year ended February 26, 2022, p.6.
[9] "Timeline: A History of Sweetbay," *Supermarket News* , June 3, 2013, available at https://www.supermarketnews.com/finance/timeline-a-history-of-sweetbay (confirming Kash N Karry's rebranding as Sweetbay and its acquisition by BI-LO); See also, "Delhaize, Bi-Lo Complete Deal," *Supermarket News,* June 2, 2014, available at https://www.supermarketnews.com/finance/delhaize-bi-lo-complete-deal (confirming acquisition closing date); See also, "Sweetbay Becoming a Winn-Dixie," *Gainesville Sun,* March 5, 2014, available at https://www.gainesville.com/story/news/guardian/2014/03/05/sweetbay-becoming-a-winn-dixie/31120888007/ (confirming Sweetbay's conversion to Winn-Dixie); See also, "Winn-Dixie, BI-LO Parent Takes New Corporate Name," *Supermarket News,* May 18, 2015, available at https://www.supermarketnews.com/finance/winn-dixie-bi-lo-parent-takes-new-corporate-name (confirming BI-LO's name change to Southeastern Grocers).
[10] "Walgreens Wraps Up Duane Reade Acquisition," *Chain Drug Review,* April 9, 2010, available at https://chaindrugreview.com/walgreens-wraps-up-duane-reade-acquisition/.
[11] "Walgreens Completes Acquisition of Kerr Drug's Retail Drugstores and Specialty Pharmacy Business," *Walgreens Boots Alliance,* November 6, 2013, available at https://www.walgreensbootsalliance.com/news-media/press-releases/2013/walgreens-completes-acquisition-of-kerr-drugs-retail-drugstores-and-specialty-pharmacy-business.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY



**Exhibit 10**
**Select history of litigation in which members of Dr. Leitzinger's proposed class were joint plaintiffs**

*Many of the proposed class members have served as plaintiffs in at least one litigation jointly with another proposed class member.*

| # | Docket number | Case title | At-issue product | Court location | Total proposed class members | AmerisourceBergen, Cardinal, McKesson | Burlington Drug | RDC | Value Drug | Other proposed class members |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2:18-md-02836-RBS-DEM | In Re: Zetia (Ezetimibe) Antitrust Litigation | Zetia | Virginia Eastern | 18 | X | X | X | X | Cesar Castillo; Dakota Drug; Frank W Kerr (via FWK Holdings); H. D. Smith; Harvard Drug; J M Smith Corporation d/b/a Smith Drug; KPH Healthcare Services; Louisiana Wholesale; Miami Luken (via MLI RX); North Carolina Mutual Wholesale; Prescription Supply; Valley Wholesale Drug |
| 2 | 2:23-cv-02956-JMV-CLW<br>2:23-cv-02958-JMV-CLW<br>2:23-cv-02960-JMV-CLW | Morris & Dickson Co., LLC v. GlaxoSmithKline LLC, et al.<br>FWK Holdings, LLC v. GlaxoSmithKline LLC, et al.<br>MLI RX LLC et al. v. GLAXOSMITHKLINE LLC, et al. | Lamictal | Pennsylvania Eastern | 15 | X | X | | X | Dakota Drug; Frank W Kerr (via FWK Holdings); H.D. Smith; Harvard Drug; J M Smith Corporation d/b/a Smith Drug; Miami Luken (via MLI RX); Morris & Dickson; North Carolina Mutual Wholesale; Prescription Supply; Valley Wholesale Drug |
| 3 | 1:16-cv-12652-LTS | In Re: Lantus Direct Purchaser Antitrust Litigation | Lantus | Massachusetts | 15 | X | X | X | X | Dakota Drug; Frank W Kerr (via FWK Holdings); H. D. Smith; Harvard Drug; J M Smith Corporation d/b/a Smith Drug; Miami Luken (via MLI RX); North Carolina Mutual Wholesale; Prescription Supply; Valley Wholesale Drug |
| 4 | 2:19-cv-03565-HB | King Drug Company of Florence, Inc., et al. v. Abbott Laboratories, et al. | AndroGel | Pennsylvania Eastern | 11 | X | X | | X | Dakota Drug; Frank W Kerr (via FWK Holdings); H. D. Smith; Harvard Drug; J M Smith Corporation d/b/a Smith Drug; North Carolina Mutual Wholesale |
| 5 | 2:06-cv-01797-MSG | King Drug Company of Florence, Inc., et al. v. Cephalon, Inc., et al. | Provigil | Pennsylvania Eastern | 4 | | X | X | | J M Smith Corporation d/b/a Smith Drug; Stephen L. LaFrance Pharmacy, Inc. d/b/a SAJ Distributors |
| 6 | 4:17-cv-00323-TCK-FHM | McKesson Corporation, et al. v. Hembree, et al. | Prescription Opioids | Oklahoma Northern | 4 | X | | | | Walmart |
| 7 | 15-2005 | In Re: Nexium Antitrust | Nexium | Appellate - 1st Circuit | 3 | | X | X | X | |
| 8 | 1:12-md-02409-WGY | In Re: Nexium (Esomeprazole) Antitrust Litigation | Nexium | Massachusetts | 3 | | X | X | X | |
| 9 | 1:15-cv-12730-DJC | In Re: Asacol Antitrust Litigation | Asacol | Massachusetts | 2 | | | X | X | |

