# Exhibit 64
# (Filed Under Seal)

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE EFFEXOR XR ANTITRUST LITIGATION | C.A. No. 11-cv-05479(ZNQ)(JBD) |
| This Document Relates To:<br><br>Direct Purchaser Class Actions | |

**REPLY REPORT OF PROFESSOR THOMAS G. MCGUIRE, PH.D.**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE DISCOVERY
CONFIDENTIALITY ORDER**

TABLE OF CONTENTS

I.      WYETH MADE LARGE, UNEXPLAINED, REVERSE PAYMENTS TO TEVA ............................. 1

A.      The U.S. Effexor IR and Canadian Effexor XR Licenses ............................................. 2

B.      Explicit and Implicit No-AG Clauses ......................................................................... 9

II.     PAYMENTS TO TEVA, THE STOCK MARKET REACTION, AND THE SETTLEMENT
        NEGOTIATIONS ...................................................................................................... 17

A.      Payments to Teva .................................................................................................... 17

B.      Confirmatory Evidence of the Stock Market Reaction ............................................... 23

C.      The Terms Exchanged During the Settlement Negotiations ........................................ 26

III.    THE WYETH-TEVA AGREEMENT ALLOCATED MARKETS ..................................... 27

A.      AGs Play a Critical Role in how Brand and Generic Firms Normally Compete .......... 27

B.      The Wyeth-Teva Agreement Divided Markets .......................................................... 29

IV.     PROCOMPETITIVE BENEFITS AND ANTICOMPETITIVE HARMS .............................. 32

A.      Dr. Cremieux's Arguments About the Harms to Purchasers ...................................... 34

B.      Dr. Cremieux's Arguments About Potential Benefits to Purchasers ........................... 35

V.      TIMING OF GENERIC ENTRY IN A COMPETITIVE AGREEMENT .............................. 37

A.      Dr. Cremieux's Arguments About My Overall Approach ........................................... 38

B.      Dr. Cremieux's Arguments About Specific Inputs in My Date Calculation ................. 39

VI.     MAJOR DEFICIENCIES IN THE ELZINGA REPORT ................................................. 50

A.      Sunk Costs are not Fixed Costs and Sunk Costs do not Cause High Monopoly Prices ....... 52

B.      Misleading Presentation of Data ............................................................................... 52

C.      Prof. Elzinga Falls Victim to the "Cellophane Fallacy" ............................................ 66

VII.    DIRECT EVIDENCE OF WYETH MARKET POWER ................................................. 68

A.      Price Fall with Competition ..................................................................................... 68

B.      Gross Margins and the Lerner Index ......................................................................... 69

C.      Inelastic Demand for Effexor XR ............................................................................. 73

VIII.   INDIRECT EVIDENCE OF WYETH MARKET POWER ............................................. 79

A.      Empirical Studies of Cross-Price Elasticity of Demand ............................................. 80

B.      The Hypothetical Monopolist Test and Wyeth Market Power ..................................... 84

IX.     PROF. ELZINGA'S ANALYSIS ............................................................................... 85

A.      Clinical Guidelines and Business Documents ............................................................ 86

B.      "Switching" Analyses .............................................................................................. 88

C.      Market Shares, Barriers to Entry, and Supply Elasticity ............................................ 90

X.      CONCLUSION ...................................................................................................... 92

1.      On July 17, 2025, Teva, the Defendant in this matter, submitted expert reports.[1]  Teva's economists Dr. Pierre Cremieux and Prof. Kenneth Elzinga reviewed and commented on the report I submitted on May 15, 2025.[2]  Dr. Cremieux addressed my analysis of the Wyeth-Teva Agreement reached on November 2, 2005, and Prof. Elzinga addressed my analysis of Wyeth's market power and market definition for Effexor XR.  In this Reply Report, I respond to the points raised by these two economists.[3]  My qualifications and experience are described in Section II of my May 2025 Report and not repeated here.  Attachment A lists the materials I have relied upon and cited in this Reply.

2.      Section I addresses the central question of whether Dr. Cremieux or Prof. Elzinga have effectively rebutted my conclusion that Wyeth made large, unexplained, reverse payments to Teva in connection with their Agreement.  As I explain, they have not.

3.      Subsequent sections of this Reply respond to other criticisms made by Dr. Cremieux and Prof. Elzinga.  Nothing written by these economists in their reports causes me to change my opinions (detailed in my May 2025 Report) that Wyeth possessed substantial market power with respect to Effexor XR and that the Wyeth-Teva Agreement was anticompetitive.  The fact that I chose not to address a particular contention in either report does not mean that I agree with it.

## I.    WYETH MADE LARGE, UNEXPLAINED, REVERSE PAYMENTS TO TEVA

4.      In my May 2025 Report I concluded that Wyeth made reverse payments to Teva, payments that I conservatively estimated to total $412.8 million and that cannot be explained by

---

[1]  Plaintiffs brought suit against the following defendants: Wyeth LLC; Wyeth Pharmaceuticals, Inc.; Wyeth-Whitehall Pharmaceuticals; Wyeth Pharmaceuticals Company (collectively, "Wyeth"); Teva Pharmaceuticals USA, Inc.; and Teva Pharmaceutical Industries Ltd. (collectively, "Teva").  I understand from counsel for Plaintiffs that Plaintiffs have reached a settlement with Wyeth and that Wyeth is no longer a party to this litigation.

[2]  Expert Report of Pierre-Yves Cremieux, Ph.D., in this matter, July 17, 2025 (hereinafter "Cremieux Report") and Expert Report of Prof. Kenneth G. Elzinga, in this matter, July 17, 2025 (hereinafter "Elzinga Report").  I submitted the Expert Report of Prof. Thomas G. McGuire, Ph.D., in this matter, May 15, 2025 (hereinafter "my May 2025 Report").

[3]  The Cremieux and Elzinga Reports also criticized reports of other Plaintiff experts.  In this Reply, I respond to criticisms of my Report, not to criticisms of the reports of other Plaintiff experts.

normal business considerations.[4]  The Wyeth-to-Teva payments took three forms: a license to Teva to begin selling venlafaxine immediate release (IR) in the U.S. two years prior to the expiration of the venlafaxine compound patent; a license to Teva to sell generic Effexor XR in Canada approximately 13 months before the parties expected generic entry to occur in January 2008; and no-authorized generic (AG) clauses deterring Wyeth from selling an AG in the U.S. The $412.8 million in reverse payments vastly exceeded the future litigation costs (estimated as approximately $4.3 million) a company in Wyeth's position could reasonably anticipate saving in connection with settling its patent dispute with Teva.  I found no other potential procompetitive explanation for the payments.[5]

## A.    The U.S. Effexor IR and Canadian Effexor XR Licenses

5.       My May 2025 Report estimated the cost to Wyeth (*i.e.*, lost profits) to be $156.6 million for the generic Effexor IR license in the U.S. and $187.3 million for the generic Effexor XR license in Canada.[6]  I highlighted the importance of Wyeth documents acknowledging that the purpose of the generic Effexor IR license was to "give Teva ... value to keep them off XR."[7]  I concluded that there was no normal business reason that Wyeth would cede either of these profitable sales to Teva prior to when generic Effexor IR or generic Effexor XR in Canada otherwise could have entered.[8]

6.       Dr. Cremieux does not respond to key points in my analysis of the lack of explanation for the payments in the two licenses.  His offered explanations for the payments are his speculation without reference to a single Wyeth document for support.  Some of what he writes is simply

---

[4]  I use the terms "reverse," "unexplained," "large," and "unjustified" to describe payments in the same way I did in my May 2025 Report (see ¶ 9).

[5]  My May 2025 Report, Section VIII.

[6]  These figures are in nominal dollars; I also showed that "accounting for the time value of money does not affect my qualitative conclusions."  My May 2025 Report, footnote 498 and Attachment D.6.  Dr. Cremieux points out that I made a minor error in how I accounted for the time value of money with respect to the Canadian license (Cremieux Report, footnote 175).  I corrected the error in Attachment D of this Reply Report.  My conclusions are unchanged.

[7]  My May 2025 Report, ¶ 242 citing WYEFFAT3767261 and WYEFFAT3767262.00001-.00003.

[8]  My May 2025 Report, ¶¶ 247-248 and 253-254.

illogical.  Table 1 summarizes my and Dr. Cremieux's analyses of the explanations for Wyeth's reverse payments to Teva contained in these two licenses.

### TABLE 1
### EXPLANATIONS FOR WHY WYETH TRANSFERS PROFITS TO TEVA IN U.S. EFFEXOR IR AND CANADIAN EFFEXOR XR LICENSES

| McGuire Explanation/Evidence | Cremieux Critique (if any) | McGuire Reply/Comment |
|---|---|---|
| Highlights explicit Wyeth acknowledgement that the purpose of the IR license is to give value to Teva "to keep them off XR" | Ignored; document highlighted in my Report not included in his list of material considered | Cremieux fails to respond to notable evidence |
| Wyeth documents and depositions provide no normal business reason that explains why Wyeth would cede the market for Effexor IR to Teva | McGuire overstates the value of the IR license by ignoring Wyeth's line extension Pristiq | Cremieux is incorrect; the Wyeth forecast models and actual sales data I used accounted for Pristiq; he cites no Wyeth documents or testimony and does not dispute that the IR license represented a substantial cost to Wyeth |
| Wyeth documents and depositions provide no normal business reason that explains why Wyeth would cede the market for Effexor XR in Canada to Teva | Canadian XR license removes risk Teva could have won patent litigation in Canada and entered the Canadian market earlier | Cremieux is incorrect; Teva could not have entered earlier than the Agreement allowed if it won the litigation; he cites no Wyeth documents or testimony expressing this possibility prior to the Agreement and cites no evidence this in fact could have occurred |
| | Canadian XR license ████ ████████ | ███████████████████ ███████████ |
| | Canadian XR license saved Wyeth litigation expenses in Canada | Wyeth still incurred expenses litigating the patent validity with other firms in Canada; even so, litigation expenses are negligible |
| Wyeth's saved litigation costs are significantly smaller than payments and do not explain payments | Ignored | Cremieux fails to compare reverse payments to saved litigation costs |

*Generic Effexor IR License*

7.      My May 2025 Report stated that I found no Wyeth document offering a normal business reason for Wyeth to offer Teva a license to sell generic Effexor IR (other than to make a reverse payment to delay entry for Effexor XR in the U.S.).[9]  Dr. Cremieux likewise finds no explanation in Wyeth's business records.[10]  He cites no Wyeth document to explain this reverse payment I estimated to be worth $156.6 million.

8.      Dr. Cremieux ignores evidence highlighted in my Report.  He does not mention or cite the Wyeth documents I emphasized indicating that the purpose of the Effexor IR license was to delay Teva's launch of generic version of Effexor XR.[11]  He does not question my interpretation of these telling documents.

9.      Dr. Cremieux argues that I overstate the cost to Wyeth from the Effexor IR license because I "ignore" that Effexor IR had "limited commercial value" given Wyeth's plans to sell the line extension Pristiq.[12]  This is incorrect.  The Wyeth evidence I relied on calculated the expected cost to Wyeth from lost sales of brand Effexor IR *after* accounting for Wyeth's plans to

---

[9]  My May 2025 Report, ¶¶ 247-249.  Unless specifically noted, when I use "Effexor XR" in this report I am referring to Effexor XR sold in the U.S.  Where I am referring to brand or generic Effexor XR sold in Canada, I will make that clear.

[10]  In deposition, Dr. Cremieux agreed that the Effexor XR license "had value to Teva" and "was a cost to Wyeth" and that Wyeth must have gotten "something in exchange" for giving the license.  Deposition of Pierre-Yves Cremieux, in this matter, September 11, 2025 (hereinafter "Cremieux Deposition"), pp. 96-97.  He disagrees that the license affected the generic entry date in the Agreement but did not provide an alternative explanation in his Report.  To the extent that he speculated in his deposition that it may have been given in order to "reach a settlement" and that this would be different from delaying generic entry, that is incorrect (and is not an opinion he developed or offered in his report).  This issue has been dealt with in the academic literature on reverse-payment settlements.  See E. Elhauge and A. Krueger, "Solving the Patent Settlement Puzzle," *Texas Law Review*, 91, 2012, pp. 283-330 at pp. 303-304.

[11]  The documents I cited in my May 2025 Report, ¶ 242 (*i.e.*, WYEFFAT3767261 and WYEFFAT3767262.00001-.00003) are not listed in his materials relied on or referenced or discussed anywhere in his report.

[12]  Cremieux Report, ¶ 92.  Dr. Cremieux also argues that this is supported by the fact that Wyeth "began phasing out" brand Effexor IR "throughout 2009 and 2010."  Cremieux Report, ¶ 93.  Obviously, Brand Effexor IR sales were substantially reduced after multiple generic versions were launched in 2008, so of course Brand Effexor IR had limited value in 2009-2010.  But Brand Effexor IR had significant value at the time of the Wyeth-Teva Agreement in 2005 and at the time that Teva was permitted to enter as the only generic on the market, before the 2009-2010 time period.  Specifically, in 2005, Wyeth forecasted that net sales of Effexor IR would total $100 million per year in 2006 and 2007.  See WYEFFAT06426692, tab "Draft AHT Summary Sheet," row 25.

transition patients to Pristiq.[13]  I also calculated the cost to Wyeth based on the actual sales of generic and brand Effexor IR, which naturally accounts for actual sales of brand Effexor XR with Pristiq on the market.[14]  Pristiq is already accounted for in my calculations.[15]

### *Generic Effexor XR Canada License*

10.     Dr. Cremieux also identifies no Wyeth document or testimony reporting a normal business reason to give Teva an early license to sell generic Effexor XR in Canada.  Dr. Cremieux does not cite a single Wyeth document to explain why Wyeth would transfer profits to Teva through the generic Effexor XR Canada license.[16]  With nothing to go on from Wyeth, Dr. Cremieux instead attempts to explain the license by misrepresenting points in a report from Plaintiffs' expert Connie Lin.[17]

11.     At the time the Wyeth-Teva Agreement was reached, Wyeth's venlafaxine active ingredient patent was set to expire in Canada in January 2006,[18] but Wyeth was in the process of obtaining a formal listing for a new patent that had an expiration date in Canada of 2017.[19]  Dr. Cremieux argues that I ignore the possibility that Wyeth granted Teva the generic Effexor XR Canada license to resolve potential Canadian patent litigation with Teva related to the new Canadian patent.[20]  He claims that I did not consider the risk that Teva could have won the

---

[13]  See WYEFFAT05979443, tab "Draft AHT Summary Sheet," rows 8-10 showing that, even if Wyeth won the patent litigation, Effexor XR sales were expected to decline.

[14]  My May 2025 Report, footnote 477 and Attachment D.6.  Dr. Cremieux agreed that "Wyeth calculated that Teva's entry into the market would deplete Wyeth's profit in Effexor IR."  Cremieux Deposition, pp. 42 and 94-97.

[15]  Pristiq is also referred to in Wyeth documents as desvenlafaxine, DVS, or DVS-233.

[16]  Cremieux Report, ¶ 81 cites some materials to support his argument that the Canadian market for Effexor XR was small relative to the U.S. market, but that does not explain why Wyeth granted the Canadian license.

[17]  See Cremieux Report, ¶ 79 citing the Expert Report of Connie Lin, in this matter, May 15, 2025 (hereinafter "Lin Report").

[18]  Teva and other generic companies did not challenge the validity of the active ingredient patent in Canada, so they could not enter before it expired.

[19]  My May 2025 Report, ¶ 250.

[20]  Cremieux Report, ¶¶ 78-80.  The Agreement was reached before Wyeth listed the new patent so no litigation was ever initiated against Teva in Canada related to Effexor XR.

---

potential Canadian patent litigation related to the new patent and entered in Canada.[21]  But, to the extent that Dr. Cremieux is opining, or implying that Teva could have won the potential litigation against Wyeth in Canada related to the new patent and launched in Canada in or before December 2006 *without a license* from Wyeth, he is mistaken, and his opinion is contrary to Ms. Lin's and contrary to Wyeth's own documents.

12.    I understand that Wyeth expected to list the new patent in Canada (and in fact did) prior to the expiration of the venlafaxine active ingredient patent in January 2006.[22]  In this scenario, upon filing a prohibition action in Canadian Federal Court based on this new patent, I understand Wyeth would be entitled to a statutory 24-month stay in Canada that would prevent Teva from selling generic Effexor XR in Canada until a legal resolution was rendered, unless Teva received a license from Wyeth.[23]  I understand that Ms. Lin will testify that, in this scenario, the Canadian litigation (once filed) would not have concluded by 2006, and so Teva could not have launched generic Effexor XR in Canada in 2006 (again, absent a license from Wyeth).[24]

13.    In the unlikely (and counterfactual) scenario that Wyeth failed to list the new Effexor XR patent in Canada, then Teva and others could have entered in Canada as soon as they obtained regulatory approval.  In this scenario, there would be no prohibition action filed by Wyeth against Teva, so Teva and others would not need a license from Wyeth.[25]

---

[21] Cremieux Report, footnote 169.

[22] Wyeth's forecast models did not include a scenario in which generics were expected to launch in Canada upon expiration of the venlafaxine active ingredient patent in January 2006 but rather did not show generic launch until January 2008.  See WYEFFAT06426692, tab "Draft AHT Summary Sheet," rows 40-64.

[23] Lin Report, ¶ 9; Rebuttal Expert Report of Connie Lin, in this matter, September 9, 2025 (hereinafter "Lin Rebuttal"), ¶¶ 4-5 and footnote 1.

[24] Consistent with Ms. Lin's opinion, prior to the Agreement being signed, both Wyeth and Teva expected generic Effexor XR entry in Canada to occur in January 2008, and so it appears that both expected that Wyeth would list the patent, sue Teva in Canada, and obtain a 24-month stay.  After the Agreement was signed, the 24-month stay prevented a different generic firm from launching its product in Canada until the Canadian court resolved the patent dispute.  After the patent listing was rejected by the Canadian court, second generic entry occurred in August 2007. My May 2025 Report, ¶ 250 and footnotes 464-465.

[25] If Wyeth failed to obtain a formal patent listing, the Wyeth-Teva Agreement simply gave Teva a license to launch upon receiving approval from Health Canada, which Teva could have done without the Agreement.  My May 2025 Report, ¶ 119.

---

14.    Dr. Cremieux fails to mention that the likely timing of Teva's generic Effexor XR entry in Canada without the license from Wyeth was explicitly considered in my May 2025 Report.[26] Both Wyeth's and Teva's forecast models reflected that generic entry of Effexor XR in Canada would not occur until January 2008 if not for the Wyeth-Teva Agreement.[27] This is consistent with the opinions of Ms. Lin.[28]

15.    In summary, Dr. Cremieux's argument that Wyeth granted Teva a license to sell generic Effexor XR in Canada starting in December 2006 to resolve the litigation risk that Teva otherwise could have entered in Canada in December 2006 or earlier is invalid.  He cites no Wyeth documents to support his incorrect speculation that this would have been a consideration for a company in Wyeth's position.  The Agreement enabled Teva to enter in Canada in December 2006, before its competitors and earlier than Teva could have entered even if Teva had won the litigation against Wyeth in the U.S. or in Canada.

16.



---

[26] My May 2025 Report, ¶ 250.

[27] See my May 2025 Report, ¶¶ 250-252, citing WYEFFAT05979443, WYEFFAT06426692, and TEVA_EFFEX_0906117.

[28] Lin Report, ¶¶ 27, 31-32, 37-38 (on the very day Wyeth listed the new patent, the new patent was challenged by a second generic company, but Wyeth invoked the 24-month stay, which ultimately delayed the second generic company's sales of Effexor XR until September 18, 2007).

[29] Cremieux Report, ¶ 80.

[30]



17.    Finally, Dr. Cremieux argues that the license made business sense to Wyeth because it allowed Wyeth to save litigation expenses it could incur in Canada.[32]  This point is also incorrect.  Despite granting the license to Teva, Wyeth still had to defend the validity of the new Effexor XR patent in Canada, and it still incurred legal expenses doing so,[33] so Wyeth likely saved little or no legal expenses by granting a license to Teva.  Furthermore, any actual savings would be minimal.  Dr. Cremieux has no explanation for why Wyeth would agree to grant Teva a license that Wyeth estimated would cost Wyeth $181 million to save a few million dollars in litigation costs.[34]  It would not make economic sense for Wyeth to do so.

### Conclusion:  The Generic Effexor IR (U.S.) and Effexor XR (Canada) Licenses are Stark Examples of Unexplained Reverse Payments

18.    In my May 2025 Report, I concluded that there was no business reason why Wyeth would license Teva to sell either generic Effexor IR in the U.S. or generic Effexor XR in Canada prior to when generic entry otherwise could have occurred in either country, and that both licenses are stark examples of reverse payments.[35]  Dr. Cremieux offered *no explanation* for why Wyeth would grant the Effexor IR license and only *invalid explanations* for why it would grant the Effexor XR Canada license.  My conclusion stands that the licenses to Teva are stark examples of large unexplained reverse payments.

---

[31]  See WYEFFAT06426692, tab "AHT Summary Sheet," rows 55-58.

[32]  Cremieux Report, ¶ 80.

[33]  My May 2025 Report, footnote 465.

[34]  Litigation costs are not explicitly considered in the Wyeth forecast models (WYEFFAT06426692, tab "AHT Summary Sheet," rows 43-55 and WYEFFAT05979443, tab "Draft AHT Summary Sheet," rows 43-55), possibly because Wyeth still had to litigate the validity of the patent with other generic firms.

Teva's Canadian legal expenses were estimated to total $1.5 million in its forecast model.  See TEVA_EFFEX_0906117, tab "4 in 2008."

[35]  My May 2025 Report, ¶¶ 247-249 and 253-254.

**B.    Explicit and Implicit No-AG Clauses**

19.    My May 2025 Report explained that the Wyeth-Teva Agreement contains two no-AG clauses: an explicit no-AG clause wherein Wyeth promised not to launch an AG during Teva's 180-day exclusivity period in the U.S., and an implicit no-AG clause deterring Wyeth from launching an AG in the five months after Teva's initial 180 days.  Together, these clauses succeeded in allocating the entire generic Effexor XR market in the U.S. to Teva for 11 months. I estimated that the no-AG clauses represented a payment of $68.9 million from Wyeth, at minimum, bringing Wyeth's total reverse payment to Teva to $412.8 million.[36]

20.    Dr. Cremieux does not dispute the presence of an explicit no-AG clause during Teva's 180-day regulatory exclusivity period or that ███████████████████████████████ █████ deterred Wyeth from launching an AG.  Instead, he falls back on the argument that Wyeth sacrificed nothing by including them because Wyeth would not have introduced an AG upon Teva's entry even without the no-AG clauses in the Wyeth-Teva Agreement.[37]  As summarized in Table 2 and explained below, his weak fallback position is inconsistent with the wealth of available information about Wyeth's likely sale of an AG, including, notably, Wyeth's own documents.

---

[36]  My May 2025 Report, ¶¶ 219-240.

[37]  Cremieux Report, ¶ 80.

