# Exhibit 65
# (Filed Under Seal)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE EFFEXOR XR ANTITRUST LITIGATION | C.A. No. 11-cv-05479 (ZNQ-JBD) |
| This Document Relates To:<br><br>Direct Purchaser Class Actions | |

### REBUTTAL EXPERT REPORT OF DAISY RIVERA-MUZZIO

### HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Highly Confidential—
Attorneys' Eyes Only

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.    NOTHING IN THE GALSON REPORT CAUSES ME TO CHANGE MY OPINION THAT TEVA DID NOT DEMONSTRATE THE LEVEL OF URGENCY IN RESPONDING TO FDA DEFICIENCY LETTERS THAT ONE WOULD EXPECT OF A REASONABLE GENERIC COMPANY WITH AN IMMINENT LAUNCH OPPORTUNITY IN ORDER TO GET FDA APPROVAL AS QUICKLY AS POSSIBLE. ........................................................................................ 5

    A.    Dr. Galson's contention that it took 22 months to respond to FDA's October 2006 deficiency letter because the QbD and QbR initiatives added new and unexpected requirements is meritless. ...................................................................... 5

    B.    Dr. Galson's contention that there is no evidence indicating that Teva did not act with urgency throughout the 22 months it took Teva to respond to FDA's October 2006 deficiency letter is meritless. ......................................................... 17

    C.    The purported "complexity" of generic Effexor XR and the work that Teva needed to complete does not explain the inordinate amount of time it took Teva to respond to the October 2006 deficiency letter, and the slow pace of its actions between June 2006 and June 2009. ...................................................................... 25

    D.    Dr. Galson's contention that I failed to consider Teva's need to perform various tasks before manufacturing new batches needed to respond to the October 2006 deficiency letter is baseless and incorrect. ........................................... 30

    E.    The acceleration clause did not have a demonstrable effect on Teva's response time to FDA deficiencies between June 2006-June 2009. ........................................... 32

    F.    Dr. Galson's criticisms of my opinions as to how generic companies prioritize their finite resources are baseless and without merit. ................................................... 35

    G.    My opinion that Teva could have obtained FDA approval as early as March 2009 is conservative: I do not assume the amount of time FDA took to review each of Teva's submissions would change. .......................................................... 38

    H.    The difference in Teva's response times after June 2009 cannot be explained by the different nature of FDA deficiencies after June 2009. ........................................... 40

III.    DR. GALSON'S CRITICISM OF MY OPINION ABOUT MYLAN'S ABILITY TO OBTAIN FDA APPROVAL AND LAUNCH EARLIER IS UNFOUNDED. ................. 43

Highly Confidential—
Attorneys' Eyes Only

## I. INTRODUCTION

1.      My name is Daisy Rivera-Muzzio. I make this expert rebuttal report in the case entitled *In re Effexor XR*, Civil Action No. 11-cv-5479 (D.N.J.), pending in the U.S. District Court for the District of New Jersey.

2.      I previously submitted an Expert Report on May 15, 2025 in this litigation ("Opening Report"). A summary of my qualifications, compensation, experience, and previous testimony is outlined in the Opening Report.

3.      On July 17, 2025, Defendants submitted the Expert Report of Dr. Steven Galson ("Galson Report"). I have been asked by counsel to review, evaluate and respond to the Galson Report to the extent that it addresses the opinions that I previously offered in my Opening Report.

4.      My Opening Report addressed, among other things, whether Teva would have been able to obtain FDA approval to launch generic Effexor XR earlier than July 1, 2010 and thereafter launch its AB-rated generic version of Effexor XR, and if so, when. Opening Report ¶ 5. My analysis was focused on the actions and inactions of Teva in the process of responding to FDA deficiency letters related to Teva's ANDA during the period of June 2006 to June 2009, as well as circumstances that might have impacted Teva's incentives and ability to respond to the deficiency letters in a timely manner – including Teva's November 2005 agreement not to launch its generic Effexor XR product until July 1, 2010. I concluded that "it is my opinion that absent Teva's agreement not to launch its generic Effexor XR until July 1, 2010, Teva or a reasonable generic company in Teva's position would have been incentivized and able to obtain final approval by no later than March 2009 and commercially launch its generic Effexor XR product by no later than April 2009." Opening Report ¶ 7.

Highly Confidential—
Attorneys' Eyes Only

5.     To accurately assess the nature and timing of the actions taken by Teva and the FDA during this period of time, it is necessary to have (a) an understanding of the formulation and manufacturing process of Teva's generic Effexor XR and the underlying principles of pharmaceutical sciences; (b) knowledge, education and practical experience in developing generic pharmaceutical formulations of extended release products; (c) knowledge of and experience with the ANDA review process and relevant FDA regulations applicable to Teva's generic Effexor ANDA; and (d) practical experience working in the generic pharmaceutical industry and understanding the challenges, the limited resources and cross functional process employed by generic manufacturers in making decisions and establishing priorities when answering deficiency letters.