**Note:** Opt-outs are excluded from this exhibit.

**Sources:**
[1] Pretrial Order No. 11, In re: Zetia (Ezetimibe) Antitrust Litigation, U.S. District Court for the Eastern District of Virginia Norfolk Division, Case No. 2:18-md-2836-RBS-DEM, October 26, 2022.
[2] Complaint, Morris & Dickson Co., L.L.C., v. GLAXOSMITHKLINE LLC et al., U.S. District Court for the Eastern District of Pennsylvania, Case No. 2:23-cv-02956-JMV-CLW, February 7, 2023; Complaint, FWK Holdings, LLC v. GLAXOSMITHKLINE LLC et al., U.S. District Court for the Eastern District of Pennsylvania, Case No. 2:23-cv-02958-JMV-CLW, February 27, 2023; Complaint, MLI RX LLC et al., v. GLAXOSMITHKLINE LLC et al., U.S. District Court for the Eastern District of Pennsylvania, Case No. 2:23-cv-02960-JMV-CLW, February 2, 2023.
[3] Amended and Consolidated Complaint and Demand for Jury Trial, In re: Lantus Direct Purchaser Antitrust Litigation, U.S. District Court District of Massachusetts, Case No. 1:16-cv-12652-JGD-LTS, March 6, 2023.
[4] Complaint, King Drug Company of Florence, Inc., et al. v. Abbot Laboratories, et al., U.S. District Court for the Eastern District of Pennsylvania, Case No. 2:19-cv-03565-HB, August 7, 2019.
[5] Direct Purchaser Class Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Certification of a Settlement Class, Appointment of Class Counsel, Preliminary Approval of Proposed Settlement, Approval of the Form and Manner of Notice to the Class and Proposed Schedule for a Fairness Hearing, King Drug Company of Florence, Inc., et al. v. Cephalon, Inc., et al., U.S. District Court for the Eastern District of Pennsylvania, Case No. 2:06-cv-01797, February 3, 2017.
[6] First Amended Complaint, McKesson Corporation, et al. v. Hembree, et al., U.S. District Court for the Northern District of Oklahoma, Case No. 4:17-cv-00323-TCK-FHM, June 27, 2017.
[7] Direct Purchaser Class Plaintiffs-Appellants' Petition for Rehearing and Rehearing En Banc, In re: Nexium (Esomeprazole) Antitrust Litigation, U.S. Court of Appeals for the First Circuit, Case No. 15-2005, December 12, 2016.
[8] Order Granting Plaintiffs' Motion for Reimbursement of Expenses, Payment of Administration and Notice Costs, and Awarding Incentive Awards to the Class Representatives for the Direct Purchaser Class and End-Payor Class, In re: Nexium (Esomeprazole) Antitrust Litigation, U.S. District Court District of Massachusetts, Case No. 1:12-md-02409, October 5, 2015.
[9] Direct Purchaser Plaintiffs' Memorandum of Law in Support of Unopposed Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Service Awards for the Class Representatives, In re: Asacol Antitrust Litigation, U.S. District Court District of Massachusetts, Case No. 1:15-cv-12730, October 5, 2017.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 11**
**Current / historical membership in group purchasing organizations (GPO)**
**and generic sourcing programs (GSP) across members of the proposed class**

*Proposed class members belong to various GPOs and GSPs, indicating both a willingness and ability to cooperate.*

| GPO/GSP | Proposed class member |
|---|---|
| TopCo | 1. GOLUB |
| | 2. WAKEFERN FOOD CORP |
| | 3. WEIS MARKETS |
| Optisource | 1. CAPITAL WHOLESALE |
| | 2. BURLINGTON DRUG |
| | 3. DAKOTA DRUG |
| | 4. DROGUERIA BETANCES |
| | 5. FRANK W KERR |
| | 6. J M SMITH CORPORATION D/B/A SMITH DRUG |
| | 7. LOUISIANA WHOLESALE |
| | 8. MIAMI LUKEN |
| | 9. PRESCRIPTION SUPPLY |
| | 10. QUALITY CARE PRODUCTS |
| | 11. RDC |
| | 12. VALUE DRUG |
| Chain Pharmacy Alliance | 1. DISCOUNT DRUG MART |
| | 2. KPH HEALTHCARE SERVICES INC (formerly KINNEY DRUGS) |
| | 3. THRIFTY WHITE |
| Premier Generics | 1. BLOODWORTH WHOLESALE |
| | 2. DRUGS UNLIMITED |
| | 3. GENETCO |
| | 4. QUEST PHARMACEUTICALS |
| | 5. RICHIE PHARMACAL |

**Note:** Exhibit excludes opt-outs and their subsidiaries.

**Sources:**
[1] "Our Members," *TopCo,* available at https://www.topco.com/Members.
[2] "OptiSource LLC," *SAP Business Network,* available at https://portal.us.bn.cloud.ariba.com/profile/public?anId=AN01014679739.
[3] "Chain Drug Consortium Launches Pharmacy Alliance," *Progressive Grocer,* August 25, 2010, available at https://progressivegrocer.com/chain-drug-consortium-launches-pharmacy-alliance.
[4] "About Us," *Premier Generics,* available at https://www.premiergenerics.com.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
Page ID: 19818