TABLE 2
ABSENT THE NO-AG CLAUSES, A FIRM IN WYETH'S POSITION LIKELY WOULD HAVE
LAUNCHED AN AG

| McGuire Explanation/Evidence | Cremieux Critique (if any) | McGuire Reply/Comment |
|---|---|---|
| After the Agreement, Wyeth prepared to sell its AG in case the Agreement terms were violated | Ignored; documents highlighted in my Report not discussed | Cremieux fails to account for notable evidence |
| Industry experience; most firms in similar circumstances have sold AGs at start of generic competition | "Only" ~80% of similarly situated firms have sold AGs; the remainder have not | A high but less than 100% percentage still supports my conclusion; Cremieux understates the share launching, 86%-100% of eligible firms have sold AGs |
| Market participants, including Teva, assumed that brand firms would sell AGs | In a 2025 deposition in this antitrust matter, a Teva executive claimed Teva did not expect an AG because of Wyeth's line extension | The testimony is inconsistent with Teva's earlier forecast models, documents, and other testimony; the logic is also incorrect as an economic and empirical matter |
| Prior to the Agreement, Wyeth forecasted that selling an AG upon generic entry would be profitable | During the 180-day exclusivity period, Wyeth modeled that selling an AG was unprofitable because it would hasten generic erosion | Cremieux's analysis is incomplete; Wyeth forecasted that profits during *and after* exclusivity period would be higher if it sold an AG |
| | Profits after 180 days should be ignored because Wyeth could have sold AG then | A post-exclusivity AG launch was not considered by Wyeth prior to the Agreement; Cremieux fails to account for first-mover advantage |
| Pfizer launched AG upon expiration of the no-AG clauses | Pfizer could have launched AG when the explicit no-AG clause expired, but instead waited until "mass generic entry," so explicit no-AG had no effect | Cremieux neglects the implicit no-AG clause; Pfizer did not launch AG after the exclusivity period because of the clause, which is also an anticompetitive market division |
| Protonix was Wyeth's only other AG-launch opportunity, and Wyeth did launch a Protonix AG upon Teva's entry | Protonix is different from Effexor XR because there was no Protonix line extension | Cremieux is incorrect as an economic and empirical matter; a firm can launch an AG and a line extension, no data indicate that line extensions deter an AG launch |
| | Protonix AG was sold in response to an at-risk entry whereas the generic Effexor XR launched under a settlement | Cremieux provides no explanation for why this matters |
| | The Protonix AG was launched two years after the Effexor XR Agreement was signed | Protonix is the only comparable example; Cremieux provides no others |

*Absent the No-AG Clauses, A Firm in Wyeth's Position Likely Would Have Launched an AG*

21.    In my May 2025 Report, I concluded that, absent the no-AG clauses, a firm in Wyeth's position likely would have launched an AG when Teva first introduced its generic version of Effexor XR. My conclusion is consistent with and further supported by the opinions of Plaintiffs' expert Donald Allen.[38]

22.    My conclusion was also supported by, among other things, Wyeth's post-agreement preparations to sell an AG version of Effexor XR in case the terms of the Wyeth-Teva Agreement were violated.[39] Dr. Cremieux ignores this part of my May 2025 Report and the Wyeth documents I call attention to supporting my conclusion.[40] Dr. Cremieux's failure to contend with this evidence biases his analysis against finding that Wyeth likely would have launched an AG in the absence of the no-AG clauses.

23.    As part of my analysis, I described the AG-related experience of firms in similar circumstances.[41] Dr. Cremieux argues that the data I present are "irrelevant" as to whether Wyeth likely would have sold an AG in the absence of the no-AG clauses because brand firms do not *always* sell AGs *100%* of the time. Specifically, he argues that "among drugs with the highest pre-entry brand sales (at least $500 million annually) over 20 percent did not launch an AG during the exclusivity period."[42] Dr. Cremieux does not explain why it is reasonable to assume that that Wyeth would have been in the *minority* of these firms. Dr. Cremieux also ignores evidence I present regarding how no-AG agreements in other settlements taint this

---

[38] Expert Report of Donald S. Allen, in this matter, May 15, 2025. Dr. Allen concludes that, in the absence of the Agreement, Wyeth would have had incentives to launch an AG when it first faced generic competition for Effexor XR (¶¶ 54-61); Wyeth would have been ready to launch an AG in June 2008 or after (¶¶ 62-73); and Wyeth had the capacity to sell an AG in and after June 2008 (¶¶ 74-83).

[39] My May 2025 Report, ¶¶ 225-226.

[40] Neither Wyeth's actions nor any of the documents I cited are discussed in his report. My May 2025 Report, ¶¶ 225-226, cites WYEFFAT04649501, WYEFFAT3709177-81, WYEFFAT3650173, WYEFFAT3712553-87, and WYEFFAT3613120-26. Although WYEFFAT3712553-87 is included in Dr. Cremieux's list of materials relied upon, it is not discussed or cited in the main text of his report. The other documents are not included in his list of materials relied upon or anywhere else in his report.

[41] My May 2025 Report, ¶ 220.

[42] Cremieux Report, ¶ 69.

---

statistic.  As discussed in my May 2025 Report, Dr. Cremieux's "over 20 percent" figure falls to "between 0% and 14%" after accounting for generic entries that were affected by no-AG agreements.[43]

24.    Next, I described how market participants, including Teva, generally assumed an AG would be sold after generic launches.[44]  In response, Dr. Cremieux cites a deposition from this antitrust matter of a former Teva executive indicating that Teva would not have expected Wyeth to sell an AG because Wyeth had plans to sell a line extension.[45]  The testimony Dr. Cremieux relies on was given in February 2025, almost 20 years after the Wyeth-Teva Agreement was signed.[46]  It is inconsistent with Teva's forecast models,[47] other Teva documents created around the time of the Wyeth-Teva Agreement,[48] and other Teva testimony.[49]  It also does not make sense as an economic or empirical matter.[50]  Teva sold generic products that faced both line extensions and AGs.[51]

---

[43] My May 2025 Report, ¶ 220.

[44] My May 2025 Report, ¶ 221.  I cited several documents supporting this position, including a 2004 earnings conference call during which Teva's President and CEO said that "We now factor authorized generics into our plans as a given." WYEFFAT3609860-10024 at 9869.

[45] See Cremieux Report, ¶ 63 citing the Deposition of William S. Marth, in this matter, February 26, 2025 (hereinafter "Marth Deposition").

[46] Cremieux Report, footnote 81.

[47] See my May 2025 Report, Attachment E, describing WYEFFAT2163587 and TEVA_EFFEX_0440657.  The other Teva forecast models described in Attachment E assumed that Wyeth would not sell an AG, but they were created after the Wyeth-Teva Agreement was reached.

[48] For example, see my May 2025 Report, ¶ 221 citing a 2004 earnings conference call during which Teva's President and CEO said that "We now factor authorized generics into our plans as a given."  WYEFFAT3609860-10024 at 9869.

[49] For example, see my May 2025 Report, ¶ 221 citing the Deposition of Jennifer Wodarczyk, in this matter, February 26, 2025.

[50] My May 2025 Report, footnote 415.

[51] See my May 2025 Report, footnote 415, describing the example of Paxil (Teva sold a generic version of Paxil).  Another example is Augmentin.  Sandoz launched generic Augmentin in July of 2002.  S. Foley, "GSK Shares Dive as Rival Launches Cheaper Version of Augmentin," *Independent*, July 17, 2002 (https://www.independent.co.uk/news/business/news/gsk-shares-dive-as-rival-launches-cheaper-version-of-augmentin-184602.html).  An authorized generic version of the drug was sold by Teva during this period.  WYEFFAT3786460-92 at 90.  The line extension Augmentin XR received FDA approval in 2002.  See NDA050785 on FDA, "Drugs@FDA: FDA-Approved Drugs," (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm).

---

25.    I then described Wyeth's own pre-Agreement preparations to sell an AG version of Effexor XR, which included Wyeth's analysis showing that selling an AG would be profitable.[52] Dr. Cremieux argues that, *during Teva's 180-day regulatory exclusivity period*, Wyeth forecasted losses from selling an AG because, in his words, of "significant brand cannibalization to its Effexor XR profits if two generics were on the market."[53]  However, this is an incomplete and misleading description of Wyeth's documents.  As I described in my May 2025 Report, Wyeth forecasted *higher profits* in the long term (including from during and after the regulatory exclusivity period) from selling an AG compared to not selling one.[54]

26.    Dr. Cremieux suggests that profits after the 180-day regulatory exclusivity period should be ignored because Wyeth could have launched its AG 181 days after Teva, right after the regulatory exclusivity period (and explicit no-AG period) expired.[55]  This day-181 AG launch scenario was not modeled by Wyeth.[56]  Industry data indicate that Dr. Cremieux's proposal for an AG launch on day 181 has been extremely rare, likely because launching on day 181 sacrifices the first-mover advantage that AGs typically enjoy when launched at the same time as the traditional generic.[57]  Dr. Cremieux argues that there is "no quantification" supporting the importance of the first-mover advantage in my Report or in Wyeth's forecast models.[58]  To the

---

[52] My May 2025 Report, ¶¶ 222-224.

[53] Cremieux Report, ¶ 59.

[54] My May 2025 Report, ¶ 224 ("Even with an aggressive assumption about the AG hastening generic erosion, however, Wyeth's analyses indicate that Wyeth's cumulative AG profits would outweigh the initial brand losses within a year so that, overall, it would be more profitable than not to sell an AG.").

[55] Cremieux Report, ¶¶ 60-62.

[56] For example, see WYEFFAT3781144, which does not include any scenarios where Wyeth launches 181 days after Teva (or anything similar).

[57] Federal Trade Commission, "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact," August 2011 (https://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission) at p. 74 showing that 2/88 = 2% of AGs were launched on day 181.  It is worth noting that the two launches could have been affected by no-AG clauses and pp. 72, 77, 93, 100, 103, and 105 discussing the first-mover advantage typically enjoyed by the first generic entrant.

[58] Cremieux Report, ¶ 61.  In his deposition, Dr. Cremieux acknowledged that "it is often the case, not always, that being the first to identify a market and provide a particular product or service is an advantage…"  Cremieux Deposition, p. 18.

contrary, the fact that there is no indication that Wyeth modeled Dr. Cremieux's day-181 launch scenario indicates that Dr. Cremieux's option was not given serious consideration by Wyeth.

27.    Dr. Cremieux's disregard of the first-mover advantage is disconnected from the reality of generic drug markets, as shown by Figure 1, which displays generic Effexor XR sales for Teva and the AG during the two years after multiple generic entry occurred (when the AG entered).[59] Yes, the AG captured some sales, but Teva's sales during this period were about 2,000% higher.[60]  AG sales clearly would have been substantially larger if the AG had been launched on the same day as Teva's generic product.  These data confirm that accounting for the possibility that Wyeth could have launched its AG 181 days after Teva's launch (something Wyeth did not forecast) in my evaluation of Wyeth's profit sacrifice from the no-AG clauses would have a negligible effect on the results.[61]

---

[59]  IQVIA NSP Data.

[60]  Teva's sales between June 2011 and May 2013 totaled $230 million whereas the AG's totaled $12 million. IQVIA NSP Data.  $230/$12 * 100% = 1,978%.  The percentage difference in profits would be even more pronounced because the first-mover advantage likely extended to price as well as quantity.

[61]  As illustrated in Figure 1, the AG's sales totaled $12 million during the two years after it entered.  Profits from these sales would be substantially lower than sales revenues.

FIGURE 1
GENERIC EFFEXOR XR SALES AFTER MULTIPLE GENERIC ENTRY



28.    Dr. Cremieux argues further that the fact that Pfizer did not launch its AG until "mass generic entry" occurred, five months after the end of the explicit no-AG clause period ended, is evidence that, absent the no-AG clauses, Wyeth would not have launched an AG upon Teva's entry (*i.e.*, the strategy the explicit no-AG clause precluded).[62]    Dr. Cremieux argues that launching upon mass generic entry must have been Pfizer's preferred strategy.  Dr. Cremieux's version of a revealed-preference argument is illogical.  Pursuant to the Agreement, Wyeth *could not* have started selling an AG at the time of Teva entry.  It is impossible therefore to conclude from what Wyeth actually did that it was preferred over something Wyeth could not do.  Dr. Cremieux also neglects the implicit no-AG clause – during the five months after the explicit no-AG period, Pfizer clearly was better off ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under the implicit no-

---

[62]  Cremieux Report, ¶ 61.

AG clause than it would have been from competing with Teva with its own AG.[63]  As described in more detail below in Section III, this component of the no-AG clauses is an anticompetitive market division agreement.

29.      Finally, I described Wyeth's decision to launch an AG version of Protonix as supporting my opinion that Wyeth was likely to launch an AG version of Effexor XR in the absence of the no-AG agreement.[64]  Dr. Cremieux argues that Wyeth's AG launch for Protonix is irrelevant because (1) Wyeth planned to launch a line extension for Effexor XR but not for Protonix, (2) generic Protonix was launched at risk (*i.e.*, during litigation) whereas generic Effexor XR was launched pursuant to the terms of a settlement agreement, and (3) generic Protonix was launched "more than two years" after the Wyeth-Teva Agreement was signed.[65]  Dr. Cremieux is incorrect, as none of these points supports his argument:

- First, as explained in my May 2025 Report, as an economic and empirical matter, it is incorrect that Wyeth's line extension plans would affect its AG-launch decision.[66]

- Second, Dr. Cremieux does not explain why the AG-launch decision would be affected by whether the generic is launching at risk versus with a license from a settlement.  Obviously if a settlement includes a no-AG clause, then it precludes the brand from selling an AG.  But there is no reason that a competitive settlement (*i.e.*, without a no-AG clause) would deter the brand from launching an AG.

- Third, Dr. Cremieux supplies no reason to disregard the later Protonix decision, where Wyeth launched an AG, as evidence for whether Wyeth would have launched AG Effexor XR without the no-AG clause.  As I described in my May 2025 Report, Protonix was the only other AG launch decision Wyeth faced

---



[64] My May 2025 Report, ¶ 227.

[65] Cremieux Report, ¶ 68.

[66] My May 2025 Report, footnote 415.  Also see footnote 51 above describing the examples of Paxil and Augmentin.

around the time of the Wyeth-Teva Agreement.[67]  Tellingly, Dr. Cremieux
provides no counterexamples of Wyeth not launching an AG that support his
opinion.

30.    Dr. Cremieux also cites to the deposition testimony of Wyeth employees from this

antitrust matter to support his opinion that Wyeth was unlikely to sell an AG regardless of the

no-AG agreement.[68]  I note that this deposition testimony, taken nearly 20 years after the Wyeth-

Teva Agreement, is inconsistent with industry patterns, Wyeth's contemporaneous documents

and actions from around the time of the Wyeth-Teva Agreement, and other evidence described in

my May 2025 Report and in this Reply.

### *Conclusion:  The No-AG Clauses Represent Unexplained Reverse Payments*

31.    As explained above, a wealth of evidence supports my conclusion that Wyeth would have

launched its AG upon Teva's entry in the absence of the no-AG clauses and runs contrary to Dr.

Cremieux's opposing view.  My conclusion stands that the no-AG clauses represent unexplained

reverse payments of substantial value.

## II.    PAYMENTS TO TEVA, THE STOCK MARKET REACTION, AND THE SETTLEMENT NEGOTIATIONS

### A.    Payments to Teva

32.    In my May 2025 Report, I also evaluated the reverse payments in the Wyeth-Teva

Agreement from Teva's perspective.  I found that the Wyeth-Teva Agreement "more than

doubled" Teva's expected profits compared to its "best-case scenario" of winning the Effexor

XR litigation and then launching generic Effexor XR.  I concluded that the reverse payments

were sufficient to induce Teva to delay its generic Effexor XR entry.[69]

---

[67]  My May 2025 Report, ¶ 227.

[68]  Cremieux Report, footnotes 132-134.

[69]  My May 2025 Report, ¶¶ 260-278.

33.     Dr. Cremieux again offers only unfounded speculation and illogical analysis.  Table 3 summarizes my and Dr. Cremieux's analyses of the reverse payments from Teva's perspective.

TABLE 3
SUMMARY OF ANALYSIS OF PAYMENTS TO TEVA, DR. CREMIEUX'S CRITIQUES, AND MY RESPONSES

| McGuire Explanation/Evidence | Cremieux Critique | McGuire Reply/Comment |
|---|---|---|
| The Agreement more than doubled Teva's expected profits compared to winning the litigation; the reverse payments were sufficient to induce Teva to delay its entry | The no-AG clauses "may have been of limited value" because Teva was not expecting Wyeth to launch an AG | The 2025 testimony Cremieux relies on is inconsistent with Teva's earlier forecast models and documents, as well as other Teva testimony; the logic is also incorrect as an economic and empirical matter |
| | It is not economically rational for Teva to delay Effexor XR generic entry for the generic Effexor IR license because of its limited value compared to generic Effexor XR | Cremieux's argument is illogical and incorrect -- it is economically rational for Teva to delay its generic entry *to some extent* in exchange for compensation |
| | It is not economically rational for Teva to delay Effexor XR (U.S.) generic entry in exchange for the generic Effexor XR Canada license because of its limited value compared to generic Effexor XR (U.S.) | Moreover, Cremieux's comparisons are misleading because (1) Teva's generic Effexor XR profits were inflated by the no-AG clauses and (2) he misleadingly examines the payments that Teva received from the Effexor IR and Effexor XR Canada licenses separately instead of taken together |

34.     Dr. Cremieux argues that the no-AG clauses "may have been of limited value" to Teva because "Teva was not expecting Wyeth to launch an AG during its 180-day exclusivity period in the first place."[70]  As described above, Dr. Cremieux's sole source of support for this speculation is a single deposition from this antitrust matter of a former Teva employee,[71] taken 20-years after the Wyeth-Teva Agreement was signed.  The deposition testimony is inconsistent with Teva's forecast models, other Teva documents created around the time of the Wyeth-Teva

---

[70] Cremieux Report, ¶ 63.

[71] See Cremieux Report, ¶ 63, citing the Marth Deposition.

Agreement, and other Teva testimony, as well as other materials described above and in my May 2025 Report.[72]  It also does not make sense as an economic or empirical matter.[73]

35.     Dr. Cremieux also argues that the separate values to Teva from the Effexor IR and Effexor XR Canada licenses are small compared to Teva's generic Effexor XR U.S. profits.[74] He argues that this shows that "it would not have been economically rational for Teva to delay its entry of Effexor XR in exchange" for either license.[75]  Dr. Cremieux's argument is illogical and incorrect.  In the presence of a large reverse payment, the generic firm's expected total profits increase with a short enough delay in its generic entry.  It is economically rational for a generic firm to delay the agreed-upon date of generic entry *to some extent* in a settlement in exchange for compensation.  It is merely a question of the magnitude of delay that is equivalent to the compensation (which Wyeth and Teva would hash out in negotiation).  For example, if Teva receives $240 million (the approximate value of the reverse payments from the generic Effexor IR U.S. and Effexor XR Canada licenses),[76] it would certainly be economically rational for Teva to agree to a delay that reduces its expected profits from selling a generic version of Effexor XR in the U.S. by less than $240 million.[77]

36.     Dr. Cremieux compares Teva's profits from generic Effexor XR sold in the U.S. to, separately, Teva's profits from generic Effexor IR and generic Effexor XR in Canada.[78]  His comparisons are misleading for two reasons.  First, the value of Teva's generic Effexor XR (U.S.) profits that Dr. Cremieux presents is inflated by the reverse payment from the no-AG

---

[72]  My May 2025 Report, ¶¶ 220-232.

[73]  See ¶ 24 above.

[74]  Cremieux Report, ¶¶ 84 and 91.

[75]  Cremieux Report, ¶¶ 84 and 91.

[76]  See Reply Attachment F.6.

[77]  Dr. Cremieux acknowledged this in his deposition.  See Cremieux Deposition, p. 84: "if what you're telling me is I have a -- you have two ways in which you can make a certain amount of money.  One is you can enter this market, or the other one is I can give it to you, I agree with you that if you give me the money, then you have provided me with the equivalent of what I would get by entering the market.  And, therefore, I'm now going to be indifferent between the money you give me and entering the market."

[78]  Cremieux Report, ¶¶ 84 and 91 and Exhibit 7 and Exhibit 8.

clauses in the Wyeth-Teva Agreement.[79]  Second, he presents the value of the payments in the Effexor IR and Effexor XR Canada licenses separately.  To understand how the reverse payments may have influenced Teva, the value that Teva received from all the reverse payment terms should be totaled.

37.      In Figure 2.A, I correct Dr. Cremieux's misleading calculations.[80]  Specifically, I compare (a) Teva's expected profits from selling generic Effexor XR with a license that does not include reverse payment terms with (b) the combined expected value Teva received from the Effexor XR U.S. license with the no-AG terms, the Effexor IR license, and the Effexor XR Canada license.  The cumulative profits Teva could have expected to earn from (a) a competitive settlement are dwarfed by the (b), the profits Teva expected to earn from the reverse payments in the Wyeth-Teva Agreement.  This is the relevant comparison to address the question of whether Teva was paid enough in the Agreement to induce it to delay the likely date of its generic entry.  I demonstrated this numerically in my May 2025 Report and depict it visually here in this new Figure 2.A.  Figure 2.B presents the same comparison based on actual sales data rather than Teva's projections.[81]

---

[79]  If Wyeth had sold an AG, Teva's generic Effexor XR profits would have been much lower.  Thus, the value Teva received from the Effexor IR U.S. and Effexor XR Canada licenses would be relatively larger.

[80]  Figures 2.A and 2.B depict the Teva profit calculations in Attachment F of this Reply Report, discounted to 2005.  See my workpapers for details.

[81]  The one exception is that, because I did not find or review any Teva forecasts of its profits from the Effexor IR license (see my May 2025 Report, ¶ 275), I use Teva's actual sales data for Effexor IR in both Figure 2.A and 2.B.  Dr. Cremieux used a mix of expected and actual values in his own calculations.  See Cremieux Report, Exhibit 7 and Exhibit 8.

**FIGURE 2.A**
**COMPARISON OF EXPECTED PROFITS TO TEVA FROM THE WYETH-TEVA AGREEMENT AND A
HYPOTHETICAL SETTLEMENT WITHOUT REVERSE PAYMENTS**



FIGURE 2.B
COMPARISON OF ACTUAL PROFITS TO TEVA FROM THE WYETH-TEVA AGREEMENT AND A
HYPOTHETICAL SETTLEMENT WITHOUT REVERSE PAYMENTS



38.    Dr. Cremieux points out two minor errors in my calculation of Teva's expected profits from the Canada license.[82]  First, I used the 60% profit split to Teva input included in Teva's September 30, 2005 forecast model instead of the profit split that was specified in the final Agreement of 55% during the first year and 50% thereafter (until patent expiration or entry by a

---

[82]  Cremieux Report, footnote 176.  He also argues that Teva's projected sales that were listed under 2006 represent sales for a full year so should be divided by 12 to reflect the December 2006 entry date included in the Agreement.  I disagree with this modification.  Given that Teva's forecast model was created just weeks before the Agreement was reached, it is reasonable to assume Teva's model reflects the generic entry date from the Agreement and so reflects sales that would be made in December 2006.  Pharmacies typically stock up on a new generic product, so generic sales are often large in the first month after entry.

different generic firm).[83]  Second, to convert Canadian dollars to the U.S. equivalent, I
multiplied by the U.S./Canada exchange rate when I should have divided.  I corrected my
calculations in Attachment F of this Reply Report.  These corrections do not change my
conclusion that the Agreement more than doubled Teva's profit expectations.  Specifically,
Attachment F of this Reply Report shows that a company in Teva's position could have expected
to make $318.4 million more in profits from the Wyeth-Teva Agreement ($564.6 million) than it
could have from winning the Effexor XR patent infringement litigation ($246.2 million).
(Profits in Figure 2 are smaller because they are discounted to 2005 value.)


## B.    Confirmatory Evidence of the Stock Market Reaction

39.    In my May 2025 Report, I examined how the stock market reacted to news of the Wyeth-
Teva Agreement using event-study methods.  The increases in Wyeth's stock price corresponded
to billions of dollars in increased profits for Wyeth.  I concluded that this was "confirmatory
evidence" that the Wyeth-Teva Agreement harmed competition by delaying Teva's likely
generic entry and increasing Wyeth's profits.[84]

40.    While critical of my stock-price analysis in his report, Dr. Cremieux has previously
acknowledged (in an online publication specifically discussing my published research on
interpreting stock-price movements) that stock-price evidence "may at times be useful in
analyzing the effects of reverse-payment settlements" and can "be useful in the rule of reason
evaluation described in the Supreme Court's ruling in *Actavis*."[85]  The methods and

---

[83]  My May 2025 Report, Attachment F.3, row [1] (using Teva's unaltered forecast model) and ¶ 120 (describing the
▮▮▮▮▮▮▮ included in the Agreement).  Also see TEVA_EFFEX_0906117, tab "on our own," row 31 (Teva's
forecast model ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[84]  My May 2025 Report, ¶¶ 279-286 and Attachment G.

[85]  See P. Cremieux, *et al.*, "Pay-For-Delay & Stock Prices: Smoking Gun Or Damp Squib?" *Law360*, August 24,
2016 (https://www.analysisgroup.com/globalassets/insights/publishing/law360_pay_for_delay.pdf).  Despite the
combative title, the article acknowledges that stock price evidence may be useful but argues it should not replace
other forms of analyses ("…the proposed stock market event study approach is no shortcut and cannot replace the
rule of reason analysis envisioned in Actavis.").  This is consistent with my view that stock price evidence can be
used to complement and confirm analysis of the reverse payment itself.  It is also consistent with my work in this
matter.  See my May 2025 Report, ¶ 286 and footnote 517.

interpretations I apply to the stock-price effects of the Wyeth-Teva Agreement are the same as those Dr. Cremieux commented on in his public remarks.[86]

41.    In his report in this matter, Dr. Cremieux mischaracterizes my Report and makes several incorrect criticisms of the stock price analysis.  Table 4 summarizes my conclusions and explains why Dr. Cremieux's arguments are invalid.