6.     In performing this assessment, I relied on my review of Teva's documents related to its Effexor XR ANDA, public records, scientific literature and regulatory guidances applicable during the period of time being evaluated, as identified herein and Exhibit B to my Opening Report. I applied my knowledge and practical first-hand experience in coordinating, executing and supervising the activities required to answer a deficiency letter for an extended-release solid dosage product. These activities included leading discussions to establish the strategy and the schedule for responding to the deficiency; identifying the resources required, *i.e.* personnel, equipment, materials; approving orders of raw materials and equipment; supervising testing and trouble-shooting activities; and reviewing and approving documentation. I have a comprehensive understanding of the effort, complexity, resources and time required to perform the work that is documented in an ANDA and in responses to FDA deficiency letters. This knowledge and hands-on experience is necessary to accurately assess how a motivated and incentivized generic company responds to a deficiency letter based on scientific principles and regulatory

2

Highly Confidential—
Attorneys' Eyes Only

requirements. I conducted my analysis applying my experience developing sustained release

formulation manufactured by spray drying sugar pellets and understanding the controls that are

required to achieve a product of reproducible quality. I also applied my experience of being part

of the executive decision-making team of a generic company who made decisions regarding

business priorities, product launches and technology transfers and many other aspects of a

generic company's business. I understand the challenges that need to be surmounted and the

juggling of multiple priorities to make sure that deficiency letters are responded to in a timely

fashion.

       7.     I have reviewed the CV attached to the Galson Report, as well as the transcript of

Dr. Galson's deposition in this case. Based on that review, it does not appear that Dr. Galson has

any relevant experience or expertise in many areas necessary to accurately assess whether Teva

acted with the urgency that one would expect of a reasonable generic company in Teva's

position in seeking FDA approval of its ANDA – i.e., that sought ANDA approval as quickly as

possible in order to take advantage of an imminent launch opportunity. Opening Report ¶¶ 7-9.

For example, he testified at his deposition that (a) he was never employed by a generic company

(Galson Tr. 30:7-9); (b) while at Amgen, he never did any work on any generic ANDAs or on

any responses to FDA deficiency letters relating to ANDAs (id. at 29:8-17, 30:10-16); (c) while

at FDA, he had only oversight and policy responsibilities and therefore was not involved in

reviewing particular ANDAs or answering questions regarding the CMC section of ANDAs (id.

at 24:7-25:13); (d) he has no expertise formulating or manufacturing generic products, or

addressing issues related to formulating or manufacturing generic products (id. at 25:5-9, 30:19-

31:16, 31:20-32:4) and he believed questions regarding such issues were beyond the scope of his

report (id. at 31:20-32:8); (e) he has no experience regarding how generic companies decide to

Highly Confidential—
Attorneys' Eyes Only

prioritize their limited resources (id. at 123:20-124:1, 124:13-125:13, 134:9-136:6); (f) he is not

an expert regarding the product quality in-process controls testing addressed in the FDA's

deficiency letters to Teva, including particle size distribution, weight gain calculations, and yield

(id. at 202:2-203:16); and (g) he had no knowledge about how to perform physical testing and

prepare basic documentation such as analytical process validation reports or certificates of

analysis or how long it takes to prepare such documents. (id. at 219:18-220:10).

8.      My Opening Report and this Rebuttal Report fully set forth my opinions. Nothing

in the Galson Report changes any of the opinions set forth in my Opening Report. To the extent

that this Rebuttal Report does not address every opinion offered in the Galson Report, it is not to

suggest that I agree with them.

9.      As is set forth below, I disagree with Dr Galson's opinion that Teva's delay in

responding to the October 2006 deficiency letter was justified by "new and unexpected"

requirements due to the FDA's implementation of Quality by Design ("QbD") and Question-

Based Review ("QbR") initiatives and the supposedly complex nature of the manufacturing

process for Effexor XR.

10.     I also disagree with his opinion that the existence of the acceleration clause in the

settlement agreement between Wyeth and Teva refutes my opinion that between June 2006 and

June 2009 Teva did not act with the urgency in responding to FDA deficiency letters that one

would expect of a generic manufacturer with an imminent launch opportunity seeking to obtain

FDA approval as quickly as possible, especially where the generic manufacturer had a claim for

generic exclusivity on a drug where the RLD (Effexor XR) had large sales. Opening Report ¶ 9.

11.     I further disagree with Dr. Galson's criticisms of my opinion that, if Teva had

acted with the urgency one would expect of a reasonable generic manufacturer with an imminent

4

Highly Confidential—
Attorneys' Eyes Only

launch opportunity seeking to obtain FDA approval as quickly as possible, it could and would

have obtained FDA approval of its Effexor XR ANDA by March 2009. Opening Report ¶ 83. As

I explain below, Dr. Galson's criticisms are meritless and reveal a lack of understanding of how

a reasonable generic company, incentivized to obtain ANDA approval as quickly as possible,

operates to juggle competing priorities and perform the work necessary to produce the data

needed to respond to deficiency letters.