TABLE 4
SUMMARY OF STOCK PRICE ANALYSIS, DR. CREMIEUX'S CRITIQUES, AND MY RESPONSES

| McGuire Explanation/Evidence | Cremieux Critique | McGuire Reply/Comment |
|---|---|---|
| The value of Wyeth's stock increased by billions of dollars as news of the Wyeth-Teva Agreement was announced; this is confirmatory evidence that unanticipated profit flows were created at the expense of purchasers | McGuire applied the average findings from a group of settlements to assess the Agreement | Cremieux misinterprets my background discussion; the empirical results in my Report are specific to the Agreement |
| | The first announcement of the Agreement did not include Teva's generic entry date so the resulting stock price increase could not be from delay | The market's consensus view was that Teva would launch in June 2008 when the venlafaxine patent expired (because Wyeth's other patents were vulnerable) so news of a settlement with likely entry beyond 2008 was met positively |
| | Wyeth's stock price may have increased because the settlement resolved business uncertainty | Cremieux's speculation is incorrect theoretically and empirically; investors diversify, and experience indicates resolving simple uncertainty does not increase stock prices |

42.    Dr. Cremieux argues that I incorrectly applied the average finding from two of my prior co-authored papers that examined the stock price reaction to groups of settlements to assess the

---

[86]  The methods I use in my May 2025 Report are also the same as those in a co-authored paper studying stock-price movements in response to settlement announcements recently published in the *Journal of Health Economics*.  The *Journal of Health Economics* is peer-reviewed and the leading journal in the field of health economics.  K. Drake and T. McGuire, "Using Stock Price Movements to Estimate the Harm from Drug Patent Litigation Settlements," *Journal of Health Economics*, 103, 2025, 103054.  A previous working paper version of this paper was available to and known by Dr. Cremieux.  He cites the National Bureau of Economic Research working paper at ¶ 100, footnote 207.

single, specific case of Effexor XR.[87]  Dr. Cremieux misunderstands my discussion of my previous research.  I described the findings from these two papers for background, but it is inaccurate to say I applied their findings to assess the Wyeth-Teva Agreement.  The empirical findings I presented in my Report were based on the Agreement specifically.  My May 2025 Report also cited and described other papers that used event-study methods to assess settlements, and I applied those methods (not the results) to assess the stock price reaction to the Wyeth-Teva Agreement specifically.[88]

43.     Dr. Cremieux also argues that the stock-price reaction to the first announcement of the Wyeth-Teva Agreement "could not have conveyed whether the Settlement included delayed entry since the entry date was not yet known."[89]  He argues that my opinion was solely based on several financial analyst reports that described the settlement as a likely pay for delay.[90]  This statement also reflects Dr. Cremieux's misunderstanding of what I did.  My May 2025 Report documented how, prior to the Wyeth-Teva Agreement, financial analysts described the market's "consensus" view as expecting Teva to launch in June 2008 (because, other than the compound patent that expired in June 2008, financial analysts viewed Wyeth's patents as highly vulnerable) so that any news of a settlement could "only create upside."[91]

44.     Dr. Cremieux argues that stock prices are affected by multiple factors, including "the resolution of business uncertainty."[92]  As my coauthors and I pointed out in a response to Dr. Cremieux's online publication where he made the same argument, these claims about simple uncertainty are incorrect: (i) theoretically, because investors can diversify their portfolios to

---

[87]  Cremieux Report, ¶ 100.

[88]  My May 2025 Report, ¶¶ 279-286 and Attachment G.

[89]  Cremieux Report, ¶¶ 101-102.

[90]  Cremieux Report, ¶ 102.

[91]  My May 2025 Report, Attachment G, ¶¶ 11-15.

[92]  Cremieux Report, ¶ 101.

protect against firm-specific risk and (ii) empirically, because settlements without indication of reverse payment have not had a statistically significant impact on brand firms' stock prices.[93]

## C.    The Terms Exchanged During the Settlement Negotiations

45.    In the Factual Background section of my May 2025 Report, I described the settlement proposals that were put forth by Teva and Wyeth during the negotiations in the context of events occurring in the patent infringement litigation.  I described how, as Teva won the *Markman* decision and the judge rejected Wyeth's request to re-argue the decision, Teva rejected Wyeth's proposals and negotiated for better terms.  I concluded that the terms Wyeth initially offered were insufficient to convince Teva to drop its legal threat to Wyeth's patents, but eventually Wyeth conceded enough to induce Teva to drop its patent challenge and sign the Agreement.[94]

46.    Dr. Cremieux argues that the explicit no-AG clause and Effexor IR license were "included in Settlement negotiations from the first high-level Settlement proposal," so there is no evidence from the negotiations implying that these terms were added "in exchange for a revised later entry date."[95]  Dr. Cremieux also argues that, if the Effexor IR license was a reverse payment, one would expect the Effexor IR entry date to move earlier and the Effexor XR date to move later during the negotiations.  Dr. Cremieux points out that, in contrast, Teva's Effexor XR and Effexor IR entry dates were both moved earlier at the same time.[96]

47.    Dr. Cremieux's logic is incorrect.  The order that different terms were introduced or modified during the negotiation is irrelevant to an economic interpretation of the final agreement.  There is no economic distinction between "here is what I am willing to pay, let's discuss what date this buys me" and "here is the date I want, let's discuss how much it costs me to get it."[97]

---

[93]  T. McGuire, *et al.*, "A 'Smoking Gun' In Reverse-Payment Settlements," *Law360*, July 29, 2016 (https://www.law360.com/articles/821969/a-smoking-gun-in-reverse-payment-settlements).

[94]  My May 2025 Report, ¶¶ 102-112.

[95]  Cremieux Report, ¶¶ 72 and 95.

[96]  Cremieux Report, ¶ 95.

[97]  My May 2025 Report, ¶¶ 111-112.

The important takeaway is that the terms were connected.[98]  There is also no sense to Dr. Cremieux's argument that one would expect the Effexor IR entry date to move earlier and the Effexor XR date to move later during the negotiations.  Both terms move in Teva's favor during the course of the negotiation simply because Wyeth needed to up the offer to convince Teva to accept a settlement.  If the generic Effexor IR and Effexor XR Canada licenses and the no-AG clauses were not involved, Wyeth would have had only one way to induce Teva to drop its patent challenge: by moving Teva's generic Effexor XR entry date earlier.

### III.    THE WYETH-TEVA AGREEMENT ALLOCATED MARKETS

48.    I found that the Wyeth-Teva Agreement allocated markets in three ways:  i) an agreed-upon delay by Teva likely allocates the entire venlafaxine ER market to Wyeth until July 1, 2010; ii) the express no-AG clause in the Agreement prevents Wyeth from launching an AG during Teva's 180-day regulatory exclusivity period; and iii) the ███████████ in the Agreement function as an implicit no-AG clause that deters Wyeth from launching an AG after Teva's 180-day regulatory exclusivity period.[99]  By reducing the number of competing products during all affected periods, the market division increased profits to Wyeth and Teva financed by higher prices from purchasers.[100]

### A.    AGs Play a Critical Role in how Brand and Generic Firms Normally Compete

49.    Dr. Cremieux argues that, because brand Effexor XR and its generic equivalents were part of the same market, and the Wyeth-Teva Agreement "contained no specific conditions that

---

[98] 

[99] My May 2025 Report, ¶ 294.

[100] My conclusion accords with scholarship.  As prominent antitrust authorities Edlin, Hemphill, Hovenkamp, and Shapiro have written, a no-AG clause is a particularly insidious form of reverse payment because it "places a second *naked market division agreement* on top of the first," making "a bad situation worse" (emphasis added).  A. Edlin, *et al.*, "The Actavis Inference: Theory and Practice," *Rutgers University Law Review*, 67, 2015, pp. 585-635 at p. 597.

defined how brand Effexor XR could compete with generic Effexor XR," that meant that "market forces were to determine competition between Wyeth and Teva in the market for Effexor XR…"[101]  This statement ignores the reality of brand-generic competition and ignores that, under the Wyeth-Teva agreement, Teva agreed not to compete with Wyeth for a period of time, delaying its generic Effexor XR U.S. entry, and Wyeth agreed not to compete with Teva for generic sales with an AG.

50.    Dr. Cremieux ignores the role of AGs in a competitive strategy of a brand firm and the harm to competition from no-AG clauses.  Upon generic entry, prescriptions quickly shift from brand-name drugs to generics.[102]  Brand-drug prices are kept relatively high because a small segment of so-called "brand loyalists" will continue paying high prices.[103]  The brand firm usually launches an AG (in the absence of a no-AG clause) to compete for and obtain a substantial portion of the larger segment of the market, the generic sales, which drives down generic prices.  A no-AG clause blocks the brand firm from selling an AG, which is what it would normally do.  Thus, no-AG clauses are "specific conditions" that interfere with how brand and generic firms normally compete.  And as described above, a wealth of information indicates that Wyeth would have introduced an AG upon Teva's generic entry if not for the no-AG clauses in the Wyeth-Teva Agreement.

51.    Dr. Cremieux also ignores that, in exchange for the no-AG clauses (and the Effexor IR and Effexor XR Canada licenses), Teva agreed to a market allocation by delaying its date of first generic sales and assigning the entire market for Effexor XR to Wyeth until July 1, 2010.  As I described in my May 2025 Report, a no-AG pay-for-delay agreement allocates markets in *time*, a

---

[101]  Cremieux Report, ¶ 107.  He also argues that, "[i]f these products [brand and generic Effexor XR] were part of the same market and the Settlement did not contain any provisions limiting the quantity that Teva could produce, restricting geographies it could sell in, or defining specific customers it could sell to, the Settlement did not prevent or discourage competition between brand and generic Effexor XR."  Cremieux Report, ¶ 108.

[102]  My May 2025 Report, ¶ 47.

[103]  For example, see K. Iacocca, J. Sawhill, and Y. Zhao, "Why Brand Drugs Priced Higher than Generic Equivalents," *International Journal of Pharmaceutical and Healthcare Marketing*, 9(1), 2015, pp. 3-19 at pp. 16-17.

perfectly functional form of market division.[104]  This was another "specific condition" that interfered with how the Wyeth and Teva would have otherwise competed.

52.    Dr. Cremieux points to Pfizer's use of couponing in 2010 as evidence that there was competition between brand Effexor XR and Teva's generic product.[105]  However, selling an AG and couponing are not mutually exclusive strategies; they are often done at the same time.[106]  A brand firm can try to retain brand sales through couponing or other means while also selling an AG to compete for generic sales.  But instead of doing this, Wyeth ceded all generic sales to Teva by not launching an AG.

**B.    The Wyeth-Teva Agreement Divided Markets**

53.    Dr. Cremieux's second argument is that I fail "to show that any of the Challenged Terms influenced the competitive dynamic of the Effexor XR market."[107]  Specifically, Dr. Cremieux argues that I have not shown (i) that Teva's entry was likely delayed by the Agreement, (ii) that the no-AG clause during Teva's 180-day exclusivity period affected Wyeth's decision to sell an AG, ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████

54.    Dr. Cremieux writes as if the facts of what happened after the Agreement are on his side, whereas exactly the opposite is true.  Teva waited until July 1, 2010 to enter, Wyeth did not sell

---

[104]  My May 2025 Report, ¶ 80.

[105]  Cremieux Report, ¶ 109.

[106]  Brand manufacturers often employ multiple, overlapping strategies to attempt to retain market share after generic entry.  AGs allow brand-drug firms to capture part of the generic market, while coupons reduce patient switching to generics by lowering out-of-pocket costs for the brand drug.  A list of drugs with coupons that experienced generic entry around the same time as Effexor XR includes multiple instances of brands launching an AG in parallel with copay coupons.  See Table 3 of L. Dafney, C. Ody, and M. Schmitt, "When Discounts Raise Costs: The Effect of Copay Coupons on Generic Utilization," *American Economic Journal: Economic Policy*, 9(2), 2017, pp. 91-123 at p. 101.  See, for example, Protonix (A. Kraemer "Wyeth Announces Launch of Own Generic Version of Protonix," *Drug Store News*, January 30, 2008 (https://drugstorenews.com/pharmacy/wyeth-announces-launch-own-generic-version-protonix)) and Ambien CR (Sanofi US News, "Sanofi-Aventis: Solid Results in 2010," February 9, 2011 (https://www.news.sanofi.us/press-releases?item=118548))).

[107]  This quote is taken from the title of Dr. Cremieux's section V.B.

[108]  Dr. Cremieux discusses the impact of the Agreement during each of these three time periods in his Section V.B.

an AG during or in the months after Teva's 180-day exclusivity when no other generics were available, and Wyeth did not license any third-party generic to sell at the end of Teva's 180 days. Contrary to Dr. Cremieux's claim that the Agreement failed to influence "the competitive dynamic," the facts of the matter demonstrate that the Agreement successfully orchestrated Wyeth's and Teva's (anti) competitive dynamic.

### *The Likely Delay in Teva's Generic Entry and the Explicit No-AG Clause During Teva's 180-Day Regulatory Exclusivity Period*

55.    Dr. Cremieux simply points to his prior arguments to support his positions that the reverse payments did not delay Teva's generic entry and that the explicit no-AG clause did not reduce competition during Teva's 180-day regulatory exclusivity period.[109]  These arguments are summarized and rebutted above.

### *The Implicit No-AG Clauses After Teva's 180-day Regulatory Exclusivity Period*

56.



---

[109]  Cremieux Report, ¶ 111, referencing his Sections III and IV.

[110]  My May 2025 Report, ¶¶ 223 and 297.

57. 

58.

59.

_____

115 Cremieux Report, ¶ 122.



## IV.    PROCOMPETITIVE BENEFITS AND ANTICOMPETITIVE HARMS

60.    In my May 2025 Report, I assessed whether the anticompetitive harms from the reverse payments and market division in the Wyeth-Teva Agreement outweighed potential procompetitive benefits.[117]  I estimated that the expected harm to purchasers of brand and generic Effexor XR from the challenged terms in the Wyeth-Teva Agreement was approximately $1 billion.  Based on sales data, I concluded that the actual harm to purchasers was even larger.[118]  I assessed several potential procompetitive benefits (such as savings to purchasers of brand and generic Effexor IR) and concluded that they were small relative to the harms.[119]  As described below and summarized in Table 5, none of Dr. Cremieux's arguments cause me to modify these conclusions.

---

[116]  My May 2025 Report, ¶¶ 301-305.

[117]  My May 2025 Report, Section X.  Although I understand from counsel that only effects on purchasers and payors of Effexor XR in the U.S. that stem from the challenged terms should be assessed, I also conservatively assessed broader effects.  I understand that procompetitive effects in Canada in particular should not be considered.  Prof. Elzinga does not argue that the Canadian version of Effexor XR is in the same market as the U.S. version.

[118]  My May 2025 Report, ¶¶ 307-312.

[119]  My May 2025 Report, ¶¶ 313-324.

**TABLE 5**

**SUMMARY OF DR. CREMIEUX'S CRITIQUES OF MY ASSESSMENT OF THE ANTICOMPETITIVE HARMS AND POTENTIAL PROCOMPETITIVE BENEFITS STEMMING FROM THE CHALLENGED TERMS, AND MY RESPONSES**

| McGuire Assessment | Cremieux Critique | McGuire Reply/Comment |
|---|---|---|
| The harms from the delay in generic Effexor XR entry and reduction in generic competition in the U.S. total at least $1 billion | McGuire does not show that the challenged terms harmed competition | Cremieux relies on invalid arguments summarized and rebutted above |
| | McGuire does not show that Teva could have gotten FDA approval before June 2010 | Wyeth's forecast models assumed Teva would get FDA approval by 2008; Plaintiffs' expert Rivera-Muzzio opines that Teva could have gotten FDA approval earlier than the July 2009 date assumed in my calculations of harm to purchasers |
| Potential procompetitive benefits, if any, were small relative to the generic Effexor XR harms | Wyeth and Teva could have agreed to an entry date after July 2010 in a settlement without the challenged terms | Cremieux is incorrect as an economic matter; removing the reverse payment benefits Wyeth at the expense of Teva, so Wyeth would be willing to concede and Teva would demand an earlier date, which they would have agreed on |
| | Benefits to purchasers of Effexor IR were higher than I estimate because the brand price decreased after generic entry | Cremieux's argument has no effect on my calculation of expected benefits, little effect on my calculation of the actual benefits, and no bearing on my conclusions |
| | McGuire ignores benefits to indirect purchasers of Effexor IR | These benefits are small and occur in a different market |
| | McGuire does not account for procompetitive benefits from the Effexor XR acceleration clauses in the Wyeth-Teva Agreement | The acceleration clauses are not challenged terms and so could remain in an alternative settlement, nor is the delay in generic Effexor XR entry the least restrictive means of obtain this purported benefit |
| | Launching generic Effexor XR in Canada gave Teva a "dry run" that improved its launch of generic Effexor XR in the U.S. | Cremieux's argument is speculative and unsupported; it is implausible that the largest generic company in the world would need a dry run and unlikely that Teva having a "dry run" would benefit drug purchasers; Cremieux also provides no quantification |

### A.    Dr. Cremieux's Arguments About the Harms to Purchasers

61.    First, Dr. Cremieux argues that I failed to show that the challenged terms in the Wyeth-Teva Agreement delayed Teva's generic entry or reduced generic competition after entry.[120]  In support of his position, he refers to his prior arguments, which are described and rebutted above.[121]

62.    Second, Dr. Cremieux argues that I failed to show that Teva could have received FDA approval earlier than it did in June 2010, just days before it launched.[122]  My first calculation of the harm from the Agreement was based on Wyeth's expectations at the time of the Agreement.[123]  Wyeth's forecast models indicated that Wyeth did not expect Teva or other generic firms to have trouble obtaining FDA approval.[124]  In addition, I understand that Plaintiffs' expert Daisy Rivera-Muzzio will testify that Teva could have gotten FDA approval prior to the July 2009 entry date that is used as an input in my date calculations.[125]  My second calculation of the harm from the Agreement was based on what actually happened and actual sales data.[126]

---

[120]  Cremieux Report, ¶ 124.

[121]  See Sections I and II.A above.

[122]  Cremieux Report, ¶ 125.

[123]  My May 2025 Report, ¶¶ 307-311.  I understand that Teva withheld its analyses as privileged.

[124]  For example, see WYEFFAT06847939-85, especially at 43, 47-52, 58, 64, and 85, which summarizes Wyeth's model and does not consider the possibility that Teva would have difficulty getting FDA approval.  Wyeth assumed Teva would be able to enter with 100% certainty in 2008 if it won the litigation or if Wyeth granted Teva a license.

[125]  Expert Report of Daisy Rivera-Muzzio, in this matter, May 15, 2025, ¶ 7.  Also see ¶¶ 85-87 where she opines that, if Teva had received FDA approval and launched its generic version of Effexor XR earlier than July 2010, then Mylan could have received final FDA approval and been ready to launch no later than eleven months after Teva.  In this scenario, Mylan would have had an economic incentive to launch as soon after Teva's earlier entry as possible. As described in my May 2025 Report, ¶¶ 301-302, when there is not an anticompetitive market division in place between the brand firm and the first filer, later-filing generics for top-selling drugs like Effexor XR almost always launched after the 180-day generic exclusivity period expires.

[126]  My May 2025 Report, ¶ 312.

**B.     Dr. Cremieux's Arguments About Potential Benefits to Purchasers**

63.     Regarding potential procompetitive benefits from the challenged terms in the Agreement, Dr. Cremieux argues that it was possible that the parties would have agreed to a generic entry date after July 2010 in a settlement without reverse payments or market division.[127]  I explained in my May 2025 Report why his argument is incorrect:[128]

> "Removing the massive reverse payments from the Wyeth-Teva Agreement benefits Wyeth at the expense of Teva.  In relation to the observed Agreement, taking away the payments, a reasonable company in Wyeth's position would be willing to give an earlier date and a company in Teva's position would demand an earlier date.  To reach an agreement without reverse payments, the parties would have to adjust the date terms in Teva's favor, advancing the generic entry date earlier in time.  Thus, the generic entry date in a payment-free settlement must be before the July 1, 2010 date specified in the Agreement."

Dr. Cremieux fails to respond to this argument.

64.     Dr. Cremieux argues that my calculation of the actual benefit to purchasers of Effexor IR from the Effexor IR license is too low because I did not account for a brand Effexor IR price decrease after generic Effexor IR entry.[129]  Dr. Cremieux's estimate of the procompetitive benefit due to brand Effexor IR price decrease upon Teva's launch of generic Effexor IR is much lower, even combined with the benefit from generic Effexor IR launching at a lower price, than my calculation of the harm, resulting from delayed Effexor XR entry, indicating that this argument and Dr. Cremieux's new calculations have no effect on my conclusions that the harm from the delay in generic Effexor XR competition far outweighs any procompetitive benefits.

65.     Dr. Cremieux argues that I only calculate benefits to direct purchasers and ignore benefits to end payors.[130]  I agree with Dr. Cremieux that earlier generic entry benefits drug purchasers at different levels of the supply chain, just as later generic entry harms these same purchasers.

---

[127] Cremieux Report, ¶ 126.

[128] My May 2025 Report, ¶ 327.

[129] Cremieux Report, ¶ 127.

[130] Cremieux Report, ¶ 128.

Again, the benefits from earlier Effexor IR entry occur in a different market from Effexor XR (as I opined in my market power opinion). Even if the price reductions for Effexor IR were cognizable procompetitive benefits, they are so small relative to the economic harm from the delayed generic Effexor XR competition that they do not affect my conclusion that the anticompetitive harm from the challenged conduct far outweighs any procompetitive benefits. This is true whether the benefits of Teva's launch of generic Effexor IR are measured in terms of end-payor price benefits or direct purchaser price benefits (the two are correlated), since the benefits to either end-payors or direct purchasers of Effexor IR are much smaller than the harm to end-payors or direct purchasers of Effexor XR, respectively, including because Effexor XR was a much larger drug. The same holds true for any purported procompetitive benefits stemming from the Canadian license. It is undisputed that any benefits to competition in Canada are in a different market from the U.S. Effexor XR market; not even Teva's expert Prof. Elzinga contends that the relevant market for Effexor XR in the U.S. includes drugs sold in Canada. In addition, whether the harms and benefits are measured in terms of harm to end-payors or direct purchasers, the harms to U.S. Effexor XR purchasers far outweighs any price benefits to purchasers of Effexor XR in Canada.

66.     Dr. Cremieux argues that I fail to account for the "unambiguously procompetitive acceleration clauses."[131] I disagree with Dr. Cremieux's naïve and unexplained assessment of the acceleration clauses, which are indicative of an anticompetitive effect. In any case, Plaintiffs have not challenged their presence in the Agreement. Thus, the acceleration clauses (and any potential benefit stemming from them) could remain in an alternative settlement without the challenged terms.

67.     Dr. Cremieux argues that the generic Canadian Effexor XR license and Teva's related generic Effexor XR Canadian launch in December 2006 "may have allowed Teva to better prepare for its generic Effexor XR launch in the U.S...."[132] Dr. Cremieux's argument is pure

---

[131] Cremieux Report, ¶ 50.

[132] Cremieux Report, ¶ 130.

speculation, with no support from Wyeth or Teva documents.[133]  He also provides no actual valuation of the purported benefit.  Because Teva was the largest and most experienced generic manufacturer in the world in 2005,[134] it is implausible that Teva needed "a dry run" of a generic launch Effexor XR.[135]  Moreover, if not for the challenged terms in the Wyeth-Teva Agreement, Teva still could have launched generic Effexor IR in the U.S. after the compound patent expired in 2008, so Teva still could have enjoyed whatever benefits were conveyed by a "dry run." Finally, any economies in Teva's launch would augment Teva's profits and may not benefit purchasers of generic Effexor XR.