12.    I further disagree with his opinion that the adoption in February 2010 of the

guidance regarding alcohol dose-dumping means that Mylan would have been unable to obtain

FDA approval any earlier if it had an earlier licensed launch date.

## II.    NOTHING IN THE GALSON REPORT CAUSES ME TO CHANGE MY OPINION THAT TEVA DID NOT DEMONSTRATE THE LEVEL OF URGENCY IN RESPONDING TO FDA DEFICIENCY LETTERS THAT ONE WOULD EXPECT OF A REASONABLE GENERIC COMPANY WITH AN IMMINENT LAUNCH OPPORTUNITY IN ORDER TO GET FDA APPROVAL AS QUICKLY AS POSSIBLE.

### A.    Dr. Galson's contention that it took 22 months to respond to FDA's October 2006 deficiency letter because the QbD and QbR initiatives added new and unexpected requirements is meritless.

13.    In my Opening Report, I opined that Teva did not act with the urgency one would

expect of a reasonable generic company seeking to obtain FDA approval as quickly as possible,

and I explained the bases of that opinion. In particular, I focused on Teva's failure to respond to

FDA's October 2006 deficiency letter until August 2008—22 months later. Opening Report ¶¶

51-68. I opined that if Teva had acted with such urgency, it could have submitted its response by

April 2007 – 16 months earlier than it actually responded. Id. at ¶ 68.

14.    Dr. Galson contends that my opinion is unreliable because I supposedly ignored

various facts and circumstances explaining why it took Teva 22 months to respond.

Highly Confidential—
Attorneys' Eyes Only

15. ████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

16. ██████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

17. ██████████████████████████████████████████

████████████████████████████████████████████ ██
█████████████████████████████████████████████
███████████████████████████████ ████

---

[1] Galson Ex. 6. at 9, defining "Process Analytical Technology (PAT)" as a "system for designing, analyzing, and controlling manufacturing through timely measurements (i.e., during processing) of critical quality and performance attributes of raw and in-process materials and processes with the goal of ensuring final product quality."

[2] *Id.*, defining "Design Space" as the "multidimensional combination and interaction of input variables (e.g., material attributes) and process parameters that have been demonstrated to provide assurance of quality. Working within the design space is not considered as a change. Movement out of the design space is considered to be a change and would normally initiate a regulatory postapproval change process. Design space is proposed by the applicant and is subject to regulatory assessment and approval."

[3] The ECA Acad., "FDA: QbD Becomes Mandatory for Generics," GMP Newsletter, Jan. 2, 2012 ("Starting with January 2013, the U.S. Food and Drug Administration (FDA) expects generic drug manufacturers to implement Quality by Design (QbD) into their Abbreviated New Drug Applications (ANDA), Module 3 Quality 3.2.P.2 Pharmaceutical Development. To support generic manufacturers, the Office of Generic Drugs (OGD) has published a 161 page example of a fictitious modified release tablet formulation."), (https://www.gmp-compliance.org/gmp-news/fda-qbd-becomes-mandatory-for-generics#:~:text=Register%20now%20for%20ECA's%20GMP,fictitious%20modified%20release%20tabl

Highly Confidential—
Attorneys' Eyes Only

18. 

---

et%20formulation). See also "Quality by Design for Generics by 2013," GaBI Online, (Generics and Biosimilars Initiative), Sept. 12, 2011, (https://gabionline.net/generics/general/Quality-by-design-for-generics-by-2013#:~:text=0%20Post%20your%20comment,of%20QbD%20to%20generic%20products).

See also "MAPP 5015.10: Chemistry Review of Question-Based Review (QbR) Submissions" in CDER MANUAL OF POLICIES & PROCEDURES | MAPP, *U.S. Food and Drug Administration*, *Center of Drug and Evaluation Research (CDER)*, 1, 12 (Nov. 18, 2014) (https://www.fda.gov/files/about%20fda/published/Chemistry-Review-of-Question-based-Review-%28QbR%29-Submissions.pdf).

See also Robert Iser, "Update on Question Based Review (QbR)," Regulatory Education for Industry (REdI), Office of Process & Facilities/OPQ/CDER, April 22-23, 2015 (https://fda.report/media/91769/Update-on-Question-based-Review.pdf).

[4] See Galson Report ¶ 87 n. 240 ("OGD is changing its CMC review process though our question-based review (QbR) initiative, which is described in more detail on the OGD website: http://www.fda.gov/cder/ogd/QbR.htm. OGD's QbR was designed with the expectation that ANDA applications would be organized according to the Common Technical Document (CTD), a submission format adopted by multiple regulatory bodies including the FDA. Generic firms are strongly recommended to submit their ANDAs in the CTD format (either eCTD or paper) to facilitate the implementation of the QbR and to avoid undue delays in the review of their applications.").