68.     Finally, I note that the restraints on competition caused by the challenged terms (*i.e.*, the reverse payments, comprising of the Effexor XR no-AG clauses, the Effexor IR license, and the Canadian Effexor XR license) were not necessary to achieve (much less the least restrictive means of achieving) the purported procompetitive benefits that Cremieux argues for.[136]

## V.    TIMING OF GENERIC ENTRY IN A COMPETITIVE AGREEMENT

69.     In my May 2025 Report, I investigated what would have happened if rational, competitively acting firms in the positions of Wyeth and Teva had not included the challenged terms (or other anticompetitive clauses) in the Wyeth-Teva Agreement.  Based on inputs about the strength of Wyeth's patent drawn from Wyeth's own documents, I determined that the feasible range for an entry date in a settlement without the challenged terms would have fallen between December 2008 and February 2010.  With the parties dividing the gains in a competitive settlement in the same way as in the Wyeth-Teva Agreement, I determined that the entry date

---

[133]  Dr. Cremieux acknowledged that he did not "do anything to determine if manufacturing of Effexor XR for sale in Canada helped Teva to be able to manufacture Effexor XR for sale in the United States."  Cremieux Deposition, p. 113.

[134]  H. Long, "Israelis' $7.4bn Buy Creates World's Biggest Generic Drug Firm," *The Guardian*, July 25, 2005 (https://www.theguardian.com/business/2005/jul/26/israel.internationalnews).

[135]  Cremieux Report, ¶ 130 uses this specific language.

[136]  Dr. Cremieux opined that he did not see any evidence that it was necessary for Wyeth and Teva to include the Effexor IR license or the Canadian Effexor XR license in order to settle the U.S. patent litigation related to Effexor XR.  See Cremieux Deposition, pp. 23-24.

was most likely to fall within May 2009. I conducted a number of sensitivity analyses to show how the results could differ with alternative inputs.[137]

## A.    Dr. Cremieux's Arguments About My Overall Approach

70.    Dr. Cremieux argues that I "incorrectly assume rather than test that the Challenged Terms served to delay generic Effexor XR entry."[138] This is false. As discussed in my May 2025 Report and quoted above in ¶ 63, an economic argument ignored by Dr. Cremieux implies that the generic entry date in a payment-free settlement must be before the July 2010 date specified in the Wyeth-Teva Agreement.[139] My position is also supported by the fundamental economic inference that a rational brand firm would not make otherwise unexplained reverse payments – as I have established Wyeth did – unless it expected to profit more from obtaining a longer period of delay prior to generic entry.[140] Dr. Cremieux mischaracterizes my Report and does not critique the rationale for my position.

71.    Dr. Cremieux argues that the timing of when the challenged terms entered into the settlement negotiations indicates that they were not "an instrument of delay."[141] In support, Dr. Cremieux points to the same arguments that I have already discussed and rebutted above in Section II.C.

---

[137]  My May 2025 Report, Section XI. As stated in footnote 596: "The model is set up so that alternative assumptions could be made…"

[138]  Cremieux Report, ¶¶ 28-29.

[139]  See ¶ 63 above quoting my May 2025 Report, ¶ 327. Note that Attachment D and Attachment F of this Reply Report contain small corrections that affect the value of the Canadian license. This does not affect my calculation of the date range for a potential settlement without reverse payments, but it could affect my estimate of the most likely date within the range. However, Attachment I of this Reply Report shows that the results reported in Table 18 of my May 2025 Report are not affected by these changes.

[140]  My May 2025 Report, ¶¶ 69-72.

[141]  Cremieux Report, ¶ 30.

72.      Dr. Cremieux argues that my approach to calculating the most likely entry date within the feasible range is "incorrect."  He does not provide any explanation or support for this opinion.  He also does not offer an alternative method.[142]

73.      Finally, Dr. Cremieux argues that I "fail to provide evidence" that the profit split would be identical in a settlement with or without reverse payments.[143]  He provides no contrary evidence or suggestions about how one could possibly do so.  The counterfactual competitive settlement with no reverse payments is hypothetical and, unfortunately, unobserved.

**B.      Dr. Cremieux's Arguments About Specific Inputs in My Date Calculation**

74.      Dr. Cremieux also criticizes several of the specific inputs that were employed in my model.  Table 6 summarizes the inputs I used, Dr. Cremieux's critiques, and my responses.

---

[142]  Cremieux Report, ¶ 43.

[143]  Cremieux Report, ¶ 45.

**TABLE 6**
**SUMMARY OF DR. CREMIEUX'S CRITIQUES OF MY INPUTS IN ALTERNATIVE DATE CALCULATIONS, AND MY RESPONSES**

| McGuire Date Calculation Input | Cremieux Critique | McGuire Reply/Comment |
|---|---|---|
| The evidence suggests that Teva had a 50%-90% chance of winning patent litigation; I used midpoint of 70% in base calculation and conducted sensitivity analyses | McGuire assumed Teva had a 70% chance of winning *with certainty*; the model predicts later entry if 40% is used instead | Cremieux is incorrect, I conducted sensitivity analyses with the full 50%-90% range supported by the evidence; his preferred 40% figure is arbitrary and unsupported |
| Wyeth forecasted that the later filing-generics had a 50%-100% chance of winning patent litigation; I used a midpoint of 75% in my base calculation and conducted sensitivity analyses | The model predicts later entry if the 100% input is used for the litigation scenario and the 50% input is used in settlement scenarios (because the settlement would void the *Markman* decision) | Cremieux's modification is arbitrary, speculative, and inconsistent with Wyeth's own modeling efforts |
| Teva would launch in June 2008 after the compound patent expired if it first won a district court decision regarding the other patents | The model predicts later entry if, after winning the litigation through the appeals process, Teva would not enter until February 2009 | Cremieux provides no support for his modification, which is inconsistent with Teva's business practices and the empirical data and does not make sense as an economic matter |
| Wyeth would launch an AG upon Teva's entry in a litigation or competitive settlement scenario | Wyeth would not launch an AG upon Teva's entry | Cremieux's position runs contrary to the wealth of available information discussed above |
| The acceleration clauses were unlikely to be triggered so do not affect the calculations | Wyeth and Teva may have valued the acceleration clauses differently in the absence of reverse payments | Available information indicates that Effexor XR sales were not expected to fall below the acceleration clauses' thresholds so were relatively unimportant

Accounting for a change in the clauses' value would result in an earlier generic entry date for Teva |
| | McGuire's analysis is unreliable because it does not account for Teva's "major concern" about how Pristiq's launch would affect Effexor XR sales | Teva's forecast model was similar to Wyeth's; both indicate the acceleration clauses were unlikely to be triggered

Accounting for a steeper potential drop in Effexor XR sales in my model would result in an earlier generic entry date in a competitive agreement |

*The Probability of Litigation Outcomes*

75.    Dr. Cremieux claims that my date calculations assume with absolute (100%) certainty Teva had a 70% chance of winning the litigation.[144]  This is incorrect.  I used 70% (the midpoint of the 50%-90% range described in the documents) in my base calculations as a "reasonable" input to illustrate how the model works, but I also described how "the model is set up so that alternative assumptions could be made…" and I reported results for the range of alternative values that appeared in the documents I reviewed.[145]

76.    Dr. Cremieux modifies my base calculations by using a Teva 40% chance of winning the patent litigation.[146]  Dr. Cremieux ignores the available evidence regarding Teva's chances of winning the patent litigation, described in my May 2025 Report, including Wyeth's own estimates, which are inconsistent with his preferred input for Teva's chance of winning the litigation.[147]

77.    Dr. Cremieux also modifies the input that the later-filing generics would have a 75% chance of entering in 2010 and, if the litigation were still active and they had not entered earlier, another 75% chance of entering 2013, which was based on the inputs made in Wyeth's forecast model.  He instead uses a probability of entry for later filers of 50% if Wyeth settled its litigation with Teva and 100% if Wyeth did not settle its litigation with Teva.[148]  He justifies this by arguing that Wyeth used the 100% input after the *Markman* decision whereas the 50% input was made beforehand, so 50% should be used in a settlement scenario in which the *Markman* decision is vacated.

78.    Dr. Cremieux's modifications are ill-chosen speculation and inconsistent with Wyeth's own modeling efforts.  Wyeth modeled the chance of later generic entry as being the same in the

---

[144]  Cremieux Report, ¶ 35.

[145]  My May 2025 Report, ¶ 346.  The midpoint is the mean of a symmetric distribution, and a reasonable starting point for assessing the role of an input.

[146]  Cremieux Report, ¶ 39.

[147]  See my May 2025 Report, ¶¶ 340-344.

[148]  Cremieux Report, ¶ 39 and Exhibit 2.

litigation and settlement scenarios within days of when the first settlement proposal was exchanged, which included the clause vacating the *Markman* decision.[149]  In addition, the Wyeth document simply referred to the 100% probability as an "Alternative Assumption[];" it does not indicate that the new alternative assumption was added because of the *Markman* decision, as Cremieux assumes.

### *The Timing of Teva's Entry with a Litigation Win*

79.    Based on industry patterns and Teva's own business practices, I concluded that Teva would have launched in June 2008 when the compound patent expired if it had previously won a district court decision.[150]  Dr. Cremieux modifies my calculations to assume that Teva would not have launched until February 2009, after the appeals process was complete.[151]  He provides no support for this modification, which is inconsistent with Teva's experience, Teva's expectations for generic Effexor XR, and the empirical data, and does not make sense as an economic matter.[152]

### *Wyeth's AG-Launch Decision*

80.    Dr. Cremieux modifies the input that Wyeth would launch an AG upon Teva's entry.[153]  He assumes there would be no launch.  In support, Dr. Cremieux points to the same arguments that I have already discussed and rebutted above.[154]

---

[149]  See WYEFFAT06847939-85 at 58 (a September 13, 2005 slideshow about Wyeth's model) and TEVA_EFFEX_0752832-33 attaching TEVA_EFFEX_0752834-40 at 38 (dated September 16, 2005).

[150]  My May 2025 Report, ¶ 337.

[151]  Cremieux Report, ¶ 39 and Exhibit 2.

[152]  See K. Drake, *et al.*, "No Free Launch: At-Risk Entry by Generic Drug Firms," *International Journal of the Economics of Business*, 29(3), 2022, pp. 301-15 at pp. 309-10.

[153]  Cremieux Report, ¶ 39 and Exhibit 2.

[154]  See Section I.B above.

*The Acceleration Clauses and Wyeth's Line Extension Pristiq*

81.     Dr. Cremieux argues that my approach is speculative because the Wyeth-Teva Agreement also contained acceleration clauses – allowing Teva to enter earlier if Effexor XR sales declined below certain thresholds – that the parties may have valued differently in the absence of the reverse-payment terms.[155]  Dr. Cremieux's argument itself is highly speculative as the available information indicates the acceleration clauses were relatively unimportant because, as the parties understood it, they were unlikely to be triggered.  It appears that the acceleration clauses merely provided some protection for Teva against an unlikely worst-case scenario in which Pristiq decimated Effexor XR volumes such that Teva's sales of generic Effexor XR were also decimated.[156]

82.     There were two potential scenarios of declining sales that would have allowed Teva to enter before July 2010.  Teva could have entered:[157]

---

[155]  Cremieux Report, ¶ 44.

[156]  As explained in my May 2025 Report, ¶ 93, a delay in generic entry gives Wyeth more time to convert a greater portion of Effexor XR prescriptions to the line extension Pristiq.  Because generic Effexor XR can be automatically substituted for Effexor XR but not Pristiq, the brand Effexor XR-to-Pristiq shift had the potential to reduce Teva's expected profits.

An internal Wyeth email from August 2005 mentioned the possibility that Effexor XR sales could drop below the $1 billion acceleration-clause threshold if "the DVS switch were equivalent to the Lexapro experience."  However, the Lexapro yardstick is not included in Wyeth's model, which has two options: "Modeled on Paxil" and "Modeled on Nexium."  Nexium is the default and was the option used to create Wyeth's slide decks.  For example, WYEFFAT06859914, tab "Branded Inputs," rows 27-34; and tab "Cash Flow," cells E9:F9 (the default 1=P setting refers to Paxil); and my May 2025 Report, footnote 583 in which I explain how the slides in WYEFFAT06847939-85 at 63-64 match Wyeth's model.

Although not the default, the Nexium yardstick assumed that there would be more conversion from Effexor XR to Pristiq.  Based on the Nexium yardstick, estimated gross sales of Effexor XR were still estimated to total $1.3 billion in 2009, which is still larger than the acceleration-clause threshold.  To calculate gross sales based on the Nexium yardstick, in WYEFFAT06859914, in the "Cash Flow" tab, first change cell E4 to 2012 (the year of generic entry) and cell E9 to 2 (the Nexium yardstick).  Gross sales are calculated as cell K9* K51 in the "Branded Inputs" tab.

Also see WYEFFAT3311977-2081 at 2032 describing how Lexapro was a more successful line extension than Nexium and Paxil, but that Wyeth was using a mix of the Nexium and Paxil data to construct a forecast model for Pristiq.

[157]  My May 2025 Report, footnote 217.  The Agreement included other acceleration clauses that were unrelated to a decline in Effexor XR sales.

- "…as early as October 1, 2009 or anytime thereafter if rolling 12-month gross sales of Effexor XR dropped below $1 billion" and

- "…the same date that a generic version of Next Generation XR [Pristiq] was sold by a third party and rolling 12-month gross sales of Effexor XR dropped below $500 million."

83.    As summarized in Figure 3, around the time of the Wyeth-Teva Agreement, Wyeth forecasted that its gross sales of Effexor XR sales would be $1.8 billion in 2009 (without generic entry),[158] which is almost double the threshold that would trigger an acceleration clause ($1 billion).  Wyeth's actual sales of Effexor XR were much larger than Wyeth forecasted,[159] so the acceleration clauses were not in fact triggered.

---

[158]  I rely on the forecast from WYEFFAT06859914.  If tab "Cash Flow," cell E4 and E10 are changed to 2017, these sales are then calculated in tab "Branded Inputs," as row 9 * row 51.

Also see WYEFFAT3311977-2081 at 1984 indicating that Pristiq was expected to add "solid incremental value to the antidepressant franchise" and generate additional revenue from a new indication in women's health.  Wyeth was optimistically projecting that Pristiq would convert 42% of Effexor XR prescriptions over 16.5 months before generic entry.  WYEFFAT3311977-2081 at 2031-2032.

[159]  My May 2025 Report, ¶ 312.

FIGURE 3
WYETH'S EXPECTED EFFEXOR XR AND PRISTIQ SALES WITHOUT GENERIC ENTRY ($ MILLIONS)



84.    As summarized in Figure 4, other sources were consistent with Wyeth's expectation that sales of Effexor XR would remain well above the $1 billion threshold prior to generic entry.[160] Sandoz forecasted that Effexor XR's pre-generic sales would be much higher than Wyeth predicted, remaining above $2.6 billion during 2006-2008.  And a September 2005 Morgan

---

[160]  WYEFFAT2394360-68 is a Sandoz model from sometime in late 2006/early 2007 based on the timing of ANDA filings and patent litigation referenced in the assumptions.  Sandoz forecasted that unit sales of Effexor XR would decrease but that dollar sales would remain fairly constant because of price increases.

The Teva forecast (TEVA_EFFEX_0440657) was summarized in my May 2025 Report, Attachment E and described below.  I calculate the 2006 sales as the 2008 sales ($1.9 billion) divided by 70% because the forecast model noted that it was adjusted down 30% because of desvenlafaxine.  The Wyeth sales data are the same as in Figure 3 above.

Stanley analyst report similarly forecasted Effexor sales of $1.8 billion and Pristiq sales of $600 million in 2009.[161]





**FIGURE 4**
**PROJECTED EFFEXOR XR SALES WITHOUT GENERIC ENTRY ($ MILLIONS)**

85.    Although Teva withheld as privileged most of its analyses from prior to the Wyeth-Teva Agreement,[162] a September 2006 email with an attached forecast model (that was probably

---

[161]  WYEFFAT3753515-35 at 16-19.  The "Effexor" estimate appears to account for a high probability of generic entry in 2008.  It also may include sales of Effexor IR or sales from outside the U.S.  Also see WYEFFAT2951300-483 at 466, which is a research report about the antidepressant market estimating that DVS sales would reach $694 million in 2009.

[162]  My May 2005 Report, Attachment E, describes a forecast model from 2003.  I understand from counsel that a number of other Teva forecasts, including those made closer to the time of the Agreement, were withheld as privileged.

created earlier) provides some insight into Teva's assessment of Pristiq.[163]  The email indicated that:[164]

> "Teva decided to adjust the forecast down 30% based on the information we have about desvenlafaxine."  (Desvenlafaxine is the active ingredient in Pristiq.)

And the attached model noted:[165]

> "Adjusted forecast down 30%, due to next generation desvenlafaxine that is set to enter in the market in '07."

After the 30% reduction, Teva still forecasted that Effexor XR's gross sales would total *$1.9 billion* at the assumed generic entry date of June 2008.[166]  As illustrated in Figure 4 above, Teva's forecast of Effexor XR sales was similar to Wyeth's forecast ($2.1 billion). As I mention above, these figures are consistent with Morgan Stanley's sales projections from 2005.

86.    Further, accounting for the possibility that the acceleration clauses could be triggered in my model would result in earlier generic entry for Teva in a settlement without reverse payments.  If reasonable firms in the positions of Wyeth and Teva were negotiating for an earlier entry date in a settlement without reverse payments, the probability that the acceleration clauses could be triggered would decrease.  This is because Wyeth would have less time to switch patients from Effexor XR to Pristiq.[167]  A lower probability of acceleration would make the

---

[163]  TEVA_EFFEX_0440656 attaching TEVA_EFFEX_0440657.  Although the forecast model was attached to a September 2006 email, the assumed generic entry date of June 2008 and the high level of Effexor XR sales (which is much too high to trigger an acceleration clause), as well as the assumption that Wyeth would launch an AG, indicate that the assumptions may have been vestiges from forecasting efforts from before the Agreement.  See my May 2025 Report, Attachment E.

Although this forecast model is informative about Teva's expectations regarding Pristiq, it does not contain all of the information necessary to use in my model.

[164]  TEVA_EFFEX_0440656.

[165]  TEVA_EFFEX_0440657.  A model from March 2008 included the following notes: "Doc's [sic] are stating that they do not see added value of pristiq over venla xr … Wyeth has had problems with getting it approved.  Will launch pristiq in 2Q08, only for MDD but will not get menopausal symptom indication until 2009.  Therefore may not get managed care buy in until sometime in 2009.  In addition this is assumed to expand the mkt vs canabalize [sic] it."  See TEVA_EFFEX_0443328 attaching TEVA_EFFEX_0443329.

[166]  TEVA_EFFEX_0440657.

[167]  See WYEFFAT3311977-2081 at 2022-2023. More time before generic entry led to higher conversion rates among previous transitions to follow-on drugs.

---

clauses less valuable to Teva, less costly to Wyeth, and less important overall. Accounting for this change would tend to shift the resulting generic entry date for Teva stemming from the negotiation earlier in time.[168]

87.     Dr. Cremieux also argues that my analyses do not specifically account for Teva's expectations about how Pristiq could lower the sales of Effexor XR.[169] He acknowledges that Teva's forecast models were not available (because Teva withheld them as privileged) and concludes that it is therefore "not possible" to quantify the risk that Teva faced from Effexor XR market declines at the time of the Agreement.[170] Dr. Cremieux offers no evidence regarding the extent to which Teva expected Effexor XR sales to decline.[171] Instead, he asserts that the acceleration clauses in the Agreement provide evidence that Teva was concerned about the erosion of Effexor XR sales and that their inclusion in the Agreement mitigated those concerns.[172]

88.     I accounted for Pristiq's expected effect on Effexor XR sales by using the inputs embedded in Wyeth's forecast model. As described above, forecasts of Effexor XR sales constructed by Teva and others were consistent with Wyeth's model. The bottom line is that all the available information indicates that, at the time of the Agreement, Pristiq sales were not

---

[168]  As described above in Section IV.B, if the reverse payments are removed from the settlement, Teva's expected profits decrease and Wyeth's increase. The corresponding generic entry date must move earlier in time to compensate Teva for this change. The same logic applies to the potential change in the value of the acceleration clauses.

[169]  Cremieux Report, ¶¶ 47-50.

[170]  Cremieux Report, footnote 104. Dr. Cremieux repeatedly refers to what he regards to be Teva's "major concern" over Pristiq sales. See, e.g., Cremieux Report, ¶¶ 22 (fourth bullet), 23 (second and third bullets), 47, and 85. He supplies minimal support for this position. He refers to the acceleration clauses in the settlement agreement (which are commonly included in such agreements) and a few general statements from depositions taken 20 years after the Agreement simply noting that such clauses are common (¶ 47 and footnote 98). The only contemporaneous document Dr. Cremieux cites does not in fact support his position. It contains an email exchange between Teva's Richard Egosi and Wyeth's David Manspeizer concerning the logistics of setting up an initial meeting to discuss the potential of a settlement. The chain also contains a follow up email about Pristiq, but it is internal to Wyeth. Cremieux Report, ¶ 47, footnote 100 citing WYEFFAT3786771.

[171]  In his report, Dr. Cremieux creates a purely hypothetical scenario whereby Effexor XR sales decrease by 50%. He provides no evidence that Teva expected sales to decline to this extent. Cremieux Report, ¶ 48.

[172]  Cremieux Report, ¶ 47.

---

expected to replace Effexor XR sales to nearly the degree that would trigger an acceleration clause. And actual Effexor XR sales remained well above the threshold that would have triggered an acceleration clause, so they were not in fact triggered.

89. Also, as described above, to the extent that Teva was concerned about Wyeth shifting the market to Pristiq, those concerns would be lessened if a reasonable party in Teva's position negotiated for an earlier entry date in a settlement without reverse payments because Wyeth would have less time to convert Effexor XR sales to Pristiq.[173] As shown below, accounting for Teva's expectation of an increased risk of market decline in my model would tend to make the resulting generic entry date in a settlement without reverse payments earlier in time.

***Sensitivity Analysis Regarding the Most Likely Date of Generic Entry in a Settlement without Reverse Payments***

90. By changing inputs, Dr. Cremieux finds an altered feasible range for a settlement without reverse payments. He makes no attempt to identify the most likely date of generic entry within the feasible range. As explained above, his rationales for altering the inputs into my date calculations are highly flawed. Even so, even with Dr. Cremieux's flawed inputs, Table 7 shows that the most likely date of generic entry in a payment-free settlement would have been earlier than the July 2010 date included in the Wyeth-Teva Agreement.

---

[173] Performance of previous predecessor-successor analogs at Wyeth clearly indicates that the more time before generic entry translates to higher conversion to the analog drug. WYEFFAT3311977-2081 at 2022-2023.

TABLE 7
MOST LIKELY MONTH FOR TEVA'S GENERIC EFFEXOR XR ENTRY IN A PAYMENT-FREE
SETTLEMENT BASED ON DR. CREMIEUX'S PREFERRED INPUTS INTO MY DATE CALCULATIONS

| Input | McGuire Base | Cremieux | Most Likely Entry Month |
|---|---|---|---|
| No Changes to My Calculations | - | - | May 2009 |
| Teva's chance of generic entry in 2008 | 70% | 40% | September 2009 |
| Later filers' chance of entry in 2010 and 2013 | 75% | 50% in settlement and 100% in litigation | June 2009 |
| Timing of Teva's Entry in Litigation Win | June 2008 | February 2009 | October 2009* |
| Absent no-AG clauses, does Wyeth launch an AG upon Teva's entry? | Yes | No | February 2010 |
| Pristiq's effect on Effexor XR sales | Wyeth's forecast model assumption | Teva expected more conversion to Pristiq than Wyeth | March 2009** |

* This calculation is conservative because it incorporates the input that Teva cannot enter until July 2009 because Wyeth's model was only set up to use July entry dates as inputs.

** I used the Effexor XR-to-Pristiq conversion rate used in Wyeth's forecast model for my base calculation. Wyeth's model includes a second, more aggressive conversion rate, which I use for this calculation.

## VI.    MAJOR DEFICIENCIES IN THE ELZINGA REPORT

91.    The Elzinga Report contains serious deficiencies including 1) conflating sunk and fixed costs, 2) presenting misleading empirical analyses, and 3) falling victim to the Cellophane Fallacy.  These serious deficiencies undermine Prof. Elzinga's analyses and conclusions, rendering his criticisms invalid.

92.    This section explains these major deficiencies and the consequences for his analyses. Table 8 contains a summary.  As I discuss in later sections, these are not the only deficiencies in

Prof. Elzinga's Report. In subsequent sections, I respond point-by-point to Prof. Elzinga's critiques of my May 2025 Report, rebut his misleading claims, and elucidate serious limitations in his empirical analyses.