See also Pastore Ex. 7, TEVA_EFFEX_0774574 at 576 ("Because of the increasing number of ANDA submissions OGD received each year, the Quality Overall Summary (QOS) part of the CTD format is extremely important to making our new review process more efficient. Beginning in January 2007, all ANDA applicants are recommended to provide an electronic copy of a QOS that addresses OGD's QbR questions. The QbR-Quality Overall Summary Outline posted on our webpage http://www.fda.gov/cder/ogd/ contains all the questions to prepare the QOS. The QOS should be submitted in both MS Word and pdf format along with the paper and electronic submission. The QOS should be provided even if the remainder of the application is not in CTD format. OGD has prepared QOS models that can be found on the OGD website. We ask you to use these as a guide for your submissions.").

Highly Confidential—
Attorneys' Eyes Only

███████████████████████████████████████████████

█████████████████████████████████

19.    ████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

20.    ████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

21.    ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

8

Highly Confidential—
Attorneys' Eyes Only

22.

Highly Confidential—
Attorneys' Eyes Only

23. 

24.

---

[5] "Guidance for Industry: SUPAC-MR: Modified Release Solid Oral Dosage Forms: Scale-Up and Post Approval Changes: Chemistry, Manufacturing, and Controls; In Vitro Dissolution Testing and In Vivo Bioequivalence Documentation," *U.S. Department of Health and Human Services*, *U.S Food and Drug Administration*, *Center for Drug Evaluation and Research (CDER)*, September 1997, CMC 8.

[6] "ICH Harmonised Tripartite Guideline: Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances Q6A," *International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use*, October 1999.

[7] *United States Pharmacopeial Convention* Monographs, General Chapters and Material Reference Standards: usp.org/ reference- standards

[8] "Pharmaceutical Quality Control Labs (7/93): Guide to Inspections of Pharmaceutical Quality Control Laboratories," *U.S. Food and Drug Administration*, (https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-guides/pharmaceutical-quality-control-labs-793).

10

Highly Confidential—
Attorneys' Eyes Only

---

[9] Illustration of differences of QbT and QbD: see Khagga Bhavya Sri, Saba Fatima, and Mogili Sumakanth, "Analytical Quality by Design Used in the Pharmaceutical Industry: A Review," *Drug Discovery*, Vol. 17, No. 39, 2023, (https://doi.org/10.54905/disssi.v17i39.e22dd1930).

[10] Many companies still use a QbT approach because "[g]uidance documents describe FDA's interpretation of or policy on a regulatory issue (21 C.F.R. § 10.115(b)). In general, FDA's guidance documents do not establish legally enforceable responsibilities and thus are not binding on FDA or the public. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as

Highly Confidential—
Attorneys' Eyes Only

25. ███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ███████████████████████████████

████████████████████████████████████

26. █████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

---

recommendations, unless specific regulatory or statutory requirements are cited. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations." See "Guidances," *U.S. Food and Drug Administration*, Jan. 17, 2025, (https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidances).

Highly Confidential—
Attorneys' Eyes Only

27.



28.

29.

---

[11] Galson Report ¶ 49 n. 136, citing "Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation and Application of Invitro/Invivo Correlations," *U.S. Food and Drug Administration*, September 1997, (https://www.fda.gov/media/70939/download).

[12] "Draft Guidance on Venlafaxine Hydrochloride," *U.S. Food and Drug Administration*, Feb. 2006, (https://www.accessdata.fda.gov/drugsatfda_docs/psg/Venlafaxine_HCl_ERcap_20699_RC2-06.pdf).

[13] Pastore Ex. 7, TEVA_EFFEX_0010240 at 241.

Highly Confidential—
Attorneys' Eyes Only



[14] Pastore Ex. 5, TEVA_EFFEX_00833460, August 8, 2006 email from Bob Vincent (Associate Director, Regulatory Affairs at Teva USA) to Uri Hillel of Teva Israel ("it is our opinion that the proposal to perform the in-process tests only on the three validation batches will not be found acceptable to FDA.").

[15] Galson Tr. 202:2–19 (Galson acknowledged that he is not an expert regarding product quality issues, including particle size distribution, weight gain calculations, and in-process controls to test such issues (id. at 25:5-9, 30:19-31:16, 31:20-32:4). *See also*, id. at 29:8-17, 30:10-16 (while at Amgen, Galson never did any work on any generic ANDAs or on any responses to FDA deficiency letters relating to ANDAs); id. at 24:17-25:13 (while at FDA, he had only oversight and policy responsibilities, and therefore was not involved in reviewing particular ANDAs or answering questions regarding the CMC section of ANDAs).

[16] 21 C.F.R. § 211.110. "Sampling and testing of in-process materials and drug products. To assure batch uniformity and integrity of drug products, written procedures shall be established and followed that describe the in-process controls, and tests, or examinations to be conducted on appropriate samples of in-process materials of each batch. **Such control procedures shall be established to monitor the output and to validate the performance of those manufacturing processes that may be responsible for**

Highly Confidential—
Attorneys' Eyes Only



**causing variability in the characteristics of in-process material and the drug product."** (emphasis added). See also Galson Tr. 202:2–19.