TABLE 8
MAJOR DEFICIENCIES IN PROF. ELZINGA'S REPORT

| Deficiency | Implications of corrections for Prof. Elzinga's analysis |
|---|---|
| Elzinga treats sunk costs (*e.g.*, R&D) as a fixed cost (*e.g.*, plant and equipment), a basic price theory mistake | Previously incurred sunk costs (bygones) are not why a monopolist charges high prices<br><br>High prices are set to maximize current profits<br><br>Ability to charge high prices is the reason for R&D investment, not the other way around<br><br>Use of gross margins as evidence for market power is appropriate, and R&D and other sunk costs should not be netted out of gross margins |
| Elzinga's misleading empirical analyses:<br><br>*(1) Price trends around generic entry:*<br><br>Elzinga distorts the timing of the price fall to make it appear that it occurred before Teva entry whereas his own data show the price fall occurred after<br><br>Elzinga presents different price series from different sources before and after Teva entry<br><br>Elzinga neglects trends in Wyeth pricing of Effexor XR<br><br>*(2) "Switching" analysis*<br><br>Elzinga uses the wrong denominator to make it appear there was a change in rates | *(1) Price trends around generic entry:*<br><br>Teva entry did reduce prices and is a reasonable "natural experiment"<br><br><br><br><br><br>*(2) "Switching" analysis*<br><br>When correctly interpreted, no evidence that switching rates change after price drop for Effexor XR and no evidence of any patients switching due to price |
| Elzinga falls victim to the "Cellophane Fallacy," ignoring that a monopolist prices at elastic portion of demand curve; at high monopoly prices all goods subject to some substitution | Wyeth paying rebates for formulary placement at high monopoly prices does not imply Wyeth lacks substantial monopoly power |

## A.    Sunk Costs are not Fixed Costs and Sunk Costs do not Cause High Monopoly Prices

93.    The term "sunk costs" is not found in Prof. Elzinga's discussion of the cost structure of the pharmaceutical industry, a glaring omission in light of their importance in the research-intensive pharmaceutical sector.[174]  Prof. Elzinga does not comment on or even acknowledge my discussion of the role of sunk, fixed, and marginal costs in the understanding of profit-maximizing pricing of drugs.  Prof. Elzinga makes a grave error in basic price theory by failing to acknowledge that R&D costs are sunk and do not influence current profit-maximizing pricing. In addition to the many citations to support this statement in my May 2025 Report, the textbook Prof. Elzinga assigns for his introductory economics class at University of Virginia concurs, defining sunk costs as "costs that have already been incurred and cannot be recovered."[175]  The textbook author goes on to say, "Sunk costs… are often included in making decisions, but should not be," advising students, "there's no use crying over spilt milk."[176]

94.    Prof. Elzinga avoids the four-letter word in his Report, and its immediate economic connotation.  If he were to use it appropriately, his attempt at justifying high Effexor XR prices and margins as something other than substantial market power would itself be sunk.  Sunk costs are bygones and do not affect (and do not explain) profit-maximizing prices and extraordinarily high gross margins like the ones Wyeth earned on its Effexor XR sales.

## B.    Misleading Presentation of Data

95.    This section calls attention to two egregious mischaracterizations of the data contained in the Elzinga Report.

---

[174]  Elzinga Report, Section V.A.  The term "sunk costs" appears once in the Elzinga Report, ¶ 106 where he comments on Professor Leffler's use of the term.  Prof. Elzinga never uses the term himself in describing the economics of pharmaceutical R&D or addresses my use of the term when I discuss its role in pharmaceutical pricing.

[175]  D. Colander, *Microeconomics*, 12th ed., New York, NY: McGraw Hill, 2024, p. 8.  See Prof. Elzinga's Fall 2024 syllabus: K. Elzinga and A. MacKay, "Econ 2010: Principles of Microeconomics," Fall 2024 (https://economics. virginia.edu/sites/economics.as.virginia.edu/files/2025-03/ECON%202010-%20Elzinga.pdf).

[176]  *Ibid.*, pp. 9 and 281.

*Misrepresentation of the Impact of Teva Entry on Prices for Venlafaxine ER*

96.     Teva's (delayed) entry on July 1, 2010 changed the competitive landscape for Effexor XR and had a meaningful, favorable, and immediate impact on the prices paid by purchasers. Price declines following generic entry are typical in the pharmaceutical industry, and can be driven by the brand manufacturer, the generic manufacturers, or both (as is observed here).[177] Prof. Elzinga seeks to obscure this typical effect of generic entry on prices by 1) distorting the timing of Wyeth's Effexor XR net prices to obscure the fact that brand net prices fell markedly *after* Teva's entry, not before, 2) conducting an apples-to-oranges comparison of Wyeth *net prices* to Teva *wholesale prices* from two different data sources, and 3) misleadingly suppressing evidence of the trends in price increases by truncating the data display.  When Prof. Elzinga's distorted display and discussion of the prices are corrected, it is clear that generic Effexor XR entry did in fact cause prices to fall substantially, and that Teva's generic entry is an appropriate natural experiment.

<u>Distorting the timing of venlafaxine ER capsule price decline</u>

97.     Prof. Elzinga's presentation of data obscures the timing of Teva's entry in relation to the data on price, conveying the illusion that the brand Effexor XR net price dropped before Teva's entry.  Figure 5.A below reproduces Prof. Elzinga's presentation of the SSR Health data in his Exhibit 5.[178]  The 2010 Q3 price represents the net price of Effexor XR over three months of

---

[177]  May 2025 Report, ¶¶ 47-56, where I discuss typical impact of generic entry on prices. For the drug of interest in this matter, following Teva's entry *both brand and generic* venlafaxine ER capsules were available at prices lower than pre-generic brand prices as a result of generic entry.  Wyeth dropped the Effexor XR net price substantially with the onset of generic Effexor XR.  This is confirmed in Wyeth's data.  See WYEFFAT08626909 and backup materials to Figure 7.  Wyeth's net price of Effexor XR in the first half of 2010 was $3.49 per extended unit and declined to $0.96 in the third quarter of 2010 when Teva entered.

Dr. Cremieux also acknowledges that generic competition results in lower prices for the molecule.  Cremieux Deposition, p. 43 ("[I]n general, when you have a generic that enters, what happens is you have competition from that generic.  And that competition results typically in lower prices for the molecule simply because the generic is being priced at a lower level, given the lower costs associated with the production of that product in the first place.").

[178]  SSR Health data estimates drug-level net prices by combining manufacturers' publicly reported drug-level net revenue data with quantity data that are estimated from a data sample collected by a third-party data vendor.  It was unnecessary for Prof. Elzinga to rely on SSR Health's *estimated* net prices when *actual* data are available via

---

data – July through September 2010 – whereas Teva's entry occurs on the <u>first day</u> of that quarter (July 1, 2010), and thus all the price data in that quarter occurs *after* Teva's entry, not *before* as Prof. Elzinga's line graph makes it appear.

98.     I correct the timing of events with the price data shown more accurately as intervals in Figure 5.B.  The intervals are a graph of Prof. Elzinga's own data, but with corrected timing to avoid a misleading impression of the relation between Teva's generic Effexor XR entry and the timing of the price fall.[179]

---

discovery materials in this matter.  Indeed, when I discussed net prices in my Report, I used Wyeth's *actual* data on Effexor XR's net revenue.  See, *e.g.*, my May 2025 Report, Section VI.A, ¶ 144.  I reported Effexor XR's net prices on an annual basis as that was sufficient for my purposes in my May 2025 Report.  Prof. Elzinga provides no explanation for ignoring Wyeth's own data on actual net prices and instead using estimated data from SSR Health.

[179]  There is nothing fundamentally wrong with line graphs.  The tool for displaying data is appropriate in some circumstances and not others.

FIGURE 5
SSR NET PRICE DATA FOR BRAND EFFEXOR XR[180]



A. Reproduction of Prof. Elzinga's Exhibit 5

B. Correction of Timing in Prof. Elzinga's Exhibit 5

---

[180] Source: SSR data provided by Prof. Elzinga. SSR data need to be interpreted with caution post-loss of exclusivity (see ¶ 99 and footnote 181 below). However, I have included a longer times series of net prices using the SSR data provided by Prof. Elzinga in the backup materials. The longer time series provide additional context regarding net price trends following Wyeth's drop in Effexor XR's brand net price in the quarter of Teva's generic entry. The data show that in subsequent quarters Wyeth steadily increased Effexor XR's net price to return to and subsequently exceed its pre-generic entry net prices. Wyeth's increase in Effexor XR's net prices following generic entry is not surprising. After loss of exclusivity, brand products retain some customers, known in the industry as "brand loyalists" with inelastic demands. Wyeth could profitably increase prices for this small segment of the purchasers. H. Grabowski and J. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, 35(2), 1992, pp. 331-50.

Comparing apples to oranges: Wyeth's net prices vs. Teva's wholesale prices

99.    Prof. Elzinga's Exhibit 5 charts Wyeth's brand Effexor XR's *pre-generic* entry *net prices* from SSR Health data against Teva's *post-generic* entry generic Effexor XR *wholesale prices* from IQVIA NSP data.  These data series are from different vendors and have different properties.  Grafting them together can and here does yield a misleading impression about how prices change at the time one data series is substituted for another.  SSR Health data net out all discounts and rebates; IQVIA wholesale data do not.  SSR Health data come with limitations around the time of generic entry because of buildup or draw down of inventory around that time.[181]  Prof. Elzinga chose to compare apples (net prices from SSR data) to oranges (wholesale prices from IQVIA data) while purporting to assess price differences before and after Teva's entry, and he did so despite the fact that data are available to make both apples-to-apples and oranges-to-oranges comparisons.  These proper comparisons reveal the true dampening effect of generic entry on prices, exposing Prof. Elzinga's depiction as a consequence of comparing different price series.

100.    Prof. Elzinga attempts to justify comparing net to wholesale prices by contending that "wholesale prices *typically* reflect the manufacturer net price for generic drugs"[182] (emphasis added).  However, there are typically some generic discounts that move net price below the wholesale price.[183]  Indeed, the data produced by Teva show that its generic Effexor XR *net prices* (Figure 7) were lower than the generic venlafaxine ER capsule *wholesale prices* (Figure 6), as well as lower than brand Effexor XR's pre-generic entry *net price* in the *SSR data* that

---

[181]  B. Ippolito and J. Levy, "Best Practices Using SSR Health Net Drug Pricing Data," *Health Affairs Forefront*, March 10, 2022 (https://www.healthaffairs.org/content/forefront/best-practices-using-ssr-health-net-drug-pricing-data).

[182]  Elzinga Report, ¶ 51, emphasis added.

[183]  CBO, "Prescription Drugs: Spending, Use, and Prices," January 2022 (https://www.cbo.gov/publication/57772) ("Manufacturers of generic drugs generally do not offer rebates to insurance plans, although they pay rebates to pharmacies…. Unlike rebates for brand-name drugs, those rebates do not reduce net costs to plans because they are paid to pharmacies or wholesalers rather than to plans or PBMs."); IMS Institute for Healthcare Informatics, "Price Declines after Branded Medicines Lose Exclusivity in the U.S.," January 2016 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/price-declines-after-branded-medicines-lose-exclusivity-in-the-us.pdf) ("The average [NSP] price is typically lower than the list price, but higher than the net price.").

Prof. Elzinga used (Figure 5). And it is unnecessary to rely on an assumption about what "typically" happens when actual data to make an apples-to-apples comparison are available, as they are in this case. I do this for both price series, beginning with a wholesale-to-wholesale price comparison using IQVIA data, and then with a net price-to-net price comparison using Wyeth and Teva's own data. In both series, when comparing apples to apples (or, oranges to oranges), prices fall after Teva's entry.

101.    Figure 8a from my May 2025 Report tracks wholesale prices for both sellers across the time of Teva entry. Here, in Figure 6, I report these same prices matching the time frame in Prof. Elzinga's Exhibit 5 (2008Q4-2011Q4) and displaying the data at the quarter level to match his depiction. The price decline after Teva's entry is sharp and unmistakable.

**FIGURE 6**
**DECLINE IN THE WHOLESALE PRICE OF VENLAFAXINE ER**
**FOLLOWING TEVA'S GENERIC ENTRY[184]**



Note: The venlafaxine ER generic price is the average generic price following multiple generic entry.

---

[184] Source: IQVIA NSP Data.

102.     Next, Figure 7 graphs net prices using actual data available in discovery.[185]  I use the actual annual net sales provided by Wyeth for Effexor XR and divide by IQVIA retail extended units to approximate consumer demand.[186]  Teva also supplied net sales data for its venlafaxine ER product.  I report net price on an annual basis (the second half of 2010 and the full year for 2011).[187]

---

[185]  Prof. Elzinga relies on SSR Health's *estimated* net price despite *actual* net price data for both brand Effexor XR and for its generics being available via discovery in this matter.

[186]  Wyeth net sales data are net of rebates and price adjustments.  Quarterly net sales for Wyeth are available for 2010 and applied accordingly in Figures 7 and 8 below.  Wyeth's net price can also be calculated using wholesale extended units to approximate what the manufacturer received in exchange for those net sales in the numerator. Using retail or wholesale units has little impact on the net price.  For the wholesale unit version see backup materials to this figure, as well as a longer net price series in Reply Attachment B, Figure B.3.

[187]  Annual net prices are used to avoid discontinuities due to initial stocking and lags between sales and rebate payments.  *E.g.*, in the first month after Teva's entry, net sales are over-inflated by a stocking effect.  To account for this, I calculate Teva's generic Effexor XR net price on an annual or half-yearly basis.

FIGURE 7
DECLINE IN THE NET PRICE OF VENLAFAXINE ER
FOLLOWING TEVA'S GENERIC ENTRY[188]



Notes: Teva's generic enters in July 2010. Effexor's XR 2010 net price is limited to the period prior to Teva's entry (January-June 2010). Teva's net prices per extended unit are calculated as Teva's venlafaxine ER capsule net sales divided by the corresponding extended units. Teva's 2010 net price is calculated using Teva's net sales and extended units from July-December 2010. With multiple generic entry in June 2011, Teva's 2011 net price is separated into the first and second half of the year to allow separate reporting of Teva's net price before and after multiple generic entry.[189]

103.    The price shock is even more dramatic recognizing the trends in price for Effexor XR that were in place prior to July 2010, as I show next.

Suppressing pricing trends by truncating the data

104.    Prof. Elzinga makes a third choice in his Exhibit 5 that obscures the favorable price impact of Teva entry. Figure 8a of my May 2025 Report showed more than 12 years of price

---

[188]  Sources: TEVA_EFFEX_0641185; TEVA_EFFEX_0498788; and IQVIA Data. See backup materials.

[189]  See footnote 187 above.

data leading up to Teva's entry, whereas Prof. Elzinga's Exhibit 5 shows less than 2 years.[190] Truncating the price series masks the steady trend in Wyeth price increases for Effexor XR. Prof. Elzinga's foreshortened Exhibit 5 makes it appear as if there is little upward trend in Wyeth's net prices for Effexor XR, whereas in fact, Wyeth was increasing prices year after year.[191]

105.    Figure 8 graphs annual net prices for Effexor XR from 1999 through 2009 and extends the trend forward.  Teva's entry causes a clear trend break.  If not for Teva's entry, buyers had every reason to expect Effexor XR's price to have continued its upward trajectory.  The real price impact of Teva's entry is the difference between what Wyeth would have charged without Teva (the projected prices in Figure 8) and what Teva actually charged, shown in the Figure.  In the first six months after entry, Teva's net price was down 38% from Wyeth's trended net price. In the following six months, Teva's price was 76% lower.  Multiple generic entry caused even greater net price drops.

---

[190]  SSR Health data for Effexor only go back until 2008, and Prof. Elzinga does take the SSR Health series back until then.  SSR Health is not the only source of data on net prices.  Net prices can also be estimated by annual net sales provided by Wyeth in this matter divided by IQVIA extended units, as done in my May 2025 Report, footnote 284.  In the overlapping year of 2009, net prices from SSR Health are very close to net prices derived from net sales and IQVIA unit sales.

[191]  Between 1999 and 2009, the net price increased by 106% and averaged 8% increases per year.  See backup materials to Figure 8.  I exclude 1998 from this figure to avoid any stocking effect in Effexor XR's first full year of sales.

**FIGURE 8**
**WYETH AND TEVA NET PRICE DATA FOR EFFEXOR XR[192]**



Notes: The dashed vertical lines represent the price difference associated with Teva entry.

Summary of data on corrected price trends around Teva's entry

106.    Generic entry in the drug industry is understood to cause a sudden and dramatic shift in the competitive landscape for a successful brand product and is commonly used as the basis for a natural experiment in academic research papers.[193]  Prof. Elzinga attempts to use his misleading

---

[192]  Sources: TEVA_EFFEX_0641185; TEVA_EFFEX_0498788; TEVA_EFFEX_0499088; and IQVIA Data.  See backup materials.

[193]  See my May 2025 Report, ¶ 47 and footnote 66 for citations to academic studies that study generic entry.  See also R. Conti and E. Berndt, "Specialty Drug Prices and Utilization after Loss of US Patent Exclusivity, 2001–

depiction of the data in his Exhibit 5 to claim that Teva's entry in July 2010 did not represent a competitive shock to the market for Effexor XR that lowered prices considerably and so is not a reasonable basis for use as a "natural experiment."[194] Prof. Elzinga makes these same arguments for three out of the seven symmetric natural experiments that I conducted depicted in his Exhibit 6. As I explain in Attachment B, his criticisms are incorrect for the same reasons as those he makes in connection with his Exhibit 5. Contrary to what Prof. Elzinga claims, it is clear from an accurate presentation of the proper data that a strong competitive effect occurred here. Teva's generic entry was a competitive price shock that caused venlafaxine ER prices to fall substantially and is a valid basis for study as a natural experiment.

### *Misinterpretation of "Switching" Data and Economic Substitutability*

107.    In a second misleading data analysis, Prof. Elzinga uses claims data from three large PBMs and survey data from the Medical Expenditure Panel Survey (MEPS) to study prescribing patterns for second-generation antidepressants.[195] For patients who started taking generic Effexor XR in the first two years of generic entry, he reviews which drugs they used previously and identifies patients who he regards as having "switched" from another drug. He then compares rates of patients coming from different drugs between the first year of generic entry (when Teva was the only generic seller) and the second year of generic entry (after the price of the generic had fallen further following multiple generic entry). His purpose is "to examine whether these market entries led *only* Effexor XR patients to switch their antidepressant ... or whether these market entries led to a meaningful number of patient switches from other

---

[194] Elzinga Report, ¶¶ 116-117 and 121 ("As I demonstrated in Exhibit 5, after accounting for these discounts, it is clear that the July 2010 entry date for Teva's generic version of Effexor XR that forms the basis of Prof. McGuire's natural experiment does not correspond to a reduction in the price that is relevant for driving demand.").

[195]  See Elzinga Report, Exhibits 8, 9, and 10, and the surrounding discussion.

2007," in A. Aizcorbe, *et al.*, eds., *Measuring and Modeling Health Care Costs*, University of Chicago Press, 2018, pp. 273-321; R. Conrad and R. Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," FDA Report, December 2019 (https://www.fda.gov/media/133509/download); and C. Kallberg, *et al.*, "The Effect of Generic Market Entry on Antibiotic Prescriptions in the United States," *Nature Communications*, 12(2937), 2021 at p. 6.

antidepressants"[196] (his emphasis).  Prof. Elzinga emphasizes "only" because he mistakenly believes this is my position, which is incorrect.  Switching can occur for *therapeutic* reasons. But, Prof. Elzinga's data for his "switching" analysis do not include any information on why a patient switched, and thus do not allow him to differentiate between *therapeutic* and *economic* switches.   Furthermore, the claims data relied upon by Prof. Elzinga do not even include information on diagnosis or anything about a patient's clinical condition.  Prof. Elzinga's analysis is uninformative about the magnitude of any *economic* substitution.[197]  At his deposition, Prof. Elzinga acknowledged that he could not identify a single patient that moved between antidepressants because of price.[198]

108.     Prof. Elzinga misinterprets his comparison of switching rates between the first year of Teva's entry and the following year after multiple generic entry.  Prof. Elzinga's Exhibit 8 shows, according to his definition of switching, what percentage of the patients that "switched" to generic Effexor XR had previously used brand Effexor XR versus other antidepressants drugs. For example, from his Express Scripts drug claims analysis, Prof. Elzinga calculates that in the first year of generic entry, 74.5% of patients who "switched" to generic Effexor XR had previously used brand Effexor XR, compared to 22.4% who previously used Effexor XR in the following year.[199]  This fall in the share of generic users previously using brand Effexor XR,

---

[196]  Elzinga Report, ¶ 168.

[197]  Note that Prof. Elzinga does not report the full set of sources of patients newly using generic versions of Effexor XR in either of his two periods.  Drug claims data do not include patient diagnoses, so Prof. Elzinga does not know if any particular patient has been diagnosed with depression, or, whether patients in his data with depression are taking some other drug not in his list of second-generation antidepressants for depression.  Some patients would have switched from these other drugs.  Some patients would have been untreated prior to using generic Effexor XR. Prof. Elzinga's percentages are all affected in unknown ways by these omissions.

[198]  Deposition of Kenneth Elzinga, in this matter, September 10, 2025 (hereinafter "Elzinga Deposition"), pp. 306-307 ("Q.  And can you identify whether the reason for any of the switching in any of those Exhibits 7 through 10 was because of price? A. Well, if I understand your question, no, you can't single out the extent to which a particular patient switched from Zoloft to Paxil because of the price that the retailer happened to pay or the patient happened to pay, if it was a direct purchase, or whether it was due to some other quality attribute that one offered its product to the other, such as a change in the dosage time."); see also p. 314 ("Q. And 7E is the same thing. There's a patient that was first on Effexor XR, and then it looks like they were on -- prescribed Cymbalta. And you don't know the reason for that switch either? A. Not for that particular patient.  All I know is that patient switched.").

[199]  Elzinga Report, Exhibit 8 under "Express Scripts."

---

according to Prof. Elzinga, implies the share previously using other drugs must have gone up from 25.5% in year one to 77.6% in the following year.[200]

109.    Comparing these relative percentages, Prof. Elzinga incorrectly concludes that: "*switching rates* from other antidepressants *increased* substantially in the second year after Teva's generic entry, after the launch of additional AB-rated generic versions of Effexor XR"[201] (emphasis added).  This claim is mistaken.  Prof. Elzinga's exhibits *do not* show switching rates have increased.  In fact, his exhibits do not report switching rates at all.[202]

110.    I explain with a simplified version of his analysis that illustrates switches to generic Effexor XR from just two sources, brand Effexor XR and "all other" antidepressants.  Following Prof. Elzinga, I use two periods: the year immediately after first generic entry, and the year of multiple generic entry.  My illustrative analysis is shown below in Table 9.  The first row reports switching from brand Effexor XR to the generic version.  During the first year of generic entry, the base of users of brand Effexor XR is relatively large, composed of 100 users.  Assuming a high switch rate of 90% due to generic substitution, 90 switched to generic Effexor XR.  In the second period the number of Effexor XR brand users (the base) has fallen to 10.  The switch rate remains unchanged at 90%, yielding 9 new generic version users.  The second row shows the data for Other Drugs with 1000 patients as a base.  In the first period only 4% of these switches to generic Effexor XR (for therapeutic reasons), yielding 40 new generic users.  The base users for Other Drugs falls too but not by much because the base is much bigger and the (therapeutic) switching rate is much lower.  The switching rate from Other Drugs to generic Effexor XR remains at 4% in the second period when 38 switch.

---

[200]  Elzinga Report, ¶¶ 169-170.

[201]  Elzinga Report, ¶ 170.

[202]  A switching rate is the number of users who change divided by the base number of users (the denominator). Prof. Elzinga never reports the base.  Switching rate changes caused by price changes are what matter for the economics of substitutability.  The switching rate is the numerator of a cross-price elasticity.  Cross-price elasticity is about changes in switching rates of a potential economic substitute in response to a price change for Effexor XR. Economic interest is in the rates of switching among patients using a potential economic substitute.  Prof. Elzinga's misleading interpretation implies he has shown changes in rates of switching, but he has not.