See also Atul M. Mehta, *Chapter 11: Evaluation and Characterization of Pellets* of PHARMACEUTICAL PELLETIZATION TECHNOLOGY (Isaac Ghebre-Selassie ed., CRC Press, 2022, copy. 1989).

See also Sarfaraz K. Niazi, *Uncompressed Solid Products* in HANDBOOK OF PHARMACEUTICAL MANUFACTURING FORMULATIONS, Vol. 2 (CRC Press 2004).

See also David M. Jones, "Factors to Consider in Fluid Bed Processing," *Encyclopedia of Pharmaceutical Technology*, April 1985, *reprinted in* GLATT; see also David M. Jones, "Air Suspension Coating," *Encyclopedia of Pharmaceutical Technology*, Jan. 1988, *reprinted in* GLATT.

[17] Yield is the calculation of the difference of  weight gain of coated pellets after sieving compared to the weight of the coated pellets before sieving and reported on a percentage basis. It is an indication of the

Highly Confidential—
Attorneys' Eyes Only



amount of available or "usable" pellets, as Teva described them, for coating. This is also a simple process of weighing the drums containing the pellets and doing the mathematical calculation and express it as a percentage.

[18] Pastore Ex. 6, TEVA_EFFEX_0009912 at 913-14.

[19] Pastore Ex. 7, TEVA_EFFEX_0010240 at 241.

[20] Pastore Ex. 5, TEVA_EFFEX_0833460 ("it is our opinion that the proposal to perform the in-process tests only on the three validation batches will not be found acceptable to FDA.").

30. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████

31. ███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ ████████████████████

█████████████████████████████████████████

██████████████████████████████████

32. ███████████████████████████████████████

████████████████████████████████████████████████

---

[21] Galson Tr. 273:13-274:13.

Highly Confidential—
Attorneys' Eyes Only

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ ██████████████████████████████

█ ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

33.   ████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[22] Pastore Ex. 7, TEVA_EFFEX_0774574 at 575.

[23] Pastore Ex. 23a, TEVA_EFFEX_0010218 at 219 ("other than the additional in-process controls (discussed in detail herein), no other changes were made to the manufacturing processes used to manufacture the pivotal batches of drug product. The scale of the new exhibit batches and the proposed commercial processes are also unchanged.")

Highly Confidential—
Attorneys' Eyes Only



34.

35.

---

[24] See Ex. B to my Opening Report (listing the email exchange, TEVA_EFFEX 0096703).

Highly Confidential—
Attorneys' Eyes Only

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

36.    ███████████████████████████████████

████████████████████████████████████████

████████████████████    ████    ██████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

█████████████

37.    ████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

██████████████████████████████    ██████████

---

[25] He acknowledges that Teva had manufactured and packaged the new batches between February and March 2007. Id. at ¶ 93 n. 269. See also Galson Tr. 216:5-21.

[26] The usual process for approval of any analytical method validation involves the preparation of a report by the person that did the method validation, one person to audit it, and a manager or director to

Highly Confidential—
Attorneys' Eyes Only

38. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

39. ███████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

40. ███████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

---

approve it. In my experience, this process for a validation of sample dilution method and issue of the validation report would take an incentivized company no more than one to two months.

[27] See Galson Report ¶¶ 93, 100 (stating that the batches were manufactured and packaged by March 2007, and the COAs were issued between July and September 2007.)

[28] Galson Report ¶ 102.

[29] It was not until June 2014 that the ICH implemented a standard of 6 months of accelerated stability **for new ANDA submissions**. Even so, in my decades of experience in the generic industry, I have not seen FDA request 6 months accelerated stability data for a lot of a solid dosage form manufactured *to answer a deficiency letter*.

Highly Confidential—
Attorneys' Eyes Only

41.

---

[30] Galson Ex. 15, TEVA_EFFEX_0773600.

Highly Confidential—
Attorneys' Eyes Only

42. ████████████████████████████████████

████████ ████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████ ████ ██████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

43. ████████████████████████████████

████████████████████████████████████████████

---

[31] During the period of the generic Effexor XR ANDA review process 2002 to 2010, the stability requirements for submission of an ANDA of a solid dosage form were defined by "ICH Q1A (R2) Stability Testing of New Drug Substances and Products," Jan. 8, 2003 (R2) and required completion of 3 months of accelerated stability before ANDA submission. It provided that ANDA stability data must be updated with the execution of a full stability program during the review cycle. (Accelerated: 0, 3, 6 months; Long Term: every three months in the first year, every six months in the second year, and one annually ever after, if applicable). The 1997 SUPAC MR guidance defined stability requirements according to changes proposed during ANDA review, scale-up and post approval. For example, a Level 2 process, equipment change or site transfer requires 3 months of accelerated stability. See "Guidance for Industry: SUPAC-MR: Modified Release Solid Oral Dosage Forms: Scale-Up and Post Approval Changes: Chemistry, Manufacturing, and Controls; In Vitro Dissolution Testing and In Vivo Bioequivalence Documentation," U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Sept. 1997.