**TABLE 9**
**SIMPLIFIED VERSION OF ELZINGA'S SWITCHING ANALYSIS**

| | First Period | | | | Second Period | | | |
|---|---|---|---|---|---|---|---|---|
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) |
| | Base Users | Switching Rate | Switched Users | Rate Reported by Elzinga | Base Users | Switching Rate | Switched Users | Rate Reported by Elzinga |
| | | | =(a)*(b) | =(c)/Total (c) | =(a)-(c) | | =(e)*(f) | =(g)/Total (g) |
| Effexor XR | 100 | 90% | 90 | 69% | 10 | 90% | 9 | 19% |
| Other Drugs | 1000 | 4% | 40 | 31% | 960 | 4% | 38 | 81% |
| Total | 1100 | - | 130 | - | 970 | - | 47 | - |

111.    *Switching rates* to generic Effexor XR from brand Effexor XR and from Other Drugs have not changed across these two waves of data, by assumption, and as shown in columns b and f. The source of changes across the waves is the change in the base number of brand Effexor XR users, which is much lower following generic entry, as would be expected because of high rates of generic substitution at the pharmacy when a generic version is available.

112.    What does Prof. Elzinga do with his data?  He chooses not to report the green column, which shows the switching rate from other drugs, though his data certainly contains these rates.[203]  Instead, he reports the yellow column which shows the *share by source*, a different statistic that is not informative about substitutability because it does not indicate the switching rate for any drug.  He then misrepresents the change in the share by source by describing it as if it were a change in the economically relevant switching rate.[204]  But it is not, because it merely reflects that there are less brand sales years after generic Effexor XR entry to continue switching

---

[203]  As I discuss below, claims data analyses are not well-suited for estimating market-level economic effects in any case.  See Section IX.B below.

[204]  Elzinga Report, ¶ 170.  The points I make here apply to both his analyses of the PBM data and the data from MEPS, which he handles similarly.

to the generic, since most of the conversion to generic Effexor XR has already occurred, and so over time the share of "switches" that is from brand Effexor XR to generic Effexor XR falls.

113.    In my simple example, the switching rates for Other Drugs is unaffected by Effexor XR's price, analogous to a zero cross-price elasticity: no change in the quantity of Other Drugs in response to a price change in Effexor XR.  All that happens in the data is that when a generic is available, buyers leave the brand and move to the generic in large numbers.  Prof. Elzinga's misinterpreted "switching" exhibits therefore do not include evidence that other antidepressants are an economic substitute for Effexor XR.

## C.    Prof. Elzinga Falls Victim to the "Cellophane Fallacy"

114.    A profit-maximizing firm – even a monopolist – prices on the elastic portion of the demand curve.  This simply means that a firm with market power will raise price until the negative effect of the loss of customers on profits offsets the positive effect on profits of a higher price per unit sale.  Observing some substitution at the high monopoly price does not therefore imply that a firm does not have substantial market power, or that demand is not inelastic near the competitive price.  An analyst claiming the presence of substitution at the high monopoly price contradicts substantial market power commits the "Cellophane Fallacy."[205]

115.    Prof. Elzinga falls victim to the Cellophane Fallacy with his misinterpretation of instances of Wyeth bargaining with PBMs for formulary placement through rebates.  Prof. Elzinga documents examples of Wyeth's negotiations with PBMs around formulary placement to

---

[205]  My May 2025 Report, ¶ 159, cited H. Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, 5th ed., St. Paul, MN: West Publishing, 2016, p. 139 for discussion of the Cellophane Fallacy.  See also, D. Carlton and J. Perloff, *Modern Industrial Organization,* 4th ed., Boston, MA: Pearson/Addison-Wesley, 2005*,* pp. 646-47.  Du Pont was sued by the U.S. DOJ for monopolizing the cellophane market.  In what is regarded as mistaken reasoning, the Supreme Court in 1956 decided there was no monopoly because it found there were economic substitutes for cellophane at the high monopoly price.  Prof. Elzinga is well-aware of the Cellophane Fallacy as he discusses this case in a book that he co-authored titled "Antitrust Casebook: Milestones in Economic Regulation."  See W. Briet and K. Elzinga, *Antitrust Casebook: Milestones in Economic Regulation*, 3rd ed., New York, NY: Dryden Press, 1997, at pp. 196-201.

claim that Wyeth's "competitive strategy" around formulary placement demonstrates that Effexor XR faced price competition from other products and therefore lacks market power.[206]

116.    It is common for brand firms to negotiate rebates with PBMs.  However, companies bargaining with PBMs for formulary placement "is neither unusual nor inconsistent with market power."[207]  Accordingly, the U.S. District Court for the Northern District of California, in a matter concerning a reverse-payment with respect to the product Lidoderm, found that a positive responsiveness of sales to rebates "does not mean that the *other* products on the market… constrained the price of Lidoderm.  It simply shows that, in order to grow the market for what defendants repeatedly characterize as a unique product, price concessions and rebates for Lidoderm were necessary"[208] (their emphasis).

117.    The economics of this legal decision are sound.  PBMs bargaining about substitution of one very high-priced drug product for another is a perfect illustration of the Cellophane circumstances.  A monopolist pushes prices to heights where substitution takes place.  If it did not, prices could be raised further to increase profits.  Moreover, as discussed below, Wyeth increased brand Effexor XR rebates significantly when generic Effexor XR launched, showing that, even under Prof. Elzinga's framework, generic Effexor XR provoked significantly greater rebate competition, evidence that Wyeth possessed significant market power before Teva's launch.

---

[206]  For example, he uses a MedImpact contract that he summarizes: "to be eligible for rebates, products including Effexor XR 'shall be included on the Plan Formulary(ies) at a co-pay/coinsurance level no greater than any other preferred branded product in the same therapeutic or pharmacologic class and shall be in no way disadvantaged by any other branded product in the same therapeutic or pharmacologic class.'"  Elzinga Report, ¶¶ 114-115.

[207]  Federal Trade Commission, Complaint Counsel's Post-Trial Reply Brief, *In the Matter of Impax Laboratories, Inc.*, Public Docket No. 9373, February 14, 2018, at p. 59 (https://www.ftc.gov/system/files/documents/cases/180214ccposttrialreplybrief 589661.pdf).

[208]  *United Food & Commercial Workers Local 1776  v. Teikoku Pharma United States*, 296 F. Supp. 3d 1142, 1174 (N.D. Cal. 2017).

## VII.    DIRECT EVIDENCE OF WYETH MARKET POWER

118.    My May 2025 Report assessed four forms of direct evidence: 1) a large price fall after competition from multiple sellers; 2) high margins between price and marginal cost prior to competition; 3) inelasticity of own-price demand; and 4) a large unexplained reverse payment from Wyeth to Teva.[209]  Prof. Elzinga criticizes my analyses of the first three, but not the fourth, forms of direct evidence of Wyeth market power.[210]

### A.    Price Fall with Competition

119.    Using IQVIA NSP (wholesale price) data, my May 2025 Report showed that prices fell by about 90% between the period prior to Teva entry and June 2011 when competition from multiple generic sellers began.[211]  In his Section VIII.A, Prof. Elzinga argues that my analysis relies on "inappropriate benchmarks" using wholesale instead of net prices for Wyeth's Effexor XR.  As I explained in my May 2025 Report, the price fall with competition is so dramatic that using wholesale or net prices as the starting point doesn't matter: competition sharply reduces prices from what Wyeth was charging prior to competition.[212]

120.    The SSR Health data used by Prof. Elzinga rebuts his own argument.  In 2010 Q1, Wyeth's net price for Effexor XR was \$3.55.[213]  In 2010 Q3, when Teva's generic entered, Wyeth's net price for Effexor XR dropped to \$0.86, a 76% decrease in brand net price.[214]

---

[209]  See Table 4 from my May 2025 Report for a summary.

[210]  Prof. Elzinga avoids discussing the implications of the evidence of the presence of a large unexplained reverse payment in the Agreement on the grounds that Teva counsel has informed him that Dr. Cremieux "demonstrated that the Settlement Agreement did not reflect a large, unexplained payment from Wyeth to Teva."  Elzinga Report, footnote 175.  As I explain above in Section I, Dr. Cremieux does not effectively rebut my conclusion of the presence of large, unexplained Wyeth-to-Teva payments, leaving this form of evidence unaddressed by Prof. Elzinga.

[211]  See Figure 8a and 8b from my May 2025 Report and the surrounding discussion.

[212]  Figures 5-8 above confirm that "[t]he picture of a dramatic decline in price following generic competition persists regardless of which price in the pharmaceutical distribution process is used as the focal price." My May 2025 Report, ¶ 144.

[213]  Elzinga Report, Exhibit 5 backup materials.

[214]  Elzinga Report, Exhibit 5 backup materials. ((3.55-0.86)/3.55) = 0.76.

Wholesale prices also show evidence of price declines. By July 2011 the wholesale price (which is greater than net price) fell to $0.42, a drop of 88%.[215] Prof. Elzinga refers to the comparison of Wyeth's pre-competition price to the price with multiple generic sellers as "misleading" because it is one year after Teva's entry. There is nothing misleading about it. Price while colluding with Teva is not price with competition. Price with competition happens when multiple non-colluding sellers introduce real competition. In addition, Prof. Elzinga has argued that Wyeth's brand Effexor XR rebates are a form of price competition that show that Wyeth lacked significant market power prior to generic Effexor XR entry. I disagree with this interpretation but note that Wyeth's rebates increased significantly at both Teva's launch and multiple generic entry, and so, even under Prof. Elzinga's own logic, generic Effexor XR entry provoked significant increased price competition from Wyeth, evidence that Wyeth had market power before Teva's generic entry even under Prof. Elzinga's logic.

121.     Prof. Elzinga seeks to blunt the force of the evidence by claiming that there was no large price fall in net prices upon *Teva's entry*, but this is wrong too, as previously demonstrated. A correctly displayed apples-to-apples comparison of price trends makes clear that prices for Effexor XR fell sharply after Teva's entry. See Figures 5-8 above.

## B.     Gross Margins and the Lerner Index

122.     Prof. Elzinga makes several incorrect assertions regarding my use of gross margins (also known as the Lerner Index) as direct evidence of market power.[216] Gross margins, (Price – Marginal Cost)/Price, are the percent of price represented by profit after accounting for the costs of selling the product, and are an intuitive and widely used indicator of market power. Wyeth enjoyed exceptionally high gross margins on Effexor XR, in the range of 98 - 99% from 2005 – 2009, clear evidence that Wyeth had substantial market power with respect to Effexor XR.[217]

---

[215]  ((3.55-0.42)/3.55) = 0.88. This percentage drop is slightly less than shown above in Figure 8 because the figure projects Wyeth increases in net prices through 2011.

[216]  Elzinga Report, ¶¶ 99-112.

[217]  My May 2025 Report, Table 6.

123.    To elucidate the high magnitude of Wyeth's gross margins on Effexor XR, I juxtaposed them with several comparative benchmarks in my May 2025 Report.[218]  Prof. Elzinga argues that the comparative benchmarks I present are not appropriate because they are company or industry-wide gross margins rather than product-level.  His mistaken critique calls attention to strength of my comparison, not a weakness.  A company-wide (or industry-wide) comparison amounts to an average which, given the industry, includes some products for which the manufacturer also has substantial market power.  The conservative nature of these company-wide average gross margins is evident by comparing my reported Teva company-wide gross margins to the actual Teva product-level gross margins for its Effexor XR generic.  In my May 2025 Report, I note that from 2005-2009, Teva's average gross margin was 51%.[219]  By comparison, just one year after multiple product entry (2012 Q2), Teva's actual product-level gross margin for venlafaxine ER capsules was just 41%.[220]  These company and industry benchmarks are therefore conservative, as I pointed out in my May 2025 Report.[221]

124.    Prof. Elzinga's failure to distinguish between sunk and fixed costs discussed above in Section VI.A comes into play when he disputes that Wyeth's high gross margins for Effexor XR (also known as the Lerner Index) are evidence of Wyeth's market power.[222]  Prof. Elzinga contends that "the most important limitation of the Lerner Index is that it 'does not recognize that some of the deviation of [price] from [marginal cost] comes from either efficient use of scale or the need to cover fixed costs.'"[223]  My May 2025 Report considers the role of fixed costs in

---

[218]  My May 2025 Report compared Wyeth's Effexor gross margins to those of other large brand and generic drug companies, and to large U.S. firms overall.  My May 2025 Report, ¶ 150.

[219]  My May 2025 Report, Table 6.

[220]  TEVA_EFFEX_0500481.

[221]  My May 2025 Report, ¶ 150.

[222]  Prof. Elzinga coauthored an academic paper on the Lerner Index as a measure of monopoly power.  K. Elzinga and D. Mills, "The Lerner Index of Monopoly Power:  Origins and Uses," *American Economic Review*, 101(3), 2011, pp. 558-64.  He draws on some arguments he previously made in his 2011 paper for his report in this matter.  He does not, however, balance his criticism with observations he makes about the Index in his paper that go the other way, such as that the Index *understates* the difference between the monopoly price and competitive marginal cost because a monopolist may not pursue cost minimization to the same extent as a competitive firm.  *Ibid.*, p. 559.

[223]  Elzinga Report, ¶ 105.  Prof. Elzinga is quoting other authors he agrees with regarding the limitation related to fixed costs.

interpreting gross margins, as Prof. Elzinga acknowledges I do.[224]  Considering the role of fixed costs is one reason to look to comparative benchmarks with firms of similar fixed/marginal cost structures for interpreting Wyeth's gross margins on Effexor XR.  A 98% gross margin corresponds to a price set at 50 times marginal cost.  This is exceptionally high, in absolute terms, and in comparison to my benchmarks that included firms selling patent-protected brand drugs.[225]  Wyeth's Lerner Index for Effexor XR is thus clear evidence of substantial market power. Prof. Elzinga's claim that operating margins should be used in place of gross margins for assessing market power is incorrect.[226]  Operating margins net out additional costs, including marketing, ongoing R&D, and some fixed costs, in addition to costs of goods sold.[227]  These costs do not belong in the calculation to assess market power.  Marketing costs are worthwhile for a firm with high markups and are an indication of market power.  Ongoing R&D is an investment in increasing future sales of a modified product and are sunk costs.[228]  Fixed costs do not affect profit-maximizing prices.  Furthermore, the objective of the analysis is not to assess firm profitability, it is to assess the ability of a firm to profitably mark up costs.[229]  In contrast, gross margins utilize costs of goods sold which are the aggregate marginal costs of producing the product, and thus the relevant benchmark for assessing market power.[230]  Moreover, even if these other types of costs (e.g. marketing, R&D) were *incorrectly* netted out of gross profits, Wyeth's profits would remain extraordinarily high because those other cost types are dwarfed by net sales (see Figure 9 below).

---

[224]  Elzinga Report, footnote 211.

[225]  My May 2025 Report compared Wyeth's Effexor gross margins to those of other large brand and generic drug companies, and to large U.S. firms overall. My May 2025 Report, ¶ 150.

[226]  Elzinga Report, ¶ 109.

[227]  Even adding in these costs, Prof. Elzinga reports an operating margin for Wyeth of over 70% for the period 1998-2009.  Elzinga Report, ¶ 109.

[228]  See Section IV.A above.

[229]  The additional costs that are used for operating margins are not ones that are relevant for determining *marginal costs* – which is the economic standard for *perfectly competitive market prices,* and thus the relevant cost for assessing *mark up of price above competitive levels*.

[230]  My May 2025 Report, ¶¶ 148 and 150.

**FIGURE 9**
**EFFEXOR XR NET SALES COMPARED TO OPERATING COSTS**



Source: WYEFFAT06382990 and Prof. Elzinga's Exhibit 3.

125.    Prof. Elzinga argues that Wyeth would have lost money had it sold Effexor XR at the wholesale price received by generic sellers for the entire period, starting at launch.[231]  But this is an irrelevant observation, even if it is true, since Wyeth was able to and did sell Effexor XR at significantly higher prices from launch through when generic entry occurred, and had recouped its sunk R&D expenditures long before the expiration of the venlafaxine compound patent in June 2008.  Wyeth would have profited significantly from Effexor XR even if it had sold Effexor XR at the generic price starting in May 2009, after years of selling at higher prices.  Prof. Elzinga also seems to be unaware that Wyeth's successor, Pfizer, began selling an authorized

---

[231] Elzinga Report, ¶ 109.

generic form of Effexor XR on June 2011 (when multiple generics entered) with an entry NSP price of $0.34 per extended unit.[232]

126.    Prof. Elzinga adds an irrelevant argument that "The Lerner Index also is not well suited for measuring the price deviation from the social optimum in an industry like pharmaceuticals, which has dynamic innovation and economies of scale."[233]  This case is not about social optimality, it is about interference with competition and market power.  It is undisputed that there is a clear rationale for time-limited patents and the monopoly prices they provide the foundation for.  This rationale does not mean that patents do not contribute to market power.  Quite the opposite: that's the intention of the patent system.[234]

## C.    Inelastic Demand for Effexor XR

127.    I estimated demand elasticity for Effexor XR (its own-price elasticity of demand) by empirical study of the change in the rate of growth of Effexor XR sales at the time of first generic (Teva) entry in percentage terms.  I found that after 12 months, monthly quantity had fallen but far less than price had fallen, implying a highly inelastic demand, supporting my conclusion about Wyeth's market power with respect to Effexor XR.

128.    Prof. Elzinga raises two objections to my empirical analyses.  First, he claims price did not decline after Teva's generic entry.  Second, he claims that my model suffers from omitted variable bias.  Both of these criticisms are invalid.

129.    Prof. Elzinga argues that "there is no price decrease when comparing the net price for Effexor XR before the entry of Teva's AB-rated generic to the wholesale price of the latter after its launch in July 2010."[235]  I have shown this statement to be false in Section VI.B above.  Prices for Effexor XR started falling immediately after Teva's entry, as the generic was priced

---

[232]  IQVIA NSP Data.

[233]  Elzinga Report, ¶ 104.

[234]  See my May 2025 Report, ¶¶ 38-40 for discussion.

[235]  Elzinga Report, ¶ 121.

below the brand and as brand prices fell.[236]  First generic entry is a unique event in pharmaceutical markets, signaling an inevitable transition from high prices charged by a single seller to much lower prices charged first with one and then with many generic competitors.[237] My finding that Effexor XR had inelastic demand at the time of Teva's entry is unaffected by my choice of price.  Whether I calculate Effexor XR's own-price elasticity of demand using the wholesale price decline (as I did in my May 2025 report), or the decline in net prices reported by Prof. Elzinga based on SSR data, the own-price elasticity remains inelastic.[238]

130.    Prof. Elzinga's second claim is that my analysis "fails to account for other determinants of demand that may influence sales of Effexor XR and its AB-rated generics."[239]  Prof. Elzinga does not acknowledge that natural experiment methods generally, and my regression specification in particular, allow for estimation of a stimuli's effect on the outcome of interest *even if* other factors are changing over time that also influence the outcome of interest.[240]  He is incorrect for several reasons, including:

- First, my choice of an exogenous event (generic entry) reduces bias from potential confounders.  This helps isolate the effect of the price change from those other factors.

- Second, my event-study method uses an estimation window of 37 months (18 months before and after the month of the event of interest) to minimize the effect of unrelated events.[241]

---

[236] Even considering the SSR data provided by Prof. Elzinga, rather than the wholesale price declines, demand remains inelastic.  See footnote 2388 below.

[237] See footnote 193 above.

[238] The SSR net prices supplied by Prof. Elzinga show a decline in Effexor XR's net price from $3.00 to $0.86. Using these net prices in place of the wholesale prices that I used in my May 2025 Report for the arc elasticity calculation has little impact on Effexor XR's own price elasticity, increasing from -0.149 (my May 2025 Report, Table C3) to -0.219 when calculated using the net price decline.  See "OPE sensitivity.xlsx" in the backup materials to this report.

[239] Elzinga Report, ¶ 122.

[240] As a general matter, Prof. Elzinga does not critique my specific econometric analysis.

[241] My May 2025 Report, ¶ 163.

- Third, sensitivity analyses check for the effect of using shorter estimation window. A shorter window excludes additional events as possibly affecting trends in sales.

- Fourth, my time series regression specification allows for and controls for changes over time in the outcome variable (Effexor XR demand) that are caused by other factors. In other words, the effect of changes in drivers of demand that were present in the pre-period are already reflected in the pre-period trends.

- Fifth, as I show below, Prof. Elzinga's purported changes to drivers of demand near Teva's generic entry (changes in promotion, formularies, and clinical guidelines) are either non-existent or so minimal that they would have no impact on demand.

131.    As to the fifth point, Prof. Elzinga argues that I fail to control for changes in marketing around the time of generic entry.[242] In fact, there were no meaningful changes in promotion during the estimation period – either for Effexor XR or for the antidepressants he mentions (Zoloft and Wellbutrin XL).[243] Wyeth essentially stopped promoting Effexor XR when it launched Pristiq (April 2008), which it then began promoting, well before the estimation window (January 2009 through January 2012) that I used to assess the impact of generic entry for Effexor XR (see Figure 10).[244]

---

[242] Elzinga Report, ¶ 122. Prof. Elzinga argues that "[p]harmaceutical companies often change marketing and detailing efforts around the time of generic entry events, which can affect sales of their own drugs."

[243] Elzinga Report, ¶¶ 122-124.

[244] My May 2025 Report, footnote 329. See also IQVIA Channel Dynamics Data and backup materials to Figure 10 below.

FIGURE 10
MONTHLY PROMOTION DATA FOR EFFEXOR XR



Source: IQVIA Channel Dynamics data provided by Prof. Elzinga.

132.    Prof. Elzinga's claim that Zoloft and Wellbutrin XL marketing expenditures increased "dramatically" in 2010 (by 2-3 fold) ignores the existing trends of those drugs' marketing expenditures.[245]  In fact, both of these drugs went generic many years before 2010 and thus their original brand manufacturers had already decreased promotional expenditures to extremely low levels.  Zoloft expenditures were so low that they are barely distinguishable from the $0 axis on the promotional spending trend chart below.  A doubling or tripling of such a small number does not imply a meaningful economic effect.  The purported "dramatic" increases are nearly invisible

---

[245]  Elzinga Report, ¶ 124 and Workpaper 12.

on the longer trend chart, so I have labeled where Prof. Elzinga claims these big changes occur.[246]

### FIGURE 11
### MONTHLY PROMOTION DATA FOR ZOLOFT AND WELLBUTRIN XL



Source: IQVIA Channel Dynamics data provided by Prof. Elzinga.

133.     Prof. Elzinga argues that I fail to control for changes in formulary placement in my study of quantity demanded of drugs treating depression.[247]  This comment reflects a misunderstanding of basic econometrics; specifically, a misunderstanding of what variables belong on which side of a regression equation.  A change in formulary placement is a response to a manufacturer price change.  Using a measure of formulary placement as a control variable in a regression relating price to quantity would bias estimated coefficients of the effect of generic entry.

---

[246]  Prof. Elzinga is incorrect for another reason.  He misinterprets the connection between current promotion and current sales.  The economics literature recognizes that the flow of current promotion contributes to a stock of goodwill capital.  It is the stock of goodwill, not the current flow of promotion, that influences current sales.  E. Berndt, *et al.,* "Information, Marketing, and Pricing in the U.S. Antiulcer Drug Market," *The American Economic Review*, 85(2), 1995, pp. 100-105.

[247]  Elzinga Report, ¶ 125.

134.     In a related point, although Prof. Elzinga acknowledges that "[e]ntry of AB-rated generics typically triggers formulary changes, including preferred placement with lower patient cost-sharing required for these generic drugs," he argues that "some plans" may have lags in moving generic versions to the preferred tier, which would obscure the demand response to price changes.[248]  Prof. Elzinga does not undertake any aggregate analysis of formulary placement for Effexor XR or its AB-rated generics, nor does he cite to any literature that would support this statement.[249]  Even if there is such a lag, generic substitution occurs quickly and inevitably in any case.  Regulations of AB-rated generics, such as automatic substitution laws, under which a pharmacist is allowed (and sometimes mandated) to fill a prescription with the AB-rated generic if available catalyze this shift in prescriptions and subsequent price decline.[250]  This is mentioned in Prof. Elzinga's report; however, he does not acknowledge that automatic substitution rapidly ushers in lower priced generics and is a notable event to study.[251]  Moreover, PBMs have "generic tiers" with low copays irrespective of the price at which the PBM procures the product.[252]

---

[248] Elzinga Report, ¶ 125.  In my analysis, launch date for a generic is the first month when prescriptions exceed 100 in the IQVIA NPA data to account for formulary lagged response.  Furthermore, my empirical specification allows the "event" to affect the slope of the path of sales recognizing that the full effect takes place over time.