[32] Teva's representative that was deposed could not provide a rationale for Teva's decision to wait for the 9-month stability data to be generated to submit its response to the October 2006 deficiency letter. Pastore Tr. 336:11-21.

23

Highly Confidential—
Attorneys' Eyes Only

---

[33] To support this assertion, he relied on the Master Production Formula for commercial production, this is a template of the master formula and manufacturing instructions for the proposed commercial batch size, not evidence that a batch was executed with such instructions. Galson Ex. 20 at TEVA- EFFEX - 001111.

[34] TEVA_EFFEX 0010474 at 234- 238, Execution of Coating of ER procedure for demonstration batch K8343, the drying instructions were "f. 5 minutes or until max outlet air temperature is reached." The demonstration batch did not include the change in process of an extended 30 minutes drying time, so absent a change in manufacturing process no stability was required to be submitted. Teva responded the

Highly Confidential—
Attorneys' Eyes Only

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

44.    ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

█    ██████████████████████████████████████
    ██████████████████████████████████████
    ██████████████████████████████████████
    ████████████████████

45.    ██████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████

46.    ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

---

deficiency observation of Low potency of ER beads with a recalculation of assay subtracting LOD of the
sample tested and proposed an LOD specification of NMT 4.5 % as an in process control for the ER
coating of beads step (TEVA _EFFEX 0010223). No change in drying time was included in the August
2008 response. TEVA_EFFEX 0010219–223.

Highly Confidential—
Attorneys' Eyes Only

████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████ █████████████████████████

████████████████████████████

██████████████████ █████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

███████████████████████████████████████

███████████████████████████████████

█████████████████████████████████

---

[35] See William H. Helfand and David L. Cowen, *Evolution of Pharmaceutical Oral Dosage Forms*, 25 PHARMACY IN HISTORY, 3, 5, 7–18 (1983), (https://www.jstor.org/stable/41109385).

See also Haesun Park, Andrew Otte & Kinam Park, *Evolution of Drug Delivery Systems: From 1950 to 2020 and Beyond*, 342 JOURNAL OF CONTROLLED RELEASE, 53–65 (2022).

[36] See David Gettman, "Chapter 18 – Control Release and Novel Delivery," in A COMPREHENSIVE STUDY COMPANION TO REMINGTON'S PHARMACEUTICAL SCIENCES, 15TH EDITION (1975) FOR STUDENTS IN PHARMACEUTICS I-IV (PHAR 359, 360, 461, 462), (Univ. of Mont., 15th ed., Sept. 1977) ("The scope of these courses spans the fundamental and advanced principles of drug formulation, dosage form design, compounding, quality control, manufacturing, stability, and delivery systems, culminating in a working knowledge of the pharmaceutical sciences sufficient to prepare the student for both professional practice and further specialization. Remington's Pharmaceutical Sciences, first published in 1885 and now in its 15th edition, remains the standard reference for pharmacists worldwide. […] **Chapter 18 – Control Release and Novel Delivery:** the 15th edition includes one of the earliest comprehensive treatments of sustained-release dosage forms, covering: Coated pellets (Spansules), matrix tablets, osmotic pumps[,] mechanisms of release – diffusion, dissolution, osmotic pressure[,] advantages (reduced dosing frequency, improved compliance) and disadvantages (dose dumping, manufacturing complexity").) (emphasis added).

Highly Confidential—
Attorneys' Eyes Only

██████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████ ■

47.    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ ■

48.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

---

[37] Glatt is one of the manufacturers of Fluid Bed Dryers and published two related articles: see David M. Jones, "Air Suspension Coating," *Encyclopedia of Pharmaceutical Technology*, Vol. 20 Supp. 3 (James Swarbrick and James C. Boylan, eds. Jan. 1988), *reprinted in* GLATT at 189 (http://www.cjtech.co.kr/w0016%20Air%20suspension%20coating.pdf) (providing an in-depth analysis of Fluid Bed Dryers equipped with Wurster column process and product variables).

See also David M. Jones, "Factors to Consider in Fluid Bed Processing," *Encyclopedia of Pharmaceutical Technology*, April 1985, *reprinted in* GLATT (https://onlinelibrary.wiley.com/doi/abs/10.1002/pauz.19900190309), (http://www.cjtech.co.kr/w002%20Factors%20to%20consider%20in%20Fluid-bed%20processing.pdf) (providing a comprehensive analysis of Fluid Bed Dryers with Wurster column critical process parameters including weight gain and particle size).