[249] Prof. Elzinga mentions two examples but makes no effort to quantify the magnitude of these purported formulary lags.  Elzinga Report, ¶ 125.

[250] My May 2025 Report, ¶ 54 ("State generic substitution laws... allow (and sometimes require) pharmacists to dispense a generic drug in place of a brand-name drug, as long as the physician does not indicate that the prescription should be 'dispensed as written.'"), citing J. Vivian, "Generic Substitution Laws," *U.S. Pharmacist*, 33(6), 2008, pp. 30-34; and Y. Song and D. Barthold, "The Power of Not Asking: How Do Generic Drug Substitution Laws Affect Patient's Demand for Generic Drugs?" Working Paper version, January 27, 2015, pp. 11-12.

[251] Elzinga Report, ¶ 140.

[252] While PBMs negotiate drug-specific rebates with manufacturers and pharmacies, MCOs and PBMs set co-payments, a fixed amount paid by the patient, according to formulary tiers. For example, the Kaiser Family Foundation (KFF) found that in a three-tiered formulary, Tier 1 drugs are generally "low-cost generics for which enrollees have the lowest copay (such as $10); drugs in Tier 2 are 'preferred brands,' which have a higher copay (for example, $35); and drugs in Tier 3 are 'nonpreferred' brands, which are covered by the plan but have a still-higher copay (for example, $60)."  My May 2025 Report, ¶ 55, citing Kaiser Family Foundation, "Employer Health Benefits: 2020 Annual Survey," 2020, p. 152 (https://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf).  See also M. Aime and J. Murdock, "A Guide to Medication Formularies: Understanding Your Prescription Medication Coverage," *GoodRx*, July 16, 2025 (https://www.goodrx.com/insurance/health-insurance/medication-formulary).

---

135.    Prof. Elzinga argues that I do not "fully account" for "contemporaneous market events such as updated clinical guidance or label expansions."[253]  Prof. Elzinga specifically notes that the American Psychiatric Association released new major depressive disorder treatment guidelines in 2010.[254]  However, these new guidelines were not as impactful as Prof. Elzinga implies.  Alan Gelenberg, who chaired the working group that wrote the new guidelines, noted that they would "offer information on developments made since the last guidelines were published in 2000" but that "no major breakthroughs in the treatment of depression have occurred."[255]  Furthermore, Prof. Elzinga makes no effort to determine what the 2010 guidelines imply for Effexor XR use.  Instead, Prof. Elzinga merely speculates "the release of these updated recommendations likely influenced prescriber behavior."[256]  Ignoring his own advice, Prof. Elzinga did not control for or even acknowledge guidelines in his comparison of "switching" rates in 2010 and 2011 discussed in Section VI.B above.[257]

## VIII.  INDIRECT EVIDENCE OF WYETH MARKET POWER

136.    My May 2025 Report considered several forms of indirect evidence for Wyeth's market power with respect to Effexor XR, summarized in Table 7 from my Report.  Prof. Elzinga criticizes some but not all of the forms of evidence I considered.[258]

---

[253] Elzinga Report, ¶ 126.

[254] Elzinga Report, ¶ 126.

[255] A. Gelenberg, "A Review of the Current Guidelines for Depression Treatment," *Journal of Clinical Psychiatry*, 71(7), 2010, e15. See article abstract (https://www.psychiatrist.com/jcp/review-current-guidelines-depression-treatment). American Psychiatric Association (APA), *Practice Guideline for the Treatment of Patients with Major Depressive Disorder*, 3rd ed., Arlington, VA: American Psychiatric Association, October 2010 (https://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/mdd.pdf).

[256] Elzinga Report, ¶ 126.

[257] See also Section IX.B below.

[258] See my May 2025 Report, ¶ 190.  Prof. Elzinga does not dispute or even mention the implications of a low own-price elasticity of demand for the magnitude of cross-price elasticities, one of the four forms of indirect evidence I assessed.  If few buyers stop buying a product as its price goes up, there are fewer available new buyers for other products, implying that the magnitudes of any cross-price elasticities are also small.

## A.    Empirical Studies of Cross-Price Elasticity of Demand

137.    My May 2025 Report found no evidence for statistically significant positive cross-price elasticity for a large set of candidate economic substitute drugs.  Prof. Elzinga conducts no regression analysis of his own.  He fails to assess the empirical importance of any of the points he raises.

### *Price Shocks Associated with Generic Entry*

138.    Prof. Elzinga recycles his mistaken argument that generic entry did not cause a drop in the net price of venlafaxine ER capsules, and that Teva's generic entry is not an appropriate event for a natural experiment.[259]  As explained above in Section VI.B, when the right data are used and interpreted correctly, it is clear that Teva's generic entry did trigger a price shock (reduction) and thus is a suitable event for the natural experiment I conducted.

139.    In addition to a series of analyses based on that natural experiment, I also examined the impact of other potential economic substitutes' generic entry on Effexor XR.  Prof. Elzinga presents the same argument that these generic events were not price shocks.[260]  As I show in Section VI.B above and Attachment B, all three examples that Prof. Elzinga shows present the data in misleading ways.  By correcting his exhibits, I show that generic entries for these drugs did introduce price declines, and the entry events are a suitable basis for a natural experiment.

140.    It is well-established that price declines following generic entry accelerate as the number of generic competitors increase.[261]  Effexor XR's generic entry is no exception – following the June 2011 entry of multiple generics,[262] venlafaxine ER prices declined even more than they did when Teva was the only generic.  Prof. Elzinga is incorrect that this additional price decline renders the Teva generic entry an inappropriate natural experiment event.  In fact, if I were to

---

[259]  Elzinga Report, ¶¶ 134-135.

[260]  Elzinga Report, ¶ 136 and Exhibit 6.

[261]  See footnote 193 above.

[262]  Seven generics entered on June 2011.  See my May 2025 Report, Table 3.

utilize the price decline upon multiple generic entry for venlafaxine ER as an additional natural experiment opportunity, this further supports my conclusions. The entry of additional generic versions of venlafaxine ER had no statistically significant impact on quantity demanded of other antidepressants, indicating that this second price event confirms a lack of cross-price elasticity between Effexor XR and other antidepressants.[263]

### *Promotion, Formulary Placement, and Out-of-Pocket Prices Affecting Quantity Demanded*

141.    Prof. Elzinga argues that I ignore several factors influencing demand that should be controlled for in my econometric analyses.[264] Prof. Elzinga is incorrect in principle that his suggested variables belong in the model. Furthermore, he fails to back up his contentions by checking his economically unsound ideas against data.

142.    Prof. Elzinga raises the same mistaken objection to my study of cross-price elasticities that he raised with respect to my study of own-price elasticity, stating that "Prof. McGuire fails to control for changes in promotional activities by competing antidepressants' manufacturers, which are known to affect drug demand."[265] As I show in Figure 10 and 11 above, Wyeth's promotion on Effexor XR and other pharmaceutical manufacturers' promotion on Zoloft and Wellbutrin XL had decreased to minimal levels well in advance of the estimation period, and thus any change in such minimal promotional efforts would not impact demand of any of these drugs.

143.    As noted above in discussion of my study of own-price demand elasticity, it would be a mistake to include formulary placement and out-of-pocket prices as right-hand side control

---

[263] As I did in my May 2025 Report, I re-evaluate the drugs and the potential for any confounding event during the estimation window. I am able to study 18 of the 20 drugs that I studied in my May 2025 Report. See "drug identification - reply.xlsx" in the backup materials to this report. My conclusions are robust to sensitivity tests. See Reply Attachment C.

[264] See Elzinga Report, ¶ 137.

[265] The quote is from Elzinga Report, ¶ 122, where he acknowledges in a footnote that as I note in my Report, Wyeth stopped promoting Effexor XR well before Teva entry so there could be no discontinuous change in the effect of Wyeth's own promotion on demand for Effexor XR. Prof. Elzinga makes the same argument in his ¶ 138.

variables.  These variables are endogenous responses to competitive shocks and would bias the estimated coefficient on generic entry.

### *Estimated Negative Cross-Price Elasticities*

144.    The results of two of the 10 main-model regressions checking for economic substitutability upon generic venlafaxine ER capsules entry (Figure 11 in my May 2025 Report) that I conducted found negative and significant estimated coefficients for Paxil CR and Cymbalta.  As an initial matter, these coefficients are not important to my findings because only *positive* and significant estimated coefficients would indicate economic substitutability, which is the point of my analysis.  In addition, in Attachment C to my May 2025 Report, I analyzed an additional 10 drugs that Prof. Elzinga does not address.  A negative cross-price effect would be associated with economic complementarity.  Prof. Elzinga argues this finding violates an "economic sense" test (in that it is unlikely market-wide that Effexor XR is an economic complement to alternative drugs used to treat depression).[266]  Contrary to Prof. Elzinga, when interpreted correctly, there is no violation of economic sense in my results.  The violation is by Prof. Elzinga.  His report fails an elementary "statistical sense" test.

145.    Statistically significant results can appear by chance.  When an investigator reports a relatively large number of independent statistical tests, the possibility that a significant effect can appear by chance needs to be kept in mind, and if called for, addressed using standard statistical methods for conducting "multiple comparisons."  My May 2025 Report did not bring in the issue of multiple comparisons to strengthen my finding of no significant economic substitutability because it was not necessary – there were no significant positive cross-price effects even without a correction for multiple comparisons.

146.    In response to Prof. Elzinga's misinterpretation of my findings, I can readily apply a basic correction for multiple comparisons, and after doing so, clarify that there is no significant

---

[266]  Elzinga Report, ¶¶ 142-149.

evidence for economic complementarity for Paxil CR and Cymbalta.[267]  And as just noted, applying such a correction *strengthens* my original findings regarding no evidence for economic substitutability.

### No Forgone Conclusion on the Relevant Market

147.    Prof. Elzinga finds the relevant market I identify to be "too narrow," while making no attempt to conduct empirical tests for economic substitution.[268]  He argues that a narrow relevant antitrust market for Effexor XR implies "each and every antidepressant drug would be its own market."[269]  I do not make this claim.  I specifically say that market power for any drug cannot be assumed but must be assessed using empirical economics tools.[270]

148.    In a related point, Prof. Elzinga criticizes my evaluation of potential economic substitutes, particularly Pristiq.[271]  Prof. Elzinga argues that "[o]mitting a major SNRI artificially narrows the set of potentially competing drugs."[272]  There is nothing "artificial" about my assessment of Pristiq, rather it is based on the well-established facts in this matter and fundamental economics.  Pristiq is omitted from regressions for a very valid reason: as a line extension of Effexor XR, it was not an economic competitor to Effexor XR prior to Effexor

---

[267] The Bonferroni method for correcting for multiple comparisons takes the p-value threshold of 0.05 (p-value<0.05) for statistical significance and divides it by the number of tests being studied.  Therefore, when applying the Bonferroni correction to the 20 drugs listed in my May 2025 Report's Table C4, a p-value must be below 0.0025 to achieve statistical significance (0.05 divided by 20 equals 0.0025).  After applying the Bonferroni correction to the 20 drugs I study, the statistically significant results of complementarity for Paxil CR and Cymbalta, for which Prof. Elzinga explicitly calls out, no longer meet the threshold for statistical significance.  The results are the same if using the Holm-Bonferroni method instead.  In the Holm-Bonferroni method, I first rank the p-values for each of the 20 drugs studied, and then use the following formula is used to get the Holm Bonferroni adjusted p-value: Adjusted p-value = p-value*(number of tests-rank+1).  J. Romano, A. Shaikh, and M. Wolf, "Hypothesis Testing in Econometrics," *Annual Review of Economics*, 2(1), 2010, pp. 75-104 at pp. 97-98.  See "multiple comparisons.xlsx" in the backup materials to this report.

[268] Elzinga Report, ¶ 129.

[269] Elzinga Report, ¶ 129.

[270] Similarly, "substantial market power for a successful brand drug is to be expected but cannot be assumed; assessing it for a particular product is an empirical task."  My May 2025 Report, ¶ 40.

[271] Elzinga Report, ¶ 139.

[272] Elzinga Report, ¶ 139.

---

XR's loss of exclusivity because both Effexor XR and Pristiq were controlled by the same firm, Wyeth.[273]

149.    Additionally, Prof. Elzinga ignores my analysis of alternative relevant markets.  Even though I concluded that products on which Wyeth received profits (i.e., Pristiq, Osmotica's non-AB venlafaxine ER product, and venlafaxine IR) were not economic competitors, I nonetheless conservatively calculated market shares of a relevant market that included them.  Ultimately, this alternative, conservative approach leaves Wyeth with dominant shares of the relevant antitrust market and does not change my opinion that Wyeth had substantial market power with respect to Effexor XR in the relevant market.[274]

## B.    The Hypothetical Monopolist Test and Wyeth Market Power

150.    The fact that Wyeth was able to maintain the price of Effexor XR at a price well above the competitive level (observed after multiple generic entry) for years until generics finally entered indicates clearly that the Hypothetical Monopolist could profitably sustain such a price.[275]  Thus, no additional products need to be added to the relevant antitrust market: The test indicates that brand Effexor XR and its AB-rated generics belong in the same antitrust market, whereas other drugs do not.

151.    Prof. Elzinga makes three off-hand, poorly explained, and flatly wrong, criticisms of my application of the Test.[276]

- First, Prof. Elzinga asserts, "The [Hypothetical Monopolist Test] hinges on Prof. McGuire's finding that there is low elasticity of demand for Effexor XR and its AB-rated generics."  False.  It doesn't hinge on my demand study, it hinges on the price before and after generic

---

[273] See *e.g.* my May 2025 Report, ¶¶ 127-128.  Products that I evaluated in my May 2025 Report that had confounding events, such as a recent brand launch in relation to the estimation window or own generic entry within the estimation window, were excluded from regressions.  See my May 2025 Report, ¶ 183 and footnote 353.  In addition to being a line extension of Effexor XR, Pristiq also falls in the former category – a recently launched drug in relation to the estimation period.

[274] My May 2025 Report, ¶¶ 204-205.

[275] My May 2025 Report, ¶ 211.

[276] Elzinga Report, ¶¶ 151-153.  In total, he devotes 14 lines of his report to these three points.

Effexor XR competition.  Prof. Elzinga neglects to explain his reasoning behind this mistaken assertion.

- Second, Prof. Elzinga contends that generic entry should not be conceptualized as a price fall for Effexor XR.[277]  This surprising statement goes against the well-accepted idea that AB-rated generics are near perfect economic substitutes for the brand version and their price can certainly be regarded as a price fall for the product.  Prof. Elzinga attempts to support this statement with an allusion to different brand and generic cost structures.[278]  His argument makes no sense.

- Third, Prof. Elzinga points out that the Merger Guidelines "recognize that other evidence of competition should be considered when available, including evidence of non-price competition."[279]  It is true that in theory a Hypothetical Monopolist might lower quality and/or raise price after attaining additional market power.  This possibility is not relevant here – the "quality" of Effexor XR does not change before and after generic entry.

## IX.    PROF. ELZINGA'S ANALYSIS

152.    Prof. Elzinga reviews business documents and conducts an analysis of PBM claims and MEPS data to study "switching."[280]  Prof. Elzinga draws invalid conclusions from these analyses, including his calculation of market shares, discussion of barriers to entry, and portrayal of the role of supply elasticity.[281]

---

[277]  I quote Elzinga Report, ¶ 152 in full:

"Further, Prof. McGuire's HMT conceptualizes generic entry as equivalent to an actual price decline in Effexor XR, but this conceptualization is flawed. As I discuss throughout this report, branded drugs differ from their generic counterparts along various dimensions, and the cost structures to produce branded drugs differ dramatically from the cost structures to produce generic drugs, which lead to different prices for branded versus generic drugs."

[278]  Elzinga Report, ¶ 152.

[279]  Elzinga Report, ¶ 153.

[280]  Elzinga Report, Section IX.B.

[281]  Elzinga Report, Section X.

## A.     Clinical Guidelines and Business Documents

153.     Prof. Elzinga's Section IX.B covers much of the same ground as my May 2025 Report, Attachment C.  We rely on some of the same sources.[282]  I disagree with some of Prof. Elzinga's interpretations of the documents and data.

154.     The main difference between us is how we use the documents.  We both consider the documents as potentially informative about substitutability.  Prof. Elzinga makes comments on the documents and stops there.[283]  I moved to the next step of using the discussion of alternatives in the documents to generate a list of candidate economic substitutes for Effexor XR.[284]  I then conducted a series of econometric tests for the presence and magnitude of any cross-price elasticity to indicate economic substitutability based on this list.[285]  Prof. Elzinga conducted no empirical analysis of any potential substitute.

155.     Prof. Elzinga ignores the critical distinction between clinical alternatives and economic substitutability.  It is economic substitutability, not merely being a clinical alternative, that constrains the exercise of market power.[286]  This is the principal reason why testing for the presence and magnitude of cross-price elasticity, not merely commenting on clinical guidelines and other material, is required to assess economic substitutability.  Failing to test for economic substitutability when he had the ability to do so is one of the major omissions in Prof. Elzinga's report.

### *Clinical Guidelines*

156.     Prof. Elzinga and I both begin with the observation that clinical guidelines are about therapeutic (clinical) substitutability.[287]  Prof. Elzinga goes too far when he argues that

---

[282] *E.g.*, APA, *op. cit.*

[283] See Elzinga Report, Section IX.B.

[284] My May 2025 Report, Attachment C, Section C.II, ¶¶ 8-19.

[285] My May 2025 Report, Section VII.C and Attachment C.

[286] My May 2025 Report, ¶ 172.

[287] Elzinga Report, Section IX.B.  Prof. Elzinga acknowledges this is my position as well.  Elzinga Report, ¶ 160.

"[McGuire's] opinion that the relevant economic market does not include other molecules in the therapeutic class is at odds with medical guidelines on antidepressant prescribing."[288]  There is no "at odds" at issue.  Drugs can be therapeutic substitutes but not economic substitutes.  Analysis of economic substitutability does not stop at commenting on clinical guidelines.[289]  Empirical testing of economic substitution is necessary.  Prof. Elzinga fails to do so.

### *Business Documents*

157.    Prof. Elzinga states, "Wyeth's internal documents… reveal that the firm closely monitored the prices of other [second generation antidepressants] when making strategic decisions regarding Effexor XR."[290]  He further argues that if my conclusion that "the relevant market consists of a single molecule were true, it would not make economic sense for Wyeth to consider these competitor prices in their decision-making process."[291]

158.    Pharmaceutical companies routinely conduct "market" research, a common business practice.[292]  This "market" is not the same as a relevant antitrust market.  Outside of antitrust, the term "market" is used more broadly and would likely include products that would not qualify for membership in a relevant antitrust market.  While material from the business documents is useful for identifying potential candidate economic substitutes, the business documents themselves do not define the relevant antitrust market.  A firm like Wyeth might designate another drug as being in a business "market" if it were a therapeutic alternative to Effexor XR, whether or not it was an economic substitute and introduced competition based on price.

---

[288]  Elzinga Report, ¶ 155.

[289]  See American Bar Association. *Section of Antitrust Law, Pharmaceutical Industry Antitrust Handbook*, 2nd ed., Chicago, IL: ABA Publishing, 2018, pp. 161, cited in my May 2025 Report, ¶ 137 ("Mere functional substitutability is not enough to define a relevant product market.").  See also *ibid.*, pp. 163-164 ("Thus, functional or therapeutic substitutability does not necessarily suggest price constraint among branded products.").

[290]  Elzinga Report, ¶ 183.

[291]  Elzinga Report, ¶ 183.

[292]  See Attachment C from my May 2025 Report.

159.     Prof. Elzinga notes examples of Wyeth's decisions on Effexor XR prices referring to prices of other antidepressants to demonstrate Wyeth competed on price with these other drugs. He explicitly highlights Wyeth's decision to increase the price of Effexor XR as other antidepressants were raising prices.[293]  It is common business practice for a company like Wyeth to track prices and formulary placement of therapeutic substitutes.  Prof. Elzinga's observation is insufficient to attach any causal economic relationship between prices.  As my discussion of the Cellophane Fallacy referenced above implies, any "competitive effect" of pricing at these high levels does not contradict the presence of Wyeth's substantial market power.

160.     Prof. Elzinga also claims, "large price concessions are another indication that Effexor XR was competing with other antidepressants.  Otherwise, there would be no reason to provide such large rebates and price concessions had Wyeth been a monopolist prior to generic entry."[294] Prof. Elzinga provides a few examples of PBM contracts.  As noted above, Prof. Elzinga falls victim to the Cellophane Fallacy.  The offer of rebates at high monopoly prices does not contradict the presence of substantial market power.  These concessions translate to access and favorable formulary placement and are not inconsistent with monopoly pricing.

161.     Prof. Elzinga also makes the unsound claim that Wyeth's practice of providing "free samples" to physicians contradicts a conclusion that Wyeth had substantial market power.[295]  A monopolist wants to expand its market by introducing its product to new users.  Prof. Elzinga's observation is irrelevant to an empirical assessment of Wyeth market power.

## B.     "Switching" Analyses

162.     Prof. Elzinga presents data on six patients who used a different antidepressant before using Effexor XR in his Exhibit 7.  He claims without support that, "The patient history examples … are not simply isolated occurrences but rather reflect a broader pattern of

---

[293]  Elzinga Report, ¶ 184.

[294]  Elzinga Report, ¶ 189.

[295]  Elzinga Report, ¶ 190.

substitution between Effexor XR or its AB-rated generics and other antidepressants."[296]  Prof. Elzinga's six patients provide no support for economic substitutability between Effexor XR and any other product.  Six hand-picked patients in a market with millions of users have trivial empirical weight.  Prof. Elzinga cannot tell whether his patients even have depression or how their clinical condition might be changing over time.  Further, Prof. Elzinga cannot, with his examples, distinguish between therapeutic and economic substitution.  In other words, Prof. Elzinga cannot say whether patients switched for therapeutic reasons, or for price reasons, or for some other reason.[297]

163.    Prof. Elzinga, in his Exhibits 8, 9, 10, and 11 (A and B), presents data from three large PBMs and the Medical Expenditure Panel Survey (MEPS) on shares of patients using various antidepressants and on rates on his definition of "switching" between antidepressants.  Prof. Elzinga portrays these data sets as being very large but never reports a sample size or confidence interval to support his empirical statements, as would be expected in an empirical analysis.[298]

164.    As described in Section VI.B above, these analyses are highly misleading.  Prof. Elzinga does not present the relevant "switching rate."

165.    Furthermore, claims data analyses are not well-suited to determine the relevant market. While Prof. Elzinga describes these claims data as "large-scale" and the MEPS data to be nationally representative,[299] the IQVIA data that I rely upon is better able to determine aggregate results appropriate for evaluating market-level cross-price elasticity of demand.[300]

---

[296] Elzinga Report, ¶ 168.

[297] Elzinga Deposition, pp. 306-307 and 314.

[298] See Elzinga Report, ¶ 162, where he refers to between 27 million and 136 million prescriptions for antidepressants in the PBM data and, in footnote 306, over 800,000 "observations of patients" who use antidepressants.  He avoids reporting the sample size for his selective analyses.

[299] Elzinga Report, ¶¶ 15 and 162.

[300] IQVIA data are widely recognized as the "'gold standard' of pharmaceutical data by researchers and industry participants, such as Wyeth and Teva.  See my May 2025 Report, ¶ 50, footnotes 74, and 278.  See also footnote 198 above regarding Prof. Elzinga's inability to identify a patient switch due to price.

## C.    Market Shares, Barriers to Entry, and Supply Elasticity

166.    Prof. Elzinga's report contains a discursive discussion of issues of market shares, barriers to entry, and supply elasticity of potential competitors as relevant to assessing market power.[301] His assertions in this section rely on incorrect and unsupported assumptions regarding the relevant market in this matter, leaving his comments unhelpful in assessing Wyeth's market power.  Contrary to Prof. Elzinga assertions, the data show that Wyeth had a very large share of the relevant market, the relevant market had substantial barriers to entry (as is typical in the pharmaceutical industry), and there is no evidence that supply elasticity of other antidepressants restrained Wyeth's monopoly pricing for Effexor XR.