[38] See William H. Helfand and David L. Cowen, *Evolution of Pharmaceutical Oral Dosage Forms*, 25 PHARMACY IN HISTORY, 3, 5, 7–18 (1983), (https://www.jstor.org/stable/41109385). See also Haesun Park, Andrew Otte & Kinam Park, *Evolution of Drug Delivery Systems: From 1950 to 2020 and Beyond*, 342 JOURNAL OF CONTROLLED RELEASE, 53–65 (2022) (https://www.sciencedirect.com/science/article/abs/pii/S0168365921006830#:~:text=rights%20and%20content-,Abstract,%2Dalbumin%20complex)%20in%202005.) https://ars.els-cdn.com/content/image/1-s2.0-S0168365921006830-ga1_lrg.jpg).

Highly Confidential—
Attorneys' Eyes Only

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

█████  █████████████████████████████████████

████████████████████████████████████████████████

██████████████████

49.    █████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████  █████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

---

[39] Mathematical calculations:

Weight gain: Weight of the content of a drum of material after a coating step( X)- weight of the content of material before the coating step (Y) = Z ; Z/X *100 = %

Yield: Weight of Usable coated beads (A) + Material retained in filters (B) + Rejected material (C) = D; A/D X 100 = % Yield

 Particle size Distribution: Weight of the sample:(F) ): material retained in each sieve ( G)  ( Usually 2 to 5 sieves used) : Calculation of % retained in each sieve : G/F X 100 = % retained in each sieve

[40] Galson Tr. 24:7-25:13.

Highly Confidential—
Attorneys' Eyes Only

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████

50.    ███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████

---

[41] In furtherance of cGMP's, the FDA had published guidance for conducting investigations when out of specifications test results are obtained as was reported in the case of Teva's generic Effexor ER. The Guidance to Inspections of Pharmaceutical Quality Control Laboratories published in July 1993 discusses what must be included in OOS investigations and basic requirements: "Expect to see consistent in-process test results within batches and between batches of the same formulation/process (including development or exhibit batches). If this is not the case, expect to see scientific data to justify the variation." See "Pharmaceutical Quality Control Labs (7/93): Guide to Inspections of Pharmaceutical Quality Control Laboratories," *U.S. Food and Drug Administration*, (https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-guides/pharmaceutical-quality-control-labs-793).

■ ████████████████████████████████████
████████████████████████████████████
████████████████████

51. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████

52. ████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

53. ████████████████████████████

████████████████████████████████████

████████████████████████████████

54. ████████████████████████████

████████████████████████████████

---

[42] Galson Tr. 30:7-9, 25:5-9; 30:19-31:16, 31:20-32:4.

Highly Confidential—
Attorneys' Eyes Only

████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

55.    ███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

██████████

56.    ███████████████████████████████████████

██████████████████████████████████████████████████

---

[43] According to the Certificate of Analysis ("COA") of the manufacturer of Alcohol 95% - Pharmco-USA, the material was manufactured in May 2006 and a COA was issued in December 12, 2006. Teva analysis date of the COA's for Alcohol 95% USP are dated February 14, February 23 and March 1, 2007. It is inconclusive if the material was available at the plant or not by December 2006. As Dr. Galson noted, not all the materials were tested prior to use in the manufacture of the batch, "in the event a lot of raw material used in the manufacturing of the pivotal batches was not fully tested (as defined by our vendor validation system), a certificate of analysis from a fully tested lot of the material has been provided in addition to the certificate of the lot used in manufacturing." Galson Report ¶ 95 n. 274. Capsules #0E for 150 mg and #1 for 75 mg were manufactured and released in December 2006; Capsule #2 for 37.5 mg was manufactured in January 2007. Teva tested the empty capsules between January and February 2007. There is no evidence of when Teva ordered the empty capsules shells, but as indicated above capsules usual lead time and quick test before they can be used would not be an impediment to manufacture the demonstration batch within two months of receipt of the deficiency letter.

Highly Confidential—
Attorneys' Eyes Only

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

■    ██████████████████████████████████████████████
█████████████████████████████████████

57.    ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

58.    ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

59.     ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████

60.     ██████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only

61. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

62. ████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

63. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only

64.

65.

_____

[44] *See also,* id. at ¶ 42 ("it is my opinion, to a reasonable degree of professional certainty, that after it entered into the agreement with Wyeth with a licensed entry date for its generic Effexor XR product in July 2010, Teva did not act like a first to file generic manufacturer motivated to obtain FDA approval of its venlafaxine ER capsule ANDA as quickly as possible"); id. at ¶ 50 ("Teva's actions, particularly between June 2006 and July 2009, were inconsistent with the actions that a motivated generic company would take in order to avoid potential delays in obtaining FDA approval, and to obtain FDA approval as quickly as possible").

Highly Confidential—
Attorneys' Eyes Only

66.

67.

68.

Highly Confidential—
Attorneys' Eyes Only

69. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

70. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████ █

71. ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████

---

[45] I am not offering an opinion on whether Teva would have had a license to launch earlier than July 1, 2010, absent the alleged payments. I am opining that if Teva had a licensed entry date earlier than July 1, 2010 and had acted like an incentivized generic company with an imminent launch date, it could have obtained FDA approval as early as March 2009 and launched a month later.