167.    As discussed extensively above, Prof. Elzinga has no support for his argument that Effexor XR's relevant market includes "virtually all [second generation antidepressants]."[302]  He fails to conduct an empirical analysis of cross-price elasticity or apply the logic of the Hypothetical Monopolist Test to affirmatively define the market, rendering his "market share" calculations meaningless.  When the market is properly defined, Wyeth's share is extraordinarily high and clear evidence of Wyeth's market power.[303]

168.    Prof. Elzinga discusses barriers to entry.  He and I both acknowledge that the pharmaceutical industry has unique regulations limiting supply and similarly define a barrier to entry as "a cost that new entrants must bear that incumbent firms did not have to shoulder."[304] The apparatus of pharmaceutical regulations contains legal and regulatory exclusivities that are undeniable barriers to entry for generics.  Prof. Elzinga falls back on the argument that other branded antidepressants launched during the time periods of Wyeth's alleged misconduct.  He

---

[301]  Elzinga Report, ¶ 205.

[302]  Elzinga Report, ¶ 206.  Prof. Elzinga acknowledges that "relevant markets are defined to encompass the most narrowly defined lines of business that could be profitably monopolized. … If the market is defined too broadly, the degree of competition facing these firms will be exaggerated."  Elzinga Report, ¶¶ 73 and 75.  Prof. Elzinga's violates this tenant when he purposes a relevant market containing "virtually all second generation antidepressants" without conducting any empirical analyses.

[303]  See my May 2025 Report, ¶¶ 203-205 and 211.

[304]  Elzinga Report, ¶ 210.  See my May 2025 Report, ¶ 153.

states, "This stream of successful new products is evidence that there were no high barriers to entry sufficient to protect Wyeth's position in a market for antidepressants," a surprising and completely incorrect statement.[305]  While other branded antidepressants did launch during this period of time, my analysis of cross-price elasticity of demand indicates that none competed with Effexor XR on price.  Furthermore, Prof. Elzinga contradicts himself.  Elsewhere in his report he argued that costs of developing and obtaining regulatory approval for a new drug can be substantial.[306]  Can Prof. Elzinga possibly believe these costs and the need for FDA approval to launch do not constitute a barrier to entry?  They clearly do.

169.     Prof. Elzinga also offers comments on the role of supply elasticity – the percentage increase in quantity supplied (by a firm or by an industry) in response to a percentage increase in the price of a product.  Only a product's economic substitutes in demand could restrain price of the product in question.  Therefore, supply elasticity must be viewed in the context of the properly defined relevant market that is based on demand-side substitution.[307]  Prof. Elzinga conducts no appropriate analysis of demand-side substitution.

170.     Furthermore, Prof. Elzinga neglects the basic economics of demand and supply.  Supply elasticity is already accounted for in the study of the own-price elasticity of demand.[308]  And supply elasticity is already accounted for in the Hypothetical Monopolist Test.  If competitors increased supply greatly, the Hypothetical Monopolist would not be able to profitably implement

---

[305]  Elzinga Report, ¶ 214.

[306]  Wyeth long ago covered its R&D costs for Effexor XR.  According to Prof. Elzinga's Exhibit 4, Wyeth's R&D for Effexor XR prior to launch totaled $66.4 million.  In its first year on the market, Effexor XR net sales were $204.7 million or 3 times the previous R&D.  Even if Effexor IR R&D costs were conservatively included for Effexor XR, net sales of Effexor XR were approximately 1.5 times the previous R&D.  See Elzinga Report, Exhibit 4 and WYEFFAT06382990.  Figure 9 above also demonstrates that Effexor XR net sales were magnitudes above R&D costs throughout its exclusivity.

[307]  See DOJ and FTC, "Merger Guidelines," December 18, 2023, § 4.3.D.3 (https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf) ("Market definition focuses solely on demand substitution factors…. Supplier responses may be considered in the analysis of competition between firms, entry and repositioning, and in calculating market shares and concentration." Internal references removed).

[308]  As a seller increases price, supply elasticities of competitors take sales.  If there is no/little alternative supply, demand is inelastic, as I found here.  If supply elasticity of competitors were high, by contrast, own-price demand would be elastic as well.

and sustain a small but significant increase in price.  Prof. Elzinga's discursive comments are unhelpful for evaluating Wyeth's market power in this case.

## X.  CONCLUSION

171.    For the reasons set out above, nothing in the reports of Dr. Cremieux or Prof. Elzinga cause me to change my opinions in my May 2025 Report.

_____

Thomas G. McGuire, Ph.D.

September 18, 2025

**REPLY ATTACHMENT A**

REPLY ATTACHMENT A

MATERIALS CONSIDERED

**Bates Documents**

TEVA_EFFEX_0162035.

TEVA_EFFEX_0162095.

TEVA_EFFEX_0166761.

TEVA_EFFEX_0166768.

TEVA_EFFEX_0166770.

TEVA_EFFEX_0166778.

TEVA_EFFEX_0166779.

TEVA_EFFEX_0342067.

TEVA_EFFEX_0440656.

TEVA_EFFEX_0440657.

TEVA_EFFEX_0443328.

TEVA_EFFEX_0443329.

TEVA_EFFEX_0498788.

TEVA_EFFEX_0499088.

TEVA_EFFEX_0500481.

TEVA_EFFEX_0617714.

TEVA_EFFEX_0641185.

TEVA_EFFEX_0752832.

TEVA_EFFEX_0752834.

TEVA_EFFEX_0863427.

TEVA_EFFEX_0906117.

WYEFFAT04649501.

WYEFFAT05979443.

WYEFFAT06382990.

WYEFFAT06426692.

WYEFFAT06452251.00001.

WYEFFAT06847939.

WYEFFAT06859914.

WYEFFAT07645434.

WYEFFAT08172778.

WYEFFAT2163587.

WYEFFAT2394360.

WYEFFAT2951300.

WYEFFAT3311977.

WYEFFAT3609860.

WYEFFAT3613120.

WYEFFAT3650173.

WYEFFAT3709177.

WYEFFAT3712553.

WYEFFAT3753515.

WYEFFAT3767261.

WYEFFAT3767262.00001.

WYEFFAT3781144.

WYEFFAT3786460.

WYEFFAT3786771.

**Legal Documents in This Matter**

Deposition of Kenneth Elzinga, in this matter, September 10, 2025.

Deposition of Jennifer Wodarczyk, in this matter, February 26, 2025.

Deposition of Pierre-Yves Cremieux, in this matter, September 11, 2025.

Deposition of William S. Marth, in this matter, February 26, 2025.

Expert Report of Connie Lin, in this matter, May 15, 2025.

Expert Report of Daisy Rivera-Muzzio, in this matter, May 15, 2025.

Expert Report of Donald S. Allen, in this matter, May 15, 2025.

Expert Report of Prof. Thomas G. McGuire, Ph.D., in this matter, May 15, 2025.

Rebuttal Expert Report of Connie Lin, in this matter, September 9, 2025.

Expert Report of Pierre-Yves Cremieux, Ph.D., in this matter, July 17, 2025.

Expert Report of Prof. Kenneth G. Elzinga, in this matter, July 17, 2025.

**Electronic Data**

FDA, "Drugs@FDA: FDA-Approved Drugs," (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm).

FRED, "Canadian Dollars to U.S. Dollar Spot Exchange Rate," (https://fred.stlouisfed.org/graph/?g=Gb51).

FRED, "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," (https://fred.stlouisfed.org/series/CPIAUCSL).

IQVIA NPA Data.

IQVIA NSP Data.

**Other Documents**

Aime, M. and J. Murdock, "A Guide to Medication Formularies: Understanding Your Prescription Medication Coverage," *GoodRx*, July 16, 2025 (https://www.goodrx.com/insurance/health-insurance/medication-formulary).

American Bar Association. *Section of Antitrust Law, Pharmaceutical Industry Antitrust Handbook*, 2nd ed., Chicago, IL: ABA Publishing, 2018.

American Psychiatric Association (APA), *Practice Guideline for the Treatment of Patients with Major Depressive Disorder*, 3rd ed., Arlington, VA: American Psychiatric Association, October 2010 (https://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/mdd.pdf).

Berndt, E., *et al.,* "Information, Marketing, and Pricing in the U.S. Antiulcer Drug Market," *The American Economic Review*, 85(2), 1995, pp. 100-105.

Briet, W. and K. Elzinga, *Antitrust Casebook: Milestones in Economic Regulation*, 3rd ed., New York, NY: Dryden Press, 1997, at pp. 196-201.

Carlton, D. and J. Perloff, *Modern Industrial Organization,* 4th ed., Boston, MA: Pearson/Addison-Wesley, 2005.

CBO, "Prescription Drugs: Spending, Use, and Prices," January 2022 (https://www.cbo.gov/publication/57772).

CBO, "The Budget and Economic Outlook: 2025-2035," January 2025 (https://www.cbo.gov/system/files/2025-01/60870-Outlook-2025.pdf).

Colander, D., *Microeconomics*, 12th ed., New York, NY: McGraw Hill, 2024.

Conrad, R. and R. Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," FDA Report, December 2019 (https://www.fda.gov/media/133509/download).

Conti, R. and E. Berndt, "Specialty Drug Prices and Utilization after Loss of US Patent Exclusivity, 2001–2007," in A. Aizcorbe, *et al.*, eds., *Measuring and Modeling Health Care Costs*, University of Chicago Press, 2018, pp. 273-321.

Cremieux, P., *et al.*, "Pay-For-Delay & Stock Prices: Smoking Gun Or Damp Squib?" *Law360*, August 24, 2016 (https://www.analysisgroup.com/globalassets/insights/publishing/law360_pay_for_delay.pdf).

Dafney, L., C. Ody, and M. Schmitt, "When Discounts Raise Costs: The Effect of Copay Coupons on Generic Utilization," *American Economic Journal: Economic Policy*, 9(2), 2017, pp. 91-123.

DOJ and FTC, "Merger Guidelines," December 18, 2023, § 4.3.D.3 (https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf).

Drake, K. and T. McGuire, "The Simple Math of Royalties and Drug Competition During the 180-Day Generic Exclusivity Period," *Journal of Competition Law and Economics*, 20(1-2), 2024, pp. 50-59.

Drake, K. and T. McGuire, "Using Stock Price Movements to Estimate the Harm from Drug Patent Litigation Settlements," *Journal of Health Economics*, 103, 2025, 103054.

Drake, K., *et al.*, "No Free Launch: At-Risk Entry by Generic Drug Firms," *International Journal of the Economics of Business*, 29(3), 2022, pp. 301-15.

Edlin, A., *et al.*, "The Actavis Inference: Theory and Practice," *Rutgers University Law Review*, 67, 2015, pp. 585-635.

Elhauge, E. and A. Krueger, "Solving the Patent Settlement Puzzle," *Texas Law Review*, 91, 2012, pp. 283-330.

Elzinga, K. and A. MacKay, "Econ 2010: Principles of Microeconomics," Fall 2024 (https://economics.virginia.edu/sites/economics.as.virginia.edu/files/2025-03/ECON%202010-%20Elzinga.pdf).

Elzinga, K. and D. Mills, "The Lerner Index of Monopoly Power: Origins and Uses," *American Economic Review*, 101(3), 2011, pp. 558-64.

FDA, "FDA Drug Safety Communication: Abnormal Heart Rhythms Associated with High Doses of Celexa (citalopram hydrobromide)," August 24, 2011 (https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-abnormal-heart-rhythms-associated-high-doses-celexa-citalopram).

FDA, "FDA Drug Safety Communication: Revised Recommendations for Celexa (citalopram hydrobromide) Related to a Potential Risk of Abnormal Heart Rhythms With High Doses," March 28, 2012 (https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-revised-recommendations-celexa-citalopram-hydrobromide-related).

Federal Trade Commission, "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact," August 2011 (https://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission).

Federal Trade Commission, Complaint Counsel's Post-Trial Reply Brief, *In the Matter of Impax Laboratories, Inc*., Public Docket No. 9373, February 14, 2018 (https://www.ftc.gov/system/files/documents/cases/180214ccp osttrialreplybrief589661.pdf).

Foley, S., "GSK Shares Dive as Rival Launches Cheaper Version of Augmentin," *Independent*, July 17, 2002 (https://www.independent.co.uk/news/business/news/gsk-shares-dive-as-rival-launches-cheaper-version-of-augmentin-184602.html).

Gelenberg, A., "A Review of the Current Guidelines for Depression Treatment," *Journal of Clinical Psychiatry*, 71(7), 2010, e15 (https://www.psychiatrist.com/jcp/review-current-guidelines-depression-treatment).

Grabowski, H. and J. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, 35(2), 1992, pp. 331-50.

Hovenkamp, H., *Federal Antitrust Policy: The Law of Competition and Its Practice*, 5th ed., St. Paul, MN: West Publishing, 2016.

Iacocca, K., J. Sawhill, and Y. Zhao, "Why Brand Drugs Priced Higher than Generic Equivalents," *International Journal of Pharmaceutical and Healthcare Marketing*, 9(1), 2015, pp. 3-19.

IMS Institute for Healthcare Informatics, "Price Declines after Branded Medicines Lose Exclusivity in the U.S.," January 2016 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/price-declines-after-branded-medicines-lose-exclusivity-in-the-us.pdf).

Ippolito, B. and J. Levy, "Best Practices Using SSR Health Net Drug Pricing Data," *Health Affairs Forefront*, March 10, 2022 (https://www.healthaffairs.org/content/forefront/best-practices-using-ssr-health-net-drug-pricing-data).

Kaiser Family Foundation, "Employer Health Benefits: 2020 Annual Survey," 2020 (https://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf).

Kallberg, C., *et al*., "The Effect of Generic Market Entry on Antibiotic Prescriptions in the United States," *Nature Communications*, 12(2937), 2021.

Kraemer, A., "Wyeth Announces Launch of Own Generic Version of Protonix," *Drug Store News*, January 30, 2008 (https://drugstorenews.com/pharmacy/wyeth-announces-launch-own-generic-version-protonix).

Long, H., "Israelis' $7.4bn Buy Creates World's Biggest Generic Drug Firm," *The Guardian*, July 25, 2005 (https://www.theguardian.com/business/2005/jul/26/israel.internationalnews).

McGuire, T., *et al.*, "A 'Smoking Gun' In Reverse-Payment Settlements," *Law360*, July 29, 2016 (https://www.law360.com/articles/821969/a-smoking-gun-in-reverse-payment-settlements).

Romano, J., A. Shaikh, and M. Wolf, "Hypothesis Testing in Econometrics," *Annual Review of Economics*, 2(1), 2010, pp. 75-104.

Sanofi US News, "Sanofi-Aventis: Solid Results in 2010," February 9, 2011 (https://www.news.sanofi.us/press-releases?item=118548).

Song, Y. and D. Barthold, "The Power of Not Asking: How Do Generic Drug Substitution Laws Affect Patient's Demand for Generic Drugs?" Working Paper version, January 27, 2015.

*United Food & Commercial Workers Local 1776  v. Teikoku Pharma United States*, 296 F. Supp. 3d 1142 (N.D. Cal. 2017).

Vivian, J., "Generic Substitution Laws," *U.S. Pharmacist*, 33(6), 2008, pp. 30-34.

**REPLY ATTACHMENT B**

REPLY ATTACHMENT B

**Cross-Price Elasticity Natural Experiments**

*Prices of Potential Substitutes Decline at Time of Their Generic Entries*

1.        Prof. Elzinga introduces SSR net price data for Effexor XR (his Exhibit 5) and three other products that underwent generic entry:  Cymbalta, Lexapro, and Luvox CR (his Exhibit 6).  I address Prof. Elzinga's Exhibit 5 pertaining to Effexor XR in Section VI.B of the body of this Reply Report.  As to Cymbalta, Lexapro, and Luvox CR, these are three out of the seven potential substitutes on which I conducted symmetric natural experiments to study the effect of these products' generic entries on quantity of sales of Effexor XR.  Prof. Elzinga argues that, for these three drugs, "the initial generic entry dates used by Prof. McGuire were not in fact accompanied by a substantial price decline."[1]  As I show below, his claim of an absence of decline for these three drugs is misleading for similar reasons as in connection with his Exhibit 5 (see Section VI.B of the body of this Reply Report) and when the price data are displayed properly, all three Exhibit 6 drugs show price declines following their generic entries.

2.        First, Prof. Elzinga distorts the timing of price changes at the time of generic entry in his Exhibit 6, just as he did for Effexor XR in his Exhibit 5.  Below I present Prof. Elzinga's own data, but with the corrected timing to avoid a misleading impression (analogous to Figure 5 in the body of this Reply Report).  As I explain in Section VI.B of this Reply Report, a price decline could be driven by the *brand* manufacturer (via reductions in brand price), the *generic* manufacturers' pricing (e.g., entering at a price lower than the pre-generic entry brand price), or *both*.  SSR data are limited to *brand* net prices so can only be used to assess brand net price changes.  SSR data show that Cymbalta and Lexapro brand net prices declined at generic entry, Luvox CR did not.  In the absence of generic net price data from SSR or discovery, I return to an apples-to-apples comparison by comparing wholesale prices before and after generic entry.  In Figure B.2 below, I show that Luvox CR's wholesale prices dropped markedly at generic entry (as did the wholesale prices of Cymbalta and Lexapro).

3.        Second, Prof. Elzinga's truncated displays of the price series for Cymbalta, Lexapro and Luvox CR neglect their increasing trends in net prices that were interrupted by generic entry.  As

---

[1]  Elzinga Report, ¶ 136.

I do for Effexor XR, I utilize these existing price trends to project what the brand net prices for Cymbalta, Lexapro, and Luvox CR would have been in the quarter that their generics entered had their upward price trajectories continued.  Relative to these projected prices, the brand net prices for Cymbalta, Lexapro, and Luvox CR represent price declines of 41%, 18%, and 2%, respectively, in the first quarter of generic entry.

FIGURE B.1
SSR NET PRICE DATA FOR BRAND DRUGS



Source: SSR Data provided by Prof. Elzinga.



**FIGURE B.2**
**DECLINE IN THE WHOLESALE PRICES FOLLOWING GENERIC ENTRY**

Source: IQVIA NSP Data.

*Potential Substitutes' Generic Entries Remain Appropriate Natural Experiments*

4.    When Cymbalta, Lexapro, and Luvox CR price data are presented appropriately they clearly show that these products' generic entries were associated with meaningful price declines, confirming that these events are an appropriate basis for natural experiments studying the effect of these price declines on Effexor XR quantity demanded (i.e. symmetric cross-price elasticities).[2]  Note that I study the economic relationship between Effexor XR and these drugs two ways.  First, examining the effect of entry of a generic form of Effexor XR on demand for these drugs (cross-price elasticities).  Second, the symmetrical effect of entry of a generic form

_____
[2]  These symmetric cross-price elasticities are presented in Table C5 and C8 of my May 2025 Report.

of these drugs on demand for Effexor XR (Tables C5 and C8).[3]  There is no evidence of economic substitutability in any of these empirical analyses.


**Alternate Calculation of Effexor XR Net Prices**

5.       While Prof. Elzinga relies on SSR data for his Effexor XR net prices, I utilize actual Effexor XR net sales from Wyeth discovery to calculate Wyeth's net prices on Effexor XR in my Figures 7 and 8 of this Reply Report.  In the main body of this Reply Report, I calculate Effexor XR's net price by applying IQVIA retail quantity data to Wyeth's own net sales data.  I state that the conclusions on net price are unchanged when using IQVIA *wholesale* quantity data in place of *retail* data.  Below in Figure B.3, I replicate Figure 8 using wholesale quantity data for Effexor XR.  Effexor XR's price trends are similar regardless of whether wholesale or retail quantity are used to calculate the net prices, and my conclusions are unchanged.

---

[3]  Cross-price elasticities estimated from Effexor XR's generic entry are presented in my May 2025 Report, Tables C4 and C7.  Symmetric cross-price elasticities are presented in Tables C5 and C8 of my May 2025 Report.

**FIGURE B.3**
**WYETH AND TEVA NET PRICE DATA FOR EFFEXOR XR**



REPLY ATTACHMENT C

REPLY ATTACHMENT C

TABLE C.1
ESTIMATED CHANGE IN PRESCRIBING TREND FOR POTENTIAL SUBSTITUTE
DRUGS AFTER MULTIPLE ENTRIES OF GENERIC EFFEXOR ER
(JUNE 2011)

|  | Estimated change in trend[A] | p-value of estimated coefficient |
|---|---|---|
| *Top-prescribed "newer" antidepressants* | | |
| Paxil | 0.713** | 0.001 |
| Paxil CR | 0.382** | 0.036 |
| Prozac | 0.592** | 0.003 |
| Zoloft | 0.231 | 0.161 |
| Cymbalta | 0.048 | 0.791 |
| Wellbutrin | 0.241 | 0.232 |
| Wellbutrin SR | -0.069 | 0.723 |
| Wellbutrin XL | 0.440** | 0.013 |
| *Other antidepressants* | | |
| Luvox | 0.002 | 0.990 |
| Desyrel | 0.273 | 0.147 |
| Remeron | 0.100 | 0.564 |
| Serzone | 0.812** | 0.005 |
| Elavil | 0.640** | 0.002 |
| Pamelor | 0.306* | 0.095 |
| Sinequan | 0.179 | 0.378 |
| Tofranil | 0.257 | 0.122 |
| MAO Inhibitors | 0.321* | 0.050 |
| *Other form of venlafaxine* | | |
| Venlafaxine IR | -0.321* | 0.082 |

[A] Estimate of coefficient c in equation [1].
Statistical significance:  * p-value of <0.10; ** p-value <0.05.

## TABLE C.2
### SENSITIVITY ANALYSES (JUNE 2011)

| | Estimated impact of generic entry | | | | | |
|---|---|---|---|---|---|---|
| | 12-month [A] | p-value | ITSA [B] | p-value | Newey-West [A] (lag months) | p-value |
| Top-prescribed "newer" antidepressants | | | | | | |
| Paxil | 1.303** | 0.000 | 7.143** | 0.001 | 0.713** (0) | 0.001 |
| Paxil CR | 0.431 | 0.176 | 3.975 | 0.102 | 0.382** (3) | 0.000 |
| Prozac | 1.091** | 0.002 | 5.801** | 0.004 | 0.592** (0) | 0.003 |
| Zoloft | 0.439 | 0.128 | 1.519 | 0.407 | 0.231** (3) | 0.027 |
| Cymbalta | 0.040 | 0.906 | 4.882** | 0.014 | 0.048 (3) | 0.716 |
| Wellbutrin | 0.380 | 0.190 | 0.408 | 0.845 | 0.241 (0) | 0.232 |
| Wellbutrin SR | 0.396 | 0.179 | -1.812 | 0.404 | -0.069 (3) | 0.663 |
| Wellbutrin XL | 0.589* | 0.058 | 4.814** | 0.021 | 0.440** (3) | 0.000 |
| Other antidepressants | | | | | | |
| Luvox | 0.052 | 0.860 | 0.305 | 0.868 | 0.002 (3) | 0.981 |
| Desyrel | 0.652** | 0.040 | 1.18 | 0.599 | 0.273* (3) | 0.079 |
| Remeron | 0.174 | 0.556 | -2.144 | 0.416 | 0.100 (3) | 0.537 |
| Serzone | 2.283** | 0.011 | 9.172** | 0.004 | 0.812** (0) | 0.005 |
| Elavil | 1.159** | 0.001 | 4.688** | 0.037 | 0.640** (0) | 0.002 |
| Pamelor | 0.733** | 0.024 | 0.744 | 0.731 | 0.306** (3) | 0.039 |
| Sinequan | 0.361 | 0.275 | 2.673 | 0.275 | 0.179 (3) | 0.260 |
| Tofranil | 0.631** | 0.026 | 1.178 | 0.615 | 0.257** (3) | 0.032 |
| MAO Inhibitors | 0.253 | 0.426 | 2.443 | 0.213 | 0.321* (0) | 0.050 |
| Other form of venlafaxine | | | | | | |
| Venlafaxine IR | 0.171 | 0.586 | -4.216* | 0.077 | -0.321* (0) | 0.082 |

[A] Estimate of coefficient c in equation [1].
[B] Estimate of overall differential effect of generic entry, accounting for level and trend changes.
Statistical significance: * p-value of <0.10; ** p-value <0.05.

**REPLY ATTACHMENT D**



**REPLY ATTACHMENT F**







**REPLY ATTACHMENT I**



