Highly Confidential—
Attorneys' Eyes Only

■ ███████████████████████████████████
███████████████████████████████████████
███████████████████

72. ███████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

73. ███████████████████████████████

███████████████████████████████████████
███ ██ ██████████████████████████████████
████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

---

[46] This is especially so when the proposed action could be implemented post-FDA approval. Id.

Highly Confidential—
Attorneys' Eyes Only

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

74.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

75.    ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

76.    ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[47] [59 FR 50366, Oct. 3, 1994] § 314.96 "Amendments to an unapproved abbreviated application. (a) Abbreviated new drug application. (1) An applicant may amend an abbreviated new drug application that is submitted under §314.94, but not yet approved, to revise existing information or provide additional information. (2) Submission of an amendment containing significant data or information constitutes an agreement between FDA and the applicant to extend the review period only for the time necessary to review the significant data or information and for no more than 180 days." This was the section of 314.96 from 1994, which was current from 2002-2006. The same language appears after various revisions and is still current in 2016.

Highly Confidential—
Attorneys' Eyes Only

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ █████████████████

████████████████████████████████████████████

███████████████████████████████

██   ████████████████████████████████████████████
     ███████████████████████████████

77.    ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

78.    ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

---

[48] As stated in my Opening Report, a motivated company seeking to obtain approval as quickly as possible would not have filed the unsolicited amendment. See Opening Report ¶ 72.

Highly Confidential—
Attorneys' Eyes Only

79. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

80. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

81. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

82. ███████████████████████████████████████

████████████████████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

83.    ██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

84.    ███████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

Highly Confidential—
Attorneys' Eyes Only

████████████████████████████

████████████████████████████

██████████████████████████

85.    ████████████████████████

█████████████████████████████

█████████████████████████████

██████████████████████████████

██████████████████████████

███████████████████

## III.    DR. GALSON'S CRITICISM OF MY OPINION ABOUT MYLAN'S ABILITY TO OBTAIN FDA APPROVAL AND LAUNCH EARLIER IS UNFOUNDED.

86.    In my Opening Report, I opine that "if Teva had obtained final FDA approval and launched its generic version of Effexor XR earlier than July 1, 2010, Mylan would have been able to obtain FDA approval and commercially manufacture its generic Effexor XR product 11 months after Teva's launch, assuming it had a license from Wyeth to do so." Opening Report ¶ 85.

87.    Dr. Galson contends my opinion that Mylan would have been able to obtain FDA approval and commercially manufacture its generic Effexor XR product as early as March 2010 (11 months after an April 2009 approval and launch by Teva) is flawed because Mylan received a bioequivalency deficiency letter from FDA on April 13, 2011 requesting dose-dumping testing, which Mylan responded to on April 29, 2011. Mylan requested final approval on May 6, 2011, and the FDA granted final approval on June 1, 2011. Opening Report ¶¶ 41e, 41f. Dr. Galson contends Mylan could not have gotten earlier approval as a result. Galson Report ¶ 154. Dr. Galson is mistaken.

Highly Confidential—
Attorneys' Eyes Only

88.    I have been asked by Plaintiffs' counsel to assume that Plaintiffs will offer evidence from which the jury can find that Mylan would have obtained a patent settlement with Wyeth that included an earlier licensed entry date that was 11 months after Teva's earlier licensed entry date.[49] Assuming Mylan had an earlier licensed entry date, based on my experience and review of the record of FDA deficiencies to Mylan's ANDA; Mylan's responses; Mylan's representative's declaration submitted in this case and the fact that Mylan ANDA received tentative approval on November 2008, a reasonable generic company in Mylan's position would have requested final FDA approval approximately one month prior to the earlier licensed entry date, i.e., Mylan would have done what it did prior to its June 1, 2011 licensed entry date.[50,51]

89.    In my experience, when FDA has granted tentative approval and knows of a date certain licensed entry date, it will respond promptly to a request for final approval with any outstanding issues, such as the need for dose dumping testing– certainly before the licensed entry date.

90.    A reasonable generic company in Mylan's position would respond to any such deficiency in no more than 2-3 weeks, just as Mylan did, and FDA would respond within a week or so, just as the FDA did. Thus, none of Dr. Galson's arguments cause me to change my opinions regarding Mylan.

---

[49]  I am offering no opinion regarding the truth or reasonableness of these assumptions.

[50] As noted in my Opening Report, Mylan had received tentative approval in November 2008, and requested final approval in May 2011, one month before the June 1, 2011 "effective date of the license" Mylan received from Wyeth. Opening Report ¶¶ 41c, 41e.

[51] For example, if Mylan's earlier licensed entry date were March 2010, Mylan would have requested final approval approximately one months prior to its licensed entry date. The FDA would then respond with a request for the dose dumping test.

Highly Confidential—
Attorneys' Eyes Only

Dated: September 18, 2025

/s/ _Daisy Rivera-Muzzio_

Daisy Rivera-Muzzio